**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------------x

In re:

HBL SNF, LLC, d/b/a EPIC REHABILITATION
AND NURSING AT WHITE PLAINS,

Debtor.

------------------------------------------------------------------------x

WHITE PLAINS HEALTHCARE PROPERTIES I, LLC,

Plaintiff,

against

HBL SNF, LLC, LIZER JOZEFOVIC A/K/A LIZER
JOZEFOVIC, and MARK NEUMAN,

Defendants and Third-Party Plaintiffs,

against

CCC EQUITIES, LLC, PROJECT EQUITY
CONSULTING, THE CONGRESS COMPANIES,
HOWARD FENSTERMAN, WILLIAM NICHOLSON, and
METROPOLITAN COMMERCIAL BANK

Third-Party Defendants

------------------------------------------------------------------------x

Chapter 11

Case No. 21-22623 (SHL)

Adversary Proceeding

Case No. 21-07096 (SHL)

**WHITE PLAINS HEALTHCARE PROPERTIES I, LLC'S**
**SUPPLEMENTAL BRIEF IN FURTHER SUPPORT OF ITS MOTION**
**FOR PARTIAL SUMMARY JUDGMENT ON LEASE TERMINATION ISSUE**

# <u>TABLE OF CONTENTS</u>

Page

TABLE OF AUTHORITIES ................................................................................ iv

PRELIMINARY STATEMENT ............................................................................1

STATEMENT OF FACTS .....................................................................................3

    I.         THE LEASE REQUIREMENTS AND TENANT'S DEFAULTS............ 3

    II.        NON-WAIVER AND RELEASE PROVISIONS IN THE LEASE .......... 5

    III.      THE LETTER OF INTENT ....................................................... 5

    IV.      TERMINATION OF THE LEASE ............................................. 6

PROCEDURAL HISTORY ....................................................................................6

ARGUMENT...........................................................................................................8

    I.    THE TENANT DEFAULTED UNDER THE LEASE ......................... 8

          A.    Strict Compliance with the Lease Is Required............................ 8

          B.    The Tenant Concedes that It Failed to Provide the Security Deposit........ 9

          C.    There Were Numerous Additional Defaults Under the Lease ................. 11

    II.    THE LANDLORD TERMINATED THE LEASE.............................. 12

          A.    The Landlord Had the Right to Terminate the Lease Because of the Tenant's Lease Defaults................................................ 12

          B.    The Landlord Transmitted a Proper Notice of Termination ..................... 15

          C.    The Landlord Was Authorized to Terminate the Lease............................ 15

          D.    The Landlord's Counsel Was Authorized to Sign the Termination Notice ....................................................................... 16

    III.    AS A MATTER OF LAW, THE LANDLORD DID NOT WAIVE THE TENANT'S LEASE DEFAULTS ........................................ 17

          A.    Any Purported Delay in Terminating the Lease Did Not Waive the Tenant's Lease Defaults................................................ 17

          B.    The Acceptance of Rent from the Tenant Did Not Waive the Tenant's Lease Defaults................................................ 18

C.    The LOI Did Not Waive the Tenant's Lease Defaults ............................ 19

IV.    THE TENANT RELEASED ALL CLAIMS AGAINST THE LANDLORD ..... 19

CONCLUSION.................................................................................................................20

## TABLE OF AUTHORITIES

**CASES**                                                                            **Page(s)**

*CooperVision, Inc. v. Intek Integration Techs., Inc.,*
    794 N.Y.S.2d 812 (N.Y. Sup. Ct. 2005) ............................................................... 16

*Georgetown Unsold Shares, LLC v. Ledet*,
    12 N.Y.S.3d 160 (N.Y. App. Div. 2015) .............................................................. 19

*Jefpaul Garage Corp. v. Presbyterian Hosp. in N.Y.*,
    462 N.E.2d 1176 (N.Y. 1984)........................................................................ 18, 19

*Kallen v. Kassin*,
    606 N.Y.S.2d 312 (N.Y. App. Div. 1994) ............................................................ 11

*Luna Park Hous. Corp. v. Besser*,
    329 N.Y.S.2d 332 (N.Y. App. Div. 1972) ............................................................ 18

*Markowitz v. Landau*,
    567 N.Y.S.2d 268 (N.Y. App. Div. 1991) ............................................................ 11

*MHR Cap. Partners LP v. Presstek, Inc.*,
    912 N.E.2d 43 (N.Y. 2009).......................................................................... 8, 11

*Oppenheimer & Co. v. Oppenheim, Appel, Dixon & Co.*,
    660 N.E.2d 415 (N.Y. 1995).............................................................................. 8

*PS Food Corp. v. Granville Payne Retail, LLC*,
    7 N.Y.S.3d 244, 45 Misc.3d 1216(A) (N.Y. Sup. Ct. 2014), *aff'd*, 34 N.Y.S.3d 158 (N.Y.
    App. Div. 2016) ................................................................................................ 17

*Schron v. Troutman Sanders LLP*,
    989 N.E.2d 430 (N.Y. 2013)............................................................................. 20

*Sullivan v. Brevard Assocs.*,
    488 N.E.2d 1208 (N.Y. 1985)............................................................................ 19

*Thor 725 8th Ave. LLC v. Goonetilleke*,
    138 F. Supp. 3d 497 (S.D.N.Y. 2015), *aff'd*, 675 F. App'x 31 (2d Cir. 2017)....................... 17

**STATUTES**

28 U.S.C. §1334.................................................................................................... 7

28 U.S.C. §1452.................................................................................................... 7

Plaintiff White Plains Healthcare Properties I, LLC ("**Plaintiff**" or the "**Landlord**") respectfully submits this supplemental memorandum of law in further support of its motion for partial summary judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure, Rule 7056 of the Federal Rules of Bankruptcy Procedure, and Rule 7056-1 of the Local Bankruptcy Rules, seeking a ruling that defendant HBL SNF, LLC ("**Defendant**" or the "**Tenant**") defaulted under the Lease (defined below), and that the Landlord properly terminated the Lease.

## PRELIMINARY STATEMENT

The Landlord and the Tenant are parties to the amended and restated Lease of the Real Property (the "**Lease**"), relating to a newly constructed state-of-the-art nursing facility in White Plains, New York (the "**Facility**"). The only issue before the Court on this motion for partial summary judgment is whether the Landlord properly terminated the Lease due to the Tenant's defaults. The undisputed facts establish as a matter of law that the Lease was properly terminated by the Landlord more than two years ago in January 2020.

The Lease contains the entire agreement between the parties with regard to their mutual obligations concerning the Facility, and the Tenant was required to strictly comply with its terms. Sixty days before taking occupancy of the Facility the Tenant was required to provide a security deposit to the Landlord in two parts. First, the Tenant was required to deliver a Letter of Credit or cash in the amount of $3.7 million to the Landlord. Second, the Tenant was required to deliver to the Landlord an additional $1.6 million of cash, which was then on deposit in one of the Tenant's bank accounts at JPMorgan. Failure to deliver either component of the two-part security deposit is a default under the Lease. The Tenant delivered neither.

In addition to the security deposit defaults, the Tenant defaulted under the Lease in numerous other respects detailed below and in the Statement of Undisputed Facts submitted herewith.

The Landlord spent a number of months trying to resolve the Tenant's defaults and avoid Lease termination, though it was under no obligation to do so.  For example, consistent with a letter of intent between the parties, the Landlord pursued a potential transaction that could have resulted in joint ownership of the Facility between the Landlord and the Tenant.  Indeed, the Tenant's motive in flagrantly defaulting on its threshold security deposit obligations under the Lease was to try to use the leverage of its default to precipitate a renegotiation of terms between the parties, just as the Facility was being launched into operation.  Once again, however, as soon as the ink had dried on the letter of intent, the Tenant failed to live up to its terms and so the contemplated transaction never came to fruition.  Contrary to the Tenant's contentions, as a matter of law and under the express terms of the Lease, the Landlord's forbearance and its efforts to try to resolve the parties' disputes did not waive any of the Landlord's rights and remedies, including its right to terminate the Lease.

Eventually, a number of months after the Tenant's defaults, the Landlord sent a January 7, 2020 notice to the Tenant terminating the Lease, which, consistent with the Lease, took effect five days later on January 12, 2020.  Thus, as of January 12, 2020, the Lease was terminated.

In the summary judgment briefing in the New York State Court Action, the Tenant offered scattershot arguments that diverged from any issue relevant to the motion.  Some of the Tenant's arguments are based on claimed grievances that arose before the parties entered into the Lease.  The pre-history rehearsed by the Tenant was wiped clean by the Lease, which is the entire agreement between the parties that cancels all prior agreements and in which the Tenant released the Landlord from all claims arising before the Lease.

Other arguments advanced by the Tenant are based on contentions that the Landlord allegedly acted, or failed to act, in ways that waived the Tenant's defaults.  These arguments also

2

cannot be squared with the Lease, which only allows for written amendments of its terms executed by both parties and further states that no failure to act or delay in acting upon any default will waive the Landlord's right to insist upon strict performance of the Lease's terms.

Finally, the Tenant offered arguments that the Lease termination notice was not valid because it was sent by the Landlord's counsel or because it was not sent with the consent of the Landlord's construction lender. As detailed below, the form of the termination notice was fully compliant with the Lease's terms, and the Lease's language makes clear that nothing in the Landlord's construction loan agreement (to which the Tenant is not a party) has any effect on the Landlord's right to terminate the Tenant's leasehold interest.

Accordingly, the Landlord respectfully requests a ruling that the Lease was terminated effective January 12, 2020.

## STATEMENT OF FACTS

### I.    THE LEASE REQUIREMENTS AND TENANT'S DEFAULTS

After a series of other agreements and disputes during the pre-construction phase of the Facility's development, the Landlord and the Tenant entered into the Lease in 2017, which states, in relevant part:

> This instrument contains the entire agreement between the Parties hereto with respect to the subject matter hereof. All representations, promises and prior or contemporaneous undertakings between such Parties are merged into and expressed in this instrument, and any and all prior agreements between such Parties are hereby canceled. The agreements contained in this instrument shall not be amended, modified, or supplemented except by a written agreement duly executed by both Landlord and Tenant.

3

Plf. 56.1 Stmt. ¶¶ 1-2.[1]  Upon executing the Lease, the Tenant agreed to release any and all prior

claims it may have had against the Landlord and abide by the terms of the newly executed

contract.  *Id.* ¶ 37.

Tenant began occupancy under the Lease as of September 30, 2019.  *Id.* ¶ 3.

Immediately thereafter, the Tenant defaulted under the lease and continued to amass defaults as

the Lease term continued.  The most significant, but certainly not the only, Lease default was the

Tenant's failure to deliver a security deposit prior to the beginning of the Lease.  *See generally*

*id.* ¶¶ 4-12.  As prescribed in the Lease, the security deposit required two components: a Letter

of Credit or cash in the amount of $3,700,000, and the delivery of an additional $1,600,000 that

was being held by Tenant in a specified account at JPMorgan Chase Bank, N.A.  *Id.*  Tenant

failed to provide either form of security deposit.  *Id.* ¶¶ 9, 12.

In addition to the Tenant's failure to deliver the $3.7 million Letter of Credit or the $1.6

million additional security deposit, there were numerous additional defaults by the Tenant under

the Lease.  The Tenant's additional defaults include:

- failure to pay rent in a timely manner in certain months, as required by Section 3.2 of the Lease, resulting in late and interest charges in an amount in excess of $220,784.14 (*id.* ¶¶ 14-19);

- failure to pay real estate taxes in a timely manner, resulting in interest at the overdue rate in the amount of $2,621.94 (*id.* ¶¶ 20-21);

- failure to pay (i) certain utility charges to Con Edison, and (ii) utility deposits and municipal maintenance escrows, for which Tenant still owes the Landlord $35,921.44 (*id.* ¶¶ 22-24);

- failure to deliver the required certificates of insurance and obtain insurance that fully complies with the policy requirements in the Lease (*id.* ¶¶ 25-28);

---

[1] References herein to Plaintiff's 56.1 Statement are to the Landlord's Statement of Undisputed Facts in Support of its Motion for Partial Summary Judgment on Lease Termination Issue that is being filed concurrently with this Memorandum of Law.

- failure to deliver Medicare and Medicaid provider agreements, reimbursement rate sheets, and other documentation to Landlord (*id.* ¶¶ 29-31); and

- failure to deliver the required financial and operational reporting (*id.* ¶¶ 32-33).

## II.   <u>NON-WAIVER AND RELEASE PROVISIONS IN THE LEASE</u>

The Lease contains non-waiver provisions to ensure that any efforts by the Landlord to resolve disputes arising under the Lease are not deemed to waive those breaches. *Id.* ¶ 34. Specifically, Section 20.3 of the Lease provides:

> Neither any failure nor any delay on the part of any party hereto in insisting upon strict performance of any term, condition, covenant or agreement, or exercising any right, power, remedy or privilege hereunder, or any other document or instrument entered into or delivered in connection herewith or pursuant hereto, shall operate as or constitute a waiver thereof, nor shall a single or partial exercise thereof preclude any other future exercise, or the exercise of any other right, power, remedy or privilege. A waiver of one default with respect to any Person shall not be construed to be a waiver of any subsequent default with respect to such Person or any other Person or to impair any remedy, right or power consequent thereon.

*Id.* ¶ 35. Section 20.2 of the Lease further states that "[t]he waiver by either party of a breach or violation of any provision of this Lease shall not operate as, or be construed to be a waiver of, any subsequent breach of the same or other provision hereof. No waiver shall be effective unless set forth in writing and signed by the party against whom such waiver is asserted." *Id.* ¶ 36.

## III.   <u>THE LETTER OF INTENT</u>

In November 2019, the parties entered into a letter of intent (the "**LOI**") as part of an effort to resolve the accumulation of issues arising from the Tenant's numerous breaches. *Id.* ¶ 38. Due to the Tenant's failure to comply with the terms of the LOI, including its failure to timely deliver sums promised pursuant to the LOI, the LOI did not result in a completed transaction. *Id.* ¶¶ 39-40.

IV.    **TERMINATION OF THE LEASE**

The Lease includes a list of defaults that, upon occurrence, permit the Landlord to terminate the Lease.  *Id.* ¶ 41.  These enumerated defaults include but are not limited to: (i) failure to pay any installment of rent within five (5) days after the date when due; (ii) failure to timely deliver documents required under Sections 7.4(c) through (o) of the Lease; (iii) failure to procure the insurance coverage required by the Lease; and (iv) failure to deposit all or any portion of the security deposit.  *Id.* ¶ 41.

The Lease provides that upon the occurrence of a default under the Lease, "Landlord may, if Landlord so elects, upon five (5) days written notice of such election, forthwith terminate this Lease and Tenant's right to possession of the Leased Premises."  *Id.* ¶ 43.  Upon default, the Landlord also may in its "sole and absolute discretion, accelerate the payment of all Rent for the balance of the Term and declare the same presently due and payable in full."  *Id.* ¶ 44.

On January 7, 2020, after it became apparent to the Landlord that the Tenant would not remedy its defaults, the Landlord sent a termination notice to the Tenant exercising its right to terminate the Lease.  *Id.* ¶ 45.  The Lease's termination took effect five days later on January 12, 2020, and, as of January 12, 2020, Tenant's right to possession of the Leased Facility came to an end.  *Id.* ¶ 46.  Notwithstanding the Lease's termination, the Tenant continues to occupy the Facility.  *Id.* ¶ 47.

## PROCEDURAL HISTORY

On September 16, 2020, the Landlord commenced a litigation against the Tenant in the Supreme Court of the State of New York, Westchester County (the "**New York State Court Action**").  In the first amended complaint (the "**Complaint**") in the New York State Court Action, the Landlord asserted two breach of contract claims in connection with the Tenant's material defaults and the Landlord's resulting termination of the Lease.  Donnellan Aff. Ex. 3

¶¶ 92-95 (First and Second Causes of Action).[2]  The Complaint also asserts various claims against the guarantors under the Lease, Mr. Jozefovic and Mr. Neuman (the "**Guarantor Claims**").  *Id.* ¶¶ 96-101 (Third, Fourth, and Fifth Causes of Action).  The Landlord filed a motion to remand the Guarantor Claims back to the New York State Court, Adv. Dkt. Nos. 17-19, which remains pending.  Thus, the Guarantor Claims are not part of the motion currently before this Court.

In August 2021, the Landlord filed a motion for summary judgment in the New York State Court Action.  NYSCEF Doc. Nos. 183-230.[3]  On October 25, 2021, the Tenant opposed the motion for summary judgment (the "**Opposition**").  NYSCEF Doc. Nos. 236-255.

On November 1, 2021, days before the return date on the motion for summary judgment before the New York State Court, the Tenant filed a voluntary petition for relief under Subchapter V of Chapter 11 of the United States Bankruptcy Code (the "**HBL Bankruptcy**") in the United States Bankruptcy Court for the Southern District of New York.  On November 3, 2021, the Tenant filed its Notice removing the New York State Court Action from the Supreme Court, Westchester County, to the United States District Court for the Southern District of New York pursuant to 28 U.S.C. §§ 1334 (b) and 1452.  *See* Adv. Dkt. No. 1 (Notice of Removal at 1).  On November 8, 2021, pursuant to the Amended Standing Order of Reference, the action was transferred to this Court.  Adv. Dkt. No. 1-44.

---

[2] References herein to the Donnellan Affirmation are to the Affirmation of Alfred E. Donnellan, dated August 18, 2021, filed in the Supreme Court of the State of New York, County of Westchester, Index No. 60278/2020 (NYSCEF Doc. No. 184).

[3] References herein to documents from the NYSCEF docket are to filings while the case was pending in the Supreme Court of the State of New York, County of Westchester, Index No. 60278/2020.

The motion for summary judgment was fully briefed on November 5, 2021.  Adv. Dkt. Nos. 1-39-1-42.  After removal of the action, upon the Tenant's request, this Court afforded the Tenant an opportunity to take discovery in connection with the motion for summary judgment. The Tenant sought and obtained documents and took depositions of the Landlord's principal decision-makers.  With this Court's permission and by agreement between the parties, this supplemental brief is submitted in further support of the Landlord's motion for partial summary judgment on the issue of the Lease's termination.

## ARGUMENT

## I.   THE TENANT DEFAULTED UNDER THE LEASE

### A.   Strict Compliance with the Lease Is Required

The Tenant was required to strictly comply with the provisions in the Lease.  "Express conditions must be literally performed." *Oppenheimer & Co. v. Oppenheim, Appel, Dixon & Co.*, 660 N.E.2d 415, 418 (N.Y. 1995).  "Substantial performance will not suffice." *MHR Cap. Partners LP v. Presstek, Inc.*, 912 N.E.2d 43, 47 (N.Y. 2009).   This is because express contractual conditions are "agreed to and imposed by the parties themselves" and they contain "the same sanctity as the promise itself." *Oppenheimer*, 660 N.E.2d at 418.  The New York Court of Appeals has instructed that absent a violation of public policy, "the court . . . must [] generally enforce the will of the parties." *Id.*  The Tenant's repeated references to its "substantial compliance" with certain of the Lease terms, *see* NYSCEF Doc. No 255 (Opp. at 2, 5-6), are therefore not relevant to whether the Tenant breached the Lease's express conditions, which required literal compliance.  In any event, as the undisputed facts make plain, the Tenant's utter failure to comply with basic Lease provisions could not satisfy even the most forgiving standard.

**B.**    **The Tenant Concedes that It Failed to Provide the Security Deposit**

Pursuant to the Lease, the Tenant was required to deliver two forms of security deposit to the Landlord sixty days before the start of occupancy under the Lease. *See generally* Nicholson Aff. Ex. 12 §§ 7.1(a)(ii), (iii).[4]  First, the Tenant was required to deliver to the Landlord an unconditional Letter of Credit, or cash, in the amount of $3,700,000.00. *Id.* § 7.1(a)(ii).  Second, the Tenant was required to deliver to the Landlord as "additional Security Deposit," $1,600,000.00 in cash, funds that were then being held by the Tenant in a controlled account at JPMorgan. *Id.* § 7.1(a)(iii).

The Tenant does not dispute that the $3,700,000 Letter of Credit (or cash) was never delivered. *See, e.g.*, Opp. at 11 ("[b]y July 2019, White Plains knew that HBL had not provided the $3.6 million [*sic*] letter of credit.").  The Tenant argues that the occupancy date was December 2, 2019, instead of September 30, 2019, NYSCEF Doc. No. 254 (Response to Statement of Material Facts ¶ 4), even though section 6 of the LOI drafted by the Tenant acknowledges September 30, 2019 as the Lease's commencement date.  Regardless, that disagreement is of no consequence to this motion.  Even under the Tenant's erroneous claim that occupancy occurred on the later date of December 2, 2019, the Letter of Credit and the additional cash security deposit were due 60 days prior; in other words, no later than October 3, 2019.  The Tenant, however, has never delivered any security deposit at all.  The Tenant failed to deliver the Letter of Credit; and the Tenant failed to deliver the additional cash security deposit.

The Lease expressly provides that the "Tenant's failure to deliver the Letter of Credit or timely pay to Landlord the Security Deposit shall be deemed a Lease Default by Tenant."

---

[4] References herein to the Nicholson Affidavit are to the Affidavit of William A. Nicholson, dated August 18, 2021, filed in the Supreme Court of the State of New York, County of Westchester, Index No. 60278/2020 (NYSCEF Doc. No. 196).

Nicholson Aff. Ex. 12 § 7.1(a)(ii).  Notwithstanding the clear requirement in the Lease and the

fact that Tenant's failure to comply "shall be deemed" a default under the Lease, the Tenant

asserts that because it purports to have paid rent every month, "additional security deposits

would serve no purpose" and that the Landlord never "demanded" payment of the $3.7 million

letter of credit.  Opp. at 16.

These arguments are at odds with fundamental contract law and are insufficient to defeat

the Landlord's motion for partial summary judgment.  Parties to a contract are bound by the

terms of their agreement – there is no obligation to "demand" that a party comply with the plain

language of a contract.  Nor does it matter what provisions of the binding contract the Tenant

thinks "serve [a] purpose," though it is now apparent that the Landlord was very much in need of

its security deposit from this Tenant.  The simple fact remains that under the Lease, the Tenant

was required to deliver a Letter of Credit or cash in the amount of $3,700,000 to secure the

Tenant's obligations under the Lease, and the Tenant failed to do so.

Similarly, the plain language of the Lease requires that the Tenant *deliver* $1,600,000 in

funds held at a JPMorgan account *to* the Landlord as additional security deposit.  The Tenant's

response is to assert that it "substantially complied" with this provision by "tendering signatory

authority" to the Landlord.  Opp. at 16.  But the Tenant's argument misses the mark.

Endeavoring to tender signatory authority does not substantially comply with a provision that

requires the delivery of funds into the Landlord's account by a certain date.  The additional

security deposit was never delivered.  And, in any event, as explained above, even if, for the sake

of argument, the Tenant had substantially complied, that would be insufficient as a matter of law

to avoid breach of this express contractual obligation.  *MHR Cap. Partners.*, 912 N.E.2d at 46-

47.  Failure to provide the security deposit required by the Lease is a material breach and default

10

under the Lease.  *See, e.g., Kallen v. Kassin*, 606 N.Y.S.2d 312, 313 (N.Y. App. Div. 1994);

*Markowitz v. Landau*, 567 N.Y.S.2d 268, 268 (N.Y. App. Div. 1991).

###### C.    There Were Numerous Additional Defaults Under the Lease

In addition to the Tenant's failure to deliver the $3.7 million Letter of Credit (or cash) or

the $1.6 million additional security deposit, there were numerous additional defaults by the

Tenant under the Lease.  *See generally* Plf. 56.1 Stmt. ¶¶ 13-33.  The Tenant's response to these

additional breaches is similarly unavailing and insufficient as a matter of law.

With respect to breach of the requirement that the Tenant provide insurance certificates

showing that the requisite insurance had been procured, and the requirement to provide

Medicaid, Medicare and other provider agreements and rate sheets, the Tenant asserts that there

is no breach because it substantially complied with the provision or delivered "substantial"

documents.  Opp. at 15 (claiming that certificates of insurance substantially comply with the

insurance requirements); *id.* at 15-16 (claiming that the Tenant "delivered substantial

documentation" concerning provider agreements and rate sheets).  But as set forth above,

"substantial compliance" is not the standard for performing under the Lease and does not excuse

the Tenant's breach of express contractual provisions.  Furthermore, the Tenant has failed to

demonstrate that it delivered to the Landlord any Medicaid, Medicare and other provider

agreements and rate sheets until July 2021, well over a year after the Lease had been terminated.

The Tenant's secondary excuse that it did not breach certain provisions because the

Landlord failed to "demand" adherence to the contract is similarly unavailing. *id*. at 15 (Landlord

"never notified" Tenant of the unpaid utility charges); *id.* (Landlord "never demanded that

[Tenant] obtain additional insurance coverage"); *id.* at 16 (Landlord "never demanded" that

Tenant provide the required documentation concerning provider agreements and rate sheets).

Notably, the Tenant does not dispute that the Landlord repeatedly demanded payment of the

security deposit.  In any event, the Tenant signed a contract that obligated it to live up to its express obligations; it is not incumbent on the Landlord to "demand" compliance with each individual obligation in the Lease.  Moreover, the Landlord notified the Tenant of the defaults in the Notice of Termination and yet the Tenant still failed to perform its contractual obligations.

The Tenant offers no explanation at all for its failure to comply with the financial documentation and reporting obligations.

As explained below, the security-deposit defaults and the defaults itemized above each serves as an independent basis for terminating the Lease.

## II.   THE LANDLORD TERMINATED THE LEASE

### A.   The Landlord Had the Right to Terminate the Lease Because of the Tenant's Lease Defaults

The Lease provides that, "Tenant shall be in default under this Lease" upon the occurrence of *any* of a series of events (each referred to as a "**Lease Default**").  The following defaults by the Tenant are specifically enumerated defaults under the Lease:

*First*, the Tenant was required to deliver two forms of security deposit to the Landlord sixty (60) days before the start of the Lease.  Nicholson Aff. Ex. 12 §§ 7.1(a)(ii), (iii).  The Tenant has never delivered either form of security deposit to the Landlord.  Plf. 56.1 Stmt. ¶¶ 4-12.  The failure to deliver the security deposit and additional security deposit required by the Lease was specifically noticed as a default in the Notice of Termination.  *See* Tabor Aff. Ex. 26.[5] Pursuant to the Lease, the Tenant "shall be in default" for the failure "to deposit all or any portion of the Security Deposit or Letter of Credit."  Nicholson Aff. Ex. 12 § 16.1(a)(xxvi).

---

[5] References herein to the Tabor Affidavit are to the Affidavit of Edward O. Tabor, dated August 18, 2021, filed in the Supreme Court of the State of New York, County of Westchester, Index No. 60278/2020 (NYSCEF Doc. No. 212).

*Second*, the Lease requires that Tenant pay rent on the first day of each calendar month in the amount of $506,096.50.  Nicholson Aff. Ex. 12 §§ 3.2 (a), (d).  The Tenant incurs late fees for any rent payment, or portion thereof, paid more than five days after the due date.  *Id.* § 3.2(e).  On numerous occasions, the Tenant failed to make all or a portion of a rent payment, or failed to make a *timely* rent payment resulting in incurred late and interest charges in excess of $220,784.14.  Plf. 56.1 Stmt. ¶¶ 14-19.  A chart itemizing each missed or late payment is set forth as Exhibit 25 to the Tabor Affidavit.  The failure to pay rent was specifically noticed as a default in the Notice of Termination.  *See* Tabor Aff. Ex. 26.  Pursuant to the Lease, the Tenant "shall be in default" for failing to pay "any installment of Rent within five (5) days after the date when due."  Nicholson Aff. Ex. 12 § 16.1(a)(i).

*Third*, the Lease requires the Tenant to deliver all Medicare, Medicaid, and other provider agreements within thirty (30) days of receipt by the Tenant, and reimbursement rate sheets within ten (10) days of receipt by the Tenant.  Nicholson Aff. Ex. 12 §§ 7.4(g) & (j).  The Tenant has never delivered any Medicare or Medicare provider agreements to the Landlord.  Plf. 56.1 Stmt. ¶ 30.  The Tenant failed to provide any Medicaid reimbursement rate sheets until July 2021, has never provided Medicare documentation, or any revised or amended reimbursement rate sheets, as required by Sections 7.4(g) and 7.4(j) of the Lease.  *Id.* ¶ 31.  The failure to provide the provider agreements and reimbursement sheets was specifically noticed as a default in the Notice of Termination.  *See* Tabor Aff. Ex. 26.  Pursuant to the Lease, Tenant "shall be in default" for failure to "give Landlord and Mortgagee timely notice or timely deliver copies of documents within the times required under Section 7.4(c) through (o)."  Nicholson Aff. Ex. 12 §§ 16.1(a), 16.1(a)(xv).

13

*Fourth*, the Lease requires that the Tenant procure various forms of insurance with specified policy limits and deducible amounts.  Nicholson Aff. Ex. 12 § 6.1.  The Lease also requires that the Tenant furnish the Landlord with certificates of insurance showing compliance with the Tenant's insurance obligations under the Lease.  *Id.* § 6.2.  The Tenant failed to deliver any certificates of insurance until January 2020 and July 2021.  Plf. 56.1 Stmt. ¶ 26.  Further, the certificates of insurance that were belatedly provided to the Landlord showed that the insurance procured by the Tenant failed to comply with the policy limits and other insurance requirements under the Lease.  *Id.* ¶¶ 27-8.  An analysis of the deficiencies that are apparent from the face of the certificates of insurance are attached to the Tabor Affidavit as Exhibit 40.  The failure to deliver certificates of insurance was specifically noticed as a default in the Notice of Termination.  *See* Tabor Aff. Ex. 26.  Pursuant to the Lease, the Tenant "shall be in default" for failure to "procure the insurance coverage, or loss of the insurance coverage, required by this Lease."  Nicholson Aff. Ex. 12 § 16.1(a)(xxxv).

The remaining defaults by the Tenant that are not specifically enumerated as a default fall squarely within the "catch all" default provision, which states that it is a Lease default if the Tenant defaults in "the prompt and full performance of any other of Tenant's covenants, obligations or agreements hereunder which are not specifically enumerated herein as a Lease Default and fails to correct such failure within thirty (30) days of receipt of written notice from Landlord of such default."  *Id.* § 16.1(ii).  The Lease required that the Tenant pay real estate taxes in a timely manner and provide financial and operational reporting to the Landlord.  Nicholson Aff. Ex. 12 §§ 4.2, 7.4 (a).  The Tenant failed to adhere to either obligation.  Plf. 56.1 Stmt. ¶¶ 20-1; 32-3.  These deficiencies were specifically noted as defaults in the Notice of Termination.  *See* Tabor Aff. Ex. 26.  The Tenant's failure to cure these defaults within thirty

14

(30) days, or at any point thereafter, provided additional bases for the Landlord's termination of the Lease.

### B.    The Landlord Transmitted a Proper Notice of Termination

Upon the occurrence of a default under the Lease, the "Landlord may, if Landlord so elects, upon five (5) days written notice of such election, forthwith terminate this Lease and Tenant's right to possession of the Leased Premises."  Nicholson Aff. Ex. 12 § 16.1(a).  The Landlord also may in its "sole and absolute discretion, accelerate the payment of all Rent for the balance of the Term and declare the same presently due and payable in full."  *Id.*

On January 7, 2020, as a result of the Tenant's numerous and continuing Lease Defaults, the Landlord sent a notice to the Tenant exercising the Landlord's right to terminate the Lease upon five days' notice and accelerate all rents due for the balance of the lease term (the "**Notice of Termination**").  Tabor Aff. ¶¶ 9, 10; *id.* Ex. 26.  As set forth below, this was a valid exercise of the Landlord's remedies under the Lease as a result of the Tenant's defaults under the Lease.

### C.    The Landlord Was Authorized to Terminate the Lease

The Landlord's failure to obtain the consent of its construction lender, Security Benefit Corporation ("**Security Benefit**"), *see* Opp. at 10-11, is simply irrelevant to whether the Landlord acted within its rights to terminate the Lease.  The Tenant was not a party to the separate agreement the Landlord entered into with Security Benefit (the "**Construction Loan Agreement**"), and although certain specified provisions of the Construction Loan Agreement were incorporated into the Lease by reference, the provision requiring the Landlord to obtain the consent of Security Benefit before it terminated the Lease is not one of them.  Nicholson Aff. Ex. 12 § 11.2 ("All provisions contained in the loan documents between Landlord and Mortgagee . . . *which concern or pertain to the restoration of the Leased Premises, the application of insurance proceeds and any and all matters concerning a casualty,* shall take precedence over and be in

15

lieu of any contrary provision provided for in this Lease" (emphasis added)); *see also* Jozefovic Aff., Ex. F, § 3.5(vi).[6] Thus, by its terms, the Lease makes plain that the Construction Loan Agreement does *not* impact any of the default or termination provisions in the Lease. The Tenant cannot avoid its obligations under the Lease by pointing to an unrelated obligation that the Landlord had to a different party under a different contract. *CooperVision, Inc. v. Intek Integration Techs., Inc.,* 794 N.Y.S.2d 812, 819 (N.Y. Sup. Ct. 2005) ("The well settled rule is that 'a reference by the contracting parties to an extraneous writing for a particular purpose makes it a part of their agreement only for the purpose specified.'")

### D.    The Landlord's Counsel Was Authorized to Sign the Termination Notice

That the Notice of Termination was signed by Alfred Donnellan, the Landlord's counsel and Joshua Roccapriore, the Landlord's authorized representative, does not negate its validity. *See* Opp. at 17-18. Nothing in the Lease limited which of the Landlord's authorized agents could provide such notice,[7] and the record is clear that based on the Tenant's extensive prior dealings with both Mr. Donnellan and Mr. Roccapriore, the authority of these individuals to act on behalf of the Landlord was well understood to Tenant. Donnellan Reply Decl. ¶¶ 4-7.[8] Moreover, the facsimile version of the notice transmitted to the Tenant came directly from the Landlord, and the notice expressly informed the Tenant that its signatories were "attorneys for your Landlord,

---

[6] References herein to the Jozefovic Affidavit are to the Affidavit of Lizer Jozefovic, dated October 25, 2021, filed in the Supreme Court of the State of New York, County of Westchester, Index No. 60278/2020 (NYSCEF Doc. No. 236).

[7] Section 13.1 of the Lease, the provision Tenant claims limited which authorized representatives could act on behalf of the Landlord, simply provides an address where the Tenant is obligated to send *its* notices. *Compare* Opp. at 18 *with* Nicholson Aff. Ex. 12 § 13.1.

[8] References herein to the Donnellan Reply Declaration are to the Reply Declaration of Alfred Donnellan, dated November 5, 2021, filed in this adversary proceeding, Case No. 21-07096 (SHL) (Adv. Dkt. No. 1-39).

White Plains Health Care Properties I, LLC." Nicholson Aff. Ex. 26. Accordingly, the Notice of

Termination complied with the Lease. *See Thor 725 8th Ave. LLC v. Goonetilleke*, 138 F. Supp.

3d 497, 512 (S.D.N.Y. 2015), *aff'd*, 675 F. App'x 31 (2d Cir. 2017) (notice valid even where

authorized signatory's signature line not legible where entity on whose behalf the letter was

signed clearly identified multiple times in notice); *PS Food Corp. v. Granville Payne Retail,*

*LLC*, 7 N.Y.S.3d 244, 45 Misc.3d 1216(A) at *11 (N.Y. Sup. Ct. 2014), *aff'd*, 34 N.Y.S.3d 158

(N.Y. App. Div. 2016) (notice sufficient where lease "did not expressly obligate [the landlord] to

act only personally or through an identified agent" in providing notice and "tenant had fair notice

that the landlord's attorney was authorized to act on behalf of the landlord because they have had

prior dealings").

## III.   AS A MATTER OF LAW, THE LANDLORD DID NOT WAIVE THE TENANT'S LEASE DEFAULTS

### A.   Any Purported Delay in Terminating the Lease Did Not Waive the Tenant's Lease Defaults

The Tenant erroneously argues that the Landlord waived the Lease Defaults by waiting

several months before terminating the Lease, and several months thereafter before filing a

lawsuit against the Tenant seeking to enforce its contractual rights. *See* Opp. at 11-12.

However, the Lease contains non-waiver provisions to ensure that any efforts by the Landlord to

resolve disputes arising from the Tenant's breaches of the Lease are not deemed to waive those

breaches. Nicholson Aff. Ex. 12 §§ 20.2, 20.3.

Specifically, the Lease provides that "[n]either any failure nor any delay on the part of

any party hereto in insisting upon strict performance of any term, condition, covenant or

agreement, or exercising any right, power, remedy or privilege hereunder . . . shall operate as or

constitute a waiver thereof." *Id.* § 20.3. The Lease also specifies that to be effective, any

waivers must be "set forth in writing and signed by the party against whom such waiver is

asserted." *Id.* § 20.2.  New York courts routinely enforce such nonwaiver clauses contained in

leases.  *See, e.g., Jefpaul Garage Corp. v. Presbyterian Hosp. in N.Y.*, 462 N.E.2d 1176, 1178

(N.Y. 1984); *Luna Park Hous. Corp. v. Besser*, 329 N.Y.S.2d 332, 333 (N.Y. App. Div. 1972).

> **B.**    **The Acceptance of Rent from the Tenant Did Not Waive the Tenant's Lease Defaults**

The Tenant erroneously claims that the Landlord waived the Lease Defaults by accepting

monthly rent payments from the Tenant.  Opp. at 12.  Although not an issue before the Court on

this current motion, all of the rent accepted by the Landlord was a fraction of the rent to which it

is entitled by virtue of the Tenant's holdover tenancy and its failure to leave the premises when

its leasehold interest was terminated in January 2020.  Regardless, as already set forth above, any

waiver of a term of the Lease must be set forth in a signed writing, and so the Landlord's

acceptance of rent cannot constitute a waiver under any circumstances.

Further, courts have consistently recognized that the post-default acceptance of rent is not

a basis for waiver.  *See Sullivan v. Brevard Assocs.*, 488 N.E.2d 1208, 1211 (N.Y. 1985);

*Georgetown Unsold Shares, LLC v. Ledet*, 12 N.Y.S.3d 160, 163-164 (N.Y. App. Div. 2015).

Indeed, the case primarily relied on by the Tenant, *Jefpaul Garage Corp*, 462 N.E.2d at 1178,

expressly contradicts the Tenant's position.  In *Jefpaul*, the Court of Appeals held that the

landlord's acceptance of rent *did not* constitute a waiver of its rights under the lease per the

lease's explicit non-waiver provision.  *Id.* at 446 ("While waiver may be inferred from the

acceptance of rent in some circumstances, it may not be inferred, and certainly not as a matter of

law, to frustrate the reasonable expectations of the parties embodied in a lease when they have

expressly agreed otherwise.").  The same is true here.

### C.      The LOI Did Not Waive the Tenant's Lease Defaults

Among its efforts to resolve the Tenant's defaults, the Landlord entered into the LOI to pursue a potential transaction that would have resolved the disputes and resulted in joint ownership of the Facility.  Due to the Tenant's failure to perform in accord with its terms, the LOI did not lead to a completed transaction, and thus all of the Lease terms continued to govern the relationship between the Landlord and the Tenant: "The parties shall remain as Landlord and Tenant pursuant to the existing Lease until such time as the Transaction closes." Nicholson Aff. Ex. 17 § 1(h).

## IV.    <u>THE TENANT RELEASED ALL CLAIMS AGAINST THE LANDLORD</u>

In opposing the Landlord's motion for summary judgment, the Tenant attempts to inject manufactured "factual disputes" regarding the development, construction, and financing of the Facility.  *See generally* Opp. Br. at 2-3, 8-10.  However, the Lease contains a provision expressly releasing any and all claims the Tenant may have had against the Landlord that pre-date negotiation and execution of the Lease in 2017.  The provision states in relevant part:

> EFFECTIVE AS OF THE DATE OF THIS LEASE, TENANT SHALL RELEASE LANDLORD FROM ALL CLAIMS WHICH TENANT OR ANY AGENT, REPRESENTATIVE, AFFILIATE, EMPLOYEE, DIRECTOR, OFFICER, PARTNER, MANAGER, MEMBER, SERVANT, SHAREHOLDER, TRUSTEE OR OTHER PERSON OR ENTITY ACTING ON TENANT'S BEHALF OR OTHERWISE RELATED TO OR AFFILIATED WITH TENANT ARISING FROM OR RELATED TO ANY MATTER OR THING RELATED TO OR IN CONNECTION WITH THE LEASED PREMISES, INCLUDING THE INFORMATION AD ANY PHYSICAL OR ENVIRONMENTAL CONDITIONS, AND TENANT SHALL NOT LOOK TO LANDLORD IN CONNECTION WITH THE FOREGOING FOR ANY REDRESS OR RELIEF . . . . EXCEPT AS TO MATTERS SPECIFICALLY SET FORTH IN THIS LEASE: (A) TENANT WILL ACQUIRE THE LEASED PREMISES SOLELY ON THE BASIS OF ITS OWN PHYSICAL AND FINANCIAL EXAMINATIONS, REVIEWS AND INSPECTIONS, AND (B) WITHOUT LIMITING THE FOREGOING, WAIVES ANY RIGHT IT OTHERWISE MAY HAVE AT LAW OR IN EQUITY AGAINST LANDLORD WITH RESPECT TO ANY ASPECT OF LEASED PREMISES.

Nicholson Aff. Ex. 12 § 5.6(b).

The Lease also contains a merger clause that dictates that the Lease represents the "entire

agreement between the Parties" and that "any and all prior agreements between such Parties are

hereby canceled." *Id* § 20.6. Thus, absent a signed amendment of the Lease's terms, the Lease,

and only the Lease, governs the parties' obligations to one another. *See Schron v. Troutman*

*Sanders LLP*, 989 N.E.2d 430, 434 (N.Y. 2013) ("[W]here a contract contains a merger clause, a

court is obliged 'to require full application of the parol evidence rule in order to bar the

introduction of extrinsic evidence to vary or contradict the terms of the writing.'").

## **CONCLUSION**

For the foregoing reasons, the Landlord respectfully requests that the Court grant its

motion for partial summary judgment and enter an order: (i) ruling that the Tenant defaulted

under the Lease; (ii) ruling that the Landlord properly terminated the Lease; and (iii) granting

such other and further relief as the Court deems just and proper.

Dated:  February 11, 2022
      New York, New York

Respectfully submitted,

BINDER & SCHWARTZ LLP

/s/ Eric B. Fisher
Eric B. Fisher
Lindsay A. Bush
366 Madison Avenue, 6th Floor
New York, NY 10017
Tel.: (212) 510-7272
Email: efisher@binderschwartz.com
Email: lbush@binderschwartz.com

-and-

DELBELLO DONNELLAN WEINGARTEN WISE &
WIEDERKEHR, LLP
Alfred E. Donnellan
One North Lexington Avenue, 11th Floor
White Plains, New York 10601

Tel.: (914) 681-0200
Email: aed@ddw-law.com

ABRAMS FENSTERMAN LLP
Robert A. Spolzino
81 Main Street, Suite 306
White Plains, New York 10601
Tel.: (914) 607-7010
Email: RSpolzino@Abramslaw.com

*Counsel for White Plains Healthcare Properties I, LLC*