**KLESTADT WINTERS JURELLER**
**SOUTHARD & STEVENS, LLP**
Tracy L. Klestadt
Brendan Scott
Christopher Reilly
200 West 41st Street, 17th Floor
New York, New York 10036
Tel: (212) 972-3000
Fax: (212) 972-2245
*Counsel to the Debtor and Debtor in*
*Possession*

**MICHELMAN & ROBINSON, LLP**
John Giardino
800 Third Avenue, 24th Floor
New York, NY 10022
Tel: (212) 730-7700
Fax: (212) 730-7725
*Proposed Special Counsel to the Debtor and*
*Debtor in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------ X

In re                                                                    Chapter 11

HBL SNF, LLC, d/b/a EPIC REHABILITATION           (Subchapter V)
AND NURSING AT WHITE PLAINS,

                                                                         Case No. 21-22623 (SHL)

                                          Debtor.

------------------------------------------------------------ X

**SUPPLEMENTAL MEMORANDUM OF LAW IN OPPOSITION**
**TO LANDLORD'S MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

I.    PROCEDURAL STATEMENT ........................................................................... 1

II.   ISSUE PRESENTED ...................................................................................... 2

III.  SUMMARY OF DEBTOR'S ARGUMENTS ..................................................... 3

IV.   STATEMENT OF RELEVANT FACTS ........................................................... 7

  1.  Debtor Contributes $2,200,000 to the Landlord Entity ..................................... 10

  2.  Landlord Never Intended to Terminate the Lease and Waived Its Election by Subsequent Conduct ........................................................................................................... 19

  3.  The Election Contained in the January 7th Notice is Unauthorized and Unenforceable.... 22

  4.  Debtor Substantially Performed Its Lease Obligations and has the Right to Assume ....... 23

  5.  Relevant Transactional Timeline ..................................................................... 24

V.    LEGAL ARGUMENTS ................................................................................. 26

  1.  Landlord's Summary Request For A Determination That The Lease Is Terminated ........ 26

  Must Be Denied ............................................................................................. 26

  2.  Standard For Review On Summary Judgment .................................................... 26

  3.  Landlord's Prior Breach Of The Loan Agreement Precludes The Relief Sought Against Debtor ........................................................................................................... 29

  4.  Material Factual Issues In Dispute Require Denial Of Landlord's Motion ................... 30

  5.  Landlord's Conduct And Statements Waived Any Defaults ................................... 30

  6.  On The Record Before It, This Court Must Find As A Matter Of Law That The Lease Was Not Terminated As Of November 1, 2021 ....................................................... 32

VI.   CONCLUSION ........................................................................................... 33

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Caldor, Inc.-NY*,
   204 BR 855 [Bankr SDNY 1997].........................................................................................31

*In re G. Survivor Corp.*,
   217 BR 433 [Bankr SDNY 1998].....................................................................................26, 27

*Gibbs–Alfano v. Burton*,
   281 F.3d 12 (2d Cir.2002)...................................................................................................27

*In re Inflight Newspapers, Inc.*,
   423 BR 6 [Bankr EDNY 2010]............................................................................................26

*In re Lebenthal Holdings, LLC*,
   17-13337, 2019 WL 6379779, [Bankr SDNY Nov. 27, 2019].............................................30

*Novick v AXA Network, LLC*,
   642 F3d 304 [2d Cir 2011].................................................................................................27

*R.B. Ventures, Ltd. v. Shane*,
   112 F.3d 54 (2d Cir.1997)..................................................................................................27

*Ring v Mpath Interactive, Inc.*,
   302 F Supp 2d 301 [SDNY 2004], *affd*, 130 Fed Appx 501 [2d Cir 2005]...........................31

*Smith v Masterson*,
   538 F Supp 2d 653 [SDNY 2008], *affd*, 353 Fed Appx 505 [2d Cir 2009]...........................26

*United States v Schmitt*,
   999 F Supp 317 [EDNY 1998], *affd*, 28 Fed Appx 63 [2d Cir 2002] ...................................31

*White Plains Healthcare Properties I, LLC v. HBL SNF, LLC et al.*,
   Index No. 60278/2020 ..........................................................................................................1

*World Wide Polymers, Inc. v Shinkong Synthetic Fibers Corp.*,
   03-CV-8843, 2010 WL 3155176, [SDNY July 30, 2010], *affd*, 694 F3d 155
   [2d Cir 2012]................................................................................................................27, 28

### I.    PROCEDURAL STATEMENT

Together with the accompanying Declarations of John Giardino and Lizer Josefovic, this Supplemental Memorandum of Law in further opposition to Landlord's Motion for Summary Judgment is submitted on behalf of the Debtor HBL SNF, LLC ("Debtor"), to address what this Court has recognized as a threshold issue in this case:

**Can the Debtor assume its lease or did the Landlord terminate the lease prior to Debtor's Chapter 11 filing?**

Debtor filed its Chapter 11 petition on November 1, 2021. At the time of filing, Debtor was engaged in litigation brought by its landlord, White Plains Healthcare Properties I, LLC ("Landlord"), in New York Supreme Court involving multiple claims and counterclaims.  In those proceedings, Landlord filed a motion for summary judgment on August 19, 2021, and Debtor filed answering papers on October 25, 2021 (the "Motion").  The New York Supreme Court record on the Motion is now before this Court. *See* W*hite Plains Healthcare Properties I, LLC v. HBL SNF, LLC et al.*, Index No. 60278/2020, New York State Supreme Court, Westchester County, Dkt. Nos. 183-255 (the "State Court Action").

As this Court knows, Landlord brought the Motion before any discovery took place in the State Court Action[1] and was subject to dismissal pursuant to Civil Practice Rule 3212(f). Upon review of the record and after hearing from the parties on the discovery issues, the Court granted Debtor's request to conduct discovery limited to the complex issues concerning the alleged termination of the lease. [Dkt. No. 21]. In accordance with the Court's instruction, Debtor obtained documents from and conducted depositions of the two managing members of the Landlord,

---

[1] The Debtor served initial discovery notices on the Landlord on December 18, 2020, and amended discovery notices on May 7,2020. Landlord provided no responses until the proceedings before this Court.

Howard Fensterman ("Fensterman") and William Nicholson ("Nicholson"), limited to the issue of the alleged termination of the Lease which discovery materials are now incorporated into this supplemental opposition. Declaration of John Giardino ("Giardino Dec."), Exhibit 1 ("Fensterman Dep."), Exhibit 2 ("Nichibit Dep.").

As argued herein, the documents produced by and testimony adduced from the Landlord clearly establish that, despite Landlord's purported Notice of Default and Election to Terminate dated January 7, 2020 (the "Notice of Default"), the Landlord <u>never</u> terminated Debtor's lease. Giardino Dec., Exhibit 3. Debtor is free to assume the lease in these proceedings and, as it has made clear to the Court, cure any uncured lease defaults as may be determined by the Court. Declaration of Lizer Jozefovic ("Jozefovic Dec."), ¶ 2.

Debtor argues that the record before this Court on Landlord's Motion not only requires denial of summary judgement, but also supports the legal determination that the lease was not terminated at the time of Debtor's Chapter 11 filing.

## II.   <u>ISSUE PRESENTED</u>

Did the Landlord's Notice of Default serve to unilaterally terminate the Amended and Restated Operating Lease, dated as of November 19, 2015 (the "Lease"), [2] such that the Lease was not in effect as of the date of the Debtor's Chapter 11 filing on November 1, 2021, thereby precluding assumption of the Lease pursuant to Section 365 of the Bankruptcy Code.

---

[2] Although dated as of November 2015, the Lease was executed by the parties contemporaneously with the Security Benefit financing in July or August of 2017.

### III.    <u>SUMMARY OF DEBTOR'S ARGUMENTS</u>

As set forth in this Memorandum, Debtor asserts that pursuant to Section 365, it has the right to assume the Lease and to cure any outstanding defaults. Although the Notice of Default enumerates numerous alleged defaults, the only real issue relates, as the Landlord acknowledges,[3] to two separate security deposits as set forth in Section 7.1(a)(ii) and (iii) of the Lease: (1) the turn-over of an existing $1.6M cash account maintained by Debtor as a rent security account since 2017, and (2) the delivery of a $3.7M letter of credit (collectively, the "security deposits"). In any event, long before taking occupancy of the Leased premises in 2019, Debtor raised issues with the Landlord about the delivery of these two undertakings.[4] Jozefovic Dec., ¶¶ 17-19. Importantly, as to the security deposit required by Section 7.1(a)(ii) of the Lease, the Notice of Default cites the refusal to deliver a security deposit of $1,000,000, not a $3,700,000 letter of credit as set forth in the Lease.

Initially, it must be noted that the Lease requires that any Notice of Default include a minimum thirty (30) day cure period.[5] The Notice of Default is defective as Landlord admits it does not provide for any cure period.[6] The Notice of Default alleges certain defaults that, as the

---

[3] *See Landlord's Objection to Stay Relief*, ¶ 8 [Dkt. No. 103] ("The Debtor's Lease defaults include, among other things, the failure to provide security deposits to WPHP in the total amount of $5,300,000 consisting of: (i) an unconditional letter of credit in the amount of $3,700,000; and (ii) an additional $1,600,000 that was being held in the Debtor's account during construction of the Facility and should have been, but never was, delivered to WPHP prior to commencement of the Lease.").

[4] Fensterman Dep. 106:13-23. ("We discussed the security deposit that was contained in the lease. . . . We were discussing the terms of the 2017 lease and what its requirements were . . . and we were telling him security deposit was due and he was refusing, he refused to pay it.").

[5] *See* Lease, Section 16.1 ("(ii) If Tenant defaults in the prompt and full performance of any other of Tenant's covenants, obligations or agreements hereunder which are not specifically enumerated hemin as a Lease Default and fails to correct such failure within thirty (30) days of receipt of written notice from Landlord of such default (unless such default cannot reasonably be cured within thirty (30) days, in which event such period shall be extended, provided Tenant shall have commenced in good faith to cure such default within the first such thirty (30) day period and shall proceed with all due diligence to correct such default thereafter but in no event more than ninety (90) days of receipt of such written notice).").

[6] Nicholson Dep. 167:2-3 ("No, I don't see that there is a cure period or provision in [the Notice of Default].").

3

testimony of Landlord confirms, were never actual defaults and alleges other defaults which Landlord admits have been cured.[7]   As set forth herein, in its testimony, Landlord admits that Debtor has (1) paid all base rent, (2) paid all additional rent including property taxes, and (3) properly maintained the Leased premises.

The alleged defaults involving the two security deposits are set forth in enumerated Paragraphs 9 and 10 of the Notice of Default and are matters which Landlord admits are disputed given Debtor's substantial cash contributions to the Landlord for which the Debtor never received credit.[8] As stated above, Paragraph 9 of the Notice of Default is not even consistent with the language of the Lease even though it cites performance under the Lease. The Notice of Default as to the $3,700,000 letter of credit is defective on its face because it demands performance inconsistent with the terms of the Lease itself.

These alleged security deposit defaults caused no harm to the Landlord because the Debtor performed all of Lease obligations which those undertakings were intended to secure – the payments of rent, additional rent, insurance, and the proper maintenance of the lease premises. Jozefovic Dec. ¶ 34. These alleged security deposit defaults can and will be cured by the Debtor once the disputed issues are resolved by this Court including whether Debtor owes a $3,700,000 letter of credit as set forth in Section 7.1(a)(ii) of the Lease or $1,000,000 as set forth in paragraph "9" of the Notice of Default. Jozefovic Dec. ¶ 1.

To that end, Debtor acknowledges that the Lease requires delivery of these two security deposits. However, as Landlord further acknowledges,[9] Debtor purposely withheld delivery of the

---

[7] Nicholson Dep., 198:3-17 (acknowledging that Landlord accepted payments from Debtor to cure certain defaults).
[8] Fensterman Dep. 126:14 ("He didn't get the [title to the $1.5 million] FF&E"); 129:7-11 ("Q Does that agreement that Amended and Restated Lease does address the $700,000 credit? **A No, it does not**."); 163:2-6 ("Q I want to be clear, when you say that the $2.2 million was used to pay accrued obligations of White Plains what type of obligations are you referring to? **A As I indicated earlier, I don't recall**.").
[9] Fensterman Dep., 106:21-23 ("[W]e were telling [Debtor that the] security deposit was due and he was refusing, he refused to pay it.").

security deposits because Debtor had already contributed $4,400,000 in capital to the Landlord for which Landlord has never, even to this day, provided an accounting and, more importantly, never delivered on its promises to Debtor. Jozefovic Dec., ¶¶ 17, 24, 35.

As the testimony further reveals, although Landlord knew as early as July 2019 that Debtor was refusing to deliver the security deposits, Landlord not only granted possession of the Facility to Debtor in September 2019, but it also demanded that Debtor take possession of the premises. [10] Since October 2019, Landlord has accepted both Fixed Rent Payments and Additional Rent Payments from Debtor without reservation or qualification associated with this alleged default.

It is only on January 7, 2020, after accepting rent from Debtor for four (4) months, that Landlord issued the Notice of Default. However, even after issuing the Notice of Default, Landlord continued to accept without reservation Debtor's rent and additional rent payments, never demanded that Debtor surrender of the premises,[11] and took specific affirmative actions in relation to Debtor's tenancy which unequivocally evidence Landlord's waiver of both the alleged defaults and its election to terminate the Lease.

In fact, Landlord's conduct and statements after it issued the Notice of Default reveal that it never intended to terminate the Lease. For many months after issuing the Notice of Default, Landlord took affirmative acts which are consistent with the continuation of Debtor's tenancy and, of critical importance to the resolution of the threshold issue in this case, even went so far as to represent to its lender Security Benefit on July 15, 2020 that the Lease was in effect such that Landlord would direct "Tenant" to deposit its monthly rent payment into the lender's cash management account for the next twelve (12) months. Giardino Dec., Exhibit 4.

---

[10] Fensterman Dep., 56:2-16 (describing how Landlord provided Debtor with the keys and insisted that Debtor take possession of the Facility).
[11] Nicholson Dep., 195:9-16 (admitting that Landlord never advised Debtor it was "accepting rent with reservations.").

Against this backdrop of the defective and unauthorized Notice of Default and conduct inconsistent with that notice, Landlord itself was <u>in default</u> of its loan agreement with Security Benefit as of <u>October 18, 2019</u>. Between October 18, 2019, and May 22, 2020, Security Benefit issued four (4) notices of default to Landlord which center upon Landlord's failure to properly account for payments received by Landlord from the Debtor. Giardino Dec., Exhibit 5. Importantly, not one of these notices references the failure by Debtor to deliver the two security deposits.

These breaches by the Landlord preceded the alleged breaches by Debtor. By its own admission in these proceedings, Landlord's breaches put Debtor's rights under the Lease at risk. Remarkably, Landlord came before this Court in opposition to Security Benefit's request for stay relief to argue that Security Benefit's legal action upon Landlord's defaults <u>will cause harm to Debtor</u>. Landlord's breach of its loan agreement is also a breach of the Lease and prevents it from asserting claims for breach against Debtor.

Of critical relevance to these proceedings is Landlord's breach of the Loan Agreement by failing to obtain the prior consent of Security Benefit in order to issue of the Notice of Default. As stated in Security Benefit's Notice of Default, dated May 22, 2020, "pursuant to Section 3.5 of the Loan Agreement, the Operating Lease <u>cannot be terminated</u> without the consent of Lender." Giardino Dec., Exhibit 5 (emphasis added). In its testimony, Landlord not only admits that it <u>did not obtain the consent</u> of Security Benefit but also that it did not – and does not - even know of this contractual requirement (emphasis added).[12] Security Benefit <u>did not</u> consent to the

---

[12] Fensterman Dep., 155:23-156:12 ("Q Well do you know if under the terms of your loan agreement with Security Benefit White Plains is required to obtain the consent of the lender Security Benefit before issuing a Notice of Default? **A I do not**. Q Are you familiar with a provision of the loan agreement that requires Security Benefit's consent to any Notice of Termination? **A No, I am not. I am not. My concern is with my agreement with Mr. Jozefovic. When I say Mr. Jozefovic his enterprise but he has a guarantor. Not my agreement with my lender**.").

termination and, as stated on the record in these proceedings, will not seek to terminate the Lease or Debtor's rights thereunder (emphasis added).[13] Landlord's failure to obtain Security Benefit's consent renders its election to terminate as set forth in the Notice of Default strictly unenforceable.

As the record on this motion establishes, Debtor has substantially performed its obligations under the Lease.  The assumption of the Lease is essential to the continuation of Debtor's business for without it, Debtor has no business. The basis for Landlord's alleged but defective and unauthorized termination of the Lease is the failure to deliver two security deposits which are clearly matters of legitimate dispute between the parties. These disputes which can be resolved by the Court in these proceedings and any default cured by Debtor. However, given the defect in the Notice of Default, the questions of fact regarding the alleged defaults themselves, Landlord's waiver of both the defaults and the election to terminate by its objective consent and statements, there is no basis whatsoever upon which to determine that the Lease was validly terminated prior to November 1, 2021.

## IV.   STATEMENT OF RELEVANT FACTS

### 1.  The Relationships Between the Parties

The relationship among the parties to this dispute establishes the context in which the dealings and communications between them should be understood.  The development of White Plains Skilled Nursing and Rehabilitation project has its very origins in the law offices of Abrams Fensterman, LLP.[14]  The development involved four principals who shared relationships in

---

[13] In a thinly veiled attempt to evade its contractual obligations to Security Benefit and stall foreclosure proceedings, WPHP has filed the Objection under the guise of protecting the Debtor's rights under the very Operating Lease that WPHP has sought to terminate for over two years. *See Amended Reply of Security Benefit In Support of Protective Motion from Automatic Stay*, ¶ 2 [Dkt. No. 110].
[14] Fensterman Dep., 19:15-23:25, 29:5-30-9.

common: Howard Fensterman, Mark Zafrin, Lizer Josefovic, and William Nicholson. Jozefovic Dec., ¶ 5.

Mr. Fensterman and Mr. Zafrin were law partners at the Abrams Fensterman law firm. Mr. Jozefovic was a client of the Abrams Fensterman firm who at that time was seeking to acquire the license to operate a skilled nursing facility in White Plains. Mr. Zafrin introduced his client Mr. Nicholson to his partner Mr. Fensterman and to Mr. Josefovic. Jozefovic Dec., ¶ 6. Mr. Nicholson became a client, business partner, and friend to Mr. Fensterman.[15] Mr. Nicholson also became the development partner to Mr. Jozefovic.

Together, these individuals planned the development of the Facility, each one taking on respective roles to accomplish the development. The plan involved the creation of two legal entities – one to own the real estate assets and the other to hold the licenses to operate the skilled nursing business within Facility.[16]

During the development phase of the project, Mr. Fensterman acted on behalf of Mr. Josefovic and his family to obtain the license to operate the skilled nursing facility from the New York State Department of Health.[17] Mr. Zafrin was tasked with arranging the financing for the construction of building and when he was unsuccessful, Mr. Nicholson was able to secure the financing from Security Benefit.[18] Mr. Josefovic purchased the licenses for ninety (90) skilled nursing beds from Hebrew Hospital and worked with Mr. Nicholson to select a site for the new building. Jozefovic Dec., ¶ 9. When Mr. Nicholson recommended that additional beds be obtained to make the new construction feasible, Mr. Zafrin and Mr. Josefovic arranged for the purchase of

---

[15] In fact, Mr. Fensterman has loaned millions of dollars to Mr. Nicholson. Fensterman Dep., 46:22-24 ("I have participated with Mr. Nicholson to the extent that I have arranged for loaning him or his or certain enterprises money.").
[16] Fensterman Dep., 26:3-14.
[17] Fensterman Dep., 42:20-44:5.
[18] Fensterman Dep., 33:6-12.

an additional seventy-five (75) beds from two other skilled nursing operators. Jozefovic Dec., ¶ 10.

The collaboration between the principals accounted for the informal way they transacted business as all parties acted in concert.  However, that collaboration ended when Mr. Fensterman and Mr. Zafrin had an acrimonious falling out and became adverse to each other.[19]  It is in this context of this initial collaboration and subsequent hostility that the dealings between the parties and circumstances surrounding the Notice of Default should be understood.



White Plains Relationship Chart

---

[19] Fensterman Dep., 78:13-15 ("Mr. Zafrin got angry at me and attempted to physically assault me.").

## 2. Debtor Contributes $2,200,000 to the Landlord Entity

Given this collaborative relationship, Debtor, although not a member of the Landlord entity, contributed capital to it. Pursuant to a Term Sheet dated November 20, 2015, Debtor made a $2,200,000 interest-free loan to Landlord. Giardino Dec., Exhibit 6. In return, Landlord promised to repay Debtor by (1) purchasing and conveying title to $1,500,000 worth of furniture, fixtures, and equipment ("FF&E") for the Debtors use and (2) giving a $700,000 credit against to future rent payments. These assets are listed on the Debtor's schedule of assets.

By 2017, the $2,200,000 capital contribution from Debtor had been spent by Landlord.[20] Landlord has not provided Debtor with an accounting of the use of these funds. Jozefovic Dec., ¶¶ 4, 11. More importantly, Landlord breached its promise to repay Debtor by failing to deliver title to $1,500,000 of FF&E and by failing to credit the sum of $700,000 against Debtor's rent payments. Jozefovic Dec., ¶ 12.

Landlord refused and, in fact, continues to refuse to transfer title to $1,500,000 of FF&E assets.[21] In his testimony, Mr. Fensterman simply states that because the Debtor did not turn over the $1,600,000 deposit account, the Landlord did not deliver the $1,500,000 of FF&E assets.[22]

Likewise, Landlord admits that $700,000 " . . .[was] going to be paid back to [Debtor] from a deduction in [Debtor's] rent."[23] Once again, Landlord refused to provide any rent credits or return the $700,000.[24]  In his testimony, Mr. Fensterman absurdly suggests that the $700,000 rent credit

---

[20] Nicholson Dep., 73:13-17.
[21] Nicholson Dep. 65:9-10.
[22] Fensterman Dep., 126:14-16 ("[Debtor] didn't get the FF&E.").
[23] Fensterman Dep., 128:12-18.
[24] Fensterman Dep., 128:12-18; 131:12-13.

was waived by the Debtor and the Debtor is not entitled to the credit or repayment because the credit was not included in the Lease.

In addition to the lack of an accounting for the use of these funds, Landlord cannot account for how these funds were treated on Landlord's balance sheet or income statement.[25] To date, Debtor has not received $1,500,000 of FF&E assets, the $700,000 rent credit, or repayment of its $2,200,000 loan. Jozefovic Dec., ¶ 12.

### 3. Debtor Established the $1,600,000 Rent Deposit Account But Refused To Turn It Over In The Presence Of Landlord's Breaches

As Landlord admits *supra*, it is for these reasons that Debtor refused to turn over to the Landlord the $1,600,000 cash account Debtor established in 2017. By establishing that account, Debtor had already committed $3,800,000 in cash to the Facility before construction had even begun.  The rent deposit account required by the Lease places no restrictions upon the Landlord as to how the deposit monies can be used by the Landlord. *See* Lease, Section 7.1(a). Given the lack of accounting for the use of the $2,200,000 loan, the failure to deliver the FF&E, the failure to provide a credit against rent payments, and Landlord's defaults under its loan agreement, Debtor refused to place the additional $1.6M funds into the Landlord's hands.

Instead, Debtor proposed that the funds be held in a joint account with Landlord. Jozefovic Dec., ¶ 13. To that end, Debtor delivered to Landlord, and Landlord admits receiving, the requisite documentation which gave Landlord control of the $1,600,000 rent deposit account.[26] Jozefovic Dec., ¶ 14. Landlord also admits that it never took any steps to confirm the $1,600,000 on deposit

---

[25] Nicholson Dep., 70:11-23.
[26] Fensterman Dep., 116:19.

in the rent security account.[27]   In his testimony, Fensterman testified that although the $1.6 million account remains in place, Debtor's failure to turn the account over into the hands of the Landlord constitutes a breach of the Lease.[28] The issue of custody of the $1,600,000 rent deposit account can be resolved by this Court and any default, if one is determined by the Court, can be cured by Debtor.

### 4.   Debtor Contributes Another $2,200,000 to the Landlord Entity

Given the dispute over possession of the $1,600,000 security account, Debtor refused to deliver the $3,700,000 letter of credit required by the Lease.  Jozefovic Dec., ¶ 17. Debtor's refusal is reasonable given the likelihood that Landlord would resolve the rent security dispute by simply drawing the sum of $1,6000,000 on the letter of credit which amount would then need to be replenished by Debtor. *See* Lease, Section 7.1(a).  Importantly, Landlord knew of Debtor's objections and concerns, knew that Debtor would not deliver the letter of credit, but granted possession of the leased premises anyway.[29]

On March 12, 2019, Landlord through Nicholson's company, The Congress Companies, notified Debtor of the lease provision that required the letter of credit. Giardino Dec., Exhibit 7 ("March 12 Notice"). The March 12 Notice anticipated that the lease Commencement Date would be May 15th, 2019. Ultimately, the Commencement Date did not occur for many months later.[30]

---

[27] Fensterman Dep., 123:8-15 ("Q Did you ever take any steps to ensure that the balance remained in the account from August of 2017 until 2019? **A No, my understanding of our deal was that my signature would have been required to diminish the account in anyway or to remove the funds and that is what I thought I had sent back but I never got any information from him.**")

[28] Fensterman Dep., 155:12-15.

[29] Fensterman Dep., 106:12-23.

[30] The Lease Commencement Date remains a matter of dispute between the parties. The Landlord argues that the date is established by the field inspection conducted by the Department of Health. The Debtor argue that it is the date the Department of Health, much like the municipal Building Department, issues its permit for occupancy. The Landlord's attempt to accelerate the Commencement Date and demand the Debtor take possession without delivery of the letter of credit is further evidence of Landlord's waiver of the letter of credit requirement.

As a result of which Debtor's commencement of operations occurred as the COVID-19 pandemic arose causing substantial financial losses to Debtor. Jozefovic Dec., ¶ 22. However, in response to the March 12 Notice, Debtor advised that it would not deliver the letter of credit given the existing disputes. Jozefovic Dec., ¶ 19.

Some time between July and early September, a meeting between Landlord and Debtor took place at the Facility.[31] As Landlord admits, Debtor vigorously refused to deliver the two security deposits because Landlord had not delivered the $1,500,000 of FF&E assets and had not given the $700,000 rent credit.[32] Notwithstanding Debtor's refusal, weeks later Landlord insisted that Debtor take possession and accepted Debtor's performance of the Lease including the payment of Fixed Rent and Additional Rent. Landlord also knew that Debtor was funding the start-up operating losses at the facility. Jozefovic Dec., ¶ 22.[33]

The dispute over the $3,700,000 letter of credit is entangled with the very same issues related to the $1,600,000 security deposit account and can be resolved by this Court and cured by Debtor once a resolution is determined. However, in an attempt to resolve these issues, the parties entered into a Letter of Intent on November 20, 2019 (the "LOI"). Giardino Dec., Exhibit 8.

The LOI provided for the purchase of a portion of the equity interests in the Landlord entity by Debtor and made numerous revisions to the Lease and the Lease undertakings. To advance the resolution of the outstanding issues and consummate the proposed equity transaction, Debtor contributed another $2,200,000 in capital to Landlord. Given the uncertainties in the health care

---

[31] Mr. Fensterman testified that the meeting took place in July. Mr. Nicholson testified that the meeting took place in early September. In ether event the meeting took place before Landlord granted possession of the lease premises to Debtor.

[32] Fensterman Dep., 106:12-23.

[33] Although Debtor has not made the COVID Pandemic an issue affecting its performance in these proceeding the Court should take notice that Debtor's operation commenced at the time the COVID Pandemic was breaking out. The devastating effects that the Pandemic had on nursing homes is well documented.

and financial markets caused by the COVID Pandemic, Debtor was unable to consummate the equity transaction.   Jozefovic Dec., ¶ 23. Thereupon, Landlord immediately took the position that the $2,200,000 payment from Debtor was not refundable and retained the full amount of Debtor's payment.[34] [35]

By this time, Debtor had contributed $4,400,000 in capital to Landlord and set aside another $1,600,000 in a rent security account, for a total of $6,000,000. In its moving papers and other filings with the Court, Landlord alleges that Debtor has defaulted on $5,300,000 of security deposits. Notwithstanding Landlord's refusal to return or credit to Debtor's account the $2,200,000 payment made on November 20, 2019, Debtor continued to make Fixed Rent Payments in the amount of $509,000 per month to Landlord (rather than offset the payment) and has fully performed its Lease obligations. Jozefovic Dec., ¶ 25.

## 5.  Debtor Performed Under The Lease

After receiving Debtor's $2,200,000 payment in November 2019 and collecting rents through January, Landlord issued its unauthorized Notice of Default on January 7, 2020. The Notice of Default lists many alleged defaults under the terms of the Lease.  However, Nicholson's testimony, as Managing Member of the Landlord, disclosed that these alleged defaults either did not exist, or else had been subsequently cured:

a.  As to allegations regarding failure to pay rent, Nicholson testified as follows:

Q What rent did HBL fail to pay?

**A My CFO advised me that many installments of rent were late.**

Q That is not what the allegation says. It says "failed to pay". So I am asking you?

---

[34] The dispute over the language of the LOI with respect to the refund of the $2,200,000 deposit is not analyzed in this memorandum as it does not directly bear on the issue of termination of the Lease.  However, this issue may be brought before this Court for resolution.
[35] Fensterman Dep. 163:6-10.

**A It does because as required by the lease includes the time it is suppose to be paid so in fact it is the answer.**

Q Are you saying that a late payment is the same as a failure to make a payment?

**A I am saying that I am looking at the words "failure to pay rent as required by the lease", the lease tells you how much and when and in many instances the when was late is what I am testifying to.**

Q Is it your testimony that paragraph 55 relates to the late payment of rent?

**A If you allow me to finish my response then I can address that. So my CFO has advised me that the rent was in many instances late so therefore it was not paid as required by the lease while I did previous testify that <u>ultimately the base rent was paid</u>, in addition there is a rent provision that requires that the rent be 300 percent of the base rent on default and that was not paid properly in accordance with the lease.**

Nicholson Dep., 143:5-144:8 (emphasis added). In fact, the Debtor has paid rent in the amount of $509,000 each month since October 2019. Jozefovic Dep., ¶ 25.

      b.   As to the allegations regarding the failure to pay taxes, Nicholson testified as follows:

Q Paragraph 56 allegation 56 states that "HBL failed to pay real estate taxes as required by the lease". What did you mean by that allegation when you made it?

**A My CFO informed me that HBL did not pay the real estate taxes in accordance with the timeframes required by the lease and as a result there were certain late payments of taxes. That is what I meant by that.**

Q As you testify today are you able to say whether any amounts are due and owing to any taxing authority for this property?

**A I think I was advised by Ed that the taxes have ultimately been paid. Whether or not there are late charges that are generated by our lease or generated by the municipal authority I do not know but I can tell you that I can testify that <u>ultimately the rent was paid</u> (emphasis added).**

Q We are talking about the taxes?

**A The taxes, excuse me, I beg your pardon. Excuse me. <u>Ultimately the taxes were paid</u>, yes.**

Nicholson Dep., 145:4-146:2. (emphasis added). In fact, all property taxes have been paid as evidenced by the tax certificate. Jozefovic Dec., Exhibit 1.

c.      As to the allegations regarding the failure to pay utility charges, Nicholson testified

as follows:

> Q Are you aware of any efforts on the part of the tenant to have those security deposits returned to the landlord?
>
> **A I don't know. I guess that would involve going down and writing a check, right. I don't think that was the tenant – my recollection of the lease it was the tenant's obligation to pay those was not conditioned on any receipt of them back by him from the utility deposit. The tenant just owes the deposit to us. There is no pre conditions to it. I guess I don't know if he has gone down and got a check written from his accounting department or not.**
>
> Q I really have two questions on this. My first question is are you aware of efforts by the tenant to cause the utility company to return those deposits to White Plains; are you aware of it?
>
> **A I am not aware of it, no.**
>
> Q Are you aware of an offer by the tenant HBL to reimburse the landlord for those security deposit?
>
> **A No, I don't recall such an offer but my memory could be refreshed. I just don't remember.**

Nicholson Dep., 147:3-148:3. Debtor has either caused the utility deposits to be returned to the

Lender or proposed to reimburse Landlord. Jozefovic Dec., ¶ 28.

d.      As to the allegations of the failure to pay municipal maintenance escrow, Nicholson

testified as follows:

> Q Paragraph 58, allegation 58 is that "HBL failed to pay municipal maintenance escrow as required by the lease", do you know what you meant when you made that allegation?
>
> ****
>
> **A This is in the same, yes, there were certain -- during the course of construction Josh and Ed told me there were certain deposits that the City of White Plains required for maintenance escrows that we paid that the tenant needs to reimburse us for.**
>
> Q Do you know the amount of that deposit?
>
> **A I would have to refer to documents, John.**
>
> Q Do you have an estimate?
>
> **A I think it is under $10,000 but it's in the order of magnitude under $10,000.**
>
> Q Has White Plains ever issued a bill to HBL for that reimbursement of deposit?

16

**A I don't know. My staff told me we paid it and we are entitled to it back from the tenant.**

Q Do you know if prior to White Plains paying it it ever made a request to the tenant HBL to pay that deposit?

**A I would have to check the records to ascertain that.**

Q As you testify today you are not aware of any request to the tenant to pay that deposit and that a refusal or failure to do so?

**A I don't recall. I have to look at the records. I have to look at the records for that. Given it's under $10,000 I was not intimately involved in the details. I have to rely on my folks for that.**

Q Are you aware of a proposal by HBL to reimburse the landlord for that deposit?

**A No.**

Nicholson Dep., 148:4-149:19.

      e.      As to the allegations regarding the failure to pay utility charges, Nicholson testified

as follows:

Q I will ask you to look at allegation number 59. "HBL failed to pay utility charges as required by the lease". Can you tell me what you mean when you made that allegation?

**A These were when you ask me for an estimate of 57, 57 and 59 I had grouped together. There were a series of deposits and charges surrounding the startup of gas, surrounding the startup of electric, surrounding the date of commencement that were accumulated by Josh and tabulated by Ed inside that estimate that I gave you of 3250 and 59 and 57 are together.**

Q In your experience in the construction industry when there is a hand over of a building from the owner who is constructing it to the tenant taking over various accounts isn't it common that the transition of those accounts require reimbursement to different parties?

**A It is usual and ordinary that there is a true up of sorts, yes.**

Q Other than the utility charges that were paid during the transition to the tenant does this paragraph 59 allege that HBL failed to pay any utility payments since it took occupancy of the building?

**A 59 and 57 are together. Ed Tabor tabulated them. I was not intimately involved with them. I did look at a schedule and the schedule is in the documents. I just I don't have detailed recollection of the specifics of it.**

Nicholson Dep., 149:20-151:3.

f.      As to the allegations regarding the failure to deliver a certificate of insurance,

Nicholson testified as follows:

> Q Let's take a look at your allegation number 60 which "HBL failed or refused to deliver Certificate of Insurance as required by the lease" and what did you mean when you made that allegation?
>
> **A I asked Ed Tabor to do an analysis of the insurance documents that we got from the tenant and I saw a schedule that he prepared which I believe is one of the exhibits in this proceeding that outlined the deficiencies in the insurance.**
>
> Q Did White Plains make a request of the tenant to conform those coverages to the coverages required by the lease?
>
> **A I don't know. I would have to ask Ed. I don't know the answer to that.**
>
> Q But you have verified this Complaint; didn't you?
>
> **A Yes.**

Nicholson Dep. 151:4-22. In fact, all insurance required by the Lease has been put in place as

evidenced by the Certificate of Insurance. Jozefovic Dec., Exhibit 2.

g.      As to the failure to provide the Medicare Provider Agreement, Nicholson testified

as follows:

> Q Allegation number 61, "HBL failed to deliver to WPH Properties all Medicare, Medicaid and other provider agreements and reimbursement rate sheets for the facility, as required by the lease"; what did you mean when you made that allegation?
>
> **A Exactly what it says.**
>
> Q Have you ever received any of those agreements or rate sheets?
>
> **A Ed Tabor advised me that <u>we got them in connection with the litigation</u> through your office and that is the only, and I don't know, I am not sure whether the submission was complete or not but we did get some of them or all of them I don't know in connection with this litigation.**

Nicholson Dep., 152:21-153:11 (emphasis added).

h.      As for the allegations that Debtor failed to deliver financial reporting, Nicholson

testified as follows:

> Q Allegation 63, "HBL failed to deliver to WPH Properties the required financial reporting as required by the lease", what did you mean when you made that allegation?

18

> **A What I mean was if one were to go through the reporting requirements of the lease financial reporting which is if we were to refer to the lease I could testify in detail we did not receive those in the substance or timing as required by the lease.**

Nicholson Dep., 153:12-21.

As the testimony of the Landlord evidences, none of the aforementioned obligations of the Tenant are in default or incapable of simple cure by Debtor.  As the Landlord admits, the only real issue between the parties relates to the security deposits. Although Landlord now purports to have terminated the Lease for failure to deliver the security deposits, Landlord's conduct clearly demonstrates that it did not intend and <u>never intended</u> to terminate the Lease.

### 6. Landlord Never Intended to Terminate the Lease and Waived Its Election by Subsequent Conduct

As discussed *supra*, even though Debtor did not deliver the security deposits to Landlord, Landlord waived this obligation and granted Debtor possession of the Facility by delivering the keys to Debtor before the New York State Department of Health had issued the final permits necessary to admit patients and Debtor was still preparing to commence operations.[36] Certainly, Landlord could have demanded delivery of the security deposits before granting possession. Instead, Landlord accelerated the Commencement Date of the Lease, demanded and collected Fixed Rent and Additional Rent from Debtor, and accepted Debtor's performance of the other obligations under the Lease.

On January 7, 2020, Landlord issued the unauthorized Notice of Default.  While the Notice of Default references both the Lease and the LOI, the alleged defaults refer to the LOI even though the LOI had not been consummated. As stated above, the Notice of Default recites Debtor's failure to deliver a $1,000,000 security deposit, a failure that is completely inconsistent with Debtor's

---

[36] Fensterman Dep., 56:2-5 ("[Debtor] entered into technical possession of the facility in on or around September 18, 17 or 18, when keys were given to [Debtor]."); Nicholson Dep., 93:3-4 ("[T]he keys had been tendered [to Debtor] by September 30.").

obligation under the Lease. Furthermore, Landlord admits that the Notice of Default provided no opportunity for cure even though the Lease requires such a cure period.[37] Yet, Landlord claims that the Notice of Default terminated the Lease because of Debtors defaults, but did not terminate the LOI as a result of the very same defaults.[38]

As evidenced by Landlord's subsequent conduct and statements, the Notice of Default was nothing more than an attempt to strong-arm Debtor into capitulating on its demands for an accounting and credit for the $4,400,000 of cash Debtor had contributed to the Landlord.[39] In fact, Fensterman testified that the purpose of the Notice of Default was as follows:

> **"The purpose of the [Notice of Default] was to put Mr. Jozefovic on notice that he had materially breached both the Lease and the Letter of Intent."**

Fensterman Dep., 93:22-24.

By putting "Mr. Jozefovic on notice" it remains unclear as to what his obligations were with respect to the security deposit set forth in Section 7.1(a)(ii) of the Lease.

The lack of intent to terminate the Lease is further evidenced by Landlord's participation in the negotiation of an Intercreditor Agreement between Debtor, its accounts receivable lender, Security Benefit, and Landlord. Giardino Dec., Exhibit 9. The very purpose of the Intercreditor Agreement was to finance receivables that Debtor would generate from the future operation of the lease premises.

---

[37] Nicholson Dep., 167:2-3.
[38] Nicholson Dep., 191:10-13 ("[The Notice of Default] terminates the lease. I think it is a legal issue as to whether or not the LOI is terminated. I am not -- I have to defer that to my counsel.").
[39] By this time the relationship between Fensterman and Zafrin had deteriorated to the point of physical violence between them. Fensterman Dep., 78:13-15.

From February 2020 through May 2020, Landlord negotiated the terms of the Intercreditor Agreement with Debtor. Jozefovic Dec., ¶ 30. These negotiations continued for months after the Notice of Default and at no time did Landlord assert that the Lease had been terminated or reference a termination in any way. To the contrary, the affirmative acts of the Landlord, including submitting the Intercreditor Agreement to Security Benefit for its approval, clearly indicates that Landlord never considered the Lease terminated. Giardino Dec., Exhibit 10. In fact, Security Benefit gave its approval to the Intercreditor Agreement which meant that it <u>released</u> accounts receivable from the security interest it acquired from Debtor at the time of the project financing. Giardino Dec., Exhibit 10. The record is clear that Landlord never advised Security Benefit of its election to terminate the Lease on January 7, 2020. What is even more compelling is that any defaults by Debtor in the delivery of the security deposits were not material to Security Benefit in any way when it agreed to release its interest in Debtor's accounts receivable.

As evidenced in the written communications between Debtor and Landlord in regard to the Intercreditor Agreement, Landlord repeatedly references the cure of the lease defaults. Giardino Dec., Exhibit 10. The discussions about curing the security deposit issues continued through May 2020 – five (5) months after Landlord's purported election to terminate the Lease. Ultimately, Debtor was unable to satisfy Landlord's demands in relation to the terms of the Intercreditor Agreement and the transaction did not close.

Despite the inability to close the Intercreditor Agreement which provide a means of cash flow to the Debtor, on July 15, 2020, Landlord requested that Security Benefit extend the term of its loan by twelve (12) months. Giardino Dec., Exhibit 4 ("July 15 Letter"). Landlord's representations to its Lender are dispositive of the issues in this case.

21

> **"In addition, to meet the needs of all parties, we are prepared to provide a Direction Letter to the Tenant, which would be irrevocable during the term of the loan, to direct the Tenant to pay Rent to the 1st Mortgage and Mezzanine lenders to the extent of the monthly interest, and the remaining Rent paid directly to the Landlord."**

Giardino Dec., Exhibit 4.

Landlord promised to Security Benefit that it would direct Debtor to pay the monthly installment of rent into the cash management account maintain by Security Benefit <u>for the next twelve (12) months</u>.  This written promise to Security Benefit unequivocally contravenes any intention to terminate the Lease.  If the election to terminate had any validity, which Debtor argues it did not, the July 15 Letter unequivocally extinguishes any effect which could be given to the unauthorized and improper Notice of Default.  What is clear from the record in this case is that Landlord did not discuss the purported termination of the Lease with Security Benefit, did not obtain its consent, and with the July 15, 2020 Letter purposefully avoided disclosure of it.[40]

Security Benefit did not agree to the proposed extension given Landlord's substantial uncured defaults, none of which included the security deposits.  Thereafter Landlord brought the State Court action against Debtor on September 18, 2020.

### 7.  The Election Contained in the January 7th Notice is Unauthorized and Unenforceable

The record is clear that Landlord never obtained the consent of Security Benefit to issue the Notice of Default or to terminate the Lease. Pursuant to Section 3.5(vi) of the Landlord's Loan Agreement with Security Benefit ("Loan Agreement"), Landlord "will not, without prior written consent of [Security Benefit], terminate or consent to the cancellation or surrender of any Lease." Giardino Dec., Exhibit 11. Of importance to the Debtor, Section 11.2 of the Lease states that "All

---

[40] Fensterman Dep., 168:11-14; Nicholson Dep., 85:9-86:4.

provisions contained in the loan documents between [Landlord] and [Security Benefit] . . . shall take precedence over and be in lieu of any contrary provision provided for in this Lease, and in all respects are binding upon Tenant who agrees to and acknowledges the same."

This specific issue was raised by Security Benefit in its action against Landlord, alleging that Landlord "sent a Notice of Termination to the tenant under the Operating Lease in late 2019 or early 2020" in breach of the Loan Agreement. Giardino Dec., Exhibit 12, ¶ 43.

When asked whether Landlord had obtained Security Benefit's consent to terminate the Lease, Fensterman replied "No, I did not."[41]

Not only did Landlord (1) never intend to terminate the Lease and (2) nullify the Notice of Default by its subsequent conduct, but the Notice of Default was also unauthorized and never should have been issued in the first instance.  Not only did Landlord issue the Notice of Default without Security Benefit's consent, Landlord also concealed the existence of the Notice of Default at the time it promised to have Debtor pay future rent payments into Security Benefit's account. Giardino Dec., Exhibit 4.

### 8.  Debtor Substantially Performed Its Lease Obligations and has the Right to Assume

As the factual record reveals, Debtor has fully performed its obligations under the Lease with the exception of the security deposits about which there has been and continues to be a legitimate dispute.  Jozefovic Dec., ¶ 34. Debtor has contributed $6,000,000 to the Facility, in addition to its obligations under the Lease. Jozefovic Dec., ¶ 35.  While Landlord has alleged that Debtor has failed to provide the security deposits, there are no damages as Debtor has performed

---

[41] Fensterman Dep., 168:14.

the obligation for which the security undertaking was intended, *i.e.*, the monthly Fixed Rent Payments.

The disputes over capital contributions, purchased assets, and rent credits, combined with the extreme animosity that later arose between counsel for the parties, have stymied a mutually beneficial resolution to these issues.  Debtor initiated these proceedings to resolve these disputes, assume the Lease, cure any remaining defaults determined by the Court, and continue providing excellent care to its residents.

### 9.  Relevant Transactional Timeline

As the events and transactions between the parties is complex, a summary of significant transactions and chronology is set forth below:

| | |
|---|---|
| **July-August 2017:** | Landlord and Debtor enter into the Lease dated November 19, 2015. |
| **August 17, 2017**: | Debtor provides the executed certification statements to Landlord for the $1.6 million rent security account. |
| **August 18, 2017:** | Landlord and Security Benefit close on the Construction Loan for a total of $38.5 million. |
| **August 22, 2019:** | The City of White Plains issues a Temporary Certificate of Occupancy for the Facility. |
| **August 31, 2019**: | Landlord fails to establish cash management account for as required by its loan agreement. |
| **September 30, 2019**: | Landlord issues notice that Debtor take possession of the Facility. |
| **October 16, 2019**: | Security Benefit issues Notice of Default to Landlord. |
| **October 30, 2019**: | Debtor makes the first Fixed Rent Payment to Landlord of $509,000, pursuant to Section 3.2(a) of the Lease.[42] |

---

[42] HBL SNF, LLC has made twenty-eight (28) consecutive Fixed Rent Payments to White Plains totaling $10,500,000.

**October 30, 2019**:        Landlord fails to direct tenant to pay rent to the cash management account as required by its loan agreement.

**November 5, 2019**:        Security Benefit issues second notice of default to Landlord.

**November 20, 2019**:       Debtor pays $2.2 million to Landlord pursuant to the Letter of Intent.

**December 2, 2019**:        NYSDOH issues a letter finding the Facility substantially complete, retroactive to November 14, 2019, establishing the Commencement Date of the Lease.

**January 7, 2020**:         **Landlord issues Notice of Default.**

**April 1-May 14, 2020:**    Landlord negotiates Intercreditor Agreement pledging receivables from Debtor's operation of the premises with interest to cure defaults.

**April 16, 2020**:          Security Benefit issues third notice to Landlord, stating that Landlord failed to (1) provide monthly payments of interest; and (2) establish a Cash Management Account.

**May 22, 2020**:            Security Benefit issues Notice of Default to Landlord, citing that Landlord has failed to (1) provide monthly payments of interest; (2) establish a Cash Management Account; (3) send a Tenant Direction Notice for direct payment of rent to Security Benefit; (4) provide a $2.2 million payment to Security Benefit, which was received from Debtor; (5) provide financial statements for Landlord; and (6) provide financial statements for each guarantor.

**July 15, 2020:**           Landlord proposes to Security Benefit to "provide a direction letter to the [Debtor]… to direct the [Debtor] to pay rent…" to Security Benefit.

**September 18, 2020:**      Landlord files the Summons and Complaint in Westchester County.

## V.    **LEGAL ARGUMENTS**

### 1.  **Landlord's Summary Request For A Determination That The Lease Is Terminated Must Be Denied**

#### 1.  Standard For Review On Summary Judgment

Under New York law, "the proponent of a summary judgment motion must make a prima facie showing of entitlement to judgment as a matter of law, tendering sufficient evidence to demonstrate the <u>absence of any material issues of fact</u>" (emphasis added). *Smith v Masterson*, 538 F Supp 2d 653, 661 [SDNY 2008], *affd,* 353 Fed Appx 505 [2d Cir 2009] (quoting *Alvarez v. Prospect Hospital,* 68 N.Y.2d 320, 324, 508 N.Y.S.2d 923, 501 N.E.2d 572 (1986)).

Likewise, pursuant to Rule 56(c), incorporated by Bankruptcy Rule 7056(c), summary judgment is warranted "only upon a showing by the movant that . . . there is no <u>genuine issue as to any material fact</u> and that the moving party is entitled to judgment as a matter of law" (emphasis added). *Matter of In re Inflight Newspapers, Inc.*, 423 BR 6, 16 [Bankr EDNY 2010] (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)); *see also Smith v Masterson*, 538 F Supp 2d 653, 656-57 [SDNY 2008], *affd*, 353 Fed Appx 505 [2d Cir 2009].

When considering a motion for summary judgment, "the court's responsibility is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *In re G. Survivor Corp.*, 217 BR 433, 439 [Bankr SDNY 1998] (quoting *Cartier v. Lussier,* 955 F.2d 841, 845 (2d Cir.1992)). Should the non-moving party demonstrate that there is a genuine dispute over a "material fact," *i.e.*, a fact which may "affect the outcome of the suit" such that "a reasonable

jury could return a verdict for the nonmoving party," the motion for summary judgment must be denied. *R.B. Ventures, Ltd. v. Shane,* 112 F.3d 54, 57 (2d Cir.1997).

Finally, the court must resolve all ambiguities and draw all reasonable inferences against the moving party, in this case the Landlord. *See Gibbs–Alfano v. Burton,* 281 F.3d 12, 18 (2d Cir.2002). If there is a factual dispute, the "allegations of the nonmovant are to be taken as true and are to be given the benefit of doubt." *In re G. Survivor Corp.*, 217 BR 433, 439 [Bankr SDNY 1998] (citing *Cruden v. Bank of New York,* 957 F.2d 961, 975 (2d Cir.1992)).

## 2. Landlord Was Prohibited From Terminating The Lease By The Loan Agreement And Its Election Is Unauthorized And Ineffective

Landlord had no right to issue the Notice of Default or terminate the Amended Lease without first prior authorization from Security Benefit, which it failed to obtain.

Given the agreement between the parties, the failure to obtain that consent renders the election to terminate ineffective under the terms of the Lease. In August 2017, Landlord, Security Benefit, and Debtor entered into the Amended Lease and the Loan Agreement. These agreements must be read together as one. *World Wide Polymers, Inc. v Shinkong Synthetic Fibers Corp.*, 03-CV-8843, 2010 WL 3155176, at *15 [SDNY July 30, 2010], *affd,* 694 F3d 155 [2d Cir 2012] ("Typically, instruments that are executed at substantially the same time and relate to the same subject matter are read together as one.") (citing *This Is Me, Inc. v. Taylor,* 157 F.3d 139, 143 (2d Cir.1998)).

The Amended Lease and Loan Agreement constitute an integrated agreement as they were signed at the same time and contain interlocking provisions with both Landlord and Debtor bound to the terms of the Loan Agreement. *Novick v AXA Network, LLC*, 642 F3d 304, 312 [2d Cir 2011] ("[T]he issue of the dependency of separate contracts ... boils down to the intent of the parties.")

27

(quoting *National Union Fire Insurance Company of Pittsburgh, Pa. v. Turtur,* 892 F.2d 199, 205 (2d Cir.1989)); *World Wide Polymers, Inc. v Shinkong Synthetic Fibers Corp.*, 03-CV-8843, 2010 WL 3155176, at *15 [SDNY July 30, 2010], *affd,* 694 F3d 155 [2d Cir 2012] ("In determining whether contracts are separable or entire, the primary standard is the intent manifested, viewed in the surrounding circumstances.") (quoting *Rudman v. Cowles Commc'ns, Inc.,* 30 N.Y.2d 1, 330 N.Y.S.2d 33, 280 N.E.2d 867, 873 (N.Y.1972)).

The Amended Lease and the Loan Agreement were intentionally integrated because both contracts contain an explicit transfer of rights from Landlord to Security Benefit concerning the administration of the Amended Lease. Specifically, Section 11.2 of the Amended Lease subrogates the Amended Lease to the Loan Agreement, stating:

> "All provisions contained in the loan documents between [Landlord] and [Security Benefit] . . . shall take precedence over and be in lieu of any contrary provision provided for in this Lease, and in all respects are binding upon [Debtor] who agrees to and acknowledges the same."

This provision corresponds to Section 4.1 of the Loan Agreement, which "assigns to [Security Benefit] . . . all of [Landlord's] rights in and under all Leases." Finally, and most importantly, Section 3.5(vi) of the Loan Agreement states that Landlord "will not, without prior written consent of [Security Benefit], terminate or consent to the cancellation or surrender of any Lease."

Pursuant to Section 11.2 of the Amended Lease and Section 4.1 of the Loan Agreement, Landlord's rights were subrogated to Security Benefit, and pursuant to pursuant to Section 3.5 of the Loan Agreement, Landlord was prohibited from declaring a default or terminating the Amended Lease, "without the prior written consent of [Security Benefit]." Yet, this is exactly what occurred:

28

"Q To this date have you ever secured the consent of Security Benefit to terminate the lease?"

**A No, I did not**."

Fensterman Dep., 168:11-14.

Landlord could not serve the Notice of Default or terminate the Amended Lease because, as stated in the plain terms of Section 11.2 of the Amended Lease and Sections 3.5 and 4.1 of the Loan Agreement, Landlord failed to obtain Security Benefit's prior, written consent. As Landlord never obtained—and does not currently have—Security Benefit's consent, the Amended Lease was not and cannot be terminated.

### 3. Landlord's Prior Breach Of The Loan Agreement Precludes The Relief Sought Against Debtor

As set forth in the Memorandum, the Landlord defaulted on its loan agreement with Security Benefit before the January 7th Notice of Default and election to terminate. Security Benefit issued two (2) notices of default prior to January 7, 2020. Giardino Dec., Exhibit 5. Landlord admits that these defaults put Debtor's rights under the Lease at risk. Landlord's prior events of non-performance preclude Landlord from seeking this relief against Debtor. Under its loan agreement with Security Benefit, which is specifically incorporated into the Lease, Landlord had no right to issue the election to terminate without the consent of Security Benefit. Its failure to obtain such consent is yet another default. Giardino Dec., Exhibit 12. Not only did Landlord not seek such consent, it concealed its purported election from its lender Security Benefit.  Security Benefit did not, and to this day, will not consent to the termination of Debtor's Lease.

### 4.  Material Factual Issues In Dispute Require Denial Of Landlord's Motion

Factual issues exist about Landlord's allegation of defaults. The record reveals that the majority of the alleged defaults were not defaults at all or were cured.  The only issue involves the security deposits and clear questions of fact exist, including the issue raised by Landlord's defective Notice of Default. Landlord admits that Debtor established the $1,600,000 rent security account. Its allegation is that Debtor did not turn this account over to the sole possession of Landlord. However, Debtor asserts and Landlord acknowledges that Debtor refused to do so because Landlord defaulted on its obligation to repay Debtor $2,200,000 by delivering $1,500,000 in FF&E assets to Debtor and providing a $700,000 rent credit.

These same issues arise in connection with the $3,700,000 Letter of Credit.  Together with the failure to repay the $2,200,000 loan, Debtor paid an additional $2,200,000 in cash to Landlord in November 2019. The Debtor has repeatedly sought credit for these capital contributions in the amount of $4,400,000. Debtor has contributed $6,000,000 to Landlord which must be taken into account in relation to these security deposits.

### 5.  Landlord's Conduct And Statements Waived Any Defaults

Landlord's actions before, during, and after the issuance of the Notice of Default demonstrate that Landlord waived the alleged defaults. Under New York law, parties may "knowingly, voluntarily and intentionally" abandon their contract rights by waiver through "affirmative conduct or by failure to act so as to evince an intent not to claim a purported advantage." *In re Lebenthal Holdings, LLC*, 17-13337, 2019 WL 6379779, at *9 [Bankr SDNY Nov. 27, 2019] (citing *Fund'l Portfolio Advisors, Inc. v. Tocqueville Asset Mgmt., L.P.,* 7 N.Y.3d 96, 104 (2006)).

As Landlord testified, it knew Debtor would not deliver the security undertakings. Nonetheless, it granted Debtor possession of the Leased premises and accepted Debtor as its Tenant. In addition, Landlord collected rent and additional rent without reservation.

> When a landlord accepts rent from a tenant while knowing of a lease violation which would otherwise permit the landlord to terminate the tenancy, New York courts normally deem the violation waived. The "primary reason" for such a rule is the inconsistency inherent in the landlord's treating the tenant as both a tenant (in accepting rent) and as a trespasser (in maintaining the right to terminate the tenancy).

*Ring v Mpath Interactive, Inc.*, 302 F Supp 3d 301, 304 [SDNY 2004], *affd,* 130 Fed Appx 501 [2d Cir 2005] (citing *Woollard v. Schaffer Stores Co.,* 272 N.Y. 304, 5 N.E.2d 829, 832 (1936); *Jefpaul Garage Corp. v. Presbyterian Hosp.,* 61 N.Y.2d 442, 474 N.Y.S.2d 458, 462 N.E.2d 1176, 1178 (1984)).

Courts have consistently held that when "rent is accepted with knowledge of particular conduct which is claimed to be a default, the acceptance of such rent constitutes a waiver by the landlord of the default." *United States v Schmitt*, 999 F Supp 317, 371 [EDNY 1998], *affd,* 28 Fed Appx 63 [2d Cir 2002] (quoting *Atkin's Waste Materials, Inc. v. May,* 34 N.Y.2d 422, 426, 427, 358 N.Y.S.2d 129, 132, 314 N.E.2d 871 (1974)); *see also In re Caldor, Inc.-NY*, 204 BR 855, 860 [Bankr SDNY 1997] ("[A] tenant's breach of a lease covenant may be waived by the acts of a landlord. In fact, during the entire time that Newburgh claims Caldor was in breach of The Lease, it continued to accept rental payments from Caldor.").

Therefore, Landlord waived its rights by having actual knowledge of the alleged defaults when it accepted Debtor as its Tenant when it granted possession and accepted rent payments each month without dispute for nearly one year before commencing litigation. To date, Landlord has accepted twenty-eight (28) Fixed Rent Payments.

**2.** **On The Record Before It, This Court Must Find As A Matter Of Law That The Lease Was Not Terminated As Of November 1, 2021**

Although factual issues arise in regard to Landlord's claim that it terminated the Lease with Debtor, there are <u>no</u> issues of fact as to the following issues which are the basis to determine that the Lease was not terminated:

1) the Landlord did not have the consent of Security Benefit to issue the Notice of Default and Election to Terminate,

2) Landlord was in default of its loan agreement <u>prior to</u> the January 7, 2020 Notice of Default,

3) after the January 7, 2020 Notice of Default, Landlord accepted performance by Debtor including the payment of rent and additional rent,

4) after January 7, 2020, Landlord never demanded surrender of the Leased premises by Debtor,

5) Landlord expressly sought approval from Security Benefit of the Intercreditor Agreement associated with Debtor's continued tenancy of the Leased premises,

6) Landlord engaged in discussions directed at curing defaults, and

7) Landlord communicated to Security Benefit on July 15, 2020 that the Lease was in effect and that it would direct Debtor to make rent payments to the Security Benefit cash money account.

On the basis of these <u>undisputed</u> facts, this Court should determine as a matter of law that the Lease was not terminated as of November 1, 2020 and that Debtor may move to assume the Lease in these proceedings.

## VI.    **CONCLUSION**

For the foregoing reasons, Debtor HBL SNF, LLC respectfully requests that the Court (i) deny the Motion in its entirety, and (ii) find that the Lease has not been terminated, remains in effect, and may be assumed by Debtor, together with such other and further relief as this Court deems just, proper, and equitable.

Dated:    New York, New York
February 11, 2022

**MICHELMAN & ROBINSON, LLP**

By:    */s/ John Giardino*
John Giardino
800 Third Avenue, 24th Floor
New York, NY 10022
Tel: (212) 730-7700
Fax: (212) 730-7725

*Proposed Special Counsel to the Debtor and Debtor in Possession*

-and-

**KLESTADT WINTERS JURELLER
SOUTHARD & STEVENS, LLP**

By:    */s/ Tracy L. Klestadt*
Tracy L. Klestadt
Brendan M. Scott
Christopher Reilly
200 West 41st Street, 17th Floor
New York, New York 10036-7203
Tel: (212) 972-3000
Fax: (212) 972-2245
Email: tklestadt@klestadt.com
        bscott@klestadt.com
        creilly@klestadt.com

*Attorneys for Debtor and Debtor in possession*

33