# **Exhibit 1**

SUPREME COURT OF THE STATE OF NEW YORK

COUNTY OF WESTCHESTER

--------------------------------------------x

WHITE PLAINS HEALTHCARE PROPERTIES I, LLC,

                         Plaintiff(s),

                              Index No. 60278/2020

           -against-

HBL SNF, LLC, LIZER JOZEFOVIC a/k/a

LIZER JOZOFOVIC and MARK NEUMAN,

                         Defendant(s).

--------------------------------------------x

                   January 11, 2022

                   10:04 a.m.


               VIDEO CONFERENCED EXAMINATION BEFORE

TRIAL of Plaintiff WHITE PLAINS HEALTHCARE

PROPERTIES I, LLC by HOWARD FENSTERMAN, ESQ.,

pursuant to Order, before Laura B. Lowenthal, a

Notary Public within and for the State of New

York.

```
 (1)
 (2)        A P P E A R A N C E S:
 (3)
            DELBELLO, DONNELLAN, WEINGARTEN, WISE &
 (4)        WIEDERKEHR, LLP
            Attorneys for Plaintiff(s)
 (5)          One North Lexington Avenue
              White Plains, New York 10601
 (6)
            BY: ALFRED DONNELLAN, ESQ.
 (7)          E-mail:  aed@ddw-law.com
 (8)
            MICHELMAN & ROBINSON, LLP
 (9)        Attorneys for Defendant(s) HBL SNF, LLC, LIZER
            JOZEFOVIC a/k/a LIZER JOZOFOVIC and MARK
(10)        NEUMAN
              800 Third Avenue, 24th Floor
(11)          New York, New York 10022
(12)        BY: JOHN GIARDINO, ESQ.
              E-mail:  jgiardino@mrllp.com
(13)
            BY:  ALEX BARNETT-HOWELL, ESQ.
(14)
(15)
            KLESTADT, WINTERS, JURELLER, SOUTHARD &
(16)        STEVENS, LLP
            Attorneys for Defendant(s) HBL SNF, LLC
(17)          200 West 41st Street, Floor 17
              New York, New York 10036-7209
(18)
            BY: BRENDAN SCOTT, ESQ.
(19)          E-mail:  bscott@klestadt.com
(20)
         ALSO PRESENT:
(21)
            ONLINE NOTARY.US
(22)        Document Handler
(23)        BY: CLAUDIA M. GOETZ, Document Handler
              E-mail:  cimgoetz@icloud.com
(24)
(25)
```

(1)

(2)    **ALSO PRESENT:**

(3)        **Lizer Jozefovic**

(4)        **Joe Jozefovic**

(5)        **Ari Kresimann**

(6)

(7)

(8)

(9)

(10)

(11)

(12)

(13)

(14)

(15)

(16)

(17)

(18)

(19)

(20)

(21)

(22)

(23)

(24)

(25)

(1)

(2)                        STIPULATIONS

(3)

(4)         IT IS HEREBY STIPULATED AND AGREED by

(5)    and between(among) counsel for the respective

(6)    parties hereto, that:

(7)

(8)         All rights provided by the C.P.L.R.,

(9)    including the right to object to any question,

(10)   except as to form, or to move to strike any

(11)   testimony at this(these) examination(s), are

(12)   reserved, and, in addition, the failure to object

(13)   to any question or to move to strike any

(14)   testimony at this(these) examination(s) shall not

(15)   be a bar or waiver to make such motion at, and is

(16)   reserved for the trial of this action;

(17)

(18)         IT IS FURTHER STIPULATED AND AGREED by

(19)   and between(among) counsel for the respective

(20)   parties hereto, that this(these) examination(s)

(21)   may be sworn to by the witness(es) being

(22)   examined, before a Notary public other than the

(23)   Notary Public before whom this(these)

(24)   examination(s) was(were) begun; but the failure

(25)   to do so, or to return the original of

(1)

(2)     this(these) examination(s) to counsel, shall not

(3)     be deemed a waiver of the rights provided by

(4)     Rules 3116 and 3117 of the C.P.L.R., and shall be

(5)     controlled thereby;

(6)

(7)             IT IS FURTHER STIPULATED AND AGREED by

(8)     and between(among) counsel for the respective

(9)     parties hereto, that this(these) examination(s)

(10)    may be utilized for all purposes as provided by

(11)    the C.P.L.R.;

(12)

(13)            IT IS FURTHER STIPULATED AND AGREED by

(14)    and between(among) counsel for the respective

(15)    parties hereto, that the filing and certification

(16)    of the original of this(these) examination(s)

(17)    shall be and the same hereby are waived;

(18)

(19)            IT IS FURTHER STIPULATED AND AGREED by

(20)    and between(among) counsel for the respective

(21)    parties hereto, that all rights provided by the

(22)    C.P.L.R., and Part 221 of the Uniform Rules for

(23)    the Conduct of Depositions, including the right

(24)    to object to any question, except as to form, or

(25)    to move to strike any testimony at this

(1)

(2)     examination is reserved; and in addition, the

(3)     failure to object to any question or to move to

(4)     strike any testimony at this examination shall

(5)     not be a bar or waiver to make such motion at,

(6)     and is reserved to, the trial of this action;

(7)

(8)             IT IS FURTHER STIPULATED AND AGREED by

(9)     and between(among) counsel for the respective

(10)    parties hereto, that a copy of the within

(11)    examination(s) shall be furnished to counsel

(12)    representing the witness(es) testifying, without

(13)    charge.

(14)                     *   *   *

(15)

(16)

(17)

(18)

(19)

(20)

(21)

(22)

(23)

(24)

(25)

January 11, 2022

(1)

(2)                    VIDEOCONFERENCE STIPULATION

(3)

(4)              IT IS HEREBY STIPULATED AND AGREED by

(5)    and between counsel for all parties present that

(6)    pursuant to the CPLR section 3113(d) this

(7)    deposition is to be conducted by video

(8)    conference, that the court reporter, all counsel,

(9)    and the witness are all in separate remote

(10)   locations and participating via videoconference

(11)   (LegalView/Zoom) meeting under the control of

(12)   Lexitas Court Reporting Service, that the officer

(13)   administering the oath to the witness need not be

(14)   in the place of the deposition and the witness

(15)   shall be sworn in remotely by the court reporter

(16)   after confirming the witnesses identity, that

(17)   this videoconference will not be recorded in any

(18)   manner and that any recording without the express

(19)   written consent of all parties shall be

(20)   considered unauthorized, in violation of law, and

(21)   shall not be used for any purpose in this

(22)   litigation or otherwise.

(23)              IT IS FURTHER STIPULATED that exhibits

(24)   may be marked by the attorney presenting the

(25)   exhibit to the witness, and that a copy of any

(1)

(2)     exhibit presented to a witness shall be e-mailed

(3)     to or otherwise in possession of all counsel

(4)     prior to any questioning of a witness regarding

(5)     the exhibit in question. All parties shall bear

(6)     their own costs in the conduct of this deposition

(7)     by videoconference, notwithstanding the

(8)     obligation by CPLR to supply a copy of the

(9)     transcript to the deposed party by the taking

(10)    party in civil litigation matters.

(11)

(12)

(13)

(14)

(15)

(16)

(17)

(18)

(19)

(20)

(21)

(22)

(23)

(24)

(25)

(1)

(2)  H O W A R D   F E N S T E R M A N ,   E S Q .,

(3)      called as a witness, having been first duly

(4)      sworn by a Notary Public, was examined and

(5)      testified as follows:

(6)  EXAMINATION BY

(7)  **MR. GIARDINO:**

(8)      Q    Can you please state your full name

(9)  for the record?

(10)      **A    Howard Fensterman, Esq.**

(11)      Q    Can you please state your current work

(12)  address for the record?

(13)      **A    I work at 3 Dakota Drive, Third Floor,**

(14)  **Lake Success, New York  11042.**

(15)      Q    Good morning, Mr. Fensterman. As you

(16)  know my name is John Giardino. I am here with

(17)  Alex Barnett-Howell from Michelman & Robinson to

(18)  conduct this deposition this morning.

(19)          Do you prefer Mr. Fensterman or Howard

(20)  for purposes of this deposition?

(21)      **A    Howard is fine.**

(22)      Q    Howard, I sort of apologize in advance

(23)  for the awkwardness of our setup here in the

(24)  conference room, our video is over here, our

(25)  audio is over here, so it's a little bit of an

(1)                H. Fensterman, Esq.

(2)    awkward setup.

(3)            If you don't understand a question

(4)    that I am asking you let me know. I will restate

(5)    it.

(6)        **A    I can tell you already that you're**

(7)    **breaking up.**

(8)        Q    Howard, this morning it is my

(9)    understanding that you're testifying on behalf of

(10)   the plaintiff in this action White Plains

(11)   Healthcare Properties I, LLC; is that correct?

(12)       **A    I will ask my counsel because I don't**

(13)   **know what capacity I have been asked to come here**

(14)   **today.**

(15)           **MR. DONNELLAN:   We received a Notice**

(16)           **of Deposition and he is a principal in**

(17)           **that company.  That is correct.**

(18)       Q    So your testimony is on behalf of

(19)   White Plains Healthcare Properties I; can we

(20)   agree on that?

(21)           **THE WITNESS:  Yes, but am I also named**

(22)           **individually, Al, in the case and am I**

(23)           **being deposed on that basis as well?**

(24)           **MR. DONNELLAN:   Well, let me think**

(25)           **about that for a minute.  Because in**

(1)                H. Fensterman, Esq.

(2)           the original -- in the case pending in

(3)           Supreme Court there is a cross claim

(4)           by them. I don't recall whether that

(5)           has been moved over to Federal Court.

(6)           MR. GIARDINO:   I can make this easy.

(7)           I will stipulate that today's

(8)           examination relates only to White

(9)           Plains Healthcare Properties as the

(10)          claimant and its dealings with and has

(11)          no connection to any claims against

(12)          Mr. Fensterman personally.

(13)          MR. DONNELLAN:   As I understand it we

(14)          have expedited discovery for the

(15)          purpose of dealing with the

(16)          termination issue and the motions that

(17)          are coming up before the bankruptcy

(18)          court.

(19)          MR. GIARDINO:   That is correct.  And

(20)          my examination is really addressed to

(21)          the issue of termination of the lease

(22)          and anything related to that.  It has

(23)          nothing to do with any of the

(24)          counterclaims, it has nothing to do

(25)          with any of the claims against any

(1)                H. Fensterman, Esq.

(2)           other parties.

(3)           MR. DONNELLAN:    That is correct. We

(4)           agree.

(5)           THE WITNESS:  John, can I just make a

(6)           suggestion.  As you're looking at I

(7)           guess the camera at me that is where

(8)           your voice is going at because I guess

(9)           your microphone is in front of you and

(10)          the camera is to the side of you so

(11)          just for technical reasons I am just

(12)          telling you I see that happening.

(13)          THE WITNESS:  As I said, we have a

(14)          pretty screwy setup here so I think

(15)          let me see if I can make a better

(16)          arrangement.

(17)     Q    Howard, what is your relationship to

(18) White Plains Healthcare Properties I LLC?

(19)     A    I am one of the managing members.

(20)     Q    For purposes of examination I am going

(21) to refer to that entity as White Plains as we go

(22) forward; is that acceptable?

(23)     A    Yes.

(24)     Q    How many managing members are there of

(25) White Plains?

(1)                    H. Fensterman, Esq.

(2)        **A**      **Two.**

(3)        Q      Who is the other managing member?

(4)        **A**      **Bill Nicholson.**

(5)        Q      Are you managing members in your

(6)   individual capacity?

(7)        **A**      **Yes, we are managing members by virtue**

(8)   **of the fact that we are members of the**

(9)   **enterprise.**

(10)       Q      How many members are there of the

(11)  enterprise?

(12)       **A**      **I don't recall.**

(13)       Q      Do you have an estimate?

(14)       **A**      **At least ten.**

(15)       Q      Do you know when White Plains was

(16)  actually formed?

(17)       **A**      **I do not. I apologize.**

(18)       Q      Do you have an estimate approximate

(19)  year in which it may have been formed?

(20)       **A**      **I am sorry. I don't. I don't. But if**

(21)  **you would like me to find that out I am happy to.**

(22)       Q      Did you or your firm play a role in

(23)  performing White Plains as an entity?

(24)       **A**      **I don't know whether we did or not.**

(25)       Q      Do you know if White Plains operates

(1)                    H. Fensterman, Esq.

(2)    pursuant to an Operating Agreement or any other

(3)    governing document?

(4)        **A      I am not sure whether we have an**

(5)    **executed Operating Agreement. I know there was a**

(6)    **draft of one. I don't know whether it was ever**

(7)    **signed.**

(8)        Q      Are you familiar with the terms of

(9)    that Operating Agreement whether it was signed or

(10)   not?

(11)       **A      I don't have a recollection.  No, I**

(12)   **don't.  Not as I sit here.**

(13)       Q      What are your responsibilities to

(14)   White Plains as a managing member?

(15)       **A      Right now my only responsibility is**

(16)   **basically as it relates to this litigation as my**

(17)   **particular responsibility. That would be it for**

(18)   **right now.**

(19)       Q      Are you referring to things you

(20)   actually do or are you referring to your duties

(21)   under any sort of governing document?

(22)       **A      No, this would not be under any sort**

(23)   **of governing document because no one contemplated**

(24)   **I imagine that we would in bankruptcy court at**

(25)   **the time but by virtue of my background my**

(1)                    **H. Fensterman, Esq.**

(2)     **responsibility as of now is to assist in managing**

(3)     **the litigation against the entity and Mr.**

(4)     **Jozefovic and Mr. Neuman.**

(5)         Q     Other than managing this litigation do

(6)     you have any other duties to the White Plains

(7)     entity?

(8)         **A     Other than managing the litigation?**

(9)         Q     Yes.

(10)        **A     At this juncture, no.**

(11)        Q     At some other time did you have duties

(12)    to perform for the benefit of the entity?

(13)        **A     I would say at the time that the**

(14)    **construction was going on just to basically**

(15)    **advise those other members of the entity as to**

(16)    **the status of the construction, the status of the**

(17)    **tenant and the litigation.**

(18)        Q     So how did you actually go about doing

(19)    that?

(20)        **A     Telephonically.**

(21)        Q     Did you ever prepare any written

(22)    reports to the members of White Plains about the

(23)    activities of the entity?

(24)        **A     I did, I remember sending a letter to**

(25)    **them after the Letter of Intent was signed. I am**

(1)                    **H. Fensterman, Esq.**

(2)    **referencing I believe it is the November 20, 2019**

(3)    **Letter of Intent.**

(4)        Q    To your recollection is that the only

(5)    writing you ever presented to the members of the

(6)    White Plains LLC?

(7)        **A    There may have been others but right**

(8)    **now that is the one that I recall. It is**

(9)    **certainly the most recent one.**

(10)       Q    Did the Letter of Intent from November

(11)   of 2019 require the approval of the members

(12)   before it was signed?

(13)       **A    No.**

(14)       Q    Do you know what acts are required,

(15)   required the approval of the members?

(16)       **A    I don't as I sit here, no.**

(17)       Q    Do you know if the borrowing of money

(18)   requires the consent of the members?

(19)       **A    No, I don't recall.**

(20)       Q    Do you know if the disposition of the

(21)   assets requires the consent of the members?

(22)       **A    I do not know.**

(23)       Q    Is that Operating Agreement whether it

(24)   is signed or not signed a document that you keep

(25)   in your file concerning the White Plains venture?

(1)                     H. Fensterman, Esq.

(2)        **A      I don't personally maintain a file**

(3)    **regarding the venture.**

(4)        Q     Who would maintain any records of the

(5)    Operating Agreement or communications with the

(6)    members?

(7)        **A      Communications with the members would**

(8)    **be maintained by my secretary, Executive**

(9)    **Assistant, and the other documents would be by**

(10)   **one of the corporate lawyers in my firm.**

(11)       Q     Fair to say those records are then

(12)   controlled by your law firm?

(13)       **A      Some of them perhaps. The attorney**

(14)   **that handled the transaction was an attorney**

(15)   **named Jerry Billows. He was not with my firm.  He**

(16)   **is with the law firm of Arent Fox.**

(17)       Q     Other than your role as the managing

(18)   member as one of the two managing members of

(19)   White Plains do you have any other relationship

(20)   to the entity?

(21)       **A      Well I am a member of the entity.**

(22)       Q     Do you have any other relationship?

(23)             Are you a lender to the entity?

(24)       **A      I am an investor in the entity. I am**

(25)   **an equity member, yes.**

(1)                    **H. Fensterman, Esq.**

(2)        Q      That investment is through your

(3)    understanding as a member; is that correct?

(4)        **A      Yes, yes.**

(5)        Q      Do you also act as counsel to the

(6)    entity?

(7)        **A      I act as one of the counsel to the**

(8)    **entity.  When I say me it's Abrams Fensterman.  I**

(9)    **personally have not been involving myself as an**

(10)   **attorney in connection with this transaction**

(11)   **except under limited circumstances.**

(12)       Q      I stipulated earlier on the record

(13)   that this examination is not about any

(14)   counterclaims or claims against you personally

(15)   but I do want to ask you whether or not you have

(16)   ever acted as counsel to Lizer Jozefovic?

(17)       **A      I have never personally -- my law firm**

(18)   **has never represented Lizer Jozefovic personally,**

(19)   **no.**

(20)       Q      How long have you known Mr. Jozefovic?

(21)       **A      I believe that I know him some time in**

(22)   **the middle 2000s.**

(23)       Q      Do you recall how it was that you came

(24)   to meet him?

(25)       **A      I believe that I met him initially**

(1)               H. Fensterman, Esq.

(2)   through Mr. Mark Zafrin.

(3)        Q    What was the nature of your

(4)   interaction with Mr. Jozefovic at that period of

(5)   time?

(6)        A    The only recollection I have is that

(7)   we have it in our law firm we do what I will call

(8)   medicaid collection work on behalf of nursing

(9)   homes to help them collect their receivables and

(10)  Mark was seeking, Mark at that time was a partner

(11)  in Abrams Fensterman, and he was seeking to bring

(12)  at that time that particular business into the

(13)  firm as well as other business that he had

(14)  previously had with Mr. Jozefovic.

(15)       Q    Was the White Plains venture business

(16)  that Mr. Zafrin was looking to bring into the

(17)  firm?

(18)       A    Mr. Zafrin was looking to create a

(19)  venture but it was not called White Plains at

(20)  that time.

(21)            He was looking to develop or introduce

(22)  Lizer Jozefovic into the development of a nursing

(23)  home that he wanted to bring into the law firm

(24)  ultimately but he, Mark, was doing it to try to

(25)  help Lizer in business.

(1)                     **H. Fensterman, Esq.**

(2)          Q      Was there a time that you spoke to Mr.

(3)    Jozefovic about the development of a nursing home

(4)    facility?

(5)          **A      I spoke to him a few months before Mr.**

(6)    **Zafrin left my law firm on July 15, 2010 to go to**

(7)    **your law firm Michelman & Robinson and that is my**

(8)    **recollection as I sit here.**

(9)                     **Then naturally we would have**

(10)   **conversations we would have meetings. There would**

(11)   **be a meeting with Mr. Zafrin representing Mr.**

(12)   **Jozefovic and myself and Bill Nicholson either**

(13)   **telephonically occasionally, telephonically or**

(14)   **occasionally in person.**

(15)         Q      Do you have any other experience in

(16)   the development of nursing home facilities?

(17)         **A      In the actual building of a nursing**

(18)   **home facility, the only -- the only experience I**

(19)   **had was in connection with my being a lawyer but**

(20)   **not directly, no.**

(21)         Q      Other than the construction other

(22)   aspect of development of the financing of nursing

(23)   homes did you have any other experience in the

(24)   financing of nursing homes?

(25)         **A      In the financing of nursing homes,**

(1)                    H. Fensterman, Esq.

(2)    sure.  Over the years I have personally been an

(3)    investor in acquiring nursing homes.  So as far

(4)    as getting financing to buy those nursing homes I

(5)    had experience in that.

(6)         Q      Are you able to estimate the number of

(7)    transactions that you participated in that

(8)    related to the financing of nursing homes?

(9)         A      When I say participate I say that that

(10)   was for existing buildings that we were acquiring

(11)   so it was not, I don't want to confuse you, in

(12)   starting a nursing home from scratch. But the

(13)   answer --

(14)        Q      I understood.

(15)        A      The answer to that would be at least

(16)   ten. At least ten or more.

(17)        Q      When you say when we were acquiring

(18)   who is we?

(19)        A      Well I had various partners over the

(20)   years that I went into various nursing homes

(21)   transaction deals with.

(22)        Q      Those are deals in that you have an

(23)   equity interest?

(24)        A      Yes, I require an equity interest in

(25)   the nursing homes.

(1)                    **H. Fensterman, Esq.**

(2)        Q    Did you serve as a managing member of

(3)    any of those ventures that you just described?

(4)        **A    Yes.**

(5)        Q    How many of those ventures would you

(6)    estimate you served as the managing member?

(7)        **A    Are you asking me the ventures or the**

(8)    **nursing homes themselves?**

(9)        Q    The ventures?

(10)       **A    The ventures, I would say in excess of**

(11)   **five.**

(12)       Q    You raise a good point.

(13)            There is a difference between managing

(14)   the ownership of a nursing facility and the

(15)   actual management of the home itself; is that

(16)   correct?

(17)       **A    Well, no, the way that the**

(18)   **transaction -- if you are asking me the**

(19)   **distinction, the distinction is a nursing home**

(20)   **there is an operating company and there is a real**

(21)   **estate company. Sometimes they're owned by the**

(22)   **same people on other times they're not.**

(23)       Q    Have you ever been the managing member

(24)   of an operating company?

(25)       **A    Yes.**

(1)                    **H. Fensterman, Esq.**

(2)        Q      How many operating companies have you

(3)    been a managing member of?

(4)        **A      Again in excess of five.**

(5)        Q      Do you know the names of them?

(6)        **A      I know the names of a couple of them.**

(7)    **I don't know the formal corporate names of all of**

(8)    **them.**

(9)        Q      Can you just identify however you wish

(10)    to those ventures in which you're a managing

(11)    member?

(12)        **A      Which I currently am or I was?**

(13)        Q      Well let's say that you have both?

(14)        **A      One was Grace Plaza Nursing Home in**

(15)    **Great Neck.**

(16)            **Now you're asking me about operations,**

(17)    **not real estate; correct, John?**

(18)        Q      About operations right now, yes.

(19)        **A      Grace Plaza Nursing Home in Great**

(20)    **Neck, New York. A number of nursing homes in**

(21)    **California but I don't know their names.**

(22)        Q      As far as the real estate entities are

(23)    concerned in how many of the real estate entities

(24)    have you served as a managing member?

(25)        **A      Grace Plaza Nursing Home in Great**

(1)                  H. Fensterman, Esq.

(2)     Neck.

(3)              Are you asking me how many without

(4)     naming?

(5)          Q     Yes.

(6)          A     In excess of five.

(7)          Q     I take it that there is a relationship

(8)     between the real estate entity and the operating

(9)     company; is that correct?

(10)         A     What do you mean by -- I just ask that

(11)    you explain the question.  What do you mean by a

(12)    relationship?

(13)         Q     Well would it be fair to say the

(14)    development of one of these facilities as an

(15)    entity that owns the real estate asset and leases

(16)    those assets to the operating company?

(17)         A     Yes, but you are using the word

(18)    development.

(19)              MR. DONNELLAN:   Which entity are you

(20)              talking about?

(21)              MR. GIARDINO:  I am talking about

(22)              generally, just the general structure

(23)              of the transaction he is describing if

(24)              that is fair. If it's not he can tell

(25)              me.

(1)              H. Fensterman, Esq.

(2)              MR. DONNELLAN:   Objection to the form

(3)              of the question because it's just not

(4)              it is so general and not specific

(5)              every entity may be different. It is

(6)              an unfair question.  If you want to

(7)              ask him about a specific transaction

(8)              that makes sense but to generalize

(9)              about how deals or his deals were done

(10)             it is just too broad.

(11)        Q    I will ask it this way.

(12)             Is there a generalized approach to the

(13)   ownership of these types of facilities in your

(14)   experience?

(15)             MR. DONNELLAN:   Again, for which?

(16)             For his facilities or you are talking

(17)             broader than his own experience?

(18)             MR. GIARDINO:  That he has been

(19)             involved in as a managing member.

(20)             MR. DONNELLAN:   The ones that he is

(21)             involved in?

(22)             MR. GIARDINO:  As a managing member.

(23)             And look, I am not trying to trip

(24)             anybody up.  I am trying to get a

(25)             sense of the structure of these

(1)                    **H. Fensterman, Esq.**

(2)            **transactions.**

(3)      **A      The structure of the transactions are**

(4)  **you have a real estate entity and you have an**

(5)  **operating entity and there is at least between**

(6)  **the two and sometimes the parties in both the**

(7)  **real estate and the operating entity are the same**

(8)  **and other times they're not.**

(9)      Q      So turning your attention to White

(10)  Plains specifically in this instance the

(11)  ownership of the real estate is different than

(12)  the ownership of the operating company; is that

(13)  correct?

(14)      **A      Correct.**

(15)      Q      You have been describing your role as

(16)  a managing member in nursing homes that were

(17)  already operating and acquired.

(18)          Have you participated in the ground up

(19)  development as you described it of a nursing

(20)  facility?

(21)      **A      Besides White Plains?**

(22)      Q      Besides White Plains?

(23)      **A      No, I have not.**

(24)      Q      Just to be clear, White Plains

(25)  involved the development of a new facility from

(1)                    H. Fensterman, Esq.

(2)  the ground up; correct?

(3)      **A      Yes, it did.**

(4)      Q      Were there ever any discussions in

(5)  White Plains that the owner of the real estate

(6)  entity would include the same individuals as the

(7)  ownership of the operating entity?

(8)      **A      Of all the individuals in the real**

(9)  **estate owning the operations, is that your**

(10) **question?**

(11)     Q      No, I will ask it this way.

(12)            Was there ever any discussions that

(13) the owners of the operating company would also be

(14) owners of the real estate entity?

(15)            **MR. DONNELLAN:   In the White Plains**

(16)            **deal you're talking about?**

(17)            **MR. GIARDINO:  Yes, we are talking**

(18)            **about White Plains.**

(19)     **A      I don't have any recollection of there**

(20) **being any conversations to that extent other than**

(21) **the fact that the lease provided, the first lease**

(22) **provided, an ability to purchase the real estate**

(23) **and the second lease provided a right of first**

(24) **refusal to purchase the real estate.  So to that**

(25) **extent the operator meaning Mr. Jozefovic and Mr.**

January 11, 2022

(1)                        H. Fensterman, Esq.

(2)    Neuman were going to be able to come into it.

(3)              And then ultimately there was a Letter

(4)    of Intent that was signed on November 20, 2019

(5)    where the whole thing was going to be put into

(6)    what Mr. Zafrin structured and suggested as a

(7)    Delaware statutory trust and we were going to be

(8)    partners in that my group and Mr. Jozefovic were

(9)    going to be partners in that to the extent of the

(10)   respective percentages outlined in that

(11)   agreement.

(12)      Q    Was the LOI the first time there was

(13)   any discussion about common ownership of the

(14)   assets and the operating company?

(15)      A    As I said, I don't recall any. The

(16)   transaction there was many, many discussions over

(17)   the years but I don't think ultimately were all

(18)   included in the written documents that you have

(19)   which are the lease that was signed in 2015 and

(20)   then the Amended Lease in 2017 and all of the

(21)   conversations ultimately that were had ended up

(22)   in those two documents, the 2017 superseding the

(23)   2015 and then that was attempted was further

(24)   modified to the extent that it was with the lease

(25)   surviving in the Letter of Intent of November 20.

(1)                    H. Fensterman, Esq.

(2)    So any of the conversations that were had

(3)    ultimately found themselves in those documents

(4)    that I just alluded to.

(5)        Q    What was the status of the White

(6)    Plains development project when you first learned

(7)    of it?

(8)        A    Well I was in it on the very

(9)    beginning.  So the status of it it was no

(10)   project. It evolved into a project over a course

(11)   of years.

(12)       Q    What were the steps that needed to be

(13)   taken in order to evolve the project over that

(14)   period of years?

(15)       A    Money had to be raised initially and

(16)   then approvals had to obtained so that the

(17)   Department of Health Public Health and Planning

(18)   Council of the State of New York would approve

(19)   the project.

(20)            Once that was done approvals had to be

(21)   obtained from the municipalities and there was an

(22)   interim period where further approval had to be

(23)   obtained from the Department of Health.

(24)            And then the project had to be

(25)   constructed with municipal approvals, Department

(1)                    H. Fensterman, Esq.

(2)    of Health approvals, all of which had to be

(3)    accomplished before construction could start and

(4)    then there was construction thereafter there was

(5)    the approvals that needed to be obtained to get a

(6)    Certificate of Occupancy, Temporary Certificate

(7)    of Occupancy, and then a permanent Certificate of

(8)    Occupancy and the Department of Health approval

(9)    all of which were accomplished.

(10)        Q      Did you play any role in the raising

(11)   of money for the project?

(12)        A      Yes, I did.

(13)        Q      What role did you play?

(14)        A      I was the individual in the

(15)   partnership responsible for raising the money.

(16)        Q      When you say in the partnership what

(17)   are you referring to partnership?

(18)        A      Partnership was myself and Bill

(19)   Nicholson.

(20)        Q      How did you go about raising the

(21)   money?  What do you mean by that?

(22)        A      I would communicate with friends and

(23)   family and ask them if they were interested in

(24)   investing in the project.

(25)        Q      What was the nature of the investments

(1)                    H. Fensterman, Esq.

(2)    that you were seeking for the project?

(3)        **A      Well initially they were considered to**

(4)    **be loans and those loans were ultimately**

(5)    **converted into equity.**

(6)        Q      When you raised those monies did you

(7)    use a convertible note?

(8)        **A      I don't believe that that was the**

(9)    **instrument that was used.**

(10)       Q      Do you recall what instrument was

(11)   used?

(12)       **A      I don't, no.  I am not even certain**

(13)   **that there was a note that was used initially. I**

(14)   **don't recall. It goes back almost ten years now.**

(15)       Q      Do you know in what period of time

(16)   those loans were converted to equity?

(17)       **A      I believe they were converted -- had**

(18)   **to be converted, you don't want me to guess but**

(19)   **if you don't want me to guess I won't be able to**

(20)   **answer the question but I can try to piece it**

(21)   **together for you.**

(22)       Q      What is your best bet knowing the

(23)   evolution of the project as to when the lenders

(24)   to the project converted their loans to equity?

(25)       **A      It would be some time in 2015 and**

(1)                    **H. Fensterman, Esq.**

(2)     **2017.**

(3)         Q       Is it your recollection that that

(4)     conversion took place before the construction of

(5)     the project?

(6)         **A       Yes.**

(7)         Q       Were there any documents that

(8)     memorialized that conversion from debt to equity

(9)     for those who contributed money to the project?

(10)        **A       I don't believe that there were, no,**

(11)    **it was just me advising them that that is what we**

(12)    **were doing.**

(13)        Q       Did you advise them in that manner in

(14)    writing?

(15)        **A       No.**

(16)        Q       When you talk about money raised do

(17)    you also -- are you also referring to borrowed

(18)    institutional borrowing for the project?

(19)        **A       No, I am not referring to**

(20)    **institutional borrowing to start the project, no.**

(21)        Q       One of the steps for this development

(22)    project the actual project financing itself?

(23)        **A       I am sorry, John, repeat the question.**

(24)        Q       You enumerated a number of steps.

(25)        **A       Right.**

(1)                    **H. Fensterman, Esq.**

(2)        Q       Raising money, approval from the

(3)    State, construction, was also one of the steps

(4)    during the project financing, securing the

(5)    project financing?

(6)        **A       Well initially we were not securing**

(7)    **the project financing.   That was being undertaken**

(8)    **by Mark Zafrin.**

(9)                **When he failed to do that Mr.**

(10)   **Nicholson undertook to obtain a loan from an**

(11)   **insurance company, a mez loan, and it was handled**

(12)   **by Mr. Nicholson.**

(13)       Q       Would it be fair to say Mr. Nicholson

(14)   handled that aspect of the project development?

(15)       **A       He secured, yes, it is fair to say**

(16)   **that Nicholson secured the construction financing**

(17)   **in the face of Mr. Zafrin not producing what he**

(18)   **represented he was going to produce.**

(19)       Q       Do you know who actually provided the

(20)   construction financing what entity?

(21)       **A       I believe I think the name Security**

(22)   **Benefit if I am not mistaken.**

(23)       Q       I think we can agree that it is

(24)   Security Benefit.

(25)                When Security Benefit, when Mr.

(1)                    H. Fensterman, Esq.

(2)    Nicholson procured Security Benefit as the

(3)    project lender did you have the opportunity to

(4)    review loan documents?

(5)        **A    No, I did not review loan documents.**

(6)    **We had an attorney. It was either Jerry Billows**

(7)    **or somebody in my office but just to be clear in**

(8)    **connection with this transaction I tried not act**

(9)    **as my own attorney.**

(10)       Q    Did you familiarize yourself with the

(11)    terms of the financing?

(12)       **A    I don't -- all I remember is having a**

(13)    **conversation with Bill about what the interest**

(14)    **rate would be for both.  It was two loans by the**

(15)    **way.  It was also a mez loan.  A mezzanine loan.**

(16)       Q    I was going to ask you about that.

(17)           Do you recall the name of the entity

(18)    that provide the mezzanine financing?

(19)       **A    I believe their name is Bradford**

(20)    **Allen.**

(21)       Q    Did you play any role in the

(22)    procurement or negotiations of mezzanine debt

(23)    with Bradford Allen?

(24)       **A    No.**

(25)       Q    Other than the discussion with Mr.

(1)                    H. Fensterman, Esq.

(2)  Nicholson about the interest rate do you recall

(3)  discussing any other terms of the Security

(4)  Benefit financing?

(5)       **A       As I sit here I do not.**

(6)       Q       When you first became involved in the

(7)  White Plains project was there a site identified

(8)  for the construction of this project?

(9)       **A       When I first became involved I do not**

(10) **recall their being a designated site involved**

(11) **when I first got involved.**

(12)              **Eventually obviously a site was**

(13) **identified.  That was being handled by Mr.**

(14) **Nicholson.**

(15)      Q       Did you play any role in the

(16) identification or procurement of the site for

(17) this development?

(18)      **A       I did not personally, no.**

(19)      Q       You already identified that the

(20) project required an approval from the State.

(21)              Did you play any role in securing the

(22) approval from the State of New York?

(23)      **A       Which approvals are you alluding to?**

(24)      Q       Well I think you mentioned approval

(25) from the State and then you mentioned approval

(1)                    H. Fensterman, Esq.

(2)   from the Department of Health. So why don't we

(3)   start with the Department of Health.

(4)                    Did you play any role in securing

(5)   approvals from the Department of Health?

(6)        **A        I did.**

(7)        Q        What role did you play in connection

(8)   with that?

(9)        **A        The role I played was securing a**

(10)  **commitment from the State to authorize the**

(11)  **project because it had been in the interim**

(12)  **preliminarily rejected.**

(13)       Q        So when you indicate it was

(14)  preliminarily rejected who had presented that

(15)  application for approval to the State that was

(16)  rejected?

(17)       **A        It was presented on behalf of Mr.**

(18)  **Jozefovic by his consultants whose names were**

(19)  **Robert Shapiro and Andrew Blatt and their**

(20)  **company's name at least then was called Pinnacle**

(21)  **Consulting.**

(22)       Q        Are you familiar with the reasons why

(23)  that application was rejected?

(24)       **A        Yes, because Mr. Zafrin failed to**

(25)  **advise everyone who was involved in the project**

(1)                    H. Fensterman, Esq.

(2)    that there was a regulation that was in place

(3)    that promulgated that in the event that the

(4)    census in a particular -- any county in the State

(5)    of New York was less than 95 percent there would

(6)    be a presumption of what is called "no need", "no

(7)    need", I put that in quotes, to build a new

(8)    facility or authorize new beds, when I say

(9)    authorize new beds new Medicaid or Medicare beds,

(10)   into the County and that presumption would be

(11)   rebuttable if you could rebut it. You were given

(12)   an opportunity to rebut it but it was presumed to

(13)   be "no need". And Mr. Zafrin in representing Mr.

(14)   Jozefovic neglected to advise him and everyone

(15)   else that was involved in the project that such a

(16)   regulation existed and that is why it was

(17)   preliminarily rejected.

(18)            Oh, I left out because the census in

(19)   Westchester County at the time I believe was 91%

(20)   or 92% fell below the 95% threshold so therefore

(21)   the presumption was triggered of "no need".

(22)        Q    Do you recall when that Certificate of

(23)   Need was denied on the basis that you just

(24)   described, do you recall what year that was?

(25)        A    It was not, I don't mean to be a wise

(1)                    H. Fensterman, Esq.

(2)  guy, it was not a Certificate of Need that was

(3)  rejected.

(4)            An application goes in and the process

(5)  starts and it was right out of the gate. Zafrin

(6)  advised us that it was not -- Zafrin and the

(7)  consultants, so Mr. Shapiro and Mr. Blatt advised

(8)  us all that it was not going to be granted at

(9)  unless we rebutted the presumption.

(10)      Q     Do you recall what year that happened?

(11)      A     I would say it was on or between 2013

(12)  and 2014 somewhere in there.

(13)      Q     Was that at a time after which Mr.

(14)  Zafrin had left your law firm or was he still

(15)  with your firm?

(16)      A     Mr. Zafrin left my law firm on July

(17)  15, 2010 and he joined Michelman & Robinson at

(18)  that time.  So it was after several years after

(19)  he left my firm.

(20)      Q     So what steps did you take to address

(21)  the Department of Health's issues about the

(22)  presumption of "no need" what steps did you take?

(23)      A     I asked for and obtained a meeting

(24)  with the Deputy Secretary of I believe the title

(25)  was Public Health of the State of New York which

(1)                    H. Fensterman, Esq.

(2)    was granted to me to attempt to persuade him that

(3)    the presumption should be rebutted.

(4)              In addition to that I communicated

(5)    with somebody in my firm who was a former

(6)    republican assemblyman at that time, communicated

(7)    with the assemblyman whose district White Plains

(8)    was in and I don't recall his name to secure his

(9)    support for the project.

(10)              And then in turn I had a meeting with

(11)    the Mayor of the City of White Plains to secure

(12)    his support of the project.

(13)              I had another meeting scheduled for me

(14)    with the Deputy County Executive of Westchester

(15)    County whose name I don't recall and I had that

(16)    meeting and one of the other individuals secured

(17)    the support of the local New York State Senator

(18)    for that district as well as the local

(19)    congressperson for that district and all of those

(20)    individuals sent letters to I believe to then

(21)    Governor Cuomo in support of the project.

(22)              In addition, at the behest I believe

(23)    of Mr. Jozefovic Mr. Shapiro and Blatt prepared a

(24)    document that demonstrated that notwithstanding

(25)    the fact that the census number was lower in the

(1)                    H. Fensterman, Esq.

(2)    particular locale of the City of White Plains

(3)    there was a need and it involved various

(4)    statistic, etcetera.

(5)              So by the time that document was

(6)    presented to the Department of Health and the

(7)    elected officials who were in agreement with what

(8)    was in that document that there was a need in the

(9)    City of White Plains for a brand new nursing home

(10)   all of that was presented to the State and they

(11)   ultimately approved the project but took knocked

(12)   beds off of it.

(13)       Q     When you were having these meetings

(14)   and communications about the project did you also

(15)   discuss with these various government

(16)   representatives who the operator of the project

(17)   would be?

(18)       A     I don't recall whether I did or not.

(19)       Q     Did you ever attend any of these

(20)   meeting with Mr. Jozefovic?

(21)       A     No, those meetings Mr. Jozefovic was

(22)   not involved in those meetings. Those meetings

(23)   were attended by myself and on occasion by myself

(24)   and one of the other lawyers in my office who had

(25)   been a former member of the New York State

(1)                      **H. Fensterman, Esq.**

(2)     **Assembly.**

(3)          Q      Did you keep Mr. Jozefovic advised

(4)     about your progress in recommending that

(5)     Department of Health reverse its position and

(6)     grant its approval?

(7)          **A      I believe that those communications**

(8)     **were being communicated to Mr. Zafrin. We did not**

(9)     **know what, other than the fact that they were**

(10)    **advised of what we would be attempting to do to**

(11)    **save the project they played no role in it**

(12)    **whatsoever.**

(13)         Q      In order to operate the facility that

(14)    you were proposing you needed to have a licensed

(15)    operator; is that correct?

(16)         **A      Correct.**

(17)         Q      For the White Plains project who was

(18)    designated as the licensed operator?

(19)         **A      Mr. Jozefovic and his family.**

(20)         Q      Do you know if that designation was

(21)    granted to an entity rather than Mr. Jozefovic

(22)    personally?

(23)         **A      I believe that it was.**

(24)              **Generally it is always granted to an**

(25)    **entity but in the process of getting the CON the**

(1)                    H. Fensterman, Esq.

(2)   people who are part of the entity are vetted by a

(3)   state entity that is called a Public Health and

(4)   Planning Council.  At the time it may have been

(5)   called the Public Health Council who vet the

(6)   individuals who are members of the entity.

(7)       Q     As you testify today is it your

(8)   understanding that that license is held by the

(9)   defendant HBL SNF LLC?

(10)      A      As last I am aware of the fact that

(11)  entity is the licensee.

(12)      Q     Do you know when HBL SNF acquired its

(13)  license?

(14)      A      Are you talking about the license to

(15)  operate the facility?

(16)      Q     Yes.

(17)      A      I believe, well it is twofold. I don't

(18)  know when -- it is a twofold question.

(19)             There was a Public Health Council

(20)  approval which gave them, yes, if that is the

(21)  question, there was a Public Health Council

(22)  approval that granted them the right after we

(23)  rebutted the presumption to have the beds

(24)  licensed not merely to them but there were two

(25)  other entity, there was a partnership, one part

(1)                    H. Fensterman, Esq.

(2)    of the partnership I believe was Hebrew Hospital

(3)    and another part of the partnership I believe was

(4)    another enterprise whose name escapes me for the

(5)    moment but Hebrew Hospital was one of the

(6)    partners and then there was another one that they

(7)    assembled a partnership with and that group

(8)    applied for the license of the building.

(9)         Q     Other than what you described as far

(10)   as the meetings with various government officials

(11)   did you play any other role in securing the

(12)   approval for the development of the White Plains

(13)   project from the Department of Health?

(14)        A     No, I personally did not play any role

(15)   in it other than securing the approvals.

(16)              Well, trying to persuade these folks

(17)   the elected officials to support the project.

(18)   Ultimately it went to the Public Health Council

(19)   and as I mentioned I had a meeting with the

(20)   Deputy Secretary of Health and he represented at

(21)   that time that he would recommend the approval of

(22)   the project subject to reduction of beds.

(23)        Q     You mentioned other approvals.

(24)              Were there any other approval required

(25)   from the State of New York?

(1)                    H. Fensterman, Esq.

(2)        **A      I believe that it is governed by the**

(3)  **Department of Health. I don't think that there**

(4)  **were other approvals from the State of New York**

(5)  **for the project. Not that I am aware of.**

(6)        Q      You mentioned approvals from the local

(7)  municipalities?

(8)        **A      Right.**

(9)        Q      What approvals are you referring to

(10) there?

(11)       **A      It would be building approvals.**

(12) **Construction and Certificate of Occupancy and**

(13) **that like. Nothing to do with the health side of**

(14) **it.**

(15)       Q      Did you play any role in securing

(16) those various approvals from the municipal

(17) entity?

(18)       **A      I did not.**

(19)       Q      Just to touch on the site selection

(20) again, who identified the ultimate site for the

(21) White Plains project?

(22)       **A      I believe it was Bill Nicholson.**

(23)       Q      Were there any other sites that were

(24) identified as potential sites for the project?

(25)       **A      I don't have a knowledge of any other**

```
(1)                   H. Fensterman, Esq.
(2)    sites, no, that I recall as I am sitting here.
(3)         Q      Did you play any role in the
(4)    acquisition of that site?
(5)         A      When you say me, me individually?
(6)         Q      Yes, you individually?
(7)         A      I don't recall playing any role, no.
(8)         Q      Could you describe for me your
(9)    relationship with Mr. Nicholson?
(10)        A      As far as whether we are friends or
(11)   not is that what you're asking me?
(12)        Q      You could describe the relationship
(13)   however you want.
(14)        A      Mr. Nicholson and I are business
(15)   associates having been introduced to one another
(16)   from Mr. Mark Zafrin and we are I would consider
(17)   us friends.
(18)        Q      When did Mr. Zafrin introduce you to
(19)   Mr. Nicholson?
(20)        A      Mr. Zafrin introduced me to Mr.
(21)   Nicholson at some point I think it might have
(22)   been at some point after 2006 or 2007 but it
(23)   could have been before but that is my
(24)   recollection.
(25)        Q      What was the nature of that
```

(1)                    H. Fensterman, Esq.

(2)    introduction, the purpose of that introduction if

(3)    there was one?

(4)        A    I think Mr. Zafrin enhanced my law

(5)    firm at that time may have been doing some work

(6)    under the aegis of Mr. Zafrin and he was in the

(7)    conference room and I remember coming in there

(8)    and Mr. Zafrin introducing me to him.

(9)        Q    When did you form your business

(10)   association with Mr. Nicholson?

(11)       A    Our formal, I don't recall when our

(12)   formal association was done.

(13)       Q    Do you recall what the purpose of

(14)   forming a business relationship with Mr.

(15)   Nicholson was?

(16)       A    Well, the purpose was to this project.

(17)       Q    So this project being White Plains?

(18)       A    Correct.

(19)       Q    Have you participated in any other

(20)   business ventures other than White Plains with

(21)   Mr. Nicholson?

(22)       A    I have participated with Mr. Nicholson

(23)   to the extent that I have arranged for loaning

(24)   him or his or certain enterprises money.

(25)       Q    So what is Mr. Nicholson's

(1)                    H. Fensterman, Esq.

(2)    relationship with Congress Construction?

(3)        **A       My understanding is that he is the**

(4)    **owner of it.**

(5)        Q      How have you arrived at that

(6)    understanding?

(7)        **A       That is just what I have assumed after**

(8)    **all of these years that he is the owner of**

(9)    **Congress Construction.**

(10)        Q      Have you ever had any dealings with

(11)    Mr. Nicholson involving the construction of

(12)    anything other than White Plains?

(13)        **A       Me personally, no. I have not.**

(14)        Q      When you say me personally are you

(15)    involved in any entity that has engaged Mr.

(16)    Nicholson or his company for construction?

(17)        **A       No, I am not.**

(18)        Q      So other than the lending of money

(19)    that you discussed your business relationship

(20)    with Mr. Nicholson arises from the development of

(21)    the White Plains project; is that fair?

(22)        **A       Yes.**

(23)        Q      When you say you have loaned money did

(24)    you loan money to Mr. Nicholson personally or to

(25)    Congress Construction?

(1)                    H. Fensterman, Esq.

(2)       **A      I don't know whether I loaned to an**

(3)    **entity or not but I know that Mr. Nicholson in**

(4)    **each and every instance has been personally an**

(5)    **obliger on any money that I have loaned.  So he**

(6)    **might have been a guarantor of money that I have**

(7)    **loaned or directly loaned.  I am not sure.**

(8)       Q      Do you recall over what period of time

(9)    you loaned money to Mr. Nicholson?

(10)      **A      Maybe over the last ten years a few**

(11)   **times.**

(12)      Q      Are you able to tell me how many loan

(13)   transactions you have undertaken with Mr.

(14)   Nicholson?

(15)      **A      I believe that there are just two.**

(16)      Q      Do you know the approximate amount of

(17)   those loans?

(18)      **A      One is for $500,000 and the other I**

(19)   **think was for a couple of million dollars.**

(20)            **MR. FENSTERMAN:  John, I need to take**

(21)            **a bathroom break for two minutes.  I**

(22)            **will be right back, okay.**

(23)            **(Short break:  10:58 to 11:16)**

(24)      Q      Howard, just to pick up where we left

(25)   off you mentioned you made two personally you

(1)                      H. Fensterman, Esq.

(2)   made two loans to Mr. Nicholson.

(3)              Do you recall what year you made those

(4)   loans?

(5)              **MR. DONNELLAN:   Objection to the**

(6)              **form. I am not sure that he actually**

(7)              **specifically indicated he personally**

(8)              **made loans.**

(9)              **MR. GIARDINO:  Let's clear that up**

(10)             **then.**

(11)     Q    Who would the actual lender to Mr.

(12)   Nicholson?

(13)     **A    I don't know the name. It would have**

(14)   **been an entity that I formed that had people in**

(15)   **the entity that were participants in the loan.**

(16)     Q    Was the $500,000 loan the first loan

(17)   that was made to Mr. Nicholson?

(18)     **A    I am not sure. It may have been the**

(19)   **other one that was the first loan.**

(20)     Q    Do you know if either one of those two

(21)   loans were made before the construction of the

(22)   White Plains project?

(23)     **A    I don't recall.**

(24)     Q    Do those loans require installment

(25)   payments?

```
(1)                    H. Fensterman, Esq.

(2)        A       They require interest payments, yes.

(3)        Q       So the installment payments are

(4)   interest only?

(5)        A       One of them is interest only and I am

(6)   not sure of the other one is amortized or not. It

(7)   may be over actually.  I am not sure.

(8)        Q       Are both of those loans current to

(9)   your knowledge?

(10)       A       Yes.

(11)       Q       Very briefly did you know a gentleman

(12)  by the name of Ben Landa?

(13)       A       Yes, I do.

(14)       Q       What is the nature of your

(15)  relationship with Mr. Landa?

(16)       A       I am his attorney, one of his

(17)  attorneys, and a very close friend of mine.

(18)       Q       How long have you known Mr. Landa?

(19)       A       I have known Mr. Landa since, well, I

(20)  first met him in December of 2000 calendar year.

(21)       Q       Is Mr. Landa an investor in the White

(22)  Plains project?

(23)       A       Yes.

(24)       Q       Are you familiar with the declaration

(25)  that Mr. Landa filed in the bankruptcy court?
```

(1)                     H. Fensterman, Esq.

(2)        **A       I am.**

(3)        Q       You have read that declaration?

(4)        **A       I believe I read it. I believe I read**

(5)   **it.**

(6)        Q       Let me ask you this.

(7)                Did you prepare it?

(8)        **A       I don't think, no, I did not prepare**

(9)   **it.**

(10)       Q       Do you know who did prepare it?

(11)       **A       I believe that that was prepared by**

(12)  **bankruptcy counsel.**

(13)       Q       In that declaration Mr. Landa says

(14)  that he is familiar with the White Plains plan to

(15)  install a new operator; are you familiar with

(16)  that statement?

(17)       **A       No, but if you show it to me I can see**

(18)  **it.**

(19)       Q       Well I think we will defer on that. We

(20)  are having a little difficulty with that

(21)  document.

(22)       **A       Sure.**

(23)       Q       We will return to it later.

(24)       **A       No problem.**

(25)       Q       At this time I want to direct

(1)                      H. Fensterman, Esq.

(2)    questions to the First Amended Verified Complaint

(3)    in the State court lawsuit which is Exhibit

(4)    number 68.

(5)        A     I don't have it in front of me but

(6)    okay.

(7)                (Whereupon, Defendant's Exhibit 1,

(8)                First Amended Verified Complaint, (Ex

(9)                68), 18 pages, was marked for

(10)               identification.)

(11)       Q     We will pull it up on the screen.

(12)       A     Sure.

(13)               MR. DONNELLAN:   Exhibit 68 to what?

(14)               MR. GIARDINO:  Exhibit 68 to the

(15)               deposition of Howard Fensterman.

(16)               MR. DONNELLAN:   Okay. So you have

(17)               marked that as Exhibit 68?

(18)               MR. GIARDINO:  We have marked it as

(19)               exhibit 68, yes.

(20)       Q     Howard, are you familiar with the

(21)    Amended Complaint that has been filed in the

(22)    State court action in the County of Westchester?

(23)       A     I am aware it exists. I don't know

(24)    when I read every word of it or not but I am

(25)    certainly aware it exists.

(1)                    **H. Fensterman, Esq.**

(2)        Q    Are you aware that it is a Verified

(3)    Complaint?

(4)        **A    That is what it says, yes.**

(5)        Q    It is Mr. Nicholson who verified the

(6)    Complaint?

(7)        **A    If that is what it says.  I don't see**

(8)    **it but if that is what it says, yes.**

(9)        Q    Why don't we go to page 18.

(10)             I will ask you to take a look at page

(11)    18 and then I will ask the question if Mr.

(12)    Nicholson has verified this complaint based on

(13)    what you're reviewing?

(14)        **A    That is what it appears to say.**

(15)        Q    He has verified this complaint on

(16)    behalf of White Plains Healthcare Properties I

(17)    LLC; is that correct?

(18)        **A    That is what it says, yes.**

(19)        Q    Before Mr. Nicholson gave that

(20)    verification on behalf of White Plains entity did

(21)    you review the Complaint?

(22)        **A    No, I did not.**

(23)        Q    When was the first time you saw the

(24)    Complaint?

(25)        **A    I don't recall when I saw it.**

(1)                    **H. Fensterman, Esq.**

(2)        Q      Is it your testimony that you saw the

(3)    Complaint after it was filed?

(4)        **A      As I said, I don't recall when I saw**

(5)    **it for the first time.**

(6)        Q      But in any event, did you discuss the

(7)    allegations in the Complaint with Mr. Nicholson

(8)    at any time?

(9)        **A      Did I ever discuss any of the**

(10)   **allegations in the Complaint with Mr. Nicholson**

(11)   **at any time?  I am sure at some point in time he**

(12)   **and I had discussion about a good deal of what**

(13)   **was in the Complaint, yes.**

(14)       Q      I am asking a slightly different

(15)   question.  I will rephrase it.

(16)              As to the individual and numbered

(17)   allegations of the Amended Complaint did you at

(18)   any time discuss with Mr. Nicholson what was

(19)   included in the Complaint as allegations?

(20)       **A      Again, and I am not trying to be**

(21)   **difficult.**

(22)              **If there are allegations in the**

(23)   **Complaint of the factual history of the case the**

(24)   **answer is at some point in time over the last**

(25)   **several years I have discussed as those**

(1)                    H. Fensterman, Esq.

(2)    allegations became right for discussion these

(3)    issues with Mr. Nicholson.

(4)              So the answer would be did I ever

(5)    discuss it with him?  The answer would be at some

(6)    point I am sure I did discuss most if not all of

(7)    the allegations in the Complaint with him.

(8)        Q    I want to direct your attention to

(9)    page three of the Amended Complaint.

(10)       A    Okay.

(11)       Q    Are you able to see that on the

(12)   screen?

(13)       A    Yes, I am.

(14)       Q    In particular I want to direct your

(15)   attention to numbered allegation 13 which states

(16)   HBL entered into possession of the facility on

(17)   September 30, 2019; do you see that allegation?

(18)       A    Yes.

(19)       Q    On what information is that allegation

(20)   based to your knowledge?

(21)       A    Well, in actuality it's probably the

(22)   effective date, that is where Mr. Jozefovic

(23)   agreed that it was the effective date of his

(24)   occupancy.

(25)              In point in fact to the best of my

(1)                H. Fensterman, Esq.

(2)   knowledge he actually entered into technical

(3)   possession of the facility in on or around

(4)   September 18, 17 or 18, when keys were given to

(5)   him and he acknowledge receipt of the keys to the

(6)   facility.

(7)        Q    How did Mr. Jozefovic acknowledge

(8)   receipt of keys?

(9)        A    There was -- there were e-mails that I

(10)  recall seeing and I can't cite them chapter and

(11)  verse but there were as Mr. Jozefovic's

(12)  representative was working with Mr. Nicholson's

(13)  representative they were having virtually daily

(14)  meetings and there was a sign off I believe of

(15)  receipt of the keys by Mr. Jozefovic's

(16)  representative of his occupancy of the facility.

(17)           There was a whole list and I will have

(18)  to get there was a whole list of the various keys

(19)  that were turned over to Mr. Jozefovic of the

(20)  various locks I believe that were in the building

(21)  of various locks that he needed keys to so they

(22)  were all turned over to him in on or around

(23)  September 17 or 18 of 2019.

(24)           MR. GIARDINO:  So Al, the documents

(25)           that Howard is referring to I do not

(1)                    H. Fensterman, Esq.

(2)            believe are included in the documents

(3)            that have been produced to us.  So I

(4)            just want to make a note of that

(5)            because I would ask that those

(6)            documents be produced.

(7)            MR. DONNELLAN:   Regarding the

(8)            turnover of the keys, okay.  We will

(9)            see if there are any documents that

(10)           relate to that.

(11)           MR. GIARDINO:  I think it would fall

(12)           within the documents that we requested

(13)           as part of this discovery effort.

(14)           MR. DONNELLAN:   I don't know whether

(15)           it was included or not in what we

(16)           produced but we can look.

(17)      Q    So Mr. Fensterman, you make a

(18) distinction between technical possession and

(19) actual possession.

(20)           What do you mean by technical

(21) possession?

(22)      A    Technically he agreed the lease and

(23) occupancy started on September 30, 2019. That was

(24) I believe in the Letter of Intent dated November

(25) 20, 2019 but his actual in my view his actual

(1)                    **H. Fensterman, Esq.**

(2)    **constructive procession however you want to**

(3)    **legally characterize it in my view was when the**

(4)    **keys were turned over to him two weeks before**

(5)    **that, 12 days before that, 13 days, something.**

(6)         Q    Let me address the time period in

(7)    which the keys are turned over and your

(8)    describing as actual possession.

(9)              Did HBL begin operating in the

(10)   facility in September of 2019?

(11)        **A    How do you define operate?**

(12)        Q    Well I guess I am asking you that.

(13)             When you say that they had -- did they

(14)   have anything other than the keys as of that

(15)   date?  Were they actually physically in the

(16)   building?

(17)        **A    That made them physically in the**

(18)   **building and my understanding was that they were**

(19)   **preparing themselves to operate a nursing home at**

(20)   **that time and they had to bring in what ever**

(21)   **materials, staff to gear themselves up and**

(22)   **prepare themselves to be an operating skilled**

(23)   **nursing facility. So that was done when they took**

(24)   **possession. That is my knowledge.**

(25)             **As to when they started accepting**

(1)                    H. Fensterman, Esq.

(2)     patients I don't know the date they started

(3)     accepting patients. I know the date they were

(4)     authorized to start accepting patients but I

(5)     don't know the date they actually started to

(6)     accept them.

(7)          Q     During the period of let's say mid

(8)     September, September 15 to September 30, did you

(9)     visit the facility?

(10)         A     No, no, I did not.

(11)         Q     Did you visit the facility in October

(12)    of 2019?

(13)         A     I don't think I ever, let me put it to

(14)    you this way, I will re characterize it.

(15)               There is was a meeting when there was

(16)    a dispute as there was all along with Mr.

(17)    Jozefovic and there was a meeting in a conference

(18)    room in the facility and the facility was built

(19)    and equipped and furnished. That was the first

(20)    time that I saw the inside of the building and we

(21)    were in a conference room having that meeting and

(22)    that meeting may have been may have been in

(23)    September of 2019 or August of 2019. Somewhere in

(24)    that area to be comfortable because I don't

(25)    remember the days somewhere between July 1 and

(1)                    **H. Fensterman, Esq.**

(2)    **let's say the middle of September I was in that**

(3)    **building for a meeting that I attended.**

(4)        Q     Do you know who else attended that

(5)    meeting?

(6)        **A     Yes, it was Mr. Zafrin of Michelman &**

(7)    **Robinson, it was Mr. Frimmel from Michelman &**

(8)    **Robinson, it was Mr. Patrick Formato who is my**

(9)    **partner in Abrams, Fensterman, myself, Mr.**

(10)   **Jozefovic and his son.  I don't recall anybody**

(11)   **else being there. It might have been Mr. Shapiro**

(12)   **was there or Mr. Blatt that is a possibility but**

(13)   **the ones I just testified to were definitely**

(14)   **there.**

(15)       Q     Do you know if there were any minutes

(16)   or notes or other means by which that meeting was

(17)   memorialized?

(18)       **A     No, not that I am aware of. There may**

(19)   **have been but as I sit here today I am not aware**

(20)   **of it.**

(21)       Q     Did you tour the building at that

(22)   time?

(23)       **A     Yes, I did.**

(24)       Q     What observations did you make about

(25)   the tenants presence in the building as of the

(1)                    H. Fensterman, Esq.

(2)    date of that building?

(3)        A       The observation was that the tenant

(4)    had a fully equipped, ready to go nursing home

(5)    that was and is in my judgment the nicest nursing

(6)    home I have ever seen. That was my observation.

(7)        Q       Other than the turnover of the keys is

(8)    there any other observations or information that

(9)    you have that identifies when the tenant took

(10)   possession?

(11)       A       In my judgment he took possession when

(12)   he got the keys. What he did with it, if I could

(13)   just finish, what he did thereafter was up to him

(14)   to prepare himself to operate the nursing home.

(15)       Q       You mentioned that there was another

(16)   point in time when he actually became authorized

(17)   to operate the nursing home.

(18)              When was that?

(19)       A       Well I believe he received his

(20)   authorization from the Department of Health he

(21)   was authorized as of November 14 of that year to

(22)   operate although he was in a position to operate

(23)   much earlier than that but he elected not to do

(24)   so.

(25)       Q       So when you say he was in a position

(1)                    H. Fensterman, Esq.

(2)    to operate what do you mean by that?

(3)        A     There was a communication between Mr.

(4)    Nicholson's representative and the New York State

(5)    Department of Health that as of October 1 they

(6)    were prepared to grant the final the approval for

(7)    him to operate. That is the approval I alluded to

(8)    earlier that he got on November 14 and that

(9)    e-mail said that he would be given it right away

(10)   and they needed, they being Mr. Nicholson's

(11)   representative, was dealing with it was told by

(12)   the Department of Health that they needed the

(13)   quote unquote Provider Certification and this is

(14)   just my knowledge in a conversation that Mr.

(15)   Nicholson had with Mr. Jozefovic to get the

(16)   document signed Mr. Jozefovic refused to sign it

(17)   claiming that if he signed it he would have to

(18)   start paying rent so he refused to sign it.

(19)            So the Department of Health was

(20)   prepared in an e-mail stated unequivocally that

(21)   they were prepared to issue the letter that

(22)   ultimately Mr. Jozefovic got, I believe he

(23)   received the letter approximately eight weeks

(24)   later some time in early December of 2019 if I am

(25)   not mistaken, granting him retroactive to

(1)                    H. Fensterman, Esq.

(2)     November 14 his occupancy but he would have had

(3)     it approximately six weeks earlier had he, he

(4)     being Mr. Jozefovic, signed the provider

(5)     certificate that the Department of Health

(6)     requested and which they noted that they were

(7)     prepared to grant the same letter that they would

(8)     ultimately give two months later after Mr.

(9)     Jozefovic signed the document that needed to be

(10)    signed.

(11)         Q    You're referring to a communication

(12)    from the Department of Health on October 1; is

(13)    that your testimony?

(14)         A    Yes, my testimony is is that

(15)    communication between the Department of Health an

(16)    e-mail a communication in the form of an e-mail,

(17)    I forget the gentleman's name who sent the e-mail

(18)    on behalf of the Department of Health, but it was

(19)    sent to Mr. Nicholson's representative saying

(20)    they're ready, everything has been satisfied,

(21)    they need a Provider Certification and they will

(22)    issue the letter immediately. Words to sum and

(23)    substance of that.  And Mr. Jozefovic was asked

(24)    to sign it and he refused.

(25)         Q    Did you consider his refusal to sign

(1)                H. Fensterman, Esq.

(2)     it a breach of your agreement with Mr. Jozefovic?

(3)        A     I would consider it a breach of the

(4)     agreement that he was thwarting his ability to

(5)     commence his occupancy to get licensed.  So

(6)     certainly I don't know which provision because I

(7)     don't have the lease know the lease chapter and

(8)     verse but a failure of a tenant to sign a

(9)     document that would enable him to commence his

(10)    operations seems to me to be a breach of the

(11)    lease.  He has a duty I would think to cooperate

(12)    with the regulatory agency that governs his

(13)    business and governs the authority with which he

(14)    can conduct his business and he refused to sign

(15)    the document and eventually after presumably, I

(16)    am presuming that what occurred was after the

(17)    Letter of Intent was signed he probably signed

(18)    the document at that point in time and the

(19)    Department of Health issued the letter in some

(20)    point in December retroactive giving him a

(21)    retroactive date to November 14.

(22)                MR. GIARDINO:  Can we call up Exhibit

(23)                19 please.

(24)                (Whereupon, Defendant's Exhibit 2,

(25)                e-mails, (Ex 19) 3, pages, was marked

(1)                **H. Fensterman, Esq.**

(2)                **for identification.)**

(3)     Q     Howard, I will show you what we

(4)  previously marked as Exhibit 19.

(5)     **A     Right.**

(6)     Q     I would ask you to review it and let

(7)  me know if that is the document that you just

(8)  have been testifying about?

(9)     **A     Yes, it is.**

(10)    Q     There is an e-mail dated Tuesday,

(11) October 1, 2019 from a Christopher Chow to a Josh

(12) Josh Roccapriore?

(13)    **A     Right.**

(14)    Q     Asking for the Letter of

(15) Certification; is that correct?

(16)    **A     It says "Josh, I do need the Letter of**

(17) **Certification signed by the provider. Whenever**

(18) **you can get that to me I will give the approval**

(19) **to occupy.  Thanks"; yes, that is what it says.**

(20)    Q     Do you know what Mr. Roccapriore did

(21) with this communication?

(22)    **A     I do not. I have no personal knowledge**

(23) **of what he did with it, no.**

(24)    Q     How did you come into the information

(25) that Mr. Jozefovic refused to sign the Letter of

(1)                    H. Fensterman, Esq.

(2)    Certification who told you that?

(3)        **A      Mr. Nicholson.**

(4)        Q      Did you ever speak with Mr. Jozefovic

(5)    about his refusal to sign the Letter of

(6)    Certification?

(7)        **A      No, I did not.**

(8)        Q      Have you reviewed any e-mails between

(9)    either Mr. Nicholson or White Plains and Mr.

(10)   Jozefovic and/or HBL about that refusal?

(11)       **A      No, I have not.**

(12)           **When I say I have not, I don't recall**

(13)   **because again this was a couple of years ago and**

(14)   **I don't know whether there were e-mail or whether**

(15)   **I was shown any e-mails but as I sit here today I**

(16)   **don't recall. I did remember this e-mail because**

(17)   **I thought it was significant.**

(18)           **And I remember Mr. Nicholson telling**

(19)   **me being very upset that Mr. Jozefovic refused to**

(20)   **sign the Provider Certification because he was of**

(21)   **the view that it would trigger his obligation to**

(22)   **start paying rent. That is what I do remember.**

(23)       Q      As far as the obligation as you

(24)   referred to to pay rent do you know what the

(25)   Amended Lease provides as to when the

(1)                    H. Fensterman, Esq.

(2)    commencement date of the lease is established?

(3)        **A      I really, I don't know the specific**

(4)    **language. If you would like me to look at it I**

(5)    **will look at it but I don't remember the specific**

(6)    **language.**

(7)            **I only remember that the we signed**

(8)    **something in the Letter of Intent and that Mr.**

(9)    **Jozefovic paid rent.  I don't know if he ever**

(10)    **paid the one day of rent for September 30 but he**

(11)    **paid the rent for starting from October 1, 2019.**

(12)            **MR. GIARDINO:  Can we call up Exhibit**

(13)            **10.**

(14)            **(Whereupon, Defendant's Exhibit 3,**

(15)            **Amended and Restated Operating Lease**

(16)            **(Ex 10), 96 pages, was marked for**

(17)            **identification.)**

(18)        Q      Howard, do you recognize the Amended

(19)    and Restated Operating Lease?

(20)        **A      Yes, it appears to be, yes, that is**

(21)    **what it says.**

(22)        Q      What is the date that appears on the

(23)    cover page of the Operating Lease?

(24)        **A      The Operating Lease is dated as of**

(25)    **November 19, 2015 and it was signed in 2017.**

(1)                    **H. Fensterman, Esq.**

(2)        Q    To your knowledge was there a reason

(3)    for dating the lease as of November 19, 2015 when

(4)    it was signed in 2017?

(5)        **A    I don't know what the reasoning was.**

(6)    **That is between the attorneys at that time. I**

(7)    **only know how this Amended and Restated Operating**

(8)    **Lease came to be. That I have knowledge of.  And**

(9)    **I know that the period of time without knowing**

(10)   **the exact date I know the period of time it was**

(11)   **signed in.**

(12)       Q    Howard, did you play any role in the

(13)   development of the Amended Lease?

(14)       **A    Well when you say did I play a role in**

(15)   **it, I attended a meeting in the offices of**

(16)   **Michelman & Robinson which we were called to by**

(17)   **Mr. Zafrin when Mr. Jozefovic threatened not to**

(18)   **go forward with the deal.  And that is how the**

(19)   **Amended and Restated Operating Lease came into**

(20)   **being.**

(21)       Q    That meeting took place some time

(22)   before 2017 when ever this lease was signed.

(23)            Do you know when it was actually

(24)   signed?

(25)       **A    I am not going to give you the exact**

(1)                    **H. Fensterman, Esq.**

(2)    **date but based upon the facts I would say that it**

(3)    **was signed somewhere between June 20, 2017 to**

(4)    **August 1, 2017 because the meeting that I am**

(5)    **alluding to was held in the offices of Michelman**

(6)    **& Robinson I believe on June 20.  I could be**

(7)    **wrong but that is my recollection of 2017.**

(8)         Q    So I am going to ask you to return

(9)    again to what we marked as Exhibit 10 and direct

(10)   your attention to page six section 3.1(a) and ask

(11)   you to review that section.

(12)            Page six of the document itself.  I

(13)   will ask you to review what I think is section

(14)   3.1(a) and to see if that is the language that

(15)   you were referring to moments ago in your

(16)   testimony?

(17)       **A    3.1(a) you want me to read the whole**

(18)   **thing?**

(19)        Q    Well, I think you asked me to provide

(20)   you with the lease language that established the

(21)   commencement date. I think you can review any

(22)   portion of the lease or this article to see if

(23)   that helps you testify about when the

(24)   commencement date actually occurred.

(25)       **A    I was testifying as to actually when I**

(1)                    H. Fensterman, Esq.

(2) think it occurred but I am happy to read the

(3) lease. Just give me a minute please. Okay I have

(4) read.

(5)      Q      Is it fair to say that the term of the

(6) lease commences on an either time?

(7)      A      I think it is fair to say it says what

(8) it says. It says what it says and the facts are

(9) what the facts are and they include the facts

(10) that I just alluded to because Mr. Jozefovic's

(11) refusal to do what was necessary with the

(12) Department of Health which is alluded to in the

(13) earlier exhibit you showed me.

(14)      Q      You testified earlier that the

(15) Department of Health issued its approval in

(16) December retroactive to November?

(17)      A      Correct.

(18)      Q      Is that the approval that is

(19) referenced in subsection (a) item number two?

(20)      A      Subsection (a) item number two.

(21)      Q      (ii).

(22)      A      Give me a minute to identify (ii).

(23)             MR. DONNELLAN:    Can you be clear

(24)             which approval you're asking about,

(25)             approval for occupancy or approval for

(1)                    **H. Fensterman, Esq.**

(2)            **patients?**

(3)        Q    I am referring to subsection (a)(ii)

(4)    which states "the date that New York State

(5)    Department of Health determined that the landlord

(6)    work is sufficiently complete as constructed but

(7)    not necessarily the tenant's operations to accept

(8)    patients"?

(9)        **A    There are two dates.**

(10)           **MR. DONNELLAN:   I am just trying**

(11)              **clarify because I think there is**

(12)              **getting mixed up between two different**

(13)              **issues but I will let the witness**

(14)              **answer.**

(15)       **A    I believe that the Department of**

(16)    **Health made a preliminary approval on September**

(17)    **19 at an inspection and then in the document that**

(18)    **I alluded to earlier from December of that year**

(19)    **they sent out another letter retroactive to the**

(20)    **14th but that is the same approval that from the**

(21)    **document you showed me earlier from I guess it is**

(22)    **Mr. Chow that would have been in place six weeks**

(23)    **earlier at the very beginning of October.**

(24)        Q    So I am asking if you can answer if

(25)    the Department of Health noticed in December

(1)                    H. Fensterman, Esq.

(2)     represented the approval that is identified in

(3)     this subsection (ii).

(4)              MR. DONNELLAN:   Objection to the form

(5)              of the question. Can you show him the

(6)              notice so we don't confuse which

(7)              notices, there are several notices now

(8)              that we are talking about.

(9)              MR. GIARDINO:  Well I am referring to

(10)             what he has identified as the notice

(11)             of December that was retroactive to

(12)             November 14 but we can call that up.

(13)             MR. DONNELLAN:   Can you call up that

(14)             notice?

(15)             MR. GIARDINO:  Exhibit 23 please.

(16)             (Whereupon, Defendant's Exhibit 4,

(17)             Letter dated 12/2/19 from Department

(18)             of Health Chris Chow to Andrew Blatt,

(19)             (Ex 23), 1 page, was marked for

(20)             identification.)

(21)        A    Okay I see it.

(22)        Q    Let me ask you if what we have marked

(23)     as Exhibit 23 is the notice and authorization

(24)     from the Department of Health about which you

(25)     were testifying earlier?

(1)                    H. Fensterman, Esq.

(2)      **A      This letter is the one that I was**

(3)   **alluding to and I also believe that there was an**

(4)   **earlier communication because they were I believe**

(5)   **that everyone was advised based upon the**

(6)   **pre-opening survey the document of September 19**

(7)   **that the facility was found to be in substantial**

(8)   **compliance.**

(9)              **I think the hold up, I don't think, I**

(10)  **believe based upon my information that the hold**

(11)  **up in this of the December 2 was the fact that**

(12)  **Mr. Jozefovic did not sign the certification that**

(13)  **was alluded to in the e-mail that you showed me**

(14)  **earlier.**

(15)     Q      The source of your information just to

(16)  confirm is Mr. Nicholson; is that correct?

(17)     **A      That is correct.**

(18)     Q      Any other information that you

(19)  received that caused you to believe that Mr.

(20)  Jozefovic did not provide that certification when

(21)  he should have?

(22)     **A      Well my only other information is that**

(23)  **we were in a dispute with Mr. Jozefovic because**

(24)  **he had not put up his security deposit which was**

(25)  **due 60 days before he took occupancy and we were**

(1)                      H. Fensterman, Esq.

(2) asking him at the time also $1.6 million which I

(3) was suppose have signatory ability on that he had

(4) allegedly pledged and we were only to find out a

(5) later point that that was not the case either

(6) that he had not done what he was suppose to do

(7) with that.  So the discussions that were taking

(8) place at the time were a major dispute about his

(9) failure to put up the security deposit of $5.3

(10) million and included in that was the

(11) collateralization of a $1.6 million.

(12)          He had one major complaint at the time

(13) that was Mr. Nicholson did put up a set of blinds

(14) for him, automated blinds in a room.  That was in

(15) the meeting that I am alluding to that took place

(16) in the facility that was the one time that I was

(17) there and inside.

(18)      Q    I am going to return to those issues

(19) in a minute but just to close out my questioning

(20) about this section of the lease.

(21)      A    Okay.

(22)      Q    So it's your understanding that the

(23) commencement date of the lease was delayed

(24) because Mr. Jozefovic had not delivered the

(25) certification required of him by the Department

(1)                    H. Fensterman, Esq.

(2)     of Health?

(3)         A     No, I believe that the commencement of

(4)     the lease was in September because they were

(5)     aware as of September 19 that the facility was

(6)     found to be in substantial compliance.

(7)              But having said that, there was a

(8)     communication that you showed me from October 1

(9)     that the nature of this letter was such that he

(10)    could have taken that could have gotten this

(11)    letter in early October and I believe that this

(12)    letter and his ability to take occupancy is more

(13)    tied into when his ability to bill Medicaid would

(14)    be than this actual occupancy of the facility and

(15)    they are two different things. He had to, which

(16)    he did not do, he had to ready his building to

(17)    accept patients and we were concerned at the time

(18)    that he was not doing so. He had everything there

(19)    to operate the nursing home but he was not

(20)    showing any interest in operating it other than

(21)    when we gave him the keys and he was doing what

(22)    ever he needed to at that time.

(23)        Q     You mentioned a dispute about the $5.3

(24)    million Letter of Credit and the $1.6 million

(25)    security collateral and I believe your testimony

(1)                    H. Fensterman, Esq.

(2) was that was due 60 days prior to him taking

(3) possession of the building?

(4)      **A     It is not my testimony merely.  It is**

(5) **what is on the lease and it was not merely a**

(6) **Letter of Credit.  It was a Letter of Credit or**

(7) **cash.**

(8)      Q     So let's agree that the lease

(9) provides, I am trying to get your understanding

(10) of the chronology of these events.

(11)      **A     Sure.**

(12)      Q     So what was your understanding of when

(13) Mr. Jozefovic should have provided you with the

(14) Letter of Credit or cash that you just described,

(15) when was that due to you?

(16)      **A     I believe that it was due to us,**

(17) **ultimately it was due to us on July 30, 2019.**

(18)      Q     Would the same be true with respect to

(19) the $1.6 million security deposit account?

(20)      **A     I believe that is part, if I am not**

(21) **mistaken, that was part of the $5.3 million.  If**

(22) **I am wrong I will stand corrected.  But I believe**

(23) **the entire $5.3 million.**

(24)          **However, he was suppose to deposit the**

(25) **$1.6 million into the security account with the**

(1)                    H. Fensterman, Esq.

(2)    landlord as well as the balance either the LC or

(3)    cash 60 days before the lease commencement.

(4)        Q    Is it your testimony that these were

(5)    issues that were discussed at the meeting that

(6)    was held Michelman & Robinson offices in June?

(7)        A    No, you're confusing years and the

(8)    dates. That was a -- let me just take you back.

(9)            The Michelman & Robinson meeting that

(10)   I alluded to occurred in 2017, okay. The meeting

(11)   in the nursing home occurred in 2019 after the

(12)   building was constructed.

(13)           There was a dispute in 2017 however

(14)   about money that he was suppose to have put into

(15)   an account that could not be removed and we

(16)   discovered that he had defalcated the funds and

(17)   taken them out of the account. That gave rise to

(18)   a major dispute. But that was all ultimately

(19)   resolved with the execution of the Amended and

(20)   Restated Lease.

(21)           So all disputes that were there

(22)   between the parties up until that point in time

(23)   were essentially all merged into a resolution in

(24)   the 2017 lease which I mentioned was signed some

(25)   time between July 1 and August 1, 2017.

(1)                        **H. Fensterman, Esq.**

(2)        Q      So thank you for that clarification.

(3)               When did the meeting at the nursing

(4)    home itself take place in 2019?

(5)        **A      As I testified, I believe it took**

(6)    **place some time between July and early September**

(7)    **of 2019. The building was built, it was equipped,**

(8)    **it was furnished, it was fully ready to go and**

(9)    **Mr. Jozefovic took me on a tour of the facility**

(10)   **at that time to show me what he was very proud**

(11)   **of.**

(12)       Q      How long did that meeting last?

(13)       **A      Well it got broken up because Mr.**

(14)   **Zafrin got angry at me and attempted to**

(15)   **physically assault me and he was stopped by two**

(16)   **people in between us and the meeting sort of**

(17)   **broke up after that.**

(18)              **Mr. Formato who happened to be sitting**

(19)   **next to me caught Mr. Zafrin as he attempted to**

(20)   **fly over the table at me.**

(21)       Q      You testified earlier that there were

(22)   no minutes or other notes memorializing the

(23)   conversation at that meeting that you're aware

(24)   of; is that correct?

(25)       **A      I have no recollection or knowledge of**

(1)                    H. Fensterman, Esq.

(2)    any as I sit here today that there was any such

(3)    notes that were done.  I don't know.

(4)        Q     At that meeting did you discuss the

(5)    $1.6 million security deposit account?

(6)        A     We discussed the security deposit

(7)    again and we were I don't have a specific

(8)    recollection of discussing the $1.6 million

(9)    again. I just know that there were a myriad of

(10)   disputes dealing with that that we wanted the

(11)   security deposit, the building had been built and

(12)   we still didn't have the security deposit and we

(13)   wanted to know where the $1.6 million was and we

(14)   wanted to Mr. Jozefovic's cooperation to start

(15)   moving to get into the building and he was

(16)   refusing to do so.

(17)       Q     If you answered this before I

(18)   apologize but was Mr. Nicholson in attendance at

(19)   this meeting?

(20)       A     I don't recall. I don't recall.

(21)   Logically in my head I would think he was but I

(22)   don't remember.  I am thinking as you're asking

(23)   me the questions who in my memory do I see at the

(24)   meeting and I believe I testified to who was

(25)   there. I remember specifically who was at that

(1)                    **H. Fensterman, Esq.**

(2)  **meeting.**

(3)        Q     So with respect to the security

(4)  deposit that you just been testifying about did

(5)  you consider that the tenant's overdue in

(6)  providing the security deposit to you?

(7)        **A     Yes, did I think his security deposit**

(8)  **was due us, yes, I did.**

(9)        Q     Did you consider the tenant to be in

(10)  breach of the Lease Agreement by not providing it

(11)  to you?

(12)        **A     I considered him at that time to be in**

(13)  **breach of the Lease Agreement for two reasons.**

(14)              **One, the $1.6 million we had no proof**

(15)  **that it was there and I had delivered to him what**

(16)  **ever he gave me that was necessary to secure it**

(17)  **and they provided us no proof at that time and**

(18)  **when we asked for the security deposit he said he**

(19)  **was not putting it up. He was not going to give**

(20)  **it to us.**

(21)        Q     You testified moments ago that you had

(22)  concerns that Mr. Jozefovic was not readying the

(23)  building for operations?

(24)        **A     Correct.**

(25)        Q     Did you form that concern when you

(1)                    H. Fensterman, Esq.

(2)   were at the building for this meeting?

(3)      A      No, the building, I formed the concern

(4)   before that because and this again is coming to

(5)   me through Mr. Nicholson.

(6)             Mr. Nicholson was putting the final

(7)   touches on the building.  His representative was

(8)   meeting with Mr. Jozefovic's representative and

(9)   things that were requested to be done on Mr.

(10)  Jozefovic's part were not being done. I don't

(11)  know specifically what they were but I know that

(12)  that was the sum and substance of the concern.

(13)            And we knew that on our end we had

(14)  done everything that was required to deliver the

(15)  building to him and I personally observed that

(16)  not knowing every piece of equipment but I

(17)  personally observed it when I took the tour with

(18)  Mr. Jozefovic of the building.

(19)     Q      Was that a subject of discussion

(20)  during the course of the meeting?

(21)     A      I am sorry. Was what a subject of

(22)  discussion?

(23)     Q      The fact that you were concerned that

(24)  he was not readying the building for operation,

(25)  did you discuss that at the meeting?

(1)                    H. Fensterman, Esq.

(2)        **A**      **I don't recall. I don't recall.**

(3)        Q      Do you recall what other subjects were

(4)   discussed at that meeting?

(5)        **A**      **The only thing that I recall is that**

(6)   **Mr. Jozefovic was trying to renegotiate the lease**

(7)   **once again. He basically essentially reported**

(8)   **that he was not going to pay the security deposit**

(9)   **at that time and he had no intention of paying it**

(10)  **and eventually this went on until a period of**

(11)  **time where we had a series of meetings in Mr.**

(12)  **Donnellan's office which ultimately resulted in a**

(13)  **Letter of Intent being signed.**

(14)       Q      Howard, I need to get a little bit of

(15)  clarification.

(16)              You said he said he had no intention?

(17)       **A**      **Right.**

(18)       Q      Were those words spoken by Mr.

(19)  Jozefovic or by his counsel on his behalf?

(20)       **A**      **Both.**

(21)       Q      Did Mr. Jozefovic tell you why he was

(22)  not putting up the security deposit?

(23)       **A**      **I don't recall. I don't recall why he**

(24)  **was not going to put it up.  I only knew that he**

(25)  **was not going to put it up and he was -- he**

(1)                    H. Fensterman, Esq.

(2)    always had the same fundamental complaints that

(3)    he had put money up for the building already and

(4)    that was enough. And he did not pay attention to

(5)    why the money was put up, what the agreements

(6)    that existed at the time reflected with respect

(7)    to the money that he was going to put up and he

(8)    was specifically alluding to money that he had

(9)    put up several years earlier on the building and

(10)   I know that he and Mr. Zafrin at that meeting did

(11)   not agree on that.  He was Mr. Jozefovic was very

(12)   unhappy with the fact that several years earlier

(13)   he had put up money and he thought that he should

(14)   be getting credit for that money.

(15)        Q    We will get back to that issue in a

(16)   bit.

(17)        A    Sure.

(18)        Q    You have identified that Mr. Jozefovic

(19)   was represented by counsel.

(20)             Were you represented by counsel in

(21)   this meeting?

(22)        A    You can say I was because I had my

(23)   partner Pat Formato there so I would say yes, I

(24)   was represented by counsel.

(25)        Q    Prior to that meeting had Mr. Formato

(1)                    H. Fensterman, Esq.

(2)    became aware of these issues which you considered

(3)    to be breaches of the Lease Agreement?

(4)         **A      Mr. Formato had participated for quite**

(5)    **a long period of time in and out of the**

(6)    **transaction where his counsel was sought relative**

(7)    **to the disputes in the lease going back several**

(8)    **years.**

(9)         Q      But as to the specific, the two items

(10)   that you specifically identified the $1.6 million

(11)   account and then the Letter of Credit was Mr.

(12)   Formato prior to this meeting familiar with the

(13)   failure to provide those two items?

(14)        **A      The failure to provide the money**

(15)   **you're talking about was he aware that that was**

(16)   **an issue?**

(17)        Q      Yes.

(18)        **A      Well I am in a difficult situation**

(19)   **because it's really an attorney/client privilege**

(20)   **if I am speaking to him as my attorney so I don't**

(21)   **really want to get into what I said to him.**

(22)        Q      That is fine.

(23)               During the course of the meeting did

(24)   Mr. Formato respond to the position taken by Mr.

(25)   Jozefovic or Mr. Zafrin?

(1)                    H. Fensterman, Esq.

(2)        **A      I know that he spoke, John, but I**

(3)    **don't recall what he said.**

(4)              **The meeting unfortunately got heated**

(5)    **at one point and I alluded to what happened.**

(6)        Q      So we have reviewed what has been

(7)    marked as Exhibit 23.

(8)        **A      Okay, that is the Department of Health**

(9)    **letter?**

(10)       Q      The Department of Health letter.

(11)       **A      Okay.**

(12)       Q      That letter references a retroactive

(13)   date for the approval; do you see that?

(14)       **A      Let me put my glasses back on.**

(15)              **Well it doesn't say retroactive.  It**

(16)   **says it is effective as of November 14.**

(17)       Q      Fair enough.

(18)              And what is your understanding as to

(19)   why November 14 is identified as the effective

(20)   date of the notice?

(21)       **A      I don't have an understanding.**

(22)       Q      Did you ever discuss with the

(23)   Department of Health this letter?

(24)       **A      No, I did not. This letter you know is**

(25)   **addressed as you all know to Mr. Blatt from**

(1)                     H. Fensterman, Esq.

(2)    Pinnacle who is Mr. Jozefovic's representative,

(3)    his consultant as he is defined there.

(4)         Q    Do you know if as of November 14, 2019

(5)    all other approvals for operation of the building

(6)    had been granted to either White Plains or HBL?

(7)         A    I believe that everything that Mr.

(8)    Jozefovic needed was approved, yes, I do.

(9)         Q    Would that include all of the

(10)   municipal approvals for the project?

(11)        A    To the best of my knowledge, yes.

(12)        Q    Do you know when those municipal

(13)   approvals were granted?

(14)        A    I believe he got his TCO in August,

(15)   his architect certification in September.  I

(16)   don't recall after that what any dates were and I

(17)   don't know the exact dates.  But my recollection

(18)   is the TCO was in the second or third week of

(19)   August and the architect certification was on

(20)   September 30 and the Department of Health as I

(21)   indicated was prepared on October 1 to issue the

(22)   nature of this letter that is on the screen now.

(23)        Q    I want to return to Exhibit 68 which

(24)   is the Verified Amended Complaint.

(25)        A    Sure.

(1)                    **H. Fensterman, Esq.**

(2)        Q     If we can go to page two of the

(3)    document. I would direct you to the third

(4)    allegation of the Complaint.

(5)        **A      Alright.**

(6)        Q     "On January 7, 2020 WPH Properties

(7)    served Notice of Default and elected to terminate

(8)    the lease and accelerate all rents due"; do you

(9)    see that statement?

(10)       **A      Yes, I do.**

(11)       Q     You're familiar with that assertion by

(12)   White Plains that it issued a Notice of Default

(13)   and Termination as of that date; is that right?

(14)       **A      Correct, I am.**

(15)       Q     Did the January 7, 2020 Notice of

(16)   Default include the issue of the delay in

(17)   providing the Department of Health with the

(18)   certification that you have been describing?

(19)       **A      I don't know whether it did or not.**

(20)   **The document I assume will speak for itself.**

(21)                **MR. GIARDINO:  Can we call up what has**

(22)                **been marked for identification as**

(23)                **Exhibit 28.**

(24)                **(Whereupon, Defendant's Exhibit 5,**

(25)                **Letter dated 1/7/20 from Donnellan to**

(1)                    **H. Fensterman, Esq.**

(2)                    **HBL SNF (Ex 28), 5 pages, was marked**

(3)                    **for identification.)**

(4)        Q      Howard, I will show you what we marked

(5)    Exhibit 28 of January 7, 2020 letter and ask you

(6)    to review it and if you recognize it as the

(7)    Notice of Default?

(8)        **A      Am I able to scroll down. I am only**

(9)    **looking at the first page.**

(10)        Q      You can direct the document manager to

(11)    go to what ever section of the document you would

(12)    like.

(13)        **A      Sure, okay.  I read this page.  Go**

(14)    **ahead. Okay.**

(15)        Q      So my question is and again I agree

(16)    the document speaks for itself but having

(17)    reviewed it are any one of these items set forth

(18)    in this notice relate to the failure by HBL to

(19)    sign the certification for the Department of

(20)    Health?

(21)        **A      The document speaks for itself but I**

(22)    **did not see it in there. There are many, many**

(23)    **material defaults itemized there but I don't see**

(24)    **that one.**

(25)        Q      Did you play any role in the

(1)                    H. Fensterman, Esq.

(2)    preparation of this Notice of Default?

(3)        **A      I don't believe that you could**

(4)    **consider that I played a role.**

(5)            **Did I know about that it was going to**

(6)    **happen, yes, I did. And again, I am trying to**

(7)    **balance here because of my communications with**

(8)    **Mr. Donnellan are confidential.**

(9)            **So if you say did I play a role in it**

(10)    **I was aware of it.**

(11)        Q      Let me be clear.  I have no interest

(12)    in adducing any testimony about conversations you

(13)    had at any time with any of your counsel

(14)    including the counsel within your law firm.  I

(15)    will acknowledge there is arguably a privilege

(16)    that applies to all of that.  I am fine with

(17)    that.  That is not my purpose.

(18)        **A      Okay.**

(19)        Q      Did you review this Notice of Default

(20)    before it was issued to HBL?

(21)        **A      I don't believe that I did.**

(22)        Q      Did you have conversations with Mr.

(23)    Nicholson about this notice?

(24)        **A      Yes, I did.**

(25)        Q      On how many occasions did you discuss

(1)                    H. Fensterman, Esq.

(2)    this notice with Mr. Nicholson?

(3)         A      I don't recall how many times I

(4)    discussed it with him.

(5)         Q      Do you have an estimate?

(6)         A      It probably, an estimate, I know you

(7)    don't want me to guess, so I would say it is

(8)    somewhere between one and two times.

(9)         Q      Did you discuss with Mr. Nicholson

(10)   whether or not this notice needed to be issued at

(11)   all?

(12)              MR. DONNELLAN:   Note my objection

(13)              that it should not include any

(14)              conversations where counsel were on.

(15)              It would be privileged.

(16)        A      I don't recall having any such

(17)   conversations with Mr. Nicholson about whether it

(18)   should be issued at all other than the fact that

(19)   it was going to be issued.

(20)        Q      Would it be fair to say that Mr.

(21)   Nicholson was representing White Plains in

(22)   dealing with these issues of the tenant default?

(23)        A      I think it is fair to say that Mr.

(24)   Nicholson was dealing principally with those

(25)   issue but I certainly was being apprised of them

(1)                    H. Fensterman, Esq.

(2)    and his office was handling the quote unquote

(3)    money issues dealing with the lease so that he

(4)    was keeping and Mr. Ed Tabor who is a controller

(5)    of Mr. Nicholson was monitoring monies that were

(6)    suppose to have been paid whether all the various

(7)    defaults that were listed here such as failure to

(8)    pay real estate taxes, utility deposit, etcetera,

(9)    were all being monitored by Mr. Nicholson's

(10)   office.

(11)        Q    Did Mr. Tabor or Mr. Nicholson

(12)   provided the information about the financial

(13)   issues represented by this notice -- in other

(14)   words, the payments of rent, the payments of

(15)   taxes and so on?

(16)        A    That would be from both of them.

(17)        Q    But your source of information would

(18)   have been representatives from Congress; correct?

(19)        A    I would not call it Congress. It was

(20)   Mr. Nicholson and Mr. Tabor.

(21)        Q    Is Mr. Tabor an employee of Congress

(22)   Construction?

(23)        A    I don't know who his direct employer

(24)   is.  I don't know how many companies Mr. Bill

(25)   Nicholson has but Mr. Tabor is certainly in the

(1)                    **H. Fensterman, Esq.**

(2)    **employ of one of Mr. Nicholson's companies.**

(3)        Q    Attached to the notice as an exhibit

(4)    is an accounting; is that right?

(5)        **A    You can scroll down to that.**

(6)            **MR. GIARDINO:  Can we scroll down**

(7)            **further in the document.**

(8)        Q    Who prepared this accounting?

(9)        **A    That would have been done by Mr.**

(10)   **Nicholson and Mr. Tabor.**

(11)       Q    At the top it references the Congress

(12)   Companies?

(13)       **A    Yes, it says care of the Congress**

(14)   **Companies, right.**

(15)       Q    How was it that the Congress Companies

(16)   came into information about the various security

(17)   deposit and utility deposit and so on how was it

(18)   that they came into that information?

(19)       **A    That is where the funds were sent to.**

(20)   **That is where they were directed. Not Congress**

(21)   **but to White Plains Healthcare Properties but**

(22)   **those accounts were being monitored by Mr.**

(23)   **Nicholson and Mr. Tabor.**

(24)       Q    Was that part of the agreement that

(25)   White Plains had with the Congress Companies to

(1)                    H. Fensterman, Esq.

(2)    manage those aspects of the project?

(3)        **A        No, not at all.  There was no formal**

(4)    **agreement between the White Plains Healthcare and**

(5)    **Congress.  That was Mr. Nicholson as one of the**

(6)    **two managing members that was a responsibility**

(7)    **that he assumed and he assigned it to whom ever**

(8)    **he assigned it to to comprise a compose these**

(9)    **material defaults.**

(10)       Q    Going back to the body of the notice

(11)   itself, the notice relates to both the lease and

(12)   the Letter of Intent; is that correct?

(13)       **A    Can you scroll backup to it please.**

(14)   **You want me to look at this page.**

(15)       Q    The first page there is a reference to

(16)   violations of provisions of the lease and the

(17)   Letter of Intent; is that correct?

(18)       **A    Yes.**

(19)       Q    Was it the purpose of this notice to

(20)   address alleged default under both of those

(21)   agreements?

(22)       **A    The purpose of the notice was to put**

(23)   **Mr. Jozefovic on notice that he had materially**

(24)   **breached both the lease and the Letter of Intent.**

(25)       Q    Those are two separate agreements;

(1)                    H. Fensterman, Esq.

(2)  right?

(3)      **A      Except to the extent that the Letter**

(4)  **of Intent provides that the lease is also a**

(5)  **governing document.**

(6)              **So if you're asking me are they two**

(7)  **separate pieces of paper, yes, they are, but I**

(8)  **believe the Letter of Intent by its terms states**

(9)  **that the lease continues to survive and govern**

(10) **the conduct of the parties some language to that**

(11) **effect. If you would like I can try to find it**

(12) **but I don't have it off the top of my head.**

(13)     Q     That is alright. I think my plan was

(14) to break around 12:30 and if you wanted to look

(15) at that while we are on our noon break that is

(16) fine. I will continue for another few minutes on

(17) this document.

(18)     **A      Sure.**

(19)     Q     So is it your testimony that its the

(20) lease that governs the nature of the default

(21) under each of these items listed in the Notice of

(22) Default?

(23)     **A      No, it is my position that Mr.**

(24) **Jozefovic materially breached the lease and he**

(25) **materially breached the Letter of Intent.**

(1)                    **H. Fensterman, Esq.**

(2)      Q      But I believe your testimony a moment

(3)   ago was that the lease governed all of these

(4)   issues; did I misunderstand?

(5)              MR. DONNELLAN:    Objection to the

(6)              form. You can read the plain meaning

(7)              of what the letter says.

(8)      **A      The letter speaks for itself. The**

(9)   **lease makes the Letter of Intent makes certain**

(10)  **modifications to the lease but there was many**

(11)  **provisions in the lease I think 70 odd pages of**

(12)  **it that I believe the Letter of Intent indicated**

(13)  **would continue to govern the conduct of the**

(14)  **parties. For example, the security deposit was**

(15)  **modified in the Letter of Intent. The ability to**

(16)  **acquire the facility was modified in the Letter**

(17)  **of Intent. As it relates to the security deposit**

(18)  **Mr. Jozefovic signed the Letter of Intent on**

(19)  **November 20, he was obligated to put $1 million**

(20)  **of the security deposit down ten days later or 11**

(21)  **days later and he failed to do so. Then, and**

(22)  **continuing to now and that was just ten or 11**

(23)  **days after he signed an agreement that had been**

(24)  **negotiated after multiple sessions of discussions**

(25)  **in Mr. Donnellan's office.**

(1)                    H. Fensterman, Esq.

(2)                 So Mr. Jozefovic well knew who Mr.

(3)    Donnellan was because he was in his office on

(4)    multiple occasions negotiating the Letter of

(5)    Intent with him.  So it's not as if he didn't

(6)    know that it was Mr. Donnellan had the authority

(7)    to send this letter. He had been working with him

(8)    since September of the previous year, August or

(9)    September the previous years in multiple meetings

(10)   in his office which gave rise to that Letter of

(11)   Intent. Mr. Jozefovic having been represented at

(12)   the time by Mr. Zafrin and Mr. Frimmel of

(13)   Michelman & Robinson.

(14)        Q    I don't think there is any -- there is

(15)   no dispute about that, Howard.

(16)        A    Right.

(17)        Q    You have testified earlier --

(18)        A    I am just making it clear it was not

(19)   you. That is why I am making it clear.

(20)        Q    In many ways I appreciate that,

(21)   Howard.  Let's move on.

(22)                 I think you testified earlier that the

(23)   Letter of Intent was signed on November 20, 2019?

(24)        A    I believe that is the date, yes.

(25)        Q    Was there any term of the Letter of

(1)               H. Fensterman, Esq.

(2)   Intent -- in other words, was there a period of

(3)   time under which the parties were acting under

(4)   the Letter of Intent?

(5)        A     Well it was suppose to result in a

(6)   closing I believe in April of -- when the

(7)   Delaware Statutory Trust, and it required certain

(8)   condition precedence over a period of time.  The

(9)   first one was a nonrefundable down payment was to

(10)  be made on the sale of the interest to the

(11)  Delaware Statutory Trust and then ten days later

(12)  the installment of the security deposit which

(13)  prior in time still had not been made but had

(14)  been reduced substantially reduced in order to

(15)  resolve it with Mr. Jozefovic and as I said that

(16)  piece of the security deposit was due a mere ten

(17)  days after we signed ten or 11 days after we

(18)  signed the agreement and he didn't even pay that

(19)  security deposit portion of the security deposit.

(20)             So at that point in my view he was in

(21)  breach of the Letter of Intent 11 days after we

(22)  signed it and maybe after four to five sessions

(23)  of working hours and hours and hours in Mr.

(24)  Donnellan's office and then outside of it with

(25)  conversations between my counsel that I was not

(1)                    H. Fensterman, Esq.

(2)    privy to and Mr. Zafrin and Mr. Frimmel relative

(3)    to a resolution that gave rise to that Letter of

(4)    Intent and notwithstanding that a mere 11 days

(5)    later he materially breached that document.

(6)         Q     So was there a date on which the

(7)    Letter of Intent by its own terms would expire?

(8)         A     I don't have it in front of me but as

(9)    far as I was concerned --

(10)                    MR. DONNELLAN:    Note my objection.

(11)                    The document speaks for itself.

(12)         A     It speaks for itself. He was in

(13)    material breach of the contract that contract by

(14)    December 1 when he failed to pay his security

(15)    deposit.

(16)                    Judge Lane will ultimately determine

(17)    what the affect of that means.   That is not for

(18)    me to opine on. I have my opinion and I am sure

(19)    John you have yours but at end of the day he

(20)    materially breached that contract then and

(21)    certainly I will leave it at that. The legal

(22)    impact of that will be for the court to

(23)    ultimately bankruptcy Judge Lane to ultimately

(24)    determine, not me.

(25)         Q     I don't have a disagreement with

(1)                    H. Fensterman, Esq.

(2)    anything that you said and Al, I absolutely

(3)    agree, the document speak for itself.  I am

(4)    asking a different question.

(5)              Howard, to your knowledge, did the

(6)    Letter of Intent provide a date on which it would

(7)    expire to your knowledge?

(8)        A     I would have to, John, I would have to

(9)    look at it. I don't see it in front of me.

(10)              But as far as I am concerned it

(11)    essentially ended up expiring upon his material

(12)    breach of it but that didn't relieve him of his

(13)    obligations. It only essentially negated the

(14)    entire Letter of Intent because he failed to pay

(15)    $1 million within a week and a half of signing

(16)    the agreement.

(17)                    MR. GIARDINO:   It is 12:30.  I think

(18)                    this is if it is alright with you Al a

(19)                    convenient time to take a break for

(20)                    the noon hour. Howard, how long do you

(21)                    need?  I know you have other business.

(22)                    (Discussion off the record.)

(23)                    (Short break:  12:31 to 1:21)

(24)                    (Whereupon, Defendant's Exhibit 6,

(25)                    Letter of Intent dated 11/20/19, (Ex

(1)                    **H. Fensterman, Esq.**

(2)              **22) 11 pages, was marked for**

(3)              **identification.)**

(4)        Q      Howard, we have marked the LOI dated

(5)    November 20, 2019 as Exhibit 22. Just to confirm

(6)    this is the Letter of Intent about which you have

(7)    been giving testimony throughout this deposition;

(8)    is that correct?

(9)        **A      Correct.**

(10)       Q      To your knowledge was there ever any

(11)   other Letter of Intent between the parties?

(12)       **A      I don't believe so, no.**

(13)       Q      Just before the break you were talking

(14)   about a million dollar payment that was due from

(15)   HBL?

(16)       **A      Yes.**

(17)       Q      Do you know under what section of this

(18)   Letter of Intent that payment is addressed?

(19)       **A      I will tell you in a second. Interim**

(20)   **Operation.**

(21)       Q      I was wait to identify which section

(22)   of the LOI the million dollar payment --

(23)       **A      I said section Interim Operation.**

(24)       Q      Is there a subsection that

(25)   specifically identifies this payment?

(1)                    H. Fensterman, Esq.

(2)        **A      Yes, D.**

(3)        Q      Did you read the language of the

(4)   agreement of the LOI that required a $1 million

(5)   payment?

(6)        **A      I don't understand what your question**

(7)   **is. I am referring to D.  It says "The sum shall**

(8)   **be paid by tenant as follows.  7.1(a)(ii) of the**

(9)   **lease is amended is to provide that the**

(10)  **obligation for the Security Deposit shall**

(11)  **initially be reduced to $2 million.**

(12)         **The sum shall be paid by Tenant as**

(13)  **follows:  (a) Provided that the Contributor has**

(14)  **obtained a permanent Certificate of Occupancy the**

(15)  **Tenant shall draw the initial $1 million from its**

(16)  **credit line on or no later than December 1,**

(17)  **2019".**

(18)       Q      Let me ask you this question first.

(19)             So this subsection (d) deals with the

(20)  security deposit required by section 7.1(a)(ii)

(21)  of the lease; is that correct?

(22)       **A      It deals with the reduction of the**

(23)  **$5.3 million that was suppose to be paid on July**

(24)  **30 to down to $2 million.  That is what was**

(25)  **negotiated.**

(1)                    **H. Fensterman, Esq.**

(2)        Q     When you say $5.3 million earlier in

(3)    your testimony you said that included the $1.6

(4)    million; is that correct?

(5)        **A     Yes, I believe it is, yes, I believe**

(6)    **it does.  $3.7 million and $1.6 million.**

(7)        Q     I will get back to that.

(8)              There is a condition about paying the

(9)    million dollars and that is that the contributor

(10)   obtained a permanent Certificate of Occupancy?

(11)       **A     Right.**

(12)       Q     Who is the contributor?

(13)       **A     That is defined by the agreement.**

(14)       Q     To your knowledge other than what is

(15)   defined in the agreement who is the contributor;

(16)   do you know?

(17)       **A     I will tell you in a second. White**

(18)   **Plains Healthcare.**

(19)       Q     Would you have known that without

(20)   referring to the document definition?

(21)       **A     I am sure I would have but I would**

(22)   **rather we have a document that speaks for itself**

(23)   **so I would rather reference the document than**

(24)   **speculate.**

(25)       Q     As of December 1, 2019 had White

(1)                    H. Fensterman, Esq.

(2)    Plains obtained the Certificate of Occupancy?

(3)         **A      I don't know whether there was a**

(4)    **Certificate of Occupancy. I know that Temporary**

(5)    **Certificate of Occupancy was obtained on 8/22.  I**

(6)    **don't know when the final one was obtained.  I**

(7)    **don't have the date off the top of my head when**

(8)    **it was obtained.**

(9)         Q     This LOI refers to the permanent, not

(10)   the temporary; is that right?

(11)        **A      Yes, it does.**

(12)        Q     When you say that they were in default

(13)   for not making the million dollar payment do you

(14)   know whether or not the condition precedent to

(15)   that payment was satisfied?

(16)        **A      Yes, there was definitely a permanent**

(17)   **Certificate of Occupancy obtained.**

(18)        Q     I am afraid we will have to go back to

(19)   Exhibit 10. Is that up on the screen?  Can we go

(20)   to page 25 of the document. Internal page 25.

(21)             So again, Howard, for accuracy

(22)   purposes the Letter of Intent section (d)

(23)   addresses the obligation under the lease section

(24)   7.1(a)(ii).

(25)             So now I am going to refer you to the

(1)                    H. Fensterman, Esq.

(2)   lease section 7.1(a)(ii) and ask you which

(3)   security deposit or security undertaking is

(4)   addressed in that section (a)(ii)?

(5)        **A     (A)(ii) is $3.7 million.**

(6)        Q     Earlier you testified that this was

(7)   reducing $5.3 million to $2 million.

(8)             Is it more accurate to say that this

(9)   is reducing $3.7 million to $2 million?

(10)       **A     Yes, it appears that way, yes.**

(11)       Q     And then in (d)(ii) there are

(12)  additional payments to be made by the tenant for

(13)  purposes of fulfilling the security deposit

(14)  undertaking; is that correct?

(15)       **A     Right.**

(16)       Q     Would it be fair to say that the

(17)  purpose of this Letter of Intent subsection (d)

(18)  6(d) is to achieve the $3.7 million but to

(19)  achieve it in a different manner than as provided

(20)  under the lease?

(21)       **A     Yes, with bearing in mind that at that**

(22)  **point in time it was contemplated that Mr.**

(23)  **Jozefovic would also own a substantial percentage**

(24)  **of the real estate and hence where the Delaware**

(25)  **trust would be but indirectly his enterprise**

(1)                H. Fensterman, Esq.

(2)  would be and so he would essentially be paying a

(3)  portion of this to himself.  That was the

(4)  contemplation.

(5)       Q    I believe it was your testimony

(6)  earlier that as of December 1, 2019 the $1

(7)  million payment from the credit line had not been

(8)  made?

(9)       A    I just want to be crystal clear, John,

(10)  at no point at any time has Mr. Jozefovic paid

(11)  any security deposit whatsoever. He didn't pay

(12)  the security deposit provided for in the lease

(13)  and he didn't pay the security deposit as

(14)  provided for in the Letter of Intent.  We have

(15)  not received one penny at any time of a security

(16)  deposit.  That is my position.

(17)       Q    Again, for purposes of clarity, this

(18)  Letter of Intent established a deadline by which

(19)  at least $1 million of that security deposit

(20)  should have been paid; is that right?

(21)       A    When you say deadline he was in

(22)  consideration for the reduction of his obligation

(23)  from the $3.7 million that was suppose to be paid

(24)  60 days prior to the commencement and his

(25)  occupancy. This was reduced as part of a

(1)                    H. Fensterman, Esq.

(2)    settlement negotiation, yes, to $1 million which

(3)    he was suppose to pay on and no later than

(4)    December 1.

(5)        Q    This $3.7 million is the same security

(6)    deposit that you discussed with him in your July

(7)    meeting at the facility; correct?

(8)        A    You say July meeting.

(9)             As I said it was between July and

(10)   September.  I don't know when it was but it was

(11)   in that time period.

(12)            No, this security deposit is not the

(13)   one we discussed.  We discussed the security

(14)   deposit that was contained in the lease. This

(15)   Letter of Intent is not dated until November 20

(16)   of that year and we didn't even know we were

(17)   going to end up there with a Letter of Intent. We

(18)   were discussing the terms of the 2017 lease and

(19)   what its requirements were and that we were

(20)   actually we were in the building, we knew it was

(21)   built, we knew it was furnished and we were

(22)   telling him security deposit was due and he was

(23)   refusing, he refused to pay it.

(24)       Q    And again, my question was probably

(25)   not clear so I will try to clarify it.

(1)                    H. Fensterman, Esq.

(2)        **A        Sure.**

(3)        Q        This Letter of Intent section 6(d)

(4)   which addresses the security deposit under the

(5)   lease section 7.1(a)(ii) the obligation under the

(6)   lease 7.1(a)(ii) is the security deposit you

(7)   addressed at the meeting at the building when

(8)   ever that took place?

(9)        **A        We addressed the entire security**

(10)  **deposit at that meeting in July, August of 2019.**

(11)  **We addressed the $1.6 million and we addressed**

(12)  **the $3.7 million. We wanted our security deposit.**

(13)       Q        They had not put it up at the time of

(14)  the meeting at the building and they still had

(15)  not put it up by November 20, 2019; correct?

(16)       **A        They not merely had not put it up at**

(17)  **any of those dates, they had not put it up till**

(18)  **today's date.**

(19)       Q        The answer to my question is yes, they

(20)  had not put it up July and they had not put it up

(21)  in November?

(22)       **A        Correct. They had not put it up in**

(23)  **July. They had not put it up in November.  And as**

(24)  **I said preliminarily to answer these questions**

(25)  **just to be helpful to you they have never put it**

(1)                    H. Fensterman, Esq.

(2)    up.  So any question that you ask me my answer it

(3)    is not my intention to truncate your questions

(4)    but for purposes of time they have never put up a

(5)    security deposit.

(6)        Q      Just before the break I had asked you

(7)    if this Letter of Intent had a provision which

(8)    would cause it to expire on its own terms?

(9)        A      Right.

(10)       Q      Recognizing that the document speaks

(11)   for itself I am asking you if you have any

(12)   understanding that this LOI would have expired on

(13)   its own terms?

(14)       A      To be candid with you, I did not

(15)   really review it again.  I got tied up with other

(16)   unrelated business matters so I would have to

(17)   review it again.

(18)            But I will tell you that as far as I

(19)   was concerned that the agreement was terminated

(20)   essentially by and materially breached by his

(21)   failure to put up the $1 million.

(22)       Q      That would be as of December 1?

(23)       A      Correct.  That is my view. And I have

(24)   not read specifically what you're asking me to do

(25)   but if you want to direct me to a provision I am

(1)                    **H. Fensterman, Esq.**

(2)     **happy to look at it. I do have the agreement in**

(3)     **front of me.**

(4)          Q     Well let me ask you this.

(5)                When was the last time you reviewed

(6)     this agreement?

(7)          **A     I reviewed this agreement yesterday.**

(8)          Q     Did you review other documents in

(9)     preparation for your testimony today?

(10)         **A     I did.**

(11)         Q     Can you just kind of outline for me

(12)    the other documents that you did review in

(13)    preparation for your testimony?

(14)         **A     Sure.  I reviewed the motion papers**

(15)    **from the motion for summary judgment and some of**

(16)    **the exhibits from that.**

(17)                **I did not review the cases, the case**

(18)    **law or anything of that nature that was cited but**

(19)    **I reviewed specifically that document, the Letter**

(20)    **of Intent and certain provisions of the lease as**

(21)    **well as the development agreement.**

(22)         Q     When you reviewed those documents did

(23)    you make any notes about the terms of these

(24)    various agreements or the chronology of these

(25)    various agreements?

(1)                    H. Fensterman, Esq.

(2)      A      As far at notes of the terms, no.

(3)             I made some notes as to certain dates

(4)   of the documents themselves.

(5)      Q      Are those notes that you have been

(6)   referring to in your testimony today?

(7)      A      Are they in my testimony?  I

(8)   incorporated them or tried to in my testimony,

(9)   yes.

(10)            MR. GIARDINO:   I would just ask that

(11)            you preserve those notes as part of

(12)            the transcript for your testimony

(13)            today and I will followup with Mr.

(14)            Donnellan on that.

(15)            THE WITNESS:  No problem. They're

(16)            handwritten.  To the extent you can

(17)            read them I am happy to furnish them

(18)            to you.

(19)            MR. GIARDINO:  Fully understand.

(20)      Q      Rather than cause you to review the

(21)   section of the Letter of Intent that deals with

(22)   the timeline for the Letter of Intent let me ask

(23)   you this question.

(24)            After December 1 when the million

(25)   dollar payment was not made did HBL have the

(1)                    H. Fensterman, Esq.

(2)    right to cure that default by providing the

(3)    million dollar at a later date?

(4)        A    I don't know what the -- I would have

(5)    to look at the provisions of this agreement

(6)    whether there was a cure in there or whether

(7)    there was continuing conversations between my

(8)    counsel and Mr. Zafrin relative to making the

(9)    payment.

(10)            I only know that by January I guess it

(11)   was 7 or early January of the following year the

(12)   security deposit had still not been paid and that

(13)   is when the default notice went in. The security

(14)   deposit as well as the multiple other defaults

(15)   under the lease had not been complied with, the

(16)   financial statements, the utility deposit,

(17)   everything that was outlined in that document

(18)   that you showed me that default notice had not

(19)   been cured by that date.

(20)       Q    I will ask you if you know is there a

(21)   provision in the Letter of Intent for the cure of

(22)   any defaults under the Letter of Intent to your

(23)   knowledge?

(24)       A    John, again, I will say the document

(25)   speaks for itself. I would not know off the top

(1)                    **H. Fensterman, Esq.**

(2)     **of my head whether there are cure provisions in**

(3)     **there.**

(4)         Q    Do you know if the Letter of Intent

(5)     provides for its termination in the event that

(6)     for example the million dollar payment was not

(7)     made on December 1?

(8)         **A    I don't know. I believe, now I am not**

(9)     **speaking factually, I believe that the failure to**

(10)    **pay the million dollar was a material breach of**

(11)    **the agreement and as a lawyer I believe that as a**

(12)    **material breach it served to relieve us meaning**

(13)    **the landlord from any further obligations under**

(14)    **that agreement should we chose to proceed in that**

(15)    **direction.**

(16)        Q    Did you in fact choose to proceed in

(17)    that direction?

(18)        **A    We chose to proceed in that direction**

(19)    **on January 7 when we sent the default notice. I**

(20)    **am quite certain that between that December 1**

(21)    **date and the date we sent the default notice that**

(22)    **conversations were had between the attorneys in**

(23)    **an effort to continue to move the resolution that**

(24)    **had been attained in that letter forward and**

(25)    **naturally, I shouldn't say naturally, the facts**

(1)                    H. Fensterman, Esq.

(2)  are that none of the items noted in the default

(3)  notice had been provided up until the date of

(4)  that default notice.  So he was in my judgment

(5)  and factually everything that is in that default

(6)  notice he had failed to provide which in my

(7)  judgment was a material breach of both the lease

(8)  provisions and the Letter of Intent.

(9)       Q     You referenced January 7 Notice of

(10)  Default?

(11)      A     Right.

(12)      Q     Is it your position that that notice

(13)  also terminated the LOI?

(14)      A     I believe that all agreements between

(15)  the parties were terminated at that point in

(16)  time.

(17)            If you're asking me as a matter of law

(18)  which again will be something within the

(19)  exclusive purview of Judge Lane in my view his

(20)  failure to pay the security deposit within ten

(21)  days constituted a material breach of his

(22)  agreement meaning the Letter of Intent which

(23)  would serve to terminate it at that time. But

(24)  that again is my opinion.  That is not my

(25)  testimony factually as a witness.

(1)                          **H. Fensterman, Esq.**

(2)        Q     So let me be clear, I am not asking

(3)    for a legal conclusion.

(4)        **A     Right.**

(5)        Q     And you're right the judge will make

(6)    that.

(7)              I am asking you if by pending that

(8)    January 7, 2020 notice it was your intention to

(9)    terminate the Letter of Intent for the failure to

(10)   pay the million dollar deposit?

(11)       **A     It was my intention or our intention**

(12)   **to terminate the lease as a result of his failure**

(13)   **to comply with his provisions that were contained**

(14)   **both in the lease and in the Letter of Intent. In**

(15)   **my judgment that is what that document does.**

(16)       Q     So you have been clear about

(17)   terminating the lease.

(18)       **A     Right.**

(19)       Q     Was it your intention to also

(20)   terminate the Letter of Intent which is a

(21)   separate agreement as you pointed out earlier?

(22)       **A     I don't believe that the Letter of**

(23)   **Intent is separate and apart from the lease hold**

(24)   **itself. The Letter of Intent addresses itself to**

(25)   **the relationship between the landlord and the**

(1)                    H. Fensterman, Esq.

(2)    tenant and certain -- and a settlement of a lease

(3)    dispute that was extant at time.  So I believe

(4)    that the whole document was terminated at that

(5)    time because of his failure to pay the security

(6)    deposit and that ended that document. He was in

(7)    material breach of it at that point in time.  In

(8)    my judgment he was in material breach of that

(9)    agreement as of the date he failed to make his

(10)   security deposit and continued to fail to make

(11)   the security deposit, the payments, on

(12)   everything. So all relations, all business

(13)   relations between the landlord and the tenant

(14)   were as far as the agreements were concerned the

(15)   lease and the Letter of Intent in my judgment

(16)   were terminated by that default letter.

(17)       Q    As long as we have Exhibit 10 up on

(18)   the screen, Howard, I will ask you to take a look

(19)   at 7.1(a)(i).

(20)       A    Okay.

(21)       Q    Actually I apologize. I will ask you

(22)   to take a look at 7.1(a)(iii).

(23)       A    Okay. I see it.

(24)       Q    7.1(a)(iii) deals with another

(25)   security deposit requirement; is that correct?

(1)                    H. Fensterman, Esq.

(2)        **A       Yes, it dealt with the $1.6 million.**

(3)        Q       Let's talk about the $1.6 million.

(4)                This is the money that was on deposit

(5)    with the JP Morgan bank; is that right?

(6)        **A       I don't know that it was on deposit. I**

(7)    **have no proof it was on deposit. I was suppose to**

(8)    **be a signatory to that account and have access to**

(9)    **that but I was never given that.**

(10)               **I don't know if the money was there**

(11)   **then or its been there at any time.**

(12)       Q       So when you say you were never given

(13)   that what is that?

(14)       **A       That was what was required in the**

(15)   **terms of the lease that I was suppose to be a**

(16)   **signatory on the account and the account could**

(17)   **not be drawn down upon without my signature and**

(18)   **that never happened.**

(19)               **I was sent documents, I sent them back**

(20)   **although Mr. Zafrin claimed that I did not, I**

(21)   **sent them back I think that is Exhibit 34 in the**

(22)   **motion papers, I Fed Ex'd them back and I never**

(23)   **heard from them again.**

(24)       Q       Is it your testimony that you did

(25)   receive signature cards which would have provided

(1)                    H. Fensterman, Esq.

(2)  you with authorization over this account?

(3)      **A      I don't know what I received. What**

(4)  **ever I received it was asked to sign I signed and**

(5)  **I sent back by Federal Express.**

(6)      Q      Where did you send that document?

(7)      **A      I apologize but I believe it is an**

(8)  **exhibit in the motion papers. I don't have it in**

(9)  **front of me. My recollection is that it is**

(10) **Exhibit 34 but again I don't have that in front**

(11) **of me and if I am wrong on the number I may be**

(12) **but that is my recollection.**

(13)     Q      So Exhibit 34 is a deposition Exhibit.

(14) We could make arrangements to have it marked.

(15)            But I am just wondering of your

(16) knowledge do you know when you sent that document

(17) by Fed Ex to whom you sent it?

(18)     **A      I don't know who it was sent to**

(19) **because I don't have it in front of me.**

(20)            **MR. GIARDINO:  We will take a minute**

(21)            **to mark that. That document is on it**

(22)            **is way.**

(23)            **(Whereupon, Defendant's Exhibit 7, Fed**

(24)            **Ex mailing receipt (Ex 76), 1 page,**

(25)            **was marked for identification.)**

(1)                    **H. Fensterman, Esq.**

(2)        Q    Howard, I will ask you if what we

(3)    marked as Exhibit 77 is the mailing receipt that

(4)    you referred to and I will represent to you that

(5)    we took this document from Exhibit 34 attached to

(6)    the motion papers?

(7)        **A    If that is what is attached that is**

(8)    **what is attached.  I don't remember. I know there**

(9)    **was a Fed Ex receipt.**

(10)       Q    This document are you able to identify

(11)   where the document was sent?

(12)       **A    On this document there is no address.**

(13)   **Apparently it is a copy of a Fed Ex document.**

(14)       Q    Would your office have any other

(15)   records related to this mailing that would

(16)   identify what address this was sent to?

(17)       **A    It may very well.  I would have to**

(18)   **look for it. It was not sent in a vacuum.  That**

(19)   **is for sure.**

(20)       Q    Is it your testimony that this

(21)   envelope to which this label or what ever mailing

(22)   document this is contains a signature card which

(23)   would have given you signature authority over the

(24)   security deposit account?

(25)       **A    I don't know if it was a signature**

(1)                    H. Fensterman, Esq.

(2)    card. It contained what ever Mark Zafrin asked me

(3)    to sign. I can't represent that that was a

(4)    signature card. I don't know what it was.  I

(5)    don't recall what it was.

(6)        Q     But is it your understanding that by

(7)    signing it and returning it would have granted to

(8)    you signature authority over the account?

(9)        A     My understanding is that it was Mr.

(10)   Zafrin's obligation to send me what ever

(11)   documents were required to be signed by me to

(12)   effectuate and implement the terms of our

(13)   agreement. That is what I understood he was going

(14)   to be doing and sending to me. What ever he sent

(15)   to me I signed.

(16)       Q     You have no recollection about the

(17)   document that you signed at this time?

(18)       A     I don't remember whether it was a

(19)   signature card.

(20)             I remember receiving something from

(21)   him and I am certainly happy to check, go back

(22)   into my e-mails from that time period and check

(23)   what it is he sent to me and whether there was

(24)   any cover letters or communications beyond this I

(25)   am happy to do that.

(1)                    H. Fensterman, Esq.

(2)        Q      Well, did you retain a copy of the

(3)   document after you signed it?

(4)        A      I don't know. I don't recall.

(5)        Q      Have you made a search for that

(6)   document?

(7)        A      I don't remember that specific

(8)   document.  I certainly know I made a search when

(9)   I was requested for discovery but I will re visit

(10)  it again and ask my staff to look to see if there

(11)  is any backup for this document.

(12)           This document is sent to me from one

(13)  of the people in my business office and the day

(14)  it shows there.

(15)       Q      As an aside, when you referenced that

(16)  you made a search for documents in connection

(17)  with this litigation I assume you are talking

(18)  about the request that our office prepared and

(19)  tendered to your counsel?

(20)       A      Yes, but I also tried to, this goes

(21)  back a ways now, but refresh my recollection of

(22)  all the issues in the case to see whether I had

(23)  it but specifically with regard to what ever the

(24)  request for production was that is what we were

(25)  specifically addressing.

(1)                    **H. Fensterman, Esq.**

(2)        Q      Did you personally conduct a search

(3)    for documents or did you call upon personnel in

(4)    your office to do it?

(5)        **A      Personnel in my office. I may have**

(6)    **participated to the tune of 15 minutes of my**

(7)    **time.**

(8)        Q      So who in your office did you ask to

(9)    conduct the search for documents?

(10)       **A      I asked my business office to conduct**

(11)   **a search of documents and to do it through the IT**

(12)   **department and possibly one of my lawyers that**

(13)   **works in the firm but I don't remember which one**

(14)   **so it could be supervised under the auspices of a**

(15)   **lawyer.**

(16)       Q      Do you know the names of any of the

(17)   individuals that were involved in the search for

(18)   and production of documents?

(19)       **A      It could be any one of four attorneys**

(20)   **and I don't remember which one it was.**

(21)       Q      After you sent in this document which

(22)   was for the purposes of giving you signatory

(23)   authority over the account did you ever followup

(24)   with Mr. Zafrin, Mr. Jozefovic or anyone else to

(25)   ensure that you had signatory authority?

(1)                    H. Fensterman, Esq.

(2)        A      Well let me be clear, again.

(3)             I don't recall what the document was

(4)   that was sent to me. My understanding was it was

(5)   part and parcel of what ever it was that I needed

(6)   to sign in order to implement the terms of our

(7)   agreement but I don't know specifically what it

(8)   was and I don't, the second part of your

(9)   question, I don't recall whether I had any

(10)  conversations with Mr. Jozefovic and it is highly

(11)  unlikely I had any conversations with Mr. Zafrin

(12)  because unfortunately Mr. Zafrin and I were not

(13)  on speaking terms.  As I mentioned he tried to

(14)  assault me in a meeting that was several years

(15)  later but we have not been on good business terms

(16)  or personal terms for a long time.

(17)       Q      Did you ever receive any bank

(18)  statements for this account?

(19)       A      No, not that I am aware of.

(20)       Q      Did you ever ask to receive statements

(21)  for this account?

(22)       A      No, I don't know that I was suppose to

(23)  get statements for the account.

(24)             The object as I recall was that in as

(25)  much as that we had had problem previous with Mr.

(1)                    **H. Fensterman, Esq.**

(2)    **Jozefovic regarding money in an account the**

(3)    **object here was to ensure that this money stayed**

(4)    **in the account until 60 days before the date it**

(5)    **was due and then be put into the security deposit**

(6)    **account of the landlord as part of the security**

(7)    **deposit.**

(8)         Q    Did you ever take any steps to ensure

(9)    that the balance remained in the account from

(10)   August of 2017 until 2019?

(11)        **A    No, my understanding of our deal was**

(12)   **that my signature would have been required to**

(13)   **diminish the account in anyway or to remove the**

(14)   **funds and that is what I thought I had sent back**

(15)   **but I never got any information from him.**

(16)        Q    My question is did you ever take

(17)   between August of 2017 and the meeting that took

(18)   place at the White Plains facility did you ever

(19)   take any affirmative steps to confirm that you

(20)   were a signatory on that account?

(21)        **A    I don't believe that I did but I don't**

(22)   **recall specifically. I don't know whether I sent**

(23)   **an e-mail.  I just don't recall.**

(24)        Q    And then this $1.6 million account is

(25)   this the same security deposit money that was

(1)                    H. Fensterman, Esq.

(2)    discussed at the meeting at the building in July

(3)    or August of 2019?

(4)        **A      Yes.**

(5)        Q      During the course of that discussion

(6)    did you ask for any documentation that would

(7)    evidence your being a signatory on the account?

(8)        **A      No, we asked for the money.**

(9)        Q      What was the discussion about the

(10)   money?  Could you tell me what you said and can

(11)   you tell me what either Mr. Zafrin or Mr.

(12)   Jozefovic would say?

(13)       **A      We said that the security deposit was**

(14)   **going to be due, the building was ready to be**

(15)   **occupied and the security deposit was due 60 days**

(16)   **before then and we wanted the money and we were**

(17)   **told that we were not being giving the security**

(18)   **deposit.  That was I don't know the exact words**

(19)   **naturally that meeting occurred two and a half**

(20)   **years ago close to three years ago, so two and a**

(21)   **half years ago pretty much and two and a half**

(22)   **years ago, I don't remember exactly what was said**

(23)   **but clearly the substance of what we wanted was**

(24)   **the security deposit and the substance of what**

(25)   **they said was they were not paying it.**

(1)                    **H. Fensterman, Esq.**

(2)        Q      Was there any reason given for not

(3)    paying $1.6 million?

(4)        **A      There was no specific reason given**

(5)    **about the failure to pay the entire security**

(6)    **deposit other than the fact that Mr. Jozefovic**

(7)    **was still upset about the fact that he had put**

(8)    **money down several years earlier and apparently**

(9)    **wanted some concession for it.**

(10)       Q      Let's address that issue.

(11)              What money did he put down several

(12)   years earlier?

(13)       **A      He had put down money on a that I**

(14)   **think was contained in an understanding by the**

(15)   **parties that were in a term sheet and he had put**

(16)   **money down in connection with that.**

(17)       Q      Do you know how much it was?

(18)       **A      I believe it was $2.2 million.  That**

(19)   **is my recollection.**

(20)       Q      Did that term sheet identify the

(21)   purpose of that payment?

(22)       **A      I believe it did, yes.**

(23)       Q      What was the purpose or purposes of

(24)   that payment?

(25)       **A      $1.5 million was suppose to be**

(1)                    H. Fensterman, Esq.

(2)    allocated toward FF&E and the rest of it was to

(3)    be disbursed in accordance with its terms and he

(4)    was suppose to receive that money back in a

(5)    reduction of his lease payments. That was

(6)    pursuant to the first lease, not the second one.

(7)        Q    At the meeting at the facility in July

(8)    or August of 2019 did you discuss the $1.5

(9)    million for the FF&E?

(10)        A    I don't recall but I know it was

(11)    always our intention to give him the FF&E.

(12)        Q    When you say it was always your

(13)    intention did you ever give him the FF&E?

(14)        A    He didn't get the FF&E because the

(15)    lease was breached. We never came to final terms

(16)    on it because he failed to pay his security

(17)    deposit. He took occupancy of the premises in the

(18)    middle of September of 2019, has been occupying

(19)    it since then, running a business out of it and

(20)    never paid a security deposit.

(21)        Q    So is it your testimony today that the

(22)    failure to pay a security deposit justified some

(23)    sort of offset with $1.5 million that he had

(24)    previously given you?

(25)        A    It is my testimony that all agreements

(1)                    H. Fensterman, Esq.

(2)    that we attained were merged into the lease

(3)    pursuant to its merger clause and I am talking

(4)    about the 2017 lease including that so called

(5)    term sheet which in my judgment is not a contract

(6)    but putting that aside for the moment even if it

(7)    was it was merged into the merger clause in the

(8)    lease and that is my position.

(9)             So what ever is in that lease in 2017

(10)   is the operative agreement between the parties.

(11)   Except for the fact to the extent that we

(12)   attempted to amend it by the Letter of Intent.

(13)       Q    Again, the document will speak for

(14)   itself?

(15)       A    Yes, it will.

(16)       Q    I am not asking for a legal conclusion

(17)   but I understood you to say that Mr. Jozefovic

(18)   did not get $1.5 million in FF&E because he did

(19)   not provide the security deposit; is that your

(20)   testimony?

(21)       A    My testimony is that the FF&E was

(22)   never transferred to him because of his breach of

(23)   the lease. That is my testimony.  And I call it a

(24)   material breach of the lease.

(25)             His failure to pay the security

(1)                   H. Fensterman, Esq.

(2)     deposit as well as I don't want to ignore the

(3)     other itemization of the material defaults that

(4)     are contained in the January 7 letter. The

(5)     overwhelming majority of which he is never cured

(6)     or paid. Some of it may have but the overwhelming

(7)     majority he did not.

(8)         Q     If there was a $2.2 million payment

(9)     made and $1.5 million was allocated to the FF&E

(10)    and you have described what has gone on with that

(11)    what about the other $700,000?

(12)        A     The other $700,000 I believe was

(13)    suppose to be a noninterest bearing loan and it

(14)    was structured in that understanding that we

(15)    reach embodied in a it says it is to clarify the

(16)    position of the parties but it was to be it was

(17)    going to be paid back to him from a deduction in

(18)    his rent over and above the PNI which is the

(19)    formula which was in the first lease in 2015 at

(20)    the rate of $2,700 per month for a term of 420

(21)    months which is how he was getting back the

(22)    money. That agreement changed when the second

(23)    lease was signed and that is what he was so

(24)    particularly upset about.

(25)        Q     So when you say the second lease

(1)                    H. Fensterman, Esq.

(2)    you're referring to the Amended and Restated

(3)    Operating Lease which we marked Exhibit 10 which

(4)    was signed in 2017; correct?

(5)         A     **Correct.  That is what I am referring**

(6)    **to.**

(7)         Q     Does that agreement that Amended and

(8)    Restated Lease does address the $700,000 credit?

(9)         A     **No, it does not because he waived it.**

(10)              **In connection with the negotiation of**

(11)   **that lease he gave up that money.**

(12)        Q     When you say he waived it how did he

(13)   waive it?

(14)        A     **Because when we negotiated the terms**

(15)   **of the Amended and Restated Lease that was**

(16)   **negotiated out and was not incorporated into the**

(17)   **lease as a result of that.**

(18)              **He received the amendment of the**

(19)   **lease, well, suffice to say it was negotiated**

(20)   **out.**

(21)        Q     Is there any document that evidences

(22)   the waiver of the right to that $700,000?

(23)        A     **Yes, the Amended Lease. The amended**

(24)   **lease and its merger clause.**

(25)        Q     When you refer to the amended lease is

(1)                    H. Fensterman, Esq.

(2)    there any section of that lease that references

(3)    the waiver of the right to receive $700,000 in

(4)    rent credit?

(5)         **A     Yes, the provisions in the lease that**

(6)    **were eliminated in the 2015 lease and restated by**

(7)    **that amendment in the 2017 lease which are**

(8)    **crystal clear does not contain any reimbursement**

(9)    **of those funds because in the negotiation of that**

(10)   **lease which took place in the Michelman &**

(11)   **Robinson offices he waived it and it was not and**

(12)   **the agreement the second lease was negotiated**

(13)   **between the parties and it was not incorporated**

(14)   **in that second agreement, second lease, because**

(15)   **he had agreed to waive it in consideration from**

(16)   **receiving other benefits from that second lease**

(17)   **which he requested.**

(18)        Q     Again, my question is simple, that I

(19)   am asking you reference the fact that the

(20)   $700,000 was waived because it's eliminated.

(21)              I am asking you if there is any

(22)   expressed writing that evidences Mr. Jozefovic or

(23)   HBL's intention to waive that credit?

(24)        **A     Yes, the Amended and Restated Lease**

(25)   **which is an Amended and Restated Lease of the**

(1)                    H. Fensterman, Esq.

(2)    first lease which provided for his receiving that

(3)    money back and when it was Amended and Restated

(4)    it eliminated it. So that is the writing. That is

(5)    why it was Amended and Restated.

(6)         Q     Again, let's be clear, the Lease

(7)    Agreement will speak for itself?

(8)         A     Yes.

(9)         Q     I am asking you of your own knowledge

(10)   is there a specific expressed provision in that

(11)   amended lease expressed that waives the $700,000?

(12)        A     Is there any language that expressly

(13)   says that it's being amended and eliminated, the

(14)   document, I don't believe there is but again as

(15)   we both mutually agree the document speaks for

(16)   itself.

(17)        Q     These issues were discussed at the

(18)   time of the meeting at the facility in July or

(19)   August of 2019?

(20)        A     Mr. Jozefovic was irate as he was on

(21)   multiple occasions about having put up that money

(22)   back then he expressed that he felt he made a

(23)   mistake, I don't know whether he was mad at Mr.

(24)   Zafrin or not but he felt and he was irate that

(25)   that issue was not addressed in the second lease.

(1)                    **H. Fensterman, Esq.**

(2)        Q      So you mentioned that in describing

(3)   multiple defaults that are identified in the July

(4)   7 letter that HBL or Jozefovic never cured any of

(5)   them; is that your testimony?

(6)        **A      First of all, just for the record you**

(7)   **said the July 7 letter, it is a January 7 letter**

(8)   **so I just ask the reporter to correct that if**

(9)   **that is okay with you John.**

(10)       Q      I apologize.

(11)              I am referring to the January 7 Notice

(12)   of Default.

(13)       **A      Right.**

(14)       Q      I am asking you if after that the

(15)   issuance of the Notice of Default if either HBL

(16)   or Jozefovic ever cured any of those defaults?

(17)       **A      Yes, I think I testified earlier that**

(18)   **he made have cured some of them. I don't think he**

(19)   **cured them within the timeframe he was suppose to**

(20)   **cure them in but I do believe that for some of**

(21)   **the minor ones he may have cured them. I don't**

(22)   **know exactly which ones they were but my**

(23)   **recollection is that he may have undertaken to do**

(24)   **some of those things.  Certainly not the security**

(25)   **deposit but some of the other items that are**

(1)                    **H. Fensterman, Esq.**

(2)     **listed there he may have at one point in time**

(3)     **after January 7 when he was defaulted paid some**

(4)     **of those bills but I am not sure which ones.**

(5)         Q     You're not able to say which one of

(6)     the defaults occurred after January 7?

(7)         **A     No, I am not.  I apologize but I am**

(8)     **not.**

(9)         Q     To your knowledge is there any

(10)    difference between the iteration of the default

(11)    under the January 7, 2020 letter and the

(12)    iteration of the default in the Amended Complaint

(13)    which we reviewed?

(14)        **A     I don't know the answer to that.  I**

(15)    **have to review it, John.  I would have to take the**

(16)    **two documents and look at them side by side and**

(17)    **juxtapose them and give you that answer.**

(18)    **Certainly off the top of my head I am not in the**

(19)    **position to discuss that but again, those**

(20)    **documents similarly will speak for themselves.**

(21)        Q     Did you ever participate in a

(22)    conversation between Mr. Nicholson to identify

(23)    which of the notice defaults had been cured and

(24)    which ones had not?

(25)        **A     No, I did not.**

(1)                    **H. Fensterman, Esq.**

(2)        Q      One of the defaults that is referenced

(3)    in the Complaint is the failure to pay rent; are

(4)    you familiar with that?

(5)        **A      Yes.**

(6)        Q      In particular do you know which

(7)    installments of rent you allege HBL failed to

(8)    pay?

(9)        **A      I am sorry, which document are you**

(10)   **asking me that I made that allegation?**

(11)       Q      In the Verified Amended Complaint?

(12)       **A      I don't know which installment.**

(13)              **(Short break:  2:20 to 2:27)**

(14)       Q      Before the break I was asking you

(15)   about the allegation in the Amended Complaint

(16)   about the failure to pay rent.

(17)       **A      Right.**

(18)       Q      Do you want to review the Complaint in

(19)   order to respond to that question?

(20)       **A      I don't know which months it would be**

(21)   **discussed so as I indicated earlier my testimony**

(22)   **Mr. Nicholson maintained those records.**

(23)       Q      I will represent to you that paragraph

(24)   55 of the Amended Complaint alleges that HBL

(25)   failed to pay rent?

(1)                    H. Fensterman, Esq.

(2)        **A      Yes.**

(3)        Q      As you testified today do you know

(4)   what installment of rent HBL failed to pay?

(5)        **A      I don't as I testify today.**

(6)        Q      Do you know the first month in which

(7)   HBL did pay rent?

(8)        **A      My recollection is is that after the**

(9)   **Letter of Intent was signed or we had attained an**

(10)  **oral understanding preliminary to it being signed**

(11)  **rent was paid it was suppose to be paid from**

(12)  **September 30 forward, it was not, it was paid**

(13)  **from October 1, Mr. Jozefovic did not pay I think**

(14)  **it amounted to $10,000 or $11,000 for that day's**

(15)  **rent that remained in default for a long period**

(16)  **of time and he paid I don't remember which months**

(17)  **he paid at that point.**

(18)           **And then of course after the default**

(19)  **he was suppose to be paying holdover rent and he**

(20)  **has never paid that.**

(21)       Q      Other than the rent for September 30

(22)  are you aware of any other installment of rent

(23)  recognizing you have got a claim for holdover

(24)  rent any other installment of monthly rent that

(25)  was not made between October 1 and today?

(1)                    H. Fensterman, Esq.

(2)        **A      I don't know specifically. I remember**

(3)    **that there were months when it was late beyond**

(4)    **all period and then it was may have been**

(5)    **eventually paid but Mr. Nicholson if you need**

(6)    **that information Mr. Nicholson would maintain**

(7)    **those records and he will know.**

(8)        Q      As you testify today you have no

(9)    knowledge of a month in which payment of rent was

(10)   not made?

(11)       **A      As I am testifying I don't know which**

(12)   **months it was, no, I do not.**

(13)       Q      Was there ever an occasion that HBL

(14)   paid rent and you rejected the payment of rent?

(15)       **A      I don't have any recollection of doing**

(16)   **that.**

(17)       Q      Do you know if any month when HBL paid

(18)   rent White Plains notified HBL that the

(19)   acceptance of rent was not a waiver of any

(20)   default?

(21)       **A      I don't know whether we did but I can**

(22)   **tell you I know that we didn't have to under the**

(23)   **terms of the lease but again the lease will speak**

(24)   **for itself.**

(25)       Q      I am asking you again recognizing the

(1)                    H. Fensterman, Esq.

(2)   lease speaks for itself I am asking you if White

(3)   Plains whether it is you, Mr. Nicholson or anyone

(4)   else advised HBL that the acceptance of rent was

(5)   not a waiver of any default?

(6)        **A     I know that I don't believe I ever did**

(7)   **that. I cannot speak to what Mr. Nicholson did or**

(8)   **did not do.**

(9)        Q     After the January 7, 2020 Notice of

(10)  Default did White Plains ever make a demand on

(11)  HBL to surrender the premises?

(12)       **A     I don't recall. I don't recall.**

(13)       Q     There is an allegation in the

(14)  Complaint allegation number 56 that HBL failed to

(15)  pay real estate taxes due for the property.

(16)            Are you able to identify what real

(17)  estate taxes HBL failed to pay?

(18)       **A     The only thing that I recall about**

(19)  **that is that we being White Plains had to pay**

(20)  **real estate taxes that Mr. Jozefovic was suppose**

(21)  **to pay. I believe that amount was in the $60,000**

(22)  **range because he had not paid it.  That is my**

(23)  **recollection. Again, I am not looking to dodge**

(24)  **the question but Mr. Nicholson has all the facts**

(25)  **and figures regarding those issues but I do have**

(1)                    H. Fensterman, Esq.

(2)    a recollection that we needed to cut a check to

(3)    the municipality for real estate taxes and Mr.

(4)    Jozefovic did not pay.

(5)         Q     Do you recall when that was?

(6)         A     I believe, I believe it was in late

(7)    2019 or early 2020 but I don't know.  I would be

(8)    guessing which I know you don't want me to do as

(9)    to when that was but I believe that it occurred.

(10)        Q     Do you know what the current status of

(11)   real estate taxes for the property is?

(12)        A     I do not.

(13)        Q     Have you received any worth about

(14)   adequate payment of real estate taxes?

(15)        A     I am not aware of any but those

(16)   reports would go to Mr. Nicholson.

(17)        Q     So as you're testify today do you know

(18)   whether or not HBL continued to pay the real

(19)   estate taxes after the January 7 Notice of

(20)   Default?

(21)        A     I do not have personal knowledge of

(22)   whether they did or did not.

(23)        Q     You testified earlier that the amended

(24)   lease was in an integrated document; do you

(25)   recall that testimony?

(1)                     H. Fensterman, Esq.

(2)        **A    I don't but ask me the question and I**

(3)   **will try to answer it.**

(4)              **MR. DONNELLAN:   Objection.  I don't**

(5)              **recall that testimony either.**

(6)              **MR. GIARDINO:  I will not put the**

(7)              **court reporter to the task of finding**

(8)              **it but you indicated that that**

(9)              **agreement was integrated with the**

(10)             **other documents and I just wanted to**

(11)             **ask you I will start from scratch.**

(12)        Q    Is the amended lease integrated with

(13)   any other documents?

(14)        **A    The amended, what I was referring, if**

(15)   **I made that statement my reference is to the**

(16)   **merger clause in the lease which merges all other**

(17)   **agreements into the lease including the**

(18)   **agreements that were contemporaneously signed.**

(19)        Q    Would that include for example the

(20)   Development Agreement?

(21)        **A    That is going to be a matter for Judge**

(22)   **Lane to determine.**

(23)        Q    I am just asking you your

(24)   understanding.  I am not asking you for a legal

(25)   conclusion but were you of the understanding that

(1)                    H. Fensterman, Esq.

(2)     the development agreement was integrated into the

(3)     amended lease?

(4)          **A      I didn't think to have an**

(5)     **understanding of it at any time. I am not being a**

(6)     **wise guy about it but it is nothing that I really**

(7)     **thought about at all.**

(8)               **I am referring when I say the merger**

(9)     **agreement just for the record I am referring to**

(10)    **section 20.6 of the Amended and Restated Lease on**

(11)    **page 64.**

(12)         Q    If you don't, if you didn't have a

(13)    thought or an understanding that is fine just say

(14)    so.

(15)         **A      I didn't, it is not nothing that in my**

(16)    **normal course of events I would think about as to**

(17)    **whether the merger clause incorporates the**

(18)    **development agreement or not.**

(19)         Q    Okay.

(20)              What other agreements were signed

(21)    contemporaneously that would have been

(22)    integrated?

(23)         **A      I think that the only**

(24)    **contemporaneous --**

(25)              **MR. DONNELLAN:   Objection to the form**

(1)                    H. Fensterman, Esq.

(2)                of the question.

(3)        A      I think that the operative agreements

(4)    really as it relates to the development agreement

(5)    that agreement was the principal agreement was I

(6)    believe in 2015. There was an amendment to it

(7)    dealing with bonding like a one page amendment

(8)    that was dealt with in 2017 and I am not sure

(9)    those two documents were even signed

(10)   contemporaneously or recently contemporaneously.

(11)   I don't recall. But I know that there was an

(12)   amendment to the development agreement that dealt

(13)   with something having to do with bonding.

(14)        Q      When you say that the merger clause in

(15)   the lease effected all other agreements that were

(16)   contemporaneously signed --

(17)        A      Right.

(18)        Q      -- do you have any agreements in mind

(19)   when you say that?  What agreements do you have

(20)   in mind?

(21)        A      The only agreements that I have in my

(22)   mind as I make that statement are a development

(23)   agreement and our lease because that is what was

(24)   signed contemporaneously.

(25)                The Letter of Intent was signed many

(1)                    H. Fensterman, Esq.

(2)    years after the lease. So that would not be and

(3)    the term sheet if it was signed on or around the

(4)    same time as the lease I would believe that that

(5)    was similarly integrated into the 2017 lease by

(6)    20.6.

(7)        Q      Was the Amended Lease signed at the

(8)    time that White Plains closed on its financing

(9)    with Security Benefit?

(10)       A      I don't know what the timing was. I

(11)   know that in order to go forward with our

(12)   financing we needed to have an estoppel letter

(13)   and that is what Mr. Jozefovic was refusing to

(14)   sign and he only signed it I believe after we

(15)   came to terms on the Amended Lease.

(16)              Because it was renegotiated he was

(17)   refusing to sign the estoppel certificate and

(18)   cooperate with us closing our construction

(19)   financing until we agreed to his demands to

(20)   modify the 2015 lease, 2017 and that was done in

(21)   the Michelman offices and in a meeting that was

(22)   attended by a number of people.

(23)       Q      I guess my question is was the Amended

(24)   Lease part of the financing transaction?

(25)       A      I don't know whether it was part of

(1)                    H. Fensterman, Esq.

(2)  the financial transaction. We certainly had to

(3)  have -- we couldn't go forward with the financing

(4)  transaction absent having an estoppel letter and

(5)  Mr. Jozefovic refused to sign an estoppel letter

(6)  until he got what he wanted in the Amended Lease.

(7)  The amendment to the lease was done at his

(8)  request and I would characterize it as a demand,

(9)  it was not a request. He absolutely was

(10) intransigent about signing an estoppel letter

(11) until he got what he wanted out of the Amended

(12) and Restated Lease which I will again say was

(13) initiated and done at his demand.

(14)      Q    So is it your testimony that for

(15) purposes of the Security Benefit financing HBL

(16) and/or as you refer to Mr. Jozefovic signed an

(17) estoppel?

(18)           MR. DONNELLAN:   Objection. That is

(19)           not his testimony.  You're trying to

(20)           put words in this mouth. The witness

(21)           has answered the question several

(22)           times several different ways and

(23)           you're trying to get him to say that

(24)           it was part of the same transaction

(25)           and he already said he didn't say

(1)              **H. Fensterman, Esq.**

(2)              that.

(3)        Q     Okay, I am just asking if did the

(4)   tenant deliver an estoppel certificate to White

(5)   Plains at any point in time?

(6)        **A     He delivered an estoppel certificate**

(7)   **to White Plains after he got what he wanted in an**

(8)   **amended lease. I will say it again.  It was not**

(9)   **our request to amend the lease. He wanted certain**

(10)  **pecuniary benefits from the amendment to the**

(11)  **lease so we were asked to come to the Michelman &**

(12)  **Robinson offices to attend a meeting, Mr.**

(13)  **Jozefovic had multiple representatives on his**

(14)  **side of the table that were there including his**

(15)  **accountant and his consultants and his attorney**

(16)  **and insisted upon a reduction and a modification**

(17)  **of multiple -- of two principle multiple issues**

(18)  **in that lease and we spent about eight hours**

(19)  **there and we came to terms and the terms were**

(20)  **embodied in the Amended and Restated Lease.**

(21)        Q     I know you have a concern about trying

(22)  to wrap this up. I am asking you a very simple

(23)  question.

(24)              Did the tenant ever deliver an

(25)  estoppel certificate?

(1)                     H. Fensterman, Esq.

(2)        **A      I said yes, he did.**

(3)        Q      That is the answer. That is the

(4)   answer.

(5)              Was that estoppel certificate

(6)   delivered to Security Benefit?

(7)        **A      I believe that at some point in time**

(8)   **what ever, it was, I believe that that was**

(9)   **something that in order for any landlord to get**

(10)  **financing you have to be able to demonstrate your**

(11)  **tenant is not in material breach of your lease**

(12)  **which unfortunately is the position we have been**

(13)  **in now for several years because our tenant has**

(14)  **been in material breach of his lease for several**

(15)  **years and you can't get a loan as anyone who**

(16)  **practices in this area knows with a tenant who is**

(17)  **in material breach of a lease. It is as simple as**

(18)  **that.**

(19)       Q      I am really trying to just ask very

(20)  simple questions and they're fact questions.

(21)              Did the tenant sign an estoppel, yes.

(22)  Was that estoppel delivered to Security Benefit,

(23)  I take it that that answer you just gave means

(24)  yes, am I right?

(25)       **A      I don't know for a fact whether it was**

(1)                    **H. Fensterman, Esq.**

(2)    **or not. I don't know for a fact whether it was or**

(3)    **not. I only know that he certainly signed one and**

(4)    **if you're asking me did I deliver it, I don't**

(5)    **know.  If you are asking me to make an assumption**

(6)    **did we deliver I will assume that we did.**

(7)         Q    I don't know is a perfectly fine

(8)    answer.

(9)              Do you know if the tenant signed any

(10)   other documents for the purposes of closing on

(11)   the Security Benefit agreement?

(12)        **A    I do not.**

(13)        Q    Do you know if the tenant gave an

(14)   interest in its assets to Security Benefit?

(15)        **A    I do not.**

(16)        Q    Back to the Complaint, there is an

(17)   allegation in paragraph 57 that the tenant failed

(18)   to pay utility deposit.

(19)              Do you know what deposits those were?

(20)        **A    I don't know specifically what**

(21)   **deposits they were but I do know in fact that Mr.**

(22)   **Nicholson repeated to me on a number of occasions**

(23)   **that we had to put up those deposits because the**

(24)   **tenant was not putting them up.**

(25)        Q    Did you know if the tenant ever

(1)                    H. Fensterman, Esq.

(2)    reimbursed you for those deposits or attempted to

(3)    do so?

(4)        **A      I don't know.**

(5)        Q      There is an allegation --

(6)        **A      I know that he didn't put them in up**

(7)    **initially. Whether he cured it at some point I**

(8)    **don't know.**

(9)        Q      There is allegation in paragraph 60

(10)   that the tenant failed to deliver Certificates of

(11)   Insurance as required by the lease.

(12)           Do you have any information about that

(13)   default?

(14)       **A      I only know that I did not receive any**

(15)   **Certificates of Insurance and Mr. Nicholson had**

(16)   **advised me that he had not. Whether that ever got**

(17)   **changed or not or corrected I don't know.**

(18)       Q      So do you know whether there is

(19)   insurance covering the building on not as of

(20)   today?

(21)       **A      I don't know.**

(22)       Q      Had you ever made any inquiry since

(23)   2019 about whether the building is insured?

(24)       **A      I personally have not, no.**

(25)       Q      When the default was issued on January

(1)                    H. Fensterman, Esq.

(2)   7, 2020 did you personally have any discussions

(3)   with Security Benefit about that Notice of

(4)   Default?

(5)        **A      No, I did not.**

(6)        Q      Do you know if Mr. Nicholson had any

(7)   discussion with Security Benefit about the Notice

(8)   of Default?

(9)        **A      I do not know whether he did or not,**

(10)  **no.**

(11)       Q      At any time since the closing on your

(12)  financing with Security Benefit have you had a

(13)  discussion with Security Benefit about a tenant

(14)  default?

(15)       **A      I don't -- I had discussions with**

(16)  **Security Benefit over the years but I do not**

(17)  **recall whether I personally had a discussion with**

(18)  **them after January 7, 2020 regarding a tenant**

(19)  **default. I just don't recall.**

(20)       Q      When was the last time you had a

(21)  discussion with any representative of Security

(22)  Benefit?

(23)       **A      I don't recall. I truly don't recall.**

(24)       Q      Do you know if you spoke to them

(25)  during the year 2021?

(1)                    H. Fensterman, Esq.

(2)        **A      I don't recall whether I did or not.**

(3)   **It was generally something that was being handled**

(4)   **by Mr. Nicholson.**

(5)        Q      Have you had an occasion to review the

(6)   Complaint that Security Benefit filed against

(7)   White Plain?

(8)        **A      I did not review it very carefully.   I**

(9)   **am aware they filed a complaint that was**

(10)  **withdrawn.**

(11)       Q      Did you familiarize yourself with any

(12)  of the allegations in that Complaint?

(13)       **A      No, I did not.**

(14)       Q      Are you aware that Security Benefit

(15)  makes a claim that monies paid by the tenant were

(16)  diverted by the tenant?

(17)       **A      Repeat the question.**

(18)       Q      Are you aware that there are

(19)  allegations made to that Complaint the landlord

(20)  diverted monies paid by the tenant?

(21)       **A      No, I am not.**

(22)            **MR. DONNELLAN:    Objection to the form**

(23)            **of the question.**

(24)       Q      Are you aware of any allegations in

(25)  that Complaint about the failure of the landlord

(1)                    H. Fensterman, Esq.

(2)   to establish a cash management account?

(3)      **A      Again, I am not familiar with the**

(4)   **allegations in the Complaint so any questions you**

(5)   **are going to ask me about it I really did not**

(6)   **review the Complaint. I was not concerned about**

(7)   **it at the time it was filed because I knew that**

(8)   **there was a moratorium.**

(9)      Q      Do you know if under the terms of the

(10)  loan agreement White Plains was required to

(11)  establish cash advantagement account to which the

(12)  rent from the tenant were to be paid?

(13)     **A      I am not aware of it but I heard of**

(14)  **the issue.**

(15)     Q      Who did you hear about that issue

(16)  from?

(17)     **A      Bill Nicholson.**

(18)     Q      When you heard about that from Mr.

(19)  Nicholson did you discuss with him establishing

(20)  such an account?

(21)     **A      No.**

(22)     Q      Did Mr. Nicholson provide any reason

(23)  to you the reason not to establishing that

(24)  account?

(25)     **A      Well at one point Mr. Jozefovic was**

(1)                    H. Fensterman, Esq.

(2)    not paying rent and so there was no point in

(3)    establishing the account and I don't recall what

(4)    the concern was other than the fact that Mr.

(5)    Jozefovic there was a concern whether Mr.

(6)    Jozefovic was going to pay rent or not.

(7)         Q     In what period of time was he not

(8)    paying rent?

(9)         A     Well we did not expect -- we expected

(10)   rent to be paid in late 2019 and it was not paid

(11)   until some time towards the end of November.  And

(12)   then of course ten days later there was a default

(13)   when the security deposit was not paid so we did

(14)   not know whether it was going to be a

(15)   continuation of the payment of rent or not in as

(16)   much as he failed to pay the security deposit

(17)   again for the second time.

(18)        Q     Your earlier testimony is you have no

(19)   knowledge of any monthly installment of rent that

(20)   was not paid?

(21)        A     No, that is not what I said. I said I

(22)   don't know which months he did not pay that you

(23)   asked me were recited in the Amended Complaint. I

(24)   don't know what months he didn't pay.

(25)        Q     Did you ever report to Security

(1)                    H. Fensterman, Esq.

(2)    Benefit that the tenant was not paying rent?

(3)        **A       I remember having a conversation with**

(4)    **Security Benefit a long time ago in which we told**

(5)    **them that the tenant was a problem.**

(6)        Q      Who did you tell that to?

(7)        **A       I don't recall but I remember being**

(8)    **involved in a conversation where we discussed the**

(9)    **fact that there was suppose to be $1.6 million I**

(10)   **believe it was a $1.6 million in an account that**

(11)   **had been defalcated the money had been taken out,**

(12)   **Mr. Jozefovic thought he was free to take the**

(13)   **money out notwithstanding what ever agreement we**

(14)   **had regarding that.**

(15)       Q      First let me ask you who was involved

(16)   in this discussion with Security Benefit in which

(17)   you reported that Mr. Jozefovic took money out of

(18)   an account, who was involved in that discussion?

(19)       **A       Myself and Mr. Nicholson.  I don't**

(20)   **know who from Security Benefit it was.**

(21)       Q      Are you sure that someone from

(22)   Security Benefit was involved in that discussion?

(23)       **A       Yes.**

(24)       Q      Would Mr. Nicholson know who that

(25)   individual was?

(1)                    H. Fensterman, Esq.

(2)        **A      I don't know what Mr. Nicholson**

(3)   **truthfully would know or not know at this point**

(4)   **in time. Again unfortunately many of these**

(5)   **conversations took place years ago and I don't**

(6)   **have a recollection of who I spoke to.**

(7)        Q      From what source did you receive the

(8)   information that Mr. Jozefovic had taken money

(9)   out of an account?

(10)       **A      Actually from Mr. Zafrin.**

(11)       Q      What did Mr. Zafrin say to you?

(12)       **A      The money wasn't there.**

(13)       Q      When you say there where are you

(14)  talking about?

(15)       **A      It was suppose to be in an account, I**

(16)  **don't remember what agreement that was in, but it**

(17)  **was suppose to be an account that we had agreed**

(18)  **would be there for purposes of putting it down as**

(19)  **part of a security deposit.**

(20)       Q      I know you indicated a familiarity

(21)  with some of the exhibits.

(22)              Did you ever have occasion to review

(23)  the exhibits that included the bank account

(24)  statements for the bank account established by

(25)  Mr. Jozefovic for the security account?

(1)                    H. Fensterman, Esq.

(2)        **A      I did not, no.**

(3)        Q      You have never reviewed those

(4)   documents?

(5)        **A      I have not. As I indicated my**

(6)   **objective here is not to be acting as my own**

(7)   **attorney. I have reviewed the documents that I**

(8)   **told you that I reviewed which are the operative**

(9)   **legal agreements I believe that are involved in**

(10)  **this litigation.**

(11)       Q      The source of your information that

(12)  money was removed was Mr. Zafrin and other than

(13)  that no one has ever told you about bank records

(14)  that are part of this court record evidencing

(15)  balances on account; is that right?

(16)       **A      Remember we are not -- we are talking**

(17)  **about the first obligation, not the second one.**

(18)       Q      The first obligation meaning what, the

(19)  $1.6 million security?

(20)       **A      $1.6 million that the first time**

(21)  **around we alleged Mr. Jozefovic had removed from**

(22)  **the account, not the second one.**

(23)       Q      What is the second one?  I am

(24)  confused.

(25)       **A      The second one is the one referenced**

(1)                 **H. Fensterman, Esq.**

(2)  **in the 2017 agreement.**

(3)      Q    Well in the course of this litigation

(4)  in which you have actually submitted affidavits

(5)  have you had occasion to review a bank statement

(6)  at JP Morgan evidencing dollars on deposit?

(7)      **A    No, I have not and frankly even if I**

(8)  **had absent them having been delivered to me as**

(9)  **part of the terms of the lease which Mr.**

(10) **Jozefovic was required to do it was not**

(11) **important.**

(12)             **The key thing to me was whether the**

(13) **$1.6 million pursuant to the terms of the lease**

(14) **were delivered to us as a security deposit and it**

(15) **was not then or now.**

(16)     Q    Are you aware of the allegation in the

(17) Security Benefit complaint that the borrower

(18) White Plains failed to obtain Security Benefit

(19) since to the issuance of the Notice of Default?

(20)     **A    As I mentioned to you, I did not read**

(21) **the Complaint and there is no Complaint right**

(22) **now.  There is no case pending.**

(23)     Q    Well do you know if under the terms of

(24) your loan agreement with Security Benefit White

(25) Plains is required to obtain the consent of the

(1)                    H. Fensterman, Esq.

(2)    lender Security Benefit before issuing a Notice

(3)    of Default?

(4)        **A**      **I do not.**

(5)        Q      Are you familiar with a provision of

(6)    the loan agreement that requires Security

(7)    Benefit's consent to any Notice of Termination?

(8)        **A      No, I am not. I am not.**

(9)            **My concern is with my agreement with**

(10)   **Mr. Jozefovic.  When I say Mr. Jozefovic his**

(11)   **enterprise but he has a guarantor.  Not my**

(12)   **agreement with my lender.**

(13)       Q      So you're not concerned about your

(14)   agreement with your lender?

(15)       **A      No, I didn't say I was not concerned**

(16)   **about my in the context of this litigation and my**

(17)   **dispute with Mr. Jozefovic I don't think it has**

(18)   **anything to do with Mr. Jozefovic's failure to**

(19)   **comply with the terms of his lease. That is my**

(20)   **concern.**

(21)       Q      Howard, you have alleged that the

(22)   tenant failed to pay rent, you don't know which

(23)   installments were not made, that is your

(24)   testimony; correct?

(25)           **MR. DONNELLAN:   Objection.  That has**

(1)                    H. Fensterman, Esq.

(2)               been asked and answered several times.

(3)      A      You asked me a question of what was

(4)   contained in the Amended Complaint.

(5)               The July 7 which you have put up on

(6)   the screen the July 7 Notice of Default coupled

(7)   with the exhibit attached sets forth what the

(8)   defaults are. I will be crystal clear.  I don't

(9)   know whether other than the fact that I know that

(10)  Mr. Jozefovic never paid the $5.3 million

(11)  security deposit nor did he pay the $1 million

(12)  security deposit other than that there are a

(13)  multitude of other defaults there. I don't know

(14)  whether he cured some or any of them and if he

(15)  did whether he cured them within the time period

(16)  provided in the lease or whether he didn't. So I

(17)  am not going to be able to answer those

(18)  questions.  I am hopeful that Mr. Nicholson can

(19)  be helpful to you to answer those questions and I

(20)  suspect he will be.

(21)      Q      So first of all, now I get to say to

(22)  you, Howard, that it is the January 7, 2020

(23)  letter not the June 7, 2020 letter.

(24)      A      Thank you very much.  I stand

(25)  corrected, John.

(1)                    **H. Fensterman, Esq.**

(2)        Q      So do you know what period of time is

(3)    provided for under the lease as you just said to

(4)    cure those defaults?

(5)        **A      I do not. I do not. I am happy to look**

(6)    **at the lease if you want me to but off the top of**

(7)    **my head I do not.**

(8)        Q      Who would have been responsible for at

(9)    White Plains to oversee the issuance of the

(10)   Notice of Default and whether or not the tenant

(11)   subsequently cured those defaults?

(12)       **A      Well the overseeing of the Notice of**

(13)   **Default is two separate things.  If you're asking**

(14)   **about the numbers, the numbers and records of the**

(15)   **numbers are maintained by Mr. Nicholson and Mr.**

(16)   **Tabor.**

(17)           **The general question of the Notice of**

(18)   **Default and the decision to issue it was made by**

(19)   **myself and Mr. Nicholson.**

(20)       Q      Who made the determination as to

(21)   whether or not the tenant subsequently cured

(22)   those defaults or not?

(23)       **A      I don't think there has ever been a**

(24)   **determination as to whether he did or not because**

(25)   **for the most part first number one first and**

(1)                    H. Fensterman, Esq.

(2)    foremost a security deposit has never been made

(3)    so we know for a fact he never cured that and as

(4)    to whether or not he cured any of the other

(5)    material defaults he certainly has not provided

(6)    us with the financials and the financial

(7)    reporting that he was required to do, we received

(8)    some bare bone information courtesy of you John

(9)    in response to I believe a court conference that

(10)   was wholly incomplete but it was only when we

(11)   were in that environment that you were kind

(12)   enough to send us that information. Other than

(13)   that we never received any information. That is

(14)   on the reporting requirements but there are a

(15)   myriad of other defaults that are there and as I

(16)   mentioned Mr. Nicholson I am sure will be able to

(17)   tell you with certainty which ones if any he did

(18)   anything about and which ones he did not.

(19)        Q      Was Mr. Formato from your office

(20)   involved in efforts to cure the defaults?

(21)        A      I don't understand the question. Was

(22)   he involved to cure the defaults.

(23)              He is an attorney in my office in

(24)   charge of my health care practice.  He is an

(25)   executive partner actually in my law firm. So my

(1)                  **H. Fensterman, Esq.**

(2)      **recollection of Mr. Formato's involvement is to**

(3)      **the extent that, and I don't want to divulge any**

(4)      **attorney/client privilege, but when it comes to**

(5)      **health law issues that would be his involvement**

(6)      **and I mentioned to you he did attend that meeting**

(7)      **in the facility in White Plains on Church Street.**

(8)           Q      To your knowledge was Mr. Formato

(9)      involved in discussions with either HBL or its

(10)     attorney about curing the defaults?

(11)          **A      I don't recall.  I don't recall.**

(12)                 **(Short break:  3:03 to 3:16)**

(13)                 **(Whereupon, Defendant's Exhibit 8,**

(14)                 **Letter dated 4/16/20 from Security**

(15)                 **Benefit to White Plains, (Ex 29), 5**

(16)                 **pages, was marked for identification.)**

(17)          Q      So Howard, in connection with the

(18)     Letter of Intent of November 2019 you testified

(19)     about the million dollar payment that was not

(20)     paid?

(21)          **A      Correct.**

(22)          Q      Was there payment made in connection

(23)     that Letter of Intent?

(24)          **A      Yes.**

(25)          Q      What payment was made?

(1)                    H. Fensterman, Esq.

(2)        **A      The payment that was provided for as a**

(3)  **down payment on the purchase of the interest for**

(4)  **the Delaware Trust of $2.2 million.   That was**

(5)  **paid.**

(6)        Q      To whom was that $2.2 million paid?

(7)        **A      White Plains Healthcare.**

(8)        Q      Did White Plains place that $2.2

(9)  million down payment in an escrow account?

(10)       **A      No, it didn't have to be.**

(11)       Q      So what did White Plains do with the

(12)  $2.2 million it received from the tenant?

(13)       **A      I don't recall what the flow of funds**

(14)  **were.   There were certain monies that were owed**

(15)  **and I believe that the money was utilized to**

(16)  **reduce obligations of White Plains which had**

(17)  **accrued at that time.**

(18)       Q      What obligations of White Plains did

(19)  that money reduce?

(20)       **A      I don't recall but I know that Mr.**

(21)  **Nicholson will have the full disbursement of that**

(22)  **if the question is asked.**

(23)       Q      Well did the application of that $2.2

(24)  million cure any of the defaults that you have

(25)  been talking about previously?

(1)                    H. Fensterman, Esq.

(2)        A        Absolutely not. Zero.  That $2.2

(3)    million by the terms of that Letter of Intent was

(4)    a down payment which is what the document says

(5)    towards the transfer.

(6)               It says in the document and I will

(7)    refer you to it 1(a) it says it will acquire it

(8)    from the trust by a purchase agreement, I am

(9)    paraphrasing, 77.50 percent of the Beneficial

(10)   Interest in the trust --

(11)              It says in 1(a) "Lizer Jozefovic and

(12)   Mark Neuman will acquire from the Trust by a

(13)   Purchase Agreement 77.50 percent of the

(14)   Beneficial Interests in the Trust and redemption

(15)   of a portion of the B Beneficiaries' interest for

(16)   a purchase price of $52,200,000 paid as follows:

(17)              And the first one, John, that you

(18)   asked me about was (i), 1(a)(i) by a down payment

(19)   (the "Down Payment")  not to be held in escrow,

(20)   but to be made upon the execution and delivery of

(21)   this LOI of $2.2 million by a wire transfer to

(22)   the account of White Plains Healthcare Properties

(23)   I, LLC according to the wire instructions annexed

(24)   hereto".  That is, I am not reading the rest of

(25)   it but it was not held in escrow.

(1)                    **H. Fensterman, Esq.**

(2)        Q      I want to be clear, when you say that

(3)    the $2.2 million was used to pay accrued

(4)    obligations of White Plains what type of

(5)    obligations are you referring to?

(6)        **A      As I indicated earlier, I don't recall**

(7)    **but Mr. Nicholson will know where the money was**

(8)    **disbursed but it was a nonrefundable deposit on**

(9)    **the rest of the deal and then the rest of the**

(10)   **deal as set out in the rest of the agreement.**

(11)               **MR. DONNELLAN:   Just to be clear, we**

(12)               **defined White Plains at the beginning**

(13)               **of this deposition as meaning White**

(14)               **Plains Healthcare so when the witness**

(15)               **refers to White Plains that is**

(16)               **obligations of White Plains**

(17)               **Healthcare, not obligations of the**

(18)               **tenants just so to be clear on the**

(19)               **record.**

(20)               **MR. GIARDINO:  That is actually, Al,**

(21)               **exactly what I am trying to clarify.**

(22)        Q      The $2.2 million was applied to

(23)    obligations of the landlord White Plains and not

(24)    the tenants HBL; correct?

(25)        **A      Well to be accurate it was applied**

(1)                    H. Fensterman, Esq.

(2)    towards the down payment of the obligation to

(3)    purchase the 77.5 percent and the money was

(4)    disbursed towards obligations of White Plains

(5)    Healthcare Properties and not the tenant.

(6)         Q    Are you familiar with the allegation

(7)    or complaint by Security Benefit that the $2.2

(8)    million should have been paid over to them?

(9)         A    No, I am not. I am not familiar with

(10)   it and as I said I am not concerned about it

(11)   because my agreement was with my tenant and my

(12)   tenant has no interest in any agreement with

(13)   Security Benefit. My lease was separate and apart

(14)   and all of my legal documents with the tenant are

(15)   separate and apart from my obligations to

(16)   Security Benefit.

(17)             The tenant was obligated to pay me

(18)   rent and had no legal obligation to pay rent or a

(19)   legal obligation to pay rent to my lender. He was

(20)   not in a contract with.

(21)        Q    I am not talking about a legal

(22)   obligation of the tenant to pay your lender.

(23)             I am talking about your obligation as

(24)   the borrower to pay those funds over to your

(25)   lender?

(1)                    H. Fensterman, Esq.

(2)        A      So what are you trying to say?

(3)               MR. DONNELLAN:    Objection to the form

(4)               of the question.

(5)               MR. GIARDINO:    Let's do this. Let's

(6)               call up Exhibit 29.

(7)        Q      Howard, I will show you what we marked

(8)    Exhibit 29 which is a Notice of Default issued by

(9)    Security Benefit to White Plains Healthcare

(10)   Properties I LLC and I will ask you have you ever

(11)   seen this notice before?

(12)       A      I believe that I have but I don't

(13)   specifically recall it. I don't have the second

(14)   page but if I had to look at it I wouldn't be

(15)   surprised if I was not CC'd in it. Go to the

(16)   second page maybe I was CC'd in it.

(17)              Madam manager of the documents can you

(18)   scroll down to the last page of the document

(19)   please.

(20)              There you go.  It says that I got it

(21)   by Federal Express. So I recall it but I don't

(22)   recall the substance of it.

(23)              MR. GIARDINO: Can we scroll to the

(24)              May 22 letter first page.

(25)       Q      So the first paragraph relates to a

[Page 166]
January 11, 2022

(1)                    H. Fensterman, Esq.

(2)    payment default.

(3)            Are you familiar with the notice that

(4)    White Plains failed to make payment as required

(5)    by the loan agreement?

(6)        A    I am not familiar with it but I am

(7)    aware that I probably it says that I received

(8)    this letter I am sure that I did. I do know that

(9)    we paid the lender for every month.

(10)       Q    Then the letter continues to identify

(11)   other defaults?

(12)       A    Right.

(13)       Q    So there is a statement that White

(14)   Plains failed to establish a cash management

(15)   account?

(16)       A    Right.

(17)       Q    Has White Plains ever established a

(18)   cash management account?

(19)       A    Not to my knowledge, no.

(20)       Q    Item number two on the next page

(21)   states that White Plains failed to direct a

(22)   tenant to pay rent directly to the lender, has

(23)   White Plains ever direct HBL to pay Security

(24)   Benefit?

(25)       A    I don't believe that we did, no.

(1)                    **H. Fensterman, Esq.**

(2)         Q       Item number three is the matter about

(3)    which I inquired just a few moments ago which

(4)    states that the tenant may have paid borrower

(5)    approximately $2.2 million in late 2019.  Any

(6)    such revenue should been deposited with the

(7)    lender.

(8)         **A       Right.**

(9)         Q       Did you ever have any discussion with

(10)   Security Benefit about the use of the $2.2

(11)   million?

(12)        **A       I don't recall whether we did or not,**

(13)   **no, I don't recall whether I did. I can't speak**

(14)   **for Bill.**

(15)        Q       Item four and five relate to the

(16)   borrower White Plains obligations to provide

(17)   financial statements to Security Benefit, have

(18)   you as a guarantor or White Plains ever provided

(19)   financial statements to its lender?

(20)        **A       I don't whether we did or not.  That I**

(21)   **don't have knowledge of.**

(22)        Q       Further down the page on other issues

(23)   item number two is a statement we understand

(24)   borrower may have sent a Notice of Termination to

(25)   the tenant under the Operating Lease in late 2019

(1)                    H. Fensterman, Esq.

(2)    or early 2020. Please note that pursuant to

(3)    section 3.5 of the loan agreement the Operating

(4)    Lease cannot be terminated without the consent of

(5)    the lender.

(6)        **A      Right.**

(7)        Q      Have you seen that before?

(8)        **A      I don't recall seeing it but it**

(9)    **doesn't matter to me as it relate to my Notice of**

(10)   **Termination.**

(11)       Q      To this date have you ever secured the

(12)   consent of Security Benefit to terminate the

(13)   lease?

(14)       **A      No, I did not.**

(15)       Q      Are you aware of any other notices

(16)   that Security Benefit issued to White Plains?

(17)       **A      I am not as I sit here, no.**

(18)       Q      Would you disagree that Security

(19)   Benefit notified White Plains of defaults as

(20)   early as October of 2019?

(21)       **A      If you have a document that says that**

(22)   **I don't recall October unless you showed me a**

(23)   **document.**

(24)       Q      Well actually that was a document that

(25)   we asked you to produce that was not in your

(1)                  H. Fensterman, Esq.

(2)    production.

(3)            So based upon the documents we have

(4)    from Security Benefit there are notices dated

(5)    October 16, 2019, November 5, 2019, April 16,

(6)    2020 and the notice that we just reviewed May 22,

(7)    2020.

(8)        A    Right.

(9)        Q    We did receive both the April 16 and

(10)   the May 22 notices.  We did not receive the

(11)   October 16 or the November 5 notices.

(12)       A    Right.

(13)           MR. DONNELLAN:   No, objection to

(14)           that. We made a supplemental

(15)           production.

(16)           MR. GIARDINO:   Al, I don't believe

(17)           those notices were in the supplement

(18)           production but if I am wrong that is

(19)           fine.  I was simply going to ask that

(20)           we make another search and produce

(21)           those documents.

(22)           MR. DONNELLAN:   The October 18 notice

(23)           that you're referring to was produced.

(24)           I am looking at it.

(25)           MR. GIARDINO:  Okay.

(1)                    H. Fensterman, Esq.

(2)            MR. DONNELLAN:   Was there another

(3)            date that you said you don't think you

(4)            have?

(5)            MR. GIARDINO:  Well I think there is a

(6)            November 5, 2019.

(7)            MR. DONNELLAN:   I have to look.  I

(8)            don't recall seeing that one but the

(9)            October one that I believe we have

(10)           made a search, we made a supplemental

(11)           search for all notices of default and

(12)           we produced them in a supplemental

(13)           production and like I said I am

(14)           looking at the one that was produced

(15)           that is October 18. It is bates

(16)           stamped WPH0018684 starts with that

(17)           number and it's two pages.

(18)      Q    To your knowledge, Howard, has White

(19)  Plains made any effort to cure any of the

(20)  defaults noticed to it by Security Benefit?

(21)      A    To my knowledge we have not

(22)  articularly the maturity date of the loan we have

(23)  not but that directly evolves upon Mr.

(24)  Jozefovic's defaults.

(25)      Q    Howard, before the break we were

(1)                    H. Fensterman, Esq.

(2)    talking about whether Mr. Formato was involved in

(3)    efforts or discussions with the tenant to cure

(4)    the defaults that were noticed in the January 7,

(5)    2020 letter.

(6)             Are you familiar with any of those

(7)    discussions or efforts by Mr. Formato?

(8)        A    I don't know whether he did or he

(9)    didn't.

(10)            MR. DONNELLAN:   Objection to the

(11)            question.

(12)       A    I am not familiar with it.

(13)       Q    Are you familiar with any effort in

(14)   2020 to enter into an intercreditor agreement

(15)   involving the tenant HBL and its accounts

(16)   receivable lender?

(17)       A    I do seem to have a recollection that

(18)   there were discussions regarding that but it

(19)   still always came back down to the fact that

(20)   there were a myriad of material defaults not the

(21)   least of which was that the security deposit had

(22)   to be paid and second of all my vague

(23)   recollection is that an issue arose regarding the

(24)   demands of that creditor who they wanted to get

(25)   financing from that would result in a

(1)                    H. Fensterman, Esq.

(2)     subordination of some rights of the landlord but

(3)     I don't recall what they were but I recall first

(4)     the necessity to cure the defaults before we

(5)     would even enter into those discussions and

(6)     second of all, diminishing the collateral of the

(7)     landlord at the request of the intercreditor and

(8)     then I believe that the discussions just blew

(9)     apart.

(10)          Q      Do you recall what period of time

(11)     those discussion were underway?

(12)          A      I don't know.  I only recall Mr.

(13)     Zafrin made multiple representation as to what he

(14)     was going to be able to accomplish and was never

(15)     able to accomplish it including that agreement.

(16)               He could never get his lender as Mr.

(17)     Jozefovic's lender to agree to what we all what

(18)     we required as the landlord and eventually the

(19)     discussions ended. I don't remember when they

(20)     occurred but I do remember there being

(21)     discussions about that, yes.

(22)          Q      Let me ask you this.

(23)               Did you ever review a proposed

(24)     intercreditor agreement?

(25)          A      As I mentioned to you my function I

(1)                    H. Fensterman, Esq.

(2)   don't recall whether I ever did but I do know

(3)   that I was reposing the responsibility for

(4)   reviewing agreements in the attorneys that were

(5)   representing me because I was trying to be

(6)   careful not to inject myself since I was a

(7)   principal.

(8)        Q    When you say representing me do you

(9)   really mean to say representing White Plains?

(10)       A    Yes, thank you. When I say me I am

(11)  talking about White Plains.

(12)       Q    Do you have a general understanding as

(13)  to whether or not those negotiations regarding

(14)  the intercreditor agreement came before the

(15)  January 7 notice or after the January 7 notice?

(16)       A    I don't.

(17)            MR. DONNELLAN:   Objection to the form

(18)            of the question.

(19)       A    I don't really recall. I don't recall.

(20)            I do know that there was a continuing

(21)  effort at some point in time to effectuate

(22)  resolution of our dispute.  We did not want to

(23)  have to go into litigation with Mr. Jozefovic but

(24)  unfortunately he left us no choice because he

(25)  continued to fail to pay a security deposit.

(1)                   **H. Fensterman, Esq.**

(2)        Q     Do you know when those efforts ceased

(3)    that you just described?

(4)        **A     I apologize. I don't because I can't**

(5)    **pin the time when we were having those**

(6)    **discussions. Off the top of my head maybe there**

(7)    **are documents that show it but I don't recall as**

(8)    **I am sitting here testifying when those**

(9)    **discussions occurred and when they broke apart. I**

(10)   **just don't recall.**

(11)       Q     Do you recall when White Plains filed

(12)   a lawsuit against HBL?

(13)       **A     I believe it was in August or**

(14)   **September of 2020 but I could be wrong.  That is**

(15)   **my recollection.**

(16)       Q     Are you able to say when those efforts

(17)   to resolve any disputes ceased in relation to the

(18)   time that you filed that White Plains filed its

(19)   complaint?

(20)       **A     I don't.**

(21)       Q     Do you know what the purpose of the

(22)   intercreditor agreement was?

(23)       **A     I understand it was to get Mr.**

(24)   **Jozefovic account receivable financing. He was**

(25)   **consistently complaining about cash flow and that**

(1)                    H. Fensterman, Esq.

(2)    he was having problems, he was having economic

(3)    problems, he didn't have the where with all to

(4)    put up the deposit and he needed, he was a new

(5)    nursing home so he needed accounts receivable

(6)    financing and that so I believe that that is what

(7)    its object was.

(8)         Q     Was it your understanding that the

(9)    White Plains nursing facility opened during a

(10)   period of time when the COVID pandemic was

(11)   effecting the health care marketplace?

(12)        A     No, it was my understanding that it

(13)   opened well before that and I will also go

(14)   further and say that I am well aware of the

(15)   nursing homes not mere in New York but across the

(16)   country whose businesses boomed during the COVID

(17)   pandemic even though their census went down

(18)   because they were receiving stimulus money from

(19)   the government.

(20)             And I recall being told that Mr.

(21)   Jozefovic formed a COVID floor dedicated to COVID

(22)   patients in his nursing home in the nursing home

(23)   and I presume that was to be because he wanted

(24)   the increased payments that the government was

(25)   paying for skilled nursing facility who were

(1)              H. Fensterman, Esq.

(2) caring for COVID patients even if they were

(3) medicaid patients their rate of payment was

(4) higher.

(5)     Q    Is it your understanding that the

(6) COVID pandemic was actually a benefit to the

(7) operation of the White Plains home?

(8)     A    I don't know how Mr. Jozefovic ran his

(9) business as to whether it was a benefit or not a

(10) benefit. I only know that he didn't pay his

(11) security deposit and committed other multiple

(12) breaches and they occurred well prior in time to

(13) the COVID pandemic.

(14)         If he had to pay 60 days before

(15) commencement of his lease that was in 2019 the

(16) COVID pandemic technically did not start till on

(17) or around March 23, 2020.  So that obligation of

(18) his was six to seven months before that pandemic

(19) started. That was on one tranche of the security

(20) deposit. The other one was on December 1 when he

(21) was obligated to pay it and that was also prior

(22) in time. None of us knew about COVID at least I

(23) didn't and I don't think most people in this

(24) country did on December 1 of the calendar year

(25) 2019.

(1)                     **H. Fensterman, Esq.**

(2)        Q      Back to the intercreditor agreement

(3)   you indicated that Mr. Jozefovic was looking, and

(4)   again I take it you're referring to HBL, was

(5)   looking to finance its receivables, is that your

(6)   understanding of what the purpose of that

(7)   agreement was?

(8)        **A      It was and I recall another thing that**

(9)   **the numbers that there was something he wanted to**

(10)  **fund it I believe at a number that was in excess**

(11)  **of what we had agreed to in the lease but I am**

(12)  **not sure of that. That is something I recall, it**

(13)  **was like $4 million versus $2 million, something**

(14)  **of that nature.**

(15)       Q      When you talk about receivables are

(16)  you talking about receivables generated from the

(17)  operation of the White Plains facility or

(18)  something else?

(19)       **A      Yes, the White Plains facility.**

(20)       Q      So the idea that the receivables

(21)  generated from operating the White Plains

(22)  facility would be financed through his proposed

(23)  lender but it required an intercreditor

(24)  agreement?

(25)       **A      Yes, that is my recollection.**

(1)                    H. Fensterman, Esq.

(2)           Again, I don't have the documents in

(3)      front of me.  That is my recollection.

(4)      Q    I am sorry if I am repeating this but

(5)      did you actually receive a draft of the proposed

(6)      intercreditor agreement?

(7)      A    I personally did not and I don't know

(8)      whether anyone in my organization or represented

(9)      me did.  I don't have personal knowledge of that

(10)     as I sit here today.

(11)     Q    Do you know if anyone on your behalf

(12)     sent the proposed intercreditor agreement to

(13)     Security Benefit?

(14)     A    I don't know whether they did or not

(15)     but I seem to have a recollection of some efforts

(16)     being made to try to make that entire situation

(17)     work but I don't know when that occurred.

(18)     Q    I want to just be accurate here.

(19)           To your knowledge did someone acting

(20)     on behalf of White Plains tender the proposed

(21)     intercreditor agreement to your lender Security

(22)     Benefit?

(23)     A    I don't know whether they did or they

(24)     didn't.

(25)     Q    I need to ask the question but do you

(1)                    H. Fensterman, Esq.

(2)   know if Security Benefit ever approved the form

(3)   of the intercreditor agreement?

(4)      **A     I do not know whether it was presented**

(5)   **to them or not so I don't know whether they would**

(6)   **approved anything and I don't know what**

(7)   **obligations would have existed on our part to**

(8)   **obtain an approval from them of something.  If it**

(9)   **involved a lien that they had perhaps they would**

(10)  **have but I don't recall.**

(11)             **(Whereupon, Defendant's Exhibit 9,**

(12)             **e-mail (Ex 60), 3 pages, was marked**

(13)             **for identification.)**

(14)     Q    Before we go to that document, Howard,

(15)  I am just thinking through the issue regarding

(16)  the startup of the home and the COVID.

(17)             Was it your understanding that HBL's

(18)  startup operations were profitable or running at

(19)  a deficit?

(20)     **A     I didn't have any understanding at all**

(21)  **because as I mentioned to you our tenant had an**

(22)  **obligation to provide us financial documents**

(23)  **pursuant to the terms of the lease which he**

(24)  **failed to do and the first time that we got to my**

(25)  **knowledge financial documents was when you John**

(1)                    H. Fensterman, Esq.

(2)    on behalf of your client interceded and sent us

(3)    financial documents some time I believe in 2021

(4)    when we were having discussions before Justice

(5)    Walsh. Other than that the tenant breached his

(6)    agreement with us to send us information.  We

(7)    didn't get information.  And that was an

(8)    obligation under the lease and it was part of I

(9)    believe and again I don't have it in front of me

(10)   but if you take a look at the January 7 default

(11)   notice I suspect that that is one of the material

(12)   breaches that are set forth in that notice so we

(13)   were not getting the information. So if he had

(14)   been opened as he was in 2019 he was not sending

(15)   us the information so there would be no way for

(16)   me to know what his financials were or not and

(17)   the first time I believe we ascertained knowledge

(18)   of it is when you were kind enough to send us

(19)   that information several months ago.

(20)        Q    Prior to my sending you the financials

(21)   at had you ever received a ProForma or a forecast

(22)   for the operations of the tenant?

(23)        A    Are you asking me did we ever get a

(24)   forecast of how the tenant thought that he would

(25)   do?

(1)                  **H. Fensterman, Esq.**

(2)          Q      Yes.

(3)          **A      I don't recall but if we had it would**

(4)   **have been many many many years ago well before**

(5)   **the building was built.**

(6)          Q      As you testify today you don't know

(7)   whether or not the operation of HBL at White

(8)   Plains were incurring losses or generating

(9)   profit; is that correct?

(10)         **A      I think that is a fair statement that**

(11)  **I don't know because my tenant breached his**

(12)  **agreement to me to provide me that information.**

(13)  **That is my answer.  And I never got it, I will**

(14)  **repeat it again, until his attorney, you,**

(15)  **interceded and sent us that information almost I**

(16)  **would imagine it was ten or eleven months after**

(17)  **it was due for all the financial reporting we**

(18)  **were suppose to have.**

(19)         Q      Turning our attention to what we

(20)  marked as Exhibit 60, and I will ask you to

(21)  direct your attention first to the third page of

(22)  that document and it's really the lower two

(23)  thirds which is an e-mail from a James Wine.

(24)         **A      Right.**

(25)         Q      Do you know who James Wine is?

(1)                    H. Fensterman, Esq.

(2)        **A       Yes, I believe he was the attorney for**

(3)   **Security Benefit.**

(4)        Q       Did you ever have any dealings with

(5)   Mr. Wine?

(6)        **A       I personally did not except to the**

(7)   **extent on one occasion I tried to send him a**

(8)   **piece of business and he couldn't take it because**

(9)   **he had a conflict.**

(10)       Q       But as far as White Plains or the

(11)  White Plains project is concerned did ever have

(12)  any discussion with Mr. Wine?

(13)       **A       I don't believe so. I may have had one**

(14)  **discussion with him but I don't remember what the**

(15)  **sum and substance of it was.**

(16)       Q       I will ask you to just read to

(17)  yourself the first sentence of Mr. Wine's e-mail

(18)  dated May 1, 2020 addressed to Patrick Formato of

(19)  your firm.

(20)       **A       It is addressed to Pat Formato, it is**

(21)  **addressed to Andrew Kasman, it is addressed to**

(22)  **Mark Zafrin of Michelman & Robinson.**

(23)       Q       It is addressed to a number of people,

(24)  it is addressed to it is copied to people.  I am

(25)  trying to identify this document for the record.

(1)                    H. Fensterman, Esq.

(2)         **A       Sure. You're correct who it is**

(3)    **addressed to.**

(4)         Q       Reading the first sentence of Mr.

(5)    Wine's e-mail is it fair to understand that

(6)    Security Benefit had received the intercreditor

(7)    agreement and issued certain comments to it?

(8)         **A       The document speaks for itself. I**

(9)    **don't recall it but it says what it says.**

(10)        Q       Let's agree that this document would

(11)   indicate that Security Benefit received the

(12)   proposed intercreditor agreement and engaged

(13)   counsel to review and make recommendations about

(14)   it; correct?

(15)        **A       It appears that --**

(16)             **MR. DONNELLAN:    Objection to the**

(17)             **form. The document speaks for itself.**

(18)        Q       I directed your attention to the third

(19)   page of Mr. Wine's e-mail of May 1.

(20)        **A       Right.**

(21)        Q       And the document certainly does speak

(22)   for itself but what appears to precede at least

(23)   in terms of the physical characterization of this

(24)   document e-mail were issued in response to Mr.

(25)   Wine; is that fair to say?

(1)                    H. Fensterman, Esq.

(2)      **A     I think that the document says what it**

(3)   **says. It seems Mr. Zafrin was involved in it and**

(4)   **a certain the page I am looking at here and Mr.**

(5)   **Wine was involved in it.**

(6)      Q     Do you know who Alexander Frame is?

(7)      **A     Alexander Frame, where is he listed?**

(8)   **I don't.  That is why I am asking the question.**

(9)      Q     That would be on the second page in

(10)  the middle.

(11)     **A     I don't have the second page in front**

(12)  **of me.  I only have three.**

(13)     Q     Let's go to page two.

(14)     **A     I don't know who Alex Frame is.  I**

(15)  **guess he is from Kincaid law firm in Ohio.**

(16)     Q     Do you have any knowledge as to who he

(17)  represented?

(18)     **A     No.**

(19)     Q     Let me direct your attention to the

(20)  first page of the document and in particular at

(21)  the top the e-mail from Patrick Formato of your

(22)  firm to Mr. Frimmel and others including you and

(23)  Mr. Nicholson in which Mr. Formato makes a

(24)  statement "it's my understanding that our clients

(25)  have had discussions regarding such defaults and

(1)                    H. Fensterman, Esq.

(2)    such discussions are ongoing.  When they come to

(3)    a resolution we will provide you with our

(4)    revisions to the intercreditor"; do you see that?

(5)        **A    I do but I also see before that that**

(6)    **Mr. Formato tells Mr. Zafrin he is misinformed**

(7)    **that we have additional revisions to the**

(8)    **document. It is not acceptable in its current**

(9)    **form. In addition, we have been informed by A/R**

(10)   **lenders counsel that they will not close the A/R**

(11)   **loan until such time as tenant cures its default**

(12)   **under the lease.  And then the next sentence**

(13)   **starts.**

(14)       Q    I will agree with that and I will

(15)   adopt your language that the document speak for

(16)   itself.

(17)       **A    Right.**

(18)       Q    I was referring to Mr. Formato's

(19)   characterization of the efforts being made

(20)   between the landlord and the tenant to cure those

(21)   defaults?

(22)       **A    I don't think there was an effort**

(23)   **being made. I think that the problem continued**

(24)   **had to remain outstanding which is that Mr.**

(25)   **Jozefovic did not cure its defaults and the**

(1)              H. Fensterman, Esq.

(2)    lender, in this case it appears the A/R lender,

(3)    was not going to make any advances absent those

(4)    defaults being cured and they were not then and

(5)    as it relates certainly to the security deposit

(6)    still are not today.

(7)        Q    Conversely the understanding would be

(8)    if the defaults were cured the A/R lender would

(9)    have preceded and made the advances that HBL had

(10)   requested if the defaults were cured?

(11)       A    I don't know that that was the case,

(12)   would have been the case or not. I think that is

(13)   a speculation because there were other problem

(14)   and I am again I am only extrapolating out from

(15)   what Mr. Formato said. He said there that in

(16)   large caps the form in its current state was not

(17)   acceptable. There was going to be other issues

(18)   that arose such as an ongoing legal fees that Mr.

(19)   Jozefovic was responsible for and any bank

(20)   meaning Security Benefit default interest or

(21)   penalties that were going to be charged to us by

(22)   Security Benefit arising from Mr. Jozefovic

(23)   defaults under the lease that Security Benefit

(24)   now claims that we owe them money for those

(25)   defaults. So we were in default because Mr.

(1)                **H. Fensterman, Esq.**

(2)     **Jozefovic was in default.**

(3)         Q     I am really just trying to get, let's

(4)     agree the document speak for itself the entirety

(5)     of it there is no agreement about the

(6)     intercreditor.

(7)             I am just trying to establish what

(8)     discussions were ongoing.

(9)             So you have the issue of certain

(10)    defaults, you have the issue of attorneys fees,

(11)    you have the issue of interest or other charges

(12)    due to Security Benefit, were there any other

(13)    issues to your recollection that were under

(14)    discussion at this time?

(15)        **A     I don't know with specificity what**

(16)    **those discussions were. I don't know what they**

(17)    **were. I don't have -- you can see this is between**

(18)    **Mr. Formato and the folks that are listed on the**

(19)    **two.  I am listed on it but I am there just for**

(20)    **informational purposes.  I was not participating**

(21)    **in this process. Patrick Formato apparently was**

(22)    **leading that on our end and he was working on it**

(23)    **at that time apparently with Mark Frimmel from**

(24)    **your office and with Mark Zafrin.**

(25)            **(Short break:  3:58 to 4:08)**

(1)                   **H. Fensterman, Esq.**

(2)                **MR. GIARDINO:  No further questions.**

(3)          **Thank you very much.**

(4)          **You have my consent to share the**

(5)          **exhibits with other counsel.**

(6)             **(Time noted: 4:09 p.m.)**

(7)

(8)

(9)                        HOWARD  FENSTERMAN,  ESQ.

(10)

(11)    Subscribed and sworn to before me

(12)    this        day of                  , 2022.

(13)

(14)

(15)                   NOTARY  PUBLIC

(16)

(17)

(18)

(19)

(20)

(21)

(22)

(23)

(24)

(25)

(1)                    H. Fensterman, Esq.

(2)    --------------- EXHIBIT INDEX-----------------

(3)    WITNESS                    EXAMINATION BY    PAGE

(4)    HOWARD FENSTERMAN, ESQ.  MR. GIARDINO       9

(5)

(6)    ------------------ EXHIBITS------------------

(7)    DEFENDANT'S    PAGE

(8)    Exhibit 1,      52   First Amended Verified

(9)                         Complaint, (Ex 68), 18 pages

(10)   Exhibit 2,      64   e-mails, (Ex 19) 3, pages

(11)   Exhibit 3,      67   Amended and Restated

(12)                        Operating Lease (Ex 10),

(13)                        96 pages

(14)   Exhibit 4,      72   Letter dated 12/2/19 from

(15)                        Department of Health Chris

(16)                        Chow to Andrew Blatt,

(17)                        (Ex 23), 1 page

(18)   Exhibit 5,      87   Letter dated 1/7/20 from

(19)                        Donnellan to HBL SNF

(20)                        (Ex 28), 5 pages

(21)   Exhibit 6,      99   Letter of Intent dated

(22)                        11/20/19, (Ex 22) 11 pages

(23)   Exhibit 7,     117   Fed Ex mailing receipt

(24)                        (Ex 76), 1 page

(25)   Exhibit 8,     160   Letter dated 4/16/20 from

(1)                    H. Fensterman, Esq.

(2)                        Security Benefit to White

(3)                        Plains, (Ex 29), 5 pages

(4)    Exhibit 9,      179  e-mail (Ex 60), 3 pages

(5)

(6)      "INFORMATION/DOCUMENTATION REQUEST INDEX"

(7)

(8)    -------------- DOCUMENT REQUEST --------------

(9)    PAGE        56  List of the various keys that

(10)                   were turned over to Mr. Jozefovic

(11)                   of the various locks

(12)              110 Notes as to certain dates of the

(13)                   documents themselves

(14)

(15)    --------- INFORMATION TO BE FURNISHED --------

(16)                    -NONE-

(17)

(18)    ----------------- RULINGS --------------------

(19)                    -NONE-

(20)                      oOo

(21)

(22)

(23)

(24)

(25)

```
 (1)                    H. Fensterman, Esq.

 (2)                    CERTIFICATION

 (3)    STATE OF NEW YORK   )

                          )  ss.:

 (4)    COUNTY OF NEW YORK )

 (5)

 (6)              I, LAURA B. LOWENTHAL, a Notary

 (7)    Public within and for the State of New York, do

 (8)    hereby certify:

 (9)              That HOWARD FENSTERMAN, ESQ. The

(10)    witness(es) whose deposition(s) is(are)

(11)    hereinbefore set forth, was(were) duly sworn by

(12)    me and that such deposition(s) is(are) a true and

(13)    accurate record of the testimony given by such

(14)    witness(es).

(15)              I further certify that I am not

(16)    related to any of the parties to the action by

(17)    blood or marriage; and that I am in no way

(18)    interested in the outcome of this matter.

(19)              IN WITNESS WHEREOF, I have

(20)    hereunto set my hand this 11th day of

(21)    January, 2022.

(22)

(23)                    Laura B. Lowenthal

(24)                    LAURA B. LOWENTHAL

(25)
```

January 11, 2022

| A |
| --- |

**a.m (1)**
1:14

**a/k/a (2)**
1:9 2:9

**A/R (4)**
185:9,10 186:2
186:8

**ability (6)**
27:22 64:4
74:3 75:12,13
95:15

**able (15)**
21:6 28:2
31:19 48:12
55:11 88:8
118:10 133:5
137:16
145:10
157:17
159:16
172:14,15
174:16

**Abrams (3)**
18:8 19:11
60:9

**absent (3)**
143:4 155:8
186:3

**absolutely (3)**
99:2 143:9
162:2

**accelerate (1)**
87:8

**accept (3)**
59:6 71:7
75:17

**acceptable (3)**
12:22 185:8
186:17

**acceptance (2)**
136:19 137:4

**accepting (3)**
58:25 59:3,4

**access (1)**
116:8

**accomplish (2)**
172:14,15

**accomplishe...**
30:3,9

**account (44)**
76:19,25 77:15
77:17 79:5
84:11 116:8
116:16,16
117:2 118:24
119:8 121:23
122:18,21,23
123:2,4,6,9
123:13,20,24
124:7 150:2
150:11,20,24
151:3 152:10
152:18 153:9
153:15,17,23
153:24,25
154:15,22
161:9 162:22
166:15,18
174:24

**accountant (1)**
144:15

**accounting (2)**
92:4,8

**accounts (3)**
92:22 171:15
175:5

**accrued (2)**
161:17 163:3

**accuracy (1)**
103:21

**accurate (4)**
104:8 163:25
178:18
191:13

**achieve (2)**
104:18,19

**acknowledge...**

**56:5,7 89:15**

**acquire (3)**
95:16 162:7,12

**acquired (2)**
26:17 42:12

**acquiring (3)**
21:3,10,17

**acquisition (1)**
45:4

**act (3)**
18:5,7 34:8

**acted (1)**
18:16

**acting (3)**
97:3 154:6
178:19

**action (5)**
4:16 6:6 10:10
52:22 191:16

**activities (1)**
15:23

**acts (1)**
16:14

**actual (9)**
20:17 22:15
32:22 49:11
57:19,25,25
58:8 75:14

**actuality (1)**
55:21

**addition (5)**
4:12 6:2 39:4
39:22 185:9

**additional (2)**
104:12 185:7

**address (8)**
9:12 38:20
58:6 93:20
118:12,16
125:10 129:8

**addressed (16)**
11:20 85:25
100:18 104:4
107:7,9,11,11

**131:25**
182:18,20,21
182:21,23,24
183:3

**addresses (3)**
103:23 107:4
114:24

**addressing (1)**
120:25

**adducing (1)**
89:12

**adequate (1)**
138:14

**administerin...**
7:13

**adopt (1)**
185:15

**advance (1)**
9:22

**advances (2)**
186:3,9

**advantageme...**
150:11

**advise (4)**
15:15 32:13
36:25 37:14

**advised (7)**
38:6,7 41:3,10
73:5 137:4
147:16

**advising (1)**
32:11

**aed@ddw-la...**
2:7

**aegis (1)**
46:6

**affect (1)**
98:17

**affidavits (1)**
155:4

**affirmative (1)**
123:19

**afraid (1)**
103:18

**against- (1)**
1:8

**agency (1)**
64:12

**ago (13)**
66:13 69:15
80:21 95:3
124:20,20,21
124:22 152:4
153:5 167:3
180:19 181:4

**agree (12)**
10:20 12:4
33:23 76:8
83:11 88:15
99:3 131:15
172:17
183:10
185:14 187:4

**agreed (13)**
4:4,18 5:7,13
5:19 6:8 7:4
55:23 57:22
130:15
142:19
153:17
177:11

**agreement (83)**
14:2,5,9 16:23
17:5 28:11
40:7 64:2,4
80:10,13 84:3
92:24 93:4
95:23 97:18
99:16 101:4
102:13,15
108:19 109:2
109:6,7,21
111:5 112:11
112:14
113:22
114:21 115:9
119:13 122:7
127:10

January 11, 2022

[Page 193]

128:22 129:7
130:12,14
131:7 139:9
139:20 140:2
140:9,18
141:4,5,5,12
141:23
146:11
150:10
152:13
153:16 155:2
155:24 156:6
156:9,12,14
162:8,13
163:10
164:11,12
166:5 168:3
171:14
172:15,24
173:14
174:22 177:2
177:7,24
178:6,12,21
179:3 180:6
181:12 183:7
183:12 187:5
**agreements (...**
83:5 93:21,25
109:24,25
113:14
115:14
126:25
139:17,18
140:20 141:3
141:15,18,19
141:21 154:9
173:4
**ahead (1)**
88:14
**Al (6)**
10:22 56:24
99:2,18
163:20
169:16

**Alex (3)**
2:13 9:17
184:14
**Alexander (2)**
184:6,7
**ALFRED (1)**
2:6
**allegation (13)**
55:15,17,19
87:4 134:10
134:15
137:13,14
146:17 147:5
147:9 155:16
164:6
**allegations (1...**
54:7,10,17,19
54:22 55:2,7
149:12,19,24
150:4
**allege (1)**
134:7
**alleged (3)**
93:20 154:21
156:21
**allegedly (1)**
74:4
**alleges (1)**
134:24
**Allen (2)**
34:20,23
**allocated (2)**
126:2 128:9
**alluded (8)**
29:4 62:7
70:10,12
71:18 73:13
77:10 85:5
**alluding (5)**
35:23 69:5
73:3 74:15
83:8
**alright (3)**
87:5 94:13

99:18
**amend (2)**
127:12 144:9
**amended (47)**
28:20 52:2,8
52:21 54:17
55:9 66:25
67:15,18 68:7
68:13,19
77:19 86:24
101:9 129:2,7
129:15,23,23
129:25
130:24,25
131:3,5,11,13
133:12
134:11,15,24
138:23
139:12,14
140:3,10
142:7,15,23
143:6,11
144:8,20
151:23 157:4
189:8,11
**amendment (...**
129:18 130:7
141:6,7,12
143:7 144:10
**amortized (1)**
50:6
**amount (2)**
48:16 137:21
**amounted (1)**
135:14
**and/or (2)**
66:10 143:16
**Andrew (4)**
36:19 72:18
182:21
189:16
**angry (1)**
78:14
**annexed (1)**

162:23
**answer (21)**
21:13,15 31:20
54:24 55:4,5
71:14,24
107:19,24
108:2 133:14
133:17 139:3
145:3,4,23
146:8 157:17
157:19
181:13
**answered (3)**
79:17 143:21
157:2
**anybody (2)**
25:24 60:10
**anyway (1)**
123:13
**apart (5)**
114:23 164:13
164:15 172:9
174:9
**apologize (8)**
9:22 13:17
79:18 115:21
117:7 132:10
133:7 174:4
**apparently (4)**
118:13 125:8
187:21,23
**appears (7)**
53:14 67:20,22
104:10
183:15,22
186:2
**application (4)**
36:15,23 38:4
161:23
**applied (3)**
43:8 163:22,25
**applies (1)**
89:16
**appreciate (1)**

96:20
**apprised (1)**
90:25
**approach (1)**
25:12
**approval (29)**
16:11,15 29:22
30:8 33:2
35:20,22,24
35:25 36:15
41:6 42:20,22
43:12,21,24
62:6,7 65:18
70:15,18,24
70:25,25
71:16,20 72:2
85:13 179:8
**approvals (17)**
29:16,20,25
30:2,5 35:23
36:5 43:15,23
44:4,6,9,11
44:16 86:5,10
86:13
**approve (1)**
29:18
**approved (4)**
40:11 86:8
179:2,6
**approximate...**
13:18 48:16
**approximate...**
62:23 63:3
167:5
**April (3)**
97:6 169:5,9
**architect (2)**
86:15,19
**area (2)**
59:24 145:16
**Arent (1)**
17:16
**arguably (1)**
89:15

January 11, 2022

**Ari (1)**
3:5
**arises (1)**
47:20
**arising (1)**
186:22
**arose (2)**
171:23 186:18
**arranged (1)**
46:23
**arrangement...**
12:16
**arrangement...**
117:14
**arrived (1)**
47:5
**article (1)**
69:22
**articularly (1)**
170:22
**ascertained (1)**
180:17
**aside (2)**
120:15 127:6
**asked (17)**
10:13 38:23
63:23 69:19
80:18 108:6
117:4 119:2
121:10 124:8
144:11
151:23 157:2
157:3 161:22
162:18
168:25
**asking (38)**
10:4 22:7,18
23:16 24:3
45:11 54:14
58:12 65:14
70:24 71:24
74:2 79:22
94:6 99:4
108:11,24

113:17 114:2
114:7 127:16
130:19,21
131:9 132:14
134:10,14
136:25 137:2
139:23,24
144:3,22
146:4,5
158:13
180:23 184:8
**aspect (2)**
20:22 33:14
**aspects (1)**
93:2
**assault (2)**
78:15 122:14
**assembled (1)**
43:7
**Assembly (1)**
41:2
**assemblyma...**
39:6,7
**assertion (1)**
87:11
**asset (1)**
24:15
**assets (4)**
16:21 24:16
28:14 146:14
**assigned (2)**
93:7,8
**assist (1)**
15:2
**Assistant (1)**
17:9
**associates (1)**
45:15
**association (2)**
46:10,12
**assume (3)**
87:20 120:17
146:6
**assumed (2)**

47:7 93:7
**assumption (1)**
146:5
**attached (5)**
92:3 118:5,7,8
157:7
**attained (3)**
112:24 127:2
135:9
**attempt (1)**
39:2
**attempted (5)**
28:23 78:14,19
127:12 147:2
**attempting (1)**
41:10
**attend (3)**
40:19 144:12
160:6
**attendance (1)**
79:18
**attended (5)**
40:23 60:3,4
68:15 142:22
**attention (9)**
26:9 55:8,15
69:10 83:4
181:19,21
183:18
184:19
**attorney (14)**
7:24 17:13,14
18:10 34:6,9
50:16 84:20
144:15 154:7
159:23
160:10
181:14 182:2
**attorney/clie...**
84:19 160:4
**attorneys (9)**
2:4,9,16 50:17
68:6 112:22
121:19 173:4

187:10
**audio (1)**
9:25
**August (13)**
59:23 69:4
77:25 86:14
86:19 96:8
107:10
123:10,17
124:3 126:8
131:19
174:13
**auspices (1)**
121:14
**authority (6)**
64:13 96:6
118:23 119:8
121:23,25
**authorizatio...**
61:20 72:23
117:2
**authorize (3)**
36:10 37:8,9
**authorized (3)**
59:4 61:16,21
**automated (1)**
74:14
**Avenue (2)**
2:5,10
**aware (24)**
42:10 44:5
52:23,25 53:2
60:18,19 75:5
78:23 84:2,15
89:10 122:19
135:22
138:15 149:9
149:14,18,24
150:13
155:16 166:7
168:15
175:14
**awkward (1)**
10:2

**awkwardnes...**
9:23

_____

**B**

**B (4)**
1:19 162:15
191:6,24
**back (24)**
31:14 48:22
77:8 83:15
84:7 85:14
93:10 102:7
103:18
116:19,21,22
117:5 119:21
120:21
123:14 126:4
128:17,21
131:3,22
146:16
171:19 177:2
**background ...**
14:25
**backup (2)**
93:13 120:11
**balance (3)**
77:2 89:7
123:9
**balances (1)**
154:15
**bank (7)**
116:5 122:17
153:23,24
154:13 155:5
186:19
**bankruptcy (5)**
11:17 14:24
50:25 51:12
98:23
**bar (2)**
4:15 6:5
**bare (1)**
159:8
**Barnett-How...**

January 11, 2022

2:13 9:17
**based (6)**
53:12 55:20
69:2 73:5,10
169:3
**basically (3)**
14:16 15:14
82:7
**basis (2)**
10:23 37:23
**bates (1)**
170:15
**bathroom (1)**
48:21
**bear (1)**
8:5
**bearing (2)**
104:21 128:13
**beds (6)**
37:8,9,9 40:12
42:23 43:22
**beginning (3)**
29:9 71:23
163:12
**begun (1)**
4:24
**behalf (11)**
10:9,18 19:8
36:17 53:16
53:20 63:18
82:19 178:11
178:20 180:2
**behest (1)**
39:22
**believe (96)**
16:2 18:21,25
31:8,17 32:10
33:21 34:19
37:19 38:24
39:20,22 41:7
41:23 42:17
43:2,3 44:2
44:22 48:15
51:4,4,11

56:14,20 57:2
57:24 61:19
62:22 69:6
71:15 73:3,4
73:10,19 75:3
75:11,25
76:16,20,22
78:5 79:24
86:7,14 89:3
89:21 94:8
95:2,12 96:24
97:6 100:12
102:5,5 105:5
112:8,9,11
113:14
114:22 115:3
117:7 123:21
125:18,22
128:12
131:14
132:20 137:6
137:21 138:6
138:6,9 141:6
142:4,14
145:7,8
152:10 154:9
159:9 161:15
165:12
166:25
169:16 170:9
172:8 174:13
175:6 177:10
180:3,9,17
182:2,13
**Ben (1)**
50:12
**Beneficial (2)**
162:9,14
**Beneficiaries...**
162:15
**benefit (56)**
15:12 33:22,24
33:25 34:2
35:4 142:9

143:15 145:6
145:22
146:11,14
148:3,7,12,13
148:16,22
149:6,14
152:2,4,16,20
152:22
155:17,18,24
156:2 160:15
164:7,13,16
165:9 166:24
167:10,17
168:12,16,19
169:4 170:20
176:6,9,10
178:13,22
179:2 182:3
183:6,11
186:20,22,23
187:12 190:2
**Benefit's (1)**
156:7
**benefits (2)**
130:16 144:10
**best (3)**
31:22 55:25
86:11
**bet (1)**
31:22
**better (1)**
12:15
**between(amo...**
4:5,19 5:8,14
5:20 6:9
**beyond (2)**
119:24 136:3
**bill (9)**
13:4 20:12
30:18 34:13
44:22 75:13
91:24 150:17
167:14
**Billows (2)**

17:15 34:6
**bills (1)**
133:4
**bit (3)**
9:25 82:14
83:16
**Blatt (7)**
36:19 38:7
39:23 60:12
72:18 85:25
189:16
**blew (1)**
172:8
**blinds (2)**
74:13,14
**blood (1)**
191:17
**body (1)**
93:10
**bonding (2)**
141:7,13
**bone (1)**
159:8
**boomed (1)**
175:16
**borrowed (1)**
32:17
**borrower (5)**
155:17 164:24
167:4,16,24
**borrowing (3)**
16:17 32:18,20
**Bradford (2)**
34:19,23
**brand (1)**
40:9
**breach (19)**
64:2,3,10
80:10,13
97:21 98:13
99:12 112:10
112:12 113:7
113:21 115:7
115:8 127:22

127:24
145:11,14,17
**breached (9)**
93:24 94:24,25
98:5,20
108:20
126:15 180:5
181:11
**breaches (3)**
84:3 176:12
180:12
**break (13)**
48:21,23 94:14
94:15 99:19
99:23 100:13
108:6 134:13
134:14
160:12
170:25
187:25
**breaking (1)**
10:7
**BRENDAN (1)**
2:18
**briefly (1)**
50:11
**bring (4)**
19:11,16,23
58:20
**broad (1)**
25:10
**broader (1)**
25:17
**broke (2)**
78:17 174:9
**broken (1)**
78:13
**bscott@klest...**
2:19
**build (1)**
37:7
**building (35)**
20:17 43:8
44:11 56:20

58:16,18
59:20 60:3,21
60:25 61:2
75:16 76:3
77:12 78:7
79:11,15
80:23 81:2,3
81:7,15,18,24
83:3,9 86:5
106:20 107:7
107:14 124:2
124:14
147:19,23
181:5
**buildings (1)**
21:10
**built (5)**
59:18 78:7
79:11 106:21
181:5
**business (20)**
19:12,13,15,25
45:14 46:9,14
46:20 47:19
64:13,14
99:21 108:16
115:12
120:13
121:10
122:15
126:19 176:9
182:8
**businesses (1)**
175:16
**buy (1)**
21:4

**C**

**C (1)**
2:2
**C.P.L.R (4)**
4:8 5:4,11,22
**calendar (2)**
50:20 176:24

**California (1)**
23:21
**call (10)**
19:7 64:22
67:12 72:12
72:13 87:21
91:19 121:3
127:23 165:6
**called (8)**
9:3 19:19
36:20 37:6
42:3,5 68:16
127:4
**camera (2)**
12:7,10
**candid (1)**
108:14
**capacity (2)**
10:13 13:6
**caps (1)**
186:16
**card (4)**
118:22 119:2,4
119:19
**cards (1)**
116:25
**care (3)**
92:13 159:24
175:11
**careful (1)**
173:6
**carefully (1)**
149:8
**caring (1)**
176:2
**case (10)**
10:22 11:2
54:23 74:5
109:17
120:22
155:22 186:2
186:11,12
**cases (1)**
109:17

**cash (8)**
76:7,14 77:3
150:2,11
166:14,18
174:25
**caught (1)**
78:19
**cause (2)**
108:8 110:20
**caused (1)**
73:19
**CC'd (2)**
165:15,16
**ceased (2)**
174:2,17
**census (4)**
37:4,18 39:25
175:17
**certain (14)**
31:12 46:24
95:9 97:7
109:20 110:3
112:20 115:2
144:9 161:14
183:7 184:4
187:9 190:12
**certainly (15)**
16:9 52:25
64:6 90:25
91:25 98:21
119:21 120:8
132:24
133:18 143:2
146:3 159:5
183:21 186:5
**certainty (1)**
159:17
**certificate (18)**
30:6,6,7 37:22
38:2 44:12
63:5 101:14
102:10 103:2
103:4,5,17
142:17 144:4

144:6,25
145:5
**Certificates (2)**
147:10,15
**certification ...**
5:15 62:13
63:21 65:15
65:17 66:2,6
66:20 73:12
73:20 74:25
86:15,19
87:18 88:19
191:2
**certify (2)**
191:8,15
**changed (2)**
128:22 147:17
**chapter (2)**
56:10 64:7
**characterizat...**
183:23 185:19
**characterize ...**
58:3 59:14
143:8
**charge (2)**
6:13 159:24
**charged (1)**
186:21
**charges (1)**
187:11
**check (3)**
119:21,22
138:2
**choice (1)**
173:24
**choose (1)**
112:16
**chose (2)**
112:14,18
**Chow (4)**
65:11 71:22
72:18 189:16
**Chris (2)**
72:18 189:15

**Christopher ...**
65:11
**chronology (2)**
76:10 109:24
**Church (1)**
160:7
**cimgoetz@ic...**
2:23
**circumstance...**
18:11
**cite (1)**
56:10
**cited (1)**
109:18
**City (3)**
39:11 40:2,9
**civil (1)**
8:10
**claim (3)**
11:3 135:23
149:15
**claimant (1)**
11:10
**claimed (1)**
116:20
**claiming (1)**
62:17
**claims (4)**
11:11,25 18:14
186:24
**clarification ...**
78:2 82:15
**clarify (4)**
71:11 106:25
128:15
163:21
**clarity (1)**
105:17
**CLAUDIA (1)**
2:23
**clause (6)**
127:3,7 129:24
139:16
140:17

141:14
**clear (18)**
26:24 34:7
49:9 70:23
89:11 96:18
96:19 105:9
106:25 114:2
114:16 122:2
130:8 131:6
157:8 163:2
163:11,18
**clearly (1)**
124:23
**client (1)**
180:2
**clients (1)**
184:24
**close (4)**
50:17 74:19
124:20
185:10
**closed (1)**
142:8
**closing (4)**
97:6 142:18
146:10
148:11
**collateral (2)**
75:25 172:6
**collateralizat...**
74:11
**collect (1)**
19:9
**collection (1)**
19:8
**come (5)**
10:13 28:2
65:24 144:11
185:2
**comes (1)**
160:4
**comfortable ...**
59:24
**coming (3)**

11:17 46:7
81:4
**commence (2)**
64:5,9
**commencem...**
67:2 69:21,24
74:23 75:3
77:3 105:24
176:15
**commences (1)**
70:6
**comments (1)**
183:7
**commitment ...**
36:10
**committed (1)**
176:11
**common (1)**
28:13
**communicat...**
30:22
**communicat...**
39:4,6 41:8
**communicati...**
62:3 63:11,15
63:16 65:21
73:4 75:8
**communicati...**
17:5,7 40:14
41:7 89:7
119:24
**companies (7)**
23:2 91:24
92:2,12,14,15
92:25
**company (11)**
10:17 22:20,21
22:24 24:9,16
26:12 27:13
28:14 33:11
47:16
**company's (1)**
36:20
**complaining ...**

174:25
**complaint (44)**
52:2,8,21 53:3
53:6,12,15,21
53:24 54:3,7
54:10,13,17
54:19,23 55:7
55:9 74:12
86:24 87:4
133:12 134:3
134:11,15,18
134:24
137:14
146:16 149:6
149:9,12,19
149:25 150:4
150:6 151:23
155:17,21,21
157:4 164:7
174:19 189:9
**complaints (1)**
83:2
**complete (1)**
71:6
**compliance (2)**
73:8 75:6
**complied (1)**
111:15
**comply (2)**
114:13 156:19
**compose (1)**
93:8
**comprise (1)**
93:8
**CON (1)**
41:25
**concern (8)**
80:25 81:3,12
144:21 151:4
151:5 156:9
156:20
**concerned (12)**
23:23 75:17
81:23 98:9

99:10 108:19
115:14 150:6
156:13,15
164:10
182:11
**concerning (1)**
16:25
**concerns (1)**
80:22
**concession (1)**
125:9
**conclusion (3)**
114:3 127:16
139:25
**condition (3)**
97:8 102:8
103:14
**conduct (9)**
5:23 8:6 9:18
64:14 94:10
95:13 121:2,9
121:10
**conducted (1)**
7:7
**conference (6)**
7:8 9:24 46:7
59:17,21
159:9
**CONFEREN...**
1:16
**confidential (...**
89:8
**confirm (3)**
73:16 100:5
123:19
**confirming (1)**
7:16
**conflict (1)**
182:9
**confuse (2)**
21:11 72:6
**confused (1)**
154:24
**confusing (1)**

77:7
**Congress (12)**
47:2,9,25
91:18,19,21
92:11,13,15
92:20,25 93:5
**congresspers...**
39:19
**connection (...**
11:11 18:10
20:19 34:8
36:7 120:16
125:16
129:10
160:17,22
**consent (8)**
7:19 16:18,21
155:25 156:7
168:4,12
188:4
**consider (6)**
45:16 63:25
64:3 80:5,9
89:4
**consideratio...**
105:22 130:15
**considered (4)**
7:20 31:3
80:12 84:2
**consistently (1)**
174:25
**constituted (1)**
113:21
**constructed (3)**
29:25 71:6
77:12
**construction ...**
15:14,16 20:21
30:3,4 32:4
33:3,16,20
35:8 44:12
47:2,9,11,16
47:25 49:21
91:22 142:18

January 11, 2022

constructive ...
58:2
consultant (1)
86:3
consultants (3)
36:18 38:7
144:15
Consulting (1)
36:21
contain (1)
130:8
contained (6)
106:14 114:13
119:2 125:14
128:4 157:4
contains (1)
118:22
contemplate...
14:23 104:22
contemplatio...
105:4
contemporan...
140:24
contemporan...
139:18 140:21
141:10,10,16
141:24
context (1)
156:16
continuation ...
151:15
continue (3)
94:16 95:13
112:23
continued (4)
115:10 138:18
173:25
185:23
continues (2)
94:9 166:10
continuing (3)
95:22 111:7
173:20
contract (5)

98:13,13,20
127:5 164:20
contributed (1)
32:9
contributor (4)
101:13 102:9
102:12,15
control (1)
7:11
controlled (2)
5:5 17:12
controller (1)
91:4
convenient (1)
99:19
conversation...
34:13 62:14
78:23 133:22
152:3,8
conversation...
20:10 27:20
28:21 29:2
89:12,22
90:14,17
97:25 111:7
112:22
122:10,11
153:5
Conversely (1)
186:7
conversion (2)
32:4,8
converted (5)
31:5,16,17,18
31:24
convertible (1)
31:7
cooperate (2)
64:11 142:18
cooperation (...
79:14
copied (1)
182:24
copy (5)

6:10 7:25 8:8
18:13 120:2
corporate (2)
17:10 23:7
correct (44)
10:11,17 11:19
12:3 18:3
22:16 23:17
24:9 26:13,14
27:2 41:15,16
46:18 53:17
65:15 70:17
73:16,17
78:24 80:24
87:14 91:18
93:12,17
100:8,9
101:21 102:4
104:14 106:7
107:15,22
108:23
115:25 129:4
129:5 132:8
156:24
160:21
163:24 181:9
183:2,14
corrected (3)
76:22 147:17
157:25
costs (1)
8:6
Council (6)
29:18 42:4,5
42:19,21
43:18
counsel (30)
4:5,19 5:2,8,14
5:20 6:9,11
7:5,8 8:3
10:12 18:5,7
18:16 51:12
82:19 83:19
83:20,24 84:6

89:13,14
90:14 97:25
111:8 120:19
183:13
185:10 188:5
counterclaim...
11:24 18:14
country (2)
175:16 176:24
county (8)
1:3 37:4,10,19
39:14,15
52:22 191:4
couple (3)
23:6 48:19
66:13
coupled (1)
157:6
course (8)
29:10 81:20
84:23 124:5
135:18
140:16
151:12 155:3
court (15)
1:2 7:8,12,15
11:3,5,18
14:24 50:25
52:3,22 98:22
139:7 154:14
159:9
courtesy (1)
159:8
cover (2)
67:23 119:24
covering (1)
147:19
COVID (10)
175:10,16,21
175:21 176:2
176:6,13,16
176:22
179:16
CPLR (2)

7:6 8:8
create (1)
19:18
credit (11)
75:24 76:6,6
76:14 83:14
84:11 101:16
105:7 129:8
130:4,23
creditor (1)
171:24
cross (1)
11:3
crystal (3)
105:9 130:8
157:8
Cuomo (1)
39:21
cure (14)
111:2,6,21
112:2 132:20
158:4 159:20
159:22
161:24
170:19 171:3
172:4 185:20
185:25
cured (18)
111:19 128:5
132:4,16,18
132:19,21
133:23 147:7
157:14,15
158:11,21
159:3,4 186:4
186:8,10
cures (1)
185:11
curing (1)
160:10
current (5)
9:11 50:8
138:10 185:8
186:16

January 11, 2022

**currently (1)**
23:12
**cut (1)**
138:2

**D**

**d (7)**
9:2 101:2,7,19
103:22
104:11,17
**daily (1)**
56:13
**Dakota (1)**
9:13
**date (34)**
55:22,23 58:15
59:2,3,5 61:2
64:21 67:2,22
68:10 69:2,21
69:24 71:4
74:23 85:13
85:20 87:13
96:24 98:6
99:6 103:7
107:18 111:3
111:19
112:21,21
113:3 115:9
123:4 168:11
170:3,22
**dated (15)**
57:24 65:10
67:24 72:17
87:25 99:25
100:4 106:15
160:14 169:4
182:18
189:14,18,21
189:25
**dates (7)**
71:9 77:8
86:16,17
107:17 110:3
190:12

**dating (1)**
68:3
**day (5)**
67:10 98:19
120:13
188:12
191:20
**day's (1)**
135:14
**days (20)**
58:5,5 59:25
73:25 76:2
77:3 95:20,21
95:23 97:11
97:17,17,21
98:4 105:24
113:21 123:4
124:15
151:12
176:14
**deadline (2)**
105:18,21
**deal (6)**
27:16 54:12
68:18 123:11
163:9,10
**dealing (7)**
11:15 62:11
79:10 90:22
90:24 91:3
141:7
**dealings (3)**
11:10 47:10
182:4
**deals (8)**
21:21,22 25:9
25:9 101:19
101:22
110:21
115:24
**dealt (3)**
116:2 141:8,12
**debt (2)**
32:8 34:22

**December (19)**
50:20 62:24
64:20 70:16
71:18,25
72:11 73:11
98:14 101:16
102:25 105:6
106:4 108:22
110:24 112:7
112:20
176:20,24
**decision (1)**
158:18
**declaration (3)**
50:24 51:3,13
**dedicated (1)**
175:21
**deduction (1)**
128:17
**deemed (1)**
5:3
**defalcated (2)**
77:16 152:11
**default (52)**
87:7,12,16
88:7 89:2,19
90:22 93:20
94:20,22
103:12 111:2
111:13,18
112:19,21
113:2,4,5,10
115:16
132:12,15
133:10,12
135:15,18
136:20 137:5
137:10
138:20
147:13,25
148:4,8,14,19
151:12
155:19 156:3
157:6 158:10

158:13,18
165:8 166:2
170:11
180:10
185:11
186:20,25
187:2
**defaulted (1)**
133:3
**defaults (38)**
88:23 91:7
93:9 111:14
111:22 128:3
132:3,16
133:6,23
134:2 157:8
157:13 158:4
158:11,22
159:5,15,20
159:22
160:10
161:24
166:11
168:19
170:20,24
171:4,20
172:4 184:25
185:21,25
186:4,8,10,23
186:25
187:10
**defendant (1)**
42:9
**Defendant's ...**
52:7 64:24
67:14 72:16
87:24 99:24
117:23
160:13
179:11 189:7
**Defendant(s)...**
1:11 2:9,16
**defer (1)**
51:19

**deficit (1)**
179:19
**define (1)**
58:11
**defined (4)**
86:3 102:13,15
163:12
**definitely (2)**
60:13 103:16
**definition (1)**
102:20
**Delaware (5)**
28:7 97:7,11
104:24 161:4
**delay (1)**
87:16
**delayed (1)**
74:23
**DELBELLO...**
2:3
**deliver (6)**
81:14 144:4,24
146:4,6
147:10
**delivered (7)**
74:24 80:15
144:6 145:6
145:22 155:8
155:14
**delivery (1)**
162:20
**demand (3)**
137:10 143:8
143:13
**demands (2)**
142:19 171:24
**demonstrate ...**
145:10
**demonstrate...**
39:24
**denied (1)**
37:23
**department (...**
29:17,23,25

January 11, 2022

[Page 200]

30:8 36:2,3,5
38:21 40:6
41:5 43:13
44:3 61:20
62:5,12,19
63:5,12,15,18
64:19 70:12
70:15 71:5,15
71:25 72:17
72:24 74:25
85:8,10,23
86:20 87:17
88:19 121:12
189:15
**deposed (2)**
8:9 10:23
**deposit (86)**
73:24 74:9
76:19,24 79:5
79:6,11,12
80:4,6,7,18
82:8,22 91:8
92:17,17
95:14,17,20
97:12,16,19
97:19 98:15
101:10,20
104:3,13
105:11,12,13
105:16,19
106:6,12,14
106:22 107:4
107:6,10,12
108:5 111:12
111:14,16
113:20
114:10 115:6
115:10,11,25
116:4,6,7
118:24 123:5
123:7,25
124:13,15,18
124:24 125:6
126:17,20,22

127:19 128:2
132:25
146:18
151:13,16
153:19 155:6
155:14
157:11,12
159:2 163:8
171:21
173:25 175:4
176:11,20
186:5
**deposited (1)**
167:6
**deposition (10)**
7:7,14 8:6 9:18
9:20 10:16
52:15 100:7
117:13
163:13
**deposition(s)...**
191:10,12
**Depositions (1)**
5:23
**deposits (4)**
146:19,21,23
147:2
**Deputy (3)**
38:24 39:14
43:20
**describe (2)**
45:8,12
**described (7)**
22:3 26:19
37:24 43:9
76:14 128:10
174:3
**describing (5)**
24:23 26:15
58:8 87:18
132:2
**designated (2)**
35:10 41:18
**designation (1)**

41:20
**determinatio...**
158:20,24
**determine (3)**
98:16,24
139:22
**determined (1)**
71:5
**develop (1)**
19:21
**development...**
19:22 20:3,16
20:22 24:14
24:18 26:19
26:25 29:6
32:21 33:14
35:17 43:12
47:20 68:13
109:21
139:20 140:2
140:18 141:4
141:12,22
**difference (2)**
22:13 133:10
**different (8)**
25:5 26:11
54:14 71:12
75:15 99:4
104:19
143:22
**difficult (2)**
54:21 84:18
**difficulty (1)**
51:20
**diminish (1)**
123:13
**diminishing (...**
172:6
**direct (12)**
51:25 55:8,14
69:9 87:3
88:10 91:23
108:25
166:21,23

181:21
184:19
**directed (2)**
92:20 183:18
**direction (3)**
112:15,17,18
**directly (4)**
20:20 48:7
166:22
170:23
**disagree (1)**
168:18
**disagreemen...**
98:25
**disbursed (3)**
126:3 163:8
164:4
**disbursemen...**
161:21
**discovered (1)**
77:16
**discovery (3)**
11:14 57:13
120:9
**discuss (14)**
40:15 54:6,9
54:18 55:5,6
79:4 81:25
85:22 89:25
90:9 126:8
133:19
150:19
**discussed (13)**
47:19 54:25
77:5 79:6
82:4 90:4
106:6,13,13
124:2 131:17
134:21 152:8
**discussing (3)**
35:3 79:8
106:18
**discussion (21)**
28:13 34:25

54:12 55:2
81:19,22
99:22 124:5,9
148:7,13,17
148:21
152:16,18,22
167:9 172:11
182:12,14
187:14
**discussions (...**
27:4,12 28:16
74:7 95:24
148:2,15
160:9 171:3,7
171:18 172:5
172:8,19,21
174:6,9 180:4
184:25 185:2
187:8,16
**disposition (1)**
16:20
**dispute (10)**
59:16 73:23
74:8 75:23
77:13,18
96:15 115:3
156:17
173:22
**disputes (4)**
77:21 79:10
84:7 174:17
**distinction (3)**
22:19,19 57:18
**district (3)**
39:7,18,19
**diverted (2)**
149:16,20
**divulge (1)**
160:3
**document (86)**
2:22,23 14:3
14:21,23
16:24 39:24
40:5,8 51:21

**January 11, 2022**

62:16 63:9
64:9,15,18
65:7 69:12
71:17,21 73:6
87:3,20 88:10
88:11,16,21
92:7 94:5,17
98:5,11 99:3
102:20,22,23
103:20
108:10
109:19
111:17,24
114:15 115:4
115:6 117:6
117:16,21
118:5,10,11
118:12,13,22
119:17 120:3
120:6,8,11,12
121:21 122:3
127:13
129:21
131:14,15
134:9 138:24
162:4,6
165:18
168:21,23,24
179:14
181:22
182:25 183:8
183:10,17,21
183:24 184:2
184:20 185:8
185:15 187:4
190:8
**documentati...**
124:6
**documents (...**
17:9 28:18,22
29:3 32:7
34:4,5 56:24
57:2,6,9,12
109:8,12,22

110:4 116:19
119:11
120:16 121:3
121:9,11,18
133:16,20
139:10,13
141:9 146:10
154:4,7
164:14
165:17 169:3
169:21 174:7
178:2 179:22
179:25 180:3
190:13
**dodge (1)**
137:23
**doing (8)**
15:18 19:24
32:12 46:5
75:18,21
119:14
136:15
**dollar (9)**
100:14,22
103:13
110:25 111:3
112:6,10
114:10
160:19
**dollars (3)**
48:19 102:9
155:6
**Donnellan (43)**
2:3,6 10:15,24
11:13 12:3
24:19 25:2,15
25:20 27:15
49:5 52:13,16
57:7,14 70:23
71:10 72:4,13
87:25 89:8
90:12 95:5
96:3,6 98:10
110:14 139:4

140:25
143:18
149:22
156:25
163:11 165:3
169:13,22
170:2,7
171:10
173:17
183:16
189:19
**Donnellan's (...**
82:12 95:25
97:24
**draft (2)**
14:6 178:5
**draw (1)**
101:15
**drawn (1)**
116:17
**Drive (1)**
9:13
**due (16)**
73:25 76:2,15
76:16,17 80:8
87:8 97:16
100:14
106:22 123:5
124:14,15
137:15
181:17
187:12
**duly (2)**
9:3 191:11
**duties (3)**
14:20 15:6,11
**duty (1)**
64:11

_____
E
_____

**E (5)**
2:2,2 9:2,2,2
**e-mail (22)**
2:7,12,19,23

62:9,20 63:16
63:16,17
65:10 66:14
66:16 73:13
123:23
179:12
181:23
182:17 183:5
183:19,24
184:21 190:4
**e-mailed (1)**
8:2
**e-mails (6)**
56:9 64:25
66:8,15
119:22
189:10
**earlier (28)**
18:12 61:23
62:8 63:3
70:13,14
71:18,21,23
72:25 73:4,14
78:21 83:9,12
96:17,22
102:2 104:6
105:6 114:21
125:8,12
132:17
134:21
138:23
151:18 163:6
**early (7)**
62:24 75:11
78:6 111:11
138:7 168:2
168:20
**easy (1)**
11:6
**economic (1)**
175:2
**Ed (1)**
91:4
**effect (1)**

94:11
**effected (1)**
141:15
**effecting (1)**
175:11
**effective (4)**
55:22,23 85:16
85:19
**effectuate (2)**
119:12 173:21
**effort (6)**
57:13 112:23
170:19
171:13
173:21
185:22
**efforts (7)**
159:20 171:3,7
174:2,16
178:15
185:19
**eight (2)**
62:23 144:18
**either (12)**
20:12 34:6
49:20 66:9
70:6 74:5
77:2 86:6
124:11
132:15 139:5
160:9
**elected (4)**
40:7 43:17
61:23 87:7
**eleven (1)**
181:16
**eliminated (4)**
130:6,20 131:4
131:13
**embodied (2)**
128:15 144:20
**employ (1)**
92:2
**employee (1)**

91:21
**employer (1)**
91:23
**enable (1)**
64:9
**ended (4)**
28:21 99:11
   115:6 172:19
**engaged (2)**
47:15 183:12
**enhanced (1)**
46:4
**ensure (3)**
121:25 123:3,8
**enter (2)**
171:14 172:5
**entered (2)**
55:16 56:2
**enterprise (5)**
13:9,11 43:4
   104:25
   156:11
**enterprises (1)**
46:24
**entire (5)**
76:23 99:14
   107:9 125:5
   178:16
**entirety (1)**
187:4
**entities (2)**
23:22,23
**entity (38)**
12:21 13:23
   15:3,7,12,15
   15:23 17:20
   17:21,23,24
   18:6,8 24:8
   24:15,19 25:5
   26:4,5,7 27:6
   27:7,14 33:20
   34:17 41:21
   41:25 42:2,3
   42:6,11,25

44:17 47:15
48:3 49:14,15
53:20
**enumerated ...**
32:24
**envelope (1)**
118:21
**environment...**
159:11
**equipment (1)**
81:16
**equipped (3)**
59:19 61:4
   78:7
**equity (7)**
17:25 21:23,24
   31:5,16,24
   32:8
**escapes (1)**
43:4
**escrow (3)**
161:9 162:19
   162:25
**Esq (191)**
1:18 2:6,12,13
   2:18 9:10
   10:1 11:1
   12:1 13:1
   14:1 15:1
   16:1 17:1
   18:1 19:1
   20:1 21:1
   22:1 23:1
   24:1 25:1
   26:1 27:1
   28:1 29:1
   30:1 31:1
   32:1 33:1
   34:1 35:1
   36:1 37:1
   38:1 39:1
   40:1 41:1
   42:1 43:1
   44:1 45:1

46:1 47:1
48:1 49:1
50:1 51:1
52:1 53:1
54:1 55:1
56:1 57:1
58:1 59:1
60:1 61:1
62:1 63:1
64:1 65:1
66:1 67:1
68:1 69:1
70:1 71:1
72:1 73:1
74:1 75:1
76:1 77:1
78:1 79:1
80:1 81:1
82:1 83:1
84:1 85:1
86:1 87:1
88:1 89:1
90:1 91:1
92:1 93:1
94:1 95:1
96:1 97:1
98:1 99:1
100:1 101:1
102:1 103:1
104:1 105:1
106:1 107:1
108:1 109:1
110:1 111:1
112:1 113:1
114:1 115:1
116:1 117:1
118:1 119:1
120:1 121:1
122:1 123:1
124:1 125:1
126:1 127:1
128:1 129:1
130:1 131:1
132:1 133:1

134:1 135:1
136:1 137:1
138:1 139:1
140:1 141:1
142:1 143:1
144:1 145:1
146:1 147:1
148:1 149:1
150:1 151:1
152:1 153:1
154:1 155:1
156:1 157:1
158:1 159:1
160:1 161:1
162:1 163:1
164:1 165:1
166:1 167:1
168:1 169:1
170:1 171:1
172:1 173:1
174:1 175:1
176:1 177:1
178:1 179:1
180:1 181:1
182:1 183:1
184:1 185:1
186:1 187:1
188:1,9 189:1
189:4 190:1
191:1,9
**essentially (6)**
77:23 82:7
   99:11,13
   105:2 108:20
**establish (4)**
150:2,11
   166:14 187:7
**established (5)**
67:2 69:20
   105:18
   153:24
   166:17
**establishing (...**
150:19,23

151:3
**estate (23)**
22:21 23:17,22
   23:23 24:8,15
   26:4,7,11
   27:5,9,14,22
   27:24 91:8
   104:24
   137:15,17,20
   138:3,11,14
   138:19
**estimate (6)**
13:13,18 21:6
   22:6 90:5,6
**estoppel (12)**
142:12,17
   143:4,5,10,17
   144:4,6,25
   145:5,21,22
**etcetera (2)**
40:4 91:8
**event (3)**
37:3 54:6
   112:5
**events (2)**
76:10 140:16
**eventually (5)**
35:12 64:15
   82:10 136:5
   172:18
**evidence (1)**
124:7
**evidences (2)**
129:21 130:22
**evidencing (2)**
154:14 155:6
**evolution (1)**
31:23
**evolve (1)**
29:13
**evolved (1)**
29:10
**evolves (1)**
170:23

January 11, 2022

[Page 203]

**Ex (23)**
52:8 64:25
67:16 72:19
88:2 99:25
117:17,24,24
118:9,13
160:15
179:12 189:9
189:10,12,17
189:20,22,23
189:24 190:3
190:4
**Ex'd (1)**
116:22
**exact (4)**
68:10,25 86:17
124:18
**exactly (3)**
124:22 132:22
163:21
**examination ...**
1:16 6:2,4 9:6
11:8,20 12:20
18:13 189:3
**examination(...**
4:11,14,20,24
5:2,9,16 6:11
**examined (2)**
4:22 9:4
**example (3)**
95:14 112:6
139:19
**excess (4)**
22:10 23:4
24:6 177:10
**exclusive (1)**
113:19
**executed (1)**
14:5
**execution (2)**
77:19 162:20
**executive (3)**
17:8 39:14
159:25

**exhibit (54)**
7:25 8:2,5 52:3
52:7,13,14,17
52:19 64:22
64:24 65:4
67:12,14 69:9
70:13 72:15
72:16,23 85:7
86:23 87:23
87:24 88:5
92:3 99:24
100:5 103:19
115:17
116:21 117:8
117:10,13,13
117:23 118:3
118:5 129:3
157:7 160:13
165:6,8
179:11
181:20 189:2
189:8,10,11
189:14,18,21
189:23,25
190:4
**exhibits (5)**
7:23 109:16
153:21,23
188:5
**EXHIBITS--...**
189:6
**existed (3)**
37:16 83:6
179:7
**existing (1)**
21:10
**exists (2)**
52:23,25
**expect (1)**
151:9
**expected (1)**
151:9
**expedited (1)**
11:14

**experience (6)**
20:15,18,23
21:5 25:14,17
**expire (3)**
98:7 99:7
108:8
**expired (1)**
108:12
**expiring (1)**
99:11
**explain (1)**
24:11
**express (3)**
7:18 117:5
165:21
**expressed (4)**
130:22 131:10
131:11,22
**expressly (1)**
131:12
**extant (1)**
115:3
**extent (10)**
27:20,25 28:9
28:24 46:23
94:3 110:16
127:11 160:3
182:7
**extrapolatin...**
186:14

---

**F**

**F (1)**
9:2
**face (1)**
33:17
**facilities (4)**
20:16 24:14
25:13,16
**facility (34)**
20:4,18 22:14
26:20,25 37:8
41:13 42:15
55:16 56:3,6

56:16 58:10
58:23 59:9,11
59:18,18 73:7
74:16 75:5,14
78:9 95:16
106:7 123:18
126:7 131:18
160:7 175:9
175:25
177:17,19,22
**fact (24)**
13:8 27:21
39:25 41:9
42:10 55:25
73:11 81:23
83:12 90:18
112:16 125:6
125:7 127:11
130:19
145:20,25
146:2,21
151:4 152:9
157:9 159:3
171:19
**facts (6)**
69:2 70:8,9,9
112:25
137:24
**factual (1)**
54:23
**factually (3)**
112:9 113:5,25
**fail (2)**
115:10 173:25
**failed (22)**
33:9 36:24
95:21 98:14
99:14 113:6
115:9 126:16
134:7,25
135:4 137:14
137:17
146:17
147:10

151:16
155:18
156:22 166:4
166:14,21
179:24
**failure (22)**
4:12,24 6:3
64:8 74:9
84:13,14
88:18 91:7
108:21 112:9
113:20 114:9
114:12 115:5
125:5 126:22
127:25 134:3
134:16
149:25
156:18
**fair (15)**
17:11 24:13,24
33:13,15
47:21 70:5,7
85:17 90:20
90:23 104:16
181:10 183:5
183:25
**fall (1)**
57:11
**familiar (18)**
14:8 36:22
50:24 51:14
51:15 52:20
84:12 87:11
134:4 150:3
156:5 164:6,9
166:3,6 171:6
171:12,13
**familiarity (1)**
153:20
**familiarize (2)**
34:10 149:11
**family (2)**
30:23 41:19
**far (11)**

**January 11, 2022**

| | | | | |
|---|---|---|---|---|
| 21:3 23:22 | 53:1 54:1 | 141:1 142:1 | 103:6 126:15 | 20:7 38:14,15 |
| 43:9 45:10 | 55:1 56:1 | 143:1 144:1 | **finance (1)** | 38:16,19 39:5 |
| 66:23 98:9 | 57:1,17 58:1 | 145:1 146:1 | 177:5 | 46:5 89:14 |
| 99:10 108:18 | 59:1 60:1,9 | 147:1 148:1 | **financed (1)** | 121:13 |
| 110:2 115:14 | 61:1 62:1 | 149:1 150:1 | 177:22 | 159:25 |
| 182:10 | 63:1 64:1 | 151:1 152:1 | **financial (10)** | 182:19 |
| **Fed (6)** | 65:1 66:1 | 153:1 154:1 | 91:12 111:16 | 184:15,22 |
| 116:22 117:17 | 67:1 68:1 | 155:1 156:1 | 143:2 159:6 | **first (43)** |
| 117:23 118:9 | 69:1 70:1 | 157:1 158:1 | 167:17,19 | 9:3 27:21,23 |
| 118:13 | 71:1 72:1 | 159:1 160:1 | 179:22,25 | 28:12 29:6 |
| 189:23 | 73:1 74:1 | 161:1 162:1 | 180:3 181:17 | 35:6,9,11 |
| **Federal (3)** | 75:1 76:1 | 163:1 164:1 | **financials (3)** | 49:16,19 |
| 11:5 117:5 | 77:1 78:1 | 165:1 166:1 | 159:6 180:16 | 50:20 52:2,8 |
| 165:21 | 79:1 80:1 | 167:1 168:1 | 180:20 | 53:23 54:5 |
| **fees (2)** | 81:1 82:1 | 169:1 170:1 | **financing (25)** | 59:19 88:9 |
| 186:18 187:10 | 83:1 84:1 | 171:1 172:1 | 20:22,24,25 | 93:15 97:9 |
| **fell (1)** | 85:1 86:1 | 173:1 174:1 | 21:4,8 32:22 | 101:18 126:6 |
| 37:20 | 87:1 88:1 | 175:1 176:1 | 33:4,5,7,16 | 128:19 131:2 |
| **felt (2)** | 89:1 90:1 | 177:1 178:1 | 33:20 34:11 | 132:6 135:6 |
| 131:22,24 | 91:1 92:1 | 179:1 180:1 | 34:18 35:4 | 152:15 |
| **Fensterman ...** | 93:1 94:1 | 181:1 182:1 | 142:8,12,19 | 154:17,18,20 |
| 1:18 9:10,15 | 95:1 96:1 | 183:1 184:1 | 142:24 143:3 | 157:21 |
| 9:19 10:1 | 97:1 98:1 | 185:1 186:1 | 143:15 | 158:25,25 |
| 11:1,12 12:1 | 99:1 100:1 | 187:1 188:1,9 | 145:10 | 162:17 |
| 13:1 14:1 | 101:1 102:1 | 189:1,4 190:1 | 148:12 | 165:24,25 |
| 15:1 16:1 | 103:1 104:1 | 191:1,9 | 171:25 | 172:3 179:24 |
| 17:1 18:1,8 | 105:1 106:1 | **FF&E (8)** | 174:24 175:6 | 180:17 |
| 19:1,11 20:1 | 107:1 108:1 | 126:2,9,11,13 | **find (3)** | 181:21 |
| 21:1 22:1 | 109:1 110:1 | 126:14 | 13:21 74:4 | 182:17 183:4 |
| 23:1 24:1 | 111:1 112:1 | 127:18,21 | 94:11 | 184:20 189:8 |
| 25:1 26:1 | 113:1 114:1 | 128:9 | **finding (1)** | **five (5)** |
| 27:1 28:1 | 115:1 116:1 | **figures (1)** | 139:7 | 22:11 23:4 |
| 29:1 30:1 | 117:1 118:1 | 137:25 | **fine (7)** | 24:6 97:22 |
| 31:1 32:1 | 119:1 120:1 | **file (2)** | 9:21 84:22 | 167:15 |
| 33:1 34:1 | 121:1 122:1 | 16:25 17:2 | 89:16 94:16 | **floor (4)** |
| 35:1 36:1 | 123:1 124:1 | **filed (9)** | 140:13 146:7 | 2:10,17 9:13 |
| 37:1 38:1 | 125:1 126:1 | 50:25 52:21 | 169:19 | 175:21 |
| 39:1 40:1 | 127:1 128:1 | 54:3 149:6,9 | **finish (1)** | **flow (2)** |
| 41:1 42:1 | 129:1 130:1 | 150:7 174:11 | 61:13 | 161:13 174:25 |
| 43:1 44:1 | 131:1 132:1 | 174:18,18 | **firm (24)** | **fly (1)** |
| 45:1 46:1 | 133:1 134:1 | **filing (1)** | 13:22 17:10,12 | 78:20 |
| 47:1 48:1,20 | 135:1 136:1 | 5:15 | 17:15,16 | **folks (2)** |
| 49:1 50:1 | 137:1 138:1 | **final (4)** | 18:17 19:7,13 | 43:16 187:18 |
| 51:1 52:1,15 | 139:1 140:1 | 62:6 81:6 | 19:17,23 20:6 | **following (1)** |

111:11
**follows (4)**
9:5 101:8,13
162:16
**followup (2)**
110:13 121:23
**forecast (2)**
180:21,24
**foremost (1)**
159:2
**forget (1)**
63:17
**form (17)**
4:10 5:24 25:2
46:9 49:6
63:16 72:4
80:25 95:6
140:25
149:22 165:3
173:17 179:2
183:17 185:9
186:16
**formal (4)**
23:7 46:11,12
93:3
**Formato (19)**
60:8 78:18
83:23,25 84:4
84:12,24
159:19 160:8
171:2,7
182:18,20
184:21,23
185:6 186:15
187:18,21
**Formato's (2)**
160:2 185:18
**formed (5)**
13:16,19 49:14
81:3 175:21
**former (2)**
39:5 40:25
**forming (1)**
46:14

**formula (1)**
128:19
**forth (4)**
88:17 157:7
180:12
191:11
**forward (6)**
12:22 68:18
112:24
135:12
142:11 143:3
**found (3)**
29:3 73:7 75:6
**four (3)**
97:22 121:19
167:15
**Fox (1)**
17:16
**Frame (3)**
184:6,7,14
**frankly (1)**
155:7
**free (1)**
152:12
**friend (1)**
50:17
**friends (3)**
30:22 45:10,17
**Frimmel (5)**
60:7 96:12
98:2 184:22
187:23
**front (11)**
12:9 52:5 98:8
99:9 109:3
117:9,10,19
178:3 180:9
184:11
**fulfilling (1)**
104:13
**full (2)**
9:8 161:21
**fully (3)**
61:4 78:8

110:19
**function (1)**
172:25
**fund (1)**
177:10
**fundamental...**
83:2
**funds (6)**
77:16 92:19
123:14 130:9
161:13
164:24
**furnish (1)**
110:17
**furnished (5)**
6:11 59:19
78:8 106:21
190:15
**further (14)**
4:18 5:7,13,19
6:8 7:23
28:23 29:22
92:7 112:13
167:22
175:14 188:2
191:15

---

**G**

**gate (1)**
38:5
**gear (1)**
58:21
**general (4)**
24:22 25:4
158:17
173:12
**generalize (1)**
25:8
**generalized (1)**
25:12
**generally (3)**
24:22 41:24
149:3
**generated (2)**

177:16,21
**generating (1)**
181:8
**gentleman (1)**
50:11
**gentleman's ...**
63:17
**getting (6)**
21:4 41:25
71:12 83:14
128:21
180:13
**Giardino (33)**
2:12 9:7,16
11:6,19 24:21
25:18,22
27:17 49:9
52:14,18
56:24 57:11
64:22 67:12
72:9,15 87:21
92:6 99:17
110:10,19
117:20 139:6
163:20 165:5
165:23
169:16,25
170:5 188:2
189:4
**give (9)**
63:8 65:18
68:25 70:3,22
80:19 126:11
126:13
133:17
**given (10)**
37:11 56:4
62:9 116:9,12
118:23 125:2
125:4 126:24
191:13
**giving (4)**
64:20 100:7
121:22

124:17
**glasses (1)**
85:14
**go (23)**
12:21 15:18
20:6 30:20
53:9 61:4
68:18 78:8
87:2 88:11,13
103:18,19
119:21
138:16
142:11 143:3
165:15,20
173:23
175:13
179:14
184:13
**goes (3)**
31:14 38:4
120:20
**GOETZ (1)**
2:23
**going (37)**
12:8,20 15:14
28:2,5,7,9
33:18 34:16
38:8 68:25
69:8 74:18
80:19 82:8,24
82:25 83:7
84:7 89:5
90:19 93:10
103:25
106:17
119:13
124:14
128:17
139:21 150:5
151:6,14
157:17
169:19
172:14 186:3
186:17,21

**January 11, 2022**

| | | | | |
|---|---|---|---|---|
| **good (4)** | 142:23 | 80:1 81:1 | 168:1 169:1 | 110:25 132:4 |
| 9:15 22:12 | 184:15 | 82:1 83:1 | 170:1 171:1 | 132:15 134:7 |
| 54:12 122:15 | **guessing (1)** | 84:1 85:1 | 172:1 173:1 | 134:24 135:4 |
| **gotten (1)** | 138:8 | 86:1 87:1 | 174:1 175:1 | 135:7 136:13 |
| 75:10 | **guy (2)** | 88:1 89:1 | 176:1 177:1 | 136:17,18 |
| **govern (2)** | 38:2 140:6 | 90:1 91:1 | 178:1 179:1 | 137:4,11,14 |
| 94:9 95:13 | | 92:1 93:1 | 180:1 181:1 | 137:17 |
| **governed (2)** | **H** | 94:1 95:1 | 182:1 183:1 | 138:18 |
| 44:2 95:3 | **H (183)** | 96:1 97:1 | 184:1 185:1 | 143:15 160:9 |
| **governing (4)** | 9:2 10:1 11:1 | 98:1 99:1 | 186:1 187:1 | 163:24 |
| 14:3,21,23 | 12:1 13:1 | 100:1 101:1 | 188:1 189:1 | 166:23 |
| 94:5 | 14:1 15:1 | 102:1 103:1 | 190:1 191:1 | 171:15 |
| **government ...** | 16:1 17:1 | 104:1 105:1 | **half (4)** | 174:12 177:4 |
| 40:15 43:10 | 18:1 19:1 | 106:1 107:1 | 99:15 124:19 | 181:7 186:9 |
| 175:19,24 | 20:1 21:1 | 108:1 109:1 | 124:21,21 | 189:19 |
| **Governor (1)** | 22:1 23:1 | 110:1 111:1 | **hand (1)** | **HBL's (2)** |
| 39:21 | 24:1 25:1 | 112:1 113:1 | 191:20 | 130:23 179:17 |
| **governs (3)** | 26:1 27:1 | 114:1 115:1 | **handled (5)** | **head (7)** |
| 64:12,13 94:20 | 28:1 29:1 | 116:1 117:1 | 17:14 33:11,14 | 79:21 94:12 |
| **Grace (3)** | 30:1 31:1 | 118:1 119:1 | 35:13 149:3 | 103:7 112:2 |
| 23:14,19,25 | 32:1 33:1 | 120:1 121:1 | **Handler (2)** | 133:18 158:7 |
| **grant (3)** | 34:1 35:1 | 122:1 123:1 | 2:22,23 | 174:6 |
| 41:6 62:6 63:7 | 36:1 37:1 | 124:1 125:1 | **handling (1)** | **health (47)** |
| **granted (8)** | 38:1 39:1 | 126:1 127:1 | 91:2 | 29:17,17,23 |
| 38:8 39:2 | 40:1 41:1 | 128:1 129:1 | **handwritten ...** | 30:2,8 36:2,3 |
| 41:21,24 | 42:1 43:1 | 130:1 131:1 | 110:16 | 36:5 38:25 |
| 42:22 86:6,13 | 44:1 45:1 | 132:1 133:1 | **happen (1)** | 40:6 41:5 |
| 119:7 | 46:1 47:1 | 134:1 135:1 | 89:6 | 42:3,5,19,21 |
| **granting (1)** | 48:1 49:1 | 136:1 137:1 | **happened (4)** | 43:13,18,20 |
| 62:25 | 50:1 51:1 | 138:1 139:1 | 38:10 78:18 | 44:3,13 61:20 |
| **Great (3)** | 52:1 53:1 | 140:1 141:1 | 85:5 116:18 | 62:5,12,19 |
| 23:15,19,25 | 54:1 55:1 | 142:1 143:1 | **happening (1)** | 63:5,12,15,18 |
| **ground (2)** | 56:1 57:1 | 144:1 145:1 | 12:12 | 64:19 70:12 |
| 26:18 27:2 | 58:1 59:1 | 146:1 147:1 | **happy (7)** | 70:15 71:5,16 |
| **group (2)** | 60:1 61:1 | 148:1 149:1 | 13:21 70:2 | 71:25 72:18 |
| 28:8 43:7 | 62:1 63:1 | 150:1 151:1 | 109:2 110:17 | 72:24 75:2 |
| **guarantor (3)** | 64:1 65:1 | 152:1 153:1 | 119:21,25 | 85:8,10,23 |
| 48:6 156:11 | 66:1 67:1 | 154:1 155:1 | 158:5 | 86:20 87:17 |
| 167:18 | 68:1 69:1 | 156:1 157:1 | **HBL (38)** | 88:20 159:24 |
| **guess (10)** | 70:1 71:1 | 158:1 159:1 | 1:9 2:9,16 42:9 | 160:5 175:11 |
| 12:7,8 31:18 | 72:1 73:1 | 160:1 161:1 | 42:12 55:16 | 189:15 |
| 31:19 58:12 | 74:1 75:1 | 162:1 163:1 | 58:9 66:10 | **Health's (1)** |
| 71:21 90:7 | 76:1 77:1 | 164:1 165:1 | 86:6 88:2,18 | 38:21 |
| 111:10 | 78:1 79:1 | 166:1 167:1 | 89:20 100:15 | **Healthcare (...** |

1:5,17 10:11
10:19 11:9
12:18 53:16
92:21 93:4
102:18 161:7
162:22
163:14,17
164:5 165:9
**hear (1)**
150:15
**heard (3)**
116:23 150:13
150:18
**heated (1)**
85:4
**Hebrew (2)**
43:2,5
**held (5)**
42:8 69:5 77:6
162:19,25
**help (2)**
19:9,25
**helpful (2)**
107:25 157:19
**helps (1)**
69:23
**hereinbefore...**
191:11
**hereto (7)**
4:6,20 5:9,15
5:21 6:10
162:24
**hereunto (1)**
191:20
**higher (1)**
176:4
**highly (1)**
122:10
**history (1)**
54:23
**hold (3)**
73:9,10 114:23
**holdover (2)**
135:19,23

**home (24)**
19:23 20:3,16
20:18 21:12
22:15,19
23:14,19,25
40:9 58:19
61:4,6,14,17
75:19 77:11
78:4 175:5,22
175:22 176:7
179:16
**homes (13)**
19:9 20:23,24
20:25 21:3,4
21:8,20,25
22:8 23:20
26:16 175:15
**hopeful (1)**
157:18
**Hospital (2)**
43:2,5
**hour (1)**
99:20
**hours (4)**
97:23,23,23
144:18
**Howard (34)**
1:18 9:10,19
9:21,22 10:8
12:17 48:24
52:15,20
56:25 65:3
67:18 68:12
82:14 88:4
96:15,21 99:5
99:20 100:4
103:21
115:18 118:2
156:21
157:22
160:17 165:7
170:18,25
179:14 188:9
189:4 191:9

## I

**idea (1)**
177:20
**identification...**
35:16 52:10
65:2 67:17
72:20 87:22
88:3 100:3
117:25
160:16
179:13
**identified (11)**
35:7,13,19
44:20,24 72:2
72:10 83:18
84:10 85:19
132:3
**identifies (2)**
61:9 100:25
**identify (10)**
23:9 70:22
100:21
118:10,16
125:20
133:22
137:16
166:10
182:25
**identity (1)**
7:16
**ignore (1)**
128:2
**ii (7)**
70:21,22 71:3
72:3 104:4,5
104:11
**imagine (2)**
14:24 181:16
**immediately ...**
63:22
**impact (1)**
98:22
**implement (2)**
119:12 122:6

**important (1)**
155:11
**include (6)**
27:6 70:9 86:9
87:16 90:13
139:19
**included (7)**
28:18 54:19
57:2,15 74:10
102:3 153:23
**including (8)**
4:9 5:23 89:14
127:4 139:17
144:14
172:15
184:22
**incomplete (1)**
159:10
**incorporated...**
110:8 129:16
130:13
**incorporates ...**
140:17
**increased (1)**
175:24
**incurring (1)**
181:8
**Index (2)**
1:7 190:6
**INDEX------...**
189:2
**indicate (2)**
36:13 183:11
**indicated (9)**
49:7 86:21
95:12 134:21
139:8 153:20
154:5 163:6
177:3
**indirectly (1)**
104:25
**individual (4)**
13:6 30:14
54:16 152:25

**individually ...**
10:22 45:5,6
**individuals (6)**
27:6,8 39:16
39:20 42:6
121:17
**information ...**
55:19 61:8
65:24 73:10
73:15,18,22
91:12,17
92:16,18
123:15 136:6
147:12 153:8
154:11 159:8
159:12,13
180:6,7,13,15
180:19
181:12,15
190:15
**INFORMAT...**
190:6
**informationa...**
187:20
**informed (1)**
185:9
**initial (1)**
101:15
**initially (7)**
18:25 29:15
31:3,13 33:6
101:11 147:7
**initiated (1)**
143:13
**inject (1)**
173:6
**inquired (1)**
167:3
**inquiry (1)**
147:22
**inside (2)**
59:20 74:17
**insisted (1)**
144:16

January 11, 2022

[Page 208]

inspection (1)
71:17
install (1)
51:15
installment (8)
49:24 50:3
97:12 134:12
135:4,22,24
151:19
installments ...
134:7 156:23
instance (2)
26:10 48:4
institutional ...
32:18,20
instructions (...
162:23
instrument (2)
31:9,10
insurance (4)
33:11 147:11
147:15,19
insured (1)
147:23
integrated (6)
138:24 139:9
139:12 140:2
140:22 142:5
Intent (63)
15:25 16:3,10
28:4,25 57:24
64:17 67:8
82:13 93:12
93:17,24 94:4
94:8,25 95:9
95:12,15,17
95:18 96:5,11
96:23 97:2,4
97:21 98:4,7
99:6,14,25
100:6,11,18
103:22
104:17
105:14,18

106:15,17
107:3 108:7
109:20
110:21,22
111:21,22
112:4 113:8
113:22 114:9
114:14,20,23
114:24
115:15
127:12 135:9
141:25
160:18,23
162:3 189:21
intention (10)
82:9,16 108:3
114:8,11,11
114:19
126:11,13
130:23
interaction (1)
19:4
interceded (2)
180:2 181:15
intercreditor...
171:14 172:7
172:24
173:14
174:22 177:2
177:23 178:6
178:12,21
179:3 183:6
183:12 185:4
187:6
interest (17)
21:23,24 34:13
35:2 50:2,4,5
75:20 89:11
97:10 146:14
161:3 162:10
162:15
164:12
186:20
187:11

interested (2)
30:23 191:18
Interests (1)
162:14
interim (4)
29:22 36:11
100:19,23
Internal (1)
103:20
intransigent ...
143:10
introduce (2)
19:21 45:18
introduced (2)
45:15,20
introducing (1)
46:8
introduction ...
46:2,2
investing (1)
30:24
investment (1)
18:2
investments (...
30:25
investor (3)
17:24 21:3
50:21
involved (25)
25:19,21 26:25
35:6,9,10,11
36:25 37:15
40:3,22 47:15
121:17 152:8
152:15,18,22
154:9 159:20
159:22 160:9
171:2 179:9
184:3,5
involvement ...
160:2,5
involving (3)
18:9 47:11
171:15

irate (2)
131:20,24
is(are) (2)
191:10,12
issuance (3)
132:15 155:19
158:9
issue (19)
11:16,21 62:21
63:22 83:15
84:16 86:21
87:16 90:25
125:10
131:25
150:14,15
158:18
171:23
179:15 187:9
187:10,11
issued (12)
64:19 70:15
87:12 89:20
90:10,18,19
147:25 165:8
168:16 183:7
183:24
issues (18)
38:21 55:3
71:13 74:18
77:5 84:2
90:22 91:3,13
95:4 120:22
131:17
137:25
144:17 160:5
167:22
186:17
187:13
issuing (1)
156:2
item (6)
70:19,20
166:20 167:2
167:15,23

itemization (1)
128:3
itemized (1)
88:23
items (6)
84:9,13 88:17
94:21 113:2
132:25
iteration (2)
133:10,12

_____
J
_____

James (2)
181:23,25
January (25)
1:14 87:6,15
88:5 111:10
111:11
112:19 113:9
114:8 128:4
132:7,11
133:3,6,11
137:9 138:19
147:25
148:18
157:22 171:4
173:15,15
180:10
191:21
Jerry (2)
17:15 34:6
jgiardino@...
2:12
Joe (1)
3:4
John (17)
2:12 9:16 12:5
23:17 32:23
48:20 85:2
98:19 99:8
105:9 111:24
132:9 133:15
157:25 159:8
162:17

January 11, 2022

179:25
**joined (1)**
38:17
**Josh (3)**
65:11,12,16
**Jozefovic (105)**
1:9 2:9 3:3,4
15:4 18:16,18
18:20 19:4,14
19:22 20:3,12
27:25 28:8
36:18 37:14
39:23 40:20
40:21 41:3,19
41:21 55:22
56:7,19 59:17
60:10 62:15
62:16,22 63:4
63:9,23 64:2
65:25 66:4,10
66:19 67:9
68:17 73:12
73:20,23
74:24 76:13
78:9 80:22
81:18 82:6,19
82:21 83:11
83:18 84:25
86:8 93:23
94:24 95:18
96:2,11 97:15
104:23
105:10
121:24
122:10 123:2
124:12 125:6
127:17
130:22
131:20 132:4
132:16
135:13
137:20 138:4
142:13 143:5
143:16

144:13
150:25 151:5
151:6 152:12
152:17 153:8
153:25
154:21
155:10
156:10,10,17
157:10
162:11
173:23
174:24
175:21 176:8
177:3 185:25
186:19,22
187:2 190:10
**Jozefovic's (...**
56:11,15 70:10
79:14 81:8,10
86:2 156:18
170:24
172:17
**JOZOFOVI...**
1:10 2:9
**JP (2)**
116:5 155:6
**judge (5)**
98:16,23
113:19 114:5
139:21
**judgment (9)**
61:5,11 109:15
113:4,7
114:15 115:8
115:15 127:5
**July (20)**
20:6 38:16
59:25 76:17
77:25 78:6
101:23 106:6
106:8,9
107:10,20,23
124:2 126:7
131:18 132:3

132:7 157:5,6
**juncture (1)**
15:10
**June (4)**
69:3,6 77:6
157:23
**JURELLER ...**
2:15
**Justice (1)**
180:4
**justified (1)**
126:22
**juxtapose (1)**
133:17

---

**K**

**Kasman (1)**
182:21
**keep (2)**
16:24 41:3
**keeping (1)**
91:4
**key (1)**
155:12
**keys (14)**
56:4,5,8,15,18
56:21 57:8
58:4,7,14
61:7,12 75:21
190:9
**Kincaid (1)**
184:15
**kind (3)**
109:11 159:11
180:18
**KLESTADT...**
2:15
**knew (7)**
81:13 82:24
96:2 106:20
106:21 150:7
176:22
**knocked (1)**
40:11

**know (191)**
9:16 10:4,13
13:15,24,25
14:5,6 16:14
16:17,20,22
18:21 23:5,6
23:7,21 31:15
33:19 41:9,20
42:12,18 48:2
48:3,16 49:13
49:20 50:11
51:10 52:23
57:14 59:2,3
59:5 60:4,15
64:6,7 65:7
65:20 66:14
66:24 67:3,9
68:5,7,9,10
68:23 79:3,9
79:13 81:11
81:11 83:10
85:2,24,25
86:4,12,17
87:19 89:5
90:6 91:23,24
96:6 99:21
100:17
102:16 103:3
103:4,6,14
106:10,16
111:4,10,20
111:25 112:4
112:8 116:6
116:10 117:3
117:16,18
118:8,25
119:4 120:4,8
121:16 122:7
122:22
123:22
124:18
125:17
126:10
131:23

132:22
133:14 134:6
134:12,20
135:3,6 136:2
136:7,11,17
136:21,22
137:6 138:7,8
138:10,17
141:11
142:10,11,25
144:21
145:25 146:2
146:3,5,7,9
146:13,19,20
146:21,25
147:4,6,8,14
147:17,18,21
148:6,9,24
150:9 151:14
151:22,24
152:20,24
153:2,3,3,20
155:23
156:22 157:9
157:9,13
158:2 159:3
161:20 163:7
166:8 171:8
172:12 173:2
173:20 174:2
174:21 176:8
176:10 178:7
178:11,14,17
178:23 179:2
179:4,5,6
180:16 181:6
181:11,25
184:6,14
186:11
187:15,16
**knowing (3)**
31:22 68:9
81:16
**knowledge (3...**

**Lexitas Court Reporting**
**800-678-0166**

44:25 50:9
55:20 56:2
58:24 62:14
65:22 68:2,8
78:25 86:11
99:5,7 100:10
102:14
111:23
117:16 131:9
133:9 136:9
138:21
151:19 160:8
166:19
167:21
170:18,21
178:9,19
179:25
180:17
184:16
**known (4)**
18:20 50:18,19
102:19
**knows (1)**
145:16
**Kresimann (1)**
3:5

**L**

**label (1)**
118:21
**Lake (1)**
9:14
**Landa (7)**
50:12,15,18,19
50:21,25
51:13
**landlord (14)**
71:5 77:2
112:13
114:25
115:13 123:6
145:9 149:19
149:25
163:23 172:2

172:7,18
185:20
**Lane (4)**
98:16,23
113:19
139:22
**language (8)**
67:4,6 69:14
69:20 94:10
101:3 131:12
185:15
**large (1)**
186:16
**late (5)**
136:3 138:6
151:10 167:5
167:25
**Laura (3)**
1:19 191:6,24
**law (17)**
7:20 17:12,16
18:17 19:7,23
20:6,7 38:14
38:16 46:4
89:14 109:18
113:17
159:25 160:5
184:15
**lawsuit (2)**
52:3 174:12
**lawyer (3)**
20:19 112:11
121:15
**lawyers (3)**
17:10 40:24
121:12
**LC (1)**
77:2
**leading (1)**
187:22
**learned (1)**
29:6
**lease (154)**
11:21 27:21,21

27:23 28:19
28:20,24
57:22 64:7,7
64:11 66:25
67:2,15,19,23
67:24 68:3,8
68:13,19,22
69:20,22 70:3
70:6 74:20,23
75:4 76:5,8
77:3,20,24
80:10,13 82:6
84:3,7 87:8
91:3 93:11,16
93:24 94:4,9
94:20,24 95:3
95:9,10,11
101:9,21
103:23 104:2
104:20
105:12
106:14,18
107:5,6
109:20
111:15 113:7
114:12,14,17
114:23 115:2
115:15
116:15 126:5
126:6,15
127:2,4,8,9
127:23,24
128:19,23,25
129:3,8,11,15
129:17,19,23
129:24,25
130:2,5,6,7
130:10,12,14
130:16,24,25
131:2,6,11,25
136:23,23
137:2 138:24
139:12,16,17
140:3,10

141:15,23
142:2,4,5,7
142:15,20,24
143:6,7,12
144:8,9,11,18
144:20
145:11,14,17
147:11 155:9
155:13
156:19
157:16 158:3
158:6 164:13
167:25 168:4
168:13
176:15
177:11
179:23 180:8
185:12
186:23
189:12
**leases (1)**
24:15
**leave (1)**
98:21
**left (7)**
20:6 37:18
38:14,16,19
48:24 173:24
**legal (10)**
98:21 114:3
127:16
139:24 154:9
164:14,18,19
164:21
186:18
**legally (1)**
58:3
**LegalView/Z...**
7:11
**lender (22)**
17:23 34:3
49:11 156:2
156:12,14
164:19,22,25

166:9,22
167:7,19
168:5 171:16
172:16,17
177:23
178:21 186:2
186:2,8
**lenders (2)**
31:23 185:10
**lending (1)**
47:18
**let's (14)**
23:13 49:9
59:7 60:2
76:8 96:21
116:3 125:10
131:6 165:5,5
183:10
184:13 187:3
**letter (116)**
15:24,25 16:3
16:10 28:3,25
57:24 62:21
62:23 63:7,22
64:17,19
65:14,16,25
66:5 67:8
71:19 72:17
73:2 75:9,11
75:12,24 76:6
76:6,14 82:13
84:11 85:9,10
85:12,23,24
86:22 87:25
88:5 93:12,17
93:24 94:3,8
94:25 95:7,8
95:9,12,15,16
95:18 96:4,7
96:10,23,25
97:4,21 98:3
98:7 99:6,14
99:25 100:6
100:11,18

103:22
104:17
105:14,18
106:15,17
107:3 108:7
109:19
110:21,22
111:21,22
112:4,24
113:8,22
114:9,14,20
114:22,24
115:15,16
127:12 128:4
132:4,7,7
133:11 135:9
141:25
142:12 143:4
143:5,10
157:23,23
160:14,18,23
162:3 165:24
166:8,10
171:5 189:14
189:18,21,25
**letters (2)**
39:20 119:24
**Lexington (1)**
2:5
**Lexitas (1)**
7:12
**license (4)**
42:8,13,14
43:8
**licensed (4)**
41:14,18 42:24
64:5
**licensee (1)**
42:11
**lien (1)**
179:9
**limited (1)**
18:11
**line (2)**

101:16 105:7
**list (3)**
56:17,18 190:9
**listed (6)**
91:7 94:21
133:2 184:7
187:18,19
**litigation (12)**
7:22 8:10
14:16 15:3,5
15:8,17
120:17
154:10 155:3
156:16
173:23
**little (3)**
9:25 51:20
82:14
**Lizer (10)**
1:9,10 2:9,9
3:3 18:16,18
19:22,25
162:11
**LLC (12)**
1:5,9,18 2:9,16
10:11 12:18
16:6 42:9
53:17 162:23
165:10
**LLP (3)**
2:4,8,16
**loan (21)**
33:10,11 34:4
34:5,15,15
47:24 48:12
49:15,16,16
49:19 128:13
145:15
150:10
155:24 156:6
166:5 168:3
170:22
185:11
**loaned (6)**

47:23 48:2,5,7
48:7,9
**loaning (1)**
46:23
**loans (12)**
31:4,4,16,24
34:14 48:17
49:2,4,8,21
49:24 50:8
**local (3)**
39:17,18 44:6
**locale (1)**
40:2
**locations (1)**
7:10
**locks (3)**
56:20,21
190:11
**Logically (1)**
79:21
**LOI (8)**
28:12 100:4,22
101:4 103:9
108:12
113:13
162:21
**long (9)**
18:20 50:18
78:12 84:5
99:20 115:17
122:16
135:15 152:4
**look (19)**
25:23 53:10
57:16 67:4,5
93:14 94:14
99:9 109:2
111:5 115:18
115:22
118:18
120:10
133:16 158:5
165:14 170:7
180:10

**looking (11)**
12:6 19:16,18
19:21 88:9
137:23
169:24
170:14 177:3
177:5 184:4
**losses (1)**
181:8
**Lowenthal (3)**
1:19 191:6,24
**lower (2)**
39:25 181:22

_____

**M**

**M (2)**
2:23 9:2
**mad (1)**
131:23
**Madam (1)**
165:17
**mailing (5)**
117:24 118:3
118:15,21
189:23
**maintain (3)**
17:2,4 136:6
**maintained (3)**
17:8 134:22
158:15
**major (3)**
74:8,12 77:18
**majority (2)**
128:5,7
**making (4)**
96:18,19
103:13 111:8
**manage (1)**
93:2
**management...**
22:15 150:2
166:14,18
**manager (2)**
88:10 165:17

**managing (22)**
12:19,24 13:3
13:5,7 14:14
15:2,5,8
17:17,18 22:2
22:6,13,23
23:3,10,24
25:19,22
26:16 93:6
**manner (3)**
7:18 32:13
104:19
**March (1)**
176:17
**mark (14)**
1:10 2:9 19:2
19:10,10,24
33:8 45:16
117:21 119:2
162:12
182:22
187:23,24
**marked (24)**
7:24 52:9,17
52:18 64:25
65:4 67:16
69:9 72:19,22
85:7 87:22
88:2,4 100:2
100:4 117:14
117:25 118:3
129:3 160:16
165:7 179:12
181:20
**marketplace ...**
175:11
**marriage (1)**
191:17
**material (18)**
88:23 93:9
98:13 99:11
112:10,12
113:7,21
115:7,8

January 11, 2022

[Page 212]

127:24 128:3
145:11,14,17
159:5 171:20
180:11
**materially (6)**
93:23 94:24,25
98:5,20
108:20
**materials (1)**
58:21
**matter (5)**
113:17 139:21
167:2 168:9
191:18
**matters (2)**
8:10 108:16
**maturity (1)**
170:22
**Mayor (1)**
39:11
**mean (7)**
24:10,11 30:21
37:25 57:20
62:2 173:9
**meaning (7)**
27:25 95:6
112:12
113:22
154:18
163:13
186:20
**means (3)**
60:16 98:17
145:23
**medicaid (4)**
19:8 37:9
75:13 176:3
**Medicare (1)**
37:9
**meet (1)**
18:24
**meeting (55)**
7:11 20:11
38:23 39:10

39:13,16
40:20 43:19
59:15,17,21
59:22 60:3,5
60:16 68:15
68:21 69:4
74:15 77:5,9
77:10 78:3,12
78:16,23 79:4
79:19,24 80:2
81:2,8,20,25
82:4 83:10,21
83:25 84:12
84:23 85:4
106:7,8 107:7
107:10,14
122:14
123:17 124:2
124:19 126:7
131:18
142:21
144:12 160:6
**meetings (9)**
20:10 40:13,21
40:22,22
43:10 56:14
82:11 96:9
**member (16)**
13:3 14:14
17:18,21,25
18:3 22:2,6
22:23 23:3,11
23:24 25:19
25:22 26:16
40:25
**members (18)**
12:19,24 13:5
13:7,8,10
15:15,22 16:5
16:11,15,18
16:21 17:6,7
17:18 42:6
93:6
**memorialize...**

32:8 60:17
**memorializin...**
78:22
**memory (1)**
79:23
**mentioned (16)**
35:24,25 43:19
43:23 44:6
48:25 61:15
75:23 77:24
122:13 132:2
155:20
159:16 160:6
172:25
179:21
**mere (3)**
97:16 98:4
175:15
**merely (4)**
42:24 76:4,5
107:16
**merged (3)**
77:23 127:2,7
**merger (7)**
127:3,7 129:24
139:16 140:8
140:17
141:14
**merges (1)**
139:16
**met (2)**
18:25 50:20
**mez (2)**
33:11 34:15
**mezzanine (3)**
34:15,18,22
**Michelman (...**
2:8 9:17 20:7
38:17 60:6,7
68:16 69:5
77:6,9 96:13
130:10
142:21
144:11

182:22
**microphone ...**
12:9
**mid (1)**
59:7
**middle (4)**
18:22 60:2
126:18
184:10
**million (82)**
48:19 74:2,10
74:11 75:24
75:24 76:19
76:21,23,25
79:5,8,13
80:14 84:10
95:19 99:15
100:14,22
101:4,11,15
101:23,24
102:2,4,6,6,9
103:13 104:5
104:7,7,9,9
104:18 105:7
105:19,23
106:2,5
107:11,12
108:21
110:24 111:3
112:6,10
114:10 116:2
116:3 123:24
125:3,18,25
126:9,23
127:18 128:8
128:9 152:9
152:10
154:19,20
155:13
157:10,11
160:19 161:4
161:6,9,12,24
162:3,21
163:3,22

164:8 167:5
167:11
177:13,13
**mind (4)**
104:21 141:18
141:20,22
**mine (1)**
50:17
**minor (1)**
132:21
**minute (5)**
10:25 70:3,22
74:19 117:20
**minutes (5)**
48:21 60:15
78:22 94:16
121:6
**misinformed...**
185:6
**mistake (1)**
131:23
**mistaken (3)**
33:22 62:25
76:21
**misundersta...**
95:4
**mixed (1)**
71:12
**modification ...**
144:16
**modification...**
95:10
**modified (3)**
28:24 95:15,16
**modify (1)**
142:20
**moment (3)**
43:5 95:2
127:6
**moments (3)**
69:15 80:21
167:3
**money (53)**
16:17 29:15

30:11,15,21
32:9,16 33:2
46:24 47:18
47:23,24 48:5
48:6,9 77:14
83:3,5,7,8,13
83:14 84:14
91:3 116:4,10
123:2,3,25
124:8,10,16
125:8,11,13
125:16 126:4
128:22
129:11 131:3
131:21
152:11,13,17
153:8,12
154:12
161:15,19
163:7 164:3
175:18
186:24
**monies (5)**
31:6 91:5
149:15,20
161:14
**monitored (2)**
91:9 92:22
**monitoring (1)**
91:5
**month (5)**
128:20 135:6
136:9,17
166:9
**monthly (2)**
135:24 151:19
**months (12)**
20:5 63:8
128:21
134:20
135:16 136:3
136:12
151:22,24
176:18

180:19
181:16
**moratorium ...**
150:8
**Morgan (2)**
116:5 155:6
**morning (3)**
9:15,18 10:8
**motion (7)**
4:15 6:5
109:14,15
116:22 117:8
118:6
**motions (1)**
11:16
**mouth (1)**
143:20
**move (6)**
4:10,13 5:25
6:3 96:21
112:23
**moved (1)**
11:5
**moving (1)**
79:15
**multiple (11)**
95:24 96:4,9
111:14
131:21 132:3
144:13,17,17
172:13
176:11
**multitude (1)**
157:13
**municipal (4)**
29:25 44:16
86:10,12
**municipalitie...**
29:21 44:7
**municipality ...**
138:3
**mutually (1)**
131:15
**myriad (3)**

79:9 159:15
171:20

---

**N**

**N (3)**
2:2 9:2,2
**name (12)**
9:8,16 33:21
34:17,19
36:20 39:8,15
43:4 49:13
50:12 63:17
**named (2)**
10:21 17:15
**names (6)**
23:5,6,7,21
36:18 121:16
**naming (1)**
24:4
**naturally (4)**
20:9 112:25,25
124:19
**nature (9)**
19:3 30:25
45:25 50:14
75:9 86:22
94:20 109:18
177:14
**necessarily (1)**
71:7
**necessary (2)**
70:11 80:16
**necessity (1)**
172:4
**Neck (3)**
23:15,20 24:2
**need (17)**
7:13 37:6,7,13
37:21,23 38:2
38:22 40:3,8
48:20 63:21
65:16 82:14
99:21 136:5
178:25

**needed (15)**
29:12 30:5
41:14 56:21
62:10,12 63:9
75:22 86:8
90:10 122:5
138:2 142:12
175:4,5
**negated (1)**
99:13
**neglected (1)**
37:14
**negotiated (6)**
95:24 101:25
129:14,16,19
130:12
**negotiating (1)**
96:4
**negotiation (3)**
106:2 129:10
130:9
**negotiations ...**
34:22 173:13
**Neuman (5)**
1:10 2:10 15:4
28:2 162:12
**never (23)**
18:17,18
107:25 108:4
116:9,12,18
116:22
123:15
126:15,20
127:22 128:5
132:4 135:20
154:3 157:10
159:2,3,13
172:14,16
181:13
**new (31)**
1:2,20 2:5,11
2:11,17,17
9:14 23:20
26:25 29:18

35:22 37:5,7
37:8,9,9
38:25 39:17
40:9,25 43:25
44:4 51:15
62:4 71:4
175:4,15
191:3,4,7
**nicest (1)**
61:5
**Nicholson (83)**
13:4 20:12
30:19 33:10
33:12,13,16
34:2 35:2,14
44:22 45:9,14
45:19,21
46:10,15,21
46:22 47:11
47:16,20,24
48:3,9,14
49:2,12,17
53:5,12,19
54:7,10,18
55:3 62:15
66:3,9,18
73:16 74:13
79:18 81:5,6
89:23 90:2,9
90:17,21,24
91:5,11,20,25
92:10,23 93:5
133:22
134:22 136:5
136:6 137:3,7
137:24
138:16
146:22
147:15 148:6
149:4 150:17
150:19,22
152:19,24
153:2 157:18
158:15,19

**January 11, 2022**

[Page 214]

159:16
161:21 163:7
184:23
**Nicholson's (7)**
46:25 56:12
62:4,10 63:19
91:9 92:2
**NONE- (2)**
190:16,19
**noninterest (1)**
128:13
**nonrefundab...**
97:9 163:8
**noon (2)**
94:15 99:20
**normal (1)**
140:16
**North (1)**
2:5
**Notary (6)**
1:20 4:22,23
9:4 188:15
191:6
**NOTARY.U...**
2:21
**note (6)**
31:7,13 57:4
90:12 98:10
168:2
**noted (3)**
63:6 113:2
188:6
**notes (9)**
60:16 78:22
79:3 109:23
110:2,3,5,11
190:12
**notice (59)**
10:15 72:6,10
72:14,23
85:20 87:7,12
87:15 88:7,18
89:2,19,23
90:2,10 91:13

92:3 93:10,11
93:19,22,23
94:21 111:13
111:18
112:19,21
113:3,4,6,9
113:12 114:8
132:11,15
133:23 137:9
138:19 148:3
148:7 155:19
156:2,7 157:6
158:10,12,17
165:8,11
166:3 167:24
168:9 169:6
169:22
173:15,15
180:11,12
**noticed (3)**
71:25 170:20
171:4
**notices (8)**
72:7,7 168:15
169:4,10,11
169:17
170:11
**notified (2)**
136:18 168:19
**notwithstand...**
8:7 39:24 98:4
152:13
**November (28)**
16:2,10 28:4
28:25 57:24
61:21 62:8
63:2 64:21
67:25 68:3
70:16 72:12
85:16,19 86:4
95:19 96:23
100:5 106:15
107:15,21,23
151:11

160:18 169:5
169:11 170:6
**number (18)**
21:6 23:20
32:24 39:25
52:4 70:19,20
117:11
137:14
142:22
146:22
158:25
166:20 167:2
167:23
170:17
177:10
182:23
**numbered (2)**
54:16 55:15
**numbers (4)**
158:14,14,15
177:9
**nursing (39)**
19:8,22 20:3
20:16,17,22
20:24,25 21:3
21:4,8,12,20
21:25 22:8,14
22:19 23:14
23:19,20,25
26:16,19 40:9
58:19,23 61:4
61:5,14,17
75:19 77:11
78:3 175:5,9
175:15,22,22
175:25

_____
**O**
**O (1)**
9:2
**oath (1)**
7:13
**object (7)**
4:9,12 5:24 6:3

122:24 123:3
175:7
**objection (16)**
25:2 49:5 72:4
90:12 95:5
98:10 139:4
140:25
143:18
149:22
156:25 165:3
169:13
171:10
173:17
183:16
**objective (1)**
154:6
**obligated (3)**
95:19 164:17
176:21
**obligation (18)**
8:8 66:21,23
101:10
103:23
105:22 107:5
119:10
154:17,18
164:2,18,19
164:22,23
176:17
179:22 180:8
**obligations (...**
99:13 112:13
161:16,18
163:4,5,16,17
163:23 164:4
164:15
167:16 179:7
**obliger (1)**
48:5
**observation (2)**
61:3,6
**observations ...**
60:24 61:8
**observed (2)**

81:15,17
**obtain (4)**
33:10 155:18
155:25 179:8
**obtained (12)**
29:16,21,23
30:5 38:23
101:14
102:10 103:2
103:5,6,8,17
**obviously (1)**
35:12
**occasion (6)**
40:23 136:13
149:5 153:22
155:5 182:7
**occasionally ...**
20:13,14
**occasions (4)**
89:25 96:4
131:21
146:22
**occupancy (21)**
30:6,7,8 44:12
55:24 56:16
57:23 63:2
64:5 70:25
73:25 75:12
75:14 101:14
102:10 103:2
103:4,5,17
105:25
126:17
**occupied (1)**
124:15
**occupy (1)**
65:19
**occupying (1)**
126:18
**occurred (12)**
64:16 69:24
70:2 77:10,11
124:19 133:6
138:9 172:20

174:9 176:12
178:17
**October (18)**
59:11 62:5
63:12 65:11
67:11 71:23
75:8,11 86:21
135:13,25
168:20,22
169:5,11,22
170:9,15
**odd (1)**
95:11
**office (19)**
34:7 40:24
82:12 91:2,10
95:25 96:3,10
97:24 118:14
120:13,18
121:4,5,8,10
159:19,23
187:24
**officer (1)**
7:12
**offices (6)**
68:15 69:5
77:6 130:11
142:21
144:12
**officials (3)**
40:7 43:10,17
**offset (1)**
126:23
**Oh (1)**
37:18
**Ohio (1)**
184:15
**okay (20)**
48:22 52:6,16
55:10 57:8
70:3 72:21
74:21 77:10
85:8,11 88:13
88:14 89:18

115:20,23
132:9 140:19
144:3 169:25
**once (2)**
29:20 82:7
**ones (8)**
25:20 60:13
132:21,22
133:4,24
159:17,18
**ongoing (3)**
185:2 186:18
187:8
**ONLINE (1)**
2:21
**oOo (1)**
190:20
**opened (3)**
175:9,13
180:14
**operate (11)**
41:13 42:15
58:11,19
61:14,17,22
61:22 62:2,7
75:19
**operates (1)**
13:25
**operating (31)**
14:2,5,9 16:23
17:5 22:20,24
23:2 24:8,16
26:5,7,12,17
27:7,13 28:14
58:9,22 67:15
67:19,23,24
68:7,19 75:20
129:3 167:25
168:3 177:21
189:12
**operation (7)**
81:24 86:5
100:20,23
176:7 177:17

181:7
**operations (8)**
23:16,18 27:9
64:10 71:7
80:23 179:18
180:22
**operative (3)**
127:10 141:3
154:8
**operator (5)**
27:25 40:16
41:15,18
51:15
**opine (1)**
98:18
**opinion (2)**
98:18 113:24
**opportunity ...**
34:3 37:12
**oral (1)**
135:10
**order (8)**
1:19 29:13
41:13 97:14
122:6 134:19
142:11 145:9
**organization ...**
178:8
**original (3)**
4:25 5:16 11:2
**outcome (1)**
191:18
**outline (1)**
109:11
**outlined (2)**
28:10 111:17
**outside (1)**
97:24
**outstanding (...**
185:24
**overdue (1)**
80:5
**oversee (1)**
158:9

**overseeing (1)**
158:12
**overwhelmin...**
128:5,6
**owe (1)**
186:24
**owed (1)**
161:14
**owned (1)**
22:21
**owner (3)**
27:5 47:4,8
**owners (2)**
27:13,14
**ownership (6)**
22:14 25:13
26:11,12 27:7
28:13
**owning (1)**
27:9
**owns (1)**
24:15

---

**P**

**P (2)**
2:2,2
**p.m (1)**
188:6
**page (35)**
53:9,10 55:9
67:23 69:10
69:12 72:19
87:2 88:9,13
93:14,15
103:20,20
117:24
140:11 141:7
165:14,16,18
165:24
166:20
167:22
181:21
183:19 184:4
184:9,11,13

184:20 189:3
189:7,17,24
190:9
**pages (16)**
52:9 64:25
67:16 88:2
95:11 100:2
160:16
170:17
179:12 189:9
189:10,13,20
189:22 190:3
190:4
**paid (41)**
67:9,10,11
91:6 101:8,12
101:23
105:10,20,23
111:12
126:20 128:6
128:17 133:3
135:11,11,12
135:16,17,20
136:5,14,17
137:22
149:15,20
150:12
151:10,10,13
151:20
157:10
160:20 161:5
161:6 162:16
164:8 166:9
167:4 171:22
**pandemic (6)**
175:10,17
176:6,13,16
176:18
**paper (1)**
94:7
**papers (4)**
109:14 116:22
117:8 118:6
**paragraph (4)**

January 11, 2022

134:23
146:17 147:9
165:25
**paraphrasin...**
162:9
**parcel (1)**
122:5
**part (23)**
5:22 42:2,25
43:3 57:13
76:20,21
81:10 92:24
105:25
110:11 122:5
122:8 123:6
142:24,25
143:24
153:19
154:14 155:9
158:25 179:7
180:8
**participants ...**
49:15
**participate (2)**
21:9 133:21
**participated ...**
21:7 26:18
46:19,22 84:4
121:6
**participating...**
7:10 187:20
**particular (7)**
14:17 19:12
37:4 40:2
55:14 134:6
184:20
**particularly ...**
128:24
**parties (22)**
4:6,20 5:9,15
5:21 6:10 7:5
7:19 8:5 12:2
26:6 77:22
94:10 95:14

97:3 100:11
113:15
125:15
127:10
128:16
130:13
191:16
**partner (4)**
19:10 60:9
83:23 159:25
**partners (4)**
21:19 28:8,9
43:6
**partnership (...**
30:15,16,17,18
42:25 43:2,3
43:7
**party (2)**
8:9,10
**Pat (2)**
83:23 182:20
**patients (9)**
59:2,3,4 71:2,8
75:17 175:22
176:2,3
**Patrick (4)**
60:8 182:18
184:21
187:21
**pay (51)**
66:24 82:8
83:4 91:8
97:18 98:14
99:14 105:11
105:13 106:3
106:23
112:10
113:20
114:10 115:5
125:5 126:16
126:22
127:25 134:3
134:8,16,25
135:4,7,13

137:15,17,19
137:21 138:4
138:18
146:18 151:6
151:16,22,24
156:22
157:11 163:3
164:17,18,19
164:22,24
166:22,23
173:25
176:10,14,21
**paying (12)**
62:18 66:22
82:9 102:8
105:2 124:25
125:3 135:19
151:2,8 152:2
175:25
**payment (32)**
97:9 100:14,18
100:22,25
101:5 103:13
103:15 105:7
110:25 111:9
112:6 125:21
125:24 128:8
136:9,14
138:14
151:15
160:19,22,25
161:2,3,9
162:4,18,19
164:2 166:2,4
176:3
**payments (9)**
49:25 50:2,3
91:14,14
104:12
115:11 126:5
175:24
**pecuniary (1)**
144:10
**penalties (1)**

186:21
**pending (3)**
11:2 114:7
155:22
**penny (1)**
105:15
**people (9)**
22:22 42:2
49:14 78:16
120:13
142:22
176:23
182:23,24
**percent (4)**
37:5 162:9,13
164:3
**percentage (1)**
104:23
**percentages (...**
28:10
**perfectly (1)**
146:7
**perform (1)**
15:12
**performing (1)**
13:23
**period (22)**
19:4 29:14,22
31:15 48:8
58:6 59:7
68:9,10 82:10
84:5 97:2,8
106:11
119:22
135:15 136:4
151:7 157:15
158:2 172:10
175:10
**permanent (5)**
30:7 101:14
102:10 103:9
103:16
**person (1)**
20:14

**personal (4)**
65:22 122:16
138:21 178:9
**personally (24)**
11:12 17:2
18:9,14,17,18
21:2 35:18
41:22 43:14
47:13,14,24
48:4,25 49:7
81:15,17
121:2 147:24
148:2,17
178:7 182:6
**personnel (2)**
121:3,5
**persuade (2)**
39:2 43:16
**physical (1)**
183:23
**physically (3)**
58:15,17 78:15
**pick (1)**
48:24
**piece (4)**
31:20 81:16
97:16 182:8
**pieces (1)**
94:7
**pin (1)**
174:5
**Pinnacle (2)**
36:20 86:2
**place (14)**
7:14 32:4 37:2
68:21 71:22
74:8,15 78:4
78:6 107:8
123:18
130:10 153:5
161:8
**plain (2)**
95:6 149:7
**Plains (106)**

January 11, 2022

10:10,19 11:9
12:18,21,25
13:15,23,25
14:14 15:6,22
16:6,25 17:19
19:15,19
26:10,21,22
26:24 27:5,15
27:18 29:6
35:7 39:7,11
40:2,9 41:17
43:12 44:21
46:17,20
47:12,21
49:22 50:22
51:14 53:16
53:20 66:9
86:6 87:12
90:21 92:21
92:25 93:4
102:18 103:2
123:18
136:18 137:3
137:10,19
142:8 144:5,7
150:10
155:18,25
158:9 160:7
160:15 161:7
161:8,11,16
161:18
162:22 163:4
163:12,14,15
163:16,23
164:4 165:9
166:4,14,17
166:21,23
167:16,18
168:16,19
170:19 173:9
173:11
174:11,18
175:9 176:7
177:17,19,21

178:20 181:8
182:10,11
190:3
**plaintiff (2)**
1:17 10:10
**Plaintiff(s) (2)**
1:6 2:4
**plan (2)**
51:14 94:13
**Planning (2)**
29:17 42:4
**play (16)**
13:22 30:10,13
34:21 35:15
35:21 36:4,7
43:11,14
44:15 45:3
68:12,14
88:25 89:9
**played (3)**
36:9 41:11
89:4
**playing (1)**
45:7
**Plaza (3)**
23:14,19,25
**please (8)**
9:8,11 64:23
70:3 72:15
93:13 165:19
168:2
**pledged (1)**
74:4
**PNI (1)**
128:18
**point (27)**
22:12 45:21,22
54:11,24 55:6
55:25 61:16
64:18,20 74:5
77:22 85:5
97:20 104:22
105:10
113:15 115:7

133:2 135:17
144:5 145:7
147:7 150:25
151:2 153:3
173:21
**pointed (1)**
114:21
**portion (4)**
69:22 97:19
105:3 162:15
**position (11)**
41:5 61:22,25
84:24 94:23
105:16
113:12 127:8
128:16
133:19
145:12
**possession (11)**
8:3 55:16 56:3
57:18,19,21
58:8,24 61:10
61:11 76:3
**possibility (1)**
60:12
**possibly (1)**
121:12
**potential (1)**
44:24
**practice (1)**
159:24
**practices (1)**
145:16
**pre-opening ...**
73:6
**precede (1)**
183:22
**preceded (1)**
186:9
**precedence (1)**
97:8
**precedent (1)**
103:14
**prefer (1)**

9:19
**preliminarily...**
36:12,14 37:17
107:24
**preliminary ...**
71:16 135:10
**premises (2)**
126:17 137:11
**preparation ...**
89:2 109:9,13
**prepare (6)**
15:21 51:7,8
51:10 58:22
61:14
**prepared (9)**
39:23 51:11
62:6,20,21
63:7 86:21
92:8 120:18
**preparing (1)**
58:19
**presence (1)**
60:25
**present (3)**
2:20 3:2 7:5
**presented (7)**
8:2 16:5 36:14
36:17 40:6,10
179:4
**presenting (1)**
7:24
**preserve (1)**
110:11
**presumably (...**
64:15
**presume (1)**
175:23
**presumed (1)**
37:12
**presuming (1)**
64:16
**presumption...**
37:6,10,21
38:9,22 39:3

42:23
**pretty (2)**
12:14 124:21
**previous (3)**
96:8,9 122:25
**previously (4)**
19:14 65:4
126:24
161:25
**price (1)**
162:16
**principal (3)**
10:16 141:5
173:7
**principally (1)**
90:24
**principle (1)**
144:17
**prior (9)**
8:4 76:2 83:25
84:12 97:13
105:24
176:12,21
180:20
**privilege (3)**
84:19 89:15
160:4
**privileged (1)**
90:15
**privy (1)**
98:2
**probably (5)**
55:21 64:17
90:6 106:24
166:7
**problem (6)**
51:24 110:15
122:25 152:5
185:23
186:13
**problems (2)**
175:2,3
**proceed (3)**
112:14,16,18

process (3)
38:4 41:25
187:21
procession (1)
58:2
procured (1)
34:2
procurement...
34:22 35:16
produce (3)
33:18 168:25
169:20
produced (6)
57:3,6,16
169:23
170:12,14
producing (1)
33:17
production (6)
120:24 121:18
169:2,15,18
170:13
profit (1)
181:9
profitable (1)
179:18
ProForma (1)
180:21
progress (1)
41:4
project (50)
29:6,10,10,13
29:19,24
30:11,24 31:2
31:23,24 32:5
32:9,18,20,22
32:22 33:4,5
33:7,14 34:3
35:7,8,20
36:11,25
37:15 39:9,12
39:21 40:11
40:14,16
41:11,17

43:13,17,22
44:5,21,24
46:16,17
47:21 49:22
50:22 86:10
93:2 182:11
promulgated...
37:3
proof (3)
80:14,17 116:7
Properties (12)
1:5,18 10:11
10:19 11:9
12:18 53:16
87:6 92:21
162:22 164:5
165:10
property (2)
137:15 138:11
proposed (6)
172:23 177:22
178:5,12,20
183:12
proposing (1)
41:14
proud (1)
78:10
provide (14)
34:18 69:19
73:20 84:13
84:14 99:6
101:9 113:6
127:19
150:22
167:16
179:22
181:12 185:3
provided (23)
4:8 5:3,10,21
27:21,22,23
33:19 76:13
80:17 91:12
101:13
104:19

105:12,14
113:3 116:25
131:2 157:16
158:3 159:5
161:2 167:18
provider (5)
62:13 63:4,21
65:17 66:20
provides (4)
66:25 76:9
94:4 112:5
providing (4)
80:6,10 87:17
111:2
provision (6)
64:6 108:7,25
111:21
131:10 156:5
provisions (8)
93:16 95:11
109:20 111:5
112:2 113:8
114:13 130:5
public (13)
1:20 4:22,23
9:4 29:17
38:25 42:3,5
42:19,21
43:18 188:15
191:7
pull (1)
52:11
purchase (7)
27:22,24 161:3
162:8,13,16
164:3
purpose (13)
7:21 11:15
46:2,13,16
89:17 93:19
93:22 104:17
125:21,23
174:21 177:6
purposes (13)

5:10 9:20
12:20 103:22
104:13
105:17 108:4
121:22
125:23
143:15
146:10
153:18
187:20
pursuant (8)
1:19 7:6 14:2
126:6 127:3
155:13 168:2
179:23
purview (1)
113:19
put (40)
28:5 37:7
59:13 73:24
74:9,13 77:14
82:24,25 83:3
83:5,7,9,13
85:14 93:22
95:19 107:13
107:15,16,17
107:20,20,22
107:23,25
108:4,21
123:5 125:7
125:11,13,15
131:21 139:6
143:20
146:23 147:6
157:5 175:4
putting (6)
80:19 81:6
82:22 127:6
146:24
153:18

**Q**

question (46)
4:9,13 5:24 6:3

8:5 10:3
24:11 25:3,6
27:10 31:20
32:23 42:18
42:21 53:11
54:15 72:5
88:15 99:4
101:6,18
106:24
107:19 108:2
110:23 122:9
123:16
130:18
134:19
137:24 139:2
141:2 142:23
143:21
144:23
149:17,23
157:3 158:17
159:21
161:22 165:4
171:11
173:18
178:25 184:8
questioning (2)
8:4 74:19
questions (10)
52:2 79:23
107:24 108:3
145:20,20
150:4 157:18
157:19 188:2
quite (2)
84:4 112:20
quote (2)
62:13 91:2
quotes (1)
37:7

**R**

R (3)
2:2 9:2,2
raise (1)

[Page 219]

22:12
**raised (3)**
29:15 31:6
32:16
**raising (4)**
30:10,15,20
33:2
**ran (1)**
176:8
**range (1)**
137:22
**rate (4)**
34:14 35:2
128:20 176:3
**reach (1)**
128:15
**read (14)**
51:3,4,4 52:24
69:17 70:2,4
88:13 95:6
101:3 108:24
110:17
155:20
182:16
**reading (2)**
162:24 183:4
**ready (5)**
61:4 63:20
75:16 78:8
124:14
**readying (2)**
80:22 81:24
**real (23)**
22:20 23:17,22
23:23 24:8,15
26:4,7,11
27:5,8,14,22
27:24 91:8
104:24
137:15,16,20
138:3,11,14
138:18
**really (13)**
11:20 67:3

84:19,21
108:15 140:6
141:4 145:19
150:5 173:9
173:19
181:22 187:3
**reason (5)**
68:2 125:2,4
150:22,23
**reasoning (1)**
68:5
**reasons (3)**
12:11 36:22
80:13
**rebut (2)**
37:11,12
**rebuttable (1)**
37:11
**rebutted (3)**
38:9 39:3
42:23
**recall (93)**
11:4 13:12
16:8,19 18:23
28:15 31:10
31:14 34:17
35:2,10 37:22
37:24 38:10
39:8,15 40:18
45:2,7 46:11
46:13 48:8
49:3,23 53:25
54:4 56:10
60:10 66:12
66:16 79:20
79:20 82:2,2
82:3,5,23,23
85:3 86:16
90:3,16 119:5
120:4 122:3,9
122:24
123:22,23
126:10
137:12,12,18

138:5,25
139:5 141:11
148:17,19,23
148:23 149:2
151:3 152:7
160:11,11
161:13,20
163:6 165:13
165:21,22
167:12,13
168:8,22
170:8 172:3,3
172:10,12
173:2,19,19
174:7,10,11
175:20 177:8
177:12
179:10 181:3
183:9
**receipt (7)**
56:5,8,15
117:24 118:3
118:9 189:23
**receivable (3)**
171:16 174:24
175:5
**receivables (5)**
19:9 177:5,15
177:16,20
**receive (10)**
116:25 122:17
122:20 126:4
130:3 147:14
153:7 169:9
169:10 178:5
**received (16)**
10:15 61:19
62:23 73:19
105:15 117:3
117:4 129:18
138:13 159:7
159:13
161:12 166:7
180:21 183:6

183:11
**receiving (4)**
119:20 130:16
131:2 175:18
**recited (1)**
151:23
**recognize (2)**
67:18 88:6
**recognizing (3)**
108:10 135:23
136:25
**recollection (...**
14:11 16:4
19:6 20:8
27:19 32:3
45:24 69:7
78:25 79:8
86:17 117:9
117:12
119:16
120:21
125:19
132:23 135:8
136:15
137:23 138:2
153:6 160:2
171:17,23
174:15
177:25 178:3
178:15
187:13
**recommend (...**
43:21
**recommenda...**
183:13
**recommendi...**
41:4
**record (10)**
9:9,12 18:12
99:22 132:6
140:9 154:14
163:19
182:25
191:13

**recorded (1)**
7:17
**recording (1)**
7:18
**records (7)**
17:4,11 118:15
134:22 136:7
154:13
158:14
**redemption (1)**
162:14
**reduce (2)**
161:16,19
**reduced (4)**
97:14,14
101:11
105:25
**reducing (2)**
104:7,9
**reduction (5)**
43:22 101:22
105:22 126:5
144:16
**refer (5)**
12:21 103:25
129:25
143:16 162:7
**reference (4)**
93:15 102:23
130:19
139:15
**referenced (5)**
70:19 113:9
120:15 134:2
154:25
**references (3)**
85:12 92:11
130:2
**referencing (1)**
16:2
**referred (2)**
66:24 118:4
**referring (24)**
14:19,20 30:17

32:17,19 44:9
56:25 63:11
69:15 71:3
72:9 101:7
102:20 110:6
129:2,5
132:11
139:14 140:8
140:9 163:5
169:23 177:4
185:18
**refers (2)**
103:9 163:15
**reflected (1)**
83:6
**refresh (1)**
120:21
**refusal (5)**
27:24 63:25
66:5,10 70:11
**refused (8)**
62:16,18 63:24
64:14 65:25
66:19 106:23
143:5
**refusing (4)**
79:16 106:23
142:13,17
**regard (1)**
120:23
**regarding (12)**
8:4 17:3 57:7
123:2 137:25
148:18
152:14
171:18,23
173:13
179:15
184:25
**regulation (2)**
37:2,16
**regulatory (1)**
64:12
**reimbursed (1)**

147:2
**reimburseme...**
130:8
**rejected (7)**
36:12,14,16,23
37:17 38:3
136:14
**relate (4)**
57:10 88:18
167:15 168:9
**related (4)**
11:22 21:8
118:15
191:16
**relates (7)**
11:8 14:16
93:11 95:17
141:4 165:25
186:5
**relation (1)**
174:17
**relations (2)**
115:12,13
**relationship ...**
12:17 17:19,22
24:7,12 45:9
45:12 46:14
47:2,19 50:15
114:25
**relative (3)**
84:6 98:2
111:8
**relieve (2)**
99:12 112:12
**remain (1)**
185:24
**remained (2)**
123:9 135:15
**remember (27)**
15:24 34:12
46:7 59:25
66:16,18,22
67:5,7 79:22
79:25 118:8

119:18,20
120:7 121:13
121:20
124:22
135:16 136:2
152:3,7
153:16
154:16
172:19,20
182:14
**remote (1)**
7:9
**remotely (1)**
7:15
**remove (1)**
123:13
**removed (3)**
77:15 154:12
154:21
**renegotiate (1)**
82:6
**renegotiated ...**
142:16
**rent (41)**
62:18 66:22,24
67:9,10,11
91:14 128:18
130:4 134:3,7
134:16,25
135:4,7,11,15
135:19,21,22
135:24,24
136:9,14,14
136:18,19
137:4 150:12
151:2,6,8,10
151:15,19
152:2 156:22
164:18,18,19
166:22
**rents (1)**
87:8
**repeat (3)**
32:23 149:17

181:14
**repeated (1)**
146:22
**repeating (1)**
178:4
**rephrase (1)**
54:15
**report (1)**
151:25
**reported (2)**
82:7 152:17
**reporter (4)**
7:8,15 132:8
139:7
**reporting (4)**
7:12 159:7,14
181:17
**reports (2)**
15:22 138:16
**reposing (1)**
173:3
**represent (3)**
118:4 119:3
134:23
**representatio...**
172:13
**representativ...**
56:12,13,16
62:4,11 63:19
81:7,8 86:2
148:21
**representativ...**
40:16 91:18
144:13
**represented (...**
18:18 33:18
43:20 72:2
83:19,20,24
91:13 96:11
178:8 184:17
**representing ...**
6:12 20:11
37:13 90:21
173:5,8,9

**republican (1)**
39:6
**request (8)**
120:18,24
143:8,9 144:9
172:7 190:6,8
**requested (6)**
57:12 63:6
81:9 120:9
130:17
186:10
**require (4)**
16:11 21:24
49:24 50:2
**required (20)**
16:14,15 35:20
43:24 74:25
81:14 97:7
101:4,20
116:14
119:11
123:12
147:11
150:10
155:10,25
159:7 166:4
172:18
177:23
**requirement ...**
115:25
**requirement...**
106:19 159:14
**requires (3)**
16:18,21 156:6
**reserved (4)**
4:12,16 6:2,6
**resolution (5)**
77:23 98:3
112:23
173:22 185:3
**resolve (2)**
97:15 174:17
**resolved (1)**
77:19

respect (3)
76:18 80:3
83:6
respective (7)
4:5,19 5:8,14
5:20 6:9
28:10
respond (2)
84:24 134:19
response (2)
159:9 183:24
responsibiliti...
14:13
responsibilit...
14:15,17 15:2
93:6 173:3
responsible (3)
30:15 158:8
186:19
rest (5)
126:2 162:24
163:9,9,10
restate (1)
10:4
restated (17)
67:15,19 68:7
68:19 77:20
129:2,8,15
130:6,24,25
131:3,5
140:10
143:12
144:20
189:11
result (4)
97:5 114:12
129:17
171:25
resulted (1)
82:12
retain (1)
120:2
retroactive (8)
62:25 64:20,21

70:16 71:19
72:11 85:12
85:15
return (5)
4:25 51:23
69:8 74:18
86:23
returning (1)
119:7
revenue (1)
167:6
reverse (1)
41:5
review (24)
34:4,5 53:21
65:6 69:11,13
69:21 88:6
89:19 108:15
108:17 109:8
109:12,17
110:20
133:15
134:18 149:5
149:8 150:6
153:22 155:5
172:23
183:13
reviewed (13)
66:8 85:6
88:17 109:5,7
109:14,19,22
133:13 154:3
154:7,8 169:6
reviewing (2)
53:13 173:4
revisions (2)
185:4,7
right (50)
4:9 5:23 14:15
14:18 16:7
23:18 27:23
32:25 38:5
42:22 44:8
48:22 55:2

62:9 65:5,13
82:17 87:13
92:4,14 94:2
96:16 102:11
103:10
104:15
105:20 108:9
111:2 113:11
114:4,5,18
116:5 129:22
130:3 132:13
134:17
141:17
145:24
154:15
155:21
166:12,16
167:8 168:6
169:8,12
181:24
183:20
185:17
rights (4)
4:8 5:3,21
172:2
rise (3)
77:17 96:10
98:3
Robert (1)
36:19
Robinson (14)
2:8 9:17 20:7
38:17 60:7,8
68:16 69:6
77:6,9 96:13
130:11
144:12
182:22
Roccapriore ...
65:12,20
role (22)
13:22 17:17
26:15 30:10
30:13 34:21

35:15,21 36:4
36:7,9 41:11
43:11,14
44:15 45:3,7
68:12,14
88:25 89:4,9
room (5)
9:24 46:7
59:18,21
74:14
Rules (2)
5:4,22
RULINGS (1)
190:18
running (2)
126:19 179:18

―――――――
S
―――――――
S (3)
2:2 9:2,2
sale (1)
97:10
satisfied (2)
63:20 103:15
save (1)
41:11
saw (5)
53:23,25 54:2
54:4 59:20
saying (1)
63:19
says (29)
51:13 53:4,7,8
53:18 65:16
65:19 67:21
70:7,8,8,8
85:16 92:13
95:7 101:7
128:15
131:13 162:4
162:6,7,11
165:20 166:7
168:21 183:9
183:9 184:2,3

scheduled (1)
39:13
SCOTT (1)
2:18
scratch (2)
21:12 139:11
screen (6)
52:11 55:12
86:22 103:19
115:18 157:6
screwy (1)
12:14
scroll (6)
88:8 92:5,6
93:13 165:18
165:23
search (10)
120:5,8,16
121:2,9,11,17
169:20
170:10,11
second (24)
27:23 86:18
100:19
102:17 122:8
126:6 128:22
128:25
130:12,14,14
130:16
131:25
151:17
154:17,22,23
154:25
165:13,16
171:22 172:6
184:9,11
secretary (3)
17:8 38:24
43:20
section (20)
7:6 69:10,11
69:13 74:20
88:11 100:17
100:21,23

January 11, 2022

[Page 222]

101:20
103:22,23
104:2,4 107:3
107:5 110:21
130:2 140:10
168:3
**secure (3)**
39:8,11 80:16
**secured (4)**
33:15,16 39:16
168:11
**securing (8)**
33:4,6 35:21
36:4,9 43:11
43:15 44:15
**security (132)**
33:21,24,25
34:2 35:3
73:24 74:9
75:25 76:19
76:25 79:5,6
79:11,12 80:3
80:6,7,18
82:8,22 92:16
95:14,17,20
97:12,16,19
97:19 98:14
101:10,20
104:3,3,13
105:11,12,13
105:15,19
106:5,12,13
106:22 107:4
107:6,9,12
108:5 111:12
111:13
113:20 115:5
115:10,11,25
118:24 123:5
123:6,25
124:13,15,17
124:24 125:5
126:16,20,22
127:19,25

132:24 142:9
143:15 145:6
145:22
146:11,14
148:3,7,12,13
148:16,21
149:6,14
151:13,16,25
152:4,16,20
152:22
153:19,25
154:19
155:14,17,18
155:24 156:2
156:6 157:11
157:12 159:2
160:14 164:7
164:13,16
165:9 166:23
167:10,17
168:12,16,18
169:4 170:20
171:21
173:25
176:11,19
178:13,21
179:2 182:3
183:6,11
186:5,20,22
186:23
187:12 190:2
**see (22)**
12:12,15 51:17
53:7 55:11,17
57:9 69:14,22
72:21 79:23
85:13 87:9
88:22,23 99:9
115:23
120:10,22
185:4,5
187:17
**seeing (3)**
56:10 168:8

170:8
**seeking (3)**
19:10,11 31:2
**seen (3)**
61:6 165:11
168:7
**selection (1)**
44:19
**Senator (1)**
39:17
**send (7)**
96:7 117:6
119:10
159:12 180:6
180:18 182:7
**sending (4)**
15:24 119:14
180:14,20
**sense (2)**
25:8,25
**sent (28)**
39:20 63:17,19
71:19 92:19
112:19,21
116:19,19,21
117:5,16,17
117:18
118:11,16,18
119:14,23
120:12
121:21 122:4
123:14,22
167:24
178:12 180:2
181:15
**sentence (3)**
182:17 183:4
185:12
**separate (8)**
7:9 93:25 94:7
114:21,23
158:13
164:13,15
**September (...**

55:17 56:4,23
57:23 58:10
59:8,8,8,23
60:2 67:10
71:16 73:6
75:4,5 78:6
86:15,20 96:8
96:9 106:10
126:18
135:12,21
174:14
**series (1)**
82:11
**serve (2)**
22:2 113:23
**served (4)**
22:6 23:24
87:7 112:12
**Service (1)**
7:12
**sessions (2)**
95:24 97:22
**set (6)**
74:13 88:17
163:10
180:12
191:11,20
**sets (1)**
157:7
**settlement (2)**
106:2 115:2
**setup (3)**
9:23 10:2
12:14
**seven (1)**
176:18
**Shapiro (4)**
36:19 38:7
39:23 60:11
**share (1)**
188:4
**sheet (4)**
125:15,20
127:5 142:3

**Short (5)**
48:23 99:23
134:13
160:12
187:25
**show (7)**
51:17 65:3
72:5 78:10
88:4 165:7
174:7
**showed (6)**
70:13 71:21
73:13 75:8
111:18
168:22
**showing (1)**
75:20
**shown (1)**
66:15
**shows (1)**
120:14
**side (5)**
12:10 44:13
133:16,16
144:14
**sign (19)**
56:14 62:16,18
63:24,25 64:8
64:14 65:25
66:5,20 73:12
88:19 117:4
119:3 122:6
142:14,17
143:5 145:21
**signatory (7)**
74:3 116:8,16
121:22,25
123:20 124:7
**signature (9)**
116:17,25
118:22,23,25
119:4,8,19
123:12
**signed (52)**

January 11, 2022

[Page 223]

14:7,9 15:25
16:12,24,24
28:4,19 62:16
62:17 63:4,9
63:10 64:17
64:17 65:17
67:7,25 68:4
68:11,22,24
69:3 77:24
82:13 95:18
95:23 96:23
97:17,18,22
117:4 119:11
119:15,17
120:3 128:23
129:4 135:9
135:10
139:18
140:20 141:9
141:16,24,25
142:3,7,14
143:16 146:3
146:9
**significant (1)**
66:17
**signing (3)**
99:15 119:7
143:10
**similarly (2)**
133:20 142:5
**simple (4)**
130:18 144:22
145:17,20
**simply (1)**
169:19
**sit (9)**
14:12 16:16
20:8 35:5
60:19 66:15
79:2 168:17
178:10
**site (7)**
35:7,10,12,16
44:19,20 45:4

**sites (3)**
44:23,24 45:2
**sitting (3)**
45:2 78:18
174:8
**situation (2)**
84:18 178:16
**six (5)**
63:3 69:10,12
71:22 176:18
**skilled (2)**
58:22 175:25
**slightly (1)**
54:14
**SNF (7)**
1:9 2:9,16 42:9
42:12 88:2
189:19
**somebody (2)**
34:7 39:5
**son (1)**
60:10
**sorry (5)**
13:20 32:23
81:21 134:9
178:4
**sort (5)**
9:22 14:21,22
78:16 126:23
**sought (1)**
84:6
**source (4)**
73:15 91:17
153:7 154:11
**SOUTHARD...**
2:15
**speak (12)**
66:4 87:20
99:3 127:13
131:7 133:20
136:23 137:7
167:13
183:21
185:15 187:4

**speaking (3)**
84:20 112:9
122:13
**speaks (12)**
88:16,21 95:8
98:11,12
102:22
108:10
111:25
131:15 137:2
183:8,17
**specific (9)**
25:4,7 67:3,5
79:7 84:9
120:7 125:4
131:10
**specifically (...**
26:10 49:7
79:25 81:11
83:8 84:10
100:25
108:24
109:19
120:23,25
122:7 123:22
136:2 146:20
165:13
**specificity (1)**
187:15
**speculate (1)**
102:24
**speculation (1)**
186:13
**spent (1)**
144:18
**spoke (5)**
20:2,5 85:2
148:24 153:6
**spoken (1)**
82:18
**ss (1)**
191:3
**staff (2)**
58:21 120:10

**stamped (1)**
170:16
**stand (2)**
76:22 157:24
**start (9)**
30:3 32:20
36:3 59:4
62:18 66:22
79:14 139:11
176:16
**started (5)**
57:23 58:25
59:2,5 176:19
**starting (2)**
21:12 67:11
**starts (3)**
38:5 170:16
185:13
**startup (2)**
179:16,18
**state (26)**
1:2,20 9:8,11
29:18 33:3
35:20,22,25
36:10,15 37:4
38:25 39:17
40:10,25 42:3
43:25 44:4
52:3,22 62:4
71:4 186:16
191:3,7
**stated (1)**
62:20
**statement (9)**
51:16 87:9
139:15
141:22 155:5
166:13
167:23
181:10
184:24
**statements (7)**
111:16 122:18
122:20,23

153:24
167:17,19
**states (5)**
55:15 71:4
94:8 166:21
167:4
**statistic (1)**
40:4
**status (5)**
15:16,16 29:5
29:9 138:10
**statutory (3)**
28:7 97:7,11
**stayed (1)**
123:3
**steps (8)**
29:12 32:21,24
33:3 38:20,22
123:8,19
**STEVENS (1)**
2:16
**stimulus (1)**
175:18
**stipulate (1)**
11:7
**stipulated (9)**
4:4,18 5:7,13
5:19 6:8 7:4
7:23 18:12
**STIPULATI...**
7:2
**STIPULATI...**
4:2
**stopped (1)**
78:15
**Street (2)**
2:17 160:7
**strike (4)**
4:10,13 5:25
6:4
**structure (3)**
24:22 25:25
26:3
**structured (2)**

28:6 128:14
**subject (3)**
43:22 81:19,21
**subjects (1)**
82:3
**submitted (1)**
155:4
**subordinatio...**
172:2
**Subscribed (1)**
188:11
**subsection (7)**
70:19,20 71:3
72:3 100:24
101:19
104:17
**subsequently...**
158:11,21
**substance (6)**
63:23 81:12
124:23,24
165:22
182:15
**substantial (3)**
73:7 75:6
104:23
**substantially...**
97:14
**Success (1)**
9:14
**suffice (1)**
129:19
**sufficiently (1)**
71:6
**suggested (1)**
28:6
**suggestion (1)**
12:6
**sum (5)**
63:22 81:12
101:7,12
182:15
**summary (1)**
109:15

**superseding ...**
28:22
**supervised (1)**
121:14
**supplement (1)**
169:17
**supplementa...**
169:14 170:10
170:12
**supply (1)**
8:8
**support (5)**
39:9,12,17,21
43:17
**suppose (23)**
74:3,6 76:24
77:14 91:6
97:5 101:23
105:23 106:3
116:7,15
122:22
125:25 126:4
128:13
132:19
135:11,19
137:20 152:9
153:15,17
181:18
**Supreme (2)**
1:2 11:3
**sure (28)**
14:4 21:2 48:7
49:6,18 50:6
50:7 51:22
52:12 54:11
55:6 76:11
83:17 86:25
88:13 94:18
98:18 102:21
107:2 109:14
118:19 133:4
141:8 152:21
159:16 166:8
177:12 183:2

**surprised (1)**
165:15
**surrender (1)**
137:11
**survey (1)**
73:6
**survive (1)**
94:9
**surviving (1)**
28:25
**suspect (2)**
157:20 180:11
**sworn (5)**
4:21 7:15 9:4
188:11
191:11

___

**T**

**T (1)**
9:2
**table (2)**
78:20 144:14
**Tabor (8)**
91:4,11,20,21
91:25 92:10
92:23 158:16
**take (21)**
24:7 38:20,22
48:20 53:10
75:12 77:8
78:4 99:19
115:18,22
117:20 123:8
123:16,19
133:15
145:23
152:12 177:4
180:10 182:8
**taken (6)**
29:13 75:10
77:17 84:24
152:11 153:8
**talk (3)**
32:16 116:3

177:15
**talking (19)**
24:20,21 25:16
27:16,17
42:14 72:8
84:15 100:13
120:17 127:3
153:14
154:16
161:25
164:21,23
171:2 173:11
177:16
**task (1)**
139:7
**taxes (9)**
91:8,15 137:15
137:17,20
138:3,11,14
138:19
**TCO (2)**
86:14,18
**technical (4)**
12:11 56:2
57:18,20
**technically (2)**
57:22 176:16
**telephonicall...**
15:20 20:13,13
**tell (12)**
10:6 24:24
48:12 82:21
100:19
102:17
108:18
124:10,11
136:22 152:6
159:17
**telling (3)**
12:12 66:18
106:22
**tells (1)**
185:6
**temporary (3)**

30:6 103:4,10
**ten (13)**
13:14 21:16,16
31:14 48:10
95:20,22
97:11,16,17
113:20
151:12
181:16
**tenant (54)**
15:17 61:3,9
64:8 80:9
90:22 101:8
101:12,15
104:12 115:2
115:13 144:4
144:24
145:11,13,16
145:21 146:9
146:13,17,24
146:25
147:10
148:13,18
149:15,16,20
150:12 152:2
152:5 156:22
158:10,21
161:12 164:5
164:11,12,14
164:17,22
166:22 167:4
167:25 171:3
171:15
179:21 180:5
180:22,24
181:11
185:11,20
**tenant's (2)**
71:7 80:5
**tenants (3)**
60:25 163:18
163:24
**tender (1)**
178:20

January 11, 2022

178:20
**tendered (1)**
120:19
**term (7)**
70:5 96:25
125:15,20
127:5 128:20
142:3
**terminate (6)**
87:7 113:23
114:9,12,20
168:12
**terminated (6)**
108:19 113:13
113:15 115:4
115:16 168:4
**terminating (...**
114:17
**termination (...**
11:16,21 87:13
112:5 156:7
167:24
168:10
**terms (31)**
14:8 34:11
35:3 94:8
98:7 106:18
108:8,13
109:23 110:2
116:15
119:12 122:6
122:13,15,16
126:3,15
129:14
136:23
142:15
144:19,19
150:9 155:9
155:13,23
156:19 162:3
179:23
183:23
**testified (14)**
9:5 60:13

70:14 78:5,21
79:24 80:21
96:17,22
104:6 132:17
135:3 138:23
160:18
**testify (6)**
42:7 69:23
135:5 136:8
138:17 181:6
**testifying (8)**
6:12 10:9 65:8
69:25 72:25
80:4 136:11
174:8
**testimony (41)**
4:11,14 5:25
6:4 10:18
54:2 63:13,14
69:16 75:25
76:4 77:4
89:12 94:19
95:2 100:7
102:3 105:5
109:9,13
110:6,7,8,12
113:25
116:24
118:20
126:21,25
127:20,21,23
132:5 134:21
138:25 139:5
143:14,19
151:18
156:24
191:13
**thank (4)**
78:2 157:24
173:10 188:3
**Thanks (1)**
65:19
**thing (6)**
28:5 69:18

82:5 137:18
155:12 177:8
**things (5)**
14:19 75:15
81:9 132:24
158:13
**think (50)**
10:24 12:14
28:17 33:21
33:23 35:24
44:3 45:21
46:4 48:19
51:8,19 57:11
59:13 64:11
69:13,19,21
70:2,7 71:11
73:9,9 79:21
80:7 90:23
94:13 95:11
96:14,22
99:17 116:21
125:14
132:17,18
135:13 140:4
140:16,23
141:3 156:17
158:23 170:3
170:5 176:23
181:10 184:2
185:22,23
186:12
**thinking (2)**
79:22 179:15
**third (6)**
2:10 9:13
86:18 87:3
181:21
183:18
**thirds (1)**
181:23
**this(these) (7)**
4:11,14,20,23
5:2,9,16
**thought (7)**

66:17 83:13
123:14 140:7
140:13
152:12
180:24
**threatened (1)**
68:17
**three (4)**
55:9 124:20
167:2 184:12
**threshold (1)**
37:20
**thwarting (1)**
64:4
**tied (2)**
75:13 108:15
**till (2)**
107:17 176:16
**time (114)**
14:25 15:11,13
18:21 19:5,10
19:12,20 20:2
28:12 31:15
31:25 37:19
38:13,18 39:6
40:5 42:4
43:21 46:5
48:8 51:25
53:23 54:5,8
54:11,11,18
54:24 58:6,20
59:20 60:22
61:16 62:24
64:18 68:6,9
68:10,21 70:6
74:2,8,12,16
75:17,22
77:22,25 78:6
78:10 80:12
80:17 82:9,11
83:6 84:5
89:13 96:12
97:3,8,13
99:19 104:22

105:10,15
106:11
107:13 108:4
109:5 113:16
113:23 115:3
115:5,7
116:11
119:17,22
121:7 122:16
131:18 133:2
135:16 140:5
142:4,8 144:5
145:7 148:11
148:20 150:7
151:7,11,17
152:4 153:4
154:20
157:15 158:2
161:17
172:10
173:21 174:5
174:18
175:10
176:12,22
179:24 180:3
180:17
185:11
187:14,23
188:6
**timeframe (1)**
132:19
**timeline (1)**
110:22
**times (7)**
22:22 26:8
48:11 90:3,8
143:22 157:2
**timing (1)**
142:10
**title (1)**
38:24
**today (18)**
10:14 42:7
60:19 66:15

79:2 109:9
110:6,13
126:21 135:3
135:5,25
136:8 138:17
147:20
178:10 181:6
186:6
**today's (2)**
11:7 107:18
**told (7)**
62:11 66:2
124:17 152:4
154:8,13
175:20
**top (8)**
92:11 94:12
103:7 111:25
133:18 158:6
174:6 184:21
**touch (1)**
44:19
**touches (1)**
81:7
**tour (3)**
60:21 78:9
81:17
**tranche (1)**
176:19
**transaction (...**
17:14 18:10
21:21 22:18
24:23 25:7
28:16 34:8
84:6 142:24
143:2,4,24
**transactions ...**
21:7 26:2,3
48:13
**transcript (2)**
8:9 110:12
**transfer (2)**
162:5,21
**transferred (1)**

127:22
**trial (3)**
1:17 4:16 6:6
**tried (5)**
34:8 110:8
120:20
122:13 182:7
**trigger (1)**
66:21
**triggered (1)**
37:21
**trip (1)**
25:23
**true (2)**
76:18 191:12
**truly (1)**
148:23
**truncate (1)**
108:3
**trust (9)**
28:7 97:7,11
104:25 161:4
162:8,10,12
162:14
**truthfully (1)**
153:3
**try (6)**
19:24 31:20
94:11 106:25
139:3 178:16
**trying (18)**
25:23,24 43:16
54:20 71:10
76:9 82:6
89:6 143:19
143:23
144:21
145:19
163:21 165:2
173:5 182:25
187:3,7
**Tuesday (1)**
65:10
**tune (1)**

121:6
**turn (1)**
39:10
**turned (5)**
56:19,22 58:4
58:7 190:10
**turning (2)**
26:9 181:19
**turnover (2)**
57:8 61:7
**two (40)**
13:2 17:18
26:6 28:22
34:14 42:24
48:15,21,25
49:2,20 58:4
63:8 70:19,20
71:9,12 75:15
78:15 80:13
84:9,13 87:2
90:8 93:6,25
94:6 124:19
124:20,21
133:16 141:9
144:17
158:13
166:20
167:23
170:17
181:22
184:13
187:19
**twofold (2)**
42:17,18
**type (1)**
163:4
**types (1)**
25:13

_____
**U**

**ultimate (1)**
44:20
**ultimately (16)**
19:24 28:3,17

28:21 29:3
31:4 40:11
43:18 62:22
63:8 76:17
77:18 82:12
98:16,23,23
**unauthorize...**
7:20
**understand (8)**
10:3 11:13
101:6 110:19
159:21
167:23
174:23 183:5
**understandi...**
10:9 18:3 42:8
47:3,6 58:18
74:22 76:9,12
85:18,21
108:12 119:6
119:9 122:4
123:11
125:14
128:14
135:10
139:24,25
140:5,13
173:12 175:8
175:12 176:5
177:6 179:17
179:20
184:24 186:7
**understood (3)**
21:14 119:13
127:17
**undertaken (3)**
33:7 48:13
132:23
**undertaking ...**
104:3,14
**undertook (1)**
33:10
**underway (1)**
172:11

**unequivocall...**
62:20
**unfair (1)**
25:6
**unfortunatel...**
85:4 122:12
145:12 153:4
173:24
**unhappy (1)**
83:12
**Uniform (1)**
5:22
**unquote (2)**
62:13 91:2
**unrelated (1)**
108:16
**upset (3)**
66:19 125:7
128:24
**use (2)**
31:7 167:10
**utility (4)**
91:8 92:17
111:16
146:18
**utilized (2)**
5:10 161:15

_____
**V**

**vacuum (1)**
118:18
**vague (1)**
171:22
**various (15)**
21:19,20 40:3
40:15 43:10
44:16 56:18
56:20,21 91:6
92:16 109:24
109:25 190:9
190:11
**venture (4)**
16:25 17:3
19:15,19

**ventures (7)**
22:3,5,7,9,10
23:10 46:20
**verification (1)**
53:20
**verified (9)**
52:2,8 53:2,5
53:12,15
86:24 134:11
189:8
**verse (2)**
56:11 64:8
**versus (1)**
177:13
**vet (1)**
42:5
**vetted (1)**
42:2
**video (3)**
1:16 7:7 9:24
**videoconfere...**
7:2,10,17 8:7
**view (6)**
57:25 58:3
66:21 97:20
108:23
113:19
**violation (1)**
7:20
**violations (1)**
93:16
**virtually (1)**
56:13
**virtue (2)**
13:7 14:25
**visit (3)**
59:9,11 120:9
**voice (1)**
12:8

_____

**W**

**W (1)**
9:2
**wait (1)**

100:21
**waive (3)**
129:13 130:15
130:23
**waived (5)**
5:17 129:9,12
130:11,20
**waiver (7)**
4:15 5:3 6:5
129:22 130:3
136:19 137:5
**waives (1)**
131:11
**Walsh (1)**
180:5
**want (26)**
18:15 21:11
25:6 31:18,19
45:13 51:25
55:8,14 57:4
58:2 69:17
84:21 86:23
90:7 93:14
105:9 108:25
128:2 134:18
138:8 158:6
160:3 163:2
173:22
178:18
**wanted (17)**
19:23 79:10,13
79:14 94:14
107:12
124:16,23
125:9 139:10
143:6,11
144:7,9
171:24
175:23 177:9
**was(were) (2)**
4:24 191:11
**wasn't (1)**
153:12
**way (9)**

22:17 25:11
27:11 34:15
59:14 104:10
117:22
180:15
191:17
**ways (3)**
96:20 120:21
143:22
**week (2)**
86:18 99:15
**weeks (4)**
58:4 62:23
63:3 71:22
**WEINGART...**
2:3
**went (5)**
21:20 43:18
82:10 111:13
175:17
**West (1)**
2:17
**Westchester ...**
1:3 37:19
39:14 52:22
**whatsoever (2)**
41:12 105:11
**WHEREOF ...**
191:19
**White (107)**
1:5,17 2:5
10:10,19 11:8
12:18,21,25
13:15,23,25
14:14 15:6,22
16:6,25 17:19
19:15,19 26:9
26:21,22,24
27:5,15,18
29:5 35:7
39:7,11 40:2
40:9 41:17
43:12 44:21
46:17,20

47:12,21
49:22 50:21
51:14 53:16
53:20 66:9
86:6 87:12
90:21 92:21
92:25 93:4
102:17,25
123:18
136:18 137:2
137:10,19
142:8 144:4,7
149:7 150:10
155:18,24
158:9 160:7
160:15 161:7
161:8,11,16
161:18
162:22 163:4
163:12,13,15
163:16,23
164:4 165:9
166:4,13,17
166:21,23
167:16,18
168:16,19
170:18 173:9
173:11
174:11,18
175:9 176:7
177:17,19,21
178:20 181:7
182:10,11
190:2
**wholly (1)**
159:10
**WIEDERKE...**
2:4
**Wine (6)**
181:23,25
182:5,12
183:25 184:5
**Wine's (3)**
182:17 183:5

183:19
**WINTERS (1)**
2:15
**wire (2)**
162:21,23
**wise (3)**
2:3 37:25
140:6
**wish (1)**
23:9
**withdrawn (1)**
149:10
**witness (17)**
7:9,13,14,25
8:2,4 9:3
10:21 12:5,13
71:13 110:15
113:25
143:20
163:14 189:3
191:19
**witness(es) (4)**
4:21 6:12
191:10,14
**witnesses (1)**
7:16
**wondering (1)**
117:15
**word (2)**
24:17 52:24
**words (6)**
63:22 82:18
91:14 97:2
124:18
143:20
**work (6)**
9:11,13 19:8
46:5 71:6
178:17
**working (4)**
56:12 96:7
97:23 187:22
**works (1)**
121:13

January 11, 2022

[Page 228]

**worth (1)**
138:13
**wouldn't (1)**
165:14
**WPH (1)**
87:6
**WPH001868...**
170:16
**wrap (1)**
144:22
**writing (4)**
16:5 32:14
130:22 131:4
**written (3)**
7:19 15:21
28:18
**wrong (5)**
69:7 76:22
117:11
169:18
174:14

---
**X**
**x (2)**
1:4,12

---
**Y**
**year (12)**
13:19 37:24
38:10 49:3
50:20 61:21
71:18 96:8
106:16
111:11
148:25
176:24
**years (29)**
21:2,20 28:17
29:11,14
31:14 38:18
47:8 48:10
54:25 66:13
77:7 83:9,12
84:8 96:9

122:14
124:20,20,21
124:22 125:8
125:12 142:2
145:13,15
148:16 153:5
181:4
**yesterday (1)**
109:7
**York (23)**
1:2,21 2:5,11
2:11,17,17
9:14 23:20
29:18 35:22
37:5 38:25
39:17 40:25
43:25 44:4
62:4 71:4
175:15 191:3
191:4,7

---
**Z**
**Zafrin (45)**
19:2,16,18
20:6,11 28:6
33:8,17 36:24
37:13 38:5,6
38:14,16 41:8
45:16,18,20
46:4,6,8 60:6
68:17 78:14
78:19 83:10
84:25 96:12
98:2 111:8
116:20 119:2
121:24
122:11,12
124:11
131:24
153:10,11
154:12
172:13
182:22 184:3
185:6 187:24

**Zafrin's (1)**
119:10
**Zero (1)**
162:2

---
**0**
---
**1**
**1 (40)**
52:7 59:25
62:5 63:12
65:11 67:11
69:4 72:19
75:8 77:25,25
86:21 95:19
98:14 99:15
101:4,15,16
102:25 105:6
105:6,19
106:2,4
108:21,22
110:24 112:7
112:20
117:24
135:13,25
157:11
176:20,24
182:18
183:19 189:8
189:17,24
**1(a) (2)**
162:7,11
**1(a)(i) (1)**
162:18
**1.5 (5)**
125:25 126:8
126:23
127:18 128:9
**1.6 (22)**
74:2,11 75:24
76:19,25 79:5
79:8,13 80:14
84:10 102:3,6
107:11 116:2

116:3 123:24
125:3 152:9
152:10
154:19,20
155:13
**1/7/20 (2)**
87:25 189:18
**1:21 (1)**
99:23
**10 (7)**
67:13,16 69:9
103:19
115:17 129:3
189:12
**10,000 (1)**
135:14
**10:04 (1)**
1:14
**10:58 (1)**
48:23
**10022 (1)**
2:11
**10036-7209 (1)**
2:17
**10601 (1)**
2:5
**11 (8)**
1:14 95:20,22
97:17,21 98:4
100:2 189:22
**11,000 (1)**
135:14
**11/20/19 (2)**
99:25 189:22
**11:16 (1)**
48:23
**110 (1)**
190:12
**11042 (1)**
9:14
**117 (1)**
189:23
**11th (1)**
191:20

**12 (1)**
58:5
**12/2/19 (2)**
72:17 189:14
**12:30 (2)**
94:14 99:17
**12:31 (1)**
99:23
**13 (2)**
55:15 58:5
**14 (8)**
61:21 62:8
63:2 64:21
72:12 85:16
85:19 86:4
**14th (1)**
71:20
**15 (4)**
20:6 38:17
59:8 121:6
**16 (4)**
169:5,5,9,11
**160 (1)**
189:25
**17 (3)**
2:17 56:4,23
**179 (1)**
190:4
**18 (9)**
52:9 53:9,11
56:4,4,23
169:22
170:15 189:9
**19 (9)**
64:23,25 65:4
67:25 68:3
71:17 73:6
75:5 189:10

---
**2**
**2 (8)**
64:24 73:11
101:11,24
104:7,9

January 11, 2022

177:13
189:10
**2,700 (1)**
128:20
**2.2 (14)**
125:18 128:8
161:4,6,8,12
161:23 162:2
162:21 163:3
163:22 164:7
167:5,10
**2:20 (1)**
134:13
**2:27 (1)**
134:13
**20 (11)**
16:2 28:4,25
57:25 69:3,6
95:19 96:23
100:5 106:15
107:15
**20.6 (2)**
140:10 142:6
**200 (1)**
2:17
**2000 (1)**
50:20
**2000s (1)**
18:22
**2006 (1)**
45:22
**2007 (1)**
45:22
**2010 (2)**
20:6 38:17
**2013 (1)**
38:11
**2014 (1)**
38:12
**2015 (9)**
28:19,23 31:25
67:25 68:3
128:19 130:6
141:6 142:20

**2017 (24)**
28:20,22 32:2
67:25 68:4,22
69:3,4,7
77:10,13,24
77:25 106:18
123:10,17
127:4,9 129:4
130:7 141:8
142:5,20
155:2
**2019 (44)**
16:2,11 28:4
55:17 56:23
57:23,25
58:10 59:12
59:23,23
62:24 65:11
67:11 76:17
77:11 78:4,7
86:4 96:23
100:5 101:17
102:25 105:6
107:10,15
123:10 124:3
126:8,18
131:19 138:7
147:23
151:10
160:18 167:5
167:25
168:20 169:5
169:5 170:6
176:15,25
180:14
**2020 (19)**
87:6,15 88:5
114:8 133:11
137:9 138:7
148:2,18
157:22,23
168:2 169:6,7
171:5,14
174:14

176:17
182:18
**2021 (2)**
148:25 180:3
**2022 (3)**
1:14 188:12
191:21
**22 (6)**
100:2,5 165:24
169:6,10
189:22
**221 (1)**
5:22
**23 (6)**
72:15,19,23
85:7 176:17
189:17
**24th (1)**
2:10
**25 (2)**
103:20,20
**28 (4)**
87:23 88:2,5
189:20
**29 (4)**
160:15 165:6,8
190:3

_____
**3**
_____
**3 (7)**
9:13 64:25
67:14 179:12
189:10,11
190:4
**3.1(a) (3)**
69:10,14,17
**3.5 (1)**
168:3
**3.7 (7)**
102:6 104:5,9
104:18
105:23 106:5
107:12
**3:03 (1)**

160:12
**3:16 (1)**
160:12
**3:58 (1)**
187:25
**30 (9)**
55:17 57:23
59:8 67:10
76:17 86:20
101:24
135:12,21
**3113(d) (1)**
7:6
**3116 (1)**
5:4
**3117 (1)**
5:4
**34 (4)**
116:21 117:10
117:13 118:5

_____
**4**
_____
**4 (3)**
72:16 177:13
189:14
**4/16/20 (2)**
160:14 189:25
**4:08 (1)**
187:25
**4:09 (1)**
188:6
**41st (1)**
2:17
**420 (1)**
128:20

_____
**5**
_____
**5 (9)**
87:24 88:2
160:15 169:5
169:11 170:6
189:18,20
190:3
**5.3 (8)**

74:9 75:23
76:21,23
101:23 102:2
104:7 157:10
**500,000 (2)**
48:18 49:16
**52 (1)**
189:8
**52,200,000 (1)**
162:16
**55 (1)**
134:24
**56 (2)**
137:14 190:9
**57 (1)**
146:17

_____
**6**
_____
**6 (2)**
99:24 189:21
**6(d) (2)**
104:18 107:3
**60 (11)**
73:25 76:2
77:3 105:24
123:4 124:15
147:9 176:14
179:12
181:20 190:4
**60,000 (1)**
137:21
**60278/2020 (1)**
1:7
**64 (2)**
140:11 189:10
**67 (1)**
189:11
**68 (8)**
52:4,9,13,14
52:17,19
86:23 189:9

_____
**7**
_____
**7 (29)**

**January 11, 2022**

87:6,15 88:5
111:11
112:19 113:9
114:8 117:23
128:4 132:4,7
132:7,11
133:3,6,11
137:9 138:19
148:2,18
157:5,6,22,23
171:4 173:15
173:15
180:10
189:23
**7.1(a)(i) (1)**
115:19
**7.1(a)(ii) (6)**
101:8,20
103:24 104:2
107:5,6
**7.1(a)(iii) (2)**
115:22,24
**70 (1)**
95:11
**700,000 (7)**
128:11,12
129:8,22
130:3,20
131:11
**72 (1)**
189:14
**76 (2)**
117:24 189:24
**77 (1)**
118:3
**77.5 (1)**
164:3
**77.50 (2)**
162:9,13

_____
**8**
_____
**8 (2)**
160:13 189:25
**8/22 (1)**

103:5
**800 (1)**
2:10
**87 (1)**
189:18

_____
**9**
_____
**9 (3)**
179:11 189:4
190:4
**91% (1)**
37:19
**92% (1)**
37:20
**95 (1)**
37:5
**95% (1)**
37:20
**96 (2)**
67:16 189:13
**99 (1)**
189:21