# <u>Exhibit 2</u>

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF WESTCHESTER
----------------------------------------------x
WHITE PLAINS HEALTHCARE PROPERTIES I, LLC,
Plaintiff(s),
Index No. 60278/2020
-against-
HBL SNF, LLC, LIZER JOZEFOVIC a/k/a
LIZER JOZOFOVIC and MARK NEUMAN,
Defendant(s).
----------------------------------------------x
January 12, 2022
10:09 a.m.

VIDEO CONFERENCED EXAMINATION BEFORE TRIAL of Plaintiff WHITE PLAINS HEALTHCARE PROPERTIES I, LLC by BILL NICHOLSON, pursuant to Order, before Laura B. Lowenthal, a Notary Public within and for the State of New York.

```
(1)    A P P E A R A N C E S:
(2)
(3)    DELBELLO, DONNELLAN, WEINGARTEN, WISE &
(4)    WIEDERKEHR, LLP
       Attorneys for Plaintiff(s)
(5)      One North Lexington Avenue
         White Plains, New York 10601
(6)
       BY: ALFRED DONNELLAN, ESQ.
(7)      E-mail:  aed@ddw-law.com
(8)
       MICHELMAN & ROBINSON, LLP
(9)    Attorneys for Defendant(s) HBL SNF, LLC, LIZER
       JOZEFOVIC a/k/a LIZER JOZOFOVIC and MARK
(10)   NEUMAN
         800 Third Avenue, 24th Floor
(11)     New York, New York 10022
(12)   BY: JOHN GIARDINO, ESQ.
         E-mail:  jgiardino@mrllp.com
(13)
       BY:  ALEX BARNETT-HOWELL, ESQ.
(14)
(15)
       KLESTADT, WINTERS, JURELLER, SOUTHARD &
(16)   STEVENS, LLP
       Attorneys for Defendant(s) HBL SNF, LLC
(17)     200 West 41st Street, Floor 17
         New York, New York 10036-7209
(18)
       BY: BRENDAN SCOTT, ESQ.
(19)     E-mail:  bscott@klestadt.com
(20)
     ALSO PRESENT:
(21)
       ONLINE NOTARY.US
(22)   Document Handler
(23)   BY: CLAUDIA M. GOETZ, Document Handler
         E-mail:  cimgoetz@icloud.com
(24)
       BY:  GEORGE POLETES, Document Handler
(25)     E-mail:  gpoletes@gmail.com
```

(1)

(2)     **ALSO PRESENT:**

(3)         Lizer Jozefovic

(4)         Joe Jozefovic

(5)         Ari Kresimann

(6)

(7)

(8)

(9)

(10)

(11)

(12)

(13)

(14)

(15)

(16)

(17)

(18)

(19)

(20)

(21)

(22)

(23)

(24)

(25)

(1)

(2)                          STIPULATIONS

(3)

(4)              IT IS HEREBY STIPULATED AND AGREED by

(5)      and between(among) counsel for the respective

(6)      parties hereto, that:

(7)

(8)              All rights provided by the C.P.L.R.,

(9)      including the right to object to any question,

(10)     except as to form, or to move to strike any

(11)     testimony at this(these) examination(s), are

(12)     reserved, and, in addition, the failure to object

(13)     to any question or to move to strike any

(14)     testimony at this(these) examination(s) shall not

(15)     be a bar or waiver to make such motion at, and is

(16)     reserved for the trial of this action;

(17)

(18)             IT IS FURTHER STIPULATED AND AGREED by

(19)     and between(among) counsel for the respective

(20)     parties hereto, that this(these) examination(s)

(21)     may be sworn to by the witness(es) being

(22)     examined, before a Notary public other than the

(23)     Notary Public before whom this(these)

(24)     examination(s) was(were) begun; but the failure

(25)     to do so, or to return the original of

(1)

(2)      this(these) examination(s) to counsel, shall not

(3)      be deemed a waiver of the rights provided by

(4)      Rules 3116 and 3117 of the C.P.L.R., and shall be

(5)      controlled thereby;

(6)

(7)               IT IS FURTHER STIPULATED AND AGREED by

(8)      and between(among) counsel for the respective

(9)      parties hereto, that this(these) examination(s)

(10)     may be utilized for all purposes as provided by

(11)     the C.P.L.R.;

(12)

(13)              IT IS FURTHER STIPULATED AND AGREED by

(14)     and between(among) counsel for the respective

(15)     parties hereto, that the filing and certification

(16)     of the original of this(these) examination(s)

(17)     shall be and the same hereby are waived;

(18)

(19)              IT IS FURTHER STIPULATED AND AGREED by

(20)     and between(among) counsel for the respective

(21)     parties hereto, that all rights provided by the

(22)     C.P.L.R., and Part 221 of the Uniform Rules for

(23)     the Conduct of Depositions, including the right

(24)     to object to any question, except as to form, or

(25)     to move to strike any testimony at this

(1)

(2)     examination is reserved; and in addition, the

(3)     failure to object to any question or to move to

(4)     strike any testimony at this examination shall

(5)     not be a bar or waiver to make such motion at,

(6)     and is reserved to, the trial of this action;

(7)

(8)             IT IS FURTHER STIPULATED AND AGREED by

(9)     and between(among) counsel for the respective

(10)    parties hereto, that a copy of the within

(11)    examination(s) shall be furnished to counsel

(12)    representing the witness(es) testifying, without

(13)    charge.

(14)                    *   *   *

(15)

(16)

(17)

(18)

(19)

(20)

(21)

(22)

(23)

(24)

(25)

(1)

(2)                    VIDEOCONFERENCE STIPULATION

(3)

(4)             IT IS HEREBY STIPULATED AND AGREED by

(5)    and between counsel for all parties present that

(6)    pursuant to the CPLR section 3113(d) this

(7)    deposition is to be conducted by video

(8)    conference, that the court reporter, all counsel,

(9)    and the witness are all in separate remote

(10)   locations and participating via videoconference

(11)   (LegalView/Zoom) meeting under the control of

(12)   Lexitas Court Reporting Service, that the officer

(13)   administering the oath to the witness need not be

(14)   in the place of the deposition and the witness

(15)   shall be sworn in remotely by the court reporter

(16)   after confirming the witnesses identity, that

(17)   this videoconference will not be recorded in any

(18)   manner and that any recording without the express

(19)   written consent of all parties shall be

(20)   considered unauthorized, in violation of law, and

(21)   shall not be used for any purpose in this

(22)   litigation or otherwise.

(23)             IT IS FURTHER STIPULATED that exhibits

(24)   may be marked by the attorney presenting the

(25)   exhibit to the witness, and that a copy of any

(1)

(2)     exhibit presented to a witness shall be e-mailed

(3)     to or otherwise in possession of all counsel

(4)     prior to any questioning of a witness regarding

(5)     the exhibit in question. All parties shall bear

(6)     their own costs in the conduct of this deposition

(7)     by videoconference, notwithstanding the

(8)     obligation by CPLR to supply a copy of the

(9)     transcript to the deposed party by the taking

(10)    party in civil litigation matters.

(11)

(12)

(13)

(14)

(15)

(16)

(17)

(18)

(19)

(20)

(21)

(22)

(23)

(24)

(25)

(1)

(2)   B I L L   N I C H O L S O N ,

(3)        called as a witness, having been first duly

(4)        sworn by a Notary Public, was examined and

(5)        testified as follows:

(6)   EXAMINATION BY

(7)   **MR. GIARDINO:**

(8)        Q     Can you please state your full name

(9)   for the record?

(10)        **A     Bill Nicholson.**

(11)        Q     Can you please state your current work

(12)   address for the record?

(13)        **A     I work at 168 Centre Street, Danbers,**

(14)   **Massachusetts  01923.**

(15)        Q     Good morning, Mr. Nicholson. As you

(16)   know my name is John Giardino. I am here in the

(17)   conference room in my law firm offices in Midtown

(18)   Manhattan.  With me is my associate attorney Alex

(19)   Barnett-Howell and Lizer Jozefovic.

(20)        For the purposes of our examination

(21)   this morning do you prefer to be referred to or

(22)   addressed as Mr. Nicholson or Bill?

(23)        **A     Bill is fine.**

(24)        Q     Bill, I will ask you have you given

(25)   deposition testimony before?

                             B. Nicholson

(1)

(2)        **A**     **Yes.**

(3)        Q     So you know that I will be asking you

(4)   a series of questions and if you don't understand

(5)   my question please let me know that, I will

(6)   rephrase it in a way that hopefully we can come

(7)   to an understanding of what it is that I am

(8)   asking.

(9)             If you don't recall something that is

(10)  an absolutely acceptable answer and we will go

(11)  from there.

(12)            Have you ever given testimony in this

(13)  case before the White Plains versus HBL SNF?

(14)       **A**     **No.**

(15)       Q     In what other cases have you given

(16)  testimony?

(17)       **A**     **We had an office tenant matter within**

(18)  **the last year or so that I was deposed in.**

(19)       Q     Was that case venued in New York

(20)  State?

(21)       **A**     **No. It was not with White Plains**

(22)  **Healthcare.  It was with another company that I**

(23)  **was involved with.**

(24)       Q     Any other matters in which you have

(25)  given deposition testimony?

(1)                      B. Nicholson

(2)        **A      Not that I can recall.**

(3)        Q      This morning you're appearing, I am

(4)   just trying to confirm, you're actually appearing

(5)   on behalf of White Plains Healthcare Properties I

(6)   LLC; is that correct?

(7)        **A      Yes.**

(8)        Q      What is your relationship to that

(9)   entity?

(10)       **A      I am a Manager of White Plains**

(11)  **Healthcare Properties.**

(12)       Q      As we go through your testimony today

(13)  I will refer to that entity as White Plains.

(14)       **A      Fair enough.**

(15)       Q      If I use the name White Plains I am

(16)  referring to the entity.

(17)              If I am going to refer to the building

(18)  itself I will make it clear that I am referring

(19)  to the building.

(20)       **A      Fine.**

(21)       Q      So when you say you are a Manager of

(22)  that entity are you the only Manager?

(23)       **A      No, Fensterman and I are both**

(24)  **managers.**

(25)       Q      Is there an Operating Agreement that

(1)                         B. Nicholson

(2)    governs your management of that entity?

(3)         **A      Yes.**

(4)         Q      Do you have a copy of that Operating

(5)    Agreement?

(6)         **A      Not with me but it exists, yes.**

(7)         Q      By the way, the address that you gave

(8)    this morning as a business address is that

(9)    different than the Two Bourbon Street address?

(10)        **A      Correct. We moved about one year ago**

(11)   **approximately.**

(12)        Q      Are you familiar with the terms of the

(13)   Operating Agreement for the White Plains entity?

(14)        **A      I have not looked at them in a long**

(15)   **time so I am not intimately familiar with them**

(16)   **but I am generally familiar with them.**

(17)        Q      Does the White Plains entity hold

(18)   meetings for its members?

(19)        **A      No, Fensterman and I just speak as**

(20)   **needed.**

(21)        Q      How would you characterize that as

(22)   needed?  How frequently do you speak to members

(23)   of the LLC?

(24)        **A      I speak with Fensterman in the**

(25)   **ordinary course of business as required.**

(1)                         **B. Nicholson**

(2)         Q      So is it fair to say that there are

(3)    other individuals or entities that are members in

(4)    the White Plains entity?

(5)         **A      Yes.**

(6)         Q      Do you know any of those members?

(7)         **A      I can't recall the exact structure but**

(8)    **there is an investment -- there are investors**

(9)    **that are members either I believe through another**

(10)   **entity but I don't know. I don't know off hand.**

(11)        Q      My question was do you ever speak to

(12)   those individual investors directly you

(13)   personally?

(14)        **A      No.**

(15)        Q      Have you ever spoken with any of those

(16)   investors directly?

(17)        **A      Yes.**

(18)        Q      Which of those investors have you

(19)   spoken with?

(20)        **A      I spoke with Matthew Barbera and Paul**

(21)   **Barbera before a closing of the construction**

(22)   **loan.**

(23)        Q      Any other individuals?

(24)        **A      No.**

(25)        Q      Is that the only -- was that one

(1)                     B. Nicholson

(2)    occasion that you spoke to Matthew and Paul

(3)    Barbera?

(4)        **A      One or very few. Not regular.**

(5)        Q     Do you recall what the subject of that

(6)    conversation was?

(7)        **A      Simply apprising them of the status of**

(8)    **the construction loan and its closing.**

(9)        Q     Do you know if under the terms of the

(10)   Operating Agreement the Manager is authorized to

(11)   perform certain duties?

(12)       **A      I don't know off hand.**

(13)       Q     Do you know if any transactions by the

(14)   entity require the approval or consent of the

(15)   members?

(16)       **A      I couldn't recall those specifics, no.**

(17)       Q     If White Plains were to sell the

(18)   building, the nursing home building, do you know

(19)   if that would require the approval of the

(20)   members?

(21)       **A      Not without reviewing the document,**

(22)   **no.**

(23)       Q     Did you participate in the financing,

(24)   you mentioned the construction loan, did that

(25)   construction loan require the approval of the

(1)                       B. Nicholson

(2)      members?

(3)          **A       I don't recall.**

(4)          Q      Was your conversation with the

(5)      Barberas for the purposes of gaining their

(6)      approval for taking on the debt?

(7)          **A       No.**

(8)          Q      What is your relationship to the

(9)      Congress Companies?

(10)         **A       CEO.**

(11)         Q      CEO?

(12)         **A       Yes.**

(13)         Q      By that you mean Chief Executive

(14)     Officer?

(15)         **A       Correct.**

(16)         Q      Do you have any other relationship to

(17)     the Congress Construction company?

(18)         **A       Congress Companies is a group of**

(19)     **companies. It is simply a tradename. A banner**

(20)     **name.  It is not a legal entity.**

(21)         Q      So what companies are included in the

(22)     banner name The Congress Companies?

(23)         **A       There is no legal inclusions. It is**

(24)     **just a name.**

(25)         Q      So the name we are talking about is

(1)                         B. Nicholson

(2)    The Congress Companies; correct?

(3)        **A      I don't know. You're asking me so you**

(4)    **tell me what you're asking about.**

(5)        Q      Let me ask you this.

(6)               What does the name The Congress

(7)    Companies refer?

(8)        **A      We have a few entities that do**

(9)    **construction. Construction management and general**

(10)   **contracting and a property management company and**

(11)   **all of our people from time to time provide**

(12)   **management services for projects like White**

(13)   **Plains and other properties from time to time.**

(14)       Q      So what is the name of the entity that

(15)   provides construction management services?

(16)       **A      Congress Construction Corp.**

(17)       Q      What is your relationship to that

(18)   company?

(19)       **A      I am the CEO of it.**

(20)       Q      Do you have any ownership interest in

(21)   it?

(22)       **A      No.**

(23)       Q      Who is the owner of Congress

(24)   Construction Company?

(25)       **A      Charlene Nicholson.**

(1)                    **B. Nicholson**

(2)        Q      What is your relationship to Charlene?

(3)        **A      She is my wife.**

(4)        Q      Is Charlene the only owner of that

(5)   company?

(6)        **A      Yes.**

(7)        Q      Approximately what is the dollar

(8)   amount of contracts, construction management

(9)   contracts, that that company performs on an

(10)   annual basis?

(11)        **A      It varies.**

(12)        Q      Can you give me a range?

(13)        **A      Right now it has approximately $40**

(14)   **million of work in progress.**

(15)        Q      When you say $40 million is that the

(16)   total dollar amount of the contracts that

(17)   Congress is overseeing?

(18)        **A      Yes.**

(19)        Q      It manages those contracts for a fee?

(20)        **A      The method of contracting varies with**

(21)   **each project.**

(22)        Q      So could you describe typically how

(23)   Congress Construction is paid for its

(24)   construction management services?

(25)        **A      Depends on the contract entered into.**

(1)                      **B. Nicholson**

(2)        Q    Well for the $40 million of contracts

(3)    that are currently underway can you describe how

(4)    Congress is paid for that work?

(5)        **A    Yes, they're guaranteed maximum price**

(6)    **contracts under AIA A133 with costs plus a fee**

(7)    **with a guarantee maximum price, shared savings**

(8)    **provisions and monthly draws.**

(9)        Q    Is that $40 million one project or

(10)    more than one project?

(11)        **A    More than one.**

(12)        Q    How many projects are currently being

(13)    managed by Congress Construction?

(14)        **A    There is two in active construction**

(15)    **right now.**

(16)        Q    What is the name of the general

(17)    contracting company?

(18)        **A    Congress Building Corp.**

(19)        Q    Do you have a relationship with

(20)    Congress Building Corp?

(21)        **A    Yes, Congress Building Corp is owned**

(22)    **by a trust called Congress Construction Trust of**

(23)    **which I own a majority.**

(24)        Q    Who else owns that trust?

(25)        **A    Charlene owns a diminutus piece of the**

(1)                          **B. Nicholson**

(2)    **trust.**

(3)        Q      Are you the CEO of that company also?

(4)        **A      Yes.**

(5)        Q      Does that company obtain bonding from

(6)    a surety company?

(7)        **A      From time to time.**

(8)        Q      Is there a designated surety company

(9)    that provides bonding to that company?

(10)       **A      It depends who our agent places us**

(11)   **with.**

(12)       Q      How much work is Congress Building

(13)   Corporation currently have under contract?

(14)       **A      Congress Building Corp has a very**

(15)   **small amount, just very very small projects right**

(16)   **now. Less than $100,000.**

(17)       Q      What is the name of the property

(18)   management company?

(19)       **A      PCE Management.**

(20)       Q      Could you say that again?

(21)       **A      PCE Management.**

(22)       Q      PCE?

(23)       **A      Correct.**

(24)       Q      What does PCE stand for?

(25)       **A      They're the initials of my children,**

(1)                        **B. Nicholson**

(2)    **Peter, Kristina and Elita.**

(3)         Q     Is that a corporation?

(4)         **A     It is an LLC.**

(5)         Q     Are you the CEO of that LLC?

(6)         **A     No, Charlene runs the -- is the**

(7)    **Manager of the LLC.**

(8)         Q     Are you a member of that LLC?

(9)         **A     No.**

(10)        Q     Are your children members of that LLC?

(11)        **A     No.**

(12)        Q     Other than Charlene are there any

(13)   other members?

(14)        **A     No.**

(15)        Q     Are you able to say or estimate what

(16)   the annual revenues of that company are for

(17)   property management services?

(18)        **A     Not off hand not with specificity. I**

(19)   **could estimate approximately $75,000.**

(20)        Q     That would be annual revenues?

(21)        **A     Yes.**

(22)        Q     Yesterday Mr. Fensterman testified

(23)   that either he personally or an entity that he

(24)   formed loaned money to you for your entity; are

(25)   you familiar with those loans?

(1)                    B. Nicholson

(2)        A     Yes.

(3)        Q     Mr. Fensterman testified that there

(4)   were two separate loans; is that your

(5)   understanding?

(6)        A     I recall, I couldn't, I don't know

(7)   exactly how many loans Fensterman has made to me

(8)   over the years but he has made loans to entities

(9)   I have been related to affiliated with.

(10)       Q     So currently how much -- what is the

(11)  loan amount the aggregate loan amount that exists

(12)  between you and your entities and Mr. Fensterman

(13)  and his entities?

(14)             MR. DONNELLAN:   John, let me just

(15)             interject here.  Where are we really

(16)             going with this?  This deposition is

(17)             about White Plains Healthcare and HBL

(18)             SNF and we are now taking a half an

(19)             hour talking anything but White Plains

(20)             Healthcare.  These are his own family

(21)             companies.  If the loans have anything

(22)             to do with White Plains Healthcare I

(23)             think that is relevant but what loans

(24)             for other companies other family

(25)             companies that have nothing to do with

(1)                    B. Nicholson

(2)          either the parties in this case or

(3)          this case we are just kind of wasting

(4)          a lot of time and it's starting to get

(5)          to the point where it is asking for a

(6)          lot of personal and financial

(7)          information that is completely

(8)          unrelated to this case.

(9)          MR. GIARDINO:  I appreciate that. I

(10)         think you can observe that if it is an

(11)         area that is not related to this I

(12)         have moved on Al but I am certainly

(13)         entitled to find out what is going on

(14)         between these parties who were all

(15)         principals in the transactions that is

(16)         the subject of this lawsuit.  I am not

(17)         trying to find out anything beyond

(18)         that.  So I am trying to establish

(19)         relationships here and I will get to

(20)         whether or not these loans benefited

(21)         or were involved in White Plains.  So

(22)         I think I am actually entitled to

(23)         develop his background.

(24)         MR. DONNELLAN:   I don't think so but

(25)         I will let you go to some point but at

(1)                        **B. Nicholson**

(2)              **some point it gets ridiculous. Let's**

(3)              **keep on going.  I don't want to waste**

(4)              **time.**

(5)       Q      In the interest of saving time, Bill,

(6)   Mr. Fensterman testified that there are two loans

(7)   outstanding, a $2 million loan and a $500,000

(8)   loan; is that consistent with your understanding?

(9)              **MR. DONNELLAN:    Objection to the form**

(10)             **of the question. I don't think Howard**

(11)             **testified that the loans were**

(12)             **outstanding. I don't recall that. I**

(13)             **recall him saying that the loans were**

(14)             **made and that payments were made in**

(15)             **accordance with the terms of those**

(16)             **agreements. I don't recall ever**

(17)             **getting to whether or not the loans**

(18)             **have been repaid or not.**

(19)      Q      What is your understanding, Bill?

(20)      **A      Can you repeat the question please.**

(21)      Q      Mr. Fensterman identified two loans. A

(22)   $500,000 loan and a $2 million loan.

(23)             Are you familiar with either one of

(24)   those loans in those amounts?

(25)      **A      No, no, I don't without some**

(1)                        **B. Nicholson**

(2)    **additional specificity I couldn't comment.**

(3)        Q      Let me ask the question this way.

(4)               Do you personally owe any money to Mr.

(5)    Fensterman?

(6)        **A      I don't owe any money personally to**

(7)    **Mr. Fensterman, no.**

(8)        Q      Do you owe any money to an entity in

(9)    which Mr. Fensterman is a principal or member?

(10)       **A      Yes.**

(11)       Q      What is the name of that entity?

(12)       **A      I don't recall the name of the special**

(13)   **purpose entity that Howard created for the loan**

(14)   **that is currently outstanding.**

(15)       Q      What is the amount of the loan that is

(16)   currently outstanding?

(17)       **A      $500,000.**

(18)       Q      When was that loan made?

(19)       **A      I don't remember.**

(20)       Q      Do you have any estimate a year in

(21)   which it was made?

(22)       **A      No, I don't. I would just be**

(23)   **speculating.  I am sorry.**

(24)       Q      Do you know if it was before the

(25)   commencement of construction of the White Plains

(1)                    B. Nicholson

(2)    project?

(3)        **A      I don't know.**

(4)        Q      Is there a loan agreement or a note

(5)    evidencing the borrowing of $500,000?

(6)        **A      I don't know. I would have to speak to**

(7)    **my CFO. I don't remember.**

(8)        Q      Are you familiar with the loan in the

(9)    amount of $2 million?

(10)        **A      From Fensterman to me?**

(11)        Q      Yes.

(12)        **A      No.**

(13)        Q      How about a $2 million loan from

(14)    Fensterman to any of your companies?

(15)        **A      Without specificity I couldn't**

(16)    **comment.  I am sorry.**

(17)        Q      What type of specificity would you

(18)    need?

(19)        **A      I really don't know of a $2 million**

(20)    **loan.**

(21)        Q      At any point in time during the

(22)    development of the White Plains project did you

(23)    or one of your companies owe Mr. Fensterman $2

(24)    million?

(25)        **A      Can you bracket the development of the**

(1)                          **B. Nicholson**

(2)    **White Plains project with dates so I can address**

(3)    **that question with proper specificity.**

(4)         Q      Let's put it this way.

(5)                When did you first become involved in

(6)    the White Plains project?

(7)         **A      Late 2009, early 2010.**

(8)         Q      So from late 2009 or 2010 until the

(9)    present have you or any of your companies owed

(10)   Mr. Fensterman the sum of $2 million?

(11)        **A      I don't believe so.**

(12)        Q      Do you or any of your companies owe an

(13)   entity formed by Mr. Fensterman the sum of $2

(14)   million?

(15)        **A      During what period?**

(16)        Q      The same period 2009 to present?

(17)        **A      I don't believe so.**

(18)        Q      Did you or any of your entities during

(19)   this same period of time owe Mr. Fensterman an

(20)   amount in addition to the $500,000 that you

(21)   described?

(22)        **A      I don't believe so.**

(23)        Q      So it would be fair to say that your

(24)   testimony is that the amount of money that Mr.

(25)   Fensterman or the entity that he formed loaned to

(1)                       B. Nicholson

(2)   you was $500,000?

(3)        **A        That is my recollection.**

(4)        Q      Do you recall what the purpose of that

(5)   loan was?

(6)        **A        No.**

(7)        Q      By the way, are there any other

(8)   companies that fall under The Congress Companies

(9)   banner other than the three that you have

(10)  identified?

(11)       **A        I don't know how to answer that**

(12)  **question because The Congress Companies is simply**

(13)  **a trade name to identify us. So I am not quite**

(14)  **sure I understand the question.**

(15)       Q      I am trying to work with the words

(16)  that you used which is banner. So now let's say

(17)  trade name.

(18)             You have identified Construction

(19)  Management, the general contracting and the

(20)  property management companies as falling under

(21)  the trade name The Congress Companies.

(22)             Are there any other businesses that

(23)  fall under that trade name?

(24)       **A        I don't know how to answer the**

(25)  **question because I don't know how to define**

(1)                          B. Nicholson

(2)    falling under a trade name. What falling under a

(3)    trade name. I don't understand the question.

(4)        Q      Are there any other companies that you

(5)    personally are involved with?

(6)        A      Yes.

(7)        Q      What are they?

(8)        A      I have an interest in Forest Manor

(9)    Nursing Home in Hope, New Jersey at this time.  I

(10)   assume your question refers to at this time

(11)   because I have been in and out of businesses over

(12)   the course of years.

(13)       Q      At this moment?

(14)       A      I have an interest in White Plains, I

(15)   have an interest in Forest Manor Nursing Home. I

(16)   have an interest in nursing home in Milwaukee

(17)   that was closed. And that is it right now beyond

(18)   the other entities that I previously referred to.

(19)       Q      What was the name of the nursing home

(20)   in Milwaukee?

(21)       A      Wellspring.

(22)       Q      Which of The Congress Companies

(23)   entered into a contract for the development and

(24)   construction of the White Plains nursing home?

(25)       A      Congress Construction Corp held a

(1)                          **B. Nicholson**

(2)     **contract between White Plains Healthcare and**

(3)     **itself for the development services.**

(4)              **Congress Building Corp entered into a**

(5)     **joint venture with Consigli of New York for the**

(6)     **general contracting services.**

(7)          Q    Congress Construction Corp provided

(8)     construction management services for the project?

(9)          **A    No, Congress Construction Corp was**

(10)    **held a contract for development services to**

(11)    **actually do the task and activities of the**

(12)    **developer for a fee.**

(13)         Q    Congress Building Corp held what

(14)    contract?

(15)         **A    Congress Building Corp entered into a**

(16)    **joint venture with Consigli Construction of New**

(17)    **York to be the General Contractor for the**

(18)    **project.**

(19)         Q    Was there a formal Joint Venture

(20)    Agreement?

(21)         **A    Yes.**

(22)         Q    What was Congress Building

(23)    Corporation's role in that joint venture?

(24)         **A    It was the controlling venture of the**

(25)    **joint venture and Consigli shared responsibility**

(1)                            **B. Nicholson**

(2)    **for providing personnel to the project. It being**

(3)    **Congress Building Corp.**

(4)         Q      Did Congress Building Corp enter into

(5)    subcontract on that project?

(6)         **A      All of the subcontracts were entered**

(7)    **into by the joint venture.**

(8)         Q      Did the joint venture provide bonding

(9)    for the project?

(10)        **A      No.**

(11)        Q      Did the joint venture attempt to

(12)   secure bonding for the project?

(13)        **A      No.**

(14)        Q      Who on behalf of the joint venture was

(15)   responsible for maintaining all of the cost

(16)   reporting and cost reporting documents?

(17)        **A      Consigli accounting department did**

(18)   **that.**

(19)        Q      You mentioned Forest Manor Nursing

(20)   Home in Hope, New Jersey.

(21)             What is the nature of your

(22)   relationship to that business?

(23)        **A      I hold 50 percent beneficial interest**

(24)   **in the real estate and 50 percent beneficial**

(25)   **interest in the operating entity.**

(1)                          **B. Nicholson**

(2)        Q     Who holds the license to operate that

(3)   facility?

(4)        **A     The operating entity which I don't**

(5)   **remember the exact name of.**

(6)        Q     What is your role in the operating

(7)   entity?

(8)        **A     I don't understand the question.**

(9)        Q     Well you're 50 percent owner of the

(10)  operating entity; correct?

(11)       **A     Yes.**

(12)       Q     Do you have any role in the management

(13)  of the operating entity?

(14)       **A     The property -- the operating entity**

(15)  **that holds the license has entered into a**

(16)  **management contract with a management firm which**

(17)  **is owned and controlled by Zev Farkas.  The**

(18)  **management company does the day-to-day management**

(19)  **of the company.**

(20)       Q     So what do you actually do in

(21)  connection with your involvement in the operation

(22)  of management contract?

(23)       **A     I look at the facility and manage it**

(24)  **at a very high executive level with Zev who is**

(25)  **the other 50 percent partner in the operating**

(1)                          B. Nicholson

(2)    entity. Zev's company manages.  It we make

(3)    decisions jointly.

(4)        Q     Was the Forest Manor Nursing Home a

(5)    project that was developed by you?

(6)        A     Yes.

(7)        Q     So was that a ground up construction

(8)    project?

(9)        A     It was an existing 10,000 square foot

(10)   building to which we added approximately 60,000

(11)   square feet. The 60,000 foot addition effectively

(12)   is the entire nursing home and the 10,000 feet of

(13)   existing building is supplemental/ancillary space

(14)   so it's effectively a ground up.

(15)       Q     Did one of The Congress Companies

(16)   either perform the construction or construction

(17)   management for that project?

(18)       A     Yes.

(19)       Q     When was that project?

(20)       A     I believe it was completed in 2008.

(21)       Q     So was that before you became involved

(22)   in the White Plains project?

(23)       A     Yes.

(24)       Q     You mentioned a facility by the name

(25)   of Wellspring in Milwaukee?

(1)                    B. Nicholson

(2)        **A**     Yes.

(3)        Q     Do you still have an interest in that

(4)  facility?

(5)        **A     The nursing operations are closed.   I**

(6)  **have an interest in the real estate.**

(7)        Q     Did you have an interest in the

(8)  operations while they were operating?

(9)        **A**     Yes.

(10)        Q     What was the name of the operating

(11)  company?

(12)        **A     Milwaukee Healthcare.**

(13)        Q     When did that entity cease its

(14)  operations?

(15)        **A     I don't recall a specific date.**

(16)        Q     Do you have an approximate year?

(17)        **A     I would have to refer to records.**

(18)        Q     Did that entity become involved in

(19)  litigation at any point in time?

(20)        **A     Yes.**

(21)        Q     What was the nature of the litigation?

(22)        **A     There was a brain trauma company that**

(23)  **was working with Milwaukee Healthcare under its**

(24)  **license. There were issues surrounding the**

(25)  **accounts receivable, accounts receivable**

(1)                      B. Nicholson

(2)    revolving line of credit. The facility was not

(3)    doing good, the brain injury was not doing good

(4)    and there was litigation surrounding that.

(5)         Q    Was that one litigation or more than

(6)    one litigation?

(7)         A    I think it was one litigation.

(8)         Q    Who brought that litigation against

(9)    the entity?

(10)        A    An entity called Milwaukee Center for

(11)   MCFI, Milwaukee Center For Independence who owned

(12)   the brain trauma entity.

(13)        Q    Were you individually a defendant in

(14)   that action?

(15)        A    Yes.

(16)        Q    What was the outcome of that

(17)   litigation?

(18)        A    It was adverse to me and adverse to

(19)   Milwaukee Healthcare.

(20)        Q    When you say adverse are you

(21)   indicating that some verdict or judgment was

(22)   entered against you?

(23)        A    Yes.

(24)        Q    When was that?

(25)        A    I couldn't tell you the date without

(1)                         B. Nicholson

(2)   documents.

(3)        Q     Do you know the amount of the

(4)   judgment?

(5)        **A     The judgment was $2.5 million**

(6)   **approximately.**

(7)        Q     Has that judgment been satisfied?

(8)        **A     Yes.**

(9)        Q     When was that judgment satisfied?

(10)       **A     Approximately I would be speculating**

(11)  **to tell you. I don't have a specific date.**

(12)       Q     Do you know if its been in the last

(13)  year?

(14)       **A     No, it was prior to the last year.**

(15)       Q     The last two years?

(16)       **A     I would be guessing at that point.**

(17)       Q     Do you have any documents that would

(18)  evidence when that judgment was satisfied?

(19)       **A     Yes, the document exists, yes.**

(20)       Q     Do you have those in your business

(21)  records?

(22)       **A     Yes.**

(23)       Q     Are you familiar with a company by the

(24)  name of CNH?

(25)       **A     Yes.**

(1)                        B. Nicholson

(2)        Q      Who is CNH?

(3)        A      **CNH is accounts receivable lender to**

(4)    **the nursing home industry.**

(5)        Q      Did you have a lending or a borrowing

(6)    relationship with CNH when you were operating

(7)    Wellspring?

(8)        A      **Yes, CNH or one of its affiliates.**

(9)        Q      Was CNH involved in the litigation

(10)   involving the accounts receivable at Wellspring?

(11)       A      **I don't recall whether or not CNH was**

(12)   **a party but CNH was providing the accounts**

(13)   **receivable funding in that matter, yes.**

(14)       Q      Was CNH paid off on its loans?

(15)       A      **Yes.**

(16)       Q      Were there allegations in that lawsuit

(17)   of financial improprieties?

(18)       A      **I don't really understand what your**

(19)   **question means, John.**

(20)       Q      Were there allegations in that lawsuit

(21)   about the diversion of accounts receivable?

(22)       A      **Yes, there were complex matters**

(23)   **surrounding the flow of cash through DACA**

(24)   **accounts or accounts receivable cash management**

(25)   **accounts that were technically frankly beyond my**

(1)                          B. Nicholson

(2)  expertise and when we settled the case the case

(3)  was mishandled by counsel we had out there and

(4)  when we settled the case my attorneys ENL

(5)  participated heavily in the settlement.

(6)       Q    How were you first introduced to the

(7)  White Plains project?

(8)       A    Mark Zafrin introduced me to Lizer

(9)  Jozefovic and the project.

(10)      Q    How did you know Mr. Zafrin?

(11)      A    I knew Zafrin through -- Zafrin

(12) represented a nursing home operator that we built

(13) a building for in New Jersey Royal Suites Nursing

(14) Home and so Zafrin and I were working together on

(15) that project, him on behalf of his client, which

(16) we built and I met him that way.

(17)      Q    Did he represent you as counsel?

(18)      A    On a very few select matters unrelated

(19) to White Plains.

(20)      Q    Did he represent you as counsel on the

(21) project that you just described in New Jersey?

(22)      A    No.

(23)      Q    So on what matters did Mr. Zafrin

(24) represent you?

(25)      A    Zafrin represented me with respect to

(1)                        **B. Nicholson**

(2)  **a proposed nursing home in New Jersey which did**

(3)  **not go forward and he was involved in a**

(4)  **negotiation or mediation of sorts with the party**

(5)  **that sold us the license of the CON.**

(6)        Q     Do you recall the name of that

(7)  project?

(8)        **A     No, I don't recall the name of it.**

(9)        Q     So did you form an entity to acquire

(10) that license?

(11)       **A     Don't remember.**

(12)       Q     Was that for the acquisition of an

(13) existing facility or for the development of a new

(14) facility?

(15)       **A     Development of a new facility which**

(16) **did not occur.**

(17)       Q     Other than the instances where Mr.

(18) Zafrin represented you as counsel did you form a

(19) personal relationship with Mr. Zafrin?

(20)       **A     I grew to know Mark, yes, over the**

(21) **years for sure.**

(22)       Q     How would you describe your personal

(23) relationship with Mr. Zafrin?

(24)       **A     We were business friends.**

(25)       Q     That relationship began in 2008?

(1)                    B. Nicholson

(2)        **A      No, prior to that. It initiated**

(3)    **earlier than 2008. In the early 2000s it**

(4)    **initiated concurring with the pre construction**

(5)    **and construction of the project in South Jersey**

(6)    **the Royal Suites project.**

(7)        Q      Do you recall when did Mr. Zafrin

(8)    introduced you to Lizer Jozefovic?

(9)        **A      Around 2009.**

(10)       Q      Did Mr. Zafrin indicate to you what

(11)   the purpose of such an introduction was?

(12)       **A      Yes.**

(13)       Q      What did he indicate to you?

(14)       **A      For the subject project.**

(15)       Q      Meaning White Plains?

(16)       **A      What eventually became White Plains,**

(17)   **yes.**

(18)       Q      How did Mr. Zafrin describe the

(19)   opportunity to you?

(20)       **A      I don't recall. I don't recall the**

(21)   **specifics of the introduction.**

(22)       Q      What was your understanding as to Mr.

(23)   Jozefovic's relationship to the project when Mr.

(24)   Zafrin introduced you?

(25)       **A      I had no specific understanding other**

                        **B. Nicholson**

(1)

(2)     **than that Lizer would operate it.**

(3)          Q      Did you discuss with Lizer his role in

(4)     operating the facility to be developed?

(5)          **A      I don't recall a specific discussion.**

(6)          Q      From the time that you met Mr.

(7)     Jozefovic how frequently did you speak with him

(8)     about the development of the project?

(9)          **A      I can't answer that question over a**

(10)    **ten year span it varied.**

(11)         Q      Well this early stage when Mr. Zafrin

(12)    first introduced you what was the status of the

(13)    project when you were introduced to it?

(14)         **A      What was the status?  The question is**

(15)    **broad. Could you -- I don't know how to answer**

(16)    **it.**

(17)         Q      Well was it an idea, did someone have

(18)    a license, was there a location, what was the

(19)    status?

(20)         **A      It was really an idea to pursue a sale**

(21)    **of beds being sold by a facility in Westchester**

(22)    **was the initial discussion.**

(23)         Q      Were you aware that there was an RFP

(24)    issued for the sale of those beds?

(25)         **A      I was aware of that, yes.**

**B. Nicholson**

(2)    Q    Did you receive a copy of that Request

(3) For Proposal?

(4)    **A**    **I saw that RFP, yes.**

(5)    Q    Did you participate in the response to

(6) that RFP?

(7)    **A**    **I discussed the response with Zafrin**

(8) **and Jozefovic, yes.**

(9)    Q    Do you recall the discussions that you

(10) had with either Mr. Zafrin or Mr. Jozefovic?

(11)    **A**    **Not specifically, no.**

(12)    Q    What was your role in responding to

(13) that RFP?

(14)    **A**    **I don't think there was a specific**

(15) **role.**

(16)    Q    Were you putting up the money to

(17) purchase the beds that were the subject of that

(18) RFP?

(19)    **A**    **No, I was not going to personally put**

(20) **up the money, no.**

(21)    Q    Were you going to participate in the

(22) purchase or entity that if successful would

(23) acquire those beds?

(24)    **A**    **The contemplation was that I would**

(25) **participate in the entity that would develop the**

(1)                          **B. Nicholson**

(2)    **project.**

(3)        Q        You would participate together with

(4)    Mr. Zafrin and Mr. Jozefovic; is that correct?

(5)        **A        No, I don't know how to answer that**

(6)    **question. Participate in what?  I don't**

(7)    **understand the question.**

(8)        Q        Well you said that you were to be a

(9)    participant in the development; correct?

(10)       **A        That is what I said, yes.**

(11)       Q        So who were the other participants in

(12)   the development?

(13)       **A        It had not been determined when the**

(14)   **project was initially delivered to me.**

(15)       Q        Was it your understanding Mr.

(16)   Jozefovic would be a participant in the

(17)   development?

(18)       **A        I don't remember. I don't remember the**

(19)   **discussions specifically.**

(20)       Q        Did you understand that it was Mr.

(21)   Jozefovic who was actually acquiring the beds?

(22)       **A        Yes.**

(23)       Q        If he were successful and he held the

(24)   beds would you expect that he would participate

(25)   in the development?

(1)                      B. Nicholson

(2)        **A**      **I don't recall any such expectation.**

(3)              **MR. DONNELLAN:    Objection to the**

(4)              **question.**

(5)        Q      Do you know did you review the

(6)    proposal that Mr. Jozefovic submitted to acquire

(7)    the beds?

(8)        **A**      **I remember looking at it, yes.**

(9)        Q      Did you consult with Mr. Jozefovic

(10)   about the dollar amount of that proposal?

(11)       **A**      **I don't recall. I don't recall**

(12)   **specifically, John.**

(13)       Q      Do you recall if Mr. Jozefovic was

(14)   successful there?

(15)       **A**      **Yes, I recall that Lizer was the**

(16)   **successful bidder for those Westchester beds,**

(17)   **yes.**

(18)       Q      Do you recall when that was?

(19)       **A**      **No.**

(20)       Q      After Mr. Jozefovic became the

(21)   successful bidder what discussions did you have

(22)   about the development of the project?

(23)       **A**      **I don't recall the specific**

(24)   **discussions.**

(25)       Q      Did you know if materials were being

(1)                          B. Nicholson

(2)    prepared to submit to the Department of Health?

(3)         **A      When are you referring to?**

(4)         Q      At the time of the RFP and the award

(5)    of the beds?

(6)         **A      The question is so broad. I just don't**

(7)    **remember. I don't remember particular sequences**

(8)    **of events now. It was ten years ago.  I am sorry.**

(9)         Q      When did you meet Mr. Fensterman?

(10)        **A      Concurrent with right around the time**

(11)   **I met Mr. Zafrin approximately in connection**

(12)   **early 2000.**

(13)        Q      Did you know Mr. Fensterman before you

(14)   met Mr. Jozefovic?

(15)        **A      Yes.**

(16)        Q      Did you consult with Mr. -- well did

(17)   Mr. Fensterman ever act as your counsel?

(18)        **A      I don't understand the question. The**

(19)   **firm -- the question I answered previously, the**

(20)   **firm only represented us on one or two select**

(21)   **matters but Fensterman was not the active**

(22)   **attorney.**

(23)        Q      So that was a period of time when Mr.

(24)   Zafrin was a member of Mr. Fensterman's law firm;

(25)   is that fair?

(1)                      B. Nicholson

(2)          **A      When I was introduced to Fensterman.**

(3)          Q      When the legal services were provided

(4)    to you that was Mr. Zafrin was the attorney that

(5)    you consulted and he was a member of the

(6)    Fensterman firm; is that fair?

(7)          **A      Yes, in fact there were two matters,**

(8)    **allow me to supplement my response please. There**

(9)    **was the matter of this particular license that we**

(10)   **were involved with a New Jersey and there was**

(11)   **another matter an abandoned project in Brooklyn**

(12)   **that was abandoned and someone in Fensterman's**

(13)   **firm I don't remember who it was handled a lien**

(14)   **and a collection matter for me for my companies.**

(15)         Q      Did you ever discuss the RFP for the

(16)   Westchester beds with Mr. Fensterman?

(17)         **A      I don't remember.**

(18)         Q      Do you recall the first time you spoke

(19)   to Mr. Fensterman about the White Plains project?

(20)         **A      No.**

(21)         Q      We can agree that Mr. Fensterman

(22)   became involved in the White Plains project; is

(23)   that fair?

(24)         **A      It is true that Fensterman became**

(25)   **involved in the White Plains project, that is**

(1)                    **B. Nicholson**

(2) true.

(3)      Q      To your knowledge what was his role in

(4) the White Plains project?

(5)      **A      I am not sure I can answer the**

(6) **question. The project spanned ten years.  I don't**

(7) **understand the question.**

(8)      Q      Was Mr. Fensterman involved in the

(9) project before it was approved by the Department

(10) of Health?

(11)      **A      Define approval from the Department of**

(12) **Health please.**

(13)      Q      In order to develop this project and

(14) to construct this building was it necessary to

(15) obtain approval from the New York State

(16) Department of Health?

(17)      **A      Yes, there were a series of approvals.**

(18) **That is correct.**

(19)      Q      Did you participate in any

(20) applications to gain those approvals?

(21)      **A      I did.**

(22)      Q      What was your role in the preparation

(23) and submission of those applications to gain

(24) those approvals?

(25)      **A      We costed the project out initially**

(1)                         B. Nicholson

(2)    back in 2009, 2010 era.

(3)        Q    When you say we who are you referring

(4)    to?

(5)        A    I don't really remember. I was

(6)    involved personally in it but as far as on behalf

(7)    of what entity I can't speak to when each entity

(8)    was formed. I can't recall that sequence, John.

(9)        Q    Let's not worry about the entity.

(10)             You were involved in costing out the

(11)    project.

(12)             Was Mr. Jozefovic involved in costing

(13)    out the project?

(14)        A    Most of that information costing out

(15)    the project we interfaced with Zafrin and with

(16)    Pinnacle, Bob Shapiro and Andrew Blatt of

(17)    Pinnacle.  Those were our primary interfaces but

(18)    certainly Mr. Jozefovic was involved to a degree.

(19)        Q    When you say we who are you referring

(20)    to?

(21)        A    Me and my companies and my people my

(22)    staff.

(23)        Q    Who is Pinnacle?

(24)        A    Pinnacle is HBL's the tenants CON

(25)    consultant.

(1)                         **B. Nicholson**

(2)        Q       CON meaning Certificate of Need?

(3)        **A       Yes.**

(4)        Q       Who did you work with at Pinnacle?

(5)        **A       Andrew Blatt and Bob Shapiro.**

(6)        Q       What information or what services did

(7)    they contribute to the effort to gain the

(8)    approval from the Department of Health?

(9)        **A       It is a very broad question. They did**

(10)    **the interface with the Department of Health and**

(11)    **they directed the team in any submissions to the**

(12)    **Department of Health.**

(13)        Q       Did they have any role in the design

(14)    of the project?

(15)        **A       The only role that I recall them**

(16)    **playing was that they really more Andrew Blatt**

(17)    **but Pinnacle interfaced with the Department of**

(18)    **Health more as a consultant and expeditor in**

(19)    **delivering designs, obtaining information and**

(20)    **feedback back from the Department of Health,**

(21)    **comments, during the design process.**

(22)                **To say they participated in the design**

(23)    **I don't think would be accurate.**

(24)        Q       Fair enough. So who participated in

(25)    the design?

                        B. Nicholson

(1)

(2)        **A      A number of people.**

(3)        Q     Who are they?

(4)        **A      Construction Manager employed by my**

(5)    **company by the name of Mark Joudrey, a**

(6)    **Construction Manager in our firm by the name of**

(7)    **Steven King, Construction Manager in our firm at**

(8)    **the time Peter Nicholson my son, the**

(9)    **architectural team primarily Gary Kane from the**

(10)   **architectural team and other architects working**

(11)   **under him, Lizer, a number of Lizer's people in**

(12)   **various roles having input into the design, the**

(13)   **design being a collaborative project.  Those are**

(14)   **primarily the people although they may not be**

(15)   **exclusively the people.**

(16)       Q     Were the people associated with your

(17)   company participating in this team for the

(18)   purpose of providing cost information?

(19)       **A      Not limited to cost information but,**

(20)   **yes, they were providing cost information.**

(21)       Q     I am not trying to limit. I am asking

(22)   if they were providing the cost information?

(23)       **A      Yes, they were.**

(24)       Q     What other information did your

(25)   members of the team provide?

B. Nicholson

(2)     **A      Our team was involved in matters of**

(3)   **construct-ability, purchasing, site logistics,**

(4)   **site layout.  We routinely collaborate with**

(5)   **architects on design elements, concepts,**

(6)   **programatic matters.  So that would be -- those**

(7)   **are the general topics that we participated in.**

(8)        Q      Did there come a point in time when

(9)    you arrived at the conclusion that there were not

(10)   enough beds to make the project cost feasible?

(11)       **A      There was discussion when the initial**

(12)   **RFP came out which for the facility which Lizer**

(13)   **was a successful bidder that was approximately 90**

(14)   **beds and there were discussions at that time**

(15)   **about the overall economic feasibility of a 90**

(16)   **bed facility both from a construction and**

(17)   **operations perspective.**

(18)             **I recall generally that there were**

(19)   **conversations in that regard, yes.**

(20)       Q      Did you ever form the opinion that 90

(21)   beds were insufficient or an insufficient number

(22)   of beds to cause a new build project to be cost

(23)   effective?

(24)       **A      I opined that 90 beds was a small**

(25)   **number of beds and the fewer beds that were**

(1)                          **B. Nicholson**

(2)     **constructed the more costly per bed the project**

(3)     **would be, yes.**

(4)          Q     So was it your recommendation that

(5)     this project cost effective that they seek

(6)     authority to add additional beds?

(7)          **A     There were discussions in that period**

(8)     **surrounding our general perspective and**

(9)     **recommendations that the more beds we could build**

(10)    **within reason naturally the more effective the**

(11)    **cost per bed would be.**

(12)         Q     I didn't mean to cut you off.

(13)         **A     I was done. I beg your pardon.**

(14)         Q     So then did you become aware of the

(15)    effort to acquire additional beds for the White

(16)    Plains project?

(17)         **A     Yes, I became aware of efforts to**

(18)    **acquire additional beds, yes.**

(19)         Q     Were you involved in the effort to

(20)    acquire additional beds?

(21)         **A     Not directly.**

(22)         Q     Do you know who took on the

(23)    responsibility of acquiring those additional

(24)    beds?

(25)         **A     Generally Lizer and Zafrin were the**

(1)                            B. Nicholson

(2)     **individuals that were leading that bidding that**

(3)     **effort.**

(4)          Q     Do you know if ultimately they were

(5)     successful in acquiring additional beds?

(6)          **A     Yes.**

(7)          Q     How did that come about to your

(8)     understanding?

(9)          **A     I don't remember the specifics. I know**

(10)    **that the -- I don't remember the specifics of how**

(11)    **that came about.  I am sorry.**

(12)         Q     Did you ever have any direct contact

(13)    with anyone from the department -- so let me

(14)    withdraw that.

(15)              Earlier you mentioned CON. Are you

(16)    referring to Certificate of Need; correct?

(17)         **A     Correct.**

(18)         Q     Is the Certificate of Need the

(19)    approval from the Department of Health that was

(20)    necessary before you could begin building this

(21)    project?

(22)         **A     It was one of the approvals, yes.**

(23)         Q     Did you have any direct contact with

(24)    anybody at the Department of Health in relation

(25)    to the application for the Certificate of Need?

B. Nicholson

(1)

(2)     A     I don't recall. I know that I attended

(3)   a select few meetings at the Department of Health

(4)   but I don't recall the specifics of them or I

(5)   don't recall the specific or when they were, no.

(6)     Q     When you attended those meetings who

(7)   else from the White Plains team attended those

(8)   meetings?

(9)     A     I would be speculating. I don't

(10)  remember. I don't remember the exact meetings and

(11)  I don't remember the exact participants.  I am

(12)  sorry.

(13)    Q     Do you know if there were occasions in

(14)  which Mr. Jozefovic attended?

(15)    A     I just don't recall. I am sorry. I

(16)  don't recall specifically.

(17)    Q     How about Mr. Zafrin, do you recall

(18)  him being in attendance of any of those meetings?

(19)    A     I would be speculating to say yes. I

(20)  just don't recall.  I am sorry.

(21)    Q     Can you describe for me what were the

(22)  development services that Congress Construction

(23)  were providing to this project?

(24)    A     I would describe them at a hygiene

(25)  level, yes.

B. Nicholson

(1)

(2)     Q     Yes, please.

(3)     **A     We were involved in the acquisition of**

(4)  **the site, we were involved in the what we were**

(5)  **involved with all municipal approval zoning and**

(6)  **related approvals. We were involved with the**

(7)  **acquisition of the architects and the engineers**

(8)  **managing them.  We were involved with the**

(9)  **costing. We kept the cost records and related**

(10) **financial matters. We managed all of the**

(11) **administration, the document control that kind of**

(12) **thing. And we managed the acquisition of the**

(13) **construction loan, got the acquisition of getting**

(14) **the construction loan I should say.**

(15)          **(Short break:  11:17 to 11:32)**

(16)     Q     Bill, with respect to the work that

(17) you did on selecting a site for White Plains who

(18) did you work with to identify a site?

(19)     **A     I don't recall the specifics. I just**

(20) **don't recall the specific. I just don't recall**

(21) **the specifics.  I am sorry.**

(22)     Q     Do you recall if you actually traveled

(23) with Lizer to evaluate certain sites?

(24)     **A     I don't recall. I don't recall.**

(25)     Q     Do you recall how the site in which

(1)                        B. Nicholson

(2)   the project was ultimately built was selected?

(3)        **A      I don't. I am sorry.**

(4)        Q      Do you recall if Lizer was involved in

(5)   the decision to acquire that site?

(6)        **A      Yes, I know there were conversations**

(7)   **with Lizer before we decided to acquire the site,**

(8)   **yes.**

(9)        Q      You mentioned that the construction

(10)  company had responsibility for the administration

(11)  of the project.

(12)           Is that different and apart from the

(13)  administration of the construction itself?

(14)       **A      I don't recall saying that we had -- I**

(15)  **guess I am not sure what testimony I gave that**

(16)  **you're referring to, John.**

(17)       Q      As part of the development services

(18)  was there the administration or any oversight of

(19)  the construction project?

(20)       **A      Yes.**

(21)       Q      Would it be fair to say that Congress

(22)  Construction acted as the owner's representative

(23)  for the construction project?

(24)       **A      That was one of the rules that we**

(25)  **received, yes.**

<center>**B. Nicholson**</center>

(1)

(2)     Q      Are you familiar with any transactions

(3)  in 2015 in which Lizer advanced monies to the

(4)  project?

(5)     **A      I recall that there were such**

(6)  **contractions, yes.**

(7)     Q      Do you recall what the amount of those

(8)  transactions were?

(9)     **A      Without looking at documents I**

(10)  **couldn't testify to specificity.**

(11)     Q      Do you know how those transactions

(12)  came about?

(13)     **A      I don't remember without looking at**

(14)  **documents I couldn't respond to your question.**

(15)     Q      That is fine.

(16)            Were there discussions that in order

(17)  to move forward the project needed money?

(18)     **A      I don't recall specific discussions.**

(19)     Q      So at that point in time in 2015 was

(20)  Congress Construction Company involved for

(21)  development services purposes?

(22)     **A      Yes.**

(23)     Q      Was Congress Construction responsible

(24)  for directing payments for the purposes of moving

(25)  the project forward?

(1)                        B. Nicholson

(2)        **A      Yes.**

(3)        Q      And so it is obvious that a well

(4)   addressed issue in this litigation that in 2015

(5)   Lizer put up $2.2 million; are you familiar with

(6)   that?

(7)               **MR. DONNELLAN:   Objection to the form**

(8)               **of the question.**

(9)        **A      I recall the transaction broadly, yes.**

(10)       Q      When Lizer put up $2.2 million in 2015

(11)  do you know how those $2.2 million were spent on

(12)  behalf of the project?

(13)       **A      I couldn't answer that without**

(14)  **referring to documents, John.**

(15)       Q      Are you familiar with the claim that

(16)  $1.5 million of those dollars were to be for the

(17)  purposes of acquiring furniture, fixtures and

(18)  equipment?

(19)       **A      I don't recall that to be specific the**

(20)  **case, no.**

(21)       Q      You filed affidavits in this

(22)  litigation; have you not?

(23)       **A      I have.**

(24)       Q      In the course of completing sworn

(25)  statements have you reviewed the allegations in

(1)                       B. Nicholson

(2)   the Complaint and in the moving papers?

(3)       **A**      **I have.**

(4)       Q      Are you familiar with Lizer's

(5)   contention that of that $2.2 million $1.5 million

(6)   was for the purposes of acquiring furniture,

(7)   fixtures and equipment?

(8)       **A**      **I need to look at the documents in**

(9)   **order to answer that question with specificity.**

(10)      Q      Well that is fair enough.

(11)             Without looking at documents you don't

(12)   know whether that is accurate or not?

(13)      **A**      **I don't know whether it is**

(14)   **specifically accurate.  That is correct.**

(15)      Q      Are you familiar with the claim made

(16)   by Lizer that $700,000 was for the purposes of a

(17)   future credit against rent payments?

(18)      **A**      **I recall the issue.**

(19)      Q      In 2015 was the project purchasing

(20)   furniture, fixtures and equipment?

(21)      **A**      **No, I have not reached that point yet.**

(22)      Q      When the project did purchase

(23)   furniture, fixture and equipment did Congress

(24)   Construction play a role in that?

(25)      **A**      **Yes.**

(1)                           **B. Nicholson**

(2)        Q      What role did Congress Construction

(3)   play?

(4)        **A      We managed the design and procurement**

(5)   **of the FF&E which is an acronym for furniture,**

(6)   **fixture and equipment.**

(7)        Q      Do you recall in what year Congress

(8)   procured the FF&E for the project?

(9)        **A      Not without documents, no.**

(10)       Q      Do you know when the construction of

(11)  the building was completed?

(12)       **A      September 2019.**

(13)       Q      Do you know in relation to that date

(14)  how long previously would the FF&E have been

(15)  purchased?

(16)       **A      It was previous to that naturally but**

(17)  **I can't answer that question without looking at**

(18)  **documents.**

(19)       Q      I am not trying to pin you down here

(20)  but was it within 12 months, 24 months, based on

(21)  the industry what would you expect it to be?

(22)       **A      It was within the 24 months prior to**

(23)  **the completion of the project that the FF&E was**

(24)  **procured.**

(25)       Q      Do you recall when you closed on the

(1)                        B. Nicholson

(2)    construction loan with Security Benefit?

(3)        A       **Mid August 2017 is my recollection.**

(4)        Q       Prior to the closing on the

(5)    construction loan did Congress Construction

(6)    oversee the procurement of any FF&E for the

(7)    project?

(8)        A       **No, the procurement took place**

(9)    **immediately after the -- shortly after the**

(10)   **closing of the construction loan.**

(11)       Q       Do you know who held the funds for the

(12)   FF&E the $1.5 million between 2015 and 2017?

(13)       A       **I don't understand the question.**

(14)       Q       In 2015 Lizer put up $1.5 million for

(15)   the purchase of FF&E for the project; correct?

(16)       A       **I am not sure I would agree with that**

(17)   **without looking at documents.**

(18)       Q       Is it your testimony today that you

(19)   don't know whether or not Lizer put up money in

(20)   2015?

(21)       A       **No.**

(22)       Q       What is your testimony about a

(23)   transaction that incurred in 2015 between Lizer

(24)   and the project?

(25)       A       **My testimony is I would need to see**

(1)                      **B. Nicholson**

(2)     **documents in order to testify as to the specifics**

(3)     **of that transaction.**

(4)          Q     I am trying to get your general

(5)     understanding of what occurred.

(6)               Do you have any general understanding

(7)     without referring to a document?

(8)          A     Yes.

(9)               **MR. DONNELLAN:   Objection.  He has**

(10)              **already asked and answered that he**

(11)              **needs to refer to the documents**

(12)              **regarding the $1.5 million.**

(13)              **MR. GIARDINO:  Al, I am trying to**

(14)              **shortcut some of this, really, okay,**

(15)              **we can go through the documents if you**

(16)              **want?**

(17)              **MR. DONNELLAN:  Sure.  The problem is**

(18)              **the documents speak for themselves and**

(19)              **they don't say what you're presuming**

(20)              **they do say in your questions so that**

(21)              **is why I think we have a problem with**

(22)              **it.  So you're trying to put words in**

(23)              **his mouth that the documents don't**

(24)              **say. The witness is being careful that**

(25)              **that is not the case.**

(1)                    B. Nicholson

(2)          MR. GIARDINO:  Al, I will only respond

(3)      to you by saying your other witness

(4)      had no difficulty yesterday testifying

(5)      about these numbers so I accept your

(6)      objection but.

(7)          MR. DONNELLAN:   It is not a question

(8)      about the numbers.  We don't have a

(9)      dispute that the $1.5 million was paid

(10)     in some manner. Whether it was put up

(11)     specifically for the FF&E or whether

(12)     or not we had to deliver the FF&E at

(13)     another time those are also issues

(14)     that are covered in the documents.

(15)     They are not exactly jiving with the

(16)     way you're asking the questions.  That

(17)     is the problem, John. I am not trying

(18)     to create a problem.

(19)         MR. GIARDINO:  And I am not trying to

(20)     twist words in this witness's mouth.

(21)         MR. DONNELLAN:  The $1.5 million was a

(22)     deposit for the FF&E.

(23)         MR. GIARDINO:  I am not trying to put

(24)     words in this witness's mouth.  I want

(25)     to get his understanding just as we

(1)                    B. Nicholson

(2)          did yesterday with Mr. Fensterman so

(3)          we will find another way to do it.

(4)          Claudia, could you put what was

(5)          previously marked for identification

(6)          as Exhibit 6 up on the screen and Al,

(7)          how do you want to title this?  We

(8)          numbered them yesterday.  Let's do

(9)          this Exhibit 1 in the Nicholson

(10)         deposition. This was previously marked

(11)         as Exhibit 6 but Laura this will be

(12)         Exhibit 1 Nicholson.

(13)         (Whereupon, Defendant's Exhibit 1,

(14)         Term Sheet, (Ex 6) 5 pages, was marked

(15)         for identification.)

(16)         MR. DONNELLAN:   Yesterday I know you

(17)         pre marked a lot of exhibits. But

(18)         yesterday we only had like nine

(19)         exhibits or something like that. This

(20)         is not one of them. In yesterday we

(21)         marked them in accordance with the

(22)         numbers that they were pre marked so

(23)         we don't have the first exhibit

(24)         yesterday was Exhibit 68. How do we

(25)         want to coordinate this?

(1)                     B. Nicholson

(2)             **MR. GIARDINO:   My mistake.  Let's**

(3)             **stick with that same system.  We will**

(4)             **use the pre marked number. This is**

(5)             **Exhibit 6.  We will use the pre marked**

(6)             **number so this is Exhibit 6.**

(7)        Q     Mr. Nicholson, I will ask you to

(8)   review it and once you have had a chance to

(9)   review it and recognize it let me know and I will

(10)  ask you some questions.

(11)       **A     I am familiar with the document.  Go**

(12)  **ahead and ask me what you need to please.**

(13)       Q     Do you recall entering into this term

(14)  sheet?

(15)       **A     Yes, I recall the document. I recall**

(16)  **entering into it.**

(17)       Q     In order to see the whole document we

(18)  will have to scroll.

(19)       **A     Yes.**

(20)             **MR. GIARDINO:   I am going to ask that**

(21)             **we scroll to page two.**

(22)       Q     Mr. Nicholson, I will direct your

(23)  attention to subsection (e) of section 1 and

(24)  subsection 1 of (e)?

(25)       **A     Yes.**

January 12, 2022

(1)                     **B. Nicholson**

(2)         Q      And so do you see that the statement

(3)   there that "$1.5 million is deemed to be an

(4)   advance payment for FF&E"?

(5)         **A      I do.**

(6)         Q      Does that refresh your recollection as

(7)   to how the monies contributed by Lizer in 2015

(8)   were to be allocated?

(9)         **A      It says what it says. $1.5 million was**

(10)  **deemed to be an advanced payment for FF&E.**

(11)        Q      To whom was that $1.5 million paid?

(12)        **A      White Plains Healthcare Properties.**

(13)        Q      How was that $1.5 million disbursed

(14)  from White Plains Healthcare?

(15)        **A      It was disbursed -- when you say who**

(16)  **was -- how it was disbursed?  Can you ask the**

(17)  **question again please.**

(18)        Q      Earlier you testified that Congress

(19)  Construction was responsible for making

(20)  disbursement of monies for the development of

(21)  project; is that correct?

(22)        **A      Yes, we managed disbursements, that is**

(23)  **correct.**

(24)        Q      How did Congress Construction disburse

(25)  the $1.5 million it received in November of 2015?

(1)                       B. Nicholson

(2)        A      To be clear, the disbursements were

(3)    made from White Plains Healthcare Properties.

(4)               Congress was effectively the Manager

(5)    of what -- was in a management role.

(6)               So the disbursements were as set forth

(7)    in DB user proceeds.

(8)        Q      Did Congress oversee the use of the

(9)    proceeds as set forth in D?

(10)       A      My recollection, yes.

(11)              MR. DONNELLAN:   Objection to the form

(12)              of the question. The agreement doesn't

(13)              say how the proceeds are to be used.

(14)              MR. GIARDINO:   I think he just

(15)              testified.

(16)       A      To be clear, the document says that

(17)   the $2.2 million would be generally for in an

(18)   outline categories of costs that it would be

(19)   generally used for. It says generally the

(20)   document says what it says.

(21)       Q      It says what it says.

(22)              And I am asking if you know if those

(23)   funds were disbursed and I asked you generally

(24)   how were they disbursed.

(25)              To your knowledge were they disbursed

B. Nicholson

in accordance with the schedule that is listed in

this sub (e)?

        MR. DONNELLAN:   Objection to the form

        of the question.  Again, let me try to

        clarify. The words in the document say

        that there is $2.2 million

        disbursement to White Plains

        Healthcare.  I don't think that is

        what you're talking about. I think you

        are talking about how White Plains

        disbursed it. But it says it was

        disbursed to them as a noninterest

        bearing loan. The $1.5 million is to

        how it is suppose to be advanced.

        There is nothing in this agreement

        that says that the $1.5 was suppose to

        be used for the purchase of the FF&E

        and your question assumes that and

        that is the problem with that.

  A    I am totally confused.

        MR. DONNELLAN:  It says that the $1.5

        is to be deemed an advance payment and

        repayable by that but it doesn't say

        how White Plains Healthcare is suppose

(1)                    B. Nicholson

(2)           to use the $2.2 million. It is not set

(3)           forth in that paragraph.

(4)           MR. GIARDINO:  I didn't say that it

(5)           was.  I am not going to waste our

(6)           time --

(7)           MR. DONNELLAN:   You did say

(8)           disbursement.  That was my only issue,

(9)           John.  That your question -- my

(10)          problem with the form of the question

(11)          is that your question refers to did

(12)          they though disburse the funds in

(13)          accordance with this schedule and my

(14)          problem with the form is that the

(15)          schedule doesn't say how the funds are

(16)          suppose to be disbursed. So that is my

(17)          problem with the form of the question.

(18)          That is all.

(19)          MR. GIARDINO:  I am just responding to

(20)          what the witness said. He said it was

(21)          disbursed in accordance with sub (d).

(22)          That is fine.

(23)          MR. DONNELLAN:   There was

(24)          disbursement to the White Plains

(25)          Healthcare.

(1)                         B. Nicholson

(2)              MR. GIARDINO:  That is (e). In

(3)              response to that.

(4)              MR. DONNELLAN:   I think those were

(5)              two different amounts but what ever.

(6)         A      My problem with this whole thing is I

(7)    am kind of confused with the questions and the

(8)    objections. So it's likely I testified to the --

(9)    it's likely I answered question incorrectly or

(10)   inaccurately so can we roll the clock back and

(11)   just get clear on this whole.

(12)        Q      I am trying to start over.

(13)        A      Okay.

(14)        Q      In November of 2015 did White Plains

(15)   receive a contribution from Lizer for purposes of

(16)   the development of the project?

(17)        A      Yes.

(18)        Q      Earlier you said you couldn't recall

(19)   how much without looking at a document.

(20)               Does this document which has been

(21)   marked as Exhibit 6 refresh your recollection as

(22)   to the amount contributed by Lizer?

(23)        A      Yes.

(24)        Q      What was the amount that was

(25)   contributed?

(1)                    B. Nicholson

(2)        **A        $2.2 million.**

(3)        Q        Then I asked you how those funds that

(4)    were received from Lizer were disbursed by the

(5)    project and again you said you needed to refresh

(6)    your recollection by looking at a document.

(7)              Does this document refresh your

(8)    recollection as to how the funds received by

(9)    White Plains were disbursed?

(10)       **A        Generally, yes.**

(11)       Q        Can you tell me what your recollection

(12)   as to how those funds were disbursed?

(13)       **A        Without documents I can't give you any**

(14)   **more specific than they generally went out to**

(15)   **those categories.**

(16)       Q        When you say documents whose documents

(17)   are you referring to?

(18)       **A        I don't know. I have to go to cost**

(19)   **documents or something like that. I don't**

(20)   **remember. I know these all got paid but beyond**

(21)   **that I don't know the specifics of the cash**

(22)   **disbursements and the dates and all of that**

(23)   **stuff.**

(24)       Q        Didn't you testify earlier that

(25)   Congress Construction was responsible for keeping

(1)                         B. Nicholson

(2)    all of the cost records?

(3)         **A     Yes, yes.**

(4)         Q     So would Congress Construction have

(5)    the cost records relating to the disbursement by

(6)    White Plains of the monies it received from Lizer

(7)    in 2015?

(8)         **A     Yes, it would, yes. I just can't**

(9)    **testify to the specifics because I am not looking**

(10)   **at them.  That is my point.**

(11)        Q     That is fine.

(12)              Is it your recollection that the

(13)   proceeds or that the $2.2 million received by

(14)   White Plains in 2015 from Lizer were used for

(15)   purposes other than the purchase of FF&E?

(16)        **A     During what period, John?**

(17)        Q     In 2015?

(18)        **A     Yes, in the 2015 to 2017 period the**

(19)   **$2.2 million was used for general development**

(20)   **expenses as generally outlined in item DB not for**

(21)   **the purposes of paying for the FF&E. That is**

(22)   **correct.**

(23)        Q     In exchange for that contribution of

(24)   $2.2 million in 2015 does subsection E refer to

(25)   what HBL would receive in the future?

B. Nicholson

**A      He speaks for itself. It doesn't speak**

**to consideration or anything like that. It speaks**

**to what how the $2.2 would be characterized.**

Q      Were you involved in the negotiations

regarding the contribution of $2.2 million?

**A      Yes.**

Q      What was your role in those

negotiations?

**A      I was involved in them on behalf of**

**White Plains Healthcare Properties.**

Q      Who else was involved in those

negotiations on behalf of White Plains?

**A      Fensterman.**

Q      How was the amount of $2.2 million to

be contributed by HBL arrived at?

**A      I don't know.  I don't recall.**

Q      Was Congress Construction responsible

for identifying and managing the development

budget?

**A      Yes.**

Q      Did the development budget identify

the need for the contribution of capital in 2015?

**A      Yes.**

Q      Was that a development budget that you

(1)                    B. Nicholson

(2)   developed?

(3)      **A      I would have overseen the development**

(4)   **of it. I would have overseen. I oversaw the**

(5)   **development budget. I didn't necessarily do them**

(6)   **all with my own two hands and keyboard.**

(7)      Q      Who else participated in the

(8)   development of the project development budget?

(9)      **A      Me, Joudrey, Tabor, Ed Tabor.  I was**

(10)  **involved though no doubt.**

(11)     Q      So I want to return to the question I

(12)  asked earlier.

(13)                After you closed on the Security

(14)  Benefit loan and began purchasing the FF&E these

(15)  $2.2 million contributed 2015 had already been

(16)  spent on other development purposes; correct?

(17)     **A      That is correct.**

(18)     Q      You mentioned earlier you were

(19)  involved in procurement but really the more

(20)  accurate word would be the identification of

(21)  Security Benefit as the construction lender to

(22)  the project; correct?

(23)     **A      Yes.**

(24)     Q      Did you work with anyone else on the

(25)  White Plains team in identifying Security Benefit

(1)                    B. Nicholson

(2)    as a lender to the project?

(3)        A      **Yes, I worked with a broker/consultant**

(4)    **by the name of Kevin O'Malley.**

(5)        Q      With what firm is Kevin O'Malley

(6)    associated?

(7)        A      **He is a sole practitioner broker and**

(8)    **consultant for Capital Stack Project Funding.**

(9)        Q      Had you worked with Kevin O'Malley on

(10)   any projects prior to White Plains?

(11)       A      **No.**

(12)       Q      How were you introduced to Mr.

(13)   O'Malley?

(14)       A      **I don't remember.**

(15)       Q      Did there come a time one Security

(16)   Benefit issued a term sheet for the financing?

(17)       A      **Yes.**

(18)       Q      Did any other lender issue term sheets

(19)   for the financing?

(20)       A      **Lancaster Pollard had issued a term**

(21)   **sheet and in fact are referenced in this**

(22)   **document.**

(23)       Q      Who is that?

(24)       A      **Lancaster Pollard.  They are**

(25)   **identified in paragraph C as the first loan and**

(1)                     **B. Nicholson**

(2)  **mezzanine financing source.**

(3)       Q     Did you initiate discussions with

(4)  Lancaster Pollard?

(5)       **A     I don't recall specifically.**

(6)       Q     Did Lancaster Pollard provide a term

(7)  sheet for the project?

(8)       **A     Yes.**

(9)       Q     To whom did they provide that term

(10) sheet?

(11)      **A     To which individual?**

(12)      Q     To whom on White Plains, White Plains

(13) or was it Congress?

(14)      **A     I have to look at the document. It was**

(15) **issued to the White Plains.**

(16)      Q     Did Congress receive that term sheet?

(17)      **A     I can't speak to the actual**

(18) **transmission of the document but we definitely**

(19) **had it, yes.**

(20)      Q     So would that document still be within

(21) your business records?

(22)      **A     Yes.**

(23)      Q     Was Lancaster Pollard prepared to go

(24) forward with the construction funding?

(25)      **A     It is a broad question. Lancaster**

(1)                           B. Nicholson

(2)    **Pollard did not ultimately fund the project. They**

(3)    **got out of this particular line of business and**

(4)    **did not do the job for us. They withdrew from**

(5)    **this project and from general construction**

(6)    **financing.**

(7)         Q      Did you receive any other term sheets

(8)    other than the Lancaster Pollard which you just

(9)    described and the Security Benefit term sheet?

(10)        **A      Not that I recall, no.**

(11)        Q      In connection with this Security

(12)   Benefit construction loan was White Plains

(13)   required to provide information about the project

(14)   construction costs and the project

(15)   capitalization?

(16)        **A      To who?**

(17)        Q      To Security Benefit?

(18)        **A      Yes.**

(19)        Q      Who took responsibility to provide

(20)   that information to Security Benefit?

(21)        **A      Well individuals within my company**

(22)   **were participating in that whole underwriting**

(23)   **process.**

(24)        Q      It is fair to say that Congress took

(25)   the lead on providing Security Benefit with what

(1)                        B. Nicholson

(2)     ever information they needed to approve the

(3)     construction loan?

(4)          **A      Yes.**

(5)          Q      Was anyone else outside of Congress

(6)     involved in that process?

(7)          **A      Yes.**

(8)          Q      Who else?

(9)          **A      Well, in the underwriting of the**

(10)    **construction loan we Congress collected**

(11)    **information from the tenant and the tenant's**

(12)    **principals from Pinnacle the tenant's DOH**

(13)    **consultant concerning regulatory and DOH matters.**

(14)              **I will characterize the assembly and**

(15)    **delivery of document to Security Benefit as being**

(16)    **done by Congress from documents Congress prepared**

(17)    **and also from documents Congress obtained from**

(18)    **other participants in the overall project.**

(19)         Q      Pursuant to that term sheet White

(20)    Plains Healthcare Properties LLC was to be the

(21)    borrower; correct?

(22)         **A      Yes.**

(23)         Q      Did Security Benefit require any

(24)    disclosures as to who the members of White Plains

(25)    were?

(1)                        B. Nicholson

(2)        **A        Yes, Security Benefit did, yes.**

(3)        Q        Who provided that information about

(4)    White Plains to Security Benefit; do you recall?

(5)        **A        I don't.**

(6)        Q        Were there ever any discussions about

(7)    Lizer being a member of the borrower landlord

(8)    entity?

(9)        **A        I don't recall such discussions.**

(10)        Q        Do you recall any discussions in which

(11)    the structure of the transaction as between the

(12)    owner and the operator were discussed?

(13)        **A        I don't recall specific discussions**

(14)    **but Security Benefit understood the org chart and**

(15)    **we did deliver them an org chart for the project.**

(16)        Q        Who prepared the org chart?

(17)        **A        Don't recall specifically.**

(18)        Q        Do you know when the organizational

(19)    structure as represented by that org chart was

(20)    agreed upon by the principals in the transaction?

(21)        **A        I couldn't answer that question with**

(22)    **specificity, no.**

(23)        Q        Do you recall any discussions at any

(24)    time about how the transaction was going to be

(25)    structured as between the principals?

B. Nicholson

(2)     **A       When you say as between the principals**

(3)  **I don't understand what that means, John.**

(4)  **Between the principals of White Plains or between**

(5)  **the other parties to the transaction?**

(6)     Q       Well when this development project

(7)  first began there were a number of different

(8)  individuals involved as you testified; correct?

(9)     **A       There were a number of individuals**

(10) **involved, that is correct.**

(11)    Q       You're familiar with nursing home

(12) developments where the ownership of the real

(13) estate group has some commonality with the

(14) ownership of the operating group; correct?

(15)    **A       That is a model.   That is correct.**

(16)    Q       In fact, you are the owner of an

(17) operating company and at the same time that

(18) you're the owner of the real estate ownership

(19) company; correct?

(20)    **A       Correct.**

(21)    Q       Was that structure discussed as a

(22) possible structure for White Plains?

(23)    **A       I don't recall such a discussion.**

(24)    Q       Did you ever discuss with Lizer

(25) becoming a member of the operating company?

(1)                    B. Nicholson

(2)        **A      I don't recall such discussions.**

(3)        Q      After Security Benefit issued its term

(4)   sheet I take it that that term sheet was accepted

(5)   by White Plains?

(6)        **A      At some point.**

(7)        Q      Did you have any role to play in the

(8)   acceptance of that term sheet?

(9)        **A      Yes.**

(10)       Q      What role did you play in the

(11)  acceptance of the term sheet?

(12)       **A      I led the negotiations of the term**

(13)  **sheet on behalf of White Plains.**

(14)       Q      With whom on behalf of White Plains

(15)  did you discuss the terms of the financing?

(16)       **A      With whom within White Plains?  Could**

(17)  **you repeat your question again please, John, so I**

(18)  **can answer it accurately.**

(19)       Q      With whom, you led the negotiations,

(20)  and with whom in the White Plains organization

(21)  did you discuss the terms of the Security Benefit

(22)  financing as you negotiated them?

(23)       **A      Fensterman.**

(24)       Q      Anyone else?

(25)       **A      No, Fensterman and I within the White**

(1)                     B. Nicholson

(2)    Plains organization were the guys that discussed

(3)    the Security Benefit financing.

(4)         Q    Were the terms of that term sheet

(5)    ultimately embodied in a loan agreement?

(6)         A    I will let the document speak for

(7)    themselves. There was a term sheet signed and

(8)    there was a loan agreement.  The loan agreement

(9)    was negotiated subsequently with the loan

(10)   agreement as generally they are.

(11)        Q    Let's have an agreement that the

(12)   document speak for themselves and I am not trying

(13)   to catch you in anything. I am just trying to get

(14)   your general understanding of how this

(15)   transaction evolved.

(16)             Who actually represented White Plains

(17)   in the closing of the Security Benefit finances?

(18)        A    Jerry Billows from the firm of

(19)   Posternak in Boston.  And Joanne Marzullo from

(20)   the firm of Posternak in Boston.  Posternak has

(21)   since been acquired by or merged with Arent Fox.

(22)        Q    Was Jerry Billows an individual that

(23)   you had had previous dealings?

(24)        A    Yes.

(25)        Q    What were the nature of your previous

(1)                    B. Nicholson

(2)    dealings with Mr. Billows and I am not asking for

(3)    any attorney/client privilege information.   I

(4)    just want to know generally how it was that he

(5)    came to be working there?

(6)        A    **Jerry was an experienced health care**

(7)    **attorney that we had known in the Boston market**

(8)    **for years and Jerry represented us in other**

(9)    **nursing home transactions and we brought him in**

(10)   **to represent us in this one.**

(11)       Q    Mr. Billows acted as counsel to White

(12)   Plains; correct?

(13)       A    **Yes.**

(14)       Q    Did he also act as counsel to the

(15)   guarantors of the Security Benefit loan?

(16)       A    **I don't know.**

(17)       Q    To your knowledge did you have

(18)   separate counsel representing you with respect to

(19)   the guarantee obligations associated with the

(20)   loan?

(21)       A    **No, I did not.**

(22)       Q    Do you know if Mr. Fensterman sought

(23)   counsel other than Mr. Billows with respect to

(24)   the guarantee obligations to him personally?

(25)       A    **I don't recall.**

B. Nicholson

(1)

(2)     Q     Were you familiar with the requirement

(3)  in the loan agreement to establish a cash

(4)  management account?

(5)     **A     I know of it.**

(6)     Q     Did you ever discuss the establishment

(7)  of a cash management account with Mr. Fensterman?

(8)     **A     Yes.**

(9)     Q     Did you discuss the establishment of a

(10) cash management account with Mr. Fensterman

(11) before you closed on the Security Benefit?

(12)    **A     I don't recall.**

(13)    Q     What discussions have you had with Mr.

(14) Fensterman about the establishment of a cash

(15) management account?

(16)    **A     I can't recall the specific times or**

(17) **discussions but I can only tell you that I do**

(18) **recall having spoken with him about that matter.**

(19)    Q     On behalf of White Plains who would

(20) have had the responsibility to create such an

(21) account?

(22)    **A     I am not sure what your question is.**

(23)          **Are you talking about the actual**

(24) **setting up the checking account and the signature**

(25) **cards?  Is that the question?**

(1)                          **B. Nicholson**

(2)          Q      Yes.

(3)          **A      I don't understand your question.**

(4)          Q      That is exactly what I meant by that.

(5)                 On the day-to-day operation of White

(6)   Plains you indicated to me there were two

(7)   managers?

(8)          **A      Yes, Congress would have overseen that**

(9)   **activity, yes.**

(10)         Q      To your knowledge did Congress ever

(11)  undertake to establish a cash management account

(12)  with any bank?

(13)         **A      I don't recall whether the account was**

(14)  **mechanically, mechanically whether it was setup**

(15)  **or not. I just don't recall.**

(16)         Q      If there was an account setup would

(17)  you have records of that account?

(18)         **A      Likely.**

(19)         Q      Were you familiar with the requirement

(20)  under the loan agreement that either prohibited

(21)  or restricted distributions that White Plains

(22)  could make to its members?

(23)         **A      Without looking at the loan agreement**

(24)  **I couldn't respond to that question.**

(25)         Q      Again, I am not asking for the details

(1)                         B. Nicholson

(2)     but I am asking you if you were familiar with any

(3)     requirement or restriction in the loan agreement

(4)     effecting distribution to members of White

(5)     Plains?

(6)         **A      I wouldn't change my testimony on**

(7)     **that. Without looking at the documents I wouldn't**

(8)     **testify to that.**

(9)         Q      Are you familiar with any provision of

(10)    the loan agreement that requires Security Benefit

(11)    to consent to any Notice of Termination to the

(12)    tenant before it is issued?

(13)        **A      Again, without looking at the document**

(14)    **I wouldn't comment. I would need to look at the**

(15)    **document.**

(16)        Q      Let me ask it this way.

(17)               As you testify today do you know

(18)    whether or not the loan agreement requires

(19)    consent by Security Benefit prior to the issuance

(20)    of any Notice of Termination?

(21)        **A      I would need to look at the document**

(22)    **in order to answer the question, John.**

(23)        Q      Is it now fair to say that you don't

(24)    know if it does or not?

(25)        **A      I would need to look at the document.**

B. Nicholson

I am not going to testify to or speculate on it.

I would prefer to look at the document and then I

can answer your question.

(5)    Q    Have you received Notices of Default

from Security Benefit?

(7)    A    Yes.

(8)    Q    Have you read those?

(9)    A    Yes.

(10)    Q    Do you know if the failure to obtain

the consent of Security Benefit to the issuance

of a Notice of Termination is included in those

Notices of Default as an event of default?

(14)    A    I would have to read the document in

order to provide testimony as to that point.

(16)    Q    Without reading the document you don't

know; is that correct?

(18)    A    I would need to look at the document

in order to provide any testimony as to that

point, yes.

(21)    Q    Do you know how many notices of

default Security Benefit has issued to White

Plains?

(24)    A    No.

(25)    Q    Do you know when the first Notice of

(1)                         B. Nicholson

(2)    Default was issued by Security Benefit?

(3)         **A        No, not without looking at a document.**

(4)         Q        Have you ever reviewed the Complaint

(5)    that was filed by Security Benefit against White

(6)    Plains?

(7)         **A        Yes.**

(8)         Q        When did you review the Complaint that

(9)    was filed by Security Benefit against White

(10)   Plains?

(11)        **A        I couldn't give you a date. I couldn't**

(12)   **answer that question with specificity.**

(13)        Q        Have you reviewed that Complaint in

(14)   the last 30 days?

(15)        **A        No.**

(16)        Q        By the way, did you review any

(17)   documents in preparation for your testimony

(18)   today?

(19)        **A        Yes.**

(20)        Q        What documents did you review?

(21)        **A        I reviewed my affidavit and I reviewed**

(22)   **some exhibits in the matter.**

(23)        Q        What exhibits did you review?

(24)        **A        There were a plethora of them.   I**

(25)   **couldn't recite them. I looked at a number of**

(1)                          B. Nicholson

(2)    them and I perused them.  They're very voluminous

(3)    as you know.

(4)        Q    Were those documents obtained from the

(5)    file that you maintained or were they provided?

(6)        A    No, they were provided by counsel.

(7)        Q    Were they provided to you by Mr.

(8)    Donnellan's office?

(9)        A    Yes.

(10)       Q    Did you keep those documents in a

(11)   folder for your review?

(12)       A    Yes.

(13)       Q    Do you still have that folder of

(14)   documents?

(15)       A    Uh-huh.

(16)            MR. GIARDINO:  Al, I plan to break at

(17)            12:30 as we did yesterday. I am going

(18)            to have the witness review the

(19)            Complaint in the State court action

(20)            and ask a couple of preliminary

(21)            questions and then why don't we take

(22)            our break.

(23)            MR. GIARDINO:  If we can call up

(24)            Exhibit 68 which was marked yesterday

(25)            in the deposition of Mr. Fensterman.

(1)                         B. Nicholson

(2)         A      Could I look at the title again

(3)   please.

(4)         Q      I will represent to you that this is

(5)   the Amended Verified Complaint filed by White

(6)   Plains against HBL SNF and Mr. Jozefovic and Mr.

(7)   Neuman and take a look and let me know if you

(8)   have seen this document before?

(9)         A      I have seen it, yes.

(10)               MR. GIARDINO:  I am going to ask the

(11)               document manager to scroll all the way

(12)               to the last page of this document.

(13)               (Whereupon, Defendant's Exhibit 2,

(14)               First Amended Verified Complaint, (Ex

(15)               68), 18 pages, was marked for

(16)               identification.)

(17)         Q      Mr. Nicholson, on the last page of

(18)   this captioned verification is that your sworn

(19)   testimony that the contents of this Complaint are

(20)   true?

(21)         A      Yes.

(22)         Q      I take it that you made that

(23)   verification after you carefully reviewed the

(24)   contents of this Complaint?

(25)         A      Correct.

(1)                         B. Nicholson

(2)        Q      Did you play any role in the drafting

(3)    of the Complaint?

(4)        **A      Don't recall.**

(5)        Q      Do you recall receiving the Complaint

(6)    and making changes to it?

(7)        **A      I don't recall specifically editing**

(8)    **the document but I do recall reviewing it as it**

(9)    **was being -- I remember the document being**

(10)   **composed. I remember the document being composed,**

(11)   **yes.**

(12)       Q      Did you provide any factual

(13)   information to your counsel regarding dates and

(14)   matters of default?

(15)       **A      My staff more than likely did. I don't**

(16)   **really handle a lot of documents specifically**

(17)   **myself.**

(18)       Q      What members of your staff?

(19)       **A      Ed Tabor and Kimberly Jackson really**

(20)   **managed the documents for our company.**

(21)       Q      By the way, what company is Mr. Tabor

(22)   employed by?

(23)       **A      Congress Construction Corp.**

(24)       Q      And what company, by which company is

(25)   Miss Jackson employed?

(1)                    B. Nicholson

(2)        **A**     **The same.**

(3)        Q     This is a preliminary matter, let's go

(4)   back to page one of the document.

(5)            I will direct your attention to the

(6)   second numbered or the allegation number two and

(7)   the fourth sentence in that paragraph which

(8)   states the lease commenced on September 30, 2019.

(9)        **A**     **I see that.**

(10)       Q     On what basis do you make the

(11)  statement that the lease commenced on September

(12)  30, 2019?

(13)       **A**     **There was a determination made by**

(14)  **Chris Chow of the Department of Health that the**

(15)  **building was constructed suitably on or about**

(16)  **that date.**

(17)       Q     This statement is based upon a

(18)  determination made by Chris Chow?

(19)       **A**     **Which particular sentence are you**

(20)  **referring to; "the lease commenced September 30"?**

(21)       Q     Yes.

(22)       **A**     **Yes, that sentence has, yes, yes, the**

(23)  **New York Department of Health Chris Chow was the**

(24)  **person in charge of the review of the physical**

(25)  **plan, the physical facility.  He determined that**

(1)                          B. Nicholson

(2)    **it was acceptable on that date and we also had a**

(3)    **PCO and we also had an architect certificate of**

(4)    **substantial completion on that date.**

(5)         Q    Do you know what the lease says about

(6)    the commencement date of the lease?

(7)         **A    I would need to read the lease with**

(8)    **you to be very, very clear on that.**

(9)         Q    Did you read the provisions of the

(10)   lease before you swore to the statement that the

(11)   lease commenced on September 30?

(12)        **A    I did.**

(13)        Q    After reading the lease did you make

(14)   the determination that the lease commenced on

(15)   September 30?

(16)        **A    I did. The lease was one of the**

(17)   **documents that I read.**

(18)        Q    And then the second the next sentence

(19)   is "HBL took possession of the facility on

(20)   September 30, 2019"; do you see that statement?

(21)        **A    Yes.**

(22)        Q    On what basis do you make that

(23)   statement?

(24)        **A    Well, the Department of Health had**

(25)   **determined that the facility was acceptable,**

(1)                      B. Nicholson

(2)    there was a TCO, there was a certificate of

(3)    substantial completion and the keys had been

(4)    tendered by September 30.

(5)        Q    Is that what you consider to be

(6)    possession?

(7)        A    Yes.

(8)        Q    Did you make any observations as to

(9)    whether or not HBL actually occupied the building

(10)   at that time?

(11)       A    Did I go to the building on September

(12)   30, no, not physically. I did not. But I know

(13)   those events took place.

(14)       Q    Let's go to paragraph three.  It says

(15)   on "January 7, 2020 WPH Properties served Notice

(16)   of Default and elected to terminate the lease and

(17)   accelerate all rent due"; do you see that

(18)   statement?

(19)       A    I do.

(20)       Q    Before swearing to the accuracy of

(21)   that statement did you review the notice dated

(22)   January 7, 2020?

(23)       A    I did.

(24)       Q    Did you draft the notice dated January

(25)   7, 2020?

(1)                        B. Nicholson

(2)        **A      I did not draft it but I reviewed it,**

(3)    **I participated in it and my people, my staff,**

(4)    **participated in providing information in order to**

(5)    **compose that document, yes.**

(6)        Q      Who composed the document?

(7)        **A      The document was composed jointly**

(8)    **between my people and my, congress's people, I**

(9)    **don't mean to used word my. When I use the word**

(10)   **my, Congress's people and my attorney's people,**

(11)   **Al's firm.**

(12)               **MR. GIARDINO: It is 12:30.  I will**

(13)               **propose that we take another 45 minute**

(14)               **noon hour break and reconvene at 1:15**

(15)               **if that is agreeable with you?**

(16)               **MR. DONNELLAN:   Yes, that is good**

(17)               **with me. Sounds good, John.**

(18)               **(Time Noted:  12:31 to 1:17)**

(19)               **(Whereupon, Defendant's Exhibit 3,**

(20)               **Amended and Restated Operating Lease,**

(21)               **(Ex 10), 96 pages, was marked for**

(22)               **identification.)**

(23)        Q      Bill, you can see the cover page of

(24)    what we marked as Exhibit 10. I will represent to

(25)    you that it is the Amended and Restated Operating

(1)                          B. Nicholson

(2)    Lease but if you can take a look and see if you

(3)    recognize that?

(4)         **A      I do. It looks like this and the**

(5)    **former discarded lease look the same but if you**

(6)    **show me the rent provision I can feel comfortable**

(7)    **that we are dealing with the proper document.**

(8)         Q      Let me ask you this.

(9)                When you say the prior agreement is it

(10)   your -- when was the Amended and Restated

(11)   Operating Lease signed?

(12)        **A      I don't have an exact date.**

(13)        Q      Do you know the year?

(14)        **A      I know that I believe it was signed in**

(15)   **July of 2017.**

(16)        Q      You can see from the cover page of

(17)   this document it says dated as of November 19,

(18)   2015; correct?

(19)        **A      Correct.**

(20)        Q      Do you know why the Amended Lease was

(21)   dated as of November of 2015 when it was actually

(22)   executed in 2017?

(23)        **A      I don't.**

(24)        Q      Can we go to page six of the document.

(25)                Bill, I will ask you to review section

(1)                    B. Nicholson

(2)  3.1(a) for the purposes of identifying how the

(3)  commencement date of the lease is to be

(4)  established.

(5)      **A      Okay, I see it.**

(6)      Q      In reviewing that language can you

(7)  describe for me what needed to occur in order to

(8)  establish the commencement date of the lease?

(9)      **A      As the document says, a permanent or**

(10) **temporary CO, the New York Department of Health**

(11) **determines that the landlord work is sufficiently**

(12) **complete. Those are the two additions in this**

(13) **lease.**

(14)     Q      Can we agree that it is the later of

(15) those two conditions?

(16)     **A      It says on the later to occur of, yes.**

(17)     Q      As to the condition that is identified

(18) as sub (ii) that is the New York State Department

(19) of Health determination that the work is

(20) sufficiently complete so that the facility can

(21) accept patients; is that correct?

(22)         **MR. DONNELLAN:   Objection to the form**

(23)         **of the question.**

(24)     **A      No, it is as constructed but not**

(25) **necessarily as to operations.**

(1)                        **B. Nicholson**

(2)        Q      To accept patients?

(3)        **A      The physical, the facility meaning the**

(4)   **physical facility as constructed.   That is**

(5)   **correct.**

(6)        Q      I just when you were reciting it the

(7)   first time you didn't to accept patients.   I just

(8)   wanted to point out that language, okay.

(9)              What is your testimony as to when that

(10)  determination was made by the Department of

(11)  Health?

(12)       **A      Well it was made in mid September and**

(13)  **it was further it was further set forth in Chris**

(14)  **Chow's e-mails and there is a series of e-mails**

(15)  **from Chris Chow that stated that he has**

(16)  **determined that facility is ready. He needed some**

(17)  **paperwork which he got from us and he made that**

(18)  **determination.**

(19)             **I beg your pardon.   I didn't hear what**

(20)  **you said John.**

(21)       Q      I was just asking for a document

(22)  number.   Go ahead.

(23)       **A      Yes, it is clear that he determined**

(24)  **that at the end of September.**

(25)             **And the Letter of Intent clarifies**

(1)                        B. Nicholson

(2)    that we all agreed to it.

(3)            And furthermore the Department of

(4)    Health letter in mid December states that the

(5)    inspection was conducted and approved in mid

(6)    September.

(7)            So there can be no doubt that the

(8)    facility was ready and NYDOH had determined that

(9)    it was ready by the end of September at the

(10)   latest.

(11)        Q    Is it your testimony that this is a

(12)   determination or was it an informal approval from

(13)   the Department of Health?

(14)        A    Well I am reading the lease and it

(15)   says the date that New York State Department of

(16)   Health determines, that is what I am reading in

(17)   the lease, John.

(18)        Q    Determined?

(19)        A    Yes, when they determine it. It

(20)   doesn't say a formal letter there and I don't

(21)   think unless you can point me to it and it

(22)   doesn't say issues a certificate or anything like

(23)   that. It says determines.

(24)        Q    Is it your testimony that that

(25)   determination was made on the inspection that

(1)                    B. Nicholson

(2)    Chris Chow conducted in September?

(3)        **A**     **Their letter, Department of Health's**

(4)    **letter says that.  And Chris Chow's letter says**

(5)    **it as well. Chris Chow's e-mail, I beg your**

(6)    **pardon, Chris Chow's e-mail makes it clear that**

(7)    **he has made that determination and the subsequent**

(8)    **letter of December, early December, from the DOH**

(9)    **says that they made a determination on their**

(10)   **inspection in mid September.**

(11)                   **MR. GIARDINO:  Why don't we call up**

(12)                   **Exhibit 23.**

(13)                   **(Whereupon, Defendant's Exhibit 4,**

(14)                   **Letter dated 12/2/19 from DOH to Blatt**

(15)                   **(Ex 23), 1 page, was marked for**

(16)                   **identification.)**

(17)       Q     Take a look at Exhibit 23 and I ask

(18)   you if that is the letter that you are referring

(19)   to?

(20)       **A**     **It is.**

(21)       Q     In the first sentence the letter

(22)   recites "the pre opening survey that was

(23)   conducted on September 19"; correct?

(24)       **A**     **Correct.**

(25)       Q     It goes on to say that "the facility

(1)                    B. Nicholson

(2)    was found to be in substantial compliance with

(3)    the applicable provision of 10NYCR"?

(4)        **A      Yes. The determination was made. They**

(5)    **did the survey and they determined that it was**

(6)    **substantially compliant.**

(7)        Q      Is it your testimony that there was

(8)    any documentation of that prior to September

(9)    19 -- prior to December 2?

(10)       **A      I don't understand the question.**

(11)       Q      I will restate it.

(12)              Is it your testimony that there is

(13)   documentation establishing that approval prior to

(14)   December 2, 2019?

(15)       **A      Yes, Chris Chow's e-mail is clear.**

(16)       Q      Do you know the date of Chris Chow's

(17)   e-mail?

(18)       **A      On or about 28, 29, 30 September.  It**

(19)   **is a string that may have gone passed one**

(20)   **particular day.**

(21)       Q      Was anyone from HBL present during

(22)   this September 19 pre opening survey?

(23)       **A      I don't know. I wasn't there**

(24)   **personally so I can't answer that question.**

(25)       Q      So if you were not there personally

B. Nicholson

(1)

(2) how do you know that it was approved on September

(3) 19?

(4) **A      Because I am reading this letter.**

(5) Q      So you are relying on the contents of

(6) the December 2 letter to establish the date of

(7) September 19?

(8) **A      Yes, and my people reported to me**

(9) **because my construction crew was at the facility**

(10) **as well.**

(11) Q      In your experience and in the

(12) construction industry if there is an inspection

(13) for the purposes of getting a Certificate of

(14) Occupancy and the inspector finds that the

(15) construction is in accordance with the building

(16) code is that the same as receiving a Certificate

(17) of Occupancy?

(18) **A      I don't understand. I don't understand**

(19) **the question.**

(20) Q      You are an experienced construction

(21) professional; correct?

(22) **A      Yes.**

(23) Q      And you're familiar with the process

(24) of obtaining a Certificate of Occupancy; correct?

(25) **A      A Certificate of Occupancy being a**

(1)                    **B. Nicholson**

(2)   **municipal Certificate of Occupancy please?  I am**

(3)   **asking you to clarify the question.**

(4)        Q     It is the municipality that issues the

(5)   Certificate of Occupancy; correct?

(6)        **A     Correct.**

(7)        Q     In order to have that Certificate of

(8)   Occupancy issued certain inspections need to take

(9)   place; is that correct?

(10)       **A     That is correct.**

(11)       Q     Is it your testimony here today that

(12)  if that inspection for purposes of issuing the CO

(13)  finds that the construction complies with the

(14)  building code that that is the same as receiving

(15)  a Certificate of Occupancy?

(16)       **A     I didn't testify to that.**

(17)       Q     You would say that the Certificate of

(18)  Occupancy is issued when it is issued by the

(19)  municipality; correct?

(20)       **A     Certificate of Occupancy are issued in**

(21)  **various forms and in various times in municipal**

(22)  **arenas in which the document I am looking at**

(23)  **doesn't refer to a Certificate of Occupancy,**

(24)  **John. It refers to the Department of Health.**

(25)       Q     I offered that as a comparison. Let's

(1)                    B. Nicholson

(2)    take a look at 23 again.

(3)            In the second paragraph, the second

(4)    sentence says "this approval is effective

(5)    November 14, 2019"; do you see that?

(6)        A    I do.

(7)        Q    What is your understanding of what is

(8)    meant by approval?

(9)        **A    I think that we would -- I can tell**

(10)   **you that after the determination was made which**

(11)   **it clearly had been made on the 19 and had been**

(12)   **made on the 30 as well that the DOH required**

(13)   **certain documents which were delivered to them**

(14)   **and others that were not.**

(15)           **The documents that were delivered were**

(16)   **the, and we would need to, if you go to Chris**

(17)   **Chow's e-mail you will refresh my memory as to**

(18)   **the specifics and I can walk you through it in**

(19)   **detail.**

(20)       Q    That really was not my question.

(21)           My question is what approval is this

(22)   referring to?  The approval of what?

(23)       **A    This is referring to the approval --**

(24)           **MR. DONNELLAN:   Other than what it**

(25)           **states in the document?**

(1)                         **B. Nicholson**

(2)        Q     Yes, I am asking him I am reading the

(3)    document what is being approved by this document?

(4)        **A     This letter memorializes the**

(5)    **inspection of September 19.  It is a physical**

(6)    **plan.**

(7)        Q     Doesn't the approval refer to the same

(8)    approval in the preceding sentence that it is the

(9)    approval granting to use the areas that you

(10)   constructed?

(11)       **A     Yes, that is what it says.**

(12)       Q     Is it your testimony that that

(13)   approval was granted even before the issuance of

(14)   this letter?

(15)       **A     No, I didn't say that. I didn't say**

(16)   **that.**

(17)       Q     Okay.

(18)       **A     I said it was determined.**

(19)       Q     Okay, and you're saying that that

(20)   determination is different from the approval that

(21)   is set forth in this letter?

(22)       **A     This formal approval was delayed**

(23)   **because --**

(24)       Q     That is not my question.

(25)             I am asking you if what you say is a

(1)                    B. Nicholson

(2)    determination is different from the approval that

(3)    is cited in this letter?

(4)        **A      The determination preceded this**

(5)    **letter, yes.**

(6)        Q      When you say determination are you

(7)    referring to the findings of an inspection?

(8)        **A      I am referring to the findings of the**

(9)    **inspection on September 19 and I am referring to**

(10)   **Chris Chow's written words in his e-mail at the**

(11)   **end of September.**

(12)       Q      Is it your testimony today that HBL

(13)   could have used areas that were constructed prior

(14)   to November 14?

(15)       **A      I don't understand the word "use". I**

(16)   **am not using that, no, I am not testifying to**

(17)   **that.**

(18)           **I am testifying that New York DOH had**

(19)   **determined that the physical building was**

(20)   **compliant as required as the lease says prior to**

(21)   **September 30 and it's memorialized by that**

(22)   **inspection date and by Chris Chow's e-mail.**

(23)       Q      On September 19 you say you were not

(24)   present?

(25)       **A      That is what I said.**

(1)                    **B. Nicholson**

(2)        Q      And you testified that your staff was

(3)   present?

(4)        **A      Correct.**

(5)        Q      Did you issue a formal notification to

(6)   HBL that as of that date the conditions of the

(7)   lease had been met and that the commencement date

(8)   had been established?

(9)        **A      No, no, we did it on September 19.**

(10)       Q      You did that on September 19?

(11)       **A      No, I don't know that we did. I don't**

(12)  **know that we did.**

(13)       Q      Do you have any document in which you

(14)  on behalf of White Plains notify HBL that the

(15)  determination has been made and that the lease

(16)  has commenced?

(17)       **A      A Letter of Intent. A Letter of Intent**

(18)  **we agreed to it. And the Chris Chow e-mail**

(19)  **string.  If you -- if we look at it together**

(20)  **makes it clear to all parties that that was the**

(21)  **determination has been made.**

(22)       Q      Again that is not my question.

(23)       **A      I know it is not.**

(24)       Q      I am asking you as the Manager of

(25)  White Plains, the landlord under the terms of the

(1)                    B. Nicholson

(2)   lease, if you notified HBL, the tenant, that the

(3)   lease had formally commenced as of September 19;

(4)   yes or no?

(5)       **A      I don't know the specific document**

(6)   **that that notice occurred in.**

(7)              **I believe it is included in the Chow**

(8)   **e-mail string. That is my recollection.**

(9)       Q      Your testimony means that determines

(10)  as used in the lease means the result of an

(11)  inspection by a field inspector from the

(12)  Department of Health?

(13)      **A      That and Chris Chow the principal**

(14)  **sanitarian approving it which he did at the end**

(15)  **of September.**

(16)             **MR. GIARDINO:   Let's call up Exhibit**

(17)             **19.**

(18)             **(Whereupon, Defendant's Exhibit 5,**

(19)             **e-mail, (Ex 19), 3 pages, was marked**

(20)             **for identification.)**

(21)      Q      So Bill, take a look at what we marked

(22)  Exhibit 19 and let me know if that is the Chris

(23)  Chow e-mail that you have been referring to?

(24)      **A      This appears to be the string, yes.**

(25)      Q      This is a two page document that your

(1)                    B. Nicholson

(2)    counsel has produced to us and I will ask you to

(3)    review it and I will ask you to cite the language

(4)    in it in which Chris Chow states that the

(5)    building was ready to use as of September 19?

(6)                    MR. DONNELLAN:    Objection to the form

(7)                    of the question.

(8)        A    May I read the e-mail from the bottom

(9)    up please in order to.

(10)       Q    Read the entire e-mail.

(11)                   MR. DONNELLAN:    The reason for my

(12)                   objection is that what the witness

(13)                   testified to is what the document

(14)                   says. The landlord's work is

(15)                   sufficiently completed as constructed

(16)                   to accept patients but not necessarily

(17)                   tenant's operation. Your question

(18)                   refers to the tenant using the

(19)                   premises and that is different from

(20)                   what the witness testified to.

(21)                   MR. GIARDINO:  Al, I appreciate your

(22)                   testimony.  You can object to the

(23)                   form.  I have no problem with that.

(24)                   MR. DONNELLAN:    I am also I should

(25)                   also give the reason for my objection

(1)                    B. Nicholson

(2)          and I stated that reason.  That is

(3)          all. That is all I am trying to do.

(4)          MR. GIARDINO:  No, I think you're

(5)          absolutely coaching your witness

(6)          through your objection and I ask you

(7)          to refrain from doing that.

(8)          MR. DONNELLAN:   No, I have said it

(9)          time and time again. That the reason

(10)         you're mischaracterizing the witness's

(11)         testimony and the documentation. The

(12)         witness has caught it every time but I

(13)         still have an obligation so as not to

(14)         waive the objection to voice my

(15)         objection and the reason why.  I have

(16)         stated it for the record.

(17)     Q    My question to you, Bill, is could you

(18) cite the language in Chris Chow's e-mail that you

(19) referred to earlier which I have now presented to

(20) you that states that the premises were ready for

(21) use as of September 19?

(22)         MR. DONNELLAN:   Note my objection to

(23)         the form of the question.

(24)     A    Can you scroll a little bit please.

(25) Can you scroll to the next entry on the screen

(1)                    B. Nicholson

(2)    please.

(3)              The answer to my question will have

(4)    more than one part.

(5)              In the September 30, 12:29 entry, can

(6)    you scroll down just a bit so I can see who sent

(7)    that please.

(8)              Chris Chow what we are looking at in

(9)    the screen now September 30 at 12:29 writes to

(10)   Joshua who is the owner Property Manager and also

(11)   included the tenant's DOH representative Andrew

(12)   Blatt says "was the Letter of Certification

(13)   completed three signature letter. The provided

(14)   plan of action was acceptable so once we get a

(15)   copy of the three signature letter, an official

(16)   approval letter to be sent."

(17)             So clearly Chow at this point was

(18)   waiting for a document what is known as a three

(19)   signature letter in the vernacular, in public

(20)   health vernacular, in order to document his

(21)   determination that the building is ready in this

(22)   e-mail.

(23)             Would you please scroll up more so I

(24)   can see. Stop please so I can see that. Scroll up

(25)   higher please.

(1)                          B. Nicholson

(2)              In the October 1 10:52 e-mail from

(3)      Chris, Chris says to Josh, "I need the Letter of

(4)      Certification signed by provider.  When ever you

(5)      can get that I will give the approval to occupy."

(6)              So again, it is crystal clear that

(7)      Chris had made the determination that the

(8)      building was constructed sufficiently and what he

(9)      was waiting on was a document, a three party

(10)     letter, that needed to be signed. I don't have

(11)     the document in front of me but I can tell you

(12)     one of the signatures was the tenant and the

(13)     tenant withheld that signature.

(14)             But clearly Chow had made that

(15)     determination which is the indicia test set forth

(16)     in the lease which is what I am basing my

(17)     ascertain on, John.

(18)         Q     As far as Chow's e-mail of October 1

(19)     was concerned he says "when ever you can get that

(20)     to me I will give the approval to occupy", are

(21)     you saying that that approval to occupy is not

(22)     relevant to the determination of when the lease

(23)     commences?

(24)         A     What I am saying, no, I am not saying

(25)     that.

(1)                    B. Nicholson

(2)          What I am saying is that both of

(3)    Chow's entries in this string are crystal clear

(4)    that he had determined that the facility was

(5)    acceptable for occupancy and he needed a three

(6)    party letter that was to be signed by the

(7)    architect and by the tenant, I don't know, I need

(8)    to see the letter but the missing signature my

(9)    guys told me was the tenant and if you look at

(10)   Joshua who, scroll down please.

(11)         So this letter, I don't know if the

(12)   attachments are with this document but the letter

(13)   of certification was signed by the architect

(14)   already and it was not signed by the

(15)   tenant/operator. Tenant operator are essentially

(16)   the same entity.  And that is what hung up the

(17)   formality of DOH's approval to occupy but the

(18)   determination had been made.

(19)      Q    Let me ask you a simple question.

(20)         As of October 1, 2019 had Chris Chow

(21)   given his approval to occupy the building?

(22)      A    He determined it was occupiable. He

(23)   could not give his formal approval because Lizer

(24)   had not signed the three party letter. That is

(25)   what the status of events was on September 30.

B. Nicholson

(1)

(2)      Q      That is fine. I will ask my question

(3)   again and ask you to answer it.

(4)              As of October 1, 2019 had Chris Chow

(5)   given his approval to occupy the building?

(6)      **A      No, he couldn't.  He was being blocked**

(7)   **by Lizer.**

(8)      Q      Thank you. So it is no.

(9)              We have been focusing on the section

(10)   of the lease which requires a determination by

(11)   the DOH about the landlord's work being

(12)   sufficiently complete.

(13)              The other requirement or condition is

(14)   the date on which either the permanent or

(15)   temporary Certificate of Occupancy was issued; is

(16)   that correct?

(17)      **A      If bring me back to the lease I can**

(18)   **verify that.**

(19)      Q      Let's go back to Exhibit 10 page six.

(20)      **A      That is correct, yes.**

(21)      Q      As of September 19 had a Certificate

(22)   of Occupancy been issued?

(23)      **A      I don't remember the date of the**

(24)   **Temporary Certificate of Occupancy. You have to**

(25)   **refresh my memory with the document itself.**

(1)                    **B. Nicholson**

(2)        Q      If the Certificate of Occupancy was

(3)   not issued as of September 19 would September 19

(4)   be the date on which the lease commenced?

(5)            **MR. DONNELLAN:   Objection to the form**

(6)            **of the question.**

(7)        **A      You are asking me a theoretical**

(8)   **question that is probably over my head. I don't**

(9)   **know the date of the temporary C of O.   If you**

(10)  **show it to me I can verify it.**

(11)       Q      You testified earlier that September

(12)  19 was the date on which the tenant could have

(13)  taken occupancy and the lease commenced; correct?

(14)       **A      I don't believe I testified to that.**

(15)            **I think I testified that the DOH had**

(16)  **determined by their inspection that the building**

(17)  **was sufficient but I don't think I testified**

(18)  **anything else but I am happy to clarify any such**

(19)  **ambiguity in my testimony.**

(20)       Q      In forming your opinion about the

(21)  tenant taking occupancy or taking possession as

(22)  of September 30 did you review both the documents

(23)  from the Department of Health and the Certificate

(24)  of Occupancy?

(25)       **A      I reviewed it.**

(1)                        B. Nicholson

(2)            MR. DONNELLAN:    Objection to the form

(3)            of the question.

(4)       A      During the period of the second two

(5)    weeks of September I was looking at documents

(6)    with my staff pertaining to this matter on an

(7)    ongoing basis. I don't remember the dates that

(8)    they were issued particularly as we sit here now.

(9)            MR. GIARDINO:  Let's take a look at

(10)            Exhibit 20.

(11)            (Whereupon, Defendant's Exhibit 6,

(12)            Temporary Certificate of Occupancy,

(13)            (Ex 20), 1 page, was marked for

(14)            identification.)

(15)       Q      Take look at Exhibit 20.  If you

(16)    recognize it tell me what that document is.

(17)       A      This looks like an extension of the

(18)    TCO. It is my recollection that the TCO was

(19)    issued prior to this date and was extended and

(20)    administratively White Plains was very slow in

(21)    getting their documents together.

(22)            But my recollection was that there was

(23)    a TCO issued earlier than this and it had to be

(24)    extended.

(25)       Q      Did you play any role in the

(1)                    B. Nicholson

(2)    production of documents pursuant to the document

(3)    request presented in this case?

(4)        **A      No, we delegated that to our**

(5)    **administration people and did document searches**

(6)    **through our system and kind of stuff. I didn't**

(7)    **really have a hand in that, no.**

(8)        Q    So is it your testimony that there is

(9)    another Certificate of Occupancy that predates

(10)   the one that has been marked as Exhibit 20?

(11)       **A      I believe that there is a TCO that was**

(12)   **issued before this document, yes, I just actually**

(13)   **testified to my understanding and my recollection**

(14)   **that there was a TCO issued prior to this and**

(15)   **this extended the TCO.  That is my recollection.**

(16)       Q    Is there anything on the face of this

(17)   document which has been marked as Exhibit 20 that

(18)   indicates that it's an extension or that a

(19)   previous temporary certificate was issued?

(20)       **A      No.**

(21)       **MR. DONNELLAN:   John, do you not have**

(22)       **the previous one?**

(23)       **MR. GIARDINO:   I have this one. Do**

(24)       **you have the previous one?**

(25)       **MR. DONNELLAN:   Yes.**

(1)                    B. Nicholson

(2)          MR. GIARDINO:  Okay, if you can send

(3)          that over to us. Was that an exhibit

(4)          in anything?

(5)          MR. DONNELLAN:   I believe so. I can

(6)          send you another copy so you have it

(7)          handy. Do you want me to do that?

(8)          MR. GIARDINO:   Yes, why don't you

(9)          send it.  We will look at it and it

(10)         may resolve these questions.

(11)         MR. DONNELLAN:   I'll send it to you

(12)         right now.

(13)     Q   Bill, I want to get back to my

(14) question?

(15)         MR. DONNELLAN:   I just e-mailed it.

(16)         Just to help this along I did just

(17)         e-mail the other TCO.  It is dated

(18)         October 22, 2019. I believe it was the

(19)         production.  I am asking somebody in

(20)         my office to verify that.

(21)         THE WITNESS:  TCO was issued before

(22)         October 22.

(23)         MR. DONNELLAN:   August 22.

(24)         THE WITNESS:  August 22, yes. You said

(25)         October, Al.

(1)                    B. Nicholson

(2)          MR. DONNELLAN:   The one I just sent

(3)          is the one actually the only one I had

(4)          seen before.   I actually had not seen

(5)          October 1.

(6)          THE WITNESS:  August 22 sounds like

(7)          the accurate date that we received the

(8)          TCO.

(9)          MR. DONNELLAN:   That is the one I

(10)         just sent. Like I said, John, I am

(11)         trying to have somebody check and make

(12)         sure that was included in our

(13)         production.  If it was an oversight on

(14)         our part I apologize but I just sent

(15)         you that.

(16)         MR. GIARDINO:  Thank you.  I would

(17)         like to go back to Exhibit 68.

(18)    Q    Bill, how frequently were you in the

(19) White Plains building in the period of August and

(20) September of 2019?

(21)    A    Between once a week and every other

(22) week I was there in that period.

(23)    Q    Did there come a time where you

(24) attended a meeting in the building at which Mr.

(25) Fensterman, Mr. Zafrin, Mr. Jozefovic and another

(1)                    B. Nicholson

(2)    attorney at Mr. Fensterman's office I forget his

(3)    name attended?

(4)         A      Yes.

(5)         Q      Do you recall when that meeting took

(6)    place?

(7)         A      **My recollection was that it was in**

(8)    **early September 2019. I don't have the exact date**

(9)    **but that is my recollection.**

(10)        Q      Did you make any notes from that

(11)   meeting?

(12)        A      **No.**

(13)        Q      Was there an agenda prepared for that

(14)   meeting?

(15)        A      **I don't remember.**

(16)        Q      Would you have a calendar entry in

(17)   your calendar that would establish the date for

(18)   that meeting?

(19)        A      **I should.**

(20)        Q      Do you recall what subjects were

(21)   discussed during the course of that meeting?

(22)        A      **I recall the general topics, yes.**

(23)        Q      What were they?

(24)        A      **Generally the topics were the failure**

(25)   **of the tenant to deliver the necessary financial**

(1)                         B. Nicholson

(2)      instruments required by the lease that is the

(3)      lease deposit, the lease letters of credit, the

(4)      working capital account. Those documents.

(5)              We discussed the tenant's desire to

(6)      have a particular mortgage delivered for its

(7)      operational purposes. And I believe we discussed

(8)      a cost certification.

(9)              The meeting was contentious.  It was

(10)     frankly difficult for anyone to keep anything

(11)     straight.

(12)     Q    Any other topics that you recall were

(13)     discussed?

(14)     A    No, the meeting was so boisterous,

(15)     contentious and frankly got to physicality that

(16)     it was not real organized and not real productive

(17)     and I don't remember any other thing beyond that.

(18)     Q    I would like to turn your attention to

(19)     the financial instruments that you described and

(20)     I think did you describe three different

(21)     financial instruments.

(22)     A    I gave examples of three that was

(23)     required for the lease, that is correct.

(24)     Q    I think you said the first one was

(25)     lease deposit?

(1)                    B. Nicholson

(2)      A     I would have to refer to the lease to

(3)  give you a response with proper specificity,

(4)  John.

(5)      Q     When you said lease deposits what did

(6)  you mean by that?

(7)      A     There were a series of financial

(8)  instruments that were to be delivered by the

(9)  tenant in the lease, I would need to look at it

(10)  to give you proper specific descriptions of them,

(11)  but they included a line of credit, a Letter of

(12)  Credit, a cash deposit and a working capital

(13)  deposit and they're all set forth in the lease.

(14)      Q     If referring to the lease would be

(15)  helpful let's pull up Exhibit 10 again and --

(16)      A     I believe 7.1 would be the place to

(17)  start, John.

(18)      Q     Yes, I was just going to say page 25?

(19)            MR. POLETES:  Gentleman, this is

(20)            George Poletes.  I will be handing it

(21)            back over to Claudia to do the exhibit

(22)            presentation.  Sorry about the

(23)            interruption.  She is going to step in

(24)            right now. Claudia, we are in Exhibit

(25)            10.

(1)                    B. Nicholson

(2)      Q     We are going to page 25 of that

(3)  document.

(4)      A     To answer your question 7.1(a)(i) is a

(5)  line of credit that was to be delivered that was

(6)  not.

(7)            The next item in terms of the

(8)  financial instruments that I am referring to are

(9)  (ii) a $3.7 million Letter of Credit and the

(10) third one is a $1.6 million lease deposit in

(11) (iii) and I believe you would scroll to 7.6 or

(12) 7.7 to find the fourth instrument that was to

(13) have been delivered which was not, that was the

(14) fourth instrument, the working capital account,

(15) that was as the lease says here that was to have

(16) been established in accounts acceptable to the

(17) landlord which was in an amount of the greater of

(18) $4.5 million or the aggregate negative operating

(19) income during the fill up or any debt reserve

(20) required by the mortgagee which were not

(21) required. So that instrument was the -- that is

(22) the fourth instrument I am referring to that was

(23) not delivered.

(24)     Q     Let try to go through those one by

(25) one.

(1)                    B. Nicholson

(2)          Let's start with what you identify in

(3)     section 7.1(a)(i) and you described that as a

(4)     line of credit; correct?

(5)          **A      Can we scroll backup to it please.**

(6)          Q      Page 25.

(7)          **A      Yes, it is exactly what it says. It is**

(8)     **a line of credit.**

(9)          Q      When was the tenant required to have

(10)    that line of credit in place?

(11)         **A      According to the lease I am reading**

(12)    **here 60 days prior to the commencement date.**

(13)         Q      So in your assessment what timeframe

(14)    or date would that have been on given the

(15)    commencement date of the lease?

(16)         **A      On or about July 30. Calendar math is**

(17)    **not my specialty but 60 days prior to September**

(18)    **30.**

(19)         Q      At the time of the meeting in early

(20)    September to your knowledge was that line of

(21)    credit in place?

(22)         **A      To my knowledge, no.**

(23)         Q      What was the purpose of that line of

(24)    credit?

(25)         **A      As the lease says to allow the tenant**

(1)                          B. Nicholson

(2)    to draw down on its credit line each month and

(3)    pay the rent.

(4)        Q    Was that line of credit to be

(5)    available to a specific period of time?

(6)        A    It doesn't say how long the line of

(7)    credit was to be in place for but the lease says

(8)    that there would be a direct payment from Capital

(9)    Funding to the landlord of the rent amount for

(10)   the first 12 months, the initial and the

(11)   following 11 months.

(12)       Q    Are you referring to the language at

(13)   the end of that section which says "commencing

(14)   the commencement date and on each date fix rent

(15)   is due for the following the 11 months"?

(16)       A    Correct.

(17)       Q    So by your calculations when would the

(18)   eleventh month be as required by the terms of

(19)   this section?

(20)       A    The first draw would have been on the

(21)   commencement date and the following 11 months

(22)   would have been 12 months so it was basically one

(23)   years worth of rent.  Commencement date plus

(24)   eleven.  Twenty years worth of rent.

(25)       Q    When would that requirement have been

(1)                          B. Nicholson

(2)  satisfied?

(3)       **A      When would what requirement have been**

(4)  **satisfied?**

(5)       Q      The requirement to have this line of

(6)  credit in place for a period of time and if it is

(7)  discrete period of time the commencement date and

(8)  eleven successive months.

(9)              So when would that timeframe have been

(10) satisfied?

(11)      **A      When would the timeframe of rent**

(12) **payments have been satisfied, is that your**

(13) **question?**

(14)      Q      No, the timeframe during which the

(15) line of credit was required to be in place as

(16) required by this agreement?

(17)      **A      It would have been September 30, 2019**

(18) **through September 30 a year after that. It is a**

(19) **one year period following the commencement date.**

(20)              **The way it is expressed is**

(21) **commencement date plus eleven.  It is a one year**

(22) **period.**

(23)      Q      So is it your answer that through

(24) September 2020?

(25)      **A      Yes.**

(1)                          B. Nicholson

(2)        Q      To your knowledge was that line of

(3)   credit put in place at any time from September of

(4)   2019 through September 2020?

(5)        A      I don't -- to my knowledge Capital

(6)   Funding Group or no, to my knowledge it was line

(7)   of credit was not put in place.

(8)        Q      During this period of time from

(9)   September of 2019 through September of 2020 were

(10)  any installments of rent not paid to the

(11)  landlord?

(12)       A      I would have to go back and look at

(13)  the records. I think ultimately my recollection

(14)  is ultimately they were all paid but they were

(15)  not paid timely.

(16)              However, this and the other four

(17)  instruments were critical to our refinancing our

(18)  construction loan. They were part of the tenant

(19)  credit.

(20)       Q      That really isn't my question.  I am

(21)  asking a very simple fact question.  And that is

(22)  whether or not the monthly installments of rent

(23)  were actually paid during this period of time

(24)  from September until 2019 through September 2020?

(25)       A      My recollection is they were

(1)                          **B. Nicholson**

(2)   **ultimately paid. They were ultimately paid, yes.**

(3)        Q     I will direct your attention to item

(4)   two and I believe you testified earlier that that

(5)   was to be a Letter of Credit in the amount of

(6)   $3.7 million?

(7)        **A     Correct.**

(8)        Q     Looking at the language when was that

(9)   Letter of Credit to have been delivered to the

(10)  landlord?

(11)       **A     Sixty days prior to the anticipated**

(12)  **commencement date which would have been on or**

(13)  **about July 30, 2019.**

(14)       Q     Again, I will ask the question, when

(15)  you had the meeting in early September was that

(16)  Letter of Credit in place?

(17)       **A     No.**

(18)       Q     Do you recall any specific discussion

(19)  about that Letter of Credit?

(20)       **A     When?**

(21)       Q     During the meeting in early September?

(22)       **A     I recall that it was a topic, yes.**

(23)       Q     I am asking do you recall what the

(24)  discussion on that topic was during the time of

(25)  that meeting?

(1)                      B. Nicholson

(2)      A      No, as I said the meeting was a very

(3)   confusing and hectic meeting, so no, I can't

(4)   recall the specifics.

(5)      Q      For what purpose was the $3.7 million

(6)   Letter of Credit required?

(7)      A      Well, the $3.7 million Letter of

(8)   Credit as well as the other three financial

(9)   instruments were required to ensure that the

(10)  tenant's overall credit worthiness and surety so

(11)  to speak for the fill up and operation of the

(12)  facility and this particular letter of credit in

(13)  fact was a replenishing Letter of Credit so to

(14)  the extent it was ever drawn on the tenant had

(15)  the obligation to replenish it.

(16)           So it had two purposes as did the

(17)  other three instruments. One was to ensure

(18)  payment of the rent and operations and the other

(19)  was to support the value of the lease as does any

(20)  lease security or tenant credit instrument for

(21)  the purposes of refinance or sale.

(22)           So it was integral to the value of the

(23)  property, it was integral to the ability of the

(24)  landlord to refinance the facility.

(25)     Q      From the period of September 2020, I

(1)                    B. Nicholson

(2)   am sorry, September 2019 until present day

(3)   January of 2022 have all of the installments of

(4)   rent been made, been paid?

(5)        A    **The base rent has been paid, yes,**

(6)   **correct.**

(7)        Q    Has there been any failure by the

(8)   tenant that has caused the landlord to expend

(9)   monies to address performance obligations for

(10)  which --

(11)       A    **Oh yes, the very failure of the**

(12)  **delivery of the financial instruments has caused**

(13)  **significant expense to the landlord, sure.**

(14)       Q    This Letter of Credit was to be in

(15)  place to provide security for the tenant's

(16)  performance; is that right?

(17)       A    **That is one of the reasons but as I**

(18)  **just testified it also is there to support the**

(19)  **overall value of the lease.**

(20)       Q    Let's go to the language of the lease.

(21)            What does it actually say that it

(22)  secures?

(23)       A    **It secures the full and timely payment**

(24)  **and performance of the tenant's obligation under**

(25)  **the lease which extends far beyond the payment of**

(1)                          B. Nicholson

(2)    rent. There are a plethora of obligations in the

(3)    lease in addition to the rent.

(4)         Q    Can you give me some examples from

(5)    that plethora?

(6)         A    Sure, the obligation to provide the

(7)    line of credit, 7(a)(i), the obligation to

(8)    provide the $1.6 million item three, the

(9)    obligation to provide the working capital, the

(10)   working capital account in 7.7, are among the

(11)   performance.  And taken as a whole the financial

(12)   instruments create the value of the lease which

(13)   allows the landlord to refinance the property. It

(14)   is indisputable.

(15)        Q    Let me direct your attention now to

(16)   sub (iii) and can you tell me what financial

(17)   undertaking that is?

(18)        A    It is a $1.6 million lease deposit.

(19)   Security deposit. A security deposit.  If I said

(20)   lease deposit please allow me to correct my

(21)   testimony. It is a $1.6 million security deposit

(22)   that was to be delivered to the landlord.

(23)        Q    Are you familiar with an account that

(24)   tenant maintained at Chase bank?

(25)        A    Yes, I am one or two layers away from

(1)                          B. Nicholson

(2)    the details of that but I am familiar with

(3)    something that the tenant wanted to put the money

(4)    in a different account and not the landlord's

(5)    security deposit account.

(6)         Q     Do you know the reason why the tenant

(7)    wanted to put the $1.6 million in a different

(8)    account?

(9)         A     I don't know. I don't see it in the

(10)   lease so I don't know.

(11)        Q     Did you have ever have any discussion

(12)   with Lizer about why those funds should be

(13)   maintained in a different account in his opinion?

(14)        A     Yes.

(15)        Q     What reason did he give you for

(16)   maintaining those funds in a different account?

(17)        A     None of substance.

(18)        Q     Have you actually had the opportunity

(19)   in the course of this litigation to review the

(20)   bank documents which evidence the amount of $1.6

(21)   million on deposit?

(22)        A     No, Fensterman really handled that.  I

(23)   was not intimately involved with that aspect of

(24)   it. Howard managed that aspect of it. He was

(25)   intimately involved.  I was not. I just read the

(1)                      B. Nicholson

(2)   lease and I never got the $1.6 million in

(3)   accordance with the lease, John.

(4)        Q    Didn't you in fact submit an affidavit

(5)   saying that even those funds are in an account it

(6)   doesn't matter?

(7)        A    I don't understand the question.

(8)        Q    Do you recall giving an affidavit in

(9)   which you said that it didn't matter that those

(10)  funds were in the account maintained by the

(11)  tenant because it had to be in an account

(12)  maintained by the landlord?

(13)       A    I don't recall such an affidavit but

(14)  if you refresh my memory with a document I would

(15)  be pleased to review it.

(16)       Q    That is okay.

(17)            Did you ever have a discussion with

(18)  Lizer about the $1.6 million for this security

(19)  deposit being satisfied by the $2.2 million that

(20)  he had put up in 2015?

(21)       A    I don't even understand what you're

(22)  saying. The $2.2 million was we just discussed

(23)  that. That is a different issue. I don't

(24)  understand the point.

(25)       Q    I will go at it this way.

(1)                    B. Nicholson

(2)            In 2015 Lizer put up $2.2 million in

(3)     cash; correct?

(4)          **A      Yes.**

(5)          Q      And that money went to White Plains

(6)     the owner of the real estate; correct?

(7)          **A      Correct.**

(8)          Q      Did Lizer get a membership interest in

(9)     White Plains in exchange for that $2.2 million?

(10)         **A      No, I didn't testify to that.**

(11)                **I already testified as to the $2.2**

(12)    **million.  I didn't testify anything about a**

(13)    **membership interest.**

(14)         Q      I really have to insist that you

(15)    listen to my questions and answer the questions

(16)    that I am asking please.

(17)                I asked you the question simply if

(18)    Lizer got a membership interest in White Plains

(19)    for the $2.2 million that he put up in 2015?

(20)         **A      No.**

(21)                **MR. DONNELLAN:   Note my objection.**

(22)                **That question has been asked and**

(23)                **answered. You can answer the question.**

(24)         **A      No.**

(25)         Q      What did Lizer get for the $2.2

(1)                      B. Nicholson

(2)   million he put up in 2015?

(3)            MR. DONNELLAN:   Objection to the form

(4)            of the question.

(5)      A      What did he get?

(6)            He got the FF&E and there was a

(7)   $700,000 difference between the $1.5 million and

(8)   the $2.2 million that was contemplated in the

(9)   first lease to be retired as a credit of

(10)  approximately $35,000 a month that was

(11)  subsequently substituted in the second lease and

(12)  was not included.

(13)     Q      I believe your earlier testimony was

(14)  that that $2.2 million was characterized as the

(15)  FF&E and the rent credit; correct?

(16)     A      I read what the document said.  If you

(17)  want to go back to it I will be happy to go back

(18)  and look it , John.

(19)     Q      I am referring to the testimony that

(20)  you gave in which you said it was characterized

(21)  that way.

(22)     A      I don't remember my testimony.

(23)            MR. DONNELLAN:   Objection. Is there a

(24)            question?  I don't think there is a

(25)            question. He just stated what he was

(1)                        B. Nicholson

(2)            referring to.

(3)      Q      Did Lizer ever receive the $1.5

(4)   million worth of FF&E?

(5)      **A      Yes, it is in the building.**

(6)      Q      Is it your testimony that he has title

(7)   to that FF&E?

(8)      **A      I don't -- I wouldn't testify. I don't**

(9)   **understand, I am not a lawyer, so as title I**

(10)  **would defer that to my counsel but I can't, I am**

(11)  **not qualified to determine title and stuff like**

(12)  **that.**

(13)     Q      Well you testified earlier that your

(14)  company was in charge of procuring the furniture,

(15)  fixtures and equipment; is that right?

(16)     **A      That is correct.**

(17)     Q      Did you maintain some type of a

(18)  schedule of those assets?

(19)     **A      Yes, there is a schedule in the**

(20)  **record. It is a multiple vendor schedule but yes,**

(21)  **that exists.**

(22)     Q      Did you ever provide that schedule of

(23)  assets to the tenant?

(24)     **A      I don't know.**

(25)     Q      Did there come a time where there was

                        B. Nicholson

(1)
(2)    a discussion about White Plains actually

(3)    executing a document to transfer title to those

(4)    assets to the tenant?

(5)        **A    Yes, it was discussed in the LOI of**

(6)    **November 2019.**

(7)        Q    To your knowledge did White Plains

(8)    ever transfer title to those assets to the

(9)    tenant?

(10)        **A    I don't believe so.**

(11)            **MR. DONNELLAN:    Asked and answered.**

(12)        **A    I don't believe that but I would defer**

(13)    **that to my counsel as to what title exists.  I am**

(14)    **not an expert on title so.**

(15)        Q    Again, I will ask the question, in

(16)    accordance with the terms of the lease at what

(17)    time was this rent security account to have been

(18)    established by the tenant?

(19)        **A    According to the lease 60 days prior**

(20)    **to the anticipated commencement date it was**

(21)    **suppose to have been -- please erase that.  Let**

(22)    **me just look at this again.  Beer with me.**

(23)            **The money was suppose to be delivered**

(24)    **from what I read my reading of this 60 days prior**

(25)    **to the commencement, of the anticipated**

(1)                    **B. Nicholson**

(2)  **commencement date.**

(3)       Q     That would have been the same July

(4)  timeframe?

(5)       **A     Yes.**

(6)       Q     Was this $1.6 million account

(7)  discussed at the time of the meeting at the

(8)  facility in early September?

(9)       **A     I don't remember.**

(10)      Q     At the meeting in early September did

(11) you consider the failure to deliver the

(12) instruments that are listed in subsection (a) of

(13) 7.1 to be a default?

(14)      **A     You said September or December, John?**

(15)      Q     The meeting in September that took

(16) place in the building. I will restate the

(17) question so it's clear.

(18)            My question to you is as of the time

(19) of that meeting in early September which took

(20) place at the building did you consider the tenant

(21) to be in default of its obligations to deliver

(22) the three financial instruments that we just

(23) reviewed that are part of section 7.1(a) of the

(24) lease?

(25)      **A     Yes, I considered the tenant to be in**

(1)                        **B. Nicholson**

(2)    **default of those provisions.**

(3)        Q     Did you tell the tenant that they were

(4)    in default of those provisions?

(5)        **A     Yes, we discussed, not at that meeting**

(6)    **but there were numerous discussions about the**

(7)    **fact that these instructions needed to be**

(8)    **delivered, numerous discussions. Me and my people**

(9)    **discussed this numerous times with Jozefovic.**

(10)       Q     Over what period of time did those

(11)   discussions take place?

(12)       **A     Throughout the last approximately from**

(13)   **March, April through the Letter of Intent through**

(14)   **the default letter of January 7. March, April of**

(15)   **2019 through the default letter. They were**

(16)   **ongoing discussions about these issues.**

(17)       Q     It is your testimony that as early as

(18)   March of 2019 you began discussing the obligation

(19)   to deliver these financial instruments with the

(20)   tenant?

(21)       **A     Approximately, yes.**

(22)       Q     Were there ever any writings that you

(23)   issued on behalf of White Plains to the tenant

(24)   about any one of these three financial

(25)   instruments?

(1)                    B. Nicholson

(2)       **A       Certainly.  Josh Roccapriore who was**

(3)  **the tenant -- not tenant, the landlord's Project**

(4)  **Manager attended regular meetings with the tenant**

(5)  **and this was a discussion topic in most of those**

(6)  **discussions, in most of those meetings, yes.**

(7)       Q    I am asking you if you Bill Nicholson

(8)  issued any writings to the tenant from March of

(9)  2019 through up until the meeting in September

(10)  early September that took place in the building

(11)  did you issue any writings to the tenant about an

(12)  obligation to deliver these instruments?

(13)       **A       No, Josh did.  Josh is our**

(14)  **representative. I don't remember whether I**

(15)  **specifically I made a writing but I know that**

(16)  **Josh did.**

(17)            **MR. GIARDINO:  Al, in reviewing the**

(18)            **documents that had been produced to us**

(19)            **I am not familiar with and if we**

(20)            **overlooked them I apologize but I have**

(21)            **not seen any correspondence from White**

(22)            **Plains to HBL between March of 2019**

(23)            **and early September of 2019 in**

(24)            **accordance with description that Bill**

(25)            **has just provided.  So if there is an**

(1)                    B. Nicholson

(2)              updated --

(3)              MR. DONNELLAN:   Yes, there is. I have

(4)              seen those documents.  We produced

(5)              them and they are in the production.

(6)              And also I double checked on the TCO

(7)              that was from August as opposed to the

(8)              one from October that you initially

(9)              showed the witness the one from August

(10)             that I sent you we produced that eight

(11)             times. It is eight bates stamp number

(12)             that I have that if you need the bates

(13)             stamp number I can give them to you

(14)             for that production of the August TCO

(15)             in production.

(16)             MR. GIARDINO:  If it's in there

(17)             somehow it got overlooked over here

(18)             but I don't think you need to do

(19)             anything else.

(20)             MR. DONNELLAN:  The correspondence

(21)             from Josh that he is referring to was

(22)             also in there.

(23)       Q     At the time that Lizer put up the $2.2

(24)   million in 2015 to your knowledge did any other

(25)   members of White Plains contribute capital to the

(1)                         B. Nicholson

(2)     project?

(3)          A      I don't remember the capitalization at

(4)     that point.

(5)          Q      Have you contributed capital to White

(6)     Plains?

(7)          A      Yes.

(8)          Q      What is the amount of your capital

(9)     contribution to White Plains?

(10)         A      Approximately $250,000 plus, excuse

(11)    me, I am sorry, it's more than that. Please

(12)    strike that.

(13)                It is approximately $1.3 million or

(14)    $1.4 million in that range.

(15)         Q      Was that a one time capital

(16)    contribution or was that contributed over a

(17)    period of time?

(18)         A      I don't remember the dates of those

(19)    contributions.

(20)         Q      Is there some kind of capital

(21)    contribution schedule that you maintain that

(22)    would identify those contributions and the dates

(23)    they were made?

(24)         A      I assume so. I don't know. I don't

(25)    look at the accounting on a regular basis but I

(1)                             **B. Nicholson**

(2)    **know that -- I don't know.**

(3)         Q      Do you know off hand the date of your

(4)    earliest contribution to White Plains?

(5)         **A      No, without records I couldn't specify**

(6)    **that.**

(7)         Q      Did Congress Building Corporation make

(8)    a profit on the construction contract?

(9)         **A      Yes.**

(10)        Q      Do you know the approximate amount of

(11)   that profit?

(12)        **A      Probably $1 million.**

(13)        Q      How about Congress Construction did it

(14)   make a profit on its agreement with White Plains?

(15)        **A      No, it actually wound up being in the**

(16)   **red because the project took so long.**

(17)              **You are talking about asset**

(18)   **development, no, we didn't do well on that, John.**

(19)              **MR. GIARDINO:    I would like to go**

(20)              **back to Exhibit 68. Once again this is**

(21)              **the Verified Complaint in this action.**

(22)              **I am going to ask Claudia if you can**

(23)              **scroll to page ten of the document.**

(24)        Q      Bill, I will ask you to look at

(25)   paragraph 55 in which the allegation is made that

(1)                    B. Nicholson

(2)    "HBL failed to pay rent as required by the

(3)    lease"; do you see that?

(4)        **A        Yes.**

(5)        Q        What rent did HBL fail to pay?

(6)        **A        My CFO advised me that many**

(7)    **installments of rent were late.**

(8)        Q        That is not what the allegation says.

(9)                 It says "failed to pay". So I am

(10)    asking you?

(11)        **A        It does because as required by the**

(12)    **lease includes the time it is suppose to be paid**

(13)    **so in fact it is the answer.**

(14)        Q        Are you saying that a late payment is

(15)    the same as a failure to make a payment?

(16)        **A        I am saying that I am looking at the**

(17)    **words "failure to pay rent as required by the**

(18)    **lease", the lease tells you how much and when and**

(19)    **in many instances the when was late is what I am**

(20)    **testifying to.**

(21)        Q        Is it your testimony that paragraph 55

(22)    relates to the late payment of rent?

(23)        **A        If you allow me to finish my response**

(24)    **then I can address that.**

(25)                 **So my CFO has advised me that the rent**

B. Nicholson

was in many instances late so therefore it was

not paid as required by the lease while I did

previous testify that ultimately the base rent

was paid, in addition there is a rent provision

that requires that the rent be 300 percent of the

base rent on default and that was not paid

properly in accordance with the lease.

Q    So the 300 percent relates to holdover

rent; is that correct?

A    Yes, there is a holdover rent

provision in the lease.

Q    I am trying to understand what this

allegation relates to. And what I hear you

testify to is this allegation relates to either

the late payment of rent or the failure to pay

holdover rent.

Does it relate to any other failure by

HBL?

A    It is not or, and. It refers to the

late payment of rent and the failure to pay the

holdover rent both as required by the lease.

Q    Do you agree that the obligation to

pay holdover rent is at issue in this lawsuit?

A    I could only answer that question if

(1)                        **B. Nicholson**

(2)     **you showed me the lease. If you would show me the**

(3)     **lease I can answer that question.**

(4)          Q     Paragraph 56 allegation 56 states that

(5)     "HBL failed to pay real estate taxes as required

(6)     by the lease".

(7)               What did you mean by that allegation

(8)     when you made it?

(9)          A     My CFO informed me that HBL did not

(10)    pay the real estate taxes in accordance with the

(11)    timeframes required by the lease and as a result

(12)    there were certain late payments of taxes.  That

(13)    is what I meant by that.

(14)         Q     As you testify today are you able to

(15)    say whether any amounts are due and owing to any

(16)    taxing authority for this property?

(17)         A     I think I was advised by Ed that the

(18)    taxes have ultimately been paid. Whether or not

(19)    there are late charges that are generated by our

(20)    lease or generated by the municipal authority I

(21)    do not know but I can tell you that I can testify

(22)    that ultimately the rent was paid.

(23)         Q     We are talking about the taxes?

(24)         A     The taxes, excuse me, I beg your

(25)    pardon.  Excuse me.  Ultimately the taxes were

(1)                        B. Nicholson

(2)   paid, yes.

(3)         Q     I will direct your attention to

(4)   allegation number 57 which state that "HBL failed

(5)   to pay utility deposits as required by the

(6)   lease", can you tell me what you meant when you

(7)   made that allegation?

(8)         A     Yes, my CFO prepared a schedule of

(9)   utility deposits and charges that were

(10)  surrounding the project and outlined in his

(11)  exhibits the partial payment of some of those and

(12)  amounts due of others that were not properly paid

(13)  to us or to the utility company that we had to

(14)  pay.

(15)        Q     Do you know what the amount of those

(16)  utility deposits are?

(17)        A     Not without his exhibit and his

(18)  detail, no, I relied on him for that.

(19)        Q     Would you be able to estimate that

(20)  amount?

(21)        A     Between 30 and 50 is my recollection

(22)  but I don't have specifics so it's a very gross

(23)  estimate, John.

(24)        Q     When you say 30 and 50 you mean

(25)  thousand dollars?

(1)                          B. Nicholson

(2)        **A        Thousand dollars, yes.**

(3)        Q        Are you aware of any efforts on the

(4)    part of the tenant to have those security

(5)    deposits returned to the landlord?

(6)        **A        I don't know. I guess that would**

(7)    **involve going down and writing a check, right. I**

(8)    **don't think that was the tenant -- my**

(9)    **recollection of the lease it was the tenant's**

(10)   **obligation to pay those was not conditioned on**

(11)   **any receipt of them back by him from the utility**

(12)   **deposit.  The tenant just owes the deposit to us.**

(13)   **There is no pre conditions to it. I guess I don't**

(14)   **know if he has gone down and got a check written**

(15)   **from his accounting department or not.**

(16)       Q        I really have two questions on this.

(17)              My first question is are you aware of

(18)   efforts by the tenant to cause the utility

(19)   company to return those deposits to White Plains;

(20)   are you aware of it?

(21)       **A        I am not aware of it, no.**

(22)       Q        Are you aware of an offer by the

(23)   tenant HBL to reimburse the landlord for those

(24)   security deposit?

(25)       **A        No, I don't recall such an offer but**

(1)                          B. Nicholson

(2)   my memory could be refreshed.  I just don't

(3)   remember.

(4)        Q     Paragraph 58, allegation 58 is that

(5)   "HBL failed to pay municipal maintenance escrow

(6)   as required by the lease", do you know what you

(7)   meant when you made that allegation?

(8)        A     Can you scroll to it please.

(9)        Q     It is number 57.

(10)       A     This is in the same, yes, there were

(11)  certain -- during the course of construction Josh

(12)  and Ed told me there were certain deposits that

(13)  the City of White Plains required for maintenance

(14)  escrows that we paid that the tenant needs to

(15)  reimburse us for.

(16)       Q     Do you know the amount of that

(17)  deposit?

(18)       A     I would have to refer to documents,

(19)  John.

(20)       Q     Do you have an estimate?

(21)       A     I think it is under $10,000 but it's

(22)  in the order of magnitude under $10,000.

(23)       Q     Has White Plains ever issued a bill to

(24)  HBL for that reimbursement of deposit?

(25)       A     I don't know. My staff told me we paid

(1)                        B. Nicholson

(2)    it and we are entitled to it back from the

(3)    tenant.

(4)        Q    Do you know if prior to White Plains

(5)    paying it it ever made a request to the tenant

(6)    HBL to pay that deposit?

(7)        A    I would have to check the records to

(8)    ascertain that.

(9)        Q    As you testify today you are not aware

(10)   of any request to the tenant to pay that deposit

(11)   and that a refusal or failure to do so?

(12)       A    I don't recall. I have to look at the

(13)   records. I have to look at the records for that.

(14)   Given it's under $10,000 I was not intimately

(15)   involved in the details. I have to rely on my

(16)   folks for that.

(17)       Q    Are you aware of a proposal by HBL to

(18)   reimburse the landlord for that deposit?

(19)       A    No.

(20)       Q    I will ask you to look at allegation

(21)   number 59. "HBL failed to pay utility charges as

(22)   required by the lease".

(23)            Can you tell me what you mean when you

(24)   made that allegation?

(25)       A    These were when you ask me for an

(1)                          B. Nicholson

(2)    estimate of 57, 57 and 59 I had grouped together.

(3)    There were a series of deposits and charges

(4)    surrounding the startup of gas, surrounding the

(5)    startup of electric, surrounding the date of

(6)    commencement that were accumulated by Josh and

(7)    tabulated by Ed inside that estimate that I gave

(8)    you of 3250 and 59 and 57 are together.

(9)         Q     In your experience in the construction

(10)   industry when there is a hand over of a building

(11)   from the owner who is constructing it to the

(12)   tenant taking over various accounts isn't it

(13)   common that the transition of those accounts

(14)   require reimbursement to different parties?

(15)        A     It is usual and ordinary that there is

(16)   a true up of sorts, yes.

(17)        Q     Other than the utility charges that

(18)   were paid during the transition to the tenant

(19)   does this paragraph 59 allege that HBL failed to

(20)   pay any utility payments since it took occupancy

(21)   of the building?

(22)        A     59 and 57 are together. Ed Tabor

(23)   tabulated them.  I was not intimately involved

(24)   with them. I did look at a schedule and the

(25)   schedule is in the documents.  I just I don't

(1)                          B. Nicholson

(2)     have detailed recollection of the specifics of

(3)     it.

(4)          Q     Let's take a look at your allegation

(5)     number 60 which "HBL failed or refused to deliver

(6)     Certificate of Insurance as required by the

(7)     lease" and what did you mean when you made that

(8)     allegation?

(9)          A     I asked Ed Tabor to do an analysis of

(10)    the insurance documents that we got from the

(11)    tenant and I saw a schedule that he prepared

(12)    which I believe is one of the exhibits in this

(13)    proceeding that outlined the deficiencies in the

(14)    insurance.

(15)         Q     Did White Plains make a request of the

(16)    tenant to conform those coverages to the

(17)    coverages required by the lease?

(18)         A     I don't know. I would have to ask Ed.

(19)    I don't know the answer to that.

(20)         Q     But you have verified this Complaint;

(21)    didn't you?

(22)         A     Yes.

(23)               MR. DONNELLAN:    Objection.  Asked and

(24)               answered.

(25)         Q     And you swore to the accuracy of the

(1)                    B. Nicholson

(2)   statements; correct?

(3)        A       Correct.  And the statement says that

(4)   HBL failed or refused to deliver the certificate.

(5)        Q       In what way did HBL refuse to deliver

(6)   the certificate?

(7)        A       I know that they to my knowledge I

(8)   know they failed to produce the insurance in

(9)   accordance with the lease. Ed reviewed that with

(10)  me.  He showed me a schedule that he prepared

(11)  that exists in these proceedings that show the

(12)  deficiencies.

(13)       Q       Did Ed tell you that HBL is refusing

(14)  to provide the insurance required by the lease?

(15)       A       No, Ed told me that the insurance was

(16)  defective, deficient.

(17)       Q       As you testify today do you know if

(18)  the insurance in place on the building conforms

(19)  to the requirements of the lease?

(20)       A       I don't.

(21)       Q       Allegation number 61, "HBL failed to

(22)  deliver to WPH Properties all Medicare, Medicaid

(23)  and other provider agreements and reimbursement

(24)  rate sheets for the facility, as required by the

(25)  lease"; what did you mean when you made that

(1)                    B. Nicholson

(2)  allegation?

(3)       **A        Exactly what it says.**

(4)       Q     Have you ever received any of those

(5)  agreements or rate sheets?

(6)       **A       Ed Tabor advised me that we got them**

(7)  **in connection with the litigation through your**

(8)  **office and that is the only, and I don't know, I**

(9)  **am not sure whether the submission was complete**

(10) **or not but we did get some of them or all of them**

(11) **I don't know in connection with this litigation.**

(12)      Q     Allegation 63, "HBL failed to deliver

(13) to WPH Properties the required financial

(14) reporting as required by the lease", what did you

(15) mean when you made that allegation?

(16)      **A       What I mean was if one were to go**

(17) **through the reporting requirements of the lease**

(18) **financial reporting which is if we were to refer**

(19) **to the lease I could testify in detail we did not**

(20) **receive those in the substance or timing as**

(21) **required by the lease.**

(22)      Q     Allegation number 65 relate to

(23) security deposit and I will ask you if those are

(24) the security deposits about which you previously

(25) testified to your understanding?

(1)                        B. Nicholson

(2)          **A      Yes.**

(3)          Q      Allegation 66 relates to the failure

(4)   to deliver and maintain a required credit line

(5)   for 12 months rent as required by the lease, is

(6)   that the credit line under the first subsection

(7)   of 7.1 that we reviewed earlier?

(8)          **A      Yes.**

(9)          Q      And is it your testimony that the

(10)  tenant is still under an obligation to provide

(11)  that line of credit?

(12)         **A      I would have to look at the lease to**

(13)  **answer.**

(14)         Q      When we looked at the lease earlier

(15)  you identified that that line of credit was to be

(16)  in place for the commencement date and the eleven

(17)  months thereafter.

(18)              So I am asking if you are of the

(19)  opinion today or making the allegation today that

(20)  the tenant still has an obligation to deliver

(21)  that line of credit?

(22)         **A      I heard the question.  I need to look**

(23)  **at the lease to answer it.**

(24)         Q      Allegation 67 relates to the failure

(25)  to maintain the working capital account required

(1)                    B. Nicholson

(2)    by the lease and is that the working capital

(3)    account that you identified in section 7.6?

(4)         **A      I believe it is 7.7, John.**

(5)         Q      Yes, well in either event the one that

(6)    we reviewed earlier in your testimony?

(7)         **A      Yes, it is.**

(8)         Q      And then paragraph 68 "HBL failed to

(9)    pay late fees and costs, as required by the

(10)   lease", do you know the amount of the late fees

(11)   that are due?

(12)        **A      I don't know the amounts, no.  Ed**

(13)   **tabulated them and but I don't know specific**

(14)   **amount, no.**

(15)        Q      Do you have an estimate?

(16)        **A      No, I could not estimate that without**

(17)   **a document.**

(18)        Q      And then it says costs, do you know

(19)   what costs refers to?

(20)        **A      Yes, costs include costs that we**

(21)   **incurred as a result of the tenant's late**

(22)   **payment, professional fees, transactional costs,**

(23)   **all for which the tenant is responsible in the**

(24)   **lease.**

(25)        Q      Do you know the amount of those costs

B. Nicholson

(1)

(2) that you allege the tenant is responsible for?

(3)     **A**    **I would not testify to such an amount**

(4) **without a document in front of me. I know they**

(5) **were tabulated but I would not guess on that one.**

(6)     Q    As you testify today do you have any

(7) range of dollars or estimate as to the amount

(8) that you claim is due from the tenant for those

(9) costs?

(10)     **A**    **I would need to go to the documents**

(11) **that were provided surrounding that to answer**

(12) **that question, John. I don't know them by heart.**

(13)         **(Short break:  2:53 to 3:26)**

(14)     Q    One last question on your capital

(15) contribution is to White Plains what ever the

(16) number is you said it was $250,000 and then you

(17) said it is in excess of $1.3 million.

(18)         Does that include capital

(19) contributions in the form of services rendered to

(20) the venture or is that all cash that you

(21) contributed?

(22)     **A**    **It is all cash.**

(23)         **(Whereupon, Defendant's Exhibit 7,**

(24)         **Letter of January 7, 2020 from the**

(25)         **Donnellan firm to HBL, Notice of**

(1)                        B. Nicholson

(2)                **Default, (Ex 28), 5 pages, was marked**

(3)                **for identification.)**

(4)        Q    We will mark for identification

(5)    Exhibit 28 which is the letter of January 7, 2020

(6)    from the Donnellan firm to HBL and I will ask you

(7)    to talk a look and familiarize yourself with it.

(8)        **A    Okay.**

(9)        Q    Let me know when you're ready.

(10)       **A    I am ready.  I can only see one page**

(11)   **but I am ready.**

(12)       Q    Have you seen this document before?

(13)       **A    I have.**

(14)       Q    Did you play any role in the

(15)   composition of this document?

(16)       **A    I participated in it, yes, with my**

(17)   **people.**

(18)       Q    This document is a Notice of Default

(19)   and addresses obligations under both the lease

(20)   and the Letter of Intent; is that correct?

(21)       **A    That is correct.**

(22)       Q    What role did you play in identifying

(23)   the various defaults under the lease and the

(24)   Letter of Intent?

(25)       **A    I worked with my team and with**

(1)                         **B. Nicholson**

(2)    **Fensterman and with our counsel to compose and**

(3)    **assemble the items in this letter.**

(4)         Q     For the most part would it be fair to

(5)    say that the items in this letter at least as

(6)    they pertain to the lease correspond with the

(7)    allegations of the Complaint that we reviewed

(8)    earlier?

(9)         **A     I have not done an item for item**

(10)   **comparison.**

(11)        Q     Fair enough.

(12)              I will ask that we look at the last

(13)   page of the exhibit which is a schedule.

(14)              Have you seen that schedule before?

(15)        **A     Yes.**

(16)        Q     Do you know who prepared this

(17)   schedule?

(18)        **A     Ed Tabor. Our company CFO.**

(19)        Q     I want to similarly go through line by

(20)   line on the items that are listed here.

(21)              So listed in item number one is rent

(22)   January 2020; do you see that?

(23)        **A     Yes.**

(24)        Q     So the amount due for rent is listed

(25)   as $546,096.50.

(1)                    B. Nicholson

(2)              Is that the amount of rent that is due

(3)     under the lease?

(4)        **A      It is the amount of rent that is due**

(5)     **in the lease plus a $40,000 per month amount**

(6)     **agreed to in the LOI and you would have to refer**

(7)     **to the LOI itself as part of an attempt to**

(8)     **resolve the $3.7 million LOC that was not**

(9)     **delivered.**

(10)             **For specifics I would need to look at**

(11)    **the LOI but that is what it refers to.**

(12)       Q      We can do that but as you testify

(13)    today is the Letter of Intent still in effect?

(14)       **A      I don't know.  That is a legal**

(15)    **question I would have to defer to my counsel on.**

(16)       Q      Other than the legal question do you

(17)    consider obligations arising under the Letter of

(18)    Intent to continue to be obligations of the

(19)    tenant?

(20)       **A      Like I said, that is a legal question.**

(21)    **I have would have to defer to my counsel on.**

(22)       Q      So if we look at that line and amounts

(23)    paid the amount paid is $506,096.50, is that the

(24)    amount of the rent due under the terms of the

(25)    lease?

(1)                          B. Nicholson

(2)        **A       The $506,000 and change is the base**

(3)    **rent in the lease, correct.**

(4)        Q      That was paid in January; is that

(5)    correct?

(6)        **A       I don't know when it was paid. But**

(7)    **according to this schedule it was paid some time**

(8)    **in January, yes.**

(9)        Q      And then item two is rent from

(10)   September 30 to November 30, 2019 and the

(11)   indication there is that the amount due is

(12)   $10,831, do you know how that amount was arrived

(13)   at?

(14)       **A       There was a series of -- there was a**

(15)   **series of -- it had to do with the one day in**

(16)   **September that was not paid and then some prior**

(17)   **amounts paid that were not exactly the rent**

(18)   **amount. Ed Tabor could I think he schedule out**

(19)   **the exact details but it had to do with those two**

(20)   **components.**

(21)       Q      When you say the two components you

(22)   mentioned September 30, do you know what the

(23)   other component is?

(24)       **A       There was a -- Ed told me there were**

(25)   **certain rent payments between September and**

B. Nicholson

January that were not exactly the amount of the

rent and so there was I don't want to call it

rounding but it was some payments that were made

on account that didn't tie exactly to the rent

amount plus or minus as component one and

component two is the September 30 one day rent.

Q    You testified earlier when we reviewed

the complaint allegations that there were late

fees associated with the late payment of rent?

A    Yes.

Q    Are those late fees included on this

schedule in line ten?

A    Yes, they appear to be again. I didn't

prepare that particular, yes, as of this time it

appears that those are the late fees referred to,

yes.

Q    Line ten refers to late fees on the

January rent or the January additional rent of

$40,000 and the rent in line two for September

30; correct?

A    What I am reading on that line item it

refers to late fees on items one, two, three,

five, six, seven, so it would include all of

those six items. All of those five items.

**B. Nicholson**

(1)

(2)      Q      In any event, the total at least at

(3)   this time of all of those five items was $9,000;

(4)   is that right?

(5)      **A      According to the schedule, yes.**

(6)      Q      Do you know if at the time of filing

(7)   the Complaint that that number of $9,000 for late

(8)   fees had increased?

(9)      **A      To my recollection it was at the time**

(10)   **of filing the Complaint Ed did a calculation**

(11)   **contemporaneous with that time since it was a**

(12)   **different point in time than this document.**

(13)      Q      Do you recall if it was a number

(14)   different from the $9,000 number?

(15)      **A      I would not want to speculate. I would**

(16)   **need to look at the document in order to answer**

(17)   **that question, John.**

(18)      Q      Let's look at line item number three,

(19)   real estate taxes and it appears that that is for

(20)   a period in which the landlord had some

(21)   responsibility and the a period in which the

(22)   tenant had some responsibility; it that right?

(23)      **A      That is my understanding of that line**

(24)   **item.  It was a split period, yes.**

(25)      Q      The amount that appears to be due from

(1)                     B. Nicholson

(2)   the tenant is $61,000?

(3)        **A      At this point in time, yes.**

(4)        Q      And then there is real estate taxes

(5)   for January 1, 2020 through June 30, 2020;

(6)   correct?

(7)        **A      Yes, that is what that says.**

(8)        Q      And those were entirely the

(9)   responsibility of the tenant; correct?

(10)       **A      Yes.**

(11)       Q      In both of those items three and four

(12)  there is an indication that they were due on

(13)  December 1?

(14)       **A      This is really small so I am having a**

(15)  **hard time reading it but where do you see that?**

(16)  **I am sorry.  It is difficult.**

(17)       Q      It is the column to the left so there

(18)  is amounts payable, due date, amount due, amount

(19)  paid, amount passed due.

(20)       **A      Again, I didn't prepare the details of**

(21)  **the schedule so if that is what it says, yes.**

(22)       Q      As of January 7 is it your

(23)  understanding that these amounts were not paid?

(24)       **A      That is my understanding, correct.**

(25)       Q      What was the purpose of issuing the

(1)                    B. Nicholson

(2)    January 7, 2020 letter?

(3)         **A        What was the purpose of issuing the**

(4)    **letter?  Can we scroll up please so I can see the**

(5)    **letter. Scroll down please. Scroll down further**

(6)    **please.**

(7)              **The purpose of the letter is to**

(8)    **terminate the lease based upon the tenant's**

(9)    **default is as of this writing.**

(10)        Q      Had there been any prior notice of a

(11)   default in the payment of taxes prior to January

(12)   7?

(13)        **A        I don't know.**

(14)        Q      Have you ever reviewed a Notice of

(15)   Default prior to January 7 addressing the issue

(16)   of the property taxes?

(17)        **A        I am not sure I understand the**

(18)   **question.**

(19)        Q      Have you ever reviewed a document that

(20)   was issued prior to January 7, 2020 notifying the

(21)   tenant about the failure to pay property taxes?

(22)        **A        I don't remember such a specific**

(23)   **notice.**

(24)        Q      These taxes were due according to this

(25)   schedule on December 1, 2019 and on January 7

(1)                    B. Nicholson

(2)    there is a letter issued terminating the lease

(3)    for the failure to make those payments, there are

(4)    other issues; correct, in part?

(5)        **A        There are other issues, correct.**

(6)        Q        Was there a right for the tenant to

(7)    cure any defaults under the lease?

(8)        **A        I would have to look at the lease to**

(9)    **answer that question.**

(10)       Q        As you testify here today are you

(11)   familiar at all with any provision of the lease

(12)   that allows the tenant to cure a default?

(13)       **A        I am familiar with the lease generally**

(14)   **but in order to answer your specific question I**

(15)   **would need to look at the lease because various**

(16)   **defaults were treated differently.**

(17)       Q        Did you approve of this sending of the

(18)   letter on January 7, 2020 before it was actually

(19)   issued?

(20)       **A        Yes.**

(21)       Q        Before it was issued on January 7 did

(22)   you discuss this letter with your lender Security

(23)   Benefit?

(24)       **A        No, I did not.**

(25)       Q        Have you ever discussed this letter

(1)                      B. Nicholson

(2)     with Security Benefit?

(3)         **A      Yes.**

(4)         Q      When did you discuss this letter with

(5)     Security Benefit?

(6)         **A      I couldn't speak to it a specific**

(7)     **date. I couldn't speak to a specific date. I**

(8)     **couldn't testify to a particular date.**

(9)         Q      Did you provide Security Benefit with

(10)    a copy of this letter?

(11)        **A      I don't recall.**

(12)        Q      When you had your conversation with

(13)    Security Benefit do you know did they have a copy

(14)    of this letter in their possession?

(15)        **A      I don't recall.**

(16)        Q      Have you ever received from Security

(17)    Benefit their consent to issue a letter in which

(18)    the landlord claims to terminate the lease?

(19)        **A      I don't recall such a document.**

(20)        Q      Is there any provision in this January

(21)    7, 2020 notice that affords the tenant an

(22)    opportunity to cure any of the defaults and you

(23)    can scroll through it, take your time?

(24)        **A      Please bring me to the top of the**

(25)    **letter. Scroll down please. Scroll down.**

(1)                    **B. Nicholson**

(2)            **No, I don't see that there is a cure**

(3)    **period or provision in this letter.**

(4)        Q      Did this letter also terminate the

(5)    Letter of Intent?

(6)        **A      That is a legal question.  I would**

(7)    **have to refer to my counsel on. I am not**

(8)    **qualified to answer that question.**

(9)        Q      So back to line three and four of the

(10)   schedule attached to the January 7 letter.

(11)           Is it your understanding and

(12)   consistent with your testimony earlier today that

(13)   these tax payments have been made by the tenant?

(14)       **A      Yes, Ed Tabor told me that the taxes**

(15)   **were ultimately paid.**

(16)       Q      To the extent that these are defaults

(17)   under the lease would it be fair to say those

(18)   defaults were cured?

(19)           **MR. DONNELLAN:  Note my objection.**

(20)           **That called for a legal conclusion.**

(21)           **The word cure has a legal connotation**

(22)           **to it.**

(23)           **MR. GIARDINO:  Al, you can object.**

(24)           **It's fine.   Object.**

(25)           **MR. DONNELLAN:    I am objecting**

(1)                    B. Nicholson

(2)            because it calls for a legal

(3)            conclusion so.

(4)            MR. GIARDINO:  That is fine, okay. He

(5)            can answer the question. Are you

(6)            directing him not to answer?

(7)            MR. DONNELLAN:   He can answer it if

(8)            he knows.

(9)      A      I am not qualified to opine as to

(10)  whether something has been cured or not.

(11)      Q      Other than the legal meaning of cure

(12)  if someone performs an act after they have been

(13)  put on notice and in performing that act resolves

(14)  the matter about which notice is given do you

(15)  consider that to be a cure?

(16)            MR. DONNELLAN:   Same objection. Calls

(17)            for a legal conclusion by a witness

(18)            who is not qualified.

(19)      A      Same response. I know that the taxes

(20)  were ultimately paid.

(21)      Q      Do you know when they were paid?

(22)      A      I don't know. I don't know the dates.

(23)      Q      As you testify today is the payment of

(24)  taxes an item of default under the lease?

(25)      A      Is the payment of taxes, the taxes,

(1)                          **B. Nicholson**

(2)    **the nonpayment of taxes in a timely, in the time**

(3)    **required, is a default under the lease, yes.**

(4)        Q    So again you're referring to the

(5)    lateness of the payment rather than the payment

(6)    itself?

(7)        **A    I don't understand the question.**

(8)        Q    Well you said it is the lateness of

(9)    the payment?

(10)       **A    If the taxes are not paid on time that**

(11)   **is a default.**

(12)       Q    So even if they're paid if they're

(13)   paid late it's a default; is that your testimony?

(14)               **MR. DONNELLAN:    Objection. He already**

(15)               **asked and answered that question.**

(16)       Q    Let's go to item number five, utility

(17)   deposit.

(18)               The item here is listed at $60,000; is

(19)   that consistent with your understanding of the

(20)   utility deposits that are claimed to be due in

(21)   the Complaint?

(22)       **A    Generally consistent, yes.**

(23)       Q    Do you know if any payments have been

(24)   made on the utility deposit since January 7?

(25)       **A    Ed Tabor told me that we did receive**

(1)                         B. Nicholson

(2)   certain funds against items five, six and seven.

(3)   The specific I don't have at my fingertips but Ed

(4)   Tabor did advise me that we did receive some of

(5)   the $68,000 of five, six and seven.

(6)        Q     Do you know when those payments were

(7)   received?

(8)        A     I don't as we speak. Unless I had a

(9)   document in front of me I couldn't answer that

(10)  question specifically.

(11)       Q     When those payments were made to White

(12)  Plains did White Plains accept those payments?

(13)       A     In other words, did they cash the

(14)  check or tender the deposit, is that the

(15)  question?

(16)       Q     Yes, did they, did White Plains accept

(17)  those payments when they were received or did

(18)  they reject those payment?

(19)       A     No, we did not reject them.  We

(20)  accepted it.

(21)       Q     Line item eight, security deposit

(22)  first payment, is that a security deposit that is

(23)  due under the lease or is that a payment due

(24)  under the Letter of Intent?

(25)       A     That was an installment of the

(1)                          **B. Nicholson**

(2)      **security deposit due under the Letter of Intent.**

(3)           Q       To your knowledge has that ever been

(4)      paid?

(5)           **A       It has not to my knowledge.**

(6)           Q       And then nine, ten and 11 relate to

(7)      interest on past due real estate. Let's take them

(8)      one at a time.

(9)                Item nine, interest on past due real

(10)     estate taxes on a per diem basis, is that money

(11)     that is owed to White Plains or owed to the

(12)     taxing authorities?

(13)          **A       I don't know. I would have to refer to**

(14)     **Ed Tabor on that. It is a level of -- it is a**

(15)     **number that is small enough that I would not be**

(16)     **involved in the details of.**

(17)          Q       Number ten, late fees we talked about

(18)     it on line item one, two, three, five, six and

(19)     seven and the total as of January 7 was $9,000,

(20)     we talked about that.

(21)                On number 11, interest on items one,

(22)     two, three, five, six at the over due rate prime

(23)     plus five percent can you tell me what that is?

(24)          **A       It is a calculation Ed Tabor did based**

(25)     **on the over due rate in the lease when certain**

(1)                         B. Nicholson

(2)     items were not paid on time and Ed Tabor did this

(3)     calculation.  I did not do it but that is what it

(4)     refers to.

(5)         Q     That is $11,000; correct?

(6)         A     That is what it says, yes, and change,

(7)     yes.

(8)         Q     To your knowledge did HBL make its

(9)     rent payment for the month of January?

(10)        A     What year?

(11)        Q     2020?

(12)        A     Yes, this chart so suggests that it

(13)    paid the $506,000 and to my knowledge it was

(14)    paid, yes.

(15)        Q     Do you know whether it was paid on

(16)    time or not?

(17)        A     I don't. I would defer to Ed Tabor on

(18)    that.

(19)        Q     Do you know if White Plains made its

(20)    rent payment for February of 2020?

(21)        A     I believe yes, it made a February rent

(22)    payment.

(23)        Q     Did White Plains issue a billing for

(24)    that rent?

(25)        A     I don't believe rent was billed, no.

(1)                    **B. Nicholson**

(2)       Q      Has White Plains ever issued a billing

(3)   for HBL?

(4)       **A      I don't believe in the ordinary course**

(5)   **of business White Plains issued invoices for**

(6)   **rent, no.**

(7)       Q      Do you know the date on which the

(8)   February rent was paid?

(9)       **A      No, I would need documents in front of**

(10)  **me to answer that question.**

(11)      Q      When the February rent was paid by HBL

(12)  was it accepted by White Plains?

(13)      **A      In other words, did we cash the check,**

(14)  **yes, in the same definition that you previously**

(15)  **suggested, yes.**

(16)      Q      Did White Plains notify HBL that it

(17)  considered that additional rent was still due and

(18)  payable for the month of February?

(19)      **A      What additional amount are you**

(20)  **referring to?  I am not sure I understand the**

(21)  **question.**

(22)      Q      Well, you testified that alleged is in

(23)  the Complaint the failure to pay rent related to

(24)  the failure to pay rent on time which resulted in

(25)  late fees and the failure to pay rent at 300

(1)                    B. Nicholson

(2)    percent.

(3)              So do you know did HBL pay 300 percent

(4)    of the rent for the month of February?

(5)         **A      No, HBL did not pay the 300 percent.**

(6)         Q      Did White Plains notify HBL that its

(7)    failure to pay 300 percent constituted an event

(8)    of default?

(9)         **A      I don't know.**

(10)              **MR. DONNELLAN:   Note my objection to**

(11)              **the form.**

(12)         **A      I don't recall.**

(13)         Q      Did White Plains ever issue to HBL any

(14)   sort of notice or communication that going

(15)   forward that its monthly rent was 300 times the

(16)   $506,000 it was previously paying?

(17)         **A      I would have to check the record on**

(18)   **that. I don't know the answer to that question.**

(19)         Q      Do you know if HBL paid the rent for

(20)   the month of March 2020?

(21)         **A      Tabor advised me that HBL paid that**

(22)   **rent, yes.**

(23)         Q      Was that rent accepted by White

(24)   Plains?

(25)         **A      Yes.**

**B. Nicholson**

(1)

(2)    Q    Did White Plains continue to receive

(3) rent in the amount of $506,096.50 for the

(4) succeeding months of May, June, July, August

(5) through December for 2020?

(6)    **A    Yes.**

(7)    Q    Did White Plains ever reject any of

(8) those rent payments?

(9)    **A    No.**

(10)    Q    Did you participate in any discussions

(11) regarding the borrowing by the tenant HBL against

(12) its accounts receivable?

(13)    **A    I was not intimately involved with**

(14) **those discussions, no. I don't recall specific**

(15) **discussions. I was not I don't recall being**

(16) **intimately involved with those, no.**

(17)    Q    Earlier I asked you if you were

(18) familiar with a company by the name of CNH and

(19) you indicated that you had some history with

(20) them.

(21)        Were you aware of efforts being made

(22) by HBL to put in place a line of credit for its

(23) receivables with CNH?

(24)    **A    Yes.**

(25)    Q    Do you know what period of time that

(1)                         B. Nicholson

(2)     was?

(3)         A       I specifically don't, no.

(4)         Q       Do you know if it was after January 7,

(5)     2020?

(6)         A       I believe it was but I don't know.

(7)         Q       Did you ever receive a copy of a

(8)     proposed intercreditor agreement?

(9)         A       I saw those documents. I was not

(10)    really involved in them deeply. Pat Formato was

(11)    addressing that matter. He is an attorney at

(12)    Abrams Fensterman.

(13)        Q       Do you know who a Tim Peters is?

(14)        A       I know who Tim Peters is, yes.

(15)        Q       Who is Tim Peters?

(16)        A       Tim Peters is an executive or Manager

(17)    of CNH.

(18)        Q       Have you had any direct dealings with

(19)    CNH?

(20)        A       Yes, as I testified earlier our

(21)    Milwaukee property had borrowings from CNH or one

(22)    of its affiliates and our Forest Manor project in

(23)    Hope, New Jersey had borrowings with CNH.

(24)        Q       During the course of those business

(25)    relationships with CNH did you deal with Tim

(1)                      B. Nicholson

(2)    Peters?

(3)         **A      I dealt with Tim on Milwaukee.**

(4)         **I did not really deal with Tim on**

(5)    **Forest Manor. Zev Farkas who was the management**

(6)    **company dealt more with Tim than I did.**

(7)         Q      Did you have --

(8)         **A      I will correct that.**

(9)         **On Forest Manor, I should not have**

(10)   **said more than I did. Zev dealt with Tim on**

(11)   **Forest Manor.**

(12)        Q      Did you ever have any conversations

(13)   with Tim about HBL or White Plains?

(14)        **A      I think Tim and I spoke once about it.**

(15)        Q      Is that your answer?

(16)        **A      Yes.**

(17)        Q      Do you recall when that conversation

(18)   took place?

(19)        **A      I do not.**

(20)        Q      Did you recall the substance of that

(21)   conversation?

(22)        **A      Not in detail, no.**

(23)        Q      Did you call him or did Tim call you?

(24)        **A      I don't recall.**

(25)        Q      Was Tim seeking any information from

(1)                      B. Nicholson

(2)   you about the White Plains project?

(3)        A        I don't remember the particulars of

(4)   the conversation.

(5)        Q        Do you recall if the conversation was

(6)   about White Plains or was it about something

(7)   else?

(8)        A        No, it was about White Plains.

(9)        Q        When you had the conversation with Tim

(10)  Peters did you relate to Tim Peters that the

(11)  tenant was in default?

(12)       A        Yes.

(13)       Q        So you do recall that?

(14)       A        Yes.

(15)       Q        What did you say about that?

(16)       A        That it was in default.

(17)       Q        Did you describe the nature of the

(18)  default to Mr. Peters?

(19)       A        I don't really recall the conversation

(20)  beyond that.

(21)       Q        You simply advised him that the tenant

(22)  is in default?

(23)       A        Yes.

(24)       Q        What do you recall what Mr. Peters

(25)  might have said to you?

(1)                    B. Nicholson

(2)        **A     No, I don't recall the details of the**

(3)   **conversation beyond that.**

(4)        Q    By the way, did you ever default in

(5)   the Milwaukee project on your loan agreement with

(6)   CNH?

(7)        **A     No, we paid that off.  I testified to**

(8)   **that earlier.**

(9)        Q    I understand you paid it off but was

(10)  there a period of time where you were in default?

(11)       **A     I don't know because it was a rotating**

(12)  **line.  Ed Tabor was handling it. We were closing**

(13)  **the business down Ed Tabor and Tim and I did have**

(14)  **some discussions and we managed through the**

(15)  **closeout. I just don't remember whether there was**

(16)  **any default or not.  I don't recall one but that**

(17)  **was a while ago so.**

(18)       Q    When you spoke to Mr. Peters about the

(19)  White Plains project did you know whether or not

(20)  CNH was prepared to make the loan to HBL?

(21)       **A     I don't recall beyond that. I really**

(22)  **don't. I was not handling the particulars so I**

(23)  **don't know.**

(24)       Q    Did you ever speak with Pat Formato

(25)  about the loan with CNH?

B. Nicholson

(2)     **A       Pat and I spoke.**

(3)             **MR. DONNELLAN:  Just note my objection**

(4)             **that it should not include any**

(5)             **attorney/client privilege**

(6)             **communication. You can testify.**

(7)     **A       I talked about it, yes.**

(8)     Q       Did you provide any comment to the

(9)   proposed loan documents between CNH and HBL?

(10)    **A       I don't recall doing so. I was not**

(11)  **that involved in that particular issue.**

(12)    Q       Do you know whether or not Security

(13)  Benefit approved the loan documents as between

(14)  CNH and HBL?

(15)    **A       I don't. I was not really that**

(16)  **involved in that particular issue.**

(17)    Q       Were you aware of discussions ongoing

(18)  during that period of time about curing any

(19)  defaults under the lease in relation to that

(20)  transaction?

(21)    **A       No, I was not particularly aware of**

(22)  **that of those discussions, no.**

(23)            **MR. GIARDINO:  Could we call up**

(24)            **Exhibit 22.**

(25)            **(Short break:  4:05 to 4:07)**

(1)                            B. Nicholson

(2)                    (Whereupon, Defendant's Exhibit 8,

(3)                    Letter of Intent, (Ex 22), 11 pages,

(4)                    was marked for identification.)

(5)          Q    I will ask you to take a look at what

(6)     we marked as Exhibit 22 and ask you if you are

(7)     familiar with that document?

(8)          A    I am.

(9)          Q    Is that the document that we have been

(10)    referring to throughout your testimony as the

(11)    LOI?

(12)         A    Yes.

(13)         Q    Did you sign that document as the

(14)    Manager of White Plains Healthcare?

(15)         A    If you scroll down and allow me to

(16)    verify I can answer that question.

(17)               Yes, that is my signature.

(18)         Q    Did the LOI provide for a period of

(19)    time in which it would remain in effect and then

(20)    a date in which it would terminate to your

(21)    knowledge?

(22)         A    I would have to review its terms to

(23)    answer that question.

(24)         Q    To assist you in that I am going to

(25)    refer you to section 1(h) which begins on page

(1)                    B. Nicholson

(2)    two and continues to page three and then that may

(3)    be of some assistance, there may be other

(4)    sections that you're familiar with.

(5)         **A    Paragraph 1(g) says that LOI, says**

(6)    **that additional formal agreements will be**

(7)    **complete by November 22, 2019 and absent**

(8)    **execution of formal contracts this LOI shall**

(9)    **govern provided the down payment is received in**

(10)   **good funds by Contributor upon execution of the**

(11)   **LOI.**

(12)        Q    When it refers to the down payment do

(13)   you know what payment that refers to?

(14)        **A    It is a defined term because it is**

(15)   **capitalized so I need to find it in the document.**

(16)             **Can you scroll up again please.**

(17)             **I believe that the down payment is the**

(18)   **$2.2 million in item (a)(3) by trust making a**

(19)   **non-refundable down payment of $2.2 million.**

(20)        Q    I will direct your attention to item

(21)   1(a)(i) which is on page one.  That section

(22)   refers to a down payment of $2.2 million; does it

(23)   not?

(24)        **A    They both do.**

(25)        Q    Do you know did White Plains receive a

(1)                         B. Nicholson

(2)    down payment of $2.2 million?

(3)         **A**      **Yes.**

(4)         Q      Do you know how that payment was made?

(5)         **A**      **I am not sure I understand the**

(6)    **question.**

(7)         Q      Do you know how that payment was made?

(8)             Do you know if was made by wire or by

(9)    check or some other means?

(10)        **A**      **I don't -- I couldn't testify to that**

(11)   **specifically. Ed Tabor would have handled that**

(12)   **but Ed Tabor told me we got the money.**

(13)        Q      Would there be a record showing the

(14)   manner in which that $2.2 million was paid?

(15)        **A**      **I believe so, yes.**

(16)        Q      Section 1(a)(i) references a wire

(17)   payment in accordance with the wire instructions

(18)   that were attached to the Letter of Intent.

(19)        **A**      **I don't see that, John, I am sorry.  I**

(20)   **am not because it's kind of small on my screen**

(21)   **so.**

(22)        Q      Section 1(a)(i) says "by a down

(23)   payment" which is then identified as 'down

(24)   payment' "so not to be held in escrow, but to be

(25)   made upon the execution and delivery of this LOI

(1)                     B. Nicholson

(2)    of $2.2 million by wire transfer to the account

(3)    of White Plains Healthcare Properties I LLC

(4)    according to the wire instructions annexed

(5)    hereto"?

(6)        A    That would suggest the Ed delivered

(7)    wiring instructions and HBL wired.

(8)        Q    Would you have in your records a copy

(9)    of the wire instructions that Ed Tabor would have

(10)   prepared that accompanied this LOI?

(11)       A    I believe so.

(12)       Q    I think you testified already that you

(13)   were aware that White Plains received the wire

(14)   transfer in the amount of $2.2 million; is that

(15)   correct?

(16)       A    I know we received the funds. Ed Tabor

(17)   told me we received the funds.

(18)       Q    Do you know if those funds were

(19)   received in accordance with subsection G that you

(20)   read earlier as of November 22?

(21)       A    I do not know the date those funds

(22)   were wired or paid.  I don't know.

(23)       Q    Would you have any knowledge has

(24)   anyone ever told you that that $2.2 million was

(25)   received after November 22?

B. Nicholson

(2)      **A      I don't have -- I don't remember ever**

(3)  **having any discussions about whether it came in**

(4)  **before or after.  I don't recall such discussions**

(5)  **but I do recall Ed Tabor telling me we received**

(6)  **the money.**

(7)      Q      Subsection (g) the down payment that

(8)  is to be made is a down payment that is capital

(9)  Down Payment; is that right?

(10)      **A      That is what it says.**

(11)      Q      That corresponds to the identification

(12)  of the payment under section 1(a)(i); is that

(13)  right?

(14)      **A      I can't see that.  I can't see**

(15)  **1(a)(i).  Yes, that is the same $2.2 million.**

(16)      Q      Those funds once they were received by

(17)  White Plains were those funds utilized by White

(18)  Plains in any manner?

(19)      **A      I don't recall.**

(20)      Q      Yesterday Mr. Fensterman testified

(21)  that once the $2.2 million funds were received

(22)  that they were disbursed by White Plains as

(23)  managed by Congress for various obligations of

(24)  White Plains that had accrued; does that sound,

(25)  is that consistent with your understanding of the

(1)                          B. Nicholson

(2)    use of the $2.2 million?

(3)        A       I don't remember. I don't remember

(4)    frankly absent a document.  I would not deny or

(5)    confirm.

(6)        Q       As you testified today do you have any

(7)    knowledge as to what White Plains did with the

(8)    $2.2 million it received on or before November

(9)    22, 2019?

(10)       A       No, I wouldn't testify. I wouldn't

(11)   have specific knowledge about it as we sit here

(12)   without any documents in front of me, no.

(13)       Q       To your knowledge did White Plains

(14)   ever return the $2.2 million to HBL?

(15)       A       No, it was nonrefundable it was not

(16)   returned.

(17)       Q       It is your contention that the $2.2

(18)   million is nonrefundable?

(19)       A       Well as I am reading the document,

(20)   yes. In paragraph A, a nonrefundable down payment

(21)   of $2.2 million. The $2.2 million is clearly

(22)   nonrefundable.

(23)       Q       Can you point me to the language that

(24)   you're reading?

(25)       A       Paragraph A (ii)item three.

(1)                     **B. Nicholson**

(2)        Q     Is that your testimony that that is

(3)    the same $2.2 million payment that is referenced

(4)    in (a)(i)?

(5)        **A     Yes.**

(6)        Q     On what basis do you make that

(7)    statement?

(8)        **A     It is the only $2.2 million payment**

(9)    **that is referenced in this entire document. That**

(10)   **was part of the overall agreement in the Letter**

(11)   **of Intent.**

(12)       Q     Referencing subsection three of

(13)   section 1(a)(ii) is down payment capitalized in

(14)   that section?

(15)       **A     No.**

(16)       Q     To your knowledge was that $2.2

(17)   million payment made by the Trust?

(18)       **A     I don't know. I don't know who made**

(19)   **the payment or who sourced it but I know we**

(20)   **received it. Ed Tabor told me we received it.**

(21)       Q     Do you know if as of November 22 the

(22)   Trust had been formed?

(23)       **A     I don't because I was, no, I don't.**

(24)       Q     Are you aware that in the litigation

(25)   between White Plains and HBL, HBL claims it's

(1)                    B. Nicholson

(2)  entitled to a return of that $2.2 million?

(3)     **A      No.**

(4)     Q      Did White Plains set the $2.2 million

(5)  aside as any sort of security or collateral for

(6)  its transactions with HBL?

(7)     **A      Not to my knowledge.**

(8)     Q      When White Plains received the $2.2

(9)  million payment how did it record it on its books

(10)  and records?

(11)     **A      I don't know. I am not the CFO.   I**

(12)  **have to defer to Ed Tabor on that.**

(13)     Q      That would be your CFO that would have

(14)  treated that payment in some manner; correct?

(15)     **A      Yes.**

(16)     Q      Have you ever inquired as to whether

(17)  it was treated as a capital contribution to White

(18)  Plains?

(19)     **A      No, I never inquired.**

(20)     Q      Have you ever inquired as to whether

(21)  White Plains took that in as income?

(22)     **A      No, I didn't inquire.**

(23)     Q      Are you aware of the notice by

(24)  Security Benefit that that $2.2 million should

(25)  have been remitted to your lender?

(1)                     B. Nicholson

(2)          **A      Yes.**

(3)          Q      Did you ever have any conversations

(4)   with Security Benefit about why that money was

(5)   not remitted to your lender?

(6)          **A      No, I have not had a conversation with**

(7)   **him about that.**

(8)          Q      Subsection G that you referred to

(9)   earlier references in the last sentence that "if

(10)  the tenant defaults in the payment of rent on the

(11)  lease and such default continues for five days

(12)  contributor shall have the right to terminate

(13)  this LOI and all formal contracts"; do you see

(14)  that?

(15)         **A      No, I don't see it.**

(16)         Q      It is the last sentence in

(17)  subparagraph G?

(18)         **A      I don't see G.  The document manager**

(19)  **needs to scroll. I see that.**

(20)         Q      Having that sentence do you know who

(21)  contributor, who the contributor is?

(22)         **A      No.**

(23)         Q      You don't.

(24)                Was there any other part of this

(25)  document if you go to the top of the document are

(1)                        B. Nicholson

(2)    you able to identify who the contributor is?

(3)        **A       I can't see the top of the document.**

(4)            **MR. GIARDINO:  Document Manager, you**

(5)            **need to be moving the document as we**

(6)            **go through it.**

(7)        **A       Yes, it says White Plains Healthcare**

(8)    **Properties is the contributor.**

(9)        Q      Now we need to go back to the bottom

(10)   of page two and returning to that language, my

(11)   question to you is did the contributor White

(12)   Plains ever terminate the LOI?

(13)       **A       Not to my knowledge.**

(14)       Q      The language is that if the tenant

(15)   defaults in the payment of rent on the lease and

(16)   such default continues contributor shall have the

(17)   right to terminate this LOI and I asked you

(18)   earlier if the January 7, 2020 Notice of Default

(19)   and termination was intended to terminate the

(20)   LOI?

(21)           **MR. DONNELLAN:   Is there a question?**

(22)       Q      Was the January 7, 2020 letter

(23)   intended to terminate the LOI?

(24)           **MR. DONNELLAN:   It speaks for itself**

(25)           **and he already asked and answered that**

(1)                    B. Nicholson

(2)              question a while ago.

(3)              MR. GIARDINO:    I am asking him again.

(4)              You can object.

(5)              MR. DONNELLAN:    I did. You can answer

(6)              the question.

(7)      A      I need to see the January 7 letter

(8)  again.

(9)              MR. GIARDINO:    Exhibit 28.

(10)     A      This document terminates the lease. I

(11) think it is a legal issue as to whether or not

(12) the LOI is terminated. I am not -- I have to

(13) defer that to my counsel.

(14)     Q      When the January 7, 2020 notice speaks

(15) of termination does it mention the LOI?

(16)     A      Document speaks for itself. It

(17) mentioned defaults under the LOI.  If you are

(18) asking me if so the document does mention the

(19) LOI, yes.

(20)     Q      Let me ask you this question then.   I

(21) am not asking for a legal conclusion.

(22)              I am asking you when you participated

(23) in the preparation and issuance of the January 7,

(24) 2020 letter did you intend to terminate the

(25) Letter of Intent, you Mr. Nicholson?

B. Nicholson

(2)     **A      I did not have an intent. The lease**

(3)  **was terminated because the tenant did not provide**

(4)  **any of the financial instruments required and the**

(5)  **additional reasons set forth in this letter.**

(6)          **The LOI was an attempt to resolve**

(7)  **these defaults.  We were suppose to get $1**

(8)  **million in lieu of the $3.6 million.  We never**

(9)  **got the million dollars. We never got anything.**

(10)          **So I am not able to make slicing and**

(11)  **dicing legal arguments about whether the LOI was**

(12)  **terminated because I am not qualified to do so.**

(13)  **The lease was terminated.**

(14)     Q      I am not asking that.  Please

(15)  understand I am not asking you a legal question.

(16)          I am asking you what your intentions

(17)  were when you participated in the issuance of

(18)  this letter.

(19)          Now the million dollar payment under

(20)  the LOI was due by what date?

(21)     **A      I have to look at it to answer that**

(22)  **question.**

(23)     Q      Let's agree the document speaks for

(24)  itself.

(25)          As of January 7, 2020 was that million

(1)                    B. Nicholson

(2)    dollar payment overdue?

(3)        A     I would like to look at the LOI in

(4)    order to answer that question please.

(5)        Q     Do you know as you testify today of

(6)    your own knowledge without looking at the

(7)    documents as of January 7 was the million dollar

(8)    payment provided for in the LOI due and payable?

(9)        A     To my recollection it was due and

(10)   payable.

(11)       Q     Was the tenant in default of that

(12)   payment as of January 7?

(13)       A     Of the first million dollars of the

(14)   two set forth in the LOI, is that what you're

(15)   referring to?

(16)       Q     Yes.

(17)       A     Yes.

(18)       Q     After January 7 did White Plains

(19)   continue to work with HBL to consummate the

(20)   transaction that is laid out in the Letter of

(21)   Intent?

(22)       A     I don't recall. I just know that none

(23)   of the money that was suppose to be paid to us

(24)   got paid to us.

(25)       Q     Do you know if efforts were ongoing to

(1)                    B. Nicholson

(2)    continue to structure the deal that is laid out

(3)    in the Letter of Intent?

(4)        A     I don't recall.

(5)        Q     Do you recall any discussions about

(6)    the tax treatments of the various participants in

(7)    the Delaware Statutory Trust structure?

(8)        A     I do but I don't recall whether those

(9)    were before or after the January 7 letter.

(10)       Q     But you recall that those discussions

(11)   took place?

(12)       A     Yes.

(13)       Q     Did you participate in those

(14)   discussions?

(15)       A     We brought in a CPA to engage.

(16)       Q     Do you, and this is not a legal

(17)   question, do you consider the LOI to still be in

(18)   effect?

(19)       A     I don't know the answer to that

(20)   question.

(21)       Q     Do you consider the lease to still be

(22)   in effect?

(23)       A     The lease has been terminated.

(24)       Q     Do you have an opinion as to the lease

(25)   but you don't have an opinion as to the LOI?

(1)                    B. Nicholson

(2)        **A      That is correct.  I am deferring to my**

(3)    **counsel on the LOI.**

(4)        Q      When was the lease terminated?

(5)        **A      I believe January 7.**

(6)        Q      After January 7 did you ever ask HBL

(7)    to surrender possession of the building?

(8)        **A      No.**

(9)        Q      After January 7 did you ever advise

(10)   the tenant that you were accepting rent with

(11)   reservations because the lease had been

(12)   terminated?

(13)           **MR. DONNELLAN:  Note my objection to**

(14)           **the form.**

(15)       **A      I don't recall such an advice.  The**

(16)   **lease speaks for itself.**

(17)       Q      After January 7 did the tenant

(18)   continue to have the right to cure any defaults

(19)   under the lease?

(20)           **MR. DONNELLAN:  That is clearly a**

(21)           **question asking for a legal conclusion**

(22)           **that this witness is not qualified to**

(23)           **give.**

(24)           **MR. GIARDINO:  Thank you to your**

(25)           **testimony once again.**

(1)                    B. Nicholson

(2)              MR. DONNELLAN:    It is a clear

(3)         objection to an improper question. If

(4)         you want to ask questions like that

(5)         you will get a straight objection,

(6)         John.  I am not obstructing the

(7)         witness. I am giving an exact proper

(8)         objection to an improper question.

(9)              MR. GIARDINO:  Al, please confer with

(10)        the federal rules.

(11)             MR. DONNELLAN:    I did.

(12)             MR. GIARDINO:  I will restate the

(13)        question.

(14)             MR. DONNELLAN:    You can ask the

(15)        question and he can answer it but if

(16)        you want to ask questions.  We don't

(17)        have argue about it. He can answer it.

(18)             MR. GIARDINO:  The reason these

(19)        narratives are not permitted under the

(20)        federal rules. Anyway.

(21)    Q    Bill --

(22)             MR. DONNELLAN:    The federal rules

(23)        clearly say that I am suppose to voice

(24)        the purpose for my objection and that

(25)        is the reason why I stated it. I don't

(1)                        B. Nicholson

(2)              just get to say objection.  I have to

(3)              state the reason why and that is the

(4)              reason why for the record so I don't

(5)              waive my objection and I made my

(6)              objection clear.  That is the only

(7)              reason why I am trying to do it, John.

(8)              I am not trying to create any problem.

(9)              I have been pretty quiet on this whole

(10)             examination. If there is clear

(11)             question that I feel is improper I

(12)             have to state, my feeling is, I have

(13)             to state the reason why.

(14)             MR. GIARDINO:   You can say that is a

(15)             legal conclusion.  Not a problem.

(16)             MR. DONNELLAN:  That is all I said.

(17)    Q     Bill, as the Manager of White Plains

(18)  the landlord of the building were you of the

(19)  opinion in January 7 as of January 7 that the

(20)  tenant could cure defaults under the lease?

(21)       A     Again.

(22)             MR. DONNELLAN:   Note my objection for

(23)             the reasons I already stated.

(24)       A     I think it is a theoretical question

(25)  because clearly he has not.

(1)                          **B. Nicholson**

(2)        Q      That is not my question.

(3)               Did you entertain discussions in which

(4)    the tenant after January 7 could cure the default

(5)    identified under the lease?

(6)        **A      I don't recall.**

(7)               **MR. DONNELLAN:   Additional objection**

(8)               **since you're asking for discussion**

(9)               **about settlement discussions.**

(10)       Q      You testified earlier when we reviewed

(11)   the schedule attached to the January 7, 2020

(12)   notice that various payments had been made that

(13)   corresponded to the notices of default; correct?

(14)       **A      Various, correct.**

(15)       Q      You also testified that White Plains

(16)   accepted those payments; correct?

(17)       **A      Correct.**

(18)       Q      Outside of any settlement discussions

(19)   are you aware of discussions that were ongoing

(20)   between White Plains and HBL to solve any of the

(21)   defaults identified in the January 7 letter after

(22)   January 7?

(23)       **A      I don't recall.**

(24)               **MR. DONNELLAN:   I have to object**

(25)               **again because any discussions**

(1)                        B. Nicholson

(2)                regarding resolving defaults would

(3)                fall into the settlement discussions

(4)                and they are prohibited by the

(5)                agreement the parties executed the

(6)                pre-negotiation agreement they cannot

(7)                be part of this case.  Parties have

(8)                already agreed to that in writing.

(9)        Q      Bill, earlier you testified that the

(10)   failure of the tenant to provide certain

(11)   financial instruments prevented White Plains from

(12)   refinancing on the property; do you recall that?

(13)       A      Yes.

(14)       Q      You testified that the tenant was

(15)   unable to provide an estoppel for the purpose of

(16)   a refinancing; is that right?

(17)       A      I don't remember that testimony.

(18)       Q      With what lending institutions was

(19)   White Plains in discussion with about refinancing

(20)   the building?

(21)       A      At what time?

(22)       Q      At the time that the loan with

(23)   Security Benefit matured?

(24)              MR. DONNELLAN:   Note my objection to

(25)              the form of the question.

(1)                          B. Nicholson

(2)        A      Well that is a complex question

(3)   because the loan with Security Benefit

(4)   contemplated two extensions which never came to

(5)   fruition and the notion of going to a bank with a

(6)   tenant that had not put up $15 million worth of

(7)   financial instruments required for the lease was

(8)   silly. It was a non-starter in the financial

(9)   markets.

(10)       Q      Other than Security Benefit, and I am

(11)  sorry I forgot the name of the other lender that

(12)  you identified earlier that did not finance the

(13)  project, other than Security Benefit what other

(14)  lenders had you spoken to about financing the

(15)  White Plains facility?

(16)       A      Refinancing the facility post

(17)  construction?

(18)       Q      Sure.

(19)       A      That is the question.  None, I know

(20)  better than to churn the market at bring a loan

(21)  to a nursing home lender with a tenant that is in

(22)  such gross default of millions of dollar of lease

(23)  security and no where near in compliance with the

(24)  lease.  Just a nonstarter. I wouldn't do that. It

(25)  is a nonstarter.

(1)                    B. Nicholson

(2)          MR. GIARDINO:  Can we call up Exhibit

(3)     50.

(4)          (Whereupon, Defendant's Exhibit 9,

(5)          Tenant letter, (Ex 50), 10 pages, was

(6)          marked for identification.)

(7)     Q     Before we go to Exhibit 50, do you

(8) agree that in 2015 the tenant put up $2.2 million

(9) for the White Plains project?

(10)         MR. DONNELLAN:  Objection to the form

(11)         of the question.

(12)    A     I agree $2.2 million was put up by the

(13) tenant, yes.

(14)    Q     Do you agree that in 2019 the tenant

(15) contributed an additional $2.2 million to White

(16) Plains?

(17)    A     Again?

(18)         MR. DONNELLAN:  Objection to the form

(19)         of the question.

(20)    A     I disagree.  The tenant did not

(21) contribute anything in 2019. Tenant made a

(22) nonrefundable deposit toward the purchase of the

(23) building under the Delaware Statutory Trust set

(24) forth in the LOI.

(25)    Q     So let's say it this way.

(1)                        B. Nicholson

(2)              Do you agree that on or before

(3)      November 22, 2019 the tenant paid to White Plains

(4)      the sum of $2.2 million?

(5)          **A        Yes.**

(6)          Q        You testified earlier that you were

(7)      aware that the tenant maintained a bank account

(8)      that had $1.6 million in it that it had proposed

(9)      as a rent security account; do you agree with that?

(10)         **A        I don't think I testified that I was**

(11)     **aware of any bank account. I testified that I was**

(12)     **not really handling that matter. Fensterman was**

(13)     **and I saw various bank accounts but that I**

(14)     **believe my testimony was that White Plains never**

(15)     **got the $1.6 million as prescribed in the lease.**

(16)         Q        I am responding to your comment

(17)     earlier about how silly it would be to approach a

(18)     lender when the tenant had failed to put up the

(19)     amount of money that you described and I am

(20)     trying to identify the dollars that the tenant

(21)     did put up or was prepared to put up which would

(22)     equal $6 million?

(23)                   **MR. DONNELLAN:    Objection to the form**

(24)                   **of the question.**

(25)         **A        I don't understand the question.**

(1)                          **B. Nicholson**

(2)         Q     I direct your attention to what has

(3)    been marked as Exhibit 50. I will ask if you

(4)    recognize that document.

(5)         **A     Scroll through it please further.**

(6)               **Yes, I recall this document.**

(7)         Q     Did you draft this letter?

(8)         **A     Yes.**

(9)         Q     Did anyone else contribute to the

(10)   drafting of this letter?

(11)        **A     I recall Tabor helping me with the**

(12)   **drafting of it.  Beyond that I just don't recall.**

(13)        Q     In your paragraph number one you make

(14)   the statement that "the tenant has no option

(15)   rights under the lease since the lease has long

(16)   been terminated".

(17)        **A     That is what it says.**

(18)        Q     Is there any other reason why the

(19)   tenant does not have option rights?

(20)        **A     I don't know.  I don't know of any**

(21)   **other reason or not.**

(22)              **(Short break:  4:48 to 4:51)**

(23)              **MR. GIARDINO:  We are done with the**

(24)              **document. You can take that down.**

(25)              **So I have no further questions. Thank**

(1)                    B. Nicholson

(2)          you Bill for your testimony today.

(3)          Al, I will have some followup requests

(4)          for some documents. I trust we won't

(5)          have a problem.  I am just looking for

(6)          things likes the wire instructions

(7)          that were attached to the LOI. I can't

(8)          remember off the top.  I have some

(9)          notes. Bill's CFO's treatment of the

(10)         payments that were received. Obviously

(11)         there is a disbursement that neither

(12)         he nor Howard can remember what they

(13)         actually did with the money I think we

(14)         are interested in that. It will be

(15)         limited but we will have a very short

(16)         followup on those things.

(17)         MR. DONNELLAN:   Okay. So I look

(18)         forward to receiving that. We will

(19)         followup.

(20)         MR. GIARDINO:  With that we are

(21)         concluded. Thank you Claudia and thank

(22)         you Laura.

(23)         You have my permission to share the

(24)         exhibits with counsel.

(25)         (Time noted: 4:52 p.m.)

(1)              **D E C L A R A T I O N**

(2)

(3)

(4)

(5)        I hereby certify that having been

(6)   first duly sworn to testify to the truth, I

(7)   gave the above testimony.

(8)

(9)        I FURTHER CERTIFY that the foregoing

(10)  transcript is a true and correct transcript

(11)  of the testimony given by me at the time and

(12)  place specified hereinbefore.

(13)

(14)

(15)              _____

(16)                   BILL NICHOLSON

(17)

(18)  Subscribed and sworn to before me on

(19)  this     day of            , 2022.

(20)  _____

(21)  NOTARY PUBLIC

(22)

(23)

(24)

(25)

(1) --------------- EXHIBIT INDEX-----------------

(2) WITNESS          EXAMINATION BY     PAGE

(3) BILL NICHOLSON  MR. GIARDINO        9

(4)

(5) ------------------ EXHIBITS------------------

(6) DEFENDANT'S      PAGE

(7) Exhibit 1,       63   Term Sheet, (Ex 6) 5 pages

(8) Exhibit 2,       89   First Amended Verified

(9)                       Complaint, (Ex 68), 18 pages

(10) Exhibit 3,      94   Amended and Restated

(11)                      Operating Lease, (Ex 10),

(12)                      96 pages

(13) Exhibit 4,      99   Letter dated 12/2/19 from

(14)                      DOH to Blatt (Ex 23), 1 page

(15) Exhibit 5,      107  e-mail, (Ex 19), 3 pages

(16) Exhibit 6,      115  Temporary Certificate of

(17)                      Occupancy, (Ex 20), 1 page

(18) Exhibit 7,      156  Letter of January 7, 2020

(19)                      from the Donnellan firm to

(20)                      HBL, Notice of Default,

(21)                      (Ex 28), 5 pages

(22) Exhibit 8,      181  Letter of Intent, (Ex 22),

(23)                      11 pages

(24) Exhibit 9,      201  Tenant letter, (Ex 50),

(25)                      10 pages

```
 (1)        "INFORMATION/DOCUMENTATION REQUEST INDEX"

 (2)

 (3)    -------------- DOCUMENT REQUEST --------------

 (4)    PAGE       204 (See attached)

 (5)

 (6)    --------- INFORMATION TO BE FURNISHED --------

 (7)                  -NONE-

 (8)

 (9)    ----------------- RULINGS --------------------

(10)                  -NONE-

(11)                    oOo

(12)

(13)

(14)

(15)

(16)

(17)

(18)

(19)

(20)

(21)

(22)

(23)

(24)

(25)
```

[Page 208]
January 12, 2022

(1)                    CERTIFICATION

(2)    STATE OF NEW YORK  )

(3)                            )  ss.:

(4)    COUNTY OF NEW YORK )

(5)

(6)              I, LAURA B. LOWENTHAL, a Notary

(7)    Public within and for the State of New York, do

(8)    hereby certify:

(9)              That BILL NICHOLSON the

(10)   witness(es) whose deposition(s) is(are)

(11)   hereinbefore set forth, was(were) duly sworn by

(12)   me and that such deposition(s) is(are) a true and

(13)   accurate record of the testimony given by such

(14)   witness(es).

(15)              I further certify that I am not

(16)   related to any of the parties to the action by

(17)   blood or marriage; and that I am in no way

(18)   interested in the outcome of this matter.

(19)              IN WITNESS WHEREOF, I have

(20)   hereunto set my hand this 12th day of

(21)   January, 2022.

(22)

(23)              _Laura B. Lowenthal_

(24)              LAURA B. LOWENTHAL

(25)

**January 12, 2022**

[Page 209]

| | | | | |
|---|---|---|---|---|
| **A** | 83:21,24 | 58:6 | 143:24 | 1:7 |
| **a.m (1)** | 84:11,13,16 | **acquisition (5)** | **addressed (2)** | **agenda (1)** |
| 1:13 | 84:17 120:4 | 38:12 54:3,7 | 9:22 57:4 | 119:13 |
| **a/k/a (2)** | 122:14 | 54:12,13 | **addresses (1)** | **agent (1)** |
| 1:8 2:9 | 130:10,23 | **acronym (1)** | 157:19 | 19:10 |
| **A133 (1)** | 131:4,5,8,13 | 59:5 | **addressing (2)** | **aggregate (2)** |
| 18:6 | 131:16 132:5 | **act (4)** | 164:15 176:11 | 21:11 122:18 |
| **abandoned (2)** | 132:10,11 | 44:17 82:14 | **administerin...** | **ago (4)** |
| 45:11,12 | 136:17 137:6 | 168:12,13 | 7:13 | 12:10 44:8 |
| **ability (1)** | 154:25 155:3 | **acted (2)** | **administrati...** | 179:17 191:2 |
| 128:23 | 161:5 184:2 | 55:22 82:11 | 54:11 55:10,13 | 192:10 |
| **able (5)** | 202:7,9,11 | **action (7)** | 55:18 116:5 | **agreeable (1)** |
| 20:15 145:14 | **accounting (3)** | 4:16 6:6 34:14 | **administrati...** | 94:15 |
| 146:19 190:2 | 30:17 141:25 | 88:19 110:14 | 115:20 | **agreed (12)** |
| 192:10 | 147:15 | 142:21 | **advance (2)** | 4:4,18 5:7,13 |
| **Abrams (1)** | **accounts (14)** | 208:16 | 65:4 67:23 | 5:19 6:8 7:4 |
| 176:12 | 33:25,25 36:3 | **active (2)** | **advanced (3)** | 78:20 98:2 |
| **absent (2)** | 36:10,12,21 | 18:14 44:21 | 56:3 65:10 | 106:18 159:6 |
| 182:7 186:4 | 36:24,24,25 | **activities (1)** | 67:15 | 199:8 |
| **absolutely (2)** | 122:16 | 29:11 | **adverse (3)** | **agreement (27)** |
| 10:10 109:5 | 150:12,13 | **activity (1)** | 34:18,18,20 | 11:25 12:5,13 |
| **accelerate (1)** | 175:12 | 84:9 | **advice (1)** | 14:10 25:4 |
| 93:17 | 202:13 | **actual (2)** | 195:15 | 29:20 66:12 |
| **accept (7)** | **accrued (1)** | 75:17 83:23 | **advise (2)** | 67:16 81:5,8 |
| 62:5 96:21 | 185:24 | **add (1)** | 170:4 195:9 | 81:8,10,11 |
| 97:2,7 108:16 | **accumulated...** | 51:6 | **advised (6)** | 83:3 84:20,23 |
| 170:12,16 | 150:6 | **added (1)** | 143:6,25 | 85:3,10,18 |
| **acceptable (6)** | **accuracy (2)** | 32:10 | 145:17 153:6 | 95:9 125:16 |
| 10:10 92:2,25 | 93:20 151:25 | **addition (6)** | 174:21 | 142:14 176:8 |
| 110:14 112:5 | **accurate (6)** | 4:12 6:2 26:20 | 178:21 | 179:5 187:10 |
| 122:16 | 48:23 58:12,14 | 32:11 130:3 | **aed@ddw-la...** | 199:5,6 |
| **acceptance (2)** | 73:20 118:7 | 144:5 | 2:7 | **agreements (4)** |
| 80:8,11 | 208:13 | **additional (14)** | **affidavit (4)** | 23:16 152:23 |
| **accepted (5)** | **accurately (1)** | 24:2 51:6,15 | 87:21 132:4,8 | 153:5 182:6 |
| 80:4 170:20 | 80:18 | 51:18,20,23 | 132:13 | **ahead (2)** |
| 173:12 | **acquire (8)** | 52:5 161:19 | **affidavits (1)** | 64:12 97:22 |
| 174:23 | 38:9 41:23 | 173:17,19 | 57:21 | **AIA (1)** |
| 198:16 | 43:6 51:15,18 | 182:6 192:5 | **affiliated (1)** | 18:6 |
| **accepting (1)** | 51:20 55:5,7 | 198:7 201:15 | 21:9 | **Al (11)** |
| 195:10 | **acquired (1)** | **additions (1)** | **affiliates (2)** | |
| **accompanied...** | 81:21 | 96:12 | 36:8 176:22 | |
| 184:10 | **acquiring (5)** | **address (7)** | **affords (1)** | |
| **account (31)** | 42:21 51:23 | 9:12 12:7,8,9 | 166:21 | |
| 83:4,7,10,15 | 52:5 57:17 | 26:2 129:9 | **against- (1)** | |

22:12 61:13
62:2 63:6
88:16 108:21
117:25
139:17
167:23 196:9
204:3
**Al's (1)**
94:11
**Alex (2)**
2:13 9:18
**ALFRED (1)**
2:6
**allegation (23)**
91:6 142:25
143:8 144:14
144:15 145:4
145:7 146:4,7
148:4,7
149:20,24
151:4,8
152:21 153:2
153:12,15,22
154:3,19,24
**allegations (5)**
36:16,20 57:25
158:7 161:9
**allege (2)**
150:19 156:2
**alleged (1)**
173:22
**allocated (1)**
65:8
**allow (5)**
45:8 123:25
130:20
143:23
181:15
**allows (2)**
130:13 165:12
**ambiguity (1)**
114:19
**Amended (8)**
89:5,14 94:20

94:25 95:10
95:20 206:8
206:10
**amount (48)**
17:8,16 19:15
21:11,11
24:15 25:9
26:20,24 35:3
43:10 56:7
69:22,24
72:15 122:17
124:9 127:5
131:20 141:8
142:10
146:15,20
148:16
155:10,14,25
156:3,7
158:24 159:2
159:4,5,23,24
160:11,12,18
161:2,6
162:25
163:18,18,19
173:19 175:3
184:14
202:19
**amounts (9)**
23:24 69:5
145:15
146:12
155:12
159:22
160:17
163:18,23
**analysis (1)**
151:9
**Andrew (4)**
47:16 48:5,16
110:11
**annexed (1)**
184:4
**annual (3)**
17:10 20:16,20

**answer (48)**
10:10 27:11,24
40:9,15 42:5
46:5 57:13
58:9 59:17
78:21 80:18
85:22 86:4
87:12 100:24
110:3 113:3
122:4 125:23
133:15,23
143:13
144:25 145:3
151:19
154:13,23
156:11
162:16 165:9
165:14 167:8
168:5,6,7
170:9 173:10
174:18
177:15
181:16,23
191:5 192:21
193:4 194:19
196:15,17
**answered (8)**
44:19 61:10
69:9 133:23
136:11
151:24
169:15
190:25
**anticipated (3)**
127:11 136:20
136:25
**anybody (1)**
52:24
**Anyway (1)**
196:20
**apart (1)**
55:12
**apologize (2)**
118:14 139:20

**appear (1)**
161:14
**appearing (2)**
11:3,4
**appears (4)**
107:24 161:16
162:19,25
**applicable (1)**
100:3
**application (1)**
52:25
**applications ...**
46:20,23
**appreciate (2)**
22:9 108:21
**apprising (1)**
14:7
**approach (1)**
202:17
**approval (31)**
14:14,19,25
    15:6 46:11,15
    48:8 52:19
    54:5 98:12
    100:13 103:4
    103:8,21,22
    103:23 104:7
    104:8,9,13,20
    104:22 105:2
    110:16 111:5
    111:20,21
    112:17,21,23
    113:5
**approvals (5)**
46:17,20,24
    52:22 54:6
**approve (2)**
77:2 165:17
**approved (5)**
46:9 98:5
    101:2 104:3
    180:13
**approving (1)**
107:14

**approximate...**
33:16 142:10
**approximate...**
12:11 17:7,13
    20:19 32:10
    35:6,10 44:11
    50:13 134:10
    138:12,21
    141:10,13
**April (2)**
138:13,14
**architect (3)**
92:3 112:7,13
**architects (3)**
49:10 50:5
    54:7
**architectural...**
49:9,10
**area (1)**
22:11
**areas (2)**
104:9 105:13
**arenas (1)**
102:22
**Arent (1)**
81:21
**argue (1)**
196:17
**arguments (1)**
192:11
**Ari (1)**
3:5
**arising (1)**
159:17
**arrived (3)**
50:9 72:16
    160:12
**ascertain (2)**
111:17 149:8
**aside (1)**
188:5
**asked (13)**
61:10 66:23
    70:3 73:12

133:17,22
136:11 151:9
151:23
169:15
175:17
190:17,25
**asking (33)**
10:3,8 16:3,4
22:5 49:21
62:16 66:22
82:2 84:25
85:2 97:21
102:3 104:2
104:25
106:24 114:7
117:19
126:21
127:23
133:16 139:7
143:10
154:18 191:3
191:18,21,22
192:14,15,16
195:21 198:8
**aspect (2)**
131:23,24
**assemble (1)**
158:3
**assembly (1)**
77:14
**assessment (1)**
123:13
**asset (1)**
142:17
**assets (4)**
135:18,23
136:4,8
**assist (1)**
181:24
**assistance (1)**
182:3
**associate (1)**
9:18
**associated (4)**

49:16 74:6
82:19 161:10
**assume (2)**
28:10 141:24
**assumes (1)**
67:19
**attached (5)**
167:10 183:18
198:11 204:7
207:4
**attachments ...**
112:12
**attempt (3)**
30:11 159:7
192:6
**attendance (1)**
53:18
**attended (7)**
53:2,6,7,14
118:24 119:3
139:4
**attention (8)**
64:23 91:5
120:18 127:3
130:15 146:3
182:20 203:2
**attorney (7)**
7:24 9:18
44:22 45:4
82:7 119:2
176:11
**attorney's (1)**
94:10
**attorney/clie...**
82:3 180:5
**attorneys (4)**
2:4,9,16 37:4
**August (9)**
60:3 117:23,24
118:6,19
140:7,9,14
175:4
**authorities (1)**
171:12

**authority (3)**
51:6 145:16,20
**authorized (1)**
14:10
**available (1)**
124:5
**Avenue (2)**
2:5,10
**award (1)**
44:4
**aware (20)**
40:23,25 51:14
51:17 147:3
147:17,20,21
147:22 149:9
149:17
175:21
180:17,21
184:13
187:24
188:23
198:19 202:7
202:11

---

**B**

**B (199)**
1:18 9:2 10:1
11:1 12:1
13:1 14:1
15:1 16:1
17:1 18:1
19:1 20:1
21:1 22:1
23:1 24:1
25:1 26:1
27:1 28:1
29:1 30:1
31:1 32:1
33:1 34:1
35:1 36:1
37:1 38:1
39:1 40:1
41:1 42:1
43:1 44:1

45:1 46:1
47:1 48:1
49:1 50:1
51:1 52:1
53:1 54:1
55:1 56:1
57:1 58:1
59:1 60:1
61:1 62:1
63:1 64:1
65:1 66:1
67:1 68:1
69:1 70:1
71:1 72:1
73:1 74:1
75:1 76:1
77:1 78:1
79:1 80:1
81:1 82:1
83:1 84:1
85:1 86:1
87:1 88:1
89:1 90:1
91:1 92:1
93:1 94:1
95:1 96:1
97:1 98:1
99:1 100:1
101:1 102:1
103:1 104:1
105:1 106:1
107:1 108:1
109:1 110:1
111:1 112:1
113:1 114:1
115:1 116:1
117:1 118:1
119:1 120:1
121:1 122:1
123:1 124:1
125:1 126:1
127:1 128:1
129:1 130:1
131:1 132:1

133:1 134:1
135:1 136:1
137:1 138:1
139:1 140:1
141:1 142:1
143:1 144:1
145:1 146:1
147:1 148:1
149:1 150:1
151:1 152:1
153:1 154:1
155:1 156:1
157:1 158:1
159:1 160:1
161:1 162:1
163:1 164:1
165:1 166:1
167:1 168:1
169:1 170:1
171:1 172:1
173:1 174:1
175:1 176:1
177:1 178:1
179:1 180:1
181:1 182:1
183:1 184:1
185:1 186:1
187:1 188:1
189:1 190:1
191:1 192:1
193:1 194:1
195:1 196:1
197:1 198:1
199:1 200:1
201:1 202:1
203:1 204:1
208:6,24
**back (17)**
47:2 48:20
69:10 91:4
113:17,19
117:13
118:17
121:21

January 12, 2022

[Page 212]

126:12
134:17,17
142:20
147:11 149:2
167:9 190:9
**background ...**
22:23
**backup (1)**
123:5
**bank (7)**
84:12 130:24
131:20 200:5
202:7,11,13
**banner (4)**
15:19,22 27:9
27:16
**bar (2)**
4:15 6:5
**Barbera (3)**
13:20,21 14:3
**Barberas (1)**
15:5
**Barnett-How...**
2:13 9:19
**base (4)**
129:5 144:4,7
160:2
**based (4)**
59:20 91:17
164:8 171:24
**basically (1)**
124:22
**basing (1)**
111:16
**basis (7)**
17:10 91:10
92:22 115:7
141:25
171:10 187:6
**bates (2)**
140:11,12
**bear (1)**
8:5
**bearing (1)**

67:14
**becoming (1)**
79:25
**bed (3)**
50:16 51:2,11
**beds (24)**
40:21,24 41:17
41:23 42:21
42:24 43:7,16
44:5 45:16
50:10,14,21
50:22,24,25
50:25 51:6,9
51:15,18,20
51:24 52:5
**Beer (1)**
136:22
**beg (4)**
51:13 97:19
99:5 145:24
**began (4)**
38:25 73:14
79:7 138:18
**begins (1)**
181:25
**begun (1)**
4:24
**behalf (12)**
11:5 30:14
37:15 47:6
57:12 72:10
72:13 80:13
80:14 83:19
106:14
138:23
**believe (29)**
13:9 26:11,17
26:22 32:20
95:14 107:7
114:14
116:11 117:5
117:18 120:7
121:16
122:11 127:4

134:13
136:10,12
151:12 155:4
172:21,25
173:4 176:6
182:17
183:15
184:11 195:5
202:14
**beneficial (2)**
30:23,24
**Benefit (42)**
60:2 73:14,21
73:25 74:16
76:9,12,17,20
76:25 77:15
77:23 78:2,4
78:14 80:3,21
81:3,17 82:15
83:11 85:10
85:19 86:6,11
86:22 87:2,5
87:9 165:23
166:2,5,9,13
166:17
180:13
188:24 189:4
199:23 200:3
200:10,13
**benefited (1)**
22:20
**better (1)**
200:20
**between(amo...**
4:5,19 5:8,14
5:20 6:9
**beyond (10)**
22:17 28:17
36:25 70:20
120:17
129:25
178:20 179:3
179:21
203:12

**bidder (3)**
43:16,21 50:13
**bidding (1)**
52:2
**bill (25)**
1:17 9:10,22
9:23,24 23:5
23:19 54:16
94:23 95:25
107:21
109:17
117:13
118:18 139:7
139:24
142:24
148:23
196:21
197:17 199:9
204:2 205:16
206:3 208:9
**Bill's (1)**
204:9
**billed (1)**
172:25
**billing (2)**
172:23 173:2
**Billows (5)**
81:18,22 82:2
82:11,23
**bit (2)**
109:24 110:6
**Blatt (6)**
47:16 48:5,16
99:14 110:12
206:14
**blocked (1)**
113:6
**blood (1)**
208:17
**Bob (2)**
47:16 48:5
**boisterous (1)**
120:14
**bonding (4)**

19:5,9 30:8,12
**books (1)**
188:9
**borrower (2)**
77:21 78:7
**borrowing (3)**
25:5 36:5
175:11
**borrowings (2)**
176:21,23
**Boston (3)**
81:19,20 82:7
**bottom (2)**
108:8 190:9
**Bourbon (1)**
12:9
**bracket (1)**
25:25
**brain (3)**
33:22 34:3,12
**break (7)**
54:15 88:16,22
94:14 156:13
180:25
203:22
**BRENDAN (1)**
2:18
**bring (3)**
113:17 166:24
200:20
**broad (4)**
40:15 44:6
48:9 75:25
**broadly (1)**
57:9
**broker (1)**
74:7
**broker/consu...**
74:3
**Brooklyn (1)**
45:11
**brought (3)**
34:8 82:9
194:15

January 12, 2022

[Page 213]

bscott@klest...
2:19
**budget (5)**
72:20,22,25
73:5,8
**build (2)**
50:22 51:9
**building (47)**
11:17,19 14:18
14:18 18:18
18:20,21
19:12,14 29:4
29:13,15,22
30:3,4 32:10
32:13 37:13
46:14 52:20
59:11 91:15
93:9,11
101:15
102:14
105:19 108:5
110:21 111:8
112:21 113:5
114:16
118:19,24
135:5 137:16
137:20
139:10 142:7
150:10,21
152:18 195:7
197:18
199:20
201:23
**built (3)**
37:12,16 55:2
**business (10)**
12:8,25 30:22
35:20 38:24
75:21 76:3
173:5 176:24
179:13
**businesses (2)**
27:22 28:11

**C**

**C (5)**
2:1 9:2 74:25
114:9 205:1
**C.P.L.R (4)**
4:8 5:4,11,22
**calculation (3)**
162:10 171:24
172:3
**calculations (...**
124:17
**calendar (3)**
119:16,17
123:16
**call (8)**
88:23 99:11
107:16 161:3
177:23,23
180:23 201:2
**called (4)**
9:3 18:22
34:10 167:20
**calls (2)**
168:2,16
**capital (20)**
72:23 74:8
120:4 121:12
122:14 124:8
126:5 130:9
130:10
140:25 141:5
141:8,15,20
154:25 155:2
156:14,18
185:8 188:17
**capitalizatio...**
76:15 141:3
**capitalized (2)**
182:15 187:13
**captioned (1)**
89:18
**cards (1)**
83:25
**care (1)**

82:6
**careful (1)**
61:24
**carefully (1)**
89:23
**case (12)**
10:13,19 22:2
22:3,8 37:2,2
37:4 57:20
61:25 116:3
199:7
**cases (1)**
10:15
**cash (14)**
36:23,24 70:21
83:3,7,10,14
84:11 121:12
133:3 156:20
156:22
170:13
173:13
**catch (1)**
81:13
**categories (2)**
66:18 70:15
**caught (1)**
109:12
**cause (2)**
50:22 147:18
**caused (2)**
129:8,12
**cease (1)**
33:13
**Center (2)**
34:10,11
**Centre (1)**
9:13
**CEO (5)**
15:10,11 16:19
19:3 20:5
**certain (11)**
14:11 54:23
102:8 103:13
145:12

148:11,12
160:25 170:2
171:25
199:10
**certainly (3)**
22:12 47:18
139:2
**certificate (30)**
48:2 52:16,18
52:25 92:3
93:2 98:22
101:13,16,24
101:25 102:2
102:5,7,15,17
102:20,23
113:15,21,24
114:2,23
115:12 116:9
116:19 151:6
152:4,6
206:16
**certification ...**
5:15 110:12
111:4 112:13
120:8 208:1
**certify (4)**
205:5,9 208:8
208:15
**CFO (8)**
25:7 143:6,25
145:9 146:8
158:18
188:11,13
**CFO's (1)**
204:9
**chance (1)**
64:8
**change (3)**
85:6 160:2
172:6
**changes (1)**
90:6
**characterize ...**
12:21 77:14

characterize...
72:4 134:14,20
**charge (3)**
6:13 91:24
135:14
**charges (5)**
145:19 146:9
149:21 150:3
150:17
**Charlene (6)**
16:25 17:2,4
18:25 20:6,12
**chart (5)**
78:14,15,16,19
172:12
**Chase (1)**
130:24
**check (8)**
118:11 147:7
147:14 149:7
170:14
173:13
174:17 183:9
**checked (1)**
140:6
**checking (1)**
83:24
**Chief (1)**
15:13
**children (2)**
19:25 20:10
**Chow (15)**
91:14,18,23
97:15 99:2
106:18 107:7
107:13,23
108:4 110:8
110:17
111:14
112:20 113:4
**Chow's (12)**
97:14 99:4,5,6
100:15,16
103:17

January 12, 2022

[Page 214]

105:10,22
109:18
111:18 112:3
**Chris (25)**
91:14,18,23
97:13,15 99:2
99:4,5,6
100:15,16
103:16
105:10,22
106:18
107:13,22
108:4 109:18
110:8 111:3,3
111:7 112:20
113:4
**churn (1)**
200:20
**cimgoetz@ic...**
2:23
**cite (2)**
108:3 109:18
**cited (1)**
105:3
**City (1)**
148:13
**civil (1)**
8:10
**claim (3)**
57:15 58:15
156:8
**claimed (1)**
169:20
**claims (2)**
166:18 187:25
**clarifies (1)**
97:25
**clarify (3)**
67:6 102:3
114:18
**Claudia (6)**
2:23 63:4
121:21,24
142:22

204:21
**clear (15)**
11:18 66:2,16
69:11 92:8
97:23 99:6
100:15
106:20 111:6
112:3 137:17
196:2 197:6
197:10
**clearly (7)**
103:11 110:17
111:14
186:21
195:20
196:23
197:25
**client (1)**
37:15
**clock (1)**
69:10
**closed (5)**
28:17 33:5
59:25 73:13
83:11
**closeout (1)**
179:15
**closing (6)**
13:21 14:8
60:4,10 81:17
179:12
**CNH (21)**
35:24 36:2,3,6
36:8,9,11,12
36:14 175:18
175:23
176:17,19,21
176:23,25
179:6,20,25
180:9,14
**coaching (1)**
109:5
**code (2)**
101:16 102:14

**collaborate (1)**
50:4
**collaborative...**
49:13
**collateral (1)**
188:5
**collected (1)**
77:10
**collection (1)**
45:14
**column (1)**
163:17
**come (6)**
10:6 50:8 52:7
74:15 118:23
135:25
**comfortable ...**
95:6
**commenced (...**
91:8,11,20
92:11,14
106:16 107:3
114:4,13
**commencem...**
24:25 92:6
96:3,8 106:7
123:12,15
124:14,21,23
125:7,19,21
127:12
136:20,25
137:2 150:6
154:16
**commences (1)**
111:23
**commencing ...**
124:13
**comment (5)**
24:2 25:16
85:14 180:8
202:16
**comments (1)**
48:21
**common (1)**

150:13
**commonality...**
79:13
**communicati...**
174:14 180:6
**companies (24)**
15:9,18,19,21
15:22 16:2,7
21:21,24,25
25:14,23 26:9
26:12 27:8,8
27:12,20,21
28:4,22 32:15
45:14 47:21
**company (39)**
10:22 15:17
16:10,18,24
17:5,9 18:17
19:3,5,6,8,9
19:18 20:16
31:18,19 32:2
33:11,22
35:23 49:5,17
55:10 56:20
76:21 79:17
79:19,25
90:20,21,24
90:24 135:14
146:13
147:19
158:18
175:18 177:6
**comparison (2)**
102:25 158:10
**complaint (20)**
58:2 87:4,8,13
88:19 89:5,14
89:19,24 90:3
90:5 142:21
151:20 158:7
161:9 162:7
162:10
169:21
173:23 206:9

**complete (5)**
96:12,20
113:12 153:9
182:7
**completed (4)**
32:20 59:11
108:15
110:13
**completely (1)**
22:7
**completing (1)**
57:24
**completion (3)**
59:23 92:4
93:3
**complex (2)**
36:22 200:2
**compliance (2)**
100:2 200:23
**compliant (2)**
100:6 105:20
**complies (1)**
102:13
**component (3)**
160:23 161:6,7
**components ...**
160:20,21
**compose (2)**
94:5 158:2
**composed (4)**
90:10,10 94:6
94:7
**composition ...**
157:15
**CON (4)**
38:5 47:24
48:2 52:15
**concepts (1)**
50:5
**concerned (1)**
111:19
**concerning (1)**
77:13
**concluded (1)**

204:21
**conclusion (7)**
50:9 167:20
   168:3,17
   191:21
   195:21
   197:15
**Concurrent (1)**
44:10
**concurring (1)**
39:4
**condition (2)**
96:17 113:13
**conditioned (1)**
147:10
**conditions (3)**
96:15 106:6
   147:13
**conduct (2)**
5:23 8:6
**conducted (4)**
7:7 98:5 99:2
   99:23
**confer (1)**
196:9
**conference (2)**
7:8 9:17
**CONFEREN...**
1:15
**confirm (2)**
11:4 186:5
**confirming (1)**
7:16
**conform (1)**
151:16
**conforms (1)**
152:18
**confused (2)**
67:21 69:7
**confusing (1)**
128:3
**Congress (61)**
15:9,17,18,22
   16:2,6,16,23

17:17,23 18:4
   18:13,18,20
   18:21,22
   19:12,14 27:8
   27:12,21
   28:22,25 29:4
   29:7,9,13,15
   29:22 30:3,4
   32:15 53:22
   55:21 56:20
   56:23 58:23
   59:2,7 60:5
   65:18,24 66:4
   66:8 70:25
   71:4 72:18
   75:13,16
   76:24 77:5,10
   77:16,16,17
   84:8,10 90:23
   142:7,13
   185:23
**congress's (2)**
94:8,10
**connection (5)**
31:21 44:11
   76:11 153:7
   153:11
**connotation (...**
167:21
**consent (6)**
7:19 14:14
   85:11,19
   86:11 166:17
**consider (7)**
93:5 137:11,20
   159:17
   168:15
   194:17,21
**consideratio...**
72:3
**considered (3)**
7:20 137:25
   173:17
**Consigli (4)**

29:5,16,25
   30:17
**consistent (5)**
23:8 167:12
   169:19,22
   185:25
**constituted (1)**
174:7
**construct (1)**
46:14
**construct-abi...**
50:3
**constructed (8)**
51:2 91:15
   96:24 97:4
   104:10
   105:13
   108:15 111:8
**constructing ...**
150:11
**construction ...**
13:21 14:8,24
   14:25 15:17
   16:9,9,15,16
   16:24 17:8,23
   17:24 18:13
   18:14,22
   24:25 27:18
   28:24,25 29:7
   29:8,9,16
   32:7,16,16
   39:4,5 49:4,6
   49:7 50:16
   53:22 54:13
   54:14 55:9,13
   55:19,22,23
   56:20,23
   58:24 59:2,10
   60:2,5,5,10
   65:19,24
   70:25 71:4
   72:18 73:21
   75:24 76:5,12
   76:14 77:3,10

90:23 101:9
   101:12,15,20
   102:13
   126:18 142:8
   142:13
   148:11 150:9
   200:17
**consult (2)**
43:9 44:16
**consultant (4)**
47:25 48:18
   74:8 77:13
**consulted (1)**
45:5
**consummate ...**
193:19
**contact (2)**
52:12,23
**contemplate...**
134:8 200:4
**contemplatio...**
41:24
**contemporan...**
162:11
**contention (2)**
58:5 186:17
**contentious (2)**
120:9,15
**contents (3)**
89:19,24 101:5
**continue (5)**
159:18 175:2
   193:19 194:2
   195:18
**continues (3)**
182:2 189:11
   190:16
**contract (9)**
17:25 19:13
   28:23 29:2,10
   29:14 31:16
   31:22 142:8
**contracting (5)**
16:10 17:20

18:17 27:19
   29:6
**contractions ...**
56:6
**Contractor (1)**
29:17
**contracts (8)**
17:8,9,16,19
   18:2,6 182:8
   189:13
**contribute (4)**
48:7 140:25
   201:21 203:9
**contributed (9)**
65:7 69:22,25
   72:16 73:15
   141:5,16
   156:21
   201:15
**contribution ...**
69:15 71:23
   72:6,23 141:9
   141:16,21
   142:4 156:15
   188:17
**contribution...**
141:19,22
   156:19
**contributor (8)**
182:10 189:12
   189:21,21
   190:2,8,11,16
**control (2)**
7:11 54:11
**controlled (2)**
5:5 31:17
**controlling (1)**
29:24
**conversation...**
14:6 15:4
   166:12
   177:17,21
   178:4,5,9,19
   179:3 189:6

conversation...
50:19 55:6
177:12 189:3
**coordinate (1)**
63:25
**copy (11)**
6:10 7:25 8:8
12:4 41:2
110:15 117:6
166:10,13
176:7 184:8
**Corp (14)**
16:16 18:18,20
18:21 19:14
28:25 29:4,7
29:9,13,15
30:3,4 90:23
**corporation (...**
19:13 20:3
142:7
**Corporation'...**
29:23
**correct (80)**
11:6 12:10
15:15 16:2
19:23 31:10
42:4,9 46:18
52:16,17
58:14 60:15
65:21,23
71:22 73:16
73:17,22
77:21 79:8,10
79:14,15,19
79:20 82:12
86:17 89:25
95:18,19
96:21 97:5
99:23,24
101:21,24
102:5,6,9,10
102:19 106:4
113:16,20
114:13

120:23 123:4
124:16 127:7
129:6 130:20
133:3,6,7
134:15
135:16
144:10 152:2
152:3 157:20
157:21 160:3
160:5 161:21
163:6,9,24
165:4,5 172:5
177:8 184:15
188:14 195:2
198:13,14,16
198:17
205:10
**correspond (1)**
158:6
**corresponde...**
198:13
**corresponde...**
139:21 140:20
**corresponds ...**
185:11
**cost (15)**
30:15,16 49:18
49:19,20,22
50:10,22 51:5
51:11 54:9
70:18 71:2,5
120:8
**costed (1)**
46:25
**costing (4)**
47:10,12,14
54:9
**costly (1)**
51:2
**costs (12)**
8:6 18:6 66:18
76:14 155:9
155:18,19,20
155:20,22,25

156:9
**counsel (32)**
4:5,19 5:2,8,14
5:20 6:9,11
7:5,8 8:3 37:3
37:17,20
38:18 44:17
82:11,14,18
82:23 88:6
90:13 108:2
135:10
136:13 158:2
159:15,21
167:7 191:13
195:3 204:24
**COUNTY (2)**
1:2 208:4
**couple (1)**
88:20
**course (8)**
12:25 28:12
57:24 119:21
131:19
148:11 173:4
176:24
**court (5)**
1:1 7:8,12,15
88:19
**cover (2)**
94:23 95:16
**coverages (2)**
151:16,17
**covered (1)**
62:14
**CPA (1)**
194:15
**CPLR (2)**
7:6 8:8
**create (4)**
62:18 83:20
130:12 197:8
**created (1)**
24:13
**credit (40)**

34:2 58:17
120:3 121:11
121:12 122:5
122:9 123:4,8
123:10,21,24
124:2,4,7
125:6,15
126:3,7,19
127:5,9,16,19
128:6,8,10,12
128:13,20
129:14 130:7
134:9,15
154:4,6,11,15
154:21
175:22
**crew (1)**
101:9
**critical (1)**
126:17
**crystal (2)**
111:6 112:3
**cure (10)**
165:7,12
166:22 167:2
167:21
168:11,15
195:18
197:20 198:4
**cured (2)**
167:18 168:10
**curing (1)**
180:18
**current (1)**
9:11
**currently (6)**
18:3,12 19:13
21:10 24:14
24:16
**cut (1)**
51:12

_____
**D**

**d (3)**

66:9 68:21
205:1
**DACA (1)**
36:23
**Danbers (1)**
9:13
**date (51)**
33:15 34:25
35:11 59:13
87:11 91:16
92:2,4,6
95:12 96:3,8
98:15 100:16
101:6 105:22
106:6,7
113:14,23
114:4,9,12
115:19 118:7
119:8,17
123:12,14,15
124:14,14,21
124:23 125:7
125:19,21
127:12
136:20 137:2
142:3 150:5
154:16
163:18 166:7
166:7,8 173:7
181:20
184:21
192:20
**dated (7)**
93:21,24 95:17
95:21 99:14
117:17
206:13
**dates (7)**
26:2 70:22
90:13 115:7
141:18,22
168:22
**day (6)**
100:20 129:2

160:15 161:7
205:19
208:20
**day-to-day (2)**
31:18 84:5
**days (7)**
87:14 123:12
123:17
127:11
136:19,24
189:11
**DB (2)**
66:7 71:20
**deal (2)**
176:25 177:4
194:2
**dealing (1)**
95:7
**dealings (3)**
81:23 82:2
176:18
**dealt (3)**
177:3,6,10
**debt (2)**
15:6 122:19
**December (10)**
98:4 99:8,8
100:9,14
101:6 137:14
163:13
164:25 175:5
**decided (1)**
55:7
**decision (1)**
55:5
**decisions (1)**
32:3
**deemed (4)**
5:3 65:3,10
67:23
**deeply (1)**
176:10
**default (40)**
86:5,13,13,22

87:2 90:14
93:16 137:13
137:21 138:2
138:4,14,15
144:7 157:2
157:18 164:9
164:11,15
165:12
168:24 169:3
169:11,13
174:8 178:11
178:16,18,22
179:4,10,16
189:11
190:16,18
193:11 198:4
198:13
200:22
206:20
**defaults (15)**
157:23 165:7
165:16
166:22
167:16,18
180:19
189:10
190:15
191:17 192:7
195:18
197:20
198:21 199:2
**defective (1)**
152:16
**defendant (1)**
34:13
**Defendant's ...**
63:13 89:13
94:19 99:13
107:18
115:11
156:23 181:2
201:4 206:6
**Defendant(s)...**
1:10 2:9,16

**defer (7)**
135:10 136:12
159:15,21
172:17
188:12
191:13
**deferring (1)**
195:2
**deficiencies (2)**
151:13 152:12
**deficient (1)**
152:16
**define (2)**
27:25 46:11
**defined (1)**
182:14
**definitely (1)**
75:18
**definition (1)**
173:14
**degree (1)**
47:18
**Delaware (2)**
194:7 201:23
**delayed (1)**
104:22
**DELBELLO...**
2:3
**delegated (1)**
116:4
**deliver (14)**
62:12 78:15
119:25
137:11,21
138:19
139:12 151:5
152:4,5,22
153:12 154:4
154:20
**delivered (14)**
42:14 103:13
103:15 120:6
121:8 122:5
122:13,23

127:9 130:22
136:23 138:8
159:9 184:6
**delivering (1)**
48:19
**delivery (3)**
77:15 129:12
183:25
**deny (1)**
186:4
**department (...**
30:17 44:2
46:9,11,16
48:8,10,12,17
48:20 52:13
52:19,24 53:3
91:14,23
92:24 96:10
96:18 97:10
98:3,13,15
99:3 102:24
107:12
114:23
147:15
**depends (2)**
17:25 19:10
**deposed (2)**
8:9 10:18
**deposit (30)**
62:22 120:3,25
121:12,13
122:10
130:18,19,19
130:20,21
131:5,21
132:19
147:12,12,24
148:17,24
149:6,10,18
153:23
169:17,24
170:14,21,22
171:2 201:22
**deposition (8)**

7:7,14 8:6 9:25
10:25 21:16
63:10 88:25
**deposition(s)...**
208:10,12
**Depositions (1)**
5:23
**deposits (10)**
121:5 146:5,9
146:16 147:5
147:19
148:12 150:3
153:24
169:20
**describe (9)**
17:22 18:3
38:22 39:18
53:21,24 96:7
120:20
178:17
**described (6)**
26:21 37:21
76:9 120:19
123:3 202:19
**description (1)**
139:24
**descriptions ...**
121:10
**design (8)**
48:13,21,22,25
49:12,13 50:5
59:4
**designated (1)**
19:8
**designs (1)**
48:19
**desire (1)**
120:5
**detail (4)**
103:19 146:18
153:19
177:22
**detailed (1)**
151:2

details (7)
84:25 131:2
149:15
160:19
163:20
171:16 179:2
determinatio...
91:13,18 92:14
96:19 97:10
97:18 98:12
98:25 99:7,9
100:4 103:10
104:20 105:2
105:4,6
106:15,21
110:21 111:7
111:15,22
112:18
113:10
determine (2)
98:19 135:11
determined (...
42:13 91:25
92:25 97:16
97:23 98:8,18
100:5 104:18
105:19 112:4
112:22
114:16
determines (4)
96:11 98:16,23
107:9
develop (3)
22:23 41:25
46:13
developed (3)
32:5 40:4 73:2
developer (1)
29:12
development...
25:22,25 28:23
29:3,10 38:13
38:15 40:8
42:9,12,17,25

43:22 53:22
55:17 56:21
65:20 69:16
71:19 72:19
72:22,25 73:3
73:5,8,8,16
79:6 142:18
development...
79:12
dicing (1)
192:11
diem (1)
171:10
difference (1)
134:7
different (16)
12:9 55:12
69:5 79:7
104:20 105:2
108:19
120:20 131:4
131:7,13,16
132:23
150:14
162:12,14
differently (1)
165:16
difficult (2)
120:10 163:16
difficulty (1)
62:4
diminutus (1)
18:25
direct (11)
52:12,23 64:22
91:5 124:8
127:3 130:15
146:3 176:18
182:20 203:2
directed (1)
48:11
directing (2)
56:24 168:6
directly (3)

13:12,16 51:21
disagree (1)
201:20
disburse (2)
65:24 68:12
disbursed (14)
65:13,15,16
66:23,24,25
67:12,13
68:16,21 70:4
70:9,12
185:22
disbursemen...
65:20 67:8
68:8,24 71:5
204:11
disbursemen...
65:22 66:2,6
70:22
discarded (1)
95:5
disclosures (1)
77:24
discrete (1)
125:7
discuss (9)
40:3 45:15
79:24 80:15
80:21 83:6,9
165:22 166:4
discussed (14)
41:7 78:12
79:21 81:2
119:21 120:5
120:7,13
132:22 136:5
137:7 138:5,9
165:25
discussing (1)
138:18
discussion (12)
40:5,22 50:11
79:23 127:18
127:24

131:11
132:17 136:2
139:5 198:8
199:19
discussions (...
41:9 42:19
43:21,24
50:14 51:7
56:16,18 75:3
78:6,9,10,13
78:23 80:2
83:13,17
138:6,8,11,16
139:6 175:10
175:14,15
179:14
180:17,22
185:3,4 194:5
194:10,14
198:3,9,18,19
198:25 199:3
dispute (1)
62:9
distribution (...
85:4
distributions...
84:21
diversion (1)
36:21
document (1...
2:22,23,24
14:21 35:19
54:11 61:7
64:11,15,17
66:16,20 67:6
69:19,20 70:6
70:7 74:22
75:14,18,20
77:15 81:6,12
85:13,15,21
85:25 86:3,14
86:16,18 87:3
89:8,11,12
90:8,9,10

91:4 94:5,6,7
95:7,17,24
96:9 97:21
102:22
103:25 104:3
104:3 106:13
107:5,25
108:13
110:18,20
111:9,11
112:12
113:25
115:16 116:2
116:5,12,17
122:3 132:14
134:16 136:3
142:23
155:17 156:4
157:12,15,18
162:12,16
164:19
166:19 170:9
181:7,9,13
182:15 186:4
186:19 187:9
189:18,25,25
190:3,4,5
191:10,16,18
192:23 203:4
203:6,24
207:3
documentati...
100:8,13
109:11
documents (...
30:16 35:2,17
56:9,14 57:14
58:8,11 59:9
59:18 60:17
61:2,11,15,18
61:23 62:14
70:13,16,16
70:19 77:16
77:17 85:7

January 12, 2022

[Page 219]

87:17,20 88:4
88:10,14
90:16,20
92:17 103:13
103:15
114:22 115:5
115:21 116:2
120:4 131:20
139:18 140:4
148:18
150:25
151:10
156:10 173:9
176:9 180:9
180:13
186:12 193:7
204:4
**DOH (10)**
77:12,13 99:8
99:14 103:12
105:18
110:11
113:11
114:15
206:14
**DOH's (1)**
112:17
**doing (4)**
34:3,3 109:7
180:10
**dollar (7)**
17:7,16 43:10
192:19 193:2
193:7 200:22
**dollars (7)**
57:16 146:25
147:2 156:7
192:9 193:13
202:20
**Donnellan (71)**
2:3,6 21:14
22:24 23:9
43:3 57:7
61:9,17 62:7

62:21 63:16
66:11 67:4,22
68:7,23 69:4
94:16 96:22
103:24 108:6
108:11,24
109:8,22
114:5 115:2
116:21,25
117:5,11,15
117:23 118:2
118:9 133:21
134:3,23
136:11 140:3
140:20
151:23
156:25 157:6
167:19,25
168:7,16
169:14
174:10 180:3
190:21,24
191:5 195:13
195:20 196:2
196:11,14,22
197:16,22
198:7,24
199:24
201:10,18
202:23
204:17
206:19
**Donnellan's (...**
88:8
**double (1)**
140:6
**doubt (2)**
73:10 98:7
**draft (3)**
93:24 94:2
203:7
**drafting (3)**
90:2 203:10,12
**draw (2)**

124:2,20
**drawn (1)**
128:14
**draws (1)**
18:8
**due (29)**
93:17 124:15
145:15
146:12
155:11 156:8
158:24 159:2
159:4,24
160:11
162:25
163:12,18,18
163:19
164:24
169:20
170:23,23
171:2,7,9,22
171:25
173:17
192:20 193:8
193:9
**duly (3)**
9:3 205:6
208:11
**duties (1)**
14:11

—————
**E**
**e (8)**
2:1,1 64:23,24
67:3 69:2
71:24 205:1
**e-mail (24)**
2:7,12,19,23
2:25 99:5,6
100:15,17
103:17
105:10,22
106:18 107:8
107:19,23
108:8,10

109:18
110:22 111:2
111:18
117:17
206:15
**e-mailed (2)**
8:2 117:15
**e-mails (2)**
97:14,14
**earlier (30)**
39:3 52:15
65:18 69:18
70:24 73:12
73:18 109:19
114:11
115:23 127:4
134:13
135:13 154:7
154:14 155:6
158:8 161:8
167:12
175:17
176:20 179:8
184:20 189:9
190:18
198:10 199:9
200:12 202:6
202:17
**earliest (1)**
142:4
**early (15)**
26:7 39:3
40:11 44:12
99:8 119:8
123:19
127:15,21
137:8,10,19
138:17
139:10,23
**economic (1)**
50:15
**Ed (34)**
73:9 90:19
145:17

148:12 150:7
150:22 151:9
151:18 152:9
152:13,15
153:6 155:12
158:18
160:18,24
162:10
167:14
169:25 170:3
171:14,24
172:2,17
179:12,13
183:11,12
184:6,9,16
185:5 187:20
188:12
**editing (1)**
90:7
**effect (4)**
159:13 181:19
194:18,22
**effecting (1)**
85:4
**effective (4)**
50:23 51:5,10
103:4
**effectively (3)**
32:11,14 66:4
**effort (4)**
48:7 51:15,19
52:3
**efforts (5)**
51:17 147:3,18
175:21
193:25
**eight (3)**
140:10,11
170:21
**either (10)**
13:9 20:23
22:2 23:23
32:16 41:10
84:20 113:14

144:15 155:5
**elected (1)**
93:16
**electric (1)**
150:5
**elements (1)**
50:5
**eleven (4)**
124:24 125:8
125:21
154:16
**eleventh (1)**
124:18
**Elita (1)**
20:2
**embodied (1)**
81:5
**employed (3)**
49:4 90:22,25
**engage (1)**
194:15
**engineers (1)**
54:7
**ENL (1)**
37:4
**ensure (2)**
128:9,17
**enter (1)**
30:4
**entered (7)**
17:25 28:23
29:4,15 30:6
31:15 34:22
**entering (2)**
64:13,16
**entertain (1)**
198:3
**entire (3)**
32:12 108:10
187:9
**entirely (1)**
163:8
**entities (7)**
13:3 16:8 21:8

21:12,13
26:18 28:18
**entitled (4)**
22:13,22 149:2
188:2
**entity (39)**
11:9,13,16,22
12:2,13,17
13:4,10 14:14
15:20 16:14
20:23,24 24:8
24:11,13
26:13,25
30:25 31:4,7
31:10,13,14
32:2 33:13,18
34:9,10,12
38:9 41:22,25
47:7,7,9 78:8
112:16
**entries (1)**
112:3
**entry (3)**
109:25 110:5
119:16
**equal (1)**
202:22
**equipment (6)**
57:18 58:7,20
58:23 59:6
135:15
**era (1)**
47:2
**erase (1)**
136:21
**escrow (2)**
148:5 183:24
**escrows (1)**
148:14
**ESQ (4)**
2:6,12,13,18
**essentially (1)**
112:15
**establish (6)**

22:18 83:3
84:11 96:8
101:6 119:17
**established (4)**
96:4 106:8
122:16
136:18
**establishing (...**
100:13
**establishmen...**
83:6,9,14
**estate (11)**
30:24 33:6
79:13,18
133:6 145:5
145:10
162:19 163:4
171:7,10
**estimate (11)**
20:15,19 24:20
146:19,23
148:20 150:2
150:7 155:15
155:16 156:7
**estoppel (1)**
199:15
**evaluate (1)**
54:23
**event (4)**
86:13 155:5
162:1 174:7
**events (3)**
44:8 93:13
112:25
**eventually (1)**
39:16
**evidence (2)**
35:18 131:20
**evidencing (1)**
25:5
**evolved (1)**
81:15
**Ex (18)**
63:14 89:14

94:21 99:15
107:19
115:13 157:2
181:3 201:5
206:7,9,11,14
206:15,17,21
206:22,24
**exact (8)**
13:7 31:5
53:10,11
95:12 119:8
160:19 196:7
**exactly (8)**
21:7 62:15
84:4 123:7
153:3 160:17
161:2,5
**examination ...**
1:15 6:2,4 9:6
9:20 197:10
206:2
**examination(...**
4:11,14,20,24
5:2,9,16 6:11
**examined (2)**
4:22 9:4
**examples (2)**
120:22 130:4
**excess (1)**
156:17
**exchange (2)**
71:23 133:9
**exclusively (1)**
49:15
**excuse (3)**
141:10 145:24
145:25
**executed (2)**
95:22 199:5
**executing (1)**
136:3
**execution (3)**
182:8,10
183:25

**executive (3)**
15:13 31:24
176:16
**exhibit (57)**
7:25 8:2,5 63:6
63:9,11,12,13
63:23,24 64:5
64:6 69:21
88:24 89:13
94:19,24
99:12,13,17
107:16,18,22
113:19
115:10,11,15
116:10,17
117:3 118:17
121:15,21,24
142:20
146:17
156:23 157:5
158:13
180:24 181:2
181:6 191:9
201:2,4,7
203:3 206:1,7
206:8,10,13
206:15,16,18
206:22,24
**exhibits (8)**
7:23 63:17,19
87:22,23
146:11
151:12
204:24
**EXHIBITS--...**
206:5
**existing (3)**
32:9,13 38:13
**exists (6)**
12:6 21:11
35:19 135:21
136:13
152:11
**expect (2)**

42:24 59:21
**expectation (1)**
43:2
**expeditor (1)**
48:18
**expend (1)**
129:8
**expense (1)**
129:13
**expenses (1)**
71:20
**experience (2)**
101:11 150:9
**experienced ...**
82:6 101:20
**expert (1)**
136:14
**expertise (1)**
37:2
**express (1)**
7:18
**expressed (1)**
125:20
**extended (3)**
115:19,24
116:15
**extends (1)**
129:25
**extension (2)**
115:17 116:18
**extensions (1)**
200:4
**extent (2)**
128:14 167:16

———————
**F**
**face (1)**
116:16
**facility (29)**
31:3,23 32:24
33:4 34:2
38:13,14,15
40:4,21 50:12
50:16 91:25

92:19,25
96:20 97:3,4
97:16 98:8
99:25 101:9
112:4 128:12
128:24 137:8
152:24
200:15,16
**fact (8)**
45:7 74:21
79:16 126:21
128:13 132:4
138:7 143:13
**factual (1)**
90:12
**fail (1)**
143:5
**failed (14)**
143:2,9 145:5
146:4 148:5
149:21
150:19 151:5
152:4,8,21
153:12 155:8
202:18
**failure (23)**
4:12,24 6:3
86:10 119:24
129:7,11
137:11
143:15,17
144:16,18,21
149:11 154:3
154:24
164:21 165:3
173:23,24,25
174:7 199:10
**fair (14)**
11:14 13:2
26:23 44:25
45:6,23 48:24
55:21 58:10
76:24 85:23
158:4,11

167:17
**fall (3)**
27:8,23 199:3
**falling (3)**
27:20 28:2,2
**familiar (27)**
12:12,15,16
20:25 23:23
25:8 35:23
56:2 57:5,15
58:4,15 64:11
79:11 83:2
84:19 85:2,9
101:23
130:23 131:2
139:19
165:11,13
175:18 181:7
182:4
**familiarize (1)**
157:7
**family (2)**
21:20,24
**far (3)**
47:6 111:18
129:25
**Farkas (2)**
31:17 177:5
**feasibility (1)**
50:15
**feasible (1)**
50:10
**February (6)**
172:20,21
173:8,11,18
174:4
**federal (3)**
196:10,20,22
**fee (3)**
17:19 18:6
29:12
**feedback (1)**
48:20
**feel (2)**

95:6 197:11
**feeling (1)**
197:12
**fees (11)**
155:9,10,22
161:10,12,16
161:18,23
162:8 171:17
173:25
**feet (2)**
32:11,12
**Fensterman ...**
11:23 12:19,24
20:22 21:3,7
21:12 23:6,21
24:5,7,9
25:10,14,23
26:10,13,19
26:25 44:9,13
44:17,21 45:2
45:6,16,19,21
45:24 46:8
63:2 72:14
80:23,25
82:22 83:7,10
83:14 88:25
118:25
131:22 158:2
176:12
185:20
202:12
**Fensterman'...**
44:24 45:12
119:2
**fewer (1)**
50:25
**FF&E (20)**
59:5,8,14,23
60:6,12,15
62:11,12,22
65:4,10 67:18
71:15,21
73:14 134:6
134:15 135:4

135:7
**field (1)**
107:11
**file (1)**
88:5
**filed (4)**
57:21 87:5,9
89:5
**filing (3)**
5:15 162:6,10
**fill (2)**
122:19 128:11
**finance (1)**
200:12
**finances (1)**
81:17
**financial (21)**
22:6 36:17
54:10 119:25
120:19,21
121:7 122:8
128:8 129:12
130:11,16
137:22
138:19,24
153:13,18
192:4 199:11
200:7,8
**financing (9)**
14:23 74:16,19
75:2 76:6
80:15,22 81:3
200:14
**find (5)**
22:13,17 63:3
122:12
182:15
**findings (2)**
105:7,8
**finds (2)**
101:14 102:13
**fine (8)**
9:23 11:20
56:15 68:22

71:11 113:2
167:24 168:4
**fingertips (1)**
170:3
**finish (1)**
143:23
**firm (16)**
9:17 31:16
44:19,20,24
45:6,13 49:6
49:7 74:5
81:18,20
94:11 156:25
157:6 206:19
**first (22)**
9:3 26:5 37:6
40:12 45:18
63:23 74:25
79:7 86:25
89:14 97:7
99:21 120:24
124:10,20
134:9 147:17
154:6 170:22
193:13 205:6
206:8
**five (10)**
161:24,25
162:3 169:16
170:2,5
171:18,22,23
189:11
**fix (1)**
124:14
**fixture (2)**
58:23 59:6
**fixtures (4)**
57:17 58:7,20
135:15
**Floor (2)**
2:10,17
**flow (1)**
36:23
**focusing (1)**

113:9
**folder (2)**
88:11,13
**folks (1)**
149:16
**following (4)**
124:11,15,21
125:19
**follows (1)**
9:5
**followup (3)**
204:3,16,19
**foot (2)**
32:9,11
**foregoing (1)**
205:9
**Forest (8)**
28:8,15 30:19
32:4 176:22
177:5,9,11
**forget (1)**
119:2
**forgot (1)**
200:11
**form (26)**
4:10 5:24 23:9
38:9,18 50:20
57:7 66:11
67:4 68:10,14
68:17 96:22
108:6,23
109:23 114:5
115:2 134:3
156:19
174:11
195:14
199:25
201:10,18
202:23
**formal (8)**
29:19 98:20
104:22 106:5
112:23 182:6
182:8 189:13

**formality (1)**
112:17
**formally (1)**
107:3
**Formato (2)**
176:10 179:24
**formed (5)**
20:24 26:13,25
47:8 187:22
**former (1)**
95:5
**forming (1)**
114:20
**forms (1)**
102:21
**forth (11)**
66:6,9 68:3
97:13 104:21
111:15
121:13 192:5
193:14
201:24
208:11
**forward (6)**
38:3 56:17,25
75:24 174:15
204:18
**found (1)**
100:2
**four (3)**
126:16 163:11
167:9
**fourth (4)**
91:7 122:12,14
122:22
**Fox (1)**
81:21
**frankly (4)**
36:25 120:10
120:15 186:4
**frequently (3)**
12:22 40:7
118:18
**friends (1)**

38:24
**front (5)**
111:11 156:4
170:9 173:9
186:12
**fruition (1)**
200:5
**full (2)**
9:8 129:23
**fund (1)**
76:2
**funding (5)**
36:13 74:8
75:24 124:9
126:6
**funds (20)**
60:11 66:23
68:12,15 70:3
70:8,12
131:12,16
132:5,10
170:2 182:10
184:16,17,18
184:21
185:16,17,21
**furnished (2)**
6:11 207:6
**furniture (6)**
57:17 58:6,20
58:23 59:5
135:14
**further (13)**
4:18 5:7,13,19
6:8 7:23
97:13,13
164:5 203:5
203:25 205:9
208:15
**furthermore ...**
98:3
**future (2)**
58:17 71:25

_____

G

_____

**g (5)**
184:19 185:7
189:8,17,18
**gain (3)**
46:20,23 48:7
**gaining (1)**
15:5
**Gary (1)**
49:9
**gas (1)**
150:4
**general (13)**
16:9 18:16
27:19 29:6,17
50:7 51:8
61:4,6 71:19
76:5 81:14
119:22
**generally (15)**
12:16 50:18
51:25 66:17
66:19,19,23
70:10,14
71:20 81:10
82:4 119:24
165:13
169:22
**generated (2)**
145:19,20
**Gentleman (1)**
121:19
**George (2)**
2:24 121:20
**getting (4)**
23:17 54:13
101:13
115:21
**Giardino (45)**
2:12 9:7,16
22:9 61:13
62:2,19,23
64:2,20 66:14
68:4,19 69:2
88:16,23

January 12, 2022

[Page 223]

89:10 94:12
99:11 107:16
108:21 109:4
115:9 116:23
117:2,8
118:16
139:17
140:16
142:19
167:23 168:4
180:23 190:4
191:3,9
195:24 196:9
196:12,18
197:14 201:2
203:23
204:20 206:3
**give (13)**
17:12 70:13
87:11 108:25
111:5,20
112:23 121:3
121:10 130:4
131:15
140:13
195:23
**given (11)**
9:24 10:12,15
10:25 112:21
113:5 123:14
149:14
168:14
205:11
208:13
**giving (2)**
132:8 196:7
**go (31)**
10:10 11:12
22:25 38:3
61:15 64:11
70:18 75:23
91:3 93:11,14
95:24 97:22
103:16

113:19
118:17
122:24
126:12
129:20
132:25
134:17,17
142:19
153:16
156:10
158:19
169:16
189:25 190:6
190:9 201:7
**goes (1)**
99:25
**GOETZ (1)**
2:23
**going (20)**
11:17 21:16
22:13 23:3
41:19,21
64:20 68:5
78:24 86:2
88:17 89:10
121:18,23
122:2 142:22
147:7 174:14
181:24 200:5
**good (6)**
9:15 34:3,3
94:16,17
182:10
**govern (1)**
182:9
**governs (1)**
12:2
**gpoletes@g...**
2:25
**granted (1)**
104:13
**granting (1)**
104:9
**greater (1)**

122:17
**grew (1)**
38:20
**gross (2)**
146:22 200:22
**ground (2)**
32:7,14
**group (4)**
15:18 79:13,14
126:6
**grouped (1)**
150:2
**guarantee (3)**
18:7 82:19,24
**guaranteed (1)**
18:5
**guarantors (1)**
82:15
**guess (4)**
55:15 147:6,13
156:5
**guessing (1)**
35:16
**guys (2)**
81:2 112:9

_____

**H**

**H (1)**
9:2
**half (1)**
21:18
**hand (7)**
13:10 14:12
20:18 116:7
142:3 150:10
208:20
**handing (1)**
121:20
**handle (1)**
90:16
**handled (3)**
45:13 131:22
183:11
**Handler (3)**

2:22,23,24
**handling (3)**
179:12,22
202:12
**hands (1)**
73:6
**handy (1)**
117:7
**happy (2)**
114:18 134:17
**hard (1)**
163:15
**HBL (63)**
1:8 2:9,16
10:13 21:17
71:25 72:16
89:6 92:19
93:9 100:21
105:12 106:6
106:14 107:2
139:22 143:2
143:5 144:19
145:5,9 146:4
147:23 148:5
148:24 149:6
149:17,21
150:19 151:5
152:4,5,13,21
153:12 155:8
156:25 157:6
172:8 173:3
173:11,16
174:3,5,6,13
174:19,21
175:11,22
177:13
179:20 180:9
180:14 184:7
186:14
187:25,25
188:6 193:19
195:6 198:20
206:20
**HBL's (1)**

47:24
**head (1)**
114:8
**health (26)**
44:2 46:10,12
46:16 48:8,10
48:12,18,20
52:19,24 53:3
82:6 91:14,23
92:24 96:10
96:19 97:11
98:4,13,16
102:24
107:12
110:20
114:23
**Health's (1)**
99:3
**Healthcare (...**
1:4,16 10:22
11:5,11 21:17
21:20,22 29:2
33:12,23
34:19 65:12
65:14 66:3
67:9,25 68:25
72:11 77:20
181:14 184:3
190:7
**hear (2)**
97:19 144:14
**heard (1)**
154:22
**heart (1)**
156:12
**heavily (1)**
37:5
**hectic (1)**
128:3
**held (6)**
28:25 29:10,13
42:23 60:11
183:24
**help (1)**

January 12, 2022

[Page 224]

117:16
**helpful (1)**
121:15
**helping (1)**
203:11
**hereinbefore...**
205:12 208:11
**hereto (7)**
4:6,20 5:9,15
5:21 6:10
184:5
**hereunto (1)**
208:20
**high (1)**
31:24
**higher (1)**
110:25
**history (1)**
175:19
**hold (2)**
12:17 30:23
**holdover (5)**
144:9,11,17,22
144:24
**holds (2)**
31:2,15
**home (16)**
14:18 28:9,15
28:16,19,24
30:20 32:4,12
36:4 37:12,14
38:2 79:11
82:9 200:21
**Hope (3)**
28:9 30:20
176:23
**hopefully (1)**
10:6
**hour (2)**
21:19 94:14
**Howard (4)**
23:10 24:13
131:24
204:12

**hung (1)**
112:16
**hygiene (1)**
53:24

---

**I**

**idea (2)**
40:17,20
**identification...**
63:5,15 73:20
89:16 94:22
99:16 107:20
115:14 157:3
157:4 181:4
185:11 201:6
**identified (11)**
23:21 27:10,18
74:25 96:17
154:15 155:3
183:23 198:5
198:21
200:12
**identify (7)**
27:13 54:18
72:22 123:2
141:22 190:2
202:20
**identifying (4)**
72:19 73:25
96:2 157:22
**identity (1)**
7:16
**ii (2)**
96:18 122:9
**ii)item (1)**
186:25
**iii (2)**
122:11 130:16
**immediately ...**
60:9
**improper (3)**
196:3,8 197:11
**improprietie...**
36:17

**inaccurately ...**
69:10
**include (4)**
155:20 156:18
161:24 180:4
**included (8)**
15:21 86:12
107:7 110:11
118:12
121:11
134:12
161:12
**includes (1)**
143:12
**including (2)**
4:9 5:23
**inclusions (1)**
15:23
**income (2)**
122:19 188:21
**incorrectly (1)**
69:9
**increased (1)**
162:8
**incurred (2)**
60:23 155:21
**Independenc...**
34:11
**Index (2)**
1:6 207:1
**INDEX-------...**
206:1
**indicate (2)**
39:10,13
**indicated (2)**
84:6 175:19
**indicates (1)**
116:18
**indicating (1)**
34:21
**indication (2)**
160:11 163:12
**indicia (1)**
111:15

**indisputable ...**
130:14
**individual (3)**
13:12 75:11
81:22
**individually ...**
34:13
**individuals (6)**
13:3,23 52:2
76:21 79:8,9
**industry (4)**
36:4 59:21
101:12
150:10
**informal (1)**
98:12
**information ...**
22:7 47:14
48:6,19 49:18
49:19,20,22
49:24 76:13
76:20 77:2,11
78:3 82:3
90:13 94:4
177:25 207:6
**INFORMAT...**
207:1
**informed (1)**
145:9
**initial (3)**
40:22 50:11
124:10
**initially (3)**
42:14 46:25
140:8
**initials (1)**
19:25
**initiate (1)**
75:3
**initiated (2)**
39:2,4
**injury (1)**
34:3
**input (1)**

49:12
**inquire (1)**
188:22
**inquired (3)**
188:16,19,20
**inside (1)**
150:7
**insist (1)**
133:14
**inspection (11)**
98:5,25 99:10
101:12
102:12 104:5
105:7,9,22
107:11
114:16
**inspections (1)**
102:8
**inspector (2)**
101:14 107:11
**installment (1)**
170:25
**installments ...**
126:10,22
129:3 143:7
**instances (3)**
38:17 143:19
144:2
**institutions (1)**
199:18
**instructions (...**
138:7 183:17
184:4,7,9
204:6
**instrument (5)**
122:12,14,21
122:22
128:20
**instruments ...**
120:2,19,21
121:8 122:8
126:17 128:9
128:17
129:12

January 12, 2022

130:12
137:12,22
138:19,25
139:12 192:4
199:11 200:7
**insufficient (2)**
50:21,21
**insurance (7)**
151:6,10,14
152:8,14,15
152:18
**integral (2)**
128:22,23
**intend (1)**
191:24
**intended (2)**
190:19,23
**intent (19)**
97:25 106:17
106:17
138:13
157:20,24
159:13,18
167:5 170:24
171:2 181:3
183:18
187:11
191:25 192:2
193:21 194:3
206:22
**intentions (1)**
192:16
**intercreditor...**
176:8
**interest (17)**
16:20 23:5
28:8,14,15,16
30:23,25 33:3
33:6,7 133:8
133:13,18
171:7,9,21
**interested (2)**
204:14 208:18
**interface (1)**

48:10
**interfaced (2)**
47:15 48:17
**interfaces (1)**
47:17
**interject (1)**
21:15
**interruption ...**
121:23
**intimately (7)**
12:15 131:23
131:25
149:14
150:23
175:13,16
**introduced (8)**
37:6,8 39:8,24
40:12,13 45:2
74:12
**introduction ...**
39:11,21
**investment (1)**
13:8
**investors (4)**
13:8,12,16,18
**invoices (1)**
173:5
**involve (1)**
147:7
**involved (43)**
10:23 22:21
26:5 28:5
32:21 33:18
36:9 38:3
45:10,22,25
46:8 47:6,10
47:12,18 50:2
51:19 54:3,4
54:5,6,8 55:4
56:20 72:5,10
72:12 73:10
73:19 77:6
79:8,10
131:23,25

149:15
150:23
171:16
175:13,16
176:10
180:11,16
**involvement ...**
31:21
**involving (1)**
36:10
**is(are) (2)**
208:10,12
**issuance (5)**
85:19 86:11
104:13
191:23
192:17
**issue (15)**
57:4 58:18
68:8 74:18
106:5 132:23
139:11
144:24
164:15
166:17
172:23
174:13
180:11,16
191:11
**issued (31)**
40:24 74:16,20
75:15 80:3
85:12 86:22
87:2 102:8,18
102:18,20
113:15,22
114:3 115:8
115:19,23
116:12,14,19
117:21
138:23 139:8
148:23
164:20 165:2
165:19,21

173:2,5
**issues (7)**
33:24 62:13
98:22 102:4
138:16 165:4
165:5
**issuing (3)**
102:12 163:25
164:3
**item (19)**
71:20 122:7
127:3 130:8
158:9,9,21
160:9 161:22
162:18,24
168:24
169:16,18
170:21 171:9
171:18
182:18,20
**items (11)**
158:3,5,20
161:23,25,25
162:3 163:11
170:2 171:21
172:2

_____
**J**
_____
**Jackson (2)**
90:19,25
**January (51)**
1:12 93:15,22
93:24 129:3
138:14
156:24 157:5
158:22 160:4
160:8 161:2
161:19,19
163:5,22
164:2,11,15
164:20,25
165:18,21
166:20
167:10

169:24
171:19 172:9
176:4 190:18
190:22 191:7
191:14,23
192:25 193:7
193:12,18
194:9 195:5,6
195:9,17
197:19,19
198:4,11,21
198:22
206:18
208:21
**Jerry (4)**
81:18,22 82:6
82:8
**Jersey (8)**
28:9 30:20
37:13,21 38:2
39:5 45:10
176:23
**jgiardino@...**
2:12
**jiving (1)**
62:15
**Joanne (1)**
81:19
**job (1)**
76:4
**Joe (1)**
3:4
**John (35)**
2:12 9:16
21:14 36:19
43:12 47:8
55:16 57:14
62:17 68:9
71:16 79:3
80:17 85:22
94:17 97:20
98:17 102:24
111:17
116:21

118:10 121:4
121:17 132:3
134:18
137:14
142:18
146:23
148:19 155:4
156:12
162:17
183:19 196:6
197:7
**joint (9)**
29:5,16,19,23
29:25 30:7,8
30:11,14
**jointly (2)**
32:3 94:7
**Josh (8)**
111:3 139:2,13
139:13,16
140:21
148:11 150:6
**Joshua (2)**
110:10 112:10
**Joudrey (2)**
49:5 73:9
**Jozefovic (24)**
1:8 2:9 3:3,4
9:19 37:9
39:8 40:7
41:8,10 42:4
42:16,21 43:6
43:9,13,20
44:14 47:12
47:18 53:14
89:6 118:25
138:9
**Jozefovic's (1)**
39:23
**JOZOFOVI...**
1:9 2:9
**judgment (6)**
34:21 35:4,5,7
35:9,18

**July (5)**
95:15 123:16
127:13 137:3
175:4
**June (2)**
163:5 175:4
**JURELLER ...**
2:15

**K**

**Kane (1)**
49:9
**keep (3)**
23:3 88:10
120:10
**keeping (1)**
70:25
**kept (1)**
54:9
**Kevin (3)**
74:4,5,9
**keyboard (1)**
73:6
**keys (1)**
93:3
**Kimberly (1)**
90:19
**kind (6)**
22:3 54:11
69:7 116:6
141:20
183:20
**King (1)**
49:7
**KLESTADT...**
2:15
**knew (1)**
37:11
**know (164)**
9:16 10:3,5
13:6,10,10
14:9,12,13,18
16:3 21:6
24:24 25:3,6

25:19 27:11
27:24,25 35:3
35:12 37:10
38:20 40:15
42:5 43:5,25
44:13 51:22
52:4,9 53:2
53:13 55:6
56:11 57:11
58:12,13
59:10,13
60:11,19
63:16 64:9
66:22 70:18
70:20,21
72:17 78:18
82:4,16,22
83:5 85:17,24
86:10,17,21
86:25 88:3
89:7 92:5
93:12 95:13
95:14,20
100:16,23
101:2 106:11
106:12,23
107:5,22
112:7,11
114:9 131:6,9
131:10
135:24
139:15
141:24 142:2
142:3,10
145:21
146:15 147:6
147:14 148:6
148:16,25
149:4 151:18
151:19 152:7
152:8,17
153:8,11
155:10,12,13
155:18,25

156:4,12
157:9 158:16
159:14 160:6
160:12,22
162:6 164:13
166:13
168:19,21,22
168:22
169:23 170:6
171:13
172:15,19
173:7 174:3,9
174:18,19
175:25 176:4
176:6,13,14
179:11,19,23
180:12
182:13,25
183:4,7,8
184:16,18,21
184:22
187:18,18,19
187:21
188:11
189:20 193:5
193:22,25
194:19
200:19
203:20,20
**knowledge (2...**
46:3 66:25
82:17 84:10
123:20,22
126:2,5,6
136:7 140:24
152:7 171:3,5
172:8,13
181:21
184:23 186:7
186:11,13
187:16 188:7
190:13 193:6
**known (2)**
82:7 110:18

**knows (1)**
168:8
**Kresimann (1)**
3:5
**Kristina (1)**
20:2

**L**

**L (4)**
9:2,2,2 205:1
**laid (2)**
193:20 194:2
**Lancaster (7)**
74:20,24 75:4
75:6,23,25
76:8
**landlord (19)**
78:7 96:11
106:25
122:17 124:9
126:11
127:10
128:24 129:8
129:13
130:13,22
132:12 147:5
147:23
149:18
162:20
166:18
197:18
**landlord's (4)**
108:14 113:11
131:4 139:3
**language (10)**
96:6 97:8
108:3 109:18
124:12 127:8
129:20
186:23
190:10,14
**late (24)**
26:7,8 143:7
143:14,19,22

144:2,16,21
145:12,19
155:9,10,21
161:9,10,12
161:16,18,23
162:7 169:13
171:17
173:25
**lateness (2)**
169:5,8
**latest (1)**
98:10
**Laura (5)**
1:18 63:11
204:22 208:6
208:24
**law (3)**
7:20 9:17
44:24
**lawsuit (4)**
22:16 36:16,20
144:24
**lawyer (1)**
135:9
**layers (1)**
130:25
**layout (1)**
50:4
**lead (1)**
76:25
**leading (1)**
52:2
**lease (143)**
91:8,11,20
92:5,6,7,10
92:11,13,14
92:16 93:16
94:20 95:2,5
95:11,20 96:3
96:8,13 98:14
98:17 105:20
106:7,15
107:2,3,10
111:16,22

113:10,17
114:4,13
120:2,3,3,23
120:25 121:2
121:5,9,13,14
122:10,15
123:11,15,25
124:7 128:19
128:20
129:19,20,25
130:3,12,18
130:20
131:10 132:2
132:3 134:9
134:11
136:16,19
137:24 143:3
143:12,18,18
144:3,8,12,22
145:2,3,6,11
145:20 146:6
147:9 148:6
149:22 151:7
151:17 152:9
152:14,19,25
153:14,17,19
153:21 154:5
154:12,14,23
155:2,10,24
157:19,23
158:6 159:3,5
159:25 160:3
164:8 165:2,7
165:8,11,13
165:15
166:18
167:17
168:24 169:3
170:23
171:25
180:19
189:11
190:15
191:10 192:2

192:13
194:21,23,24
195:4,11,16
195:19
197:20 198:5
200:7,22,24
202:15
203:15,15
206:11
**led (2)**
80:12,19
**left (1)**
163:17
**legal (19)**
15:20,23 45:3
159:14,16,20
167:6,20,21
168:2,11,17
191:11,21
192:11,15
194:16
195:21
197:15
**LegalView/Z...**
7:11
**lender (10)**
36:3 73:21
74:2,18
165:22
188:25 189:5
200:11,21
202:18
**lenders (1)**
200:14
**lending (2)**
36:5 199:18
**let's (22)**
23:2 26:4
27:16 47:9
63:8 64:2
81:11 91:3
93:14 102:25
107:16
113:19 115:9

121:15 123:2
129:20 151:4
162:18
169:16 171:7
192:23
201:25
**letter (92)**
97:25 98:4,20
99:3,4,4,8,14
99:18,21
101:4,6 104:4
104:14,21
105:3,5
106:17,17
110:12,13,15
110:16,19
111:3,10
112:6,8,11,12
112:24
121:11 122:9
127:5,9,16,19
128:6,7,12,13
129:14
138:13,14,15
156:24 157:5
157:20,24
158:3,5
159:13,17
164:2,4,5,7
165:2,18,22
165:25 166:4
166:10,14,17
166:25 167:3
167:4,5,10
170:24 171:2
181:3 183:18
187:10
190:22 191:7
191:24,25
192:5,18
193:20 194:3
194:9 198:21
201:5 203:7
203:10

206:13,18,22
206:24
**letters (1)**
120:3
**level (3)**
31:24 53:25
171:14
**Lexington (1)**
2:5
**Lexitas (1)**
7:12
**license (7)**
31:2,15 33:24
38:5,10 40:18
45:9
**lien (1)**
45:13
**lieu (1)**
192:8
**likes (1)**
204:6
**limit (1)**
49:21
**limited (2)**
49:19 204:15
**line (36)**
34:2 76:3
121:11 122:5
123:4,8,10,20
123:23 124:2
124:4,6 125:5
125:15 126:2
126:6 130:7
154:4,6,11,15
154:21
158:19,20
159:22
161:13,18,20
161:22
162:18,23
167:9 170:21
171:18
175:22
179:12

January 12, 2022

[Page 228]

**listed (6)**
67:2 137:12
158:20,21,24
169:18
**listen (1)**
133:15
**litigation (17)**
7:22 8:10
33:19,21 34:4
34:5,6,7,8,17
36:9 57:4,22
131:19 153:7
153:11
187:24
**little (1)**
109:24
**Lizer (42)**
1:8,9 2:9,9 3:3
9:19 37:8
39:8 40:2,3
43:15 49:11
50:12 51:25
54:23 55:4,7
56:3 57:5,10
58:16 60:14
60:19,23 65:7
69:15,22 70:4
71:6,14 78:7
79:24 112:23
113:7 131:12
132:18 133:2
133:8,18,25
135:3 140:23
**Lizer's (2)**
49:11 58:4
**LLC (14)**
1:4,8,17 2:9,16
11:6 12:23
20:4,5,7,8,10
77:20 184:3
**LLP (3)**
2:4,8,16
**loan (50)**
13:22 14:8,24

14:25 21:11
21:11 23:7,8
23:22,22
24:13,15,18
25:4,8,13,20
27:5 54:13,14
60:2,5,10
67:14 73:14
74:25 76:12
77:3,10 81:5
81:8,8,9
82:15,20 83:3
84:20,23 85:3
85:10,18
126:18 179:5
179:20,25
180:9,13
199:22 200:3
200:20
**loaned (2)**
20:24 26:25
**loans (14)**
20:25 21:4,7,8
21:21,23
22:20 23:6,11
23:13,17,21
23:24 36:14
**LOC (1)**
159:8
**location (1)**
40:18
**locations (1)**
7:10
**logistics (1)**
50:3
**LOI (31)**
136:5 159:6,7
159:11
181:11,18
182:5,8,11
183:25
184:10
189:13
190:12,17,20

190:23
191:12,15,17
191:19 192:6
192:11,20
193:3,8,14
194:17,25
195:3 201:24
204:7
**long (5)**
12:14 59:14
124:6 142:16
203:15
**look (45)**
31:23 58:8
75:14 85:14
85:21,25 86:3
86:18 89:2,7
95:2,5 99:17
103:2 106:19
107:21 112:9
115:9,15
117:9 121:9
126:12
134:18
136:22
141:25
142:24
149:12,13,20
150:24 151:4
154:12,22
157:7 158:12
159:10,22
162:16,18
165:8,15
181:5 192:21
193:3 204:17
**looked (3)**
12:14 87:25
154:14
**looking (20)**
43:8 56:9,13
58:11 59:17
60:17 69:19
70:6 71:9

84:23 85:7,13
87:3 102:22
110:8 115:5
127:8 143:16
193:6 204:5
**looks (2)**
95:4 115:17
**lot (4)**
22:4,6 63:17
90:16
**Lowenthal (3)**
1:18 208:6,24

_____
**M**

**M (1)**
2:23
**magnitude (1)**
148:22
**maintain (4)**
135:17 141:21
154:4,25
**maintained (6)**
88:5 130:24
131:13
132:10,12
202:7
**maintaining ...**
30:15 131:16
**maintenance...**
148:5,13
**majority (1)**
18:23
**making (4)**
65:19 90:6
154:19
182:18
**manage (1)**
31:23
**managed (9)**
18:13 54:10,12
59:4 65:22
90:20 131:24
179:14
185:23

**management...**
12:2 16:9,10
16:12,15 17:8
17:24 19:18
19:19,21
20:17 27:19
27:20 29:8
31:12,16,16
31:18,22,22
32:17 36:24
66:5 83:4,7
83:10,15
84:11 177:5
**manager (18)**
11:10,21,22
14:10 20:7
49:4,6,7 66:4
89:11 106:24
110:10 139:4
176:16
181:14
189:18 190:4
197:17
**managers (2)**
11:24 84:7
**manages (2)**
17:19 32:2
**managing (2)**
54:8 72:19
**Manhattan (1)**
9:18
**manner (5)**
7:18 62:10
183:14
185:18
188:14
**Manor (8)**
28:8,15 30:19
32:4 176:22
177:5,9,11
**March (6)**
138:13,14,18
139:8,22
174:20

**mark (6)**
1:9 2:9 37:8
38:20 49:5
157:4
**marked (25)**
7:24 63:5,10
63:14,17,21
63:22 64:4,5
69:21 88:24
89:15 94:21
94:24 99:15
107:19,21
115:13
116:10,17
157:2 181:4,6
201:6 203:3
**market (2)**
82:7 200:20
**markets (1)**
200:9
**marriage (1)**
208:17
**Marzullo (1)**
81:19
**Massachuset...**
9:14
**materials (1)**
43:25
**math (1)**
123:16
**matter (15)**
10:17 36:13
45:9,11,14
83:18 87:22
91:3 115:6
132:6,9
168:14
176:11
202:12
208:18
**matters (12)**
8:10 10:24
36:22 37:18
37:23 44:21

45:7 50:2,6
54:10 77:13
90:14
**Matthew (2)**
13:20 14:2
**matured (1)**
199:23
**maximum (2)**
18:5,7
**MCFI (1)**
34:11
**mean (11)**
15:13 51:12
94:9 121:6
145:7 146:24
149:23 151:7
152:25
153:15,16
**meaning (4)**
39:15 48:2
97:3 168:11
**means (5)**
36:19 79:3
107:9,10
183:9
**meant (5)**
84:4 103:8
145:13 146:6
148:7
**mechanically...**
84:14,14
**mediation (1)**
38:4
**Medicaid (1)**
152:22
**Medicare (1)**
152:22
**meet (1)**
44:9
**meeting (21)**
7:11 118:24
119:5,11,14
119:18,21
120:9,14

123:19
127:15,21,25
128:2,3 137:7
137:10,15,19
138:5 139:9
**meetings (8)**
12:18 53:3,6,8
53:10,18
139:4,6
**member (6)**
20:8 24:9
44:24 45:5
78:7 79:25
**members (16)**
12:18,22 13:3
13:6,9 14:15
14:20 15:2
20:10,13
49:25 77:24
84:22 85:4
90:18 140:25
**membership (3)**
133:8,13,18
**memorialize...**
105:21
**memorializes...**
104:4
**memory (4)**
103:17 113:25
132:14 148:2
**mention (2)**
191:15,18
**mentioned (8)**
14:24 30:19
32:24 52:15
55:9 73:18
160:22
191:17
**merged (1)**
81:21
**met (5)**
37:16 40:6
44:11,14
106:7

**method (1)**
17:20
**mezzanine (1)**
75:2
**MICHELM...**
2:8
**mid (5)**
60:3 97:12
98:4,5 99:10
**Midtown (1)**
9:17
**million (109)**
17:14,15 18:2
18:9 23:7,22
25:9,13,19,24
26:10,14 35:5
57:5,10,11,16
58:5,5 60:12
60:14 61:12
62:9,21 65:3
65:9,11,13,25
66:17 67:7,14
68:2 70:2
71:13,19,24
72:6,15 73:15
122:9,10,18
127:6 128:5,7
130:8,18,21
131:7,21
132:2,18,19
132:22 133:2
133:9,12,19
134:2,7,8,14
135:4 137:6
140:24
141:13,14
142:12
156:17 159:8
182:18,19,22
183:2,14
184:2,14,24
185:15,21
186:2,8,14,18
186:21,21

187:3,8,17
188:2,4,9,24
192:8,8,9,19
192:25 193:7
193:13 200:6
201:8,12,15
202:4,8,15,22
**millions (1)**
200:22
**Milwaukee (...**
28:16,20 32:25
33:12,23
34:10,11,19
176:21 177:3
179:5
**minus (1)**
161:6
**minute (1)**
94:13
**mischaracter...**
109:10
**mishandled (1)**
37:3
**missing (1)**
112:8
**mistake (1)**
64:2
**model (1)**
79:15
**moment (1)**
28:13
**money (19)**
20:24 24:4,6,8
26:24 41:16
41:20 56:17
60:19 131:3
133:5 136:23
171:10
183:12 185:6
189:4 193:23
202:19
204:13
**monies (5)**
56:3 65:7,20

| | | | | |
|---|---|---|---|---|
| 71:6 129:9 | 2:1 9:2,2 205:1 | 159:10 | **Nicholson (2...** | 91:1 92:1 |
| **month (8)** | **name (32)** | 162:16 | 1:17 9:10,15 | 93:1 94:1 |
| 124:2,18 | 9:8,16 11:15 | 165:15 173:9 | 9:22 10:1 | 95:1 96:1 |
| 134:10 159:5 | 15:20,22,24 | 182:15 190:5 | 11:1 12:1 | 97:1 98:1 |
| 172:9 173:18 | 15:25 16:6,14 | 190:9 191:7 | 13:1 14:1 | 99:1 100:1 |
| 174:4,20 | 18:16 19:17 | **needed (10)** | 15:1 16:1,25 | 101:1 102:1 |
| **monthly (3)** | 24:11,12 | 12:20,22 56:17 | 17:1 18:1 | 103:1 104:1 |
| 18:8 126:22 | 27:13,17,21 | 70:5 77:2 | 19:1 20:1 | 105:1 106:1 |
| 174:15 | 27:23 28:2,3 | 96:7 97:16 | 21:1 22:1 | 107:1 108:1 |
| **months (12)** | 28:19 31:5 | 111:10 112:5 | 23:1 24:1 | 109:1 110:1 |
| 59:20,20,22 | 32:24 33:10 | 138:7 | 25:1 26:1 | 111:1 112:1 |
| 124:10,11,15 | 35:24 38:6,8 | **needs (3)** | 27:1 28:1 | 113:1 114:1 |
| 124:21,22 | 49:5,6 74:4 | 61:11 148:14 | 29:1 30:1 | 115:1 116:1 |
| 125:8 154:5 | 119:3 175:18 | 189:19 | 31:1 32:1 | 117:1 118:1 |
| 154:17 175:4 | 200:11 | **negative (1)** | 33:1 34:1 | 119:1 120:1 |
| **morning (4)** | **narratives (1)** | 122:18 | 35:1 36:1 | 121:1 122:1 |
| 9:15,21 11:3 | 196:19 | **negotiated (2)** | 37:1 38:1 | 123:1 124:1 |
| 12:8 | **naturally (2)** | 80:22 81:9 | 39:1 40:1 | 125:1 126:1 |
| **mortgage (1)** | 51:10 59:16 | **negotiation (1)** | 41:1 42:1 | 127:1 128:1 |
| 120:6 | **nature (4)** | 38:4 | 43:1 44:1 | 129:1 130:1 |
| **mortgagee (1)** | 30:21 33:21 | **negotiations ...** | 45:1 46:1 | 131:1 132:1 |
| 122:20 | 81:25 178:17 | 72:5,9,13 | 47:1 48:1 | 133:1 134:1 |
| **motion (2)** | **near (1)** | 80:12,19 | 49:1,8 50:1 | 135:1 136:1 |
| 4:15 6:5 | 200:23 | **neither (1)** | 51:1 52:1 | 137:1 138:1 |
| **mouth (3)** | **necessarily (3)** | 204:11 | 53:1 54:1 | 139:1,7 140:1 |
| 61:23 62:20,24 | 73:5 96:25 | **Neuman (3)** | 55:1 56:1 | 141:1 142:1 |
| **move (5)** | 108:16 | 1:9 2:10 89:7 | 57:1 58:1 | 143:1 144:1 |
| 4:10,13 5:25 | **necessary (3)** | **never (6)** | 59:1 60:1 | 145:1 146:1 |
| 6:3 56:17 | 46:14 52:20 | 132:2 188:19 | 61:1 62:1 | 147:1 148:1 |
| **moved (2)** | 119:25 | 192:8,9 200:4 | 63:1,9,12 | 149:1 150:1 |
| 12:10 22:12 | **need (32)** | 202:14 | 64:1,7,22 | 151:1 152:1 |
| **moving (3)** | 7:13 25:18 | **new (29)** | 65:1 66:1 | 153:1 154:1 |
| 56:24 58:2 | 48:2 52:16,18 | 1:1,19 2:5,11 | 67:1 68:1 | 155:1 156:1 |
| 190:5 | 52:25 58:8 | 2:11,17,17 | 69:1 70:1 | 157:1 158:1 |
| **multiple (1)** | 60:25 64:12 | 10:19 28:9 | 71:1 72:1 | 159:1 160:1 |
| 135:20 | 72:23 85:14 | 29:5,16 30:20 | 73:1 74:1 | 161:1 162:1 |
| **municipal (5)** | 85:21,25 | 37:13,21 38:2 | 75:1 76:1 | 163:1 164:1 |
| 54:5 102:2,21 | 86:18 92:7 | 38:13,15 | 77:1 78:1 | 165:1 166:1 |
| 145:20 148:5 | 102:8 103:16 | 45:10 46:15 | 79:1 80:1 | 167:1 168:1 |
| **municipality ...** | 111:3 112:7 | 50:22 91:23 | 81:1 82:1 | 169:1 170:1 |
| 102:4,19 | 121:9 140:12 | 96:10,18 | 83:1 84:1 | 171:1 172:1 |
| | 140:18 | 98:15 105:18 | 85:1 86:1 | 173:1 174:1 |
| ――――― **N** ――――― | 154:22 | 176:23 208:2 | 87:1 88:1 | 175:1 176:1 |
| **N (4)** | 156:10 | 208:4,7 | 89:1,17 90:1 | 177:1 178:1 |

January 12, 2022

[Page 231]

179:1 180:1
181:1 182:1
183:1 184:1
185:1 186:1
187:1 188:1
189:1 190:1
191:1,25
192:1 193:1
194:1 195:1
196:1 197:1
198:1 199:1
200:1 201:1
202:1 203:1
204:1 205:16
206:3 208:9
**nine (3)**
63:18 171:6,9
**non-refunda...**
182:19
**non-starter (1)**
200:8
**NONE- (2)**
207:7,10
**noninterest (1)**
67:13
**nonpayment ...**
169:2
**nonrefundab...**
186:15,18,20
186:22
201:22
**nonstarter (2)**
200:24,25
**noon (1)**
94:14
**North (1)**
2:5
**Notary (6)**
1:18 4:22,23
9:4 205:21
208:6
**NOTARY.U...**
2:21
**note (9)**

25:4 109:22
133:21
167:19
174:10 180:3
195:13
197:22
199:24
**noted (2)**
94:18 204:25
**notes (2)**
119:10 204:9
**notice (22)**
85:11,20 86:12
86:25 93:15
93:21,24
107:6 156:25
157:18
164:10,14,23
166:21
168:13,14
174:14
188:23
190:18
191:14
198:12
206:20
**notices (4)**
86:5,13,21
198:13
**notification (1)**
106:5
**notified (1)**
107:2
**notify (3)**
106:14 173:16
174:6
**notifying (1)**
164:20
**notion (1)**
200:5
**notwithstand...**
8:7
**November (14)**
65:25 69:14

95:17,21
103:5 105:14
136:6 160:10
182:7 184:20
184:25 186:8
187:21 202:3
**number (30)**
49:2,11 50:21
50:25 64:4,6
79:7,9 87:25
91:6 97:22
140:11,13
146:4 148:9
149:21 151:5
152:21
153:22
156:16
158:21 162:7
162:13,14,18
169:16
171:15,17,21
203:13
**numbered (2)**
63:8 91:6
**numbers (3)**
62:5,8 63:22
**numerous (3)**
138:6,8,9
**nursing (17)**
14:18 28:9,15
28:16,19,24
30:19 32:4,12
33:5 36:4
37:12,13 38:2
79:11 82:9
200:21
**NYDOH (1)**
98:8

_____
|       O       |
‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾
**O (4)**
9:2,2 114:9
205:1
**O'Malley (4)**

74:4,5,9,13
**oath (1)**
7:13
**object (9)**
4:9,12 5:24 6:3
108:22
167:23,24
191:4 198:24
**objecting (1)**
167:25
**objection (40)**
23:9 43:3 57:7
61:9 62:6
66:11 67:4
96:22 108:6
108:12,25
109:6,14,15
109:22 114:5
115:2 133:21
134:3,23
151:23
167:19
168:16
169:14
174:10 180:3
195:13 196:3
196:5,8,24
197:2,5,6,22
198:7 199:24
201:10,18
202:23
**objections (1)**
69:8
**obligation (13)**
8:8 109:13
128:15
129:24 130:6
130:7,9
138:18
139:12
144:23
147:10
154:10,20
**obligations (9)**

82:19,24 129:9
130:2 137:21
157:19
159:17,18
185:23
**observations ...**
93:8
**observe (1)**
22:10
**obstructing (1)**
196:6
**obtain (3)**
19:5 46:15
86:10
**obtained (2)**
77:17 88:4
**obtaining (2)**
48:19 101:24
**obvious (1)**
57:3
**Obviously (1)**
204:10
**occasion (1)**
14:2
**occasions (1)**
53:13
**occupancy (23)**
101:14,17,24
101:25 102:2
102:5,8,15,18
102:20,23
112:5 113:15
113:22,24
114:2,13,21
114:24
115:12 116:9
150:20
206:17
**occupiable (1)**
112:22
**occupied (1)**
93:9
**occupy (6)**
111:5,20,21

112:17,21
113:5
**occur (3)**
38:16 96:7,16
**occurred (2)**
61:5 107:6
**October (9)**
111:2,18
112:20 113:4
117:18,22,25
118:5 140:8
**offer (2)**
147:22,25
**offered (1)**
102:25
**office (5)**
10:17 88:8
117:20 119:2
153:8
**officer (2)**
7:12 15:14
**offices (1)**
9:17
**official (1)**
110:15
**Oh (1)**
129:11
**okay (11)**
61:14 69:13
96:5 97:8
104:17,19
117:2 132:16
157:8 168:4
204:17
**once (8)**
64:8 110:14
118:21
142:20
177:14
185:16,21
195:25
**ongoing (5)**
115:7 138:16
180:17

193:25
198:19
**ONLINE (1)**
2:21
**oOo (1)**
207:11
**opening (2)**
99:22 100:22
**operate (2)**
31:2 40:2
**operating (23)**
11:25 12:4,13
14:10 30:25
31:4,6,10,13
31:14,25 33:8
33:10 36:6
40:4 79:14,17
79:25 94:20
94:25 95:11
122:18
206:11
**operation (4)**
31:21 84:5
108:17
128:11
**operational (1)**
120:7
**operations (6)**
33:5,8,14
50:17 96:25
128:18
**operator (3)**
37:12 78:12
112:15
**opine (1)**
168:9
**opined (1)**
50:24
**opinion (7)**
50:20 114:20
131:13
154:19
194:24,25
197:19

**opportunity ...**
39:19 131:18
166:22
**opposed (1)**
140:7
**option (2)**
203:14,19
**order (18)**
1:18 46:13
56:16 58:9
61:2 64:17
85:22 86:15
86:19 94:4
96:7 102:7
108:9 110:20
148:22
162:16
165:14 193:4
**ordinary (3)**
12:25 150:15
173:4
**org (4)**
78:14,15,16,19
**organization ...**
80:20 81:2
**organization...**
78:18
**organized (1)**
120:16
**original (2)**
4:25 5:16
**outcome (2)**
34:16 208:18
**outline (1)**
66:18
**outlined (3)**
71:20 146:10
151:13
**outside (2)**
77:5 198:18
**outstanding (...**
23:7,12 24:14
24:16
**overall (5)**

50:15 77:18
128:10
129:19
187:10
**overdue (1)**
193:2
**overlooked (2)**
139:20 140:17
**oversaw (1)**
73:4
**oversee (2)**
60:6 66:8
**overseeing (1)**
17:17
**overseen (3)**
73:3,4 84:8
**oversight (2)**
55:18 118:13
**owe (6)**
24:4,6,8 25:23
26:12,19
**owed (3)**
26:9 171:11,11
**owes (1)**
147:12
**owing (1)**
145:15
**owned (3)**
18:21 31:17
34:11
**owner (9)**
16:23 17:4
31:9 78:12
79:16,18
110:10 133:6
150:11
**owner's (1)**
55:22
**ownership (4)**
16:20 79:12,14
79:18
**owns (2)**
18:24,25

**P**

**P (2)**
2:1,1
**p.m (1)**
204:25
**page (26)**
64:21 89:12,17
91:4 94:23
95:16,24
99:15 107:25
113:19
115:13
121:18 122:2
123:6 142:23
157:10
158:13
181:25 182:2
182:21
190:10 206:2
206:6,14,17
207:4
**pages (14)**
63:14 89:15
94:21 107:19
157:2 181:3
201:5 206:7,9
206:12,15,21
206:23,25
**paid (56)**
17:23 18:4
36:14 62:9
65:11 70:20
126:10,14,15
126:23 127:2
127:2 129:4,5
143:12 144:3
144:5,7
145:18,22
146:2,12
148:14,25
150:18
159:23,23
160:4,6,7,16
160:17

January 12, 2022

163:19,23
167:15
168:20,21
169:10,12,13
171:4 172:2
172:13,14,15
173:8,11
174:19,21
179:7,9
183:14
184:22
193:23,24
202:3
**papers (1)**
58:2
**paperwork (1)**
97:17
**paragraph (1...**
68:3 74:25
91:7 93:14
103:3 142:25
143:21 145:4
148:4 150:19
155:8 182:5
186:20,25
203:13
**pardon (4)**
51:13 97:19
99:6 145:25
**part (13)**
5:22 55:17
110:4 118:14
126:18
137:23 147:4
158:4 159:7
165:4 187:10
189:24 199:7
**partial (1)**
146:11
**participant (2)**
42:9,16
**participants ...**
42:11 53:11
77:18 194:6

**participate (...**
14:23 41:5,21
41:25 42:3,6
42:24 46:19
175:10
194:13
**participated ...**
37:5 48:22,24
50:7 73:7
94:3,4 157:16
191:22
192:17
**participating...**
7:10 49:17
76:22
**particular (11)**
44:7 45:9 76:3
91:19 100:20
120:6 128:12
161:15 166:8
180:11,16
**particularly ...**
115:8 180:21
**particulars (2)**
178:3 179:22
**parties (17)**
4:6,20 5:9,15
5:21 6:10 7:5
7:19 8:5 22:2
22:14 79:5
106:20
150:14 199:5
199:7 208:16
**partner (1)**
31:25
**party (7)**
8:9,10 36:12
38:4 111:9
112:6,24
**passed (2)**
100:19 163:19
**Pat (3)**
176:10 179:24
180:2

**patients (4)**
96:21 97:2,7
108:16
**Paul (2)**
13:20 14:2
**pay (26)**
124:3 143:2,5
143:9,17
144:16,21,24
145:5,10
146:5,14
147:10 148:5
149:6,10,21
150:20 155:9
164:21
173:23,24,25
174:3,5,7
**payable (4)**
163:18 173:18
193:8,10
**paying (3)**
71:21 149:5
174:16
**payment (56)**
65:4,10 67:23
124:8 128:18
129:23,25
143:14,15,22
144:16,21
146:11
155:22
161:10
164:11
168:23,25
169:5,5,9
170:18,22,23
172:9,20,22
182:9,12,13
182:17,19,22
183:2,4,7,17
183:23 185:7
185:8,9,12
186:20 187:3
187:8,13,17

187:19 188:9
188:14
189:10
190:15
192:19 193:2
193:8,12
**payment' (1)**
183:24
**payments (19)**
23:14 56:24
58:17 125:12
145:12
150:20
160:25 161:4
165:3 167:13
169:23 170:6
170:11,12,17
175:8 198:12
198:16
204:10
**PCE (4)**
19:19,21,22,24
**PCO (1)**
92:3
**people (16)**
16:11 47:21
49:2,11,14,15
49:16 94:3,8
94:8,10,10
101:8 116:5
138:8 157:17
**percent (11)**
30:23,24 31:9
31:25 144:6,9
171:23 174:2
174:3,5,7
**perform (2)**
14:11 32:16
**performance...**
129:9,16,24
130:11
**performing (1)**
168:13
**performs (2)**

17:9 168:12
**period (28)**
26:15,16,19
44:23 51:7
71:16,18
115:4 118:19
118:22 124:5
125:6,7,19,22
126:8,23
128:25
138:10
141:17
162:20,21,24
167:3 175:25
179:10
180:18
181:18
**permanent (2)**
96:9 113:14
**permission (1)**
204:23
**permitted (1)**
196:19
**person (1)**
91:24
**personal (3)**
22:6 38:19,22
**personally (10)**
13:13 20:23
24:4,6 28:5
41:19 47:6
82:24 100:24
100:25
**personnel (1)**
30:2
**perspective (2)**
50:17 51:8
**pertain (1)**
158:6
**pertaining (1)**
115:6
**perused (1)**
88:2
**Peter (2)**

January 12, 2022

[Page 234]

20:2 49:8
**Peters (10)**
176:13,14,15
176:16 177:2
178:10,10,18
178:24
179:18
**physical (6)**
91:24,25 97:3
97:4 104:5
105:19
**physicality (1)**
120:15
**physically (1)**
93:12
**piece (1)**
18:25
**pin (1)**
59:19
**Pinnacle (7)**
47:16,17,23,24
48:4,17 77:12
**place (25)**
7:14 60:8
93:13 102:9
119:6 121:16
123:10,21
124:7 125:6
125:15 126:3
126:7 127:16
129:15
137:16,20
138:11
139:10
152:18
154:16
175:22
177:18
194:11
205:12
**places (1)**
19:10
**Plains (147)**
1:4,16 2:5

10:13,21 11:5
11:10,13,15
12:13,17 13:4
14:17 16:13
21:17,19,22
22:21 24:25
25:22 26:2,6
28:14,24 29:2
32:22 37:7,19
39:15,16
45:19,22,25
46:4 51:16
53:7 54:17
65:12,14 66:3
67:8,11,25
68:24 69:14
70:9 71:6,14
72:11,13
73:25 74:10
75:12,12,15
76:12 77:20
77:24 78:4
79:4,22 80:5
80:13,14,16
80:20 81:2,16
82:12 83:19
84:6,21 85:5
86:23 87:6,10
89:6 106:14
106:25
115:20
118:19 133:5
133:9,18
136:2,7
138:23
139:22
140:25 141:6
141:9 142:4
142:14
147:19
148:13,23
149:4 151:15
156:15
170:12,12,16

171:11
172:19,23
173:2,5,12,16
174:6,13,24
175:2,7
177:13 178:2
178:6,8
179:19
181:14
182:25 184:3
184:13
185:17,18,22
185:24 186:7
186:13
187:25 188:4
188:8,18,21
190:7,12
193:18
197:17
198:15,20
199:11,19
200:15 201:9
201:16 202:3
202:14
**Plaintiff (1)**
1:16
**Plaintiff(s) (2)**
1:5 2:4
**plan (4)**
88:16 91:25
104:6 110:14
**play (8)**
58:24 59:3
80:7,10 90:2
115:25
157:14,22
**playing (1)**
48:16
**please (36)**
9:8,11 10:5
23:20 45:8
46:12 54:2
64:12 65:17
80:17 89:3

102:2 108:9
109:24 110:2
110:7,23,24
110:25
112:10 123:5
130:20
133:16
136:21
141:11 148:8
164:4,5,6
166:24,25
182:16
192:14 193:4
196:9 203:5
**pleased (1)**
132:15
**plethora (3)**
87:24 130:2,5
**plus (7)**
18:6 124:23
125:21
141:10 159:5
161:6 171:23
**point (21)**
22:5,25 23:2
25:21 33:19
35:16 50:8
56:19 58:21
71:10 80:6
86:15,20 97:8
98:21 110:17
132:24 141:4
162:12 163:3
186:23
**Poletes (3)**
2:24 121:19,20
**Pollard (7)**
74:20,24 75:4
75:6,23 76:2
76:8
**possession (6)**
8:3 92:19 93:6
114:21
166:14 195:7

**possible (1)**
79:22
**post (1)**
200:16
**Posternak (3)**
81:19,20,20
**practitioner ...**
74:7
**pre (8)**
39:4 63:17,22
64:4,5 99:22
100:22
147:13
**pre-negotiati...**
199:6
**preceded (1)**
105:4
**preceding (1)**
104:8
**predates (1)**
116:9
**prefer (2)**
9:21 86:3
**preliminary ...**
88:20 91:3
**premises (2)**
108:19 109:20
**preparation ...**
46:22 87:17
191:23
**prepare (2)**
161:15 163:20
**prepared (12)**
44:2 75:23
77:16 78:16
119:13 146:8
151:11
152:10
158:16
179:20
184:10
202:21
**prescribed (1)**
202:15

January 12, 2022

[Page 235]

**present (9)**
2:20 3:2 7:5
26:9,16
100:21
105:24 106:3
129:2
**presentation ...**
121:22
**presented (3)**
8:2 109:19
116:3
**presenting (1)**
7:24
**presuming (1)**
61:19
**pretty (1)**
197:9
**prevented (1)**
199:11
**previous (7)**
59:16 81:23,25
116:19,22,24
144:4
**previously (8)**
28:18 44:19
59:14 63:5,10
153:24
173:14
174:16
**price (2)**
18:5,7
**primarily (2)**
49:9,14
**primary (1)**
47:17
**prime (1)**
171:22
**principal (2)**
24:9 107:13
**principals (6)**
22:15 77:12
78:20,25 79:2
79:4
**prior (26)**

8:4 35:14 39:2
59:22 60:4
74:10 85:19
95:9 100:8,9
100:13
105:13,20
115:19
116:14
123:12,17
127:11
136:19,24
149:4 160:16
164:10,11,15
164:20
**privilege (2)**
82:3 180:5
**probably (2)**
114:8 142:12
**problem (13)**
61:17,21 62:17
62:18 67:20
68:10,14,17
69:6 108:23
197:8,15
204:5
**proceeding (1)**
151:13
**proceedings ...**
152:11
**proceeds (4)**
66:7,9,13
71:13
**process (4)**
48:21 76:23
77:6 101:23
**procured (2)**
59:8,24
**procurement...**
59:4 60:6,8
73:19
**procuring (1)**
135:14
**produce (1)**
152:8

**produced (4)**
108:2 139:18
140:4,10
**production (6)**
116:2 117:19
118:13 140:5
140:14,15
**productive (1)**
120:16
**professional ...**
101:21 155:22
**profit (3)**
142:8,11,14
**programatic ...**
50:6
**progress (1)**
17:14
**prohibited (2)**
84:20 199:4
**project (93)**
17:21 18:9,10
25:2,22 26:2
26:6 29:8,18
30:2,5,9,12
32:5,8,17,19
32:22 37:7,9
37:15,21 38:7
39:5,6,14,23
40:8,13 42:2
42:14 43:22
45:11,19,22
45:25 46:4,6
46:9,13,25
47:11,13,15
48:14 49:13
50:10,22 51:2
51:5,16 52:21
53:23 55:2,11
55:19,23 56:4
56:17,25
57:12 58:19
58:22 59:8,23
60:7,15,24
65:21 69:16

70:5 73:8,22
74:2,8 75:7
76:2,5,13,14
77:18 78:15
79:6 139:3
141:2 142:16
146:10
176:22 178:2
179:5,19
200:13 201:9
**projects (4)**
16:12 18:12
19:15 74:10
**proper (5)**
26:3 95:7
121:3,10
196:7
**properly (2)**
144:8 146:12
**properties (14)**
1:4,17 11:5,11
16:13 65:12
66:3 72:11
77:20 93:15
152:22
153:13 184:3
190:8
**property (13)**
16:10 19:17
20:17 27:20
31:14 110:10
128:23
130:13
145:16
164:16,21
176:21
199:12
**proposal (4)**
41:3 43:6,10
149:17
**propose (1)**
94:13
**proposed (4)**
38:2 176:8

180:9 202:8
**provide (23)**
16:11 30:8
49:25 75:6,9
76:13,19
86:15,19
90:12 129:15
130:6,8,9
135:22
152:14
154:10 166:9
180:8 181:18
192:3 199:10
199:15
**provided (15)**
4:8 5:3,10,21
29:7 45:3
78:3 88:5,6,7
110:13
139:25
156:11 182:9
193:8
**provider (2)**
111:4 152:23
**provides (2)**
16:15 19:9
**providing (8)**
30:2 36:12
49:18,20,22
53:23 76:25
94:4
**provision (8)**
85:9 95:6
100:3 144:5
144:12
165:11
166:20 167:3
**provisions (4)**
18:8 92:9
138:2,4
**public (7)**
1:18 4:22,23
9:4 110:19
205:21 208:7

**Lexitas Court Reporting**
**800-678-0166**

January 12, 2022

[Page 236]

**pull (1)**
121:15
**purchase (7)**
41:17,22 58:22
60:15 67:18
71:15 201:22
**purchased (1)**
59:15
**purchasing (3)**
50:3 58:19
73:14
**purpose (12)**
7:21 24:13
27:4 39:11
49:18 123:23
128:5 163:25
164:3,7
196:24
199:15
**purposes (18)**
5:10 9:20 15:5
56:21,24
57:17 58:6,16
69:15 71:15
71:21 73:16
96:2 101:13
102:12 120:7
128:16,21
**pursuant (4)**
1:17 7:6 77:19
116:2
**pursue (1)**
40:20
**put (27)**
26:4 41:19
57:5,10 60:14
60:19 61:22
62:10,23 63:4
126:3,7 131:3
131:7 132:20
133:2,19
134:2 140:23
168:13
175:22 200:6

201:8,12
202:18,21,21
**putting (1)**
41:16

———————
**Q**
**qualified (6)**
135:11 167:8
168:9,18
192:12
195:22
**question (141)**
4:9,13 5:24 6:3
8:5 10:5
13:11 23:10
23:20 24:3
26:3 27:12,14
27:25 28:3,10
31:8 36:19
40:9,14 42:6
42:7 43:4
44:6,18,19
46:6,7 48:9
56:14 57:8
58:9 59:17
60:13 62:7
65:17 66:12
67:5,19 68:9
68:10,11,17
69:9 73:11
75:25 78:21
80:17 83:22
83:25 84:3,24
85:22 86:4
87:12 96:23
100:10,24
101:19 102:3
103:20,21
104:24
106:22 108:7
108:17
109:17,23
110:3 112:19
113:2 114:6,8

115:3 117:14
122:4 125:13
126:20,21
127:14 132:7
133:17,22,23
134:4,24,25
136:15
137:17,18
144:25 145:3
147:17
154:22
156:12,14
159:15,16,20
162:17
164:18 165:9
165:14 167:6
167:8 168:5
169:7,15
170:10,15
173:10,21
174:18
181:16,23
183:6 190:11
190:21 191:2
191:6,20
192:15,22
193:4 194:17
194:20
195:21 196:3
196:8,13,15
197:11,24
198:2 199:25
200:2,19
201:11,19
202:24,25
**questioning (1)**
8:4
**questions (13)**
10:4 61:20
62:16 64:10
69:7 88:21
117:10
133:15,15
147:16 196:4

196:16
203:25
**quiet (1)**
197:9
**quite (1)**
27:13

———————
**R**
**R (2)**
2:1 205:1
**range (3)**
17:12 141:14
156:7
**rate (4)**
152:24 153:5
171:22,25
**reached (1)**
58:21
**read (11)**
86:8,14 92:7,9
92:17 108:8
108:10
131:25
134:16
136:24
184:20
**reading (12)**
86:16 92:13
98:14,16
101:4 104:2
123:11
136:24
161:22
163:15
186:19,24
**ready (9)**
97:16 98:8,9
108:5 109:20
110:21 157:9
157:10,11
**real (13)**
30:24 33:6
79:12,18
120:16,16

133:6 145:5
145:10
162:19 163:4
171:7,9
**really (23)**
21:15 25:19
36:18 40:20
47:5 48:16
61:14 73:19
90:16,19
103:20 116:7
126:20
131:22
133:14
147:16
163:14
176:10 177:4
178:19
179:21
180:15
202:12
**reason (16)**
51:10 108:11
108:25 109:2
109:9,15
131:6,15
196:18,25
197:3,4,7,13
203:18,21
**reasons (3)**
129:17 192:5
197:23
**recall (126)**
10:9 11:2 13:7
14:5,16 15:3
21:6 23:12,13
23:16 24:12
27:4 33:15
36:11 38:6,8
39:7,20,20
40:5 41:9
43:2,11,11,13
43:15,18,23
45:18 47:8

| | | | | |
|---|---|---|---|---|
| 48:15 50:18 | **receivable (8)** | 71:12 107:8 | **references (2)** | **refresh (7)** |
| 53:2,4,5,15 | 33:25,25 36:3 | 115:18,22 | 183:16 189:9 | 65:6 69:21 |
| 53:16,17,20 | 36:10,13,21 | 116:13,15 | **Referencing ...** | 70:5,7 103:17 |
| 54:19,20,20 | 36:24 175:12 | 119:7,9 | 187:12 | 113:25 |
| 54:22,24,24 | **receivables (1)** | 126:13,25 | **referred (5)** | 132:14 |
| 54:25 55:4,14 | 175:23 | 146:21 147:9 | 9:21 28:18 | **refreshed (1)** |
| 56:5,7,18 | **receive (12)** | 151:2 162:9 | 109:19 | 148:2 |
| 57:9,19 58:18 | 41:2 69:15 | 193:9 | 161:16 189:8 | **refusal (1)** |
| 59:7,25 64:13 | 71:25 75:16 | **recommenda...** | **referring (29)** | 149:11 |
| 64:15,15 | 76:7 135:3 | 51:4 | 11:16,18 44:3 | **refuse (1)** |
| 69:18 72:17 | 153:20 | **recommenda...** | 47:3,19 52:16 | 152:5 |
| 75:5 76:10 | 169:25 170:4 | 51:9 | 55:16 57:14 | **refused (2)** |
| 78:4,9,10,13 | 175:2 176:7 | **reconvene (1)** | 61:7 70:17 | 151:5 152:4 |
| 78:17,23 | 182:25 | 94:14 | 91:20 99:18 | **refusing (1)** |
| 79:23 80:2 | **received (26)** | **record (9)** | 103:22,23 | 152:13 |
| 82:25 83:12 | 55:25 65:25 | 9:9,12 109:16 | 105:7,8,9 | **regard (1)** |
| 83:16,18 | 70:4,8 71:6 | 135:20 | 107:23 | 50:19 |
| 84:13,15 90:4 | 71:13 86:5 | 174:17 | 121:14 122:8 | **regarding (6)** |
| 90:5,7,8 | 118:7 153:4 | 183:13 188:9 | 122:22 | 8:4 61:12 72:6 |
| 119:5,20,22 | 166:16 170:7 | 197:4 208:13 | 124:12 | 90:13 175:11 |
| 120:12 | 170:17 182:9 | **recorded (1)** | 134:19 135:2 | 199:2 |
| 127:18,22,23 | 184:13,16,17 | 7:17 | 140:21 169:4 | **regular (3)** |
| 128:4 132:8 | 184:19,25 | **recording (1)** | 173:20 | 14:4 139:4 |
| 132:13 | 185:5,16,21 | 7:18 | 181:10 | 141:25 |
| 147:25 | 186:8 187:20 | **records (14)** | 193:15 | **regulatory (1)** |
| 149:12 | 187:20 188:8 | 33:17 35:21 | **refers (13)** | 77:13 |
| 162:13 | 204:10 | 54:9 71:2,5 | 28:10 68:11 | **reimburse (3)** |
| 166:11,15,19 | **receiving (4)** | 75:21 84:17 | 102:24 | 147:23 148:15 |
| 174:12 | 90:5 101:16 | 126:13 142:5 | 108:18 | 149:18 |
| 175:14,15 | 102:14 | 149:7,13,13 | 144:20 | **reimburseme...** |
| 177:17,20,24 | 204:18 | 184:8 188:10 | 155:19 | 148:24 150:14 |
| 178:5,13,19 | **recite (1)** | **red (1)** | 159:11 | 152:23 |
| 178:24 179:2 | 87:25 | 142:16 | 161:18,23 | **reject (3)** |
| 179:16,21 | **recites (1)** | **refer (15)** | 172:4 182:12 | 170:18,19 |
| 180:10 185:4 | 99:22 | 11:13,17 16:7 | 182:13,22 | 175:7 |
| 185:5,19 | **reciting (1)** | 33:17 61:11 | **refinance (3)** | **relate (4)** |
| 193:22 194:4 | 97:6 | 71:24 102:23 | 128:21,24 | 144:18 153:22 |
| 194:5,8,10 | **recognize (4)** | 104:7 121:2 | 130:13 | 171:6 178:10 |
| 195:15 198:6 | 64:9 95:3 | 148:18 | **refinancing (5)** | **related (6)** |
| 198:23 | 115:16 203:4 | 153:18 159:6 | 126:17 199:12 | 21:9 22:11 |
| 199:12 203:6 | **recollection (...** | 167:7 171:13 | 199:16,19 | 54:6,9 173:23 |
| 203:11,12 | 27:3 60:3 65:6 | 181:25 | 200:16 | 208:16 |
| **receipt (1)** | 66:10 69:21 | **referenced (3)** | **refrain (1)** | **relates (6)** |
| 147:11 | 70:6,8,11 | 74:21 187:3,9 | 109:7 | 143:22 144:9 |

January 12, 2022

[Page 238]

144:14,15
154:3,24
**relating (1)**
71:5
**relation (3)**
52:24 59:13
180:19
**relationship ...**
11:8 15:8,16
16:17 17:2
18:19 30:22
36:6 38:19,23
38:25 39:23
**relationships...**
22:19 176:25
**relevant (2)**
21:23 111:22
**relied (1)**
146:18
**rely (1)**
149:15
**relying (1)**
101:5
**remain (1)**
181:19
**remember (41)**
24:19 25:7
31:5 38:11
42:18,18 43:8
44:7,7 45:13
45:17 47:5
52:9,10 53:10
53:10,11
56:13 70:20
74:14 90:9,10
113:23 115:7
119:15
120:17
134:22 137:9
139:14 141:3
141:18 148:3
164:22 178:3
179:15 185:2
186:3,3

199:17 204:8
204:12
**remitted (2)**
188:25 189:5
**remote (1)**
7:9
**remotely (1)**
7:15
**rendered (1)**
156:19
**rent (76)**
58:17 93:17
95:6 124:3,9
124:14,23,24
125:11
126:10,22
128:18 129:4
129:5 130:2,3
134:15
136:17 143:2
143:5,7,17,22
143:25 144:4
144:5,6,7,10
144:11,16,17
144:21,22,24
145:22 154:5
158:21,24
159:2,4,24
160:3,9,17,25
161:3,5,7,10
161:19,19,20
172:9,20,21
172:24,25
173:6,8,11,17
173:23,24,25
174:4,15,19
174:22,23
175:3,8
189:10
190:15
195:10 202:9
**repaid (1)**
23:18
**repayable (1)**

67:24
**repeat (2)**
23:20 80:17
**rephrase (1)**
10:6
**replenish (1)**
128:15
**replenishing ...**
128:13
**reported (1)**
101:8
**reporter (2)**
7:8,15
**reporting (6)**
7:12 30:16,16
153:14,17,18
**represent (6)**
37:17,20,24
82:10 89:4
94:24
**representativ...**
55:22 110:11
139:14
**represented (...**
37:12,25 38:18
44:20 78:19
81:16 82:8
**representing ...**
6:12 82:18
**request (7)**
41:2 116:3
149:5,10
151:15 207:1
207:3
**requests (1)**
204:3
**require (5)**
14:14,19,25
77:23 150:14
**required (39)**
12:25 76:13
103:12
105:20 120:2
120:23

122:20,21
123:9 124:18
125:15,16
128:6,9 143:2
143:11,17
144:3,22
145:5,11
146:5 148:6
148:13
149:22 151:6
151:17
152:14,24
153:13,14,21
154:4,5,25
155:9 169:3
192:4 200:7
**requirement ...**
83:2 84:19
85:3 113:13
124:25 125:3
125:5
**requirement...**
152:19 153:17
**requires (4)**
85:10,18
113:10 144:6
**reservations ...**
195:11
**reserve (1)**
122:19
**reserved (4)**
4:12,16 6:2,6
**resolve (3)**
117:10 159:8
192:6
**resolves (1)**
168:13
**resolving (1)**
199:2
**respect (4)**
37:25 54:16
82:18,23
**respective (6)**
4:5,19 5:8,14

5:20 6:9
**respond (3)**
56:14 62:2
84:24
**responding (3)**
41:12 68:19
202:16
**response (7)**
41:5,7 45:8
69:3 121:3
143:23
168:19
**responsibilit...**
29:25 51:23
55:10 76:19
83:20 162:21
162:22 163:9
**responsible (7)**
30:15 56:23
65:19 70:25
72:18 155:23
156:2
**restate (3)**
100:11 137:16
196:12
**Restated (4)**
94:20,25 95:10
206:10
**restricted (1)**
84:21
**restriction (1)**
85:3
**result (3)**
107:10 145:11
155:21
**resulted (1)**
173:24
**retired (1)**
134:9
**return (5)**
4:25 73:11
147:19
186:14 188:2
**returned (2)**

January 12, 2022

[Page 239]

147:5 186:16
**returning (1)**
190:10
**revenues (2)**
20:16,20
**review (17)**
43:5 64:8,9
87:8,16,20,23
88:11,18
91:24 93:21
95:25 108:3
114:22
131:19
132:15
181:22
**reviewed (17)**
57:25 87:4,13
87:21,21
89:23 94:2
114:25
137:23 152:9
154:7 155:6
158:7 161:8
164:14,19
198:10
**reviewing (4)**
14:21 90:8
96:6 139:17
**revolving (1)**
34:2
**RFP (8)**
40:23 41:4,6
41:13,18 44:4
45:15 50:12
**ridiculous (1)**
23:2
**right (21)**
4:9 5:23 17:13
18:15 19:15
28:17 44:10
117:12
121:24
129:16
135:15 147:7

162:4,22
165:6 185:9
185:13
189:12
190:17
195:18
199:16
**rights (5)**
4:8 5:3,21
203:15,19
**ROBINSON ...**
2:8
**Roccapriore ...**
139:2
**role (20)**
29:23 31:6,12
40:3 41:12,15
46:3,22 48:13
48:15 58:24
59:2 66:5
72:8 80:7,10
90:2 115:25
157:14,22
**roles (1)**
49:12
**roll (1)**
69:10
**room (1)**
9:17
**rotating (1)**
179:11
**rounding (1)**
161:4
**routinely (1)**
50:4
**Royal (2)**
37:13 39:6
**rules (6)**
5:4,22 55:24
196:10,20,22
**RULINGS (1)**
207:9
**runs (1)**
20:6

**S**
**S (2)**
2:1 9:2
**sale (3)**
40:20,24
128:21
**sanitarian (1)**
107:14
**satisfied (8)**
35:7,9,18
125:2,4,10,12
132:19
**saving (1)**
23:5
**savings (1)**
18:7
**saw (4)**
41:4 151:11
176:9 202:13
**saying (12)**
23:13 55:14
62:3 104:19
111:21,24,24
112:2 132:5
132:22
143:14,16
**says (47)**
65:9,9 66:16
66:19,20,20
66:21,21
67:12,17,22
92:5 93:14
95:17 96:9,16
98:15,23 99:4
99:4,9 103:4
104:11
105:20
108:14
110:12 111:3
111:19
122:15 123:7
123:25 124:7
124:13 143:8
143:9 152:3

153:3 155:18
163:7,21
172:6 182:5,5
183:22
185:10 190:7
203:17
**schedule (24)**
67:2 68:13,15
135:18,19,20
135:22
141:21 146:8
150:24,25
151:11
152:10
158:13,14,17
160:7,18
161:13 162:5
163:21
164:25
167:10
198:11
**SCOTT (1)**
2:18
**screen (4)**
63:6 109:25
110:9 183:20
**scroll (23)**
64:18,21 89:11
109:24,25
110:6,23,24
112:10
122:11 123:5
142:23 148:8
164:4,5,5
166:23,25,25
181:15
182:16
189:19 203:5
**searches (1)**
116:5
**second (6)**
91:6 92:18
103:3,3 115:4
134:11

**section (16)**
7:6 64:23
95:25 113:9
123:3 124:13
124:19
137:23 155:3
181:25
182:21
183:16,22
185:12
187:13,14
**sections (1)**
182:4
**secure (1)**
30:12
**secures (2)**
129:22,23
**security (60)**
60:2 73:13,21
73:25 74:15
76:9,11,17,20
76:25 77:15
77:23 78:2,4
78:14 80:3,21
81:3,17 82:15
83:11 85:10
85:19 86:6,11
86:22 87:2,5
87:9 128:20
129:15
130:19,19,21
131:5 132:18
136:17 147:4
147:24
153:23,24
165:22 166:2
166:5,9,13,16
170:21,22
171:2 180:12
188:5,24
189:4 199:23
200:3,10,13
200:23 202:9
**see (32)**

January 12, 2022

60:25 64:17
65:2 91:9
92:20 93:17
94:23 95:2,16
96:5 103:5
110:6,24,24
112:8 131:9
143:3 157:10
158:22
163:15 164:4
167:2 183:19
185:14,14
189:13,15,18
189:19 190:3
191:7 207:4
**seek (1)**
51:5
**seeking (1)**
177:25
**seen (8)**
89:8,9 118:4,4
139:21 140:4
157:12
158:14
**select (3)**
37:18 44:20
53:3
**selected (1)**
55:2
**selecting (1)**
54:17
**sell (1)**
14:17
**send (4)**
117:2,6,9,11
**sending (1)**
165:17
**sent (6)**
110:6,16 118:2
118:10,14
140:10
**sentence (10)**
91:7,19,22
92:18 99:21

103:4 104:8
189:9,16,20
**separate (3)**
7:9 21:4 82:18
**September (...**
59:12 91:8,11
91:20 92:11
92:15,20 93:4
93:11 97:12
97:24 98:6,9
99:2,10,23
100:8,18,22
101:2,7 104:5
105:9,11,21
105:23 106:9
106:10 107:3
107:15 108:5
109:21 110:5
110:9 112:25
113:21 114:3
114:3,11,22
115:5 118:20
119:8 123:17
123:20
125:17,18,24
126:3,4,9,9
126:24,24
127:15,21
128:25 129:2
137:8,10,14
137:15,19
139:9,10,23
160:10,16,22
160:25 161:7
161:20
**sequence (1)**
47:8
**sequences (1)**
44:7
**series (7)**
10:4 46:17
97:14 121:7
150:3 160:14
160:15

**served (1)**
93:15
**Service (1)**
7:12
**services (14)**
16:12,15 17:24
20:17 29:3,6
29:8,10 45:3
48:6 53:22
55:17 56:21
156:19
**set (13)**
66:6,9 68:2
97:13 104:21
111:15
121:13 188:4
192:5 193:14
201:23
208:11,20
**setting (1)**
83:24
**settled (2)**
37:2,4
**settlement (4)**
37:5 198:9,18
199:3
**setup (2)**
84:14,16
**seven (4)**
161:24 170:2,5
171:19
**Shapiro (2)**
47:16 48:5
**share (1)**
204:23
**shared (2)**
18:7 29:25
**sheet (17)**
63:14 64:14
74:16,21 75:7
75:10,16 76:9
77:19 80:4,4
80:8,11,13
81:4,7 206:7

**sheets (4)**
74:18 76:7
152:24 153:5
**short (5)**
54:15 156:13
180:25
203:22
204:15
**shortcut (1)**
61:14
**shortly (1)**
60:9
**show (4)**
95:6 114:10
145:2 152:11
**showed (3)**
140:9 145:2
152:10
**showing (1)**
183:13
**sign (1)**
181:13
**signature (7)**
83:24 110:13
110:15,19
111:13 112:8
181:17
**signatures (1)**
111:12
**signed (9)**
81:7 95:11,14
111:4,10
112:6,13,14
112:24
**significant (1)**
129:13
**silly (2)**
200:8 202:17
**similarly (1)**
158:19
**simple (2)**
112:19 126:21
**simply (5)**
14:7 15:19

27:12 133:17
178:21
**sit (2)**
115:8 186:11
**site (8)**
50:3,4 54:4,17
54:18,25 55:5
55:7
**sites (1)**
54:23
**six (8)**
95:24 113:19
161:24,25
170:2,5
171:18,22
**Sixty (1)**
127:11
**slicing (1)**
192:10
**slow (1)**
115:20
**small (6)**
19:15,15 50:24
163:14
171:15
183:20
**SNF (6)**
1:8 2:9,16
10:13 21:18
89:6
**sold (2)**
38:5 40:21
**sole (1)**
74:7
**solve (1)**
198:20
**somebody (2)**
117:19 118:11
**son (1)**
49:8
**sorry (15)**
24:23 25:16
44:8 52:11
53:12,15,20

January 12, 2022

54:21 55:3
121:22 129:2
141:11
163:16
183:19
200:11
**sort (2)**
174:14 188:5
**sorts (2)**
38:4 150:16
**sought (1)**
82:22
**sound (1)**
185:24
**sounds (2)**
94:17 118:6
**source (1)**
75:2
**sourced (1)**
187:19
**South (1)**
39:5
**SOUTHARD...**
2:15
**space (1)**
32:13
**span (1)**
40:10
**spanned (1)**
46:6
**speak (17)**
12:19,22,24
13:11 25:6
40:7 47:7
61:18 72:2
75:17 81:6,12
128:11 166:6
166:7 170:8
179:24
**speaks (7)**
72:2,3 190:24
191:14,16
192:23
195:16

**special (1)**
24:12
**specialty (1)**
123:17
**specific (25)**
33:15 35:11
39:25 40:5
41:14 43:23
53:5 54:20
56:18 57:19
70:14 78:13
83:16 107:5
121:10 124:5
127:18
155:13
164:22
165:14 166:6
166:7 170:3
175:14
186:11
**specifically (...**
41:11 42:19
43:12 53:16
58:14 62:11
75:5 78:17
90:7,16
139:15
170:10 176:3
183:11
**specificity (10)**
20:18 24:2
25:15,17 26:3
56:10 58:9
78:22 87:12
121:3
**specifics (15)**
14:16 39:21
52:9,10 53:4
54:19,21 61:2
70:21 71:9
103:18 128:4
146:22 151:2
159:10
**specified (1)**

205:12
**specify (1)**
142:5
**speculate (2)**
86:2 162:15
**speculating (4)**
24:23 35:10
53:9,19
**spent (2)**
57:11 73:16
**split (1)**
162:24
**spoke (6)**
13:20 14:2
45:18 177:14
179:18 180:2
**spoken (4)**
13:15,19 83:18
200:14
**square (2)**
32:9,11
**ss (1)**
208:3
**Stack (1)**
74:8
**staff (7)**
47:22 90:15,18
94:3 106:2
115:6 148:25
**stage (1)**
40:11
**stamp (2)**
140:11,13
**stand (1)**
19:24
**start (3)**
69:12 121:17
123:2
**starting (1)**
22:4
**startup (2)**
150:4,5
**state (15)**
1:1,19 9:8,11

10:20 46:15
88:19 96:18
98:15 146:4
197:3,12,13
208:2,7
**stated (6)**
97:15 109:2,16
134:25
196:25
197:23
**statement (11)**
65:2 91:11,17
92:10,20,23
93:18,21
152:3 187:7
203:14
**statements (2)**
57:25 152:2
**states (6)**
91:8 98:4
103:25 108:4
109:20 145:4
**status (5)**
14:7 40:12,14
40:19 112:25
**Statutory (2)**
194:7 201:23
**step (1)**
121:23
**Steven (1)**
49:7
**STEVENS (1)**
2:16
**stick (1)**
64:3
**STIPULATE...**
4:4,18 5:7,13
5:19 6:8 7:4
7:23
**STIPULATI...**
7:2
**STIPULATI...**
4:2
**Stop (1)**

110:24
**straight (2)**
120:11 196:5
**Street (3)**
2:17 9:13 12:9
**strike (5)**
4:10,13 5:25
6:4 141:12
**string (5)**
100:19 106:19
107:8,24
112:3
**structure (7)**
13:7 78:11,19
79:21,22
194:2,7
**structured (1)**
78:25
**stuff (3)**
70:23 116:6
135:11
**sub (4)**
67:3 68:21
96:18 130:16
**subcontract (...**
30:5
**subcontracts...**
30:6
**subject (4)**
14:5 22:16
39:14 41:17
**subjects (1)**
119:20
**submission (2)**
46:23 153:9
**submissions ...**
48:11
**submit (2)**
44:2 132:4
**submitted (1)**
43:6
**subparagrap...**
189:17
**Subscribed (1)**

205:18
**subsection (9)**
64:23,24 71:24
137:12 154:6
184:19 185:7
187:12 189:8
**subsequent (1)**
99:7
**subsequently...**
81:9 134:11
**substance (3)**
131:17 153:20
177:20
**substantial (3)**
92:4 93:3
100:2
**substantially...**
100:6
**substituted (1)**
134:11
**succeeding (1)**
175:4
**successful (7)**
41:22 42:23
43:14,16,21
50:13 52:5
**successive (1)**
125:8
**sufficient (1)**
114:17
**sufficiently (5)**
96:11,20
108:15 111:8
113:12
**suggest (1)**
184:6
**suggested (1)**
173:15
**suggests (1)**
172:12
**suitably (1)**
91:15
**Suites (2)**
37:13 39:6

**sum (3)**
26:10,13 202:4
**supplement (1)**
45:8
**supplementa...**
32:13
**supply (1)**
8:8
**support (2)**
128:19 129:18
**suppose (10)**
67:15,17,25
68:16 136:21
136:23
143:12 192:7
193:23
196:23
**SUPREME (1)**
1:1
**sure (15)**
27:14 38:21
46:5 55:15
60:16 61:17
83:22 118:12
129:13 130:6
153:9 164:17
173:20 183:5
200:18
**surety (3)**
19:6,8 128:10
**surrender (1)**
195:7
**surrounding ...**
33:24 34:4
36:23 51:8
146:10 150:4
150:4,5
156:11
**survey (3)**
99:22 100:5,22
**swearing (1)**
93:20
**swore (2)**
92:10 151:25

**sworn (8)**
4:21 7:15 9:4
57:24 89:18
205:6,18
208:11
**system (2)**
64:3 116:6

––––––––––

**T**

**T (1)**
205:1
**Tabor (27)**
73:9,9 90:19
90:21 150:22
151:9 153:6
158:18
160:18
167:14
169:25 170:4
171:14,24
172:2,17
174:21
179:12,13
183:11,12
184:9,16
185:5 187:20
188:12
203:11
**tabulated (4)**
150:7,23
155:13 156:5
**take (18)**
80:4 88:21
89:7,22 94:13
95:2 99:17
102:8 103:2
107:21 115:9
115:15
138:11 151:4
166:23 171:7
181:5 203:24
**taken (2)**
114:13 130:11
**talk (1)**

157:7
**talked (3)**
171:17,20
180:7
**talking (7)**
15:25 21:19
67:10,11
83:23 142:17
145:23
**task (1)**
29:11
**tax (2)**
167:13 194:6
**taxes (21)**
145:5,10,12,18
145:23,24,25
162:19 163:4
164:11,16,21
164:24
167:14
168:19,24,25
168:25 169:2
169:10
171:10
**taxing (2)**
145:16 171:12
**TCO (12)**
93:2 115:18,18
115:23
116:11,14,15
117:17,21
118:8 140:6
140:14
**team (9)**
48:11 49:9,10
49:17,25 50:2
53:7 73:25
157:25
**technically (1)**
36:25
**tell (15)**
16:4 34:25
35:11 70:11
83:17 103:9

111:11
115:16
130:16 138:3
145:21 146:6
149:23
152:13
171:23
**telling (1)**
185:5
**tells (1)**
143:18
**temporary (7)**
96:10 113:15
113:24 114:9
115:12
116:19
206:16
**ten (8)**
40:10 44:8
46:6 142:23
161:13,18
171:6,17
**tenant (93)**
10:17 77:11
85:12 107:2
108:18
111:12,13
112:7,9,15
114:12,21
119:25 121:9
123:9,25
126:18
128:14,20
129:8 130:24
131:3,6
132:11
135:23 136:4
136:9,18
137:20,25
138:3,20,23
139:3,3,4,8
139:11 147:4
147:8,12,18
147:23

**January 12, 2022**

147:23
148:14 149:3
149:5,10
150:12,18
151:11,16
154:10,20
155:23 156:2
156:8 159:19
162:22 163:2
163:9 164:21
165:6,12
166:21
167:13
175:11
178:11,21
189:10
190:14 192:3
193:11
195:10,17
197:20 198:4
199:10,14
200:6,21
201:5,8,13,14
201:20,21
202:3,7,18,20
203:14,19
206:24
**tenant's (11)**
77:11,12
108:17
110:11 120:5
128:10
129:15,24
147:9 155:21
164:8
**tenant/opera...**
112:15
**tenants (1)**
47:24
**tender (1)**
170:14
**tendered (1)**
93:4
**term (20)**

63:14 64:13
74:16,18,20
75:6,9,16
76:7,9 77:19
80:3,4,8,11
80:12 81:4,7
182:14 206:7
**terminate (11)**
93:16 164:8
166:18 167:4
181:20
189:12
190:12,17,19
190:23
191:24
**terminated (8)**
191:12 192:3
192:12,13
194:23 195:4
195:12
203:16
**terminates (1)**
191:10
**terminating (...**
165:2
**termination (...**
85:11,20 86:12
190:19
191:15
**terms (12)**
12:12 14:9
23:15 80:15
80:21 81:4
106:25 122:7
124:18
136:16
159:24
181:22
**test (1)**
111:15
**testified (36)**
9:5 20:22 21:3
23:6,11 65:18
66:15 69:8

79:8 106:2
108:13,20
114:11,14,15
114:17
116:13 127:4
129:18
133:11
135:13
153:25 161:8
173:22
176:20 179:7
184:12
185:20 186:6
198:10,15
199:9,14
202:6,10,11
**testify (29)**
56:10 61:2
70:24 71:9
85:8,17 86:2
102:16
133:10,12
135:8 144:4
144:15
145:14,21
149:9 152:17
153:19 156:3
156:6 159:12
165:10 166:8
168:23 180:6
183:10
186:10 193:5
205:6
**testifying (5)**
6:12 62:4
105:16,18
143:20
**testimony (52)**
4:11,14 5:25
6:4 9:25
10:12,16,25
11:12 26:24
55:15 60:18
60:22,25 85:6

86:15,19
87:17 89:19
97:9 98:11,24
100:7,12
102:11
104:12
105:12 107:9
108:22
109:11
114:19 116:8
130:21
134:13,19,22
135:6 138:17
143:21 154:9
155:6 167:12
169:13
181:10 187:2
195:25
199:17
202:14 204:2
205:7,11
208:13
**thank (6)**
113:8 118:16
195:24
203:25
204:21,21
**theoretical (2)**
114:7 197:24
**thing (3)**
54:12 69:6
120:17
**things (2)**
204:6,16
**think (33)**
21:23 22:10,22
22:24 23:10
34:7 41:14
48:23 61:21
66:14 67:9,10
69:4 98:21
103:9 109:4
114:15,17
120:20,24

126:13
134:24
140:18
145:17 147:8
148:21
160:18
177:14
184:12
191:11
197:24
202:10
204:13
**third (2)**
2:10 122:10
**this(these) (7)**
4:11,14,20,23
5:2,9,16
**thousand (2)**
146:25 147:2
**three (24)**
27:9 93:14
110:13,15,18
111:9 112:5
112:24
120:20,22
128:8,17
130:8 137:22
138:24
161:23
162:18
163:11 167:9
171:18,22
182:2 186:25
187:12
**tie (1)**
161:5
**Tim (16)**
176:13,14,15
176:16,25
177:3,4,6,10
177:13,14,23
177:25 178:9
178:10
179:13

**January 12, 2022**

[Page 244]

time (77)
12:15 16:11,11
16:13,13 19:7
19:7 22:4
23:4,5 25:21
26:19 28:9,10
33:19 40:6
44:4,10,23
45:18 49:8
50:8,14 56:19
62:13 68:6
74:15 78:24
79:17 93:10
94:18 97:7
109:9,9,12
118:23
123:19 124:5
125:6,7 126:3
126:8,23
127:24
135:25
136:17 137:7
137:18
138:10
140:23
141:15,17
143:12 160:7
161:15 162:3
162:6,9,11,12
163:3,15
166:23 169:2
169:10 171:8
172:2,16
173:24
175:25
179:10
180:18
181:19
199:21,22
204:25
205:11
timeframe (5)
123:13 125:9
125:11,14

137:4
timeframes (1)
145:11
timely (3)
126:15 129:23
169:2
times (5)
83:16 102:21
138:9 140:11
174:15
timing (1)
153:20
title (9)
63:7 89:2
135:6,9,11
136:3,8,13,14
today (19)
11:12 60:18
85:17 87:18
102:11
105:12
145:14 149:9
152:17
154:19,19
156:6 159:13
165:10
167:12
168:23 186:6
193:5 204:2
told (11)
112:9 148:12
148:25
152:15
160:24
167:14
169:25
183:12
184:17,24
187:20
top (4)
166:24 189:25
190:3 204:8
topic (3)
127:22,24

139:5
topics (4)
50:7 119:22,24
120:12
total (3)
17:16 162:2
171:19
totally (1)
67:21
trade (6)
27:13,17,21,23
28:2,3
tradename (1)
15:19
transaction (...
57:9 60:23
61:3 78:11,20
78:24 79:5
81:15 180:20
193:20
transactional...
155:22
transactions ...
14:13 22:15
56:2,8,11
82:9 188:6
transcript (3)
8:9 205:10,10
transfer (4)
136:3,8 184:2
184:14
transition (2)
150:13,18
transmission...
75:18
trauma (2)
33:22 34:12
traveled (1)
54:22
treated (3)
165:16 188:14
188:17
treatment (1)
204:9

treatments (1)
194:6
trial (3)
1:16 4:16 6:6
true (6)
45:24 46:2
89:20 150:16
205:10
208:12
trust (10)
18:22,22,24
19:2 182:18
187:17,22
194:7 201:23
204:4
truth (1)
205:6
try (2)
67:5 122:24
trying (21)
11:4 22:17,18
27:15 49:21
59:19 61:4,13
61:22 62:17
62:19,23
69:12 81:12
81:13 109:3
118:11
144:13 197:7
197:8 202:20
turn (1)
120:18
Twenty (1)
124:24
twist (1)
62:20
two (33)
12:9 18:14
21:4 23:6,21
35:15 44:20
45:7 64:21
69:5 73:6
84:6 91:6
96:12,15

107:25 115:4
127:4 128:16
130:25
147:16 160:9
160:19,21
161:7,20,23
171:18,22
182:2 190:10
193:14 200:4
type (2)
25:17 135:17
typically (1)
17:22

_____
U
_____

Uh-huh (1)
88:15
ultimately (14)
52:4 55:2 76:2
81:5 126:13
126:14 127:2
127:2 144:4
145:18,22,25
167:15
168:20
unable (1)
199:15
unauthorize...
7:20
understand (...
10:4 27:14
28:3 31:8
36:18 42:7,20
44:18 46:7
60:13 79:3
84:3 100:10
101:18,18
105:15 132:7
132:21,24
135:9 144:13
164:17 169:7
173:20 179:9
183:5 192:15
202:25

understandi...
10:7 21:5 23:8
23:19 39:22
39:25 42:15
52:8 61:5,6
62:25 81:14
103:7 116:13
153:25
162:23
163:23,24
167:11
169:19
185:25
**understood (1)**
78:14
**undertake (1)**
84:11
**undertaking ...**
130:17
**underway (1)**
18:3
**underwriting...**
76:22 77:9
**Uniform (1)**
5:22
**unrelated (2)**
22:8 37:18
**updated (1)**
140:2
**use (11)**
11:15 64:4,5
66:8 68:2
94:9 104:9
105:15 108:5
109:21 186:2
**user (1)**
66:7
**usual (1)**
150:15
**utility (12)**
146:5,9,13,16
147:11,18
149:21
150:17,20

169:16,20,24
**utilized (2)**
5:10 185:17

_____
**V**
**value (4)**
128:19,22
129:19
130:12
**varied (1)**
40:10
**varies (2)**
17:11,20
**various (11)**
49:12 102:21
102:21
150:12
157:23
165:15
185:23 194:6
198:12,14
202:13
**vendor (1)**
135:20
**venture (11)**
29:5,16,19,23
29:24,25 30:7
30:8,11,14
156:20
**venued (1)**
10:19
**verdict (1)**
34:21
**verification (2)**
89:18,23
**verified (5)**
89:5,14 142:21
151:20 206:8
**verify (4)**
113:18 114:10
117:20
181:16
**vernacular (2)**
110:19,20

**versus (1)**
10:13
**video (2)**
1:15 7:7
**videoconfere...**
7:2,10,17 8:7
**violation (1)**
7:20
**voice (2)**
109:14 196:23
**voluminous (1)**
88:2

_____
**W**
**waiting (2)**
110:18 111:9
**waive (2)**
109:14 197:5
**waived (1)**
5:17
**waiver (3)**
4:15 5:3 6:5
**walk (1)**
103:18
**want (15)**
23:3 61:16
62:24 63:7,25
73:11 82:4
117:7,13
134:17
158:19 161:3
162:15 196:4
196:16
**wanted (3)**
97:8 131:3,7
**was(were) (2)**
4:24 208:11
**wasn't (1)**
100:23
**waste (2)**
23:3 68:5
**wasting (1)**
22:3
**way (19)**

10:6 12:7 24:3
26:4 27:7
37:16 62:16
63:3 85:16
87:16 89:11
90:21 125:20
132:25
134:21 152:5
179:4 201:25
208:17
**week (2)**
118:21,22
**weeks (1)**
115:5
**WEINGART...**
2:3
**Wellspring (4)**
28:21 32:25
36:7,10
**went (2)**
70:14 133:5
**West (1)**
2:17
**Westchester ...**
1:2 40:21
43:16 45:16
**WHEREOF ...**
208:19
**White (147)**
1:4,16 2:5
10:13,21 11:5
11:10,13,15
12:13,17 13:4
14:17 16:12
21:17,19,22
22:21 24:25
25:22 26:2,6
28:14,24 29:2
32:22 37:7,19
39:15,16
45:19,22,25
46:4 51:15
53:7 54:17
65:12,14 66:3

67:8,11,25
68:24 69:14
70:9 71:6,14
72:11,13
73:25 74:10
75:12,12,15
76:12 77:19
77:24 78:4
79:4,22 80:5
80:13,14,16
80:20,25
81:16 82:11
83:19 84:5,21
85:4 86:22
87:5,9 89:5
106:14,25
115:20
118:19 133:5
133:9,18
136:2,7
138:23
139:21
140:25 141:5
141:9 142:4
142:14
147:19
148:13,23
149:4 151:15
156:15
170:11,12,16
171:11
172:19,23
173:2,5,12,16
174:6,13,23
175:2,7
177:13 178:2
178:6,8
179:19
181:14
182:25 184:3
184:13
185:17,17,22
185:24 186:7
186:13

January 12, 2022

187:25 188:4
188:8,17,21
190:7,11
193:18
197:17
198:15,20
199:11,19
200:15 201:9
201:15 202:3
202:14
**WIEDERKE...**
2:4
**wife (1)**
17:3
**WINTERS (1)**
2:15
**wire (8)**
183:8,16,17
184:2,4,9,13
204:6
**wired (2)**
184:7,22
**wiring (1)**
184:7
**WISE (1)**
2:3
**withdraw (1)**
52:14
**withdrew (1)**
76:4
**withheld (1)**
111:13
**witness (24)**
7:9,13,14,25
8:2,4 9:3
61:24 62:3
68:20 88:18
108:12,20
109:5,12
117:21,24
118:6 140:9
168:17
195:22 196:7
206:2 208:19

**witness's (3)**
62:20,24
109:10
**witness(es) (4)**
4:21 6:12
208:10,14
**witnesses (1)**
7:16
**word (5)**
73:20 94:9,9
105:15
167:21
**words (9)**
27:15 61:22
62:20,24 67:6
105:10
143:17
170:13
173:13
**work (15)**
9:11,13 17:14
18:4 19:12
27:15 48:4
54:16,18
73:24 96:11
96:19 108:14
113:11
193:19
**worked (3)**
74:3,9 157:25
**working (11)**
33:23 37:14
49:10 82:5
120:4 121:12
122:14 130:9
130:10
154:25 155:2
**worry (1)**
47:9
**worth (4)**
124:23,24
135:4 200:6
**worthiness (1)**
128:10

**wouldn't (7)**
85:6,7,14
135:8 186:10
186:10
200:24
**wound (1)**
142:15
**WPH (3)**
93:15 152:22
153:13
**writes (1)**
110:9
**writing (4)**
139:15 147:7
164:9 199:8
**writings (3)**
138:22 139:8
139:11
**written (3)**
7:19 105:10
147:14

_____
**X**
_____
**x (2)**
1:3,11
_____
**Y**
_____
**year (13)**
10:18 12:10
24:20 33:16
35:13,14
40:10 59:7
95:13 125:18
125:19,21
172:10
**years (9)**
21:8 28:12
35:15 38:21
44:8 46:6
82:8 124:23
124:24
**yesterday (11)**
20:22 62:4
63:2,8,16,18

63:20,24
88:17,24
185:20
**York (19)**
1:1,19 2:5,11
2:11,17,17
10:19 29:5,17
46:15 91:23
96:10,18
98:15 105:18
208:2,4,7

_____
**Z**
_____
**Zafrin (25)**
37:8,10,11,11
37:14,23,25
38:18,19,23
39:7,10,18,24
40:11 41:7,10
42:4 44:11,24
45:4 47:15
51:25 53:17
118:25
**Zev (4)**
31:17,24 177:5
177:10
**Zev's (1)**
32:2
**zoning (1)**
54:5

_____
**0**
_____
**01923 (1)**
9:14

_____
**1**
_____
**1 (20)**
63:9,12,13
64:23,24
99:15 111:2
111:18
112:20 113:4
115:13 118:5
142:12 163:5
163:13

164:25 192:7
206:7,14,17
**1(a)(i) (5)**
182:21 183:16
183:22
185:12,15
**1(a)(ii) (1)**
187:13
**1(g) (1)**
182:5
**1(h) (1)**
181:25
**1.3 (2)**
141:13 156:17
**1.4 (1)**
141:14
**1.5 (17)**
57:16 58:5
60:12,14
61:12 62:9,21
65:3,9,11,13
65:25 67:14
67:17,22
134:7 135:3
**1.6 (11)**
122:10 130:8
130:18,21
131:7,20
132:2,18
137:6 202:8
202:15
**1:15 (1)**
94:14
**1:17 (1)**
94:18
**10 (8)**
94:21,24
113:19
121:15,25
201:5 206:11
206:25
**10,000 (5)**
32:9,12 148:21
148:22

January 12, 2022

[Page 247]

149:14
**10,831 (1)**
160:12
**10:09 (1)**
1:13
**10:52 (1)**
111:2
**100,000 (1)**
19:16
**10022 (1)**
2:11
**10036-7209 (1)**
2:17
**10601 (1)**
2:5
**107 (1)**
206:15
**10NYCR (1)**
100:3
**11 (7)**
124:11,15,21
171:6,21
181:3 206:23
**11,000 (1)**
172:5
**11:17 (1)**
54:15
**11:32 (1)**
54:15
**115 (1)**
206:16
**12 (5)**
1:12 59:20
124:10,22
154:5
**12/2/19 (2)**
99:14 206:13
**12:29 (2)**
110:5,9
**12:30 (2)**
88:17 94:12
**12:31 (1)**
94:18
**12th (1)**

208:20
**14 (2)**
103:5 105:14
**15 (1)**
200:6
**156 (1)**
206:18
**168 (1)**
9:13
**17 (1)**
2:17
**18 (2)**
89:15 206:9
**181 (1)**
206:22
**19 (23)**
95:17 99:23
100:9,22
101:3,7
103:11 104:5
105:9,23
106:9,10
107:3,17,19
107:22 108:5
109:21
113:21 114:3
114:3,12
206:15

———————
**2**
———————
**2 (13)**
23:7,22 25:9
25:13,19,23
26:10,13
89:13 100:9
100:14 101:6
206:8
**2.2 (52)**
57:5,10,11
58:5 66:17
67:7 68:2
70:2 71:13,19
71:24 72:4,6
72:15 73:15

132:19,22
**133:2,9,11,19**
133:25 134:8
134:14
140:23
182:18,19,22
183:2,14
184:2,14,24
185:15,21
186:2,8,14,17
186:21,21
187:3,8,16
188:2,4,8,24
201:8,12,15
202:4
**2.5 (1)**
35:5
**2:53 (1)**
156:13
**20 (6)**
115:10,13,15
116:10,17
206:17
**200 (1)**
2:17
**2000 (1)**
44:12
**2000s (1)**
39:3
**2008 (3)**
32:20 38:25
39:3
**2009 (5)**
26:7,8,16 39:9
47:2
**201 (1)**
206:24
**2010 (3)**
26:7,8 47:2
**2015 (27)**
56:3,19 57:4
57:10 58:19
60:12,14,20
60:23 65:7,25

69:14 71:7,14
71:17,18,24
72:23 73:15
95:18,21
132:20 133:2
133:19 134:2
140:24 201:8
**2017 (5)**
60:3,12 71:18
95:15,22
**2019 (30)**
59:12 91:8,12
92:20 100:14
103:5 112:20
113:4 117:18
118:20 119:8
125:17 126:4
126:9,24
127:13 129:2
136:6 138:15
138:18 139:9
139:22,23
160:10
164:25 182:7
186:9 201:14
201:21 202:3
**2020 (29)**
93:15,22,25
125:24 126:4
126:9,24
128:25
156:24 157:5
158:22 163:5
163:5 164:2
164:20
165:18
166:21
172:11,20
174:20 175:5
176:5 190:18
190:22
191:14,24
192:25
198:11

206:18
**2022 (4)**
1:12 129:3
205:19
208:21
**204 (1)**
207:4
**22 (15)**
117:18,22,23
117:24 118:6
180:24 181:3
181:6 182:7
184:20,25
186:9 187:21
202:3 206:22
**221 (1)**
5:22
**23 (5)**
99:12,15,17
103:2 206:14
**24 (2)**
59:20,22
**24th (1)**
2:10
**25 (3)**
121:18 122:2
123:6
**250,000 (2)**
141:10 156:16
**28 (5)**
100:18 157:2,5
191:9 206:21
**29 (1)**
100:18

———————
**3**
———————
**3 (5)**
94:19 107:19
182:18
206:10,15
**3.1(a) (1)**
96:2
**3.6 (1)**
192:8

**January 12, 2022**

[Page 248]

**3.7 (5)**
122:9 127:6
128:5,7 159:8
**3:26 (1)**
156:13
**30 (29)**
87:14 91:8,12
91:20 92:11
92:15,20 93:4
93:12 100:18
103:12
105:21 110:5
110:9 112:25
114:22
123:16,18
125:17,18
127:13
146:21,24
160:10,10,22
161:7,21
163:5
**300 (7)**
144:6,9 173:25
174:3,5,7,15
**3113(d) (1)**
7:6
**3116 (1)**
5:4
**3117 (1)**
5:4
**3250 (1)**
150:8
**35,000 (1)**
134:10

———— **4** ————
**4 (2)**
99:13 206:13
**4.5 (1)**
122:18
**4:05 (1)**
180:25
**4:07 (1)**
180:25

**4:48 (1)**
203:22
**4:51 (1)**
203:22
**4:52 (1)**
204:25
**40 (4)**
17:13,15 18:2
18:9
**40,000 (2)**
159:5 161:20
**41st (1)**
2:17
**45 (1)**
94:13

———— **5** ————
**5 (6)**
63:14 107:18
157:2 206:7
206:15,21
**50 (11)**
30:23,24 31:9
31:25 146:21
146:24 201:3
201:5,7 203:3
206:24
**500,000 (6)**
23:7,22 24:17
25:5 26:20
27:2
**506,000 (3)**
160:2 172:13
174:16
**506,096.50 (2)**
159:23 175:3
**546,096.50 (1)**
158:25
**55 (2)**
142:25 143:21
**56 (2)**
145:4,4
**57 (6)**
146:4 148:9

150:2,2,8,22
**58 (2)**
148:4,4
**59 (5)**
149:21 150:2,8
150:19,22

———— **6** ————
**6 (10)**
63:6,11,14
64:5,6 69:21
115:11
202:22 206:7
206:16
**60 (5)**
123:12,17
136:19,24
151:5
**60,000 (3)**
32:10,11
169:18
**60278/2020 (1)**
1:6
**61 (1)**
152:21
**61,000 (1)**
163:2
**63 (2)**
153:12 206:7
**65 (1)**
153:22
**66 (1)**
154:3
**67 (1)**
154:24
**68 (7)**
63:24 88:24
89:15 118:17
142:20 155:8
206:9
**68,000 (1)**
170:5

———— **7** ————

**7 (42)**
93:15,22,25
138:14
156:23,24
157:5 163:22
164:2,12,15
164:20,25
165:18,21
166:21
167:10
169:24
171:19 176:4
190:18,22
191:7,14,23
192:25 193:7
193:12,18
194:9 195:5,6
195:9,17
197:19,19
198:4,11,21
198:22
206:18,18
**7(a)(i) (1)**
130:7
**7.1 (3)**
121:16 137:13
154:7
**7.1(a) (1)**
137:23
**7.1(a)(i) (2)**
122:4 123:3
**7.6 (2)**
122:11 155:3
**7.7 (3)**
122:12 130:10
155:4
**700,000 (2)**
58:16 134:7
**75,000 (1)**
20:19

———— **8** ————
**8 (2)**
181:2 206:22

**800 (1)**
2:10
**89 (1)**
206:8

———— **9** ————
**9 (3)**
201:4 206:3,24
**9,000 (4)**
162:3,7,14
171:19
**90 (4)**
50:13,15,20,24
**94 (1)**
206:10
**96 (2)**
94:21 206:12
**99 (1)**
206:13