# **<u>Exhibit 8</u>**

**HBL-SNF, LLC**
**1280 Albany Post Road**
**Croton-on-Hudson, NY 10520**

November 20, 2019

White Plains Healthcare Properties, I, LL
West Peabody Executive Center
2 Bourbon Street
Peabody, MA 01960
Attn: William Nicholson

        Re:    **Letter of Intent**
                **Premises: 116-120 Church Street**
                **White Plains, New York**

Dear Mr. Nicholson

     This Letter of Intent ("LOI") outlines our proposal for White Plains Health Care Properties, I, LLC (the "Contributor") to transfer the premises known as 116-120 Church Street, White Plains New York (the "Premises") to a Delaware Statutory Trust where we would jointly hold the beneficial interests in the Trust on the terms and conditions set forth below. The Building a skilled nursing home facility consisting of one hundred sixty (160) beds (the "Facility") had been constructed pursuant to a Development Agreement dated November 19th, 2015 and for which we had simultaneously entered into that certain operating lease by and between you as Landlord and us as Tenant/Operator, (the "Lease").

1) **Basic Transaction:** (the "Transaction"): Contributor shall contribute premises 116-120 Church Street White Plains, New York to a newly formed Delaware Statutory Trust (the "Trust") formed by the parties. This transaction shall be memorialized by a contribution agreement in substantially the form annexed hereto as Exhibit A. The Contribution shall be governed by IRC Sec. 721. The agreed upon cost and fair market basis shall be $67,345,348.00

    a) Lizer Jozefovic and Mark Neuman will acquire from the Trust by a Purchase Agreement 77.50 Percent of the Beneficial Interests in the Trust and redemption of a portion of the B Beneficiaries' interest for a purchase price of $52,200,000.00 paid as follows;

        i) By a down payment (the "Down Payment") not to be held in escrow, but to be made upon the execution and delivery of this LOI of $2,200,000.00 by wire transfer to the account of White Plains Healthcare Properties I, LLC according to the wire instructions annexed hereto.

        ii) By the Trust obtaining a new first mortgage of $51,000,000.00 to pay the balance of the Purchase Price and cover closing costs to be used as follows;

NY\243882.1

    (1) To pay the first Mortgage held by Security Benefit Life Insurance in the approximate amount of $39,226,253 plus accrued interest and fees.

    (2) To pay the loan encumbering the membership interests of the Contributors by Bradford Allen in the approximate amount of $9,770,963 plus accrued interest and fees;

    (3) By the Trust making a non-refundable down payment of $2,200,000.00

    (4) To pay the costs of the financing.

b) Lizer Jozefovic and Mark Neuman shall be the A Beneficiaries of the trust holding a 77.50% Beneficial interest, and the present members of the Contributor or their designees shall be the B Beneficiary with a 22.5% equity position.

c) The A Beneficiaries shall be the personal guarantors of the new financing in the amount of Fifty-One Million ($51,000,000.00) Dollars. The Transaction is to close thirty (30) days after Buyer has received approval for the Financing set forth in paragraph 1)a) ii)). The Contribution Agreement shall call for a purchase price equal to Transferors cash basis in the property and shall not result in a taxable event for Contributor;

d) The Financing shall be an obligation of the Trust secured by a first mortgage loan on the Facility and the Premises.

e) Lizer Jozefovic and Mark Neuman shall act as the Personal Guarantors and shall be obligated if necessary, to secure additional personal guarantors to ensure that none of the B beneficiaries shall have any obligation to guarantee the Financing. Any additional guarantors on the Financing shall also execute and deliver a personal guaranty of Tenant's obligations to Landlord on the Lease. All guaranties on the Lease shall be full unlimited personal guarantees.

f) The Financing shall bear interest at a constant rate of no more than 7% per annum with Principal and Interest paid on an amortization schedule of 35 years and shall be subject to the reasonable approval of the Contributor, which consent shall not be unreasonably withheld or delivered without cost to the Tenant Borrower.

g) Formal Contracts: The Parties intend that additional agreements including the Contribution Agreement, Redemption Agreement and Trust Agreement (the Formal Contracts") shall be complete as of November 22nd, 2019, and absent execution of Formal Contracts this LOI shall govern provided the Down Payment is received in good funds by Contributor upon execution of this LOI, and in no event latter than the end of business November 22, 2019. In the event Tenant defaults in the payment of rent on the Lease and such default continues for five (5) days, Contributor shall have the right to terminate this LOI and all Formal Contracts.

h) Closing: The Closing of the Transaction ("Closing") will occur at the offices of the First Mortgagee Bank's counsel or such other location within the State of New York as may be agreed upon by the Parties thirty (30) days after receipt by the Trust of approval for

the Financing but no later than April 1st, 2020. If the Tenant has a commitment letter on April 1st, 2020 that is in the process of closing or if the closing is delayed by a title issue, the closing date shall be automatically extended for another Ninety-Days. If the closing does not occur by such date, time being of the essence, this LOI and the Formal Contracts shall be terminated and no party shall have any rights with respect thereto. The parties shall remain as Landlord and Tenant pursuant to the existing Lease until such time as the Transaction closes. The Lease may be amended as provided herein but only if and when such amendments are approved by Contributor's existing Lender.

2) **Structure of the Trust:** The Contributor and Tenant have agreed to create a Trust as a "statutory trust" in accordance with Chapter 38 of Title 12 of the Delaware Code, 12 Del. C. 3801 and enter into a Trust Agreement which shall constitute the "governing instrument" of the Trust. Each party will become a Beneficiary and will transfer certain sums of money and/or property to the Trust in exchange for a beneficial interest in the Trust as set forth above;

   a) The Trust shall be a special purpose entity which is being formed solely for the purpose of acquiring the Trust Property from the Contributor and maintaining, improving, building upon, and leasing the Trust Property for use as a skilled nursing facility and all and such other activities incident or appropriate to the preceding

   b) Simultaneously upon the closing of the transaction, the existing lease shall be modified only as set forth herein.

   c) The trust shall be permitted to have only the following liens on the Trust Property and no other:

      i) A Mortgage in the amount of Fifty-One Million ($51,000,000.00) Dollars (the "First Mortgage") the terms of which shall be acceptable to the Department of Health and the Contributor.

      ii) The Trust will designate Howard Fensterman and William Nicholson as the Administrative Trustees of the B interests.

         (1) The Trust Agreement shall provide that Howard Fensterman and William Nicholson as the B beneficiaries Administrative Trustees shall have the sole authority to all issues governing administering and enforcing the terms of the Lease including the collection and distribution of rent.

         (2) Lizer Jozefovic shall be responsible as the overall Administrative Trustee for all other matters concerning the building including but not limited to repairs, maintenance, and operation of the building. Any Trustee may be removed for cause including misconduct, bad faith, fraud or gross negligence.

         (3) Except as otherwise provided in a Trust Agreement to be executed and notwithstanding any provision of the Act that otherwise so empowers the Trust, neither the Beneficiaries nor any Trustees nor any other Person shall be authorized or empowered, nor shall they permit the Trust, to take any of the following actions

3

without the prior unanimous written consent of all of the Beneficiaries:

(a) Make any arrangements to reduce, modify, or forebear on the payment of rent by the Tenant.
(b) Guarantee any obligation of any Person, including any Affiliate;
(c) engage, directly or indirectly, in any business other than the actions required or permitted to be performed hereunder;
(d) incur, create or assume any indebtedness;
(e) make or permit to remain outstanding any loan or advance to, or own or acquire any stock or securities of, any Person;
(f) To the fullest extent permitted by law, engage in any dissolution, liquidation, consolidation, merger, asset sale or transfer of their Interests subject to obtaining any approvals required under this Trust Agreement other than a sale of the interests to qualified purchasers under a syndicated offering of the B interests. The cost of such syndication shall not be charged to the B Beneficiaries and all monies derived therefrom and due hereunder shall be net of the costs of the syndication.
(g) allow any business to be conducted on the Property other than the operation of a skilled nursing facility and ancillary uses;
(h) own any other property or engage in any business other than owning and leasing the Trust Property for use as a skilled nursing facility;
(i) take any action to consolidate or merge the Trust with or into any Person;
(j) sell all or any portion of or any interest in the Trust Property;
(k) grant an option to lease all or any portion of the Trust Property for a term (with all extension periods) ending on or after the 45th Anniversary Date;
(l) amend, terminate or waive any material provisions of any lease for all or any portion of the Trust Property;
(m) enter into any agreement with any Person giving any Person any rights with respect to the Trust Property that extend beyond the 45th Anniversary Date or which are not terminable without penalty on less than 90 days' notice;
(n) encumber the Trust Property with any mortgages or another lien, easement, covenant or restriction other than the First Mortgage, or a HUD Mortgage to refinance the debt contemplated by this Agreement, at such time as HUD regulations shall allow;
(o) modify the Trust Agreement or the Trust's certificate of trust in any manner, issue additional Interests in the Trust to any Person, or modify the rights and privileges of the Interest owners;
(p) institute proceedings to have the Trust be adjudicated bankrupt or insolvent, or consent to the institution of bankruptcy or insolvency proceedings against the Trust or file a petition seeking, or consent to, reorganization or relief with respect to the Trust under any applicable federal or state law relating to bankruptcy, or consent to the appointment of a receiver, liquidator, assignee, trustee, sequestrate (or other similar official) of the Trust or a substantial part of its property;
(q) make any assignment for the benefit of creditors of the Trust;

    (r) admit in writing the Trust's inability to pay its debts generally as they become due;

    (s) take action in furtherance of any of the foregoing actions; or dissolve or liquidate the Trust.

iii) The 22.5% of the Trust Owned by the B Beneficiaries interest shall be subject to a Redemption Agreement where the B interests shall be sold to the A interests or their designees, assigns or transferees, over five years for a total price of $19,800,000.00 in four tranches tranches each representing interests of 5.625% each
  (1) Tranche one on or before August 1, 2020 in the amount of $3,786,250.00
  (2) Tranche two on or before August 1, 2021 in the amount of $3,786,250.00
  (3) Tranche three on or before August 1, 2022 in the amount of $3,786,250.00
  (4) Final Tranche by August 1, 2023 in the amount of $8,441,250

iv) Any purchase of the membership interests shall be a purchase of Beneficial Interests from the B Beneficiaries and shall reduce the Priority Return proportionate to the payments as a percentage of the total remaining price of $19,800,000, which is the balance after payment of the non-refundable Down Payment.

v) The A Beneficiaries shall prepare at their sole cost and expense of the A Beneficiaries a Private Placement Memorandum for the Sale of Membership interests in the Trust by a Broker Dealer who specializes in sales of marginal interests in Delaware Statutory Trusts to individuals and other entities who have to designate property as target property in connection with 1031 Exchanges of Property. The A Beneficiaries shall have the right to designate a portion of their membership interests as C interests for the purpose of selling them as part of the same syndication, provided that (1) there is no change in control of the A Beneficiaries or the Tenant entity.

vi) The B Beneficiaries will be entitled to a priority return ( the "Priority Return") equal to all available rental and other income over and above the payment of the P&I on the New First Mortgage which shall in no event be less than $2,000,000 per year (as adjusted by periodic redemptions) and shall be paid to the B Beneficiaries as a Priority Return until such time as they have been fully redeemed pursuant to the Redemption Agreement.

vii) The Trustee shall deposit all rents and other funds collected from the operation of the Real Estate in the bank designated by the first mortgagee (the "<u>Operating Account</u>") which shall be subject to both a Deposit Account Control Agreement and Deposit Account Instruction Agreement. The Trust shall maintain books and records of the funds from the Real Estate deposited in such account, interest earned thereon, and withdrawals therefrom. The Trustee shall pay from the Operating Account the operating expenses of the Real Estate (other than those paid by a tenant of the Real Estate as set forth in its lease) and any other payments relative to the Real Estate as required by this the Trust Agreement.

viii) The Trustee shall be responsible for receiving all cash from the Tenant and placing such cash into one or more accounts as required under the distribution and investment obligations of the Trust Agreement. The Trustees shall furnish quarterly and annual reports to each of the Beneficiaries as to the amounts of rent received from the Tenant, the expenses incurred by the Trust with respect to the Real Estate (if any), the amount of any Reserves and the amount of the distributions made by the Trust to the Beneficiaries.

ix) To the extent permitted by the Internal Revenue Code depreciation, which shall be calculated on a straight-line depreciation method shall be allocated as follows: a) first to the B Beneficiary to the extent necessary to shelter the Priority return from taxes and b) second to the beneficiaries, pro rata, in accordance with the ownership interests.

3) **Condition of Property and Title**: Contributor shall give, and the Trust and the Trust shall accept, a good and marketable title which any National Title Insurance Company (the "Title Company"), will approve and insure at standard rates, free and clear of all liens, hypothecations, mortgages, easements, and encumbrances, except for the Permitted Exceptions.

   i) The Premises is being contributed subject to the following exceptions to the title (the "Permitted Exceptions"):

      (1) Zoning and building regulations, restrictions and ordinances now or hereafter adopted or imposed by any governmental or quasi-governmental body having or asserting jurisdiction over the Premises or any part thereof;
      (2) Future Real Estate taxes, assessments, water charges, sewer rents or other charges not yet due and payable (subject to apportionment as provided herein) and certified, confirmed or ratified assessment liens and pending assessments, if any;
      (3) The state of facts shown on an updated as built survey prepared originally prepared and revised to be an as built survey, (the "Survey") and such additional state of facts which said survey would show or reveal provided such additional state of facts do not render title unmarketable;
      (4) Any state of facts a physical inspection of the Premises would reveal;
      (5) Exceptions permitted by the Title Company (as defined herein) (the "Title Exceptions");

4) All payments made to purchase any portion of the B Beneficiaries 22.5% interest shall also act to proportionally reduce the amount of Priority Return paid to the B beneficiaries under the Trust and the proportionate difference shall be paid to the A Beneficiaries or whoever purchases the B Beneficiaries interests as the case may be.,

   a) Distributions: Provided that all required payments set forth herein have been made by the Tenant, During the interim period prior to the purchase of the premises Tenant may pay Management Fees so long as (i) the amount of such Management Fees paid in any twelve-month period shall not exceed five percent (5%) of Tenants' gross revenues for such period

6

and (ii) there shall not then exist, and/or the paying of such Management Fees shall not cause there to exist, a Default or Event of Default under the Lease the first mortgage on the property or the Tenant's Working Capital Loans, (iii) the Initial Payment, the payment of Rent, and all other payments set forth herein have been made by the Buyer/Tenant.. Upon the occurrence of an Event of Default, Tenant shall not pay Management Fees. The Tenant will make no distributions to its shareholders, officers, affiliates, or any related party unless the Down Payment, the payment of Rent is current, and.

5) **Confidentiality and Disclosure**: Tenant and Contributor shall each maintain the confidentiality of all confidential and non-public information supplied by the other. If this Transaction is not consummated, each party shall return all documents obtained to the other. Except as required by law, without the prior written consent of the other party, neither Tenant nor Contributor will make, and each will direct its representatives not to make, directly or indirectly, any public comment, statement, or communication with respect to, or otherwise disclose or to permit the disclosure of the existence of discussions regarding, a possible transaction between the parties or any of the terms, conditions, or other aspects of the transaction proposed in this Letter of Intent. If a party is required by law to make any such disclosure, the parties shall consult with each other and seek to agree upon appropriate language for such disclosure. The Tenant acknowledges that Contributor will be unable to furnish any patient health information unless such disclosure complies specifically and completely with all terms, conditions, regulations, and guidelines in HIPAA.

6) **Interim Operation**: Subject to the approval in writing of Contributor's existing Lender, the parties will enter into an amendment of the Lease as follows to allow for the operation of the facility before the closing.

   a) Commencement Date: The Commencement Date according to the Lease shall be September 30, 2019.

   b) Rent: An initial rent payment of $509,000.00 has been paid receipt of which is on account toward the rental period from September 30, 2019 to October 31, 2019 (the "October 2019 Rent") leaving a balance of $13,735 for October 2019 Rent. November 1, 2019, to November 30, 2019 (the "November 2019 Rent") shall be postponed until November 18, 2019 and shall be paid by Tenant on that date. The next rental payment shall be the December monthly rent amount outlined in the Lease - $506,097 which shall be paid on December 5, 2019. Also, the Tenant will reimburse the Landlord for their municipal maintenance escrow and utility deposits of $5,500 and $60,356, respectively. Such reimbursement payment shall be made on or before December 5th, 2019. Upon receipt of the $60,356 for the utility deposits from the Tenant, Landlord will direct any refund from the Utility companies to the Tenant, or otherwise pay such refund over to the Tenant forthwith provided Landlord has previously received those funds from the Tenant.

   i) The following amounts are in dispute, and neither party will be obligated to waive their rights and positions by the signing of this agreement. The landlord has demanded the following sums due to their Lender.

      (1) Late and Default Interest costs of $201,997.34 for September 2019 and October 2019,

      (2) $19,000 of Late Fees for November 2019,

      (3) $5,061 per day for Default Interest premium during November 2019.

  ii) The A Beneficiaries and the B Beneficiaries shall jointly negotiate with the Contributor's current Lenders to effectuate the best possible settlement of these late costs ( the "Late Costs"). The amounts if any remaining after such joint negotiation will be paid by the 77.5% by the Buyer and 22.5% by the Contributor (provided the Initial Payment, the payment of Rent and all other payments set forth herein are made timely) from Financing proceeds. If not available from the Financing proceeds the Tenant shall pay all Late Costs. .

c) Security Deposit/ Guaranty:   Section 7.1(a)(i) the Lease shall be amended to provide that Tenant shall enter into a Deposit Account Control Agreement with Metropolitan National Bank which can only be revoked with the consent of both parties, which shall provide that each month, the Tenant's Lender shall draw on the loan amount first to pay rent to the Landlord, notwithstanding the adequacy of any accounts receivable borrowing base calculations.  This Document shall be part of the Closing Documents on the Tenant's first initial Term Loan and shall be delivered in full effect by December 1, 2019.

d) Section 7.1(a)(ii) of the Lease shall be amended to provide that the obligation for the Security Deposit shall initially be reduced to 2,000,000 dollars.

  i) The sum shall be paid by Tenant as follows: (a) Provided that the Contributor has obtained a permanent Certificate of Occupancy the Tenant shall draw the initial $1,000,00.00 from its credit line on or no later than  December 1, 2019. (b) Landlord shall obtain a release of the lien of its Lender on the FF&E, upon delivery of free and clear title to the FF&E the Tenant will enter into a reverse lease and obtain at least $1,000,000.00 which shall be paid on account of the Security Deposit no later than April 1, 2020.

  ii)   Also, Tenant shall pay the sum of $40,000 per month commencing January 1, 2020 to be treated as additional rent until there is a total $3,700,000 posted as Security Deposit under 7.1(a)(i).

e) Section 7.1(a)(iii) of the Lease shall be amended to provide that instead of delivering the sum of $1,600,000 in cash, the parties shall enter into a blocked account agreement wherein and whereby account number 3379737272 in JP Morgan Chase Bank NA prohibiting any liquidation of that account until the Second Payment is paid.  Such account shall be not be posted as collateral security to Landlord's Lender provided the Initial Payment has been made in full, and all payments of Rent are current and the Tenant is not otherwise in Default, except that the Landlord shall have a security interest in such account under a DAISA, which allows the Landlord to demand the liquidation of such account to pay any defaults under the lease.

f) Working Capital: Section 7.7 of the Lease shall be amended to suspend the requirement for providing the working capital account. The Tenant shall be obtaining a single working capital line for $8,000,000.00 no later than December 1, 2019.

g) Right of First Refusal and Option to Purchase: The Tenant's rights with respect to the right of first refusal and option to purchase under Sections 3.7 and 3.7 of the Lease will be suspended pending payment in full of the Security Deposits required by Section 7.1(a)(i), 7.1(a)(ii) and 7.1(a)(iii) of the Lease as amended , the payment of the Initial Payment, the working capital required by Section 7.7 of the Lease and Tenant being in full compliance with the Lease.

h) Insurance: Tenant shall obtain property insurance, effective as of September 30, 2019, and (2) provide the property insurance, and all other insurances required by the Lease by November 19, 2019, effective retroactively back to September 30, 2019.

i) Real Estate Taxes: Real estate taxes shall be prorated as of September 30, 2019 and the Tenant's portion shall be paid to the Landlord no later than December 1, 2019, plus any late charges which the City of White Plains may impose.

j) Utilities: Tenant shall pay actual costs of utilities incurred at the property covering the rental period from September 30, 2019 (pro-rated as the utility company billing periods may require) forthwith upon presentation of invoices for the same from the Landlord, no later than December 1, 2019.

k) Punchlist: The punch list and all other developer obligations are deemed complete except for.

   i) The White Plains Outstanding Punchlist November 5, 2019 (the Remaining Punchlist), the value of which is has been determined by the Architect and agreed herein to be $3,800.

   ii) The Electric Blinds in rooms (the "Suspended Work") the value of which is agreed herein to be $35,000.

   iii) Provided the Initial Payment is made by November 15, 2019 and provided there are no other Defaults by the Tenant, Landlord shall complete the Remaining Punchlist and the Suspended Work to the approval of the Architect, within 45 days from the date of the Contributor's receipt of the Initial Payment. Should Landlord not do so, then the Tenant may credit the agreed values of any uncompleted Punchlist or Suspended Work from the February, 2020 Rent payment, and the Landlord's Work under the Lease and Development Agreement shall be deemed complete.

   Security: Tenant shall assume all property security obligations as of November 11, 2019.

Upon the closing of the purchase of the premises by the Trust, the Trust shall take an assignment of the lease as amended above.

9

7) **Exclusivity**: In consideration of (1) the Initial Payment, (2) the payment of Rent as set forth herein, and (3) Tenant's efforts in pursuing the Transaction, Contributor agrees that (1) until the termination of this Letter of Intent, or execution of the Formal Contracts and (2) provided the payment of the Initial Payment and the payment of Rent as set forth herein is made, and (3) all other obligations of the Tenant set forth herein,, Contributor will not permit any of its affiliates to, and will not authorize or permit any officer, director, employee, counsel, agent, investment banker, accountant, or other representative of any of them, directly or indirectly, to: (a) initiate contact with any person in an effort to solicit any proposal (other than that contemplated by this Letter of Intent for the acquisition (directly or indirectly , by sale of stock or assets, or by merger or consolidation or otherwise) of the operation of the Real Estate, or any of the Assets, or any other business combination or financing transaction involving such business (a "Proposal); (b) cooperate with, or furnish or cause to be furnished any non-public information concerning the operation of the Real Estate, to, any person in connection with any Proposal; (c) negotiate or enter into discussions with any person with respect to any Proposal; or (d) enter into any agreements or understanding with the intent to effect a Proposal. Contributor will immediately give written notice to Tenant of the details of any Proposal of which Contributor becomes aware. Contributor will, and will cause its officers, directors, affiliates, agents, and representative to, terminate all discussions regarding a Proposal, other than those with Tenant and its representatives concerning the Transaction, and represents that neither it nor any of its officers, directors, affiliates, agents, or representatives have entered into any executory agreements or accepted any commitments concerning any Proposal other than the Transaction provided that (1) this LOI or successor Formal Contracts has not terminated, and (2) the payment of the Initial Payment, the payment of Rent as set forth herein have all been paid and are current, and (3) all other obligations of the Tenant set forth herein are not in Default and are current.

8) **Waiver of Claims**: Except as set forth herein above, the Tenant waives any and all claims against the Landlord it has or every may have had for the following: (1) any claims by the Tenant that the Landlord is or ever was required to deliver a mortgage of any particular amount, terms, amortization or interest rate, for Medicaid rate setting or any other purposes (2) any claims for Punchlist or uncompleted Work, except for the Remaining Punchlist and the Suspended Work defined herein above, and the Warranties and Guarantees set forth in the Lease, (3) any claims related to the Cost Certification, except the Landlord shall complete the Final Cost Certification in the usual and ordinary course, upon the receipt of the Initial Payment, the Rent having been brought and remaining current, and all other obligations of the Tenant are paid as set forth herein above.

9) **Expenses**: Tenant and Contributor shall each be responsible for their respective accounting, legal, advisory, and other costs and expenses in connection with the Transaction. Tenant shall reimburse Contributor for its legal, advisory and other costs and expenses in connection with the Transaction and the Termination of the Lease. Reimbursement for such legal and transaction fees shall not to exceed $125,000 and may be made from the proceeds of the Closing, provided the Closing occurs and the Contributor's existing 1st Mortgage Loan and Mezzanine Loan are paid off from the proceeds of the Financing by March 31, 2020, and (2) the Initial Payment is made as set forth herein above, and (3) the Tenant is not in default under this LOI or the successor Formal Contracts. Otherwise the $125,000 cap shall expire and the Tenant shall pay the Contributor all such costs incurred after September 30, 2019.

21-07096-shl    Doc 36-8    Filed 02/11/22    Entered 02/11/22 17:43:36    Exhibit 8
DocuSign Envelope ID: B1B7AD25-A75D-4808-A38E-81A0C54A002F    Pg 12 of 12

10) <u>**Letter of Intent**</u>: This LOI represents a statement of all of the terms, conditions, representations, warranties, indemnities, covenants, and other provisions that would be contained in the definitive documentation for the proposed transactions. This LOI shall constitute a binding agreement upon payment of the  or any of their respective affiliates will have any legal obligation under this LOI unless and until one or more subsequent definitive written agreements are mutually executed and delivered by each of Contributor and Buyer. No past, present, or future action, course of conduct, or failure to act relating to the transactions referenced in this LOI or relating to the negotiation of the terms of such transactions will give rise to or serve as the basis for any obligation or other liability on the part of Contributor or Buyer or any of their respective affiliates.[ These changes should be rejected]

11) <u>**Governing Law**</u>: This Agreement shall be governed by and construed by the internal laws of the State of New York, Venue shall be in Westchester County without application of its conflicts of law rules. If you agree with the preceding, please sign and return one copy of this Letter of Intent.

HBL-SNF, LLC

*/s/ Lizer Jozefovic*
Lizer Jozefovic

ACKNOWLEDGED AND AGREED

WHITE PLAINS HEALTHCARE PROPERTIES I, LLC

By: */s/*
Name: William A. Nicholson
Title: Manager

Accepted and Agreed

*/s/ Howard Fensterman*
Howard Fensterman

11

1566078_3.docx