# Exhibit 10

Kincaid Law Office
6151 Wilson Mills Road, Suite 310
Highland Heights, OH 44143
(T): 440-352-1010
(C): 330-635-0385

**From:** Eric Simonson (NY) <esimonson@mrllp.com>
**Sent:** Wednesday, April 1, 2020 3:21 PM
**To:** Alex Frame <aframe@tjklaw.com>
**Cc:** Mark H. Zafrin (NY) <mzafrin@mrllp.com>
**Subject:** FW: White Plains

This just in from the landlord on the Intercreditor Agreement. I am reviewing it now, but upon a quick read, most of the questions and some of the comments can be explained by the fact that they haven't fully reviewed the draft Credit and Security Agreement (although I did send them the most recent draft—I guess it didn't get distributed before they made their comments).

I'll have comments in a bit, but wanted you to get this right away (because your client has far greater concerns and interest in this agreement than mine does, outside of a few limited areas).

Best regards.

**Eric Simonson, Esq.**

# M R   MICHELMAN & ROBINSON, LLP

New York | Los Angeles | Orange County | San Francisco | Chicago

**Due to the COVID-19 stay-at-home orders, our team is working remotely and is fully functioning. Please go to our website or call our main number for a Firm Directory. If you need someone's cell phone number, please call (212) 659-2559 and we will provide it for you.**

800 Third Avenue, 24th Floor, New York, NY 10022
**T** 212.730.7700 **D** 212.659.2582 **F** 212.730.7725
**E** esimonson@mrllp.com   www.mrllp.com
Bio vCard

**From:** Patrick Formato <PFormato@Abramslaw.com>
**Sent:** Wednesday, April 1, 2020 2:00 PM
**To:** Mark H. Zafrin (NY) <mzafrin@mrllp.com>
**Cc:** Eric Simonson (NY) <esimonson@mrllp.com>; Mark Frimmel (NY) <mfrimmel@mrllp.com>; Greg H. Stoller <GStoller@Abramslaw.com>; Michael Gurman <MGurman@Abramslaw.com>; Andrew Kasman <AKasman@Abramslaw.com>; Valerie Mendler <VMendler@abramslaw.com>; William Nicholson <WNicholson@congressconstruction.com>; Howard Fensterman <HFensterman@Abramslaw.com>
**Subject:** White Plains

Mark,

Attached hereto please find our initial comments to the Intercreditor Agreement. We are currently reviewing the Credit and Security Agreement which is referenced throughout the Intercreditor Agreement and therefore we may have additional comments. We are undertaking this review in a good faith effort to cooperate despite Tenant's numerous defaults under the Lease and the LOI which were set forth in a Notice of Default dated January 7, 2020. As the Credit and Security Agreement includes a

3

representation and warranty regarding Borrower not being in default under any Material Contract (as defined in the Credit and Security Agreement) and the closing is conditioned upon the accuracy of such representation, the various defaults under the Lease and the LOI appear to impose an impediment to Borrower's ability to close and therefore must be cured before any closing can occur. Accordingly, I suggest we set up a call to address the foregoing. We also must discuss the Huntington proposal. In particular, how the terms of the proposal fail to comply with the terms of the LOI, the adverse effect same will have on my clients and whether the terms will be acceptable to the DOH for rate setting purposes. With respect to the latter, I suggest we arrange for a call with Joe Martello, CPA and Tony Abbate, CPA.

Let me know your availability for a call.

Pat

## Patrick Formato, *Esq.*

<image006.jpg>

*Executive Partner*
**Tel: 516-328-2300**
**Fax: 516-368-9573**
**Email: PFormato@Abramslaw.com**
<image008.jpg>

<image007.jpg>

**Long Island Office**
**3 Dakota Drive**
**Suite 300**
**Lake Success, New York 11042**

CONFIDENTIALITY NOTICE: This e-mail may be an attorney-client communication and may contain information that is privileged and confidential and is therefore subject to legal restrictions and penalties regarding its unauthorized disclosure or other use. If you are not the intended recipient you are prohibited from copying, forwarding, distributing, disseminating, or otherwise viewing this e-mail and any attachments hereto. Please notify the sender and delete this e-mail if you are not the intended recipient.

## Mark Frimmel (NY)

**From:**      Eric Simonson (NY) <esimonson@mrllp.com>
**Sent:**      Monday, April 6, 2020 11:11 AM
**To:**        Mark H. Zafrin (NY); Mark Frimmel (NY)
**Subject:**   FW: White Plains

Did they ever get back to us regarding their ridiculous position that they won't do anything until they receive April rent?

Also, was the deal with the Hospital a sublease? I thought it was some sort of State of NY program to take patients. I am not sure that is the same thing as a sublease requiring landlord consent.

Best regards.

**Eric Simonson**

**T** 212.730.7700 **x** 2582 **D** 212.659.2582



Teamwork | Learning | Quality
Responsibility | Respect

**From:** Patrick Formato <PFormato@Abramslaw.com>
**Sent:** Monday, April 6, 2020 11:06 AM
**To:** Mark H. Zafrin (NY) <mzafrin@mrllp.com>
**Cc:** Mark Frimmel (NY) <mfrimmel@mrllp.com>; Eric Simonson (NY) <esimonson@mrllp.com>; Valerie Mendler <VMendler@abramslaw.com>; Michael Gurman <MGurman@Abramslaw.com>; Greg H. Stoller <GStoller@Abramslaw.com>; Andrew Kasman <AKasman@Abramslaw.com>
**Subject:** White Plains

Mark,

I called you on Friday to discuss a couple of things.

First, with regard to the Intercreditor Agreement, we forwarded the latest drafts of all the loan documents to Mortgage Lender's counsel for his review on Friday when we received them. We will follow up with him today with regard to getting his final comments to the IC agreement ;

Second, with regard to the Trust, when can we expect to receive draft agreements?;

Third, as previously discussed, I would like to set up a call with Joe Martello and Tony Abbate to discuss the Huntington Term Sheet;

Finally, it has come to my client's attention that the Tenant has entered into a sublease with Northern Westchester Hospital. As you are aware, any such sublease requires Landlord's prior written consent which may be withheld in Landlord's sole and absolute discretion. Please send me a copy of the sublease for our review and consideration.

Thanks

Pat

## *Patrick Formato, Esq.*

ABRAMS, FENSTERMAN, FENSTERMAN, EISMAN, FORMATO, FERRARA, WOLF & CARONE, LLP

*Executive Partner*
**Tel: 516-328-2300**
**Fax: 516-368-9573**
**Email: PFormato@Abramslaw.com**

**Long Island Office**
**3 Dakota Drive**
**Suite 300**
**Lake Success, New York 11042**

| Long Island | Manhattan | Brooklyn | Rochester |
|-------------|-----------|----------|-----------|
| (516) 328-2300 | (212) 279-9200 | (718) 215-5300 | (585) 218-9999 |

WWW.ABRAMSLAW.COM

CONFIDENTIALITY NOTICE: This e-mail may be an attorney-client communication and may contain information that is privileged and confidential and is therefore subject to legal restrictions and penalties regarding its unauthorized disclosure or other use. If you are not the intended recipient you are prohibited from copying, forwarding, distributing, disseminating, or otherwise viewing this e-mail and any attachments hereto. Please notify the sender and delete this e-mail if you are not the intended recipient.

2

**From:** Eric Simonson (NY) <esimonson@mrllp.com>
**Sent:** Tuesday, April 14, 2020 12:07 PM
**To:** Alex Frame <aframe@tjklaw.com>
**Subject:** RE: HBL SNF Intercreditor Agreement

Thanks for the report. Let us know what you client wants to do. Obviously, my client is quite anxious to get the facility in place.

Best regards.

**Eric Simonson, Esq.**

# M R   MICHELMAN & ROBINSON, LLP

New York | Los Angeles | Orange County | San Francisco | Chicago

**Due to the COVID-19 stay-at-home orders, our team is working remotely and is fully functioning.
Please go to our website or call our main number for a Firm Directory.
If you need someone's cell phone number, please call (212) 659-2559 and we will provide it for you.**

800 Third Avenue, 24th Floor, New York, NY 10022
**T** 212.730.7700 **D** 212.659.2582 **F** 212.730.7725
**E** esimonson@mrllp.com  www.mrllp.com
Bio vCard

**From:** Alex Frame <aframe@tjklaw.com>
**Sent:** Tuesday, April 14, 2020 12:04 PM
**To:** Eric Simonson (NY) <esimonson@mrllp.com>
**Subject:** RE: HBL SNF Intercreditor Agreement

Eric,

Sorry, I was in the middle of another call. My office number is forwarding to my cell phone, so either number will work. Following the landlord's markup of the ICA, my client instructed me to stop working on this transaction until further notice. CNH and Bill Nicholson have a storied history, and it is my understanding that Lizer/CNH expect Bill to cause more problems in this transaction. I'll follow up with CNH for further guidance on how to proceed, and I'll let you know whether I'm approved to start working on this deal again.

Thanks,

Alexander Frame

Kincaid Law Office
6151 Wilson Mills Road, Suite 310
Highland Heights, OH 44143
(T): 440-352-1010
(C): 330-635-0385

**From:** Eric Simonson (NY) <esimonson@mrllp.com>
**Sent:** Tuesday, April 14, 2020 11:56 AM
**To:** Alex Frame <aframe@tjklaw.com>
**Subject:** HBL SNF Intercreditor Agreement

Alex:

2

I hope you are staying healthy.

I left you voice messages on both your work and cell phone numbers. We are having some difficulty moving things along with counsel to the mortgage lender. We think it makes sense for you to reach out to him directly in a phone call and see if you can move things along. My client has a lot less at stake than yours does viz. the Intercreditor Agreement, so it seems to us that you probably should be dealing directly in order to get this thing back on track.

Counsel to the mortgage lender is:

> Nyemaster  Coode, P.C.
>
> 700 Walnut Street, Suite 1600
>
> Des Moines,  Iowa  50309
>
> Attn:    **James  C. Wine**
>
> Telephone: (515) 283-3100

Give me a call or shoot me an email to confirm you got the messages and will reach out and call James Wine.

Best regards.

**Eric Simonson, Esq.**

M R  MICHELMAN & ROBINSON, LLP
New York | Los Angeles | Orange County | San Francisco | Chicago

**Due to the COVID-19 stay-at-home orders, our team is working remotely and is fully functioning.
Please go to our website or call our main number for a Firm Directory.
If you need someone's cell phone number, please call (212) 659-2559 and we will provide it for you.**

800 Third Avenue, 24th Floor, New York, NY  10022
T 212.730.7700 D 212.659.2582 F 212.730.7725
E esimonson@mrllp.com  www.mrllp.com
Bio vCard

3

<MGurman@Abramslaw.com>; Bill Nicholson (WNicholson@congressconstruction.com)
<WNicholson@congressconstruction.com>; Howard Fensterman <HFensterman@Abramslaw.com>
**Subject:** Re: White Plains

That is exactly what we agrees to.

**Mark H. Zafrin, Esq.**

# M R MICHELMAN & ROBINSON, LLP

New York | Los Angeles | Orange County | San Francisco | Chicago

**Due to the COVID-19 stay-at-home orders, our team is working remotely and is fully functioning.**
**Please go to our website or call our main number for a Firm Directory.**
**If you need someone's cell phone number, please call (212) 659-2559 and we will provide it for you.**

800 Third Avenue, 24th Floor, New York, NY 10022
**T** 212.730.7700 **D** 212.659.2571 **F** 212.730.7725
**E** mzafrin@mrllp.com   www.mrllp.com
**Bio vCard**

**From:** Patrick Formato <PFormato@Abramslaw.com>
**Sent:** Monday, April 27, 2020 1:41:46 PM
**To:** Mark H. Zafrin (NY) <mzafrin@mrllp.com>
**Cc:** Valerie Mendler <VMendler@abramslaw.com>; Mark Frimmel (NY) <mfrimmel@mrllp.com>; Eric Simonson (NY) <esimonson@mrllp.com>; Andrew Kasman <AKasman@Abramslaw.com>; Michael Gurman <MGurman@Abramslaw.com>; Bill Nicholson (WNicholson@congressconstruction.com) <WNicholson@congressconstruction.com>; Howard Fensterman <HFensterman@Abramslaw.com>
**Subject:** RE: White Plains

You have an obligation to pay your rent. Security Benefits has agreed to pay Mezzanine Lender. Again, the Senior Lender added the language regarding paying the Mezzanine Lender. If you prefer that the amounts going to Senior Lender's designated Account only be the amounts owed them with the balance of the Rent going to the account designated by the Owner, make the revision and we will send it to Senior Lender's counsel for review.

## *Patrick Formato, Esq.*

ABRAMS, FENSTERMAN, FENSTERMAN, EISMAN, FORMATO, FERRARA, WOLF & CARONE, LLP

*Executive Partner*
**Tel: 516-328-2300**
**Fax: 516-368-9573**
**Email: PFormato@Abramslaw.com**

A F

Long Island Office
3 Dakota Drive
Suite 300
Lake Success, New York 11042

| Long Island | Manhattan | Brooklyn | Rochester |
|---|---|---|---|
| (516) 328-2300 | (212) 279-9200 | (718) 215-5300 | (585) 218-9999 |

WWW.ABRAMSLAW.COM

CONFIDENTIALITY NOTICE: This e-mail may be an attorney-client communication and may contain information that is privileged and confidential and is therefore subject to legal restrictions and penalties regarding its unauthorized disclosure or other use. If you are not the intended recipient you are prohibited from copying, forwarding, distributing, disseminating, or otherwise viewing this e-mail and any attachments hereto. Please notify the sender and delete this e-mail if you are not the intended recipient.

**From:** Mark H. Zafrin (NY) <mzafrin@mrllp.com>
**Sent:** Monday, April 27, 2020 4:34 PM
**To:** Patrick Formato <PFormato@Abramslaw.com>
**Cc:** Valerie Mendler <VMendler@abramslaw.com>; Mark Frimmel (NY) <mfrimmel@mrllp.com>; Eric Simonson (NY) <esimonson@mrllp.com>; Andrew Kasman <AKasman@Abramslaw.com>; Michael Gurman <MGurman@Abramslaw.com>; Bill Nicholson (WNicholson@congressconstruction.com) <WNicholson@congressconstruction.com>; Howard Fensterman <HFensterman@Abramslaw.com>
**Subject:** Re: White Plains

We have no obligation to pay your mezzanine lender. We have agreed with the senior lender to allow them to have direct draws if available to pay your clients mortgage however we never agreed nor do we believe that senior lender cares to make direct payments to your mezzanine lender. We don't even know if the alleged mezzanine lender is a lender to landlord or to an SPE   It adds an additional layer of complication

**Mark H. Zafrin, Esq.**

## M'R  MICHELMAN & ROBINSON, LLP

New York | Los Angeles | Orange County | San Francisco | Chicago

**Due to the COVID-19 stay-at-home orders, our team is working remotely and is fully functioning.**
**Please go to our website or call our main number for a Firm Directory.**
**If you need someone's cell phone number, please call (212) 659-2559 and we will provide it for you.**

800 Third Avenue, 24th Floor, New York, NY 10022
**T** 212.730.7700 **D** 212.659.2571 **F** 212.730.7725
**E** mzafrin@mrllp.com  www.mrllp.com
**Bio vCard**

---

**From:** Patrick Formato <PFormato@Abramslaw.com>
**Sent:** Monday, April 27, 2020 1:29:55 PM
**To:** Mark H. Zafrin (NY) <mzafrin@mrllp.com>
**Cc:** Valerie Mendler <VMendler@abramslaw.com>; Mark Frimmel (NY) <mfrimmel@mrllp.com>; Eric Simonson (NY) <esimonson@mrllp.com>; Andrew Kasman <AKasman@Abramslaw.com>; Michael Gurman <MGurman@Abramslaw.com>; Bill Nicholson (WNicholson@congressconstruction.com) <WNicholson@congressconstruction.com>; Howard Fensterman <HFensterman@Abramslaw.com>
**Subject:** RE: White Plains

Furthermore, The Mezzanine Lender is not a party to the Agreement. What contractual relationship are you concerned about?

## *Patrick Formato, Esq.*

ABRAMS, FENSTERMAN, FENSTERMAN, EISMAN, FORMATO, FERRARA, WOLF & CARONE, LLP

*Executive Partner*
**Tel: 516-328-2300**
**Fax: 516-368-9573**
**Email: PFormato@Abramslaw.com**



Long Island Office
3 Dakota Drive
Suite 300
Lake Success, New York 11042

| **Long Island** | **Manhattan** | **Brooklyn** | **Rochester** |
|---|---|---|---|
| (516) 328-2300 | (212) 279-9200 | (718) 215-5300 | (585) 218-9999 |

**WWW.ABRAMSLAW.COM**

CONFIDENTIALITY NOTICE: This e-mail may be an attorney-client communication and may contain information that is privileged and confidential and is therefore subject to legal restrictions and penalties regarding its unauthorized disclosure or other use. If you are not the intended recipient you are prohibited from copying, forwarding, distributing, disseminating, or otherwise viewing this e-mail and any attachments hereto. Please notify the sender and delete this e-mail if you are not the intended recipient.

**From:** Patrick Formato
**Sent:** Monday, April 27, 2020 4:26 PM
**To:** 'Mark H. Zafrin (NY)' <mzafrin@mrllp.com>
**Cc:** Valerie Mendler <VMendler@abramslaw.com>; Mark Frimmel (NY) <mfrimmel@mrllp.com>; Eric Simonson (NY) <esimonson@mrllp.com>; Andrew Kasman <AKasman@Abramslaw.com>; Michael Gurman <MGurman@Abramslaw.com>; Bill Nicholson (WNicholson@congressconstruction.com) <WNicholson@congressconstruction.com>; Howard Fensterman <HFensterman@Abramslaw.com>
**Subject:** RE: White Plains

The comment was made by Senior Lender. I would be happy to get their counsel on the phone.

**From:** Mark H. Zafrin (NY) <mzafrin@mrllp.com>
**Sent:** Monday, April 27, 2020 3:59 PM
**To:** Patrick Formato <PFormato@Abramslaw.com>
**Cc:** Valerie Mendler <VMendler@abramslaw.com>; Mark Frimmel (NY) <mfrimmel@mrllp.com>; Eric Simonson (NY) <esimonson@mrllp.com>; Andrew Kasman <AKasman@Abramslaw.com>; Michael Gurman <MGurman@Abramslaw.com>; Bill Nicholson (WNicholson@congressconstruction.com) <WNicholson@congressconstruction.com>; Howard Fensterman <HFensterman@Abramslaw.com>
**Subject:** Re: White Plains

We already received the Senior Lender comments, and the second round from our Lender after they had discussions with Security Benefit , which did not have the additional added language with regard to payment of the Mezzanine Lender with whom by the way we do not have a contractual relationship.

We also noticed that the Landlord entity is not the Mezzanine Borrower, so you have added an entity with whom we do not have a contractual relationship with nor do I want to create one.  We will be sending your our markup to yours.

**Mark H. Zafrin, Esq.**

# M ̦R MICHELMAN & ROBINSON, LLP
New York | Los Angeles | Orange County | San Francisco | Chicago

**Due to the COVID-19 stay-at-home orders, our team is working remotely and is fully functioning.**
**Please go to our website or call our main number for a Firm Directory.**
**If you need someone's cell phone number, please call (212) 659-2559 and we will provide it for you.**

800 Third Avenue, 24th Floor, New York, NY 10022
T 212.730.7700 D 212.659.2571 F 212.730.7725
E mzafrin@mrllp.com  www.mrllp.com
Bio vCard

8

**From:** Patrick Formato <PFormato@Abramslaw.com>
**Sent:** Monday, April 27, 2020 12:18 PM
**To:** Mark H. Zafrin (NY) <mzafrin@mrllp.com>
**Cc:** Valerie Mendler <VMendler@abramslaw.com>; Mark Frimmel (NY) <mfrimmel@mrllp.com>; Eric Simonson (NY)
<esimonson@mrllp.com>; Andrew Kasman <AKasman@Abramslaw.com>; Michael Gurman
<MGurman@Abramslaw.com>; Bill Nicholson (WNicholson@congressconstruction.com)
<WNicholson@congressconstruction.com>; Howard Fensterman <HFensterman@Abramslaw.com>
**Subject:** RE: White Plains

Mark,

I do not see the relevancy to your comment. Senior Lender has made this request.

As far as our call , per my prior email, there are a number of issues that must be resolved first. What is your availability
to discuss such issues?

Thanks

Pat

## Patrick Formato, Esq.

ABRAMS, FENSTERMAN, FENSTERMAN, EISMAN, FORMATO, FERRARA, WOLF & CARONE, LLP

*Executive Partner*
**Tel: 516-328-2300**
**Fax: 516-368-9573**
**Email: PFormato@Abramslaw.com**

Long Island Office
3 Dakota Drive
Suite 300
Lake Success, New York 11042

| Long Island | Manhattan | Brooklyn | Rochester |
| (516) 328-2300 | (212) 279-9200 | (718) 215-5300 | (585) 218-9999 |

WWW.ABRAMSLAW.COM

CONFIDENTIALITY NOTICE: This e-mail may be an attorney-client communication and may contain information that is privileged and
confidential and is therefore subject to legal restrictions and penalties regarding its unauthorized disclosure or other use. If you are not
the intended recipient you are prohibited from copying, forwarding, distributing, disseminating, or otherwise viewing this e-mail and
any attachments hereto. Please notify the sender and delete this e-mail if you are not the intended recipient.

**From:** Mark H. Zafrin (NY) <mzafrin@mrllp.com>
**Sent:** Monday, April 27, 2020 2:47 PM
**To:** Patrick Formato <PFormato@Abramslaw.com>
**Cc:** Valerie Mendler <VMendler@abramslaw.com>; Mark Frimmel (NY) <mfrimmel@mrllp.com>; Eric Simonson (NY)
<esimonson@mrllp.com>; Andrew Kasman <AKasman@Abramslaw.com>; Michael Gurman
<MGurman@Abramslaw.com>; Lizer Epic. Jozefovic <lizerj@epicmgt.com>
**Subject:** Re: White Plains

While Mark and I were reviewing your comments we noticed a bit of an anomaly your Mezz Borrower is White
Plains Mezzanine, LLC who is not a party to the Mortgage Agreements and to whom the Tenant has not given
any security interest in our AR or any other property. Please send us a full set of your mezzanine documents so
we can understand why you would insert a provision for payment to a Lender who is not a Mortgagee and has
does not have a security interest in our AR--

9

Also we do not understand why you cancelled the call as it had nothing to do with the Intercreditor agreements and was intended to discuss only the issues with regard to a refinance and ultimate transfer of title. Please send us dates so that we may move forward with this process.
**Mark H. Zafrin, Esq.**

# M R   MICHELMAN & ROBINSON, LLP
New York | Los Angeles | Orange County | San Francisco | Chicago

**Due to the COVID-19 stay-at-home orders, our team is working remotely and is fully functioning.**
**Please go to our website or call our main number for a Firm Directory.**
**If you need someone's cell phone number, please call (212) 659-2559 and we will provide it for you.**

800 Third Avenue, 24th Floor, New York, NY 10022
**T** 212.730.7700 **D** 212.659.2571 **F** 212.730.7725
**E** mzafrin@mrllp.com  www.mrllp.com
**Bio vCard**

---

**From:** Patrick Formato <PFormato@Abramslaw.com>
**Sent:** Monday, April 27, 2020 11:15 AM
**To:** Mark H. Zafrin (NY) <mzafrin@mrllp.com>
**Cc:** Valerie Mendler <VMendler@abramslaw.com>; Mark Frimmel (NY) <mfrimmel@mrllp.com>; Eric Simonson (NY) <esimonson@mrllp.com>; Andrew Kasman <AKasman@Abramslaw.com>; Michael Gurman <MGurman@Abramslaw.com>
**Subject:** White Plains

Mark,

It is my understanding that Bill and Lizer spoke on Friday and as you are aware there are numerous outstanding issues to be resolved, including but not limited Tenant's various defaults under the Lease and the LOI. These outstanding defaults are creating issues with the various Lender's including, from what I understand, the Tenant's A/R Lender. The issues need to be resolved. I suggest that you and I discuss as soon as possible.

Despite the foregoing, in an effort to keep things moving forward, attached please find a redline and a clean version of the Intercreditor Agreement which include both Landlord's and Mortgage Lender's requested revisions. The attached remains subject to any additional comments my clients may have.

Let me know your availability for a phone call.

Thanks

Pat

## *Patrick Formato, Esq.*

ABRAMS, FENSTERMAN, FENSTERMAN, EISMAN, FORMATO, FERRARA, WOLF & CARONE, LLP

*Executive Partner*
**Tel: 516-328-2300**
**Fax: 516-368-9573**
Email: PFormato@Abramslaw.com



Long Island Office
3 Dakota Drive
Suite 300
Lake Success, New York 11042

| Long Island | Manhattan | Brooklyn | Rochester |
|---|---|---|---|
| (516) 328-2300 | (212) 279-9200 | (718) 215-5300 | (585) 218-9999 |

WWW.ABRAMSLAW.COM

CONFIDENTIALITY NOTICE: This e-mail may be an attorney-client communication and may contain information that is privileged and confidential and is therefore subject to legal restrictions and penalties regarding its unauthorized disclosure or other use. If you are not the intended recipient you are prohibited from copying, forwarding, distributing, disseminating, or otherwise viewing this e-mail and any attachments hereto. Please notify the sender and delete this e-mail if you are not the intended recipient.

## Mark Frimmel (NY)

| | |
|---|---|
| **From:** | Patrick Formato <PFormato@Abramslaw.com> |
| **Sent:** | Friday, May 8, 2020 2:36 PM |
| **To:** | Mark H. Zafrin (NY); Alex Frame; James C. Wine |
| **Cc:** | Mark Frimmel (NY); Michael Smaila (NY); Bill Nicholson (WNicholson@congressconstruction.com); Howard Fensterman; Michael Gurman; Andrew Kasman; Valerie Mendler |
| **Subject:** | White Plains Intercreditor Agreement |
| **Attachments:** | AFFE Comments Intercreditor Agreement v8 05.07.2020redline.docx; AFFE Comments Intercreditor Agreement v8 05.07.2020.docx |

Mark, Alex and Jim,

Attached hereto please find a redline and clean version of the Intercreditor Agreement with our requested revisions. The compare document is a compare against Jim's draft of 5/1/20. Please note, we are simultaneously sending the attached to our client and same is therefore subject to any additional comments or revisions they may have.

Best regards

Pat

## Patrick Formato, Esq.

ABRAMS, FENSTERMAN, FENSTERMAN, EISMAN, FORMATO, FERRARA, WOLF & CARONE, LLP

*Executive Partner*
**Tel:** 516-328-2300
**Fax:** 516-368-9573
**Email:** PFormato@Abramslaw.com

Long Island Office
3 Dakota Drive
Suite 300
Lake Success, New York 11042

| Long Island | Manhattan | Brooklyn | Rochester |
|---|---|---|---|
| (516) 328-2300 | (212) 279-9200 | (718) 215-5300 | (585) 218-9999 |

WWW.ABRAMSLAW.COM

CONFIDENTIALITY NOTICE: This e-mail may be an attorney-client communication and may contain information that is privileged and confidential and is therefore subject to legal restrictions and penalties regarding its unauthorized disclosure or other use. If you are not the intended recipient you are prohibited from copying, forwarding, distributing, disseminating, or otherwise viewing this e-mail and any attachments hereto. Please notify the sender and delete this e-mail if you are not the intended recipient.

## INTERCREDITOR AGREEMENT

THIS INTERCREDITOR AGREEMENT (this "**Agreement**") is entered into as of May
_____, 2020, by and among (i) CNH FINANCE FUND I, L.P., a Delaware limited partnership
("**AR Lender**"), (ii) SECURITY BENEFIT CORPORATION, a Kansas corporation, as agent for
the benefit of Security Benefit Life Insurance Company ("**Mortgage Lender**"), (iii) WHITE
PLAINS HEALTHCARE PROPERTIES I, LLC, a Massachusetts limited liability company
("**Owner**"), and (iv) HBL SNF, LLC, a New York limited liability company ("**Operator**"). AR
Lender, Mortgage Lender, Owner and Operator are referred to in this Agreement individually as a
"**Party**" and collectively as the "**Parties**".

WHEREAS, Operator has entered into that certain Amended and Restated Operating
Lease with Owner with respect to the Facility (the "**Owner-Operator Agreement**"), and Operator
further entered into a Security Agreement, Assignment of Leases and Rents and Fixture Filing
(Operating Lease), dated as of August 18, 2017, for the benefit of Mortgage Lender (the "**Operator
Security Agreement**"), which security agreement grants a security interest in certain collateral of
the Operator which includes the AR Lender Priority Collateral;

WHEREAS, Section 9.25 of the Operator Security Agreement permits Operator to obtain
a working capital loan secured by certain accounts receivable; and

WHEREAS, AR Lender has made or may in the future make loans and/or extensions of
credit to or for the benefit of the Operator, secured by certain collateral of the Operator, which
includes the AR Lender Priority Collateral; and

WHEREAS, Mortgage Lender has made or may in the future make loans and/or extensions
of credit to or for the benefit of Owner secured by the Facility operated by the Operator or to or
for the benefit of Operator secured by certain assets of the Operator; and

WHEREAS, AR Lender and Mortgage Lender have agreed upon AR Lender's and
Mortgage Lender's respective rights in and to the AR Lender Priority Collateral and Mortgage
Lender Priority Collateral which agreements and understandings are set forth below. In the event
of a conflict between the terms of this Agreement and the terms of the AR Loan Documents, or
the Mortgage Loan Documents, the terms of this Agreement shall govern and control;

NOW, THEREFORE, in consideration of the mutual covenants set forth below, and
intending to be legally bound, the Parties hereto hereby agree as follows:

1.    **DEFINITIONS**
All terms used herein which are not specifically defined shall have the meanings provided
in Article 9 of the Uniform Commercial Code as in effect in the State of New York from time to
time (the "**UCC**"). In addition to the terms defined elsewhere in this Agreement, the following
terms shall have the following meanings when used in this Agreement.

1.1    "**Accounts**" shall mean all right, title and interest of Operator in and to the
following, in each case arising from Operator's operation of the Facility in the ordinary

course of Operator's business: (a) all rights to payment of a monetary obligation, whether or not earned by performance, including, but not limited to, accounts receivable, health-care insurance receivables, Medicaid and Medicare receivables, Veterans Administration receivables, or other governmental receivables, private patient receivables, and HMO receivables, (b) payment intangibles, (c) guaranties, letter-of-credit rights and other supporting obligations relating to the property described in clauses (a) and (b); and (d) all of the proceeds of the property described in clauses (a), (b) and (c). Notwithstanding the foregoing, "**Accounts**" do not include insurance proceeds, commercial tort claims, or accounts arising from the sale of Operator's equipment, inventory or other goods, other than accounts arising from the sale of Operator's inventory in the ordinary course of Operator's business; provided that "Accounts" shall include any Approved Business Interruption Insurance Proceeds. For purposes herein "**Approved Business Interruption Insurance Proceeds**" include the proceeds of business interruption insurance payable to Operator to the extent such proceeds support continued funding of the AR Loan, provided, however, that "Approved Business Interruption Insurance Proceeds" shall not include rent loss coverage payable to the Mortgage Lender.

1.2     "**Advances**" shall mean advances under the revolving loan facility provided for in the AR Loan Documents.

1.3     "**AR Lender Priority Collateral**" shall mean all right, title and interest of Operator in and to the following: (a) all Accounts arising from the delivery of goods and rendering of services by Operator prior to the Cut-Off Time and the proceeds thereof; (b) all Deposit Accounts (excluding the letter of credits, deposit accounts, security deposit, reserve account escrow accounts or other forms of security paid or previously paid to or on behalf of Owner under the Owner-Operator Agreement, and all payments previously paid to Owner) and the proceeds thereof; and (c) all Accounts arising after the Cut-Off Time and the proceeds thereof solely to the extent of (and in the amount of) Protective Advances made after the Cut-Off Time in accordance with the terms of this Agreement provided that the collateral should be prioritized in accordance with Section 2.1.

1.4     "**AR Loan**" shall mean a revolving loan in an amount not to exceed the Maximum Commitment Amount (including any amounts contemplated as letter of credit obligations) made by AR Lender to Operator pursuant to the AR Loan Agreement. Notwithstanding anything else in the AR Loan Documents, unless otherwise specifically approved in writing by Mortgage Lender, the AR Loan shall exclude any term loan facility, equipment loan facility and any indebtedness, liability or obligations arising under a guarantee, except to the extent that the obligations guaranteed consist solely of AR Loan Obligations and such guarantors waive subrogation and similar rights until the Mortgage Loan is Paid in Full.

1.5     "**AR Loan Agreement**" shall mean that certain Credit and Security Agreement, dated as of even date herewith, in the amount of $4,000,000.00, by and among AR Lender, as lender, and Operator, as borrower, as amended, restated, supplemented or otherwise modified from time to time in accordance with the terms of this Agreement.

1.6     "**AR Loan Documents**" shall mean any and all promissory notes, security agreements and any and all other documents evidencing or securing the AR Loan as identified on Schedule 1 attached hereto, in each case, as amended, restated, supplemented or otherwise modified from time to time in accordance with the terms of this Agreement, provided that, for purposes of this Agreement, this Agreement shall not be considered an AR Loan Document.

1.7     "**AR Loan Obligations**" shall mean the AR Loan and all other indebtedness, liabilities and obligations owing to AR Lender under the AR Loan Documents (including without limitation any Over-line Advances and/or Allowable Over-Advances, as permitted pursuant to Section 2.7, and Protective Advances), provided, however, that notwithstanding anything to the contrary set forth in the AR Loan Documents, "**AR Loan Obligations**" shall exclude any and all indebtedness, liabilities and obligations that are not directly related to the benefit of the ~~Facilities or the Other Facilities~~Facility, or the financing thereof. Notwithstanding the foregoing, the AR Loan Obligations shall also include the following: the Facility Fee (as defined in the AR Loan Agreement), the Collateral Management Fee (as defined in the AR Loan Agreement), the Unused Line Fee (as defined in the AR Loan Agreement), the Termination Fee (as defined in the AR Loan Agreement), the Software Interface Fee (as defined in the AR Loan Agreement), the Lender's processing fee as set forth in Section 2.4 of the AR Loan Agreement, all expenses chargeable to Operator under Sections 2.10(d) and (e) of the AR Loan Agreement, the audit fees and expenses as provided in Section 6.7 of the AR Loan Agreement, all costs and expenses chargeable to Operator pursuant to Sections 6.8, 6.12 and 9.1 of the AR Loan Agreement, all indemnification obligations as set forth in Section 13.4 of the AR Loan Agreement, and all expense reimbursement obligations as set forth in Section 12.7 of the AR Loan Agreement. Notwithstanding anything to the contrary in the AR Loan Documents or this Agreement, this Agreement shall not be deemed an "AR Loan Obligation."

1.8     "**Availability**" shall have the same meaning given to such term in the AR Loan Agreement.

1.9     "**Business Day**" shall mean any day other than a Saturday, a Sunday, or any day that banks in the State of New York are required or permitted by law to close.

1.10    "**Ceased Funding**" means, with respect to the Cut-Off Time, either of the following events:  (i) AR Lender (including any co-lenders pursuant to the AR Loan Documents) has received a request for an Advance under the AR Loan Agreement for which there is sufficient Availability and a period of thirty (30) calendar days has elapsed since the date of such request, during which time such Advance is not made or (ii) AR Lender has notified Operator and/or Mortgage Lender in writing that it has determined to permanently cease making further Advances (at least with respect to the Facility) under the AR Loan Agreement.

1.11    "**Cut-Off Time**" shall mean, unless subsequently extended in writing by Mortgage Lender, such time indicated in the written notice ("**Cut-Off Time Notice**") that

may be given by the Mortgage Lender to the AR Lender following the occurrence of an Mortgage Loan Triggering Event or an AR Loan Triggering Event, which Cut-Off Time Notice must be: (a) in the form set forth in Exhibit A and ~~designating the Facility as to which the Cut-Off Time applies and~~ (b) given pursuant to Section 4.5. Unless the AR Lender has Ceased Funding, the Cut-Off Time shall be no earlier than thirty (30) calendar days after the Cut-Off Time Notice has been given (as set forth in Section 4.5) by Mortgage Lender to AR Lender. If the AR Lender has Ceased Funding, the Cut-Off Time may be concurrent with the date on which Ceased Funding occurred, even if the Cut-Off Time Notice is delivered thereafter.

1.12     "**Deposit Accounts**" shall mean any deposit account (a) holding proceeds of any Accounts, (b) holding any cash of the Operator, (c) into which Advances are funded (d) for which a deposit account control agreement in favor of the AR Lender, has been entered into, or (e) to the extent permitted by applicable law, for which a deposit account services and instructions agreement or similar agreement has been entered into, but excluding the letter of credits, deposit accounts, security deposit, reserve account escrow accounts or other forms of security paid or securing Owner's obligations in connection with the Owner-Operator Agreement or all payment accounts (if any) established for the payment of, or security for, amounts due to Owner pursuant to or in connection with the Owner-Operator Agreement.

1.13     "**Facility**" shall mean that certain skilled nursing facility located at 116-120 Church Street, White Plains, New York 10601 and commonly known as the Rehabilitation and Care Institute at White Plains.

1.14     "**Mezzanine Borrower**" means White Plains Mezzanine, LLC.

1.15     "**Mezzanine Lender**" means Bradford Allen Funding Company LLC.

1.16     "**Mezzanine Loan**" means the $9,500,000.00 loan from Mezzanine Lender to Mezzanine Borrower.

~~1.14~~1.17     "**Mortgage Lender Priority Collateral**" shall mean any and all property (whether real, personal or mixed, tangible or intangible) in which Mortgage Lender was or is granted liens, encumbrances, security interests and other rights pursuant to any of the Mortgage Loan Documents, except for the AR Lender Priority Collateral, it being understood that Mortgage Lender has an "all assets" security interest on the assets of Operator including but not limited to (i) the skilled nursing facility licenses and any other healthcare or long term care licenses for the Facility, (ii) all Medicare and Medicaid/state/county provider agreements for the Facility, (iii) the certificates of need for the Facility, (iv) the Owner-Operator Agreement (including without limitation, any security deposits or other collateral posted as security under the Owner-Operator Agreement), and (v) Operator's furniture, fixtures, equipment, software and inventory directly related to such Facility.

---

1.15 1.18 ___ "**Mortgage Loan(s)**" shall mean the $38,500,000 mortgage loan made by Mortgage Lender with respect to the Facility.

1.16 1.19 ___ "**Mortgage Loan Documents**" shall mean, with respect to the Mortgage Loan, any and all promissory notes, deeds of trust, mortgages, regulatory agreements, security agreements and any and all other documents required by Mortgage Lender as identified on Schedule 2 attached hereto in connection with such Mortgage Loan, in each case, as amended, restated, supplemented or otherwise modified from time to time, provided that this Agreement shall not be considered a Mortgage Loan Document for purposes of this Agreement.

1.17 1.20 ___ "**Mortgage Loan Obligations**" shall mean the Mortgage Loan and all other indebtedness, liabilities and obligations owing to Mortgage Lender under the Mortgage Loan Documents.

1.18 1.21 ___ "**Maximum Commitment Amount**" shall mean $4,000,000.00.

1.19 ~~"Other Facilities" means any other healthcare facilities financed by the AR Loan, which facilities are described on Schedule 3 (as such list of Other Facilities may be modified from time to time with the consent of AR Lender and Mortgage Lender).~~

1.20 1.22 ___ "**Paid in Full**" shall mean the final indefeasible payment in full of all AR Loan Obligations or Mortgage Loan Obligations, as applicable, and the termination of the AR Loan Documents and the Mortgage Loan Documents, as applicable; provided, however, that a reduction in the outstanding balance due under the AR Loan Documents to zero shall not mean that the AR Loan Obligations have been "Paid in Full" unless and until, all commitments of the AR Lender to lend under the AR Loan Documents have been terminated. With respect to any AR Loan Obligations under the AR Loan Documents consisting of contingent obligations under letters of credit, final payment is considered the setting apart of cash sufficient to discharge such AR Loan Obligations in an account for the exclusive benefit of AR Lender.

1.21 1.23 ___ "**Possession Date**" shall mean, with respect to the Facility, the earlier of the date upon which (a) Mortgage Lender, or its nominee, has taken actual physical possession and control of the Facility, whether by foreclosure, deed in lieu of foreclosure, appointment of a receiver or other legal process, or (b) Mortgage Lender, or its nominee, has begun the operation and management of the Facility.

1.22 1.24 ___ "**Protective Advances**" shall mean amounts advanced by AR Lender following the Cut-Off Time and prior to the Possession Date that the AR Lender deems reasonably necessary to preserve and protect the AR Lender Priority Collateral and written notice of which is given to Mortgage Lender within five (5) Business Days after the subject advance is made, provided, however, that failure to provide such notice within five Business Days shall not affect the inclusion of Accounts arising after the Cut-Off Time as AR Lender Priority Collateral, as described more fully in the definition of AR Lender Priority Collateral.

1.231.25    "**Triggering Event**" shall mean an Mortgage Loan Triggering Event or an AR Loan Triggering Event. An "**Mortgage Loan Triggering Event**" shall mean any of (i) a payment default under the Mortgage Loan Documents, (ii) acceleration by Mortgage Lender of the sums due under the Mortgage Loan Documents, (iii) an Event of Default (as defined in any of the Mortgage Loan Documents) has occurred, or (iv) an event of default under the Owner-Operator Agreement has occurred.    An "**AR Loan Triggering Event**" shall mean any event which results in AR Lender having Ceased Funding or accelerating the AR Loan Obligations (provided, however, that any acceleration that occurs automatically pursuant to the terms of the AR Loan Agreement shall not be an AR Loan Triggering Event if such acceleration is timely waived, cured, unwound or otherwise disregarded by the AR Lender who continues to fund).

2.    **PRIORITIES**

2.1    **AR Lender Priority.**

(a)    AR Lender, Owner, and Mortgage Lender agree that, as between AR Lender, Owner, and Mortgage Lender, subject to Section 2.1(b), at all times, whether before, during or after the pendency of any bankruptcy, reorganization or other insolvency proceeding, and notwithstanding the taking of possession of, or other exercise of rights in respect of the Mortgage Lender Priority Collateral (or any portion thereof) or the priorities that ordinarily would result under the Uniform Commercial Code as enacted in each and every applicable jurisdiction, and as amended from time to time, and other applicable law for the order of granting or perfecting of any security interests referred to herein, AR Lender shall have a first and prior security interest in, upon and to the AR Lender Priority Collateral to secure the AR Loan Obligations; and Mortgage Lender and Owner hereby subordinate to AR Lender's security interest their respective security interests in the AR Lender Priority Collateral. Mortgage Lender and Owner shall abide by the standstill provisions set forth below in Section 2.3(a). Mortgage Lender, Owner, and Operator agree, that, in the event AR Lender seeks to enforce any of its remedies under the AR Loan Documents, AR Lender may have reasonable access to the Facility for any inspection and copying of the books and records of Operator relating to the AR Lender Priority Collateral and the Mortgage Lender Priority Collateral, provided that AR Lender shall promptly repair any damage to the Facility caused by AR Lender or its agents resulting from such inspection and copying. AR Lender agrees that, notwithstanding anything in the AR Loan Documents to the contrary: (i) AR Lender may not require Operator to deliver the books and records of Operator to AR Lender; and (ii) AR Lender's rights to inspect and copy Operator's books and records shall be limited to those rights set forth in the preceding sentence.

(b)    Without limiting the foregoing, following the occurrence of a Triggering Event, Mortgage Lender may deliver to AR Lender a Cut-Off Time Notice. Notwithstanding the occurrence of a Cut-Off Time, the AR Lender shall have a first and prior security interest in the AR Lender Priority Collateral, and Mortgage Lender shall have a subordinate lien in the AR Lender Priority Collateral, until the AR Loan Obligations are Paid in Full. Any Accounts arising from the delivery of goods and rendering of services by Operator at the Facility after the Cut-Off Time Notice, but prior to the Cut-Off Time, shall be AR Lender Priority Collateral notwithstanding

the collection of the same after the Cut-Off Time. For the avoidance of doubt, Mortgage Lender shall have a first and prior security interest in any Accounts arising from the delivery of goods and rendering of services by Operator at the Facility on or after the Cut-Off Time with respect to the Facility (except to the extent AR Lender makes Protective Advances), and such Accounts shall be considered Mortgage Lender Priority Collateral and not AR Lender Priority Collateral. From and after the Cut-Off Time, all amounts received by AR Lender on account of the AR Lender Priority Collateral shall be applied solely to the AR Loan Obligations. Nothing herein shall prevent AR Lender from collecting the full amount of the AR Loan Obligations from any guarantors thereof and/or from collateral other than the AR Lender Priority Collateral and/or the Mortgage Lender Priority Collateral.

(c)     If AR Lender's security interest (as now or in the future existing) in the AR Lender Priority Collateral becomes, in whole or in part, for any reason, unperfected or is judicially or administratively determined to be unenforceable, in whole or in part, or is voided, in whole or in part, and as a result thereof, a creditor subordinate to AR Lender would have or would be entitled to claim, priority over the Mortgage Lender in the AR Lender Priority Collateral, nothing in this Agreement is intended or shall be construed as a subordination by Mortgage Lender to such other creditor.

(d)     Notwithstanding anything else in this Agreement AR Loan Obligations shall not include indemnity obligations relating to any breach of this Agreement or relating to any dispute between AR Lender and Mortgage Lender.

(e)     AR Lender agrees to exercise any rights of setoff against funds on deposit in Deposit Accounts maintained with AR Lender for application to AR Loan Obligations consistently with the priorities and provisions established under this Agreement.

2.2     **Mortgage Lender Priority**.

(a)     AR Lender and Mortgage Lender agree that, as between AR Lender and Mortgage Lender, subject to Section 2.2(b), at all times, whether before, during or after the pendency of any bankruptcy, reorganization or other insolvency proceeding, and notwithstanding the taking of possession of, or other exercise of rights in respect of, the AR Lender Priority Collateral (or any portion thereof) or the priorities that ordinarily would result under the Uniform Commercial Code as enacted in each and every applicable jurisdiction, and as amended from time to time, and other applicable law for the order of granting or perfecting of any security interests referred to herein, Mortgage Lender shall have a first and prior security interest in, upon and to the Mortgage Lender Priority Collateral; and AR Lender hereby subordinates to Mortgage Lender AR Lender's security interest, if any, in the Mortgage Lender Priority Collateral to secure the Mortgage Loan. AR Lender shall abide by the standstill provisions set forth below in Section 2.3(b). Promptly upon execution of this Agreement, AR Lender agrees to cause itself to be removed from any insurance policy and insurance certificate that has any designation of AR Lender as (a) loss payee or lender's loss payee on any insurance with respect to any Mortgage Lender Priority Collateral upon which AR Lender does not have a subordinate lien as permitted by this Agreement and (b) primary loss payee or primary lender's loss payee on any insurance

with respect to any Mortgage Lender Priority Collateral upon which AR Lender has a subordinate lien permitted under this Agreement.

(b)      If Mortgage Lender's security interest (as now or in the future existing) in the Mortgage Lender Priority Collateral becomes, in whole or in part, for any reason, unperfected or is judicially or administratively determined to be unenforceable, in whole or in part, or is voided, in whole or in part, and as a result thereof, a creditor subordinate to Mortgage Lender would have or would be entitled to claim, priority over AR Lender in the Mortgage Lender Priority Collateral, nothing in this Agreement is intended or shall be construed as a subordination by AR Lender to such other creditor. Notwithstanding the foregoing, Mortgage Lender shall have a first priority security interest in the Mortgage Lender Priority Collateral applicable to the corresponding Facility, provided however, AR Lender shall have the ability to utilize the Mortgage Lender Priority Collateral solely to the extent necessary to exercise any of AR Lender's rights and/or remedies (including without limitation billing and collecting the Operator's accounts receivable and other assets comprising AR Lender Priority Collateral) under the AR Loan Documents.

(c)      Mortgage Lender acknowledges that ~~one or more of the Other Facilities, if any.~~Facility may be subject to loans made by other lenders. The AR Loan may provide financing for and may be secured by collateral pertaining to ~~any or all of~~ the ~~Other Facilities~~Facility. This Agreement is intended to set forth the priorities, rights, and responsibilities of Mortgage Lender vis-à-vis AR Lender ~~only, and shall not affect priorities of the Mortgage Lender vis-à-vis any other lender of any Other Facilities~~ only.

### 2.3    Standstill; Possession Date.

(a)      Until the AR Loan Obligations have been Paid in Full, Mortgage Lender and Owner shall not exercise any remedies with regard to the AR Lender Priority Collateral (including without limitation any remedies in conflict with Section 2.9(c) below which includes, without limitation, notifying account debtors to redirect payment for such AR Lender Priority Collateral, changing or attempting to change any direction of payment or remittance instructions to account debtors for such AR Lender Priority Collateral to any deposit accounts other than those Deposit Accounts into which Accounts have been paid historically, or any combination of the foregoing); *provided however*, that after a Triggering Event, the foregoing shall not prohibit the Mortgage Lender and or Owner, as applicable from (i) taking any action against the Operator with respect to any Mortgage Lender Priority Collateral (so long as such action does not compromise the AR Lender's ability to bill and/or collect the AR Lender Priority Collateral), (ii) terminating an Owner-Operator Agreement, (iii) commencing an action for possession or for collection of rent or other monetary amounts due under such Owner-Operator Agreement or for specific enforcement of an Operator's covenants under such Owner-Operator Agreement, so long as such actions do not comprise the exercise of a remedy with regard to AR Lender Priority Collateral, or (iv) pursuing the remedies specified in the definition of "Possession Date," (v) taking steps to appoint a receiver or (vi) contacting the necessary authorities, which may include account debtors, to begin the process of transferring the license and/or any other necessary permits or approvals, and the assignment of the provider agreements from the incumbent Operator to a new operator.

(b)      Until the Mortgage Loan Obligations have been Paid in Full, subject to AR Lender's right to access the Mortgage Lender Priority Collateral set forth in <u>Section 2.1</u> above, AR Lender shall not affirmatively exercise any remedies with regard to the Mortgage Lender Priority Collateral.

(c)      Without limiting the foregoing, Mortgage Lender ~~or Owner~~ shall deliver to AR Lender ten (10) Business Days' prior written notice of the commencement of any action or undertaking to take physical possession, control or management of the Facility (the "**Possession Date Notice**"). If a Cut-Off Time Notice has previously been issued, the Possession Date Notice shall have no effect on the Cut-Off Time. If no previous Cut-Off Time Notice has been issued, AR Lender shall have rights to and be entitled to the collections of all Accounts arising from the delivery of goods or rendering of services at the Facility for the period beginning on the date of the Possession Date Notice and continuing until the thirtieth (30th) day following a Possession Date Notice, ~~without regard~~only to ~~whether~~the extent such Accounts were generated in the name of Operator ~~or in the name of any temporary or permanent replacement operator, manager or receiver.~~

(d)      Without limiting any of its rights hereunder or under the AR Loan Documents, at any time after receiving a Cut-Off Time Notice or a Possession Date Notice, AR Lender shall have the right to cease making Advances. Irrespective of whether or not AR Lender makes any Advances (including Protective Advances) after receiving the Cut-Off Time Notice, it shall retain a first priority lien on all AR Lender Priority Collateral.

(e)      ~~Except~~During the occurrence of and continuation of an Event of Default (as ~~may be expressly~~defined in the AR Loan Documents), except as set forth ~~herein, including but not limited to~~ in <u>Section 2.6(b)</u> hereof, Mortgage Lender, ~~Owner,~~ and Operator hereby agree that any AR Lender Priority Collateral and proceeds thereof, (excluding any rent payments received by Owner and/or any proceeds that have been previously paid prior to the notification of an Event of Default (as defined in the AR Loan Documents)) which may come into the possession of Mortgage Lender or Owner or Operator will be held in trust for AR Lender, and Mortgage Lender and Owner shall turn over any AR Lender Priority Collateral and/or proceeds thereof to AR Lender, in the same form as received with any necessary endorsements, promptly upon receipt, until all of the AR Loan Obligations have been Paid in Full. Any replacement operator or receiver who commences operating the Facility shall agree in writing to abide by the provisions of this Section 2.3(e) to the extent it, or its new lender, if any, comes into possession of any AR Lender Priority Collateral, provided, however, failure to secure such written agreement shall not subject Mortgage Lender to any liability nor affect the subordination and lien priorities set forth in this Agreement.

(f)      ~~Any~~During the occurrence of and continuation of an Event of Default (as defined in the Mortgage Loan Documents) any Mortgage Lender Priority Collateral that may come into the possession of AR Lender, or Operator ~~or Owner~~ will be held in trust by AR Lender, Operator or Owner (as applicable), for Mortgage Lender, and such recipient shall turn over any Mortgage Lender Priority Collateral so received to Mortgage Lender in the same form as received, with any necessary endorsements, promptly upon receipt, until the Mortgage Loan Obligations have been Paid in Full in accordance with the terms of this Agreement. Any replacement operator

or receiver who commences operating the Facility shall agree in writing to abide by the provisions of this Section 2.3(f) to the extent it, or its new lender, if any, comes into possession of any Mortgage Lender Priority Collateral.

2.4 **No Contest**.

(a) Mortgage Lender and Owner agree that they will not make any assertion or claim in any action, suit or proceeding of any nature whatsoever in any way challenging the priority, validity or effectiveness of the liens and security interests granted to AR Lender with respect to the AR Lender Priority Collateral *provided that*, nothing in this Section 2.4(a) shall prevent Mortgage Lender from taking all appropriate steps to protect and preserve its priority in the circumstances contemplated in Section 2.1(b). Mortgage Lender further agrees that, subject to Section 2.1(b), AR Lender's lien and security interest in the AR Lender Priority Collateral shall at all times, while AR Loan Obligations are owing from Operator to AR Lender, be superior and prior to the liens and security interests granted to the Mortgage Lender in such AR Lender Priority Collateral, irrespective of the time, order or method of attachment or perfection of AR Lender's and the Mortgage Lender's liens and security interests, or the filing of financing statements, or the taking of possession of the Mortgage Lender Priority Collateral, or any portion thereof.

(b) AR Lender agrees that it will not make any assertion or claim in any action, suit or proceeding of any nature whatsoever in any way challenging the priority, validity or effectiveness of the liens and security interests granted to Mortgage Lender with respect to the Mortgage Lender Priority Collateral; *provided that*, nothing in this Section 2.4(b) shall prevent AR Lender from taking all appropriate steps to protect and preserve its priority in the circumstances contemplated in Section 2.2(b). AR Lender further agrees that Mortgage Lender's lien and security interest in the Mortgage Lender Priority Collateral shall at all times while any indebtedness or obligations under the Mortgage Loan Documents are owing from the Owner to the Mortgage Lender, be superior and prior to the liens and security interests granted to AR Lender in such Mortgage Lender Priority Collateral, irrespective of the time, order or method of attachment or perfection of the Mortgage Lender's liens and security interests, or the filing of financing statements or the taking of possession of the AR Lender Priority Collateral, or any portion thereof.

(c) AR Lender waives, in respect of Mortgage Lender, any and all rights under any theory of marshalling or ordering of the disposition of collateral and accordingly, AR Lender agrees that Mortgage Lender may (i) proceed directly against any collateral in which Mortgage Lender has a lien or security interest (subject to the terms of this Agreement) and/or any guarantor of the Mortgage Loan Obligations in any particular order and (ii) release, surrender, substitute or exchange any collateral and/or any guarantor at any time without affecting the agreements set forth in this Agreement. Mortgage Lender and Owner waive, in respect of AR Lender, any and all rights under any theory of marshalling or ordering of the disposition of collateral and accordingly, Mortgage Lender and Owner agree that AR Lender may (A) proceed directly against any collateral in which AR Lender has a lien or security interest (subject to the terms of this Agreement) and/or any guarantor of the AR Loan Obligations in any particular order and (B) release, surrender, substitute or exchange any collateral and/or any guarantor at any time without affecting the agreements set forth in this Agreement.

2.5    **Releases; Bailee for Perfection.**

(a)    Notwithstanding anything to the contrary contained herein or in any of the Mortgage Loan Documents, the Operator Security Agreement or the Owner-Operator Agreement (or any sublease thereof), but subject to Section 2.5(b) below, Mortgage Lender agrees that in the event any AR Lender Priority Collateral (but not the AR Loan) is sold, transferred or conveyed or otherwise disposed of in conjunction with the exercise of AR Lender's remedies against Operator under the AR Loan Documents, the Mortgage Lender shall release all of its rights to and interests in such AR Lender Priority Collateral. Nothing in this Section 2.5(a) shall require any release of the Mortgage Lender Priority Collateral. Mortgage Lender shall execute such release documents as AR Lender may reasonably request to effectuate the terms of this Section 2.5(a). Notwithstanding anything to the contrary contained herein or in any of the AR Loan Documents, but subject to Section 2.5(b), AR Lender agrees that in the event any Mortgage Lender Priority Collateral (but not the Mortgage Loan) is sold, transferred or conveyed or otherwise disposed of in conjunction with the exercise of Mortgage Lender's remedies under the Mortgage Loan Documents, AR Lender shall release all of its rights to and interests in (if any) such Mortgage Lender Priority Collateral and such property shall be transferred free and clear of all liens and security interests in favor of AR Lender. Nothing in this Section 2.5(a) shall require any release of the AR Lender Priority Collateral. AR Lender shall execute such release documents as Mortgage Lender may reasonably request to effectuate the terms of this Section 2.5(a).

(b)    Notwithstanding the foregoing, to the extent that the proceeds of any sale of AR Lender Priority Collateral exceed the amount necessary to pay and satisfy in full the AR Loan Obligations, such excess shall be delivered to Mortgage Lender (to the extent that Mortgage Lender is otherwise entitled thereto in accordance with the Mortgage Loan Documents and/or applicable law) for application by Mortgage Lender pursuant to the Mortgage Loan Documents. To the extent that the proceeds of any sale of Mortgage Lender Priority Collateral exceed the amount necessary to pay and satisfy the Mortgage Loan Obligations in full, such excess shall be delivered to AR Lender (to the extent that AR Lender has a security interest in the Mortgage Lender Priority Collateral and is otherwise entitled thereto in accordance with the AR Loan Documents and/or applicable law) for application by AR Lender pursuant to the AR Loan Documents.

(c)    In the event Mortgage Lender or its nominee purchases any AR Lender Priority Collateral (which it shall have no obligation to purchase), AR Lender agrees that upon receipt of the purchase price (i) all such AR Lender Priority Collateral so sold, and all liens or security interests therein, and all proceeds thereof, shall be deemed to be held by AR Lender as agent for the purchaser until effectively transferred to such purchaser's ownership and control, (ii) AR Lender shall continue to receive such AR Lender Priority Collateral and proceeds thereof in existing lockbox or controlled deposit accounts until such purchaser has made alternative collection and deposit arrangements (which it shall arrange within thirty (30) days), and (iii) AR Lender shall remit all collections of such purchased AR Lender Priority Collateral in the same manner as provided in Section 2.6.

(d) With respect to any AR Lender Priority Collateral and/or Mortgage Lender Priority Collateral that Mortgage Lender cannot perfect a security interest in by filing a financing statement, and with respect to which AR Lender has perfected a security interest, AR Lender shall be deemed to be holding such AR Lender Priority Collateral and/or Mortgage Lender Priority Collateral as representative and bailee for Mortgage Lender for the purposes of perfection of Mortgage Lender's liens thereon or therein under the Uniform Commercial Code as in effect in each applicable jurisdiction, and as amended from time to time; provided, however, that the failure of AR Lender to hold any such collateral shall not subject such AR Lender to any liability nor affect the subordination and lien priorities set forth in this Agreement.

### 2.6 Return of Payments

(a) AR Lender agrees that, upon the AR Loan Obligations being Paid in Full, any AR Lender Priority Collateral and the proceeds thereof which may come into AR Lender's possession will be held by it in trust for Mortgage Lender and it shall turn over any such AR Lender Priority Collateral and/or proceeds thereof to Mortgage Lender (or, at Mortgage Lender's direction, to a new lender who has entered into an intercreditor agreement with Mortgage Lender), in the same form as received with any necessary endorsements or in an amount equal to the proceeds received, promptly upon receipt.

(b) Mortgage Lender agrees that upon the Mortgage Loan Obligations being Paid in Full, except to the extent the Mortgage Loan Obligations are Paid in Full with the proceeds of replacement mortgage financing by a new lender that has entered into an intercreditor agreement with AR Lender, any Mortgage Lender Priority Collateral securing the AR Loan Obligations and proceeds thereof, which may come into Mortgage Lender's possession, will be held by it in trust for AR Lender and it shall turn over any such Mortgage Lender Priority Collateral and/or proceeds thereof to AR Lender, in the same form as received with any necessary endorsements or in an amount equal to the proceeds received, promptly upon receipt.

### 2.7 AR Loan Documents; Over-line Advances; Allowable Over-Advances; Collateralization.

(a) AR Lender represents and warrants that as of the date hereof Schedule 1 sets forth a list of the material documents evidencing or securing the AR Loan(s) and that true, correct and complete copies of the documents listed thereon have been provided to Mortgage Lender and its counsel.

(b) Notwithstanding anything else in this Agreement or the AR Loan Documents, AR Lender shall not make Over-line Advances without prior written consent of Mortgage Lender and Owner, except for Protective Advances. "Over-line Advance" means an Advance in excess of the Maximum Commitment Amount.

(c) Notwithstanding anything else in this Agreement or the AR Loan Documents, AR Lender shall not make any Over-Advance, other than Allowable Over-Advances, without prior written consent of Mortgage Lender and Owner.

(i)      "**Over-Advance**" means any Advances made by AR Lender pursuant to the AR Loan Documents in excess of the borrowing base formula provisions set forth in the AR Loan Documents.

(ii)     "**Allowable Over-Advances**" shall mean one or more Over-Advances which: (1) are advanced by AR Lender solely to be used by Operator for working capital purposes and/or to pay for costs and expenses incurred by the Operator relating to the operation of the Facility ~~or Other Facilities~~ (including, but not limited to payroll and related expenses, food and other dietary goods, pharmaceuticals, rent due pursuant to the Owner-Operator Agreement (if any), debt service on the Mortgage Loan Documents, or other amounts due pursuant to the Owner-Operator Agreement and/or Mortgage Loan Documents), (2) are due within 180 days; and (3) are accompanied by documentation (which documentation may include an amendment to the AR Loan Documents or letter to the Operator) dictating the amount and duration/due date of such Over-Advance and documentation (which may be from the Operator) indicating why such Over-Advance is necessary, provided that AR Lender gives notice pursuant to Section 4.5 of this Agreement to Mortgage Lender within five (5) Business Days of such Over-Advance and any extension of such Over-Advance; and provided further that failure by AR Lender to provide notice (or any required accompanying documentation) to Mortgage Lender within 5 Business Days shall not subject AR Lender to any liability hereunder nor affect the subordination and lien priorities set forth in this Agreement, and shall not cause any Over-Advance to not constitute an "Allowable Over-Advance" hereunder. In no event shall the due date for an Allowable Over-Advance be extended beyond 180 days from the making of the Over-Advance without prior written consent from Mortgage Lender.

~~(d)~~——Until the AR Loan Obligations are Paid in Full, without the prior written consent of Mortgage Lender and Owner, AR Lender shall not amend, restate, supplement or otherwise modify the AR Loan Documents in any way which, and AR Lender shall not take any action which, (i) results in the creation of any lien, security interest or other encumbrance in any collateral related to the Facility other than the security interests and liens in existence as of the date of this Agreement pursuant to the AR Loan Documents listed on Schedule 1, (ii) conflicts in any way with this Agreement, (iii) adds a term loan facility, equipment loan facility, or any additional credit facility other than the revolving loan facility and letter of credit subfacility set forth in the AR Loan Documents in existence as of the date of this Agreement, (iv) amends the definition of "Obligations" set forth in the AR Loan Agreement on the date hereof, or (v) materially and adversely affects the rights or interests of Mortgage Lender.——

~~(e)(d) For the avoidance of doubt, but without limiting in any way the agreement of AR Lender set forth in subsection (d) immediately above, Mortgage Lender agrees that its consent shall not be required for any amendment or modification of any AR Loan Documents that increases the amount of the AR Loan in connection with the joinder of a co-borrower thereunder that is an operator of a nursing and/or assisted-living facility that is encumbered by a mortgage loan.~~ and/or Owner.

~~(f)(e)~~ AR Lender agrees to provide Mortgage Lender with true, correct and complete copies of any AR Loan Documents, including any amendments thereto, upon written

request from Mortgage Lender. Operator shall provide copies of any and all amendments to the AR Loan Documents to Mortgage Lender prior to the effective date of any amendment. Nothing in this paragraph shall limit any Operator obligations to receive any necessary consents pursuant to the Mortgage Loan Documents.

(g)(f) Notwithstanding anything to the contrary in this Agreement or the Mortgage Loan Documents, it is hereby agreed that, without further approval by Mortgage Lender:

(i) The AR Loan may be extended, for an additional period or periods, but not beyond December 31, 2024, and provided that any such extension must be on the same terms and conditions except as set forth in subdivision (ii) hereof, if applicable;

(ii) Each such extension may be accompanied by an interest rate change, provided that such interest rate change does not exceed one and one-half percent (1.5%);

(iii) Representations, warranties or covenants may be modified, waived or added to the AR Loan Agreement; and

(iv) The financial and loan covenants set forth in Annex I of the AR Loan Agreement may be modified or waived, or additional financial and loan covenants of a similar type may be added to the AR Loan Agreement.

2.8     **Mortgage Loan Documents**. Mortgage Lender represents and warrants that as of the date hereof, Schedule 2 sets forth a list of certain material documents evidencing or securing the Mortgage Loan(s) and that true, correct and complete copies of the documents listed thereon have been provided to AR Lender and its counsel. Mortgage Lender agrees to provide AR Lender with true, correct and complete copies of any Mortgage Loan Documents, including any amendments thereto, upon written request from AR Lender.

2.9     **Deposit Account Control Agreements; Lien Releases**.

(a)     Any deposit accounts into which the proceeds of Accounts are deposited, shall be subject to deposit account control agreements and/or deposit account instructions and services agreements, with each depository bank maintaining such deposit accounts (each, a "**Depository Bank**").

(b)     Upon the AR Loan Obligations being Paid in Full, AR Lender agrees to promptly notify the Mortgage Lender of such event, and AR Lender further agrees that it will execute any and all such termination statements or releases as may be necessary to release any lien on the Operator's assets, including but not limited to the termination of (or, if Mortgage Lender and AR Lender are both a party to the same such agreement, release of AR Lender from) any deposit account control agreement, provider account agreement, blocked account agreement or lockbox agreement with any depository bank of Operator which holds or receives Operator's Accounts. In the event any Party to this Agreement that has been Paid in Full fails to file any required releases and/or termination statements within ten (10) Business Days of the other Party's timely demand therefor, the requesting Party hereby is authorized to file a copy of this Agreement

in any appropriate UCC financing office as conclusive evidence of such (non-complying) Party's release of its security interest in the AR Lender Priority Collateral, and any third Party shall be entitled to rely upon the filing of this Agreement as a full and complete release of such Party's security interest.

(c)        Until the AR Loan Obligations are Paid in Full, AR Lender will have the exclusive authority to exercise control (unless prohibited by law) over the Deposit Accounts and to provide appropriate instructions to the applicable Depository Bank. At such time that the AR Loan Obligations are Paid in Full, Owner and/or Mortgage Lender, as applicable under the Mortgage Loan Documents will have the exclusive authority to exercise control (unless prohibited by law) over the Deposit Accounts and to provide appropriate instructions to the applicable Depository Bank, and AR Lender will take all necessary steps to effectuate the foregoing, including, but not limited to, providing appropriate instructions to the applicable Depository Bank or terminating any deposit account control agreement, provider account agreement, blocked account agreement or lockbox agreement with any depository bank of Operator which holds or receives Operator's Accounts. After a Cut-Off Time, the parties agree to coordinate the timing of instructions given to residents and third-party payors that identify new deposit accounts into which payments should be made. Without limiting anything set forth in Section 2.3(a), each of the parties to this Agreement hereby agrees to cooperate and work in good faith with each other in order to effectively and efficiently bill, invoice and collect all Accounts due from Operator's account debtors and to promptly turn over any proceeds of Accounts to the party entitled to such proceeds.

3.     **REPRESENTATIONS; COVENANTS**

3.1     Operator operates the Facility. Operator has granted or will grant a security interest in its Accounts and certain other assets to Mortgage Lender (the "**Senior Secured Party**") pursuant to the Operator Security Agreement in connection with one or more Mortgage Loans provided to Owner.

3.2     AR Lender consents to the Operator Security Agreement and the liens granted in favor of the Senior Secured Party notwithstanding any contrary provisions of the AR Loan Documents. This Intercreditor Agreement sets forth the relative priorities of AR Lender and the Senior Secured Party in and to the assets of Operator.

3.3     Subject to the provisions of Section 3.4 below, the Parties acknowledge that funds received by Operator from AR Lender ("**AR Loan Advances**") shall be utilized (i) first, to pay current debt service obligations of Operator to AR Lender with respect to the Facility, (ii) second in accordance with Section 3.4(b) below, for the payment of rent and any other required monthly amounts due and owing to Owner pursuant to the Owner-Operator Agreement, notwithstanding the adequacy of any account receivables borrowing base calculations, (iii) third, to pay Operator's costs of operations with respect to the Facility including, but not limited to, rent and all other payment obligations due under the Owner-Operator Agreement, payroll and payroll taxes, ordinary maintenance and repairs and management and consulting fees to unaffiliated management agents or consultants ("**Current Operating Costs**"); (iii) third,iv) fourth provided that no Event of Default exists and is continuing under the Owner-Operator Agreement or Mortgage Loan Documents, to pay management and consulting fees to affiliated management

agents and (ivv) after the payment of Current Operating Costs, and consulting fees to affiliated management agents, subject to applicable restrictions, if any, in the AR Loan Documents, AR Loan Advances may be distributed to Operator's shareholders, partners, members or owners, as the case may be. AR Lender makes no representations or covenants with respect to Operator's compliance with the terms of this Section 3.3.

3.4    **AR Loan Advances Payment Structure.**

(a)    Control of Operator's Deposit Accounts.  Operator, Mortgage Lender and AR Lender agree and certify to the existence of deposit account control agreements or like agreements relating to Operator's deposit accounts. AR Lender will maintain (i) a first lien blocked deposit account control agreement on Operator's non-governmental collections deposit account, (ii) a first lien deposit account service agreement, or similar agreement, on Operator's governmental collections deposit account, and (iii) a springing deposit account control agreement on Operator's operating account. In no event shall AR Lender have a deposit account control agreement on any deposit account dedicated solely for making either Operator's payroll payments or rent payments.

(b)    AR Lender funds AR Loan Advances.  Operator, Owner, Mortgage Lender and AR Lender agree that no later than the ~~tenth (10ᵗʰ)~~fifth (5th) day of each calendar month (*provided that* if such day is not a Business Day then on the next immediately preceding Business Day), AR Lender shall disburse, by wire transfer of immediately available funds as an Advance (to the extent of Availability) an amount equal to the Current Impositions as follows: first, to the payment account for Mortgage Lender ~~shall send a written notice to Operator identifying the Current Impositions due on the first (1ˢᵗ) Business Day of the subsequent calendar month (a~~ "designated in Schedule 3.4 attached hereto (the "**Mortgage Loan Account**") and from which Mortgage Lender will access via the automated clearinghouse system, an amount equal to the Current ~~Imposition Notice"). Following Operator's receipt of a Current Imposition Notice, Operator shall request an Advance from Lender in~~Owner Loan Payments for such month, as defined below, and second, to the payment account designated by Owner in Schedule 3.4, an amount equal to the Current Impositions ~~identified in such notice, and Operator shall include the Mortgage Lender's current wire transfer instructions in such notice~~less the Current Owner Loan Payment, provided, however, that any Advance ~~request (a "Current Impositions Advance Request"). Subject to Section 3.4(d), following Lender's receipt of a Current Impositions Advance Request, such amount~~ ~~paid~~made pursuant to this subsection (b) shall be ~~credited against any rent payments owed to the Owner under the Owner Operator Agreement. Operator shall continue to pay the balance of the rent payments after credit for the payments made to the Mortgage Lender and Mezzanine Lender as aforesaid by wire transfer to Owner's account in accordance with the Owner Operator Agreement. Upon Mortgage Lender's receipt of funds for such Current Impositions, Mortgage Lender shall promptly remit~~subject to ~~mezzanine lender the portion of such Current Impositions allocable to the mezzanine loan.~~the restrictions set forth in subsection (e) below.

~~(e)    "**Current Impositions**" equals the sum of: (i) interest payments due under the Mortgage Loan, (ii) interest payments due under any mezzanine loan (including, without limitation, the $9,500,000 mezzanine loan from Bradford Allen Funding Company LLC to White~~

~~Plains Mezzanine LLC), and (iii) amounts necessary to pay past-due interest payments under the Mortgage Loan or any mezzanine loan.~~

(c)    "**Current Owner Loan Payments**" means, collectively, the monthly interest-only payments, excluding any penalties, default interest or late charges, (i) due and owing to Mortgage Lender under the Mortgage Loan and (ii) due and owing to Mezzanine Lender under the Mezzanine Loan. On or before the tenth (10th) day of each calendar month, Mortgage Lender shall certify to Owner the Owner Loan Payments due on or before the first (1st) day of the following calendar month. With respect to the Mezzanine Loan, such certification shall be based solely on information supplied by Mezzanine Lender. The Owner shall deliver the Current Owner Loan Payments amount to AR Lender within five (5) business days of receipt from Mortgage Lender.

(d)    "**Current Impositions**" equals the sum of: (i) the aggregate rent payable under the Owner-Operator Agreement for such month, plus (ii) taxes and insurance due and owing with respect to the Owner-Operator Agreement for such month, plus (iii) deposits to reserves required under the Owner-Operator Agreement.

~~(d)~~(e)    AR Lender agrees that it shall make the Advance as described in subsection (b) above unless (i) there is not sufficient Availability, or (ii) a default or event of default shall exist or be continuing under the AR Loan Agreement, or (iii) Operator fails to satisfy all conditions precedent thereto as set forth in the AR Loan Documents~~;~~: provided, that, failure of Operator to make a request shall not be a condition to make the payments described in subsection (b) above and any objections to such payment by Operator shall not prevent such payment. After payment of the Current Impositions and subject to applicable restrictions in the AR Loan Documents, any remaining Advances may be made as directed by Operator. Operator agrees to promptly, but in no event later than the ~~eighth (8th)~~fifth (5th) day of each calendar month (or the immediately preceding Business Day if such day is not a Business Day), notify Mortgage Lender and Owner in accordance with Section 4.5 if there is not sufficient Availability for AR Lender to make the disbursement set forth in this Section 3.4.

**Formatted:** Normal, Justified, Level 3, Indent: Left: -0.06", Outline numbered + Level: 3 + Numbering Style: a, b, c, ... + Start at: 1 + Alignment: Left + Aligned at: 1" + Indent at: 0"

**Formatted:** Normal, Justified, Level 2

~~(e)~~(f)    Use of AR Loan Advances to satisfy ~~Mortgage Loan~~ Current ~~Impositions.~~Owner Loan Payments.    Mortgage Lender shall ~~receive by automatic debit or~~ ~~Mortgage Lender shall~~ have a right to withdraw from the ~~account to which the AR~~ Mortgage Loan ~~Advances are made~~Account amounts ~~at least~~ equal to the Current ~~Impositions. Such amounts shall be credited against any rent due and payable by Operator under the Lease.~~Owner Loan Payments. Mortgage Lender agrees to apply amounts received on account of Current ~~Impositions~~Owner Loan Payments toward payment of Owner's monthly debt service obligations under the Mortgage Loan ~~and, if there are sufficient funds to do so, to fund applicable escrow~~only with respect to accrued and outstanding interest due and owing on the Mortgage Loan (excluding any default interest, late charges or penalties), and ~~reserve requirements~~. thereafter, to Owner's monthly debt service obligations under the Mezzanine Loan by remitting such payments to the Mezzanine Lender.

(f̶)(g)    Notwithstanding anything in this Agreement (whether express or implied) to the contrary, Senior Secured Party, Operator and Owner acknowledge and agree that (i) AR Lender shall have no liability to any Senior Secured Party, or Operator or Owner for computation

or verification of the Current Impositions nor the actual use of proceeds of AR Loan by Operator, and (ii) neither Senior Secured Party nor Owner shall be deemed to be a third party beneficiary of any financing relationship between Operator and AR Lender, and Senior Secured Party and Owner hereby expressly waive and relinquish their respective rights to claim otherwise. Notwithstanding anything herein (whether express or implied) to the contrary, to the extent Mortgage Lender receives Current Impositions or the proceeds thereof, Mortgage Lender shall be entitled to retain the same and shall not be required to hold the same in trust or to disgorge the same to AR Lender, irrespective of whether the same constitutes proceeds of AR Lender Priority Collateral. Notwithstanding the foregoing, Mortgage Lender agrees that in the event AR Lender notifies Mortgage Lender that Current Impositions are being paid improperly with AR Lender Priority Collateral and not in the manner set forth in this Section 3.4, Mortgage Lender agrees to hold any such improperly paid amounts received thereafter in trust for AR Lender as AR Lender Priority Collateral.

(g)  The signatures of Owner and Operator below shall confirm their respective agreement to the collection, payment and disbursement of the amounts set forth herein.

> **Formatted:** Indent: First line: 1"

3.5  Except as set forth herein, Operator certifies that there are no proposed agreements, arrangements, understandings or transactions (side deals) outside of the AR Loan Documents that utilize the Accounts of Operator as security for any other obligations. Operator agrees that Operator shall not be a guarantor or party to any other accounts receivable financing agreement without the consent of Mortgage Lender and Owner.

3.6  Except as set forth herein, (a) AR Lender and Operator certify and agree that there are no existing or proposed agreements, arrangements, understandings or transactions that involve the Facility (side deals) between (i) Operator, Owner, or any owner, master tenant, or operator of ~~any of the Other Facilities~~another facility, or officers, members, managers, directors, stockholders, partners, or other interest holders, employees or affiliates, or any member of their respective immediate families, and/or the parent entity of Operator, ~~Master Tenant, Owner, or any owner, master tenant, or operator of any of the Other Facilities~~or Owner, and (ii) AR Lender; (b) Mortgage Lender and Operator certify and agree that there are no existing or proposed agreements, arrangements, understandings or transactions that involve the Facility (side deals) between (i) Operator (or any of Operator's officers, members, managers, directors, stockholders, partners, or other interest holders, employees or affiliates, or any member of their respective immediate families, and/or its parent entity), and (ii) Mortgage Lender; and (c) AR Lender and Operator certify that, notwithstanding anything else in the AR Loan Documents, neither the AR Lender Priority Collateral nor the Mortgage Lender Priority Collateral shall secure any obligations to the AR Lender, or any of its affiliates (including any lender under the AR Loan Documents), relating to projects other than the Facility ~~or Other Facilities.~~ AR Lender and Operator certify and agree that any and all provisions in the AR Loan Documents that would entitle AR Lender to declare a default under the AR Loan as a result of defaults under other agreements by Operator or affiliates of Operator ("**Cross-Defaults**") are set forth on Exhibit B hereto.

3.7  Notwithstanding anything in this Agreement or the AR Loan Documents to the contrary, except for Advances made pursuant to Section 3.4(b), AR Lender shall not make, and Operator shall be prohibited from seeking, any Advance(s) to the extent that such Advance(s)

would (i) create no Availability for the subsequent monthly amount due and owing under Section 3.4(b) above or (ii) otherwise create a condition whereby AR Lender could invoke the objections to funding set forth in Section 3.4(e) above in connection with the subsequent monthly amount due and owing under Section 3.4(b) above.

## 4. MISCELLANEOUS

4.1 **Beneficiaries**. This Agreement is entered into solely for the benefit of AR Lender, Mortgage Lender, Owner, Operator and their respective successors and assigns, and no other person or entity, including but not limited to any third party assignee, investor, incidental beneficiary or any creditor of Operator or Owner, shall have any right, benefit, priority or interest under or because of the existence of this Agreement.

4.2 **Amendment**. This Agreement contains the entire understanding of the Parties with respect to the subject matter hereof, and shall not be modified, amended or terminated orally but only in writing signed by AR Lender, Mortgage Lender, Owner and Operator.

4.3 **Bankruptcy Financing**. In the event of the commencement of a bankruptcy, insolvency or similar type of proceeding filed by or against the Operator ("**Proceeding**"), AR Lender shall have the non-exclusive option (in its sole and absolute discretion) to continue to provide financing (on terms acceptable to AR Lender) to the trustee, other fiduciary or to the Operator as a debtor-in-possession, if AR Lender deems such financing to be in its best interests. The subordination and lien priority provisions of this Agreement shall continue to apply to all AR Lender Priority Collateral arising upon the commencement and during the pendency of such Proceeding without regard as to whether a Cut-Off Time has occurred prior to the commencement of such Proceeding, so that AR Lender shall have a prior lien on all AR Lender Priority Collateral, created before and during such Proceeding (to the extent AR Lender provides such financing during the Proceeding or to the extent Operator is granted the right to use, sell, or otherwise dispose of cash collateral during any such Proceeding), to secure the AR Loans, whether advanced before or during such Proceeding.

4.4 **Relative Rights; Cure Rights; Certain Notice Obligations of Mortgage Lender and AR Lender**.

(a) This Agreement is entered into solely for the purposes set forth herein, and except as expressly provided herein, neither AR Lender nor Mortgage Lender assumes any other duties or responsibilities to the other regarding the financial condition of Operator, Owner or any other party, or regarding any of Operator's property, or regarding any other circumstance bearing upon the risk of nonpayment of the obligations of Operator or Owner under any of the agreements referred to herein. Each of AR Lender and Mortgage Lender shall be responsible for managing its financial relationships with Operator and Owner, and neither shall be deemed to be the agent of the other for any purpose.

(b) AR Lender and the Mortgage Lender agree to notify the other of any notice of a "Notice Event" given to their respective borrower under any of the AR Loan Documents or

any of the Mortgage Loan Documents as applicable; provided, that the failure to provide such notice shall not subject such Party to any liability nor affect the subordination and lien priorities set forth in this Agreement. AR Lender and the Mortgage Lender shall have the right (but not the obligation) to cure any payment default under the other Party's documents within ten (10) days after notice thereof. A "**Notice Event**" for purposes of this Section shall mean (i) with regard to Mortgage Lender and the Mortgage Loan Documents, a default by the borrower thereunder triggering an acceleration of the Mortgage Loan, a foreclosure, or an action for the appointment of a receiver or similar remedy, including any Mortgage Loan Triggering Event; (ii) with regard to AR Lender and AR Loan Documents, any event which results in AR Lender having Ceased Funding or accelerating the AR Loan Obligations or the AR Loan Obligations accelerating automatically in accordance with the terms of the AR Loan Documents, including any AR Loan Triggering Event; or (iii) with regard to AR Lender and the AR Loan Documents, if there is insufficient Availability to fund the Current Impositions (as defined above in Section 3.4), at least with respect to the Facility.

4.5   **Notices**. Any notice or service of process given, or required to be given, pursuant hereto and in connection herewith, including without limitation any notice of any Cut-Off Time, shall be in writing and shall be deemed to be properly given: (a) when personally delivered; (b) the first or second Business Day after the notice is deposited with a nationally recognized overnight courier service with arrangements made for payment of charges for next or second Business Day delivery, respectively; or (c) two Business Days after the date sent by certified mail return receipt requested, in each case addressed to the Party for whom it is intended at its address hereinafter set forth or such address as subsequently provided to all Parties in writing.

| If to AR Lender to: | CNH Finance Fund I, L.P. |
| | c/o CNH Finance, L.P. |
| | 330 Railroad Avenue, Suite 101 |
| | Greenwich, CT 06830 |
| | Attn: Timothy Peters |
| | Telephone: (203) 266-3210 |

| With copies to: | Kincaid Law Office |
| | 6151 Wilson Mills Road, Suite 310 |
| | Highland Heights, OH 44143 |
| | Attn: Timothy J. Kincaid |
| | Telephone: (440) 352-1000 |

| If to Mortgage Lender to: | Security Benefit Corporation |
| | One Security Benefit Place |
| | Topeka, Kansas 66636 |
| | Attn: Douglas Schneider |
| | Telephone: (785) 438-1642 |

| With copies to: | Nyemaster Goode, P.C. |
| | 700 Walnut Street, Suite 1600 |

|                    | Des Moines, Iowa 50309<br>Attn: James C. Wine<br>Telephone: (515) 283-3100 |
|--------------------|----------------------------------------------------------------------------|
| If to Owner to:    | White Plains Healthcare Properties 1, LLC<br>2 Bourbon Street, Suite 200<br>Peabody, MA 01960<br>Attn:   William Nicholson<br>Telephone: (978) 535-6700 |
| With copies to:    | Abrams Fensterman<br>3 Dakota Dr. Ste 300<br>Lake Success, NY 11042<br>Attn:   Patrick Formato, Esq.<br>Telephone: (516)-328-2300 |
| If to Operator to: | HBL SNF, LLC<br>1280 Albany Post Road<br>Croton-on-Hudson, New York 10520<br>Attn: Lizer Jozefovic<br>Telephone: (914) 829-5114 Ext. 704 |
| With copies to:    | Michelman & Robinson, LLP<br>800 Third Avenue, 24th Floor<br>New York, NY 10022<br>Attn:   Eric Simonson, Esq.<br>Telephone: (212) 730-7700 |

4.6   **Counterparts; Facsimile Signatures**. This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, and all of which together constitute one and the same agreement. Signature transmitted by facsimile or other electronic means shall bind the Parties hereto.

4.7   **Authorization**. Each individual signatory hereto represents and warrants that he or she is duly authorized to execute this Agreement on behalf of his or her principal and that he or she executes the Agreement in such capacity and not as a Party.

4.8   **Successors and Assigns**. This Agreement shall be binding upon the Parties hereto and their legal representatives, successors and assigns, provided, however, that each of the parties hereto further agrees to provide the other party with written notice of any such assignment of the AR Loan and/or the Mortgage Loan Documents, respectively. Each of the parties hereto agrees not to assign their rights to the AR Loan and/or the Mortgage Loan Documents to Operator or any affiliate of Operator.

4.9   **Governing Law**. This Agreement and all matters arising out of or related to this Agreement shall be deemed to have been made under, and shall be governed and construed

in all respects by, the substantive laws of the State of New York without regard to principles of conflicts of laws.

4.10   **Jurisdiction and Venue**.   Mortgage Lender and AR Lender hereby irrevocably consent to the nonexclusive jurisdiction of the State and Federal Courts located in the State of New York in any and all actions and proceedings arising under or in connection with this Agreement.

4.11   **WAIVER OF JURY TRIAL.   EACH PARTY HERETO HEREBY WAIVES ANY AND ALL RIGHTS IT MAY HAVE TO A JURY TRIAL IN CONNECTION WITH ANY LITIGATION COMMENCED BY OR AGAINST ANY OTHER PARTY(IES) WITH RESPECT TO THE RIGHTS AND OBLIGATIONS SET FORTH HEREIN.**

4.12   **Severability**.   If a court of competent jurisdiction in a final determination deems any provision of this Agreement invalid, prohibited or unenforceable, such invalidity, prohibition or unenforceability shall apply only to such provision and only to the extent of such invalidity, prohibition or unenforceability, and shall not render this Agreement or any other provision of this Agreement wholly or partially invalid, prohibited or unenforceable.

4.13   **Headings**.   The paragraph headings used in this Agreement are for convenience only and shall not affect the interpretation of any of the previous hereof. The statements set forth in the Recital paragraphs are incorporated herein by reference.

4.14   **Entire Agreement.**   This Agreement is the entire agreement among the Parties regarding the subject matter of this Agreement,

4.15   **Non-Waiver of Owner Operator Agreement Defaults.**   Other than expressly set forth in this Agreement, nothing in this Agreement or in any related communications shall: (a)be deemed a waiver by Owner of any right, remedy, covenant, condition, obligation or default under the Owner Operator Agreement or that certain letter of intent, dated November 20, 2019, by and between Operator and Owner ("LOI"), attached hereto as Exhibit 4.15 (a); (b) impair any notice of default Owner has delivered (or will deliver) to Operator, including without limitation, the notice sent by Owner to Operator on January 7, 2020 attached hereto as Exhibit 4.15(b); (c) toll or suspend any cure period, notice period or other period; or (d) prevent Owner from exercising any right or remedy under the Owner Operator Agreement or LOI at any time or from time to time.

[Remainder of Page Intentionally Left Blank]

**IN WITNESS WHEREOF**, the undersigned have executed this Agreement the day and year first above written.

Formatted: Font: Bold

**AR LENDER:**

CNH FINANCE FUND I, L.P.,
a Delaware limited partnership

By: _____
Name: Timothy Peters
Title: Authorized Signatory

**MORTGAGE LENDER:**

SECURITY BENEFIT CORPORATION,
a Kansas corporation

By: _____
Name:
Title:

**OPERATOR:**

HBL SNF, LLC,
a New York limited liability company

By: _____
Name: Lizer Jozefovic
Title: Manager

**OWNER:**

WHITE PLAINS HEALTHCARE PROPERTIES I, LLC,
a Massachusetts limited liability company

By: _____
Name:
Title:

**Schedule 1**
**AR Loan Documents**

Unless stated otherwise, all of the below agreements are dated as of the date hereof.

1. Credit and Security Agreement by and between Operator and AR Lender.

2. Validity and Support Agreement by Lizer Jozefovic for the benefit of AR Lender.

3. Validity and Support Agreement by Mark Neuman for the benefit of AR Lender.

4. Guaranty Agreement by Lizer Jozefovic for the benefit of AR Lender.

5. Guaranty Agreement by Mark Neuman for the benefit of AR Lender.

6. Deposit Account Control Agreement (Active) by and between Operator, AR Lender, and Regions Bank.

7. Deposit Account Control Agreement (Passive) by and between Operator, AR Lender, and Regions Bank.

8. Deposit Account Service Agreement by and between Operator, AR Lender, and Regions Bank.

9. UCC-1 Financing Statement naming Operator as debtor, and AR Lender as secured party, filed with the New York Secretary of State.

## Schedule 2
## Mortgage Loan Documents

1. $38,500,000.00 Note executed by Owner payable to Mortgage Lender;
2. Construction Loan Agreement by and among Borrower and Mortgage Lender:
3. Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing executed by Owner in favor of Mortgage Lender;
4. Assignment of Leases and Rents executed by Owner in favor of Mortgage Lender;
5. Environmental Indemnity Agreement executed by William A. Nicholson, Howard Fensterman and Paul Barbara ("Guarantors") and Owner in favor of Mortgage Lender;
6. Assignment of Architectural Agreement, Contracts and Other Project Documents executed by Owner in favor of Mortgage Lender;
7. Assignment of Construction Agreement and Contractor's Consent executed by Owner in favor of Mortgage Lender;
8. Reserve Account Control Agreement executed by Owner, Mortgage Lender and Wells Fargo Bank;
9. Estoppel Certificate executed by Owner and HBL SNF, LLC as Tenant ("Tenant");
10. Subordination, Non-Disturbance and Attornment Agreement executed by Tenant, Owner and Mortgage Lender;
11. Security Agreement, Assignment of Leases and Rents and Fixture Filing (Operating Lease) executed by Tenant in favor of Mortgage Lender;
12. Completion Guaranty executed by Guarantors in favor of Mortgage Lender;
13. Guaranty Agreement executed by Guarantors in favor of Mortgage Lender;
14. Massachusetts Secretary of Commonwealth UCC-1 Financing Statement filed by Mortgage Lender against Owner as Debtor;
15. New York Secretary of State UCC-1 Financing Statement filed by Mortgage Lender against Tenant as Debtor;
16. Westchester County UCC-1 Financing Statement filed by Mortgage Lender against Tenant as debt;
17. Certificate of Final Budget executed by Owner in favor of Mortgage Lender;
18. Intercreditor Agreement by and between Mortgage Lender and Bradford Allen Capital Corporation ("Mezzanine Lender");
19. Construction Loan Disbursing Agreement by and among Mortgage Lender, Mezzanine Lender, First American Title Insurance Company and Owner;

**Schedule 3**
**List of Other Facilities**
**(other facilities financed by the AR Loan)**

None.

**Exhibit A**
**Form of Cut-Off Time Notice**

_____, 20 __

_____
_____
Attn: _____

Re:   Intercreditor Agreement Dated as of _____, 20 __ by and among _____
      ("AR Lender"), _____ ("Mortgage Lender"), _____
      ("Owner") and _____ ("Operator") (the "Intercreditor Agreement")

Ladies and Gentlemen:

This letter constitutes the Cut-Off Time Notice described in the Intercreditor Agreement.
All capitalized terms used, and not otherwise defined, herein shall have the meanings provided
for in the Intercreditor Agreement.

Please be advised that:
☐      an Mortgage Loan Triggering Event has occurred as a result of

_____,
and notice of such Mortgage Loan Triggering Event [is provided by this notice] *OR* [has been
provided on _____].

☐      an AR Loan Triggering Event has occurred as a result of

_____,
and notice of such AR Loan Triggering Event was received on _____.

☐      Ceased Funding has occurred as of _____.

This Cut-Off Time Notice applies to the following Facility(ies) and Mortgage Loan Nos.:

_____

In accordance with Section [1.11] of the Intercreditor Agreement the Cut-Off Time shall be
deemed to occur as of ____ [a.m./p.m.], _____ time, on _____, 20__,
*[which date and time may be concurrent with, or at any time after, the date when Ceased*
*Funding occurs (even if this notice results in retroactive designation of such Cut-Off Time),*
*but no sooner than 30 days after notice of an Mortgage Loan Triggering Event or AR Loan*
*Triggering Event]*.

All provisions of the Intercreditor Agreement applicable after the Cut-Off Time shall
govern the future relationship of AR Lender, Mortgage Lender, Owner, and Operator under the
Intercreditor Agreement with respect to the Facility(ies) identified in this Cut-Off Time Notice.
Please contact the undersigned at _____ if you have any questions.

Sincerely,

_____
By:   _____
cc: _____        Name: _____

---

Previous versions obsolete            Page **27** of **29**

Title: _____

**Exhibit B**

**AR Loan Agreement Cross-Defaults**

Defaults under certain indebtedness, as further described in Section 8.1(f) of the AR Loan Agreement.

## Mark Frimmel (NY)

| | |
|---|---|
| **From:** | Patrick Formato <PFormato@Abramslaw.com> |
| **Sent:** | Thursday, May 14, 2020 4:46 PM |
| **To:** | Mark Frimmel (NY) |
| **Cc:** | Mark H. Zafrin (NY); Alex Frame; James C. Wine; Michael Gurman; Bill Nicholson (WNicholson@congressconstruction.com); Howard Fensterman |
| **Subject:** | White Plains |
| **Attachments:** | INTERCREDITOR AGREEMENTvMR5.12.docx |

Mark,

Attached hereto please find a blacklined version of the last draft of the Intercreditor Agreement you circulated setting forth our revisions. Below is a summary of our revisions along with explanations. Note, We are sending you the attached and below before our client had had an opportunity to review and therefore, same remains subject to any additional comments/revisions they may have.

1. Section 2.3(c). Your revision to this Section is rejected  This language is not in the standard HUD form.
2. Section 2.3(e). This comment is accepted
3. Section 2.3(f). This comment is rejected.  This is of no concern to AR Lender and/or Operator.  The priority of the security interest with respect to mortgage lender is based on what is in our mortgage loan documents and doesn't need to be restated here.
4. Section 2.7(b), (c) and (d).  The removal of Owner with respect to authorizing over-line advances or over advances is rejected.  If Owner's signature is necessary for this Intercreditor Agreement, then the terms of the Intercreditor Agreement (including how much is advanced) should not be changed without its permission.
5. Section 2.9(c).  This comment is rejected.  This is of no concern to  AR Lender and/or Operator.  The priority of the security interest with respect to Mortgage Lender is based on what is in our mortgage loan documents.
6. Section 3.3.  These changes were partly accepted.  The only objection is the word "uncontested" in relation to amounts due and owing under the lease.  Uncontested is unnecessary.  We did not state that such amounts are as determined by Landlord.  They are determined by the terms of the Lease.
7. Section 3.4.  Our client objects to the requirement for Tenant to make requests prior to payment.  Our comments are in line with the requirements set forth in Section 6(c) of the Letter of Intent and Section 7.1(a)(i) of the Lease whereby the rent shall be automatically paid.
8. Section 3.5. The removal of Owner with respect to authorizing new guaranties or security agreements is rejected.  If Owner's signature is necessary for this Intercreditor Agreement, then any similar agreements should not be entered into without its permission.
9. Section 3.7.  As stated above, the LOI specifically stated that there would be no conditions to the rent being drawn from the loan. If the AR lender is unable to agree to such a requirement, then the Landlord shall require other forms of security to ensure that rent will be paid each month.
10. Section 4.15.  We agreed with the changes. We had a few minor tweaks which we expect will be acceptable to all.

Best regards

Pat

*Patrick Formato, Esq.*

1

ABRAMS, FENSTERMAN, FENSTERMAN, EISMAN, FORMATO, FERRARA, WOLF & CARONE, LLP

*Executive Partner*
Tel: 516-328-2300
Fax: 516-368-9573
Email: PFormato@Abramslaw.com

Long Island Office
3 Dakota Drive
Suite 300
Lake Success, New York 11042

| Long Island | Manhattan | Brooklyn | Rochester |
|---|---|---|---|
| (516) 328-2300 | (212) 279-9200 | (718) 215-5300 | (585) 218-9999 |

WWW.ABRAMSLAW.COM

CONFIDENTIALITY NOTICE: This e-mail may be an attorney-client communication and may contain information that is privileged and confidential and is therefore subject to legal restrictions and penalties regarding its unauthorized disclosure or other use. If you are not the intended recipient you are prohibited from copying, forwarding, distributing, disseminating, or otherwise viewing this e-mail and any attachments hereto. Please notify the sender and delete this e-mail if you are not the intended recipient.

## INTERCREDITOR AGREEMENT

THIS INTERCREDITOR AGREEMENT (this "**Agreement**") is entered into as of May _____, 2020, by and among (i) CNH FINANCE FUND I, L.P., a Delaware limited partnership ("**AR Lender**"), (ii) SECURITY BENEFIT CORPORATION, a Kansas corporation, as agent for the benefit of Security Benefit Life Insurance Company ("**Mortgage Lender**"), (iii) WHITE PLAINS HEALTHCARE PROPERTIES I, LLC, a Massachusetts limited liability company ("**Owner**"), and (iv) HBL SNF, LLC, a New York limited liability company ("**Operator**"). AR Lender, Mortgage Lender, Owner and Operator are referred to in this Agreement individually as a "**Party**" and collectively as the "**Parties**".

WHEREAS, Operator has entered into that certain Amended and Restated Operating Lease with Owner with respect to the Facility (the "**Owner-Operator Agreement**"), and Operator further entered into a Security Agreement, Assignment of Leases and Rents and Fixture Filing (Operating Lease), dated as of August 18, 2017, for the benefit of Mortgage Lender (the "**Operator Security Agreement**"), which security agreement grants a security interest in certain collateral of the Operator which includes the AR Lender Priority Collateral;

WHEREAS, Section 9.25 of the Operator Security Agreement permits Operator to obtain a working capital loan secured by certain accounts receivable; and

WHEREAS, AR Lender has made or may in the future make loans and/or extensions of credit to or for the benefit of the Operator, secured by certain collateral of the Operator, which includes the AR Lender Priority Collateral; and

WHEREAS, Mortgage Lender has made or may in the future make loans and/or extensions of credit to or for the benefit of Owner secured by the Facility operated by the Operator or to or for the benefit of Operator secured by certain assets of the Operator; and

WHEREAS, AR Lender and Mortgage Lender have agreed upon AR Lender's and Mortgage Lender's respective rights in and to the AR Lender Priority Collateral and Mortgage Lender Priority Collateral which agreements and understandings are set forth below. In the event of a conflict between the terms of this Agreement and the terms of the AR Loan Documents, or the Mortgage Loan Documents, the terms of this Agreement shall govern and control;

NOW, THEREFORE, in consideration of the mutual covenants set forth below, and intending to be legally bound, the Parties hereto hereby agree as follows:

### I.    DEFINITIONS

All terms used herein which are not specifically defined shall have the meanings provided in Article 9 of the Uniform Commercial Code as in effect in the State of New York from time to time (the "**UCC**"). In addition to the terms defined elsewhere in this Agreement, the following terms shall have the following meanings when used in this Agreement.

1.1     "**Accounts**" shall mean all right, title and interest of Operator in and to the following, in each case arising from Operator's operation of the Facility in the ordinary

Previous versions obsolete                    Page 1 of 29

4842-9343-9164, v 1

course of Operator's business: (a) all rights to payment of a monetary obligation, whether or not earned by performance, including, but not limited to, accounts receivable, health-care insurance receivables, Medicaid and Medicare receivables, Veterans Administration receivables, or other governmental receivables, private patient receivables, and HMO receivables, (b) payment intangibles, (c) guaranties, letter-of-credit rights and other supporting obligations relating to the property described in clauses (a) and (b); and (d) all of the proceeds of the property described in clauses (a), (b) and (c). Notwithstanding the foregoing, "**Accounts**" do not include insurance proceeds, commercial tort claims, or accounts arising from the sale of Operator's equipment, inventory or other goods, other than accounts arising from the sale of Operator's inventory in the ordinary course of Operator's business; provided that "Accounts" shall include any Approved Business Interruption Insurance Proceeds. For purposes herein "**Approved Business Interruption Insurance Proceeds**" include the proceeds of business interruption insurance payable to Operator to the extent such proceeds support continued funding of the AR Loan, provided, however, that "Approved Business Interruption Insurance Proceeds" shall not include rent loss coverage payable to the Mortgage Lender.

1.2 "**Advances**" shall mean advances under the revolving loan facility provided for in the AR Loan Documents.

1.3 "**AR Lender Priority Collateral**" shall mean all right, title and interest of Operator in and to the following: (a) all Accounts arising from the delivery of goods and rendering of services by Operator prior to the Cut-Off Time and the proceeds thereof; (b) all Deposit Accounts (excluding the letter of credits, deposit accounts, security deposit, reserve account escrow accounts or other forms of security paid or previously paid to or on behalf of Owner under the Owner-Operator Agreement, and all payments previously paid to Owner) and the proceeds thereof; and (c) all Accounts arising after the Cut-Off Time and the proceeds thereof solely to the extent of (and in the amount of) Protective Advances made after the Cut-Off Time in accordance with the terms of this Agreement provided that the collateral should be prioritized in accordance with Section 2.1.

1.4 "**AR Loan**" shall mean a revolving loan in an amount not to exceed the Maximum Commitment Amount (including any amounts contemplated as letter of credit obligations) made by AR Lender to Operator pursuant to the AR Loan Agreement. Notwithstanding anything else in the AR Loan Documents, unless otherwise specifically approved in writing by Mortgage Lender, the AR Loan shall exclude any term loan facility, equipment loan facility and any indebtedness, liability or obligations arising under a guarantee, except to the extent that the obligations guaranteed consist solely of AR Loan Obligations and such guarantors waive subrogation and similar rights until the Mortgage Loan is Paid in Full.

1.5 "**AR Loan Agreement**" shall mean that certain Credit and Security Agreement, dated as of even date herewith, in the amount of $4,000,000.00, by and among AR Lender, as lender, and Operator, as borrower, as amended, restated, supplemented or otherwise modified from time to time in accordance with the terms of this Agreement.

4843 8343 9104 v 1

1.6 "**AR Loan Documents**" shall mean any and all promissory notes, security agreements and any and all other documents evidencing or securing the AR Loan as identified on Schedule I attached hereto, in each case, as amended, restated, supplemented or otherwise modified from time to time in accordance with the terms of this Agreement, provided that, for purposes of this Agreement, this Agreement shall not be considered an AR Loan Document.

1.7 "**AR Loan Obligations**" shall mean the AR Loan and all other indebtedness, liabilities and obligations owing to AR Lender under the AR Loan Documents (including without limitation any Over-line Advances and/or Allowable Over-Advances, as permitted pursuant to Section 2.7, and Protective Advances), provided, however, that notwithstanding anything to the contrary set forth in the AR Loan Documents, "**AR Loan Obligations**" shall exclude any and all indebtedness, liabilities and obligations that are not directly related to the benefit of the Facility, or the financing thereof. Notwithstanding the foregoing, the AR Loan Obligations shall also include the following: the Facility Fee (as defined in the AR Loan Agreement), the Collateral Management Fee (as defined in the AR Loan Agreement), the Unused Line Fee (as defined in the AR Loan Agreement), the Termination Fee (as defined in the AR Loan Agreement), the Software Interface Fee (as defined in the AR Loan Agreement), the Lender's processing fee as set forth in Section 2.4 of the AR Loan Agreement, all expenses chargeable to Operator under Sections 2.10(d) and (e) of the AR Loan Agreement, the audit fees and expenses as provided in Section 6.7 of the AR Loan Agreement, all costs and expenses chargeable to Operator pursuant to Sections 6.8, 6.12 and 9.1 of the AR Loan Agreement, all indemnification obligations as set forth in Section 13.4 of the AR Loan Agreement, and all expense reimbursement obligations as set forth in Section 12.7 of the AR Loan Agreement. Notwithstanding anything to the contrary in the AR Loan Documents or this Agreement, this Agreement shall not be deemed an "AR Loan Obligation."

1.8 "**Availability**" shall have the same meaning given to such term in the AR Loan Agreement.

1.9 "**Business Day**" shall mean any day other than a Saturday, a Sunday, or any day that banks in the State of New York are required or permitted by law to close.

1.10 "**Ceased Funding**" means, with respect to the Cut-Off Time, either of the following events: (i) AR Lender (including any co-lenders pursuant to the AR Loan Documents) has received a request for an Advance under the AR Loan Agreement for which there is sufficient Availability and a period of thirty (30) calendar days has elapsed since the date of such request, during which time such Advance is not made or (ii) AR Lender has notified Operator and/or Mortgage Lender in writing that it has determined to permanently cease making further Advances (at least with respect to the Facility) under the AR Loan Agreement.

1.11 "**Cut-Off Time**" shall mean, unless subsequently extended in writing by Mortgage Lender, such time indicated in the written notice ("**Cut-Off Time Notice**") that may be given by the Mortgage Lender to the AR Lender following the occurrence of an

4842-0243-0104, w. 1

Mortgage Loan Triggering Event or an AR Loan Triggering Event, which Cut-Off Time Notice must be: (a) in the form set forth in Exhibit A and (b) given pursuant to Section 4.5. Unless the AR Lender has Ceased Funding, the Cut-Off Time shall be no earlier than thirty (30) calendar days after the Cut-Off Time Notice has been given (as set forth in Section 4.5) by Mortgage Lender to AR Lender. If the AR Lender has Ceased Funding, the Cut-Off Time may be concurrent with the date on which Ceased Funding occurred, even if the Cut-Off Time Notice is delivered thereafter.

1.12    "**Deposit Accounts**" shall mean any deposit account (a) holding proceeds of any Accounts, (b) holding any cash of the Operator, (c) into which Advances are funded (d) for which a deposit account control agreement in favor of the AR Lender, has been entered into, or (e) to the extent permitted by applicable law, for which a deposit account services and instructions agreement or similar agreement has been entered into, but excluding the letter of credits, deposit accounts, security deposit, reserve account escrow accounts or other forms of security paid or securing Owner's obligations in connection with the Owner-Operator Agreement or all payment accounts (if any) established for the payment of, or security for, amounts due to Owner pursuant to or in connection with the Owner-Operator Agreement.

1.13    "**Facility**" shall mean that certain skilled nursing facility located at 116-120 Church Street, White Plains, New York 10601 and commonly known as the Rehabilitation and Care Institute at White Plains.

1.14    "**Mezzanine Borrower**" means White Plains Mezzanine, LLC.

1.15    "**Mezzanine Lender**" means Bradford Allen Funding Company LLC.

1.16    "**Mezzanine Loan**" means the $9,500,000.00 loan from Mezzanine Lender to Mezzanine Borrower.

1.17    "**Mortgage Lender Priority Collateral**" shall mean any and all property (whether real, personal or mixed, tangible or intangible) in which Mortgage Lender was or is granted liens, encumbrances, security interests and other rights pursuant to any of the Mortgage Loan Documents, except for the AR Lender Priority Collateral, it being understood that Mortgage Lender has an "all assets" security interest on the assets of Operator including but not limited to (i) the skilled nursing facility licenses and any other healthcare or long term care licenses for the Facility, (ii) all Medicare and Medicaid/state/county provider agreements for the Facility, (iii) the certificates of need for the Facility, (iv) the Owner-Operator Agreement (including without limitation, any security deposits or other collateral posted as security under the Owner-Operator Agreement), and (v) Operator's furniture, fixtures, equipment, software and inventory directly related to such Facility.

1.18    "**Mortgage Loan(s)**" shall mean the $38,500,000 mortgage loan made by Mortgage Lender with respect to the Facility.

1.19  "**Mortgage Loan Documents**" shall mean, with respect to the Mortgage Loan, any and all promissory notes, deeds of trust, mortgages, regulatory agreements, security agreements and any and all other documents required by Mortgage Lender as identified on Schedule 2 attached hereto in connection with such Mortgage Loan, in each case, as amended, restated, supplemented or otherwise modified from time to time, provided that this Agreement shall not be considered a Mortgage Loan Document for purposes of this Agreement.

1.20  "**Mortgage Loan Obligations**" shall mean the Mortgage Loan and all other indebtedness, liabilities and obligations owing to Mortgage Lender under the Mortgage Loan Documents.

1.21  "**Maximum Commitment Amount**" shall mean $4,000,000.00.

1.22  "**Paid in Full**" shall mean the final indefeasible payment in full of all AR Loan Obligations or Mortgage Loan Obligations, as applicable, and the termination of the AR Loan Documents and the Mortgage Loan Documents, as applicable; provided, however, that a reduction in the outstanding balance due under the AR Loan Documents to zero shall not mean that the AR Loan Obligations have been "Paid in Full" unless and until, all commitments of the AR Lender to lend under the AR Loan Documents have been terminated. With respect to any AR Loan Obligations under the AR Loan Documents consisting of contingent obligations under letters of credit, final payment is considered the setting apart of cash sufficient to discharge such AR Loan Obligations in an account for the exclusive benefit of AR Lender.

1.23  "**Possession Date**" shall mean, with respect to the Facility, the earlier of the date upon which (a) Mortgage Lender, or its nominee, has taken actual physical possession and control of the Facility, whether by foreclosure, deed in lieu of foreclosure, appointment of a receiver or other legal process, or (b) Mortgage Lender, or its nominee, has begun the operation and management of the Facility.

1.24  "**Protective Advances**" shall mean amounts advanced by AR Lender following the Cut-Off Time and prior to the Possession Date that the AR Lender deems reasonably necessary to preserve and protect the AR Lender Priority Collateral and written notice of which is given to Mortgage Lender within five (5) Business Days after the subject advance is made, provided, however, that failure to provide such notice within five Business Days shall not affect the inclusion of Accounts arising after the Cut-Off Time as AR Lender Priority Collateral, as described more fully in the definition of AR Lender Priority Collateral.

1.25  "**Triggering Event**" shall mean an Mortgage Loan Triggering Event or an AR Loan Triggering Event. An "**Mortgage Loan Triggering Event**" shall mean any of (i) a payment default under the Mortgage Loan Documents, (ii) acceleration by Mortgage Lender of the sums due under the Mortgage Loan Documents, (iii) an Event of Default (as defined in any of the Mortgage Loan Documents) has occurred, or (iv) an event of default

4842-0345-9184 v. 1

under the Owner-Operator Agreement has occurred. An **"AR Loan Triggering Event"** shall mean any event which results in AR Lender having Ceased Funding or accelerating the AR Loan Obligations (provided, however, that any acceleration that occurs automatically pursuant to the terms of the AR Loan Agreement shall not be an AR Loan Triggering Event if such acceleration is timely waived, cured, unwound or otherwise disregarded by the AR Lender who continues to fund).

2.    **PRIORITIES**

    2.1    **AR Lender Priority**.

        (a)    AR Lender, Owner, and Mortgage Lender agree that, as between AR Lender, Owner, and Mortgage Lender, subject to Section 2.1(b), at all times, whether before, during or after the pendency of any bankruptcy, reorganization or other insolvency proceeding, and notwithstanding the taking of possession of, or other exercise of rights in respect of the Mortgage Lender Priority Collateral (or any portion thereof) or the priorities that ordinarily would result under the Uniform Commercial Code as enacted in each and every applicable jurisdiction, and as amended from time to time, and other applicable law for the order of granting or perfecting of any security interests referred to herein, AR Lender shall have a first and prior security interest in, upon and to the AR Lender Priority Collateral to secure the AR Loan Obligations; and Mortgage Lender and Owner hereby subordinate to AR Lender's security interest their respective security interests in the AR Lender Priority Collateral. Mortgage Lender and Owner shall abide by the standstill provisions set forth below in Section 2.3(a). Mortgage Lender, Owner, and Operator agree, that, in the event AR Lender seeks to enforce any of its remedies under the AR Loan Documents, AR Lender may have reasonable access to the Facility for any inspection and copying of the books and records of Operator relating to the AR Lender Priority Collateral and the Mortgage Lender Priority Collateral, provided that AR Lender shall promptly repair any damage to the Facility caused by AR Lender or its agents resulting from such inspection and copying. AR Lender agrees that, notwithstanding anything in the AR Loan Documents to the contrary: (i) AR Lender may not require Operator to deliver the books and records of Operator to AR Lender; and (ii) AR Lender's rights to inspect and copy Operator's books and records shall be limited to those rights set forth in the preceding sentence.

        (b)    Without limiting the foregoing, following the occurrence of a Triggering Event, Mortgage Lender may deliver to AR Lender a Cut-Off Time Notice. Notwithstanding the occurrence of a Cut-Off Time, the AR Lender shall have a first and prior security interest in the AR Lender Priority Collateral, and Mortgage Lender shall have a subordinate lien in the AR Lender Priority Collateral, until the AR Loan Obligations are Paid in Full. Any Accounts arising from the delivery of goods and rendering of services by Operator at the Facility after the Cut-Off Time Notice, but prior to the Cut-Off Time, shall be AR Lender Priority Collateral notwithstanding the collection of the same after the Cut-Off Time. For the avoidance of doubt, Mortgage Lender shall have a first and prior security interest in any Accounts arising from the delivery of goods and rendering of services by Operator at the Facility on or after the Cut-Off Time with respect to the Facility (except to the extent AR Lender makes Protective Advances), and such Accounts shall be considered Mortgage Lender Priority Collateral and not AR Lender Priority Collateral. From and after the Cut-Off Time, all amounts received by AR Lender on account of the AR Lender Priority Collateral shall be applied solely to the AR Loan Obligations. Nothing herein shall prevent AR

4842-9343-0164, v. 1

Lender from collecting the full amount of the AR Loan Obligations from any guarantors thereof and/or from collateral other than the AR Lender Priority Collateral and/or the Mortgage Lender Priority Collateral.

(c) If AR Lender's security interest (as now or in the future existing) in the AR Lender Priority Collateral becomes, in whole or in part, for any reason, unperfected or is judicially or administratively determined to be unenforceable, in whole or in part, or is voided, in whole or in part, and as a result thereof, a creditor subordinate to AR Lender would have or would be entitled to claim, priority over the Mortgage Lender in the AR Lender Priority Collateral, nothing in this Agreement is intended or shall be construed as a subordination by Mortgage Lender to such other creditor.

(d) Notwithstanding anything else in this Agreement AR Loan Obligations shall not include indemnity obligations relating to any breach of this Agreement or relating to any dispute between AR Lender and Mortgage Lender.

(e) AR Lender agrees to exercise any rights of setoff against funds on deposit in Deposit Accounts maintained with AR Lender for application to AR Loan Obligations consistently with the priorities and provisions established under this Agreement.

2.2 **Mortgage Lender Priority**.

(a) AR Lender and Mortgage Lender agree that, as between AR Lender and Mortgage Lender, subject to Section 2.2(b), at all times, whether before, during or after the pendency of any bankruptcy, reorganization or other insolvency proceeding, and notwithstanding the taking of possession of, or other exercise of rights in respect of, the AR Lender Priority Collateral (or any portion thereof) or the priorities that ordinarily would result under the Uniform Commercial Code as enacted in each and every applicable jurisdiction, and as amended from time to time, and other applicable law for the order of granting or perfecting of any security interests referred to herein, Mortgage Lender shall have a first and prior security interest in, upon and to the Mortgage Lender Priority Collateral; and AR Lender hereby subordinates to Mortgage Lender AR Lender's security interest, if any, in the Mortgage Lender Priority Collateral to secure the Mortgage Loan. AR Lender shall abide by the standstill provisions set forth below in Section 2.3(b). Promptly upon execution of this Agreement, AR Lender agrees to cause itself to be removed from any insurance policy and insurance certificate that has any designation of AR Lender as (a) loss payee or lender's loss payee on any insurance with respect to any Mortgage Lender Priority Collateral upon which AR Lender does not have a subordinate lien as permitted by this Agreement and (b) primary loss payee or primary lender's loss payee on any insurance with respect to any Mortgage Lender Priority Collateral upon which AR Lender has a subordinate lien permitted under this Agreement.

(b) If Mortgage Lender's security interest (as now or in the future existing) in the Mortgage Lender Priority Collateral becomes, in whole or in part, for any reason, unperfected or is judicially or administratively determined to be unenforceable, in whole or in part, or is voided, in whole or in part, and as a result thereof, a creditor subordinate to Mortgage Lender would have or would be entitled to claim, priority over AR Lender in the Mortgage Lender Priority Collateral,

nothing in this Agreement is intended or shall be construed as a subordination by AR Lender to such other creditor. Notwithstanding the foregoing, Mortgage Lender shall have a first priority security interest in the Mortgage Lender Priority Collateral applicable to the corresponding Facility, provided however, AR Lender shall have the ability to utilize the Mortgage Lender Priority Collateral solely to the extent necessary to exercise any of AR Lender's rights and/or remedies (including without limitation billing and collecting the Operator's accounts receivable and other assets comprising AR Lender Priority Collateral) under the AR Loan Documents.

(c)    Mortgage Lender acknowledges that Facility may be subject to loans made by other lenders. The AR Loan may provide financing for and may be secured by collateral pertaining to the Facility. This Agreement is intended to set forth the priorities, rights, and responsibilities of Mortgage Lender vis-à-vis AR Lender only.

### 2.3    **Standstill; Possession Date**.

(a)    Until the AR Loan Obligations have been Paid in Full, Mortgage Lender and Owner shall not exercise any remedies with regard to the AR Lender Priority Collateral (including without limitation any remedies in conflict with Section 2.9(c) below which includes, without limitation, notifying account debtors to redirect payment for such AR Lender Priority Collateral, changing or attempting to change any direction of payment or remittance instructions to account debtors for such AR Lender Priority Collateral to any deposit accounts other than those Deposit Accounts into which Accounts have been paid historically, or any combination of the foregoing); *provided however*, that after a Triggering Event, the foregoing shall not prohibit the Mortgage Lender and or Owner, as applicable from (i) taking any action against the Operator with respect to any Mortgage Lender Priority Collateral (so long as such action does not compromise the AR Lender's ability to bill and/or collect the AR Lender Priority Collateral), (ii) terminating an Owner-Operator Agreement, (iii) commencing an action for possession or for collection of rent or other monetary amounts due under such Owner-Operator Agreement or for specific enforcement of an Operator's covenants under such Owner-Operator Agreement, so long as such actions do not comprise the exercise of a remedy with regard to AR Lender Priority Collateral, or (iv) pursuing the remedies specified in the definition of "Possession Date," (v) taking steps to appoint a receiver or (vi) contacting the necessary authorities, which may include account debtors, to begin the process of transferring the license and/or any other necessary permits or approvals, and the assignment of the provider agreements from the incumbent Operator to a new operator.

(b)    Until the Mortgage Loan Obligations have been Paid in Full, subject to AR Lender's right to access the Mortgage Lender Priority Collateral set forth in Section 2.1 above, AR Lender shall not affirmatively exercise any remedies with regard to the Mortgage Lender Priority Collateral.

(c)    Without limiting the foregoing, Mortgage Lender or Owner, as applicable, shall deliver to AR Lender ten (10) Business Days' prior written notice of the commencement of any action or undertaking to take physical possession, control or management of the Facility (the "**Possession Date Notice**"). If a Cut-Off Time Notice has previously been issued, the Possession Date Notice shall have no effect on the Cut-Off Time. If no previous Cut-Off Time Notice has been issued, AR Lender shall have rights to and be entitled to the collections of all Accounts arising

Previous versions obsolete                Page **8 of 29**

4842-0043-9164; v. 1

from the delivery of goods or rendering of services at the Facility for the period beginning on the date of the Possession Date Notice and continuing until the thirtieth (30th) day following a Possession Date Notice, only to the extent such Accounts were generated in the name of Operator.

(d)    Without limiting any of its rights hereunder or under the AR Loan Documents, at any time after receiving a Cut-Off Time Notice or a Possession Date Notice, AR Lender shall have the right to cease making Advances. Irrespective of whether or not AR Lender makes any Advances (including Protective Advances) after receiving the Cut-Off Time Notice, it shall retain a first priority lien on all AR Lender Priority Collateral.

(e)    During the occurrence of and continuation of an Event of Default (as defined in the AR Loan Documents), except as set forth in Section 2.6(b) hereof, Mortgage Lender, Owner  and Operator hereby agree that any AR Lender Priority Collateral and proceeds thereof, (excluding any rent payments received by Owner and/or any proceeds that have been previously paid prior to the notification of an Event of Default (as defined in the AR Loan Documents) which may come into the possession of Mortgage Lender or Owner or Operator will be held in trust for AR Lender, and Mortgage Lender and Owner shall turn over any AR Lender Priority Collateral and/or proceeds thereof to AR Lender, in the same form as received with any necessary endorsements, promptly upon receipt, until all of the AR Loan Obligations have been Paid in Full. Any replacement operator or receiver who commences operating the Facility shall agree in writing to abide by the provisions of this Section 2.3(e) to the extent it, or its new lender, if any, comes into possession of any AR Lender Priority Collateral, provided, however, failure to secure such written agreement shall not subject Mortgage Lender to any liability nor affect the subordination and lien priorities set forth in this Agreement.

(f)    During the occurrence of and continuation of an Event of Default (as defined in the Mortgage Loan Documents) any Mortgage Lender Priority Collateral that may come into the possession of AR Lender or Operator or Owner will be held in trust by AR Lender, Operator or Owner (as applicable), for Mortgage Lender, and such recipient shall turn over any Mortgage Lender Priority Collateral so received to Mortgage Lender in the same form as received, with any necessary endorsements, promptly upon receipt, until the Mortgage Loan Obligations have been Paid in Full in accordance with the terms of this Agreement. Any replacement operator or receiver who commences operating the Facility shall agree in writing to abide by the provisions of this Section 2.3(f) to the extent it, or its new lender, if any, comes into possession of any Mortgage Lender Priority Collateral.

2.4    **No Contest.**

(a)    Mortgage Lender and Owner agree that they will not make any assertion or claim in any action, suit or proceeding of any nature whatsoever in any way challenging the priority, validity or effectiveness of the liens and security interests granted to AR Lender with respect to the AR Lender Priority Collateral *provided that*, nothing in this Section 2.4(a) shall prevent Mortgage Lender from taking all appropriate steps to protect and preserve its priority in the circumstances contemplated in Section 2.1(b). Mortgage Lender further agrees that, subject to Section 2.1(b), AR Lender's lien and security interest in the AR Lender Priority Collateral shall at all times, while AR Loan Obligations are owing from Operator to AR Lender, be superior and

prior to the liens and security interests granted to the Mortgage Lender in such AR Lender Priority Collateral, irrespective of the time, order or method of attachment or perfection of AR Lender's and the Mortgage Lender's liens and security interests, or the filing of financing statements, or the taking of possession of the Mortgage Lender Priority Collateral, or any portion thereof.

(b)      AR Lender agrees that it will not make any assertion or claim in any action, suit or proceeding of any nature whatsoever in any way challenging the priority, validity or effectiveness of the liens and security interests granted to Mortgage Lender with respect to the Mortgage Lender Priority Collateral; *provided that*, nothing in this Section 2.4(b) shall prevent AR Lender from taking all appropriate steps to protect and preserve its priority in the circumstances contemplated in Section 2.2(b). AR Lender further agrees that Mortgage Lender's lien and security interest in the Mortgage Lender Priority Collateral shall at all times while any indebtedness or obligations under the Mortgage Loan Documents are owing from the Owner to the Mortgage Lender, be superior and prior to the liens and security interests granted to AR Lender in such Mortgage Lender Priority Collateral, irrespective of the time, order or method of attachment or perfection of the Mortgage Lender's liens and security interests, or the filing of financing statements or the taking of possession of the AR Lender Priority Collateral, or any portion thereof.

(c)      AR Lender waives, in respect of Mortgage Lender, any and all rights under any theory of marshalling or ordering of the disposition of collateral and accordingly, AR Lender agrees that Mortgage Lender may (i) proceed directly against any collateral in which Mortgage Lender has a lien or security interest (subject to the terms of this Agreement) and/or any guarantor of the Mortgage Loan Obligations in any particular order and (ii) release, surrender, substitute or exchange any collateral and/or any guarantor at any time without affecting the agreements set forth in this Agreement. Mortgage Lender and Owner waive, in respect of AR Lender, any and all rights under any theory of marshalling or ordering of the disposition of collateral and accordingly, Mortgage Lender and Owner agree that AR Lender may (A) proceed directly against any collateral in which AR Lender has a lien or security interest (subject to the terms of this Agreement) and/or any guarantor of the AR Loan Obligations in any particular order and (B) release, surrender, substitute or exchange any collateral and/or any guarantor at any time without affecting the agreements set forth in this Agreement.

2.5      **Releases; Bailee for Perfection.**

(a)      Notwithstanding anything to the contrary contained herein or in any of the Mortgage Loan Documents, the Operator Security Agreement or the Owner-Operator Agreement (or any sublease thereof), but subject to Section 2.5(b) below, Mortgage Lender agrees that in the event any AR Lender Priority Collateral (but not the AR Loan) is sold, transferred or conveyed or otherwise disposed of in conjunction with the exercise of AR Lender's remedies against Operator under the AR Loan Documents, the Mortgage Lender shall release all of its rights to and interests in such AR Lender Priority Collateral. Nothing in this Section 2.5(a) shall require any release of the Mortgage Lender Priority Collateral. Mortgage Lender shall execute such release documents as AR Lender may reasonably request to effectuate the terms of this Section 2.5(a). Notwithstanding anything to the contrary contained herein or in any of the AR Loan Documents, but subject to Section 2.5(b), AR Lender agrees that in the event any Mortgage Lender Priority

Collateral (but not the Mortgage Loan) is sold, transferred or conveyed or otherwise disposed of in conjunction with the exercise of Mortgage Lender's remedies under the Mortgage Loan Documents, AR Lender shall release all of its rights to and interests in (if any) such Mortgage Lender Priority Collateral and such property shall be transferred free and clear of all liens and security interests in favor of AR Lender. Nothing in this Section 2.5(a) shall require any release of the AR Lender Priority Collateral. AR Lender shall execute such release documents as Mortgage Lender may reasonably request to effectuate the terms of this Section 2.5(a).

(b)       Notwithstanding the foregoing, to the extent that the proceeds of any sale of AR Lender Priority Collateral exceed the amount necessary to pay and satisfy in full the AR Loan Obligations, such excess shall be delivered to Mortgage Lender (to the extent that Mortgage Lender is otherwise entitled thereto in accordance with the Mortgage Loan Documents and/or applicable law) for application by Mortgage Lender pursuant to the Mortgage Loan Documents. To the extent that the proceeds of any sale of Mortgage Lender Priority Collateral exceed the amount necessary to pay and satisfy the Mortgage Loan Obligations in full, such excess shall be delivered to AR Lender (to the extent that AR Lender has a security interest in the Mortgage Lender Priority Collateral and is otherwise entitled thereto in accordance with the AR Loan Documents and/or applicable law) for application by AR Lender pursuant to the AR Loan Documents.

(c)       In the event Mortgage Lender or its nominee purchases any AR Lender Priority Collateral (which it shall have no obligation to purchase), AR Lender agrees that upon receipt of the purchase price (i) all such AR Lender Priority Collateral so sold, and all liens or security interests therein, and all proceeds thereof, shall be deemed to be held by AR Lender as agent for the purchaser until effectively transferred to such purchaser's ownership and control, (ii) AR Lender shall continue to receive such AR Lender Priority Collateral and proceeds thereof in existing lockbox or controlled deposit accounts until such purchaser has made alternative collection and deposit arrangements (which it shall arrange within thirty (30) days), and (iii) AR Lender shall remit all collections of such purchased AR Lender Priority Collateral in the same manner as provided in Section 2.6.

(d)       With respect to any AR Lender Priority Collateral and/or Mortgage Lender Priority Collateral that Mortgage Lender cannot perfect a security interest in by filing a financing statement, and with respect to which AR Lender has perfected a security interest, AR Lender shall be deemed to be holding such AR Lender Priority Collateral and/or Mortgage Lender Priority Collateral as representative and bailee for Mortgage Lender for the purposes of perfection of Mortgage Lender's liens thereon or therein under the Uniform Commercial Code as in effect in each applicable jurisdiction, and as amended from time to time; provided, however, that the failure of AR Lender to hold any such collateral shall not subject such AR Lender to any liability nor affect the subordination and lien priorities set forth in this Agreement.

2.6       **Return of Payments**

(a)       AR Lender agrees that, upon the AR Loan Obligations being Paid in Full, any AR Lender Priority Collateral and the proceeds thereof which may come into AR Lender's possession will be held by it in trust for Mortgage Lender and it shall turn over any such AR Lender

4842-5043-9164/v-1

Priority Collateral and/or proceeds thereof to Mortgage Lender (or, at Mortgage Lender's direction, to a new lender who has entered into an intercreditor agreement with Mortgage Lender), in the same form as received with any necessary endorsements or in an amount equal to the proceeds received, promptly upon receipt.

(b)  Mortgage Lender agrees that upon the Mortgage Loan Obligations being Paid in Full, except to the extent the Mortgage Loan Obligations are Paid in Full with the proceeds of replacement mortgage financing by a new lender that has entered into an intercreditor agreement with AR Lender, any Mortgage Lender Priority Collateral securing the AR Loan Obligations and proceeds thereof, which may come into Mortgage Lender's possession, will be held by it in trust for AR Lender and it shall turn over any such Mortgage Lender Priority Collateral and/or proceeds thereof to AR Lender, in the same form as received with any necessary endorsements or in an amount equal to the proceeds received, promptly upon receipt.

2.7  **AR Loan Documents; Over-line Advances; Allowable Over-Advances; Collateralization.**

(a)  AR Lender represents and warrants that as of the date hereof Schedule 1 sets forth a list of the material documents evidencing or securing the AR Loan(s) and that true, correct and complete copies of the documents listed thereon have been provided to Mortgage Lender and its counsel.

(b)  Notwithstanding anything else in this Agreement or the AR Loan Documents, AR Lender shall not make Over-line Advances without prior written consent of Mortgage Lender and Owner, except for Protective Advances. "**Over-line Advance**" means an Advance in excess of the Maximum Commitment Amount.

(c)  Notwithstanding anything else in this Agreement or the AR Loan Documents, AR Lender shall not make any Over-Advance, other than Allowable Over-Advances, without prior written consent of Mortgage Lender and Owner.

(i)  "**Over-Advance**" means any Advances made by AR Lender pursuant to the AR Loan Documents in excess of the borrowing base formula provisions set forth in the AR Loan Documents.

(ii)  "**Allowable Over-Advances**" shall mean one or more Over-Advances which: (1) are advanced by AR Lender solely to be used by Operator for working capital purposes and/or to pay for costs and expenses incurred by the Operator relating to the operation of the Facility (including, but not limited to payroll and related expenses, food and other dietary goods, pharmaceuticals, rent due pursuant to the Owner-Operator Agreement (if any), debt service on the Mortgage Loan Documents, or other amounts due pursuant to the Owner-Operator Agreement and/or Mortgage Loan Documents), (2) are due within 180 days; and (3) are accompanied by documentation (which documentation may include an amendment to the AR Loan Documents or letter to the Operator) dictating the amount and duration/due date of such Over-Advance and documentation (which may be from the Operator) indicating why such Over-Advance is

4842-0343-9164 v. 1

necessary, provided that AR Lender gives notice pursuant to Section 4.5 of this Agreement to Mortgage Lender within five (5) Business Days of such Over-Advance and any extension of such Over-Advance; and provided further that failure by AR Lender to provide notice (or any required accompanying documentation) to Mortgage Lender within 5 Business Days shall not subject AR Lender to any liability hereunder nor affect the subordination and lien priorities set forth in this Agreement, and shall not cause any Over-Advance to not constitute an "Allowable Over-Advance" hereunder. In no event shall the due date for an Allowable Over-Advance be extended beyond 180 days from the making of the Over-Advance without prior written consent from Mortgage Lender.

(d)    Until the AR Loan Obligations are Paid in Full, without the prior written consent of Mortgage Lender- and Owner, AR Lender shall not amend, restate, supplement or otherwise modify the AR Loan Documents in any way which, and AR Lender shall not take any action which, (i) results in the creation of any lien, security interest or other encumbrance in any collateral related to the Facility other than the security interests and liens in existence as of the date of this Agreement pursuant to the AR Loan Documents listed on Schedule 1, (ii) conflicts in any way with this Agreement, (iii) adds a term loan facility, equipment loan facility, or any additional credit facility other than the revolving loan facility and letter of credit sub-facilitysubfacility set forth in the AR Loan Documents in existence as of the date of this Agreement, (iv) amends the definition of "Obligations" set forth in the AR Loan Agreement on the date hereof, or (v) materially and adversely affects the rights or interests of Mortgage Lender- and/or Owner.

(d)(e) AR Lender agrees to provide Mortgage Lender with true, correct and complete copies of any AR Loan Documents, including any amendments thereto, upon written request from Mortgage Lender. Operator shall provide copies of any and all amendments to the AR Loan Documents to Mortgage Lender prior to the effective date of any amendment. Nothing in this paragraph shall limit any Operator obligations to receive any necessary consents pursuant to the Mortgage Loan Documents.

(e)(f) Notwithstanding anything to the contrary in this Agreement or the Mortgage Loan Documents, it is hereby agreed that, without further approval by Mortgage Lender:

        (i) The AR Loan may be extended, for an additional period or periods, but not beyond December 31, 2024, and provided that any such extension must be on the same terms and conditions except as set forth in subdivision (ii) hereof, if applicable;

        (ii) Each such extension may be accompanied by an interest rate change, provided that such interest rate change does not exceed one and one-half percent (1.5%);

        (iii) Representations, warranties or covenants may be modified, waived or added to the AR Loan Agreement; and

        (iv) The financial and loan covenants set forth in Annex I of the AR Loan Agreement may be modified or waived, or additional financial and loan covenants of a similar type may be added to the AR Loan Agreement.

---

4842-9343-9164, v. 1

2.8     **Mortgage Loan Documents**. Mortgage Lender represents and warrants that as of the date hereof, Schedule 2 sets forth a list of certain material documents evidencing or securing the Mortgage Loan(s) and that true, correct and complete copies of the documents listed thereon have been provided to AR Lender and its counsel. Mortgage Lender agrees to provide AR Lender with true, correct and complete copies of any Mortgage Loan Documents, including any amendments thereto, upon written request from AR Lender.

2.9     **Deposit Account Control Agreements; Lien Releases**.

(a)     Any deposit accounts into which the proceeds of Accounts are deposited, shall be subject to deposit account control agreements and/or deposit account instructions and services agreements, with each depository bank maintaining such deposit accounts (each, a "**Depository Bank**").

(b)     Upon the AR Loan Obligations being Paid in Full, AR Lender agrees to promptly notify the Mortgage Lender of such event, and AR Lender further agrees that it will execute any and all such termination statements or releases as may be necessary to release any lien on the Operator's assets, including but not limited to the termination of (or, if Mortgage Lender and AR Lender are both a party to the same such agreement, release of AR Lender from) any deposit account control agreement, provider account agreement, blocked account agreement or lockbox agreement with any depository bank of Operator which holds or receives Operator's Accounts. In the event any Party to this Agreement that has been Paid in Full fails to file any required releases and/or termination statements within ten (10) Business Days of the other Party's timely demand therefor, the requesting Party hereby is authorized to file a copy of this Agreement in any appropriate UCC financing office as conclusive evidence of such (non-complying) Party's release of its security interest in the AR Lender Priority Collateral, and any third Party shall be entitled to rely upon the filing of this Agreement as a full and complete release of such Party's security interest.

(c)     Until the AR Loan Obligations are Paid in Full, AR Lender will have the exclusive authority to exercise control (unless prohibited by law) over the Deposit Accounts and to provide appropriate instructions to the applicable Depository Bank. At such time that the AR Loan Obligations are Paid in Full, Owner and/or Mortgage Lender, as applicable under the Mortgage Loan Documents will have the exclusive authority to exercise control (unless prohibited by law) over the Deposit Accounts and to provide appropriate instructions to the applicable Depository Bank, and AR Lender will take all necessary steps to effectuate the foregoing, including, but not limited to, providing appropriate instructions to the applicable Depository Bank or terminating any deposit account control agreement, provider account agreement, blocked account agreement or lockbox agreement with any depository bank of Operator which holds or receives Operator's Accounts. After a Cut-Off Time, the parties agree to coordinate the timing of instructions given to residents and third-party payors that identify new deposit accounts into which payments should be made. Without limiting anything set forth in Section 2.3(a), each of the parties to this Agreement hereby agrees to cooperate and work in good faith with each other in order to effectively and efficiently bill, invoice and collect all Accounts due from Operator's account debtors and to promptly turn over any proceeds of Accounts to the party entitled to such proceeds.

---

4842-0343-9164, v. 1

## 3.    REPRESENTATIONS; COVENANTS

3.1     Operator operates the Facility. Operator has granted or will grant a security interest in its Accounts and certain other assets to Mortgage Lender (the "**Senior Secured Party**") pursuant to the Operator Security Agreement in connection with one or more Mortgage Loans provided to Owner.

3.2     AR Lender consents to the Operator Security Agreement and the liens granted in favor of the Senior Secured Party notwithstanding any contrary provisions of the AR Loan Documents. This Intercreditor Agreement sets forth the relative priorities of AR Lender and the Senior Secured Party in and to the assets of Operator.

3.3     Subject to the provisions of Section 3.4 below, the Parties acknowledge that funds received by Operator from AR Lender ("**AR Loan Advances**") shall be utilized (i) first, to pay current debt service obligations of Operator to AR Lender with respect to the Facility, (ii) second in accordance with Section 3.4(b) below, for the payment of rent and any other uncontested required monthly amounts currently due and owing to Owner at the time of any such AR Loan Advance pursuant to the Owner-Operator Agreement, notwithstanding the adequacy of any account receivables borrowing base calculations, (iii) third, to pay Operator's costs of operations with respect to the Facility including, but not limited to, all other uncontested payment obligations due under the Owner-Operator Agreement, payroll and payroll taxes, ordinary maintenance and repairs and management and consulting fees to unaffiliated management agents or consultants ("**Current Operating Costs**"); (iv) fourth provided that no Event of Default exists and is continuing under the Owner-Operator Agreement or Mortgage Loan Documents, to pay management and consulting fees to affiliated management agents and (v) after the payment of Current Operating Costs, and consulting fees to affiliated management agents, subject to applicable restrictions, if any, in the AR Loan Documents, AR Loan Advances may be distributed to Operator's shareholders, partners, members or owners, as the case may be. AR Lender makes no representations or covenants with respect to Operator's compliance with the terms of this Section 3.3.

### 3.4    **AR Loan Advances Payment Structure.**

(a)     Control of Operator's Deposit Accounts. Operator, Mortgage Lender and AR Lender agree and certify to the existence of deposit account control agreements or like agreements relating to Operator's deposit accounts. AR Lender will maintain (i) a first lien blocked deposit account control agreement on Operator's non-governmental collections deposit account, (ii) a first lien deposit account service agreement, or similar agreement, on Operator's governmental collections deposit account, and (iii) a springing deposit account control agreement on Operator's operating account. In no event shall AR Lender have a deposit account control agreement on any deposit account dedicated solely for making either Operator's payroll payments or rent payments.

(b)     AR Lender funds AR Loan Advances. Operator, Owner, Mortgage Lender and AR Lender agree that no later than the fifth (5th) day of each calendar month (*provided that* if such day is not a Business Day then on the next immediately preceding Business Day), Operator

shall request from the AR Lender and the AR Lender shall disburse, by wire transfer of immediately available funds as an Advance (to the extent of Availability) an amount necessary for Operator to pay the Current Impositions, after application of any payments made by Operator from its Operations, as follows: first, to the payment account for Mortgage Lender designated in Schedule 3.4 attached hereto (the "**Mortgage Loan Account**") and from which Mortgage Lender will access via the automated clearinghouse system, an amount equal to the Current Owner Loan Payments for such month, as defined below, and second, to the payment account designated by Owner in Schedule 3.4, an amount equal to the Current Impositions less the Current Owner Loan Payment, provided, however, that any Advance made pursuant to this subsection (b) shall be subject to the restrictions set forth in subsection (e) below.

(c) "**Current Owner Loan Payments**" means, collectively, the monthly interest-only payments, excluding any penalties, default interest or late charges, (i) due and owing to Mortgage Lender under the Mortgage Loan and (ii) due and owing to Mezzanine Lender under the Mezzanine Loan. On or before the tenth (10th) day of each calendar month, Mortgage Lender shall certify to Owner and Operator the Owner Loan Payments due on or before the first (1st) day of the following calendar month. With respect to the Mezzanine Loan, such certification shall be based solely on information supplied by Mezzanine Lender which information Owner shall provide to the AR Lender, Mortgage Lender and Operator within forty eight (48) hours after written request. The Owner shall deliver the Current Owner Loan Payments amount to AR Lender, Mortgage Lender and Operator within five (5) business days of receipt from Mortgage Lender.

(d) "**Current Impositions**" equals the sum of: (i) the aggregate rent payable under the Owner-Operator Agreement for such month, plus (ii) taxes and insurance due and owing with respect to the Owner-Operator Agreement for such month, unless paid directly by Operator, plus (iii) deposits to reserves if required under the Owner-Operator Agreement.

(e) AR Lender agrees that it shall make the Advance as described in subsection (b) above unless (i) there is not sufficient Availability, or (ii) a default or event of default shall exist or be continuing under the AR Loan Agreement, or (iii) Operator fails to satisfy all conditions precedent thereto as set forth in the AR Loan Documents; provided, that, failure of Operator to make a request shall not be a condition to make the payments described in subsection (b) above and any objections to such payment by Operator shall not prevent such payment. After payment of the Current Impositions and subject to applicable restrictions in the AR Loan Documents, any remaining Advances may be made as directed by Operator. Operator agrees to promptly, but in no event later than the fifth (5th) day of each calendar month (or the immediately preceding Business Day if such day is not a Business Day), notify Mortgage Lender and Owner in accordance with Section 4.5 if there is not sufficient Availability for AR Lender to make the disbursement set forth in this Section 3.4.

(f) Use of AR Loan Advances to satisfy Current Owner Loan Payments. Mortgage Lender shall have a right to withdraw from the Mortgage Loan Account amounts equal to the Current Owner Loan Payments. Mortgage Lender agrees to apply amounts received on account of Current Owner Loan Payments toward payment of Owner's monthly debt service obligations under the Mortgage Loan only with respect to accrued and outstanding interest due and owing on the Mortgage Loan (excluding any default interest, late charges or penalties), and

#842-0343-9164-v.1

thereafter, to Owner's monthly debt service obligations under the Mezzanine Loan by remitting such payments to the Mezzanine Lender.

(g) Notwithstanding anything in this Agreement (whether express or implied) to the contrary, Senior Secured Party, Operator and Owner acknowledge and agree that (i) AR Lender shall have no liability to any Senior Secured Party, or Operator or Owner for computation or verification of the Current Impositions nor the actual use of proceeds of AR Loan by Operator, and (ii) neither Senior Secured Party nor Owner shall be deemed to be a third party beneficiary of any financing relationship between Operator and AR Lender, and Senior Secured Party and Owner hereby expressly waive and relinquish their respective rights to claim otherwise. Notwithstanding anything herein (whether express or implied) to the contrary, to the extent Mortgage Lender receives Current Impositions or the proceeds thereof, Mortgage Lender shall be entitled to retain the same and shall not be required to hold the same in trust or to disgorge the same to AR Lender, irrespective of whether the same constitutes proceeds of AR Lender Priority Collateral. Notwithstanding the foregoing, Mortgage Lender agrees that in the event AR Lender notifies Mortgage Lender that Current Impositions are being paid improperly with AR Lender Priority Collateral and not in the manner set forth in this Section 3.4, Mortgage Lender agrees to hold any such improperly paid amounts received thereafter in trust for AR Lender as AR Lender Priority Collateral.

(g) The signatures of Owner and Operator below shall confirm their respective agreement to the collection, payment and disbursement of the amounts set forth herein.

3.5 Except as set forth herein, Operator certifies that there are no proposed agreements, arrangements, understandings or transactions (side deals) outside of the AR Loan Documents that utilize the Accounts of Operator as security for any other obligations. Operator agrees that Operator shall not be a guarantor or party to any other accounts receivable financing agreement without the consent of Mortgage Lender. and Owner.

3.6 Except as set forth herein, (a) AR Lender and Operator certify and agree that there are no existing or proposed agreements, arrangements, understandings or transactions that involve the Facility (side deals) between (i) Operator, Owner, or any owner, master tenant, or operator of another facility, or officers, members, managers, directors, stockholders, partners, or other interest holders, employees or affiliates, or any member of their respective immediate families, and/or the parent entity of Operator, or Owner, and (ii) AR Lender; (b) Mortgage Lender and Operator certify and agree that there are no existing or proposed agreements, arrangements, understandings or transactions that involve the Facility (side deals) between (i) Operator (or any of Operator's officers, members, managers, directors, stockholders, partners, or other interest holders, employees or affiliates, or any member of their respective immediate families, and/or its parent entity), and (ii) Mortgage Lender; and (c) AR Lender and Operator certify that, notwithstanding anything else in the AR Loan Documents, neither the AR Lender Priority Collateral nor the Mortgage Lender Priority Collateral shall secure any obligations to the AR Lender, or any of its affiliates (including any lender under the AR Loan Documents), relating to projects other than the Facility AR Lender and Operator certify and agree that any and all provisions in the AR Loan Documents that would entitle AR Lender to declare a default under the

AR Loan as a result of defaults under other agreements by Operator or affiliates of Operator ("**Cross-Defaults**") are set forth on Exhibit B hereto.

3.7    Notwithstanding anything in this Agreement or the AR Loan Documents to the contrary, except for Advances made pursuant to Section 3.4(b), AR Lender shall not make, and Operator shall be prohibited from seeking, any Advance(s) to the extent that such Advance(s) would (i) create no Availability for the subsequent monthly amount due and owing under Section 3.4(b) above or (ii) otherwise create a condition whereby AR Lender could invoke the objections to funding set forth in Section 3.4(c) above in connection with the subsequent monthly amount due and owing under Section 3.4(b) above.

4.    **MISCELLANEOUS**

4.1    **Beneficiaries**. This Agreement is entered into solely for the benefit of AR Lender, Mortgage Lender, Owner, Operator and their respective successors and assigns, and no other person or entity, including but not limited to any third party assignee, investor, incidental beneficiary or any creditor of Operator or Owner, shall have any right, benefit, priority or interest under or because of the existence of this Agreement.

4.2    **Amendment**. This Agreement contains the entire understanding of the Parties with respect to the subject matter hereof, and shall not be modified, amended or terminated orally but only in writing signed by AR Lender, Mortgage Lender, Owner and Operator.

4.3    **Bankruptcy Financing**. In the event of the commencement of a bankruptcy, insolvency or similar type of proceeding filed by or against the Operator ("**Proceeding**"), AR Lender shall have the non-exclusive option (in its sole and absolute discretion) to continue to provide financing (on terms acceptable to AR Lender) to the trustee, other fiduciary or to the Operator as a debtor-in-possession, if AR Lender deems such financing to be in its best interests. The subordination and lien priority provisions of this Agreement shall continue to apply to all AR Lender Priority Collateral arising upon the commencement and during the pendency of such Proceeding without regard as to whether a Cut-Off Time has occurred prior to the commencement of such Proceeding, so that AR Lender shall have a prior lien on all AR Lender Priority Collateral, created before and during such Proceeding (to the extent AR Lender provides such financing during the Proceeding or to the extent Operator is granted the right to use, sell, or otherwise dispose of cash collateral during any such Proceeding), to secure the AR Loans, whether advanced before or during such Proceeding.

4.4    **Relative Rights; Cure Rights; Certain Notice Obligations of Mortgage Lender and AR Lender**.

(a)    This Agreement is entered into solely for the purposes set forth herein, and except as expressly provided herein, neither AR Lender nor Mortgage Lender assumes any other duties or responsibilities to the other regarding the financial condition of Operator, Owner or any other party, or regarding any of Operator's property, or regarding any other circumstance bearing upon the risk of nonpayment of the obligations of Operator or Owner under any of the agreements referred to herein. Each of AR Lender and Mortgage Lender shall be responsible for managing its

financial relationships with Operator and Owner, and neither shall be deemed to be the agent of the other for any purpose.

(b)     AR Lender and the Mortgage Lender agree to notify the other of any notice of a "Notice Event" given to their respective borrower under any of the AR Loan Documents or any of the Mortgage Loan Documents as applicable; provided, that the failure to provide such notice shall not subject such Party to any liability nor affect the subordination and lien priorities set forth in this Agreement. AR Lender and the Mortgage Lender shall have the right (but not the obligation) to cure any payment default under the other Party's documents within ten (10) days after notice thereof. A "**Notice Event**" for purposes of this Section shall mean (i) with regard to Mortgage Lender and the Mortgage Loan Documents, a default by the borrower thereunder triggering an acceleration of the Mortgage Loan, a foreclosure, or an action for the appointment of a receiver or similar remedy, including any Mortgage Loan Triggering Event; (ii) with regard to AR Lender and AR Loan Documents, any event which results in AR Lender having Ceased Funding or accelerating the AR Loan Obligations or the AR Loan Obligations accelerating automatically in accordance with the terms of the AR Loan Documents, including any AR Loan Triggering Event; or (iii) with regard to AR Lender and the AR Loan Documents, if there is insufficient Availability to fund the Current Impositions (as defined above in Section 3.4), at least with respect to the Facility.

4.5     **Notices**. Any notice or service of process given, or required to be given, pursuant hereto and in connection herewith, including without limitation any notice of any Cut-Off Time, shall be in writing and shall be deemed to be properly given: (a) when personally delivered; (b) the first or second Business Day after the notice is deposited with a nationally recognized overnight courier service with arrangements made for payment of charges for next or second Business Day delivery, respectively; or (c) two Business Days after the date sent by certified mail return receipt requested, in each case addressed to the Party for whom it is intended at its address hereinafter set forth or such address as subsequently provided to all Parties in writing.

If to AR Lender to:     CNH Finance Fund I, L.P.
                        c/o CNH Finance, L.P.
                        330 Railroad Avenue, Suite 101
                        Greenwich, CT 06830
                        Attn: Timothy Peters
                        Telephone: (203) 266-3210

With copies to:         Kincaid Law Office
                        6151 Wilson Mills Road, Suite 310
                        Highland Heights, OH 44143
                        Attn: Timothy J. Kincaid
                        Telephone: (440) 352-1000

If to Mortgage Lender to: Security Benefit Corporation
                        One Security Benefit Place
                        Topeka, Kansas 66636

4843-5043-9164, v. 1

|                    | Attn: Douglas Schneider<br>Telephone: (785) 438-1642 |
|--------------------|------------------------------------------------------|
| With copies to:    | Nyemaster Goode, P.C.<br>700 Walnut Street, Suite 1600<br>Des Moines, Iowa 50309<br>Attn: James C. Wine<br>Telephone: (515) 283-3100 |
| If to Owner to:    | White Plains Healthcare Properties I, LLC<br>2 Bourbon Street, Suite 200<br>Peabody, MA 01960<br>Attn: William Nicholson<br>Telephone: (978) 535-6700 |
| With copies to:    | Abrams Fensterman<br>3 Dakota Dr. Ste 300<br>Lake Success, NY 11042<br>Attn: Patrick Formato, Esq.<br>Telephone: (516)-328-2300 |
| If to Operator to: | HBL SNF, LLC<br>1280 Albany Post Road<br>Croton-on-Hudson, New York 10520<br>Attn: Lizer Jozefovic<br>Telephone: (914) 829-5114 Ext. 704 |
| With copies to:    | Michelman & Robinson, LLP<br>800 Third Avenue, 24th Floor<br>New York, NY 10022<br>Attn: Eric Simonson, Esq.<br>Telephone: (212) 730-7700 |

4.6     **Counterparts; Facsimile Signatures**. This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, and all of which together constitute one and the same agreement. Signature transmitted by facsimile or other electronic means shall bind the Parties hereto.

4.7     **Authorization**. Each individual signatory hereto represents and warrants that he or she is duly authorized to execute this Agreement on behalf of his or her principal and that he or she executes the Agreement in such capacity and not as a Party.

4.8     **Successors and Assigns**. This Agreement shall be binding upon the Parties hereto and their legal representatives, successors and assigns, provided, however, that each of the parties hereto further agrees to provide the other party with written notice of any such assignment of the AR Loan and/or the Mortgage Loan Documents, respectively. Each of the parties hereto

4842-9343-9104, v. 1

agrees not to assign their rights to the AR Loan and/or the Mortgage Loan Documents to Operator or any affiliate of Operator.

4.9 **Governing Law**. This Agreement and all matters arising out of or related to this Agreement shall be deemed to have been made under, and shall be governed and construed in all respects by, the substantive laws of the State of New York without regard to principles of conflicts of laws.

4.10 **Jurisdiction and Venue**. Mortgage Lender and AR Lender hereby irrevocably consent to the nonexclusive jurisdiction of the State and Federal Courts located in the State of New York in any and all actions and proceedings arising under or in connection with this Agreement.

4.11 **WAIVER OF JURY TRIAL. EACH PARTY HERETO HEREBY WAIVES ANY AND ALL RIGHTS IT MAY HAVE TO A JURY TRIAL IN CONNECTION WITH ANY LITIGATION COMMENCED BY OR AGAINST ANY OTHER PARTY(IES) WITH RESPECT TO THE RIGHTS AND OBLIGATIONS SET FORTH HEREIN.**

4.12 **Severability**. If a court of competent jurisdiction in a final determination deems any provision of this Agreement invalid, prohibited or unenforceable, such invalidity, prohibition or unenforceability shall apply only to such provision and only to the extent of such invalidity, prohibition or unenforceability, and shall not render this Agreement or any other provision of this Agreement wholly or partially invalid, prohibited or unenforceable.

4.13 **Headings**. The paragraph headings used in this Agreement are for convenience only and shall not affect the interpretation of any of the previous hereof. The statements set forth in the Recital paragraphs are incorporated herein by reference.

4.14 **Entire Agreement.** This Agreement is the entire agreement among the Parties regarding the subject matter of this Agreement.

4.15 **Non-Waiver of Rights, Remedies and Defaults.** Other than as expressly set forth in this Agreement, nothing in this Agreement or any drafts or communications exchanged between the parties in connection with the execution of this Agreement shall be deemed a waiver by any Party of any right, remedy, covenant, condition, obligation or default that such party may have against any other Party nor impair any notice of default previously sent by any Party to another Party nor be deemed to toll or suspend any cure period, notice period or other period, prevent any Party from exercising any right or remedy such Party may have against any other Party at any time or from time to time.

[Remainder of Page Intentionally Left Blank]

4842-9343-9104, v. 1

4842-9343-9164, v. 1

**IN WITNESS WHEREOF**, the undersigned have executed this Agreement the day and year first above written.

**AR LENDER:**

CNH FINANCE FUND I, L.P.,
a Delaware limited partnership

By: _____
Name: Timothy Peters
Title: Authorized Signatory

**MORTGAGE LENDER:**

SECURITY BENEFIT CORPORATION,
a Kansas corporation

By: _____
Name:
Title:

**OPERATOR:**

HBL SNF, LLC,
a New York limited liability company

By: _____
Name: Lizer Jozefovic
Title: Manager

**OWNER:**

WHITE PLAINS HEALTHCARE PROPERTIES I, LLC,
a Massachusetts limited liability company

By: _____
Name:
Title:

4842-9343-9104, v. 1

**Schedule 1**
**AR Loan Documents**

Unless stated otherwise, all of the below agreements are dated as of the date hereof.

1. Credit and Security Agreement by and between Operator and AR Lender.

2. Validity and Support Agreement by Lizer Jozefovic for the benefit of AR Lender.

3. Validity and Support Agreement by Mark Neuman for the benefit of AR Lender.

4. Guaranty Agreement by Lizer Jozefovic for the benefit of AR Lender.

5. Guaranty Agreement by Mark Neuman for the benefit of AR Lender.

6. Deposit Account Control Agreement (Active) by and between Operator, AR Lender, and Regions Bank.

7. Deposit Account Control Agreement (Passive) by and between Operator, AR Lender, and Regions Bank.

8. Deposit Account Service Agreement by and between Operator, AR Lender, and Regions Bank.

9. UCC-1 Financing Statement naming Operator as debtor, and AR Lender as secured party. filed with the New York Secretary of State.

---

4842-9343-9184, v. 1

## Schedule 2
### Mortgage Loan Documents

1. $38,500,000.00 Note executed by Owner payable to Mortgage Lender;
2. Construction Loan Agreement by and among Borrower and Mortgage Lender:
3. Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing executed by Owner in favor of Mortgage Lender;
4. Assignment of Leases and Rents executed by Owner in favor of Mortgage Lender;
5. Environmental Indemnity Agreement executed by William A. Nicholson, Howard Fensterman and Paul Barbara ("Guarantors") and Owner in favor of Mortgage Lender;
6. Assignment of Architectural Agreement, Contracts and Other Project Documents executed by Owner in favor of Mortgage Lender;
7. Assignment of Construction Agreement and Contractor's Consent executed by Owner in favor of Mortgage Lender;
8. Reserve Account Control Agreement executed by Owner, Mortgage Lender and Wells Fargo Bank;
9. Estoppel Certificate executed by Owner and HBL SNF, LLC as Tenant ("Tenant");
10. Subordination, Non-Disturbance and Attornment Agreement executed by Tenant, Owner and Mortgage Lender;
11. Security Agreement, Assignment of Leases and Rents and Fixture Filing (Operating Lease) executed by Tenant in favor of Mortgage Lender;
12. Completion Guaranty executed by Guarantors in favor of Mortgage Lender;
13. Guaranty Agreement executed by Guarantors in favor of Mortgage Lender;
14. Massachusetts Secretary of Commonwealth UCC-1 Financing Statement filed by Mortgage Lender against Owner as Debtor;
15. New York Secretary of State UCC-1 Financing Statement filed by Mortgage Lender against Tenant as Debtor;
16. Westchester County UCC-1 Financing Statement filed by Mortgage Lender against Tenant as debt;
17. Certificate of Final Budget executed by Owner in favor of Mortgage Lender;
18. Intercreditor Agreement by and between Mortgage Lender and Bradford Allen Capital Corporation ("Mezzanine Lender");
19. Construction Loan Disbursing Agreement by and among Mortgage Lender, Mezzanine Lender, First American Title Insurance Company and Owner;

4842-9343-9164, v. 1

**Schedule 3**
**List of Other Facilities**
**(other facilities financed by the AR Loan)**

None.

4842-9343-9164, v. 1

**Exhibit A**
**Form of Cut-Off Time Notice**

_____, 20 __

_____

_____

Attn: _____

Re:   Intercreditor Agreement Dated as of _____, 20 __ by and among _____
      ("AR Lender"), _____ ("Mortgage Lender"), _____
      ("Owner") and _____ ("Operator") (the "Intercreditor Agreement")

Ladies and Gentlemen:

This letter constitutes the Cut-Off Time Notice described in the Intercreditor Agreement. All capitalized terms used, and not otherwise defined, herein shall have the meanings provided for in the Intercreditor Agreement.

Please be advised that:

☐   an Mortgage Loan Triggering Event has occurred as a result of

_____,

and notice of such Mortgage Loan Triggering Event [is provided by this notice] **OR** [has been provided on _____].

☐   an AR Loan Triggering Event has occurred as a result of

_____,

and notice of such AR Loan Triggering Event was received on _____.

☐   Ceased Funding has occurred as of _____.

This Cut-Off Time Notice applies to the following Facility(ies) and Mortgage Loan Nos.:

_____

In accordance with Section [1.11] of the Intercreditor Agreement the Cut-Off Time shall be deemed to occur as of ____ [a.m./p.m.], _____ time, on _____, 20__, [_which date and time may be concurrent with, or at any time after, the date when Ceased Funding occurs (even if this notice results in retroactive designation of such Cut-Off Time), but no sooner than 30 days after notice of an Mortgage Loan Triggering Event or AR Loan Triggering Event_].

All provisions of the Intercreditor Agreement applicable after the Cut-Off Time shall govern the future relationship of AR Lender, Mortgage Lender, Owner, and Operator under the Intercreditor Agreement with respect to the Facility(ies) identified in this Cut-Off Time Notice. Please contact the undersigned at _____ if you have any questions.

Sincerely,

By: _____
    Name: _____

cc: _____

Previous versions obsolete               Page **27** of **29**

4842-6343-9164, v. 1

Title: _____

4842-9343-9164, v. 1

**Exhibit B**

**AR Loan Agreement Cross-Defaults**

Defaults under certain indebtedness, as further described in Section 8.1(f) of the AR Loan Agreement.