# Exhibit 11

**Copy - Please Stamp** RECEIVED

AUG 25 2017

TIMOTHY C. IDONI
COUNTY CLERK
JNTY OF WESTCHESTER

Sec 125. 67
Blk 3
Lot 1

CONSTRUCTION LOAN AGREEMENT

among

E PLAINS HEALTHCARE PROPERTIES I, LLC,
a Massachusetts limited liability company,
as Borrower

and

RITY BENEFIT LIFE INSURANCE COMPANY,
a Kansas insurance company,
as Lender

and

SECURITY BENEFIT CORPORATION,
a Kansas corporation,
as Agent

Dated as of August 18, 2017

**NOTICE: THIS AGREEMENT IS INTENDED TO BE FILED AS A "BUILDING LOAN AGREEMENT" FOR PURPOSES OF THE NEW YORK LIEN LAW. A SECTION 22 AFFIDAVIT IS ATTACHED HERETO AS EXHIBIT "N".**

3028-857113-T

First American Title
Insurance Company
666 Third Avenue 5th fl
New York, N.Y. 10017
Phone: (212) 922-9700
Fax: (212) 922-0881

FILED: WESTCHESTER COUNTY CLERK 05/01/2021 09:40 AM
INDEX NO. 55883/2021
NYSCEF DOC. NO. 3
21-07096-shl    Doc 36-11    Filed 02/11/22    Entered 02/11/22 17:43:36    Exhibit 11
Pg 3 of 113
RECEIVED NYSCEF: 05/01/2021

CONSTRUCTION LOAN AGREEMENT

among

WHITE PLAINS HEALTHCARE PROPERTIES I, LLC,
a Massachusetts limited liability company,
as Borrower

and

SECURITY BENEFIT LIFE INSURANCE COMPANY,
a Kansas insurance company,
as Lender

and

SECURITY BENEFIT CORPORATION,
a Kansas corporation,
as Agent

Dated as of August 18, 2017

**NOTICE: THIS AGREEMENT IS INTENDED TO BE FILED AS A "BUILDING LOAN AGREEMENT" FOR PURPOSES OF THE NEW YORK LIEN LAW.  A SECTION 22 AFFIDAVIT IS ATTACHED HERETO AS EXHIBIT "N".**

FILED: WESTCHESTER COUNTY CLERK 05/01/2021 09:40 AM
INDEX NO. 55883/2021
NYSCEF DOC. NO. 3
21-07096-shl   Doc 36-11   Filed 02/11/22   Entered 02/11/22 17:43:36   Exhibit 11
Pg 4 of 113
RECEIVED NYSCEF: 05/01/2021

# TABLE OF CONTENTS

Page No.

ARTICLE 1 - THE LOAN ........................................................................................ 1
 1.1 General Information and Exhibits ............................................................ 1
 1.2 Purpose ..................................................................................................... 2
 1.3 Commitment to Lend ................................................................................ 2
 1.4 Budget; Budget Contingency; Budget Line Items .................................. 2
 1.5 Borrower's Deposit ................................................................................... 3
 1.6 Evidence of Debt ...................................................................................... 4

ARTICLE 2 - INTEREST RATE, ADVANCES AND PAYMENTS ...................... 4
 2.1 Interest Rate .............................................................................................. 4
 2.2 Unused Line Fee ....................................................................................... 4
 2.3 Exit Fee ..................................................................................................... 5
 2.4 Computations and Determinations ........................................................... 5
 2.5 Reserved .................................................................................................... 5
 2.6 Inability to Determine LIBOR Rate ........................................................ 5
 2.7 Increased Costs ......................................................................................... 5
 2.8 Late Charge ............................................................................................... 6
 2.9 Prepayment ............................................................................................... 6
 2.10 Default Rate .............................................................................................. 7
 2.11 Taxes ......................................................................................................... 7
 2.12 Payment Schedule and Maturity Date ..................................................... 8
 2.13 Advances and Payments ........................................................................... 8
 2.14 Initial Maturity Date; Extension Option .................................................. 9

ARTICLE 3 - ADDITIONAL COVENANTS AND AGREEMENTS; NEGATIVE
    COVENANTS .......................................................................................... 10
 3.1 Construction of the Improvements ......................................................... 10
 3.2 Plans and Changes .................................................................................. 10
 3.3 Material Contracts; Governmental Approvals ....................................... 11
 3.4 Required Equity ...................................................................................... 11
 3.5 Leases ...................................................................................................... 11
 3.6 Compliance with Laws; Operation ......................................................... 12
 3.7 Insurance; Maintenance of the Project; Alterations ............................... 13
 3.8 Assignment of Plans and Contracts and Government Approvals ........... 13
 3.9 Storage of Materials ............................................................................... 14
 3.10 Construction Inspector ........................................................................... 14
 3.11 Inspection ................................................................................................ 14
 3.12 Notice to Agent ...................................................................................... 14
 3.13 Financial Statements ............................................................................... 15
 3.14 Other Information .................................................................................... 16
 3.15 Reports and Testing ................................................................................ 16
 3.16 Appraisal ................................................................................................. 16
 3.17 Reporting Compliance ............................................................................ 16
 3.18 Payment of Withholding Taxes .............................................................. 16
 3.19 ERISA and Prohibited Transaction Taxes ............................................. 16
 3.20 Environmental Laws; Access Laws ....................................................... 17

FILED: WESTCHESTER COUNTY CLERK 05/01/2021 09:40 AM
NYSCEF DOC. NO. 3
21-07096-shl    Doc 36-11    Filed 02/11/22    Entered 02/11/22 17:43:36    Exhibit 11
Pg 5 of 113
INDEX NO. 55883/2021
RECEIVED NYSCEF: 05/01/2021

## TABLE OF CONTENTS
(continued)

Page

3.21 Taxes and Other Charges ...... 17
3.22 Existence; Qualifications ...... 18
3.23 Organizational Requirements ...... 18
3.24 Operation of the Property ...... 19
3.25 Reserved ...... 19
3.26 Additional Indebtedness ...... 19
3.27 Limitation on Distributions, etc. ...... 19
3.28 Contracts with Affiliates ...... 19
3.29 Transfers; Encumbrances ...... 19
3.30 Ownership; Merger; Consolidation; Purchase or Sale of Assets ...... 20
3.31 Financial Covenants ...... 22
3.32 Use of Proceeds; Income from the Property ...... 22
3.33 Reserved ...... 22
3.34 Easements and Restrictions; Zoning ...... 22
3.35 HVCRE Matters ...... 22

ARTICLE 4 - REPRESENTATIONS AND WARRANTIES ...... 23
4.1 Organization ...... 23
4.2 Authorization; No Conflict ...... 23
4.3 Enforceability ...... 23
4.4 No Violation; No Litigation ...... 23
4.5 Initial Equity ...... 25
4.6 Material Contracts ...... 25
4.7 Title ...... 25
4.8 Taxes ...... 25
4.9 Plans ...... 25
4.10 Requirements; Zoning ...... 25
4.11 Separate Tax Lot ...... 26
4.12 No Conveyance ...... 26
4.13 Construction Matters ...... 26
4.14 Utilities ...... 26
4.15 Financial Matters ...... 26
4.16 Borrower Not a Foreign Person ...... 26
4.17 Business Loan ...... 27
4.18 Insurance ...... 27
4.19 Condemnation ...... 27
4.20 Flood Zone ...... 27
4.21 Public Access ...... 27
4.22 Boundaries ...... 27
4.23 Liens ...... 27
4.24 Other Agreements; Defaults ...... 27
4.25 Usury; Offsets ...... 27
4.26 Interim Disbursements ...... 27
4.27 Use of Project ...... 27
4.28 Margin Stock ...... 27
4.29 Investment Company Act ...... 28
4.30 Sanctions ...... 28

FILED: WESTCHESTER COUNTY CLERK 05/01/2021 09:40 AM
NYSCEF DOC. NO. 3

INDEX NO. 55883/2021
RECEIVED NYSCEF: 05/01/2021

21-07096-shl    Doc 36-11    Filed 02/11/22    Entered 02/11/22 17:43:36    Exhibit 11
Pg 6 of 113

TABLE OF CONTENTS
(continued)

Page

4.31    ERISA ........................................................................................................ 28
4.32    No Fraudulent Transfer ............................................................................. 28
4.33    Full and Accurate Disclosure .................................................................... 28
4.34    Single Purpose Entity ................................................................................ 29
4.35    No Default .................................................................................................. 29
4.36    Labor Matters ............................................................................................ 29
4.37    Intellectual Property .................................................................................. 29

ARTICLE 5 - DEFAULT AND REMEDIES ............................................................ 29
5.1    Events of Default ........................................................................................ 29
5.2    Remedies .................................................................................................... 32

ARTICLE 6 - AGENT AND LENDER ...................................................................... 34
6.1    Appointment ............................................................................................... 34
6.2    Delegation of Duties ................................................................................... 34
6.3    Exculpatory Provisions .............................................................................. 34
6.4    Reliance by Agent ...................................................................................... 34
6.5    Non-Reliance on Agent and Lender ........................................................... 34
6.6    Indemnification ........................................................................................... 35
6.7    Agent in Its Individual Capacity ................................................................. 35
6.8    Successor Agents ...................................................................................... 35
6.9    Limitations on Agent's Liability .................................................................. 35

ARTICLE 7 - GENERAL TERMS AND CONDITIONS ........................................... 35
7.1    Consents ..................................................................................................... 35
7.2    Borrower's Indemnity ................................................................................. 36
7.3    Miscellaneous ............................................................................................ 37
7.4    Notices ....................................................................................................... 37
7.5    Payments Set Aside ................................................................................... 38
7.6    Successors and Assigns ............................................................................ 38
7.7    Cooperation ................................................................................................ 40
7.8    No Set-off ................................................................................................... 41
7.9    Servicer ...................................................................................................... 41
7.10   Survival ...................................................................................................... 41
7.11   Costs and Expenses .................................................................................. 41
7.12   Further Assurances .................................................................................... 42
7.13   Inducement to Agent and Lender ............................................................... 42
7.14   Forum ......................................................................................................... 42
7.15   Interpretation .............................................................................................. 42
7.16   No Partnership, etc .................................................................................... 43
7.17   Records ...................................................................................................... 43
7.18   Reserved .................................................................................................... 43
7.19   USA Patriot Act Notice .............................................................................. 43
7.20   Entire Agreement ....................................................................................... 43
7.21   Governing Law ........................................................................................... 44
7.22   Exculpation ................................................................................................ 44
7.23   Lien Law Compliance ................................................................................. 44

FILED: WESTCHESTER COUNTY CLERK 05/01/2021 09:40 AM
INDEX NO. 55883/2021
NYSCEF DOC. NO. 3
21-07096-shl    Doc 36-11    Filed 02/11/22    Entered 02/11/22 17:43:36    Exhibit 11
RECEIVED NYSCEF: 05/01/2021
Pg 7 of 113

## TABLE OF CONTENTS
(continued)

Page

ARTICLE 8 - CASH MANAGEMENT ........................................................................................ 44
    8.1    Cash Management ......................................................................................... 44
    8.2    Disbursements from the Cash Management Account ..................................... 45

ARTICLE 9 - RESERVE FUNDS ............................................................................................. 46
    9.1    Interest Reserve Funds .................................................................................. 46
    9.2    Tax Funds ..................................................................................................... 46
    9.3    Insurance Funds ............................................................................................ 47
    9.4    Security Interest ............................................................................................ 47

ARTICLE 10 - OPERATING LEASE ISSUES ......................................................................... 48
    10.1    Tenant Letter of Credit ................................................................................ 48
    10.2    Cash Security Deposit .................................................................................. 49
    10.3    Security Interest ........................................................................................... 49
    10.4    Lease Guarantees ......................................................................................... 49
    10.5    Application of Tenant Funds ......................................................................... 49

## CONSTRUCTION LOAN AGREEMENT

THIS CONSTRUCTION LOAN AGREEMENT (as amended, restated, replaced, supplemented or otherwise modified from time to time, this "**Agreement**") is made as of August 1X, 2017, by and among SECURITY BENEFIT CORPORATION, a Kansas corporation, having an address at One Security Benefit Place, Topeka, KS 66636 (together with its successors and/or assigns, "**Agent**"), SECURITY BENEFIT LIFE INSURANCE COMPANY, an insurance company organized under the laws of Kansas, having an address at One Security Benefit Place, Topeka, KS 66636 (together with its successors and/or assigns, "**Lender**"), and WHITE PLAINS HEALTHCARE PROPERTIES I, LLC, a Massachusetts limited liability company, having its principal place of business at West Peabody Executive Center, Suite 200, 2 Bourbon Street, Peabody, MA 01960 (together with its permitted successors and assigns, collectively, "**Borrower**").

## R E C I T A L S :

WHEREAS, Borrower owns the Land and desires to construct the Project consisting of a skilled nursing facility and other related improvements thereon; and

WHEREAS, Lender has agreed to make the Building Loan to Borrower in the amount of up to $30,293,625 in which all or a portion of the Building Loan Costs shall be advanced to Borrower, consisting solely of costs of improvements as defined in Section 2 of the New York Lien Law; and

WHEREAS, Lender has further agreed to make additional loan advances to Borrower for certain other soft costs and related costs with respect to the Project in the amount of up to $8,206,375 (the "**Project Loan**"); and

WHEREAS, the Loan secured hereby, in the total amount of up to $38,500,000, collectively refers to both the Building Loan and the Project Loan as further described in this Agreement; and

WHEREAS, Borrower, Lender and Agent desire to set forth certain agreements relating to the Loan. This Agreement constitutes both a "**Building Loan Agreement**" and a "**Project Loan Agreement**" for purposes of New York Lien Law.

NOW, THEREFORE, Borrower, Lender and Agent do hereby agree as follows.

## ARTICLE 1 - THE LOAN

1.1    General Information and Exhibits. This Agreement includes the Exhibits listed below, all of which Exhibits are attached hereto and made a part hereof for all purposes. Borrower, Agent and Lender agree that if any Exhibit to be attached to this Agreement contains blanks, the same shall be completed correctly and in accordance with this Agreement prior to or at the time of the execution and delivery thereof.

|  |  |  |
|---|---|---|
| Exhibit "A" | – | Legal Description of the Land |
| Exhibit "B" | – | Definitions and Financial Statements |
| Exhibit "C" | – | Reserved |
| Exhibit "C-2" | – | Reserved |
| Exhibit "D" | – | Reserved |
| Exhibit "E" | – | Advances |
| Exhibit "E-1" | – | Draw Request |
| Exhibit "F" | – | Survey Requirements |
| Exhibit "G" | – | Reserved |

| Exhibit "H" | – | Leasing and Tenant Matters |
| Exhibit "I" | – | Subcontractor Default Insurance |
| Exhibit "J" | – | Schedule of Lenders |
| Exhibit "K" | – | Organizational Requirements |
| Exhibit "L" | – | Tenant Direction Notice |
| Exhibit "M" | – | Form of Compliance Certificate – Borrower |
| Exhibit "N" | – | Section 22 Affidavit |
| Exhibit "O" | – | Form of Letter of Credit Agreement |
| Schedule 4.1 | – | Organizational Chart |

The Exhibits and Schedules contain other terms, provisions and conditions applicable to the Loan. Capitalized terms used in this Agreement shall have the meanings assigned to them in Exhibit "B". This Agreement, the other Loan Documents, which must be in form, detail and substance satisfactory to Agent, evidence the agreements of Borrower, Agent and Lender with respect to the Loan. Borrower shall comply with all of the Loan Documents.

    1.2    Purpose. The proceeds of the Loan shall be used by Borrower to pay the following, and only the following, items, in each case subject to the terms and conditions hereof: (a) refinancing of any existing mortgage loan secured by the Land; (b) the Hard Costs and Soft Costs of the construction and development of the Improvements on the Land, and interest, taxes and other operating costs of the Project, all in accordance with the Budget; (c) costs, expenses and fees associated with the Loan; and (d) costs of Borrower of any furniture, fixtures, personal property and equipment to be used at the Project following Completion, and (e) utility connection fees and charges, all in accordance with the Budget.

    1.3    Commitment to Lend. Borrower agrees to borrow from Lender, and Lender agrees to make Advances of the Loan Proceeds to Borrower in amounts at any one time outstanding not to exceed the Maximum Loan Amount, on the terms and subject to the conditions set forth in this Agreement and, without limitation, Exhibit "E" attached to this Agreement. Lender's commitment to lend shall expire and terminate automatically (a) if the Loan is prepaid in full, (b) upon the occurrence of a Default (unless Lender subsequently elects to reinstate its commitment if Lender elects to waive such Default in writing), and (c) at the end of the Availability Period (after giving effect to any amounts borrowed on such date in accordance with this Agreement). Notwithstanding anything to the contrary contained herein, for avoidance of doubt, no additional advances shall be made by Lender after the end of the Availability Period. The Loan is not revolving. Any amount repaid may not be reborrowed.

    1.4    Budget; Budget Contingency; Budget Line Items.

    (a)    Budget. The Budget is attached to the Certificate of Budget dated on or near the date hereof, executed by Borrower, and agreed to by Lender and Agent (the "Budget"). The amount listed in the Budget as the (i) "**Total Costs**" is the maximum cost anticipated by Borrower for each item specified therein; (ii) "**Total Budget**" is the maximum cost anticipated by Borrower for the Project; (iii) "**Loan Proceeds**" is the maximum amount to be advanced under the Loan anticipated to be advanced for such Aggregate Cost; (iv) "**Expended Cost**" is equal to the amount shown in the Budget as representing the portion of the Aggregate Cost previously paid by Borrower as of the date of this Agreement; and (v) "**Mezzanine Loan Proceeds**" is the amount to be advanced under the Mezzanine Loan anticipated to be advanced for such aggregate costs. Advances of the Loan shall be advanced subject to the terms, covenants, conditions and provisions of this Agreement. Except as set forth in Subsection (c) below, Borrower shall not amend the Budget, or otherwise reallocate Loan funds from one Budget line item to another, without the prior written approval of Agent in its sole discretion; provided, however, Borrower shall have the right to reallocate cost savings and use the Contingency Fund in accordance with the terms of this Agreement. The Budget has been prepared by Borrower, and Borrower represents to Agent and Lender that the Budget includes the entire Aggregate Cost

as estimated by Borrower in good faith as of the date of this Agreement. Unless approved by Agent in its sole discretion, no Advance shall be made (A) for any item of expenditure not set forth in the Budget, (B) from any line item in the Budget that, when added to all prior Advances from that line item, would exceed the lesser of (i) the actual cost incurred by Borrower for such line item, or (ii) the sum shown in the Budget for such line item, (C) except as set forth in Subsection (c) below, from any Contingency Fund, or (D) to pay interest on the Loan after commencement of operations of any component of the Improvements if and to the extent that there is sufficient net operating income from the Property to pay such interest. Except as set forth in Subsection (c) below, Advances from any line item in the Budget for purposes other than those for which amounts are initially allocated to such line item, or changes in the relative amounts allocated to particular line items in the Budget may only be made as Agent in its sole discretion deems necessary or advisable.

(b)  Budget Contingencies. The Budget contains line items other than the line item designated for contingency (collectively, the "**Contingency Fund**") which represent amounts necessary to provide reasonable assurances to Agent and Lender that funds are available within the applicable Budget if additional costs, expenses and/or delays are incurred or additional interest accrues on the Loan, or other unanticipated events or problems occur. Agent may, in its discretion, re-allocate the required amount of any Contingency Fund to other Budget Line Items during the continuance of a Potential Default or Default.

(c)  Budget Line Items. The Budget includes line items (collectively, "**Budget Line Items**") for the cost of all labor, materials, equipment, fixtures and furnishings needed for the completion of all work for the Improvements, and all other costs, fees and expenses relating in any way whatsoever to the construction work and the development, operation, ownership and marketing of the Project. Borrower agrees that the Advances shall be used only for the Budget Line Items for which such proceeds of the Loan are made available. Borrower may apply savings from one Budget Line Item (provided such savings are (x) in a Budget Line Item for Hard Costs, other than the Contingency Fund, or (y) in a Budget Line Item for Soft Costs, other than any Budget Line Items for interest, operating shortfalls), to cost overruns in another Budget Line Item or to the Contingency Fund, or to any other unbudgeted costs of the Improvements provided (i) there are no Defaults existing, (ii) (A) all work with respect to any Budget Line Item is completed (as verified by the Construction Inspector, if applicable), all costs and expenses with respect to such work have been paid in full, and the portion of the Loan allocated to such Budget Line Item exceeds the aggregate amount of Loan proceeds actually disbursed for the payment of such costs and expenses, or (B) Borrower demonstrates to the reasonable satisfaction of Agent that the amount allocated to any such Budget Line Item exceeds the aggregate amount of Loan proceeds that will be required in order to achieve completion of such work and pay all costs and expenses with respect thereto, and (iii) such reallocation will not affect the priority of the Security Instrument on the Project. Unused funds in any Budget Line upon payment in full of all costs and expenses for such Budget Line shall be moved to the Contingency Fund. Borrower may, with Agent's prior written consent, not to be unreasonably withheld or delayed, reallocate funds from the Contingency Fund to other Budget Line Items for costs in the Budget; provided, however, that Agent's consent shall not be required so long as (A) the percentage of the Contingency Fund reallocated by Borrower at all times is less than or equal to the percentage of the Improvements that have been completed as of the time of such reallocation, (B) Borrower delivers to Agent and Lender prior notice of such reallocation together with a certificate certifying as to calculation described in the foregoing clause (A), and (C) there are no Defaults existing.

1.5  Borrower's Deposit.

(a)  Budget. Notwithstanding anything in this Agreement to the contrary, the Loan shall at all times be In Balance. The Loan shall be deemed to be "**In Balance**" for so long as there is no Budget Shortfall. A "**Budget Shortfall**" is the deficiency, as determined by Agent, on an aggregate funds available basis, between (i) Agent's Estimate of Costs and (ii) the sum of the then undisbursed portion of the Loan,

plus any sums provided by Borrower from other sources as shown in the Budget, including, without limitation, Mezzanine Loan Proceeds.

(b)    "**Agent's Estimate of Costs**" means Agent's reasonable estimate of the remaining costs to complete the construction of the on-site and off-site work related to the Improvements through the Completion Date based on (i) the costs set forth in the Budget plus (ii) such additional amounts as Agent reasonably deems necessary through the Completion Date, which estimate shall be based on executed construction contracts, executed subcontracts and purchase orders, or, in those instances where construction contracts, subcontracts or purchase orders have not yet been executed, upon the basis of either written bids with responsible contractors, tradesmen and material suppliers obtained by Borrower and reasonably approved by Agent, or Agent's reasonable estimate of such costs where written bids have not been obtained, and shall take into account all costs and expenses to be paid by Borrower through the Completion Date, with such allowances for reserves and contingencies as Agent shall reasonably deem appropriate in its reasonable discretion (including, without limitation, any budget reallocations and use of cost savings permitted by Section 1.4).

(c)    If for any reason the Loan shall not be In Balance, within ten (10) days after written notice from Agent to Borrower, Borrower shall bring the Loan into balance (i.e., restore the In Balance status of the Loan) by making the Borrower's Deposit. Borrower shall deposit all such funds to an interest-bearing collateral account controlled by Agent with Wells Fargo, N.A. ("**Wells Fargo**"), with interest earned thereon to be part of Borrower's Deposit. Such Borrower's Deposit is hereby pledged to Agent for the benefit of Lender, and Borrower hereby grants and conveys to Agent for the benefit of Lender a security interest in all funds so deposited with Agent, as additional security for the Loan. Agent, for the benefit of Lender may advance all or a portion of Borrower's Deposit prior to making any further Advances. Agent, for the benefit of Lender may (but shall have no obligation to) apply all or any part of Borrower's Deposit against the unpaid Indebtedness in such order as Lender determines. Notwithstanding anything to the contrary, upon the Completion Date, (x) Borrower's obligations under this Section 1.5 shall cease and (y) any remaining Borrower's Deposit shall be immediately applied against the outstanding principal balance of the Loan.

1.6    Evidence of Debt. Amounts of the Loan funded by Lender shall be evidenced by one (1) or more accounts or records maintained by Agent and/or Lender in the ordinary course of business. The accounts or records maintained by Agent and Lender shall be conclusive absent manifest error of the amounts of the Loan funded by Lender to Borrower and the interest and payments thereon. Any failure to so record such amounts, interest or payments or any error in doing so shall not, however, limit or otherwise affect the obligation of Borrower hereunder to pay any amount owing with respect to the Indebtedness. Lender may attach schedules to its Note(s) and endorse thereon the date, amount and maturity of the applicable Note and payments with respect thereto.

## ARTICLE 2 - INTEREST RATE, ADVANCES AND PAYMENTS

2.1    Interest Rate. Subject to this Article 2, the Principal Debt from day to day outstanding which is not past due, shall bear interest at a fluctuating rate of interest equal to the Interest Rate. Interest shall be computed for the actual number of days which have elapsed, on the basis of a 360-day year.

2.2    Unused Line Fee. From and after the Closing Date and until the end of the Availability Period or, if sooner, the date the Commitments terminate, Borrower shall pay to Agent, for the account of Lender, a fee (the "**Unused Line Fee**") based on the unused amount of the Loan. The Unused Line Fee for each day shall be calculated as (i) the product of (A)(1) the Maximum Loan Amount outstanding on each day minus (2) the outstanding principal balance of the Loan on each day, multiplied by (B) 1/360, multiplied by (C) one hundred basis points (1.00%) per annum. The Unused Line Fee payable for each calendar month

FILED: WESTCHESTER COUNTY CLERK 05/01/2021 09:40 AM
NYSCEF DOC. NO. 3

INDEX NO. 55883/2021
RECEIVED NYSCEF: 05/01/2021

21-07096-shl    Doc 36-11    Filed 02/11/22    Entered 02/11/22 17:43:36    Exhibit 11
Pg 12 of 113

shall be the sum of the Unused Line Fee for each day during the applicable calendar month. The Unused Line Fee shall be payable monthly in arrears, beginning with September 1, 2017 and ending at the end of the Availability Period or, if sooner, the date the Commitments terminate (but in no event later than the Maturity Date), with the Unused Line Fee to be prorated to the date of such final payment.

2.3    Exit Fee. In all events and under all circumstances, voluntary, mandatory or otherwise, Borrower shall be obligated to pay to Lender an exit fee (the "**Exit Fee**") in an amount equal to one percent (1.00%) of the Maximum Loan Amount, which amount shall be payable as follows:  (i) upon any (and each) partial prepayment of the Loan in accordance with the terms hereof (except as set forth below), Borrower shall pay to Lender, on account of the Exit Fee, an amount equal to one percent (1.00%) of the amount so prepaid; (ii) upon any (and each) application of any condemnation awards or insurance proceeds to the principal amount of the Loan in accordance with the terms of this Agreement and the Security Instrument, one percent (1.00%) of the amount thereof shall be retained by Lender on account of the Exit Fee and the balance thereof shall be the repayment of the principal amount of the Loan; and (iii) upon the earliest to occur of repayment in full of the principal amount of the Loan or the Maturity Date, Borrower shall pay to Lender the entire Exit Fee less any amounts on account thereof previously paid to Lender under the foregoing clauses (i) and (ii) of this Section 2.3. Notwithstanding the foregoing, with respect to any payment made under Section 9.1(c) in connection with the termination of the Interest Reserve Fund, or with respect to any payment of principal on a monthly basis pursuant to Section 8.2 arising from the disbursement or application of a regular monthly installment of rent, the Exit Fee shall not be payable on the date of such partial paydown, but shall be deferred, without interest thereon, until the Loan is paid in full or otherwise becomes due.  Agent shall keep an accounting of any such deferred Exit Fee to be paid to Lender. Borrower's payment of the Exit Fee to Lender shall be in addition to all other amounts payable by Borrower to Lender under this Agreement and the other Loan Documents (including, without limitation, any Lockout Prepayment Premiums payable pursuant to Section 2.9(a) of this Agreement). The Exit Fee shall be deemed earned as of the date hereof and shall not be subject to reduction nor be refundable under any circumstances.

2.4    Computations and Determinations. Agent shall determine each interest rate applicable to the Principal Debt in accordance with this Agreement and its determination thereof shall be conclusive in the absence of manifest error. The books and records of Agent shall be prima facie evidence of all sums owing to Lender from time to time under this Loan, but the failure to record any such information shall not limit or affect the obligations of Borrower under the Loan Documents.

2.5    Reserved.

2.6    Inability to Determine LIBOR Rate. If the LIBOR Daily Floating Rate is no longer published or otherwise ascertainable, Lender shall select another reference rate most comparable to the LIBOR Daily Floating Rate (the "**Replacement Rate**") and thereafter the Interest Rate shall equal such Replacement Rate plus 700 basis points.

2.7    Increased Costs. If any Change in Law shall:

(a)    impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, any Lender;

(b)    subject Lender to any Taxes (other than (A) Indemnified Taxes, (B) Taxes described in clauses (b) through (d) of the definition of Excluded Taxes and (C) income taxes) on its loans, loan principal, letters of credit, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto; or

FILED: WESTCHESTER COUNTY CLERK 05/01/2021 09:40 AM
NYSCEF DOC. NO. 3
INDEX NO. 55883/2021
RECEIVED NYSCEF: 05/01/2021

21-07096-shl     Doc 36-11     Filed 02/11/22     Entered 02/11/22 17:43:36     Exhibit 11
Pg 13 of 113

(c)     impose on Lender any other condition, cost or expense affecting this Agreement or any Note or the Advances made by Lender;

and the result of any of the foregoing shall be to increase the cost to Lender of making, converting to, continuing or maintaining any Advance the interest on which is determined by reference to the LIBOR Daily Floating Rate (or of maintaining its obligation to make any such Advance), or to reduce the amount of any sum received or receivable by such Lender hereunder (whether of principal, interest or any other amount) then, upon request of Agent, Borrower will pay to such Lender such additional amount or amounts as will compensate such Lender for such additional costs incurred or reduction suffered under this Loan. Nothing herein contained shall be construed or shall operate to require Borrower to pay any interest, fees, cost or changes greater than is permitted by applicable Law. Notwithstanding the foregoing, such Lender shall assess costs or reductions to Borrower pursuant to this Section 2.7 only to the extent such Lender assesses similar costs to borrowers with loans of similar type and nature.

2.8     Late Charge. If Borrower shall fail to make any payment due hereunder or under the terms of any Note within five (5) days after the date such payment is due (excluding the repayment of the principal amount due on the Maturity Date and prepaid interest being held by Wells Fargo), Borrower shall pay to Agent for the benefit of Lender on demand, in addition to payment of interest and other amounts hereunder, a late charge equal to five percent (5%) of such payment. The "**late charge**" is imposed for the purpose of defraying the expenses of Agent and Lender incident to handling such defaulting payment. This charge shall be in addition to, and not in lieu of, any other remedy Agent and Lender may have and is in addition to any fees and charges of any agents or attorneys which Agent and Lender may employ upon the occurrence of a Default, whether authorized herein or by Law.

2.9     Prepayment.

(a)     Voluntary Prepayment; Prepayment Premium. The Loan may be prepaid in whole or in part in minimum increments of not less than One Million Dollars ($1,000,000), not more than once in any thirty (30) day period, on a Business Day, with not less than thirty (30) days' (but no more than sixty (60) days') prior written notice delivered to Lender. In connection with any such prepayment, Borrower shall pay to Agent, for the benefit of Lender (i) all amounts due hereunder and under the Note and the other Loan Documents (including, without limitation, the Exit Fee), (ii) the Prepayment Premium (as defined below); and (iii) the interest which is anticipated to accrue on the amount being prepaid for the period commencing on the date of prepayment through the first Payment Date thereafter at the Interest Rate. If the prepayment occurs prior to the date that is twenty-four (24) months from the date of this Agreement (the "**Minimum Loan Term**"), the Borrower shall pay a Prepayment Premium designed to compensate Lender for the interest payments it would have received if the Loan had been advanced and outstanding for the Minimum Loan Term. The Prepayment Premium shall be the product of the following: (a) the number of months remaining in the Minimum Loan Term; and (b) the monthly interest payments that would be payable on the principal balance being prepaid, based on the Interest Rate in effect on the date that is three (3) Business Days prior to the date of prepayment.

(b)     Mandatory Prepayment.

(i) On each date on which Agent, for the benefit of Lender actually receives a distribution of casualty insurance proceeds or an award in respect of any Condemnation, and Agent and Lender do not have any obligation to make such proceeds available to Borrower for Restoration and elects not to make such proceeds available for Borrower for Restoration, Agent shall, at Agent's option, (i) make the proceeds available to Borrower for Restoration or (ii) apply such proceeds against the Principal Debt, without payment of any otherwise applicable Prepayment Premium, in which event Borrower shall be

deemed to have prepaid the Principal Debt in an amount equal to one hundred percent (100%) of such proceeds and any other amounts due in accordance with this Agreement.

(ii) From and after the end of the Availability Period, if and to the extent permitted under the terms of this Agreement, Borrower sells or otherwise disposes of equipment or personal property for cash consideration, and Borrower does not purchase equipment or personal property of similar type within one hundred eighty (180) days thereafter, Borrower shall prepay the Loan in an amount equal to one hundred percent (100%) of the net proceeds of the sale or disposition of such equipment or personal property, together with the applicable Exit Fee and Prepayment Premium thereon.

2.10    Default Rate. Notwithstanding anything to the contrary contained herein, after the occurrence and during the continuance of a Default (including the expiration of any applicable cure period), the rate of interest accruing on the outstanding principal balance under any Loan Document shall be increased by five hundred (500) basis points above the rate of interest otherwise applicable or to the maximum rate permitted by applicable Laws, whichever is less ("**Default Rate**"), independent of whether Lender accelerates the outstanding principal balance under any Loan Document.

2.11    Taxes.

(a)    Any and all payments by or on account of any obligation of Borrower under any Loan Document shall be made without deduction or withholding for any Taxes, except as required by applicable Laws. If any applicable Laws (as determined in the good faith discretion of Lender) require the deduction or withholding of any Tax from any such payment by Lender or Borrower, then Lender or Borrower shall be entitled to make such deduction or withholding, upon the basis of the information and documentation to be delivered.

(b)    If Borrower or Lender shall be required by any applicable Laws to withhold or deduct any Taxes from any payment, then (i) Borrower or Lender, as required by such Laws, shall withhold or make such deductions as are determined by it to be required based upon the information and documentation, (ii) Borrower or Lender, to the extent required by such Laws, shall timely pay the full amount withheld or deducted to the relevant Governmental Authority in accordance with such Laws, and (iii) to the extent that the withholding or deduction is made on account of Indemnified Taxes, the sum payable by Borrower, shall be increased as necessary so that after any required withholding or the making of all required deductions (including deductions applicable to additional sums payable under this Section 2.11) the applicable Recipient receives an amount equal to the sum it would have received had no such withholding or deduction been made.

(c)    In addition, Borrower agrees to pay to the relevant Governmental Authority in accordance with applicable Law, or at the option of Lender reimburse within ten (10) days after demand for the payment of, any and all Other Taxes.

(d)    Borrower shall, and does hereby indemnify each Recipient, and shall make payment in respect thereof within ten (10) days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section 2.11) payable or paid by such Recipient or required to be withheld or deducted from a payment to such Recipient, and any penalties and interest, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority; provided, however, that if Borrower does not receive written notice of such Indemnified Taxes (an "**Indemnified Tax Notice**") within one hundred eighty (180) days after a Recipient first receives notice of such Indemnified Taxes, then no Recipient shall be entitled to receive payments from Borrower pursuant to this Section 2.11(d) for any amounts of penalties or interest incurred or accruing prior to the receipt by Borrower of the Indemnified Tax Notice. A certificate

as to the amount of such payment or liability delivered to Borrower by Lender shall be conclusive absent manifest error.

(e)    Upon written request by Borrower or Lender, as the case may be, after any payment of Taxes by Borrower or by Lender to a Governmental Authority as provided in this <u>Section 2.11</u>, Borrower shall deliver, to Lender or Lender shall deliver to Borrower, as the case may be, the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of any return required by Laws to report such payment or other evidence of such payment reasonably satisfactory to Borrower or Lender, as the case may be.

(f)    If any Recipient determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified by Borrower with respect to which Borrower has paid additional amounts pursuant to this <u>Section 2.11</u>, it shall pay to Borrower an amount equal to such refund (but only to the extent of indemnity payments made, or additional amounts paid, by Borrower under this <u>Section 2.11</u> with respect to the Taxes giving right to such refund), net of all out-of-pocket expenses (including Taxes) incurred by such Recipient, and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund), <u>provided</u> that Borrower, upon the written request of the Recipient, agrees to repay the amount paid over to Borrower (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Recipient in the event the Recipient is required to repay such refund to such Governmental Authority. Notwithstanding anything to the contrary in this <u>Section 2.11(f)</u>, in no event will the applicable Recipient be required to pay any amount to Borrower pursuant to this <u>Section 2.11(f)</u> the payment of which would place the Recipient in a less favorable net after-Tax position than such Recipient would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid. This <u>Section 2.11(f)</u> shall not be construed to require any Recipient to make available its tax returns (or any other information relating to its taxes that it deems confidential) to Borrower or any other Person.

(g)    If in the opinion of counsel for Agent or Lender (i) it might be unlawful to require Borrower to make any payment or reimbursement required pursuant to this <u>Section 2.11</u> or (ii) the making of such payment or reimbursement might result in the imposition of interest beyond the maximum amount permitted by law, then and in such event, Agent, for the benefit of Lender may elect, by notice in writing given to Borrower, to declare all of the Indebtedness to be and become due and payable sixty (60) days from the giving of such notice.

(h)    Without prejudice to the survival of any other agreement of Borrower hereunder, the agreements and obligations of Borrower, Agent and Lender contained in this <u>Section 2.11</u> shall survive the termination of the Commitments and the payment in full of all the other Indebtedness.

2.12    <u>Payment Schedule and Maturity Date</u>. Accrued and unpaid interest shall be due and payable on the first (1st) day of each calendar monthly after the date of this Agreement commencing on September 1, 2017, and continuing on the first day of each month thereafter (each a "**Payment Date**") until the Maturity Date, or the date that all principal and accrued interest owing on this Loan shall have been fully paid and satisfied, if earlier. If the first day of the calendar month is not a Business Day, the applicable Payment Date shall be the succeeding Business Day. The entire principal balance of the Loan then unpaid and all accrued interest then unpaid shall be due and payable in full on the Maturity Date.

2.13    <u>Advances and Payments</u>.

(a)    Following receipt of a Draw Request for any Advance, upon satisfaction of all conditions to advance thereof, Lender shall make proceeds of the Loan in an amount equal to the Advance available

**FILED: WESTCHESTER COUNTY CLERK 05/01/2021 09:40 AM**
INDEX NO. 55883/2021
NYSCEF DOC. NO. 3
RECEIVED NYSCEF: 05/01/2021

21-07096-shl    Doc 36-11    Filed 02/11/22    Entered 02/11/22 17:43:36    Exhibit 11
Pg 16 of 113

to Borrower on the applicable Funding Date by advancing such funds to Borrower in accordance with the provisions of Exhibit "E". All Advances made hereunder are intended to be made by both Lender and Mezzanine Lender on a pro rata basis under both the Loan and the Mezzanine Loan, as reflected in the Budget. All Draw Requests are intended to be joint requests for draws under both this Loan and the Mezzanine Loan.

(b)    All payments by Borrower shall be made without condition or deduction for any counterclaim, defense, recoupment or setoff. Except as otherwise expressly provided herein, all payments by Borrower hereunder shall be made to Agent, for the benefit of Lender, and remitted to Lender at Lender's Office in U.S. Dollars and in immediately available funds not later than 12:00 p.m. (Lender's Time) on the date specified herein. All payments received by Lender after 12:00 p.m. (Lender's Time) shall be deemed received on the next succeeding Business Day and any applicable interest or fee shall continue to accrue. If any payment to be made by Borrower shall come due on a day other than a Business Day, payment shall be made on the next following Business Day, and such extension of time shall be reflected in computing interest or fees, as the case may be. Borrower shall not be responsible for late payments from the Interest Reserve Fund to the extent of funds deposited therein that Lender or Agent failed to draw.

2.14    Initial Maturity Date; Extension Option. The Initial Maturity Date of the Loan is August 1, 2020. Borrower may, upon approval of Lender, in its discretion, request an extension of the maturity of the Loan for two (2) separate one year periods following the Initial Maturity Date (each, an "**Extension Period**"), upon and subject to the following terms and conditions:

(a)    Borrower shall request the applicable one-year extension, if at all, by written notice (the "**Extension Notice**") to Agent not more than 120 days, and not less than 30 days prior to the Initial Maturity Date, or the first extended maturity date, as applicable.

(b)    The Completion Date shall have occurred.

(c)    No Potential Default or Default shall have occurred or be continuing at the time of delivery of the Extension Notice and the commencement of the Extension Period.

(d)    Current financial statements regarding Borrower and Guarantor (dated not earlier than sixty (60) days prior to the Extension Notice) and all other financial statements and other information as may be required under the Loan Documents regarding Borrower, Guarantor and the Property, shall have been submitted promptly to Agent.

(e)    The representations and warranties made or deemed made by Borrower and Guarantor in the Loan Documents to which any of them is a party, shall be true and correct in all material respects at the time of delivery of the Extension Notice and on the commencement of the Extension Period, with the same force and effect as if made on and as of each such date, except for those that may no longer be true as a result of the passage of time and do not result in a Default or Potential Default.

(f)    Whether or not the extension becomes effective, Borrower shall pay all out-of-pocket costs and expenses incurred by Agent and Lender in connection with the proposed extension (pre- and post-closing), including, without limitation, appraisal fees, environmental audit and legal fees; all such costs and expenses incurred up to the time of Agent and Lender's written agreement to the extension shall be due and payable prior to Agent's and Lender's execution of that agreement (or if the proposed extension does not become effective, then upon demand by Agent or Lender, as applicable), and any future failure to pay such amounts shall constitute a Default under the Loan Documents.

FILED: WESTCHESTER COUNTY CLERK 05/01/2021 09:40 AM
NYSCEF DOC. NO. 3
INDEX NO. 55883/2021
RECEIVED NYSCEF: 05/01/2021
21-07096-shl    Doc 36-11    Filed 02/11/22    Entered 02/11/22 17:43:36    Exhibit 11
Pg 17 of 113

(g)    All applicable regulatory requirements applicable to Agent and/or Lender shall have been satisfied with respect to the extension.

(h)    Not later than the Initial Maturity Date or the extended maturity date, as applicable, (i) Agent shall have been provided with an updated title report and judgment and lien searches, and appropriate title insurance endorsements shall have been issued as required by Agent; and (ii) Borrower shall have paid to Agent, for the benefit of Lender a non-refundable extension fee in an amount equal to one percent (1.00%) of the sum of the then outstanding principal balance of the Loan. The one percent (1.0%) fee applies to the exercise of each such extension.

(i)    The Loan-to-Value Ratio shall not exceed sixty-five percent (65%); provided, however, that, subject to Borrower's satisfaction of all other conditions to extension set forth in this Section 2.14, Borrower may, at its sole election, prepay such portion of the Loan to the extent necessary to satisfy this condition (i).

(j)    The Operating Lease shall remain in full force and effect and no default shall exist thereunder.

If all of the foregoing conditions are not satisfied strictly in accordance with their terms, the extension shall not be or become effective.

## ARTICLE 3 - ADDITIONAL COVENANTS AND AGREEMENTS; NEGATIVE COVENANTS

3.1    Construction of the Improvements. Borrower shall prosecute the construction of the Improvements with diligence and continuity, in a good and workmanlike manner, and in accordance with sound building and engineering practices, all applicable Laws and governmental requirements, the Plans, the Construction Schedule, the Budget, and the Loan Documents in all material respects. Borrower shall complete construction of the Improvements free and clear of all liens (except liens created by the Loan Documents and Permitted Encumbrances), and shall obtain a temporary certificate of occupancy and all other permits, licenses and approvals from all applicable Governmental Authorities required for the occupancy, use and operation of the Improvements, in each case satisfactory to Agent, on or before the Completion Date. In no event shall Borrower permit or suffer any party, including subcontractors, to commence proceedings to enforce any lien (including, without limitation, any mechanic lien) unless said lien is fully bonded and such bonding effects, in accordance with Laws, the removal of any such liens or claims. Borrower shall promptly correct (a) any material defect in the Improvements, (b) any material departure from the Plans, Law or governmental requirements, or (c) any unpermitted encroachment by any Improvements or structure on any building setback line, easement, property line or restricted area. Borrower shall maintain all permits and Governmental Approvals necessary for construction of the Improvements, and Borrower shall not commence construction of any work or component or phase of work, until Borrower has obtained all permits and Government Approvals that are required to be obtained prior to the commencement of construction of such work, component or phase of work. Borrower shall, upon demand of Agent based upon the advice of the Construction Inspector, correct any Unsatisfactory Work; and the Advance shall not constitute a waiver of Agent's right to require compliance with this covenant with respect to any such Unsatisfactory Work. None of Agent, Lender or the Construction Inspector shall have any affirmative duty to Borrower or any third party to inspect for Unsatisfactory Work or other defects or to call them to the attention of Borrower or anyone else.

3.2    Plans and Changes. No construction shall be undertaken on the Land except substantially as shown in the Plans. Borrower assumes full responsibility for the compliance of the Plans and the Property with all Laws, governmental requirements and sound building and engineering practices. No plans or

FILED: WESTCHESTER COUNTY CLERK 05/01/2021 09:40 AM
NYSCEF DOC. NO. 3
INDEX NO. 55883/2021
RECEIVED NYSCEF: 05/01/2021
21-07096-shl    Doc 36-11    Filed 02/11/22    Entered 02/11/22 17:43:36    Exhibit 11
Pg 18 of 113

specifications for material improvements on the Property or any material changes thereto shall be included as part of the Plans until approved by Agent, Construction Inspector, all applicable Governmental Authorities, and all other parties required under the Loan Documents. Except for Permitted Changes, without Agent's prior written consent, Borrower shall not change or modify the Plans, agree to any change order, or allow any extras to any contractor or any subcontractor. Agent shall respond to a request for approval of a material addition or modification to any Plans within ten (10) business days of written request from Borrower. At any time that Agent's approval is required under this Section 3.2, Agent's approval shall be deemed given if Agent shall not have responded to any specific written request within such ten (10) business day period.

3.3    Material Contracts; Governmental Approvals. Without Agent's prior written approval, Borrower shall not (a) enter into any Material Contract, (b) terminate any such Material Contracts, (c) sell, assign, pledge, transfer, mortgage, hypothecate or otherwise dispose of (by operation of law or otherwise) or encumber any part of its interest in any Material Contract or any material Government Approval, (d) waive any material default under or breach of any material provisions of any Material Contract or any material Government Approval, or waive, forgive, release or fail to enforce any material right, interest or entitlement, howsoever arising, under or in respect of any of the foregoing, or vary or agree to the variation in any material way of any of the foregoing or of the performance of any other Person or Governmental Authority thereunder, (e) amend or modify any provision of, or give any consent under, any Material Contract or any material Government Approval, or (f) petition, request or take any other legal or administrative action that seeks, or may reasonably be expected, to rescind, terminate or suspend any General Contract, any Material Contract, any other Project Document or any Government Approval. Borrower shall not default under any contract or permit any contract to terminate by reason of any failure of Borrower to perform thereunder, and Borrower shall promptly notify Agent of Borrower's receipt of written notice of any default thereunder.

3.4    Required Equity. Borrower shall cause all Required Equity to be disbursed for payment of costs and expenses incurred by Borrower in accordance with the Budget before any Advance is made by Lender pursuant to this Agreement.

3.5    Leases. Borrower shall not enter into any Lease (or any renewals, amendments or modifications of a Lease) at the Property without Agent's prior written consent. Borrower agrees that (i) Borrower will observe and perform in all material respects all of the obligations imposed upon Borrower in the Leases and will not do or permit to be done anything to impair the security thereof; (ii) Borrower will use enforce or secure, or cause to be enforced or secured, the performance of each and every material obligation and undertaking of the respective tenants under the Leases and will appear in and defend, at Borrower's sole cost and expense, any action or proceeding arising under, or in any manner connected with, the Leases; (iii) no Rents will be waived, released, discounted, set off or compromised; (iv) except as stated in the Leases, Borrower has not received any funds or deposits from any tenant which for credit has not already been made on account of accrued Rents; (v) Borrower will not without the prior written consent of Agent waive, release, discount, set off, compromise, reduce or defer any Rent, receive or collect Rents more than one (1) month in advance (other than security deposits required pursuant to such Lease), grant any rent-free period to any tenant, reduce any Lease term or waive, release or otherwise amend or modify any other material obligation under any Lease, renew or extend any Lease except in accordance with a right of the tenant thereto in such Lease, approve or consent to an assignment of a Lease or a subletting of any part of the premises covered by a Lease, or settle or compromise any claim against a tenant under a Lease in bankruptcy or otherwise; (vi) Borrower will not, without the prior written consent of Agent, terminate or consent to the cancellation or surrender of any Lease; (vii) Borrower shall give prompt notice to Agent, as soon as Borrower first obtains notice, of any claim, or the commencement of any action, by any tenant or subtenant under or with respect to a Lease regarding any claimed damage, default, diminution of or offset against Rent, cancellation of the Lease, or constructive eviction, and Borrower shall defend, at Borrower's

FILED: WESTCHESTER COUNTY CLERK 05/01/2021 09:40 AM
NYSCEF DOC. NO. 3    21-07096-shl    Doc 36-11    Filed 02/11/22    Entered 02/11/22 17:43:36    Exhibit 11
Pg 19 of 113

INDEX NO. 55883/2021
RECEIVED NYSCEF: 05/01/2021

expense, any proceeding pertaining to any Lease, including, if Agent so requests, any such proceeding to which Agent is a party; and (viii) if a Default exists, promptly upon request by Agent, Borrower shall, subject to compliance with all Laws, deliver to Lender all security deposits and executed originals of all Leases and copies of all records relating thereto.

3.6    Compliance with Laws; Operation.

(a)    Borrower shall:  (i) observe and comply with all Laws applicable to the ownership, construction, operation, use and maintenance of the Property; (ii) obtain, comply with and maintain in full force and effect all Government Approvals as shall now or hereafter be necessary under applicable Law in connection with the ownership, construction, operation, use or maintenance of the Project or the execution, delivery and performance by Borrower of any Material Contract to which it is a party; and promptly furnish a true and complete copy of each such Government Approval to Lender; and (iii) unless otherwise approved by Agent, contest any proceedings before any Governmental Authority, and resist any proposed adverse changes in applicable Law if it is commercially reasonable to do so.

(b)    After prior notice to Agent, Borrower, at its own expense, may contest by appropriate legal proceedings promptly initiated and conducted in good faith and with due diligence, the validity or application of any applicable Law; provided that: (i) no Potential Default or Default exists; (ii) Borrower shall pay any outstanding fines, penalties or other payments under protest unless such proceeding shall suspend the collection of such items; (iii) such proceeding shall be permitted under and be conducted in accordance with the provisions of any other instrument to which Borrower or the Property is subject and shall not constitute a default thereunder; (iv) no part of or interest in the Property will be in danger of being sold, forfeited, terminated, canceled or lost during the pendency of the proceeding; (v) such proceeding shall not subject Borrower, Agent or Lender to criminal or civil liability (other than civil liability as to which adequate security has been provided pursuant to clause (vi) below); (vi) Borrower shall have furnished such security as may be required in the proceeding, or as may be reasonably requested by Agent, to insure the payment of any such items, together with all interest and penalties thereon, which shall not be less than one hundred ten percent (110%) of the maximum liability of Borrower as determined by Agent; and (vii) Borrower shall promptly upon final determination thereof pay the amount of such items, together with all costs, interest and penalties.

(c)    Borrower will preserve, protect, renew, extend and retain all requisite rights, powers, authority, privileges and franchises to carry on its business and to own and operate the Property in accordance with the Leases, the Permitted Encumbrances and otherwise in accordance with this Agreement, and all other material rights and privileges granted for or applicable to the Property. Borrower will not initiate or permit any zoning reclassification of the Property or seek any variance under existing zoning ordinances applicable to the Property. Borrower shall not use or permit the use of the Property in such a manner which would result in such use becoming a nonconforming use under applicable zoning ordinances or other Law. If under applicable zoning provisions the use of all or any portion of the Property is or shall become a nonconforming use, Borrower will not cause or permit the nonconforming use to be discontinued or the nonconforming Improvement to be abandoned without the prior written consent of Agent.

(d)    Other than a Permitted Encumbrance, Borrower will not impose any easement, restrictive covenant or encumbrance upon the Property, execute or file any subdivision plat or condominium declaration affecting the Property or consent to the annexation of the Property to any municipality, without the prior written consent of Lender. Without the prior written consent of Agent, there shall be no drilling or exploration for or extraction, removal or production of any mineral, hydrocarbon, gas, natural element, compound or substance (including sand and gravel) from the surface or subsurface of the Land regardless of the depth thereof or the method of mining or extraction thereof.

3.7    Insurance; Maintenance of the Project; Alterations.

(a)    Borrower shall maintain insurance with respect to the Property with such coverages, amounts and policy requirements as set forth in Section 3(d) and (e) of the Security Instrument. Borrower shall cause General Contractor to, and shall use commercially reasonable efforts (and exercise all applicable rights and remedies under any applicable agreements) to cause each Subcontractor, to maintain insurance in such amounts and coverages as set forth in the Security Instrument.

(b)    Following the Lease Commencement Date, Borrower shall: (i) maintain or cause to be maintained the Project in good condition and repair, in a manner consistent with a skilled nursing facility in Westchester County, New York, and make or cause to be made all reasonably necessary repairs or replacements thereto; (ii) subject to the alterations permitted under the Operating Lease, not remove, demolish or structurally alter, or permit or suffer the removal, demolition or structural alteration of, any of the Improvements without the prior written consent of Lender except to the extent (A) required pursuant to the development of the Project, (B) in connection with the construction work or as permitted by this Agreement, (C) in accordance with the Budget, (D) required by applicable Law or (E) performed in connection with the restoration of the Project after the occurrence of a casualty in accordance with the terms and provisions of the Security Instrument and this Agreement; (iii) subject to the terms of the Loan Documents, promptly restore or cause to be restored in like manner any portion of the Improvements which may be damaged or destroyed from any cause whatsoever; (iv) not commit, or permit, any waste of the Project; and (v) subject to the terms of the Loan Documents, not remove or permit the removal of any item constituting part of the Project without replacing it, except for the sale or disposition, in the ordinary course of business, of any property which is obsolete, all as subject to the consent of Agent.

(c)    Following the Completion Date, Borrower shall obtain Lender's prior written consent to any alterations to any Improvements that may have a material adverse effect on Borrower's financial condition, the use, operation or value of the Project, other than alterations performed in connection with the restoration of the Project after the occurrence of a casualty in accordance with the terms and provisions of the Security Instrument and this Agreement.

3.8    Assignment of Plans and Contracts and Government Approvals. As additional security for the Obligations, Borrower hereby transfers and assigns to Agent, for the benefit of Lender, and grants a security interest in all of Borrower's right, title and interest, but not its liability, in, under and to the Plans, all Material Contracts and Government Approvals, and agrees that all of the same are covered by the security agreement provisions of the Security Instrument and the General Assignment. Borrower agrees to deliver to Agent from time to time upon Agent's reasonable request such consents to the foregoing assignment from parties contracting with Borrower as Agent may require. Neither this assignment nor any action by Agent or Lender shall constitute an assumption by Agent or Lender of any obligation with respect to the Plans or under any Project Document or Government Approval. Borrower hereby agrees to perform all of its material obligations under any Project Document or Government Approval, and Borrower shall continue to be liable for all obligations of Borrower with respect thereto. Borrower agrees to take all necessary action to prevent the termination, in accordance with the terms thereof or otherwise, of the General Contract, any Material Contract, any other material Project Document and any Government Approval and to enforce in accordance with its terms each material covenant or obligation set forth in the General Contracts, each Material Contract, each other Project Document and each Government Approval. During the continuance of a Default, Agent, for the benefit of Lender, shall have the right (but shall have no obligation) to take in its name or in the name of Borrower such action as Agent may determine to be necessary to cure any default with respect to the Plans, any Government Approval or under any Project Document or to protect the rights of Borrower, Agent or Lender with respect thereto. Borrower irrevocably constitutes and appoints Agent as Borrower's attorney-in-fact, which power of attorney is coupled with an interest and irrevocable, to enforce in Borrower's name or in the name of Agent, for the benefit of Lender,

all rights of Borrower with respect to the Plans, the Government Approvals or under any Project Document during the continuance of a Default. Agent and Lender shall incur no liability if any action so taken by Agent or on Agent's or Lender's behalf shall prove to be inadequate or invalid. Subject to the rights of third parties that prepared the Plans, Agent and Lender may use the Plans for any purpose relating to the Improvements. Borrower indemnifies and holds Agent and Lender harmless from and against any actual, out-of-pocket loss, cost, liability or expense (including consultants' fees and expenses and reasonable attorneys' fees and expenses) incurred in connection with Borrower's failure to perform such contracts or any action taken by Agent and Lender. Borrower represents and warrants to Agent and Lender that the copies of the Plans delivered to Agent are and shall be true and complete copies thereof, that the copy of any Project Document and Government Approval furnished or to be furnished to Agent is and shall be a true and complete copy thereof, that there have been no modifications thereof which are not fully set forth in the copies delivered, and that Borrower's interest therein is not subject to any claim, setoff or encumbrance.

3.9     Storage of Materials. Borrower shall cause all materials supplied for, or intended to be utilized in the construction of the Improvements, but not yet affixed to or incorporated into the Improvements, on the Land or at such other site as Agent may reasonably approve, in each case, to be stored on the Land or at such other site as Agent may approve ("**Approved Off-Site Location**"), in each case with adequate safeguards to prevent loss, theft, damage or commingling with materials for other projects. The aggregate cost of materials stored on the Land at any one time shall not exceed One Million and No/100 Dollars ($1,000,000.00) and the aggregate cost of materials stored at the Approved Off-Site Location shall be Two Million Five Hundred Thousand Dollars ($2,500,000.00), in each case unless otherwise approved by Agent acting in its reasonable discretion (the "**Stored Materials Advance Limit**").

3.10     Construction Inspector. Agent, for the benefit of Lender may retain the services of a Construction Inspector, whose duties may include, among others, reviewing, on a monthly basis, the Budget, the Plans and the Construction Schedule and any proposed changes to the Budget, the Plans or the Construction Schedule, performing construction cost analyses, observing and inspecting work in place and reviewing Draw Requests. Construction Inspector shall provide reports on such inspections to Agent. The duties of Construction Inspector run solely to Agent, for the benefit of Lender, and Construction Inspector shall have no obligations or responsibilities whatsoever to Borrower, the General Contractor, any of Borrower's Design Professionals or other contractors or any of their agents or employees; provided, however, Construction Inspector is not released from any liability arising out of Construction Inspector's gross negligence or willful misconduct. All fees, costs, and expenses of Construction Inspector shall be paid by Borrower. Borrower shall cooperate with Construction Inspector and will furnish to Construction Inspector such information and other material as Construction Inspector reasonably requests in connection with the performance of its duties.

3.11     Inspection. Agent, for the benefit of Lender and its agents, including Construction Inspector, may enter upon the Property to inspect the Property, the Project and any materials at any reasonable time so long as at least one (1) business day prior notice to Borrower has been provided, unless Agent deems such inspection is of an emergency nature, in which event Borrower shall provide Agent (and its Construction Inspector) with immediate access to the Property. Borrower will also permit Agent and its agents, including Construction Inspector, to photograph the Property during normal business hours and at any other reasonable time. Borrower will furnish to Agent and its agents, including Construction Inspector, for inspection and copying, all Plans, shop drawings, specifications, books and records, and other documents and information that Agent may reasonably request from time to time.

3.12     Notice to Agent. Borrower shall, within ten (10) days after Borrower is aware of the occurrence of any of the following events, notify Agent in writing thereof, specifying in each case the action Borrower has taken or will take with respect thereto: (a) any Default or Potential Default hereunder or under

any of the other Loan Documents; (b) any violation of any Law by Borrower or any Guarantor, or any claim or assertion by any Governmental Authority that the Property or Improvements fail to comply with any Law; (c) the commencement of any investigation of Borrower or the Property by any Governmental Authority, or any litigation, arbitration or other proceeding instituted or threatened in writing against Borrower or any Guarantor or the Property, and any material development therein; (d) any actual or threatened condemnation of any portion of the Property, any negotiations with respect to any such taking, or any loss of or substantial damage to the Property; (e) any material labor controversy pending or threatened against Borrower or any contractor, and any material development in any labor controversy; (f) any written notice received by Borrower with respect to the cancellation, alteration or non-renewal of any insurance coverage maintained with respect to the Property; (g) any failure by Borrower or any contractor, subcontractor or supplier to perform any material obligation under any Material Contract, any event or condition which would permit termination of a Material Contract or suspension of work thereunder for a period of more than fifteen (15) consecutive days, or any written notice given by Borrower or any contractor with respect to any of the foregoing; (h) any lien filed against the Property or any stop notice served on Borrower in connection with construction of the Improvements; (i) any required permit, license, certificate or approval with respect to the Property lapses or ceases to be in full force and effect; (j) any occurrence or event that would reasonably be expected to result in a Material Adverse Effect; or (k) the occurrence of any judgments for the payment of money rendered against Borrower aggregating in excess of $50,000.00 or against Guarantor in excess $50,000.00, or of any material non-monetary judgments, orders or decrees entered against Borrower or any of the Borrower Parties that adversely affect Agent's and/or Lender's interest in the Loan, in either case, if the same shall remain undischarged, stayed or otherwise adequately bonded (if pursuant to statutory procedure whereby the bond stays any action to enforce judgment) against within thirty (30) days thereof (or any action shall be legally taken (and not dismissed or withdrawn) by a judgment creditor to attach or levy upon any assets of Borrower or such Borrower Party to enforce any such judgment).

3.13    Financial Statements.

(a)    Borrower shall deliver to Agent, in form and detail reasonably satisfactory to Agent, the Financial Statements and other statements and information at the times and for the periods described in (i) Exhibit "B" attached hereto and (ii) any other Loan Document.

(b)    Borrower will keep and maintain full and accurate books and records administered in accordance with sound accounting principles, consistently applied, showing in detail the earnings and expenses of the Property and the operation thereof. All Financial Statements shall be in form and detail reasonably satisfactory to Agent and shall contain or be attached to the signed and dated written certification of the reporting party in form specified by Agent to certify that the Financial Statements are furnished to Agent, for the benefit of Lender in connection with the extension of credit by Lender and constitute a true and correct statement of the reporting party's financial position. All certifications and signatures on behalf of corporations, partnerships, limited liability companies or other entities shall be by the chief accounting officer, the chief financial officer, or another representative of the reporting party reasonably satisfactory to Agent. All Financial Statements for a reporting party who is an individual shall be on a form reasonably satisfactory to Agent. All fiscal year-end Financial Statements of Borrower shall be audited and certified, without any qualification or exception not acceptable to Agent in its reasonable discretion, by an independent certified public accountant reasonably acceptable to Agent, and shall contain all reports and disclosures required by generally accepted accounting principles for a fair presentation. All monthly and quarterly Financial Statements may be prepared by the applicable reporting party and shall include a minimum of a balance sheet, income statement, and statement of cash flow. Borrower shall provide, upon Agent's reasonable request, convenient facilities for the audit and verification of any such statement. Additionally, Borrower will provide Agent at Borrower's expense with all evidence that Lender may from time to time reasonably request in writing as to compliance with all provisions of the Loan Documents.

3.14    Other Information. Borrower shall promptly furnish to Agent from time to time upon Agent's request: (a) copies of any or all subcontracts entered into by contractors or subcontractors and the names and addresses of all Persons with whom Borrower or any contractor has contracted or intends to contract for the construction of the Improvements or the furnishing of labor or materials in connection therewith; (b) copies of any or all contracts, bills of sale, statements, receipts or other documents under which Borrower claims title to any materials, fixtures or articles of personal property incorporated or to be incorporated into the Improvements or subject to the lien of the Security Instrument; (c) a list of all unpaid bills for labor and materials with respect to construction of the Improvements and copies of all invoices therefor; (d) budgets of Borrower and revisions thereof showing the estimated costs and expenses to be incurred in connection with the completion of construction of the Improvements; (e) the Accounts Payable List with each Draw Request for Soft Costs; (f) current or updated detailed Project schedules or construction schedules; and (g) such other information related to Borrower, Guarantor, the Improvements, the Property, the Loan, the construction of the Improvements or any security for the Loan. In addition, Borrower shall from time to time deliver to Agent copies of UCC, lien, judgment and litigation searches and title updates with respect to any Borrower Party and the Property as reasonably requested by Agent.

3.15    Reports and Testing. Borrower shall (a) promptly deliver to Agent, without any representation or warranty whatsoever, copies of all reports, studies, inspections and tests made on the Land, the Improvements or any materials to be incorporated into the Improvements, and (b) make such additional tests on the Land, the Improvements or any materials to be incorporated into the Improvements as Agent reasonably requires. Borrower shall immediately notify Agent of any report, study, inspection or test that indicates any adverse condition relating to the Land, the Improvements or any such materials.

3.16    Appraisal. Agent, for the benefit of Lender, at Borrower's sole cost and expense, may obtain, from time to time, an appraisal of all or any part of the Property prepared in accordance with written instructions from Agent by a third-party appraiser engaged directly by Agent, for the benefit of Lender. Each such appraiser and appraisal shall be satisfactory to Agent (including satisfaction of applicable regulatory requirements). Unless required by applicable Laws, Borrower shall pay the cost of any appraisal hereunder within ten (10) Business Days after written demand, such amount and shall be secured by the Loan Documents. Borrower shall not be required to pay for more than one (1) appraisal per calendar year, unless a Potential Default or a Default is then continuing.

3.17    Reporting Compliance. Borrower agrees to comply with any and all reporting requirements applicable to the Loan which are set forth in any law, statute, ordinance, rule, regulation, order or determination of any governmental authority, including The International Investment Survey Act of 1976, The Agricultural Foreign Investment Disclosure Act of 1978, The Foreign Investment in Real Property Tax Act of 1980 and the Tax Reform Act of 1984 and further agrees upon request of Agent to furnish Agent, for the benefit of Lender with evidence of such compliance.

3.18    Payment of Withholding Taxes. Borrower shall not use, or knowingly permit any contractor or subcontractor to use, any portion of the proceeds of any Advance to pay the wages of employees unless a portion of the proceeds or other funds are also used to make timely payment to or deposit with (a) the United States of all amounts of tax required to be deducted and withheld with respect to such wages under the Code, and (b) any state and/or local Governmental Authority or agency having jurisdiction of all amounts of tax required to be deducted and withheld with respect to such wages under any applicable state and/or local Laws.

3.19    ERISA and Prohibited Transaction Taxes. As of the date hereof and throughout the term of this Agreement: (a) Borrower is not and will not be (i) an "employee benefit plan," as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("**ERISA**"); or (ii) a "plan" within the meaning of Section 4975(e) of the Internal Revenue Code of 1986, as amended from time to time

(the "**Code**"); (b) the assets of Borrower do not and will not constitute "plan assets" within the meaning of the United States Department of Labor Regulations set forth in 29 C.F.R. § 2510.3-101; (c) Borrower is not and will not be a "governmental plan" within the meaning of Section 3(32) of ERISA; (d) transactions by or with Borrower are not and will not be subject to state statutes applicable to Borrower regulating investments of fiduciaries with respect to governmental plans; and (e) Borrower shall not engage in any transaction which would cause any obligation or action taken or to be taken hereunder (or the exercise of any of Agent's or Lender's rights under this Agreement, any Note or the other Loan Documents) to be a non-exempt (under a statutory or administrative class exemption) prohibited transaction under ERISA or Section 4975 of the Code. Borrower further agrees to deliver to Agent and/or Lender such certifications or other evidence of compliance with the provisions of this Section 3.19 as Agent and/or Lender may from time to time request.

    3.20    Environmental Laws; Access Laws.

    (a)    Borrower shall comply strictly and in all respects with applicable Environmental Laws in accordance with the provisions of the Environmental Agreement. Borrower shall provide to Agent, at Borrower's expense promptly upon the written request of Agent from time to time, an Environmental Assessment or, if required by Lender, an update to any existing Environmental Assessment, to assess the presence or absence of any Hazardous Materials and the potential costs in connection with abatement, cleanup or removal of any Hazardous Materials found on, under, at or within the Project. Borrower shall pay the cost of no more than one such Environmental Assessment or update in any twelve (12) month period, unless Lender's request for an Environmental Assessment is based on (i) information provided under Section 8 of the Environmental Agreement, (ii) a reasonable suspicion of the presence of Hazardous Materials at or near the Project in violation of Environmental Law, (iii) a breach of representations under Section 2 of the Environmental Agreement in any material respect, or (iv) a Default, in which case any such Environmental Assessment or update shall be at Borrower's expense.

    (b)    Borrower agrees that it shall ensure that the Project shall at all times comply with the applicable requirements of the Americans with Disabilities Act of 1990, the Fair Housing Amendments Act of 1988, all state and local laws and ordinances related to handicapped access and all rules, regulations, and orders issued pursuant thereto including, without limitation, the Americans with Disabilities Act Accessibility Guidelines for Buildings and Facilities (collectively, "**Access Laws**"). Borrower agrees to give prompt notice to Agent of the receipt by Borrower of any written complaints related to violation of any Access Laws with respect to the Project and of the commencement of any proceedings or investigations which relate to compliance with applicable Access Laws.

    3.21    Taxes and Other Charges. Borrower shall pay, or shall cause its Tenant to pay (to the extent any Tenant is obligated to make such payments under its Lease) all Property Taxes and Other Charges now or hereafter levied or assessed or imposed against the Property, or any part thereof, as the same become due and payable (and with respect to Property Taxes, prior to the date the same become delinquent); provided, however, Borrower's obligation to directly pay Property Taxes shall be suspended for so long as Borrower complies with the terms and provisions of Section 9.2 hereof. Borrower will deliver to Agent receipts for payment or other evidence reasonably satisfactory to Agent that the Property Taxes and Other Charges have been so paid or are not then delinquent no later than ten (10) days prior to the date on which the Property Taxes and/or Other Charges would otherwise be delinquent if not paid; provided, however, Borrower is not required to furnish such receipts for payment of Property Taxes in the event that such Property Taxes are to be paid by Agent pursuant to Section 9.2 hereof. Subject to the terms of this Section 3.21, Borrower shall not suffer and shall promptly cause to be paid and discharged any Lien or charge whatsoever, which may be or become a Lien or charge against the Property or any portion thereof, and shall promptly pay for all utility services provided to the Property. After prior notice to Agent, Borrower, at its own expense, may contest by appropriate legal proceeding, promptly initiated and conducted in good faith and with due

diligence, the amount or validity or application in whole or in part of any Property Taxes or Other Charges; provided that (a) no Default or Potential Default has occurred and remains uncured; (b) such proceeding shall be permitted under, and be conducted in accordance with, the provisions of any other instrument to which Borrower is subject and shall not constitute a default thereunder and such proceeding shall be conducted in accordance with all applicable statutes, laws and ordinances; (c) neither the Property nor any part thereof or interest therein will be in danger of being sold, forfeited, terminated, cancelled or lost; (d) Borrower shall promptly upon final determination thereof pay the amount of any such Property Taxes or Other Charges, together with all costs, interest and penalties which may be payable in connection therewith; (e) such proceeding shall suspend the collection of such contested Property Taxes or Other Charges from the Property (except that if such Property Taxes or Other Charges must be paid sooner in order to avoid being delinquent, then Borrower shall cause the same to be paid prior to delinquency, and upon making such payment prior to delinquency Borrower may continue such contest); (f) Borrower shall furnish such security as may be required in the proceeding, or as may be reasonably requested by Agent, to insure the payment of any such Property Taxes or Other Charges, together with all interest and penalties thereon. Agent may pay over any such cash deposit or part thereof held by Agent to the claimant entitled thereto at any time when, in the judgment of Lender, the entitlement of such claimant is established or the Property (or part thereof or interest therein) shall be in danger of being sold, forfeited, terminated, cancelled or lost or there shall be any danger of the Lien of the Security Instrument being primed by any related Lien; and (g) such contest shall not delay or affect the construction of the Project as required under this Agreement.

3.22    Existence; Qualifications. Borrower shall do or cause to be done all things necessary to preserve, renew and keep in full force and effect its existence and comply in all material respects with all Law applicable to it, shall not cease to be validly existing and in good standing under the laws of the Commonwealth of Massachusetts or cease to be authorized to do business in, and if required by Law, in good standing in, each state in which the Property is located.

3.23    Organizational Requirements.

(a)    Borrower shall comply with the terms and conditions of Exhibit "K" with respect to the matters described therein.

(b)    Borrower shall conduct business only in its own name (including its trade name or names) and shall not change its name, identity, or type of organization specified in the first paragraph of this Agreement unless Borrower shall have obtained the prior written consent of Agent. Borrower shall promptly notify Agent (i) of any change of its organizational identification number, or (ii) if Borrower does not now have an organization identification number and later obtains one, of such organizational identification number.

(c)    Borrower shall not change the location of its chief executive office or principal place of business unless Borrower (i) shall have given Agent at least ten (10) Business Days' prior written notice and (ii) shall have taken all actions necessary or reasonably requested by Lender to file or amend any UCC financing statement or continuation statement required to assure perfection and continuation of perfection of security interests under the Loan Documents. Borrower's principal place of business and chief executive office, and the place where Borrower keeps its books and records, including recorded data of any kind or nature, regardless of the medium of recording including software, writings, plans, specifications and schematics concerning the Property, shall be the location described in the notice provision for Borrower in this Agreement; provided, however, that Borrower shall have the right (but not the obligation) to keep its books and records at the Project.

(d)     The certificate of organization and limited liability company operating agreement of each of Borrower and Member shall not be amended, modified, supplemented and/or amended and restated without the prior written consent of Agent.

3.24     Operation of the Property.

(a)     Borrower shall not enter into any agreement for the management and/or operation of the Property without Agent's prior written consent, and conditioned upon an assignment and subordination of management agreement being executed and delivered by any such manager and Borrower as is acceptable to Agent.

(b)     All Material Agreements shall be subject to the prior review and approval of Agent.

(c)     Following Final Completion, Borrower shall, or cause its Tenant to, obtain and maintain all licenses required to operate the Property as contemplated as a skilled nursing facility. Borrower shall not transfer any licenses, except to Agent pursuant to the terms of the Loan Documents.

3.25     Reserved.

3.26     Additional Indebtedness. Borrower shall not avail itself of or permit any additional extension of credit or debt of any kind (including any guarantees or other contingent obligations) (whether recourse or non-recourse, secured or unsecured) without the prior written consent of Agent except for (A) the Indebtedness; (B) the Mezzanine Loan; (C) the construction costs for the Project incurred in the ordinary course of construction in conformance with the Budget; and (D) trade payables in the ordinary course of its business of owning and operating the Property and developing the Project, provided that such trade payables are not evidenced by a note, do not exceed in the aggregate three percent (3%) of the Loan, and such obligations are paid within sixty (60) days of the date an invoice is received for payment thereof, subject to any rights of Borrower to contest same in accordance with the terms of this Agreement. Neither Borrower nor Sole Member shall make any loans, and no direct or indirect interest in Borrower nor Sole Member may be pledged as collateral for any financing or otherwise other than the Loan.

3.27     Limitation on Distributions, etc.     So long as any amount of the Loan is outstanding, Borrower shall not make any dividend, payment or distribution to any owner of any direct or indirect equity interests of Borrower or any Affiliate of any such owner of any direct or indirect equity interests of Borrower, other than payments pursuant to either the Development Agreement between Borrower and Congress Construction Corporation (the "**Development Agreement**") and the General Contract, or the payment of Approved Operating Expenses.

3.28     Contracts with Affiliates. Except for the Development Agreement and the General Contract, without the prior written consent of Agent in its sole and absolute discretion, Borrower shall not enter into any Affiliate Contract or amend, modify or terminate any Affiliate Contract that has been approved by Agent, and Member shall not enter into any Affiliate Contract with respect to Borrower or the Property, or amend, modify or terminate any such Affiliate Contract, that has been approved by Lender.

3.29     Transfers; Encumbrances. Borrower shall not, voluntarily or involuntarily, directly or indirectly, sell, convey, transfer, lease or otherwise dispose of, or mortgage, encumber or create a lien or security interest in, the Property or the income or any other revenues therefrom or permit or suffer any such action to be taken, except in each case as permitted by the Loan Documents. Except as otherwise provided in the terms of the Loan Documents, none of the collateral for the Loan may be subject to any negative pledge or other encumbrance that prohibits the granting of a lien on such collateral to secure the Borrower's obligations hereunder or under the other Loan Documents.

5962984     - 19 -

3.30    Ownership; Merger; Consolidation; Purchase or Sale of Assets.

(a)    Without the prior written consent of Agent:

(i)    Except for Permitted Transfers, Borrower shall not allow or permit any transfer of any direct or indirect interest in any member of the Borrower Group or any direct or indirect partner, member or other legal or beneficial interest holder therein to occur;

(ii)    Except for Permitted Transfers, except due to death or incapacity of an individual, Borrower shall not (A) directly or indirectly sell, transfer, convey or assign any interest in the Project or any part thereof; (B) further mortgage, pledge, encumber, alienate, grant a Lien or grant any other interest in the Project or any part thereof, whether voluntarily or involuntarily; or (C) except for matters having no Material Adverse Effect which are approved in writing by Agent, enter into any easement or other agreement granting rights in or restricting the use or development of the Project;

(iii)    Except for Permitted Transfers, no change in the organizational documents of any member of the Borrower Group or the holder of any direct or indirect interest therein which is reasonably likely to have a material adverse effect on the Project and/or management of the Project shall be effected;

(iv)    As used in this Section 3.30, "**transfer**" shall include (A) the sale, transfer, conveyance, mortgage, pledge, grant of a Lien upon, or assignment of any direct or indirect legal or beneficial ownership of the Property or the Project, (B) the sale, transfer, conveyance, mortgage, pledge, grant of a Lien upon, or assignment of any direct or indirect partnership, membership or other legal or beneficial interest, at any tier or level, in the any member of the Borrower Group, (C) the admission or withdrawal of any partner, member or other legal or beneficial interest holder to or from any member of the Borrower Group or any direct or indirect partner, member or other legal or beneficial interest holder therein, at any tier or level, or (D) the acquisition, directly or indirectly, of the right or responsibility to manage and administer the business and affairs, or otherwise exercise rights of Control over, any member of the Borrower Group or any direct or indirect partner, member or other legal or beneficial interest holder therein, at any tier or level, but shall expressly exclude any Permitted Encumbrance.

(b)    A transfer that complies with the following terms and conditions shall be considered a Permitted Transfer:

(i)    The transfer occurs after the Completion Date.

(ii)    In connection with any such transfer, Agent shall have received not less than thirty (30) days prior to the date on which such transfer is to become effective: (A) written notice of such proposed transfer, (B) true and correct copies of all documentation that will be entered into with respect to the same, and (C) if, as a result of any transfer, when considered cumulatively with all previous transfers, any Person who did not previously own ten percent (10%) or more of the direct or indirect ownership or economic interests in Borrower would acquire or hold ten percent (10%) or more of the direct or indirect ownership or economic interests in Borrower, all appropriate papers reasonably requested by Agent that reflect the identity, organization, good standing, tax status and financial standing of the proposed transferee, which papers shall include certified copies of all documents relating to the organization and formation of transferee and of the entities, if any, which are partners or members of transferee and updated organizational charts reflecting such transfer, as well as all other documents and information reasonably requested by Agent (including such

documents as it may require for Agent to undertake such background checks and satisfy such "know-your-customer" requirements as may be required to be performed by it pursuant to applicable Law); provided, however, the proposed transferee shall not be required to provide confidential information regarding the identity, organization, tax status or financial standing of any limited partners or non-managing members who have no management authority in such proposed transferee and who do not, together with their affiliates, own ten percent (10%) or more of the direct and/or indirect ownership or economic interests in Borrower;

(iii)    Such transfer shall not affect or waive Agent's rights to enforce its rights and remedies under the Loan Documents with respect to any breach or Default by Borrower or Guarantor, including, without limitation, any breach or Default under any of the Loan Documents regarding compliance with (A) single purpose entity covenants as set forth in Exhibit "K" and other covenants applicable to Borrower, or (B) negative or other covenants in any of the Loan Documents;

(iv)    The transferee shall (x) satisfy all applicable Patriot Act and related statues, rules and regulations, including applicable "know-your-customer" requirements of Agent, (y) if, as a result of any transfer, when considered cumulatively with all previous transfers, any Person who did not previously own ten percent (10%) or more of the direct or indirect ownership or economic interests in Borrower would acquire or hold ten percent (10%) or more of the direct or indirect ownership or economic interests in Borrower, satisfy suitability requirements imposed by Agent with respect to the financial standing, qualification, lending conduct and reputation, including, without limitation, there shall not have been any (1) "bad act" default (i.e., a "bad act" which is customarily the subject of a recourse carve-outs guaranty similar to the Carveout Guaranty) on indebtedness for which Agent, Lender or any of Agent's or Lender's Affiliates is or was a lender, (2) criminal convictions against such transferee (or any Affiliate of such transferee) other than a misdemeanor not involving moral turpitude, or any ongoing criminal proceedings, (3) voluntary or involuntary bankruptcy, reorganization or insolvency proceedings with respect to such transferee (or any Affiliate of such transferee) within the seven (7) year period prior to such transfer or (4) litigation with respect to such transferee (or any Affiliate of such transferee) is pending, or has been previously filed, involving Agent, Lender or any of Agent's or Lender's Affiliates, or there has been any exercise or threatened exercise of remedies against such transferee (or any Affiliate of such transferee), in connection with any real estate finance-related transaction during the five (5) year period prior to the proposed transfer, and (z) not be the subject of any Sanctions nor be located, organized or a resident in a Designated Jurisdiction;

(v)    if, as a result of any transfer, when considered cumulatively with all previous transfers, any Person would acquire or hold ten percent (10%) or more of the direct or indirect ownership or economic interests in Borrower, Borrower shall have delivered to Agent such opinions, organizational documents, financial information and additional information related to the transferee as Agent may reasonably request; and

(vi)    such transfer, when considered cumulatively with all previously transfers, shall not result in twenty-five percent (25%) of more of the indirect ownership interest in Borrower having been  transferred and/or a change in Control of Borrower.

(c)    Agent's written consent to any one proposed transfer shall not be construed to be a waiver of the right of Agent to make such a determination as to any other transfer, or as a waiver of any right of Agent to consent to transfer, to the extent required hereunder.

(d)     Borrower shall reimburse Agent for all out-of-pocket expenses, including reasonable legal fees and costs, incurred by Agent in connection with any transfer for which the consent of Agent is required hereunder or which is described in Section 3.30(b).

3.31     Financial Covenants. From and after Completion, (a) the Loan-to-Value Ratio shall not exceed 65%, and (b) the Debt Service Coverage Ratio shall not be less than 1:25:1.00. In addition, all financial covenants of Tenant set forth in Section 7.4 of the Operating Lease shall be satisfied.

3.32     Use of Proceeds; Income from the Property. Borrower shall use the proceeds of the Loan only for the purposes set forth in Section 1.2 hereof. Borrower shall first apply all income derived from the Property to pay costs and expenses associated with the ownership, maintenance, development, operation and marketing of the Property, including all amounts then required to be paid under the Loan Documents, before using or applying such income for any other purpose.

3.33     Reserved.

3.34     Easements and Restrictions; Zoning. Except for Permitted Encumbrances and Required Permits, Borrower shall submit to Agent for Agent's approval, not to be unreasonably withheld, conditioned or delayed, prior to the execution thereof by Borrower all proposed easements, restrictions, covenants, permits, licenses, and other instruments which would affect the title to the Property or use of the Property for its intended purposes, accompanied by a Survey showing the exact proposed location thereof and such other information as Agent shall reasonably require. Borrower shall not subject the Property or any part thereof to any easement, restriction or covenant (including any restriction or exclusive use provision in any lease or other occupancy agreement) which is not a Permitted Encumbrance without the prior approval of Agent. With respect to any and all existing easements, restrictions, covenants or operating agreements which benefit or burden the Property, any easement, restriction or covenant to which the Property may hereafter be subjected in accordance with the provisions hereof and any zoning or land use classification of the Property approved by Agent, Borrower shall: (a) observe and perform the obligations imposed upon Borrower or the Property in all material respects; (b) not alter, modify or change the same without the prior written approval of Agent, not to be unreasonably withheld, conditioned or delayed; (c) enforce its rights thereunder in a commercially reasonable manner so as to preserve for the benefit of the Property the full benefits of the same; and (d) deliver to Agent a copy of any notice of default or other notice or correspondence received or delivered by Borrower in respect of the same promptly after Borrower's receipt or within a reasonable period of time before delivery of such notice or correspondence. Borrower shall not initiate or consent to any zoning reclassification of any portion of the Property or seek any variance under any existing zoning ordinance, or use or permit the use of any portion of the Property in any manner that could result in such use becoming a non-conforming use under any zoning ordinance or any other applicable land use law, rule or regulation, in each case, without the prior written consent of Agent.

3.35     HVCRE Matters. Notwithstanding anything herein to the contrary, Borrower shall not make any distribution of cash or other property to its constituent direct and indirect owners which could cause the Loan to be classified as an HVCRE Loan, and in any event shall at all times maintain sufficient cash equity invested in the Property to ensure that the Loan is not categorized as an HVCRE Loan. Notwithstanding the foregoing to the contrary, Lender's consent to any distribution of cash or other property by Borrower to its constituent direct or indirect owners shall not be unreasonably withheld, conditioned or delayed so long as such distribution would not cause the cash equity invested in the Property by Borrower to be less than fifteen percent (15%).

FILED: WESTCHESTER COUNTY CLERK 05/01/2021 09:40 AM
NYSCEF DOC. NO. 3
21-07096-shl    Doc 36-11    Filed 02/11/22    Entered 02/11/22 17:43:36    Exhibit 11
Pg 30 of 113
INDEX NO. 55883/2021
RECEIVED NYSCEF: 05/01/2021

## ARTICLE 4 - REPRESENTATIONS AND WARRANTIES

To induce Lender to make the Loan, Borrower hereby represents and warrants to Agent and Lender that:

4.1     <u>Organization</u>.

(a)     Borrower is a limited liability company and will continue to be (a) duly organized, validly existing and in good standing under the Laws of the state of its organization, (b) authorized to do business and in good standing in the State of New York, and (c) possessed of all requisite power and authority to carry on its business, to own the Property and to develop and operate the Improvements as contemplated in this Agreement and the other Loan Documents.

(b)     Borrower has heretofore delivered to Agent a true and complete copy of the Organizational Documents of each Borrower Party. <u>Schedule 4.1</u> contains a true and accurate chart reflecting the ownership of all of the direct and indirect equity interests in Borrower, including the percentage of ownership interest of the Persons shown thereon and shall remain true and accurate hereafter unless changed to reflect transfers permitted under the terms of this Agreement.

4.2     <u>Authorization; No Conflict</u>. Each Loan Document executed by Borrower and each Borrower Party has been duly authorized, executed and delivered by Borrower and each Borrower Party, and the obligations thereunder and the performance thereof by Borrower and each Borrower Party in accordance with their terms are and will continue to be within Borrower's and such Borrower Party's power and authority without the necessity of joinder or consent of any other Person. No provision of the Loan Documents violates or will violate any applicable Law, any covenants or restrictions affecting the Property, any order of any court or governmental authority or any contract or agreement binding on Borrower, any Borrower Party or the Property. The Loan Documents do not and will not result in the creation of any encumbrance against any assets or properties of Borrower or any Person liable, directly or indirectly, for any part of the Indebtedness except as expressly provided in such documents. Except for Governmental Approvals to be issued following construction of the Improvements, each Government Approval required for and each consent or approval required to be obtained from, and notice required to be delivered to, any other Person in connection with the execution, delivery and performance by Borrower of this Agreement, the other Loan Documents, and the General Contract has been obtained or delivered and is in full force and effect.

4.3     <u>Enforceability</u>. The Loan Documents constitute legal, valid and binding obligations of Borrower enforceable in accordance with their terms, except as the enforceability thereof may be limited by Debtor Relief Laws and except as the availability of certain remedies may be limited by general principles of equity.

4.4     <u>No Violation; No Litigation</u>.

(a)     Borrower is not in violation of any Law, regulation or ordinance, or any order of any court or Governmental Authority, and no provision of the Loan Documents violates any applicable Law, any covenants or restrictions affecting the Property, any order of any court or Governmental Authority or any contract or agreement binding on Borrower or the Property. There is no judicial or administrative action, claim, investigation, inquiry, proceeding or demand pending (or, to Borrower's actual knowledge, threatened) against Borrower or against any other Person liable directly or indirectly for any part of the Indebtedness or which adversely affects the Property (including any that challenges or which otherwise adversely affects Borrower's title to the Property) or the validity, enforceability or priority of any of the Loan Documents. There are no actions or proceedings pending before any court, quasi-judicial body or

FILED: WESTCHESTER COUNTY CLERK 05/01/2021 09:40 AM
INDEX NO. 55883/2021
NYSCEF DOC. NO. 3
21-07096-shl    Doc 36-11    Filed 02/11/22    Entered 02/11/22 17:43:36    Exhibit 11
RECEIVED NYSCEF: 05/01/2021
Pg 31 of 113

administrative agency relating to compliance of the Property with any applicable zoning, subdivision, building, environmental or land use law, ordinance or resolution.

(b)     Borrower and the Project, as applicable, and the contemplated use thereof and operations thereat, comply, and upon completion of construction of the Improvements applicable thereto shall comply, with all applicable Law.

(c)     All Government Approvals necessary in connection with the construction and operation of the Project as contemplated by the Loan Documents and the Material Contracts, other than those Government Approvals to be obtained after the date hereof as expressly identified in the Permitting Schedule, have been duly obtained, were validly issued, are in full force and effect, are not subject to appeal, are held in the name of Borrower (except for the Certificate of Need and other licenses for the operation of the licensed skilled nursing home that are held by tenant under the Operating Lease) (in the case of the Project) and are free from conditions or requirements which Borrower does not reasonably expect to be able to be satisfied in the ordinary course of business. Borrower is not aware of any proceeding pending or that has been threatened in writing that expressly seeks, or may reasonably be expected to result in, the rescission, termination, modification or suspension of any such Government Approval necessary in connection with the construction and operation of the Project as contemplated by the Loan Documents and the Material Contracts.

(d)     The information set forth in each application and other written material submitted by Borrower to the applicable Governmental Authority in connection with each Government Approval obtained by Borrower is accurate and complete in all material respects.

(e)     The Government Approvals expressly described on the Permitting Schedule as those Government Approvals which shall be obtained after the date hereof are required solely in connection with later stages of development, construction or operation of the Improvements and are not customarily obtained until a later stage of development or construction, and shall be obtained on or prior to the date when so required.

(f)     The Project (if constructed in accordance with the Plans and the Material Contracts) will conform to and comply with all covenants, conditions, restrictions and reservations in the Government Approvals and all applicable Laws.

(g)     Borrower has no reason to believe that Agent, acting for the benefit of Lender, will not be entitled, without undue expense or delay, to the benefit of each Government Approval set forth on the Permitting Schedule hereto with respect to the Project upon the exercise of remedies under the Security Instrument and the other Loan Documents.

(h)     Borrower has delivered to Agent a true and complete copy of each material Government Approval heretofore obtained with respect to the Project as indicated on the Permitting Schedule, as the same shall be supplemented during the course of obtaining additional Government Approvals as the construction work proceeds.

(i)     There is no action, suit or proceeding, judicial, administrative or otherwise (including any condemnation or similar proceeding), pending, filed or, to Borrower's knowledge, threatened or contemplated against any member of the Borrower Group or any Guarantor or against or affecting the Property that is not fully covered by insurance that would be reasonably likely to have a Material Adverse Effect.

(j)    Neither the Improvements as contemplated to be constructed by Borrower, nor the intended use of the Property and the contemplated accessory uses by Borrower, will violate (a) any applicable Laws (including subdivision, zoning, building, environmental protection and wetland protection Laws), or (b) any building permits, restrictions or records, or agreements affecting the Property or any part thereof. Neither the zoning authorizations, approvals or variances nor any other right to construct or to use the Property is to any extent dependent upon or related to any real estate other than the Property. The Improvements to be constructed by Borrower on the Property will comply with all applicable Laws once the Completion Date has occurred. To Borrower's actual knowledge, there are no violations or notices of violations of any Laws relating to Borrower or the Property that have not been cured as of the date of this Agreement.

4.5    Initial Equity. Borrower has caused the Initial Equity to be applied as provided in the Budget.

4.6    Material Contracts. Borrower has heretofore delivered to Agent a true and complete copy of each Material Contract and, subject to the terms of Section 3.3, none of the Material Contracts has been further amended, modified or terminated. The Material Contracts are in full force and effect and no party is in default under or with respect to any Material Contract. No party has any defense, offset right or other right to withhold performance under or terminate any Material Contract.

4.7    Title. Borrower has good, marketable and insurable fee simple title to the real property comprising the Property, and good title to the balance of the Property, free and clear of all liens on the Property whatsoever except the Permitted Encumbrances. The Security Instrument, when properly recorded in the appropriate records, together with any Uniform Commercial Code financing statements required to be filed in connection therewith, will create (i) a legal, valid and enforceable first priority, perfected security interest in and to, and perfected collateral assignments of, all personalty, the proceeds arising from the Property and other collateral securing the Loan, to the extent a security interest may be created therein and perfected by the filing of a UCC Financing Statement under the Uniform Commercial Code as in effect in the applicable jurisdiction, all in accordance with the terms thereof, in each case subject only to any Permitted Encumbrances.

4.8    Taxes. Borrower is not a party to any tax sharing agreement; except as disclosed in the preliminary title reports delivered to Agent, there is no proposed property tax assessment against Borrower. All U.S. federal income and other material tax returns and other reports required by applicable requirements of Law to be filed by Borrower and Guarantor have been filed, or extensions have been obtained, and (ii) all material taxes, assessments, and other governmental charges imposed upon Borrower and Guarantor or any property of Borrower and Guarantor have been paid, except to the extent contested in good faith by proper proceedings for which adequate reserves have been set aside for the payment thereof on the Financial Statements in accordance with GAAP.

4.9    Plans. Borrower has delivered to Agent a true, accurate and complete copy of the Plans. The Plans are complete in all material respects, contain all necessary detail and are adequate for construction of the Improvements, are satisfactory to Borrower. The Plans have been approved by all applicable Governmental Authorities and comply with the Loan Documents and all applicable Laws, restrictive covenants, and governmental requirements, rules and regulations. The Plans do, and the Improvements when constructed will, comply with all applicable Law regarding access and facilities for handicapped or disabled persons.

4.10    Requirements; Zoning. The Land and the Improvements comply in all material respects with all Laws and governmental requirements, including all subdivision and platting requirements, without reliance on any adjoining or neighboring property. The current and anticipated use of the Property will

comply in all material respects with all applicable zoning ordinances, regulations and restrictive covenants affecting the Land without the existence of any additional variance, non-complying use, nonconforming use or other special exception, all use restrictions of any Governmental Authority having jurisdiction have been satisfied, and no violation of any Law or regulation exists with respect thereto.

4.11    Separate Tax Lot. The Land is not part of a larger tract of land owned by Borrower or any of its Affiliates or Guarantor, is not otherwise included under any unity of title or similar covenant with other lands not encumbered by the Security Instrument, and constitutes one or more separate tax lots with a separate tax assessment or assessments for the Land and Improvements, independent of those for any other lands or improvements.

4.12    No Conveyance. With the exception of the collateral assignments in the Loan Documents, Borrower has not conveyed, assigned or otherwise disposed of or transferred (or agreed to do so) any development rights, air rights or other similar rights, privileges or attributes with respect to the Property, including those arising under any zoning or land use ordinance or other Law or governmental requirement.

4.13    Construction Matters. The Budget includes the entire Aggregate Cost and is true, correct and complete in all material respects as of the date thereof and does not omit to state any fact or circumstance necessary to make the statements contained therein not misleading in any material respect. The construction schedule for the Project is realistic and the Required Completion Date is a reasonable estimate of the time required to complete the Project. Attached hereto as Exhibit "I" is a description of the subcontractor default insurance to be provided by Borrower in connection with completion of the Improvements, and to the best of Borrower's knowledge, no other bonds, letters of credit or other security are currently required or will be required to be provided by Borrower prior to completion of the Improvements.

4.14    Utilities. All utility services necessary for the development of the Land and the construction of the Improvements and the operation thereof for their intended purpose are available at the boundaries of the Land, including electric and natural gas facilities, telephone service, water supply, storm and sanitary sewer facilities.

4.15    Financial Matters. Borrower is solvent after giving effect to all borrowings contemplated by the Loan Documents and no proceeding under any Debtor Relief Law is pending (or to Borrower's knowledge threatened) by or against Borrower or any Affiliate of Borrower as a debtor. All Financial Statements, financial information, reports, statements, plans, budgets, applications, agreements and other data and information (collectively, "**Submissions**") heretofore furnished or hereafter to be furnished by or on behalf of Borrower to Agent and/or Lender are and will be true, correct and complete in all material respects as of their respective dates and do not and will not omit to state any fact or circumstance necessary to make the statements contained therein not misleading. There has been no event or condition that could reasonably be expected to have a Material Adverse Effect on Borrower's or Guarantor's financial condition from the financial condition of Borrower or Guarantor (as the case may be) indicated in such Submissions. To Borrower's knowledge, no material adverse change has occurred since the dates of such Submissions in the financial condition of any tenant under any lease described therein. For purposes of this Section 4.15, "**Borrower**" shall also include any Person liable directly or indirectly for the Indebtedness or any part thereof, including any joint venturer or general partner of Borrower.

4.16    Borrower Not a Foreign Person. Neither the Borrower nor any Borrower Party is a "foreign person" within the meaning of the Code, Sections 1445 and 7701 (i.e., neither Borrower nor any Borrower Party is a non-resident alien, foreign corporation, foreign partnership, foreign trust or foreign estate as those terms are defined therein and in any regulations promulgated thereunder).

5962984

4.17    Business Loan. The Loan is solely for business and/or investment purposes, and is not intended for personal, family, household or agricultural purposes. Borrower warrants that the proceeds of the Loan shall be used for commercial purposes and stipulates that the Loan shall be construed for all purposes as a commercial loan.

4.18    Insurance. Borrower has obtained and delivered to Agent an environmental insurance policy and certificates of insurance for the Property reflecting the insurance coverages, amounts and other insurance requirements set forth in the Loan Documents. Neither Borrower nor, to the actual knowledge of Borrower, any other Person has done, by act or omission, anything which would materially and adversely impair the coverage of any such policy.

4.19    Condemnation. Borrower has not received any written notice of, and to Borrower's knowledge, no Person has threatened, any actual or proposed Condemnation.

4.20    Flood Zone. Except as may otherwise be disclosed on the Survey, none of the Improvements are, or when constructed will be, located in an area identified by the Federal Emergency Management Agency as an area having special flood hazards, or, if any portion of the Improvements is, or will be, located within such area, Borrower has obtained the insurance prescribed herein.

4.21    Public Access. All easements and rights of way necessary for the contemplated utilization of the Improvements have been acquired.

4.22    Boundaries. All of the improvements to be developed in connection with the Project lie wholly within the boundaries and building restriction lines of such project, and except as may otherwise be disclosed in the Survey and insurance against by the Title Policy, no improvements on adjoining properties encroach upon such project, and no improvements encroach upon or violate any easements or other encumbrances upon such project, so as to affect the value or marketability of such project.

4.23    Liens. Except as otherwise provided for in the Loan Documents, Borrower has not made any contract or arrangement of any kind the performance of which by the other party thereto would give rise to a lien on the Property other than Permitted Encumbrances.

4.24    Other Agreements; Defaults. Neither Borrower nor any Borrower Party is a party to any agreement or instrument or subject to any court order, injunction, permit, or restriction which might adversely affect the Project or the business, operations, or condition (financial or otherwise) of Borrower or any Borrower Party. Neither Borrower nor any Borrower Party is in violation of any agreement which violation would have a Material Adverse Effect.

4.25    Usury; Offsets. The terms of this Agreement are not usurious. Borrower has no offsets, counterclaims or defenses with respect to its Obligations.

4.26    Interim Disbursements. All proceeds of the Loan, if any, disbursed prior to the date hereof by Agent to Borrower have been applied to the respective items listed in the respective Draw Advance, except that in the case of any disputed items, such proceeds of the Loan have been applied to other Budget Line Items with Agent's prior approval or repaid to Agent for the benefit of Lender.

4.27    Use of Project. The Project, upon completion of the construction of the Improvements, will be used exclusively for purposes described in the Recitals to this Agreement.

4.28    Margin Stock. No part of proceeds of the Loan will be used for purchasing or acquiring any "margin stock" within the meaning of Regulations T, U or X of the Board of Governors of the Federal

Reserve System or for any other purpose which would be inconsistent with such Regulation U or any other Regulations of such Board of Governors, or for any purposes prohibited by Legal Requirements or by the terms and conditions of this Agreement or the other Loan Documents.

4.29    Investment Company Act. Borrower is not (a) an "investment company" or a company "controlled" by an "investment company," within the meaning of the Investment Company Act of 1940, as amended or (b) subject to any other federal or state law or regulation which purports to restrict or regulate its ability to borrow money.

4.30    Sanctions. Neither Borrower, any member of the Borrower Group, Guarantor, any of their respective subsidiaries nor, to Borrower's knowledge, any other Affiliate of Borrower, Guarantor or any subsidiary of Borrower or Guarantor or any of the partners, directors, officers, employees, agents, trustees, administrators, managers, advisors and representatives of Borrower, any member of the Borrower Group, Guarantor or any of their respective subsidiaries or other Affiliates, is an individual or entity currently the subject of any Sanctions, nor is Borrower, any member of the Borrower Group, Guarantor or any subsidiary of Borrower or Guarantor located, organized or resident in a Designated Jurisdiction.

4.31    ERISA. (a) Neither Borrower, nor any member of the Borrower Group is (i) an "employee benefit plan," as defined in Section 3(3) of ERISA or (ii) a "plan" within the meaning of Section 4975(e) of the Code; (b) the assets of Borrower and any member of the Borrower Group do not constitute "plan assets" within the meaning of the United States Department of Labor Regulations set forth in 29 C.F.R. §2510.3-101; and (c) neither Borrower nor any member of the Borrower Group is a "governmental plan" within the meaning of Section 3(32) of ERISA.

4.32    No Fraudulent Transfer. Borrower (i) has not entered into the transaction or any Loan Document with the actual intent to hinder, delay, or defraud any creditor, and (ii) received reasonably equivalent value in exchange for its Obligations under the Loan Documents. Giving effect to the Loan and Borrower's acquisition of the Property, the fair saleable value of Borrower's assets exceeds and will, immediately following the making of the Loan and Borrower's acquisition of the Property, exceed Borrower's total liabilities, including subordinated, unliquidated, disputed and contingent liabilities. The fair saleable value of Borrower's assets is, and immediately following the making of the Loan, will be, greater than Borrower's probable liabilities, including the maximum amount of its contingent liabilities on its debts as such debts become absolute and matured. Borrower does not intend to, and does not believe that it will, incur Indebtedness and liabilities (including contingent liabilities and other commitments) beyond its ability to pay such Indebtedness and liabilities as they mature (taking into account the timing and amounts of cash to be received by Borrower and the amounts to be payable on or in respect of the obligations of Borrower). No petition in bankruptcy has been filed against Borrower, and Borrower has never made an assignment for the benefit of creditors or taken advantage of any insolvency act for the benefit of debtors. Borrower is not contemplating either the filing of a petition by it under any state or federal bankruptcy or insolvency laws or the liquidation of all or a major portion of Borrower's assets or properties, and Borrower has no Knowledge of any Person contemplating the filing of any such petition against it or such constituent Persons.

4.33    Full and Accurate Disclosure. No statement of fact made by or on behalf of Borrower or any Borrower Party in this Agreement or in any of the other Loan Documents to which it is a party or in any certificate, statement or questionnaire delivered by Borrower or any Borrower Party in connection with the Loan contains any untrue statement of a material fact or omits to state any material fact necessary to make statements contained herein or therein not misleading. There is no material fact presently known to Borrower or any Borrower Party which has not been disclosed to Agent which materially and adversely affects, nor as far as Borrower can reasonably foresee, based on facts and circumstances presently known

to Borrower, is reasonably likely to materially and adversely affect, the Project or the business, operations or condition (financial or otherwise) of Borrower or any Borrower Party.

4.34     <u>Single Purpose Entity</u>. Borrower hereby represents and warrants that Borrower (a) is and has always been duly formed, validly existing and in good standing in the state of its incorporation and in all other jurisdictions where it is qualified to do business; (b) has not had and does not have any judgments or liens of any nature against it except for tax liens not yet delinquent; (c) has been and is in compliance with all Laws and has received or is in the process of obtaining all permits (including the Required Permits) necessary for it to operate its contemplated business; (d) is not, and has not been, the subject of, or currently, or in the past, involved in any capacity in, any pending or threatened litigation; (e) is not, and has not been, involved in any dispute with any taxing authority other than contesting real property taxes; (f) has paid all Taxes, as applicable, which have become due and payable; (g) has never owned any property other than the Property and has never engaged in any business except the entitlement and development of the Property, and other activities related to the foregoing; (h) has not failed to provide Agent with complete financial statements that reflect a fair and accurate view of its financial conditions; and (i) has no material contingent or actual obligations not related to the Property.

4.35     <u>No Default</u>. Neither Borrower nor any Borrower Party is in default of any provision of this Agreement or the Loan Documents to which it is a party.

4.36     <u>Labor Matters</u>. There are no collective bargaining agreements or similar agreement in effect with respect to Borrower or the Property. Borrower does not have any employees.

4.37     <u>Intellectual Property</u>. Neither Borrower nor any Affiliate (i) has or holds any tradenames, trademarks, servicemarks, logos, copyrights, patents or other intellectual property (collectively, "**Intellectual Property**") with respect to the Property or the use or operations thereof.

## ARTICLE 5 - DEFAULT AND REMEDIES

5.1     <u>Events of Default</u>. The occurrence of any one of the following Potential Defaults shall be a default under this Agreement if the same has not be cured within the notice and cure period set forth herein, if any ("**Default**"):

(a)     Any of the Indebtedness or any fees payable under the Note or this Agreement is not paid when due, whether on the scheduled due date or upon acceleration, maturity or otherwise; provided, however, that Borrower shall have a five (5) day grace period following the date when due for all payments that are not due on a Payment Date or the Maturity Date, and following written notice for any payment to be made by Agent from the Interest Reserve Fund, provided that any required deposits have been made by Borrower to the Interest Reserve Fund.

(b)     Any covenant, agreement or condition in this Agreement or in any other Loan Document (other than covenants to pay the Indebtedness and other than Defaults expressly listed in this <u>Section 5.1</u>) is not fully and timely performed, observed or kept by Borrower and such failure shall continue unremedied for more than thirty (30) days after notice thereof shall have been given to Borrower by Lender; <u>provided, however</u>, that if such failure is of a nature such that it cannot be cured by the payment of money and if such failure requires work to be performed, acts to be done or conditions to be removed which cannot reasonably, with due diligence, be performed, done or removed, as the case may be, within such thirty (30) day period and Borrower shall have commenced to cure such failure within such thirty (30) day period, such period shall be deemed extended for so long as shall be required by Borrower in the exercise of due diligence to cure such failure, but in no event shall such thirty (30) day period be so extended to be a period in excess of ninety (90) days.

(c)      Any statement, representation or warranty in any of the Loan Documents, or in any Budget, Financial Statement or any other writing heretofore or hereafter delivered to Lender in connection with the Indebtedness is false, misleading or erroneous in any material respect on the Closing Date or on the date as of which such statement, representation or warranty is made or deemed made; provided, however, that if Borrower did not have actual knowledge at the time of such representation or warranty that such representation or warranty was false or misleading in any material respect, the same is immaterial and non-recurring, and the facts underlying such representation or warranty are capable of being conformed to the representation or warranty as made, the same shall not be a Default hereunder if same is cured within thirty (30) days after written notice from Lender or Borrower become aware of same.

(d)      A default or breach by Borrower, Member or Guarantor of any obligation under any other Loan Document (taking into account any applicable notice and cure period set forth in such Loan Document).

(e)      Borrower shall fail in the due performance and observance of any of its covenants contained in Section 3.4, 3.6(d), 3.19, 3.23 and 3.26 through 3.31, inclusive, or Article 8.

(f)      Borrower shall fail in the due performance and observance of any of its covenants contained in Section 3.11, 3.12, 3.14, 3.15 or 3.24, and such failure shall continue for ten (10) days after notice thereof shall have been given to Borrower by Agent; provided, however, with respect to Section 3.14 (if such items are not within the possession or control of Borrower) and Section 3.15 only, if such failure requires work to be performed, acts to be done or conditions to be removed which cannot reasonably, with due diligence, be performed, done or removed, as the case may be, within such ten (10) day period and Borrower shall have commenced to cure such failure within such ten (10) day period, and there is no adverse effect on the Property such period shall be deemed extended for so long as shall be required by Borrower in the exercise of due diligence to cure such failure, but in no event shall such ten (10) day period be so extended to be a period in excess of sixty (60) days.

(g)      Any insurance required under the Loan Documents lapses or ceases to be in full force and effect.

(h)      Borrower shall fail in the due performance and observance of any its covenants contained in Section 2(i) of the Security Instrument pertaining to deposit of insurance proceeds and condemnation awards, Section 2(c) of the Security Instrument pertaining to payment of real estate taxes and/or Section 3.21 hereof (and such failure shall continue for thirty (30) days after notice thereof shall have been given to Borrower by Lender), or Section 2(b) of the Security Instrument pertaining to title and permitted encumbrances (and, to the extent such failure shall not affect the validity or priority of the Security Instrument, such failure continue for thirty (30) days after notice thereof shall have been given to Borrower by Lender).

(i)      Borrower uses, or permits the use of, funds from the Reserve Accounts for any purpose other than the purpose for which such funds were disbursed from the Reserve Accounts and such funds are not applied for such purpose or returned to the Reserve Accounts within five (5) Business Days after Borrower obtains knowledge of the same.

(j)      The construction of the Improvements, or any materials for which an Advance has been requested, fails to comply with the Plans, the Loan Documents, any Laws or Government Approvals, or any applicable restrictive covenants in any material respect and such failure adversely affects Lender's interest in the Loan in any material respect.

(k)      The Completion Date does not occur by the Required Completion Date.

5962984                                  - 30 -

(l)    Any Government Approval that is required for the continued construction of the Improvements or the continuous operation of the Property lapses or ceases to be in full force and effect and such event shall continue unremedied for more than thirty (30) days after the earlier of Borrower becoming aware of same or notice thereof shall have been given to Borrower by Lender; provided, however, that if such failure is of a nature such that it cannot be cured by the payment of money and if such failure requires work to be done, acts to be done or conditions to be removed which cannot reasonably, with due diligence, be performed, done or removed, as the case may be, within such thirty (30) day period and Borrower shall have commenced to cure such failure within such thirty (30) day period, such period shall be deemed extended for so long as shall be required by Borrower in the exercise of due diligence to cure such failure, but in no event shall such thirty (30) day period be so extended to be a period in excess of ninety (90) days.

(m)    A Borrower's Deposit is not made with Agent within ten (10) days after Agent's request therefor in accordance with <u>Section 1.5</u>.

(n)    If for any reason any General Contract or any Material Contract is terminated prior to the end of its contractual term and not promptly replaced with a substitute general contract or Material Contract, as the case may be, in each case acceptable to Agent and from a new general contractor, guarantor or contractor, as the case may be, approved by Agent using commercially reasonable discretion, and shall be deemed given for any subcontractor default insurer approved subcontractor for such trade.

(o)    Borrower shall fail to cause any Unsatisfactory Work to be corrected to the reasonable satisfaction of Agent and the Construction Inspector within thirty (30) days after written notice of such disapproval; <u>provided, however</u>, that if such Unsatisfactory Work cannot reasonably be corrected within such thirty (30) day period, then so long as Borrower shall have commenced to cause the correction of such Unsatisfactory Work within such thirty (30) day period and thereafter diligently and expeditiously proceeds to cause the correction of the same, such thirty (30) day period shall be extended for such time as is reasonably necessary for Borrower in the exercise of due diligence to cause the correction of such Unsatisfactory Work.

(p)    The occurrence with respect to the General Contractor or parent company of the General Contractor, of any of the occurrences or events described in <u>Section 5.1(f)</u>, <u>(u)(i)</u> or <u>(ii)</u> or <u>(v)</u> or the occurrence of any material default by General Contractor under the General Contract and, in either case, failure of Borrower to procure a contract with a new general contractor, in which case each of such contract, general contractor, guarantee and guarantor, as the case may be, shall be subject to the reasonable approval of Agent, within one hundred twenty (120) days after the occurrence of such event.

(q)    The Operating Lease is in default beyond any applicable cure period.

(r)    The owner of the Property enters into any lease of part or all of the Property which does not comply with the Loan Documents.

(s)    A lien for the performance of work or the supply of materials which is established against the Property, or any stop notice served on Borrower, the General Contractor, Agent or any Lender, remains unsatisfied or unbonded for a period of twenty (20) days after the date of filing or service.

(t)    Any condition or situation occurs which, in the sole determination of Agent, constitutes an impairment of the lien of the Security Instrument, if such condition or situation is not remedied within ten (10) days after written notice to Borrower thereof.

(u)    Borrower, Member or any Guarantor:

FILED: WESTCHESTER COUNTY CLERK 05/01/2021 09:40 AM
NYSCEF DOC. NO. 3
21-07096-shl   Doc 36-11   Filed 02/11/22   Entered 02/11/22 17:43:36   Exhibit 11
Pg 39 of 113
INDEX NO. 55883/2021
RECEIVED NYSCEF: 05/01/2021

(i)     (A) Executes an assignment for the benefit of creditors, or takes any action in furtherance thereof; or (B) admits in writing its inability to pay, or fails to pay, its debts generally as they become due; or (C) as a debtor, files a petition, case, proceeding or other action pursuant to, or voluntarily seeks the benefit or benefits of, any Debtor Relief Law, or takes any action in furtherance thereof; or (D) seeks the appointment of a receiver, trustee, custodian or liquidator of the Property or any part thereof or of any significant portion of its other property; or

(ii)     Suffers the filing of a petition, case, proceeding or other action against it as a debtor under any Debtor Relief Law or seeking appointment of a receiver, trustee, custodian or liquidator of the Property or any part thereof or of any significant portion of its other property, and (A) admits, acquiesces in or fails to contest diligently the material allegations thereof, or (B) the petition, case, proceeding or other action results in entry of any order for relief or order granting relief sought against it, or (C) in a proceeding under Debtor Relief Laws, the case is converted from one chapter to another, or (D) fails to have the petition, case, proceeding or other action permanently dismissed or discharged on or before the earlier of trial thereon or the sixtieth (60th) day following the date of its filing; or

(iii)     Conceals, removes, or permits to be concealed or removed, any part of its property, with intent to hinder, delay or defraud its creditors or any of them, or makes or suffers a transfer of any of its property which may be fraudulent under any fraudulent conveyance law or Debtor Relief Law; or makes any transfer of its property to or for the benefit of a creditor at a time when other creditors similarly situated have not been paid; or suffers or permits, while insolvent, any creditor to obtain a lien (other than as described in Subsection (iv) below) upon any of its property through legal proceedings which are not vacated and such lien is not discharged prior to enforcement thereof or in any event within sixty (60) days from the date thereof; or

(iv)     Fails to have discharged within a period of thirty (30) days any attachment, sequestration, or similar writ levied upon the Property or any of its material assets.

(v)     Any member of the Borrower Group, any Guarantor or any Person obligated to pay any part of the Indebtedness is liquidated, terminated, dissolved, or merged or consolidated into another entity without Lender's prior written consent.

(w)     Guarantors fail to satisfy the Guarantor Net Worth Requirement.

5.2     Remedies. Upon the occurrence and during the continuance of a Default, Agent, for the benefit of Lender, may, without notice, exercise any and all rights and remedies afforded by this Agreement, the other Loan Documents, Law, equity or otherwise, including (a) declaring any and all Indebtedness immediately due and payable, (b) reducing any claim to judgment, or (c) obtaining appointment of a receiver (to which Borrower hereby consents) and/or judicial or nonjudicial foreclosure under the Security Instrument. Provided, however, that upon the occurrence of and during the continuance of a Default, Agent, for the benefit of Lender, at its election may (but shall not be obligated to) without notice, do any one or more of the following: (a) terminate Lender's Commitment to lend and any obligation to disburse any Borrower's Deposit hereunder; (b) in its own name or in the name of Borrower, enter into possession of the Property, perform all work necessary to complete construction of the Improvements substantially in accordance with the Plans (as modified as deemed necessary by Lender), the Loan Documents, and all applicable Laws, governmental requirements and restrictive covenants, and continue to employ Borrower's architect, engineer and any contractor pursuant to the applicable contracts or otherwise; or (c) set-off and apply against any Indebtedness, to the extent thereof and to the maximum extent permitted by Law, any and all deposits, funds, or assets in which Agent and/or Lender has been granted a security interest on behalf

of Lender pursuant to any Loan Document to or for the credit or account of Borrower, subject to the provisions of Article 10.

Borrower hereby appoints Agent as Borrower's attorney-in-fact, which power of attorney is irrevocable and coupled with an interest, with full power of substitution if Agent so elects, to do any of the following in Borrower's name upon the occurrence and continuance of a Default: (i) use such sums as are necessary, including any proceeds of the Loan and any Borrower's Deposit, make such changes or corrections in the Plans, and employ such architects, engineers, and contractors as may be required, or as Agent, for the benefit of Lender, may otherwise consider desirable, for the purpose of completing construction of the Improvements substantially in accordance with the Plans (as modified as deemed necessary by Agent), the Loan Documents, and all applicable Laws, governmental requirements and restrictive covenants; (ii) execute all applications and certificates in the name of Borrower which may be required for completion of construction of the Improvements; (iii) endorse the name of Borrower on any checks or drafts representing proceeds of any insurance policies, or other checks or instruments payable to Borrower with respect to the Property; (iv) do every act with respect to the construction of the Improvements that Borrower may do; (v) prosecute or defend any action or proceeding incident to the Property; (vi) pay, settle, or compromise all bills and claims so as to clear title to the Property; and (vii) take over and use all or any part of the labor, materials, supplies and equipment contracted for, owned by, or under the control of Borrower, whether or not previously incorporated into the Improvements. Any amounts expended by Agent and Lender to construct or complete the Improvements or in connection with the exercise of its remedies herein shall be deemed to have been advanced to Borrower hereunder as a demand obligation owing by Borrower to Agent or Lender, as applicable, and shall constitute a portion of the Indebtedness, regardless of whether such amounts exceed any limits for Indebtedness otherwise set forth herein. Agent and Lender shall not have any liability to Borrower for the sufficiency or adequacy of any such actions taken by Agent or Lender.

No delay or omission of Agent or Lender to exercise any right, power or remedy accruing upon the happening of a Default shall impair any such right, power or remedy or shall be construed to be a waiver of any such Default or any acquiescence therein. No delay or omission on the part of Agent or Lender to exercise any option for acceleration of the maturity of the Indebtedness, or for foreclosure of the Security Instrument following any Default as aforesaid, or any other option granted to Agent or Lender hereunder in any one or more instances, or the acceptances by Agent or Lender of any partial payment on account of the Indebtedness, shall constitute a waiver of any such Default, and each such option shall remain continuously in full force and effect. No remedy herein conferred upon or reserved to Agent or Lender is intended to be exclusive of any other remedies provided for in any Note, any of the other Loan Documents, and each and every such remedy shall be cumulative, and shall be in addition to every other remedy given hereunder, or under any Note, any of the other Loan Documents, or now or hereafter existing at Law or in equity or by statute. Every right, power and remedy given to Agent or Lender by this Agreement, any Note, any of the other Loan Documents shall be concurrent, and may be pursued separately, successively or together against Borrower, or the Property or any part thereof, or any personal property granted as security under the Loan Documents, and every right, power and remedy given by this Agreement, any Note or any of the other Loan Documents may be exercised from time to time as often as may be deemed expedient by the Agent or Lender, as applicable.

Regardless of how Lender may treat payments received from the exercise of remedies under the Loan Documents for the purpose of its own accounting, for the purpose of computing the Indebtedness, payments shall be applied as elected by Lender. No application of payments will cure any Default or prevent acceleration or continued acceleration of amounts payable under the Loan Documents or prevent the exercise or continued exercise of rights or remedies of Agent or Lender hereunder or thereunder or at Law or in equity.

WHETHER OR NOT AGENT OR LENDER ELECTS TO EMPLOY ANY OR ALL OF THE REMEDIES AVAILABLE UPON THE OCCURRENCE OF A DEFAULT, LENDER SHALL NOT BE LIABLE FOR THE CONSTRUCTION OF OR FAILURE TO CONSTRUCT, COMPLETE OR PROTECT THE IMPROVEMENTS OR FOR PAYMENT OF ANY EXPENSES INCURRED IN CONNECTION WITH THE EXERCISE OF ANY REMEDY AVAILABLE TO AGENT OR LENDER OR FOR THE PERFORMANCE OR NON-PERFORMANCE OF ANY OTHER OBLIGATION OF BORROWER.

### ARTICLE 6 - AGENT AND LENDER

6.1 <u>Appointment</u>. Lender hereby irrevocably designates and appoints Agent as the agent of Lender hereunder and under the other Loan Documents, including, without limitation, acting as collateral agent for Lender under the Loan Documents, or any of them. In its capacity as Lender's contractual representative, Agent is a "representative" of Lender as used within the meaning of "Secured Party" under Section 9-102 of the Uniform Commercial Code.

6.2 <u>Delegation of Duties</u>. Agent may execute any of its duties under the Loan Documents by or through Agent or attorneys-in-fact and shall be entitled to receive and rely upon advice of counsel concerning all matters pertaining to such duties. Agent shall not be responsible to Lender for the negligence or misconduct of any agents or attorneys-in-fact selected by it with reasonable care.

6.3 <u>Exculpatory Provisions</u>. Neither Agent nor any of its officers, directors, employees, agents, attorneys-in-fact or affiliates shall be (1) liable to Lender for any action lawfully taken or omitted to be taken by it or such Person under or in connection with the Loan Documents (except for its or such Person's own gross negligence or willful misconduct), or (2) responsible in any manner to Lender for any recitals, statements, representations or warranties made by Borrower or any officer of Borrower contained in the Loan Documents or in any certificate, report, statement or other document referred to or provided for in, or received by Agent under or in connection with the Loan Documents or for the value, validity, effectiveness, genuineness, enforceability or sufficiency of the Loan Documents or for any failure of Borrower to perform its obligations hereunder. Agent shall not be under any obligation to Lender to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, the Loan Documents or to inspect the properties, books or records of Borrower.

6.4 <u>Reliance by Agent</u>. Agent shall be entitled to rely, and shall be fully protected in relying, upon any note, writing, resolution, notice, consent, certification, affidavit, letter, cablegram, telegram, telecopy, telex or teletype message, statement, order or other document or conversation reasonably believed by it to be genuine and correct and to have been signed, sent or made by the proper Person or Persons and upon advice and statements of legal counsel (including, without limitation, counsel to Borrower), independent accountants and other experts selected by Agent.

6.5 <u>Non-Reliance on Agent and Lender</u>. Lender expressly acknowledges that neither Agent nor any of its officers, directors, employees, agents, attorneys-in-fact or affiliates has made any representations or warranties to it, and that no act by Agent hereinafter taken, including any review of the affairs of Borrower, shall be deemed to constitute any representation or warranty by Agent to such Lender. Lender represents to Agent that it has, independently and without reliance upon Agent, and based on such documents and information as it has deemed appropriate, made its own appraisal of, and investigation into, the business, operations, property, financial and other condition and creditworthiness of Borrower and made its own decision to make its loans hereunder and enter into this Agreement. Lender also represents that it will, independently and without reliance upon Agent, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under this Agreement, and to make such investigation as it deems necessary to

FILED: WESTCHESTER COUNTY CLERK 05/01/2021 09:40 AM
NYSCEF DOC. NO. 3
INDEX NO. 55883/2021
RECEIVED NYSCEF: 05/01/2021
21-07096-shl   Doc 36-11   Filed 02/11/22   Entered 02/11/22 17:43:36   Exhibit 11
Pg 42 of 113

inform itself as to the business, operations, property, financial and other condition and creditworthiness of Borrower. Except for notices, reports and other documents expressly required to be furnished to a Lender by Agent hereunder, Agent shall not have any duty or responsibility to provide Lender with any credit or other information concerning the business, operations, property, financial and other condition or creditworthiness of Borrower which may come into the possession of Agent or any of their officers, directors, employees, agents, attorneys-in-fact or affiliates.

6.6     Indemnification. Lender agrees to indemnify Agent from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind whatsoever which may at any time (including without limitation at any time following the payment of the Obligations) be imposed on, incurred by or asserted against Agent in any way relating to or arising out of the Loan Documents or any documents contemplated by or referred to herein or the transactions contemplated hereby or any action taken or omitted by Agent under or in connection with any of the foregoing. Any obligation of Borrower or any other party to indemnify Lender under the Loan Documents shall also include an obligation of Borrower or such other party to indemnify Agent. The provisions of this Section 6.6 shall survive the payment of the Obligations and the termination of this Agreement.

6.7     Agent in Its Individual Capacity. Agent and its affiliates may make loans to, accept deposits from and generally engage in any kind of business with Borrower and affiliates as though Agent were not Agent hereunder. With respect to such loans made or renewed by it and any note issued to it, Agent shall have the same rights and powers under the Loan Documents as a Lender and may exercise the same as though they were not Agent, and the term "**Lender**" shall include Agent in their respective individual capacities as a Lender.

6.8     Successor Agents. Agent may resign as Agent under the Loan Documents upon thirty (30) days' notice to Lender and Borrower provided Lender shall have appointed a successor Agent and such successor Agent has accepted such appointment. The term "**Agent**" shall mean each such successor Agent, effective upon its appointment, and the former Agent's rights, powers and duties as Agent shall be terminated, without any other or further act or deed on the part of such former Agent or any of the parties to this Agreement or any of the Loan Documents or successors thereto. After any retiring Agent's resignation hereunder as Agent, the provisions of the Loan Documents shall inure to its benefit as to any actions taken or omitted to be taken by it while it was an Agent under the Loan Documents. Upon the acceptance of any appointment as an Agent hereunder by a successor Agent and upon the execution and filing or recording of such financing statements, or amendments thereto, and such amendments or supplements to the Security Instrument and Assignment of Leases, and such other instruments or notices, as may be necessary or desirable in order to continue the perfection of the Liens granted or purported to be granted by the Loan Documents, such successor Agent shall succeed to and become vested with all the rights, powers, discretion, privileges and duties of the retiring Agent, and the retiring Agent shall be discharged from its duties and obligations under the Loan Documents.

6.9     Limitations on Agent's Liability. No syndication agents, arranger, or book running manager, in such capacities, shall have any right, power, obligation, liability, responsibility or duty under this Agreement.

**ARTICLE 7 - GENERAL TERMS AND CONDITIONS**

7.1     Consents. Except where otherwise expressly provided in the Loan Documents, in any instance where the approval, consent or the exercise of Agent's or Lender's judgment is required, the granting or denial of such approval or consent and the exercise of such judgment shall be (a) within the sole and absolute discretion of Agent or Lender, as applicable, (b) deemed to have been given only by a specific writing intended for the purpose given and executed by Agent or Lender, as applicable, and (c) free from

any limitation or requirement of reasonableness. Notwithstanding any approvals or consents by Agent or Lender, Agent and Lender have no obligation or responsibility whatsoever for the adequacy, form or content of the Plans, the Budget, any appraisal, any contract, any change order, any lease, or any other matter incident to the Property or the construction of the Improvements. Agent's acceptance of an assignment of the Plans for the benefit of Lender shall not constitute approval of the Plans. Any inspection, appraisal or audit of the Property or the books and records of Borrower, or the procuring of documents and financial and other information by or on behalf of Agent or Lender, shall be for Agent's and Lender's protection only, and shall not constitute an assumption of responsibility to Borrower or anyone else with regard to the condition, value, construction, maintenance or operation of the Property, or relieve Borrower of any of Borrower's obligations. Borrower has selected all surveyors, architects, engineers, contractors, materialmen and all other Persons furnishing services or materials to the Project. Agent and Lender have no duty to supervise or to inspect the Property or the construction of the Improvements, nor any duty of care to Borrower or any other Person to protect against, or to inform Borrower or any other Person of the existence of, any negligent, faulty, inadequate or defective design or construction of the Improvements.

7.2     Borrower's Indemnity. Agent and Lender shall not be liable or responsible for, and Borrower shall indemnify Agent and Agent's Affiliates, Lender and Lender's Affiliates, and their respective partners, members, shareholders, directors, officers, agents, advisors, attorneys and employees (collectively, the "**Indemnitees**") from and against: (a) any claim, action, actual, out-of-pocket loss or cost (including reasonable attorneys' fees and costs) arising from, relating to or otherwise in connection with (i) the Property, the Improvements and the other collateral, including any defect therein, (ii) the performance or default of Borrower, Borrower's surveyors, architects, engineers, contractors, the Construction Inspector or any other Person, (iii) any failure to construct, complete, protect or insure the Improvements in accordance with the requirements set forth in this Agreement, (iv) the Cash Management Account and all other accounts of Borrower or the Property, but excluding any claim, action, loss or cost arising from the fraud or gross negligence of any unrelated third party, (v) the payment of costs of labor, materials or services supplied for the construction of the Improvements, (vi) in connection with the protection and preservation of the Loan collateral (including those with respect to property taxes, insurance premiums, completion of construction, operation, management, improvements, maintenance, repair, sale and disposition), or (vii) the failure of Borrower to perform any obligation of Borrower whatsoever; (b) any and all liabilities, obligations, losses, damages, penalties, claims, demands, actions, judgments, suits, costs, expenses and disbursements (including reasonable attorneys' fees and costs) of any kind or nature whatsoever which may at any time be imposed on, incurred by or asserted against any such Indemnitee in any way relating to or arising out of or in connection with (i) any of the matters described in the foregoing clause (a), (ii) the execution, delivery, enforcement, performance or administration of any Loan Document or any other agreement, letter or instrument delivered in connection with the transactions contemplated thereby or the consummation of the transactions contemplated thereby, (iii) any Commitment or Loan, or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory (including any investigation of, preparation for, or defense of any pending or threatened claim, investigation, litigation or proceeding) and regardless of whether any Indemnitee is a party thereto; (c) any claim, action, cause of action, liability, loss or cost (including reasonable attorneys' fees and costs) arising from, relating to or otherwise in connection with a management agreement; (d) any claim, action, cause of action, liability, actual out-of-pocket loss or cost (including reasonable attorneys' fees and costs) arising due to Borrower's violation of any federal, state or local laws relating to employment or labor practices; and (e) any and all liabilities, actual losses, out-of-pocket costs or expenses (including reasonable attorneys' fees and costs) that any Indemnitee suffers or incurs as a result of the assertion of any foregoing claim, demand, action, cause of action or proceeding, or as a result of the preparation of any defense in connection with any foregoing claim, demand, action, cause of action or proceeding, in all cases, whether or not an Indemnitee is a party to such claim, demand, action, cause of action or proceeding and whether it is defeated, successful or withdrawn, (all of the foregoing, collectively, the "**Indemnified Liabilities**"); provided, however, that such indemnity shall not, as to any Indemnitee, be

available to the extent that such liabilities, obligations, losses, damages, penalties, claims, demands, actions, judgments, suits, costs, expenses or disbursements are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee. Nothing, including any advance or acceptance of any document or instrument, shall be construed as a representation or warranty, express or implied, to any party by Agent or Lender. Inspection shall not constitute an acknowledgement or representation by Agent, Lender or the Construction Inspector that there has been or will be compliance with the Plans, the Loan Documents, or applicable Laws, governmental requirements or restrictive covenants, or that the construction is free from defective materials or workmanship. Inspection, whether or not followed by notice of Default, shall not constitute a waiver of any Default then existing, or a waiver of Agent's or Lender's right thereafter to insist that the Improvements be constructed in accordance with the Plans, the Loan Documents, and all applicable Laws, governmental requirements and restrictive covenants. Agent's or Lender's failure to inspect shall not constitute a waiver of any of Agent's or Lender's rights under the Loan Documents or at Law or in equity. All payments on account of the Indemnified Liabilities shall be due and payable upon demand by Agent or Lender therefor. The indemnities in this Section 7.2 shall not terminate upon the release, foreclosure or other termination of the Security Instrument but will survive the release, reconveyance, foreclosure of the Security Instrument or conveyance in lieu of foreclosure, the repayment of the Indebtedness, the release or reconveyance of the Security Instrument and the discharge of the other Loan Documents, any proceedings pursuant to Debtor Relief Laws, and any other event whatsoever.

7.3    Miscellaneous. This Agreement may be executed in several counterparts, all of which are identical, and all of which counterparts together shall constitute one and the same instrument. The Loan Documents are for the sole benefit of Lender and Borrower and are not for the benefit of any third party. A determination that any provision of this Agreement is unenforceable or invalid shall not affect the enforceability or validity of any other provision and the determination that the application of any provision of this Agreement to any Person or circumstance is illegal or unenforceable shall not affect the enforceability or validity of such provision as it may apply to other Persons or circumstances. Time shall be of the essence with respect to Borrower's obligations under the Loan Documents.

7.4    Notices.

(a)    Modes of Delivery; Changes. Except as otherwise provided herein, all notices and other communications required or which any party desires to give under this Agreement, any other Loan Document shall be in writing. Unless otherwise specifically provided in such other Loan Document, all such notices and other communications shall be deemed sufficiently given or furnished if delivered by personal delivery, by nationally recognized overnight courier service, by registered or certified United States mail, postage prepaid, or by facsimile (with, subject to Subsection (b) below, a confirmatory duplicate copy sent by first class United States mail), addressed to the party to whom directed or by (subject to Subsection (c) below) electronic mail address to Borrower, at the addresses set forth at the end of this Agreement or to Lender at the addresses set forth at the end of this Agreement (unless changed by similar notice in writing given by the particular party whose address is to be changed). Any such notice or communication shall be deemed to have been given and received either at the time of personal delivery, or in the case of courier or mail, as of the date of first attempted delivery at the address and in the manner provided herein, or in the case of facsimile, upon receipt; provided, however, that service of a notice required by any applicable statute shall be considered complete when the requirements of that statute are met. Notwithstanding the foregoing, no notice of change of address shall be effective except upon actual receipt. This Section shall not be construed in any way to affect or impair any waiver of notice or demand provided in any Loan Document or to require giving of notice or demand to or upon any Person in any situation or for any reason.

(b)      Effectiveness of Facsimile or Electronic Mail Documents and Signatures. The Loan Documents may be transmitted and/or signed by facsimile or e-mail transmission (e.g. "pdf" or "tif"). The effectiveness of any such documents and signatures shall, subject to applicable Law, have the same force and effect as manually-signed originals and shall be binding on all parties to the Loan Documents. Agent may also require that any such documents and signatures be confirmed by a manually-signed original thereof; provided, however, that the failure to request or deliver the same shall not limit the effectiveness of any facsimile or e-mail document or signature. The words "execute," "execution," "signed," "signature," and words of like import in any amendment or other modification hereof (including waivers and consents) shall be deemed to include electronic signatures, the electronic matching of assignment terms and contract formations on electronic platforms approved by Agent, or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable Law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

(c)      Limited Use of Electronic Mail. Electronic mail and internet and intranet websites may be used only to distribute routine communications, such as financial statements and other information, and to distribute Loan Documents for execution by the parties thereto, and for other purposes described herein, and may not be used for any other purpose.

7.5      Payments Set Aside. To the extent that any payment by or on behalf of Borrower is made to Agent or Lender, or Agent or Lender exercises any right of set-off, and such payment or the proceeds of such set-off or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by Lender in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any Debtor Relief Law, to a depository (including Agent, Lender or their respective Affiliates) for returned items or insufficient collected funds or otherwise, then to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such set-off had not occurred.

7.6      Successors and Assigns.

(a)      Successors and Assigns Generally. The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that neither Borrower nor Guarantor may assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of Agent. Agent and Lender shall have the right, without the consent of Borrower or any other Person, to (i) sell, encumber, pledge, hypothecate or otherwise transfer the Loan or any portion thereof, or (ii) issue or sell one or more participation interests in the Loan. (The transactions referred to in clauses (i) and (ii) are each hereinafter referred to as a "**Secondary Market Transaction**"). At Agent's and Lender's election, each note and/or component composing the Loan may be subject to one or more Secondary Market Transactions. Borrower acknowledges that Agent and Lender are composed of more than one Person and that each such Person composing Agent and Lender shall have the right, individually, to the benefits of this Section 7.6 and Section 7.7. Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent permitted in Subsection (d) of this Section 7.6 and, to the extent expressly contemplated hereby, the Related Parties of Lender) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)    Assignments by Lender. Lender may assign to one or more assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment and the Loan at the time owing to it); *provided* that any such assignment shall be subject to the following conditions:

(i)    Proportionate Amounts. Each partial assignment shall be made as an assignment of a proportionate part of all Lender's rights and obligations under this Agreement with respect to the Loan and the Commitment assigned.

(ii)    No Consents. No consent shall be required for any assignment.

(iii)    No Assignment to Certain Persons. No such assignment shall be made to a natural Person.

Subject to acceptance and recording thereof by Lender pursuant to Subsection (c) of this Section 7.6, from and after the effective date specified, the assignee shall be a party to this Agreement and, to the extent of the interest assigned by such assignment and assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such assignment and assumption, be released from its obligations under this Agreement (and, in the case of an assignment and assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of this Agreement with respect to Borrower's obligations surviving termination of this Agreement). Upon request by Lender, Borrower (at its reasonable expense) shall execute and deliver a Note ("**Replacement Note**") to the assignee Lender. Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this Subsection shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with Subsection (d) of this Section 7.6.

(c)    Register. Agent, acting solely for this purpose as an agent of Borrower (and such agency being solely for tax purposes), shall maintain at Agent's office a copy of each Assignment and Assumption delivered to it (or the equivalent thereof in electronic form) and a register for the recordation of the names and addresses of Lender, and the Commitments of, and the principal amount (and stated interest) of each Lender's share of the Loan owing to, each Lender pursuant to the terms hereof from time to time (the "**Register**"). The entries in the Register shall provide such books and records as are necessary for the registration and transfer of the Loan in a manner that shall cause the Loan to be considered to be in "registered form" within the meaning of Sections 163(f), 871(h)(2) and 881(c)(2) of the Code and any related regulations (and any other relevant or successor provisions of the Code or such regulations). In connection with the foregoing: (i) Lender shall record the name and address of each Lender and the amount of principal owing to each Lender under the Loan Documents, (ii) notwithstanding anything in the Loan Documents to the contrary, Borrower, Agent and Lender shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary, and (iii) the Register maintained by the Registrar shall be prima facie evidence of all sums owing to Lender(s) from time to time under this Agreement. The Register shall be available for inspection by Borrower and Lender, at any reasonable time and from time to time upon reasonable prior notice.

(d)    Participations. Lender may at any time, without the consent of, or notice to, Borrower, sell participations to any Person (other than a natural Person or Borrower or any of Borrower's Affiliates or Subsidiaries) (each, a "**Participant**") in all or a portion of Lender's rights and/or obligations under this Agreement (including all or a portion of its Commitment and/or the Loan owing to it); *provided* that (i) Lender's obligations under this Agreement shall remain unchanged, (ii) Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, (iii) Borrower, Agent and

Lender shall continue to deal solely and directly with Lender in connection with Lender's rights and obligations under this Agreement.

Any agreement or instrument pursuant to which Lender sells such a participation shall provide that Lender shall retain its sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement. A Participant shall not be entitled to receive any greater payment under Section 1.6 than the Lender would have been entitled to receive with respect to the participation sold to such Participant. A Lender that sells a participation shall, acting solely for this purpose as an agent of Borrower, maintain a register on which it enters the name and address of each Participant and the principal amount (and stated interest) of each Participant's interest in the Loan or other obligations under the Loan Documents (the "**Participant Register**"); *provided* that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any commitments, loans, letters of credit or its other obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations. Notwithstanding anything in the Loan Documents to the contrary, the entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.

7.7     Cooperation. If requested by Agent in writing, Borrower shall reasonably assist Agent, at Agent's and Lender's cost, in satisfying the market standards to which Agent customarily adheres or which may be required in the marketplace, by prospective investors, applicable Legal Requirements and/or otherwise in the marketplace in connection with any Secondary Market Transactions, including, without limitation, to:

(a)     promptly provide updated financial and other information with respect to the Property, the business operated at the Property and the Borrower, (i) provide updated budgets (including, without limitation, the applicable Budget) relating to the Property and the Project, (ii) provide updated appraisals, market studies, environmental reviews and reports (Phase I's and, if appropriate, Phase II's), property condition reports and other due diligence investigations of the Property and (iii) promptly provide updated representations and warranties set forth in Article 4 of this Agreement, with such changes to update for changes in circumstances at the time such updated representations and warranties are made (the "**Updated Information**") to the extent such Updated Information is provided or otherwise required under the Loan Documents, together, if customary, with appropriate verification of the Updated Information through letters of auditors or opinions of counsel acceptable to Agent; and

(b)     promptly provide opinions of counsel, which may be relied upon by Agent, underwriters and their respective counsel, agents and representatives, customary in Secondary Market Transactions with respect to the Property, the Loan Documents, and Borrower and its Affiliates, which counsel and opinions shall be satisfactory to.

(c)     Notwithstanding anything set forth herein to the contrary, Borrower shall not be required to modify any Loan Document or organizational document in any manner which would increase Borrower's obligations or decrease Borrower's rights (other than to a de minimis extent).

(d)     Subject to Section 7.7(c) and Section 7.7(e) hereof, Agent and Lender, without in any way limiting Agent's or Lender's other rights hereunder, in its sole and absolute discretion, shall have the right, at any time to require Borrower (at no material cost to Borrower) to execute and deliver "component" notes and/or modify the Loan in order to create one or more senior and subordinate notes (i.e., an A/B or A/B/C structure) and/or one or more additional components of the Note or any subsequently created Note(s),

reduce the number of components of any Note, revise the interest rate for each component, reallocate the principal balances of the notes constituting the Note and/or the components, increase or decrease the monthly debt service payments for each component or eliminate the component structure and/or the multiple note structure of the Loan (including the elimination of the related allocations of principal and interest payments), provided that the outstanding principal balance of all components immediately after the effective date of such modification equals the outstanding principal balance immediately prior to such modification and the weighted average of the interest rates for all components immediately after the effective date of such modification equals the interest rate of the original Note immediately prior to such modification. Agent and Lender shall have the right to modify the Note and/or Note and any components in accordance with this <u>Section 7.7(d)</u> and, provided that such modification shall comply with the terms of this <u>Section 7.7(d)</u>, it shall become immediately effective.

(e)    Subject to <u>Section 7.7(c)</u>, Borrower shall reasonably cooperate, at Agent's and Lender's expense, with all reasonable requests of Agent and Lender in connection with <u>Section 7.7(d)</u>). If requested by Agent, Borrower shall promptly execute and deliver such documents as shall be required by or in connection with any modification pursuant to <u>Section 7.7(d)</u>, all in form and substance satisfactory to Agent, including, the severance of security documents if requested. It shall be an Event of Default under this Agreement, the Note, the Security Instrument and the other Loan Documents if Borrower fails to comply with any of the terms, covenants or conditions of this <u>Section 7.7(e)</u> after expiration of fifteen (15) Business Days after notice thereof.

7.8    <u>No Set-off</u>. Neither Lender nor any assignee, Participant or Affiliate thereof (each, a "**Lender Party**") shall proceed directly, by right of set-off, banker's lien, counterclaim or otherwise, against any assets of Borrower or Guarantor (including any general or special, time or demand, provisional or other deposits or other indebtedness owing by such Lender Party to or for the credit or the account of Borrower or Guarantor) for the purpose of applying such assets against the Indebtedness, without the prior written consent of Lender.

7.9    <u>Servicer</u>. At the option of Agent, the Loan may be serviced by a servicer or special servicer (the "**Servicer**") selected by Agent and Agent may delegate all or any portion of its responsibilities under this Agreement and the other Loan Documents to the Servicer pursuant to a servicing agreement (the "**Servicing Agreement**") between Agent and Servicer. Lender shall pay all of the fees and expenses of the Servicer. Irrespective of whether or not Agent elects to have the Loan serviced by a Servicer, Borrower shall be responsible for the payment to Agent, on a quarterly basis, of an Agent fee (the "**Agent Fee**") of $50,000.00 per annum (i.e., $12,500.00 per quarter), payable in advance on each Payment Date.

7.10    <u>Survival</u>. This Agreement shall continue in full force and effect until the Indebtedness is paid in full and all of Lender's obligations under this Agreement are terminated; and all representations and warranties and all provisions herein for indemnity of the Indemnitees and Lender (and any other provisions herein specified to survive) shall survive payment in full, satisfaction or discharge of the Indebtedness, the replacement of any Lender, and any release or termination of this Agreement or of any other Loan Documents.

7.11    <u>Costs and Expenses</u>. Without limiting any Loan Document and to the extent not prohibited by applicable Laws, Borrower shall pay when due, shall reimburse to Agent and Lender on demand and shall indemnify Agent and Lender from, all out-of-pocket fees, costs and expenses paid or incurred by Lender in connection with the negotiation, preparation and execution of this Agreement or the other Loan Documents (and any amendments, approvals, consents, waivers and releases requested, required, proposed or done from time to time), or in connection with the disbursement, administration or collection of the Loan or the enforcement of the obligations of Borrower or the exercise of any right or remedy of Agent or Lender, including: (a) all reasonable fees and expenses of Agent's and Lender's counsel; (b) fees and charges of

each Construction Inspector, consultant, and engineer; (c) appraisal, re-appraisal and survey costs; (d) title insurance charges and premiums; (e) title search or examination costs, including abstracts, abstractors' certificates and Uniform Commercial Code searches; (f) judgment and tax lien searches for Borrower and each Guarantor; (g) escrow fees; (h) fees and costs of environmental investigations, site assessments and remediations; (i) recordation taxes, documentary taxes, transfer taxes and mortgage taxes; and (j) filing and recording fees. Borrower shall pay all costs and expenses incurred by Agent and Lender, including reasonable attorneys' fees, if the obligations or any part thereof are sought to be collected by or through an attorney at law, whether or not involving probate, appellate or administrative proceedings or proceedings under any Debtor Relief Law. Borrower shall pay all costs and expenses of complying with the Loan Documents, whether or not such costs and expenses are included in the Budget. Borrower's obligations under this Section 7.11 shall survive the delivery of the Loan Documents, the making of Advances, the payment in full of the Indebtedness, the release or reconveyance of any of the Loan Documents, the foreclosure of the Security Instrument or conveyance in lieu of foreclosure, any proceeding under any Debtor Relief Law, and any other event whatsoever.

7.12    Further Assurances. Borrower will, upon Agent's request (a) promptly correct any defect, error or omission in any Loan Document, (b) execute, acknowledge, deliver, procure, record or file such further instruments and do such further acts as Lender deems necessary, desirable or proper to carry out the purposes of the Loan Documents and to identify and subject to the liens and security interest of the Loan Documents any property intended to be covered thereby, including any renewals, additions, substitutions, replacements or appurtenances to the Property, (c) execute, acknowledge, deliver, procure, file or record any document or instrument Agent deems reasonably necessary, desirable or proper to protect the liens or the security interest under the Loan Documents against the rights or interests of third persons, and (d) provide such certificates, documents, reports, information, affidavits and other instruments and do such further acts deemed reasonably necessary, desirable or proper by Agent or Lender to comply with the requirements of any Governmental Authority having jurisdiction over Agent or Lender. In addition, at any time, and from time to time, upon request by Agent, Borrower will, at Borrower's expense, provide any and all further instruments, certificates and other documents as may, in the opinion of Agent, be necessary or desirable in order to verify Borrower's identity and background in a manner satisfactory to Agent.

7.13    Inducement to Agent and Lender. The representations, warranties, covenants, and agreements contained in this Agreement, the other Loan Documents (a) are made to induce Lender to make the Loan and extend any other credit to or for the account of Borrower pursuant hereto, and each of Agent and Lender is relying thereon and will continue to rely thereon, and (b) shall survive any foreclosure, any conveyance in lieu of foreclosure, or any proceedings under any Debtor Relief Law involving Borrower, Guarantor or the Property.

7.14    Forum. Any legal suit, action or proceeding against Borrower arising out of or relating to the Loan Documents may at Agent's option be instituted in any Federal or State Court in the State in which the Property is located. Each party to this Agreement hereby agrees and consents that, in addition to any methods of service of process provided for under applicable Law, all service of process in any such suit, action or proceeding in any state court or any United States federal court sitting in the State of New York may be made by certified or registered mail, return receipt requested, directed to such party at its address for notice stated in the Loan Documents, or at a subsequent address of which Lender received actual notice from such party in accordance with the Loan Documents, and service so made shall be complete five (5) days after the same shall have been so mailed. Nothing herein shall affect the right of Lender to serve process in any manner permitted by Law or limit the right of Agent or Lender to bring proceedings against any party in any other court or jurisdiction.

7.15    Interpretation. References to Articles, Sections, and Exhibits are, unless specified otherwise, references to articles, sections and exhibits of this Agreement. Captions and headings in the Loan Documents

5962984    - 42 -

FILED: WESTCHESTER COUNTY CLERK 05/01/2021 09:40 AM
INDEX NO. 55883/2021
NYSCEF DOC. NO. 3
21-07096-shl   Doc 36-11   Filed 02/11/22   Entered 02/11/22 17:43:36   Exhibit 11
RECEIVED NYSCEF: 05/01/2021
Pg 50 of 113

are for convenience only and shall not affect the construction of the Loan Documents. All references (a) to the Loan Documents are to the same as extended, amended, restated, supplemented or otherwise modified from time to time unless expressly indicated otherwise, and (b) to the Land, the Improvements or the Property shall mean all or any portion of each of the foregoing, respectively. References to "Dollars," "$," "money," "payments" or other similar financial or monetary terms are references to lawful money of the United States of America. Words of any gender shall include each other gender. Words in the singular shall include the plural and words in the plural shall include the singular. References to Borrower or Guarantor shall mean, each Person comprising same, jointly and severally. The words "herein," "hereof," "hereunder" and other similar compounds of the word "here" shall refer to this entire Agreement (including the attached exhibits) and not to any particular Article, Section, paragraph or provision. The terms "agree" and "agreements" mean and include "covenant" and "covenants". The words "include" and "including" shall be interpreted as if followed by the words "without limitation".

7.16    No Partnership, etc. The relationship between Lender and Borrower is solely that of lender and borrower. Each of Agent and Lender has no fiduciary or other special relationship with or duty to Borrower and none is created by the Loan Documents. Nothing contained in the Loan Documents, and no action taken or omitted pursuant to the Loan Documents, is intended or shall be construed to create any partnership, joint venture, association or special relationship between Borrower, on the one hand, and Agent or Lender, on the other hand, or in any way make Agent or Lender a co-principal with Borrower with reference to the Project, the Property or otherwise. In no event shall Agent's and/or Lender's rights and interests under the Loan Documents be construed to give Agent and/or Lender the right to control, or be deemed to indicate that Lender is in control of, the business, properties, management or operations of Borrower.

7.17    Records. The unpaid amount of the Loan and the amount of any other credit extended by Lender to or for the account of Borrower set forth on the books and records of Lender shall be presumptive evidence of the amount thereof owing and unpaid, but failure to record any such amount on Lender's books and records shall not limit or affect the obligations of Borrower under the Loan Documents to make payments on the Loan when due.

7.18    Reserved.

7.19    USA Patriot Act Notice. Agent and Lender hereby notifies Borrower that pursuant to the requirements of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "Act") and the federal regulations issued with respect thereto, it is required, from time-to-time, to obtain, verify and record information that identifies Borrower and/or Guarantor, which information includes the name, address, tax identification number of Borrower or Guarantor, as applicable, and other information that will allow Lender to identify Borrower in accordance with the Act and as shall otherwise be necessary for Agent and/or Lender to comply with federal law, including the Act and the federal regulations issued with respect thereto. Borrower and Guarantor shall, promptly following a request by Agent and/or Lender, provide all documentation and other information that Agent and/or Lender requests, including, without limitation, the information in the preceding sentence, in order to comply with its ongoing obligation under "know your customer" and anti-money laundering rules and regulations, including the Act.

7.20    Entire Agreement. The Loan Documents constitute the entire understanding and agreement between and among Borrower, Agent and Lender with respect to the transactions arising in connection with the Loan, and supersede all prior written or oral understandings and agreements between and among Borrower, Agent and Lender with respect to the matters addressed in the Loan Documents. In particular, and without limitation, the terms of any commitment letter, letter of intent or quote letter by Agent or Lender to make the Loan are merged into the Loan Documents. Agent has not made any commitments to Lender, and Lender has not made any commitments to extend the term of the Loan past its stated maturity date or

FILED: WESTCHESTER COUNTY CLERK 05/01/2021 09:40 AM
NYSCEF DOC. NO. 3
INDEX NO. 55883/2021
RECEIVED NYSCEF: 05/01/2021

21-07096-shl    Doc 36-11    Filed 02/11/22    Entered 02/11/22 17:43:36    Exhibit 11
Pg 51 of 113

to provide Borrower with financing except as set forth in the Loan Documents. Except as incorporated in writing into the Loan Documents, there are not, and were not, and no Persons are or were authorized by Agent or Lender to make, any representations, understandings, stipulations, agreements or promises, oral or written, with respect to the matters addressed in the Loan Documents.

7.21    Governing Law. **THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAW.**

7.22    Exculpation. Anything herein or in any other Loan Document or any certificate given in connection therewith or pursuant thereto (the Loan Documents and each such certificate, collectively, the "**Relevant Documents**") to the contrary notwithstanding, each of Agent and Lender agrees that, for repayment of the Loan and the payment and performance of any and all of Borrower's obligations under the Relevant Documents or any claim based thereon or otherwise in respect thereof, it shall look solely to the Property, the Project and the other assets of Borrower, and to such other collateral as may now or hereafter be given to secure the Loan or the Guarantor Documents, and no other property or assets of Borrower's direct or indirect constituent partners, members, affiliates, or the directors, officers, shareholders, agents or employees of Borrower or such constituent partners, members or affiliates (collectively, the "**Exculpated Parties**") shall be subject to levy, execution or other enforcement procedure for the satisfaction of remedies of Agent and/or Lender, or for any payment required to be made under the Relevant Documents or for the performance of any of the covenants or warranties contained in any of the Relevant Documents or for any claim based thereon or in respect thereof, nor shall any claim be brought against the Exculpated Parties; provided, however, notwithstanding anything to the contrary contained hereinabove, the foregoing provisions of this paragraph shall not (i) limit the right of Agent and/or Lender to name Borrower and/or the Guarantor or either of them as a party defendant in any action or suit for judicial foreclosure and sale under the Security Instrument so long as no deficiency judgment shall be sought or enforced against the Exculpated Parties, or (ii) affect or limit in any way the obligations of any party under the Guarantor Documents.

7.23    Lien Law Compliance. A statement given under oath and verified by the Borrower, as required under Section 22 of the New York Lien Law, is attached hereto as Exhibit "N" and made a part hereof.

## ARTICLE 8 - CASH MANAGEMENT

8.1    Cash Management.

(a)    Not later than sixty (60) days prior to the anticipated rent commencement date under the Operating Lease, Borrower shall establish an account with Wells Fargo, or another bank acceptable to Lender in its sole discretion (the "**Cash Management Account**") in the name of Borrower for the sole and exclusive benefit of Agent (on behalf of Lender) into which Borrower shall deposit, or cause to be deposited, all revenue generated by the Property.

(b)    Borrower represents, warrants and covenants that, so long as the Principal Debt remains outstanding, (i) Borrower shall immediately deposit all revenue derived from the Property and received by Borrower, into the Cash Management Account; (ii) Borrower shall immediately deposit (A) all revenue derived from the Property into the Cash Management Account and (B) all funds otherwise payable to Borrower in connection with the Property into the Cash Management Account; (iii) (A) Borrower shall have sent (and hereby represents that it has sent) a notice, substantially in the form of Exhibit "L" attached hereto, to each tenant to pay all rent and other sums due under its Lease into the Cash Management Account (such notice, the "**Tenant Direction Notice**"), (B) simultaneously with the execution of any lease entered

into on or after the date hereof in accordance with the applicable terms and conditions hereof, Borrower shall furnish each tenant under each such lease the Tenant Direction Notice and (C) Borrower shall continue to send the aforesaid Tenant Direction Notices until each addressee thereof complies with the terms thereof; (iv) there shall be no other accounts maintained by Borrower or any other Person into which revenues from the ownership and operation of the Property are directly deposited; and (v) neither Borrower nor any other Person shall open any other such account with respect to the direct deposit of income in connection with the Property. Until deposited into the Cash Management Account, any Rents and other revenues from the Property held by Borrower shall be deemed to be collateral and shall be held in trust by it for the benefit, and as the property, of Agent, for the benefit of Lender pursuant to the Security Instrument and shall not be commingled with any other funds or property of Borrower. Borrower warrants and covenants that it shall not rescind, withdraw or change any notices or instructions required to be sent by it pursuant to this Section 8.1 without Agent's prior written consent.

    8.2    <u>Disbursements from the Cash Management Account</u>.

    (a)    Agent shall direct the Cash Management Bank to allocate available funds on deposit in the Cash Management Account on each Payment Date in the following amounts and order of priority (and during the existence of a Default (as set forth in Section 9.4(c)):

    (i)    First, to the Tax Reserve Fund in an amount sufficient to pay the monthly deposit, if any, required to be made for Property Taxes in accordance with the terms and conditions of Section 9.2;

    (ii)    Second, to the Insurance Reserve Fund (if applicable) in an amount sufficient to pay the monthly deposit, if any, required to be made for Insurance Premiums in accordance with Section 9.3;

    (iii)    Third, to pay the Cash Management Bank the monthly portion of fees charged by such banks in accordance with the Cash Management Agreement;

    (iv)    Fourth, to provide funds sufficient to pay interest then due and payable on the Indebtedness (including interest and any fees, such as the Unused Line Fee and the Agent Fee), to be applied in accordance with the terms of this Agreement;

    (v)    Fifth, to provide funds sufficient to pay interest then due and payable on the Mezzanine Indebtedness, to the extent permitted under the Intercreditor Agreement;

    (vi)    Sixth, to provide funds to Borrower to pay for, or reimburse Borrower for, Approved Operating Expenses;

    (vii)    Seventh, after the Completion Date, to reduction of the Principal Debt under the Loan, whether or not then due and payable; and

    (viii)    Eighth, after the Completion Date, to reduction of the Mezzanine Indebtedness, whether or not then due and payable.

    (b)    The insufficiency of funds on deposit in the Cash Management Account (or any sub-account thereunder) shall not absolve Borrower of the obligation to make any payments as and when due pursuant to this Agreement or the other Loan Documents, and such obligations shall be separate and independent, and not conditioned on any event or circumstance whatsoever.

## ARTICLE 9 - RESERVE FUNDS

9.1    <u>Interest Reserve Funds</u>.

(a)    <u>Deposits to Interest Reserve Fund</u>. On or about the date of this agreement, or in any event prior to the payment due on September 1, 2017, Lender is making an initial advance to Borrower to be held in the Interest Reserve Fund, in the amount of Three Million Three Hundred Seventy-Five Thousand Dollars ($3,375,000.00). Amounts deposited pursuant to this <u>Section 9.1</u> are referred to herein as the "**Interest Reserve Fund**." If at any time Agent reasonably determines that the Interest Reserve Fund will not be sufficient to pay the next three monthly installments of interest, Agent shall notify Borrower of such determination and if there are not, Borrower shall deposit within ten (10) days the amount of such shortfall. Any interest earned on the Interest Reserve Fund shall be added to the Interest Reserve Fund and become a part thereof.

(b)    <u>Disbursements from Interest Reserve Fund</u>. Provided that no Default has occurred and is continuing, Agent will direct the Depository Bank to apply the Interest Reserve Fund to payment of accrued interest, and the Unused Line Fee, required to be made by the Borrower pursuant to this Agreement on the applicable scheduled Payment Date. In making any payment relating to the Interest Reserve Fund, the Depository Bank may do so according to any statement from Agent, without inquiry into the accuracy of such statement unless said statement is obviously incorrect. If the amount of the Interest Reserve Fund shall exceed the amounts due for interest on the applicable scheduled Payment Date pursuant to this Agreement, Agent shall retain such excess in the Interest Reserve Fund. Any Interest Reserve Funds remaining after the Obligations (other than Obligations that survive the payment in full of the Debt hereunder) have been paid in full shall be returned to Borrower.

(c)    <u>Termination of Interest Reserve Fund</u>. After the tenant has made its first rent payment under the Operating Lease, the Interest Reserve Fund shall terminate, and any funds remaining in the Interest Reserve Fund prior to such termination shall be applied to reduce the Principal Debt (but without payment of any Prepayment Premium).

9.2    <u>Tax Funds</u>.

(a)    <u>Deposits to Tax Reserve Fund</u>. On each Payment Date following the Lease Commencement Date, Borrower shall deposit or cause to be deposited with Agent, for deposit in the Tax Reserve Fund, one-twelfth of the real estate taxes that Agent reasonably estimates will be payable during the next ensuing twelve (12) months in order to accumulate with Lender fifteen (15) Business Days prior to their respective due dates sufficient funds to pay all such real estate taxes (said amounts together with the amount set forth in the first sentence of this <u>Section 9.1</u>, being, collectively, the "**Tax Reserve Fund**"). If at any time Agent reasonably determines that the Tax Reserve Fund is not or will not be sufficient to pay real estate taxes by the dates set forth above, Agent shall notify Borrower of such determination and Borrower shall increase its periodic payments to Agent by the amount that Agent reasonably estimates is sufficient to make up the deficiency thirty (30) days prior to delinquency of the real estate taxes. Any interest earned on the Tax Reserve Fund shall be added to the Tax Reserve Fund and become a part thereof.

(b)    <u>Disbursements from Tax Reserve Fund</u>. Borrower shall furnish Agent with (i) bills for the charges for which such deposits are required and (ii) a disbursement request reasonably satisfactory to Agent, executed by an authorized officer of Borrower, at least fifteen (15) days prior to the date on which the charges first become payable. Following receipt of the disbursement request and provided that no Default has occurred and is continuing, Agent will direct the Depository Bank to apply the Tax Reserve Fund to payments of real estate taxes required to be made by the Borrower pursuant to this Agreement, and under the Security Instrument but not, in any event, earlier than ten (10) days prior to the due dates thereof.

In making any payment relating to the Tax Reserve Fund, the Depository Bank may do so according to any bill, statement or estimate procured from the appropriate public office, without inquiry into the accuracy of such bill, statement or estimate or into the validity of any tax, assessment, sale, forfeiture, tax lien or title or claim thereof unless said bill, statement or estimate is obviously incorrect. If the amount of the Tax Reserve Fund shall exceed the amounts due for real estate taxes pursuant to this Agreement, Agent shall, in its sole and absolute discretion either return any excess to Borrower or credit such excess against future payments to be made to the Tax Reserve Fund.

9.3     Insurance Funds.

(a)     Deposits to Insurance Reserve Fund. On each Payment Date, following the Lease Commencement Date, Borrower shall deposit with Agent, or cause to be deposited with Agent, an amount equal to one-twelfth of the amount necessary to pay the property insurance premiums on the date the insurance premiums are due, such that the monthly amount deposited multiplied by the number of months remaining until the next scheduled due date for the payment of insurance premiums would equal the total amount of the insurance premiums due on such scheduled due date, as reasonably estimated by Agent, for the renewal of the coverage afforded by the property insurance policies required pursuant to this Agreement upon the expiration thereof. Amounts deposited pursuant to this Section 9.3 are referred to herein as the "**Insurance Reserve Fund**." If at any time Agent reasonably determines that the Insurance Reserve Fund will not be sufficient to pay the property insurance premiums, Agent shall notify Borrower of such determination and the monthly deposits for insurance premiums shall be increased by the amount that Agent reasonably estimates is sufficient to make up the deficiency at least thirty (30) Business Days prior to the due date for renewal of the insurance policies. Any interest earned on the Insurance Reserve Fund shall be added to the Insurance Reserve Fund and become a part thereof.

(b)     Disbursements from Insurance Reserve Fund. Borrower shall furnish Agent with (i) bills for the charges for which such deposits are required and (ii) a disbursement request reasonably satisfactory to Agent, executed by an authorized officer of Borrower, at least fifteen (15) Business Days prior to the date on which the charges first become payable. Following receipt of the disbursement request and provided that no Default has occurred and is continuing, Agent will direct the Depository Bank to apply the Insurance Reserve Fund to payment of insurance premiums required to be made by the Borrower pursuant to this Agreement, and under the Security Instrument but not, in any event, earlier than ten (10) days prior to the due dates thereof. In making any payment relating to the Insurance Reserve Fund, the Depository Bank may do so according to any bill, statement or estimate procured from the appropriate insurer or agent, without inquiry into the accuracy of such bill, statement or estimate unless said bill, statement or estimate is obviously incorrect. If the amount of the Insurance Reserve Fund shall exceed the amounts due for insurance premiums pursuant to this Agreement, Agent shall, in its sole and absolute discretion, either return any excess to Borrower or credit such excess against future payments to be made to the Insurance Reserve Fund.

9.4     Security Interest.

(a)     Borrower hereby grants to Agent, for the benefit of Lender a first-priority perfected security interest in, and assigns and pledges to Lender, the Cash Management Account, and each Reserve Account and any funds now or hereafter maintained therein (collectively, the "**Reserve Funds**") as collateral security for payment of the Obligations of Borrower. The provisions of this Section 9.4 and other provisions of this Agreement and the other Loan Documents are intended to give Lender or any subsequent holder of the Loan "control" of the Cash Management Account, each Reserve Account and the Reserve Funds within the meaning of the Uniform Commercial Code of each applicable jurisdiction.

(b)    Borrower authorizes Agent to file any financing statement or statements required by Agent to establish or maintain the validity, perfection and priority of the security interest granted herein in connection with the Cash Management Account and the Reserve Accounts. Borrower agrees that at any time and from time to time, at the expense of Borrower, Borrower will promptly and duly execute and deliver all _further_ instruments and documents, and take all further action that Lender may reasonably request, in order to perfect and protect any security interest granted or purported to be granted hereby or the priority thereof, to obtain or preserve the full benefits of this Agreement and of the rights and powers herein granted, or to enable Agent to exercise and enforce its rights and remedies hereunder.

(c)    Upon the occurrence and during the continuance of a Default, Agent may exercise any or all of its rights and remedies as a secured party, pledgee and lienholder with respect to the Cash Management Account, the Reserve Accounts and the Reserve Funds. Borrower hereby irrevocably authorizes Agent upon the occurrence and during the continuance of a Default to make any and all withdrawals and transfers from the Cash Management Account and the Reserve Accounts as Agent shall determine in its sole discretion. Without limitation of the foregoing, upon the occurrence and during the continuance of any Default, Agent may in its sole discretion apply amounts held in the Cash Management Account and the Reserve Accounts to pay for the costs of protecting or preserving the liens under the Loan Documents and/or the value of any collateral given in connection with the Loan, and, with the prior written consent of the Agent, for such other purposes as Agent may elect in its sole discretion, including for any of the following purposes: (i) repayment of the Obligations, including principal prepayments, if any, applicable to such full or partial prepayment; (ii) reimbursement of Agent and/or Lender for all losses, fees, costs and expenses (including reasonable legal fees) suffered or incurred by Agent and/or Lender as a result of such Default; (iii) payment of any amount expended in exercising any or all rights and remedies available to Agent and/or Lender at law or in equity or under this Agreement or under any of the other Loan Documents; or (iv) payment of any item as required or permitted under this Agreement; _provided_, _however_, that any application of funds shall not cure or be deemed to cure any Default. Without limiting any other provisions hereof, each of the remedial actions described in the immediately preceding sentence shall be deemed to be a commercially reasonable exercise of Agent's rights and remedies as a secured party with respect to the Cash Management Account and the Reserve Accounts and shall not in any event be deemed to constitute a setoff or a foreclosure of a statutory banker's lien. Nothing in this Agreement, the Cash Management Agreement shall obligate Agent to apply all or any portion of the Cash Management Account or any Reserve Account to effect a cure of any Default, or to pay the Obligations, or in any specific order of priority. Agent's right to withdraw and apply funds as stated herein, in the Cash Management Agreement shall be in addition to all other rights and remedies provided to Agent and Lender under this Agreement, the Note, the Security Instrument and the other Loan Documents. The exercise of any or all of Agent's and/or Lender's rights and remedies under this Agreement or under any of the other Loan Documents shall not in any way prejudice or affect Agent's rights to initiate and complete a foreclosure under the Security Instrument.

## ARTICLE 10 - OPERATING LEASE ISSUES

10.1    _Tenant Letter of Credit_. Pursuant to the terms of the Operating Lease, Tenant has agreed to deliver to Borrower at least sixty (60) days prior to the anticipated Lease Commencement Date, either an unconditional letter of credit in the amount of $3,700,000.00 (the "**Letter of Credit**") or $3,700,000.00 in cash (the "**Cash Deposit**"). If a Letter of Credit is delivered to Borrower as security pursuant to the terms of the Operating Lease, then in connection with such delivery, and in all events at least thirty (30) days prior to the anticipated Lease Commencement Date, Borrower and Lender shall enter into a Letter of Credit Agreement substantially in accordance with the form attached hereto as _Exhibit "O"_, whereby Lender holds the Letter of Credit but Borrower retains the drawing rights thereunder, until such time as a Default occurs under the Loan. If Tenant under the Operating Lease delivers the Cash Deposit, Borrower

shall arrange with the depository bank to provide Lender with a first priority perfected security interest in such Cash Deposit, pursuant to a control agreement or otherwise.

      10.2    <u>Cash Security Deposit</u>. At least sixty (60) days before the Lease Commencement Date, Tenant, under the Operating Lease, is required to deliver to Borrower the sum of $1,600,000.00 (or more, as provided in the Operating Lease), as an additional security deposit (the "**Additional Security Deposit**"). If Tenant under the Operating Lease delivers the Additional Security Deposit, Borrower shall arrange with the depository bank to provide Lender with a first priority perfected security interest in such Additional Security Deposit, pursuant to a control agreement or otherwise; provided, however, Lender acknowledges that Lender shall not have any right to draw upon such Additional Security Deposit unless Tenant is in default under the Operating Lease.

      10.3    <u>Security Interest</u>. Borrower hereby pledges to Lender, and grants Lender a security interest in, all rights of Borrower, whether now existing or arising in the future, in and to the Cash Deposit, the Additional Security Deposit, and any other security deposit posted by Tenant under the Operating Lease, including any existing funds held at JP Morgan Chase Bank ("Chase") for the benefit of Borrower as described in the Operating Lease, a control agreement, or related documents, including that certain Collateral Assignment and Pledge of Membership Interest and Security Agreement entered into by and between Lizer Jozefovic (as assignor) and Howard Fensterman, as nominee for Borrower (as assignee), and as assigned to Borrower by Howard Fensterman, as nominee for Borrower (the "Pledge Agreement"); and further assigns to Lender, as collateral security for the Loan, all of its rights under the Pledge Agreement to any membership interest in Waterview Acquisition I, LLC. Lender acknowledges, however, that Lender shall not have any right to draw upon any such security or security deposit posted by Tenant or to foreclose any other rights under the Pledge Agreement, unless Tenant is in default under the Operating Lease. Borrower shall not agree to release any of such funds held at Chase, or to modify any control agreement or security interest in such funds, without the prior written consent of Lender.

      10.4    <u>Lease Guarantees</u>. The Operating Lease includes lease guarantees from Lizer Jozefovic and Mark Neuman (the "**Operating Lease Guarantees**"). To Borrower's knowledge, the Operating Lease Guarantees are in full force and effect. Borrower agrees to enforce such Operating Lease Guarantees in accordance with commercially reasonably practices. The Operating Lease Guarantees shall not be amended or modified without the prior written consent of Agent. The Operating Lease Guarantees have been assigned to Lender as security for the Loan pursuant to the Assignment of Leases and Rents.

      10.5    <u>Application of Tenant Funds</u>. Borrower agrees that if Borrower draws on any funds posted as security under the Operating Lease pursuant to or described in this Article 10, or if Borrower obtains any payments or proceeds from the Lease Guarantees, any such funds shall be promptly delivered to Lender as additional security for the Loan. So long as the Loan is not in Default, such funds may, upon written request of Borrower, be used to pay debt service payments under the Loan or be applied to retenanting expenses for the Property, upon written approval of Lender. If the Operating Lease is in Default, and the Loan is in Default, any such funds shall be applied to the Principal Debt, together with any accrued interest, fees, prepayment fees, exit fees and other charges due under the Loan.

*[Signatures appear on the following page.]*

THE WRITTEN LOAN DOCUMENTS REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first written above.

BORROWER:

WHITE PLAINS HEALTHCARE PROPERTIES I, LLC, a Massachusetts limited liability company

By: _____

William A. Nicholson, a Manager

COMMONWEALTH OF MASSACHUSETTS

_____Suffolk_____ County, ss

On this 28 day of July 2017, before me, the undersigned notary public, personally appeared the above-named William A. Nicholson, a Manager of White Plains Healthcare Properties I, LLC, proved to me through satisfactory evidence of identification, which was ☐ photographic identification with signature issued by a federal or state government agency, ☐ oath or affirmation of a credible witness, ☐ personal knowledge of the undersigned, to be the person whose name is signed on the preceding or attached documents, and acknowledged to me he signed it voluntarily as his free act and deed, and the free act and deed of the White Plains Healthcare Properties I, LLC, as a manager of such limited liability company, for its stated purpose.

_____
Notary Public    Andria N. Emond
My Commission Expires: ____1/13/23____

Borrower's Address for Notices:
West Peabody Executive Center, Suite 200, 2 Bourbon Street, Peabody, MA 01960, Attention: William Nicholson, Telephone: 978-535-6700, Fax: 978-535-6701, E-mail Address: wnicholson@congressconstruction.com

With a copy to:

Posternak Blankstein & Lund LLP, Prudential Tower, 800 Boylston Street, Boston, MA 02199-8004, Attn: Jo-Ann M. Marzullo, Phone: 617.973.6267. 617.722.4935 fax, E-Mail: jmarzullo@PBL.COM

FILED: WESTCHESTER COUNTY CLERK 05/01/2021 09:40 AM
NYSCEF DOC. NO. 3

INDEX NO. 55883/2021

RECEIVED NYSCEF: 05/01/2021

21-07096-shl    Doc 36-11    Filed 02/11/22    Entered 02/11/22 17:43:36    Exhibit 11
Pg 58 of 113

LENDER:

SECURITY BENEFIT LIFE INSURANCE
COMPANY, a Kansas insurance company,
as Lender

By: _____
       Name: Joseph Wittrock
       Title: Chief Investment Officer

STATE OF KANSAS      )
                    )ss.
COUNTY OF Shawnee  )

    The foregoing instrument was acknowledged before me on July 28, 2017, by Joseph Wittrock, as Chief Investment Officer of Security Benefit Life Insurance Company, a Kansas insurance company, on behalf of the corporation.



Notary Public

My Appointment Expires: 7-12-21
(Notarial Seal)

Cassandra Blackwell
NOTARY PUBLIC—STATE OF KANSAS
MY APPT EXP: 7-12-21

The address of Lender is:

Security Benefit Life Insurance Company, 1 SW Security Benefit Pl, Topeka, Kansas 66636, Attention: Douglas Schneider, Telephone: (785) 438-1642, Fax: (785) 438-3080, E-mail Address: Douglas.Schneider@securitybenefit.com

With a copy to:

Nyemaster Goode, P.C., 700 Walnut Street, Suite 1600, Des Moines, Iowa 50309, Attention: James C. Wine, Telephone: 515-283-3188, Fax: 515-283-8045, E-mail Address: jwine@nyemaster.com

FILED: WESTCHESTER COUNTY CLERK 05/01/2021 09:40 AM
NYSCEF DOC. NO. 3
21-07096-shl    Doc 36-11    Filed 02/11/22    Entered 02/11/22 17:43:36    Exhibit 11
Pg 59 of 113

INDEX NO. 55883/2021
RECEIVED NYSCEF: 05/01/2021

AGENT:

SECURITY BENEFIT CORPORATION, a Kansas
corporation, as Agent

By: _____

Name: Joseph Wittrock
Title: Chief Investment Officer

STATE OF KANSAS          )
                                        )ss.
COUNTY OF Shawnee  )

     The foregoing instrument was acknowledged before me on July 28_____, 2017, by Joseph
Wittrock, as Chief Investment Officer of Security Benefit Corporation, a Kansas corporation, on behalf of
the corporation.

_____
Notary Public

My Appointment Expires: 7-12-21
(Notarial Seal)

Cassandra Blackwell
NOTARY PUBLIC—STATE OF KANSAS
MY APPT EXP: 7-12-21

The address of Agent is:

Security Benefit Life Insurance Company, 1 SW Security Benefit Pl, Topeka, Kansas 66636, Attention:
Douglas Schneider, Telephone: (785) 438-1642, Fax: (785) 438-3080, E-mail Address:
Douglas.Schneider@securitybenefit.com

With a copy to:

Nyemaster Goode, P.C., 700 Walnut Street, Suite 1600, Des Moines, Iowa 50309, Attention: James C.
Wine, Telephone: 515-283-3188, Fax: 515-283-8045, E-mail Address: jwine@nyemaster.com

EXHIBIT "A"

LEGAL DESCRIPTION OF LAND

Real property in the City of White Plains, County of Westchester, State of New York, described as follows:

ALL THAT CERTAIN PLOT, PIECE OR PARCEL OF LAND, SITUATE, LYING AND BEING IN THE CITY OF WHITE PLAINS, COUNTY OF WESTCHESTER AND STATE OF NEW YORK, SAID PARCEL BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT IN THE EASTERLY LINE OF CHURCH STREET WHERE THE SAME IS INTERSECTED BY THE SOUTHERLY LINE OF BARKER AVENUE;

RUNNING THENCE FROM SAID POINT NORTH 70° 40' 10" EAST A DISTANCE OF 173.57 FEET ALONG THE SOUTHERLY LINE OF BARKER AVENUE TO A POINT WHERE THE SAME IS INTERSECTED BY THE DIVISION LINE HEREIN DESCRIBED PARCEL ON THE WEST AND LANDS NOW OR FORMERLY OF KOEPPEL & MOHR EQUITIES ON THE EAST;

THENCE FROM SAID POINT AND ALONG SAID DIVISION LINE SOUTH 17° 59' 50" EAST A DISTANCE OF 200.51 FEET TO A POINT IN THE DIVISION LINE BETWEEN THE HEREIN DESCRIBED PARCEL ON THE NORTH AND LANDS NOW OR FORMERLY OF HAMILTON PLAZA COMPANY, INC. ON THE SOUTH;

THENCE FROM SAID POINT AND ALONG SAID LINE SOUTH 71° 01' 50" WEST A DISTANCE OF 173.24 FEET TO THE EASTERLY LINE OF CHURCH STREET;

THENCE FROM SAID POINT AND ALONG SAID LINE NORTH 18° 05' 04" WEST A DISTANCE OF 199.41 FEET TO THE POINT AND PLACE OF BEGINNING.

EXHIBIT "B"

DEFINITIONS

1.      DEFINITIONS:  As used in this Agreement and the attached exhibits, the following terms shall have the following meanings:

"**Access Laws**" has the meaning set forth in Section 3.20.

"**Accounts Payable List**" means a written summary from Borrower of all accounts paid and payable for Soft Costs associated with the applicable Draw Request identifying each such account and the invoice amount due, and shall be in form and substance acceptable to Agent.

"**Act**" has the meaning set forth in Section 7.19.

"**Advance**" means an advance of a portion of the Loan in accordance with the terms of this Agreement.

"**Affiliate**" shall mean, as to any Person, any other Person that (i) owns directly or indirectly ten percent (10%) or more of all equity interests in such Person, and/or (ii) is in Control of, is Controlled by or is under common ownership or Control with such Person, and/or (iii) is a director or officer of such Person or of an Affiliate of such Person, and/or (iv) is the spouse, issue or parent of such Person or of an Affiliate of such Person.

"**Affiliate Contract**" means any contract, agreement or similar arrangement between Borrower or Member, on the one hand, and any Affiliate of Borrower, on the other hand.

"**Agent Fee**" has the meaning set forth in Section 7.9.

"**Aggregate Costs**" means all costs incident to the Loan and the Project through the end of the Availability Period after taking into account the requirements of this Agreement, including "Hard Costs" and "Soft Costs", fees and expenses, and interest that may accrue and be payable on the Loan.

"**Agreement**" has the meaning set forth in the introductory paragraph of this Agreement, and includes all exhibits attached hereto and referenced in Section 1.1.

"**Annual Budget**" shall mean the operating budget, including all planned Capital Expenditures, for the Property prepared by Borrower in accordance with Exhibit B, Section 2 hereof for the applicable Fiscal Year or other period.

"**Approved Appraisal**" means an MAI appraisal that is (a) compliance with Title XI of the Financial Institutions Reform, Recovery and Enforcement Act of 1989 and the Uniform Standards of Professional Appraisal Practice, (b) in form and substance acceptable to Agent, and (c) prepared by an independent appraiser firm engaged by and otherwise acceptable to Agent.

"**Approved Annual Budget**" shall have the meaning set forth in Exhibit B, Section 2 hereof.

"**Approved Operating Expenses**" means the following expenses of Borrower, incurred in connection with the operation of the Property; payments for insurance premiums with respect to insurance required by the Security Instrument but not finished by Tenant; accounting and auditing expenses incurred by

Borrower to provide the financial statements required for the Loan; distributions for payment of income taxes arising from the Project; provided, however, that Approved Operating Expenses shall not exceed One Hundred Seventy-Two Thousand and No/100 Dollars ($172,000.00) per year.

"**Availability Period**" means the period from the Closing Date to the earlier to occur of (a) the Completion Date and (b) the last Business Day of the twenty-four (24th) month following the Closing Date.

"**Bankruptcy Code**" shall mean Title 11 of the United States Code, 11 U.S.C. § 101, et seq., as the same may be amended from time to time, and any successor statute or statutes and all rules and regulations from time to time promulgated thereunder, and any comparable foreign laws relating to bankruptcy, insolvency or creditors' rights or any other federal or state bankruptcy or insolvency law.

"**Borrower**" has the meaning set forth in the introductory paragraph of this Agreement.

"**Borrower Group**" means each of Borrower, Member and each Guarantor.

"**Borrower Party**" means each member of the Borrower Group and each Guarantor.

"**Borrower's Architect**" means The Architectural Team, Inc., a Massachusetts corporation.

"**Borrower's Deposit**" means a deposit by Borrower in the amount of any Budget Shortfall.

"**Borrower's Share**" means a fraction, (a) the numerator of which is the positive difference between (i) the Required Equity minus (ii) the Initial Equity, and (y) the denominator of which is the positive difference between (i) the sum of (A) the Maximum Loan Amount plus (B) the Required Equity, minus (ii) the sum of (A) the Initial Advance plus (B) the Initial Equity.

"**Budget**" means the budget and cost itemization for the Project, as defined in Section 1.4 of this Agreement.

"**Budget Line Item**" has the meaning set forth in Section 1.4(c).

"**Budget Shortfall**" means any deficiency, as determined or projected by Agent and Agent's Construction Inspector in their reasonable discretion on a line item basis (after taking into account any immediately available, documented costs savings and usage of applicable Contingency Fund as permitted by Section 1.3(b) or (c), so long as after giving effect to such usage, an adequate reserve for contingencies of the Project, whether foreseeable or unforeseeable, as determined by Agent in its sole and absolute discretion would remain available), between the amount of undisbursed Loan proceeds, plus any sums provided or to be provided by Borrower as shown in the Budget (including any such determination that the undisbursed Loan proceeds allocated for the payment of future interest on the Loan to be advanced or for the payment of future taxes or carrying costs, each on a line-item by line-item basis, are insufficient), and the Aggregate Cost. A Budget Shortfall may occur from a shortage of funds in any single line item or category of the Budget even if there are undisbursed Loan proceeds in other line items or categories.

"**Building Loan**" has the meaning set forth in the Recitals.

"**Building Loan Costs**" means those costs consisting solely of "costs of improvements" as defined in Section 2 of the New York Lien Law, as generally identified on the Section 22 Affidavit attached hereto as Exhibit "N".

"**Business Day**" means any day other than a Saturday, Sunday or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the state where Lender's Office is located.

"**Capital Expenditures**" shall mean, for any period, the amount expended for items capitalized under an income tax basis, consistently applied (including expenditures for building improvements or major repairs, leasing commissions and tenant improvements).

"**Carveout Guaranty**" shall mean that certain Guaranty Agreement, dated as of the date hereof, from Guarantor in favor of Agent, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Cash Management Account**" means the cash management account at Depository Bank established in accordance with Section 8.1(a) and pursuant to the Cash Management Agreement.

"**Cash Management Agreement**" means that certain Reserve Account Control Agreement contemplated to be entered into by and among Borrower, Agent, and the Depository Bank, in accordance with Section 8.1(a), as the same may be modified, amended, supplemented or reaffirmed from time to time.

"**Change in Law**" means the occurrence, after the date of this Agreement, of any of the following: (a) the adoption or taking effect of any Law, (b) any change in any Law or in the administration, interpretation, implementation or application thereof by any Governmental Authority, or (c) the making or issuance of any request, rule, guideline, or directive (whether or not having the force of Law) by any Governmental Authority; provided that notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and (y) all requests, rules, guidelines, or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority), or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted, or issued.

"**Closing Date**" shall mean the date of the initial funding of the Loan.

"**Closing Checklist**" means that certain Closing Requirements and Checklist setting forth the conditions for closing the Loan and recording the Security Instrument.

"**Code**" has the meaning set forth in Section 3.19.

"**Commitment**" means, as to Lender, its obligation to advance the Loan in an aggregate principal amount not exceeding the amount set forth opposite such Lender's name on the Schedule of Lenders at any one time outstanding, as such amount may be reduced or adjusted from time to time in accordance with this Agreement.

"**Completion Date**" shall mean the date when all on-site and off-site work related to the Improvements shall have been completed; all conditions to the final advance for the Improvements set forth in Exhibit "E" shall have been satisfied; Agent shall have received a certification from the Construction Inspector that final completion has been achieved and that all final lien waivers, as-built drawings and surveys (which survey shall satisfy all of the requirements of Exhibit "F"), and other closing-out items as required by Agent have been received and approved; a temporary certificate of occupancy shall have been issued for all components of the Project subject only to conditions acceptable to Agent, and that the Lease Commencement Date shall have occurred.

FILED: WESTCHESTER COUNTY CLERK 05/01/2021 09:40 AM
INDEX NO. 55883/2021
NYSCEF DOC. NO. 3
21-07096-shl    Doc 36-11    Filed 02/11/22    Entered 02/11/22 17:43:36    Exhibit 11
RECEIVED NYSCEF: 05/01/2021
Pg 64 of 113

"**Completion Guaranty**" shall mean that certain Completion Guaranty, dated as of the date hereof, from Guarantor in favor of Agent, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Construction Inspector**" means the construction inspector, if any, engaged by Agent with respect to the Project.

"**Construction Inspector Report**" means a written report from the Construction Inspector due to Agent on a specified predetermined day of each month acceptable to Agent.

"**Construction Schedule**" means the schedule which is attached to the Certificate of Construction Schedule and Plans dated on or near the date hereof, executed by Borrower, and agreed to by Lender and Agent, which has been prepared and certified by Borrower and verified by the Construction Inspector establishing a timetable for commencement and completion of the construction work of the Improvements, showing, on a monthly basis, the anticipated progress of the construction work and showing that all of the construction work will be completed on or before the Required Completion Date.

"**Control**" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto.

"**Debt Service Coverage Ratio**" means the ratio of (a) Net Operating Income, to (b) Deemed Debt Service, as determined by Lender in its sole but good faith discretion.

"**Debtor Relief Law(s)**" means any federal, state or local law, domestic or foreign, as now or hereafter in effect relating to bankruptcy, insolvency, liquidation, receivership, reorganization, arrangement, composition, extension or adjustment of debts, or any similar law affecting the rights of creditors.

"**Deemed Debt Service**" means, with respect to any particular period, interest payments payable under this Agreement, the Note and other Loan Documents during such period, using for the interest calculation the product of (i) the Interest Rate per annum as of the date of determination, multiplied by (ii) the outstanding principal balance of the Loan as of the date of determination.

"**Default**" has the meaning set forth in Section 5.1.

"**Default Rate**" shall have the meaning set forth in Section 2.10.

"**Depository Bank**" shall mean the depository bank party to the Cash Management Agreement.

"**Design Professional**" means Borrower's Architect and each structural engineer, mechanical engineer, geotechnical engineer, soils engineer and other engineering or design professional engaged with respect to any portion of the construction work, as approved by Agent. Any reference in this Agreement to a certification or other document to be executed by a Design Professional shall mean one or more of such Design Professionals designated by Agent as the Design Professional to execute such certification or document, depending on the areas of expertise covered by such certification or document.

"**Designated Jurisdiction**" means any country or territory to the extent that such country or territory itself is the subject of any Sanction.

"**Draw Request**" has the meaning set forth in Section 1 of Exhibit "E".

FILED: WESTCHESTER COUNTY CLERK 05/01/2021 09:40 AM
NYSCEF DOC. NO. 3
INDEX NO. 55883/2021
RECEIVED NYSCEF: 05/01/2021

21-07096-shl   Doc 36-11   Filed 02/11/22   Entered 02/11/22 17:43:36   Exhibit 11
Pg 65 of 113

"**Eligible Assignee**" means any Person that meets the requirements to be an assignee under Sections 7.6(b)(ii) and (iv) (subject to such consents, if any, as may be required under Section 7.6(b)(ii)).

"**Environmental Agreement**" means the Environmental Indemnity Agreement of even date herewith by Borrower and Guarantor to Agent, as amended, modified, replaced, extended or renewed from time to time.

"**Environmental Assessment**" means a written report (including all drafts thereof) of an environmental assessment of the Property of such scope as may be requested by Agent, including the taking of soil borings and air and groundwater samples and other above- and below-ground testing, by a consulting firm acceptable to Agent and made in accordance with Agent's established guidelines.

"**Environmental Laws**" has the meaning assigned thereto in the Environmental Agreement.

"**ERISA**" has the meaning set forth in Section 3.19.

"**Excluded Taxes**" means any of the following Taxes imposed on or with respect to any Recipient or required to be withheld or deducted from a payment to a Recipient, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, imposed as a result of such Recipient being organized under the Laws of, or having its principal office or, in the case of any Lender, the jurisdiction imposing such Tax (or any political subdivision thereof), (b) in the case of a Lender, U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Loan advance or Commitment pursuant to a Law in effect on the date on which such Lender acquires such interest in the Loan advance or Commitment or (c), amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto, and (d) any U.S. federal withholding Taxes imposed pursuant to FATCA.

"**Exculpated Parties**" has the meaning set forth in Section 7.22.

"**Excusable Delay**" means a delay, not to exceed a total of thirty (30) days, caused by unusually adverse weather conditions which have not been taken into account in the Construction Schedule, fire, earthquake or other acts of God, strikes, lockouts, acts of public enemy, riots or insurrections or any other unforeseen circumstances or events beyond the control of Borrower (except financial circumstances or events or matters which may be resolved by the payment of money), and as to which Borrower notifies Agent in writing within five (5) days after such occurrence; provided, however, no Excusable Delay shall extend the Completion Date or suspend or abate any obligation of Borrower or any Guarantor or any other Person to pay any money.

"**Exit Fee**" has the meaning set forth in Section 2.3.

"**Extension Notice**" has the meaning set forth in Section 2.14.

"**Extension Period**" has the meaning set forth in Section 2.14.

"**FATCA**" means Sections 1471 through 1474 of the Code, as in effect on the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with and any current or future regulation or official interpretation thereof).

"**Financial Statements**" means for each reporting party, a balance sheet, income statement, statements of cash flow and amounts and sources of contingent liabilities and associated footnotes, a reconciliation of changes in equity and liquidity verification, cash flow projections, real estate schedules

providing details on each individual real property in the reporting party's portfolio, including, but not limited to raw land, land under development, construction in process and stabilized properties and unless Agent otherwise consents, consolidated and consolidating statements if the reporting party is a holding company or a parent of a subsidiary entity. For purposes of this definition and any covenant requiring the delivery of Financial Statements, each party for whom Financial Statements are required is a "reporting party" and a specified period to which the required Financial Statements relate is a "reporting period"; (ii) if the reporting party is Borrower, then the Financial Statements for such reporting party shall be prepared in accordance with GAAP; and (iii) if the reporting party is Guarantor, then the Financial Statements for such reporting party shall be limited to statements of the fair market value of the assets held by such reporting party and shall be prepared in accordance with the fair market value basis of accounting, consistently applied, or another method of accounting reasonably approved by Agent.

"**Funding Date**" means the date on which an Advance of Loan proceeds shall occur.

"**GAAP**" shall mean generally accepted accounting principles set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board (or agencies with similar functions of comparable stature and authority within the accounting profession), or in such other statements by such entity as may be in general use by significant segments of the U.S. accounting profession.

"**General Assignment**" means the Assignment of Contracts and Other Project Documents dated as of the date hereof, from Borrower in favor of Agent, as amended, modified, supplemented, restated and replaced from time to time.

"**General Contractor**" means Congress/Consigli, Joint Venture comprised of Congress Building Corporation, a Massachusetts corporation, and Consigli Construction NY LLC, a New York limited liability company.

"**General Contract**" means that certain Standard Form of Agreement Between Owner and Contractor A102-2007, dated as of June 12, 2017, by and between Borrower and General Contractor, which shall be in form and substance acceptable to Agent, as the same may be modified, amended, supplemented or reaffirmed from time to time in accordance with the terms of this Agreement.

"**Government Approval**" means any action, authorization, consent, approval, license, lease, ruling, permit, tariff, rate, certification, exemption, filing or registration by or with any Governmental Authority (together with all applicable conditions thereto and restrictions therein or required as a result thereof, and any notices thereof), including all licenses, permits, allocations, authorizations, approvals and certificates obtained by or in the name of, or assigned to, Borrower and used in connection with the ownership, design, construction, operation, use or occupancy of the Project, including building permits, zoning and planning determinations or approvals, business licenses, licenses to conduct business (other than licenses held by any tenant), certificates of occupancy and all such other permits, licenses and rights.

"**Governmental Authority**" means the government of the United States or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"**Guarantor**" means, individually and collectively, jointly and severally, William A. Nicholson, Howard Fensterman, Matthew Barbara and Paul Barbara.

"**Guarantor Documents**" means, collectively, (a) the Carveout Guaranty, (b) the Completion Guaranty and (c) the Environmental Agreement, and each other guaranty executed and delivered by Guarantor to Agent from time to time in accordance with this Agreement.

"**Guarantor Net Worth Requirement**" shall mean a minimum net worth of Sixty Million Dollars ($60,000,000.00) in the aggregate.

"**Hard Costs**" means the aggregate costs of all labor, materials, equipment and fixtures necessary for completion of construction of the Improvements, as more particularly set forth in the Budget.

"**Hazardous Materials**" has the meaning assigned thereto in the Environmental Agreement.

"**HVCRE**" means High Volatility Commercial Real Estate pursuant to the Basel III Regulations.

"**HVCRE Loan**" means a loan that is classified as an HVCRE exposure.

"**Improvements**" means all on-site and off-site improvements to the Land for the skilled nursing facility to be constructed on the Land, together with all fixtures, tenant improvements and appurtenances now or hereafter to be erected or installed on the Land and/or in such improvements.

"**Indebtedness**" means any and all obligations, indebtedness and liabilities of Borrower that constitute Obligations.

"**Indemnified Liabilities**" has the meaning set forth in Section 7.2.

"**Indemnified Taxes**" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of Borrower or Guarantor under any Loan Document and (b) to the extent not otherwise described in clause (a), Other Taxes.

"**Indemnitees**" has the meaning set forth in Section 7.2.

"**Initial Advance**" means the initial Advance of proceeds of the Loan made in accordance with this Agreement.

"**Initial Equity**" means the amount of Required Equity invested in the Property effective upon the funding of the Initial Advance, but in no event less than Twelve Million Six Hundred Fifty-Five Thousand and Fifty-One and No/100 Dollars ($12,655,051.00).

"**Initial Maturity Date**" means August 1, 2020.

"**Insurance Reserve Fund**" has the meaning set forth in Section 9.3.

"**Intercreditor Agreement**" means the Loan Document bearing that heading between Lender and Bradford Allen Capital Corporation.

"**Interest Rate**" means, for any day, a fluctuating rate per annum equal to the LIBOR Daily Floating Rate, plus seven hundred (700) basis points.

"**Land**" means the parcel of real property described on Exhibit "A" attached hereto and made a part hereof.

"**Law**" or "**Laws**" means all constitutions, treaties, statutes, laws, ordinances, regulations, rules, orders, writs, injunctions, or decrees of any Governmental Authority.

"**Lease**" shall mean the Operating Lease, together with any other lease, sublease or subsublease, letting, license, concession or other agreement (whether written or oral and whether now or hereafter in effect) pursuant to which any Person is granted a possessory interest in, or right to use or occupy all or any portion of any space in the Property by or on behalf of Borrower (excluding patients), and (a) every modification, amendment or other agreement relating to such lease, sublease, subsublease, or other agreement entered into in connection with such lease, sublease, subsublease, or other agreement, and (b) every guarantee of the performance and observance of the covenants, conditions and agreements to be performed and observed by the other party thereto (including, without limitation, the Operating Lease Guarantees).

"**Lease Commencement Date**" means the Commencement Date as defined in the Operating Lease.

"**Lender**" means, singly or collectively, each lender from time to time party to this Agreement.

"**Lender's Office**" means Lender's address and account as set forth herein, or such other address or account as Lender hereafter may from time to time notify Borrower.

"**Lender's Time**" means the time of day observed in the city where Lender's Office is located.

"**LIBOR Daily Floating Rate**" means, for any day, the rate per annum equal to (a) LIBOR, at approximately 11:00 a.m., London time determined two (2) London Banking Days prior to such date for U.S. Dollar deposits being delivered in the London interbank Eurodollar market for a term of one (1) month commencing that day or (b) if such published rate is not available at such time for any reason, the rate per annum determined by Agent to be the rate at which deposits in U.S. Dollars for delivery on the date of determination in same day funds in the approximate outstanding amount of the Loan and with a term equal to one (1) month would be offered to major banks in the London interbank Eurodollar market at their request at the date and time of determination. Notwithstanding the foregoing, in no event shall the LIBOR Daily Floating Rate be more than a rate of five percent (5.00%) per annum.

"**Loan**" means the loan made by Lender to Borrower, including both the Building Loan and the Project Loan, in the maximum amount of $38,500,000.00 (the "**Maximum Loan Amount**").

"**Loan Documents**" means this Agreement (including all exhibits), the Security Instrument, each Note, the Guarantor Documents, any financing statements, the Budget, each Draw Request, and such other documents evidencing, securing or pertaining to the Loan as shall, from time to time, be executed and/or delivered by Borrower, Guarantor, or any other party to Agent and/or Lender pursuant to this Agreement, as they may be amended, modified, restated, replaced or supplemented from time to time.

"**Loan Proceeds**" has the meaning set forth in Section 1.4.

"**Loan-to-Cost Ratio**" means the ratio of (a) the Maximum Loan Amount, to (b) the costs of acquiring and developing the Property, as determined by Lender in its sole but good faith discretion, which determination shall be conclusive and binding absent manifest error.

"**Loan-to-Value Ratio**" means, as of any date, the ratio of (a) the Outstanding Principal Balance, to (b) the "as is" (appraised value of the Property as of such date, as determined by Lender in its sole but good faith discretion whether pursuant to its underwriting practices or an updated appraisal.

"**London Banking Day**" means a day on which dealings in U.S. Dollar deposits are conducted by and between banks in the London interbank Eurodollar market.

"**Material Adverse Effect**" means: (a) a material adverse change in, or a material adverse effect on, the Property and Improvements thereon, or the operations, business, assets, properties, liabilities (actual or contingent), condition (financial or otherwise) of Borrower; (b) a material adverse effect on the rights and remedies of Agent or Lender under any Loan Documents, or of the ability of Borrower to perform its obligations under any Loan Documents, or a material adverse effect on the Guarantor that would be reasonably likely to have a material adverse effect on the Borrower's or Guarantor's ability to perform their obligations under any Loan Documents; or (c) a material adverse effect upon the legality, validity, binding effect or enforceability against any party to the Loan Documents to which it is a party.

"**Material Contract**" means, collectively, (i) the General Contract, (ii) each contract with a Design Professional entered into by Borrower in accordance with this Agreement, (iii) any Affiliate Contract, and (iv) any other contract for the performance of any work or the supplying of any labor, materials or services entered into by Borrower in compliance with this Agreement related to the construction or design of the Improvements or any component thereof which exceeds $400,000.00 in total price, as the same may be modified, amended or supplemented from time to time as permitted under the Loan Documents.

"**Maturity Date**" means the Initial Maturity Date, as it may be extended in accordance with Section 2.12 hereof.

"**Member**" means any member of Borrower.

"**Mezzanine Borrower**" means White Plains Mezzanine, LLC, a Massachusetts limited liability company.

"**Mezzanine Indebtedness**" means all principal, interest and other sums due and owing under the Mezzanine Loan.

"**Mezzanine Lender**" means Bradford Allen Funding Company LLC.

"**Mezzanine Loan**" means the $9,500,000 loan from Bradford Allen Funding Company LLC to Mezzanine Borrower.

"**Net Operating Income**" means from any period.

"**Note**" means, the Note dated as of the Closing Date, executed by Borrower and payable to the order of Lender, together with all replacements and substitutes thereof, in each case, as amended, modified, replaced, restated, extended or renewed from time to time.

"**Obligations**" means all liabilities, obligations, covenants and duties of Borrower or any other party to a Loan Document arising under or otherwise with respect to any Loan Document, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest and fees that accrue after the commencement by or against Borrower or any party to a Loan Document or any Affiliate thereof of any proceeding under any Debtor Relief Laws naming such Person as the debtor in such proceeding, regardless of whether such interest and fees are allowed claims in such proceedings.

"**OFAC**" means the Office of Foreign Assets Control of the United States Department of the Treasury.

FILED: WESTCHESTER COUNTY CLERK 05/01/2021 09:40 AM    INDEX NO. 55883/2021
NYSCEF DOC. NO. 3    21-07096-shl    Doc 36-11    Filed 02/11/22    Entered 02/11/22 17:43:36    Exhibit 11    RECEIVED NYSCEF: 05/01/2021

Pg 70 of 113

"**Operating Contract**" shall mean any cleaning, maintenance, service, repair, supply, credit, personnel, staffing or other contract or agreement relating to the ownership, management, development, use, operation, leasing, maintenance or repair of the Property or any portion thereof to which any Borrower Related Party is a party. "Operating Contract" does not include any Lease, any Permitted Encumbrance, any Construction Contract or any Material Contract.

"**Operating Expenses**" shall mean, for any period, the total of all expenditures, computed in accordance with GAAP, consistently applied, of whatever kind relating to the operation, maintenance and management of the Property, which expenditures are incurred on a regular monthly or other periodic basis, including without limitation, utilities, ordinary repairs and maintenance, insurance, license fees, Taxes, Other Charges, advertising expenses, management fees, payroll and related taxes, computer processing charges, tenant improvements and leasing commissions, operational equipment or other lease payments as approved by Agent, and other similar costs. Notwithstanding anything to the contrary in the foregoing, Operating Expenses shall (x) not include depreciation, amortization and other non-cash items, debt service, Capital Expenditures, any contributions to any of the Reserve Funds, income taxes or other taxes in the nature of income taxes on sales, or use taxes required to be paid to any Governmental Authority, equity distributions, and other extraordinary and non-recurring items, and legal or other professional services fees and expenses unrelated to the operation of the Property, (y) be increased to reflect known increases in Operating Expenses that are anticipated, in Agent's reasonable determination, to occur within the succeeding twelve (12) month period including without limitation those related to Property Taxes and Insurance Premiums and (z) include the greater of (I) the actual fees paid to any Manager pursuant to Management Agreement for such period of determination and (II) an amount equal to the greater of three percent (3%) of Gross Income from Operations for such period.

"**Operating Lease**" means the Amended and Restated Lease to HBL SNF, LLC dated as of November 19, 2015.

"**Operating Lease Guarantees**" has the meaning set forth in Section 10.4.

"**Other Charges**" shall mean all ground rents, maintenance charges, impositions other than Taxes, any "common expenses" or expenses allocated to and required to be paid by Borrower and any other charges, including, without limitation, vault charges and license fees for the use of vaults, chutes and similar areas adjoining the Property or any portion thereof, now or hereafter levied or assessed or imposed against the Property or any part thereof.

"**Other Taxes**" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document.

"**Participant**" has the meaning set forth in Section 7.6(d).

"**Participant Register**" has the meaning set forth in Section 7.6(d).

"**Payment Amount**" means an Advance of the Loan, an unreimbursed Indemnified Liability, or any other amount that Lender is required to fund under this Agreement.

"**Payment Date**" has the meaning specified in Section 2.12.

"**Permitted Changes**" means changes to the Plans or Improvements, provided that the cost of any single change or extra does not exceed $100,000.00 and the aggregate amount of all such changes and extras

(whether positive or negative) does not exceed $750,000.00 (the "**Aggregate Limit**"). Notwithstanding the foregoing, individual change orders in excess of the Aggregate Limit shall be permitted provided that no such change order shall exceed $15,000.00.

"**Permitted Encumbrances**" means, collectively, (a) those exceptions to title set forth in the Title Insurance issued to Agent which are set forth on Schedule B of the Title Insurance dated as of the date hereof, (b) the Operating Lease, (c) other liens approved by Agent in writing to the extent such approval is required under the Loan Documents; it being understood that no such approval shall subordinate the lien of the Security Instrument to any right or interest of a third party unless the instrument granting such approval expressly provides for the same, (d) the liens and security interests created by the Loan Documents, (e) the liens, if any, for Taxes imposed by any Governmental Authority which are not yet delinquent, and (f) any workers', mechanics' or other similar liens on the Property provided that any such lien is bonded or discharged within thirty (30) days after Borrower becomes aware of or receives written notice of such lien, solely to the extent that the items set forth in clauses (a)-(f) of this definition, do not, in the aggregate, materially adversely affect the value or use of the Property or any portion thereof or Borrower's ability to repay the Loan.

"**Permitted Transfer**" means, (a) the Mezzanine Loan, subject to the terms and conditions of the Intercreditor Agreement, and (b) the transfer permitted pursuant to Section 3.30 of this Agreement.

"**Person**" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"**Plans**" means the plans and specifications attached to the Certificate of Construction Schedule and Plans dated on or near the date hereof, executed by Borrower, and agreed to by Lender and Agent, and all modifications thereof and additions thereto that are included as part of the Plans as the same shall be approved by Agent in the exercise of its reasonable discretion in accordance with the terms of this Agreement.

"**Potential Default**" means any condition or event which with the giving of notice or lapse of time or both would, unless cured or waived, become a Default.

"**Prime Rate**" means a rate set by *The Wall Street Journal* as the "US Prime Rate Lending Rate" based upon various factors including Lender's costs and desired return, general economic conditions and other factors, and is used as a reference point for pricing some loans, which may be priced at, above, or below such announced rate. Any change in such Prime Rate announced by *The Wall Street Journal* shall take effect at the opening of business on the day specified in the public announcement of such change.

"**Principal Debt**" means the aggregate unpaid principal balance of this Loan at the time in question.

"**Prohibited Person**" means any Person:

(a)    listed in the annex to, or who is otherwise subject to the provisions of, Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001, and relating to Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism (the "**Executive Order**");

(b)    that is owned or controlled by, or acting for or on behalf of, any person or entity that is listed in the annex to, or is otherwise subject to the provisions of, the Executive Order;

(c)    with whom a Person is prohibited from dealing or otherwise engaging in any transaction by any terrorism or money laundering law, including the Executive Order;

(d)    who commits, threatens or conspires to commit or supports "terrorism" as defined in the Executive Order;

(e)    that is named as a "specially designated national and blocked person" on the most current list published by the U.S. Treasury Department Office of Foreign Assets Control at its official website or at any replacement website or other replacement official publication of such list; or

(f)    who is an Affiliate of a Person listed in clauses (a) through (e) above.

"**Project**" means the construction of the Improvements, and if applicable, the leasing and operation of the Improvements.

"**Property**" means the Land, the Improvements, all personal property owned by Borrower and encumbered by the Security Instrument and all other property constituting the "Property" as described and defined in the Security Instrument, or subject to a right, lien or security interest to secure the Loan pursuant to any other Loan Document, together with all rights pertaining to such Land, Improvements and property.

"**Property Taxes**" shall mean all real estate and personal property taxes, assessments (excluding income taxes), and water rates or sewer rents (to the extent billed with real estate taxes) now or hereafter levied or assessed or imposed against the Property or part thereof, together with all interest and penalties thereon.

"**Recipient**" means Agent or Lender, as applicable.

"**Register**" has the meaning set forth in Section 7.6(c).

"**Related Parties**" means, with respect to any Person, such Person's Affiliates and the partners, directors, officers, employees, agents, trustees, administrators, managers, advisors and representatives of such Person and such Person's Affiliates.

"**Relevant Documents**" has the meaning set forth in Section 7.22.

"**Rents**" shall mean all rents (including additional rents of any kind and percentage rents), rent equivalents, moneys payable as damages (including payments by reason of the rejection of a Lease in a Debtor Relief Action) or in lieu of rent or rent equivalents, royalties (including, without limitation, all oil and gas or other mineral royalties and bonuses), income, receivables, receipts, revenues, deposits (including security, utility and other deposits), accounts, cash, issues, profits, charges for services rendered, and other payments and consideration of whatever form or nature received by or paid to or for the account of or benefit of Borrower or any of its agents or employees from any and all sources arising from or attributable to the Property or any portion thereof, and the Improvements, including charges for oil, gas, water, steam, heat, ventilation, air-conditioning, electricity, license fees, maintenance fees, charges for Property Taxes, operating expenses or other amounts payable to Borrower (or for the account of Borrower), revenues from vending, and all receivables, customer obligations now existing or hereafter arising or created out of the sale, lease, sublease, license, concession or other grant of the right of the use and occupancy of the Property (or any portion thereof) or rendering of services by Borrower, or any of its agents or employees and proceeds, if any, from business interruption or other loss of income insurance.

"**Replacement Note**" has the meaning set forth in Section 7.6(b).

"**Required Completion Date**" means the final day of the Availability Period.

"**Required Equity**" means an amount equal to Twelve Million Six Hundred Fifty-Five Thousand Fifty-One and No/100 Dollars ($12,655,051.00) of unborrowed funds, which Borrower has caused and shall cause to be contributed to or applied in payment of the costs and expenses incurred by Borrower in connection with Borrower's development of the Property.

"**Reserve Account**" means, collectively, the Cash Management Account, the Tax Reserve Fund, the Insurance Reserve Fund, the Interest Reserve Fund and any other sub-accounts established in accordance with this Agreement or the Loan Documents.

"**Reserve Funds**" has the meaning assigned thereto in Section 9.1 of this Agreement.

"**Restoration**" means, following the occurrence of a casualty or a Condemnation which of a type necessitating the repair of the Property (or any portion thereof), the completion of the repair and restoration of the Property (or applicable portion thereof) as nearly as possible to the condition the Property (or applicable portion thereof) was in immediately prior to such casualty or Condemnation, with such alterations as may be reasonably approved by Agent.

"**Retainage**" means (i) with respect to the General Contract, the actual retainage required under the General Contract, or (ii) with respect to any other direct trade contract entered into by Borrower and relating to construction of Improvements, either (a) ten percent (10%) of each advance on all subcontractors , (b) ten percent of each advance on work performed by General Contractor (excluding general conditions, Contractor's Fee and insurance premiums upon which Retainage shall be 0%) until Borrower's Architect has certified, and the Construction Inspector has confirmed, on AIA Form G704 or other reasonably customary form, that the work has been substantially completed in accordance with the Plans and Specifications and the terms of the General Contract, at which time all retainage shall be released other than two hundred percent (200%) of the monetized value of the punchlist, or (b) a lesser amount approved by Agent in writing.

"**Sanction(s)**" means any international economic sanction administered or enforced by the United States Government, including OFAC, the United Nations Security Council, the European Union, Her Majesty's Treasury or other relevant sanctions authority.

"**Schedule of Lenders**" means the schedule of lenders party to this Agreement as set forth on Exhibit "J", as it may be modified from time to time in accordance with this Agreement.

"**Security Instrument**" means the Mortgage, Assignment of Rents and Leases, Security Agreement and Fixture Filing dated as of the date hereof, from Borrower to the trustee named therein for the benefit of Agent, securing repayment of the Indebtedness and Borrower's performance of its other obligations to Agent and Lender under the Loan Documents, as amended, modified, supplemented, restated and replaced from time to time.

"**Servicer**" has the meaning set forth in Section 7.9.

"**Servicing Agreement**" has the meaning set forth in Section 7.9.

"**Single Purpose Entity**" is an entity that satisfies the requirements set forth on Exhibit "K" attached hereto.

"**Soft Costs**" means interest payable on the principal amount of the Loan, carrying costs for the Project and all other costs in the Budget which constitute costs, excluding Hard Costs, which relate to the

construction of the Improvements, including professional service fees, development and project management costs, permits, impact fees, and other similar fees and expenses.

"**Stored Materials**" means building materials or furnishings that are not yet incorporated into the Improvements.

"**Stored Materials Advance Limit**" has the meaning set forth in Section 3.9.

"**Subsidiary**" of a Person means a corporation, partnership, joint venture, limited liability company or other business entity of which a majority of the shares of securities or other interests having ordinary voting power for the election of directors or other governing body (other than securities or interests having such power only by reason of the happening of a contingency) are at the time beneficially owned, or the management of which is otherwise controlled, directly, or indirectly through one or more intermediaries, or both, by such Person. Unless otherwise specified, all references herein to a "Subsidiary" or to "Subsidiaries" shall refer to a Subsidiary or Subsidiaries of Borrower.

"**Survey**" means a survey prepared in accordance with Exhibit "F" or as otherwise approved by Agent in its reasonable discretion.

"**Tax Reserve Account**" has the meaning assigned to such term in the Cash Management Agreement.

"**Tax Reserve Fund**" has the meaning set forth in Section 9.1.

"**Taxes**" means all taxes, assessments, fees, levies, imposts, duties, deductions, withholdings, or other charges of any nature whatsoever from time to time or at any time imposed by any Law or Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"**Tenant**" shall mean the lessee of all or any portion of the Property under a Lease.

"**Tenant Direction Notice**" has the meaning set forth in Section 8.1.

"**Title Company**" means First American Title Insurance Company.

"**Title Insurance**" means the loan policy or policies of title insurance issued to Lender by the Title Company, in an amount equal to the maximum principal amount of the Loan, insuring the validity and priority of the Security Instrument encumbering the Land and Improvements for the benefit of Agent.

"**Title Insurance Report**" means an update of the Title Insurance in a form and substance satisfactory to Agent.

"**Total Budget**" has the meaning set forth in Section 1.4.

"**Total Costs**" has the meaning set forth in Section 1.4.

"**Unused Line Fee**" has the meaning set forth in Section 2.2.

"**Unsatisfactory Work**" means any construction work of any portion of the Improvements which Agent and/or the Construction Inspector has determined has not been completed in a good and workmanlike manner, or, to the extent any construction work of any portion of the Improvements is not specifically addressed in the construction drawings and specifications, not completed in a manner consistent with sound design principles and/or sound construction practices, or in substantial conformity with the Plans, or in accordance with all applicable Law.

2.    FINANCIAL STATEMENTS:  Borrower shall provide or cause to be provided to Agent all of the following:

(a)    Financial Statements of Borrower:  (i) for each fiscal year of such reporting party, within sixty (60) days after the close of each fiscal year, and (ii) for each calendar month, as soon as reasonably practicable and in any event within thirty (30) days after the end of such month.

(b)    Compliance Certificate of Borrower:  a duly completed compliance certificate in the form attached hereto as Exhibit "M", together with all calculations and documentation required therein, concurrently with the delivery of the financial statements referred to in clause (a) above.

(c)    Financial Statements of Guarantor: Annual Financial Statements in each instance within sixty (60) days after the end of each calendar year.

(d)    Until the completion of the Improvements, within thirty (30) days of the end of each calendar month, the following, in form and substance reasonably satisfactory to Agent, setting forth in reasonable detail (i) Borrower's total sources of funds and uses thereof during such month (specifically identifying any uses of Contingency Funds permitted to be advanced by Lender), (ii) the amount by which actual costs were greater than or less than costs anticipated in the Budget for the applicable month, (iii) the aggregate amounts paid during such month to General Contractor and/or subcontractors and any unpaid amounts owing to General Contractor and/or subcontractors which are sixty (60) days past their due date, (iv) variations from the Construction Schedule, including, without limitation, the projected Completion Dates, and the reasons therefor, (v) if the amounts payable to General Contractor and/or subcontractors during such month are at variance from the amounts scheduled to be paid pursuant to the applicable Request for Loan Advance, the reasons for such variance, (vi) any liens placed on the Project and their payment status, and (vii) the status of construction generally and of the Government Approvals necessary for the construction and operation of the Project. If the progress or costs of construction of the Project deviate in any material respect from the approved Construction Schedule or Budget, Borrower shall deliver to Agent, together with such monthly reconciliation report, its certification setting forth the actions that Borrower is taking or planning to take in order to cause the progress of such construction work to be completed in accordance with the Construction Schedule and within such Budget. Borrower will furnish, or cause to be furnished, to Agent as soon as available and in any event within thirty (30) days after the end of each calendar month (x) monthly and year-to-date operating statements (including Capital Expenditures and carrying costs) prepared for each calendar month, including a log of Stored Materials in a form acceptable to Agent and such other information as Agent may request and other information necessary and sufficient to fairly represent the financial position and results of operation of the Borrower and Property during such calendar month and containing a comparison of budgeted income and expenses and the actual income and expenses together with a detailed explanation of any variances of five percent (5%) or more between budgeted and actual amounts for such periods, all in form satisfactory to Agent, and (y) until the Completion Date and upon final close-out of the Budget, a monthly cost report for the construction of the Project on a cumulative basis and broken down by Line Item, showing percentage of completion, the original budgeted amount, the current budgeted amount pursuant to an updated Budget approved by Agent, costs incurred to date, projected costs to complete, explanations of any Budget variances, a summary of any approved reallocations, a summary of permitted approved and pending change orders, an explanation of any variances from the Budget and/or Plans and Specifications and an updated Budget and/or Plans and Specifications, as applicable, for which Borrower has requested Agent's approval. All such operating statements referenced in clause (i)(x) above shall be prepared by Borrower.

(e)    Following completion of the Improvements: (i) prior to the beginning of each fiscal year of Borrower, (A) an Annual Budget as described below, (B) rent rolls, and (C) a current leasing status report (including tenants' names, occupied tenant space, lease terms, rents, vacant space and proposed

- B-15 -

rents); and (ii) for each month, property operating statements which include all income and expenses in connection therewith, within sixty (60) days after the end of each such quarter, certified in writing as true and correct by a representative of Borrower satisfactory to Agent. Items provided under this Subsection (i) shall be in form and detail satisfactory to Agent.

(f)     From and after the Completion Date, for the partial year period commencing on the date thereof, and for each Fiscal Year thereafter, Borrower shall submit to Agent an Annual Budget not later than sixty (60) days prior to the commencement of such period or Fiscal Year in form reasonably satisfactory to Agent. The Annual Budget shall be subject to Agent's approval (each such Annual Budget, an "**Approved Annual Budget**"), which approval shall not be unreasonably withheld, condition or delayed. In the event that Agent objects to a proposed Annual Budget submitted by Borrower which requires the approval of Agent hereunder, Agent shall advise Borrower of such objections within fifteen (15) days after receipt thereof (and deliver to Borrower a reasonably detailed description of such objections) and Borrower shall promptly revise such Annual Budget and resubmit the same to Agent. Agent shall advise Borrower of any objections to such revised Annual Budget within ten (10) days after receipt thereof (and deliver to Borrower a reasonably detailed description of such objections) and Borrower shall promptly revise the same in accordance with the process described in this subsection until Agent approves the Annual Budget. Until such time that Agent approves a proposed Annual Budget that requires the approval of Agent hereunder, the most recently Approved Annual Budget shall apply; provided that, such Approved Annual Budget shall be adjusted to reflect actual increases in Taxes, Insurance Premiums and Other Charges.

(g)     Copies of filed federal income tax returns and any extensions thereof, of Borrower for each taxable year (with all K-1s and other forms and supporting schedules attached if an individual), within thirty (30) days after filing the same.

(h)     From time to time promptly after Agent's reasonable request, such additional information, reports and statements respecting the Property and the Improvements, or the business operations and financial condition of Borrower, as Agent may reasonably request.

Borrower will keep and maintain full and accurate books and records administered in accordance with sound accounting principles, consistently applied, showing in detail the earnings and expenses of the Property and the operation thereof. All Financial Statements shall be in form and detail reasonably satisfactory to Agent and shall contain or be attached to the signed and dated written certification of the reporting party in form specified by Agent to certify that the Financial Statements are furnished to Agent in connection with the extension of credit by Lender and constitute a true and correct statement of the reporting party's financial position. All certifications and signatures on behalf of corporations, partnerships, limited liability companies or other entities shall be by the chief accounting officer, the chief financial officer, or another representative of the reporting party reasonably satisfactory to Agent (an "**Authorized Representative**"). All fiscal year-end Financial Statements of Borrower shall be audited and certified, without any qualification or exception not acceptable to Agent in its reasonable discretion, by an independent certified public accountant reasonably acceptable to Agent. All monthly, quarterly Financial Statements to be provided by Borrower shall include a minimum of a balance sheet, income statement, statement of cash flow and schedule of contingent liabilities and associated footnotes. Borrower shall provide, upon Agent's request, convenient facilities for the audit and verification of any such statement. Additionally, Borrower will provide Agent at Borrower's expense with all evidence that Agent may from time to time reasonably request as to compliance with all provisions of the Loan Documents. Borrower shall promptly notify Agent of any event or condition that could reasonably be expected to have a Material Adverse Effect in the financial condition of Borrower or Guarantor (if known by Borrower), or in the construction progress of the Improvements.

FILED: WESTCHESTER COUNTY CLERK 05/01/2021 09:40 AM
INDEX NO. 55883/2021
NYSCEF DOC. NO. 3
21-07096-shl    Doc 36-11    Filed 02/11/22    Entered 02/11/22 17:43:36    Exhibit 11
Pg 77 of 113
RECEIVED NYSCEF: 05/01/2021

EXHIBIT "C"

RESERVED

EXHIBIT "C-2"

RESERVED

EXHIBIT "D"

RESERVED

EXHIBIT "E"

ADVANCES

1.    Draw Request. A "Draw Request" means a properly completed and executed written application by Borrower to Agent in the form of Exhibit "E-1" setting forth the amount of Loan proceeds desired, together with the related AIA Documents G-702 and G-703 or such other forms approved by Agent and such schedules, affidavits, releases, waivers, statements, invoices, Accounts Payable Lists, bills, and other documents, certificates and information satisfactory to Agent, to the extent applicable for an Advance for the applicable Aggregate Cost. At least five (5) Business Days before the requested date of each Advance made under the Budget from of the Loan, Borrower shall deliver a Draw Request to Agent. Borrower shall be entitled to an Advance only in an amount approved by Agent in accordance with the terms of this Agreement and the Loan Documents. Lender shall not be required to make Advances more frequently than once each calendar month. Lender shall, only upon the satisfaction, as determined by Agent in its sole but good faith discretion, of all applicable conditions of this Agreement and the Loan Documents, be required to make the requested Advance to Borrower on a Funding Date which is a Business Day within five (5) Business Days after such satisfaction. Each Draw Request, and Borrower's acceptance of any Advance, shall be deemed to ratify and confirm, as of the date of the Draw Request and the Advance, respectively, that, except as specified in the Draw Request, (a) all representations and warranties in the Loan Documents remain true and correct, and all covenants and agreements in the Loan Documents remain satisfied, (b) there is no uncured Potential Default or Default existing under the Loan Documents, (c) all conditions to the Advance, whether or not evidence thereof is required by Agent or Lender, are satisfied, (d) the AIA Document G-702 and G-703 forms executed by each contractor and approved by Borrower's architect, together with all schedules, affidavits, releases, lien waivers, statements, invoices, Accounts Payable Lists, bills, and other documents, certificates and information submitted for the Draw Request are complete and correct, and in all respects what they purport and appear to be for the amount and period applicable to the Draw Request, (e) all Advances previously made to Borrower were disbursed, and the proceeds of the Advance requested in the Draw Request will immediately be disbursed, for payments of the costs and expenses specified in the Budget for which the Advances were made, and for no other purpose, (f) after the Advance, all obligations for work and other costs heretofore incurred by Borrower in connection with the Project and which are due and payable will be fully paid and satisfied, and (g) any unadvanced portion of the Loan to which Borrower is entitled, plus the portions of the Aggregate Cost that are to be

FILED: WESTCHESTER COUNTY CLERK 05/01/2021 09:40 AM
NYSCEF DOC. NO. 3

INDEX NO. 55883/2021
RECEIVED NYSCEF: 05/01/2021

21-07096-shl    Doc 36-11    Filed 02/11/22    Entered 02/11/22 17:43:36    Exhibit 11
Pg 79 of 113

paid by Borrower from other funds that, to Agent's satisfaction, are available, set aside and committed, is or will be sufficient to pay the actual unpaid Aggregate Cost.

2.        Advances. Borrower shall use and apply all Advances made to Borrower for payment of the costs and expenses specified in the Budget for which the Advance were made, and for no other purpose. Following receipt and approval of a Draw Request, all supporting documentation and information required by Agent, and receipt and approval of a Construction Inspector Report (which shall include Construction Inspector's review and, if applicable, approval of such Draw Request) and Title Insurance Report satisfactory to Agent, Agent will determine the amount of the Advance in accordance with this Agreement, the Loan Documents, the Budget and, if and to the extent required by Agent, to Agent's satisfaction, the following standards:

(a)        For construction work, a portion of each Advance shall be retained by Lender until Borrower's Architect has certified, and the Construction Inspector has confirmed, on AIA Form G704 or other appropriate form, that the relevant Improvements have been substantially completed in accordance with the Plans and Specifications. The Retainage portion of each advance for labor, services and/or material (i) shall be the amount prescribed by the Construction Agreement or such lesser amount as may be approved in writing by Agent, and (ii) will be disbursed following timely completion of the applicable Improvements in accordance with the Plans and Specifications unless Agent and agrees to disbursements at an earlier stage.

(b)        No Advances will be made for Stored Materials unless (i) Borrower has good title to the Stored Materials and the Stored Materials are components in a form ready for incorporation into the Improvements a, (ii) the Stored Materials are in Borrower's possession and satisfactorily stored on the Land or such materials are satisfactorily stored at such other site as Agent may reasonably approve, (iii) the Stored Materials are protected and insured against theft and damage in a manner and amount satisfactory to Agent, (iv) the Stored Materials have been paid for in full or will be paid for with the funds to be Advanced and all lien rights and claims of the supplier have been released or will be released upon payment with the Advanced funds, and (v) Agent has or will have upon payment with the Advanced funds a perfected, first priority security interest in the Stored Materials. Notwithstanding the foregoing, the aggregate amount of Advances for Stored Materials that have not yet been incorporated into the Improvements shall not exceed the Stored Materials Advance Limit.

3.        Conditions to All Advances. As conditions precedent to each Advance made pursuant to a Draw Request, in addition to all other requirements contained in this Agreement, if and to the extent required by Agent:

(a)        With respect to the Initial Advance, in addition to all items set forth in clause (b) below, Agent shall have received and approved the following:

(i)        True, correct and complete copy of the General Contract, in form and substance satisfactory to Agent and a duly executed, acknowledged and delivered original consent and agreement from General Contractor in form and substance satisfactory to Agent.

(ii)        True, correct and complete copy of the agreement with Borrower's Architect, in form and substance satisfactory to Agent and a duly executed, acknowledged and delivered original consent and agreement from Borrower's Architect in form and substance satisfactory to Agent.

(iii)        Evidence satisfactory to Agent that upon the funding of the Initial Advance, there shall remain Initial Equity invested in the Property in an amount not less than Twelve Million Six Hundred Fifty-Five and Fifty-One and No/100 Dollars ($12,655,051.00).

(iv)    Evidence satisfactory to Agent that the Loan-to-Cost Ratio shall not exceed sixty-five percent (65%).

(b)    The Availability Period shall not have ended, and Agent shall have received and approved the following:

(i)    Evidence satisfactory to Agent of the continued satisfaction, as of the date of the proposed Advance, of all conditions to the recording of the Security Instrument, as set forth in the Budget.

(ii)    A Draw Request.

(iii)    Evidence satisfactory to Agent that no Default or Potential Default exists under the Loan Documents.

(iv)    Evidence satisfactory to Agent that the representations and warranties made in the Loan Documents are true and correct on and as of the date of each Advance and no event shall have occurred or condition or circumstance shall exist which, if known to Borrower, would render any such representation or warranty incorrect or misleading.

(v)    Evidence satisfactory to Agent that each subcontract or other contract for labor, materials, services and/or other work included in a Draw Request has been duly executed and delivered by all parties thereto and is effective, and a true and complete copy of a fully executed copy of each such subcontract or other contract as Agent may have requested, together with performance and payment bonds securing such contracts and subcontracts, to the extent required by Agent, in form and substance satisfactory to Agent.

(vi)    Evidence satisfactory to Agent that no mechanic's, materialman's or other similar lien or other encumbrance has been filed and remains in effect against the Property, no stop notices have been served on Agent or Lender that have not been bonded by Borrower in a manner and amount satisfactory to Agent, and releases or waivers of mechanic's liens and receipted bills showing payment of all amounts due to all parties who have furnished materials or services or performed labor of any kind in connection with the Property.

(vii)    Evidence satisfactory to Agent that the Title Insurance has been endorsed and brought to date in a manner satisfactory to Agent to increase the coverage by the amount of each Advance through the date of each such Advance with no additional title change or exception not approved by Agent.

(viii)    Certification by Construction Inspector, and if required by Agent, by Borrower's architect, that to the best of such party's knowledge, information, and belief, construction is in accordance with the Plans and Construction Schedule, the quality of the work for which the Advance is requested is in accordance with the applicable contract, the amount of the Advance requested represents work in place based on on-site observations and the data comprising the Draw Request, the work has progressed in accordance with the construction contract and schedule, and the applicable contractor is entitled to payment of the amount certified. Such certification may be provided in whole or in part on AIA Form G702.

(ix)    Evidence satisfactory to Agent that as of the date of making such Advance, no event shall have occurred, nor shall any condition exist, that could have a Material Adverse Effect.

(x)     With respect to any Advance other than the Initial Advance, Borrower shall have deposited with Agent an amount equal to the product of (x) Borrower's Share and (y) the aggregate amount contemplated to be disbursed in connection with such Draw Request.

(xi)     Evidence satisfactory to Agent that the Improvements shall not have been damaged and not repaired and shall not be the subject of any pending or threatened condemnation or adverse zoning proceeding.

(xii)     Evidence satisfactory to Agent that Borrower has paid all amounts then required to be paid by Borrower under the Budget.

(xiii)     Borrower's Deposit if required by <u>Section 1.5</u> of this Agreement.

(xiv)     With respect to any Advance to pay a contractor, original applications for payments in form approved by Agent, containing a breakdown by trade and/or other categories acceptable to Agent, executed and certified by each contractor and Borrower's architect, accompanied by invoices for all payments in excess of $10,000, and approved by Construction Inspector.

(xv)     Copies of notarized partial lien waiver forms executed by each contractor and each appropriate subcontractor, supplier and materialman, including such partial lien waivers from all parties sending statutory notices to contractors, notices to owners, or notices of nonpayment, specifying in such partial lien waivers the amount paid in consideration of such partial releases as may be required by Agent. Lien waivers shall include a conditional waiver, with an amount stated, as to the current amount to be paid with the Advance, and an unconditional waiver, with a cumulative amount stated for all prior Advances. Unless otherwise required by the Title Company, partial lien waivers shall not be required for payments of $10,000 or less.

(xvi)     Accounts Payable List for any soft costs.

(xvii)     Evidence that the Loan-to-Value Ratio, taking into account any proposed Advance, would not exceed 65%.

(xviii)     Such other information, documents and supplemental legal opinions as may be required by Agent.

4.     <u>Final Advance for Improvements</u>. If and to the extent required by Agent, to Agent's satisfaction, the final Advance for the Improvements (including retainage) shall not be made until thirty (30) days after the later of (i) the date on which the Improvements have been "completed" as defined by applicable state Law, and (ii) if required by Agent, the date on which an affidavit of completion has been recorded. In the case of each such Draw Request, if and to the extent required by Agent, Agent shall have received the following as additional conditions precedent to the requested Advance:

(a)     Certificates from Borrower's Architect, General Contractor and any other Design Professional required by Agent and if required by Agent, from the Construction Inspector, certifying that the Improvements (including any off-site improvements) have been completed in accordance with, and as completed comply with, the Plans and all Laws and governmental requirements; and Agent shall have received two (2) sets of detailed "as-built" Plans approved in writing by Borrower, Borrower's Architect, General Contractor and any each Design Professional.

FILED: WESTCHESTER COUNTY CLERK 05/01/2021 09:40 AM    INDEX NO. 55883/2021
NYSCEF DOC. NO. 3    21-07096-shl    Doc 36-11    Filed 02/11/22    Entered 02/11/22 17:43:36    Exhibit 11    RECEIVED NYSCEF: 05/01/2021

Pg 82 of 113

(b)     Final affidavits (in a form approved by Agent) from Borrower's Architect, General Contractor and each Design Professional required by Agent certifying that each of them and each of their subcontractors, laborers and materialmen has been paid in full for all labor and materials for construction of the Improvements; and final lien releases or waivers (in a form approved by Agent) by Borrower's Architect, General Contractor, each Material Contractor and each Design Professional, and all subcontractors, materialmen, and other parties who have supplied labor, materials or services for the construction and/or design of the Improvements, or who otherwise might be entitled to claim a contractual, statutory or constitutional lien against the Property.

(c)     The Title Insurance shall be endorsed to remove any exception for mechanics', materialmen's or similar liens or pending disbursements, with no additional title change or exception objectionable to Agent, and with such other endorsements required by Agent.

(d)     Evidence satisfactory to Agent that all Laws and governmental requirements have been satisfied, including receipt by Borrower of all necessary Governmental Approvals (including certificates of occupancy) with respect to the completion, use, occupancy and operation of the Improvements, together with evidence satisfactory to Agent that all such licenses, certificates and permits are in full force and effect and have not been revoked, canceled or modified.

(e)     Three (3) copies of a final as-built survey satisfactory to Agent and, to the extent required by Agent, complying with Exhibit "F".

(f)     If applicable, an estoppel certificate as Agent may reasonably require, in form and content satisfactory to Agent from each tenant, subtenant and guarantor required by Agent, and written confirmation by each tenant having the right to do so that such tenant has approved the completed Improvements.

5.     Direct Advances. Borrower hereby irrevocably authorizes Lender (but Lender shall have no obligation) to (a) advance Loan funds directly to pay interest due on the Loan, and (b) advance or authorize disbursement of, and directly apply the proceeds of any Advance, to the satisfaction of any of Borrower's obligations under any of the Loan Documents, even though Borrower did not include that amount in a Draw Request and/or no Default exists. Each such direct advance (except for application of a Borrower's Deposit) shall be added to the outstanding principal balance of the Loan and shall be secured by the Loan Documents. Unless Borrower pays such interest from other resources, Lender may advance Loan funds pursuant to this Section 5 for interest payments as and when due. Nothing contained in this Agreement shall be construed to permit Borrower to defer payment of interest on the Loan beyond the date(s) due. The allocation of Loan funds in the Budget for interest shall not affect Borrower's absolute obligation to pay the same in accordance with the Loan Documents. Agent may hold, use, disburse and apply the Loan and Borrower's Deposit for payment of any obligation of Borrower under the Loan Documents. Borrower hereby assigns and pledges the proceeds of the Loan and any Borrower's Deposit to Agent for itself and for the benefit of Lender for such purposes. Agent and/or Lender may advance and incur such expenses as Agent and/or Lender deems necessary for the completion of the Improvements and to preserve the Property, and any other security for the Loan, and such expenses, even though in excess of the amount of the Loan, shall be secured by the Loan Documents and shall be payable on demand. Agent and Lender may disburse any portion of any Advance at any time, and from time to time, to Persons other than Borrower for the purposes specified in this Section 5 and the amount of Advances to which Borrower shall thereafter be entitled shall be correspondingly reduced.

6.     Conditions and Waivers. All conditions precedent to the obligation of Lender to make any Advance are imposed hereby solely for the benefit of Agent and Lender, and no other party may require satisfaction of any such condition precedent or be entitled to assume that Lender will refuse to make any

FILED: WESTCHESTER COUNTY CLERK 05/01/2021 09:40 AM
NYSCEF DOC. NO. 3
INDEX NO. 55883/2021
RECEIVED NYSCEF: 05/01/2021

21-07096-shl    Doc 36-11    Filed 02/11/22    Entered 02/11/22 17:43:36    Exhibit 11
Pg 83 of 113

Advance in the absence of strict compliance with such conditions precedent. Lender shall have the right to approve and verify the periodic progress, costs incurred by Borrower, and the estimated costs remaining to be incurred, after consultation with the Construction Inspector. No Advance shall constitute an approval or acceptance by Agent or Lender of any construction work, or a waiver of any condition precedent to any further Advance, or preclude Agent or Lender from thereafter declaring the failure of Borrower to satisfy such condition precedent to be a Default. No waiver by Agent or Lender of any condition precedent or obligation shall preclude Agent or Lender from requiring such condition or obligation to be met prior to making any other Advance or from thereafter declaring the failure to satisfy such condition or obligation to be a Default.

7.      Funding through Title Company. Lender or Agent may require that any Advance made hereunder be made by Title Company pursuant to a separate escrow agreement to be entered into with Title Company. Borrower acknowledges that Lender, Agent or Title Company may condition the payment of any such Advance upon paying the invoice or statement of any contractor or subcontractor for the Project directly.

FILED: WESTCHESTER COUNTY CLERK 05/01/2021 09:40 AM
NYSCEF DOC. NO. 3

INDEX NO. 55883/2021
RECEIVED NYSCEF: 05/01/2021

21-07096-shl    Doc 36-11    Filed 02/11/22    Entered 02/11/22 17:43:36    Exhibit 11
Pg 84 of 113

EXHIBIT "E-1"

DRAW REQUEST

[attached]

FILED: WESTCHESTER COUNTY CLERK 05/01/2021 09:40 AM

INDEX NO. 55883/2021

NYSCEF DOC. NO. 3

21-07096-shl    Doc 36-11    Filed 02/11/22    Entered 02/11/22 17:43:36    Exhibit 11

RECEIVED NYSCEF: 05/01/2021

Pg 85 of 113

Sworn Owner's Statement
White Plains Healthcare LLC 1
Draw #1
Date:

The affiants, William A. Nicholson, being first duly sworn, on oath deposes and say that he is a Manager of White Plains Mezzanine, LLC which is the sole member of White Plains Healthcare Properties I, LLC (for which he is a Manager), of the aboved described property in White Plains, NY, to wit:

1. That he is thoroughly familiar with all the facts and circumstances concerning the property described above;
2. That with respect to improvements on the premises the only invoices received for work done or materials furnished to date are as listed below;
3. That the only contracts as modified by approved change orders let to date for the furnishing of future work or materials relative to the contemplated improvements are listed below; and
4. That this statement is true and complete statement of all such original contracts and approved change orders thereto and costs, previous payments and balances due if any, except for pending change orders or claims, and retainages.

| DESCRIPTION | PROJECT BUDGET | | | | DRAW REQUESTS | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Original | Prior Rev | Current Rev | REVISED | PREVIOUS | CURRENT | TOTAL | REMAINING BALANCE |
| **PRELIMINARY EXPENSE** | | | | | | | | |
| Hard Costs | | | | | | | | |
| CM Contingency | | | | | | | | |
| Preconstruction Expense | | | | | | | | |
| FF&E | | | | | | | | |
| Kitchen Equipment | | | | | | | | |
| Subguard Insurance | | | | | | | | |
| CGL Ins | | | | | | | | |
| Builder's Risk Insurance | | | | | | | | |
| Total PRELIMINARY EXPENSE | $    - | $    - | $    - | $    - | $    - | $    - | $    - | $    - |

| **LAND ACQUISITION** | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Acquisition - Land | | | | | | | | |
| | | | | $    - | | | $    - | $    - |
| Total LAND COSTS | $    - | $    - | $    - | $    - | $    - | $    - | $    - | $    - |

| **DESIGN AND CONSTRUCTION COSTS** | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Beds Taylor | | | | | | | | |
| Beds HH & Bethel | | | | | | | | |
| Arch. & Eng. - Plans | | | | | | | | |
| Arch. & Eng. - CA | | | | | | | | |
| Enclosure Consultant | | | | | | | | |
| Civil & Landscape | | | | | | | | |
| Geotech | | | | | | | | |
| Borings & Soils | | | | | | | | |
| LEED Consultant | | | | | | | | |
| Printing, Reproductions | | | | | | | | |
| Materials Testing | | | | | | | | |
| Surveys: As Built | | | | | | | | |
| Surveys: Initial | | | | | | | | |
| Building Permits | | | | | | | | |
| Appraisals | | | | | | | | |
| Market Studies | | | | | | | | |
| Total DESIGN & CONSTRUCTION COSTS | | | | | | | | |

**GENERAL & ADMINISTRATIVE**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| NYDOH FEE | | | | | | | |
| RE Maint, UTIL, Misc. Precon | | | | | | | |
| Utility Co. Backcharges | | | | | | | |
| Plan Reviews AHJ | | | | | | | |
| Legal: Zoning | | | | | | | |
| Title Ins. | | | | | | | |
| Owner GL Insurance | | | | | | | |
| Clos'g Misc. (UCC Insurance Premium) | | | | | | | |
| Clos'g, Filing, Record'g | | | | | | | |
| RE Taxes Precon & Const. | | | | | | | |
| Legal: Transaction | | | | | | | |
| Legal: Lender | | | | | | | |
| Organizational | | | | | | | |
| CON Consultant | | | | | | | |
| Accounting | | | | | | | |
| Traffic studies | | | | | | | |
| Inspection Fee | | | | | | | |
| | | | | | | | |
| **Total GENERAL & ADMINISTRATIVE** | | | | | | | |

**MARKETING & LEASING**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| **Total MARKETING & LEASING** $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |

**FINANCING COSTS**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Mezzanine Interest Reserve | | | | | | | |
| Senior Interest Reserve | | | | | | | |
| Legacy Broker Fee | | | | | | | |
| Developer Fee | | | | | | | |
| O'Malley Brokerage Fee - Senior | | | | | | | |
| O'Malley Brokerage Fee - Mezz | | | | | | | |
| BAC Placement Fee | | | | | | | |
| Greystone Fee | | | | | | | |
| Origination Fee - SBL | | | | | | | |
| Origination Fee - BAC | | | | | | | |
| | | | | | | | |
| **Total FINANCING COSTS** | | | | | | | |

**PROJECT CONTINGENCY**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Contingency - Changes | | | | | | | |
| Contingency: Soft | | | | | | | |
| | | | | | | | |
| **Total PROJECT CONTINGENCY** | | | | | | | |

| TOTAL PROJECT COSTS | | | | | | | |
|---|---|---|---|---|---|---|---|

FILED: WESTCHESTER COUNTY CLERK 05/01/2021 09:40 AM
NYSCEF DOC. NO. 3

INDEX NO. 55883/2021

RECEIVED NYSCEF: 05/01/2021

21-07096-shl    Doc 36-11    Filed 02/11/22    Entered 02/11/22 17:43:36    Exhibit 11
Pg 87 of 113

| SOURCES OF FUNDS | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Owner/Other Equity | | | | | | | | |
| Security Benefit | | | | | | | | |
| | | | | | | | | |
| Lender (Bradford Allen Funding Co) - Mezzanine Loan | | | | | | | | |
| TOTAL PROJECT SOURCES | | | | | | | | |

The undersigned hereby approve the above amounts for payment.


**WHITE PLAINS HEALTHCARE PROPERTIES I, LLC**

By:_____
    William A. Nicholson, a Manager


**WHITE PLAINS MEZZANINE, LLC**

By:_____
    William A. Nicholson, a Manager



Subscribed and sworn to before me this _____ day of _____, 201__.

_____
Notary Public

My Commission Expires: _____

Z:\White Plains - Westchester\Application for Payment\Owner Draw Requests\2017-08-02 - 3 - Sworn Owner's Statement - WP

FILED: WESTCHESTER COUNTY CLERK 05/01/2021 09:40 AM
INDEX NO. 55883/2021
NYSCEF DOC. NO. 3
21-07096-shl    Doc 36-11    Filed 02/11/22    Entered 02/11/22 17:43:36    Exhibit 11
RECEIVED NYSCEF: 05/01/2021
Pg 88 of 113

White Plains Healthcare LLC 1
Pre-Draw #1
Date:

| Draw Description | Vendor | Invoice | Partial Y/N | Amount | Sub Total |
|---|---|---|---|---|---|
| **LAND ACQUISITION** | | | | | |
| Acquisition - Land | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| **Land Acquisition Sub Total** | | | | | |

| Draw Description | Vendor | Invoice | Partial Y/N | Amount | Sub Total |
|---|---|---|---|---|---|
| **GENERAL & ADMINISTRATIVE** | | | | | |
| Beds Taylor | | | | | |
| Beds HH & Bethel | | | | | |
| NYDOH FEE | | | | | |
| Plan Reviews AHJ | | | | | |
| Legal: Zoning | | | | | |
| Title Ins. | | | | | |
| Clos'g Misc | | | | | |
| RE Taxes Precon & Const. | | | | | |
| Arch. & Eng.- Plans | | | | | |
| Civil & Landscape | | | | | |
| Geotech, Borings, Soils | | | | | |
| Printing, Reproductions | | | | | |
| Surveys: Initial | | | | | |
| Building Permits | | | | | |
| Appraisals | | | | | |
| Market Studies | | | | | |
| Legal: Transaction | | | | | |
| Organizational | | | | | |
| CON Consultant | | | | | |
| **General & Administrative Sub Total** | | | | | |

| Draw Description | Vendor | Invoice | Partial Y/N | Amount | Sub Total |
|---|---|---|---|---|---|
| **FINANCING COSTS** | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| **Financing Costs Sub Total** | | | | $ | - |

| TOTAL DRAW REQUEST | | | | $ | - |
|---|---|---|---|---|---|
| From Owner Equity/Other Sources | | | | | |
| | | | | | |

FILED: WESTCHESTER COUNTY CLERK 05/01/2021 09:40 AM
NYSCEF DOC. NO. 3

INDEX NO. 55883/2021
RECEIVED NYSCEF: 05/01/2021

21-07096-shl   Doc 36-11   Filed 02/11/22   Entered 02/11/22 17:43:36   Exhibit 11
Pg 89 of 113

White Plains Healthcare LLC 1
Draw #1
Date:

| Draw Description | Vendor | Invoice | Partial Y/N | Amount | Sub Total |
|---|---|---|---|---|---|
| **PRELIMINARY EXPENSE** | | | | | |
| Preconstruction Expense | | | | | |
| RE Maint, UTIL, Misc: Precon | | | | | |
| **Preliminary Expense Sub Total** | | | | | |
| | | | | | |
| **LAND ACQUISITION** | | | | | |
| | | | | | |
| **Land Acquisition Sub Total** | | | | | |
| | | | | | |
| **DESIGN AND CONSTRUCTION COSTS** | | | | | |
| Arch. & Eng - Plans | | | | | |
| Civil & Landscape | | | | | |
| Geotech, Borings, Soils | | | | | |
| Printing, Reproductions | | | | | |
| **Design and Construction Sub Total** | | | | | |
| | | | | | |
| **GENERAL & ADMINISTRATIVE** | | | | | |
| Subguard Insurance | | | | | |
| Utility Co. Backcharges | | | | | |
| CGL Ins | | | | | |
| Builder's Risk Insurance | | | | | |
| Plan Reviews AHJ | | | | | |
| Title Ins. | | | | | |
| Clos'g Misc | | | | | |
| Clos'g, Filing, Record'g | | | | | |
| Surveys: Initial | | | | | |
| Legal: Transaction | | | | | |
| Legal: Lender | | | | | |
| Organizational | | | | | |
| CON Consultant | | | | | |
| **General & Administrative Sub Total** | | | | | |
| | | | | | |
| **FINANCING COSTS** | | | | | |
| Mezzanine Interest Reserve | | | | | |
| Senior Interest Reserve | | | | | |
| Legacy Broker Fee | | | | | |
| Developer Fee | | | | | |
| O'Malley Brokerage Fee - Senior | | | | | |
| O'Malley Brokerage Fee - Mezz | | | | | |
| BAC Placement Fee | | | | | |
| Origination Fee - SBL | | | | | |
| Origination Fee - BAC | | | | | |
| **Financing Costs Sub Total** | | | | | |

| **TOTAL DRAW REQUEST** | | | | | |
|---|---|---|---|---|---|
| From Owner Equity/Other Sources | | | | | |
| | | | | | |

EXHIBIT "F"

SURVEY REQUIREMENTS

1.      Requirements. The survey shall be made in accordance with, and meet the requirements of, the certification below by a registered professional engineer or registered professional land surveyor. The description shall be a single metes and bounds perimeter description of the entire land, and a separate metes and bounds description of the perimeter of each constituent tract or parcel out of the land. The total acreage and square footage of the land and each constituent tract or parcel of the land shall be certified. If the land has been recorded on a map or plat as part of an abstract or subdivision, all survey lines must be shown, and all lot and block lines (with distances and bearings) and numbers, must be shown. The date of any revisions subsequent to the initial survey prepared pursuant to these requirements must also be shown.

2.      Certification. The certification for the property description and the map or plat shall be addressed to Agent, Borrower and the Title Company, signed by the surveyor (a registered professional land surveyor or registered professional engineer), bearing current date, registration number, and seal, and shall be in the following form or its substantial equivalent:

To Security Benefit Corporation, as Agent, Security Benefit Life Insurance Company, as Lender, WHITE PLAINS HEALTHCARE PROPERTIES I, LLC, a Massachusetts limited liability company, as Borrower, and First American Title Insurance Company, as Title Company:

This is to certify that this map or plat and the survey on which it is based were made in accordance with the 2016 Minimum Standard Detail Requirements for ALTA/NSPS Land Title Surveys, jointly established and adopted by ALTA and NSPS, and includes Items 1, 2, 3, 4, 6(b), 8, 13, 16, 17, 18, 19, 20 of Table A thereof. The field work was completed on _____ .

Date of Plat or Map:_____
(Surveyor's signature, printed name and seal with Registration/License Number)

FILED: WESTCHESTER COUNTY CLERK 05/01/2021 09:40 AM
INDEX NO. 55883/2021

NYSCEF DOC. NO. 3
RECEIVED NYSCEF: 05/01/2021

21-07096-shl   Doc 36-11   Filed 02/11/22   Entered 02/11/22 17:43:36   Exhibit 11
Pg 91 of 113

EXHIBIT "G"

RESERVED

EXHIBIT "H"

LEASING AND TENANT MATTERS

Borrower, Security Benefit Corporation, as Agent, and Lender agree as follows:

1.        Approved Leases. Borrower shall not enter into any tenant lease in the Improvements unless approved by Agent prior to execution. Any tenant lease shall be expressly subordinate to the Security Instrument. Borrower shall provide to Agent, a correct and complete copy of each tenant lease. Borrower shall, throughout the term of this Agreement, pay all reasonable costs incurred by Agent, in connection with Agent's review and approval of tenant leases and each guaranty thereof (if any), and also in connection with Agent's negotiation of subordination agreements and subordination, nondisturbance and attornment agreements with tenants, including reasonable attorneys' fees and costs.

2.        Delivery of Leasing Information and Documents. If any Leases have been entered into, from time to time upon Agent's request, Borrower shall promptly deliver to Agent (a) complete executed originals of each tenant lease, including any exhibits thereto and each guaranty thereof (if any), (b) a complete rent roll of the Property in such detail as Agent may require, together with such operating statements and leasing schedules and reports as Agent may require, (c) any and all financial statements of the tenants, subtenants and lease guarantors (if any) to the extent available to Borrower, (d) such other information regarding tenants and prospective tenants and other leasing information as Agent may request, and (e) such estoppel certificates and subordination agreements and/or subordination, nondisturbance and attornment agreements executed by such tenants, subtenants and guarantors, if any, in such forms as Agent may require.

3.        Compliance and Default. As additional conditions to Agent's and Lender's obligations under this Agreement, all tenants having the right to do so must approve all Plans and all changes thereto, the construction of the Improvements, and all other aspects of the Project requiring tenants' approval. A default by Borrower under or any failure by Borrower to satisfy any of the conditions of a lease shall constitute a Default under this Agreement. Borrower shall promptly notify Agent in writing of any failure by any party to perform any material obligation under any lease, any event or condition which would permit a tenant to terminate or cancel a lease, or any notice given by a tenant with respect to the foregoing, specifying in each case the action Borrower has taken or will take with respect thereto.

EXHIBIT "I"

SUBCONTRACTOR DEFAULT INSURANCE

[attached]

- I-2 -

# Coverage



*Subcontractor Default Insurance* provides broad, consistent coverage to secure your project

- Insures the risk of economic loss associated with non-performance of subcontractors and suppliers on the project
  - An estimated 80-90% of project values

- Coverage is provided by a *single* insurance carrier with a *single* set of terms
  - Providing certainty around what is and is not covered
  - No inconsistencies of having multiple bonding companies providing performance bonds for various subs

- Subcontractor Default Insurance is the broadest form in the industry, providing many coverage extensions not available anywhere else



© 2015, XL Catlin companies. All rights reserved. | *MAKE YOUR WORLD GO*

6

FILED: WESTCHESTER COUNTY CLERK 05/01/2021 09:40 AM
NYSCEF DOC. NO. 3
21-07096-shl   Doc 36-11   Filed 02/11/22   Entered 02/11/22 17:43:36   Exhibit 11
Pg 95 of 113
INDEX NO. 55883/2021
RECEIVED NYSCEF: 05/01/2021

# Summary



- Subcontractor Default Insurance:

  - Is a cost effective means to secure subcontractor performance risk

  - Covers the major costs associated with subcontractor default

  - Has a proven track record

  - Covers your project through statute period

  - Allows your GC to respond quickly to any subcontractor performance issues

  - Helps keep your job on time and on budget

  - *Makes your project go*





© 2015, XL Catlin companies. All rights reserved. | *MAKE YOUR WORLD GO*

10

FILED: WESTCHESTER COUNTY CLERK 05/01/2021 09:40 AM
NYSCEF DOC. NO. 3
INDEX NO. 55883/2021
RECEIVED NYSCEF: 05/01/2021

21-07096-shl    Doc 36-11    Filed 02/11/22    Entered 02/11/22 17:43:36    Exhibit 11
Pg 96 of 113

Benefits of Subcontractor Default Insurance (SDI)

- Control. CM has control of subcontractor prequalification and of the default process and remedy.
- Ability of the CM to address a default immediately without interference from an insurance company or surety
- Eliminates project delays associated with subcontractor default
- Most sub bond forms allow 21 days before the surety must meet with the CM
- Ability of the CM to be more proactive in subcontractor management which reduces the likelihood of actually having to default a subcontractor
- Ability of the CM to address a default in the best interest of the Project as opposed to subcontractor's surety
- 100% of subcontractors are covered on SDI projects vs bonding all subcontractors over a certain dollar limit.
- Coverage is provided for extended warranties up to 10 years after the completion of the work or applicable statute of limitations/ repose.
- Coverage for indirect and internal costs not paid by a surety (i.e., delay of other subs, expert consultant's)
- Larger pool of bidders - Coverage for subs that otherwise find it difficult to secure a bond.
- Limit of each default is $30m. Not limited to the penal sum of the bond. Average bond claim is 2.5 X's value of original subcontract
- Most project owners/ lenders opt not to have the CM provide performance & payment bonds as 100% of the subcontractors are covered.
- Owner can be afforded same subcontractor default protection as the CM contractually via a "Financial Interest Endorsement"

EXHIBIT "J"

SCHEDULE OF LENDERS

SECURITY BENEFIT LIFE INSURANCE COMPANY, as Lender          Percent of Loan 100%
1 SW Security Benefit Place
Topeka, Kansas 66636
Telephone:
Facsimile:
E-mail Address:

Notices:

Security Benefit Life Insurance Company
1 SW Security Benefit PL
Topeka, Kansas 66636
Telephone:
Facsimile:
E-mail Address:

Payment Instructions:

ABA #
[Bank Name]
Account #
Account Name:
FFC:
REF: Security Name, Identifier, or Reason for Wire

EXHIBIT "K"

ORGANIZATIONAL REQUIREMENTS

Borrower shall at all times be a limited liability company, duly organized in the Commonwealth of Massachusetts, which at all times has complied with and shall at all times comply with the following requirements (the "**Single Purpose Entity Requirements**") (in each case, except to the extent set forth in or contemplated by or pursuant to the terms of the Loan Documents):

(a)    is and will be formed solely for the purpose of acquiring, developing, owning, holding, selling, marketing, leasing, transferring, exchanging, financing, managing and operating the Property and transacting lawful business that is incident, necessary and appropriate to accomplish the foregoing, including executing and delivering the Loan Documents to which it is a party and performing its obligations thereunder;

(b)    is not, and will not be engaged in any business unrelated to the acquisition, development, ownership, holding, sale, marketing, leasing, transfer, exchange, financing, management, or operation of the Property;

(c)    does not have and will not have any assets other than those related to the Property;

(d)    will, to the fullest extent permitted by law, not engage in, seek or consent to or permit, (i) any dissolution, winding up, liquidation, consolidation, merger, or sale of all or substantially all of its assets, (ii) any transfer of direct ownership or equity interests in Borrower, or (iii) any amendment of its certificate of limited partnership, articles of incorporation, articles of organization, certificate of formation, by-laws, limited partnership agreement or operating agreement (as applicable) without the written consent of Agent;

(e)    will maintain its intention to remain solvent and has paid and intends to continue to pay its debts and liabilities (including, as applicable, shared personnel and overhead expenses) from its assets as the same have or shall become due, and is currently maintaining and will endeavor to maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations, in each case, to the extent sufficient cash flow exists from the Property;

(f)    will not fail, to correct any known misunderstanding regarding the separate identity of such entity;

(g)    has filed and will file its own tax returns, except to the extent that it has been or has elected or is required to file consolidated tax returns by law;

(h)    will maintain its own records, books, resolutions and agreements;

(i)    will not commingle, its funds or assets with those of any other Person other than as provided in this Agreement;

(j)    will hold its assets in its own name;

FILED: WESTCHESTER COUNTY CLERK 05/01/2021 09:40 AM
NYSCEF DOC. NO. 3

INDEX NO. 55883/2021

RECEIVED NYSCEF: 05/01/2021

21-07096-shl    Doc 36-11    Filed 02/11/22    Entered 02/11/22 17:43:36    Exhibit 11
Pg 99 of 113

(k)     will maintain its financial statements, accounts, books, records and other entity documents separate from any other Person;

(l)     will pay its own liabilities and expenses, including the salaries of its own employees (if any), out of its own funds and assets, in each instance to the extent of its sufficient cash flow from the Property; provided, however, that the foregoing shall not be interpreted so as to require any capital contributions from any Person to such Person;

(m)    will observe in all material respects all partnership, corporate or limited liability company formalities, as applicable;

(n)     has no and will have no Indebtedness other than (i) the Loan and (ii) such other liabilities that are permitted pursuant to the Loan Documents or imposed by Law;

(o)     will not assume or guarantee or become obligated for, the debts of any other Person and has not held out and will not hold out its credit as being available to satisfy the obligations of any other Person except as expressly permitted pursuant to this Agreement;

(p)     now maintains and uses, and will maintain and use, separate stationery, invoices and checks bearing its name; the stationery, invoices, and checks utilized by it or utilized to collect its funds or pay its expenses have borne and shall bear its own name and have not borne and shall not bear the name of any other entity unless such entity is clearly designated as being its agent;

(q)     will not pledge its assets for the benefit of any other Person, other than to Agent;

(r)     will hold itself out and identify itself, as a separate and distinct entity under its own name;

(s)     will maintain its assets in such a manner that it will not be costly or difficult to segregate, ascertain or identify its individual assets from those of any other Person; and

(t)     will not make loans to any Person.

EXHIBIT "L"

TENANT DIRECTION NOTICE

[___], 2017

HBL SNF, LLC

    Re:    Amended and Restated Operating Lease

Ladies and Gentlemen:

    This letter shall constitute notice to you that the undersigned has granted a security interest in the captioned lease and all rents, additional rent and all other monetary obligations to landlord thereunder (collectively, "Rent") in favor of Security Benefit Corporation ("Agent"), to secure certain of the undersigned's obligations to the Agent. The undersigned hereby irrevocably instructs and authorizes you to continue to deliver all Rent to the following address:

          **[Bank's Address]**
          Account No. _____
          Attention: _____
          ABA# _____

    The instructions set forth herein are irrevocable and are not subject to modification in any manner, except that the Agent, or any successor agent so identified by the Agent, may by written notice to you rescind the instructions contained herein.

Sincerely,

**BORROWER:**

WHITE PLAINS HEALTHCARE PROPERTIES I, LLC,
a Massachusetts limited liability company

By: _____
    William A. Nicholson, a Manager

EXHIBIT "M"

FORM OF COMPLIANCE CERTIFICATE -- BORROWER


[_____], 20[____]

COMPLIANCE CERTIFICATE

Security Benefit Corporation, as Agent
1 SW Security Benefit PL
Topeka, Kansas 66636
Attn:

Re:    **White Plains Healthcare - Compliance Statement**

Ladies and Gentlemen:

    This quarterly compliance certificate (this "Certificate") is being delivered pursuant to Section 2(b) of Exhibit "B" of that certain Construction Loan Agreement, dated as of August ___, 2017, by and among the undersigned ("Borrower"), Agent and Security Benefit Life Insurance Company ("Lender") (as the same may have been or may hereafter be amended, modified, supplemented, restated and replaced from time to time, the "Loan Agreement"). All capitalized terms used but not defined in this Certificate shall have the meanings given in the Loan Agreement.

    This Certificate is being given for the fiscal quarter ending on _____. Borrower hereby certifies to Agent and Lender as follows:

    1.    No Default has occurred and is continuing as of the date of this Certificate, except as set forth below [if blank, there are no exceptions]:

    _____

    _____

    _____

    2.    All representations and warranties made by Borrower in the Loan Documents (and any certificate, document or financial or any other statement furnished pursuant to or in connection therewith) remain true and correct in all material respects except for those that may no longer be true as a result of the passage of time or a change in circumstance and are not the result of a Default on and as of the date of this Certificate with the same force and effect as if made on and as of such date.

    3.    The Financial Statements delivered to Lender pursuant to Section 2(a) of Exhibit "B" of the Loan Agreement are true, correct and accurate as of the date of such Financial Statements.

    Should you require any further documentation or have any questions, please contact _____.

[SIGNATURE PAGE FOLLOWS]


- M-1 -

FILED: WESTCHESTER COUNTY CLERK 05/01/2021 09:40 AM
NYSCEF DOC. NO. 3

INDEX NO. 55883/2021

RECEIVED NYSCEF: 05/01/2021

21-07096-shl    Doc 36-11    Filed 02/11/22    Entered 02/11/22 17:43:36    Exhibit 11
Pg 102 of 113

IN WITNESS WHEREOF, the undersigned has executed this Compliance Certificate as of the date set forth above.

WHITE PLAINS HEALTHCARE PROPERTIES I, LLC,
a Massachusetts limited liability company


By: _____
        William A. Nicholson, a Manager

FILED: WESTCHESTER COUNTY CLERK 05/01/2021 09:40 AM
NYSCEF DOC. NO. 3
21-07096-shl   Doc 36-11   Filed 02/11/22   Entered 02/11/22 17:43:36   Exhibit 11
Pg 103 of 113
INDEX NO. 55883/2021
RECEIVED NYSCEF: 05/01/2021

EXHIBIT "N"

SECTION 22 AFFIDAVIT

[attached]

### SECTION 22 AFFIDAVIT

COMMONWEALTH OF MASSACHUSETTS )
                                     )  SS.:
COUNTY OF SUFFOLK             )

William A. Nicholson, being duly sworn, deposes and says:

1.     I reside in Ipswich, Massachusetts. I am a Manager of White Plains Healthcare Properties I, LLC, a Massachusetts limited liability company (the "Borrower").

2.     Reference hereby is made to that certain Construction Loan Agreement (the "Building Loan Agreement"), dated as of July ____, 2017, between Borrower, Security Benefit Life Insurance Company, a Kansas insurance company ("Lender"), and Security Benefit Corporation, a Kansas corporation ("Agent for Lender") in the original amount of $30,293,625 (the "Loan"), which Building Loan Agreement is to be filed in the Office of the Westchester County Clerk simultaneously herewith.

3.     The consideration paid, or to be paid, by the Borrower to the Lender for the Building Loan described in the Building Loan Agreement is $0, and all other expenses constituting cost of the Improvements incurred, or to be incurred, in connection with such Building Loan, and advanced or to be advanced pursuant to the Building Loan Agreement are as follows:

    (a)    Architect's Fees: $225,200

    (b)    Engineer's and Surveyors' Fees and Permits: $46,306

    (c)    Lender Inspections: $32,000

    (d)    Insurance Premiums During Construction: $647,499

    (e)    Demolition Costs:  $0

    (f)    Mortgage Recording Tax and Stamp Tax: $0

    (g)    Building Loan Service Fees: $0

    (h)    Sums paid to take by assignment prior existing mortgages which are consolidated with building loan mortgages and also the interest charges on such mortgages: $0

    (i)    Sums paid to discharge or reduce the indebtedness under mortgages and accrued interest thereon and other prior existing encumbrances: $0

    (j)    Taxes, Assessments, Water Rents and Sewer Rents paid (existing prior to commencement of improvement): $0

    (k)    Examination and insurance of title and recording fees: $0

    (l)    Attorneys' fees of Lender's counsel for preparation of documents, etc.: $0

    (m)    Interest reserve: $0

    (n)    Broker's commissions: $0

TOTAL: $951,006

4.    The amount, if any, to be advanced from the Building Loan to repay amounts previously advanced to the Borrower pursuant to Draw Requests for costs of the Improvements is: $0.

5.    The amount, if any, to be advanced from the Building Loan to reimburse the Borrower for costs of the Improvements expended by the Borrower after the commencement of the Improvements but prior to the date hereof is: $0.

6.    The amount to be advanced from the Building Loan for indirect costs of the Improvements which may become due and payable after the date hereof and during the construction of the Improvements (such as bond and insurance premiums, fees of the architects, engineers and surveyors, taxes, assessments and water and sewer rent, ground rent, fees for Lender's counsel, interest on the mortgage(s) which secure the Building Loan Agreement) other than as included in paragraph (3) above is: $0.

7.    The net sum which the Borrower estimates will be available to it from the Building Loan to pay contractors, subcontractors, laborers and materialmen for the Improvements is: $29,342,619.

8.    This affidavit is made pursuant to and in compliance with Section 22 of the Lien Law of the State of New York, as amended by Chapter 859 of Laws of 1930.

9.    The reason this statement is verified by deponent, and not by the Borrower, is that the Borrower is a limited liability company, and deponent is a Manager thereof.

10.    The facts herein stated are true to the knowledge of the deponent.

William A. Nicholson

Sworn to and subscribed before me
on the __28__ day of July, 2017

Notary Public



EXHIBIT "O"

FORM OF LETTER OF CREDIT AGREEMENT

## Agreement Regarding Letter of Credit

This Agreement Regarding Letter of Credit (the "Agreement") is made as of _____ ___, 20___ by and between WHITE PLAINS HEALTHCARE PROPERTIES I, LLC, a Massachusetts limited liability company ("Borrower") and SECURITY BENEFIT LIFE INSURANCE COMPANY, a Kansas corporation ("Lender").

RECITALS

A.    Borrower is indebted to Lender under a loan (the "Loan") as evidenced by a Construction Loan Agreement (the "Loan Agreement") and a Secured Promissory Note each dated on or about the Effective Date in the original principal amount of $38,500,000.00 (the "Note,").

B.    The Note is secured, in part, by a Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing dated as of the Effective Date granted by Borrower for the benefit of Lender (the "Security Instrument") and encumbering that certain land situated in Westchester County, New York as described therein, together with all buildings and improvements located thereon (such land, buildings, and improvements, being collectively referred to herein as the "Real Property").

C.    Borrower has assigned to Lender as security under the Loan, all of its rights under that certain Amended and Restated Operating Lease dated November 19, 2015 (as may be amended from time to time, the "Lease") between Borrower, as Landlord, and HBL SNF, LLC, as tenant ("Tenant"), together with all guaranties and security therefor.

D.    The Lease requires Tenant to obtain and deliver to Borrower a letter of credit to secure its obligations thereunder.

E.    Borrower and Lender desire to enter into this Agreement to provide for the grant by Borrower to Lender of a security interest in Borrower's rights under the Letter of Credit and the proceeds thereof and to provide for the drawing thereon and the disposition of any amounts drawn thereon.
NOW, THEREFORE, in consideration of the premises, in order to induce Lender to accept the Real Property as security for the Loan and to disburse the proceeds of the Loan, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.    Recitals. The Recitals are incorporated herein by reference.

2.    Letter of Credit. As used herein, the term "Letter of Credit" shall mean that certain irrevocable standby letter of credit no. _____ in the amount of $_____ issued by _____ (the "Issuer") for the benefit of Borrower's, a copy of which is attached hereto as "Exhibit A," and all amendments, extensions, substitutions and replacements thereof. Borrower shall furnish Lender with copies of all notices received from the Issuer promptly following Borrower's receipt thereof. Borrower represents and warrants to Lender that: (a) the Letter of Credit is valid and is in full force and effect; (b) the Letter of Credit has not been drawn upon; and (c) Borrower has not previously transferred or pledged the Letter of Credit or assigned the proceeds thereof to any person or entity. On the date hereof, Borrower has delivered to the Lender:

(a)     the original Letter of Credit; and

(b)     a transfer certificate in the form attached as Exhibit A to the Letter of Credit, executed by the Borrower, with the name of the transferee left blank, to be completed by Lender in accordance with the terms of this Agreement (the "Transfer Certificate").

3.     <u>Security Interest</u>. Borrower hereby pledges to Lender, and grants to Lender a continuing and unconditional first priority security interest (the "Security Interest") in, and the exclusive control over, the Letter of Credit, all of Borrower's rights as beneficiary to present and draw on the Letter of Credit, and all proceeds of the Letter of Credit. The Security Interest is given to assure the timely payment and performance of all of the obligations of Borrower under the Loan Agreement, the Note, the Mortgage, and all other instruments or documents now or hereafter evidencing or securing the Loan (collectively, the "Loan Documents").

4.     <u>Transfer of Letter of Credit</u>. Lender agrees to hold the Transfer Certificate and to not present the Transfer Certificate to the Issuer, until such time as a Default (as hereinafter defined) has occurred. Upon the occurrence of a Default, Lender may, at its option, complete and fill in the name of the transferee, which shall be the name of the Lender, or its successors or assigns at such time, and present the Transfer Certificate to the Issuer. Upon the transfer of the Letter of Credit, the Lender shall have all the rights of the beneficiary of the Letter of Credit, including the right to draw upon the Letter of Credit. If drawn upon by Lender, the proceeds of such Letter of Credit shall be applied by Lender to any amounts then owing from Borrower to Lender under the Loan Documents, and the balance shall be applied as set forth in Section 6 below.

5.     <u>Right to Draw on Letter of Credit Prior to Default</u>. Prior to the occurrence of a Default under this Agreement, the Borrower shall retain the right to draw upon the Letter of Credit, subject to the following terms and conditions:

(a)     Borrower shall immediately notify Lender in writing of any circumstance under which any draw may be made upon the Letter of Credit and the amount of such draw. Such notification shall constitute a representation under the Loan Documents. Borrower may, concurrently with such notification, request that the Letter of Credit be returned to Borrower for the purpose of making such draw.

(b)     Borrower agrees to draw upon the Letter of Credit, upon the request of Lender, either before or after the occurrence of a Default hereunder, under any of the following circumstances: (i) Lender determines in good faith that a default has occurred under the Lease (which has not been cured within the applicable grace period) and either the Letter of Credit expires within twenty (20) days or Lender determines in good faith that the failure to draw upon the Letter of Credit will adversely affect the subsequent right to draw; or (ii) notice has been given that the Letter of Credit will not be renewed, and Tenant has failed to make arrangements, reasonably satisfactory to Lender, for issuance of a substitute Letter of Credit in compliance with the terms of the Lease within twenty (20) days of the stated expiration date of the Letter of Credit. Borrower agrees that if it fails to draw upon the Letter of Credit in accordance with the terms of this paragraph, Lender shall be irreparably harmed and shall have no adequate remedy at law. Borrower agrees that Lender shall have, in addition to all other rights provided by law, the right to specific performance and all other equitable remedies to enforce the provisions set forth in this paragraph and in this Agreement.

FILED: WESTCHESTER COUNTY CLERK 05/01/2021 09:40 AM
NYSCEF DOC. NO. 3

INDEX NO. 55883/2021
RECEIVED NYSCEF: 05/01/2021

21-07096-shl    Doc 36-11    Filed 02/11/22    Entered 02/11/22 17:43:36    Exhibit 11
Pg 108 of 113

(c)     Upon the Borrower's request to draw upon the Letter of Credit pursuant to subsection (a) above, or upon Lender's request that Borrower draw upon the Letter of Credit pursuant to subsection (b) above, Lender shall deliver the original Letter of Credit to Borrower for the sole purpose of Borrower drawing upon the Letter of Credit. The Borrower shall cause the Issuer to deposit the proceeds of the Letter of Credit into the Cash Management Account (as defined in the Loan Agreement), or, at Lender's written request, if a Default occurs under the Loan, directly to Lender. The proceeds of the Letter of Credit shall be disbursed in accordance with Section 6 below. If only a partial draw is made, the original Letter of Credit shall be returned to Lender after making such draw.

(d)     Upon the earlier to occur of (a) the repayment of the Loan in full or (b) the date that the conditions for release of the Letter of Credit are met by Tenant under the terms of the Lease, the Letter of Credit (if extant) will be returned by Lender to Tenant.

6.     <u>Application of Proceeds of the Letter of Credit</u>. Upon the occurrence of a Default hereunder, the proceeds of the Letter of Credit shall be applied by Lender to reduction of the Principal Debt, and any other sums due under the Loan, in such order and manner as Lender may reasonably determine.

Notwithstanding the foregoing, if the Letter of Credit is drawn upon prior to the occurrence of a Default under this Agreement, the proceeds from such Letter of Credit shall be deposited in the Cash Management Account (the "Proceeds"). Until the occurrence of a Default hereunder, Lender shall periodically disburse the Proceeds for the following purposes:

(a)     If Tenant has defaulted in its payment of Rent under the terms of the Lease, Lender shall, on a monthly basis, on the date that rent is due under the Lease, disburse a portion of the Proceeds to payment of any sums then due under the Loan;

(b)     Lender may in its discretion also disburse to Borrower, upon request of Borrower, Retenanting Expenses relating to the space previously leased by Tenant pursuant to the Lease; and

(c)     Lender may hold any such Proceeds not released pursuant to (a) or (b) above as additional security for the Loan.

Any proceeds of the Letter of Credit held by Lender after all of Borrower's obligations under the Loan Documents have been performed shall be remitted to Borrower.

For purposes of this Agreement the term "Retenanting Expenses" shall mean the following:

(i)     Actual tenant improvement expenses, including cash allowances paid to the tenants, construction costs, engineering and architectural fees, permits and license fees and attorney fees;

(ii)     Leasing commissions paid to third party entities; and

(iii)     Other related expenses approved by Lender in its discretion.

7.     <u>Default</u>. Borrower shall be in default ("Default") hereunder if: (a) a Default occurs under the Loan Agreement, or any of the other Loan Documents; (b) Borrower fails to comply with or perform or observe any agreement, covenant, obligation, or condition to be performed, observed, or complied with by Borrower under this Agreement (including any failure to notify Lender in writing promptly of any act or circumstance which entitles Borrower to draw upon the Letter of Credit) within the applicable time period specified herein (time being of the essence of each and every provision hereof); (c) any of the representations or warranties made by Borrower under this Agreement proves to be misleading or untrue in any material respect. Any Default under this Agreement shall constitute a Default under the Loan Agreement, and any other Loan Documents.

FILED: WESTCHESTER COUNTY CLERK 05/01/2021 09:40 AM
NYSCEF DOC. NO. 3

INDEX NO. 55883/2021

RECEIVED NYSCEF: 05/01/2021

21-07096-shl    Doc 36-11    Filed 02/11/22    Entered 02/11/22 17:43:36    Exhibit 11
Pg 109 of 113

8.    Lender's Costs.  All costs and expenses (including, without limitation, reasonable attorneys' fees) whatsoever incurred by Lender in connection with the enforcement of this Agreement (whether arising before trial, at trial, or on appeal), the protection of this Agreement in any bankruptcy proceeding, or the presentation, drawing upon, or collecting of the Letter of Credit shall be paid by Borrower to Lender upon demand and shall be secured by the Security Instrument, the other Loan Documents, and this Agreement.

9.    Captions.  The section titles or captions contained in this Agreement are for convenience only and shall not be deemed to define, limit or otherwise modify the scope or intent of this Agreement.

10.    Variations in Pronouns.  All the terms and words used in this Agreement, regardless of the number and gender in which they are used, shall be deemed and construed to include any other number, singular or plural, and any other gender, masculine, feminine, or neuter,  as the context or sense of this Agreement or any paragraph or clause herein may require, the same as if such word had been fully and properly written in the correct number and gender.

11.    Notices.  In order for any demand, consent, approval or other communication to be effective under the terms of this Agreement, "Notice" must be provided under the terms of this Subsection. All Notices must be in writing.  Notices may be (a) delivered by hand, (b) transmitted by fax (with a duplicate copy sent by first class mail, postage prepaid), (c) sent by certified or registered mail, postage prepaid, return receipt requested, or (d) sent by reputable overnight courier service, delivery charges prepaid.  Notices shall be addressed as set forth below:

If to Lender:

        Security Benefit Life Insurance Company
        1 SW Security Benefit Pl
        Topeka, Kansas 66636
        Attention: Douglas Schneider
        Telephone: (785) 438-1642
        Fax: (785) 438-3080
        E-mail Address: Douglas.Schneider@securitybenefit.com

With a copy to:

        Nyemaster Goode, P.C.
        700 Walnut Street, Suite 1600
        Des Moines, Iowa 50309
        Attention: James C. Wine
        Telephone: 515-283-3188
        Fax: 515-283-8045
        E-mail Address: jwine@nyemaster.com

If to Borrower:

    White Plains Healthcare Properties I, LLC
    West Peabody Executive Center, Suite 200
    2 Bourbon Street
    Peabody, MA 01960
    Attention: William Nicholson
    Telephone: 978-535-6700
    Fax: 978-535-6701
    E-mail Address: wnicholson@congressconstruction.com
With a copy to:

    Posternak Blankstein & Lund LLP
    Prudential Tower
    800 Boylston Street
    Boston, MA 02199-8004
    Attn: Jo-Ann M. Marzullo
    Phone: 617.973.6267
    617.722.4935 fax
    E-Mail: jmarzullo@PBL.COM

Notices delivered by hand or by overnight courier shall be deemed given when actually received or when refused by their intended recipient. Faxed Notices will be deemed delivered when a legible copy has been received (provided receipt has been verified by telephone confirmation or one of the other permitted means of giving Notices under this Subsection). Mailed Notices shall be deemed given on the date of the first attempted delivery (whether or not actually received). Either Lender or Borrower may change its address for Notice by giving at least fifteen (15) Business Days' prior Notice of such change to the other party.

    12.    <u>Counterparts</u>.    This Agreement may be executed in multiple counterparts, all of which taken together shall constitute one and the same Agreement and the signature page of any counterpart may be removed therefrom and attached to any other counterpart.

    13.    <u>Severability</u>.    In the event that any one or more of the provisions of this Agreement shall for any reason be held to be invalid, illegal or unenforceable, in whole or in part, or in any respect, or in the event that any one or more of the provisions of this Agreement shall operate, or would prospectively operate, to invalidate this Agreement, then, and in any such event, such provision or provisions only shall be deemed to be null and void and of no force or effect and shall not affect any other provision of this Agreement, and the remaining provisions of this Agreement shall remain operative and in full force and effect and shall in no way be affected, prejudiced or disturbed thereby.

    14.    <u>WAIVER OF JURY TRIAL</u>.  ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING TO ENFORCE OR DEFEND ANY RIGHTS (i) UNDER THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR (ii) ARISING FROM ANY LENDING RELATIONSHIP EXISTING IN CONNECTION WITH THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT IS HEREBY WAIVED BY BORROWER AND LENDER, AND IT IS AGREED BY BORROWER AND LENDER THAT ANY SUCH ACTION OR PROCEEDING SHALL BE TRIED BEFORE A JUDGE AND NOT BEFORE A JURY. THIS WAIVER OR RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY BORROWER AND BORROWER, AND IS INTENDED TO

ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE.

15.    Governing Law.  This Agreement shall be construed and enforced according to, and governed by, the laws of the State of New York without reference to conflicts of law provisions.

16.    Successors and Assigns.  The terms, covenants, conditions and warranties contained herein and the powers granted hereby shall inure to the benefit of and bind the parties hereto and their respective successors and assigns.

IN WITNESS WHEREOF, Borrower and Lender have caused this Agreement to be duly executed effective as of the day and year first above written.

WHITE PLAINS HEALTHCARE PROPERTIES I, LLC, a Massachusetts limited liability company

By:_____
Name:_____
Title:_____

SECURITY BENEFIT LIFE INSURANCE COMPANY, a Kansas corporation

By:_____
Name:_____
Title:_____

FILED: WESTCHESTER COUNTY CLERK 05/01/2021 09:40 AM
INDEX NO. 55883/2021

NYSCEF DOC. NO. 3

21-07096-shl    Doc 36-11    Filed 02/11/22    Entered 02/11/22 17:43:36    Exhibit 11

RECEIVED NYSCEF: 05/01/2021

Pg 112 of 113

**EXHIBIT "A"**

**Copy of Letter of Credit**

FILED: WESTCHESTER COUNTY CLERK 05/01/2021 09:40 AM
NYSCEF DOC. NO. 3

21-07096-shl   Doc 36-11   Filed 02/11/22   Entered 02/11/22 17:43:36   Exhibit 11
Pg 113 of 113

INDEX NO. 55883/2021
RECEIVED NYSCEF: 05/01/2021

SCHEDULE 4.1

Organizational Chart

**Construction Loan Borrower**
WHITE PLAINS HEALTHCARE
PROPERTIES I, LLC, a Massachusetts
limited liability company

**Its Managers**
William A. Nicholson and
Howard Fensterman

**Its Sole Equity Member**
White Plains Mezzanine, LLC,
a Massachusetts limited liability company



**Mezz Loan Borrower**
White Plains Mezzanine, LLC, a Massachusetts
limited liability company

**Its Managers**
William A. Nicholson and
Howard Fensterman

**Its Members**
William A. Nicholson            6.67%
HOWBOB LLC                     13.33%
CCC Equities I, LLC              80%