# **<u>Exhibit 2</u>**

DocuSign Envelope ID: 21-01096-SHL   Doc 37-2   Filed 02/11/22   Entered 02/11/22 17:46:27   Exhibit 2
Pg 2 of 144

## PROVIDER PARTICIPATION AGREEMENT
## (ANCILLARY)

This Provider Participation Agreement (the "Agreement") is made and entered into as of the Effective Date written below, by and between Oscar Insurance Corporation and Affiliates (Commercial only) and Oscar Health Plan of New York, Inc. (Medicare Advantage only); collectively, "Oscar" as applicable in this Agreement to each specific line of business, and ___EPIC Rehabilitation and Nursing at White Plains___, including its Professionals and Affiliates (collectively, "Provider"), each individually a "Party" and, together, "Parties."

**WHEREAS**, Oscar is organized pursuant to the laws of the State of New York and wishes to contract with Provider to provide or arrange for the provision of certain Covered Services to Members (as hereinafter defined);

**WHEREAS**, Oscar has entered or may enter into contracts with individuals, employer groups and other group purchasers under which Oscar has agreed to provide or arrange health care services and benefits to Oscar Members;

**WHEREAS**, Provider desires to participate in Oscar's network of Participating Providers by providing or arranging for Covered Services to Members; and

**WHEREAS**, this Agreement, and any exhibits, attachments and addenda attached hereto, sets forth the obligations of both Parties related to the performance of such Covered Services.

**NOW, THEREFORE**, in consideration of the foregoing and incorporating the above recitals and for other good and valuable consideration, the undersigned Parties hereto agree the definitions, mutual covenants and promises contained herein.

**OSCAR**                                   **PROVIDER**

*Rebel Williams*                            *Moshe Heschel*
DocuSigned by:                              DocuSigned by:
7EED08C76571482...                          EF295068CF2D4F5...

Name: ___Rebel Williams___                  Name: ___Moshe Heschel___

Title: ___Sr Manager, Direct Contracting___  Title: ___Managed Care Consultant___

Date: ___8/17/2020___                       Date: ___1/13/2020___

Agreement Effective Date: ___6/16/2020___

Address for Notices:

Oscar Insurance Corporation                 [Provider Entity  HBL SNF LLC        ]
Attn: Network Operations                    Attn: Administration                 ]
75 Varick Street, 5th Floor                 [ 120 Church St                       ]
New York, NY 10013                          [ White Plains, NY 10601-1209         ]
Email to: providerrelations@hioscar.com     Email: [ mheschel@novacaresolutions.com ]
Copy to: legal@hioscar.com                  Copy to: [ VincentM@epicmgt.com       ]

FILED: WESTCHESTER COUNTY CLERK 10/25/2021 11:01 PM
NYSCEF DOC. NO. 250

Exhibits to Agreement

- Exhibit 1        Provider Information
- Exhibit 1-a     Provider TINs and Locations
- Exhibit 2        Compensation
- Exhibit 2-a     Data and Information Sharing
- Exhibit 3        State Mandated Provisions
- Exhibit 3-a     Medicare Advantage Provisions
- Exhibit 4        Schedule of Programs
- Exhibit 4-a     Service Area
- Exhibit 5        List of Third-Party Payors
- Exhibit 6        Carve-out Services

DocuSign Envelope ID: 21-02096-smr  Doc 37-2  Filed 02/11/22  Entered 02/11/22 17:46:27  Exhibit 2
Pg 4 of 144

## I.     DEFINITIONS

Whenever used in this Agreement, the following terms shall have the definitions contained in this Article I. Terms used in this Agreement which are defined by Law shall be interpreted consistent with such Laws.

I.1     <u>Affiliate</u> means an entity controlled by, controlling, or under common control with another entity, including through ownership of stock, joint venture, or membership interest.  For purposes of this definition, the term control means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person or entity, whether through the ownership of voting securities, by contract, or otherwise.

I.2     <u>Authorization/Authorized</u> means approval pursuant to Oscar's Utilization Management Program for the provision of Covered Services.

I.3     <u>Benefit Plan</u> means the EOC (defined below), agreement, certificate of coverage, policy forms or other documents, together with any riders, that describe the Covered Services that Oscar has agreed to provide to Members, as may be amended, modified, replaced, or supplemented from time to time by Oscar.

I.4     <u>Billed Charges</u> means the fee Provider charges for services provided to Members by Provider or Professionals as set forth in the Provider's chargemaster or list of charges, which fees do not vary based on payor or source of payment. The fees charged to Members by Provider or Professionals will not exceed the fee charged to patients not covered under a Benefit Plan.

I.5     <u>Clean Claim</u> means a claim for payment for Covered Services rendered by Provider that has no defect or impropriety, lack of any required substantiating documentation (including the substantiating documentation needed to meet the requirements for encounter data) or particular circumstances requiring special treatment that prevents timely payment from being made on the claim and that otherwise contains all data or documentation necessary for Oscar to process the claim, as specified in applicable Law and the Provider Manual.

I.6     <u>Covered Services</u> means those Medically Necessary health care services covered under the terms of a Member's Benefit Plan and subject to the limitations and exclusions of such Benefit Plan and this Agreement.

I.7     <u>Emergency or Emergency Services</u> means health care services provided in a hospital emergency facility, emergency medical care facility, or comparable emergency facility to evaluate and stabilize a medical condition of a recent onset and severity, including severe pain, that would lead a prudent layperson possessing an average knowledge of medicine and health to believe that the person's condition, sickness, or injury is of such a nature that failure to get immediate medical care could result in: (1) placing the patient's health in serious jeopardy; (2) serious impairment to bodily functions; (3) serious dysfunction of a bodily organ or part; (4) serious disfigurement; (5) in the case of a pregnant woman, serious jeopardy to the health of the woman or the fetus; or (6) in the case of a behavioral condition, placing the health or life of the person or others in serious jeopardy.

I.8     <u>Evidence of Coverage ("EOC")</u> is/are the document(s) which describe(s) the benefits, exclusions, limitations, conditions, and the benefit levels of the applicable Benefit Plans.

I.9     <u>Law</u> means any applicable constitution, statute, code, ordinance, regulation, treaty, rule, court order or mandate, common law, policy, binding interpretation or guidance document enacted, published or promulgated by any federal, state or local governmental authority which has jurisdiction over the subject matter of this Agreement or the Parties' performance of their duties hereunder.

I.10    <u>Medical Management</u> services include utilization management, case management, on-site reviews and process improvement initiatives.

I.11    <u>Medically Necessary/Medical Necessity</u> describes services, procedures, treatments, supplies, devices, equipment, Facilities or drugs that a medical practitioner, exercising prudent clinical judgment, would provide to a Member for the purpose of preventing, evaluating, diagnosing or treating an illness, injury, or

DocuSign Envelope ID: 21-02096-smr  Doc 37-2   Filed 02/11/22   Entered 02/11/22 17:46:27   Exhibit 2

disease or its symptoms, and that are (i) in accordance with generally accepted standards of medical practice; (ii) clinically appropriate in terms of type, frequency, extent, site and duration and considered effective for the Member's illness, injury or disease; (iii) not primarily for the convenience of the Member, physician or other health care provider; and (iv) not more costly than an alternative service or sequence of services at least as likely to produce equivalent therapeutic or diagnostic results as to the diagnosis or treatment of that Member's illness, injury, or disease. For purposes of this definition, "generally accepted standards of medical practice" means standards that are based on credible scientific evidence published in peer-reviewed medical literature generally recognized by the relevant medical community, national physician specialty society recommendations and the views of medical practitioners practicing in relevant clinical areas and any other relevant factors. A determination that a service is Medically Necessary does not however mean that a particular service is a Covered Service if the service is otherwise excluded under the Member's Benefit Plan.

I.12  Member is an individual who is enrolled in an individual or group Benefit Plan and who is determined to be eligible for membership in the applicable Benefit Plan as of the date the Covered Services are provided.

I.13  Member Responsibility means an amount (whether expressed as either a percentage of cost or as a specific dollar amount) that a Member is obligated to pay directly to a provider for a specific service in accordance with the Benefit Plan under which he or she is covered. For purposes of this agreement, Member Responsibility will include, but not be limited to, those payments commonly referred to as "coinsurance," "copayments" and/or "deductibles."

I.14  Non-Covered Services are those health-care services and supplies which are not Medically Necessary, or which a Member is not entitled to receive as defined in the Member's Benefit Plan.

I.15  Participating Provider means any facility, physician, or other health care provider or group which has contracted with, or on whose behalf a contract has been entered with, Oscar to provide Covered Services under a Benefit Plan.

I.16  Professionals mean the health care professionals who are employed by or under contract with Provider to provide services to patients of Provider.

I.17  Protocols are Oscar's policies and procedures that include quality assurance, quality improvement, accreditation, risk management, utilization review, utilization management, and other administrative policies and procedures.

I.18  Provider Manual means that document or series of documents created and maintained by Oscar that describes Oscar's requirements for Participating Providers.

I.19  Service Area, if applicable, means the unique geographic area identified in the Agreement. The Service Area may include the entire State or any subdivision thereof as identified in the Agreement.

I.20  State means the State of New York.

## II.  OSCAR OBLIGATIONS

Oscar agrees to perform all activities and responsibilities as follows:

II.1  Claims Payment. Oscar agrees to pay Provider for Covered Services rendered to Members in accordance with applicable Law, the terms of the Provider Manual and the terms of this Agreement.

II.2  Member Identification. Oscar will issue all Members an identification card identifying the individual as an Oscar Member and stating the name of the Member, a valid identification number and any other information, as required by Law.

II.3  Eligibility and Benefit Determinations. Oscar will communicate to Members information regarding final benefit determinations, eligibility, bills and other matters relating to their status as Members enrolled in a

DocuSign Envelope ID: 21-02696-smr   Doc 37-2   Filed 02/11/22   Entered 02/11/22 17:46:27   Exhibit 2

Benefit Plan. Oscar will maintain a telephone and/or electronic system that enables Participating Providers to confirm Member's eligibility to receive Covered Services.

II.4 <u>Medical Management</u>. Oscar will perform (or have another vendor perform on Oscar's behalf) Medical Management services.

II.5 <u>Terms Applicable to Payors</u>. Oscar agrees that each Payor is bound by the terms of this Agreement.

## III.   PROVIDER OBLIGATIONS

III.1 <u>Covered Services</u>. Provider will render Covered Services (i) as outlined in this Agreement and the applicable Oscar Benefit Plan; (ii) in a manner consistent with Provider's license, qualifications, training and experience; and (iii) within the professional, clinical, legal and ethical standards of practice for care generally recognized within the medical community in which Provider operates. Provider agrees that it will render Covered Services to Members in the same manner that Provider would provide for any other patient.

III.1.1 <u>Schedule of Programs</u>. The programs covered under this Agreement are identified in Exhibit 4.

III.1.2 <u>Provider Responsibilities</u>. Provider shall exercise independent judgment and shall be liable for the provision of Covered Services to Members. Provider understands that Oscar's determinations (if any) to deny payments for services which Oscar determines are not Covered Services or which were not provided in accordance with the requirements of this Agreement, including Exhibits, in no way limit, restrict or absolve Provider of its responsibilities pursuant to this Article.

III.2 <u>Provider Admissions</u>. If applicable, Provider agrees to admit Members to Provider: (i) upon the orders of a Participating Provider; (ii) if a Member requires inpatient services after Emergency Care; or (iii) as requested by Oscar.

III.2.1 For scheduled admissions, Provider will notify Oscar seventy-two (72) hours prior to the admission.

III.2.2 If an admission is the result of an Emergency, Provider will notify Oscar within twenty-four (24) hours.

III.2.3 Provider will comply with the requirements of Oscar's Medical Management programs, including on-site review of admissions performed by Oscar's Medical Management staff.

III.3 <u>Emergency Care</u>. Provider will meet all legal obligations with respect to the provision of Emergency Services, and shall use best efforts to obtain verification of eligibility prior to rendering Covered Services. Provider will notify Oscar within twenty-four (24) hours of rendering or learning of the rendering of Emergency Care to a Member.

III.4 <u>Determination of Member Eligibility</u>. Provider will determine whether a person seeking Covered Services is a Member in accordance with the procedures specified in the Provider Manual.

III.4.1 If Oscar determines that such person was not eligible for Covered Services on the date of service, Oscar shall make best efforts to promptly notify Provider and will be permitted to pursue recovery of any payment. If Oscar is entitled to a recovery under this Section, Oscar may recover as an overpayment pursuant to the terms of this Agreement.

III.5 <u>Authorization</u>. If applicable and except for Emergency Care, the Provider must seek authorization from Oscar or its delegate prior to providing Covered Services to Members to the extent required by, and in accordance with, the terms of the Provider Manual.  Failure to receive authorization may result in reduced payment of claims by Oscar.

III.6 <u>Protection of Members from Out of Network Charges</u>. Provider agrees to make referrals of Members for Covered Services only to Participating Providers, except as authorized by Oscar.  All referrals will be made in accordance with the provisions of this Agreement and the Provider Manual.

III.6.1 Emergency Services shall not require referrals pursuant to the terms of this Agreement.

III.6.2 Provider shall identify all hospital-based providers and shall make best efforts to update Oscar regarding any changes to such providers in its monthly list of Professionals.

DocuSign Envelope ID: 21-06096-smi   Doc 37-2   Filed 02/11/22   Entered 02/11/22 17:46:27   Exhibit 2
Pg 7 of 144

III.6.3   Provider shall make best efforts to utilize Provider-based physicians that are Participating Providers.

III.6.3.1 If a Provider-based provider group (e.g., pathology, radiology, anesthesiology, etc.) is not participating with Oscar, Provider will make best efforts to assist Oscar in bringing such groups into Oscar's network of Participating Providers prior to providing Covered Services to Oscar Members. If Oscar is unable to negotiate a Participating Provider agreement with the Provider-based provider group for Covered Services provided at the Provider, Provider agrees to meet with Oscar in good faith to discuss potential resolution.

III.7   <u>Medical Management Program</u>.  Provider will cooperate with, participate in, and comply with the decisions of Medical Management programs established by Oscar or the State. Such programs may include performance measurement/improvement programs and other policies, procedures and corrective measures reasonably established by Oscar or Provider to effect the terms and provisions of this Agreement. Further, Facility agrees to participate in government and/or accreditation entity programs that require Facility to participate and/or provide applicable data or other information (e.g., HEDIS, NCQA, CMS programs).

III.8   <u>Discharge Planning</u>. Provider, in collaboration with Participating Providers and Oscar's Medical Management staff, will utilize a system for the coordinated discharge planning of Members, including the planning of such continuing care as may be necessary.

III.9   <u>Credentialing</u>.   Provider shall develop, implement, and maintain a credentialing program for all Professionals. Such credentialing program shall operate in compliance with all applicable Laws and national standards, including those established by NCQA. Upon request of Oscar, Provider, or an authorized state or federal agency, Professionals shall furnish copies of applicable licenses, permits, certificates and registrations. Professionals shall immediately notify Provider and Oscar of any changes in licensure, certification, registration, accreditation status or hospital privileges status of any Professional.

III.9.1   When applicable, Parties shall execute a delegated credentialing agreement, and all providers will comply with Oscar's credentialing and recredentialing policies and procedures.  Any provider that fails to meet Oscar's credentialing requirements will not be considered a Participating Provider. Upon request and at no cost, Provider and Professionals shall provide Oscar, or its designee, all information necessary to ensure compliance with such standards.

III.9.2   <u>Change in Status</u>. Provider and Professionals shall promptly notify Oscar upon discovery of any change in any Professional's professional status or licensure which may impact such Professional's qualifications under the credentialing or re-credentialing requirements or Professional's ability to provide Covered Services to Members.

III.9.3   <u>Roster</u>. Provider shall provide a complete roster of each Professional upon execution of this Agreement. Provider shall immediately notify Oscar of any change in any of the information contained in the roster and provide Oscar an updated roster weekly that notes any additions, deletions, or other changes.

III.10   <u>Quality Improvement</u>.  Provider will participate in and cooperate with Oscar programs related to utilization and quality of care rendered to Members under this Agreement. This shall include participation in Oscar's provider engagement initiatives, at Oscar's discretion, unless opted-out by Provider. Oscar may use practitioner performance data for quality improvement and Member experience activities.

III.11   <u>Collaboration</u>. Provider shall agree to participate in and cooperate with Oscar's data integration, care management, population health, risk adjustment, and quality (e.g., HEDIS, electronic health record access, etc.) initiatives, including the provision of medical records, as requested.

III.11.1 Provider agrees to provide monthly data feeds to support Oscar's Population Health Management as set forth Exhibit 2-a ("Data and Information Sharing").

III.12   <u>Non-compliance with the Provider Manual</u>. Provider agrees to comply with the Provider Manual. The Provider Manual is incorporated into this Agreement and made a part hereof.

DocuSign Envelope ID: 21-0696-SMI Doc 37-2 Filed 02/11/22 Entered 02/11/22 17:46:27 Exhibit 2
Pg 8 of 144

III.12.1 Changes to the Provider Manual shall be binding on Provider thirty (30) days after notice of such change, or such other timeframe as required by Law. The Parties agree that any policies and procedures necessary to effect compliance with laws do not require thirty (30) days prior notice and shall be effective as stated in such notice. Such notice may be provided in an electronic format.

III.13 Carve-Out Vendors. A list of services carved-out from this Agreement is set forth in Exhibit 6, and such Exhibit may be updated by Oscar.

III.14 Accessibility. As applicable, Provider ensures that Covered Services will be available to Members twenty-four (24) hours a day, seven (7) days a week.

III.15 Non-Discrimination. Provider will not discriminate in the performance of its obligations under this Agreement based on a Member's race, color, national origin, sex, sexual orientation, age, religion, place of residence, health status, handicap, type of Benefit Plan, or source of payment, and agrees to observe, protect and promote the rights of Members as patients as is done for all Provider's patients.

III.16 Marketing. Provider will provide comparable treatment to Oscar as to any other payor with respect to listings, marketing or the display of cards, plaques or other logos, including any online or other electronic or digital media to identify Provider's participation status. Provider agrees that Oscar may use Participating Provider's (including service locations) information (e.g., name, logo, address and telephone number) in Oscar's marketing, informational, and educational materials. Provider also agrees to provide Oscar with the most-current information, any requested assets for marketing purposes (such as high-resolution logos and brand guidelines), and any updates thereto. Provider and Professionals agree to allow Oscar to distribute a public announcement of Provider and Professionals' affiliation with Oscar.

III.17 Member Communication. Provider or its employees, agents, or Affiliates will not directly or indirectly engage in conduct that may be interpreted as intended to persuade a Member to disenroll from any Benefit Plan or discontinue a Member's relationship with Oscar.

III.17.1 Provider and Professionals may freely communicate with Members about all treatment options, regardless of Benefit Plan limitations.

III.17.2 Provider may send mailings to Members regarding network status, health status, medical care, or treatment options.

III.18 Protection of Members. Provider and Professionals may not impose any limitations or requirements on Members that it does not impose on other patients of Provider and Professionals, including the closing of panels. Provider and Professionals must provide sixty (60) days' notice to Oscar prior to closing any panels to Members. Provider and Professionals must provide notice within forty-eight (48) hours of opening panels.

III.19 Collection of Amounts from Members. Provider and Professionals may not bill, collect, charge, or seek compensation from Members for services rendered other than (i) Member Responsibility; or (ii) payment for Non-Covered Services. For health care services deemed Non-Covered Services, Provider and Professionals may bill Members or any other responsible party only if adequate notices or consents have been provided and the Provider and Professionals obtain explicit written consent from the Member. Provider and Professionals shall collect such amounts from Members within a reasonable timeframe.

III.19.1 Provider and Professionals will use best efforts (including making use of all information reasonably available from Oscar) to determine or estimate, in good faith, the amount of Member liability before collection. In the event Provider or Professional learns (through receipt of the provider remittance advice, explanation of benefits or otherwise) that it has collected an amount in excess of the applicable Member Responsibility, Provider or Professional shall promptly remit such overpayment to the Member no later than thirty (30) calendar days from the date that Provider or Professional first learned of such overpayment.

III.19.2 If non-payment for services rendered results from Member being ineligible (as determined by Oscar), then Provider or Professional may bill and collect from the ineligible Member.

DocuSign Envelope ID: 21-02096-smr Doc 37-2 Filed 02/11/22 Entered 02/11/22 17:46:27 Exhibit 2
Pg 9 of 144

III.19.3 If any reduction in payment to Provider or Professional decreases the applicable Member Responsibility amount, Provider or Professional shall reimburse the applicable Member Responsibility amount to Members within a reasonable timeframe thereafter.

III.20 <u>Provider Representations and Warranties</u>. Provider represents and warrants, for itself, or for each Professional, if applicable, that Provider and/or each Professional:

III.20.1 is duly licensed and qualified to provide Covered Services in the Service Area;

III.20.2 provides Covered Services in compliance with all applicable Laws and professional standards of care;

III.20.3 is certified to participate in Medicare under Title XVIII of the Social Security Act and has not been debarred, suspended or otherwise excluded from participation in the Medicare Program;

III.20.4 holds a current DEA narcotic registration certificate, where applicable;

III.20.5 maintains such licensure, compliance, certification and DEA registration, throughout the term of this Agreement, where applicable;

III.20.6 maintains liability insurance as set forth in this Agreement, and that Provider will notify Oscar of any material adverse modification of its professional liability policy;

III.20.7 not been arrested, charged, indicted, or convicted of a criminal offense;

III.20.8 has not been terminated, suspended, excluded, barred, voluntarily withdrawn as part of a settlement agreement, or otherwise excluded in any program under Titles XVIII, XIX, XX or XXI of the Social Security Act;

III.20.9 maintains a professional relationship with each Member for whom Professional renders Covered Services, and is responsible to such Member for the medical care provided by such Professional; and

III.20.10 is in compliance with all laws and regulations related to Stark and anti-kickback provisions.

Provider shall provide Oscar (or its designee) all information necessary to ensure compliance with the above representations and warranties, at no cost. Provider shall, at all times during the term of this Agreement, maintain (i) certification as meeting the Conditions of Participation for the Medicare Program (Title XVIII of the Social Security Act of 1972, as amended); and (ii) accreditation by a nationally recognized and commercially accepted entity. Provider or Professionals shall immediately notify Oscar in writing of any material changes to the foregoing representations and warranties.

Further, Provider and Professionals represent and warrant that its employees, affiliates, and any individuals or entities subcontracted by Provider or Professionals to render services in connection with this Agreement will adhere to the requirements of this Agreement.

III.21 <u>Account Representative</u>. Provider agrees to appoint an account representative to facilitate requests and communications between Oscar and Provider. Such account representative shall provide timely responses to requests by Oscar, including with regard to resolving issues related to performance under this Agreement and advertising/marketing requests.

III.22 <u>Equipment</u>. Provider represents and warrants that all equipment owned and/or operated by Provider shall only be operated within the appropriate licenses, registrations, operating certificates, and commercial scope of use as established and obtained by Provider for such equipment.

## IV. INSURANCE

IV.1 <u>Oscar Insurance</u>. Oscar, at its sole cost and expense, will procure and maintain such policies of general liability and other insurance as may be required by Law.

IV.2 <u>Provider Insurance</u>. Provider represents and warrants that it shall, (and it shall require each Professional, as applicable), at its sole cost and expense, insure its activities in connection with this Agreement and obtain, keep in force, and maintain comprehensive general liability, professional liability, and workers' compensation insurance at least at the levels necessary and required by Law or applicable commercial

standards to insure Provider and Provider employees and agents against any claim for damages directly or indirectly related to performance under this Agreement, any downstream agreements, or directly or indirectly related to the provision of services or maintenance of facilities and equipment. Upon request and within five (5) business days, Provider shall provide evidence of coverage to Oscar (or change to coverage) and will provide to Oscar, within five (5) business days from date of service (or any shorter timeframe as required by law), notice of any Member lawsuit alleging malpractice. Upon termination of any claims made policy for professional liability insurance, Provider and each Professionals shall, at its sole cost and expense, obtain and maintain a "tail" policy for a period of not less than five (5) years following the effective termination of any claims made policy. The "tail" policy shall have the same policy limits as the professional liability policy.

## V.    FINANCIAL CONSIDERATIONS

V.1    Compensation. Provider will accept the amounts set forth in Exhibit 2 as payment in full for providing Covered Services to Members under the terms of the applicable Benefit Plan and this Agreement.

V.1.1    Oscar is responsible for reimbursing Provider for Covered Services rendered, and Provider agrees to accept the lesser of Billed Charges or the compensation set forth in Exhibit 2. All compensation owed to Provider by Oscar will be less any applicable Member Responsibility and shall not exceed Billed Charges.

V.1.2    The Parties agree that such compensation is not designed to directly or indirectly provide incentives to Provider to deny, limit or discontinue Medically Necessary Covered Services to any Member.

V.1.3    Provider agrees that in the event Oscar has access to Provider's services through an arrangement other than this Agreement, Oscar may determine under which agreement or arrangement payment will be made.

V.1.3.1    Any Professional who provides Covered Services at Provider and has also entered into a direct Participating Provider agreement with Oscar will be reimbursed in accordance with the terms of the agreement with the lesser reimbursement rate.

V.1.3.2    Any additional fees or costs to Members or Oscar, other than those set forth in Exhibit 2, must be mutually agreed upon in writing.

V.1.4    Notwithstanding any other reimbursement terms specified in this Agreement, for all Covered Services rendered to Medicare Advantage Members, final payment amount to Provider shall be subject to the final payment amount applied by the Centers for Medicare and Medicaid Services ("CMS") to provider payments in Medicare Parts A and/or B pursuant to the Balanced Budget and Emergency Deficit Control Act of 1985, as amended by the Budget Control Act of 2011, or any successor legislation ("Sequestration"). This provision shall apply for the duration of the time in which Sequestration reductions apply to provider payments under Medicare Parts A and/or B.

V.2    Patient Protection. Provider agrees that in no event, including non-payment by Oscar, insolvency of Oscar or breach of this Agreement, will Provider bill, charge, collect a deposit from, seek compensation, remuneration or reimbursement from, or have any recourse against a Member, eligible dependents or any person acting on behalf of the Member for Covered Services provided under this Agreement. This Section will supersede any oral or written contract now existing or hereafter entered between Provider and a Member or person acting on behalf of a Member. Provider must refund all amounts incorrectly collected from Members or from others on behalf of the Member. Alternatively, pursuant to the terms of this Agreement, Oscar may recoup payments inappropriately made by a Member from Provider's future claims payments and will remit the amount to the Member.

V.3    Claims Submission. Provider will submit Clean Claims electronically and in compliance with the terms of the Provider Manual and Protocols.

DocuSign Envelope ID: 8B72B8AD-4D52-44FB-BBBB-BC689FBE64D2

V.3.1   <u>Claims Filing Timeframe</u>.  Unless otherwise mandated by applicable Law, Provider will submit Clean Claims payable under this Agreement to Oscar within one hundred twenty (120) days of rendering Covered Services, or, in the event of coordination of benefits, within one hundred twenty (120) days of receipt of an explanation of benefits from a primary payor. If additional information is required to process a claim, such claim shall not be considered a "Clean Claim," and Provider will be required to provide additional related information as requested by Oscar within thirty (30) days.

V.3.2   Clean Claims that are submitted in a manner that is inconsistent with the provisions set forth in the Provider Manual may be denied or reimbursement may be reduced.

V.4   <u>Payment of Claims</u>.  Oscar will pay Provider in accordance with all applicable prompt pay laws, or as otherwise required by Law.

V.5   <u>Coordination of Benefits, Third Party Liability, Subrogation and Workers' Compensation</u>.  Provider will comply with Oscar's Coordination of Benefits, Third Party Liability subrogation or right of recovery and workers' compensation in accordance with applicable Law.

V.5.1   If Medicare is the primary payer, Oscar will, to the extent required by applicable Law, regulation, or CMS Office of Inspector General ("OIG") guidance, pay Provider an amount up to the amount Oscar would have paid, if it had been primary, toward any applicable unpaid Medicare Member Responsibility.

V.6   <u>Recoupment and Offset</u>. Oscar will recoup or offset all amounts owed to Oscar due to overpayments made under this Agreement, including retroactive adjustments to payments to Provider for errors and omissions relating to data entry and incorrectly submitted claims or applied discounts.  Oscar will provide Provider with prior written notice of such recoupment or offset. Oscar may immediately initiate overpayment recovery efforts if such efforts are based on the reasonable belief of fraud or other intentional misconduct or abusive billing.

V.7   <u>Financial Records</u>.  Provider will maintain all financial and accounting records required for the proper administration of this Agreement in accordance with generally accepted accounting practices. Such records will be maintained at least for a period as is required by applicable Laws, but in no event less than the later of seven (7) years from the date the service was rendered or termination of this Agreement.

V.8   <u>Acquired Conditions</u>. Provider shall be responsible for all costs related to unexpected or unauthorized services rendered resulting from Provider's or Professional's error(s) or a quality of care issue ("Acquired Condition Services"). Provider agrees not to bill Oscar or the Member for any costs incurred in connection with such Acquired Condition Services.

## VI.   ACCESS AND RECORDS

VI.1   <u>Access & Audit</u>.  Upon three (3) calendar days notice, Oscar will have the right to monitor, inspect, evaluate and audit Provider and Provider's Records.  In connection with any monitoring, inspection, evaluation or audit, Provider will provide Oscar with access to all Records, personnel, physical facilities, equipment and other information necessary for Oscar, an applicable government agency or its auditors to conduct the audit.  Within three (3) business days of Oscar's written request for Records, or such shorter time period required for Oscar to comply with requests of government agencies, Provider will compile and prepare all such Records and furnish such Records to Oscar in a format reasonably requested by Oscar.

VI.1.1   Provider agrees to indemnify and hold harmless Oscar against any and all liability, loss, damages, or expenses, including reimbursement losses, legal expenses, or costs for contracting with other facilities (in excess of the original contract) which Oscar incurs as a result of Provider's refusal to grant access to its books, documents, subcontracts, and records in accordance with the provisions of this Agreement.

FILED: WESTCHESTER COUNTY CLERK 10/25/2021 11:01 PM
DocuSign Envelope ID: 9FE68E1B-444B-4B5A-87B0-C8CAC867CF52
NYSCEF DOC. NO. 250

VI.1.2  Provider's refusal to grant access to any government agent's request for books, documents, subcontracts, or records will constitute a material breach of this Agreement and may result in the immediate termination of this Agreement or any Exhibit.  In the event of such termination for cause, Provider will not be entitled to any consequential, general, or specific costs, expenses, or damages of any kind.

VI.2  On-Site Inspection. Provider will cooperate in on-site inspections of its facilities by Oscar, authorized government officials, and accreditation bodies.  In preparation for any such on-site inspection, Provider will compile, within seven (7) calendar days (or sooner if required by a regulatory entity), all documents, data, and other information as may be requested by Oscar or government officials, and Provider will make available sufficient work space and access to all reasonably necessary personnel during an on-site inspection to Oscar or any authorized government official and accreditation body. Provider agrees to comply with any recommendations or corrective actions that result from any site evaluation.

VI.3  Medical Records/Advance Directives.  Provider will prepare and retain complete and accurate medical records relating to the Covered Services rendered under this Agreement and will maintain and include in that record all documentation required by applicable Law and the Provider Manual.  Such records will include whether Member has executed an advance directive and agrees to all applicable Laws regarding advance directives.  Provider will include a Member's medical records in all applicable communications with Participating Providers or as otherwise required by applicable Law. Provider shall be required to obtain authorization of Members (if required by Law) to permit Oscar or its designee, and/or any state or federal agency, to obtain a copy and have access, upon reasonable request, to any medical record of Member related to services provided by Provider pursuant to applicable state and federal laws.  Copies of such records for the purpose of claims processing shall be made and provided Provider at no cost to Oscar or the Member.

VI.3.1  Upon seven (7) calendar days of Oscar's request, Provider will provide to Oscar or its designee, copies of records or access to electronic records for purposes of case management, care coordination, utilization review, resolving member grievances and appeals, claims processing, peer review and other activities reasonably necessary for the proper administration of this Agreement. Provider agrees to provide such records to Oscar free of charge.

VI.4  Provider will maintain medical, operational, financial and administrative records, contracts, books, files, data and other documentation related to the Covered Services provided to Members, claims filed and other services and activities conducted under this Agreement ("Records").  Provider will ensure that such Records are (i) kept in accordance with Laws, applicable government agency requirements, applicable accrediting organization requirements, generally accepted accounting principles and prudent record keeping practices; and (ii) are sufficient to enable Oscar to enforce its rights under this Agreement, including this Section, and to determine if Provider and its employees are performing or have performed Provider's obligations in accordance with this Agreement, Laws and applicable government agency requirements.

VI.4.1  In all circumstances, Records will be maintained at least for a period as is required by applicable Laws, but in no event less than the later of seven (7) years from the date the service was rendered or termination of this Agreement.  Records that are under review or audit will be retained until the completion of such review or audit if that date is later than the timeframe indicated in this Section.

VI.5  Survival of Obligations.  The provisions and obligations contained in this Article will survive the termination of this Agreement.

## VII.   INFORMATION, NOTICE, AND REPORTING REQUIREMENTS

VII.1  Written Notice.  In addition to any other notices required under this Agreement, Provider will give immediate notice to Oscar  of the occurrence of any event that could reasonably be expected to impair the

DocuSign Envelope ID: 2B43B37E-4B22-4D9C-AFB6-C2EFA1AE6F13
21-01096-shl   Doc 37-2   Filed 02/11/22   Entered 02/11/22 17:46:27   Exhibit 2
Pg 13 of 144

ability of Provider to comply with the obligations of this Agreement, including any of the following: (i) an occurrence that causes a breach of any of representation or warranty in this Agreement made by or on behalf of Provider or a Professional, including the representations in this Agreement, or that causes any representation or warranty to become inaccurate or incomplete; (ii) Provider or a Professional fails to maintain insurance as required by this Agreement; (iii) a Professional's license, certification or accreditation expires or is suspended, revoked, conditioned or otherwise restricted; (iv) a disciplinary or regulatory action is initiated by the State or any government authority against Provider or any Professional; (v) a grievance or legal action relating to Provider or a Professional is filed by a Member; (vi) Provider or Professional is under investigation for suspected fraud or a felony; or (vii) Provider or Professional enters into a settlement related to any of the foregoing. If Provider discovers that any Professional has already provided services to a Member while in violation of the provisions of this Section, Provider agrees to work with Oscar to resolve any financial, legal or regulatory issues that may arise with regard to the provision of such services after the commencement of such violation (the "Violation Period"), including the repayment to Oscar of any amounts paid to Provider or Professional during such Violation Period and any related fines and penalties.

VII.2   Conflict of Interest. Provider will disclose to Oscar, and to any Member for whom Provider is providing a referral, any ownership interest Provider may have in a provider to whom it refers.

VII.3   Provider and Location Information. Unless set forth in a separate delegated credentialing agreement between Oscar and Provider, Provider agrees to provide (or shall ensure that Professionals provide) Oscar with updated location and provider information by updating and sending Oscar all necessary fields in accordance with Oscar's standard format i) at least thirty (30) days prior to any change in information; ii) upon request; and iii) on a monthly basis following the Effective Date. If Oscar requests an update or correction of provider or location information, Provider agrees to respond to such request within thirty (30) days. Provider further agrees that failure to respond to such a request may result in the Provider's removal from Oscar's directory.

VII.3.1   Any claims paid incorrectly or delays caused by Provider's failure to notify Oscar timely of changes to provider or location information will not be subject to any claim payment penalties and/or interest. Furthermore, Provider agrees that any penalties or fines imposed on Oscar under applicable state or federal law for failure to maintain accurate provider, location, or other information may be passed to the Provider.

VII.3.2   Staff Privileges. If Oscar requests staff privileges for a Participating Provider, such access shall not be unreasonably withheld, provided that such Participating Providers meet the reasonable standards of practice and credentialing established by Provider medical staff and the bylaws, rules, and regulations of Provider.

VII.4   Service Locations and TINs. This Agreement, including all Exhibits and attachments, will only apply to Covered Services provided at the locations and under the Tax Identification Numbers ("TIN") outlined in Exhibit 1-a. Provider represents and warrants that the TINs and/or locations listed in Exhibit 1 reflect all TINs and/or locations covered under this Agreement and will notify Oscar of any additions, removals or other changes to TINs and/or locations no later than thirty (30) days before such change, and Oscar will determine participation status of such new location or of the new TIN.

VII.4.1   If the new TIN is for a provider with whom Oscar has a direct agreement or who accesses the Provider through another agreement ("Other Contract"), Oscar may choose whether this Agreement or the Other Contract shall remain applicable for services provided to Members.

VII.4.2   Notwithstanding anything to the contrary herein, upon any addition of a new TIN to this Agreement, Provider shall not exercise any termination or non-renewal right which may otherwise exist in this Agreement for twelve (12) months subsequent to the effective date of such addition.

VII.4.3   In the event Provider begins providing Covered Services at a location that is not outlined in Exhibit 1, and the location is currently a Participating Provider, the agreement with such Participating Provider already in effect will remain in effect unless otherwise agreed upon by both Parties.

VII.4.4   Any services provided to Members at such new location or under a different Tax Identification Number that is not a Participating Provider will not be reimbursed as a Covered Service.

VII.4.5   <u>Provider Directory</u>. Provider agrees that Oscar may, in its discretion, use information pertaining to Provider and its Professionals and service locations (including name, logo, address and telephone number) in Oscar's provider directory. Provider agrees to provide Oscar with such information, including any changes or updates thereto.

VII.4.6   <u>Listings</u>.  Oscar may use information about Provider in information or publications identifying Participating Providers or as required by applicable Law.

VII.5   <u>Service Changes/Site of Service Reclassification</u>. Provider or Professional must provide no less than ninety (90) days prior written notice for any change, expansion or reduction of services, or site of service reclassification. If such change occurs and i.) services are added that are Covered Services; and/or ii.) a site of service covered under this Agreement is reclassified, Provider or Professional agree to work with Oscar to preserve revenue neutrality if such change in service would result in higher costs to Oscar. For those added services that are Covered Services where specific rates are not currently contracted, Provider and Professional agree to negotiate such rate with Oscar before providing such services.

## VIII.   DISPUTE RESOLUTION

VIII.1   <u>Dispute Resolution</u>. Oscar has established a dispute resolution mechanism to process and resolve Participating Provider disputes ("Dispute Resolution Process").  Disputes must be submitted through the Dispute Resolution Process as outlined in the Provider Manual.

VIII.1.1 <u>Grievance and Appeal Procedures</u>. Provider will cooperate with Oscar's grievance and appeal procedures as set forth in the Provider Manual and agrees that all communications and documents relating to benefit determinations, complaints, grievances, appeals and related records will be referred to Oscar in accordance with procedures set forth therein.

VIII.2   <u>Meet and Confer</u>.  For all claims payment disputes not resolved through Oscar's Dispute Resolution Process, and for any other dispute, concern, disagreement, or issue (collectively "Disputes") arising from or concerning the interpretation and application of this Agreement, the parties will meet and confer in good faith within thirty (30) calendar days following a request by either party for a meet and confer over the Dispute. The meet and confer process shall continue as long as it remains productive, or until either party determines that further meeting and conferring is unproductive.  Neither party will cease or diminish its performance under this Agreement pending dispute resolution. If the parties are unable to resolve their Disputes through the Dispute Resolution Process and following the meet and confer, then the Dispute shall be finally resolved through binding arbitration.

VIII.2.1 <u>Arbitration</u>. Any controversy, dispute or claim arising out of or related to this Agreement not resolved by the meet and confer procedure set forth above shall be submitted to binding arbitration administered by the American Arbitration Association in accordance with its Commercial Arbitration Rules ("AAA Rules"). The arbitration proceeding shall be held in New York, New York and will be conducted before a single arbitrator jointly agreed to by the Parties. If the Parties are unable to agree upon an arbitrator, the arbitrator shall be chosen in accordance with the AAA Rules. The Party wishing to initiate arbitration must initiate such arbitration within two (2) years after the claim or controversy arose, or it shall be deemed to have waived its right to pursue the dispute in any forum. For disputes concerning the denial or underpayment of claims, the dispute shall be deemed to arise at the time of initial denial or underpayment of the claim. The arbitration shall be subject to the Laws of New York without regard to conflict of law provisions. The decision of the arbitrator will be final,

INDEX NO. 60278/2020
RECEIVED NYSCEF: 10/25/2021
DocuSign Envelope ID: 21-02096-shr   Doc 37-2   Filed 02/11/22   Entered 02/11/22 17:46:27   Exhibit 2
Pg 15 of 144

conclusive and binding. The arbitrator shall have no authority to award punitive, exemplary, indirect or special damages. The Parties acknowledge that the Federal Arbitration Act applies. Nothing herein shall prohibit a Party from seeking equitable relief in a court of Law while arbitration is pending hereunder. Each Party will assume its own costs related to the arbitration, including any costs and fees (including attorneys' and consultants' fees), and expenses of any kind. The parties expressly intend that any dispute relating to this Agreement be resolved on an individual basis, such that no other dispute with any third party(ies) may be consolidated or joined with this dispute in any arbitration. The Parties acknowledge that this arbitration provision precludes any Parties from participating in a class action or class arbitration involving any other third party(ies), and agrees to opt-out of any class action or class arbitration filed against Oscar that raises claims in connection with this Agreement, including, but not limited to, class actions or class arbitrations that are currently pending. This arbitration provision shall survive termination or expiration of this Agreement.

## IX.    TERM AND TERMINATION

IX.1   Term. The initial term of this Agreement will be for a period of three (3) years (the "Initial Term") beginning on the Effective Date. The Effective Date is the later of (i) the last date written on the signature page of this Agreement, or (ii) Provider and Professionals' completion of Oscar's credentialing requirements (the "Effective Date").

IX.1.1   During the final year of the Initial Term or in any following term, the Agreement shall renew for successive periods of one (1) year unless either Party provides notice of non-renewal by March 31, for termination effective as of December 31 of that year.

IX.2   Termination for Cause. Notwithstanding the provisions contained in Section 9.1 above, either party may terminate this Agreement in whole, or any separate Exhibit individually, at any time for cause, including:

IX.2.1   Upon ninety (90) days prior written notice in the event that the other party is in material breach in the performance of any provision of this Agreement, an Exhibit, or any other agreements referred to herein, and such breach has not been cured within sixty (60) days after the defaulting party received such written notice stating the specific default, except if such default relates to imminent harm to patient health or reasonable belief of fraud, intentional misconduct, abusive billing or malfeasance, in which case termination will be effective immediately upon written notice of default;

IX.2.2   Immediately, upon written notice, in the event that either party will apply for, or consent, to the appointment of a receiver, trustee, or liquidator of all, or of a substantial part, of its assets, file involuntary petition in bankruptcy, or admit in writing its inability to pay its debts as they become due, make a general assignment for the benefit of creditors, file petition or answer seeking reorganization or arrangement with creditors, or take advantage of any insolvency law or, if an order, judgment or decree will be entered by a court of competent jurisdiction adjudicating such party bankrupt or insolvent, or approving a petition seeking reorganization of the party or appointment of a receiver, trustee, or liquidator of all or a substantial part of its assets; or

IX.2.3   Immediately upon written notice if Oscar or Provider will lose, relinquish, or have materially affected its certificate of authority to operate as an insurer or its license to provide Covered Services in the State, respectively.

IX.3   Termination by Oscar.  Notwithstanding anything herein to the contrary, Oscar may terminate this Agreement, any individual provider or provider location (however, such termination of an individual provider or location shall not terminate this Agreement), or any separate Exhibit hereto, as follows:

IX.3.1   Oscar may terminate without cause upon sixty (60) days written notice.

IX.3.2   Oscar may terminate an individual Professional or location's participation upon notice and with the approval of Provider.

21-02096-shl    Doc 37-2    Filed 02/11/22    Entered 02/11/22 17:46:27    Exhibit 2
Pg 16 of 144

IX.3.3   Immediately if Oscar believes that Provider or provider is placing Members in imminent danger or may adversely affect the health, safety or welfare of any Member.

IX.3.4   Immediately upon notice if Provider or provider fails to adhere to Oscar's credentialing criteria or in the event of a breach of any representation or warranty made in this Agreement.

IX.3.5   Immediately upon notice if the quality of medical services delivered to Members assigned to Provider or provider declines significantly or if a substantial number of Members assigned to Provider disenroll.

IX.3.6   Immediately upon notice if Provider or any of Provider's or provider's officers, directors, shareholders, interest holders, members, partners are arrested, charged or convicted of a criminal offense related to that person's involvement in any program under Titles XVIII, XIX, XX, or XXI of the Social Security Act, alcohol and drug-related offenses, offenses which upon conviction require registration in the Sex Offender Registration and Notification Act under Title I of Public Law 109-248 or has been terminated, suspended, barred, voluntarily withdrawn as part of a settlement agreement, or otherwise excluded in any program under Titles XVIII, XIX, XX or XXI of the Social Security Act.

IX.3.7   Immediately if Provider or any individual provider is excluded from participation in any federal health care program.

IX.3.8   Immediately if Provider or any individual provider voluntarily or involuntarily seeks protection from creditors through bankruptcy proceedings or engages in or acquiesces to receivership or assignment of accounts for the benefit of creditors.

IX.3.9   Oscar loses its authority to do business in total or as to any limited segment of business.

IX.3.10 Immediately upon indictment or conviction of a crime.

IX.3.11 Immediately if a change of control occurs as described in this Agreement.

IX.4   <u>Notice Requirements</u>. If Oscar terminates this Agreement pursuant to Sections 9.2 or 9.3 above, Oscar will provide a written explanation to Provider of the reasons for termination. In the event Provider provides notice of termination of this Agreement as provided for in Sections 9.2 above, Provider will provide a written explanation to Oscar of reasons for termination. In the case of termination of this Agreement as provided in Sections 9.1 or 9.2, Provider will provide reasonable notice of such termination, a copy of which has been approved by Oscar, to all affected Members.

IX.5   <u>Continuation of Care</u>. It is understood by both Parties hereto that the intent of this Agreement is to ensure that Provider continues to provide or arrange for those medical services which Oscar is obligated to provide under federal and state Law, notwithstanding the termination of this Agreement or any Exhibit. Accordingly, if either Party terminates this Agreement, for any reason, Provider must continue to provide or arrange for Covered Services to the affected Members in accordance with applicable Law. Termination will not release Provider or Oscar from liability to the others with respect to services rendered to Members, monies paid, or other actions through the date of termination, nor will it relieve Provider of its obligation not to bill Members for Covered Services. Provider agrees to accept the compensation set forth in this Agreement as payment in full for all Covered Services rendered subject to this Section.

IX.6   <u>Survival of Obligations</u>. The provisions and obligations contained in this Article will survive the termination of this Agreement.

## X.   MISCELLANEOUS

X.1   All terms and conditions of this Agreement which are applicable to Provider shall be equally applicable to each Professional.

X.2   <u>Governing Law</u>. This Agreement will be governed by and construed and enforced in accordance with the Laws of the State, except where federal law applies, without regard to principles of conflict of laws. Each

FILED: WESTCHESTER COUNTY CLERK 10/25/2021 11:01 PM
NYSCEF DOC. NO. 250

of the parties hereby agrees and consents to be subject to the exclusive jurisdiction and venue of the appropriate state or federal court in any suit, action, or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement.

X.2.1    Compliance with Laws.  In performing this Agreement, Provider and Professionals will comply with all applicable Laws, regulations and any requirements of an applicable government agency. Provider and Professionals will (i) cooperate with Oscar with respect to Oscar's compliance with Laws, regulations, government agency requirements, and the requirements of accrediting bodies; and (ii) not knowingly take any action contrary to Oscar's obligations under Laws, government agency requirements, or the requirements of accrediting bodies.

X.2.2    Federal and State Mandated Attachment(s).  Provider and Professionals agrees to be bound by and to comply with the provisions of the State Mandated Attachment(s) attached hereto as Exhibit 3 and the Medicare Advantage Provisions attached hereto as Exhibit 3-a. In the event of a conflict between the provisions in State Law and/or the Medicare Advantage provisions attachment and any other provisions in this Agreement, the provisions in those attachments, as applicable, shall control.

X.3    Conflicts between Certain Documents.  If there is any conflict between this Agreement and the Provider Manual, the Provider Manual shall control.  In the event of any conflicts between this Agreement, or any Exhibit hereto, and the applicable Oscar Benefit Plan with respect to what services constitute Covered Services, the Oscar Benefit Plan will control.  Finally, if there is any conflict between the State Mandated Attachment attached hereto as Exhibit 3 or the Medicare Advantage Provisions attached hereto as Exhibit 3-a and the Agreement or the Provider Manual, the State Mandated Attachment or Medicare Advantage Provisions shall control, as required under Law.

X.3.1    If applicable, if there is any conflict between this Agreement and the terms of any agreement between Oscar and the related Accountable Care Organization/Clinically Integrated Network ("ACO/CIN"), the terms of such Oscar/ACO/CIN agreement shall control.

X.4    Amendment.  This Agreement and any of its Exhibit may be amended at any time by mutual written agreement of both parties. This Agreement and any of its Exhibits may also be amended by Oscar furnishing Provider with written notice of any amendments or modifications, including modifications to the schedule of programs or compensation. If such amendments or modifications are required by Law, they will be deemed incorporated into this Agreement immediately. Any other amendments or modifications by Oscar will be deemed accepted and incorporated into this Agreement unless Provider rejects the amendment or modification in writing within thirty (30) days of having received notice of it from Oscar, in which case the parties will use reasonable efforts to negotiate a mutually acceptable amendment in good faith. During such negotiation period, the terms of the amendment shall not apply.

X.5    Assignment; Delegation of Duties.  This Agreement will be binding upon, and inure to the benefit of, the parties hereto, their respective heirs, successors, and assigns, but may not be assigned by Provider without the prior written consent of Oscar and any applicable governmental agencies.  Provider will not subcontract or otherwise delegate its duties under this Agreement and/or an Exhibit unless it obtains Oscar's prior written consent.

X.6    Change of Control. If Provider or Professionals are impacted by merger, acquisition, consolidation, change in ownership or control by any other entity (or through any other circumstance including, but not limited to, being merged into an affiliated entity, collectively, "Transaction Event") with whom Oscar has a direct agreement or who accesses the Provider or Professionals through another agreement ("Other Contract"), either this Agreement or the Other Contract shall be applicable, at Oscar's discretion. For purposes of this provision, the term control means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person or entity, whether through the ownership of voting securities, by contract, or otherwise. A change of control does not occur if Provider or Professional changes its name, place of business or reorganizes under a different tax identification number but retains a majority of the existing persons, entity or division exercising control as defined

21-01096-shl    Doc 37-2    Filed 02/11/22    Entered 02/11/22 17:46:27    Exhibit 2
Pg 18 of 144

above. If it is determined that a change of control has not occurred, the terms of this Agreement shall continue to remain in force. Provider or Professionals shall not exercise any termination or non-renewal right which may otherwise exist in this Agreement for twelve (12) months subsequent to the effective date of such Transaction Event.

X.7    Confidentiality.  All Parties will hold the information contained in this Agreement (including rate schedules and related terms) as confidential and shall not disclose the information contained in or gained pursuant to this Agreement to any third-party, except as required by Law or as may be necessary to administer the terms of the Agreement.

    X.7.1    All information maintained or generated by a Party in fulfilling its obligations under this Agreement, including healthcare information and member records, will be kept confidential in accordance with and to the extent required by applicable Laws, including HIPAA, as applicable.

    X.7.2    Oscar may disclose rate information to Members.

X.8    HIPAA/HITECH Compliance. Each Party represents and warrants to the other party that it will comply with the provisions of the Health Insurance Portability and Accountability Act ("**HIPAA**"), including the effective dates of regulations adopted to implement HIPAA and the Health Information Technology for Economic and Clinical Health ("HITECH") Act, or other such amendments.  Each of the parties represents and warrants to the other party, with respect to all protected health information (as that term is defined under the Standards for Privacy of Individually Identifiable Health Information (December 28, 2000; 65 F. Reg. 82462), that it is a covered entity (and not a business associate of the other party) under the HIPAA Privacy Regulations and that it will protect the privacy, integrity, security, confidentiality and availability of the protected health information disclosed to, used by, or exchanged by the parties by implementing appropriate privacy and security policies, procedures, and practices and physical and technological safeguards and security mechanisms, all as required by, and set forth more specifically in, the HIPAA Privacy Regulations and the HIPAA Security Regulations.  The Parties agree that, upon the request of the other Party, they will provide written verification of compliance with all applicable Laws and confirm full licensure and certification to the extent appropriate to its then-current operations.

X.9    Indemnification.  Provider and Professionals hereby agree to indemnify, defend and hold harmless Oscar, its Affiliates, representatives, Board members, contractors, employees, and agents from all claims, judgments, costs, liabilities, damages, fines, and expenses whatsoever, including reasonable attorneys' fees, arising from any acts or omissions in the provision by Provider or Professionals in the fulfilment by Provider or Professionals of obligations pursuant to this Agreement. Oscar hereby agrees to and indemnify, defend and hold harmless Provider from all claims, judgments, costs, liabilities, damages, fines, and expenses whatsoever, including reasonable attorneys' fees, arising from any negligent acts or omissions in the fulfilment by Oscar of its obligations pursuant to this Agreement. This provision shall survive termination or expiration of this Agreement.

    X.9.1    Provider and Professionals hereby agree to indemnify, defend and hold harmless Oscar, its Affiliates, representatives, Board members, contractors, employees, and agents from all claims, judgments, costs, liabilities, damages, fines, and expenses whatsoever, including reasonable attorneys' fees, arising from any acts or omissions in the provision by Provider or Professionals of any services provided to Members to the extent such services are not provided in accordance with the terms of this Agreement. This provision shall survive termination or expiration of this Agreement.

X.10    Parties agree that Oscar's Affiliates whose Members receive services hereunder do not assume joint responsibility or liability between or among such Affiliates for the acts or omissions of such other Affiliates.

X.11    Relationship of the Parties. The Parties are independent contractors.  This Agreement will not be deemed to create a partnership or joint venture, or an employment or agency relationship between the parties.  No party has the right or authority to assume or create any obligation or responsibility on behalf of the other. No Party is liable for the acts of the other.

DocuSign Envelope ID: 21-02096-smf Doc 37-2 Filed 02/11/22 Entered 02/11/22 17:46:27 Exhibit 2
Pg 19 of 144

X.12  <u>Third Party Beneficiary</u>. Except as otherwise provided in this Agreement, this Agreement is not a third-party beneficiary contract and no provision of this Agreement is intended to create or may be construed to create any third-party beneficiary rights in any third party, including any Member.

X.13  <u>Headings</u>. The headings of the various sections of this Agreement and Exhibit are inserted merely for convenience and do not, expressly or by implication, limit, define, or extend the specific terms of the section so designated.

X.14  <u>Enforceability; No Waiver</u>. The invalidity or unenforceability of any terms or provisions hereof will in no way affect the validity or enforceability of any other terms or provisions. The failure of Oscar or Provider to object to or to take affirmative action with respect to any conduct of the other which is a breach of this Agreement will not be construed as a waiver of that breach or of any prior or future breaches of this Agreement.

X.15  <u>Force Majeure</u>. Neither Party will be liable or deemed to be in default for any delay or failure to perform any act under this Agreement resulting, directly or indirectly, from acts of God, civil or military authority, acts of public enemy, war, accidents, fires, explosions, earthquake, flood, strikes or other work stoppages by either party's employees, or any other similar cause beyond the reasonable control of such party.

X.16  <u>Entire Contract</u>. As of the Effective Date, this Agreement (together with all attachments, exhibits, amendments, appendices and/or addenda hereto) and Provider Manual contain all the terms and conditions agreed upon by the Parties and supersedes all other agreements, oral or otherwise, of the parties regarding the subject matter of this Agreement.

X.17  <u>Non-Exclusivity</u>. This Agreement is not exclusive and does not preclude either Party from contracting with any other person or entity for any purpose.

X.18  <u>Notice</u>. Unless provided for otherwise in this Agreement, any notice required to be given pursuant to the terms and provisions hereof will be in writing (including via e-mail), and if by mail, will be sent by certified mail, return receipt requested, postage prepaid, or by recognized courier service, to the addresses set forth on the signature page of this Agreement, or to such other address as either Party may designate in writing. Notice shall be deemed to have been given in the following circumstances: i.) on the date of personal delivery; or ii.) if such notice, request, demand or other communication is provided to the party in electronic or hard copy to the electronic or physical address to which it is sent in the ordinary course of delivery, three (3) days following deposit in the United States mail. Any notice provided to Provider in accordance to the terms of this Section will also be deemed the provision of notice to each individual Professional.

X.19  Provider agrees that the responsibilities and obligations of Oscar are limited to those set forth in this Agreement and applicable Law.

X.20  <u>Authority</u>. The parties whose signatures are set forth on the signature page represent and warrant that they are duly empowered to execute this Agreement.

X.21  <u>Counterparts</u>. This agreement may be signed in any number of counterparts, each of which is an original and all of which taken together form one single document.

THIS AGREEMENT CONTAINS A BINDING ARBITRATION PROVISION THAT MAY BE ENFORCED BY THE PARTIES

FILED: WESTCHESTER COUNTY CLERK 10/25/2021 11:01 PM

**Exhibit 1**
**Provider Information**

The information required pursuant to this Exhibit shall include:

- Employed
- HBP
- Not employed but admit/Staff privileges
- Ancillary
- Admitting
- Referral

The format of transmission, shall be provided (and may be updated) by Oscar.

Provider Roster Required Fields:

- Oscar Effective Date
- First Name
- Last_Name
- Practitioner NPI
- Medicaid #
- Medicare #
- CAQH ID
- Degree/Title
- Gender
- DOB
- Initial Credentialing Date *delegated only
- Penultimate Credentialing Date *delegated only
- Latest Credentialing Date *delegated only
- Credentialing Expiration Date *delegated only
- PCP
- Specialist
- Board Status (If Certified)
- Board Certification Organization
- Board Certification Specialty
- Board Certification Expiration Date
- Specialty / Sub-specialty
- English Fluent
- Foreign Language
- Accepting New Patients
- DEA License Number
- DEA Expiration Date
- State License Number
- State License State
- Medical School Name
- Medical School Completion Year
- Service Office Name
- Service Office TIN
- Service Office NPI
- Service Office Address Line
- Service Office City
- Service Office State

Case 21-02096-shl   Doc 37-2   Filed 02/11/22   Entered 02/11/22 17:46:27   Exhibit 2
Pg 21 of 144

- Service Office Zip
- Service Office Phone
- Service Office Fax
- Service Office Directory Status
- Service Office Wheelchair Accessible
- Billing Office Name
- Billing Office TIN
- Billing Address
- Billing City
- Billing State
- Billing Zip
- Billing Phone
- Billing Fax
- Hospital Affiliation

FILED: WESTCHESTER COUNTY CLERK 10/25/2021 11:01 PM

21-01096-shl   Doc 37-2   Filed 02/11/22   Entered 02/11/22 17:46:27   Exhibit 2
Pg 22 of 144

**Exhibit 1-a**
**Provider TINs and Locations**

TIN(s):    47-5606045

Location(s):

      120 Church St
      White Plains, NY 10601-1209

Case 21-22096-shl   Doc 37-2   Filed 02/11/22   Entered 02/11/22 17:46:27   Exhibit 2
Pg 23 of 144

**Exhibit 2**
**Compensation**

Reimbursement to Provider for Covered Services shall be the lesser of either the Provider's Billed Charges or the reimbursement rates set forth in this Exhibit. Either reimbursement methodology shall remove any applicable Member Responsibility.

Oscar utilizes the current New York CMS locality based upon the service location address and zip code where Covered Services were rendered in effect as of the date of service ("Medicare Fee Schedule") or the Oscar Fee Schedule for codes not priced by Medicare.

| Service Description / Levels of Care | Billing Code | Rate |
|---|---|---|
| **Level I** - Skilled Nursing or Restorative Services<br>Patient is medically stable, requiring observation and/or monitoring and skilled nursing intervention. Care needs may include colostomy care, traction and positioning, monitoring of circulation for complex fractures, wound care, tube feeding, IV therapy, foley/bladder training, or medication adjustment for new onset conditions (uncontrolled diabetes, pain, angina, atrial fibrillation, seizure).<br><br>Nursing Hours: Up to 1 hour per day<br>Rehabilitation Therapy Hours (PT, OT, ST): Up to 1 hour per day<br>Assessment of Vitals and Body Systems: Between 1-2 times per day | Revenue Code: 191 | $325 |
| **Level II** – Post Acute Medical/Low Level Rehabilitation<br>Patients whose conditions are medically complex and require specialized medical, nursing and therapeutic services for restoration of function. Care needs may include new NG tube care, complex wound care, continuous IV therapy, tracheostomy care, frequent suctioning, Oxygen administration, or COPD or respiratory management.<br><br>Nursing Hours: Between 3-6 hours per day<br>Rehabilitation Therapy Hours (PT, OT, ST): Between 1-2 hour per day<br>Assessment of Vitals and Body Systems: Between 2-3 times per day | Revenue Code: 192 | $495 |
| **Level III** – Post Acute Medical/Mid Level Rehabilitation<br>Patients whose conditions require comprehensive medical, nursing and rehab services. Care needs may include complex wound care, IV or PICC line care, tracheostomy care, or frequent suctioning.<br><br>Nursing Hours: Between 3-6 hours per day<br>Rehabilitation Therapy Hours (PT, OT, ST): Between 1-2 hour per day<br>Assessment of Vitals and Body Systems: Between 3-4 times per day | Revenue Code: 193 | $500 |

DocuSign Envelope ID: 21-02096-shl   Doc 37-2   Filed 02/11/22   Entered 02/11/22 17:46:27   Exhibit 2
Pg 24 of 144

| | | |
|---|---|---|
| **Level IV** – Post Acute Medical/High Level Rehabilitation<br>Patients whose conditions require comprehensive medical, nursing and rehab services. Care needs may include frequent assessment such as complex wound care, IV care, tracheostomy care, or frequent suctioning.<br><br>Nursing Hours: Between 3-6 hours per day<br>Rehabilitation Therapy: Between 2-3 hours per day<br>Assessment of Vicals and Body Systems: Between 3-4 times per day | Revenue Code: 194 | $625 |
| **Level V** – Medically Complex/Chronic & Weaning Ventilators<br>Patients who requires comprehensive medical, nursing and rehabilitation services and whose rehabilitative needs require the maximum degrees of tolerance and motivation.<br><br>Nursing Hours: Between 5-8 hours per day<br>Rehabilitation Therapy: As Needed<br>Assessment of Vitals and Body Systems: Between 4-6 times per day | Revenue Code: 195 | $705 |
| **Extra Days** | Revenue Code: 199 | $250 |

## Exclusions.

*Services which are **not available** from Provider can be billed directly by the servicing provider. Provider shall use Oscar designated provider to provide such items or services, unless specifically designated otherwise by Oscar case manager or representative. Such excluded services include, but are not limited to:*

1. Physician Consultation – Specialist and all other provider visits which meet the Oscar's referral and authorization guidelines can be billed separately. Reimbursement will be at the Oscar Contracted rate
2. Dialysis
3. Non-Routine Radiology
4. Customized DME
5. Transportation
6. Pharmacy - Excluded drugs will be subject to member's benefits and reimbursed at Medicare rates. Any medication requiring prior authorization per Oscar formulary will need to be submitted to the Oscar for prior approval. If prior approval is not obtained for medication, Oscar is not financially responsible. Medications are billed directly to Oscar's PBM (Pharmacy Benefit Manager.)

INDEX NO. 60278/2020

DocuSign Envelope ID: ... 21-01096-shl   Doc 37-2   Filed 02/11/22   Entered 02/11/22 17:46:27   Exhibit 2

NYSCEF DOC. NO. 250

RECEIVED NYSCEF: 10/25/2021

**Exhibit 2-a**
**Data and Information Sharing**

The ongoing paper/electronic files shared between the Parties will include, but not be limited to, physician and hospital claims, pharmacy, and eligibility files, as well as those requirements mutually agreed to by the Parties.

1. **Risk Adjustment / HEDIS**

    1.1. <u>Medical Records / Charts</u>.

    1.1.1. Provider agrees to provide copies of medical records for Risk Adjustment and HEDIS purposes to Oscar (or Oscar's designee) within twenty five (25) business days of Oscar's request;

    1.1.2. Provider shall pay a penalty of forty dollars ($40) per medical record for each requested medical record not provided to Oscar (or Oscar's designee) within the above time frame, but no later than April 19 of each year.

    1.2. <u>Location of Medical Records</u>. Provider will provide Oscar (or Oscar's designee) with information on a quarterly basis identifying where medical records are located and the appropriate contact number for retrieval of such medical records for each applicable NPI / TIN.

    1.3. <u>Structured Data / Electronic Medical Records</u>. Upon request, if applicable, Provider will provide access to structured data (in API or CSV format) on Member medical history, including (i) problem lists; (ii) procedures performed; and (iii) diagnosis codes. Such data should include (iv) patient vitals; (v) race / ethnicity information; and (vi) vaccines.

2. **Admission, Discharge, and Transfer Notification**

    2.1. <u>ADT Notifications</u>. If applicable, Provider will provide real-time notification regarding admissions, discharges, and transfers. Provider will also include the following information in these notifications (Segment Code in *italics*):

    2.1.1. *A01* Admit/visit notification
    2.1.2. *A02* Transfer a patient
    2.1.3. *A03* Discharge/end visit
    2.1.4. *A04* Register a patient
    2.1.5. *A05* Pre-admit a patient
    2.1.6. *A06* Change an outpatient to an inpatient
    2.1.7. *A07* Change an inpatient to an outpatient
    2.1.8. *A11* Cancel admit/visit notification
    2.1.9. *A12* Cancel transfer
    2.1.10. *A13* Cancel discharge/end visit
    2.1.11. *A14* Pending admit
    2.1.12. *A15* Pending transfer
    2.1.13. *A16* Pending discharge
    2.1.14. *A20* Bed status update
    2.1.15. *A25* Cancel pending discharge
    2.1.16. *A26* Cancel pending transfer
    2.1.17. *A27* Cancel pending admit
    2.1.18. *A38* Cancel pre-admit

3. **Site of Service**

Case 7:21-cv-06096-NSR Document 37-2 Filed 02/11/22 Entered 02/11/22 17:46:27 Exhibit 2

3.1.   Ambulatory Surgery Admitting Rosters. Provider will provide requested rosters of all providers who perform procedures in Ambulatory Surgery Centers.

4.   **Provider Data**

4.1.   Electronic Medical Record Platform Use Per Location. Provider will indicate EMR platform per provider in regular roster updates.

4.2.   Department Contact Information. Provider will provide requested department-level contact information for hospitals, large provider practices, and post-acute facilities to Oscar nurses coordinating Member care.

4.3.   Provider Detail. Provider will provide granular specialty detail and / or any focus areas per provider in regular roster updates in CSV or Excel format.

5.   **Discharge Planning**

5.1.   Discharge Summary Data. If applicable, Provider will provide the following data fields for each discharge:

5.1.1.   Admission date;

5.1.2.   Admission type;

5.1.3.   Discharge date;

5.1.4.   Primary Care Provider contact information;

5.1.5.   Social history;

5.1.6.   Discharge medications;

5.1.7.   Procedures performed during hospital stay;

5.1.8.   Encounter diagnosis;

5.1.9.   Vital signs;

5.1.10.   Functional & cognitive status;

5.1.11.   History of present illness / hospitalization;

5.1.12.   Referrals;

5.1.13.   Active medications;

5.1.14.   Care plan (goals & instructions);

5.1.15.   Discharge instructions; and

5.1.16.   Care team / treating provider(s) & contact information.

6.   **Claims Payment**

6.1.   Itemized Bills. Provider will provide itemized bills to Oscar (or Oscar's designee) within five (5) business days of Oscar's request.

DocuSign Envelope ID: 21-02096-SMI  Doc 37-2  Filed 02/11/22  Entered 02/11/22 17:46:27  Exhibit 2
Pg 28 of 144

**Exhibit 3**
**State Mandated Provisions**
NEW YORK

In the event of any inconsistency between the terms and conditions of this Exhibit and the terms and conditions in the Agreement, the terms and conditions of this Exhibit shall govern.

To the extent applicable, Oscar and Facility/Provider/Professionals ("Provider") will comply with the following provisions, which are required by State law to be included in the Agreement, as such provisions may be amended from time to time by the State.

1.  As used in this Exhibit, the term "State" refers to the State of New York.

2.  Coordination of Benefits (COB): Oscar may not deny a claim because it is coordinating benefits with another insurer unless Oscar has a reasonable basis to believe that the Member has other primary health insurance coverage for the claimed benefit. Oscar will not deny a claim solely on the basis that it has not received information from a Member concerning other health insurance coverage, in accordance with New York Insurance Law Section 3224-c.

3.  Overpayment Recovery: All overpayment recoveries will be in accordance with Section 3224-b of the New York Insurance Law.

4.  Timeframe for Provider Claims Submission:

    4.1. Provider has 120 days after the date of the service to submit claims to Oscar and, for COB claims, ninety (90) days from the date the explanation of benefits was issued by the primary payor. (New York Insurance Law 3224-a)

    4.2. Oscar will reconsider Provider's late claim if Provider can demonstrate that the late claim resulted from an unusual occurrence and the provider has a pattern of timely claims submissions. Oscar may reduce the reimbursement of a claim by up to 25 percent of the amount that would have been paid had the claim been submitted in a timely manner. The right to reconsideration shall not apply to a claim submitted 365 days after the service. In such cases, Oscar may deny the claim in full. (New York Insurance Law 3224-a)

5.  No provision in the Agreement will be deemed to prohibit or restrict Provider or any Professional from disclosing to any Member any information that Provider or Professional deems appropriate regarding:

    5.1. a condition or a course of treatment with a Member including the availability of other therapies, consultations, or tests; or

    5.2. the provisions, terms, or requirements of Oscar's products as they relate to the Member. (New York Insurance Law 3217-b)

6.  No provision in the Agreement will be deemed to prohibit the Provider from filing a complaint, making a report or commenting to an appropriate governmental body regarding the policies or practices of Oscar, which the Provider believes may negatively impact upon the quality of, or access to, patient care. (New York Insurance Law 3217-b)

7.  Oscar shall not prohibit or restrict Provider or any Professional from advocating to Oscar on behalf of a Member for approval or coverage of a particular course of treatment or for the provision of health care services. (New York Insurance Law 3217-b)

NYSCEF DOC. NO: 250

INDEX NO. 60278/2020

RECEIVED NYSCEF: 10/25/2021

DocuSign Envelope ID: 21-01096-shl   Doc 37-2   Filed 02/11/22   Entered 02/11/22 17:46:27   Exhibit 2
Pg 29 of 144

8. Pursuant to applicable law, if the Agreement is not renewed or is terminated by either party, the parties shall continue to abide by the terms of the Agreement, including reimbursement terms, for a period of two months from the effective date of termination or, in the case of a non-renewal, from the end of the contract period. Notice shall be provided to all Members potentially affected by such termination or non-renewal within fifteen days after commencement of the two-month period. The commissioner of health shall have the authority to waive the two-month period upon the request of either party to a contract that is being terminated for cause. This subsection shall not apply where both parties mutually agree in writing to the termination or non-renewal and Oscar provides notice to Members at least thirty (30) days in advance of the date of termination. (New York Insurance Law 3217-b)

DocuSign Envelope ID: 7E45B44E 21-CV096-SHT Doc 37-2 Filed 02/11/22 Entered 02/11/22 17:46:27 Exhibit 2

**Exhibit 3-a**
**Medicare Advantage Provisions**

Except as provided herein, all other provisions of the Agreement between Oscar and Facility/Provider not inconsistent herein shall remain in full force and effect. This Exhibit shall supersede and replace any inconsistent provisions to such Agreement to ensure compliance with required CMS provisions, and shall continue concurrently with the term of such Agreement.

I.      Definitions:

1.  Centers for Medicare and Medicaid Services ("CMS"): the agency within the Department of Health and Human Services that administers the Medicare program.
2.  Completion of Audit: completion of audit by the Department of Health and Human Services, the Government Accountability Office, or their designees of a Medicare Advantage Organization, Medicare Advantage Organization contractor or related entity.
3.  Downstream Entity: any party that enters into a written arrangement, acceptable to CMS, with persons or entities involved with the MA benefit, below the level of the arrangement between an MA organization (or applicant) and a first tier entity. These written arrangements continue down to the level of the ultimate provider of both health and administrative services.
4.  Final Contract Period: the final term of the contract between CMS and the Medicare Advantage Organization.
5.  First Tier Entity: any party that enters into a written arrangement, acceptable to CMS, with an MA organization or applicant to provide administrative services or health care services for a Medicare eligible individual under the MA program.
6.  Medicare Advantage ("MA"): an alternative to the traditional Medicare program in which private plans run by health insurance companies provide health care benefits that eligible beneficiaries would otherwise receive directly from the Medicare program.
7.  Medicare Advantage Organization ("MA organization"): a public or private entity organized and licensed by a State as a risk-bearing entity (with the exception of provider-sponsored organizations receiving waivers) that is certified by CMS as meeting the MA contract requirements.
8.  Member or Enrollee: a Medicare Advantage eligible individual who has enrolled in or elected coverage through a Medicare Advantage Organization.
9.  Provider: (1) any individual who is engaged in the delivery of health care services in a State and is licensed or certified by the State to engage in that activity in the State; and (2) any entity that is engaged in the delivery of health care services in a State and is licensed or certified to deliver those services if such licensing or certification is required by State law or regulation.
10. Related entity: any entity that is related to the MA organization by common ownership or control and (1) performs some of the MA organization's management functions under contract or delegation; (2) furnishes services to Medicare enrollees under an oral or written agreement; or (3) leases real property or sells materials to the MA organization at a cost of more than $2,500 during a contract period.

II.     Required Provisions

Facility/Provider agrees to the following:

1.  Facility/Provider agrees to maintain books; contracts; computer or other electronic systems; records, including medical records; and other documentation of the First Tier, Downstream and Related Entities involving matters related to CMS' contract with Oscar for a period of ten (10) years following termination or expiration of this Agreement, or until completion of an audit, whichever is later.

DocuSign Envelope ID: 4E97A7F8-43E3-426B-96CB-A02AC4D3F5F1

21-01096-shl    Doc 37-2    Filed 02/11/22    Entered 02/11/22 17:46:27    Exhibit 2

Pg 31 of 144

2. HHS, the Comptroller General, or their designees have the right to audit, evaluate, collect, and inspect any pertinent information for any particular contract period, including, but not limited to, any books, contracts, computer or other electronic systems (including medical records and documentation of the first tier, downstream, and entities related to CMS' contract with Oscar, (hereinafter, "MA organization")) through 10 years from the final date of the final contract period of the contract entered into between CMS and the MA organization or from the date of completion of any audit, whichever is later. [42 C.F.R. §§ 422.504(i)(2)(i) and (iv)]

3. HHS, the Comptroller General, or their designees have the right to audit, evaluate, collect, and inspect any records under paragraph 2 of this amendment directly from any first tier, downstream, or related entity. For records subject to review under paragraph 2, except in exceptional circumstances, CMS will provide notification to the MA organization that a direct request for information has been initiated. [42 C.F.R. §§ 422.504(i)(2)(ii) and (iii)]

4. Facility/Provider will comply with the confidentiality and enrollee record accuracy requirements, including: (1) abiding by all Federal and State laws regarding confidentiality and disclosure of medical records, or other health and enrollment information, (2) ensuring that medical information is released only in accordance with applicable Federal or State law, or pursuant to court orders or subpoenas, (3) maintaining the records and information in an accurate and timely manner, and (4) ensuring timely access by enrollees to the records and information that pertain to them. [42 C.F.R. §§ 422.504(a)(13) and 422.118]

5. Enrollees will not be held liable for payment of any fees that are the legal obligation of the MA organization. [42 C.F.R. §§ 422.504(i)(3)(i) and 422.504(g)(1)(i)]

6. For all enrollees eligible for both Medicare and Medicaid, enrollees will not be held liable for Medicare Part A and B cost sharing when the State is responsible for paying such amounts. Providers will be informed of Medicare and Medicaid benefits and rules for enrollees eligible for Medicare and Medicaid. Facility/Provider may not impose cost-sharing that exceeds the amount of cost-sharing that would be permitted with respect to the individual under title XIX if the individual were not enrolled in such a plan. Providers will: (1) accept the MA plan payment as payment in full, or (2) bill the appropriate State source. [42 C.F.R. §§ 422.504(i)(3)(i) and 422.504(g)(1)(i)]

7. Any services or other activity performed in accordance with this Agreement by Facility/Provider are performed consistent and comply with the MA organization's obligations under its contract with CMS. [42 C.F.R. § 422.504(i)(3)(iii)]

8. Contracts or other written agreements between the MA organization and providers or between first tier and downstream entities must contain a prompt payment provision, the terms of which are developed and agreed to by the contracting parties. The MA organization is obligated to pay contracted providers under the terms of the contract between the Oscar and Facility/Provider. [42 C.F.R. §§ 422.520(b)(1) and (2)]. Section 5.4 of this Agreement states that Oscar will pay Facility/Provider in accordance with all applicable prompt pay laws, or as otherwise required by Law.

9. Facility/Provider and any related entity, contractor or subcontractor will comply with all applicable Medicare laws, regulations, and CMS instructions. [42 C.F.R. §§ 422.504(i)(4)(v)] Further, Facility/Provider agrees to comply with Oscar's policies and procedures as set forth in this Exhibit and the Agreement.

10. If any of the MA organization's activities or responsibilities under its contract with CMS are delegated to any first tier, downstream and related entity:

**[INFORMATIONAL NOTE: If there is no delegation of a specific activity or responsibility, please delete the related provision.]**

a) The delegated activities and reporting responsibilities are specified as follows:
**[List activities and reporting responsibilities or enter the section and name of the delegation or applicable agreement].**

DocuSign Envelope ID: 21-02096-SHI   Doc 37-2   Filed 02/11/22   Entered 02/11/22 17:46:27   Exhibit 2

b) CMS and the MA organization reserve the right to revoke the delegation activities and reporting requirements or to specify other remedies in instances where CMS or the MA organization determine that such parties have not performed satisfactorily.

c) The MA organization will monitor the performance of the parties on an ongoing basis.

**[Enter any applicable section and name of the delegation or applicable agreement].**

d) The credentials of medical professionals affiliated with the party or parties will be either reviewed by the MA organization or the credentialing process will be reviewed and approved by the MA organization and the MA organization must audit the credentialing process on an ongoing basis.

**[Enter any applicable section and name of the delegation or applicable agreement].**

e) If the MA organization delegates the selection of providers, contractors, or subcontractor, the MA organization retains the right to approve, suspend, or terminate any such arrangement.

[42 C.F.R. §§ 422.504(i)(4) and (5)]

11. After the expiration of the 60-day period specified in 42 CFR §422.222:
   a) Facility or Professional, as applicable, will no longer be eligible for payment from Oscar and will be prohibited from pursuing payment from the beneficiary as stipulated by the terms of the contract between CMS and Oscar per applicable CMS regulations and requirements; and
   b) Facility will hold financial liability for services, items, and drugs that are furnished, ordered, or prescribed after this 60-day period, at which point Facility or Professional, as applicable, will have already received notification of the preclusion.

12. Facility/Provider represents and warrants that neither Facility nor any of its officers, directors, managers, employees, contractors, Downstream Entities, or any members or shareholders appear in the list of excluded individuals/entities as published by the Department of Health and Human Services ("DHHS") Office of the Inspector General (OIG List), the Medicare Preclusion list, or the GSA Excluded Parties List. Facility shall routinely, but no less than at hire and on a monthly basis, for all officers, directors, managers, employees, contractors, Downstream Entities, and any members or shareholders, review the referenced required lists to ensure that none of such persons are excluded or have become excluded from participation in Federal programs and shall report to MA Organization on the results of such exclusion/preclusion checks as directed.

13. Notwithstanding any relationships that Oscar may have with First tier, Downstream, and Related Entities, Oscar maintains ultimate responsibility for adhering to and otherwise fully complying with all terms and conditions of its contract with the Centers for Medicare & Medicaid Services ("CMS"). Facility/Provider shall participate in and comply with Oscar's Medicare Advantage/Part D oversight program, including but not limited to: attending meetings; providing attestations; responding to document, policy, and procedure review requests; implementing corrective action plans suggested by Oscar or CMS; participating in monitoring and reviews; and providing Oscar with similar information about Facility/Provider's Downstream Entities.

14. Facility/Provider agrees to disclose to Oscar, upon request and within thirty (30) days or such lesser period of time required for Oscar to comply with all applicable state or federal laws, all of the terms and conditions of any payment arrangement that constitutes a "physician incentive plan" as defined by CMS and/or any federal law or regulation. Such disclosure should identify, at a minimum, whether services not furnished by the physician/provider are included, the type of incentive plan including the amount, identified as a percentage, of any withhold or bonus, the amount and type of any stop-loss coverage provided for or required of the physician/provider, and the patient panel size broken down by total group or individual physician/provider panel size, and by the type of insurance coverage (i.e., Commercial HMO, Medicare Advantage HMO, Medicare Advantage PPO, and Medicaid HMO).

15. Facility/Provider agrees to provide or arrange for continued treatment, including, but not limited to, medication therapy, to Medicare Advantage Members upon expiration or termination of the Agreement. In accordance with all applicable state and federal laws, rules and/or regulations, treatment must continue

FILED: WESTCHESTER COUNTY CLERK 10/25/2021 11:01 PM INDEX NO. 60278/2020

NYSCEF DOC. NO. 250    21-02096-shl   Doc 37-2   Filed 02/11/22   Entered 02/11/22 17:46:27   Exhibit 2    RECEIVED NYSCEF: 10/25/2021

Pg 33 of 144

until the Member: (i) has been evaluated by a new participating provider who has had a reasonable opportunity to review or modify the Medicare Advantage Member's course of treatment, or until Oscar has made arrangements for substitute care for the Medicare Advantage Member; and (ii) until the date of discharge for Medicare Advantage Members hospitalized on the effective date of termination or expiration of the Agreement. Facility/Provider agrees to accept as payment in full from Oscar for Covered Services rendered to Oscar's Medicare Advantage Members, the rates set forth in the payment attachment which are applicable to such Member.

16. Facility/Provider agrees to provide to Oscar accurate and complete information regarding the provision of Covered Services by Facility/Provider to Members ("Data") on a complete CMS 1500 or UB 92 form, or their respective successor forms as may be required by CMS, or such other form as may be required by law when submitting claims and encounters in an electronic format, or such other format as is mutually agreed upon by both parties. The Data shall be provided to Oscar on or before the last day of each month for encounters occurring in the immediately preceding month, or such lesser period of time as may be required in the Agreement, or as is otherwise agreed upon by the parties in writing. The submission of the Data to Oscar and/or CMS shall include a certification from Facility/Provider that the Data is accurate, complete and truthful. In the event the Data is not submitted to Oscar by the date and in the form specified above, Oscar may, in its sole option, withhold payment otherwise required to be made under the terms of the Agreement until the Data is submitted to Oscar.

17. Facility/Provider agrees to maintain written agreements with employed and contracted health care providers and health care professionals providing services under the Agreement in a form comparable to, and consistent with, the terms and conditions of the Agreement and all exhibits and attachments hereto. Facility/Provider's downstream provider agreements shall include terms and conditions which comply with all applicable requirements for provider agreements under state and federal laws, rules and regulations including, without limitation, the Medicare Advantage rules, and regulations, and CMS or Medicare Agreement terms to which Oscar is subject. In the event of a conflict between the language of the downstream provider agreements and the Agreement, the language in the Agreement shall control.


In the event of a conflict between the terms and conditions above and the terms of a related agreement, the terms above control.

FILED: WESTCHESTER COUNTY CLERK 10/25/2021 11:01 PM
INDEX NO. 60278/2020
RECEIVED NYSCEF: 10/25/2021

**Exhibit 4**

**Schedule of Programs**

Commercial (Individual) products issued by Oscar

Commercial (Group) products issued by Oscar

Medicare Advantage products issued by Oscar

FILED: WESTCHESTER COUNTY CLERK 10/25/2021 11:01 PM
INDEX NO. 60278/2020
NYSCEF DOC. NO. 250
RECEIVED NYSCEF: 10/25/2021

**Exhibit 4-a**
**Service Area**

MA Service Area:
Bronx County
Orange County
Rockland County
Westchester County

Commercial Service Area:
Bronx County
Kings County
Nassau County
New York County
Queens County
Richmond County
Rockland County
Suffolk County
Westchester County

21-01096-shl    Doc 37-2    Filed 02/11/22    Entered 02/11/22 17:46:27    Exhibit 2
Pg 36 of 144

**Exhibit 5**
**List of Third-Party Payors**

Updates to this Exhibit shall be permitted without amendment of the Agreement and will be available electronically.

None.

NYSCEF DOC. NO. 250
INDEX NO. 60278/2020

RECEIVED NYSCEF: 10/25/2021

Case 21-02096-shl    Doc 37-2    Filed 02/11/22    Entered 02/11/22 17:46:27    Exhibit 2

**Exhibit 6**

**Carve-out Services**

- Behavioral Health Covered Services
- Pharmacy Covered Services
- Dental Covered Services
- Vision Covered Services
- Non-hospital Laboratory Covered Services
- Transplant Covered Services
- Infusion Covered Services

## PARTICIPATING PROVIDER AGREEMENT

THIS PARTICIPATING PROVIDER AGREEMENT ("**Agreement**") is made and entered into as of July 1, 2020 ("**Effective Date**") by and between WellCare Affiliates ("**Health Plan**") and Nova Healthcare Solutions, Inc. ("**Contracted Provider**"). Health Plan and Contracted Provider are sometimes referred to together as the "**Parties**" and individually as a "**Party**".

WHEREAS, Health Plan issues (or is pursuing a license allowing it to issue) health benefit plans and seeks to include health care providers in one or more provider networks for such plans; and

WHEREAS, Contracted Provider provides or arranges for the provision of health care items and services to the general public by health care providers employed by or subcontracted with Contracted Provider; and

WHEREAS, Health Plan and Contracted Provider desire to enter into this Agreement whereby Contracted Provider will provide or arrange for the provision of health care items and services to Health Plan's health benefit plan enrollees in exchange for payments from Health Plan, all subject to and in accordance with the terms and conditions of this Agreement;

NOW THEREFORE, the Parties agree as follows:

1.    Construction.

1.1    The base part of this Agreement is designed for use with a variety of providers and Benefit Plans. Provisions specific to particular providers and Benefit Plans are included in Attachments to the Agreement.

1.2    The following rules of construction apply to this Agreement: (a) the word "**include**", "**including**" or a variant thereof shall be deemed to be without limitation; (b) the word "**or**" is not exclusive; (c) the word "day" means calendar day unless otherwise specified; (d) the term "**business day**" means Monday through Friday, except Federal holidays; (e) all words used in this Agreement will be construed to be of such gender or number as the circumstances require; (f) references to specific statutes, regulations, rules or forms, such as CMS 1500 and UB-04 forms, include subsequent amendments or successors to them; and (g) references to a government department or agency include any successor departments or agencies to it.

2.    Definitions. In addition to terms defined elsewhere in this Agreement, the following capitalized terms when used in this Agreement shall have the meanings set forth below. If an identical term is defined in a Program Attachment, the definition in the Program Attachment shall control with respect to Benefit Plans governed by the Program Attachment.

2.1    "**Affiliate**" means, with respect to a particular entity, another entity that directly, or indirectly through one or more intermediaries, controls, is controlled by or is under common control with, the entity. An entity "controls" an entity in which it has the power to vote, directly or indirectly, 50 percent or more of the voting interests in such entity or in the case of a partnership if it is a general partner, or the power to direct or cause direction of management and policies of such entity, whether through the ownership of voting shares, by contract or otherwise.

2.2 **"Benefit Plan"** means a health benefit policy or other health benefit contract or coverage document (a) issued by Health Plan or (b) administered by Health Plan pursuant to a Government Contract. Benefit Plans and their designs are subject to change periodically.

2.3 **"Carve Out Agreement"** means an agreement between Health Plan and a third party Participating Provider whereby the third party assumes financial responsibility for or may provide certain management services related to particular Covered Services. Examples of possible Carve Out Agreements include agreements for radiology, laboratory, dental, vision, or hearing services.

2.4 **"Clean Claim"** means a claim for Covered Services provided to a Member that (a) is received timely by Health Plan, (b) has no defect, impropriety, or lack of substantiating documentation from the Member's medical record regarding the Covered Services, (c) is not subject to coordination of benefits or subrogation issues, (d) is on a completed, legible CMS 1500 form or UB-04 form or electronic equivalent that follows then current HIPAA Administrative Simplification ASC X12 837 standards and additional Health Plan specific requirements in the WellCare Companion Guide, including all then current guidelines regarding coding and inclusive code sets, and (e) includes all relevant information necessary for Health Plan to (1) meet requirements of Laws and Program Requirements for reporting of Covered Services provided to Members, and (2) determine payor liability, and ensure timely processing and payment by Health Plan. A Clean Claim does not include a claim from a Provider who is under investigation for fraud or abuse, or a claim under review for Medical Necessity.

2.5 **"Credentialing Criteria"** means Health Plan's criteria for the credentialing or re-credentialing of Providers.

2.6 **"Covered Services"** means Medically Necessary health care items and services covered under a Benefit Plan.

2.7 **"DHHS"** means the U.S. Department of Health and Human Services, including its agency the Centers for Medicare and Medicaid Services (**"CMS"**) and its Office of Inspector General (**"OIG"**).

2.8 **"Emergency Services"** shall be as defined in the applicable Program Attachment.

2.9 **"Encounter Data"** means encounter information, data and reports for Covered Services provided to a Member that meets the requirements for Clean Claims.

2.10 **"Federal Health Care Program"** means a Federal health care program as defined in section 1128B(f) of the Social Security Act, and includes Medicare, Medicaid and CHIP.

2.11 **"Government Contract"** means a contract between Health Plan and a Governmental Authority or government authorized entity for Health Plan to provide health benefits coverage for Federal Health Care Program beneficiaries.

2.12 **"Governmental Authority"** means the United States of America, the States, or any department or agency thereof having jurisdiction over Health Plan, a Provider or their respective Affiliates, employees, subcontractors or agents.

2.13 **"Ineligible Person"** means an individual or entity who (a) is currently excluded, debarred, suspended or otherwise ineligible to participate in (i) Federal Health Care Programs, as may be identified in the List of Excluded Individuals/Entities maintained by the OIG, or (ii) Federal procurement or nonprocurement programs, as may be identified in the Excluded Parties List System maintained by the General Services Administration, (b) has been convicted of a criminal offense subject to OIG's mandatory

exclusion authority for Federal Health Care Programs described in section 1128(a) of the Social Security Act, but has not yet been excluded, debarred or otherwise declared ineligible to participate in such programs, or (c) is currently excluded, debarred, suspended or otherwise ineligible to participate in State medical assistance programs, including Medicaid or CHIP, or State procurement or nonprocurement programs as determined by a State Governmental Authority.

2.14 **"Laws"** means any and all applicable laws, rules, regulations, statutes, orders, standards, guidance and instructions of any Governmental Authority, as adopted, amended, or issued from time to time, including (a) the Social Security Act, including Titles XVIII ("**Medicare**"), XIX ("**Medicaid**") and XXI (State Children's Health Insurance Program or "**CHIP**"), (b) the Health Insurance Portability and Accountability Act of 1996 ("**HIPAA**"), (c) Federal and State privacy laws other than HIPAA, (d) Federal and State laws regarding patients' advance directives, (e) State laws and regulations governing the business of insurance, (f) State laws and regulations governing third party administrators or utilization review agents, and (g) State laws and regulations governing the provision of health care services.

2.15 **"Medically Necessary"** or **"Medical Necessity"** shall be as defined in the applicable Program Attachment.

2.16 **"Member"** means an individual properly enrolled in a Benefit Plan and eligible to receive Covered Services at the time such services are rendered.

2.17 **"Member Expenses"** means copayments, coinsurance, deductibles or other cost share amounts, if any, that a Member is required to pay for Covered Services under a Benefit Plan.

2.18 **"Non-Contracted Services"** means Covered Services that are (a) subject to Carve Out Agreements and not approved by Health Plan in advance as further described in this Agreement, or (b) provided by an Ineligible Person.

2.19 **"Participating Provider"** means an individual or entity that has entered into an agreement with Health Plan or a Health Plan contractor to provide or arrange for the provision of Covered Services to Members.

2.20 **"Principal"** means a person with a direct or indirect ownership interest of five percent or more in Provider.

2.21 **"Program"** means (a) a Federal Health Care Program, or (b) a commercial insurance program, including a program created under Laws regarding commercial health insurance exchanges.

2.22 **"Program Attachment"** means an attachment to this Agreement describing the terms and conditions of a Provider's participation in Benefit Plans under a Program.

2.23 **"Program Requirements"** means the requirements of Governmental Authorities governing a Benefit Plan, including where applicable the requirements of a Government Contract.

2.24 **"Provider"** means (a) Contracted Provider or (b) other individual or entity that is subject to an employment arrangement or direct or indirect subcontract with Contracted Provider to provide or arrange for the provision of Covered Services to Members under this Agreement.

2.25 **"Provider Manual"** means, collectively, Health Plan's provider manuals, quick reference guides and educational materials setting forth Health Plan's requirements, rules, policies and procedures applicable to Participating Providers, as adopted or amended by Health Plan from time to time, including

requirements, rules, policies and procedures regarding fraud, waste and abuse; health plan accreditation, credentialing/re-credentialing of providers, Member eligibility verification, prior authorization, submission of claims and encounter data (including the WellCare Companion Guide), claims payment, overpayment recoupment, utilization review/management, disease and case management, quality assurance/improvement, model of care, advance directives, collection of Member Expenses, Member rights, including reimbursement of Member Expenses collected in excess of the maximum out of pocket amount under a Benefit Plan; and Member or provider grievances and appeals. The Provider Manual is available on Health Plan's website.

2.26    "**State**" means any of the 50 United States, the District of Columbia or a U.S. territory.

2.27    "**WellCare**" means WellCare Health Plans, Inc., an Affiliate of Health Plan.

2.28    "**WellCare Companion Guide**" means the transaction guide that sets forth data requirements and electronic transaction requirements for Clean Claims and Encounter Data submitted to Health Plan or its Affiliates, as amended from time to time. The WellCare Companion Guide is part of the Provider Manual.

3.    Scope.

3.1    Non-Contracted Services are outside the scope of this Agreement.

3.2    Providers may freely communicate with Members about their treatment regardless of benefit coverage limitations. Health Plan does not dictate or control clinical decisions respecting a Member's medical treatment or care. Medical care is the responsibility of the treating Provider regardless of any coverage determination by Health Plan. Nothing in this Agreement shall be interpreted to permit interference by Health Plan with communications between a Provider and a Member regarding the Member's medical condition or available treatment options.

3.3    This is not an exclusive agreement for either Party, and there is no guarantee (a) Health Plan will participate in any particular Program, or (b) any particular Benefit Plan will remain in effect.

3.4    Subject to Laws and Program Requirements, Health Plan reserves the right to create distinct provider networks for a Benefit Plan, and to determine Provider participation in such networks.

3.5    Subject to Laws and Program Requirements, Health Plan reserves the right to approve any Provider's participation under this Agreement, or to terminate or suspend any Provider from participation under this Agreement or one or more particular Benefit Plans. Health Plan is not obligated to refer or assign a minimum number of Members to or maintain a minimum number of Members with a Provider.

3.6    There shall be no joint liability among the Health Plan Affiliates with regard to each Health Plan's obligations under the Agreement. The parties further agree that only the legal entity issuing the applicable Benefit Plan shall incur any liability to Provider by virtue of the Agreement.

4.    Provider Responsibilities.

4.1    Principals. Contracted Provider warrants and represents that it has provided Health Plan the information listed on the Attachment titled "Information for Contracted Provider / Principals" for itself and all of its Principals as of the Effective Date. Contracted Provider shall provide notice to Health Plan of any change in the information within 30 days of the change.

    4.2    <u>Providers.</u> Contracted Provider shall provide Health Plan with the information listed on the Attachment titled "Information for Providers" for itself and the Providers as of the Effective Date, in a form and format acceptable to Health Plan. Contracted Provider shall provide notice to Health Plan of any change in the information for itself and the Providers within 30 days of the change. When Contracted Provider terminates a Provider, other than for cause, Contracted Provider will give Health Plan at least 90 days prior written notice of the termination.

    4.2.1    <u>Employed Providers.</u> Contracted Provider shall maintain and enforce binding internal policies and procedures or agreements with its employed Providers that are consistent with and require adherence to this Agreement. Contracted Provider shall provide Health Plan with such information requested by Health Plan, or as required by a Governmental Authority or accreditation body, necessary to verify the employment of its employed Providers.

    4.2.2    <u>Subcontracted Providers.</u> The following only applies if Contracted Provider uses subcontracted Providers:

    (a)    Contracted Provider shall, and shall require its direct or indirect subcontracted Providers to, maintain and enforce written agreements with their respective subcontracted Providers that are consistent with and require adherence to this Agreement. Upon Health Plan's request, Contracted Provider shall provide Health Plan with copies of agreement templates used by itself and other Providers with their subcontracted Providers, and (1) copies of the first page, signature page and other pages necessary to identify the contracting parties and effective date for each such agreement, or (2) copies of entire agreements between itself or other Providers and the subcontracted Providers. Compensation provisions in copies of such agreements may be redacted, except where compensation information is required by Governmental Authorities. In no event shall an agreement between or among Providers supersede this Agreement respecting matters covered by this Agreement. Notwithstanding anything to the contrary in any such agreement, this Agreement shall control over the terms of any such agreement in all respects as to matters covered by this Agreement.

    (b)    Upon Health Plan's request, Contracted Provider shall provide Health Plan with a duly executed Opt In Agreement in the form set forth on the Attachment titled "Form of Opt-In Agreement" from the subcontracted Provider. Each executed Opt In Agreement shall be made a part of and incorporated into this Agreement, and Contracted Provider accepts the appointment in the Opt In Agreement to act on the subcontracted Provider's behalf. If Health Plan requests and does not receive a duly executed Opt In Agreement for a proposed subcontracted provider, Health Plan shall not approve the proposed subcontracted provider or its employed providers as Providers under this Agreement. Provider waives any non-compete provisions in its agreements with subcontracted Providers to the extent that, if enforced, would prohibit a subcontracted Provider from contracting directly with Health Plan pursuant to the Opt-In Agreement.

    (c)    Subcontracted Providers shall maintain and enforce binding internal policies and procedures or agreements with their employed Providers that are consistent with and require adherence to this Agreement. Subcontracted Providers shall provide Health Plan with such information requested by Health Plan, or as required by a Governmental Authority or accreditation body, necessary to verify the employment of their employed Providers.

    (d)    Any obligation of Contracted Provider in this Agreement shall apply to subcontracted Providers to the same extent that it applies to Contracted Provider. Contracted

Provider shall require the timely and faithful performance of this Agreement by subcontracted Providers.

      4.2.3   Credentialing.  All Providers must meet the Credentialing Criteria. Subject to Laws and Program Requirements, (a) Health Plan conducts credentialing of providers before they begin providing Covered Services and re-credentialing from time to time thereafter as required for Health Plan's compliance with Laws, Program Requirements and accreditation standards, and Providers shall consent to and cooperate with such credentialing/re-credentialing, which may include site reviews, and (b) until successful completion of credentialing of a provider by Health Plan, (i) the provider shall not be added as a Participating Provider under this Agreement, and (ii) the provision of, and payment for, Health Plan authorized Covered Services to Members by the provider shall be subject to Health Plan's policies and procedures for non-participating providers.

    4.3   Covered Services.  Providers shall provide Covered Services to Members, subject to and in accordance with the terms and conditions of this Agreement.

      4.3.1   Standards.  Providers shall provide Covered Services in accordance with Laws and generally accepted standards of medical practice, including nationally recognized clinical protocols and guidelines where available. Providers shall ensure that Covered Services are available to Members on a 24 hour/day, 7 day/week basis, except Providers who do not provide Emergency Services shall ensure that Covered Services are available to Members in accordance with standard operating hours for each Provider location and shall maintain an after-hours phone service for individuals to seek instructions in the event of an emergency.

      4.3.2   Eligibility.  Except for Emergency Services, Providers shall verify Member eligibility in accordance with the Provider Manual before providing Covered Services to a Member. Health Plan provides member eligibility information through Health Plan's provider website and other means. For Emergency Services, Providers shall verify Member eligibility within 24 hours of the Member being stabilized or the Provider learning the individual may be a Member, whichever is later. Members' eligibility status is subject to retroactive disenrollment, and Health Plan may, unless prohibited by Laws and Program Requirements, recoup payments for items or services provided to such individuals after the effective date of disenrollment even if such items and services were authorized by Health Plan.

      4.3.3   Prior Authorization.  Except for Emergency Services or where prior authorization is not required by the Provider Manual, Providers shall obtain prior authorization for Covered Services in accordance with the Provider Manual. Except where not permitted by Laws or Program Requirements, Health Plan may deny payment for Covered Services where a Provider fails to meet Health Plan's requirements for prior authorization.

      4.3.4   Referrals.  Providers shall not refer Members to other health care providers, including other Participating Providers, for Covered Services without the approval of Health Plan, except (a) in case of Emergency Services, (b) when Member self-referral is permitted by the Benefit Plan, or (c) as permitted in Provider Manual provisions regarding utilization management. When making a referral to another health care provider, a Provider shall furnish the other provider complete information on treatment procedures and diagnostic tests performed prior to such referral, which may include providing copies of the medical records.

      4.3.5   Non-Covered Services.  Every time a Provider provides items or services to a Member that are not Covered Services, before providing the items or services the Provider shall (a) inform the Member of the specific items or services that are not Covered Services and that they will not be paid for by Health Plan, and (b) obtain the Member's written agreement to pay for such specific items or services

after being so advised. Provider shall contact Health Plan for a coverage determination in any case where Provider is unsure if an item or service is a Covered Service.

4.3.6   Carve Out Agreements.  If at any time during the term of this Agreement Health Plan has a Carve Out Agreement in place, for as long as such Carve Out Agreement is in effect Covered Services subject to the Carve Out Agreement shall not be within the scope of Covered Services contracted for under this Agreement, except for (a) Emergency Services or (b) Covered Services authorized by Health Plan in advance in accordance with the Provider Manual, in which cases the terms and conditions of this Agreement, including compensation, shall apply.  Health Plan shall notify Contracted Provider of Carve Out Agreements through the Provider Manual or other notice.  Providers may enter into separate agreements with the third party Participating Provider designated by Health Plan to provide Covered Services to Members subject to a Carve Out Arrangement ("Carve Out Vendors") and, except as set forth in this paragraph, the compensation in this Agreement shall not apply.  Unless otherwise approved by Health Plan in its written notice to Contracted Provider, Providers who do not enter into a separate agreement with Carve Out Vendors will be treated as non-participating with Health Plan and Carve Out Vendor for Covered Services subject to the Carve Out Agreement.  If a Carve Out Agreement expires or is terminated, Provider shall thereafter provide the Covered Services that were subject to the Carve Out Agreement to Members, subject to and in accordance with the terms and conditions of this Agreement, including compensation.

4.4   Claims and Encounter Data / EDI.

4.4.1   Clean Claims.  Providers shall electronically prepare and submit Clean Claims to Health Plan within 180 days or such other time period required by Laws or Program Requirements, of the date of a Covered Service or the date of discharge from an inpatient facility, as the case may be.  Unless prohibited by Laws and Program Requirements, Health Plan may deny payment for any claims that fail to meet Health Plan's submission requirements for Clean Claims or that are received after the time limit in this Agreement for filing Clean Claims.

4.4.2   Encounter Data.  If Contracted Provider or other Provider is compensated by capitation, Contracted Provider shall, and shall require the other Providers to, electronically submit Encounter Data to Health Plan within 30 days of the last day of the month in which Covered Services were provided, or such shorter period necessary for Health Plan to comply with Laws or Program Requirements.

4.4.3   Additional Reports.  If Health Plan requests additional information, data or reports from a Provider regarding Covered Services to Members for any reason, including for purposes of risk adjustment data validation, even if Health Plan has already paid claims or accepted Encounter Data related to the Covered Services, the Provider shall provide the information, data or reports as requested by Health Plan.

4.4.4   NPI Numbers / Taxonomy Codes.  Providers shall give Health Plan their National Provider Identification ("**NPI**") numbers and Provider taxonomy codes prior to becoming Participating Providers under this Agreement. Payment of compensation for Covered Services is conditioned on Providers including their NPI numbers and Provider taxonomy codes on claims or encounter data submitted under this Agreement, and Health Plan may deny payment for Covered Services where a Provider fails to meet these requirements.

4.4.5   Electronic Transaction Requirements.  Provider shall submit all claims and encounter data to Health Plan electronically.  Providers shall (a) follow the requirements for electronic data interchange in the then current (1) HIPAA Administrative Simplification transaction standards and (2) WellCare Companion Guide, and (b) submit all claims and encounter data either through a clearinghouse used by Health Plan or directly to Health Plan in accordance with the WellCare Companion Guide.

4.4.6   EFT / Remittance Advice. If a Provider is able to accept payments and remittance advice electronically, (a) the Provider shall register and complete the forms for electronic funds transfer and electronic remittance advice as soon as practicable, but no later than 60 days following Health Plan's confirmation of Provider's status as participating, and (b) Health Plan shall make all payments and remittance advice to the Provider electronically. If a Provider is not able to accept payments and remittance advice electronically, the Provider shall make good faith efforts to be able to accept electronic funds transfer and electronic remittance within 24 months of the Effective Date.

4.4.7   Coordination of Benefits. Health Plan shall coordinate payment for Covered Services in accordance with the terms of a Member's Benefit Plan and Laws. Providers shall provide Health Plan with electronic versions of explanations of benefits and other documents and information in their possession regarding insurance covering a Member that is primary to the Member's Benefit Plan. Providers shall bill primary insurers for items and services they provide to a Member before they submit claims for the same items or services to Health Plan. If Health Plan is not the primary payor for Covered Services provided to a Member, then when not prohibited by Laws or Program Requirements, Health Plan's payment to Provider for such services shall not exceed the compensation in this Agreement less amounts payable by the primary payor or payors, less Member Expenses. Unless prohibited by Laws and Program Requirements, Health Plan may recoup payments for items or services provided to a Member where other insurers are determined to be responsible for such items and services.

4.4.8   Subrogation. Providers shall follow Health Plan policies and procedures regarding subrogation activity.

4.4.9   No payment made by Health Plan under this Agreement is intended as a financial incentive or inducement to reduce, limit or withhold Covered Services required by Members.

4.5   Member Protections.

4.5.1   Providers shall not discriminate in their treatment of Members based on Members' health status, source of payment, cost of treatment, participation in Benefit Plans, race, ethnicity, national origin, religion, gender, age, mental or physical disability, sexual orientation, or genetic information.

4.5.2   Providers shall not bill Members for any items or services, such as missed appointments or administrative fees, where such billing is prohibited by Laws or Program Requirements.

4.5.3   In no event including nonpayment by Health Plan, Health Plan's insolvency or breach of this Agreement, shall a Provider bill, charge, collect a deposit from, seek compensation, remuneration or reimbursement from, or have any recourse against any Member or persons other than Health Plan acting on any Member's behalf, for amounts that are the legal obligation of Health Plan. This provision (a) shall survive termination or expiration of this Agreement regardless of the cause giving rise to termination or expiration, (b) shall be construed for the benefit of Members, (c) does not prohibit collection of Member Expenses where lawfully permitted or required, and (d) supersedes any oral or written agreement to the contrary now existing or hereafter entered into between a Provider and Members or persons acting on their behalf.

4.5.4   Regardless of any denial of a claim or reduction in payment to a Provider by Health Plan, in no event will a Member be responsible for payment for any Covered Services other than Member Expenses. However, Members shall not be responsible for Member Expenses where collection of Member Expenses is prohibited by Laws, Program Requirements or this Agreement. If payment of an amount sought in a claim is denied or reduced by Health Plan, the Provider shall adjust Member Expenses accordingly.

4.5.5   Except where collection of Member Expenses is prohibited by Laws, Program Requirements or this Agreement, a Provider shall (a) collect Member Expenses directly from the Member, and (b) not waive, discount or rebate any such amounts except as permitted by and in accordance with Laws and Program Requirements regarding prohibited inducements to Federal Health Care Program beneficiaries.

4.6    Provider Manual.    The Provider Manual supplements and is made a part of and incorporated into this Agreement, and Providers shall comply with the Provider Manual. Health Plan may amend the Provider Manual from time to time upon notice to Provider by posting to Health Plan's provider website, email or other means of notice permitted by this Agreement, provided that in the case of material revisions to the Provider Manual, Health Plan shall provide notice in accordance with the provisions of this Agreement regarding written notice. Changes to the Provider Manual shall become effective 30 days after such posting or notice, or as of such other time period required for Health Plan to comply with Laws, Program Requirements or accreditation standards. Providers shall have and maintain systems necessary for access to Health Plan's provider website, and check for revisions to the Provider Manual from time to time.

4.7    Quality Improvement.    Providers shall comply with Health Plan quality improvement programs, including those designed to improve quality measure outcomes in the then current Healthcare Effectiveness Data and Information Set (HEDIS) or other quality or outcome measures. Health Plan may audit Providers periodically and upon request Providers shall provide Records to Health Plan for HEDIS or other quality reasons and risk management purposes, including Records that will enable Health Plan to perform a thorough assessment of the overall care being provided to Members. Health Plan desires open communication with Providers regarding Health Plan's quality improvement initiatives and activities.

4.8    Bonus Programs.    While there is no guarantee under this Agreement, Health Plan may offer certain Providers the opportunity to participate in bonus or incentive programs ("**Bonus Programs**"). If offered, a Bonus Program will be designed to promote preventive care, quality care or ensure the appropriate and cost effective use of Covered Services through appropriate utilization. Bonus Programs may be based in whole or part on Providers achieving certain quality benchmarks using HEDIS or some similar measure, achieving certain Member satisfaction, using electronic funds transfers and remittance or other objective criteria. If offered, Health Plan will set forth the specific terms and conditions of the Bonus Program in a separate policy and the Provider's participation shall be subject to the terms and conditions of this Agreement. Health Plan and Providers agree that no Bonus Program shall limit Medically Necessary services.

4.9    Utilization Management.    Providers shall cooperate and participate in Health Plan's utilization review and case management programs. Health Plan's utilization review/case management programs may include provisions for (a) verification of eligibility and prior authorization for Covered Services, (b) concurrent and retrospective reviews, (c) requirements regarding referrals to third party Participating Providers, including those that are party to Carve Out Agreements and (d) corrective action plans.

4.10    Member Grievances / Appeals.    Providers shall comply with the Provider Manual, Laws and Program Requirements regarding Member grievances and appeals, including by providing information, records or documents requested by Health Plan and participating in the grievance/appeal process.

4.11    Compliance.    In performing this Agreement, Providers shall comply with all Laws and Program Requirements. Providers shall (a) cooperate with Health Plan with respect to Health Plan's compliance with Laws and Program Requirements, including downstream requirements that are inherent to

Health Plan's responsibilities under Laws or Program Requirements, and (b) not knowingly take any action contrary to Health Plan's obligations under Laws or Program Requirements.

4.11.1  Privacy / HIPAA.  Providers shall maintain Member information and medical records in accordance with Laws, including Federal and State Laws related to privacy and confidentiality of Member information and medical records, including HIPAA, and shall use and disclose such information or records only in accordance with Laws and Program Requirements.

4.11.2  Fraud, Waste and Abuse.  Providers shall comply with Laws designed to prevent or ameliorate fraud, waste, and abuse, including applicable provisions of Federal criminal law, the False Claims Act (31 USC §§ 3729 et. seq.), and the anti-kickback statute (section 1128B(b) of the Social Security Act).

4.11.3  Accreditation.  Providers shall comply with policies and procedures required for Health Plan to obtain or maintain its accreditation from accreditation bodies, including the National Committee for Quality Assurance or Utilization Review Accreditation Commission.

4.11.4  Compliance Program / Reporting.  OIG publishes compliance program guidance for health care firms available at http://oig.hhs.gov/fraud/complianceguidance.asp.  Contracted Provider shall, and shall require its employees and its subcontractors and their employees to, comply with Health Plan compliance program requirements, including Health Plan's compliance training requirements, and to report to Health Plan any suspected fraud, waste, or abuse or criminal acts by Health Plan, Contracted Provider, other Providers, their respective employees or subcontractors, or by Members.  Reports may be made anonymously through the WellCare fraud hotline at (866) 678-8355.  Also, if DHHS publishes compliance program requirements that providers must follow as a condition of participation in Federal Health Care Programs, Contracted Provider shall, and shall require its subcontractors to, comply with such requirements.

4.11.5  Acknowledgement of Federal Funding.  Claims, data and other information submitted to Health Plan pursuant to this Agreement may be used, directly or indirectly, for purposes of obtaining payments from Federal or State governments under Federal Health Care Programs, and payments that Providers receive under this Agreement may be, in whole or in part, from Federal funds.

(a)     Providers shall, upon request of Health Plan, certify, based on its best knowledge, information and belief, that all data and other information directly or indirectly reported or submitted to Health Plan pursuant to this Agreement is accurate, complete and truthful.

(b)     Providers shall not claim payment in any form, directly or indirectly, from a Federal Health Care Program for items or services covered under this Agreement, except for wrap around payments made directly by Governmental Authorities to certain qualified providers, such as Federally qualified health centers ("FQHCs") or rural health clinics ("RHCs") where applicable.

4.11.6  Ineligible Persons.  Contracted Provider warrants and represents as of the Effective Date and throughout the term of the Agreement and the duration of post expiration or termination transition activities described in this Agreement, that none of it, its Principals or any individual or entity it employs or has contracted with to carry out its part of this Agreement is an Ineligible Person.

4.11.7  Compliance Audit.  Health Plan shall be entitled to audit Providers with respect to compliance issues, including their compliance programs, and require them to address compliance issues through education, counseling or corrective action plans.  Providers shall cooperate with Health Plan with

respect to any such audit, including by providing Health Plan with Records and site access within such time frames as requested by Health Plan.

       4.11.8  <u>Fines / Penalties</u>. The following applies if Provider is capitated or Health Plan has delegated activities to Provider pursuant to a separate delegation addendum: Provider shall reimburse Health Plan for any fines, penalties or costs of corrective actions required of Health Plan by Governmental Authorities caused by Provider's failure to comply with Laws or Program Requirements, including failure to submit accurate encounters on a timely basis or to properly perform delegated functions.

       4.12  <u>Licensure</u>. Providers shall secure and maintain all necessary licenses, certificates, permits, registrations, consents, approvals and authorizations that must be obtained by them to perform their obligations under this Agreement. As required by Program Requirements, Providers shall meet the conditions of participation and be enrolled in applicable Federal Health Care Programs (including for dual eligible special needs plan Members, both Medicare and Medicaid) and have all accreditations necessary to meet such conditions of participation.

       4.13  <u>Insurance</u>. Contracted Provider and its subcontracted Providers shall secure and maintain for themselves and their employees, commercial general liability and professional liability (malpractice) insurance or self insurance coverage for claims arising out of events occurring during the term of this Agreement and any post expiration or termination activities under this Agreement, in amounts required to meet Credentialing Criteria, and worker's compensation insurance as required by State Laws. Contracted Provider and its subcontracted Providers shall, upon request of Health Plan, provide Health Plan with certificates of insurance or other evidence of coverage reflecting satisfaction of the foregoing requirements of this paragraph. Contracted Provider and the subcontracted Providers shall provide at least 30 days prior notice to Health Plan in advance of any material modification, cancellation or termination of their insurance.

       4.14  <u>Proprietary Information</u>. In connection with this Agreement, Health Plan or its Affiliates may disclose to Providers, directly or indirectly, certain information that Health Plan or its Affiliate have taken reasonable measures to maintain as confidential and which derives independent economic value from not being generally known or readily ascertainable by the public ("Proprietary Information"). Proprietary Information includes Member lists, the compensation provisions of this Agreement, and other information relating to Health Plan's or its Affiliates' business that is not generally available to the public. Contracted Provider shall, and shall require its subcontractors to, hold in confidence and not disclose any Proprietary Information and not use Proprietary Information except (a) as expressly permitted under this Agreement, or (b) as required by Laws or legal or regulatory process. Contracted Provider shall, and shall require its subcontractors to, provide Health Plan with prior notice of any such disclosure required by Laws or legal or regulatory process so that Health Plan can seek an appropriate protective order. Contracted Provider shall, and shall require its subcontractors to, disclose Proprietary Information only in order to perform their obligations under this Agreement, and only to persons who have agreed to maintain the confidentiality of the Proprietary Information. The requirements of this Agreement regarding Proprietary Information shall survive expiration or termination of this Agreement.

       4.15  <u>Required Notices</u>. In addition to any other notices required under this Agreement, Contracted Provider shall give notice to Health Plan within two business days of the occurrence of any event that could reasonably be expected to impair the ability of a Provider to comply with the obligations of this Agreement, including any of the following: (a) an occurrence that causes any of the representations and warranties in this Agreement made by or on behalf of a Provider to be inaccurate, (b) a Provider fails to maintain insurance as required by this Agreement, (c) a Provider's license, certification or accreditation expires or is suspended, revoked, conditioned or otherwise restricted, (d) a Provider is excluded, suspended or debarred from, or sanctioned under a Federal Health Care Program, (e) a disciplinary action is initiated by a Governmental Authority against a Provider, (f) where applicable, a Provider's hospital privileges are

suspended, limited, revoked or terminated, (g) a grievance or legal action is filed by a Member concerning a Provider, (h) a Provider is under investigation for fraud or a felony, or (i) a Provider enters into a settlement related to any of the foregoing.

5.    Health Plan Responsibilities.

    5.1    ID Cards.  Health Plan shall issue identification cards to Members and instruct them to present their cards to providers when seeking health care items and services.

    5.2    Claims Processing.  Health Plan shall pay or deny Clean Claims within the time period set forth in Attachment C.  Health Plan uses claims editing software programs to assist it in determining proper coding for provider claim reimbursement.  Such software programs use industry standard coding criteria and incorporate guidelines established by CMS such as the National Correct Coding Initiative and the National Physician Fee Schedule Database, the AMA and Specialty Society correct coding guidelines, and state specific regulations.  These software programs may result in claim edits for specific procedure code and diagnosis code combinations.

    5.3    Compensation.  Compensation shall be as set forth in Attachment C.  Providers shall accept such compensation (plus wrap around payments from Governmental Authorities to qualified providers such as FQHCs or RHCs where applicable) as payment in full for Covered Services rendered to Members and all other activities of Providers under this Agreement.  Items and services constituting "never events" as described in the Provider Manual shall not be paid.  Health Plan shall not pay for Non-Contracted Services.

    5.4    Medical Record Review.  Health Plan shall be entitled to perform concurrent or retrospective reviews of medical records for utilization management purposes or to verify that items and services billed to or paid for by Health Plan were provided and billed correctly in accordance with this Agreement and the Provider Manual, or were Covered Services (including that such items and services were Medically Necessary).

    5.5    Recoupment.  Unless otherwise prohibited by Laws, Contracted Provider, for itself and the other Providers, authorizes Health Plan to deduct from amounts that may otherwise be due and payable to a Provider any outstanding amounts that the Provider may owe Health Plan for any reason, including Overpayments, in accordance with its recoupment policy and procedure.  "Overpayment" for purposes of this Agreement means any funds that a Provider receives or retains to which the Provider is not entitled, including overpayments (a) for items and services later determined not to be Covered Services, (b) due to erroneous or excess reimbursement, (c) resulting from errors and omissions relating to changes in enrollment, claims payment errors, data entry errors or incorrectly submitted claims, or (d) for claims paid when Health Plan was the secondary payor and the Provider should have been reimbursed by the primary payor.  An Overpayment also includes any payment Health Plan makes which is the obligation of and not paid by a Provider, including for improperly collected Member Expenses due a Member.  Prior to deducting Overpayments, Health Plan shall provide the Provider notice in accordance with Health Plan's recoupment policy that an offset will be performed against future payments unless the Provider within such notice period either refunds or repays such amounts or provides Health Plan with a written explanation, with supporting documentation, disputing that such amounts should be refunded or repaid.  If there are no future payments to offset, then the Provider shall repay Overpayments to Health Plan within 30 days, or such other timeframe as may be mandated by Laws or Program Requirements, of the Provider's receipt of notice of such Overpayment.  Health Plan agrees not to seek repayment of an Overpayment from a Provider beyond the time period set forth in Health Plan's recoupment policy, unless a longer time is required or permitted by Laws or Program Requirements.  Notwithstanding the above, there shall be no deadline within which

Health Plan may seek recovery of an Overpayment in a case of fraud. This section shall survive expiration or termination of this Agreement.

      5.6     <u>Suspension of Payment</u>. If DHHS suspends payments to a Provider while Governmental Authorities investigate a credible allegation of fraud (as determined by DHHS), then Health Plan may suspend the Provider and payments for Covered Services provided by the Provider during the period of the DHHS suspension of payments.

      5.7     <u>Health Plan Designees</u>.  Health Plan may delegate administrative functions related to Benefit Plan management to third parties.  Provider shall cooperate with any Health Plan designee performing administrative functions for Health Plan to the same extent that it is required to cooperate with Health Plan.

      5.8     <u>Insurance</u>. Health Plan shall maintain such policies of general and professional liability insurance in accordance with Laws and to insure Health Plan against claims regarding Health Plan operations and performance under this Agreement.

6.     <u>Records, Access & Audits.</u>

      6.1     <u>Maintenance.</u>  Contracted Provider shall, and shall cause its subcontractors to, maintain operational, financial and administrative records, contracts, books, files, data, information, and other documentation related to the Covered Services provided to Members, claims filed, quality and cost outcomes, quality measurements and initiatives, and other services and activities conducted under this Agreement (collectively, "**Records**").  Contracted Provider shall ensure that such Records are kept in accordance with Laws, Program Requirements, generally accepted accounting principles (as applicable) and prudent record keeping practices and are sufficient to enable Health Plan to enforce its rights under this Agreement, including this section, and to determine whether Contracted Provider and its subcontractors and their respective employees are performing or have performed Contracted Provider's obligations in accordance with this Agreement, Laws and Program Requirements. Contracted Provider shall, and shall cause its subcontractors to, maintain such Records for the time period set forth in the applicable Program Attachment governing the Benefit Plan.  Records that are under review or audit shall be retained until the completion of such review or audit if that date is later than the time frame indicated above.

      6.2     <u>Access & Audit</u>. Health Plan shall have the right to monitor, inspect, evaluate and audit Contracted Provider and its subcontractors.  In connection with any monitoring, inspection, evaluation or audit, Contracted Provider shall, and shall cause its subcontractors to, provide Health Plan with access to all Records, personnel, physical facilities, equipment and other information necessary for Health Plan or its auditors to conduct the audit. Within three business days of Health Plan's written request for Records, or such shorter time period required for Health Plan to comply with requests of Governmental Authorities, Contracted Provider shall, and shall cause its subcontractors to, collect, compile, and prepare all such Records and furnish such Records to Health Plan in a format reasonably requested by Health Plan.  Copies of such Records shall be at no cost to Health Plan.

      6.3     The requirements of this Agreement regarding Records, access and audit shall survive expiration or termination of this Agreement.

7.     <u>Term and Termination.</u>

      7.1     <u>Term</u>.  The term of this Agreement shall begin on the Effective Date and continue for a period of one year, and thereafter shall renew for successive periods of one year each unless a Party provides notice of nonrenewal to the other at least 90 days before the end of the then current (initial or renewal)

term, unless and until the Agreement is terminated in accordance with the terms and conditions of the Agreement, including those in a Program Attachment.

7.2    Termination.

    7.2.1    Termination for Convenience. Either Party may terminate this Agreement, in whole or with respect to any particular Program or Benefit Plan, at any time for any reason or no reason upon 90 days prior notice to the other. Health Plan may terminate this Agreement as to any particular Provider at any time for any reason or no reason upon 90 days prior notice to Contracted Provider.

    7.2.2    Termination for Cause.

        (a)    A Party may terminate this Agreement for material breach by the other Party of any of the terms or provisions of this Agreement by providing the other Party at least 90 days prior notice specifying the nature of the material breach. During the first 60 days of the notice period, the breaching Party may cure the breach to the reasonable satisfaction of the non-breaching Party.

        (b)    Health Plan may terminate this Agreement as to a particular Provider for a material failure by the Provider to comply with any of the terms or provisions of this Agreement by providing Contracted Provider at least 90 days prior notice specifying the nature of the material failure. During the first 60 days of the notice period, the affected Provider may cure the material failure to the reasonable satisfaction of Health Plan.

    7.2.3    Immediate Termination. Health Plan may terminate this Agreement in its entirety, or with respect to a particular Provider, upon immediate notice to Contracted Provider upon the occurrence of any of the following: (a) termination is necessary for health and safety of Members, (b) a Provider suffers the loss, suspension or restriction of a license from a Governmental Authority or accreditation from an accreditation body required to carry out its obligations under this Agreement, including meeting the conditions of participation in applicable Programs, (c)(1) Contracted Provider becomes an Ineligible Person or voluntarily withdraws from participation in applicable Programs, or (2) another Provider becomes an Ineligible Person or voluntarily withdraws from participation in applicable Programs, and is not immediately terminated by Contracted Provider, (d) a Governmental Authority orders Health Plan to terminate the Agreement, (e) Health Plan reasonably determines or a Governmental Authority determines or advises that a Provider is engaging or has engaged in fraud or abuse, or has submitted a false claim, (f) a Provider fails to meet Credentialing Criteria, (g) a Provider fails to maintain insurance as required by this Agreement, (h) a Provider undergoes a change of control that is not acceptable to Health Plan, or (i) a Provider becomes insolvent, is adjudicated as bankrupt, has its business come into possession or control of any trustee in bankruptcy, has a receiver appointed for it, or makes a general assignment for the benefit of its creditors.

    7.2.4    Transition of Care. To ensure that a transition is undertaken in an orderly manner that maximizes Member safety and continuity of care, upon expiration or termination of this Agreement for any reason except for immediate termination, Providers shall (a) continue providing Covered Services to Members through (1) the lesser of the period of active treatment for a chronic or acute medical condition or up to 90 days, (2) the postpartum period for Members in their second or third trimester of pregnancy, or (3) such longer period required by Laws or Program Requirements, and (b) cooperate with Health Plan for the transition of Members to other Participating Providers. The terms and conditions of this Agreement shall apply to any such post expiration or termination activities, provided that if a Provider is capitated, Health Plan shall pay the Provider for such Covered Services at 100 percent of Health Plan's then current

rate schedule for the applicable Benefit Plans. The transition of care provisions in this Agreement shall survive expiration or termination of this Agreement.

       7.2.5   <u>Notification to Members</u>. Upon expiration or termination of this Agreement, Health Plan will communicate such expiration or termination to Members as required by and in accordance with Laws and Program Requirements. Providers shall obtain Health Plan's prior written approval of Provider communications to Members regarding the expiration or termination of this Agreement. The foregoing sentence shall not prevent a Provider from engaging in communications with his patient regarding the patient's health.

8.   <u>Dispute Resolution</u>.

       8.1   <u>Provider Administrative Review and Appeals</u>. Where applicable, a Provider shall exhaust all Health Plan's review and appeal rights in accordance with the Provider Manual before seeking any other remedy. Where required by Laws or Program Requirements, administrative reviews and appeals shall be subject to and resolved in accordance with administrative law.

       8.2   Except as prohibited by State Laws, all claims and disputes between Health Plan and a Provider related to this Agreement must be submitted to arbitration within one year of the act or omission giving rise to the claim or dispute, except for claims based on fraud, which must be brought within the State statute of limitation governing fraud claims. The failure to initiate arbitration within the foregoing time period will constitute waiver of such claims and disputes.

       8.3   <u>Negotiation</u>. Before a Party initiates arbitration regarding a claim or dispute under this Agreement, the Parties shall meet and confer in good faith to seek resolution of the claim or dispute. If a Party desires to initiate the procedures under this section, the Party shall give notice (a "**Dispute Initiation Notice**") to the other providing a brief description of the nature of the dispute, explaining the initiating Party's claim or position in connection with the dispute, including relevant documentation, and naming an individual with authority to settle the dispute on such Party's behalf. Within 20 days after receipt of a Dispute Initiation Notice, the receiving Party shall give a written reply (a "**Dispute Reply**") to the initiating Party providing a brief description of the receiving Party's position in connection with the dispute, including relevant documentation, and naming an individual with the authority to settle the dispute on behalf of the receiving Party. The Parties shall promptly make an investigation of the dispute, and commence discussions concerning resolution of the dispute within 20 days after the date of the Dispute Reply. If a dispute has not been resolved within 30 days after the Parties have commenced discussions regarding the dispute, either Party may submit the dispute to arbitration subject to the terms and conditions herein.

       8.4   <u>Arbitration</u>. Except as barred or excepted by this Agreement, all claims and disputes between the Parties shall be resolved by binding arbitration in Tampa, Florida. The arbitration shall be conducted through the American Arbitration Association ("**AAA**") pursuant to the AAA Commercial Arbitration Rules then in effect, subject to the following: Arbitration shall be commenced by completing and filing with AAA a Demand for Arbitration form in accordance with the Commercial Arbitration Rules setting forth a description of the dispute, the amount involved and the remedy sought, and sending notice of the demand to the opposing Party. The arbitration shall be held before a single arbitrator, unless the amount in dispute is more than $10 million, in which case it will be held before a panel of three arbitrators. In a case with a single arbitrator, the Parties shall select the arbitrator by agreement within 30 days of the date the Demand for Arbitration is filed, and if the Parties are unable to agree on the selection of an arbitrator within such time, AAA shall select an independent arbitrator. In the case of a panel, within 30 days of the date the Demand for Arbitration is filed each Party shall select an arbitrator, and the two arbitrators shall select the third arbitrator, and if the two arbitrators are unable to agree on the selection of

FILED: WESTCHESTER COUNTY CLERK 10/25/2021 11:01 PM
NYSCEF DOC. NO. 250
INDEX NO. 60278/2020
RECEIVED NYSCEF: 10/25/2021
21-02096-shl    Doc 37-2    Filed 02/11/22    Entered 02/11/22 17:46:27    Exhibit 2
Pg 53 of 144

a third arbitrator within such time, AAA shall select an independent third arbitrator. If either Party disputes the arbitrability of a claim or dispute, the arbitrator or panel will decide if this arbitration agreement applies to the claim or dispute. The arbitrator or panel may not certify a class or conduct class based arbitration. The decision of the arbitrator or panel shall be final and binding on the Parties. The award of the arbitrator or panel may be confirmed or enforced in any court having jurisdiction. Each Party shall assume its own costs related to the arbitration, including costs of subpoenas, depositions, transcripts, witness fees, and attorneys' fees. The compensation and expenses of the arbitrator and administrative fees or costs of the arbitration shall be borne equally by the Parties.

9.    Miscellaneous.

9.1    Governing Law / Venue. This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of Florida, except where Federal law applies, without regard to principles of conflict of laws. Each of the Parties hereby agrees and consents to be subject to the exclusive jurisdiction and venue of the appropriate State or Federal court located in Hillsborough County, Florida, in any suit, action, or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement.

9.2    Waiver of Jury Trial. Each Party hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, trial by jury in any suit, action or proceeding arising hereunder.

9.3    Equitable Relief. Notwithstanding anything in this Agreement, either Party may bring court proceedings to seek an injunction or other equitable relief to enforce any right, duty or obligation under this Agreement.

9.4    Independent Contractors. The Parties are independent contractors. This Agreement shall not be deemed to create a partnership or joint venture, or an employment or agency relationship between the Parties. Neither Party has the right or authority to assume or create any obligation or responsibility on behalf of the other. Neither Party is liable for the acts of the other.

9.5    No Steering. For the term of this Agreement and for one year thereafter, Providers shall not engage in steering or otherwise directly or indirectly solicit any Member to join a competing health plan or induce any Member to cease doing business with Health Plan.

9.6    No Offshore Contracting. No work related to this Agreement may be performed outside of the United States without Health Plan's prior written consent.

9.7    The following applies to State plans: Contracted Provider shall not, and shall require its subcontractors not to, make any payments for items or services provided under a State plan to financial institutions or entities such as provider bank accounts or business agents located outside of the States. Further Contracted Provider shall not, and shall require its subcontractors not to, make payments to telemedicine providers located outside of the States, or payments to pharmacies located outside of the States. Any such funds paid may be recovered by Health Plan or a State Governmental Authority with applicable jurisdiction over a plan.

9.8    Third Parties. Except as otherwise provided in this Agreement, this Agreement is not a third party beneficiary contract and no provision of this Agreement is intended to create or may be construed to create any third party beneficiary rights in any third party, including any Member.

9.9     Notices. Except for non-material revisions to the Provider Manual, all notices required or permitted under this Agreement must be in writing and sent by (a) hand delivery, (b) U.S. certified mail, postage prepaid, return receipt requested, (c) overnight delivery service providing proof of receipt, (d) facsimile or (e) email, to the addresses of the Parties as set forth on the signature page. Each Party may designate by notice any future or different addresses to which notices will be sent. Notices will be deemed delivered upon receipt or refusal to accept delivery. Notice to Contracted Provider shall constitute notice to all Providers. Routine day to day operational communications between the Parties are not notices in accordance with this section.

9.10    Incorporation of Laws / Program Requirements / Accreditation Standards. All terms and conditions of this Agreement are subject to Laws, Program Requirements and accreditation standards. Any term, condition or provision now or hereafter required to be included in the Agreement by Laws, Program Requirements or accreditation standards shall be deemed incorporated herein and binding upon and enforceable against the Parties, regardless of whether or not the term, condition or provision is expressly stated in this Agreement. Health Plan may amend this Agreement upon notice to Contracted Provider to comply with Laws, Program Requirements or accreditation standards, and such amendment shall be effective upon receipt.

9.11    Amendment. Except as otherwise set forth in this Agreement, any amendments to this Agreement shall be in writing and signed by both Parties. However, Health Plan may amend this Agreement upon 30 days' prior notice to Contracted Provider, and if Contracted Provider objects to the amendment, Contracted Provider shall notify Health Plan of the objection within the 30 day notice period, and Health Plan may terminate this Agreement for convenience in accordance with this Agreement.

9.12    Assignment. Contracted Provider may not assign, delegate or transfer this Agreement, in whole or in part, without the prior written consent of Health Plan. Health Plan may assign this Agreement, in whole or in part, to any purchaser of the assets or successor to the operations of Health Plan or its Affiliate. As used in this section, the term "assign" or "assignment" includes a change of control of a Party by merger, consolidation, transfer, or the sale of the majority or controlling stock or other ownership interest in such Party.

9.13    Name, Symbol and Service Mark. The Parties shall not use each other's name, symbol, logo, or service mark for any purpose without the prior written approval of the other. However, (a) Providers may include Health Plan's or Benefit Plan names in listings of health plans the providers participate in, and (b) Health Plan may use information about Providers in information or publications identifying Participating Providers or as required by Laws or Program Requirements. Providers shall provide comparable treatment to Health Plan as provided to other managed care organizations with respect to marketing or the display of cards, plaques or other logos provided by Health Plan to identify Participating Providers to Members.

9.14    Other Agreements. If a Provider participates as a Participating Provider under more than one agreement with Health Plan for a particular Program, Health Plan will compensate the Provider for Covered Services it provides to Members of Benefit Plans in that Program under the agreement selected by Health Plan.

9.15    Health Plan Affiliates. If a Provider renders covered services to a member of a benefit plan issued or administered by a Health Plan Affiliate, the Health Plan Affiliate may pay for such covered services, and the Provider shall accept, the applicable out of network rates paid by the Health Plan Affiliate for the member's benefit plan. A list of Health Plan Affiliates is available in the Provider Manual or on Health Plan's provider website. There shall be no joint liability between or among Health Plan and its Affiliates.

9.16    Force Majeure.  The Parties shall have and maintain disaster recovery plans in accordance with high industry standards.  However, if either Party's performance under this Agreement is prevented, hindered or delayed by reason of any cause beyond the Party's reasonable control that cannot be overcome by reasonable diligence, including war, acts of terrorism, civil disorders, labor disputes (other than strikes within such Party's own labor force), governmental acts, epidemics, quarantines, embargoes, fires, earthquakes, storms, or acts of God, such Party shall be excused from performance to the extent that it is prevented, hindered or delayed thereby, during the continuances of such cause; and such Party's obligations hereunder shall be excused so long as and to the extent that such cause prevents or delays performance.  If a Provider is unable to perform under this Agreement due to an event as described in this paragraph, Health Plan may take whatever action is reasonable and necessary under the circumstances to ensure its compliance with Laws and Program Requirements and equitably adjust payments to the Provider until the Provider resumes its performance under this Agreement.

9.17    Severability.  When possible, each provision of this Agreement shall be interpreted in such manner as to be effective, valid and enforceable under Laws.  If any provision of this Agreement is held to be prohibited by, or invalid or unenforceable under Laws, such provision shall be ineffective only to the express extent of such prohibition, unenforceability or invalidity, without invalidating the remainder of this Agreement.

9.18    Waiver.  No waiver shall be effective unless in writing and signed by the waiving Party. A waiver by a Party of a breach or failure to perform this Agreement shall not constitute a waiver of any subsequent breach or failure.

9.19    Entire Agreement.  This Agreement, including the Attachments each of which are made a part of and incorporated into this Agreement, the Provider Manual and any addenda or amendments comprises the complete agreement between the Parties and supersedes all previous agreements and understandings (whether verbal or in writing) related to the subject matter of this Agreement.

9.20    Headings.  The various headings of this Agreement are provided for convenience only and shall not affect the meaning or interpretation of this Agreement or any provision of it.

9.21    Interpretation.  Both Parties have had the opportunity to review this Agreement with legal counsel, and any ambiguity found in this Agreement shall not be construed in a Party's favor on the basis that the other Party drafted the provision containing the ambiguity.

9.22    Survival.  Any provision of this Agreement, including an Attachment, that requires or reasonably contemplates the performance or existence of obligations by a Party after expiration or termination of this Agreement shall survive such expiration or termination regardless of the reason for expiration or termination.

9.23    Rights Cumulative.  Except as set forth herein, all rights and remedies of a Party in this Agreement are cumulative, and in addition to all legal rights and remedies available to such Party.

9.24    Counterparts / Electronic Signature.  This Agreement may be executed in any number of counterparts. The exchange of copies of this Agreement and of signature pages by facsimile transmission or electronic mail shall constitute effective execution and delivery of this Agreement as to the parties and may be used in lieu of the original Agreement for all purposes.

9.25    Warranties and Representations.  Each Party warrants and represents, as of the Effective Date and continuously thereafter throughout the entire term of this Agreement and during the post expiration or termination transition period described herein, as follows:

9.25.1   The Party is a corporation or other legally recognized entity duly incorporated or organized, validly existing and in good standing under the laws of the State in which it is incorporated, organized or operating and it has the authority to transact business in each State in which it operates.

9.25.2   The Party has the corporate or company power and legal authority to, and has taken all necessary corporate or other action on its part to, authorize the execution and delivery of this Agreement and the performance of its obligations hereunder.

9.25.3   This Agreement has been duly executed and delivered by the Party, and constitutes a legal, valid, and binding agreement that is enforceable against such Party in accordance with its terms, except as limited by applicable bankruptcy, reorganization, moratorium and similar Laws affecting the enforcement of creditors' rights.

9.25.4   The execution and delivery of this Agreement and the performance of the Party's obligations hereunder do not (a) conflict with or violate any provision of the Party's organizational documents or Laws, or (b) conflict with, or constitute a default under, any contractual obligation of the Party.

The following Attachments are incorporated into and made a part of this Agreement:

Attachment A - Provider Specific Requirements/Covered Services/Information
Attachment B - Program Attachments
Attachment C – Compensation
Attachment D - WellCare Affiliates

SIGNATURE PAGE FOLLOWS

# SIGNATURE PAGE

**IN WITNESS WHEREOF**, the undersigned, with the intent to be legally bound, have caused this Agreement to be duly executed and effective as of the Effective Date.

WellCare Affiliates

By: _Sue Podbielski_ _____

Print Name: Sue Podbielski

Title: VP, Network Performance

Date: _____5/12/2020_____

Nova Healthcare Solutions, Inc.

By: _Moshe Herschel_ _____

Print Name: **Moshe Heschel**

Title: **CEO** ___

Date: _____5/11/2020_____

Fed Tax ID: 475590208

Health Plan Notice Address:

8735 Henderson Rd.

Tampa, FL 33634

ATTN: Network Development

Fax: _____

Email: _____

Contracted Provider Notice Address:

2914 Ave. L.

Brooklyn, NY 11210

ATTN: Lee Sandel

Fax: **727-255-6238**

Email: Lsandel@novacaresolutions.com

Revision # 12-11

FILED: WESTCHESTER COUNTY CLERK 10/25/2021 11:01 PM
NYSCEF DOC. NO. 250
21-02096-shl    Doc 37-2    Filed 02/11/22    Entered 02/11/22 17:46:27    Exhibit 2
Pg 58 of 144
INDEX NO. 60278/2020
RECEIVED NYSCEF: 10/25/2021

## ATTACHMENT A
### PROVIDER SPECIFIC REQUIREMENTS / COVERED SERVICES / INFORMATION

**(See following attachments)**

**ATTACHMENT A-1**
**PROVIDER SPECIFIC REQUIREMENTS / COVERED SERVICES**
**(SKILLED NURSING FACILITY)**

Subject to and in accordance with the terms and conditions of this Agreement, Contracted Provider shall provide or arrange for the provision of all Covered Services that are skilled nursing facility based health care items or services available from the Providers that are within the scope of their medical or professional licenses or certifications.

FILED: WESTCHESTER COUNTY CLERK 10/25/2021 11:01 PM
INDEX NO. 60278/2020
NYSCEF DOC. NO. 250
RECEIVED NYSCEF: 10/25/2021

**ATTACHMENT A-2**
**INFORMATION FOR CONTRACTED PROVIDER / PRINCIPALS**

1. Contracted Provider is a Corporation

2. The Principals of Contracted Provider are:

| NAME | ADDRESS | PERCENT OWNERSHIP | TITLE | DATE |
|------|---------|-------------------|-------|------|
| Moshe Heschel | 2914 Ave L, Brooklyn NY 11210 | 100% | CEO | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

## ATTACHMENT A-3
## INFORMATION FOR PROVIDERS

Contracted Provider shall provide the following information for (1) Contracted Provider, (2) each other Provider and (3) each of their respective medical facilities:

- Name
- Address
- E-mail address
- Telephone and facsimile numbers
- Professional license numbers
- Medicare/Medicaid ID numbers
- Federal tax ID numbers
- Completed W-9 form
- National Provider Identifier (NPI) numbers
- Provider Taxonomy Codes
- Area of medical specialty
- Age restrictions (if any)
- Area hospitals with admitting privileges (where applicable)
- Whether Providers are employed or subcontracted with Contracted Provider using the designation "E" for employed or "C" for subcontracted.
- For a subcontracted Provider, whether its Providers are employed or contracted with the subcontracted Provider using the designation "E" for employed or "C" for contracted.
- Office contact person
- Office hours
- Billing office
- Billing office address
- Billing office telephone and facsimile numbers
- Billing office email address
- Billing office contact person
- Ownership Disclosure Form, as required to comply with Laws, Program Requirements, and Government Contract

**ATTACHMENT A-4**
**FORM OF OPT IN AGREEMENT**
**(SUBCONTRACTED PROVIDER)**

**THIS OPT IN AGREEMENT** ("**Opt In Agreement**") is made by and between Health Plan and the subcontracted Provider identified below ("Subcontractor").

**WHEREAS**, Health Plan and Nova Healthcare Solutions, Inc. ("**Contracted Provider**") are Parties to the Participating Provider Agreement (as now or hereafter amended, the "**PPA**"); and

**WHEREAS**, Subcontractor is a subcontracted Provider under the PPA and will receive substantial benefits from the PPA;

**NOW, THEREFORE**, in consideration of those benefits and Health Plan entering into the PPA and this Opt In Agreement, Subcontractor agrees to the following:

1.    Subcontractor has reviewed the PPA. The PPA is made a part of and incorporated into this Opt In Agreement. Capitalized terms not defined in this Opt In Agreement have the same definition as given in the PPA.

2.    Subcontractor agrees to the terms and conditions of the PPA. Wherever in the PPA an action is required to be taken by Contracted Provider or a Provider, Subcontractor agrees to perform such action. Wherever in the PPA any representation or warranty is made by Contracted Provider or a Provider, Subcontractor agrees to comply with such representation or warranty.

3.    Any obligation of Subcontractor in this Opt In Agreement or the PPA shall apply to Subcontractor's Providers to the same extent that it applies to Subcontractor. Subcontractor shall maintain and enforce internal policies and procedures or written agreements with its employed Providers that are consistent with and require adherence to the terms and conditions of this Opt In Agreement and the PPA. Subcontractor has the authority to bind its subcontracted Providers to this Opt In Agreement and PPA, and shall require the timely and faithful performance of this Opt In Agreement and the PPA by its subcontracted Providers.

4.    Subcontractor hereby grants to Contracted Provider a power of attorney, coupled with an interest, to represent and bind Subcontractor in connection with all matters related to the PPA and this Opt In Agreement including granting any waivers of any of the terms of the PPA and this Opt In Agreement, and entering into any amendments or modifications of the PPA or this Opt In Agreement.

5.    Subcontractor shall not assign any of its rights or delegate any of its duties or obligations under this Opt In Agreement or the PPA, in whole or in part, without the prior written consent of Health Plan.

6.    If the PPA is terminated for any reason or Contracted Provider goes out of business, ceases operations or becomes insolvent, then (a) for at least six months Subcontractor shall continue to provide Covered Services to Members, subject to and in accordance with the terms and conditions of the PPA and this Opt In Agreement, (b) Health Plan shall pay Subcontractor for such Covered Services at the lesser of the Subcontracted Provider's usual and customary billed charges or i) the fee for service rates set forth in the PPA for the applicable Benefit Plans, or ii) if the PPA does not include fee for service rates, 100 percent of Health Plan's then current fee for service rate schedule for the applicable Benefit Plans, (c) Health Plan may terminate Subcontractor's participation in one or more Programs or Benefit Plans upon notice to Subcontractor, and (d) after six months,

Subcontractor may terminate its continuing participation under the PPA and this Opt-In Agreement upon 90 days prior notice to Health Plan.

7.    In no event including nonpayment by Health Plan, Health Plan's insolvency or breach of the PPA or this Opt In Agreement, shall Subcontracted Provider bill, charge, collect a deposit from, seek compensation, remuneration or reimbursement from, or have any recourse against any Member or persons other than Health Plan acting on any Member's behalf, for amounts that are the legal obligation of Health Plan. This provision (a) shall be construed for the benefit of Members, (b) does not prohibit collection of Member Expenses where lawfully permitted or required, and (c) supersedes any oral or written agreement to the contrary now existing or hereafter entered into between Subcontracted Provider and Members or persons acting on their behalf.

8.    This Opt In Agreement shall be governed by and construed and enforced in accordance with the laws of the State of Florida, except where Federal law applies, without regard to principles of conflict of laws.

9.    Any dispute with respect to this Opt In Agreement or the PPA or Subcontractor's performance under this Opt In Agreement or PPA shall be subject to and resolved in accordance with the dispute resolution procedures in the PPA.

10.    Subcontracted Provider warrants and represents that the Providers listed on the attached schedule are included in and subject to this Opt In Agreement.

WellCare Affiliates                    **Subcontractor Name:**


By: _____          By: _____

Print Name: _____        Print Name: _____

Title: _____          Title: _____

Date: _____          Date: _____

                                      Fed. Tax ID: _____

## OPT IN AGREEMENT
## SCHEDULE OF PROVIDERS

The following Providers are included in and subject to the attached Opt In Agreement and the PPA (attach additional sheets as necessary):

Name:                                                                                     Date:

Please see attached roster.

FILED: WESTCHESTER COUNTY CLERK 10/25/2021 11:01 PM INDEX NO. 60278/2020
NYSCEF DOC. NO. 250                                                           RECEIVED NYSCEF: 10/25/2021

21-07096-shl    Doc 37-2    Filed 02/11/22    Entered 02/11/22 17:46:27    Exhibit 2
Pg 65 of 144

**ATTACHMENT B**
**PROGRAM ATTACHMENTS**


**(See following attachments)**

**ATTACHMENT B-1**
**MEDICARE ADVANTAGE PROGRAM ATTACHMENT**

1. Network Participation. Subject to and in accordance with the terms of the Agreement, including this Attachment, Providers shall provide Covered Services to Members covered by MA Benefit Plans and to Members who are enrolled with Health Plan pursuant to a joint federal and state demonstration model that will integrate care for dually eligible individuals, including without limitation the Capitated Financial Alignment Demonstration Model for Medicare-Medicaid.

2. Compensation for Covered Services provided to Members of MA Benefit Plans is set forth in Attachment C.

3. Additional Definitions.

    a. "**CMS Contract**" means a contract between CMS and Health Plan for Health Plan to provide or arrange for the provision of health care items and services to enrollees in the Medicare Advantage program, as amended from time to time. A CMS Contract is a Government Contract as defined in the Agreement.

    b. "**CMS Contract Period**" means January 1 through December 31 of each year during the term of the CMS Contract.

    c. "**Deemed Eligible Member**" means a Dual Eligible Member enrolled in a DSNP who has lost the special needs status that qualified the member to be eligible to have Member Expenses paid by the State or Health Plan, as applicable, but who may regain such eligibility during the Deeming Period.

    d. "**Deeming Period**" means the time period that Health Plan remains obligated under MA Program Requirements to provide all plan benefits to Deemed Eligible Members and ensure that such members are not liable for more than those plan premiums and Member Expenses that are payable by Dual Eligible Members who have not lost their special needs status.

    e. "**DSNP**" means an MA dual special needs plan for Dual Eligible Members.

    f. "**Dual Eligible Member**" means a Member who is also enrolled in Medicaid.

    g. "**Emergency Medical Condition**" means a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that a prudent layperson, with an average knowledge of health and medicine, could reasonably expect the absence of immediate medical attention to result in (i) serious jeopardy to the health of the individual or, in the case of a pregnant woman, the health of the woman or her unborn child, (ii) serious impairment to bodily functions or (iii) serious dysfunction of any bodily organ or part.

    h. "**Emergency Services**" means covered inpatient and outpatient services that are (i) provided by a Provider qualified to furnish emergency services, and (ii) needed to evaluate or stabilize an Emergency Medical Condition.

    i. "**MA Benefit Plan**" means a Benefit Plan under a CMS Contract.

    j. "**Medically Necessary**" or "**Medical Necessity**" means, with respect to health care items or services, items and services that are (i) necessary to protect life, prevent significant illness or significant disability or to alleviate severe pain, (ii) individualized, specific and consistent with

FILED: WESTCHESTER COUNTY CLERK 10/25/2021 11:01 PM
INDEX NO. 60278/2020
NYSCEF DOC. NO. 250
21-02096-shl Doc 37-2 Filed 02/11/22 Entered 02/11/22 17:46:27 Exhibit 2
RECEIVED NYSCEF: 10/25/2021
Pg 67 of 144

symptoms or confirm diagnosis of the illness or injury under treatment and not in excess of the Member's needs, (iii) consistent with generally accepted professional medical standards and not experimental or investigational, (iv) reflective of the level of service that can be provided safely and for which no equally effective and more conservative or less costly treatment is available statewide, (v) provided in a manner not primarily intended for the convenience of the Member, the Member's caretaker or the health care provider, and (vi) not custodial care as defined by CMS. For health care items and services provided in a hospital on an inpatient basis, **"Medically Necessary"** or **"Medical Necessity"** also means that such items and services cannot, consistent with the provisions of appropriate medical care, be effectively provided more economically on an outpatient basis or in an inpatient facility of a different type. The fact that a health care provider has prescribed, recommended or approved health care items or services does not, in itself, make such items or services Medically Necessary or a Medical Necessity.

k. **"Medicare Advantage"** or **"MA"** means Medicare Advantage, a program under the Social Security Act. The Medicare Advantage program is a Program as defined in the Agreement.

l. **"Member"** means an individual enrolled in an MA Benefit Plan.

m. **"Post-Stabilization Care Services"** means Covered Services, related to an Emergency Medical Condition, that are provided after a Member is stabilized in order to maintain the stabilized condition, or, under the circumstances described in 42 CFR § 422.113(c)(2)(iii), to improve or resolve the Member's condition.

4. The following materials include Laws and Program Requirements affecting the Medicare Advantage program, including requirements that Health Plan is required to impose on its providers and their subcontractors:

a. CMS Contract.
b. Social Security Act.
c. 42 CFR Part 422 regarding Medicare Advantage plans.
d. 42 CFR Part 423 regarding MA-PD Plans.
e. CMS Managed Care Manual ("**Manual**"), including (i) Chapter 3 including in section 70 marketing requirements affecting providers, and (ii) Chapter 11 including in sections 100 and 110 requirements for an MA plan's downstream contracts with providers and subcontractors.
f. OIG Special Advisory Bulletin regarding the Effect of Exclusion from Participation in Federal Health Care Programs.
g. OIG Special Advisory Bulletin regarding Offering Gifts and Other Inducements to Beneficiaries.

5. All provisions of the Agreement and this Attachment are cumulative. All provisions shall be given effect when possible. If there is inconsistent or contrary language between this Attachment and any other part of the Agreement, the provisions of this Attachment shall prevail with respect to the Program described in this Attachment except to the extent a provision of the Agreement exceeds the minimum requirements of the Attachment. Any obligation of Contracted Provider in this Attachment shall apply to Providers to the same extent that it applies to Contracted Provider.

6. Oversight / Accountability.

a. Health Plan shall be entitled to oversee the activities of Contracted Provider and its Providers and subcontractors under this Agreement and shall be accountable under the CMS Contract for such activities regardless of the provisions of this Agreement. [42 CFR § 422.504(i)(1)]
b. Contracted Provider shall, and shall require Providers to, comply with all applicable Medicare laws,

FILED: WESTCHESTER COUNTY CLERK 10/25/2021 11:01 PM
INDEX NO. 60278/2020
NYSCEF DOC. NO. 250
21-02096-shl   Doc 37-2   Filed 02/11/22   Entered 02/11/22 17:46:27   Exhibit 2
RECEIVED NYSCEF: 10/25/2021
Pg 68 of 144

rules, regulations and CMS instructions. [42 CFR § 422.504(i)(4)(v); Manual Ch. 11 § 100.4]

c.  Cumulative to other record retention requirements herein, Contracted Provider shall, and shall require Providers to, allow audits by CMS and/or its designees and cooperate, assist and provide information as requested, and maintain records a minimum of 10 years. [Manual Ch. 11 § 100.4]

d.  Cumulative to other oversight and monitoring requirements herein, Health Plan shall oversee and is accountable to CMS for any functions and responsibilities described in MA regulations. [Manual Ch. 11 § 100.4]

e.  Health Plan may revoke delegated activities or reporting requirements, if any, from a Provider in instances where CMS or Health Plan determines the Provider has not performed satisfactorily. [42 CFR §§ 422.504(i)(3)(ii) and 422.504(i)(4)(ii)]

f.  Contracted Provider shall, and shall require Providers to, comply with Health Plan's policies and procedures. [Manual Ch. 11 § 100.4]

g.  When assisting Members with enrollment decisions, Providers must remain neutral and provide an objective assessment of available options that are in the Member's best interest and meet their needs. [42 CFR §422.2268(e) and (j); CMS Medicare Marketing Guidelines]

7.  Record Retention / Access / Audits.

a.  Contracted Provider agrees, and shall require its Providers and subcontractors to agree and adhere, to the following:

i.  Health Plan, DHHS, the Comptroller General, or their designees have the right to audit, evaluate, collect, and inspect any pertinent information for any particular CMS Contract Period, including, but not limited to, any books, contracts, computer or other electronic systems, including medical records and documentation of Contracted Provider, its Providers or their subcontractors related to the CMS Contract through 10 years from the final date of the CMS Contract Period or from the date of completion of any audit, whichever is later. [42 C.F.R. §§ 422.504(i)(2)(i) and (iv)]

ii.  Health Plan, DHHS, the Comptroller General, or their designees have the right to audit, evaluate, collect, and inspect any records under this section directly from Contracted Provider, its Providers or subcontractors. For records subject to review under this section, except in exceptional circumstances, CMS will provide notification to the Health Plan that a direct request for information has been initiated. [42 C.F.R. §§ 422.504(i)(2)(ii) and (iii)]

b.  Cumulative to the requirements of the foregoing paragraphs, Contracted Provider agrees, and shall require its Providers and subcontractors to agree and adhere, to the following: (i) Health Plan, DHHS, the Comptroller General, or their designee may evaluate, through inspection or other means (A) the quality, appropriateness, and timeliness of services provided to Medicare enrollees under the CMS Contract; and (B) the facilities of Contracted Provider or its subcontractors; (ii) Health Plan, DHHS, the Comptroller General, or their designees may audit, evaluate, or inspect any books, contracts, medical records, documents, papers, patient care documentation, and other records of Contracted Provider or its subcontractors or transferees of Contracted Provider or its subcontractors that pertain to any aspect of services performed, reconciliation of benefit liabilities, and determination of amounts payable under the CMS Contract, as the Secretary of DHHS may deem necessary to enforce the CMS Contract, or as Health Plan may deem necessary to enforce the

Agreement, including this Attachment; (iii) Contracted Provider and its subcontractors shall make available for the purposes specified in 42 CFR § 422.504(d), their premises, physical facilities and equipment, records relating to Members, and any additional relevant information that CMS or Health Plan may require; (iv) Health Plan's, DHHS', the Comptroller General's, or their designees' right to inspect, evaluate, and audit extends through 10 years from the final date of the CMS Contract Period or completion of audit, whichever is later unless (A) CMS determines there is a special need to retain a particular record or group of records for a longer period and notifies Health Plan at least 30 days before the normal disposition date (in which case Health Plan shall promptly provide notice to Contracted Provider); (B) there has been a termination, dispute, or fraud or similar fault by Health Plan under the CMS Contract, in which case the retention period may be extended to six years from the date of any resulting final resolution of the termination, dispute, or fraud or similar fault; or (C) Health Plan, DHHS, the Comptroller General, or their designee determines that there is a reasonable possibility of fraud or similar fault, in which case they may inspect, evaluate, and audit Contracted Provider or its subcontractors at any time. [42 CFR § 422.504(e)]

8. Privacy and Accuracy of Member Records. Contracted Provider shall, and shall require its Providers and subcontractors to, (a) abide by all Federal and State Laws regarding confidentiality and disclosure of medical records or other health and enrollment information, (b) safeguard the privacy of any information that identifies a particular Member and have procedures that specify (i) for what purposes the information will be used within the organization, and (ii) to whom and for what purposes it will disclose the information outside the organization; (c) ensure that medical information is released only in accordance with applicable Federal or State Laws, or pursuant to court orders or subpoenas, (d) maintain the records and information in an accurate and timely manner, and (e) ensure timely access by Members to the records and information that pertain to them. [42 CFR §§ 422.118; Manual Ch. 11 § 100.4]

9. Emergency Services. Providers shall not be required to seek prior authorization for Emergency Services before the Member has been stabilized. Once a Member who receives Emergency Services is stabilized, Providers shall seek prior authorization for Post-Stabilization Care Services for the Member in accordance with the Provider Manual. [42 CFR § 422.113]

10. Member Financial Protections.

   a. Contracted Provider shall not, and shall require the other Providers not to, hold any Member liable for payment of any fees that are the legal obligation of Health Plan, including, without limitation, in a circumstance of Health Plan's insolvency or other financial difficulties. [42 CFR §§ 422.504(i)(3)(i) and 422.504(g)(1)(i); Manual Ch. 11 § 100.3]

   b. Contracted Provider shall, and shall require the other Providers to, hold Members harmless for payment of fees that are the legal obligation of Health Plan to fulfill. The foregoing sentence shall apply, but will not be limited to insolvency of Health Plan, contract breach, and provider billing. [Manual Ch. 11 § 100.4]

   c. Hold Harmless of Dual Eligible Members. With respect to Dual Eligible Members for whom the State Medicaid agency is otherwise required by Laws, or voluntarily has assumed responsibility in the State Medicaid Plan to cover those Medicare Part A and B Member Expenses identified and at the amounts provided for in the State Medicaid Plan, Contracted Provider shall not, and shall require the other Providers not to, bill ("**balance-bill**") Members the balance of, and that such Members are not liable for, such Medicare Part A and B Member Expenses, regardless of whether the amount a Provider receives is less than the allowed Medicare amount or Provider charges are reduced due to limitations on additional reimbursement provided in the State Medicaid Plan.

Contracted Provider shall, and shall require the other Providers to, accept Health Plan's payment as payment in full or will bill the appropriate State source if Health Plan has not assumed the State's financial responsibility under an agreement between Health Plan and the State. To clarify, for Dual Eligible Members who participate in Health Plan's dually integrated Medicare-Medicaid Program, Medicare Parts A and B Covered Services shall be provided to such Members at zero cost-sharing. [42 CFR § 422.504(g)(1)(iii) and March 29, 2012 CMS Issued Guidance]

    d.  <u>Hold Harmless of Deemed Eligible Members</u>. During the Deeming Period for a Deemed Eligible Member, Contracted Provider shall not, and shall require the other Providers to, bill or collect Medicare Part A or B Member Expenses from the Deemed Eligible Member and shall bill Health Plan for such expenses. Providers shall hold Deemed Eligible Members harmless from and ensure such members are not liable for Medicare Part A or B Member Expenses during the Deeming Period. [CMS 2009 Call Letter, page 35]

11.  <u>Compliance with CMS Contract</u>. Contracted Provider agrees, and shall require its Providers and subcontractors to agree and adhere, to the following: Any services or other activity performed under this Agreement with respect to the MA program shall be consistent and comply with Health Plan's contractual obligations under CMS Contracts. [42 CFR § 422.504(i)(3)(iii)]

12.  <u>Prompt Payment</u>. Health Plan agrees to pay Clean Claims for Covered Services to Members submitted by Contracted Provider or a subcontracted Provider promptly within the time period for payment of Clean Claims set forth in <u>Attachment C</u>. [42 CFR 422.520(b); Manual Ch. 11 § 100.4]

13.  <u>Continuation of Services</u>. Contracted Provider shall, and shall require the other Providers to, upon expiration or termination of this Agreement for any reason (except for immediate termination), continue to provide Covered Services (a) for all Members, for the duration of the CMS Contract Period for which CMS payments have been made, and (b) for Members who are hospitalized on the date the CMS Contract terminates or, in the event of an insolvency, through discharge. [42 CFR § 422.504(g)(2); Manual Ch. 11 § 100.3]

14.  <u>Hours of Operation</u>. Contracted Provider shall, and shall require the other Providers to, ensure that (a) the hours of operation of the Providers are convenient to the Member population served under Benefit Plans subject to CMS Contracts and do not discriminate against Medicare enrollees, and (b) Covered Services are available 24 hours a day, 7 days a week, when medically necessary. [42 CFR § 422.112(a)(7)]

15.  <u>Cultural Considerations</u>. Contracted Provider shall, and shall require the other Providers to, ensure that services are provided in a culturally competent manner to all Members, including those with limited English proficiency or reading skills, and diverse cultural and ethnic backgrounds. [42 CFR § 422.112(a)(8)]

16.  <u>Compliance Program</u>.

    a.  Contracted Provider shall, and shall require its subcontractors to, comply with Health Plan's compliance program elements regarding effective training and education between Health Plan's compliance officer and Contracted Provider or its subcontractors. Such training and education shall occur at a minimum annually and must be made a part of the orientation for Contracted Provider, its subcontractors and their respective employees. Providers who have met the fraud, waste, and abuse certification requirements through enrollment into the Medicare program are deemed to have met the training and educational requirements for fraud, waste, and abuse (but not necessarily other elements of Health Plan's compliance program). [42 CFR §§ 422.503(b)(4)(vi)(C)]

b.  Contracted Provider shall, and shall require its subcontractors to, comply with Health Plan's compliance program elements regarding effective lines of communication, ensuring confidentiality, between Health Plan's compliance officer and Contracted Provider or its subcontractors. Such lines of communication must be accessible to all and allow compliance issues to be reported including a method for anonymous and confidential good faith reporting of potential compliance issues as they are identified. Reports may be made anonymously through the WellCare fraud hotline at (866) 678-8355. [42 CFR § 422.503(b)(4)(vi)(D)]

17. Selection of Providers, Contractors or Subcontractors. If Health Plan delegates selection of providers, contractors, or subcontractors to Contracted Provider or its subcontractor, Health Plan retains the right to approve, suspend, or terminate any such arrangement. [42 CFR § 422.504(i)(5)]

18. Federal Funding. If a Governmental Authority imposes a reduction to the Federal funds Health Plan receives under the CMS Contract, Health Plan may adjust its payments to Provider by an equivalent or comparable amount. Such adjustment shall be effective concurrent with the effective dates such reductions are imposed upon Health Plan.

19. Delegation Requirements. Contracted Provider shall not, and shall require its subcontractors not to, delegate any services or activities under this Agreement to any other individual or entity except upon Health Plan's prior written consent, and such delegation agreements, if made, shall be in writing and conform to MA Program Requirements, including the following:

a.  Written arrangements shall specify delegated activities and reporting responsibilities. [42 CFR § 422.504(i)(4)(i)]

b.  Written arrangements shall either provide for revocation of the delegated activities and reporting requirements or specify other remedies in instances where CMS or Health Plan determine that such parties have not performed satisfactorily. [42 CFR § 422.504(i)(4)(ii)]

c.  Written arrangements must specify that the performance of the parties is monitored by Health Plan on an ongoing basis. [42 CFR § 422.504(i)(4)(iii)]

d.  Written arrangements must specify that (i) the credentials of medical professionals affiliated with the party or parties will be either reviewed by Health Plan, or (ii) the credentialing process shall be reviewed and approved by Health Plan and Health Plan must audit the credentialing process on an ongoing basis. [42 CFR § 422.504(i)(4)(iv)]

e.  All contracts or written arrangements must specify that the contractor or subcontractor must comply with all applicable Medicare laws, rules, regulations and CMS instructions. [42 CFR § 422.504(i)(4)(v)]

20. FQHCs. A subcontract between Contracted Provider and a Provider that is an FQHC shall provide for a level and amount of payment to the FQHC for Covered Services provided by such FQHC that is not less than the level and amount of payment that Health Plan would make for such services if the services had been furnished by an entity providing similar services that was not an FQHC. [Social Security Act § 1857(e)(3)]

**ATTACHMENT C**
**COMPENSATION**

**(See following attachments)**

**ATTACHMENT C-1**
**MEDICARE ADVANTAGE COMPENSATION**
**(SKILLED NURSING FACILITY)**
**(FEE FOR SERVICE)**

1. The compensation rates set forth in this Attachment apply for Benefit Plans under CMS Contracts. Compensation shall be subject to and in accordance with the terms and conditions of the Agreement, including this Attachment.

2. Compensation. Fee for service compensation for skilled nursing facility (SNF) Compensation for Covered Services provided to Members shall be the lesser of the Provider's usual and customary billed charges or the following, less Member Expenses:

   a. Inpatient Subacute Care Covered Services:

| Health Plan's Medicare SNF Per Diem Rate Table | | | | |
|---|---|---|---|---|
| Level of Care* | Level 1 | Level 2 | Level 3 | Level 4 | Level 5 for Medically Complex/Other |
| Per Diem Amount | $300 | $355 | $395 | $475 | $600 |
| Revenue Code | 191 | 192 | 193 | 194 | 199 |
| *The Level of Care is based on nationally accepted clinical care guidelines and Health Plan's clinical coverage guidelines, which are available on Health Plan's website. | | | | | |
| The Per Diem Amount set forth above is reimbursement in full for all Covered Services rendered by Providers, including rehabilitation, pharmacy, laboratory, diagnostics, and durable medical equipment. | | | | | |

   b. Outpatient Physical, Occupation and Speech Therapy Covered Services:

   $60 per visit

3. Health Plan shall process claims and pay or deny a Clean Claim within 45 days of its receipt of the Clean Claim. The date of receipt of a Clean Claim shall be the date Health Plan receives the Clean Claim electronically, or for paper claims as indicated by Health Plan's date stamp on the Clean Claim. The date of payment shall be the date of the electronic funds transfer, check or other form of payment.

4. Health Plan may, without notice to Contracted Provider or amendment to this Agreement, update code numbers or delete retired codes in the rate tables set forth in this Attachment as such are revised or implemented by Governmental Authorities or coding authorities from time to time. Health Plan may modify its rate tables for new codes, services, or otherwise upon providing 30 days prior written notice to Contracted Provider.

**ATTACHMENT C-2**
**MEDICARE ADVANTAGE COMPENSATION**
**(SKILLED NURSING FACILITY)**
**(FEE FOR SERVICE)**

**NEW YORK FACILITIES w/VENT UNITS**

**Identified in Attachment E**

1. The compensation rates set forth in this Attachment apply for Benefit Plans under CMS Contracts. Compensation shall be subject to and in accordance with the terms and conditions of the Agreement, including this Attachment.

2. Compensation. Fee for service compensation for skilled nursing facility (SNF) Compensation for Covered Services provided to Members shall be the lesser of the Provider's usual and customary billed charges or the following, less Member Expenses:

   a. Inpatient Subacute Care Covered Services:

| Health Plan's Medicare SNF Per Diem Rate Table | | | | | |
|---|---|---|---|---|---|
| Level of Care* | Level 1 | Level 2 | Level 3 | Level 4 | Level 5 for Medically Complex/Other |
| Per Diem Amount | $300 | $355 | $395 | $475 | $700 |
| Revenue Code | 191 | 192 | 193 | 194 | 199 |
| *The Level of Care is based on nationally accepted clinical care guidelines and Health Plan's clinical coverage guidelines, which are available on Health Plan's website. | | | | | |
| The Per Diem Amount set forth above is reimbursement in full for all Covered Services rendered by Providers, including rehabilitation, pharmacy, laboratory, diagnostics, and durable medical equipment. | | | | | |

   b. Outpatient Physical, Occupation and Speech Therapy Covered Services:

   $60 per visit

3. Health Plan shall process claims and pay or deny a Clean Claim within 45 days of its receipt of the Clean Claim. The date of receipt of a Clean Claim shall be the date Health Plan receives the Clean Claim electronically, or for paper claims as indicated by Health Plan's date stamp on the Clean Claim. The date of payment shall be the date of the electronic funds transfer, check or other form of payment.

4. Health Plan may, without notice to Contracted Provider or amendment to this Agreement, update code numbers or delete retired codes in the rate tables set forth in this Attachment as such are revised or implemented by Governmental Authorities or coding authorities from time to time. Health Plan may modify its rate tables for new codes, services, or otherwise upon providing 30 days prior written notice to Contracted Provider.

FILED: WESTCHESTER COUNTY CLERK 10/25/2021 11:01 PM
INDEX NO. 60278/2020
NYSCEF DOC. NO. 250
21-02096-shl    Doc 37-2    Filed 02/11/22    Entered 02/11/22 17:46:27    Exhibit 2
Pg 74 of 144
RECEIVED NYSCEF: 10/25/2021

**ATTACHMENT D**
**WELLCARE AFFILIATES**

1. WellCare Affiliates offering or administering (or applying to offer or administer) Medicare Advantage Benefit Plans pursuant to a CMS Contract and that are a party to this Agreement, include:

| WellCare Affiliates | Medicare Advantage Benefit Plans by State |
|---|---|
| WellCare of Georgia, Inc. | Georgia |
| WellCare Health Insurance Company of New Hampshire, Inc. WellCare of New Hampshire, Inc. | New Hampshire |
| American Progressive Life and Health Insurance Company of New York | New York |
| WellCare Health Insurance of New York, Inc. WellCare of New York, Inc. | New York |
| WellCare Health Insurance of Tennessee, Inc. | Tennessee |

2. Affiliates of WellCare Health Plans, Inc., that obtain a license and authority to issue Medicare Advantage Benefit Plans in a State pursuant to a CMS Contract shall become a party to this Agreement as a WellCare Affiliate upon WellCare Health Plans, Inc.'s written notice to Provider, which notice shall set forth the applicable state Medicare Benefit Plans to be included under the Agreement for that particular Affiliate.

3. WellCare Affiliates offering or administering (or pursuing a license to offer or administer) State Benefit Plans pursuant to a Government Contract with a State Governmental Authority for the Programs identified in Attachment B and that are a party to this Agreement, include:

| WellCare Affiliates | State Benefit Plans |
|---|---|
| | |

FILED: WESTCHESTER COUNTY CLERK 10/25/2021 11:01 PM
NYSCEF DOC. NO. 250

INDEX NO. 60278/2020

RECEIVED NYSCEF: 10/25/2021

21-02096-shl    Doc 37-2    Filed 02/11/22    Entered 02/11/22 17:46:27    Exhibit 2
Pg 75 of 144

Wellcare National Agreement Roster with Nova Healthcare Solutions, Inc.

**Participating Center(s) & Demographics**

**NOTE:** Center(s) are effective as of their credentialing effective date, not contract effective date.

1. HBL SNF, LLC
dba Epic Rehabilitation & Nursing at White Plains
PROVIDER ID:  2250069
Credentialing Eff. Date: 7/21/2020



## **Contract Summary Sheet**

**Approvals**

Director of Network Contracting ____Elizabeth Alvarez_____

*[signature]*

**Network Development**

■ Emma Ortiz

Date: 6/30/2020

**I. Provider type:**   ☐ PCP   ☐ Specialist   ☐ Group   ☐ Hospital   ☑ SNF   ☐ LHCSA   ☐ CDPAP

☐ Other: _____

**II. Demographic Info:**

Provider Name/DBA *if applicable:   HBL SNF LLC

Service Area: Westchester

NPI: 1528622495    TAX ID: 475606045

Delegated Entity *(Leave blank if not applicable)*

**III. CHOICE Provider ID:** SNFA57352

**IV. Contract Terms**

Type:   ☑ New Contract   ☐ Amendment   ☐ Vendor

Products:   ☐ Medicare Advantage   ☐ MLTC   ☐ FIDA   ☑ Select Health
*select all that apply*

Contract Effective Date: 8/15/2020

    **A.**   ☑ 100 of Current Medicaid   ☐ ____ of Current Medicare   ☐ Review Contract for rates

    **B.**   ☐ Non Standard Fee Schedule

Claims Type:   ☐ CMS 1500   ☑ UBO4   ☐ Invoice Cost   ☐ Both

Timely Filing: 120 Days

**V. Attachments**   ☐ Delegated Credentialing Agreement

    ☐ Delegated Roster

**VI. Additional Notes (attach additional documentation if necessary)**

SNF closes gap for hospice for SH

DBA EPIC REHABILITATION AND NURSING AT WHITE PLAINS

## VNS MEDICARE ADVANTAGE PROGRAM

## SKILLED NURSING FACILITY SERVICES AGREEMENT

This Skilled Nursing Facility Services Agreement, herein called the "Agreement," is made and entered into by and between VNS CHOICE, herein referred to as "VNS", and **HBL SNF LLC DBA EPIC REHABILITATION AND NURSING AT WHITE PLAINS** a skilled nursing facility, located at  120 Church Street, White Plains NY 10601  herein referred to as "SNF".

## PREAMBLE

**WHEREAS,** VNS has contracted with the Centers for Medicare & Medicaid Services (CMS) to participate in the Medicare Advantage program under Part C and Part D of the Medicare program and the New York State Department of Health for the VNS Medicaid Advantage Plus Plan and the VNS Medicare / Medicaid Advantage Plan;

**WHEREAS**, in accordance with such participation in the Medicare Advantage program, VNS shall arrange for the provision of SNF Services to Enrollees;

**WHEREAS**, SNF is a skilled nursing facility, duly organized and operated in accordance with Article 28 of the New York Public Health Law and applicable regulations, and in compliance with CMS conditions of participation for a provider of SNF Services;

**WHEREAS,** VNS desires to enter into this Agreement with SNF to further its objective of providing for SNF Services to Enrollees; and

**WHEREAS,** SNF is duly authorized and licensed to furnish skilled nursing facility services to Medicare beneficiaries and would like to enter into this Agreement to provide certain SNF Services that are Covered Services set forth herein under VNS's Medicare Programs.

**NOW, THEREFORE**, the parties agree as follows:

## Article I
Definitions

The following terms when used in this Agreement or any amendments herein, are defined as follows:

**"Clean Claim"** means a claim that includes the specific elements required by Medicare and which has no defect, impropriety, lack of any required substantiating documentation or particular circumstance requiring special treatment that prevents timely payment.  The specific data elements required for a claim to be deemed a Clean Claim are included in the Provider Manual and may be modified from time to time by VNS, with notice to SNF.

**"CMS"** means the Centers for Medicare & Medicaid Services.

**"Covered Services"** means those medical, hospital and other health care benefits to which Enrollees are entitled under the terms of the Enrollee's VNS Medicare Program and the applicable Evidence of Coverage.

**"Emergency Service"** means services for a medical or behavioral condition, the onset of which is sudden, that manifests itself by symptoms of sufficient severity, including severe pain, that a prudent layperson, possessing an average knowledge of medicine and health, could reasonably expect the absence of immediate medical attention to result in (i) placing the health of the person afflicted with such condition in serious jeopardy, or in the case of a behavioral condition, placing the health of such person or others in serious jeopardy; (ii) serious impairment to such person's bodily function; (iii) serious dysfunction of any bodily organ or part of such person; or (iv) serious disfigurement of such person.

**"Enrollee"** means an individual eligible for and properly enrolled in a VNS Medicare Program.

**"Evidence of Coverage"** means the written documentation, approved by CMS and provided to the Enrollee, that specifies the Covered Services to which the Enrollee is entitled and the Enrollee's cost sharing obligations under the applicable VNS Medicare Advantage Program.

**"HIPAA"** means the Health Insurance Portability and Accountability Act of 1996, Pulic Law 104-91, the Health Information Technology for Economic and Clinical Health Act, Public Law 111-5, and the regulations promulgated thereunder, as in effect or as may be amended from time to time.

**"Medical Necessity"** or **"Medically Necessary"** means Covered Services that are (i) necessary and appropriate for the symptoms, diagnosis or treatment of a medical condition, illness, disease or injury, (ii) within accepted standards of professional medical practice, (iii) not primarily for the convenience of the Enrollee, the Enrollee's physician, or another provider of health services. In the case of inpatient hospital services, Medical Necessity shall also mean that safe and adequate care could not be provided to the Enrollee on an outpatient basis or in nursing home or other medical facility.

**"Non-Participating Provider"** means a provider who or which is not a Participating Provider.

**"Participating Ancillary Provider"** means a company, corporation or entity licensed or certified in New York State as an ancillary health service provider (e.g., home health, infusion, medical supplies, etc.) and which has contracted with VNS to provide Covered Services to Enrollees.

**"Participating Primary Care Provider"** means a physician who is a general practitioner, board-certified or eligible family practitioner, internist, pediatrician, a nurse practitioner licensed in adult health, family health or gerontology, or other designated physician who has contracted with VNS to provide Covered Services to Enrollees and to refer, authorize, supervise and coordinate the provision of Covered Services to Enrollees.

**"Participating Provider"** means all providers, including Participating Hospitals, Participating Skilled Nursing Facilities, Participating Primary Care Providers, Participating Specialists,

Participating Ancillary Providers and other health professionals, who or which has contracted with VNS to provide Covered Services to Enrollees.

**"Participating Skilled Nursing Facility"** means an inpatient care skilled nursing facility which (a) is certified or licensed as such by the proper governmental authority (b) meets the requirements of the Federal Medicare program and (c) is approved by and has contacted with VNS to provide Covered Services to Enrollees.

**"Participating Specialist"** means a physician or other health professional who has contracted with VNS to provide Covered Services to Enrollees.

**"Policy and Procedure Manual"** or **"Provider Manual"** means the policies and procedures promulgated by VNS and furnished to SNF which relate to this Agreement (a copy of which shall be provided to SNF by VNS and which is incorporated as part of this Agreement), including but not limited to (a) quality improvement/management; (b) Utilization Management Program; (c) preadmission testing guidelines; (d) claims payment review; (e) Enrollee grievances and appeals; (f) provider grievances; (g) physician credentialing; and (h) electronic submission of claims and other data required by VNS.

**"Quality Improvement Program"** means activities and programs for the evaluation of the delivery of health care and services provided to Enrollees, including development of quality improvement initiatives, quality measurement and evaluation, corrective action implementation and evaluation, and annual evaluation of the program effectiveness.

**"SDOH"** means the New York State Department of Health.

**"SNF Services"** means those inpatient services such as room and board, general nursing care, medical and other health services of SNF that are eligible for Medicare coverage as skilled nursing services, and as set forth in Attachment D attached to this Agreement, as modified from time to time by VNS.

**"Utilization Management Program"** means those standards, criteria, protocols, policies and procedures adopted by VNS regarding the management, review monitoring and approval of Medically Necessary Covered Services, including but not limited to authorization of elective admissions and procedures, concurrent review of services and referral processes or protocols.

**"VNS Medicare Advantage Contract"** means the agreements(s) between VNS and CMS for the VNS Medicare Programs.

**"VNS Medicare Program(s)"** means each Medicare Advantage Plan listed on Attachment C.

## Article II
### Responsibilities of SNF

1.    SNF shall provide all Medically Necessary SNF Services to which an Enrollee may be entitled under the Enrollee's Evidence of Coverage, provided that the services are furnished within the scope of Attachment D and the licensure or certification of SNF, and SNF is capable of providing such services. Any material change or revision to

Attachment D shall be provided to SNF upon thirty (30) days prior written or electronic notice, and shall take effect as of the end of the notice period. SNF shall provide or arrange for the SNF Services set forth in this Agreement to Enrollees.

2.    Except for Emergency Services, SNF shall provide SNF Services only with the authorization of VNS. SNF shall verify the eligibility and the Participating Primary Care Physician referral or, where applicable, the Participating Specialist referral of the Enrollee prior to providing Covered Services. VNS will provide SNF with the ability to verify eligibility of the Enrollees who have been referred to it.

3.    Within 2 days of an Enrollee's admission, SNF shall, at the request of VNS, conduct a case conference to plan and coordinate the Enrollee's care. SNF will involve appropriate staff who are involved in planning the care that the Enrollee will receive, and will notify VNS staff of the case conference so that they may participate as they deem appropriate. The case conference will focus on the care the Enrollee will receive while in the SNF, as well as VNS requirements regarding coordination of care.

4.    SNF shall comply with the requirements of the VNS Quality Improvement Program and the Utilization Management Program.

5.    SNF shall provide VNS with all information necessary for VNS to meet its data reporting and submission obligations to CMS, including, but not limited to the data necessary for VNS to meet its reporting obligations under 42 CFR §422.516 and the VNS contract with CMS for the VNS Medicare Programs, and any encounter data required by CMS.

6.    SNF shall comply with all applicable Medicare laws, regulations, and CMS policies. SNF agrees to comply with the Medicare requirements set forth in Attachment A to this Agreement, as amended from time to time by VNS.

7.    SNF shall comply with all applicable VNS policies and procedures, including without limitation those set forth in the Policy and Procedure Manual. Any material change or revision to the Policy and Procedure Manual shall be provided to SNF upon thirty (30) days prior written or electronic notice, and shall take effect as of the end of the notice period.

8.    SNF acknowledges that VNS may use the name of SNF and other related, pertinent and appropriate information for the promotion, marketing, and enrollment of Enrollees into VNS Medicare Programs.

9.    SNF shall cooperate with VNS by providing the appropriate documentation of services for potential third party subrogation cases and for the coordination of benefits with other insurance and government agencies.

10.    SNF agrees that:

    a)    In no event, including but not limited to non-payment by VNS, insolvency of VNS or breach of the Agreement, shall SNF bill, charge, collect a deposit from, seek compensation, remuneration or reimbursement from, or have any recourse

FILED: WESTCHESTER COUNTY CLERK 10/25/2021 11:01 PM    INDEX NO. 60278/2020
NYSCEF DOC. NO. 250    21-07096-shl    Doc 37-2    Filed 02/11/22    Entered 02/11/22 17:46:27    Exhibit 2    RECEIVED NYSCEF: 10/25/2021

Pg 81 of 144

against an Enrollee or persons other than VNS acting on their behalf for services provided pursuant to the Agreement. This provision does not prohibit the collection of deductibles, coinsurance or copayments in accordance with the terms of the Enrollee's Evidence of Coverage. Further, this provision does not prohibit the collection of payments for services not covered under the Enrollee's VNS Medicare Program provided that, prior to furnishing the service, SNF informs the Enrollee that the services are not Covered Services under the VNS Medicare Program, the Enrollee will be financially liable, and SNF obtains the Enrollee's written acknowledgement of such financial liability.

b) In the event of VNS's insolvency or other cessation of operations, SNF Services to Enrollees will continue through the period for which the CMS payment has been paid to VNS, and services to Enrollees confined in an inpatient hospital on the date of insolvency or other cessation of operations will continue until their discharge.

c) SNF further agrees that (i) the hold harmless and continuation of Covered Services provisions shall survive the termination of this Agreement regardless of the cause giving rise to the termination and shall be construed to be for the benefit of the Enrollees, and that (ii) these provisions supersede any oral or written contrary agreement now existing or hereafter entered into between SNF and a Enrollee or persons acting on their behalf that relates to liability for payment for, or continuation of, Covered Services provided under the terms and conditions of these clauses.

11. SNF shall comply with, and accept as final, the final decisions (subject to applicable Medicare appeal rights and the Policy and Procedure Manual) of the VNS Quality Improvement Program and Utilization Management Program.

12. SNF shall comply with all applicable HIPAA requirements when conducting standard transactions.

13. SNF acknowledges and agrees that VNS has entered into an agreement with the State of New York with respect to those Enrollees who are Medicaid recipients whereby payment will be made to VNS to pay Participating Providers for the copayment, coinsurance and deductibles that are the responsibility of such Enrollees under the applicable VNS Medicare Program and for certain other services covered under the New York Medicaid Program..

SNF agrees that it will be a participating provider in all VNS Medicare Programs and will comply with all applicable New York State and Federal laws and requirements with respect to the provision of SNF Services, including the then applicable New York State Department of Health "Standard Clauses for Managed Care Provider and IPA Contracts" (the DOH Standard Clauses. The DOH Standard Clauses are expressly incorporated into this Agreement as Attachment B and are binding upon the parties to this Agreement, and in the event of any inconsistent or contrary language between the DOH Standard Clauses and any other part of this Agreement, including but not limited to appendices,

amendments and exhibits, the parties agree that the provisions of the DOH Standard Clauses shall prevail.

14.   SNF shall provide and maintain sufficient facilities, equipment, personnel and services in order to provide SNF Services to Enrollees.

15.   SNF shall meet and remain in compliance with the Medicare conditions of participation and the applicable licensure laws of the state of New York, and any accreditation requirements for provider of SNF Services.

16.   SNF shall notify VNS immediately in writing upon the occurrence of any of the following events:

   a)   SNF's license to operate as an skilled nursing facility, or its certification under Title XVIII of the Social Security Act is suspended, revoked or subject to terms of probation or other restriction. SNF shall provide VNS with any information regarding such actions reasonably requested by VNS;

   b)   Any of the grounds for immediate termination set forth in Article VIII of this Agreement;

   c)   SNF learns, or reasonably should know, that it has become a defendant in a malpractice action or is required to pay damages in any such action by way of judgment or settlement;

   d)   An act of nature or any event which occurs which substantially interrupts all or a portion of SNF's facilities or which has a materially adverse effect on SNF s ability to perform its obligations hereunder;

   e)   A petition is filed to declare SNF bankrupt or for reorganization under the bankruptcy of the United States or a receiver is appointed over all or any portion of SNF's assets, or SNF fails to pay when due any obligation under any of its bond agreements; or

   f)   Any other situation arises which could reasonably be expected to materially affect SNF's ability to carry out its obligations under this Agreement and/or the VNS Medicare Program.

## Article III
Records

1.   SNF agrees to maintain records, documents and any other information relating to Enrollees and this Agreement for 10 years or such longer period as required by law. SNF acknowledges that CMS may evaluate the quality, appropriateness and timeliness of services furnished to Enrollees, SNF's facilities and any records. SNF further acknowledges that VNS, CMS, the Comptroller General, or their designees have the right to inspect any books, contracts, medical records, patient care documentation, and other records of SNF, or its subcontractors or transferees involving transactions related to

VNS' contract with CMS through ten (10) years from the final date of the contract period, or from the date of the completion of any audit, or for such longer period provided for in 42 CFR §422.504(d) and (e) or other applicable law or regulation, whichever is later.

2.  SNF agrees to maintain Enrollee medical records and other information with respect to Enrollees in an accurate and timely manner. SNF agrees to abide by all Federal and State laws regarding confidentiality and disclosure for medical and SNF records, other health information and Enrollee information. In addition, SNF agrees to abide by the confidentiality requirements established by VNS and the Medicare Advantage program. Both VNS and SNF shall comply with the requirements for privacy and security of protected health information as set forth in HIPAA.

## Article IV
Quality of Care and Medical Management

1.  SNF agrees to participate in an VNS's Quality Improvement Program.

2.  SNF acknowledges that VNS shall maintain an ongoing Utilization Management Program to address authorization of SNF Services and concurrent and retrospective review of the quality appropriateness, level of care and utilization of SNF Services provided, or to be provided to Enrollees under the applicable Evidence of Coverage. The utilization management activities that VNS may engage in include, but are not limited to, the following:

    a)  Authorization for specific procedures, as determined by the VNS.

    b)  Retrospective inpatient review of specific diagnoses to monitor for the quality of care.

    c)  Assessment of utilization monitors, i.e., frequency of visits, top ten diagnoses, etc. to identify potential areas of under- or over- utilization.

3.  The SNF will make all State surveys and reports of external accrediting activities available for VNS' review.

## Article V
Dispute Resolution

1.  If any dispute or controversy shall arise between the parties with respect to the construction, application, or implementation of this Agreement, or the rights of either party hereunder, either party may require, by giving written notice to the other party, that the parties meet and confer in good faith to resolve such dispute or controversy. The parties shall meet at such times and such places as may be mutually and reasonably acceptable to both parties.

2.  All actions and proceedings arising out of or relating to this Agreement not otherwise subject to resolution pursuant to this Article V herein shall be heard and determined in

FILED: WESTCHESTER COUNTY CLERK 10/25/2021 11:01 PM   INDEX NO. 60278/2020
NYSCEF DOC. NO. 250   21-07096-shl   Doc 37-2   Filed 02/11/22   Entered 02/11/22 17:46:27   Exhibit 2   RECEIVED NYSCEF: 10/25/2021

Pg 84 of 144

any New York state or federal court sitting in New York County, New York, and each party hereby irrevocably accepts and consents to the exclusive personal jurisdiction of those courts for such purpose. In addition, each party hereby irrevocably waives to the fullest extent permitted by law, any objection which it may now or hereafter have to the laying of venue of any action or proceedings rising out of or relating to this Agreement or any judgment entered by any court in respect thereof brought in any state or federal court sitting in New York County, New York and further irrevocably waives any claim that any action or proceeding brought in any such court has been brought in an inconvenient forum.

### Article VI
General Provisions

1. SNF agrees that VNS may amend this Agreement effective immediately upon receipt of notice from VNS if such modification is required by any applicable law, regulation, or otherwise by CMS. Any such amendment shall be incorporated into this Agreement without the necessity of further action by the parties.

   In other situations, VNS may amend this Agreement by providing thirty (30) days prior written notice to SNF. However, for such amendments, SNF shall have thirty (30) days from receipt of the notice to object to such amendment. In the event that SNF timely objects, SNF shall not be bound to the amendment until the expiration of the applicable term of this Agreement, at which time this Agreement will terminate without any additional notice from VNS. If the SNF does not object, any such amendment shall be incorporated into this Agreement without the necessity of further action by the parties.

2. SNF, at its sole cost and expense, shall procure and maintain such policies of general and professional liability and other insurance or other acceptable arrangement as shall be necessary to insure it and its directors, officers, agents, representatives and employees against any claim or claims for damages arising by reason of injury or death occasioned directly or indirectly in connection with the use of any property or facilities provided by SNF or activities performed by SNF in connection with this Agreement. As regards professional liability, SNF shall carry active professional liability insurance on an occurrence basis in the minimum amounts of one million dollars ($1,000,000) per occurrence and three million dollars ($3,000,000) in the aggregate, and comprehensive general liability insurance policies on an occurrence basis in the minimum amounts of one million dollars ($1,000,000) per occurrence and one million dollars ($1,000,000) in the aggregate. The SNP Provider will require its subcontractors, if any to maintain similar amounts of insurance.

   SNF shall provide evidence of its compliance with these requirements and list VNS as an additional certificate holder. In addition, SNF shall have its insurance company issue a Certificate of Insurance to VNS giving VNS at least thirty (30) days advanced notice of the reduction, cancellation, or non-renewal of said policies. Insurance coverage provided pursuant to this Agreement shall be with New York State authorized or approved companies.

3.  Unless otherwise specified herein, any notice required to be given pursuant to the terms and provisions of this Agreement shall be effective only if given in writing, and shall be deemed to have been duly given when received if personally delivered; the business day after being sent, if sent for next business day delivery by a recognized overnight delivery service as verified (e.g., Federal Express); and upon receipt, if sent by certified or registered mail, return receipt requested, and addressed to the following, or to such other address or addresses as shall from time to time be designated by written notice by either party to the other as herein provided.

| VNS CHOICE | HBL SNF LLC DBA EPIC REHABILITATION AND NURSING AT WHITE PLAINS |
|---|---|
| 220 East 42nd Street, 3rd Floor | 120 Church Street, |
| New York, NY 10017 | White Plains NY 10601 |
| Attn: President, VNS CHOICE | |
| cc: Director, Hospital Contracting | |

4.  SNF shall indemnify and hold harmless VNS and any of its officers, directors employees or agents from and against that portion of any claim, cause of action, liability, damage, cost or expense, including attorney's fees and court or proceeding costs arising solely out of or in connection with the acts, omissions or negligence of SNF or its officers, directors, employees or agents.

VNS shall indemnify and hold harmless SNF and any of its officers, directors, employees or agents from and against that portion of any claim, cause of action, liability damage, cost or expense including attorney's fees and court or proceeding costs arising solely out of or in connection with the acts, omissions or negligence of VNS or its officers, directors, employees or agents.

5.  In the course of the relationship established between VNS and SNF during the term of this Agreement, certain confidential information may be disclosed by either party to the other party. Such information includes Enrollee names, Enrollee records, fee schedules, business information, and all similar information of any kind whatsoever (hereinafter referred to as "Confidential Information"). VNS and SNF shall hold Confidential Information in the strictest confidence as fiduciaries, and shall not voluntarily or involuntarily sell, transfer, publish, disclose, display, or otherwise make available to others any portion of the Confidential Information or related material without the express written consent of the other party. VNS and SNF shall each use its best efforts to protect the Confidential Information of the other consistent with the manner in which it protects its most confidential business information. The obligations to maintain this confidentiality shall survive termination of this Agreement for any reason.

6.  None of the provisions of this Agreement is intended to create, nor shall any be designed or construed to create, any relationship between VNS and SNF other than that of independent entities contracting with each other hereunder solely for effecting the provision of this Agreement. Neither of the parties hereto nor any of their respective

representatives shall be construed to be the agent, employee, or representative of the other.

7. This Agreement shall be governed in all respects by the applicable New York State, federal or Medicare laws, regulations or rules.

8. Each party to this Agreement shall comply with all applicable requirements of the Americans with Disabilities Act.

9. The waiver by either party of a breach or violation of any provision of this Agreement shall not operate or be construed to be a waiver of any subsequent breach thereof.

10. If any term, provision, covenant or condition of this Agreement is invalid, void or unenforceable, the rest of the Agreement shall remain in full force and effect. The invalidity or unenforceability of any term or provision hereof shall in no way affect the validity or enforceability of any other term or provision.

11. This Agreement contains the complete understanding and agreement between VNS and SNF and supersedes all representations, understandings or agreements prior to the execution hereof.

12. SNF shall not assign, subcontract or delegate its rights, duties, or obligations under this Agreement without the prior written consent of VNS. VNS may, without SNF's prior consent, assign this Agreement to any affiliate or successor-in-interest of VNS. VNS may also, in its sole discretion, delegate its duties or obligations to any entity with which VNS has entered into an agreement.

13. Fraud and Abuse Prevention; Whistleblower Protection. In accordance with Section 6032 of the Deficit Reduction Act of 2005 ("DRA"), SNF shall comply with the VNS Fraud and Abuse Prevention Policy, as revised from time to time by VNS. SNF acknowledges that it has received a copy of the current VNS Fraud and Abuse Prevention Policy. VNS shall provide thirty (30) days notice to the SNF of any revisions to the VNS Fraud and Abuse Prevention Policy. SNF shall make available to all employees and agents, and, to the extent required by DRA, contractors of the SNF a copy of the VNS Fraud and Abuse Prevention Policy, including specific discussion of the provisions of the VNS Fraud and Abuse Prevention Policy in an employee handbook, if such agent or SNF has an employee handbook. Upon request from VNS, SNF agrees to submit to VNS a statement certifying that SNF complies with all applicable requirements, federal and state, associated with the VNS Fraud and Abuse Prevention Policy and Section 6032 of the DRA. SNF shall cooperate fully with VNS in any examination of the implementation of the VNS Fraud and Abuse Prevention Policy and shall provide any and all assistance requested by VNS, CMS, NYS Departments of Health or Social Services, and/or any law enforcement agency or any prosecutorial agency in the investigation and prosecution of fraud and abuse and related crimes.

14. Review Federal Exclusion List. SNF agrees to conduct appropriate background checks, as and to the extent required by law, regulation, or rule, on all employees, contractors, agents and vendors to assure that all services are provided by individuals who have not

been excluded, debarred or otherwise prohibited from conducting business with, or receiving funds from, any government authority, including, without limitation, federal health care programs. Further, each party agrees that it has not been excluded, debarred or otherwise prohibited.

15. During the term of this Agreement, the parties shall not discriminate against any Enrollee in the provision of Covered Services hereunder, on any basis including age, sex, marital status, sexual orientation, race, color, religion, ancestry, national origin, disability, handicap, health status, source of payment, utilization of medical or mental health services or supplies, or other unlawful basis.

16. Neither party shall be liable for any failure, inability or delay to perform hereunder, if such failure, inability or delay is due to war, strike, fire, explosion, sabotage, accident, casualty or any other cause beyond the reasonable control of the parties so failing, providing due diligence is used by that party in curing such cause and in resuming performance.

17. SNF acknowledges and agrees that VNS is a tax-exempt organization and will pay no taxes arising out of this Agreement, nor will VNS reimburse SNF for any taxes, which SNF pays on his or her own behalf or on behalf of VNS.

18. Marketing of Managed Care Programs to Enrollees. SNF agrees that it will not endeavor to influence any Enrollee to disenroll from a VNS Medicare Program, nor shall SNF disparage VNS or VNS Medicare Programs. The SNF shall not provide any information regarding Managed Care Programs except in response to an inquiry from an Enrollee. In the event that an Enrollee asks for information regarding or inquires about Managed Care Programs from any SNF employee who is providing clinical care to the Enrollee, the employee shall refer the inquiry to an administrative employee of SNF who is knowledgeable about such Managed Care Programs. In response to an inquiry the SNF administrative employee shall limit his or her response to the list of Managed Care Programs in which SNF participates, and shall not direct, advise or otherwise influence the Enrollee to enroll in any other Managed Care Program or to disenroll from VNS. If SNF or any of its affiliates (i.e., any entity that controls, is controlled by, or is under common control with SNF) operates a Managed Care Program or has an ownership interest (i.e., hold shares of stock or, if a not-for-profit corporation, a membership interest) in a Managed Care Program, then the Enrollee shall be informed of SNF's interest as an owner or operator in such Managed Care Program.

a) For the purpose of this section, "Managed Care Programs" shall include but not be limited to managed long term care (MLTC) programs, the Lombardi program, other Medicare Advantage programs and Medicaid managed care programs.

b) Nothing herein shall limit the SNF or its employees, acting within the lawful scope of practice of such employee, from advising, or advocating on behalf of, Enrollee about (i) the Enrollee's health status, medical care, or treatment options (including any alternative treatments that may be self-administered), including the provision of sufficient information to the Enrollee to provide an opportunity to

decide among all relevant treatment options; (ii) the risks, benefits, and consequences of treatment or non-treatment; or (iii) the opportunity for the Enrollee to refuse treatment and to express preferences about future treatment decisions.

## Article VII
Compensation

1.  For Medically Necessary SNF Services that are Covered Services furnished to Enrollees, VNS shall adjudicate and pay SNF in accordance with (i) the requirements set forth in the Provider Manual; and (ii) the Compensation Schedule attached hereto as Attachment E, and as amended by VNS from time-to-time.

2.  SNF shall submit claims to VNS for services rendered to Enrollees so that they are received by VNS within ninety (90) days of the date the services were rendered.

3.  SNF shall submit claims in the form and manner directed by VNS. Any requirements for electronic submission of claims shall be consistent with requirements for standard transactions set forth in HIPAA.

4.  SNF certifies that any claim SNF submits concerning VNS Enrollees will be accurate, complete and truthful.

5.  SNF agrees that VNS will not be obligated to make payments for claims received more than ninety (90) days from the date of service. This requirement may, at VNS's discretion, be waived in the event SNF provides notice to VNS, along with appropriate evidence of extraordinary circumstances outside the control of the SNF that resulted in the delayed submission.

6.  VNS shall pay all Clean Claims within thirty (30) days of receipt.

7.  Unless SNF notifies VNS of any payment disputes within six (6) months of receipt of payment from VNS, such payment will be considered full and final payment for the related claims.

## Article VIII
Term and Termination

1.  The agreement shall automatically renew, unless (i) terminated by either party as set forth below; or (ii) nonrenewed by either party upon one hundred and twenty (120) days.

2.  This Agreement may be terminated at any time by either party upon at least sixty (60) days prior written notice of such termination to the other party upon material breach by such party of one or more of its obligations hereunder, unless such material breach is cured within thirty (30) days of the notice of termination.

3.  Notwithstanding the foregoing, VNS may immediately terminate this Agreement, or where applicable, the status of any subcontractor, at VNS's discretion at any time, due to any of the following events:

    a)  The suspension, withdrawal, expiration, revocation or non-renewal of any Federal or state license or certificate authorizing SNF to provide services;

    b)  A suspension or revocation of a SNF's DEA certification or other right to prescribe or dispense controlled substances;

    c)  The loss or material limitation of SNF's liability insurance;

    d)  The debarment or suspension of SNF from participation in any government sponsored program, including, but not limited to, Medicare or Medicaid;

    c)  A determination by VNS that SNF's continued participation in provider networks could result in harm to Enrollees;

    f)  A determination by VNS that SNF has engaged in fraud;

    g)  Any violation by SNF of the requirements of section 18 of Article VI.

4.  Also notwithstanding the foregoing, VNS may, at its sole discretion, immediately terminate this Agreement due to any of the following events:

    a)  The initiation, pendency or final disposition of any action to limit SNF's Federal or state license authorizing SNF to provide SNF Services;

    b)  Any false statement or material omission of SNF in the participation application and/or confidential information forms and all other requested information, as determined by VNS in its sole discretion;

    c)  Notification of impending bankruptcy;

    d)  Change of control of SNF to an entity not acceptable to VNS.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement to be effective as of the later of the dates on which it was signed.

**VNS CHOICE**

Signature: _____

Print Name:  Hany Abdelaal

Title:  President

Date:  7/20/2020

**HBL SNF LLC DBA EPIC REHABILITATION AND NURSING AT WHITE PLAINS**

Signature: _____

Print Name:  Jennifer Brennan

Title:  Corporate Controller

Date:  6/24/2020

Tax ID:  47-5606045

## ATTACHMENT A

## MEDICARE ADVANTAGE REQUIREMENTS
## (UPDATED MARCH 2013)

VNSNY CHOICE (the "Plan") has entered into an agreement with the Centers for Medicare & Medicaid Services ("CMS") to offer Medicare Advantage benefits to eligible individuals (hereinafter referred to as the "Medicare Advantage Contract"). As a network provider to the Plan, CMS requires that specific terms and conditions be incorporated into the Agreement between the Plan and Provider to comply with applicable laws, regulations, and CMS instructions. This Attachment A shall ensure compliance with required CMS provisions, and shall continue concurrently with the term of the Agreement.

Now, therefore, Provider hereby agrees to the following terms and conditions:

1. Definitions. Capitalized words not otherwise defined in this Attachment A shall have the meanings ascribed to them in the Agreement or as ascribed to them in federal regulations set forth at 42 C.F.R. Part 422.

2. Audits/Access. Provider shall grant HHS, the Comptroller General, or their designees the right to audit, evaluate, and inspect any pertinent information for any particular contract period, including, but not limited to, any books, contracts, computer or other electronic systems (including medical records and documentation of the first tier, downstream, and entities related to CMS' contract with Plan) through the later of ten (10) years (i) from the final date of the final contract period of the contract entered into between CMS and the Plan or (ii) from the date of completion of any audit conducted by HHS, the Comptroller General or their designees.

3. Patient Confidentiality; Accuracy of Records. Provider will comply with any patient confidentiality provisions and medical record accuracy requirements set forth in the Plan's policies and procedures, and shall abide by all applicable federal and state laws and regulations and the provisions of the Medicare Advantage Contract regarding confidentiality and release of medical records or other health or enrollment information pertaining to Enrollees. Without limiting the generality of the foregoing, Provider agrees to: (i) safeguard the privacy of all Enrollee medical records and ensure that copies of or information from such records are released only to authorized individuals; (ii) release such records only in accordance with applicable federal or state laws or pursuant to court orders or subpoenas; (iii) maintain all such records in an accurate and timely manner; and (iv) ensure timely access by Enrollees to records and information that pertain to them.

4. Hold Harmless. Provider agrees that he/she/it will not hold Enrollees liable for payment of fees that are the legal obligation of the Plan, even in the event of insolvency of the Plan.

5. Hold Harmless for Medicare-Medicaid Plans. For all Enrollees eligible for both Medicare and Medicaid ("Dual Eligibles"), Provider shall not hold Enrollees liable for

Medicare Part A and B cost sharing. Specifically, Provider shall provide Medicare Parts A and B services to Dual Eligibles at zero cost-sharing as part of the integrated package of benefits.

6. <u>Hold Harmless for MAs offering SNPs.</u> For all Dual Eligibles enrolled in the Plan's VNS Medicare Advantage Special Needs Plan, Provider may not impose cost-sharing that exceeds the amount of cost-sharing that would be permitted with respect to the Enrollee under Medicaid if the Enrollee were not enrolled in such Plan. Provider further agrees that he/she/it may not hold such Enrollees liable for any Medicare cost-sharing and that he/she/it will (i) accept the Plan payment as payment in full, or (ii) bill the State of New York Medicaid Program for the applicable coinsurance, copay or deductible.

7. <u>Compliance.</u> Any services or other activities performed by Provider in accordance with Plan's Medicare Advantage Contract with CMS shall comply with all applicable state and federal laws and regulations, including applicable CMS manuals, guidelines and instructions for a Medicare Advantage program, and with Plan's policies and procedures.

8. <u>Cultural Considerations.</u> Provider shall ensure that any services or other activities are provided in a culturally competent manner to all Enrollees, including those with limited English proficiency or reading skills, and diverse cultural and ethnic backgrounds.

9. <u>Prompt Payment.</u> Plan shall pay all Clean Claims within thirty (30) days of receipt.

10. <u>Accountability.</u> Provider acknowledges that Plan oversees and is accountable to CMS for any functions and responsibilities delegated to Provider. Provider further acknowledges and agrees that Plan or its designees will monitor Provider's performance hereunder, and that Plan and/or CMS shall have the right to terminate the Agreement and Provider's participation in the Medicare Advantage program if Provider does not perform satisfactorily hereunder.

11. <u>Delegation.</u>

   (a) <u>First Tier Entity.</u> Provider acknowledges that the Agreement with Plan, including the Attachments set forth herein, constitutes a "delegation" from Plan to Provider, and that Provider is a "First Tier Entity," as those terms are applied by CMS to Medicare Advantage plans. Provider shall comply with all requirements that apply to a First Tier Entity and with all delegation requirements imposed under CMS requirements, including on-going oversight by Plan, assuring accountability of Provider for its services, reporting requirements and on-going monitoring by Plan to assure compliance with the Agreement, this <u>Attachment A</u>, Medicare laws, regulations and sub-regulatory guidance, and other applicable laws.

   (b) <u>Downstream Entities and Related Entities.</u> Provider acknowledges and agrees that each he/she/it and any other person or entity with which Provider contracts to provide a delegated service is a "Downstream Entity" or "Related Entity," as those terms are applied by CMS to Medicare Advantage plans (referred to herein as a

"Downstream/Related Entity"). To the extent that Provider delegates any services covered by the Agreement, including this <u>Attachment A</u>, to a Downstream/Related Entity, Provider shall list the activities delegated to the Downstream/Related Entity, and shall include in each such contract provisions that require the Downstream/Related Entity to agree that:

    i. The Downstream/Related Entity shall comply with all applicable CMS requirements; and

    ii. The Plan retains the right to approve, suspend or terminate any delegated arrangement between the Provider and the Downstream/Related Entity; and

    iii. The Plan will conduct on-going oversight and monitoring to assure accountability of Downstream/Related Entity for Downstream/Related Entity's services, compliance with reporting requirements and compliance with the Agreement, Medicare laws, regulations and sub-regulatory guidance, and other applicable laws; and

    iv. The Plan may revoke the delegated activity(s) and reporting requirements or specify other remedies in instances where CMS or the Plan determines that the Downstream/Related Entity has not performed satisfactorily.

12. <u>Reporting Requirements; Policies and Procedures</u>. Provider acknowledges that Plan is subject to reporting requirements specified in the Medicare Advantage regulations and the Medicare Advantage Contract. In furtherance of any such applicable reporting requirements, Provider shall comply with all data and reporting requirements set forth by CMS and established by the Plan.

13. <u>Continued Care</u>. Provider agrees that services to Enrollees shall continue for all Enrollees for the duration of the Medicare Advantage Contract period for which CMS payments have been made to Plan.

14. <u>Fraud, Waste and Abuse Compliance Requirements</u>. Provider shall comply and cooperate with training and education given as part of Plan's compliance plan to prevent, detect, and correct fraud, waste, and abuse ("FWA"). Provider shall submit to the Plan copies of certifications evidencing that he/she/it and his/her/its employees received the FWA training within ten (10) days of the completed training. The Provider shall make information about the Plan's FWA requirements available to all of its employees, including how a report may be directly made to the Plan by calling (888) 634-1558, emailing CHOICECompliance@vnsny.org, or sending a written report to the Compliance Officer at VNSNY CHOICE, 1250 Broadway, New York, NY 10001.

15. <u>Self-Reporting</u>. Provider shall maintain procedures to voluntarily self-report to CMS and Plan potential fraud or misconduct related to the provision of services to Enrollees. Such procedures shall be submitted to Plan on or before the date of execution of this Agreement and thereafter upon request, and shall be subject to audit by Plan.

16.  Excluded Providers. Provider shall not employ or contract with any individual or entity that is excluded from participation in Medicare or Medicaid, or with an entity that employs or contracts with such any excluded individual or entity. Provider represents, warrants and covenants to the Plan that, during the term of the Agreement, he/she/it and each of his/her/its employees, contractors and/or agents has not been: (i) convicted of a criminal offense that falls within the ambit of 42 U.S.C. § 1320a-7(a), or (ii) excluded, debarred, suspended or otherwise ineligible to participate in the Federal health care programs or in Federal procurement or non-procurement programs. Without limiting the foregoing, Provider agree to check, before hiring staff and monthly thereafter, all of its employees, contractors and/or agents who shall be providing services hereunder against the exclusion lists maintained by the following: (x) the US Department of Health and Human Services' Office of Inspector General; and (y) the General Services Administration. (each individual or entity appearing on one or more of these lists is referred to herein as an "Ineligible Person"). Provider shall maintain proof of such monthly checks for at least ten (10) years, which shall be made available to the Plan or its designee promptly upon its request. Provider shall immediately report to the Plan if he/she/it, or employee or contractor becomes an Ineligible Person by either (i) calling (888) 634-1558, (ii) emailing CHOICECompliance@vnsny.org, or (iii) sending a written report to the Compliance Officer at VNSNY CHOICE, 1250 Broadway, New York, NY 10001.

17.  Submission and Certification of Data. Provider hereby acknowledges that Plan is required to provide CMS and other federal and state regulatory agencies and accrediting organizations with encounter data as requested by such agencies and organizations. Such data may include records and other data necessary to characterize each encounter between Provider and an Enrollee. Provider agrees to cooperate with Plan and provide Plan with all such information in such form and manner as reasonably requested by Plan. Provider recognizes that as a Medicare Advantage organization, Plan is required to certify the accuracy, completeness and truthfulness of data that CMS requests. Such data include encounter data, payment data, and any other information provided to Plan by its contractors and subcontractors. Provider and its subcontractors, if any, hereby certify that any such data submitted to Plan will be accurate, complete and truthful. Upon request, Provider shall make such certification in a form and manner reasonably requested by Plan or CMS.

18.  Interpretation. In the event of any inconsistency between this Attachment A and the Agreement, the parties agree that the terms of this Attachment A shall control, but only as they relate to services provided to individuals enrolled in the Plan's Medicare Advantage plans.

19.  Severability. Upon request by CMS, this Attachment A will be amended to exclude any entity specified by CMS and that, when such request is made, a separate contract will be deemed to be in place.

## ATTACHMENT B

### New York State Department of Health
### Standard Clauses for Managed Care Provider/IPA Contracts

#### (Revised 4/1/17)

Notwithstanding any other provision of this agreement, contract, or amendment (hereinafter "the Agreement " or "this Agreement ") the Article 44 plans and providers that contract with such plans, and who are a party agree to be bound by the following clauses which are hereby made a part of the Agreement. Further, if this Agreement is between a Managed Care Organization and an IPA/ACO, or between an IPA/ACO and an IPA/ACO, such clauses must be included in IPA/ACO contracts with Providers, and Providers must agree to such clauses.

### A. Definitions for Purposes of this Appendix

"Managed Care Organization" or "MCO" shall mean the person, natural or corporate, or any groups of such persons, certified under Public Health Law Article 44, who enter into an arrangement, agreement or plan or any combination of arrangements or plans which provide or offer a comprehensive health services plan, or a health and long term care services plan.

"Independent Practice Association" or "IPA" shall mean an entity formed for the limited purpose of contracting for the delivery or provision of health services by individuals, entities and facilities licensed and/or certified to practice medicine and other health professions, and, as appropriate, ancillary medical services and equipment. Under these arrangements, such health care Providers and suppliers will provide their service in accordance with and for such compensation as may be established by a contract between such entity and one or more MCOs. "IPA" may also include, for purposes of this Agreement, a pharmacy or laboratory with the legal authority to contract with other pharmacies or laboratories to arrange for or provide services to enrollees of a New York State MCO.

"Provider" shall mean physicians, dentists, nurses, pharmacists and other health care professionals, pharmacies, hospitals and other entities engaged in the delivery of Health Care Services which are licensed, registered and/or certified as required by applicable federal and state law.

### B. General Terms and Conditions

1. This agreement is subject to the approval of the New York State Department of Health (DOH) and if implemented prior to such approval, the parties agree to incorporate into this Agreement any and all modifications required by DOH for approval or, alternatively, to terminate this Agreement if so directed by DOH, effective sixty (60) days subsequent to notice, subject to Public Health Law §4403 (6)(e). This Agreement is the sole agreement between the parties regarding the arrangement established herein.

2. Any material amendment to this Agreement is subject to the prior approval of DOH, and any such amendment shall be submitted for approval in accordance with the appropriate procedures and timelines described in Sections III and VII of the New York State Department of Health Provider Contract Guidelines for MCOs and IPA/ACOs. To the extent the MCO provides and arranges for the provision of comprehensive Health Care Services to enrollees served by the Medical Assistance Program, the MCO shall notify and/or submit a copy of such material amendment to DOH, as may be required by the Medicaid Managed Care contract between the MCO and DOH.

3. Assignment of an agreement between an MCO and (1) an IPA/ACO, (2) an institutional network Provider, or (3) a medical group Provider that serves five percent or more of the enrolled population in a county, or the assignment of an agreement between an IPA/ACO and (1) an institutional Provider or (2) a medical group Provider that serves five percent or more of the enrolled population in a county, requires the prior approval of the Commissioner of Health.

4. The Provider agrees, or if the Agreement is between the MCO and an IPA/ACO or between an IPA/ACO and an IPA/ACO, the IPA/ACO agrees and shall require the IPA/ACO's Providers to agree, to comply fully and abide by the rules, policies and procedures that the MCO (a) has established or will establish to meet general or specific obligations placed on the MCO by statute, regulation, contract, or DOH or DFS guidelines or policies and (b) has provided to the Provider at least thirty days in advance of implementation, including but not limited to:

   • quality improvement/management;
   • utilization management, including but not limited to precertification procedures, referral process or protocols, and reporting of clinical encounter data;
   • member grievances; and
   • Provider credentialing.

5. The Provider or, if the Agreement is between the MCO and an IPA/ACO, or between an IPA/ACO and an IPA/ACO, the IPA/ACO agrees, and shall require its Providers to agree, to not discriminate against an enrollee based on color, race, creed, age, gender, sexual orientation, disability, place of origin, source of payment or type of illness or condition.

6. If the Provider is a primary care practitioner, the Provider agrees to provide twenty-four (24) hour coverage and back-up coverage when the Provider is unavailable. The Provider may use a twenty-four (24) hour back-up call service provided appropriate personnel receive and respond to calls in a manner consistent with the scope of their practice.

7. The MCO or IPA/ACO that is a party to this Agreement agrees that nothing within this Agreement is intended to, or shall be deemed to, transfer liability for the MCO's or IPA/ACO's own acts or omissions, by indemnification or otherwise, to a

Provider.

8. Notwithstanding any other provision of this Agreement, the parties shall comply with the provisions of the Managed Care Reform Act of 1996 (Chapter 705 of the Laws of 1996) Chapter 551 of the Laws of 2006, Chapter 451 of the Laws of 2007, Chapter 237 of the Laws of 2009, Chapter 297 of the Laws of 2012, Chapter 199 of the Laws of 2014, Part H, Chapter 60, of the Laws of 2014 and Chapter 6 of the Laws of 2015 with all amendments thereto.

9. To the extent the MCO enrolls individuals covered by the Medical Assistance Program, this Agreement incorporates the pertinent MCO obligations under the Medicaid Managed Care contract between the MCO and DOH as set forth fully herein, including:

   a. The MCO will monitor the performance of the Provider or IPA/ACO under the Agreement and will terminate the Agreement and/or impose other sanctions if the Provider's or IPA/ACO's performance does not satisfy the standards set forth in the Medicaid Managed Care contract.

   b. The Provider or IPA/ACO agrees that the work it performs under the Agreement will conform to the terms of the Medicaid managed care contract between the MCO and DOH and that it will take corrective action if the MCO identifies deficiencies or areas of needed improvement in the Provider's or IPA/ACO's performance.

   c. The Provider or IPA/ACO agrees to be bound by the confidentiality requirements set forth in the Medicaid Managed Care contract between the MCO and DOH.

   d. The MCO and the Provider or IPA/ACO agree that a woman's enrollment in the MCO's Medicaid Managed Care product is sufficient to provide services to her newborn, unless the newborn is excluded from the enrollment in Medicaid Managed Care or the MCO does not offer a Medicaid Managed Care product in the mother's county of fiscal responsibility.

   e. The MCO shall not impose obligations and duties on the Provider or IPA/ACO that are inconsistent with the Medicaid Managed Care contract or that impair any rights accorded to DOH, the local Department of Social Services, or the United States Department of Health and Human Services.

   f. The Provider or IPA/ACO agrees to provide medical records to the MCO for purposes of determining newborn eligibility for Supplemental Security Income where the mother is a member of the MCO and for quality purposes at no cost to the MCO.

   g. The Provider or IPA/ACO agrees, pursuant to 31 U.S.C. §1352 and CFR Part 93, that no federally appropriated funds have been paid or will be paid to any person by or on behalf of the Provider/IPA/ACO for the purpose of influencing or attempting to influence an officer or employee of any agency,

FILED: WESTCHESTER COUNTY CLERK 10/25/2021 11:01 PM | INDEX NO. 60278/2020

NYSCEF DOC. NO. 250        21-07096-shl    Doc 37-2    Filed 02/11/22    Entered 02/11/22 17:46:27    Exhibit 2    RECEIVED NYSCEF: 10/25/2021

Pg 98 of 144

a Member of Congress, an officer or employee of Congress, or an employee of any Member of Congress in connection with the award of any federal loan, the entering into of any cooperative agreement, or the extension, continuation, renewal, amendment, or modification of any federal contract, grant, loan, or cooperative agreement. The Provider or IPA/ACO agrees to complete and submit the "Certification Regarding Lobbying," Appendix B1 attached hereto and incorporated herein, if this Agreement exceeds $100,000. If any funds other than federally appropriated funds have been paid or will be paid to any person for the purpose of influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of a member of Congress, in connection with the award of any federal contract, the making of any federal grant, the making of any federal loan, the entering of any cooperative agreement, or the extension, continuation, renewal, amendment, or modification of any federal contract, grant loan, or cooperative agreement, and the Agreement exceeds $100,000 the Provider or IPA/ACO shall complete and submit Standard Form-LLL "Disclosure Form to Report Lobbying," in accordance with its instructions.

h. The Provider or IPA/ACO agrees to disclose to the MCO, on an ongoing basis, any managing employee who has been convicted of a misdemeanor or felony in relation to the employee's involvement in any program under Medicare, Medicaid or a Title XX services program (block grant programs).

i. The Provider or IPA/ACO agrees to monitor its employees and staff against the List of Excluded Individuals and Entities (LEIE), the Social Security Administration Death Master List, and the National Plan Provider Enumeration System (NPPES).

j. The Provider or IPA/ACO agrees to disclose to the MCO complete ownership, control, and relationship information.

k. The Provider or IPA/ACO agrees to obtain for the MCO ownership information from any subcontractor with whom the Provider has had a business transaction totaling more than $25,000 during the 12-month period ending on the date of the request made by DOH, Office of the Medicaid Inspector General (OMIG) or the United States Department of Health and Human Services (DHHS). The information requested shall be provided to the MCO within 35 days of such request.

l. The Provider or IPA/ACO agrees to have an officer, director or partner of the Provider execute and deliver to DOH a certification, using a form provided by DOH through OMIG's website, within five (5) days of executing this agreement, stating that:

- The Provider or IPA/ACO is subject to the statutes, rules, regulations, and applicable Medicaid Updates of the Medicaid program and of DOH related to the furnishing of care, services or supplies provided directly by, or under the supervision of, or ordered, referred or prescribed by the Provider. This includes 18

FILED: WESTCHESTER COUNTY CLERK 10/25/2021 11:01 PM
NYSCEF DOC. NO. 250

21-07096-shl    Doc 37-2    Filed 02/11/22    Entered 02/11/22 17:46:27    Exhibit 2
Pg 99 of 144

INDEX NO. 60278/2020
RECEIVED NYSCEF: 10/25/2021

> NYCRR 515.2 except to the extent that any reference in the regulation establishing rates, fees, and claiming instructions will refer to the rates, fees and claiming instructions set by the MCO.
>
> - All claims submitted for payment by the Provider/IPA/ACO are for care, services or medical supplies that have been provided.
>
> - Payment requests are submitted in accordance with applicable law.
>
> m. The Provider or IPA/ACO agrees to require that an officer, director or partner of all subcontractors if they are not natural persons, or the subcontractor itself if it is a natural person, execute a certification, using a form provided by DOH through OMIG's website, before the subcontractor requests payment under the subcontract, acknowledging that:
>
>   - The subcontractor is subject to the statutes, rules, regulations, and applicable Medicaid Updates of the Medicaid program and of DOH related to the furnishing of care, services or supplies provided directly by, or under the supervision of, or ordered, referred or prescribed by the subcontractor. This includes 18 NYCRR 515.2 except to the extent that any reference in the regulation establishing rates, fees, and claiming instructions will refer to the rates, fees and claiming instructions set by the MCO.
>
>   - All claims submitted for payment by the subcontractor are for care, services or medical supplies that have been provided.
>
>   - Payment requests are submitted in accordance with applicable law.

10. The parties to this Agreement agree to comply with all applicable requirements of the federal Americans with Disabilities Act.

11. The Provider agrees, or if the Agreement is between the MCO and an IPA/ACO or between an IPA/ACO and an IPA/ACO, the IPA/ACO agrees and shall require the IPA's Providers to agree, to comply with all applicable requirements of the Health Insurance Portability and Accountability Act, the HIV confidentiality requirements of Article 27-F of the Public Health Law, and Mental Hygiene Law § 33.13.

12. Compliance Program. The Provider agrees that if it claims, orders, or is paid $500,000 or more per year from the Medical Assistance Program, including, in the aggregate, claims submitted to or paid directly by the Medical Assistance Program and/or claims submitted to or paid by any MCO under the Medicaid Managed Care Program, that it shall adopt and implement a compliance program which meets the requirements of New York State Social Services Law § 363-d(2) and 18 NYCRR § 521.3.

13. Compliance Program Certification. The Provider agrees that if it is subject to the requirements of Section B (12) of this Appendix, it shall certify to DOH, using a form provided by OMIG on its website, within 30 days of entering into a Provider

Agreement with the MCO, if they have not so certified within the past year that a compliance program meeting the requirements of 18 NYCRR §521.3 and Social Services Law § 363-d(2) is in place. The Provider shall recertify during the month of December each year thereafter using a form provided by OMIG on OMIG's website.

## C. Payment and Risk Arrangements

1. Enrollee Non-liability. Provider agrees that in no event, including, but not limited to, nonpayment by the MCO or IPA/ACO, insolvency of the MCO or IPA/ACO, or breach of this Agreement, shall Provider bill; charge; collect a deposit from; seek compensation, remuneration or reimbursement from; or have any recourse against a subscriber, an enrollee or person (other than the MCO or IPA/ACO) acting on his/her/their behalf, for services provided pursuant to the subscriber contract or Medicaid Managed Care contract and this Agreement, for the period covered by the paid enrollee premium. In addition, in the case of Medicaid Managed Care, Provider agrees that, during the time an enrollee is enrolled in the MCO, Provider will not bill DOH or the City of New York for covered services within the Medicaid Managed Care benefit package as set forth in the Agreement between the MCO and DOH. This provision shall not prohibit the Provider, unless the MCO is a Managed Long Term Care plan designated as a Program of All-Inclusive Care for the Elderly (PACE), from collecting copayments, coinsurance amounts, or permitted deductibles, as specifically provided in the evidence of coverage, or fees for uncovered services delivered on a fee-for- service basis to a covered person, provided that Provider shall have advised the enrollee in writing that the service is uncovered and of the enrollee's liability therefore prior to providing the service. Where the Provider has not been given a list of services covered by the MCO, and/or Provider is uncertain as to whether a service is covered, the Provider shall make reasonable efforts to contact the MCO and obtain a coverage determination prior to advising an enrollee as to coverage and liability for payment and prior to providing the service. This provision shall survive termination of this Agreement for any reason and shall supersede any oral or written agreement now existing or hereafter entered into between Provider and enrollee or person acting on his or her behalf.

2. Coordination of Benefits (COB). To the extent otherwise permitted in this Agreement, the Provider may participate in collection of COB on behalf of the MCO, with COB collectibles accruing to the MCO or to the Provider. However, with respect to enrollees eligible for medical assistance or participating in Child Health Plus, the Provider shall maintain and make available to the MCO records reflecting COB proceeds collected by the Provider or paid directly to enrollees by third party payers, and amounts thereof, and the MCO shall maintain or have immediate access to records concerning collection of COB proceeds.

3. If the Provider is a health care professional licensed, registered or certified under Title 8 of the Education Law, the MCO or the IPA/ACO must provide notice to the

Provider at least ninety (90) days prior to the effective date of any adverse reimbursement arrangement as required by Public Health Law §4406-c(5-c). Adverse reimbursement change shall mean a proposed change that could reasonably be expected to have a material adverse impact on the aggregate level of payment to a health care professional. This provision does not apply if the reimbursement change is required by law, regulation or applicable regulatory authority; is required as a result of changes in fee schedules, reimbursement methodology or payment policies established by the American Medical Association current procedural terminology (CPT) codes, reporting guidelines and conventions; or such change is expressly provided for under the terms of this Agreement by the inclusion or reference to a specific fee or fee schedule, reimbursement methodology, or payment policy indexing scheme.

4. The parties agree to comply with and incorporate the requirements of Physician Incentive Plan (PIP) Regulations contained in 42 CFR §438.6(h), 42 CFR §422.208, and 42 CFR §422.210 into any contracts between the contracting entity (Provider, IPA/ACO, hospital, etc.) and other persons/entities for the provision of services under this Agreement. No specific payment will be made directly or indirectly under the plan to a physician or physician group as an inducement to reduce or limit medically necessary services furnished to an enrollee.

5. The parties agree that, where required by Public Health Law §4903, a claim for certain continued, extended, or additional health care services cannot be denied on the basis of medical necessity or a lack of prior authorization while a utilization review determination is pending if all necessary information was provided within the required timeframes and under the circumstances described in Public Health Law §4903.

6. The parties agree to follow Section 3224-a of the Insurance Law providing timeframes for the submission and payment of Provider claims to the MCO.

7. The parties agree to follow Section 3224-b(a) of the Insurance Law requiring an MCO to accept and initiate the processing of all claims submitted by physicians that conform to the American Medical Association's Current Procedural Technology (CPT) codes, reporting guidelines and conventions, or to the Centers for Medicare and Medicaid Services' Healthcare Common Procedure Coding System (HCPCS).

8. The parties agree to follow Section 3224-b(b) of the Insurance Law prohibiting an MCO from initiating overpayment recovery efforts more than 24 months after the original payment was received by a health care Provider, except where: (1) the plan makes overpayment recovery efforts that are based on a reasonable belief of fraud or other intentional misconduct or abusive billing; (2) for the Medicaid Managed Care and Family Health Plus programs, the overpayment recovery period for such programs is six years from date payment was received by the health care Provider with written notice 30 days prior to engaging in overpayment recovery efforts. Such notice must state the patient's name, service date, payment amount, proposed adjustment, and a reasonably specific explanation of the proposed adjustment.

FILED: WESTCHESTER COUNTY CLERK 10/25/2021 11:01 PM
INDEX NO. 60278/2020
NYSCEF DOC. NO. 250
21-07096-shl   Doc 37-2   Filed 02/11/22   Entered 02/11/22 17:46:27   Exhibit 2
RECEIVED NYSCEF: 10/25/2021
Pg 102 of 144

9. The parties agree to follow Section 3224-c of the Insurance Law providing that claims cannot be denied solely on the basis that the MCO has not received from the member information concerning other insurance coverage.

10. The parties agree that this contract does not waive, limit, disclaim, or in any way diminish the rights that any Provider may have pursuant to Section 3238 of the Insurance Law to the receipt of claims payment for services where preauthorization was required and received from the appropriate person or entity prior to the rendering of the service.

11. The parties agree that for a contract involving Tier 2 or 3 arrangements as described in Section VII.B of the Guidelines, the contract must:
    a. Provide for the MCO's ongoing monitoring of Provider financial capacity and/or periodic Provider financial reporting to the MCO to support the transfer of risk to the Provider; and
    b. Include a provision to address circumstance where the Provider's financial condition indicates an inability to continue accepting such risk; and address MCO monitoring of the financial security deposit, describing the method and frequency of monitoring and recourse for correcting underfunding of the deposit to be maintained by the MCO; and
    c. Include a provision that the Provider will submit any additional documents or information related to its financial condition to the MCO, if requested by DOH.

12. The parties agree that for any contract involving an MCO and IPA/ACO, the contract must include provisions whereby:
    a. The parties expressly agree to amend or terminate the contract at the direction of DOH (applies to Tier 1, Tier 2, and Tier 3);
    b. The IPA/ACO will submit annual financial statements to the MCO, as well as any additional documents required by the MCO as necessary to assess the IPA/ACO's progress towards achieving value based payment goals as specified in the Roadmap, and the MCO will notify DOH of any substantial change in the financial condition of the IPA/ACO (applies to Tier 2 and Tier 3); and
    c. The IPA/ACO will submit any additional documents or information related to its financial condition to the MCO, if requested by DOH (applies to Tier 2 and Tier 3); and
    d. The parties agree that all Provider contracts will contain provision prohibiting Providers, in the event of a default by the IPA/ACO, from demanding payment from the MCO for any covered services rendered to the MCO's enrollees for which payment was made by the MCO to the IPA/ACO pursuant to the risk agreement (applies to Tier 2 and Tier 3).

## D. Records and Access

1. Pursuant to appropriate consent/authorization by the enrollee, the Provider will make the enrollee's medical records and other personally identifiable information (including encounter data for government-sponsored programs) available to the

FILED: WESTCHESTER COUNTY CLERK 10/25/2021 11:01 PM
NYSCEF DOC. NO. 250
21-07096-snf    Doc 37-2    Filed 02/11/22    Entered 02/11/22 17:46:27    Exhibit 2
INDEX NO. 60278/2020
RECEIVED NYSCEF: 10/25/2021
Pg 103 of 144

MCO (and IPA/ACO if applicable) for purposes including preauthorization, concurrent review, quality assurance, (including Quality Assurance Reporting Requirements (QARR)), payment processing, and qualification for government programs, including but not limited to newborn eligibility for Supplemental Security Income (SSI) and for MCO/Manager analysis and recovery of overpayments due to fraud and abuse. The Provider will also make enrollee's medical records available to the State for management audits, financial audits, program monitoring and evaluation, licensure or certification of facilities or individuals, and as otherwise required by state law. The Provider shall provide copies of such records to DOH at no cost. The Provider (or IPA/ACO if applicable) expressly acknowledges that the Provider shall also provide to the MCO and the State (at no expense to the State), on request, all financial data and reports, and information concerning the appropriateness and quality of services provided, as required by law. These provisions shall survive termination of the contract for any reason.

2. When such records pertain to Medicaid reimbursable services, the Provider agrees to disclose the nature and extent of services provided and to furnish records to DOH and/or the United States Department of Health and Human Services, the County Department of Social Services, the Comptroller of the State of New York, the Office of the Medicaid Inspector General, the New York State Attorney General, and the Comptroller General of the United States and their authorized representatives upon request. This provision shall survive the termination of this Agreement regardless of the reason.

3. The parties agree that medical records shall be retained for a period of six years after the date of service, and in the case of a minor, for three years after majority or six years after the date of service, whichever is later, or for such longer period as specified elsewhere within this Agreement. This provision shall survive the termination of this Agreement regardless of the reason.

4. The MCO and the Provider agree that the MCO will obtain consent directly from enrollees at the time of enrollment or at the earliest opportunity, or that the Provider will obtain consent from enrollees at the time of service is rendered or at the earliest opportunity, for disclosure of medical records to the MCO, to an IPA/ACO or to third parties. If the Agreement is between an MCO and an IPA/ACO, or between an IPA/ACO and an IPA/ACO, the IPA/ACO agrees to require the Providers with which it contracts to agree as provided above. If the Agreement is between an IPA/ACO and a Provider, the Provider agrees to obtain consent from the enrollee if the enrollee has not previously signed consent for disclosure of medical records.

**E. Termination and Transition**

1. Termination or non-renewal of an agreement between an MCO and an IPA/ACO, institutional network Provider, or medical group Provider that serves five percent or more of the enrolled population in a county, or the termination or non-renewal of an agreement between an IPA/ACO and an institutional Provider or medical group Provider that serves five percent or more of the enrolled population in a county,

requires notice to the Commissioner of Health. Unless otherwise provided by statute or regulation, the effective date of termination shall not be less than 45 days after receipt of notice by either party, provided, however, that termination by the MCO may be effected on less than 45 days' notice provided the MCO demonstrates to the satisfaction of DOH, prior to termination, that circumstances exist which threaten imminent harm to enrollees or which result in Provider being legally unable to deliver the covered services and, therefore, justify or require immediate termination.

2. If this Agreement is between the MCO and a health care professional, the MCO shall provide to such health care professional a written explanation of the reasons for the proposed contract termination, other than non-renewal, and an opportunity for a review as required by state law. The MCO shall provide the health care professional 60 days' notice of its decision to not renew this Agreement.

3. If this Agreement is between an MCO and an IPA/ACO, and the Agreement does not provide for automatic assignment of the IPA/ACO's Provider contracts to the MCO upon termination of the MCO/IPA/ACO contract, in the event either party gives notice of termination of the Agreement, the parties agree, and the IPA/ACO's Providers agree, that the IPA/ACO Providers shall continue to provide care to the MCO's enrollees pursuant to the terms of this Agreement for 180days following the effective date of termination, or until such time as the MCO makes other arrangements, whichever occurs first. This provision shall survive termination of this Agreement regardless of the reason for the termination.

4. Continuation of Treatment. The Provider agrees that in the event of MCO or IPA/ACO insolvency or termination of this contract for any reason, the Provider shall continue, until medically appropriate discharge or transfer, or completion of a course of treatment, whichever occurs first, to provide services pursuant to the subscriber contract or Medicaid Managed Care contract, to an enrollee confined in an inpatient facility, provided the confinement or course of treatment was commenced during the paid premium period. **For purposes of this clause, the term "Provider" shall include the IPA/ACO and the IPA/ACO's contracted Providers if this Agreement is between the MCO and an IPA/ACO.** This provision shall survive termination of this Agreement.

5. Notwithstanding any other provision herein, to the extent that the Provider is providing Health Care Services to enrollees under the Medicaid Program, the MCO or IPA/ACO retains the option to immediately terminate the Agreement when the Provider has been terminated or suspended from the Medicaid Program.

6. In the event of termination of this Agreement, the Provider agrees, and, where applicable, the IPA/ACO agrees to require all participating Providers of its network to assist in the orderly transfer of enrollees to another Provider.

**F.  Arbitration**

To the extent that arbitration or alternative dispute resolution is authorized elsewhere in this Agreement, the parties to this Agreement acknowledge that the Commissioner of Health is not bound by arbitration or mediation decisions.  Arbitration or mediation shall occur within New York State, and the Commissioner of Health will be given notice of all issues going to arbitration or mediation and copies of all decisions.

**G.  IPA/ACO-Specific Provisions**

Any reference to IPA/ACO Quality Assurance (QA) activities within this Agreement is limited to the IPA/ACO's analysis of utilization patterns and quality of care on its own behalf and as a service to its contractual Providers.

## APPENDIX B-1
## CERTIFICATION REGARDING LOBBYING

The undersigned certifies, to the best of his or her knowledge, that:

1. No Federal appropriated funds have been paid or will be paid to any person by or on behalf of the Provider for the purpose of influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of a Member of Congress in connection with the award of any Federal loan, the entering into any cooperative agreement, or the extension, continuation, renewal, amendment, or modification of any Federal contract, grant, loan, or cooperative agreement.

2. If any funds other than Federal appropriated funds have been paid or will be paid to any person for the purpose of influencing or attempting to influence an officer or employee of any agency, a Member of Congress in connection with the award of any Federal contract, the making of any Federal grant, the making of any Federal loan, the entering into any cooperative agreement, or the extension, continuation, renewal, amendment or modification of this Federal contract, grant, loan, or cooperative agreement, and the Agreement exceeds $100,000, the Provider shall complete and submit Standard Form-LLL "Disclosure Form to Reporting Lobby," in accordance with its instructions.

This certification is a material representation of fact upon which reliance was placed when this transaction was made or entered into submission of this certification is a prerequisite for making or entering into this transaction pursuant to U.S.C. Section 1352. The failure to file the required certification shall subject the violator to a civil penalty of not less than $10,000 and not more than $100,000 for each such failure.

DATE: _6/24/2020_

TITLE: _Corporate Controller_

ORGANIZATION: HBL SNF LLC DBA EPIC REHABILITATION AND NURSING AT WHITE PLAINS

NAME: (Please Print) _Jennifer Brennan_

SIGNATURE: _Jennifer Brennan_

FILED: WESTCHESTER COUNTY CLERK 10/25/2021 11:01 PM   INDEX NO. 60278/2020
NYSCEF DOC. NO. 250   21-07096-shl   Doc 37-2   Filed 02/11/22   Entered 02/11/22 17:46:27   Exhibit 2   RECEIVED NYSCEF: 10/25/2021

Pg 107 of 144

## ATTACHMENT C
## VNS MEDICARE PROGRAMS

- **VNS Medicare Advantage Special Needs Plans** – a VNS program for Medicare beneficiaries who are also Medicaid recipients (i.e. dually eligible).

- **VNS Medicare Advantage Plans** – each VNS program available to all Medicare beneficiaries.

- **"VNS MLTC Plus Plan"** means each VNS program for Enrollees who qualify for the SDOH managed long term care program and who have enrolled in a combined VNS Medicare Advantage Plan and VNS Medicaid Advantage Plus Plan. **"VNS Medicaid Advantage Plus Plan"** means the portion of the combined program which covers payment by VNS to Participating Providers for applicable copayments, coinsurance and deductibles that would have been the responsibility of Medicaid fee-for-service and certain other services covered under the New York State Medicaid Program.

- **"VNS Medicare / Medicaid Advantage Plan"** means a VNS program for Enrollees who have enrolled in a combined VNS Medicare Advantage Plan and VNS Medicaid Advantage Plan. **"VNS Medicaid Advantage Plan"** means the portion of the combined program which covers payment by VNS to Participating Providers for applicable copayments, coinsurance and deductibles that would have been the responsibility of Medicaid fee-for-service.

## ATTACHMENT D
## SCOPE OF SNF SERVICES

I.  DUTIES AND OBLIGATIONS OF THE SNF

A.  SNF shall furnish to an Enrollee, services which are SNF Services, and which shall include all of those services which the SNF normally provides pursuant to the SNF's policies, procedures, protocols and agreements with a resident of the facility.   All services shall be in compliance Chapter V of Title 10 of the New York State Department of Health Codes, Rules, and Regulations.

B.  The SNF will provide the Enrollee with the nursing, dietary, housekeeping and other services normally offered and consistent with the care needs of the resident. These services include but are not limited to:

1. Semi-private room and board.

2. Equipment, medical supplies, and appliances.

3. Nursing and personal care including assistance in activities of daily living.

4. Rehabilitation services including physical, speech, occupational, and recreational, based on an individually developed plan of care.

5. Supervising the use of durable medical equipment, assistive devises, and prescribed therapies.

6. Recreational and socialization activities.

7. Maintenance of resident's room cleanliness.

8. Other services and furnishings related to the basic room, board, and custodial care of the resident.

C.  The SNF's medical staff will provide medical management on a fee-for-service basis, billed to VNS.   VNS may provide, as applicable, clinical protocols for the management of certain conditions.   The SNF agrees to utilize these protocols as appropriate.

FILED: WESTCHESTER COUNTY CLERK 10/25/2021 11:01 PM
INDEX NO. 60278/2020
NYSCEF DOC. NO. 250
21-07096-shl   Doc 37-2   Filed 02/11/22   Entered 02/11/22 17:46:27   Exhibit 2
Pg 109 of 144
RECEIVED NYSCEF: 10/25/2021

## ATTACHMENT E
## COMPENSATION SCHEDULE

**For SNF Services:**

**VNS Medicare Advantage Special Needs Plans (for dually eligible Enrollees)**

85% of the current Medicare rate. SNF agrees to bill NYS Medicaid for any applicable copayments, coinsurance and / or deductibles. SNF shall not bill or collect any additional amount for such services from the Enrollee.

**VNS Medicare Advantage Plans** (other than the VNS Medicare Advantage Special Needs Plan, the VNS MLTC Plus Plan and the VNS Medicare / Medicaid Advantage Plan)

85% of the current Medicare rate. SNF may bill Enrollee for any applicable copayment, coinsurance and / or deductible.

**VNS MLTC Plus Plan and VNS Medicare / Medicaid Advantage Plans**

85% of the current Medicare rate. SNF shall not bill or collect any additional amount for such services from NYS Medicaid of the Enrollee.

| Form **W-9** | **Request for Taxpayer** | **Give Form to the** |
|---|---|---|
| (Rev. December 2014)<br>Department of the Treasury<br>Internal Revenue Service | **Identification Number and Certification** | **requester. Do not send to the IRS.** |

1 Name (as shown on your income tax return). Name is required on this line; do not leave this line blank.

HBL SNF LLC

2 Business name/disregarded entity name, if different from above

Epic Rehabilitation and Nursing at White Plains

3 Check appropriate box for federal tax classification; check only **one** of the following seven boxes:

- [ ] Individual/sole proprietor or single-member LLC
- [ ] C Corporation
- [ ] S Corporation
- [ ] Partnership
- [ ] Trust/estate
- [X] Limited liability company. Enter the tax classification (C=C corporation, S=S corporation, P=partnership) ▶ **P**

**Note.** For a single-member LLC that is disregarded, do not check LLC; check the appropriate box in the line above for the tax classification of the single-member owner.

- [ ] Other (see instructions) ▶

4 Exemptions (codes apply only to certain entities, not individuals; see instructions on page 3):

Exempt payee code (if any) _____

Exemption from FATCA reporting code (if any) _____

*(Applies to accounts maintained outside the U.S.)*

5 Address (number, street, and apt. or suite no.)

120 Church Street

6 City, state, and ZIP code

White Plains NY 10601

Requester's name and address (optional)

7 List account number(s) here (optional)

*Print or type. See Specific Instructions on page 2.*

---

**Part I**    **Taxpayer Identification Number (TIN)**

Enter your TIN in the appropriate box. The TIN provided must match the name given on line 1 to avoid backup withholding. For individuals, this is generally your social security number (SSN). However, for a resident alien, sole proprietor, or disregarded entity, see the Part I instructions on page 3. For other entities, it is your employer identification number (EIN). If you do not have a number, see *How to get a TIN* on page 3.

**Note.** If the account is in more than one name, see the instructions for line 1 and the chart on page 4 for guidelines on whose number to enter.

| Social security number |
|---|
| ☐☐☐ - ☐☐ - ☐☐☐☐ |

or

| Employer identification number |
|---|
| 4 7 - 5 6 0 6 0 4 5 |

---

**Part II**    **Certification**

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me); and

2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding; and

3. I am a U.S. citizen or other U.S. person (defined below); and

4. The FATCA code(s) entered on this form (if any) indicating that I am exempt from FATCA reporting is correct.

**Certification instructions.** You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the certification, but you must provide your correct TIN. See the instructions on page 3.

| **Sign Here** | Signature of U.S. person ▶ *(signature)* | Date ▶ 12/11/2019 |
|---|---|---|

## General Instructions

Section references are to the Internal Revenue Code unless otherwise noted.

**Future developments.** Information about developments affecting Form W-9 (such as legislation enacted after we release it) is at *www.irs.gov/fw9*.

## Purpose of Form

An individual or entity (Form W-9 requester) who is required to file an information return with the IRS must obtain your correct taxpayer identification number (TIN) which may be your social security number (SSN), individual taxpayer identification number (ITIN), adoption taxpayer identification number (ATIN), or employer identification number (EIN), to report on an information return the amount paid to you, or other amount reportable on an information return. Examples of information returns include, but are not limited to, the following:

- Form 1099-INT (interest earned or paid)
- Form 1099-DIV (dividends, including those from stocks or mutual funds)
- Form 1099-MISC (various types of income, prizes, awards, or gross proceeds)
- Form 1099-B (stock or mutual fund sales and certain other transactions by brokers)
- Form 1099-S (proceeds from real estate transactions)
- Form 1099-K (merchant card and third party network transactions)

- Form 1098 (home mortgage interest), 1098-E (student loan interest), 1098-T (tuition)
- Form 1099-C (canceled debt)
- Form 1099-A (acquisition or abandonment of secured property)

Use Form W-9 only if you are a U.S. person (including a resident alien), to provide your correct TIN.

*If you do not return Form W-9 to the requester with a TIN, you might be subject to backup withholding. See What is backup withholding? on page 2.*

By signing the filled-out form, you:

1. Certify that the TIN you are giving is correct (or you are waiting for a number to be issued), and

2. Certify that you are not subject to backup withholding, or

3. Claim exemption from backup withholding if you are a U.S. exempt payee. If applicable, you are also certifying that as a U.S. person, your allocable share of any partnership income from a U.S. trade or business is not subject to the withholding tax on foreign partners' share of effectively connected income, and

4. Certify that FATCA code(s) entered on this form (if any) indicating that you are exempt from the FATCA reporting, is correct. See *What is FATCA reporting?* on page 2 for further information.

Cat. No. 10231X    Form **W-9** (Rev. 12-2014)

**VNSNY CHOICE Health Plans**

## <u>Contract Summary Sheet</u>

**Approvals**

Director of Network Contracting _____ Elizabeth Alvarez

_____

**Network Development**

_____ Emma Ortiz

Date: 6/30/2020

**I.   Provider type:**  [ ] PCP   [ ] Specialist   [ ] Group   [ ] Hospital   [✔] SNF   [ ] LHCSA   [ ] CDPAP
[ ] Other: _____

**II.   Demographic Info:**

Provider Name/DBA *if applicable: HBL SNF LLC

Service Area: Westchester

NPI: 1528622495      TAX ID: 475606045

Delegated Entity *(Leave blank if not applicable)*

**III.   CHOICE Provider ID:** SNFA57352

**IV. Contract Terms**

Type: [✔] New Contract   [ ] Amendment   [ ] Vendor

Products: [ ] Medicare Advantage   [ ] MLTC   [ ] FIDA   [✔] Select Health
*select all that apply*

Contract Effective Date: 8/15/2020

**A.**  [✔] 100 of Current Medicaid   [ ] ____ of Current Medicare   [ ] Review Contract for rates

**B.**  [ ] Non Standard Fee Schedule

Claims Type:  [ ] CMS 1500   [✔] UBO4   [ ] Invoice Cost   [ ] Both

Timely Filing: 120 Days

**V. Attachments**  [ ] Delegated Credentialing Agreement
[ ] Delegated Roster

**VI. Additional Notes (attach additional documentation if necessary)**

SNF closes gap for hospice for SH

DBA EPIC REHABILITATION AND NURSING AT WHITE PLAINS

## VNS SELECT HEALTH PROGRAM

## SKILLED NURSING FACILITY SERVICES AGREEMENT

This Skilled Nursing Facility Services Agreement, herein called the "Agreement," effective as of _____ August 15 _____ , 20 20 , (the "Effective Date") is made and entered into by and between VNS CHOICE, herein referred to as "VNS," and **HBL SNF LLC DBA EPIC REHABILITATION AND NURSING AT WHITE PLAINS,** a skilled nursing facility established and operating pursuant to Article 28 of the New York State Public Health Law and having its principal place of business at 120 Church Street, White Plains NY 10601 herein referred to as "Skilled Nursing Facility".

## PREAMBLE

**WHEREAS**, VNS has contracted with the NYS Department of Health to offer the VNSNY CHOICE Select Health plan, a comprehensive HIV Special Needs Plan organized pursuant to Section 4403-C of Article 44 of the NYS Public Health Law ("HIV SNP");

**WHEREAS**, in accordance with such participation in the HIV SNP, VNS shall arrange for the provision of Covered Services to Enrollees;

**WHEREAS**, Skilled Nursing Facility is duly organized and operated in accordance with Article 28 of the New York Public Health Law and applicable regulations, including without limitation 10 NYCRR Article 6, and in compliance with CMS conditions of participation for a provider of medical services;

**WHEREAS**, VNS desires to enter into this Agreement with Skilled Nursing Facility to further its objective of providing for Skilled Nursing Facility Services; and

**WHEREAS**, Skilled Nursing Facility is duly authorized and licensed to furnish SNF Services, and would like to enter into this Agreement to provide certain SNF Services that are Covered Services.

**NOW, THEREFORE**, the parties agree as follows:

## Article 1
### Definitions

The following terms when used in this Agreement or any amendments herein, are defined as follows:

1.1 **"SNF Services"** means inpatient nursing home care services of the SNF Provider provided to Members in accordance with this Agreement and Chapter V of Title 10 of the New York State Department of Health Codes, Rules and Regulations (10 NYCRR), and as set forth in Attachment B attached to this Agreement, as modified from time to time by VNS.

1.2   **"Clean Claim"** means a claim that includes the specific elements required by the New York State Medicaid Program and VNS, and which has no defect, impropriety, lack of any required substantiating documentation or particular circumstance requiring special treatment that prevents timely payment. The specific data elements required for a claim to be deemed a Clean Claim may be modified from time to time by VNS, with notice to Skilled Nursing Facility.

1.3   **"CMS"** means the Centers for Medicare & Medicaid Services.

1.4   **"Covered Services"** means those medical, hospital and other health care benefits to which Select Health Enrollees are entitled under the terms of Select Health and in accordance with the requirements of the SDOH HIV SNP Contract.

1.5   **"Emergency Service"** means services for a medical or behavioral condition, the onset of which is sudden, that manifests itself by symptoms of sufficient severity, including severe pain, that a prudent layperson, possessing an average knowledge of medicine and health, could reasonably expect the absence of immediate medical attention to result in (i) placing the health of the person afflicted with such condition in serious jeopardy, or in the case of a behavioral condition, placing the health of such person or others in serious jeopardy; (ii) serious impairment to such person's bodily function; (iii) serious dysfunction of any bodily organ or part of such person; or (iv) serious disfigurement of such person.

1.6   **"Enrollee"** means an individual with HIV infection eligible for and properly enrolled in Select Health.

1.7   **"Enrollee Dependent"** means a related child of an Enrollee who is eligible for and properly enrolled in Select Health.

1.8   **"Select Health Enrollee"** means an Enrollee or an Enrollee Dependent.

1.9   **"HIPAA"** means the Health Insurance Portability and Accountability Act of 1996, Public Law 104-91, the Health Information Technology for Economic and Clinical Health Act, Public Law 111-5, and regulations promulgated thereunder, as in effect or as may hereafter be amended from time to time and the regulations promulgated thereunder, as amended from time to time.

1.10   **"Medically Necessary"** means Covered Services that are (i) necessary and appropriate for the symptoms, diagnosis or treatment of a medical condition, illness, disease or injury, (ii) within accepted standards of professional medical practice, (iii) not primarily for the convenience of the Select Health Enrollee, or the Select Health Enrollee's provider of health services. In the case of inpatient hospital services, Medically Necessary shall also mean that safe and adequate care could not be provided to the Select Health Enrollee on an outpatient basis or in nursing home or other medical facility.

1.11   **"Participating Ancillary Provider"** means a company, corporation or entity licensed or certified in New York State as an ancillary health service provider (e.g., home health,

infusion, medical supplies, etc.) and which has contracted with VNS to provide Covered Services to Select Health Enrollees under Select Health.

1.12 **"Participating Diagnostic and Treatment Center"** means a company, corporation, or entity with an operating certificate as a diagnostic and treatment center issued by the NYS Department of Health pursuant to Article 28 of the New York Public Health Law, and which has contracted with VNS to provide Covered Services to Select Health Enrollees under Select Health.

1.13 **"Participating Hospital"** means a hospital that is under contract with VNS to provide Covered Services to Select Health Enrollees under Select Health.

1.14 **"Participating Provider"** means all providers, including Participating Hospitals, Participating Diagnostic and Treatment Centers, Participating Skilled Nursing Facilities, Participating Ancillary Providers and other health professionals, who or which has contracted with VNS to provide Covered Services to Select Health Enrollees.

1.15 **"Participating Skilled Nursing Facility"** means an inpatient skilled nursing care facility which (a) is certified or licensed as such by the proper governmental authority (b) meets the requirements of the New York State Medicaid Program and (c) is approved by and has contacted with VNS to provide Covered Services to Select Health Enrollees.

1.16 **"Policy and Procedure Manual"** or **"Provider Manual"** means the policies and procedures promulgated by VNS and furnished to Skilled Nursing Facility which relate to this Agreement (a copy of which shall be provided to Skilled Nursing Facility by VNS and which is incorporated as part of this Agreement), including but not limited to (a) Quality Improvement Program; (b) Utilization Management Program; (c) Care and Benefit Coordination Services Program; (d) preadmission testing guidelines; (e) claims payment review; (f) Select Health Enrollee grievances and appeals; (g) provider grievances; (h) credentialing of health professionals; and (i) electronic submission of claims and other data required by VNS.

1.17 **"Select Health"** means the Medicaid HIV SNP plan provided by VNS to Select Health Enrollees in accordance with the SDOH HIV SNP Contract.

1.18 **"SDOH"** means the New York State Department of Health.

1.19 **"SDOH HIV SNP Contract"** means the contract between SDOH and VNS for the HIV SNP.

1.20 **"Quality Improvement Program"** means activities and programs conducted by VNS for the evaluation of the delivery of health care and services provided to Select Health Enrollees, including development of quality improvement initiatives, quality measurement and evaluation, corrective action implementation and evaluation, and annual evaluation of the program effectiveness.

1.21 **"Care and Benefit Coordination Services Program"** means the activities and programs conducted by VNS related to medical case management/care coordination services,

assessment and service plan development to identify and address each Select Health Enrollee's medical and psycho-social needs, service utilization monitoring and care advocacy services to promote Select Health Enrollee access to needed care and services, and such other requirements as set forth in the SDOH HIV SNP Contract and the Provider Manual.

**1.22** **"Utilization Management Program"** means those standards, criteria, protocols, policies and procedures adopted by VNS regarding the management, review monitoring and approval of Medically Necessary Covered Services, including but not limited to authorization of elective admissions and procedures, concurrent review of Covered Services and referral processes or protocols.

### Article II
### Responsibilities of Skilled Nursing Facility

**2.1** Skilled Nursing Facility shall provide all Medically Necessary SNF Services to which a Select Health Enrollee may be entitled under Select Health, provided that the services are furnished within the scope of licensure or certification of Skilled Nursing Facility and Skilled Nursing Facility is capable of providing such services.

**2.2** Skilled Nursing Facility shall provide Covered Services to Select Health Enrollees in accordance with this Agreement, the Provider Manual, SDOH requirements for the HIV SNP, and all applicable state and federal laws and regulations.

**2.3** Skilled Nursing Facility shall comply with the requirements of the VNS Quality Improvement Program, Care and Benefit Coordination Services Program and Utilization Management Program.

**2.4** Skilled Nursing Facility acknowledges that VNS is required to maintain a health information system that collects, analyzes and integrates all data necessary to compile, evaluate and report certain statistical data related to costs, utilization and quality, and such other matters as SDOH may require from time to time. Skilled Nursing Facility shall provide VNS with all information necessary for VNS to meet its data reporting and submission obligations to SDOH regarding the delivery of Covered Services under this Agreement, including, but not limited to data necessary for VNS to meet its reporting obligations under the SDOH HIV SNP Contract, and any encounter data required by VNS.

**2.5** Skilled Nursing Facility shall comply with all applicable federal and state laws, including Medicaid laws, regulations, and SDOH policies. Skilled Nursing Facility acknowledges that: (i) VNS receives payments in whole or in part from federal funds and that Skilled Nursing Facility is subject to certain laws that are applicable to individuals and entities receiving federal funds; and (ii) VNS oversees and is accountable to SDOH for any functions and responsibilities under the SDOH HIV SNP Contract.

**2.6** Skilled Nursing Facility shall provide and maintain sufficient facilities, equipment, personnel and services in order to provide SNF Services to Select Health Enrollees.

Unique ID: VNS-SH-SkilledNursing-Template-2015    4

FILED: WESTCHESTER COUNTY CLERK 10/25/2021 11:01 PM
INDEX NO. 60278/2020
NYSCEF DOC. NO. 250
21-07096-shl    Doc 37-2    Filed 02/11/22    Entered 02/11/22 17:46:27    Exhibit 2
RECEIVED NYSCEF: 10/25/2021
Pg 116 of 144

2.7 Skilled Nursing Facility shall comply with all applicable VNS policies and procedures, including without limitation those set forth in the Provider Manual. Any material change or revision to the Provider Manual shall be provided to the Skilled Nursing Facility upon thirty (30) days prior written or electronic notice, and shall take effect as of the end of the notice period.

2.8 Skilled Nursing Facility acknowledges that VNS may use the name of Skilled Nursing Facility and other related, pertinent and appropriate information for the promotion, marketing, and enrollment of Select Health Enrollees into Select Health.

2.9 Skilled Nursing Facility cooperate with VNS by providing the appropriate documentation of services for potential third party subrogation cases and for the coordination of benefits with other insurance and government agencies.

2.10 Skilled Nursing Facility agrees that:

**2.10.1** In no event, including but not limited to non-payment by VNS, insolvency of VNS or breach of the Agreement, shall Skilled Nursing Facility bill, charge, collect a deposit from, seek compensation, remuneration or reimbursement from, or have any recourse against a Select Health Enrollee or persons other than VNS acting on their behalf for services provided pursuant to the Agreement. This provision does not prohibit the collection of deductibles, coinsurance or copayments in accordance with the terms of Select Health. Further, this provision does not prohibit the collection of payments for services not covered under Select Health provided that, prior to furnishing the service, Skilled Nursing Facility informs the Select Health Enrollee that the services will not be Covered Services under Select Health, and that the Select Health Enrollee will be financially responsible for the costs of such services, and Skilled Nursing Facility obtains the Select Health Enrollee's written acknowledgement of such financial liability.

**2.10.2** In the event of VNS's insolvency or other cessation of operations, (i) services to Select Health Enrollees will continue through the period for which New York State payment for Select Health has been paid to VNS, and (ii) services to Select Health Enrollees confined in an inpatient hospital on the date of insolvency or other cessation of operations will continue until their discharge.

**2.10.3** Skilled Nursing Facility further agrees that (i) the hold harmless and continuation of Covered Services provisions shall survive the termination of this Agreement regardless of the cause giving rise to the termination and shall be construed to be for the benefit of the Select Health Enrollees, and that (ii) these provisions supersede any oral or written contrary agreement now existing or hereafter entered into between Skilled Nursing Facility and a Select Health Enrollee or persons acting on his or her behalf that relates to liability for payment for, or continuation of, Covered Services provided under the terms and conditions of these clauses.

**2.11** Skilled Nursing Facility shall comply with, and accept as final, the final decisions (subject to applicable Medicaid appeal rights and the Provider Manual) of the VNS Quality Improvement Program and Utilization Management Program.

**2.12** Skilled Nursing Facility shall comply with all applicable HIPAA requirements when conducting standard transactions.

**2.13** Skilled Nursing Facility shall notify VNS immediately in writing upon the occurrence of any of the following events:

    **2.13.1** Skilled Nursing Facility's license or certification as a Skilled Nursing Facility, or its certification under Title XVIII of the Social Security Act is suspended, revoked or subject to terms of probation or other restriction. Skilled Nursing Facility shall provide VNS with any information regarding such actions reasonably requested by VNS;

    **2.13.2** Any event listed in sections 2, 3 and 4 of Article XIII of this Agreement;

    **2.13.3** Skilled Nursing Facility learns, or reasonably should know, that Skilled Nursing Facility has become a defendant in a malpractice action or is required to pay damages in any such action by way of judgment or settlement;

    **2.13.4** An act of nature or any event which occurs which substantially interrupts all or a portion of Skilled Nursing Facility's facilities or which has a materially adverse effect on Skilled Nursing Facility's ability to perform his or her obligations hereunder;

    **2.13.5** A petition is filed to declare Skilled Nursing Facility bankrupt or for reorganization under the bankruptcy laws of the United States or a receiver is appointed over all or any portion of Skilled Nursing Facility's assets, or Skilled Nursing Facility fails to pay when due any obligation under any of its bond agreements;

    **2.13.6** Any situation which could reasonably be expected to materially affect Skilled Nursing Facility's ability to carry out its obligations under this Agreement and/or Select Health Program.

## Article III
### Records

**3.1** Skilled Nursing Facility agrees to maintain records, documents and any other information relating to Enrollees and this Agreement for six (6) years or such longer period as required by law. In the case of an Enrollee who is a minor, Skilled Nursing Facility agrees to maintain records, documents and other information for three (3) years after the Enrollee reaches the age of majority, or for six (6) years after the date of service, whichever is longer. Skilled Nursing Facility acknowledges that SDOH may evaluate the quality, appropriateness and timeliness of services furnished to Select Health Enrollees, Skilled Nursing Facility's facilities and any enrollment and disenrollment records. Skilled

Nursing Facility further acknowledges that VNS, SDOH, the Comptroller General, the New York State Department of Health or their designees have the right to inspect any books, contracts, medical records, patient care documentation, and other records of Skilled Nursing Facility or its subcontractors involving transactions related to the SDOH HIV SNP Contract through six (6) years from the final date of the contract period, or from the date of the completion of any audit, or for such longer period provided for in or other applicable law or regulation, whichever is later.

3.2     Skilled Nursing Facility agrees to maintain Select Health Enrollee health records and other information with respect to Select Health Enrollees in an accurate and timely manner. Skilled Nursing Facility agrees to abide by all Federal and State laws regarding confidentiality and disclosure for medical and Skilled Nursing Facility records, including but not limited to the HIV confidentiality requirements of Article 27-F of the Public Health Law, other health information and Select Health Enrollee information. In addition, Skilled Nursing Facility agrees to abide by the confidentiality requirements established by VNS and SDOH. Skilled Nursing Facility agrees to comply with the requirements for privacy and security of protected health information as set forth in HIPAA.

### Article IV
### Quality Improvement and Utilization Management

4.1     Skilled Nursing Facility agrees to participate in an VNS's Quality Improvement Programs.

4.2     Skilled Nursing Facility acknowledges that VNS shall maintain an ongoing Utilization Management Program to address authorization of SNF Services and concurrent and retrospective review of the quality appropriateness, level of care and utilization of SNF Services provided, or to be provided to Select Health Enrollees. The utilization management activities that VNS may engage in include, but are not limited to, the following:

    4.2.1     Authorization for specific procedures, as determined by the VNS.

    4.2.2     Retrospective inpatient review of specific diagnoses to monitor quality of care.

    4.2.3     Assessment of utilization monitors, i.e., frequency of visits, top ten diagnoses, etc. to identify potential areas of under- or over- utilization.

4.3     Skilled Nursing Facility will make all State surveys and reports of external accrediting activities available for VNS' review.

### Article V
### Dispute Resolution

5.1     If any dispute or controversy arises between the parties with respect to the construction, application, or implementation of this Agreement, or the rights of either party hereunder, either party may require, by giving written notice to the other party, that the parties meet

and confer in good faith to resolve such dispute or controversy. The parties shall meet at such times and such places as may be mutually and reasonably acceptable to both parties.

5.2    All actions and proceedings arising out of or relating to this Agreement shall be heard and determined in any New York state or federal court sitting in New York County, New York, and each party hereby irrevocably accepts and consents to the exclusive personal jurisdiction of those courts for such purpose. In addition, each party hereby irrevocably waives to the fullest extent permitted by law, any objection which it may now or hereafter have to the laying of venue of any action or proceedings rising out of or relating to this Agreement or any judgment entered by any court in respect thereof brought in any state or federal court sitting in New York County, New York and further irrevocably waives any claim that any action or proceeding brought in any such court has been brought in an inconvenient forum.

## Article VI
### General Provisions

6.1    Skilled Nursing Facility shall not be prohibited or restricted from acting in its lawful scope of practice or from advising or advocating on behalf of a Select Health Enrollee, who is a patient of Skilled Nursing Facility, for (a) the Select Health Enrollee's health status, medical care, or treatment options, including any alternative treatment that may be self-administered, (b) any information the Select Health Enrollee needs in order to decide among relevant treatment options, (c) the risks, benefits and consequences of treatment and non-treatment, or (d) the Select Health Enrollee's right to participate in decisions regarding his or her health care, including the right to refuse treatment, and to express preferences about future treatment decisions.

6.2    Skilled Nursing Facility agrees that VNS may amend this Agreement effective immediately upon receipt of notice from VNS if such modification is required by any applicable law, regulation, or otherwise by SDOH. Any such amendment shall be incorporated into this Agreement without the necessity of further action by the parties.

In other situations, VNS may amend this Agreement by providing thirty (30) days prior written notice to Skilled Nursing Facility. However, for such amendments, Skilled Nursing Facility shall have thirty (30) days from receipt of the notice to object to such amendment. In the event that Skilled Nursing Facility timely objects, Skilled Nursing Facility shall not be bound to the amendment until the expiration of the applicable term of this Agreement, at which time this Agreement will terminate without any additional notice from VNS. If the Skilled Nursing Facility does not object, any such amendment shall be incorporated into this Agreement without the necessity of further action by the parties.

The parties agree that any material amendment, as defined by 10 NYCRR Part 98, of this Agreement is subject to SDOH approval, and if a material amendment is implemented prior to final approval by SDOH, the parties will make any modifications to the material amendment required by SDOH, and that the parties will terminate the Agreement or material amendment if so directed by SDOH.

Unique ID: VNS-SH-SkilledNursing-Template-2015                                                  8

**6.3**   Skilled Nursing Facility, at its sole cost and expense, shall procure and maintain such policies of general and professional liability and other insurance or other acceptable arrangement as shall be necessary to insure it and its directors, officers, agents, representatives and employees against any claim or claims for damages arising by reason of injury or death occasioned directly or indirectly in connection with the use of any property or facilities provided by Skilled Nursing Facility or activities performed by Skilled Nursing Facility in connection with this Agreement. As regards professional liability, Skilled Nursing Facility shall carry professional liability insurance on an occurrence basis in the minimum amounts of one million dollars ($1,000,000) per occurrence and three million dollars ($3,000,000) in the aggregate, and comprehensive general liability insurance policies on an occurrence basis in the minimum amounts of one million dollars ($1,000,000) per occurrence and one million dollars ($1,000,000) in the aggregate.

Skilled Nursing Facility shall provide VNS, upon request, evidence of its compliance with these requirements. In addition, Skilled Nursing Facility shall have its insurance company issue a Certificate of Insurance to VNS giving VNS at least thirty (30) days advanced notice of the reduction, cancellation, or non-renewal of said policies. Insurance coverage provided pursuant to this Agreement shall be with New York State authorized or approved companies.

**6.4**   Skilled Nursing Facility shall indemnify and hold harmless VNS and any of its officers, directors employees or agents from and against that portion of any claim, cause of action, liability, damage, cost or expense, including attorney's fees and court or proceeding costs arising solely out of or in connection with the acts, omissions or negligence of Skilled Nursing Facility or its officers, directors, employees, subcontractors or agents.

VNS shall indemnify and hold harmless Skilled Nursing Facility and any of its officers, directors, employees or agents from and against that portion of any claim, cause of action, liability damage, cost or expense including attorney's fees and court or proceeding costs arising solely out of or in connection with the acts, omissions or negligence of VNS or its officers, directors, employees, subcontractors or agents.

**6.5**   In the course of the relationship established between VNS and Skilled Nursing Facility during the term of this Agreement, certain confidential information may be disclosed by either party to the other party. Such information includes Select Health Enrollee names, Select Health Enrollee records, fee schedules, business information, and all similar information of any kind whatsoever (hereinafter referred to as "Confidential Information"). VNS and Skilled Nursing Facility shall hold Confidential Information in the strictest confidence as fiduciaries, and shall not voluntarily or involuntarily sell, transfer, publish, disclose, display, or otherwise make available to others any portion of the Confidential Information or related material without the express written consent of the other party. VNS and Skilled Nursing Facility shall each use its best efforts to protect the Confidential Information of the other consistent with the manner in which it protects its most confidential business information. The obligations to maintain this confidentiality shall survive termination of this Agreement for any reason.

Unique ID: VNS-SH-SkilledNursing-Template-2015                                                      9

6.6    None of the provisions of this Agreement is intended to create, nor shall any be designed or construed to create, any relationship between VNS and Skilled Nursing Facility other than that of independent entities contracting with each other hereunder solely for effecting the provision of this Agreement. Neither of the parties hereto nor any of their respective representatives shall be construed to be the agent, employee, or representative of the other.

6.7    This Agreement shall be governed in all respects by the applicable New York State, federal or Medicare laws, regulations or rules.

6.8    Upon VNS's or its designee's request, Skilled Nursing Facility shall permit VNS or its designee to enter Skilled Nursing Facility's premises for the purpose of conducting on-site audits to determine compliance with the requirements of this Agreement.

6.9    The waiver by either party of a breach or violation of any provision of this Agreement shall not operate or be construed to be a waiver of any subsequent breach thereof.

6.10   If any term, provision, covenant or condition of this Agreement is invalid, void or unenforceable, the rest of the Agreement shall remain in full force and effect. The invalidity or unenforceability of any term or provision hereof shall in no way affect the validity or enforceability of any other term or provision.

6.11   This Agreement contains the complete understanding and agreement between VNS and Skilled Nursing Facility with respect to Select Health and supersedes all representations, understandings or agreements prior to the execution hereof with respect to Select Health.

6.12   Skilled Nursing Facility shall not assign, subcontract or delegate its rights, duties, or obligations under this Agreement without the prior written permission of VNS. VNS may, without Skilled Nursing Facility's prior consent, assign this Agreement to any affiliate or successor-in-interest of VNS. VNS may also, in its sole discretion, delegate its duties or obligations to any entity with which VNS has entered into an agreement.

6.13   Skilled Nursing Facility agrees not to employ or contract with an individual or entity who is excluded from participation in Medicare or Medicaid, or with an entity that employs or contracts with such an excluded individual or entity. Skilled Nursing Facility represents, warrants and covenants to VNS that, during the term of the Agreement, Skilled Nursing Facility and each of its employees, contractors and/or agents has not been: (i) convicted of a criminal offense that falls within the ambit of 42 USC 1320a-7(a), or (ii) excluded, debarred, suspended or otherwise ineligible to participate in the Federal health care programs or in Federal procurement or non-procurement programs. Without limiting the foregoing, Skilled Nursing Facility agrees to check, before hiring staff and monthly thereafter, all of its employees, contractors and/or agents whose salaries or compensation are directly or indirectly paid for by a Federal or state health care program against the exclusion lists maintained by the following: (x) the US Department of Health and Human Services' Office of Inspector General; (y) the General Services Administration; and (z) the New York State Office of Medicaid Inspector General (each individual or entity appearing on one or more of these lists is referred to as an "Ineligible Person"). Skilled

Nursing Facility shall maintain proof of such monthly checks for at least ten (10) years, which shall be made available to VNS or its designee promptly upon its request.

Skilled Nursing Facility shall promptly notify VNS in writing in the event any of its employees, contractors or agents becomes an Ineligible Person and shall require such Ineligible Person to immediately cease providing services to or on behalf of VNS and its Select Health Enrollees, and, to the extent required by law or regulation, to terminate the employment or agreement with such Ineligible Person. VNS shall have the right to immediately terminate the Agreement in the event Skilled Nursing Facility fails to require such Ineligible Person to immediately cease providing services to or on behalf of VNS. If Skilled Nursing Facility becomes an Ineligible Person or has a pattern of employing, contracting or using agents who become Ineligible Persons, VNS shall have the right to immediately terminate this Agreement for cause in accordance with Article IX.

Skilled Nursing Facility shall promptly notify VNS in writing in the event any of its employees, contractors or agents becomes an Ineligible Person. Notice of Ineligible Persons shall be directed to Compliance Officer, VNSNY, 1250 Broadway, New York, New York 10001.

**6.14**   Fraud and Abuse Prevention; Whistleblower Protection. In accordance with Section 6032 of the Deficit Reduction Act of 2005 ("DRA"), Skilled Nursing Facility shall comply with the VNS Fraud and Abuse Prevention Policy, as revised from time to time by VNS. Skilled Nursing Facility acknowledges that it has received a copy of the current VNS Fraud and Abuse Prevention Policy.   VNS shall provide thirty (30) days notice to the Skilled Nursing Facility of any revisions to the VNS Fraud and Abuse Prevention Policy. Skilled Nursing Facility shall make available to all employees and agents, and, to the extent required by DRA, its subcontractors a copy of the VNS Fraud and Abuse Prevention Policy, including specific discussion of the provisions of the VNS Fraud and Abuse Prevention Policy in an employee handbook, if such agent or subcontractor has an employee handbook.

Upon request from VNS, Skilled Nursing Facility agrees to submit to VNS a statement certifying that Skilled Nursing Facility complies with all applicable requirements, federal and state, associated with the VNS Fraud and Abuse Prevention Policy and Section 6032 of the DRA.   Skilled Nursing Facility shall cooperate fully with VNS in any examination of the implementation of the VNS Fraud and Abuse Prevention Policy and shall provide any and all assistance requested by VNS, CMS, NYS Departments of Health, Financial Services or Social Services, and/or any law enforcement agency or any prosecutorial agency in the investigation and prosecution of fraud and abuse and related crimes.

**6.15**   During the term of this Agreement, the parties shall not discriminate against any Select Health Enrollee in the provision of Covered Services hereunder, on any basis including age, sex, marital status, sexual orientation, race, color, religion, ancestry, national origin, disability, handicap, health status, source of payment, health maintenance organization membership, utilization of medical or mental health services or supplies, or other unlawful basis.

Unique ID: VNS-SH-SkilledNursing-Template-2015                                    11

**6.16**    Solicitation of Select Health Enrollees.    During the term of this Agreement or any renewal thereof, and for a period of one (1) year from the date of non-renewal or termination of this Agreement, Skilled Nursing Facility    agrees that Skilled Nursing Facility will not advise or counsel any Select Health Enrollee to disenroll from Select Health and will not solicit such Select Health Enrollees to become enrolled with any other health maintenance organization, preferred provider organization special needs plan, prepaid health services plan or any other similar hospitalization or medical payment plan or insurance company.

**6.17**    Neither party shall be liable for any failure, inability or delay to perform hereunder, if such failure, inability or delay is due to war, strike, fire, explosion, sabotage, accident, casualty or any other cause beyond the reasonable control of the parties so failing, providing due diligence is used by that party in curing such cause and in resuming performance.

**6.18**    Skilled Nursing Facility acknowledges and agrees that VNS is a tax-exempt organization and will pay no taxes arising out of this Agreement, nor will VNS reimburse Skilled Nursing Facility for any taxes, which Skilled Nursing Facility pays on its own behalf or on behalf of VNS.

**6.19**    Protection of Electronic Information. Skilled Nursing Facility certifies that it shall be subject to, and comply with the New York Information Security Breach and Notification Act (the "Act"). Skilled Nursing Facility agrees to notify VNS immediately if Skilled Nursing Facility has cause to believe or reasonably believe that any data regarding VNS, its employees, contractors, vendors, volunteers, donors and/or patients may have been obtained by an unauthorized person, as defined in the Act, and that Skilled Nursing Facility will consult with VNS prior to, during and after any required notifications. Skilled Nursing Facility agrees to indemnify VNS for any damage caused to VNS, its employees, contractors, vendors, volunteers and/or patients by a breach of security caused by Skilled Nursing Facility.

**6.20**    Incorporation by Reference.    This Agreement incorporates and each party shall comply with the pertinent provisions of the New York State Department of Health "Medicaid Managed Care / Family Health Plan HIV Special Needs Plan Model Contract" as if set forth fully herein.

**6.21**    Standard Clauses. The "New York State Department of Health Standard Clauses for Managed Care Provider/IPA/ACO Contracts", attached to the Agreement as Attachment A, are expressly incorporated into this Agreement and are binding upon the Article 44 plans and providers that contract with such plans, and who are a party to this Agreement. In the event of any inconsistent or contrary language between the Standard Clauses and any other part of the Agreement, including but not limited to appendices, amendments, and exhibits, the parties agree that the provisions of the Standard Clauses shall prevail, except to the extent applicable law requires otherwise and/or to the extent a provision of the Agreement exceeds the minimum requirements of the Standard Clauses.

Unique ID: VNS-SH-SkilledNursing-Template-2015                                    12

### Article VII
### Compensation

**7.1**   For Medically Necessary SNF Services that are Covered Services furnished to Select Health Enrollees, the Skilled Nursing Facility will first bill Medicare directly for all Medicare-covered services, if appropriate, and any other third party payers for any SNF Services. The Skilled Nursing Facility may then bill VNS for SNF Services in accordance with (i) the requirements set forth in the Provider Manual; and (ii) the Compensation Schedule attached hereto as Attachment C, and as amended by VNS from time-to-time, minus any applicable Select Health Enrollee copayment, coinsurance or deductible obligation.

**7.2**   VNS acknowledges and agrees that Skilled Nursing Facility shall be reimbursed in accordance with all requirements of applicable law and regulations (including, without limitation, New York State Insurance Law Section 3224-a regarding standards for prompt, fair and equitable settlement of claims for health care and payments for health care services (the "Prompt Pay Law").

**7.2.1**   Skilled Nursing Facility agrees to submit claims for services rendered to Select Health Enrollees so that they are received by VNS within one hundred twenty (120) days of the date the services were rendered. Skilled Nursing Facility shall submit claims in the form and manner directed by VNS. Any requirements for electronic submission of claims shall be consistent with requirements for standard transactions set forth in HIPAA.

**7.2.2**   If a late claim is submitted by Skilled Nursing Facility, VNS shall pay a Skilled Nursing Facility's late claim if the Skilled Nursing Facility can show that the untimeliness was the result of an "unusual occurrence" and that the Skilled Nursing Facility has a pattern of timely claim submissions. However, VNS may reduce payment on a late claim by up to 25%. If a claim is submitted one year or more after the date of service, VNS may deny the claim in its entirety.

**7.3**   Skilled Nursing Facility certifies that any claim Skilled Nursing Facility submits concerning Select Health Enrollees will be accurate, complete and truthful. Financial records related to SNF Services pursuant to this Agreement shall be made available by the Skilled Nursing Facility upon request for review by VNS.

**7.4**   Overpayment.   In the event of an overpayment, VNS shall comply with New York Insurance Law § 3224-b. VNS shall provide Skilled Nursing Facility thirty (30) days advance written notice before VNS engages in overpayment recovery efforts seeking recovery of overpayments, other than duplicate payments.   Such notice shall state the patient name, service date, payment amount, proposed adjustment and provide a reasonably specific explanation of the proposed adjustment.   Skilled Nursing Facility may challenge any overpayment recovery pursuant to VNS's policies and procedures, provided such challenge sets forth the specific grounds on which the Skilled Nursing Facility is challenging the overpayment recovery. Except for fraud, any such adjustment must be made by VNS within one year of the date of payment by VNS.

**7.5** Unless Skilled Nursing Facility notifies VNS of any payment disputes within six (6) months of receipt of payment from VNS, such payment will be considered full and final payment for the related claims.

## Article VIII
### Term and Termination

**8.1** This Agreement shall commence on the Effective Date and shall automatically renew unless (i) terminated by either party as set forth below; or (ii) non-renewed by either party upon one hundred twenty (120) days.

**8.2** Immediate Termination. This Agreement may be immediately terminated by VNS upon notification to Skilled Nursing Facility for any one of the following:

    **8.2.1** The suspension, withdrawal, expiration, revocation or non-renewal of any Federal or state license or certificate authorizing Skilled Nursing Facility to provide SNF Services;

    **8.2.2** Any situation which may result in immediate harm to patients of the Skilled Nursing Facility;

    **8.2.3** A suspension or revocation of a Skilled Nursing Facility's DEA certification or other right to prescribe or dispense controlled substances;

    **8.2.4** The loss or material limitation of Skilled Nursing Facility's professional liability insurance or of other required Skilled Nursing Facility insurance;

    **8.2.5** The debarment or suspension of Skilled Nursing Facility from participation in any government sponsored program, including, but not limited to, Medicare or Medicaid;

    **8.2.6** An indictment, arrest or conviction for a felony of Skilled Nursing Facility;

    **8.2.7** An indictment, arrest or conviction for a misdemeanor of Skilled Nursing Facility related to or in any way impairing Skilled Nursing Facility's provision of SNF Services;

    **8.2.8** Any false statement or material omission of Skilled Nursing Facility in the participation application and/or confidential information forms and all other requested information, as determined by VNS in its sole discretion;

    **8.2.9** A determination of fraud and/or abuse by Skilled Nursing Facility;

    **8.2.10** Change of control of Skilled Nursing Facility to an entity not acceptable to VNS.

Skilled Nursing Facility will provide immediate notice to VNS of any of the aforesaid events.

**8.3**     Post-Termination Transition of Care.     Upon non-renewal or termination of this Agreement for any reason, Skilled Nursing Facility shall (a) continue providing Covered Services to Select Health Enrollees through (i) the lesser of the period of active treatment for a chronic or acute medical condition or up to 90 days, (ii) the postpartum period for Select Health Enrollees in their second or third trimester of pregnancy, (iii) the date upon which VNS makes alternative arrangements for the provision of Covered Services to Select Health Enrollees, or (iv) such longer period required by the Provider Manual or SDOH requirements; and (b) Skilled Nursing Facility shall cooperate with VNS for the transition of Select Health Enrollees to other Participating Providers.     The terms and conditions of this Agreement shall apply to any such post non-renewal or termination activities, including the following: (x)  reimbursement from VNS in accordance with the Compensation Schedule; (y)   Skilled Nursing Facility adherence to VNS's Quality Improvement Programs and provision to VNS of necessary medical information related to such care; and (z)   Skilled Nursing Facility adherence to VNS's policies and procedures, including but not limited to procedures regarding referrals and obtaining pre-authorization and a treatment plan approved by VNS.

The transition of care provisions in this Agreement shall survive expiration or termination of this Agreement.

**8.4**     Termination of this Agreement shall not affect the rights or obligations of the parties hereto which shall have theretofore accrued or shall thereafter arise in respect of any occurrence prior to termination and such rights and obligations shall continue to be governed by the terms of this Agreement.

### Article IX
### Notice

Unless otherwise specified herein, any notice required to be given pursuant to the terms and provisions of this Agreement shall be effective only if given in writing, and shall be deemed to have been duly given when received if personally delivered; the business day after being sent, if sent for next business day delivery by a recognized overnight delivery service as verified (e.g., Federal Express); and upon receipt, if sent by certified or registered mail, return receipt requested, and addressed to the following, or to such other address or addresses as shall from time to time be designated by written notice by either party to the other as herein provided.

| VNS CHOICE | HBL SNF LLC DBA EPIC REHABILITATION AND NURSING AT WHITE PLAINS |
|---|---|
| 220 E 42nd Street 3rd Floor | 120 Church Street, |
| New York, NY 10017 | White Plains NY 10601 |
| Attn: President, VNS CHOICE | |
| cc: Director, Hospital Contracting | |

IN WITNESS WHEREOF, the parties hereto have executed this Agreement to be effective as of the Effective Date.

**VNS CHOICE**

Signature: _____

Print Name: Hany Abdelaal

Title: President

Date: 7/20/2020

**HBL SNF LLC DBA EPIC REHABILITATION AND NURSING AT WHITE PLAINS**

Signature: _____

Print Name: Jennifer Brennan

Title: Corporate Controller

Date: 6/24/2020

Tax ID: 47-5606045

## ATTACHMENT A

## NEW YORK STATE DEPARTMENT OF HEALTH STANDARD CLAUSES FOR MANAGED CARE PROVIDER/IPA CONTRACTS

### (Revised 4/1/17)

Notwithstanding any other provision of this agreement, contract, or amendment (hereinafter "the Agreement " or "this Agreement ") the Article 44 plans and providers that contract with such plans, and who are a party agree to be bound by the following clauses which are hereby made a part of the Agreement. Further, if this Agreement is between a Managed Care Organization and an IPA/ACO, or between an IPA/ACO and an IPA/ACO, such clauses must be included in IPA/ACO contracts with Providers, and Providers must agree to such clauses.

A. Definitions for Purposes of this Appendix

"Managed Care Organization" or "MCO" shall mean the person, natural or corporate, or any groups of such persons, certified under Public Health Law Article 44, who enter into an arrangement, agreement or plan or any combination of arrangements or plans which provide or offer a comprehensive health services plan, or a health and long term care services plan.

"Independent Practice Association" or "IPA" shall mean an entity formed for the limited purpose of contracting for the delivery or provision of health services by individuals, entities and facilities licensed and/or certified to practice medicine and other health professions, and, as appropriate, ancillary medical services and equipment. Under these arrangements, such health care Providers and suppliers will provide their service in accordance with and for such compensation as may be established by a contract between such entity and one or more MCOs. "IPA" may also include, for purposes of this Agreement, a pharmacy or laboratory with the legal authority to contract with other pharmacies or laboratories to arrange for or provide services to enrollees of a New York State MCO.

"Provider" shall mean physicians, dentists, nurses, pharmacists and other health care professionals, pharmacies, hospitals and other entities engaged in the delivery of Health Care Services which are licensed, registered and/or certified as required by applicable federal and state law.

B. General Terms and Conditions

1. This agreement is subject to the approval of the New York State Department of Health (DOH) and if implemented prior to such approval, the parties agree to incorporate into this Agreement any and all modifications required by DOH for approval or, alternatively, to terminate this Agreement if so directed by DOH, effective sixty (60) days subsequent to notice, subject to Public

FILED: WESTCHESTER COUNTY CLERK 10/25/2021 11:01 PM
NYSCEF DOC. NO. 250
21-02096-shl    Doc 37-2    Filed 02/11/22    Entered 02/11/22 17:46:27    Exhibit 2
Pg 129 of 144
INDEX NO. 60278/2020
RECEIVED NYSCEF: 10/25/2021

Health Law
§4403 (6)(e). This Agreement is the sole agreement between the parties regarding the arrangement established herein.

2. Any material amendment to this Agreement is subject to the prior approval of DOH, and any such amendment shall be submitted for approval in accordance with the appropriate procedures and timelines described in Sections III and VII of the New York State Department of Health Provider Contract Guidelines for MCOs and IPA/ACOs. To the extent the MCO provides and arranges for the provision of comprehensive Health Care Services to enrollees served by the Medical Assistance Program, the MCO shall notify and/or submit a copy of such material amendment to DOH, as may be required by the Medicaid Managed Care contract between the MCO and DOH.

3. Assignment of an agreement between an MCO and (1) an IPA/ACO, (2) an institutional network Provider, or (3) a medical group Provider that serves five percent or more of the enrolled population in a county, or the assignment of an agreement between an IPA/ACO and (1) an institutional Provider or (2) a medical group Provider that serves five percent or more of the enrolled population in a county, requires the prior approval of the Commissioner of Health.

4. The Provider agrees, or if the Agreement is between the MCO and an IPA/ACO or between an IPA/ACO and an IPA/ACO, the IPA/ACO agrees and shall require the IPA/ACO's Providers to agree, to comply fully and abide by the rules, policies and procedures that the MCO (a) has established or will establish to meet general or specific obligations placed on the MCO by statute, regulation, contract, or DOH or DFS guidelines or policies and (b) has provided to the Provider at least thirty days in advance of implementation, including but not limited to:

   - quality improvement/management;
   - utilization management, including but not limited to precertification procedures, referral process or protocols, and reporting of clinical encounter data;
   - member grievances; and
   - Provider credentialing.

5. The Provider or, if the Agreement is between the MCO and an IPA/ACO, or between an IPA/ACO and an IPA/ACO, the IPA/ACO agrees, and shall require its Providers to agree, to not discriminate against an enrollee based on color, race, creed, age, gender, sexual orientation, disability, place of origin, source of payment or type of illness or condition.

6. If the Provider is a primary care practitioner, the Provider agrees to provide twenty-four (24) hour coverage and back-up coverage when the Provider is unavailable. The Provider may use a twenty-four (24) hour back-up call service provided appropriate personnel receive and respond to calls in a manner consistent with the scope of their practice.

7. The MCO or IPA/ACO that is a party to this Agreement agrees that nothing within this Agreement is intended to, or shall be deemed to, transfer liability for the MCO's or IPA/ACO's own acts or omissions, by indemnification or otherwise, to a Provider.

8. Notwithstanding any other provision of this Agreement, the parties shall comply with the provisions of the Managed Care Reform Act of 1996 (Chapter 705 of the Laws of 1996) Chapter 551 of the Laws of 2006, Chapter 451 of the Laws of 2007, Chapter 237 of the Laws of 2009, Chapter 297 of the Laws of 2012, Chapter 199 of the Laws of 2014, Part H, Chapter 60, of the Laws of 2014 and Chapter 6 of the Laws of 2015 with all amendments thereto.

9. To the extent the MCO enrolls individuals covered by the Medical Assistance Program, this Agreement incorporates the pertinent MCO obligations under the Medicaid Managed Care contract between the MCO and DOH as set forth fully herein, including:

   a. The MCO will monitor the performance of the Provider or IPA/ACO under the Agreement and will terminate the Agreement and/or impose other sanctions if the Provider's or IPA/ACO's performance does not satisfy the standards set forth in the Medicaid Managed Care contract.

   b. The Provider or IPA/ACO agrees that the work it performs under the Agreement will conform to the terms of the Medicaid managed care contract between the MCO and DOH and that it will take corrective action if the MCO identifies deficiencies or areas of needed improvement in the Provider's or IPA/ACO's performance.

   c. The Provider or IPA/ACO agrees to be bound by the confidentiality requirements set forth in the Medicaid Managed Care contract between the MCO and DOH.

   d. The MCO and the Provider or IPA/ACO agree that a woman's enrollment in the MCO's Medicaid Managed Care product is sufficient to provide services to her newborn, unless the newborn is excluded from the enrollment in Medicaid Managed Care or the MCO does not offer a Medicaid Managed Care product in the mother's county of fiscal responsibility.

   e. The MCO shall not impose obligations and duties on the Provider or IPA/ACO that are inconsistent with the Medicaid Managed Care contract or that impair any rights accorded to DOH, the local Department of Social Services, or the United States Department of Health and Human Services.

   f. The Provider or IPA/ACO agrees to provide medical records to the MCO for purposes of determining newborn eligibility for Supplemental Security Income where the mother is a member of the MCO and for quality purposes at no cost to the MCO.

Unique ID: VNS-SH-SkilledNursing-Template-2015                                                    19

FILED: WESTCHESTER COUNTY CLERK 10/25/2021 11:01 PM
NYSCEF DOC. NO. 250
21-07096-shl    Doc 37-2    Filed 02/11/22    Entered 02/11/22 17:46:27    Exhibit 2
Pg 131 of 144
INDEX NO. 60278/2020
RECEIVED NYSCEF: 10/25/2021

g. The Provider or IPA/ACO agrees, pursuant to 31 U.S.C. §1352 and CFR Part 93, that no federally appropriated funds have been paid or will be paid to any person by or on behalf of the Provider/IPA/ACO for the purpose of influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of any Member of Congress in connection with the award of any federal loan, the entering into of any cooperative agreement, or the extension, continuation, renewal, amendment, or modification of any federal contract, grant, loan, or cooperative agreement. The Provider or IPA/ACO agrees to complete and submit the "Certification Regarding Lobbying," Appendix _____attached hereto and incorporated herein, if this Agreement exceeds $100,000. If any funds other than federally appropriated funds have been paid or will be paid to any person for the purpose of influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of a member of Congress, in connection with the award of any federal contract, the making of any federal grant, the making of any federal loan, the entering of any cooperative agreement, or the extension, continuation, renewal, amendment, or modification of any federal contract, grant loan, or cooperative agreement, and the Agreement exceeds $100,000 the Provider or IPA/ACO shall complete and submit Standard Form-LLL "Disclosure Form to Report Lobbying," in accordance with its instructions.

h. The Provider or IPA/ACO agrees to disclose to the MCO, on an ongoing basis, any managing employee who has been convicted of a misdemeanor or felony in relation to the employee's involvement in any program under Medicare, Medicaid or a Title XX services program (block grant programs).

i. The Provider or IPA/ACO agrees to monitor its employees and staff against the List of Excluded Individuals and Entities (LEIE), the Social Security Administration Death Master List, and the National Plan Provider Enumeration System (NPPES).

j. The Provider or IPA/ACO agrees to disclose to the MCO complete ownership, control, and relationship information.

k. The Provider or IPA/ACO agrees to obtain for the MCO ownership information from any subcontractor with whom the Provider has had a business transaction totaling more than $25,000 during the 12-month period ending on the date of the request made by DOH, Office of the Medicaid Inspector General (OMIG) or the United States Department of Health and Human Services (DHHS). The information requested shall be provided to the MCO within 35 days of such request.

l. The Provider or IPA/ACO agrees to have an officer, director or partner of the Provider execute and deliver to DOH a certification, using a form provided by DOH through OMIG's website, within five (5) days of executing this agreement, stating that:

  • The Provider or IPA/ACO is subject to the statutes, rules,

regulations, and applicable Medicaid Updates of the Medicaid program and of DOH related to the furnishing of care, services or supplies provided directly by, or under the supervision of, or ordered, referred or prescribed by the Provider. This includes 18 NYCRR 515.2 except to the extent that any reference in the regulation establishing rates, fees, and claiming instructions will refer to the rates, fees and claiming instructions set by the MCO.

- All claims submitted for payment by the Provider/IPA/ACO are for care, services or medical supplies that have been provided.

- Payment requests are submitted in accordance with applicable law.

m. The Provider or IPA/ACO agrees to require that an officer, director or partner of all subcontractors if they are not natural persons, or the subcontractor itself if it is a natural person, execute a certification, using a form provided by DOH through OMIG's website, before the subcontractor requests payment under the subcontract, acknowledging that:

- The subcontractor is subject to the statutes, rules, regulations, and applicable Medicaid Updates of the Medicaid program and of DOH related to the furnishing of care, services or supplies provided directly by, or under the supervision of, or ordered, referred or prescribed by the subcontractor. This includes 18 NYCRR 515.2 except to the extent that any reference in the regulation establishing rates, fees, and claiming instructions will refer to the rates, fees and claiming instructions set by the MCO.

- All claims submitted for payment by the subcontractor are for care, services or medical supplies that have been provided.

- Payment requests are submitted in accordance with applicable law.

10. The parties to this Agreement agree to comply with all applicable requirements of the federal Americans with Disabilities Act.

11. The Provider agrees, or if the Agreement is between the MCO and an IPA/ACO or between an IPA/ACO and an IPA/ACO, the IPA/ACO agrees and shall require the IPA's Providers to agree, to comply with all applicable requirements of the Health Insurance Portability and Accountability Act, the HIV confidentiality requirements of Article 27-F of the Public Health Law, and Mental Hygiene Law § 33.13.

12. Compliance Program. The Provider agrees that if it claims, orders, or is paid $500,000 or more per year from the Medical Assistance Program, including, in the aggregate, claims submitted to or paid directly by the Medical Assistance Program and/or claims submitted to or paid by any MCO under the Medicaid Managed Care Program, that it shall adopt and implement a compliance program which meets the requirements of New York State Social Services Law § 363-d(2) and 18 NYCRR § 521.3.

Unique ID: VNS-SH-SkilledNursing-Template-2015                    21

13. Compliance Program Certification. The Provider agrees that if it is subject to the requirements of Section B (12) of this Appendix, it shall certify to DOH, using a form provided by OMIG on its website, within 30 days of entering into a Provider Agreement with the MCO, if they have not so certified within the past year that a compliance program meeting the requirements of 18 NYCRR §521.3 and Social Services Law § 363-d(2) is in place. The Provider shall recertify during the month of December each year thereafter using a form provided by OMIG on OMIG's website.

C. Payment and Risk Arrangements

1. Enrollee Non-liability. Provider agrees that in no event, including, but not limited to, nonpayment by the MCO or IPA/ACO, insolvency of the MCO or IPA/ACO, or breach of this Agreement, shall Provider bill; charge; collect a deposit from; seek compensation, remuneration or reimbursement from; or have any recourse against a subscriber, an enrollee or person (other than the MCO or IPA/ACO) acting on his/her/their behalf, for services provided pursuant to the subscriber contract or Medicaid Managed Care contract and this Agreement, for the period covered by the paid enrollee premium. In addition, in the case of Medicaid Managed Care, Provider agrees that, during the time an enrollee is enrolled in the MCO, Provider will not bill DOH or the City of New York for covered services within the Medicaid Managed Care benefit package as set forth in the Agreement between the MCO and DOH. This provision shall not prohibit the Provider, unless the MCO is a Managed Long Term Care plan designated as a Program of All-Inclusive Care for the Elderly (PACE), from collecting copayments, coinsurance amounts, or permitted deductibles, as specifically provided in the evidence of coverage, or fees for uncovered services delivered on a fee-for- service basis to a covered person, provided that Provider shall have advised the enrollee in writing that the service is uncovered and of the enrollee's liability therefore prior to providing the service. Where the Provider has not been given a list of services covered by the MCO, and/or Provider is uncertain as to whether a service is covered, the Provider shall make reasonable efforts to contact the MCO and obtain a coverage determination prior to advising an enrollee as to coverage and liability for payment and prior to providing the service. This provision shall survive termination of this Agreement for any reason and shall supersede any oral or written agreement now existing or hereafter entered into between Provider and enrollee or person acting on his or her behalf.

2. Coordination of Benefits (COB). To the extent otherwise permitted in this Agreement, the Provider may participate in collection of COB on behalf of the MCO, with COB collectibles accruing to the MCO or to the Provider. However, with respect to enrollees eligible for medical assistance or participating in Child Health Plus, the Provider shall maintain and make available to the MCO records reflecting COB proceeds collected by the Provider or paid directly to enrollees by third party payers, and amounts thereof, and the MCO shall maintain or have

Unique ID: VNS-SH-SkilledNursing-Template-2015                                        22

immediate access to records concerning collection of COB proceeds.

3. If the Provider is a health care professional licensed, registered or certified under Title 8 of the Education Law, the MCO or the IPA/ACO must provide notice to the Provider at least ninety (90) days prior to the effective date of any adverse reimbursement arrangement as required by Public Health Law §4406-c(5-c). Adverse reimbursement change shall mean a proposed change that could reasonably be expected to have a material adverse impact on the aggregate level of payment to a health care professional. This provision does not apply if the reimbursement change is required by law, regulation or applicable regulatory authority; is required as a result of changes in fee schedules, reimbursement methodology or payment policies established by the American Medical Association current procedural terminology (CPT) codes, reporting guidelines and conventions; or such change is expressly provided for under the terms of this Agreement by the inclusion or reference to a specific fee or fee schedule, reimbursement methodology, or payment policy indexing scheme.

4. The parties agree to comply with and incorporate the requirements of Physician Incentive Plan (PIP) Regulations contained in 42 CFR §438.6(h), 42 CFR §422.208, and 42 CFR §422.210 into any contracts between the contracting entity (Provider, IPA/ACO, hospital, etc.) and other persons/entities for the

provision of services under this Agreement. No specific payment will be made directly or indirectly under the plan to a physician or physician group as an inducement to reduce or limit medically necessary services furnished to an enrollee.

5. The parties agree that, where required by Public Health Law §4903, a claim for certain continued, extended, or additional health care services cannot be denied on the basis of medical necessity or a lack of prior authorization while a utilization review determination is pending if all necessary information was provided within the required timeframes and under the circumstances described in Public Health Law §4903.

6. The parties agree to follow Section 3224-a of the Insurance Law providing timeframes for the submission and payment of Provider claims to the MCO.

7. The parties agree to follow Section 3224-b(a) of the Insurance Law requiring an MCO to accept and initiate the processing of all claims submitted by physicians that conform to the American Medical Association's Current Procedural Technology (CPT) codes, reporting guidelines and conventions, or to the Centers for Medicare and Medicaid Services' Healthcare Common Procedure Coding System (HCPCS).

8. The parties agree to follow Section 3224-b(b) of the Insurance Law prohibiting an MCO from initiating overpayment recovery efforts more than 24 months after the original payment was received by a health care Provider, except where: (1) the plan makes overpayment recovery efforts that are based on a reasonable belief of fraud or other intentional misconduct or abusive billing; (2) for the Medicaid Managed

Care and Family Health Plus programs, the overpayment recovery period for such programs is six years from date payment was received by the health care Provider with written notice 30 days prior to engaging in overpayment recovery efforts. Such notice must state the patient's name, service date, payment amount, proposed adjustment, and a reasonably specific explanation of the proposed adjustment.

9. The parties agree to follow Section 3224-c of the Insurance Law providing that claims cannot be denied solely on the basis that the MCO has not received from the member information concerning other insurance coverage.

10. The parties agree that this contract does not waive, limit, disclaim, or in any way diminish the rights that any Provider may have pursuant to Section 3238 of the Insurance Law to the receipt of claims payment for services where preauthorization was required and received from the appropriate person or entity prior to the rendering of the service.

11. The parties agree that for a contract involving Tier 2 or 3 arrangements as described in Section VII.B of the Guidelines, the contract must:
    a. Provide for the MCO's ongoing monitoring of Provider financial capacity and/or periodic Provider financial reporting to the MCO to support the transfer of risk to the Provider; and
    b. Include a provision to address circumstance where the Provider's financial condition indicates an inability to continue accepting such risk; and
    c. Address MCO monitoring of the financial security deposit, describing the method and frequency of monitoring and recourse for correcting underfunding of the deposit to be maintained by the MCO; and
    d. Include a provision that the Provider will submit any additional documents or information related to its financial condition to the MCO, if requested by DOH.

12. The parties agree that for any contract involving an MCO and IPA/ACO, the contract must include provisions whereby:
    a. The parties expressly agree to amend or terminate the contract at the direction of DOH (applies to Tier 1, Tier 2, and Tier 3);
    b. The IPA/ACO will submit annual financial statements to the MCO, as well as any additional documents required by the MCO as necessary to assess the IPA/ACO's progress towards achieving value based payment goals as specified in the Roadmap, and the MCO will notify DOH of any substantial change in the financial condition of the IPA/ACO (applies to Tier 2 and Tier 3); and
    c. The IPA/ACO will submit any additional documents or information related to its financial condition to the MCO, if requested by DOH (applies to Tier 2 and Tier 3); and
    d. The parties agree that all Provider contracts will contain provision prohibiting Providers, in the event of a default by the IPA/ACO, from demanding payment from the MCO for any covered services rendered

FILED: WESTCHESTER COUNTY CLERK 10/25/2021 11:01 PM
NYSCEF DOC. NO. 250
INDEX NO. 60278/2020
RECEIVED NYSCEF: 10/25/2021

21-02096-shl    Doc 37-2    Filed 02/11/22    Entered 02/11/22 17:46:27    Exhibit 2
Pg 136 of 144

to the MCO's enrollees for which payment was made by the MCO to the IPA/ACO pursuant to the risk agreement (applies to Tier 2 and Tier 3).

**D.** Records and Access

1. Pursuant to appropriate consent/authorization by the enrollee, the Provider will make the enrollee's medical records and other personally identifiable information (including encounter data for government-sponsored programs) available to the MCO (and IPA/ACO if applicable) for purposes including preauthorization, concurrent review, quality assurance, (including Quality Assurance Reporting Requirements (QARR)), payment processing, and qualification for government programs, including but not limited to newborn eligibility for Supplemental Security Income (SSI) and for MCO/Manager analysis and recovery of overpayments due to fraud and abuse. The Provider will also make enrollee's medical records available to the State for management audits, financial audits, program monitoring and evaluation, licensure or certification of facilities or individuals, and as otherwise required by state law. The Provider shall provide copies of such records to DOH at no cost. The Provider (or IPA/ACO if applicable) expressly acknowledges that the Provider shall also provide to the MCO and the State (at no expense to the State), on request, all financial data and reports, and information concerning the appropriateness and quality of services provided, as required by law. These provisions shall survive termination of the contract for any reason.

2. When such records pertain to Medicaid reimbursable services, the Provider agrees to disclose the nature and extent of services provided and to furnish records to DOH and/or the United States Department of Health and Human Services, the County Department of Social Services, the Comptroller of the State of New York, the Office of the Medicaid Inspector General, the New York State Attorney General, and the Comptroller General of the United States and their authorized representatives upon request. This provision shall survive the termination of this Agreement regardless of the reason.

3. The parties agree that medical records shall be retained for a period of six years after the date of service, and in the case of a minor, for three years after majority or six years after the date of service, whichever is later, or for such longer period as specified elsewhere within this Agreement. This provision shall survive the termination of this Agreement regardless of the reason.

4. The MCO and the Provider agree that the MCO will obtain consent directly from enrollees at the time of enrollment or at the earliest opportunity, or that the Provider will obtain consent from enrollees at the time of service is rendered or at the earliest opportunity, for disclosure of medical records to the MCO, to an IPA/ACO or to third parties. If the Agreement is between an MCO and an IPA/ACO, or between an IPA/ACO and an IPA/ACO, the IPA/ACO agrees to require the Providers with

which it contracts to agree as provided above. If the Agreement is between an IPA/ACO and a Provider, the Provider agrees to obtain consent from the enrollee if the enrollee has not previously signed consent for disclosure of medical records.

**E.** Termination and Transition

1. Termination or non-renewal of an agreement between an MCO and an IPA/ACO, institutional network Provider, or medical group Provider that serves five percent or more of the enrolled population in a county, or the termination or non-renewal of an agreement between an IPA/ACO and an institutional Provider or medical group Provider that serves five percent or more of the enrolled population in a county, requires notice to the Commissioner of Health. Unless otherwise provided by statute or regulation, the effective date of termination shall not be less than 45 days after receipt of notice by either party, provided, however, that termination by the MCO may be effected on less than 45 days' notice provided the MCO demonstrates to the satisfaction of DOH, prior to termination, that circumstances exist which threaten imminent harm to enrollees or which result in Provider being legally unable to deliver the covered services and, therefore, justify or require immediate termination.

2. If this Agreement is between the MCO and a health care professional, the MCO shall provide to such health care professional a written explanation of the reasons for the proposed contract termination, other than non-renewal, and an opportunity for a review as required by state law. The MCO shall provide the health care professional 60 days' notice of its decision to not renew this Agreement.

3. If this Agreement is between an MCO and an IPA/ACO, and the Agreement does not provide for automatic assignment of the IPA/ACO's Provider contracts to the MCO upon termination of the MCO/IPA/ACO contract, in the event either party gives notice of termination of the Agreement, the parties agree, and the IPA/ACO's Providers agree, that the IPA/ACO Providers shall continue to provide care to the MCO's enrollees pursuant to the terms of this Agreement for 180 days following the effective date of termination, or until such time as the MCO makes other arrangements, whichever occurs first. This provision shall survive termination of this Agreement regardless of the reason for the termination.

4. Continuation of Treatment. The Provider agrees that in the event of MCO or IPA/ACO insolvency or termination of this contract for any reason, the Provider shall continue, until medically appropriate discharge or transfer, or completion of a course of treatment, whichever occurs first, to provide services pursuant to the subscriber contract or Medicaid Managed Care contract, to an enrollee confined in an inpatient facility, provided the confinement or course of treatment was commenced during the paid premium period. For purposes of this clause, the term

FILED: WESTCHESTER COUNTY CLERK 10/25/2021 11:01 PM
NYSCEF DOC. NO. 250
INDEX NO. 60278/2020
RECEIVED NYSCEF: 10/25/2021
21-07096-shl    Doc 37-2    Filed 02/11/22    Entered 02/11/22 17:46:27    Exhibit 2
Pg 138 of 144

"Provider" shall include the IPA/ACO and the IPA/ACO's contracted Providers if this Agreement is between the MCO and an IPA/ACO. This provision shall survive termination of this Agreement.

5. Notwithstanding any other provision herein, to the extent that the Provider is providing Health Care Services to enrollees under the Medicaid Program, the MCO or IPA/ACO retains the option to immediately terminate the Agreement when the Provider has been terminated or suspended from the Medicaid Program.

6. In the event of termination of this Agreement, the Provider agrees, and, where applicable, the IPA/ACO agrees to require all participating Providers of its network to assist in the orderly transfer of enrollees to another Provider.

**F.** Arbitration

To the extent that arbitration or alternative dispute resolution is authorized elsewhere in this Agreement, the parties to this Agreement acknowledge that the Commissioner of Health is not bound by arbitration or mediation decisions. Arbitration or mediation shall occur within New York State, and the Commissioner of Health will be given notice of all issues going to arbitration or mediation and copies of all decisions.

**G.** IPA/ACO-Specific Provisions

Any reference to IPA/ACO Quality Assurance (QA) activities within this Agreement is limited to the IPA/ACO's analysis of utilization patterns and quality of care on its own behalf and as a service to its contractual Providers.

## APPENDIX (A-1)
## CERTIFICATION REGARDING LOBBYING

The undersigned certifies, to the best of his or her knowledge, that:

1. No Federal appropriated funds have been paid or will be paid to any person by or on behalf of the Provider for the purpose of influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of a Member of Congress in connection with the award of any Federal loan, the entering into any cooperative agreement, or the extension, continuation, renewal, amendment, or modification of any Federal contract, grant, loan, or cooperative agreement.

2. If any funds other than Federal appropriated funds have been paid or will be paid to any person for the purpose of influencing or attempting to influence an officer or employee of any agency, a Member of Congress in connection with the award of any Federal contract, the making of any Federal grant, the making of any Federal loan, the entering into any cooperative agreement, or the extension, continuation, renewal, amendment or modification of this Federal contract, grant, loan, or cooperative agreement, and the Agreement exceeds $100,000, the Provider shall complete and submit Standard Form-LLL "Disclosure Form to Reporting Lobby," in accordance with its instructions.

This certification is a material representation of fact upon which reliance was placed when this transaction was made or entered into submission of this certification is a prerequisite for making or entering into this transaction pursuant to U.S.C. Section 1352. The failure to file the required certification shall subject the violator to a civil penalty of not less than $10,000 and not more than $100,000 for each such failure.

DATE: 6|24|2020

TITLE: Corporate Controller

ORGANIZATION: **HBL SNF LLC DBA EPIC REHABILITATION AND NURSING AT WHITE PLAINS**

NAME: (Please Print) Jennifer Brennan

SIGNATURE: Jennifer Brennan

Unique ID: VNS-SH-SkilledNursing-Template-2015                28

FILED: WESTCHESTER COUNTY CLERK 10/25/2021 11:01 PM
NYSCEF DOC. NO. 250

21-07096-shl   Doc 37-2   Filed 02/11/22   Entered 02/11/22 17:46:27   Exhibit 2
Pg 140 of 144

INDEX NO. 60278/2020
RECEIVED NYSCEF: 10/25/2021

## ATTACHMENT B

### SKILLED NURSING FACILITY

I.   DUTIES AND OBLIGATIONS OF SKILLED NURSING FACILITY

A.   The Skilled Nursing Facility shall furnish to Select Health Enrollees Medicaid-covered nursing home care which includes all of those services which the Skilled Nursing Facility normally provides pursuant to the Skilled Nursing Facility's policies, procedures, protocols and agreements with a resident of the facility.   All services shall be in compliance Chapter V of Title 10 of the New York State Department of Health Codes, Rules, and Regulations.

B.   The Skilled Nursing Facility will provide the Select Health Enrollee with the nursing, dietary, housekeeping and other services normally offered and consistent with the care needs of the resident. These services include but are not limited to:

1.   Semi-private room and board.

2.   Equipment, medical supplies, and appliances.

3.   Nursing and personal care including assistance in activities of daily living.

4.   Rehabilitation   services   including   physical,   speech,   occupational,   and recreational.

5.   Supervising the use of durable medical equipment, assistive devises, and prescribed therapies.

6.   Recreational and socialization activities.

7.   Maintenance of resident's room cleanliness.

8.   Other services and furnishings related to the basic room, board, and custodial care of the resident.

C.   The Skilled Nursing Facility agrees that it will accept a Select Health Enrollee for admission only after the admission is formally authorized by VNS.   Services will be authorized for defined periods of time, and the Skilled Nursing Facility will obtain authorization from the VNS HIV-SNP Program for additional periods, if a Select Health Enrollee's continued stay is deemed appropriate.

D.   It is the responsibility of VNS to provide scheduled, non-emergent transportation to medical appointments and other services authorized by the VNS HIV-SNP Program,

Unique ID: VNS-SH-SkilledNursing-Template-2015                                          29

FILED: WESTCHESTER COUNTY CLERK 10/25/2021 11:01 PM    INDEX NO. 60278/2020

NYSCEF DOC. NO.: 250    21-07096-shl    Doc 37-2    Filed 02/11/22    Entered 02/11/22 17:46:27    Exhibit 2    RECEIVED NYSCEF: 10/25/2021

Pg 141 of 144

not otherwise covered by Medicaid. All scheduled transportation must be arranged in advance by calling VNS. Transportation that is arranged by the Skilled Nursing Facility or provided without the authorization of VNS will not be covered.

E.    Within fourteen days of a Select Health Enrollee's admission to the Skilled Nursing Facility, the Skilled Nursing Facility will conduct a case conference to plan and coordinate the Select Health Enrollee's care. The case conference will include the VNS care manager, the nurse from the unit that provides care for the Select Health Enrollee, the Skilled Nursing Facility's social worker, and other staff from the Skilled Nursing Facility and VNS, as appropriate. The meeting will focus on the care the Select Health Enrollee will receive while in the Skilled Nursing Facility, as well as VNS expectations regarding coordination of care.

F.    Throughout a Select Health Enrollee's period of residing at the Skilled Nursing Facility's facility, the VNS care manager may provide information that will assist in the resident's care planning. The VNS care manager will assist in coordinating and planning a resident's discharge planning in collaboration with the Skilled Nursing Facility's social service staff. The Skilled Nursing Facility agrees that it will coordinate all services with VNS to assure consistency across settings.

G.    The VNS care manager will provide care management/care coordination services in accordance with the Care and Benefit Coordination Program.

H.    The Skilled Nursing Facility agrees that VNS may monitor the progress of each Select Health Enrollee. This includes VNS's right to have access to Select Health Enrollees and their medical records, to conduct on-site record reviews, and to make face-to-face client assessments.

I.    The Skilled Nursing Facility will make all State surveys and reports of external accrediting activities available for VNS's review.

J.    The Skilled Nursing Facility will maintain and make available to VNS certain records that are pertinent to its services. These records will include the Minimum Data Set (MDS) for Nursing Home residents. Upon a Select Health Enrollee's discharge from the Skilled Nursing Facility, the Skilled Nursing Facility will send to VNS a copy of the discharge summary within thirty (30) days of discharge.

K.    Compliance Plan and Code of Conduct. The Skilled Nursing Facility warrants that it has implemented a Compliance Plan and Code of Conduct (the "Code"), and that implementation includes the presentation of the Code to new employees as part of their orientation, and to all employees on an annual basis.

II.    PHYSICIAN ORDERS

All physician orders are the responsibility of the Select Health Enrollee's designated physician that may either be a physician on the Skilled Nursing Facility's medical staff or the Select Health Enrollee's primary care physician if duly credentialed by the Skilled Nursing Facility.   When the Select Health Enrollee has designated a primary care physician, the Skilled Nursing Facility agrees to abide by the primary care physician's recommended orders, as appropriate, upon admission and during the course of a short term stay.

III.   REPORTING REQUIREMENTS

    A.   On a semi-annual basis, VNS may require Skilled Nursing Facility to report on the utilization of services by Select Health Enrollees.   These reports from Skilled Nursing Facility shall include the following information for the current quarter and year to date:
1. Number of incidents while receiving services
2. Number of complaints registered by Select Health Enrollees
3. Number of falls while receiving services (observed and unobserved, and injuries incurred)

    B. VNS may request from Skilled Nursing Facility a report on the following quality indicators in the aggregate for the facility, on a semi-annual basis:

1. Prevalence of restraints
2. Incidence of pressure ulcers in low risk residents
3. Immunization rates
4. Medication errors rates
5. Number of surgical site infections
6. Incidence of nosocomial pressure ulcers
7. Resident infection rates by category of infection
8. Prevalence of weight loss (unintended)
9. Number of unexpected transfers and why
10. Prevalence of hypnotic, psychotropic use and antipsychotic use.
11. Incidence of fractures

## ATTACHMENT C

### COMPENSATION SCHEDULE

A.  Subject to the terms and conditions specified in Article VII of the Agreement, Skilled Nursing Facility will be reimbursed by VNS at 100% of the Skilled Nursing Facility's current Medicaid rate, as provided to VNS at the time of or prior to the submission of the Skilled Nursing Facility's claim. There will be no retroactive adjustments to the rate of payment made by VNS to the Skilled Nursing Facility. It is the Skilled Nursing Facility's responsibility to ensure that VNS is provided with the most current available documentation of its Medicaid rate.

B.  VNS will reimburse the Skilled Nursing Facility for the following additional services:

   **Bed-hold:** VNS follows New York State Medicaid Program policy payment for bed-holds. A Select Health Enrollee who has resided in Skilled Nursing Facility for a minimum of thirty (30) days is eligible for bed-hold payment, if the Skilled Nursing Facility's vacancy rate on the first day of the Select Health Enrollee's absence is not more that 5%; and if the Select Health Enrollee is expected to be discharged from the hospital back to the Skilled Nursing Facility within the allowable timeframes. The Skilled Nursing Facility must notify the Select Health Enrollee's VNS care manager at the time of Select Health Enrollee hospitalization in order for VNS to authorize and approve bed-hold payments.

C.  VNS will authorize when a placement is for a long-term stay and will notify the Skilled Nursing Facility of the net available monthly income (NAMI) amount and the effective date. The Skilled Nursing Facility will collect any NAMI directly from each Select Health Enrollee who is obligated to pay this as a condition of their Medicaid eligibility. The Skilled Nursing Facility will then bill VNS at the agreed upon rates for any amounts which are not covered by Medicaid, net of NAMI collection.

D.  Skilled Nursing Facility acknowledges and agrees that it shall not bill or collect any additional amounts for such services from Medicaid or the Select Health Enrollee.

*ALB 1593675v5 September 30, 2012*

Unique ID: VNS-SH-SkilledNursing-Template-2015                                          32

| Form **W-9** | **Request for Taxpayer** | **Give Form to the requester. Do not send to the IRS.** |
|---|---|---|
| (Rev. December 2014) Department of the Treasury Internal Revenue Service | **Identification Number and Certification** | |

**1** Name (as shown on your income tax return). Name is required on this line; do not leave this line blank.

HBL SNF LLC

**2** Business name/disregarded entity name, if different from above

Epic Rehabilitation and Nursing at White Plains

**3** Check appropriate box for federal tax classification; check only **one** of the following seven boxes:

☐ Individual/sole proprietor or single-member LLC   ☐ C Corporation   ☐ S Corporation   ☐ Partnership   ☐ Trust/estate

☒ Limited liability company. Enter the tax classification (C=C corporation, S=S corporation, P=partnership) ▶ P

**Note.** For a single-member LLC that is disregarded, do not check LLC; check the appropriate box in the line above for the tax classification of the single-member owner.

☐ Other (see instructions) ▶

**4** Exemptions (codes apply only to certain entities, not individuals; see instructions on page 3):

Exempt payee code (if any)

Exemption from FATCA reporting code (if any)

*(Applies to accounts maintained outside the U.S.)*

**5** Address (number, street, and apt. or suite no.)

120 Church Street

Requester's name and address (optional)

**6** City, state, and ZIP code

White Plains NY 10601

**7** List account number(s) here (optional)

See Specific Instructions on page 2.   Print or type

## Part I   Taxpayer Identification Number (TIN)

Enter your TIN in the appropriate box. The TIN provided must match the name given on line 1 to avoid backup withholding. For individuals, this is generally your social security number (SSN). However, for a resident alien, sole proprietor, or disregarded entity, see the Part I instructions on page 3. For other entities, it is your employer identification number (EIN). If you do not have a number, see *How to get a TIN* on page 3.

**Note.** If the account is in more than one name, see the instructions for line 1 and the chart on page 4 for guidelines on whose number to enter.

Social security number

☐ ☐ ☐ – ☐ ☐ – ☐ ☐ ☐ ☐

or

Employer identification number

4 7 – 5 6 0 6 0 4 5

## Part II   Certification

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me); and

2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding; and

3. I am a U.S. citizen or other U.S. person (defined below); and

4. The FATCA code(s) entered on this form (if any) indicating that I am exempt from FATCA reporting is correct.

**Certification instructions.** You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the certification, but you must provide your correct TIN. See the instructions on page 3.

**Sign Here**   Signature of U.S. person ▶   *[signature]*   Date ▶ 12/11/2019

## General Instructions

Section references are to the Internal Revenue Code unless otherwise noted.

**Future developments.** Information about developments affecting Form W-9 (such as legislation enacted after we release it) is at *www.irs.gov/fw9.*

### Purpose of Form

An individual or entity (Form W-9 requester) who is required to file an information return with the IRS must obtain your correct taxpayer identification number (TIN) which may be your social security number (SSN), individual taxpayer identification number (ITIN), adoption taxpayer identification number (ATIN), or employer identification number (EIN), to report on an information return the amount paid to you, or other amount reportable on an information return. Examples of information returns include, but are not limited to, the following:

• Form 1099-INT (interest earned or paid)

• Form 1099-DIV (dividends, including those from stocks or mutual funds)

• Form 1099-MISC (various types of income, prizes, awards, or gross proceeds)

• Form 1099-B (stock or mutual fund sales and certain other transactions by brokers)

• Form 1099-S (proceeds from real estate transactions)

• Form 1099-K (merchant card and third party network transactions)

• Form 1098 (home mortgage interest), 1098-E (student loan interest), 1098-T (tuition)

• Form 1099-C (canceled debt)

• Form 1099-A (acquisition or abandonment of secured property)

Use Form W-9 only if you are a U.S. person (including a resident alien), to provide your correct TIN.

*If you do not return Form W-9 to the requester with a TIN, you might be subject to backup withholding.* See *What is backup withholding?* on page 2.

By signing the filled-out form, you:

1. Certify that the TIN you are giving is correct (or you are waiting for a number to be issued),

2. Certify that you are not subject to backup withholding, or

3. Claim exemption from backup withholding if you are a U.S. exempt payee. If applicable, you are also certifying that as a U.S. person, your allocable share of any partnership income from a U.S. trade or business is not subject to the withholding tax on foreign partners' share of effectively connected income, and

4. Certify that FATCA code(s) entered on this form (if any) indicating that you are exempt from the FATCA reporting, is correct. See *What is FATCA reporting?* on page 2 for further information.

Cat. No. 10231X                                        Form **W-9** (Rev. 12-2014)