**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------------x
In re:

|  |  |
|---|---|
|  | Chapter 11 |
| HBL SNF, LLC, d/b/a EPIC REHABILITATION | |
| AND NURSING AT WHITE PLAINS, | Case No. 21-22623 (SHL) |

                                                    Debtor.
------------------------------------------------------------------------x
WHITE PLAINS HEALTHCARE PROPERTIES I, LLC,

                                              Plaintiff,

                      against                                Adversary Proceeding

HBL SNF, LLC, LIZER JOZEFOVIC A/K/A LIZER        Case No. 21-07096 (SHL)
JOZEFOVIC, and MARK NEUMAN,

                      Defendants and Third-Party Plaintiffs,

                      against

CCC EQUITIES, LLC, PROJECT EQUITY
CONSULTING, THE CONGRESS COMPANIES,
HOWARD FENSTERMAN, WILLIAM NICHOLSON, and
METROPOLITAN COMMERCIAL BANK

                              Third-Party Defendants.
------------------------------------------------------------------------x

**WHITE PLAINS HEALTHCARE PROPERTIES I, LLC'S**
**SUPPLEMENTAL REPLY BRIEF IN FURTHER SUPPORT OF ITS MOTION**
**FOR PARTIAL SUMMARY JUDGMENT ON LEASE TERMINATION ISSUE**

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................. iv

PRELIMINARY STATEMENT ...........................................................1

ARGUMENT ......................................................................................2

I.    THE TENANT DEFAULTED UNDER THE LEASE ......................... 2

    A.    The Tenant Concedes the Security Deposit Defaults ................................ 3

    B.    Tenant's Excuses for Non-Delivery of the Security Deposits Do Not Excuse Performance under the Lease .................................... 4

        i.    The Term Sheet.......................................................... 5

        ii.    The LOI...................................................................... 7

    C.    The Additional Lease Defaults .................................................. 7

        i.    Failure to Deliver Required Certificates of Insurance or Procure the Required Insurance for the Facility............................................ 8

        ii.    Failure to Deliver Medicare, Medicaid, and Other Provider Agreements and Information .......................................... 9

        iii.    Failure to Provide Financial and Operational Reporting .............. 10

        iv.    Failure to Timely Pay Rent .......................................... 11

        v.    Failure to Timely Pay Certain Utility Charges and Deposits ....... 13

        vi.    Failure to Timely Pay Real Estate Taxes .................................... 13

II.    THE LANDLORD PROPERLY TERMINATED THE LEASE ......................... 14

    A.    The Tenant Was Not Entitled to a Cure Period ........................................ 14

    B.    Reference to the LOI Does Not Render the Notice of Termination Defective ............................................................... 15

    C.    The Landlord Was Authorized to Send the Notice of Termination.......... 18

III.    THE LANDLORD DID NOT WAIVE ITS RIGHT TO TERMINATE THE LEASE ......................................................................... 20

    A.    The Non-Waiver Provisions in the Lease Are Dispositive ...................... 20

B.      The Acceptance of Rent Was Not a Waiver ............................................. 21

C.      Negotiation of the LOI and Intercreditor Agreement Did Not
        Waive Landlord's Rights under the Lease................................................ 22

CONCLUSION....................................................................................................................24

## TABLE OF AUTHORITIES

**CASES**                                                                 *Page(s)*

*Benihana of Tokyo, LLC v. Angelo, Gordon & Co.*,
    259 F. Supp. 3d 16 (S.D.N.Y. 2017), *aff'd*, 712 F. App'x 85 (2d Cir. 2018) .......................... 20

*Carriage Ct. Inn, Inc. v. Rains*,
    524 N.Y.S.2d 647 (N.Y. Civ. Ct. 1988) .................................................................. 16

*CooperVision, Inc. v. Intek Integration Techs., Inc.*,
    794 N.Y.S.2d 812 (N.Y. Sup. Ct. 2005) ................................................................ 19

*Equator Int'l, Inc. v. NH St. Invs., Inc.*,
    978 N.Y.S.2d 817 (N.Y. Sup. Ct. 2014) ................................................................ 17

*Fifty States Mgmt. Corp. v. Pioneer Auto Parks, Inc.*,
    389 N.E.2d 113 (N.Y. 1979) ................................................................................. 3

*Jefpaul Garage Corp. v. Presbyterian Hosp. in N.Y.*,
    462 N.E.2d 1176 (N.Y. 1984) ............................................................................. 21

*Kallen v. Kasin*,
    606 N.Y.S.2d 312 (N.Y. App. Div. 1994) ............................................................... 4

*King Party Ctr. Of Pitkin Ave., Inc. v. Minco Realty, LLC*,
    729 N.Y.S.2d 183 (N.Y. App. Div. 2001) ............................................................. 16

*Luna Park Hous. Corp. v. Besser*,
    329 N.Y.S.2d 332 (N.Y. App. Div. 1972) ............................................................. 21

*Markowitz v. Landau*,
    567 N.Y.S. 2d 268 (N.Y. App. Div. 1991) ............................................................. 4

*MHR Cap. Partners LP v. Presstek, Inc.*,
    912 N.E.2d 43 (N.Y. 2009) .................................................................................. 3

*NL Indus., Inc. v. PaineWebber Inc.*,
    720 F. Supp. 293 (S.D.N.Y. 1989) ........................................................... 16, 17, 21

*Novick v. AXA Network, LLC*,
    642 F.3d 304 (2d Cir. 2011) .............................................................................. 19

*Oppenheimer & Co. v. Oppenheim, Appel, Dixon & Co.*,
    660 N.E.2d 415 (N.Y. 1995) ............................................................................... 3

*Renali Realty Group 3, LLC v. Robbins MBW Corp.*,
    686 N.Y.S.2d 855 (N.Y. App. Div. 1999) ............................................................. 21

*Rodriguez v. New Carlton Grp., Inc.*,
    No. 10 Civ. 3976(GBD), 2012 WL 5077362 (S.D.N.Y. Oct. 18, 2012)................................. 17

*Rogers v. N.Y. Tel. Co.*,
    425 N.Y.S.2d 19 (N.Y. App. Div. 1980).................................................................................. 17

*Thor 725 8th Ave. LLC v. Goonetilleke* ,
    138 F. Supp. 3d 497 (S.D.N.Y. 2015), *aff'd*, 675 F. App'x 31 (2d Cir. 2017) ......................... 17

*World Wide Polymers, Inc. v Shinkong Synthetic Fibers Corp.*,
    No. 03-CV-8843 (LAP)(RME), 2010 WL 3155176 (S.D.N.Y. July 30, 2010),
    *aff'd*, 694 F.3d 155 (2d Cir. 2012) ....................................................................................... 19

Plaintiff White Plains Healthcare Properties I, LLC ("**Plaintiff**" or the "**Landlord**") respectfully submits this supplemental reply memorandum of law in further support of its motion for partial summary judgment seeking a ruling that defendant HBL SNF, LLC ("**Defendant**" or the "**Tenant**") defaulted under the Lease, and that the Landlord properly terminated the Lease.[1]

## PRELIMINARY STATEMENT

The Tenant has never moved or cross-moved for summary judgment on any issue in this adversary proceeding (or the state court litigation that preceded its removal). Though the Tenant tries to deflect the Landlord's summary judgment motion by injecting irrelevant matters, the only issue currently before the Court, by agreement of the parties, is whether the Landlord properly terminated the Lease. Having now had an opportunity for discovery, nothing about the Landlord's entitlement to summary judgment on the issue of lease termination has changed. As a matter of law, the Lease was terminated effective January 12, 2020.

First, the Tenant defaulted under the Lease. The Tenant acknowledges that it failed to deliver the Security Deposits. Indeed, the Tenant says starkly that it "vigorously refused to deliver the two security deposits." That is a non-curable default under the Lease. The Tenant's explanation for these acknowledged intentional defaults is tangled up with other disputes with the Landlord that are unrelated to the Tenant's obligations under the Lease and that do not excuse the Tenant from complying with the Lease's terms. Though the Tenant makes efforts to dispute the other Lease defaults, review of the unrebutted evidence demonstrates that there is no genuine factual dispute as to those defaults either.

---

[1] Capitalized terms not defined herein shall have the meaning set forth in the Landlord's prior summary judgment briefing.

Second, the Landlord sent a proper Notice of Termination. The Notice of Termination fairly put the Tenant on notice of its defaults. There is no question that the Tenant was fully aware of and understood the nature of the defaults identified in the Notice of Termination. As to the Lease Defaults specifically enumerated as such under the Lease, which include (i) failure to deliver security deposits; (ii) failure to procure the required insurance coverage; (iii) failure to deliver provider agreements and reimbursement rate sheets; and (iv) failure to pay rent in a timely manner, the Tenant was not entitled to any cure period. As to the other defaults, the Tenant failed to cure them, even though seven months elapsed before the Landlord filed suit. Further, the plain language of the Lease (which is flagrantly misquoted by the Tenant) makes clear that the Notice of Termination was legally effective without the prior consent of Security Benefit.

Finally, the Landlord did not waive its contractual right to terminate the Lease on account of the Tenant's defaults. The Tenant's waiver arguments lack any factual basis and do not make common sense; and in any event, the waiver arguments are barred by the non-waiver provision in the Lease. It is true that the Landlord engaged in various efforts to resolve the Tenant's defaults and the disputes arising therefrom. As a matter of law and unambiguous contractual language, however, those efforts cannot be construed as a waiver of any of the Landlord's rights under the Lease.

## ARGUMENT

## I.      THE TENANT DEFAULTED UNDER THE LEASE

Faced with undeniable Lease defaults for which it lacks a meaningful response, the Tenant argues that it "substantially performed its obligations" under the Lease, and that substantial compliance should be good enough. Tenant's Supplemental Memorandum of Law in Opposition to Landlord's Motion for Summary Judgment, Adv. Pro. Dkt. 35 ("**Def. Supp. Br.**")

at 7, 23-24. But the Tenant's claim of substantial compliance is undermined by the fundamental and egregious nature of the defaults, including the willful failure to deliver the Security Deposits. In any event, substantial compliance is not the standard. Express conditions of a contract "must be literally performed," *Oppenheimer & Co. v. Oppenheim, Appel, Dixon & Co.*, 660 N.E.2d 415, 418 (N.Y. 1995), and "[s]ubstantial performance will not suffice," *MHR Cap. Partners LP v. Presstek, Inc.*, 912 N.E.2d 43, 47 (N.Y. 2009); *see also Fifty States Mgmt. Corp. v. Pioneer Auto Parks, Inc.*, 389 N.E.2d 113, 115 (N.Y. 1979) (lease is an "agreement of the parties [that] must be enforced in accordance with its terms"). The Tenant was required to comply with the express terms of the Lease and failed to do so, resulting in a number of defaults under the Lease that cannot reasonably be disputed.

### A.  The Tenant Concedes the Security Deposit Defaults

There is no dispute that the Tenant failed to deliver the $3.7 million Security Deposit required under Section 7.1(a)(ii) of the Lease and the $1.6 million Security Deposit required under Section 7.1(a)(iii) of the Lease. The Tenant concedes this point. For example, in its brief to this Court, the Tenant "acknowledges that the Lease requires delivery of these two security deposits," and states that it "purposely withheld delivery of the security deposits." Def. Supp. Br. at 4-5.

Regarding the $3.7 million letter of credit or cash deposit in particular, the Tenant states that it "refused to deliver the $3,700,000 letter of credit required by the Lease." Def. Supp. Br. at 12 (citing Declaration of Lizer Jozefovic, dated February 11, 2022, Adv. Pro. Dkt. 37 (the "**Jozefovic Decl.**") ¶ 17); *see also id*. at 13 (Tenant "advised that it would not deliver the letter of credit given the existing disputes") and (Tenant "vigorously refused to deliver the two security deposits"). And concerning the $1.6 million additional Security Deposit, the Tenant digresses to say that it supposedly has maintained a JPMorgan Chase account in its own custody funded with

3

$1.6 million; however, the Tenant ultimately concedes that it "refused to place the additional

$1.6M funds into the Landlord's hands."  Def. Supp. Br. at 11.  Courts have consistently

recognized that the failure to provide a security deposit is a material breach of the lease.  *See,*

*e.g., Markowitz v. Landau*, 567 N.Y.S. 2d 268, 268 (N.Y. App. Div. 1991) ("The furnishing of

the security deposit is a substantial obligation of the tenancy, as it provides a fund from which

the landlord can draw for unpaid rent or damages and which puts the landlord into the status of a

secured creditor."); *see also Kallen v. Kasin*, 606 N.Y.S.2d 312, 313 (N.Y. App. Div. 1994).

But, argues the Tenant, the security-deposit defaults "can and will be cured."  Def. Supp.

Br. 4.  As an initial matter, the Lease defines the failure to timely deliver the Security Deposits as

a default, as to which the Landlord is not required to provide any opportunity to cure.  Affidavit

of William A. Nicholson, dated August 18, 2021, filed in the Supreme Court of the State of New

York, County of Westchester, Index No. 60278/2020 (NYSCEF Doc. No. 196) (the "**Nicholson**

**Aff.**") Ex. 12 § 7.1(a)(ii) ("Tenant's failure to deliver the Letter of Credit or timely pay to

Landlord the Security Deposit shall be deemed a Lease Default by Tenant"); *see also id.*

§ 16.1(a)(xxvi) (the Tenant "shall be in default" for the failure "to deposit all or any portion of

the Security Deposit or Letter of Credit").  And in any event, any attempt to cure would now be

more than two years after the Lease was terminated.  The Tenant has continued to occupy the

facility for more than two years after the Lease's termination.  It is now too late to make

promises to cure.

### B.  Tenant's Excuses for Non-Delivery of the Security Deposits Do Not Excuse Performance under the Lease

In addition to contending pointlessly that it is now ready to cure, the Tenant offers

excuses for why it never paid the Security Deposits.  The Tenant claims that it intentionally

defaulted under the Lease because of disputed amounts paid to the Landlord in connection with

other issues as to which the Tenant seeks an accounting.  However, the Tenant is not excused

from performance under the Lease based on its own self-interested views about how other non-

Lease disputes should be resolved.  In fact, the Lease prohibits the Tenant from doing so.  *See*

Nicholson Aff. Ex. 12 § 20.6 ("prior or contemporaneous undertakings between [the] Parties are

merged into and expressed in this instrument, and any and all prior agreements between such

Parties are hereby canceled"); *see also id.* § 16.4 (In connection with the Landlord's exercise of

its remedies for defaults or termination of the Lease, the Tenant "waives, to the maximum extent

permitted by applicable Laws . . . the right to interpose any counterclaim (other than compulsory

counterclaims) in any summary proceeding instituted by Landlord against Tenant in any court

for unpaid Rent under this Lease").[2]  The other non-Lease disputes raised by the Tenant concern

a November 20, 2015 term sheet (the "**Term Sheet**") and the LOI.

### i.    The Term Sheet

The Term Sheet sets forth the core components of a separate agreement that the parties

entered into during the pre-construction phase of the Facility's development, which predates the

Lease by several years and was superseded by the Lease.  The Lease contains a merger clause

that clearly states that the Lease is "the entire agreement between the Parties" and that "[a]ll

representations, promises and prior or contemporaneous undertakings between such Parties are

merged into and expressed in this instrument, and any and all prior agreements between such

Parties are hereby canceled."  White Plains Healthcare Properties I, LLC's Statement of

Undisputed Facts in Support of its Motion for Partial Summary Judgment on Lease Termination

---

[2] The term "Rent" in the Lease is defined to include both monthly rent, as well as "Additional Rent,"
which is broadly defined to include "all sums, amounts, fees, expenses and costs (including, without
limitation, legal fees and disbursements) payable or reimbursable to Landlord under this Lease, other than
[monthly rent]."  Nicholson Aff. Ex. 12 § 3.2(c).  Thus, "Rent," includes the Security Deposits, as well as
all other amounts the Tenant has failed to pay Landlord, such as utility charges and deposits.

Issue, Adv. Pro. Dkt. 34 ("**Plf. 56.1 Stmt.**") ¶ 2. Thus, the Tenant's purported gripes regarding the Term Sheet are legally irrelevant to the Tenant's defaults under the Lease.[3]

Moreover, the Tenant concedes that the $2.2 million it paid under the Term Sheet, was in exchange for the purchase of furniture, fixtures and equipment ("**FF&E**") and for a future rent credit. *See* Def. Supp. Br. at 10 ("Debtor made a $2,200,000 interest-free loan to Landlord. . . . [i]n return, Landlord promised to repay Debtor by (1) purchasing and conveying title to $1,500,000 worth of [FF&E] for the Debtors use and (2) giving a $700,000 credit against to future rent payments."). Although the Tenant contends that the Landlord failed to convey title to the FF&E, the Tenant nonetheless included the value of the FF&E in its financial statements filed with the Court in this proceeding. Bankr. Dkt. No. 52, at 9. In any event, there is no basis under the Lease to have unrelated amounts used to purchase FF&E, now an asset of the Tenant, reduce the Tenant's security-deposit obligations, which the Tenant was required to deliver 60 days before occupancy. The Lease expressly prohibits any arguments based on offset. Nicholson Aff. Ex. 12 § 3.2(b) (the "Tenant shall pay the Rent to Landlord during the term without deduction or setoff and without demand").[4] And as to the claimed future rent credit of $700,000, it is the Landlord's position that the credit was written out of the Lease when it was amended and is no longer required. In any event, to the extent that the Tenant is entitled to any such credit, it cannot serve to offset the Security Deposits and, regardless, can be addressed

---

[3] Much of the fact section in the Tenant's brief is concerned with its version of the prehistory that led up to the Lease, and much of this prehistory is misrepresented. But it does not matter. As a matter of law, events that preceded entry into the Lease are irrelevant because of its merger clause.

[4] As noted, the term "Rent" is defined to include not only Monthly Rent, but also "all sums, amounts, fees, expenses and costs . . . payable or reimbursable to Landlord under this Lease," which would include the Security Deposits. Nicholson Aff. Ex. 12 § 3.2(c).

during the damages phase of this case.  That issue has no bearing on the Tenant's Lease defaults, which the Tenant concedes occurred.

### ii.    The LOI

In November 2019, the parties entered into the LOI as part of an effort to resolve the accumulation of issues arising from the Tenant's numerous breaches.  Plf. 56.1 Stmt. ¶ 38.  The transaction contemplated under the LOI would have provided the Tenant with an ownership interest in the Facility; but, as Tenant acknowledges, the contemplated transaction was never concluded because the Tenant "was unable to consummate the equity transaction."  *See* Def. Supp. Br. at 14.  According to its terms, because the LOI was never reduced to a definitive written agreement, it was "terminated," and thus no party has rights under the LOI and the parties "remain as Landlord and Tenant pursuant to the existing Lease."  Nicholson Aff. Ex. 17 § 1(h).

In pursuit of that transaction, the Tenant was required to remit a non-refundable deposit of $2.2 million.  Nicholson Aff. Ex. 17 §§ 1(a)(i), (a)(ii)(3); *id.* § 2(c)(iv).  Again, that separate dispute has no bearing on Tenant's Lease defaults.  The Tenant admits as much when it says: "The dispute over the language of the LOI with respect to the refund of the $2,200,000 deposit is not analyzed in this memorandum, *as it does not directly bear on the issue of termination of the Lease*."  *See* Def. Supp. Br. at 14, n.34 (emphasis added).

### C.  The Additional Lease Defaults

Unlike the security-deposit defaults, which the Tenant concedes, the Tenant seeks to dispute its liability for the other Lease defaults by misrepresenting the evidence.  Review of the unrebutted facts shows that there is no genuine dispute as to those defaults either.

### i.  Failure to Deliver Required Certificates of Insurance or Procure the Required Insurance for the Facility

The Lease requires the Tenant to deliver, upon commencement of the Lease, certificates of insurance showing that each type of insurance required under the Lease is in full force and effect and cannot be canceled or modified absent prior written notice to the Landlord.  Nicholson Aff. Ex. 12 § 6.2.  The Tenant failed to deliver any certificates of insurance prior to the Landlord's Notice of Termination taking effect.  Plf. 56.1 Stmt. ¶ 26.  When the Tenant belatedly provided information regarding its insurance coverage on January 28, 2020 and July 28, 2021, the certificates evidenced that the insurance policies procured by the Tenant did not fully comply with the Lease requirements.  *Id.* ¶¶ 26-27.

Specifically, the certificates of insurance illustrate that the policy limits obtained by the Tenant are significantly lower than the requirements set forth in Section 6.1 of the Lease.  In connection with its summary judgment motion, the Landlord submitted the following chart itemizing the amount of the deficiencies that are apparent from the insurance information belatedly provided by the Tenant:

**INSURANCE REQUIREMENTS**

| | Per Lease | | Per Certificate of Insurance | | Variance |
| | Article VI. | Section 6.1 | | | |
| | Per Claim | In Aggregate | Per Claim | In Aggregate | |
| Earthquake | | $ 2,500,000 | | $ 1,000,000 | $ (1,500,000) |
| Flood | | $ 2,500,000 | | $ 2,000,000 | $ (500,000) |
| Motor Vehicle Liability | | Minimal Limits | | Not Listed | |
| Umbrella | | $ 1,000,000 | | | $ (1,000,000) |
| General Liability | $ 2,000,000 | $ 5,000,000 | | $ 1,000,000 | $ 3,000,000 |
| Professional Liability | $ 2,000,000 | $ 5,000,000 | $ 1,000,000 | $ 3,000,000 | $ (2,000,000) |
| Worker's Compensation | | No limit stated | | $ 1,000,000 | |
| Property - Building | | $ 60,620,000 | | $ 45,000,000 | $ (15,620,000) |
| Business Income | | $ 6,073,158 | | $ 2,500,000 | $ (3,573,158) |

Affidavit of Edward O. Tabor, dated August 18, 2021, filed in the Supreme Court of the State of New York, County of Westchester, Index No. 60278/2020 (NYSCEF Doc. No. 212) (the "**Tabor Aff.**") Ex. 40.

The Tenant offers no explanation for these clear deficiencies, and its failure to procure the insurance coverage required by the Lease is a specifically enumerated default under the Lease as to which the Tenant is not provided an opportunity to cure. Nicholson Aff. Ex. 12 § 16.1(a)(xxxv). The Tenant's suggestion, through its citation to deposition testimony of Mr. Nicholson, that the Tenant is somehow relieved of default because the Landlord did not make a specific "request" that the Tenant conform the insurance coverage to the Lease requirements, Def. Supp. Br. at 18, is at odds with the plain language of the Lease and legally irrelevant.

### ii.    Failure to Deliver Medicare, Medicaid, and Other Provider Agreements and Information

The Lease requires the Tenant to deliver all Medicare, Medicaid, and other provider agreements within 30 days of receipt by Tenant, and reimbursement rate sheets within 10 days of receipt by Tenant. Nicholson Aff. Ex. 12 § 7.4(g) & (j). The Tenant has never delivered any Medicare and Medicaid provider agreements to Landlord. Plf. 56.1 Stmt. ¶ 30. The Tenant failed to provide Medicaid reimbursement rate sheets until July 2021—more than a year and a half after Lease termination—and has never provided the required Medicare documentation or any revised or amended reimbursement rate sheets. *Id.* ¶ 31. Pursuant to the Lease, the Tenant is not afforded a cure period for its failure to provide this information and "shall be in default" for failure to "give Landlord and Mortgagee timely notice or timely deliver copies of documents within the times required under Section 7.4(c) through (o)," which include the referenced provider agreements and other information. Nicholson Aff. Ex. 12 §§ 16.1(a), 16.1(a)(xv).

Other than non-specific statements about its alleged delivery of "substantial documentation" concerning provider agreements and rate sheets, Memorandum of Law in Opposition to Motion for Summary Judgment and in Support of Cross-Motion to Strike, dated Oct. 25, 2021, NYSCEF Doc. No. 255 (the "**State Ct. Opp.**") at 15-16, the Tenant's only response is to cite to Mr. Nicholson's deposition testimony that the Tenant provided some information "in connection with the litigation," Def. Supp. Br. at 18.  But, as Mr. Nicholson explained, he did not know whether the Medicare and Medicaid information was complete or not.  *Id.*  As with its other defaults, Tenant's delivery of a portion of the required documentation, years after lease-termination and after litigation between the parties already was commenced, is too little, too late.

### iii.    Failure to Provide Financial and Operational Reporting

The Lease requires the Tenant to provide to the Landlord the following financial and operational reporting: (i) an annual budget; (ii) unaudited monthly financial statements; (iii) "a written report providing an operational overview of significant events and circumstances at the facility during the prior month, during the first six months of the Term and then quarterly thereafter, including, but not limited to, clinical events, employee relations and staffing matters"; and (iv) copies of all federal income tax returns within fifteen days after filing.  Nicholson Aff. Ex. 12 §§ 7.4(a)(i), 7.4(a)(iii), 7.4(a)(vi).  The Tenant failed to deliver any of the required financial and operational reporting.  Plf. 56.1 Stmt. ¶ 33.  The Tenant offers no response to its failure to provide the in-depth financial and operational reporting mandated by the Lease.  The deposition testimony of Mr. Nicholson cited by the Tenant is consistent with the fact that the Landlord did not receive in "substance or timing" the reporting information required under the Lease.  Def. Supp. Br. at 18-19. The Tenant's outright refusal to comply with its reporting

obligations under the Lease is an additional default under the Lease.  Nicholson Aff. Ex. 12

§ 16.1(a)(ii).

### iv.    Failure to Timely Pay Rent

The Lease requires not only that the Tenant pay monthly rent in the amount of

$506,096.50 every month, Nicholson Aff. Ex. 12 § 3.2(a), but also that the rent be paid on the

first day of each calendar month, *id.* § 3.2(d).  The Tenant has a 5-day grace period after which

the Tenant must pay a late charge of 5% of the unpaid portion of the monthly rent.  *Id.* § 3.2(e).

The Lease further provides that "the amount unpaid, *including any late charges*, shall bear

interest at the overdue rate from the due date of such installment to the date of such payment."

*Id.* (emphasis added).  In the Lease, the Tenant "acknowledges that late payment by Tenant to

Landlord of Rent will cause Landlord to incur costs not contemplated hereunder[,] . . . [and that]

such costs may include processing and accounting charges and late charges which may be

imposed on Landlord by the terms of any loan agreement and other expenses of a similar or

dissimilar nature."  *Id.*  Pursuant to the Lease, the Tenant "shall be in default" for failing to pay

"any installment of Rent within five (5) days after the date when due."  *Id.* § 16.1(a)(i).

The Tenant did not pay the monthly rent on time.  In connection with its summary

judgment motion, the Landlord submitted the following information itemizing each missed or

late monthly rent payment:

11

6/12/2020
**HBL SNF Default Costs due to Landlord**

| Amount Due | Due Date | Amount Paid | Date Paid | Days Late | Days > 5 Late | LATE CHARGE PER LEASE PARA 3.2 c | | Overdue Rate Section Per Lease 9.1 (b) | | TOTAL Charges |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | 5% Late Charge Per Lease 3.2 (c) | Prime Rate + | Overdue Charges | | |
| Rent | | | | | | | 5.00% | | | |
| $ 10,839.79 | 9/30/2019 | | 7/31/2021 | 670 | 665 | $ 541.99 | 10.00% | $ 1,989.77 | $ 2,531.76 | |
| $ 506,096.50 | 10/1/2019 | $ 506,096.50 | 10/30/2019 | 29 | 24 | $ 25,304.83 | 10.00% | $ 4,021.04 | $ 29,325.87 | |
| $ 506,096.50 | 11/1/2019 | $ 506,096.50 | 11/18/2019 | 17 | 12 | $ 25,304.83 | 9.75% | $ 2,298.23 | $ 27,603.06 | |
| $ 506,096.50 | 12/1/2019 | $ 506,096.50 | 12/3/2019 | 2 | -3 | $ - | 9.75% | $ - | $ - | |
| $ 506,096.50 | 1/1/2020 | $ 506,096.50 | 1/2/2020 | 1 | -4 | $ - | 9.75% | $ - | $ - | |
| $ 506,096.50 | 2/1/2020 | $ 506,096.50 | 2/1/2020 | 0 | -5 | $ - | 9.75% | $ - | $ - | |
| $ 506,096.50 | 3/1/2020 | $ 506,096.50 | 3/2/2020 | 1 | -4 | $ - | 8.78% | $ - | $ - | |
| $ 506,096.50 | 4/1/2020 | $ 506,096.50 | 5/6/2020 | 35 | 30 | $ 25,304.83 | 8.25% | $ 4,003.71 | $ 29,308.53 | |
| $ 506,096.50 | 5/1/2020 | $ 506,096.50 | 5/26/2020 | 25 | 20 | $ 25,304.83 | 8.25% | $ 2,859.79 | $ 28,164.62 | |
| $ 506,096.50 | 6/1/2020 | $ 506,096.50 | 6/2/2020 | 1 | -4 | $ - | 8.25% | $ - | $ - | |
| $ 506,096.50 | 7/1/2020 | $ 506,096.50 | 7/1/2020 | 0 | -5 | $ - | 8.25% | $ - | $ - | |
| $ 506,096.50 | 8/1/2020 | $ 506,096.50 | 8/7/2020 | 6 | 1 | $ 25,304.83 | 8.25% | $ 686.35 | $ 25,991.18 | |
| $ 506,096.50 | 9/1/2020 | $ 506,096.50 | 9/4/2020 | 3 | -2 | $ - | 8.25% | $ - | $ - | |
| $ 506,096.50 | 10/1/2020 | $ 506,096.50 | 10/2/2020 | 1 | -4 | $ - | 8.25% | $ - | $ - | |
| $ 506,096.50 | 11/1/2020 | $ 506,096.50 | 11/2/2020 | 1 | -4 | $ - | 8.25% | $ - | $ - | |
| $ 506,096.50 | 12/1/2020 | $ 506,096.50 | 12/2/2020 | 1 | -4 | $ - | 8.25% | $ - | $ - | |
| $ 506,096.50 | 1/1/2021 | $ 506,096.50 | 1/4/2021 | 3 | -2 | $ - | 8.25% | $ - | $ - | |
| $ 506,096.50 | 2/1/2021 | $ 506,096.50 | 2/4/2021 | 3 | -2 | $ - | 8.25% | $ - | $ - | |
| $ 506,096.50 | 3/1/2021 | $ 506,096.50 | 3/2/2021 | 1 | -4 | $ - | 8.25% | $ - | $ - | |
| $ 506,096.50 | 4/1/2021 | $ 506,096.50 | 4/1/2021 | 0 | -5 | $ - | 8.25% | $ - | $ - | |
| $ 506,096.50 | 5/1/2021 | $ 506,096.50 | 5/6/2021 | 5 | 0 | $ 25,304.83 | 8.25% | $ 571.96 | $ 25,876.78 | |
| $ 506,096.50 | 6/1/2021 | $ 506,096.50 | 6/7/2021 | 6 | 1 | $ 25,304.83 | 8.25% | $ 686.35 | $ 25,991.18 | |
| $ 506,096.50 | 7/1/2021 | $ 506,096.50 | 7/7/2021 | 6 | 1 | $ 25,304.83 | 8.25% | $ 686.35 | $ 25,991.18 | |
| | | | | | | $202,980.59 | | $ 17,803.55 | $ 220,784.14 | |

*See* Tabor Aff. Ex. 25.  As this chart clearly shows, the Tenant incurred late fees as a result of its failure to pay monthly rent on time.

Aside from the contention that it paid monthly rent in the amount of $506,096.50 each month, Def. Supp. Br. at 15, the Tenant does not respond to the evidence that on numerous occasions its payment was late, and that it failed to pay the resulting late charges, plus interest at the overdue rate.  The Nicholson deposition excerpt cited by the Tenant supports the Landlord's position that the default is premised on the Tenant's failure to pay rent "as required by the lease," which requires not only payment of the base monthly rent amount, but also *timely* payment of each month's rent.  *Id.* at 14-15 (citing Nicholson deposition).  The Tenant's failure to timely pay the monthly rent and the resulting charges was a default under the Lease.

12

### v.    Failure to Timely Pay Certain Utility Charges and Deposits

The Lease requires Tenant to pay all charges or deposits for electricity, steam, telephone, cable, gas, oil, water, sewer, and all other services and utilities used on or related to the Facility, Nicholson Aff. Ex. 12 § 4.1, and all utility service and maintenance deposits and expenses, *id.* § 5.2.  Landlord has provided evidence that Tenant failed to pay (i) certain utility charges to Con Edison, and (ii) utility deposits and municipal maintenance escrows, totaling $71,472.69.  Plf. 56.1 Stmt. ¶ 24.  Tenant has reimbursed Landlord for a portion of these charges in the amount of $41,175.00.  *Id.*  Tenant still owes the Landlord $35,921.44.  *Id.*  In response, the Tenant states that it "has contacted all utility companies to arrange for return of any relevant utility deposits" and, if such continuing efforts prove unsuccessful, promises to "reimburse Landlord directly." Jozefovic Decl. ¶ 28.  This is a concession that the Landlord is owed these amounts.  Notably, the Tenant also cites deposition testimony from Mr. Nicholson stating that he was unaware of Tenant's efforts to have security deposits returned to the Landlord and also unaware of any so-called promise by the Tenant to pay the Landlord.  Def. Supp. Br. at 16.  In any event, according to the Lease, the Tenant had 30 days to cure this default following the Notice of Termination— i.e., until February 6, 2020.  Nicholson Aff. Ex. 12 § 16.1(a)(ii).  Tenant failed to do so and thus was in default under the Lease for this reason as well.  Tenant's alleged continuing efforts to cure and its promises to pay two years after termination are unavailing and legally irrelevant.

### vi.    Failure to Timely Pay Real Estate Taxes

The Lease requires that the Tenant pay all real estate taxes, assessments and other taxes before penalties are incurred.  Nicholson Aff. Ex. 12 § 4.2.  The Landlord submitted evidence that the Tenant failed to timely pay real estate taxes for fiscal year 2020 (December 2019 through June 2020) and incurred interest at the overdue rate in the amount of $2,621.94.  Tabor Aff. ¶ 31 & Ex. 38.  In response, the Tenant claims it "has paid all applicable real estate taxes for the

13

Facility" and attaches a tax bill and check for the 2021 fiscal year. *See* Affidavit of Lizer

Jozefovic in Opposition to Motion for Summary Judgment and In Support of Cross-Motion to

Strike, dated October 25, 2021, NYSCEF Doc. No. 236 (the "**Jozefovic Aff.**") ¶¶ 92-93 & Ex. **L**.

The Tenant offers no response to refute the Landlord's evidence that the payment for the 2020

fiscal year was late. The Tenant's failure to cure this default within 30 days of the Notice of

Termination provided an additional basis for the Landlord's termination of the Lease.[5]

## II.   <u>THE LANDLORD PROPERLY TERMINATED THE LEASE</u>

The Landlord terminated the Lease by sending its Notice of Termination, which put the

Tenant on notice of its security-deposit defaults as well as the additional defaults. In opposing

the Landlord's motion for summary judgment, the Tenant argues that the Notice of Termination

was defective. These arguments fail as a matter of law.

### A.   **The Tenant Was Not Entitled to a Cure Period**

Citing Section 16.1 of the Lease, the Tenant argues that the Lease requires that "any

Notice of Default include a minimum thirty (30) day cure period." Def. Supp. Br. at 3. This

argument is wrong and is based on a blatant misreading of the Lease provision.

As the very excerpt cited by the Tenant makes clear, *see* Def. Supp. Br. at 3, n.5, the 30-

day cure period does <u>not</u> apply to any defaults that are "specifically enumerated herein as a Lease

Default." The specifically enumerated defaults under the Lease include (i) failure to deliver

security deposits; (ii) failure to procure the required insurance coverage; (iii) failure to provide

provider agreements and reimbursement rate sheets; and (iv) failure to pay rent in a timely

---

[5] Mr. Nicholson's deposition testimony, cited by the Tenant, is fully consistent with the Landlord's
position. Mr. Nicholson testified that, while the underlying taxes were ultimately paid, he did not know
"[w]hether or not there are late charges that are generated by our lease or generated by the municipal
authority." Def. Supp. Br. at 15. In fact, the unrebutted evidence shows that such charges were incurred
due to the Tenant's late payment of real estate taxes.

manner.  Plf. 56.1 Stmt. ¶ 41.  As to these defined "Lease Defaults," the Lease provides for no

cure period.  Nicholson Aff. Ex. 12 § 16.1(a).

Thus, the 30-day cure period applies only to defaults that are not specifically enumerated

as "Lease Defaults," including the failure to provide financial and operational reporting, the

failure to pay real estate taxes, and the failure to timely pay certain utility charges and deposits.

*Id.* § 16.1(a)(ii).  The Tenant failed to cure these non-enumerated defaults within 30 days.

Indeed, the Landlord waited seven months after sending the Notice of Termination before it filed

suit, and the Tenant failed to cure any of the Lease defaults during that seven-month window.

### B.  Reference to the LOI Does Not Render the Notice of Termination Defective

The Tenant argues that the Notice of Termination is "defective on its face" because it

references both the Lease and the LOI, and it refers to the failure to deliver the lesser $1 million

security-deposit amount that would have been due had the LOI transaction been consummated.

This argument fails as a matter of law.

To begin with, in January 2020, at the time that the Notice of Termination was sent, the

parties had been attempting to resolve Tenant's defaults and pursue a transaction under the LOI

that, if completed, would have resulted in the Tenant's joint ownership of the Facility.

Nicholson Aff. ¶ 19; Tabor Aff. Ex. 26.  Accordingly, the Notice of Termination cites to both the

LOI and the Lease provisions with regard to the security-deposit obligations because, while the

Tenant had already breached the LOI when the Notice of Termination was sent, the LOI had not

yet expired according to its terms.  *See* Tabor Aff. Ex. 26; *see also* Nicholson Aff. Ex. 17 § 1(h)

(stating that the LOI will terminate on April 1, 2020 if no closing occurs by that date); Nicholson

Aff. ¶ 21.  The LOI contemplated that instead of being pad in a lump sum, the $3,700,000

security deposit would be paid in installments beginning with a $1 million payment and

continuing with a series of payments that would have totaled $3,700,000.  Nicholson Aff. Ex. 17

§ 6(d).  However, as the Tenant acknowledges, the LOI transaction was never consummated and so, as a matter of law, all of the original Lease provisions continued to control.  *See* Nicholson Aff. Ex. 17 § 1(h) (stating that "[t]he parties shall remain as Landlord and Tenant pursuant to the existing Lease until such time as the Transaction closes").  There is no disagreement between the parties as to any of this, and the Tenant understood, and was fairly put on notice by the Landlord, as to each of its Lease defaults.  Thus, the Notice of Termination does not contain any mistake. [6]

Regardless, in general, a notice of termination is valid under New York law when it provides enough information "so that the tenant may know what to defend against and how to interpose valid legal defenses against the landlord's claims."  *Carriage Ct. Inn, Inc. v. Rains*, 524 N.Y.S.2d 647, 648 (N.Y. Civ. Ct. 1988). *See, e.g.*, *King Party Ctr. Of Pitkin Ave., Inc. v. Minco Realty, LLC*, 729 N.Y.S.2d 183, 185 (N.Y. App. Div. 2001) (notice in commercial lease sufficient because notice stated "the specific paragraphs in the lease with which [commercial tenant] had allegedly failed to comply").  In a commercial context among sophisticated parties, less specificity is required in a notice of termination.  *See NL Indus., Inc. v. PaineWebber Inc.*, 720 F. Supp. 293, 300 (S.D.N.Y. 1989) (finding "no authority for the proposition that in a commercial context, [a default] notice must cite the lease termination provision, explain its substance, include the length of the cure period, [and] explain [landlord's] rights in the event of a failure to cure" and holding that for commercial leases, "if the notice refers either to the specific termination provision or summarizes its terms, that is sufficient to put the lessee on notice that its leasehold is in jeopardy.")

---

[6] Moreover, the Tenant does not dispute that it failed to pay the first installment of the security deposit in the amount of $1 million that would have been required in the event that the LOI transaction proceeded. *See* Nicholson Aff. Ex. 17 § 6(d)(i) (requiring payment of $1 million toward the Security Deposit by December 1, 2019); *see also* Nicholson Aff. ¶ 21 (indicating that HBL failed to make the $1 million payment). So, under any version of events, it is clear that the Tenant defaulted on its security-deposit obligations.

For example, in *Thor 725 8th Ave. LLC v. Goonetilleke*, the court rejected various arguments that the notice of termination was ineffective because "the adversary party does not claim the absence of actual notice or prejudice by the deviation." 138 F. Supp. 3d 497, 509 (S.D.N.Y. 2015), *aff'd*, 675 F. App'x 31 (2d Cir. 2017).  Similarly, in *Rodriguez v. New Carlton Grp., Inc.*, No. 10 Civ. 3976(GBD), 2012 WL 5077362, at *1 (S.D.N.Y. Oct. 18, 2012), the court rejected an argument that a notice of default was defective because it "incorrectly referenced the year of the missed past due payment as July 1, 2011 instead of July 1, 2012."  *See also Equator Int'l, Inc. v. NH St. Invs., Inc.*, 978 N.Y.S.2d 817, 826 n.2 (N.Y. Sup. Ct. 2014) (demand letter which misstated principal amount as "$1,575,000" instead of "$3,675,000" sufficient because "[t]he typo does not bar the otherwise contractually-conforming termination notice from taking effect"); *Rogers v. N.Y. Tel. Co.*, 425 N.Y.S.2d 19, 20 (N.Y. App. Div. 1980) (in commercial lease context, notice sufficient where the "violations stated had been, for the most part, the subject of thirty-three letters of complaint, largely ignored by the tenant over the four years of the lease" and a letter sent by tenant in response "confirmed the tenant's understanding of the nature of the specific violations alleged."); *NL Indus., Inc.*, 720 F. Supp., at 301 (termination notice sufficient because, even assuming notice failed to properly indicate specific provision of lease violated by water damage incident, landlord's right to terminate was premised on additional defaults committed by tenant clearly specified in notice).

Here, the Tenant cannot claim it did not know that it failed to deliver the Security Deposits.  The Tenant never delivered any security deposit in any amount.  That is not in dispute. Moreover, the Tenant does not quibble with the phrasing of any of the other defaults identified in the Notice of Termination.  Thus, the Notice of Termination fairly notified the Tenant of defaults

of which it already was well aware, and the Tenant's arguments that the notice was defective

should be rejected as a matter of law.

### C.  The Landlord Was Authorized to Send the Notice of Termination

The Tenant is also incorrect when it argues that the Notice of Termination is ineffective

because the Landlord did not obtain the prior consent of its construction lender, Security Benefit

Corporation ("**Security Benefit**").  In selectively quoting from Section 11.2, the Lease provision

that the Tenant claims "subrogates" the entire Lease to a completely separate agreement the

Landlord entered into with Security Benefit (the "**Construction Loan Agreement**"), the Tenant

misleads the Court.  In full, Section 11.2 provides:

> All provisions contained in the loan documents between [the Landlord] and
> [Security Benefit], or any other document in connection therewith *which concern
> or pertain to the restoration of the Leased Premises, the application of insurance
> proceeds and any and all matters concerning a casualty*, shall take precedence over
> and be in lieu of any contrary provision provided for in this Lease, and in all
> respects are binding upon Tenant who agrees to and acknowledges the same.

Nicholson Aff. Ex. 12 § 11.2 (emphasis added).  In excerpting this provision in its brief, the

Tenant omits the italicized language.  Quoted accurately, Section 11.2 plainly states that the only

provisions of the Construction Loan Agreement incorporated by reference into the Lease are

those provisions "which concern or pertain to the restoration of the Leased Premises, the

application of insurance proceeds and any and all matters concerning a casualty."  *Id.*  Section

3.5(vi) of the Construction Loan Agreement, the provision that required the Landlord to obtain

the written consent of Security Benefit prior to terminating a lease, has nothing to do with the

restoration of the premises, insurance, or a casualty.  Jozefovic Aff. Ex. F § 3.5(vi).  Thus,

Section 3.5(vi) was not incorporated into the Lease, and it cannot save Tenant from its own

contractual obligations to the Landlord under the Lease.[7]  *See CooperVision, Inc. v. Intek Integration Techs., Inc.*, 794 N.Y.S.2d 812, 819 (N.Y. Sup. Ct. 2005) ("'[A] reference by the contracting parties to an extraneous writing for a particular purpose makes it a part of their agreement only for the purpose specified.'")

The cases cited by the Tenant do not suggest anything to the contrary.  In *World Wide Polymers, Inc. v Shinkong Synthetic Fibers Corp.*, No. 03-CV-8843 (LAP)(RME), 2010 WL 3155176, at *15 (S.D.N.Y. July 30, 2010), *aff'd*, 694 F.3d 155 (2d Cir. 2012), the court considered whether two faxes exchanged between the *same parties* concerning the *same type of transaction* were "mutually dependent contracts."  Similarly, in *Novick v. AXA Network, LLC*, 642 F.3d 304, 312 (2d Cir. 2011), the court considered whether the repayment contract for a loan extended by a company to its new hire was mutually dependent to his employment contract with the *same company*, such that the company's alleged failure to comply with the employment contract negated the new hire's obligation to repay the loan.  In both cases, which involved multiple contracts between the same parties, the courts determined that material facts regarding whether the parties intended the contracts to be mutually dependent remained in dispute and precluded the entry of summary judgment.  *Novick*, 642 F.3d at 314; *World Wide Polymers*, 2010 WL 3155176, at *15.

The principle articulated in these two cases, however, has no application here, where the contracts at issue were entered into on different dates by different parties, and the contractual language is clear.  *See Benihana of Tokyo, LLC v. Angelo, Gordon & Co.*, 259 F. Supp. 3d 16, 35

---

[7] Notably absent from the Tenant's brief is any mention of Section 3.5(ii) of the Construction Loan Agreement, which expressly obligates the Landlord to, at its own expense, "enforce or secure . . . the performance of each and every material obligation . . . of the respective tenants under the [l]eases."  In selectively pointing to a provision of the Landlord's separate contract with a separate party, the Tenant neglects to notice that this same provision actually *obligated* the Landlord to terminate the Lease in this instance, given the Tenant's numerous material breaches of its terms.

(S.D.N.Y. 2017), *aff'd*, 712 F. App'x 85 (2d Cir. 2018) ("[E]xcept in cases of ambiguity, whether multiple writings constitute a single contract is a question of law for the court.")

## III.   THE LANDLORD DID NOT WAIVE ITS RIGHT TO TERMINATE THE LEASE

The Tenant argues incorrectly that the Landlord waived its right to terminate the Lease by providing keys to the Tenant and allowing the Tenant to take occupancy of the Facility, even though the Tenant had failed to meet its security-deposit obligations.  Def. Supp. Br. at 19.  The Tenant also argues that the Landlord "never intended to terminate the Lease" and waived its right to do so by trying to pursue resolution of the Tenant's defaults though the potential LOI transaction and through a potential Intercreditor Agreement with Security Benefit.  *See generally id.* at 19-22.  Finally, the Tenant argues that the Landlord waived its right to terminate the Lease by accepting monthly rent.  *Id.* at 31.  The Tenant's arguments are at odds with the Lease provisions and are not legally tenable.

### A. The Non-Waiver Provisions in the Lease Are Dispositive

In making its waiver arguments, the Tenant fails to advise this Court of the non-waiver provisions in the Lease, which are dispositive of the issue.  Specifically, the Lease provides:

> Neither any failure nor any delay on the part of any party hereto in insisting upon strict performance of any term, condition, covenant or agreement, or exercising any right, power, remedy or privilege hereunder, or any other document or instrument entered into or delivered in connection herewith or pursuant hereto, shall operate as or constitute a waiver thereof, nor shall a single or partial exercise thereof preclude any other future exercise, or the exercise of any other right, power, remedy or privilege.  A waiver of one default with respect to any Person shall not be construed to be a waiver of any subsequent default with respect to such Person or any other Person or to impair any remedy, right or power consequent thereon.

Nicholson Aff. Ex. 12 § 20.3.  The Lease further states that "[t]he waiver by either party of a breach or violation of any provision of this Lease shall not operate as, or be construed to be a waiver of, any subsequent breach of the same or other provision hereof."  *Id.* § 20.2.

The whole point of these provisions was to ensure that the Landlord could be patient with the Tenant and pursue alternative approaches to resolving disputes without having to worry that any such conduct would be construed as a waiver of any of the Landlord's rights, including but not limited to the right to terminate the Lease.  As a matter of law, all of the Tenant's waiver arguments fail because of the non-waiver provisions in the Lease.  *See, e.g., Jefpaul Garage Corp. v. Presbyterian Hosp. in N.Y.*, 462 N.E.2d 1176, 1178  (N.Y. 1984); *Luna Park Hous. Corp. v. Besser*, 329 N.Y.S.2d 332, 333 (N.Y. App. Div. 1972).

## B.  The Acceptance of Rent Was Not a Waiver

The Tenant's position that the Landlord's acceptance of monthly rent was a waiver notwithstanding the non-waiver provisions in the Lease is expressly contradicted by a New York Court of Appeals case consistently cited in the Tenant's own submissions.  In *Jefpaul*, cited by the Tenant in both of its briefs, the court expressly holds that "[w]hile waiver may be inferred from the acceptance of rent in some circumstances, it may not be inferred, and certainly not as a matter of law, to frustrate the reasonable expectations of the parties embodied in a lease when they have expressly agreed otherwise [by including a nonwaiver and merger clause]." *Jefpaul*, 462 N.E.2d at 1178; Def. Supp. Br. at 31, State Ct. Opp. at 11-12. *See also Renali Realty Group 3, LLC v. Robbins MBW Corp.*, 686 N.Y.S.2d 855, 856 (N.Y. App. Div. 1999) (finding no triable issue of fact regarding waiver and holding that "[t]he plaintiff did not waive its right to enforce the lease provisions by accepting rent for several months, since the lease contained a clear and unambiguous 'no-waiver' clause"); *NL Indus., Inc.*, 720 F. Supp., at 303 (acceptance of rent for various months not a waiver of Landlord's right to enforce strict compliance where lease contained non-waiver provision because "[t]he trend of the modern cases is to uphold such [] non-waiver provision[s].").

21

Moreover, the Tenant overlooks the accord and satisfaction provision in the Lease, which

makes even more explicit that the Landlord may accept rent checks, even checks containing

endorsements or statements by the Tenant, and that acceptance of any such checks is "without

prejudice to any other rights or remedies which Landlord may have." Nicholson Aff. Ex. 12

§ 20.21. Indeed, the waiver argument based on acceptance of monthly rent is truly nonsensical

when one considers that, even after termination, the Tenant continued to be obligated under the

Lease for rent as a holdover tenant. *Id.* § 20.13 ("If, at the expiration of the Term, or earlier

termination of the Lease, Tenant continues to occupy the Leased Premises . . . such holding over

shall not constitute a renewal of this Lease but Tenant shall be a Tenant from month-to-month at

300% of the most recent Rent payable . . .").

### C. Negotiation of the LOI and Intercreditor Agreement Did Not Waive Landlord's Rights under the Lease

On several occasions, the parties endeavored to reach a settlement of the Tenant's

numerous and continuing Lease defaults. These efforts included the entry into the LOI in

November 2019, which would have provided the Tenant with an ownership interest in the

Facility; but due to the Tenant's failure to comply with the terms of the LOI, the LOI did not lead

to a completed transaction. Plf. 56.1 Stmt. ¶¶ 39-40. The parties also engaged in settlement

negotiations regarding an intercreditor agreement that never came to fruition.

The Tenant seems to argue without any basis in law that the mere fact that the Security

Deposits were a topic of discussion among the parties during these and other negotiations

somehow absolves the Tenant of its default. Of course, this is a frivolous argument that cannot

be squared with the Lease. The argument also is contradicted by the testimony that the Tenant

itself cites, which makes clear that the substance of those discussions between the Landlord and

the Tenant was to make clear that the Tenant had failed to meet its threshold security-deposit

obligations under the Lease. *See, e.g.*, Def. Supp. Br. at 3, n.4 (quoting Fensterman Dep. 106:13-23: "We were discussing the terms of the 2017 lease and what its requirements were…*and we were telling him security deposit was due and he was refusing, he refused to pay it.*") (emphasis added); *see also* Declaration of John Giardino in Opposition to White Plains Healthcare Properties I, LLC's Motion for Summary Judgment, Adv. Pro. Dkt. 36 (the "**Giardino Decl.**") Ex. 10 (correspondence between counsel for the Landlord and Tenant indicating serious issues with the draft intercreditor agreement, including that the closing was conditioned on the Tenant not being in default under any material contract and that "the various defaults under the Lease and the LOI appear to impose an impediment to Borrower's ability to close and therefore must be cured before any closing can occur").

## CONCLUSION

For the foregoing reasons and the reasons set forth in prior submissions, the Landlord respectfully requests that the Court grant its motion for partial summary judgment and enter an order: (i) ruling that the Tenant defaulted under the Lease; (ii) ruling that the Landlord properly terminated the Lease; and (iii) granting such other and further relief as the Court deems just and proper.

Dated: March 11, 2022
      New York, New York

Respectfully submitted,

BINDER & SCHWARTZ LLP

/s/ Eric B. Fisher
Eric B. Fisher
Lindsay A. Bush
366 Madison Avenue, 6th Floor
New York, NY 10017
Tel.: (212) 510-7272
Email: efisher@binderschwartz.com
Email: lbush@binderschwartz.com

-and-

DELBELLO DONNELLAN WEINGARTEN WISE & WIEDERKEHR, LLP
Alfred E. Donnellan
One North Lexington Avenue, 11th Floor
White Plains, New York 10601
Tel.: (914) 681-0200
Email: aed@ddw-law.com

ABRAMS FENSTERMAN, LLP
Robert A. Spolzino
81 Main Street, Suite 306
White Plains, New York 10601
Tel.: (914) 607-7010
Email: RSpolzino@Abramslaw.com

*Counsel for White Plains Healthcare Properties I, LLC*