**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------X

In re:                                                                                         :
                                                                                                 :
HBL SNF, LLC, d/b/a EPIC REHABILITATION           : Chapter 11
AND NURSING AT WHITE PLAINS,                           :
                                                                                                 : Case No. 21-22623 (SHL)
                                                                     Debtor,                :
-------------------------------------------------------------------X :
WHITE PLAINS HEALTHCARE PROPERTIES I,               :
LLC,                                                                                         :
                                                                                                 :
                                                                     Plaintiff,             :
                                                                                                 :
        -against-                                                                         :
                                                                                                 : Adversary Proceeding
HBL SNF, LLC, LIZER JOZEFOVIC A/K/A LIZER         :
JOZOFOVIC, and MARK NEUMAN,                           : Case No. 21-07096 (SHL)
                                                                                                 :
                         Defendants and Third-Party Plaintiffs,  :
                                                                                                 :
        -against-                                                                         :

CCC EQUITIES, LLC, PROJECT EQUITY
CONSULTING, THE CONGRESS COMPANIES,
HOWARD FENSTERMAN, WILLIAM
NICHOLSON, and METROPOLITAN
COMMERCIAL BANK

                                            Third-Party Defendants
-------------------------------------------------------------------X

### DECLARATION OF JOHN GIARDINO IN FURTHER OPPOSITION TO LANDLORD'S SUPPLEMENTAL BRIEF

        I, John Giardino, declare as follows:

        1.        I am a partner at Michelman & Robinson LLP, special counsel for HBL SNF, LLC,

("Debtor"). I respectfully submit this declaration in support of Debtor's Reply and in support of

the determination that Landlord never terminated the Lease and the Lease was in effect as of

November 1, 2021.

2.      This Declaration is based upon my personal knowledge and upon files maintained by my firm in relation to this action.

3.      Attached hereto as Exhibit 1 is a true and correct copy of an order of the Supreme Court at Special Term (Jerome W. Marks, J.), entered in the Office of the Clerk of New York County on July 29, 1982, in the case of *Jefpaul Garage Corp. v. Presbyterian Hosp. in City of New York,* Index No. 16876/81.

4.      Attached hereto as Exhibit 2 is a true and correct copy of the Security Agreement, Assignment of Leases and Rents and Fixture Filing (Operating Lease) dated as of August 18, 2017, signed by and among Debtor, Landlord, and Security Benefit Corporation as agent for the benefit of Security Benefit Life Insurance Company ("Security Benefit').

5.      Attached hereto as Exhibit 3 is a true and correct copy of the Complaint filed by Security Benefit, dated March 1, 2022, in the action captioned *Garfield Park, LLC and Security Benefit Corporation, v. White Plains Healthcare Properties I, LLC, et al.*, No. 57012/2022, in New York Supreme Court, Westchester County ("Security Benefit Complaint").

6.      As set forth in its Complaint Security Benefits seeks to foreclose on Leased Premises located at 120 Church Street (the "Leased Premises") due to Landlord's continuous defaults under the loan documents.

7.      Security Benefit's verified allegations support Debtor's arguments provided in the Supplemental Memorandum of Law in Opposition to Landlord's Motion for Summary Judgment dated February 11, 2022 and Reply Memorandum of Law in Opposition to Landlord's Motion for Summary Judgment dated March 11, 2022 ("Supplemental Memorandum and Reply Memorandum") that (i) Security Benefit did not consent to the termination of the Lease as required by the Loan Documents, and (ii) Landlord was and remains in default of its obligations under the

Landlord's Loan Agreement with Security Benefit ("Loan Agreement") which impair Debtor's rights under the Lease.

8.      Security Benefit's Complaint provides an itemized list of Landlord's defaults under the Loan Agreement. *See* Exhibit 3 Security Benefit Complaint, ¶ 44.

9.      Of particular significance, Security Benefit's Complaint set forth that Landlord is in breach of Section 3.5 of the Loan Agreement which prohibits Landlord from terminating the Lease without the prior written consent of the Security Benefit given that Landlord, as Landlord admits, served the Notice of Termination on Debtor without seeking prior written consent from Security Benefit. *See* Exhibit 3 Security Benefit Complaint, ¶ 49.

10.      Security Benefit's Complaint further alleges that Landlord has also defaulted on its obligations under the Loan Agreement by failing to establish a Cash Management Account, failing to send a Tenant Direction Notice to Debtor to pay rent directly into the Cash Management Account, and failing to deposit all revenue generated by the Mortgaged Property into the Cash Management Account. *See* Exhibit 3 Security Benefit Complaint, ¶ 45.

11.      Security Benefit's Complaint validates Debtor's allegations on this motion that there were  preexisting defaults on Landlord and Landlord itself was in default as of October 18, 2019.

12.      Importantly, Security Benefit Complaint does not reference to any failures on Debtor including the failure by Debtor to deliver the two security deposits.

13.      Debtor has made, and continues to make, every Fixed Rent Payments in the amount of $509,000 per month to Landlord which to this date total in excess of $14,500,000 as well as capital contributions amounting to $4,400,000, Landlord has failed to make its required payments to Security Benefit causing a default.

14.     As a result Security Benefit elects to foreclose upon the Mortgage and recover the current outstanding balance of Landlord. *See* Exhibit 3, Security Benefit Complaint, ¶ 81.

15.     Security Benefit Complaint establishes that Landlord has misappropriated the funds paid by Debtor by not making the required payments to Security Benefit, which in return has adverse effects on Debtor's rights.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Dated: March 11, 2022

_____
John Giardino

# <u>Exhibit 1</u>



SUPREME COURT      NEW YORK COUNTY

SPECIAL TERM      PART 1

- - - - - - - - - - - - - - - - - - - - x

JEFPAUL GARAGE CORP.,

            Plaintiff,

     -   against   -        Index No. 16876/81

THE PRESBYTERIAN HOSPITAL IN THE CITY
OF NEW YORK,

            Defendant.

- - - - - - - - - - - - - - - - - - - - x

MARKS, J.:

       Plaintiff, Jefpaul Garage Corp., moves for summary judgment
pursuant to CPLR 3212 seeking a declaratory judgment that it has validly and
timely exercised its option to renew a lease for two additional five year
terms, and that it is not in default of any of its obligations under the lease.
Summary judgment is denied.

       There exists a question as to whether defendant has the right
to deny plaintiff's exercise of its renewal option by reason of plaintiff's
alleged defaults in continuously making untimely rental payments or in failing
to pay April and May 1981 rent within the prescribed time, and by the use
being made of the garage by plaintiff.

       In support of the motion for summary judgment, plaintiff pro-
poses that defendant is estopped from annulling the lease because defendant

has waived any right it has to reject plaintiff's exercise of its option by continuing to accept rent while it knew of the purported default. With respect to the current usage of the garage, plaintiff points out that any objection that defendant might raise, has been waived by defendant's acceptance of rent while it had such knowledge.

While parties are deemed to have waived their right to insist on strict compliance with the letter of the lease where a course of conduct contrary to the express provisions of the lease has arisen, it seems clear that the defense of waiver is applicable only in those cases where a tenant's lease has been terminated and he is threatened with eviction. With reference to plaintiff's attempt to exercise its option of renewal, it is apparent that plaintiff's lease has not been terminated nor has he been threatened with eviction. Defendant landlord is merely refusing to extend the lease for an additional term upon expiration of the present lease on December 31, 1982. The relationship of landlord and tenant being in effect *at least* until expiration of the original term, defendant is entitled to accept the April and May, 1981 rental payments as well as subsequent rent payments, pursuant to that relationship. *whether later payments affect the option to renew is a separate issue requiring a trial.*

A triable issue of fact has also been raised concerning tenant's alleged subletting and usage of the premises by Olins Rent-A-Car Corp. Paragraph 2 of the lease [the "use" clause] states that: "Tenant shall use and occupy demised premises for a public garage and gasoline station and, for the sale of gasoline, oil and accessories and for the repair of automobiles". The affidavits submitted by the parties are not clear as to what portion of the garage is being used by Olins, for what purposes it is being used and whether the general public has actually *been* denied access or restricted *from their* use of the garage as a consequence of Olins alleged activities.

If material facts are in dispute, or if contrary *inferences* may be drawn reasonably from undisputed facts, the issue is for the fact finders to decide on trial, and not for determination by a judge on motion. See Gerard v. Inglese, 11 A.D. 2d 381, 382. There exists sharp issues of fact in this case, which must be left for a determination at trial. Sillman v. Twentieth Century Fox Film Corp. 3 N.Y. 2d 395, 404; Firedoor Corp. of America v. Reliance Electric Co., 56 A.D. 2d 523. Therefore, plaintiff's motion for summary judgment is denied.

DATED:   July 26, 1982

J.S.C.

FILED

JUL 2 9 1982

CO. CLERK'S OFFICE
NEW YORK

# Exhibit 2

AFTER RECORDING RETURN TO:

Nyemaster Goode, P.C.
700 Walnut Street, Suite 1600
Des Moines, Iowa 50309
Attn: James C. Wine

(Space above for Recorder's use)

## SECURITY AGREEMENT, ASSIGNMENT OF LEASES AND RENTS AND FIXTURE FILING (OPERATING LEASE)

THIS SECURITY AGREEMENT, ASSIGNMENT OF LEASES AND RENTS AND FIXTURE FILING (OPERATING LEASE) ("**Agreement**") is made effective as of this ____ day of July, 2017, by and among HBL SNF, LLC, a limited liability company organized and existing under the laws of New York, whose address is 537 Route 22, Purdys, New York 10578, as grantor ("**Operator**"); SECURITY BENEFIT CORPORATION, a corporation organized and existing under the laws of Kansas ("**Agent**"), as agent for the benefit of SECURITY BENEFIT LIFE INSURANCE COMPANY ("**Lender**"), whose address is One Security Benefit Place, Topeka, Kansas 66636; and WHITE PLAINS HEALTHCARE PROPERTIES I, LLC, a limited liability company organized and existing under the laws of Massachusetts, whose address is West Peabody Executive Center, Suite 200, 2 Bourbon Street, Massachusetts 01960 ("**Borrower**").

## RECITALS

A.   Borrower is the owner of a licensed skilled nursing home known as White Plains Institute for Rehabilitation & Healthcare located in White Plains, New York.

1

B.      Borrower is the maker of a Note ("**Note**") dated the same date as this Agreement, payable to the order of Lender, in the original principal amount of $38,500,000.00, bearing interest and being payable in accordance with the terms and conditions set forth in the Note, which Note evidences a loan ("**Loan**") made by Lender to provide Borrower with financing for the Mortgaged Property (as defined below) pursuant to the terms of a Construction Loan Agreement (as it may be amended, the "**Loan Agreement**") dated the same date as this Agreement, by and between Borrower and Agent and Lender. The Loan is secured by a Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing (as it may be amended, the "**Security Instrument**") that creates a first lien on and encumbers the Mortgaged Property.

C.      Borrower has leased the Mortgaged Property to Operator pursuant to a certain Amended and Restated Operating Lease dated _____ ("**Operating Lease**"), as a result of which Operator will derive substantial benefits from the Loan.

D.      The Note, Loan Agreement, Security Instrument, this Agreement, and other documents evidencing, securing or executed and delivered in connection with the Loan are referred to as the "**Loan Documents.**"

E.      As a condition precedent to Lender's making the Loan to Borrower, Agent requires that Operator execute this Agreement and other documents encumbering Operator's interests in the Collateral Property (as defined below) for the benefit of Agent.

F.      Operator will benefit materially from Agent's approval of the Operating Lease and from the Loan transaction described in this Agreement.

## AGREEMENT

NOW, THEREFORE, for good and valuable consideration, the receipt and adequacy of which each of the parties acknowledges, it is agreed as follows:

## ARTICLE 1. DEFINITIONS

As used in this Agreement, the following terms will have the meaning set forth in this Article. Any capitalized term used in this Agreement and not otherwise defined in this Agreement will have the meaning given to that term in the Loan Agreement (and if not defined in the Loan Agreement, then as defined in the Code (as defined in Section 2.2 below)). All Section references will be to Sections of this Agreement unless otherwise noted.

"**Accounts**" means all of Operator's inventory, accounts (including health care insurance receivables), accounts receivable, contract rights, general intangibles and all proceeds thereof in each case to the extent, but only to the extent, they are used in connection with or arise from the operation of the Collateral Property that are or will be subject to an Intercreditor Agreement with the AR Lender.

"**AR Lender**" means Capital Funding or such other accounts receivable lender for Operator.

"**Awards**" means all awards, payments and other compensation made or to be made by any municipal, state or federal authority with respect to the Land, the Improvements, the Fixtures, the Personalty or any other part of the Collateral Property, including any awards or settlements resulting from condemnation proceedings or the total or partial taking of the Land, the Improvements, the Fixtures, the Personalty or any other part of the Collateral Property under the power of eminent domain or otherwise and including any conveyance in lieu of condemnation or taking.

"**Collateral Property**" means all property in which a security interest is granted under this Agreement as further defined below.

"**Contracts**" means all contracts, options and other agreements for the sale of the Land, the Improvements, the Fixtures, the Personalty or any other part of the Collateral Property entered into by Operator now or in the future, including cash or securities deposited to secure performance by parties of their obligations; and all other contracts and agreements pertaining to the ownership, leasing, operation or management of the Mortgaged Property, including management and similar agreements, utility contracts and agreements for the provision of goods or services (or payment therefor) at the Mortgaged Property (whether to Borrower, Operator or the residents of the Mortgaged Property), together with all modifications, extensions or renewals, including contracts with governmental authorities for the provision of services or goods, and contracts with private insurers pursuant to which Third Party Care Payments are to be made; provided, however Contracts will not include Leases or the Operating Lease.

"**Controlled Property**" means property of every kind and description in which Operator has or may acquire any interest arising with respect to or out of the operation of the Mortgaged Property, now or hereafter at any time in the possession or control of Agent for any reason and all dividends and distributions on or other rights in connection with such property.

"**Event of Default**" means the occurrence of: (i) any Event of Default (as defined in the Loan Agreement or any of the Loan Documents), or (ii) a default by Borrower or Operator of any representation, warranty, obligation or covenant under this Agreement, or (iii) a default under the Operating Lease.

"**Fixtures**" means all property which is attached to the Land or the Improvements so as to constitute a fixture under applicable law, including: machinery, equipment, engines, boilers, incinerators and installed building materials; systems and equipment for the purpose of supplying or distributing heating, cooling, electricity, gas, water, air or light; antennas, cable, wiring and conduits used in connection with radio, television, security, fire prevention or fire detection or otherwise used to carry electronic signals; telephone systems and equipment; elevators and related machinery and equipment; fire detection, prevention and extinguishing systems and apparatus; security and access control systems and apparatus; plumbing systems; water heaters, ranges, stoves, microwave ovens, refrigerators, dishwashers, garbage disposers, washers, dryers and other appliances; light fixtures, awnings, storm windows and storm doors; pictures, screens, blinds, shades, curtains and curtain rods; mirrors; cabinets, paneling, rugs and floor and wall coverings; fences, trees and plants; swimming pools; and exercise equipment.

3



"**Improvements**" means the buildings, structures and improvements now constructed or at any time in the future constructed or placed upon the Land, including any future alterations, replacements and additions.

"**Insurance Proceeds**" means all proceeds paid or to be paid by any insurer of the Land, the Improvements, the Fixtures, the Personalty or any other part of the Collateral Property, whether or not Operator obtained the insurance pursuant to Agent's requirement.

"**Land**" means the land described in <u>Exhibit A</u>.

"**Leases**" means all present and future leases, subleases, occupancy agreements pertaining to occupants of the Project, including both residential and commercial agreements and patient admission or resident care agreements, licenses, concessions or grants or other possessory interests now or hereafter in force, whether oral or written, covering or affecting the Mortgaged Property, or any portion of the Mortgaged Property (including proprietary leases or occupancy agreements if Borrower is a cooperative housing corporation), and all modifications, extensions or renewals.

"**Licenses**" means any and all licenses, permits, certificates of need, and similar rights obtained in order to operate the Mortgaged Property as a skilled nursing facility or a health care facility.

"**Mortgaged Property**" means the real property and improvements thereon owned by Borrower and located or relating to, the Land located at 116-120 Church Street, White Plains, New York.

"**Names**" means all names under or by which the senior housing facility located at the Mortgaged Property may be operated or known, and all trademarks, trade names, and goodwill relating to such senior housing facility, including "White Plains Institute for Rehabilitation & Healthcare."

"**Obligations**" means the full and punctual payment, when due (whether at stated maturity, upon acceleration or otherwise), of any and all present and future indebtedness, liabilities and obligations of every kind and nature of Borrower to Lender and/or Agent, howsoever created, arising or evidenced, whether direct or indirect, absolute or contingent, joint or several, both now and hereafter existing, or due or to become due, arising under, out of, as a result of, or in connection with the Note, and the due and punctual performance of all of the other terms and provisions of the Note, this Agreement, the Loan Agreement and other Loan Documents.

"**Other Earnings**" means all earnings, royalties, accounts receivable, issues and profits from the Land, the Improvements or any other part of the Collateral Property and, if Operator is a cooperative housing corporation, maintenance charges or assessments payable by shareholders or residents.

"**Other Rights**" means all current and future rights, including air rights, development rights, zoning rights and other similar rights or interests, easements, tenements, rights of way, strips and gores of land, streets, alleys, roads, sewer rights, waters, watercourses, and appurtenances related



to or benefiting the Land or the Improvements, or both, and all rights-of-way, streets, alleys and roads related to the Mortgaged Property which may have been or may in the future be vacated.

"**Payments**" means all payments due, or received, from occupants of the Mortgaged Property, including rentals, entrance fees, second party charges added to base rental income, base and/or additional meal sales, fees and charges arising from commercial operations located on the Mortgaged Property or provided as a service to the occupants of the Mortgaged Property, rental from guest suites, seasonal lease charges, furniture leases, and laundry services/leases, if any, and any and all other goods and services provided to third parties in connection with the Mortgaged Property, and all judgments and settlements of litigation or threatened litigation and rights to payments thereunder, arising from the ownership, leasing, management or operation of the Mortgaged Property or the Collateral Property

"**Permitted Liens**" means the Liens described in <u>Exhibit B</u> attached hereto and made a part hereof.

"**Person**" means any natural person, sole proprietorship, corporation, general partnership, limited partnership, limited liability company, limited liability limited partnership, joint venture, association, joint stock company, bank, trust, estate, unincorporated organization, any federal, state, county or municipal government (or any agency or political subdivision thereof), endowment fund or any other form of entity.

"**Personalty**" means all of the following:

(i)     Accounts (including deposit accounts) related to the Mortgaged Property.

(ii)    Equipment and inventory, which are used now or in the future in connection with the ownership, management or operation of the Land or Improvements or are located on the Land or Improvements, including furniture, furnishings, machinery, building materials, goods, supplies, tools, books, records (whether in written or electronic form) and computer equipment (hardware and software).

(iii)   Other tangible personal property which is used now or in the future in connection with the ownership, management or operation of the Land or Improvements or is located on the Land or in the Improvements, including ranges, stoves, microwave ovens, refrigerators, dishwashers, garbage disposers, washers, dryers and other appliances (other than Fixtures).

(iv)    Any operating agreements relating to the Land or the Improvements.

(v)     Any surveys, plans and specifications and contracts for architectural, engineering and construction services relating to the Land or the Improvements.

(vi)    All other intangible property, general intangibles and rights relating to the operation of, or used in connection with, the Land or the Improvements, including all governmental permits relating to any activities on the Land and including

2304639v5/17057-6



subsidy or similar payments received from any sources, including a Governmental Authority.

(vii)    Any rights in or under any Letter of Credit.

"**Proceeds**" means all proceeds from the conversion, voluntary or involuntary, of any of the other Collateral Property into cash or liquidated claims, and the right to collect such proceeds.

"**Refunds**" means all refunds or rebates of impositions with respect to the Collateral Property by any municipal, state or federal authority or insurance premiums.

"**Rent(s)**" means all rents (whether from residential or non-residential space), revenues and other income of the Land or the Improvements, parking fees, laundry and vending machine income and fees and charges for food, health care and other services provided at the Mortgaged Property, whether now due, past due or to become due, and deposits forfeited by patients, and, if Borrower is a cooperative housing corporation or association, maintenance fees, charges or assessments payable by shareholders or residents under proprietary leases or occupancy agreements, whether now due, past due or to become due.

"**Patient Security Deposits**" means all patient security deposits (in whatever form they may be) that have not been forfeited by any patient.

"**Third Party Care Payments**" means all payments and rights to payments from Medicare, Medicaid or TRICARE programs, or similar federal, state or local programs, boards, bureaus or agencies, if any, and rights to payment from residents or private insurers, if any, arising from the operation of the Mortgaged Property as a senior housing project.

"**Third Party Miscellaneous Payments**" means all utility deposits, unearned premiums, accrued, accruing or to accrue under insurance policies now or hereafter obtained by Operator for the Collateral Property and all proceeds of any conversion of the Collateral Property or any part thereof including proceeds of hazard and title insurance and all awards and compensation for the taking by eminent domain, condemnation or otherwise, of all or any part of the Collateral Property.

## ARTICLE 2.  UNIFORM COMMERCIAL CODE SECURITY AGREEMENT

2.1    To the extent permitted by applicable law including but not limited to the rules and regulations of the State of New York and 42 USC Section 407, as security for the payment, performance and observance of the covenants and agreements of Operator contained in this Agreement and any other Loan Documents to which Operator is a party and of Borrower under the Loan Documents, including Borrower's repayment of the Loan in a timely manner and all interest and other charges under the Loan Documents and the other Obligations (collectively, "**Secured Obligations**"), Operator grants to Agent a security interest in all of Operator's now owned or hereafter acquired or arising right, title and interest in and to all of the following property (collectively, "**Collateral Property**") provided that the Collateral Property is strictly limited in all cases (whether



or not so specified below) to the extent it is a part of the Mortgaged Property or attached to, used in connection with or arising from the ownership, leasing, management or operation of the Mortgaged Property, including the operation of the Mortgaged Property by Operator pursuant to the Operating Lease:

(a)    Accounts

(b)    Awards

(c)    Contracts

(d)    Fixtures

(e)    [Reserved]

(f)    Improvements

(g)    Insurance Proceeds

(h)    Land

(i)    Leases

(j)    Licenses

(k)    Names

(l)    Other Earnings

(m)    Other Rights

(n)    Payments

(o)    Personalty

(p)    Refunds

(q)    Rents

(r)    Patient Security Deposits

(s)    Third Party Care Payments

(t)    Third Party Miscellaneous Payments

(u)    Products and Proceeds of all the foregoing

2.2     This Agreement is also a security agreement under the Uniform Commercial Code ("**Code**") for any of the Collateral Property which, under applicable law, may be subjected to a security interest under the Code, whether such Collateral Property is owned now or acquired in the future, and all products and cash and non-cash proceeds thereof (collectively, "**UCC Collateral**"), and Operator grants to Agent a security interest in the UCC Collateral to secure the timely payment and performance of the Secured Obligations of Operator and Borrower, respectively. Operator authorizes Agent to prepare and file financing statements, continuation statements and financing statement amendments in such form as Agent may require to perfect or continue the perfection of this security interest and Operator agrees, if Agent so requests, to execute and deliver to Agent such financing statements, continuation statements and amendments. Borrower will pay all filing costs and all costs and expenses of any record searches for financing statements and/or amendments that Agent may require. Without the prior written consent of Agent, Operator will not create or permit to exist any other Lien in any of the UCC Collateral or any of the other Collateral Property (except only Liens in favor of Agent to secure the Secured Obligations and Permitted Liens). Said UCC's shall state that they are given as a security interest subject to the Intercreditor Agreement to be entered into with the AR Lender.

2.3     Unless Operator gives Notice to Agent within 10 days after the occurrence of any of the following, and executes and delivers to Agent modifications or supplements of this Agreement (and any financing statement which may be filed in connection with this Agreement) as Agent may require, Operator will not: (a) change its name, identity, structure or jurisdiction of organization, (b) change the location of its place of business (or chief executive office if more than one place of business),or (c) add to or change any location at which any of the Collateral Property is stored, held or located.

2.4     If an Event of Default has occurred and is continuing, Agent will have the remedies of a secured party under the Code, in addition to all remedies provided by this Agreement or existing under applicable law or in equity. In exercising any remedies, Agent may exercise its remedies against the UCC Collateral separately or together, and in any order, without in any way affecting the availability of Agent's other remedies.

## ARTICLE 3. FORECLOSURE

3.1     In any foreclosure action the New York State Commissioner of Health (the "Commissioner") shall be made a party defendant. The Commissioner shall take all steps necessary to protect the interests of the public therein and no costs shall be awarded against the Commissioner. Foreclosures shall not be decreed unless the court to which application is made shall be satisfied that the interests of the lienholder or holders cannot be adequately assured except by the sale of the property. In any such proceeding, the court shall be authorized to appoint the Commissioner as receiver of the property, or to grant such other and further relief as may be reasonable and proper.

3.2     Any rights of reentry onto the Leased Premises do not confer on Agent, Lessor or any Lender the authority to operate a hospital as defined in Article 28 of the Public Health



Law on the Leased Premises and Agent, Lessor or any Lender agrees that it will give the New York State Department of Health, Tower Building, Empire State Plaza, Albany, NY 12237, notification by certified mail of its intent to reenter the Leased Premises or to initiate dispossessory proceedings or that the Lease is due to expire, at least thirty (30) days prior to the date on which Landlord intends to exercise a right of reentry or to initiate such proceedings or at least sixty (60) days before expiration of the Lease.

3.3     Upon receipt of notice from Agent, Lessor or any Lender of its intent to exercise its right of reentry or upon the service of process in dispossessory proceedings Lessee, shall immediately notify by certified mail the New York State Department of Health, Tower Building, Empire State Plaza, Albany, NY 12237, of the receipt of such notice or service of such process.

## ARTICLE 4. REPRESENTATIONS AND WARRANTIES OF OPERATOR

4.1     Operator represents, warrants and agrees to the following:

   (a)     Operator has good and marketable title to all of the Collateral Property (except fee simple title to the Mortgaged Property is in Borrower and subject to the Operating Lease) and none of the Collateral Property is subject to any Lien except for Permitted Liens and the security interest created pursuant to this Agreement, the Security Instrument, the Loan Agreement and any of the other Loan Documents.

   (b)     During the term of this Agreement, Operator will not commence, or join with any other creditor in commencing any bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings with respect to Borrower, without Agent's prior written consent, and as of the date hereof, Operator has not filed and is not subject to any filing for bankruptcy or reorganization under any applicable bankruptcy or insolvency laws. The Operating Lease is in full force and effect, Operator is not in default thereunder and Operator is not aware of any ongoing default thereunder by Borrower.

## ARTICLE 5. COVENANTS OF THE OPERATOR

5.1     (a)     Operator will:

      (i)     Not commit waste or permit impairment or deterioration of the Collateral Property.

      (ii)     Not abandon the Collateral Property.

      (iii)     Restore or repair or cause to be restored or repaired promptly, in a good and workmanlike manner, any damaged part of the Collateral Property to the equivalent of its original condition, or such other condition as Agent may approve in writing, whether or not Insurance Proceeds or condemnation awards are available to cover any costs of such restoration or repair.

      (iv)    Keep or caused to be kept the Collateral Property in good repair, including the replacement of tangible Personalty and Fixtures with items of equal or better function and quality.

      (v)    Give Notice to Agent of and, unless otherwise directed in writing by Agent, will appear in and defend any action or proceeding purporting to affect the Collateral Property, Agent's security or Agent's rights under this Agreement.

      (vi)    Timely perform all of its obligations under each Material Contract to which Operator is a party.

(b)    Operator will not (and will not permit any patient or other person to) remove, demolish or alter, other than in a commercially reasonable manner in the ordinary course of business, the Collateral Property or any part of the Collateral Property, except in connection with the replacement of tangible Personalty.

**5.2**    All expenses of protecting, storing, warehousing, insuring, handling and shipping of the Collateral Property, all costs of keeping the Collateral Property free of any Liens prohibited by this Agreement and of removing the same if they should arise, and any and all excise, property, sales and use taxes imposed by any state, federal or local authority on any of the Collateral Property or in respect of the sale thereof, will be borne and paid by Operator and if Operator fails to promptly pay any thereof when due, Agent may, at its option, but will not be required to, pay the same whereupon the same will constitute Obligations and will be secured by the security interests granted hereunder and by the Security Instrument and the Loan Agreement.

**5.3**    Unless Operator gives Notice to Agent within 10 days after the occurrence of any of the following, and executes and delivers to Agent modifications or supplements of this Agreement (and any financing statement which may be filed in connection with this Agreement) as Agent may require, Operator will not:

(a)    Change its name, identity, structure or jurisdiction of organization.

(b)    Change the location of its place of business (or chief executive office if more than one place of business).

(c)    Add to or change any location at which any of the Collateral Property is stored, held or located.

**5.4**    Operator will not use the Collateral Property, or knowingly permit the Collateral Property to be used, for any unlawful purpose or in violation of any federal, state or municipal law.

2304639v5/17057-6



5.5     Operator will not without Agent's express written consent, amend, extend (other than pursuant to an express option set forth in the Operating Lease), assign its interest under, or terminate the Operating Lease.

5.6     Operator will not take any action, or omit to take any action, if doing so would constitute a default of any provision of the Security Instrument, the Loan Agreement or the other Loan Documents.

5.7     Immediately upon Operator becoming aware of the existence of any Event of Default under and as defined in the Operating Lease, this Agreement or any other Loan Document, Operator will give Notice to Agent that such Event of Default exists, stating the nature of the Event of Default to Operator's knowledge, the period of existence of the Event of Default, and what action Operator proposes to take with respect to the Event of Default.

5.8     Operator will execute and deliver to Agent, from time, to time, such financing statements, assignments, and other documents covering the Collateral Property as Agent may request in order to create, evidence, perfect, maintain or continue its security interest in the Collateral Property (including any additional Collateral Property acquired by Operator after the date hereof) and will notify Agent promptly upon acquiring any additional Collateral Property.

5.9     Operator will send to Agent copies of all notices, financial reports, survey results and other matters concurrently with providing such copies to Borrower under or pursuant to the Operating Lease.

5.10    Notwithstanding any provision of the Operating Lease to the contrary, in no event will Operator transfer any License or any right thereunder (or part thereof) to any other Person or location, without the prior written approval of Agent.

5.11    Within 10 days after a request from Agent, Operator will deliver to Agent a written statement, signed and acknowledged by Operator, certifying to Agent or to any Person(s) designated by Agent, as of the date of such statement: (a) that the Operating Lease and this Agreement are unmodified and in full force and effect (or if there have been any modifications thereof, that they are in full force and effect as modified, and setting forth such modifications), (b) that Operator is not in default under the Operating Lease or this Agreement (or if Operator is in default, setting forth the details thereof and the actions Operator is taking to cure such default), (c) that to its knowledge, Borrower is not in default under the Operating Lease or the Loan Documents, and (d) as to any additional factual matters Agent may reasonably request.

5.12    Until the Obligations under the Loan are paid in full, Operator will remain a "Single Purpose Entity," which means, for the purposes of this Agreement, at all times since its formation and thereafter it will satisfy each of the following conditions:

        (i)     It will not engage in any business or activity, other than being a Licensed Skilled Nursing Home formed and operating under Article 28 of the New York State



Public Health Law, and the operation, leasing and maintenance of the Mortgaged Property and activities incidental thereto.

(ii)     It will not acquire, own, hold, lease, operate, manage, maintain, develop or improve any assets other than the Mortgaged Property and such Personalty as may be necessary for the operation of the Mortgaged Property and will conduct and operate its business as presently conducted and operated or as otherwise permitted under the Operating Lease except that the Operator shall be entitled to open an affiliated D&TC for the provision of End State Renal Dialysis, a Medical Model Daycare Center or an Outpatient Physical Therapy center provided those uses are permitted by the New York State Department of Health.

(iii)    It will preserve its existence as an entity duly organized, validly existing and in good standing (if applicable) under the laws of the jurisdiction of its formation or organization and will do all things necessary to observe organizational formalities.

(iv)     It will not merge or consolidate with any other Person.

(v)      It will not take any action to dissolve, wind-up, terminate or liquidate in whole or in part; to sell, transfer or otherwise dispose of all or substantially all of its assets; change its legal structure; transfer or permit the direct or indirect transfer of any partnership, membership or other equity interests, as applicable, other than Transfers permitted under the Loan Agreement; issue additional partnership, issue membership or other equity interests, as applicable, or seek to accomplish any of the foregoing.

(vi)     It will not, without the prior unanimous written consent of all of Operator's members, partners, or shareholders, as applicable, take any of the following actions:

    (A)     File any insolvency, or reorganization case or proceeding, to institute proceedings to have Operator be adjudicated bankrupt or insolvent.

    (B)     Institute proceedings under any applicable insolvency law.

    (C)     Seek any relief under any law relating to relief from debts or the protection of debtors.

    (D)     Consent to the filing or institution of bankruptcy or insolvency proceedings against Operator.

    (E)     File a petition seeking, or consent to, reorganization or relief with respect to Operator under any applicable federal or state law relating to bankruptcy or insolvency.



(F)    Seek or consent to the appointment of a receiver, liquidator, assignee, trustee, sequestrator, custodian, or any similar official for Operator or a substantial part of its property.

(G)    Make any assignment for the benefit of creditors of Operator.

(H)    Admit in writing Operator's inability to pay its debts generally as they become due.

(I)    Take action in furtherance of any of the foregoing.

(vii)    It will not amend or restate its organizational documents if such change would cause the provisions set forth in those organizational documents not to comply with the requirements set forth in this Section 5.10.

(viii)    It will not own any subsidiary or make any investment in, any other Person.

(ix)    It will not commingle its assets with the assets of any other Person and will hold all of its assets in its own name.

(x)    Except the proposed financing with AR Lender and as specifically set forth in Section 9.25 below, it will not incur any debt, secured or unsecured, direct or contingent (including guaranteeing any obligation), other than customary unsecured trade payables incurred in the ordinary course of operating the Mortgaged Property.

(xi)    It will maintain its records, books of account, bank accounts, financial statements, accounting records and other entity documents separate and apart from those of any other Person and will not list its assets as assets on the financial statement of any other Person; provided, however, that Operator's assets may be included in a consolidated financial statement of its Affiliate provided that (A) appropriate notation will be made on such consolidated financial statements to indicate the separateness of Operator from such Affiliate and to indicate that Operator's assets and credit are not available to satisfy the debts and other obligations of such Affiliate or any other Person, and (B) such assets will also be listed on Operator's own separate balance sheet.

(xii)    Except for capital contributions or capital distributions permitted under the terms and conditions of its organizational documents, it will only enter into any contract or agreement with any general partner, member, shareholder, principal or Affiliate of Operator, or any general partner, member, principal or Affiliate thereof, upon terms and conditions that are commercially reasonable and substantially similar to those that would be available on an arm's-length basis with third parties.



(xiii)   It will not maintain its assets in such a manner that will be costly or difficult to segregate, ascertain or identify its individual assets from those of any other Person.

(xiv)   Other than as directed or authorized by this Agreement, it will not assume or guaranty the debts or obligations of any other Person, hold itself out to be responsible for the debts of another Person, pledge its assets to secure the obligations of any other Person or otherwise pledge its assets for the benefit of any other Person, or hold out its credit as being available to satisfy the obligations of any other Person.

(xv)   It will not make or permit to remain outstanding any loans or advances to any other Person except for ordinary business purposes related to operations.

(xvi)   It will file its own tax returns separate from those of any other Person, except to the extent that Operator is treated as a "disregarded entity" for tax purposes and is not required to file tax returns under applicable law, and will pay any taxes required to be paid under applicable law.

(xvii)   It will hold itself out to the public as a legal entity separate and distinct from any other Person and conduct its business solely in its own name, will correct any known misunderstanding regarding its separate identity and will not identify itself or any of its Affiliates as a division or department of any other Person.

(xviii)   It will maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations and will pay its debts and liabilities from its own assets as the same become due.

(xix)   It will allocate fairly and reasonably shared expenses with Affiliates (including shared office space) and use separate stationery, invoices and checks bearing its own name.

(xx)   It will pay its own liabilities (including salaries of its own employees, if any) from its own funds.

(xxi)   It will not acquire obligations or securities of its partners, members, shareholders, or Affiliates, as applicable.

(xxii)   [Reserved]

(xxiii)   It will maintain a sufficient number of employees (if any) in light of its contemplated business operations and pay the salaries of its own employees, if any, only from its own funds.

(xxiv)   [Reserved]

(xxv)   [Reserved]

## ARTICLE 6. COLLECTIONS

**6.1**    Except as otherwise provided in this Agreement, Operator will continue to collect at its own expense, all amounts due or to become due to Operator with respect to the Collateral Property. In connection with such collections, Operator may take (and, at Agent's direction, will take) such action as Operator or Agent may deem necessary or advisable to enforce collection of any Awards, Proceeds, Rents, Other Earnings, Refunds, Payments, Third Party Care Payments, Third Party Miscellaneous Payments or Accounts; provided, however, that Agent will have the right, at any time upon the occurrence of an Event of Default to notify the debtors and/or payors of any Awards, Proceeds, Rents, Other Earnings, Refunds, Payments, Third Party Care Payments, Third Party Miscellaneous Payments or Accounts of the assignment of such amounts to Agent and to direct such debtors and/or payors to make payment of all amounts due or to become due to Operator thereunder directly to Agent.

**6.2**    Upon an Event of Default and during the continuation thereof, Operator will pay to Agent all Rent and other charges, fees and reserves due and payable under the Operating Lease without abatement, set off, counterclaim or reduction. Operator will not be obligated to pay Borrower any such amounts paid to Agent.

**6.3**    All amounts received by Agent pursuant to this Article 7 will be applied, at Agent's election, to the operation, preservation, improvement and maintenance of the Mortgaged Property and the Collateral Property and/or to the repayment of the Indebtedness of Borrower and/or any amounts due from Operator to Agent hereunder or under any other Loan Document, all in such manner and order as Agent may determine.

## ARTICLE 7. ASSIGNMENT

**7.1**    Operator agrees as follows:

(a)    After the date of this Agreement, no extension (other than pursuant to an express option set forth in the Operating Lease), amendment or termination of the Operating Lease will be valid as against Agent unless Agent has approved such extension, amendment or termination in writing.

(b)    Operator will not terminate the Operating Lease or cease to perform its obligations under the Operating Lease for any reason, including but not limited to Borrower's failure to make any payments to Operator, without giving Agent thirty (30) days' prior Notice of such intention, in order that Agent may, at its election, cure Borrower's default and/or exercise its rights under this Agreement.

(c)    Upon the occurrence of an Event of Default hereunder, under the other Loan Documents or under the Operating Lease, Operator may be removed and the Operating Lease terminated by Agent, without payment of any cancellation or

termination fee, penalty or other liability, at any time upon Notice to Operator by Agent of such Event of Default and termination.

(d)     Upon the termination of the Operating Lease for any reason or upon the occurrence of an Event of Default , at Agent's request, Operator will cooperate with Borrower and Agent in all respects to facilitate and effect a transition and licensing of the operation of the Mortgaged Property to a new operator. Such cooperation will include: (i) furnishing to any prospective operator designated by Agent complete and accurate books, records, files, documents and information in Operator's possession, control or custody with respect to the operation, leasing, maintenance and construction of the Mortgaged Property (including, but subject to Privacy Laws, (x) copies of all resident care agreements, resident admission agreements and all other Leases, and (y) copies of all other records pertaining to the residents at the Mortgaged Property), (ii) entering into an operations transfer agreement (in customary form and acceptable to Agent) with the new operator to permit continued operation of the Mortgaged Property without interruption while Licenses and agreements with Governmental Authorities (including provider agreements) are obtained by the new operator, (iii) assigning such Material Contracts and other agreements to such new operator as it may request (and which may be assigned by Operator), including all residential Leases, and (iv) cooperating with such new operator as to the filing of required notices or applications for Licenses with applicable Governmental Authorities (to the extent Operator's signature may be required or information in Operator's possession, control or custody may be required).

## 7.2     Subordination of Operating Lease.

(a)     The parties hereto have entered into a separate Subordination, Non-Disturbance and Attornment Agreement (of Operating Lease) dated as of the same date hereof.

## ARTICLE 8. RIGHTS AND REMEDIES ON DEFAULT

**8.1**     Upon the occurrence of an Event of Default, and at any time thereafter, and in addition to the rights granted to Agent under this Agreement or under any other Loan Document, including any collateral agreement or other instrument evidencing, securing or otherwise relating to any of the Indebtedness, Agent may exercise any one or more of the following rights and remedies:

(a)     Declare any and all Indebtedness to be immediately due and payable, and the same will thereupon become immediately due and payable without further notice or demand.

(b)     In the name of Operator or otherwise, demand, collect, receive and receipt for, compound, compromise, settle and give acquittance for and prosecute and discontinue any suits or proceedings in respect of any or all of the Collateral Property.

2304639v5/17057-6



(c)     Take any action that Agent may deem necessary or desirable in order to realize on the Collateral Property, including the power to perform any contract, to endorse in the name of Operator any checks, drafts, notes, or other instruments or documents received in payment of or on account of the Collateral Property.

(d)     Enter upon and into and take possession of all or such part or parts of the Collateral Property as may be necessary or appropriate in the judgment of Agent, to permit or enable Agent to store, lease, sell or otherwise dispose of or collect all or any part of the Collateral Property, and use and operate said property for such purposes and for such length of time as Agent may deem necessary or appropriate for said purposes without the payment of any compensation to Operator therefor. Operator will provide Agent with all information and assistance requested by Agent to facilitate the storage, leasing, sale or other disposition or collection of the Collateral Property after an Event of Default.

(e)     Exercise any and all other rights and remedies available to Agent by law, in equity or by agreement, including rights and remedies under the law of the State where the Land is located or any other applicable law as they relate to the Collateral Property and including all remedies available to Agent under Article 9 of the Code of the State where the Land is located, and, in connection therewith, Agent may require Operator to assemble the Collateral Property and make it available to Agent at a place to be designated by Agent, and any Notice of intended disposition of any of the Collateral Property required by law will be deemed reasonable if such Notice is mailed or delivered to Operator pursuant to this Agreement at least 10 days before the date of such disposition. Agent may sell or otherwise dispose of any or all of the Collateral Property in a single unit or in multiple units and Agent may be the purchaser at such sale or other disposition.

(f)     Terminate the Operating Lease or exercise any other rights of Borrower under the Operating Lease as though a default of Operator had occurred under (and as defined in) the Operating Lease entitling Borrower to terminate the Operating Lease pursuant to the term thereof and applicable law.

(g)     All proceeds of sale or disposition of the Collateral Property will be applied toward the Indebtedness of Borrower in such manner and order as Agent may elect.

## ARTICLE 9. MISCELLANEOUS

**9.1     Security Agreement.** This Assignment is also a security agreement under the Uniform Commercial Code for the Operating Lease. Operator and Borrower hereby authorize Agent to prepare and file financing statements, continuation statements and financing statement amendments in such form as Agent may require to perfect or continue the perfection of this security interest.

2304639v5/17057-6

**9.2**   **Attorney-in-Fact.** Operator irrevocably constitutes and appoints Agent as Operator's attorney-in-fact to demand, receive and enforce Operator's rights with respect to the Operating Lease and to do any and all acts in Operator's name or in the name of Agent with the same force and effect as Operator could do if this Assignment had not been made. This appointment will be deemed to be coupled with an interest and irrevocable.

**9.3**   **Termination.** Following payment of the Loan in full and the release or assignment of the Security Instrument, this Assignment and all of Agent's right, title and interest under this Assignment will terminate.

**9.4**   **Notice.**

(a)   All notices under or concerning this Assignment (**"Notice"**) will be in writing. Each Notice will be deemed given on the earliest to occur of: (i) the date when the Notice is received by the addressee, (ii) the first Business Day after the Notice is delivered to a recognized overnight courier service, with arrangements made for payment of charges for next Business Day delivery, or (iii) the third Business Day after the Notice is deposited in the United States mail with postage prepaid, certified mail, return receipt requested. Addresses for Notice are as follows:

| If to Agent: | Security Benefit Corporation<br>1 SW Security Benefit PL<br>Topeka, Kansas 66636 |
|---|---|
| If to Operator: | HBL SNF, LLC<br>537 Route 22<br>Purdys, New York 10578 |

(b)   Any party to this Assignment may change the address to which Notices intended for it are to be directed by means of Notice given to the other party in accordance with this Section 9. Each party agrees that it will not refuse or reject delivery of any Notice given in accordance with this Section 9, that it will acknowledge, in writing, the receipt of any Notice upon request by the other party and that any Notice rejected or refused by it will be deemed for purposes of this Section 9 to have been received by the rejecting party on the date so refused or rejected, as conclusively established by the records of the U.S. Postal Service or the courier service.

**9.5**   **Governing Law; Consent to Jurisdiction and Venue.**

(a)   This Assignment will be construed in accordance with and governed by the laws of the State where the Land is located.

(b)   Operator and Borrower agree that any controversy arising under or in relation to this Assignment may be litigated in the State where the Land is located. The state



and federal courts and authorities with jurisdiction in the State where the Land is located will have jurisdiction over all controversies that may arise under or in relation to this Assignment. Operator and Borrower irrevocably consent to service, jurisdiction and venue of such courts for any such litigation and waive any other venue to which it might be entitled by virtue of domicile, habitual residence or otherwise. However, nothing in this Section 10 is intended to limit Agent's right to bring any suit, action or proceeding relating to matters under this Assignment in any court of any other jurisdiction.

9.6 **Captions, Cross References and Exhibits.** The captions assigned to provisions of this Assignment are for convenience only and will be disregarded in construing this Assignment. Any reference in this Assignment to an "Exhibit" or a "Section", unless otherwise explicitly provided, will be construed as referring, respectively, to an Exhibit attached to this Assignment or to a section of this Assignment. All Exhibits attached to or referred to in this Assignment are incorporated by reference into this Assignment.

9.7 **Number and Gender.** Use of the singular in this Assignment includes the plural, use of the plural includes the singular, and use of one gender includes all other genders, as the context may require.

9.8 **No Partnership.** This Assignment is not intended to, and will not, create a partnership or joint venture among the parties, and no party to this Assignment will have the power or authority to bind any other party except as explicitly provided in this Assignment.

9.9 **Severability.** The invalidity or unenforceability of any provision of this Assignment will not affect the validity of any other provision, and all other provisions will remain in full force and effect.

9.10 **Entire Assignment.** This Assignment contains the entire agreement among the parties as to the rights granted and the obligations assumed in this Assignment.

9.11 **Waiver; No Remedy Exclusive.** Any forbearance by a party to this Assignment in exercising any right or remedy given under this Assignment or existing at law or in equity will not constitute a waiver of or preclude the exercise of that or any other right or remedy. Unless otherwise explicitly provided, no remedy under this Assignment is intended to be exclusive of any other available remedy, but each remedy will be cumulative and will be in addition to other remedies given under this Assignment or existing at law or in equity.

9.12 **Third Party Beneficiaries.** Neither any creditor of any party to this Assignment, nor any other person, is intended to be a third party beneficiary of this Assignment.

9.13 **Further Assurances and Corrective Instruments.** To the extent permitted by law, the parties will, from time to time, execute, acknowledge and deliver, or cause to be executed, acknowledged and delivered, such supplements to this Assignment and such

2304639v5/17057-6



further instruments as may reasonably be required for carrying out the intention of or facilitating the performance of this Assignment.

**9.14**   **Counterparts.** This Assignment may be executed in multiple counterparts, each of which will constitute an original document and all of which together will constitute one agreement.

**9.15**   **Indemnity.** By executing this Assignment, Operator agrees to indemnify and hold harmless Agent and its successors and assigns from and against any and all losses, claims, damages, liabilities and expenses including Attorneys' Fees and Costs, which may be imposed or incurred in connection with this Assignment due to default by Operator of its obligations under this Assignment.

**9.16**   **Costs and Expenses.** Wherever pursuant to this Assignment it is provided that Operator will pay any costs and expenses, such costs and expenses will include Agent's Attorneys' Fees and Costs.

**9.17**   **Determinations by Agent.** In any instance where the consent or approval of Agent may be given or is required, or where any determination, judgment or decision is to be rendered by Agent under this Assignment, the granting, withholding or denial of such consent or approval and the rendering of such determination, judgment or decision will be made or exercised by Agent (or its designated representative) using commercially reasonable discretion and will be final and conclusive except as may be otherwise expressly and specifically provided in this Assignment.

**9.18**   **Successors and Assigns.** This Assignment will be binding upon and inure to the benefit of Operator, Agent and Borrower and their respective successors and assigns forever.

**9.19**   **Secondary Market.** Agent may sell, transfer and deliver the Note and assign the Loan Agreement, the Security Instrument, this Assignment and the other Loan Documents to one or more investors in the secondary mortgage market ("**Investors**"). In connection with such sale, Agent may retain or assign responsibility for servicing the Loan, including the Note, the Loan Agreement, the Security Instrument, this Assignment and the other Loan Documents, or may delegate some or all of such responsibility and/or obligations to a servicer including any subservicer or master servicer, on behalf of the Investors. All references to Agent in this Assignment will refer to and include any such servicer to the extent applicable.

**9.20**   **No Liability on Collateral.** Neither this Assignment nor any action or inaction on the part of Agent will constitute an assumption on the part of Agent of any obligations under the Operating Lease and Operator will continue to be liable for all obligations under the Operating Lease.

**9.21**   **Rejection of Operating Lease.** If any bankruptcy proceedings hereafter commence with respect to Borrower, and if the Operating Lease is rejected by the trustee pursuant to Section 365 of the United States Bankruptcy Code, Operator agrees with Agent (a) not to

treat such lease as terminated, and (b) to remain in possession of the Mortgaged Property pursuant to the terms of the Operating Lease and this Agreement.

**9.22**   **Waiver of Statute of Limitations.** Borrower and Operator each waive the right to assert any statute of limitations as a bar to the enforcement of the Lien of this Agreement or to any action brought to enforce this Agreement or any other Loan Document.

**9.23**   **Waiver of Marshalling.** Notwithstanding the existence of any other security interest in the Mortgaged Property and Collateral Property held by Agent, Agent will have the right to determine the order in which any or all of the Mortgaged Property and Collateral Property will be subjected to the remedies provided in this Agreement or in the Security Instrument, the Loan Agreement, the Note, any other Loan Document or applicable law. Agent will have the right to determine the order in which any or all portions of the Secured Obligations are satisfied from the proceeds realized upon the exercise of such remedies. Borrower, Operator and any party who now or in the future acquires a security interest in the Mortgaged Property or the Collateral Property and who has actual or constructive notice of this Agreement waive any and all right to require the marshalling of assets or to require that any of the Mortgaged Property or the Collateral Property be sold in the inverse order of alienation or that any of the Mortgaged Property or the Collateral Property be sold in parcels or as an entirety in connection with the exercise of any of the remedies permitted by applicable law or provided in this Agreement.

**9.24**   **Waiver of Certain Damages.** To the fullest extent permitted by applicable law, Borrower and Operator each agree not to assert, and each waives any claim against Agent and its successors and assigns (together with their respective agents, employees, directors and officers), on any theory of liability, for special, indirect, consequential or punitive damages arising out of, incurred in connection with or resulting from, this Agreement or any other Loan Documents or any actions or omissions of Agent pursuant to this Agreement or any other Loan Document.

**9.25**   **Permitted Working Capital Loan.** Notwithstanding anything to the contrary set forth herein, Operator may, with the prior written approval of Agent, obtain a working capital loan in accordance with the terms of section III.L of that certain Development Agreement by and between Operator and Borrower dated November 20, 2015 in an amount up to Fifteen Million Dollars, subject to the working capital lender thereunder entering into an intercreditor agreement reasonably acceptable to Agent. It is hereby agreed that HUD-92322-ORCF (latest revision), modified as necessary, shall be deemed acceptable.

### [SIGNATURES ON FOLLOWING PAGE]

IN WITNESS WHEREOF, Operator, Borrower and Agent have caused the execution of this Agreement by their respective duly authorized representatives as of the date and year first above written.

**OPERATOR:**

HBL SNF, LLC, a New York limited liability company

By: _____
Name:
Title:

STATE OF _____     )
                                              ) ss
COUNTY OF _____     )

On this ____ day of _____ in the year 2017 before me, the undersigned,

personally appeared _____, personally known to me or proved to me on the basis

of satisfactory evidence to be the individual whose name is subscribed to the within instrument

and acknowledged that s/he executed the same in her/his capacity, and that by her/his signature

on the instrument, the individual or the person upon behalf of which individual acted, executed

the instrument.

_____
Notary Public

2304639v5/17057-6



**BORROWER:**

WHITE PLAINS HEALTHCARE PROPERTIES I,
LLC, a Massachusetts limited liability company

By: _____

Name: _____

Title: **William A. Nicholson, Manager**

STATE OF _____ )
                                              ) ss
COUNTY OF _____ )

On this ____ day of _____ in the year 2017 before me, the undersigned,

personally appeared ____ _____ , personally known to me or proved to me on the basis

of satisfactory evidence to be the individual whose name is subscribed to the within instrument

and acknowledged that s/he executed the same in her/his capacity, and that by her/his signature

on the instrument, the individual or the person upon behalf of which individual acted, executed

the instrument.

_____
Notary Public

**AGENT:**

SECURITY BENEFIT CORPORATION, a Kansas corporation

By: _____
Name:
Title:


STATE OF _____ )
                         ) ss
COUNTY OF _____ )


     On this ___ day of _____ in the year 2017 before me, the undersigned,

personally appeared _____, personally known to me or proved to me on the basis

of satisfactory evidence to be the individual whose name is subscribed to the within instrument

and acknowledged that s/he executed the same in her/his capacity, and that by her/his signature

on the instrument, the individual or the person upon behalf of which individual acted, executed

the instrument.


          _____
          Notary Public


24



## EXHIBIT A

### LEGAL DESCRIPTION OF LAND

2304639v5/17057-6



## EXHIBIT B

PERMITTED LIENS

2304639v5/17057-6



# **Exhibit 3**

21-07096-shl    Doc 45    Filed 03/11/22    Entered 03/11/22 17:37:28    Main Document
                                         Pg 37 of 66

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF WESTCHESTER

--------------------------------------------------------------------------- X

GARFIELD PARK, LLC and SECURITY BENEFIT
CORPORATION,

                *Plaintiffs*,

    -against-

WHITE PLAINS HEALTHCARE PROPERTIES I, LLC,
WILLIAM A. NICHOLSON, HOWARD FENSTERMAN,
MATTHEW BARBARA, PAUL BARBARA, NEW YORK
STATE DEPARTMENT OF TAXATION, CITY OF
WHITE PLAINS FINANCE DEPARTMENT, and
JOHN DOE NOS. 1-10,

                *Defendants*.

The Names of the "John Doe" Defendants Being Fictitious
and Unknown to Plaintiffs, the Persons and Firms Intended
Being Those Who May Be in Possession of, or May Have
Possessory, Lien or Other Interests in, the Premises Herein
Described.

--------------------------------------------------------------------------- X

Index No.

**VERIFIED COMPLAINT**

      Plaintiffs Garfield Park, LLC ("Garfield Park"), a Kansas limited liability company, and

Security Benefit Corporation ("Agent" and together with Garfield Park, the "Lender"), a Kansas

corporation, by their attorneys, DLA Piper LLP (US), as for their Verified Complaint against the

defendants, allege as follows:

**INTRODUCTION**

      1.      Lender brings this action to foreclose on real property and improvements in the

County of Westchester and State of New York, known as Section 125.67, Block 3 Lot 1 in the

City of White Plains and located at 120 Church Street (the "Mortgaged Property"). The Mortgaged

Property secures a $38.5 million loan made to Defendant White Plains Healthcare Properties I,

LLC ("Borrower"). Borrower first defaulted on the loan in October 2019, long before the COVID-

FILED: WESTCHESTER COUNTY CLERK 03/01/2022 07:23 PM
NYSCEF DOC. NO. 2

21-07096-shl   Doc 45   Filed 03/11/22   Entered 03/11/22 17:37:28   Main Document
Pg 38 of 66

INDEX NO. 57012/2022
RECEIVED NYSCEF: 03/01/2022

19 pandemic and related government shutdown orders took effect, by failing to pay accrued unpaid interest. Thereafter, Borrower failed to pay back all principal and outstanding interest due on the loan on its maturity date, August 1, 2020. Since then, Borrower has repeatedly defaulted on its obligations under the Loan Documents, as defined herein, including by failing to (i) timely pay accrued and unpaid interest and late charges; (ii) comply with its obligations under the Loan Documents to set up and use a cash management account; and (iii) to repay in full the principal balance of the loan and all accrued interest by the loan's maturity date. Lender also sues the individual guarantors who promised to pay the amounts due and owing if Borrower failed to perform, and who promised to cover any deficiencies that arise after application of the proceeds from a public foreclosure auction of the Mortgaged Property.

## THE PARTIES

2.      Garfield Park is, and at all relevant times hereinafter mentioned was, a limited liability company organized and existing under the laws of the State of Kansas, with an address at One Security Benefit Place, Topeka, KS 66636-0001.

3.      Agent is, and at all relevant times hereinafter mentioned was, a corporation organized and existing under the laws of the State of Kansas, with an address at One Security Benefit Place, Topeka, KS 66636-0001.

4.      Upon information and belief, Borrower is a limited liability company organized and existing under the laws of the State of Massachusetts, with an address at West Peabody Executive Center, Suite 200, 2 Bourbon Street, Peabody, MA 01960, and is the fee simple owner of the Mortgaged Property.

5.      Upon information and belief, Defendant William A. Nicholson is, and at all times hereinafter mentioned was, an individual and a resident of the State of Massachusetts, and is named

2

as a defendant because William A. Nicholson made certain promises and guarantees concerning

Borrower's performance under the Loan Documents, as defined herein, and as contained in the

Guaranty Agreement dated August 18, 2017 (the "Guaranty").

6.      Upon information and belief, Defendant Howard Fensterman is, and at all times

hereinafter mentioned was, an individual and a resident of the State of New York, and is named as

a defendant because Howard Fensterman also made certain promises and guarantees concerning

Borrower's performance under the Loan Documents, as defined herein, and as contained in the

Guaranty.

7.      Upon information and belief, Defendant Matthew Barbara is, and at all times

hereinafter mentioned was, an individual and a resident of the State of New York, and is named as

a defendant because Matthew Barbara also made certain promises and guarantees concerning

Borrower's performance under the Loan Documents, as defined herein, and as contained in the

Guaranty.

8.      Upon information and belief, Defendant Paul Barbara (together with Defendant

William A. Nicholson, Defendant Howard Fensterman, and Defendant Matthew Barbara, the

"Guarantors") is, and at all times hereinafter mentioned was, an individual and a resident of the

State of New York, and is named as a defendant because Paul Barbara also made certain promises

and guarantees concerning Borrower's performance under the Loan Documents, as defined herein,

and as contained in the Guaranty.

9.      Upon information and belief, Defendant New York State Department of Taxation

and Finance has a principal place of business located at the Office of Counsel, Building 9, W.A.

Harriman Campus, Albany, New York 12227, and is made a defendant in this action because it

has or may have an interest in or lien against the Mortgaged Property by virtue of any unpaid New

3

York State franchise taxes, licenses or maintenance fees, or other liens which may be due and owing from Borrower.

10.     Upon information and belief, Defendant City of White Plains Finance Department has a principal place of business located at 255 Main Street, Room 102, White Plains, New York 10601, and is made a defendant in this action because it has or may have an interest in or lien against the Mortgaged Property by virtue of any unpaid City of White Plains taxes, licenses, maintenance fees or other liens which may be due and owing from Borrower.

11.     Upon information and belief, non-party, HBL SNF, LLC (d/b/a Epic Rehabilitation and Nursing at White Plains) ("Tenant"), and Borrower are parties to that certain Operating Lease, dated as November 15, 2015 (as amended from time to time, the "Operating Lease"), pursuant to which Tenant leases the Leased Premises (as defined in the Operating Lease). Tenant is not a necessary party to the instant litigation by virtue of the Subordination, Non-Disturbance and Attornment Agreement ("SNDA"), dated as of August 1, 2017, among the Tenant, Borrower, and Lender.

12.     Upon information and belief, the "John Doe" defendants constitute those persons or corporations or firms that may be in possession of, or may have contract, possessory, lien or other interests in, the Mortgaged Property.

## JURISDICTION AND VENUE

13.     The Court may exercise jurisdiction over Borrower because Borrower irrevocably submitted to the jurisdiction and venue of this Court in the Loan Documents, as defined herein. Specifically, Section 7.14 of the Loan Agreement provides in relevant part as follows:

> Any legal suit, action or proceeding against Borrower arising out of or relating to the Loan Documents may at Agent's option be instituted in any Federal or State Court in the State in which the Property is located.

4

14.     The Court may exercise jurisdiction over the Guarantors because they irrevocably submitted to the jurisdiction and venue of this Court in the Guaranty.  Specifically, Section 23 of the Guaranty provides in relevant part as follows:

> Each of Agent, by its acceptance of this Guaranty, and Guarantor hereby irrevocably submits generally and unconditionally for itself and in respect of its property to the jurisdiction of any state court or any United States federal court sitting in the state specified in the governing law section of this Guaranty and to the jurisdiction of any state court or any United States federal court sitting in the state in which any of the Property is located, over any dispute hereunder.

15.     The Court may also exercise jurisdiction over Defendants Howard Fensterman, Matthew Barbara, and Paul Barbara pursuant to C.P.L.R. Section 301, and over Defendant William A. Nicholson pursuant to C.P.L.R. Section 302.

16.     In addition, Lender's collateral, which includes, among other things, the Mortgaged Property, improvements and personal property securing repayment of the $38,500,000.00 loan described below, is located in the State of New York.  Accordingly, pursuant to C.P.L.R. Section 301, and the Real Property Actions and Proceedings Law of New York ("R.P.A.P.L.") Article 1, Section 121, this Court has jurisdiction to grant the relief required by Lender in this Verified Complaint.

17.     The Court may exercise jurisdiction over the New York State Department of Taxation and the City of White Plains Finance Department because they are governmental entities of the State of New York or City of White Plains.

18.     As to all Defendants, venue is proper in Westchester County pursuant to C.P.L.R. Sections 507 and 509.

5

## THE MORTGAGED PROPERTY

19.     The Mortgaged Property that is the subject of this action consists of one lot known as Section 125.67, Block 3 Lot 1 in the City of White Plains and located at 120 Church Street, with appurtenances thereto and improvements thereon, all as more specifically described in Schedule A annexed hereto.

## THE LOAN DOCUMENTS

20.     On or about August 18, 2017, Borrower and Security Benefit Life Insurance Company ("Original Lender"), Garfield Park's predecessor-in-interest, entered into a Construction Loan Agreement (the "Loan Agreement"), whereby Original Lender agreed to make a Building Loan to Borrower (the "Building Loan") in the amount of up to $30,293,625 (the "Building Loan Costs"). Pursuant to the Loan Agreement, all or a portion of the Building Loan Costs would be advanced to Borrower, consisting solely of costs of improvements as defined in Section 2 of the New York Lien Law. The Loan Agreement further provides for additional loan advances from Original Lender to Borrower for other costs in the amount of $8,206,375 (the "Project Loan", collectively with the Building Loan referred to as the "Loan"), for a total indebtedness of $38,500,000, all of which was loaned to Borrower. The Loan Agreement was duly recorded in the County Clerk's Office on August 25, 2017, at Control No. 5962984. A true and correct copy of the Loan Agreement is attached hereto as **Exhibit 1.**

21.     On or about August 18, 2017, Borrower, for the purpose of evidencing its indebtedness to Original Lender for the sum of $38,500,000, executed and delivered to Original Lender a promissory note dated August 18, 2017 (the "Note"), whereby Borrower was bound and promised to pay Original Lender such sum, with interest thereon, at the rate therein provided. A true and correct copy of the Note is attached hereto as **Exhibit 2.**

6

22.     As collateral security for the payment of this indebtedness, Borrower simultaneously therewith executed, acknowledged, and delivered to Original Lender a mortgage dated August 18, 2017 (the "Mortgage"). The Mortgage was duly recorded in the County Clerk's office on August 31, 2017, at Control No. 572363745 and the mortgage recording tax was then and there duly paid. A true and correct copy of the Mortgage is attached hereto as **<u>Exhibit 3</u>**.

23.     The Mortgage granted Original Lender a security interest in the real property described in Schedule A, improvements, fixtures, equipment, personal property, and leases and rents, among other items described in Section 1.1 of the Mortgage, associated with the Mortgaged Property. (Mortgage § 1.1.)

24.     On August 18, 2017, Borrower also executed, acknowledged, and delivered to Original Lender an Assignment of Leases and Rents dated August 18, 2017 (the "ALR," and together with the Mortgage, the Note, the Loan Agreement, and all documents or instruments referenced in the definition of Loan Documents in the Mortgage and the Loan Agreement, and all other documents or instruments securing the repayment of the obligations of Borrower to Lender, the "Loan Documents"),[1] as further collateral security for the payment of the indebtedness. The ALR was duly recorded in the County Clerk's office on August 31, 2017, at Control No. 572363749. A true and correct copy of the ALR is attached hereto as **<u>Exhibit 4</u>**.

25.     The ALR absolutely and unconditionally assigned and granted to Agent, for Original Lender's benefit, among other things, all of Borrower's right, title and interest in all existing and future Leases of the Borrower affecting the use, enjoyment or occupancy of all or any portion of any space in that certain lot or piece of land, more particularly described in Schedule A annexed hereto, as well as all Rents, as defined in the Loan Agreement. (ALR § 1.1.)

---

[1] Capitalized terms not otherwise defined herein shall have the same meanings as ascribed in the Loan Documents.

7

26.     Lender also perfected its security interest in certain of the Mortgaged Property by recording the UCC-1 Financing Statement attached hereto as **Exhibit 5**.

27.     The Loan Documents were delivered to Original Lender in due course.

## THE GUARANTY

28.     On or about August 18, 2017, the Guarantors executed and delivered to Original Lender the Guaranty.  A true and correct copy of the Guaranty is attached hereto as **Exhibit 6**.

29.     Under the terms of the Guaranty, the Guarantors jointly and severally, unconditionally, absolutely and irrevocably guaranteed payment (and not merely collectability) of and agreed to pay, protect, defend and save harmless Original Lender or any future assignee for, from and against, and indemnify Original Lender or any such assignee for, from and against any and all liabilities, obligations, actual losses, damages, costs and expenses (including, without limitation, reasonable attorneys' fees), causes of action, suits, claims, demands, and judgment of any nature or description whatsoever, which may at any time be imposed upon, incurred by or awarded against Original Lender or its assignee as a result of, among other things, misapplication, misappropriation or conversion by Borrower, Guarantor, or any Affiliate of any of them of any Rents.  (Guaranty § 1(a)(vii).)

30.     The Guarantors also agreed that the Guaranty was an absolute, irrevocable and unconditional guaranty of payment and performance, and each party Guarantor would be jointly and severally liable for the payment and performance of the Guaranteed Obligations, as defined in the Guaranty, as a primary obligor. (Guaranty § 4(a).)

31.     The Guarantors further agreed that in the event of the occurrence of a Default (as defined in the Loan Agreement) under the Loan Documents, the Guaranteed Obligations would become immediately due and payable at the election of the Agent, in which case each Guarantor

8

would, on demand and without presentment, protest, notice of protest, further notice of nonpayment or of dishonor, default or nonperformance, or notice of acceleration or of intent to accelerate, or any other notice whatsoever, pay the amounts due to Agent or Lender, and pay all Losses that may arise in consequence of such Event of Default (including, without limitation, all reasonable attorneys' fees and expenses, investigation costs, court costs, and any and all other costs and expenses actually incurred by Agent or Lender in connection with the collection and enforcement of the Guaranty). (Guaranty § 4(b).)

32.     Under Section 4(c) of the Guaranty, the Guarantors specifically agreed that suit could be brought or demand could be made against Borrower or against any or all parties who signed the Guaranty, or against any one or more of them, separately or together, without impairing the rights of Lender against any party hereto. (Guaranty § 4(c).)

## LENDER HOLDS THE LOAN DOCUMENTS

33.     On December 27, 2021, Original Lender executed an allonge to the Note, indorsed in favor of Lender (the "Allonge"), and delivered the Note, with the Allonge affixed thereto, to Lender. By virtue of this delivery, Original Lender transferred to Lender all of its rights, title and interest in and to the Note, and Lender became the holder of the Note. A true and correct copy of the Allonge is attached hereto as **Exhibit 7**.

34.     Original Lender also executed and delivered an Assignment and Assumption of Construction Loan Agreement And Other Loan Documents and Accounts, dated as of December 27, 2021 (the "Assignment and Assumption Agreement"), pursuant to which Original Lender transferred to Lender all of its rights, title and interest in and to the Loan Documents, together with all notes, security instruments, related loan documents, and such other documents and instruments including any amendments and consents and all accounts, reserves and funds evidencing and

9

FILED: WESTCHESTER COUNTY CLERK 03/01/2022 07:23 PM
NYSCEF DOC. NO. 2

INDEX NO. 57012/2022

RECEIVED NYSCEF: 03/01/2022

21-07096-shl    Doc 45    Filed 03/11/22    Entered 03/11/22 17:37:28    Main Document
Pg 46 of 66

securing the Loan or otherwise delivered in connection with the Loan. A true and correct copy of the Assignment and Assumption Agreement is attached hereto as **Exhibit 8**.

35.     The Mortgage and the ALR were originally delivered by Borrower as mortgagor/assignor to Agent for the benefit of Lender. Agent remains the mortgagee under the Mortgage and the assignee under the ALR. Agent's rights, title, and interest in these documents were not assigned or transferred.

36.     Lender and Agent are now the owners and holders of the Loan Documents, and are authorized to exercise all of their rights with respect to the Loan Documents.

### BORROWER'S OBLIGATIONS AND DEFAULTS

**Borrower's Obligations under the Loan Documents**

37.     Pursuant to Section 3.1(a) of the Mortgage, Borrower agreed to make due and punctual payment of the Secured Indebtedness, as defined under Section 2.2 of the Mortgage to include:

(i)      The Note;

(ii)     All indebtedness, liabilities, duties, covenants, promises and other obligations owed by Borrower to Mortgagee and/or Lender pursuant to the Loan Documents, expressly excluding, however, any obligations of Guarantor under any Guarantor Document and any obligations under any other guaranty executed by a third party, whether now existing or hereafter arising, and whether joint or several, direct or indirect, primary or secondary, fixed or contingent, liquidated or unliquidated, and the cost of collection of all such amounts; and

(iii)    All amounts that Lender may from time to time advance pursuant to the terms and conditions of this Security Instrument with respect to an obligation secured by a

10

FILED: WESTCHESTER COUNTY CLERK 03/01/2022 07:23 PM

NYSCEF DOC. NO. 2

INDEX NO. 57012/2022

RECEIVED NYSCEF: 03/01/2022

21-07096-shl    Doc 45    Filed 03/11/22    Entered 03/11/22 17:37:28    Main Document

Pg 47 of 66

lien or encumbrance prior to the lien of this Security Instrument or for the protection of this Security Instrument, together with interest thereon.

(Mortgage §§ 2.2; 3.1(a).)

38.    Under the Loan Agreement, Borrower agreed that all accrued and unpaid interest would be due and payable on the first day of each calendar month commencing on September 1, 2017 until the Maturity Date, i.e., August 1, 2020, and that the entire principal balance of the Loan then unpaid and all accrued interest would be due and payable in full on the Maturity Date.  (Loan Agreement § 2.12.)

39.    If Borrower failed to make any payment due under the terms of the Loan Agreement or the Note within five days after such payment was due, Borrower agreed to pay a late charge equal to 5% of such amount.  (Loan Agreement §2.8.)

40.    In addition to the monetary obligation described above, Borrower also agreed to fulfill certain other obligations under the Loan Documents, including, inter alia:

(i)    To establish a Cash Management Account, not later than 60 days prior to the anticipated rent commencement date under the Operating Lease, in the name of Borrower for the sole and exclusive benefit of Agent (on behalf of Lender) into which Borrower was required to deposit, or cause to be deposited, all revenue generated at the Mortgaged Property (Loan Agreement § 8.1(a));

(ii)    To send a Tenant Direction Notice to direct the Tenant to pay rent directly into the Cash Management Account set up for Lender's exclusive benefit (Loan Agreement § 8.1(b));

(iii)    To deposit all revenue generated by the Mortgaged Property and received by the Borrower into the Cash Management Account (Loan Agreement § 8.1(b));

11

(iv)    To deliver the Financial Statements and other statements and information at the times and for the periods described in Exhibit "B" attached to the Loan Agreement and any other Loan Document, including the Financial Statements of Borrower and the annual Financial Statement of each Guarantor (Loan Agreement 3.13; Loan Agreement, Exhibit "B").

**Events of Default and Borrower's Defaults**

41.    Section 5.1 of the Mortgage defines an Event of Default to include, the occurrence of "Default" as defined in the Loan Agreement.  (Mortgage § 5.1.)

42.    Under Section 5.1(a) of the Loan Agreement, a Default occurs when any of the indebtedness or any fees payable under the Note or the Loan Agreement are not paid when due, whether on the scheduled due date or upon acceleration, maturity or otherwise.  (Loan Agreement § 5.1(a).)

43.    Under Section 5.1(b) of the Loan Agreement, a Default occurs when any covenant, agreement of condition in the Loan Agreement or in any other Loan Document is not fully and timely performed, observed or kept by Borrower and if such failure continues unremedied for more than thirty days after notice is given to Borrower by Lender.  (Loan Agreement §5.1(b).)

44.    Borrower has failed to timely pay accrued and unpaid interest due on the first day of each calendar month numerous times, with a number of these occasions pre-dating the COVID-19 pandemic and related government shutdown orders, including, but not limited to the following:

(i)    Borrower failed to pay accrued unpaid interest for the period beginning October 1, 2019 and ending November 1, 2019 in the amount of $159,081.07.  On October 16, 2019, Original Lender sent a letter notifying Borrower of its Default.

(ii)    In October 2019, Borrower failed to pay a late charge in the amount of $12,642.24.

12

(iii)   Borrower failed to pay accrued and unpaid interest for the period beginning November 1, 2019 and ending December 2, 2019 in the amount of $159,081.07. On November 5, 2019, Original Lender sent a letter notifying Borrower of its Default.

(iv)   In November 2019, Borrower failed to pay a late charge of $22,388.29.

(v)   In December 2019, Borrower failed to pay a late charge of $22,388.29.

(vi)   Borrower failed to pay accrued unpaid interest for the period beginning April 1, 2020 and ending May 1, 2020 in the amount of $160,416.67. On April 16, 2020, Original Lender sent a letter notifying Borrower of its Default.

(vii)   In April 2020, Borrower failed to pay a late charge of $13,765.56.

(viii)   Borrower failed to pay accrued unpaid interest for the period beginning May 1, 2020 and ending June 1, 2020 in the amount of $165,763.89. On May 13, 2020, Original Lender sent a letter notifying Borrower of its Default.

(ix)   In May 2020, Borrower failed to pay a late charge of $20,829.30.

(x)   Borrower failed to pay accrued unpaid interest for the period beginning June 1, 2020 and ending July 1, 2020 in the amount of $160,416.67.

(xi)   In June 2020, Borrower failed to pay a late charge in the amount of $20,505.21.

(xii)   Borrower failed to pay accrued unpaid interest for the period beginning July 1, 2020 and ending August 3, 2020 in the amount of $176,458.33.

(xiii)   In July 2020, Borrower failed to pay a late charge in the amount of $8,020.83.

(xiv)   In August 2020, Borrower failed to pay a late charge in the amount of $8,822.92.

45.   Borrower has also defaulted on its obligations under the Loan Documents by failing to establish a Cash Management Account, failing to send a Tenant Direction Notice to the sole

13

tenant to pay rent directly into the Cash Management Account, and failing to deposit all revenue generated by the Mortgaged Property into the Cash Management Account, as required under Section 8.1 of the Loan Agreement, as well as by failing to provide the necessary Financial Statements and other statements and information at the times and for the periods described in Exhibit "B" attached to the Loan Agreement, including the Financial Statements of Borrower and each of the Guarantors, as required by Section 3.13 of the Loan Agreement. On May 22, 2020, Original Lender sent a letter to Borrower notifying it of these Defaults.

46.    On August 1, 2020, Borrower defaulted on its obligation to repay in full the entire principal balance of the Loan then unpaid and all accrued interest by the Maturity Date.

47.    As of March 1, 2022, the total payment due by Borrower, including late charges, attorneys' fees and costs is $44,567,802.56 ("Payoff Statement"). A true and correct copy of the Payoff Statement is attached as **Exhibit 9**.

48.    Upon information and belief, Borrower may also be in breach of other terms of the Loan Documents, including, but not limited to, Section 3.27 of the Loan Agreement, which prohibits "any distribution" to "any owner of any direct or indirect equity interests of Borrower," with limited exceptions.

49.    Upon information and belief, Borrower is also in breach of Section 3.5 of the Loan Agreement, which prohibits Borrower from modifying or terminating the Operating Lease without the prior written consent of the Lender. According to the Notice of Termination provided by Borrower to Tenant on January 7, 2020, which was made publicly available by Borrower in *White Plains Healthcare Properties I, LLC v. HBL SNF, et al.*, Index No 60278/2020, (N.Y. Sup. Ct.) (the "Tenant Litigation") Borrower sought to terminate the Operating Lease, and did so without seeking prior written consent from Lender.

14

FILED: WESTCHESTER COUNTY CLERK 03/01/2022 07:23 PM
INDEX NO. 57012/2022
NYSCEF DOC. NO. 2
21-07096-shl    Doc 45    Filed 03/11/22    Entered 03/11/22 17:37:28    Main Document
RECEIVED NYSCEF: 03/01/2022
Pg 51 of 66

50.     Upon information and belief, Borrower also entered into that certain Letter of Intent, dated November 20, 2019, between Borrower and Tenant, which purported to modify the Operating Lease without seeking prior written consent of the Lender, in breach of Section 3.5 of the Loan Agreement.

51.     Upon information and belief, Borrower may also be in breach of the Loan Documents based on its failure to notify the Agent in writing of (i) any Defaults or potential Defaults under the Loan Agreement and other Loan Documents, and (ii) any occurrence or event that would reasonably be expected to result in a Material Adverse Effect, as required under Sections 3.12(a) and 3.12(j) of the Loan Agreement, respectively.

52.     The Loan Documents further provide that, upon the occurrence of a Default, the Lender shall be entitled to collect the Rents from the Mortgaged Property or have a receiver appointed to take possession of the Mortgaged Property and to collect the Rents therefrom.

53.     On December 3, 2021, Original Lender sent a default notice to Borrower that, among other things, provided notice to Borrower of its continued Defaults under the Loan Documents and demanded the immediate turnover of past and future Rents paid to Borrower under the Operating Lease (the "December Default Notice").  A true and correct copy of the December Default Notice is attached as **Exhibit 10**.

54.     As of the date of this filing, Borrower has neither responded to the December Default Notice, turned over any Rents nor paid the principal amount of the Loan and accrued interest thereon.

55.     Additionally, as of the time Lender commenced this action, Borrower had not cured any of its other Defaults.

15

56.     Borrower, through its representatives, recently acknowledged in sworn deposition testimony that it failed to take certain actions that constitute Defaults under the Loan Documents, including, *inter alia*, establishing a cash management account, directing its tenant to pay Rent directly to Lender, and obtaining Security Benefit's consent prior to purportedly terminating its lease with its tenant.

57.     Lender elects to declare immediately due and payable the entire unpaid balance of principal under the Loan Documents, together with monies advanced for taxes, insurance, property management, as well as the costs, allowances, and reasonable attorney's fees and related expenses due under the Loan Documents.

58.     No prior action or proceeding has been commenced at law or is otherwise pending for the recovery of the sums secured by the Mortgaged Property or any part thereof.

## TENANT LITIGATION AND BANKRUPTCY FILING

59.     On or around January 7, 2020, Borrower sent a letter to Tenant, without Lender's prior written consent, purportedly terminating the Operating Lease as a result of Tenant's alleged defaults thereunder.

60.     On September 18, 2020, Borrower commenced the Tenant Litigation seeking to terminate the Operating Lease and recover in excess of $100 million in damages.

61.     On November 1, 2021, Tenant commenced a bankruptcy case (Case No. 21-22623 (SHL) (the "Bankruptcy Case") under subchapter V of title 11 of the United States Code in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").

62.     On November 8, 2021, Tenant removed the Tenant Litigation to the Bankruptcy Court.

16

FILED: WESTCHESTER COUNTY CLERK 03/01/2022 07:23 PM
INDEX NO. 57012/2022
NYSCEF DOC. NO. 2
21-07096-shl    Doc 45    Filed 03/11/22    Entered 03/11/22 17:37:28    Main Document
RECEIVED NYSCEF: 03/01/2022
Pg 53 of 66

63.     In the Bankruptcy Case, Lender sought payment of rents directly from Tenant.  On December 23, 2021, the Bankruptcy Court determined that Tenant was not required to turn over rents to Lender without prejudice to Lender's renewed demand.

64.     On February 26, 2022, the Bankruptcy Court granted Lender relief from the automatic stay, to the extent necessary, to pursue this action and the relief sought herein against the Borrower.

**LENDER'S RIGHT TO THE APPOINTMENT OF A
TEMPORARY RECEIVER AND ALL RENTS FROM THE MORTGAGED PROPERTY**

65.     In accordance with the Loan Documents, Lender, as a secured creditor, is entitled to the appointment of a temporary receiver to take immediate possession of and hold, subject to the discretion of this Court, the Mortgaged Property and Borrower's Assets.

66.     Borrower agreed to allow Lender to seek, and indicate Borrower's express consent to, the appointment of a receiver upon the occurrence of a Default.  Lender's right to the appointment of a receiver is without regard for the adequacy of the security of the Mortgage, and may be made without notice.

67.     Specifically, Section 6.1(f) of the Mortgage provides that if a Default exists, "Mortgagee and Lender shall as a matter of right be entitled to the appointment of a receiver or receivers for all or any part of the Property, whether such receivership is incident to a proposed sale (or sales) of such property or otherwise, and without regard to the value of the Property or the solvency of any person or persons liable for the payment of the Secured Indebtedness, and Borrower does hereby irrevocably consent to the appointment of such receiver or receivers, waives notice of such appointment, of any request therefor or hearing in connection therewith, and any and all defenses to such appointment, agrees not to oppose any application therefor by Mortgagee or Lender, and agrees that such appointment shall in no manner impair, prejudice or otherwise

17

affect the rights of Mortgagee or Lender to application of Rents as provided in this Security

Instrument. Nothing herein is to be construed to deprive Mortgagee or Lender of any other right,

remedy or privilege they may have under the applicable Law to have a receiver appointed. Any

money advanced by Mortgagee or Lender in connection with any such receivership shall be a

demand obligation (which obligation Borrower hereby promises to pay) owing by Borrower to

Mortgagee of Lender pursuant to this Security Instrument." (Mortgage § 6.1(f).)

      68.    Furthermore, the Loan Agreement explains that, "[u]pon the occurrence and during

the continuance of a Default, Agent, for the benefit of Lender, may, without notice, exercise any

and all rights and remedies afforded by this agreement, the other Loan Documents, Law, equity or

otherwise, including (a) declaring any and all Indebtedness immediately due and payable, (b)

reducing any claim to judgment, or (c) obtaining appointment of a receiver (to which Borrower

hereby consents) and/or judicial or nonjudicial foreclosure under the Security Instrument." (Loan

Agreement, § 5.2.)

      69.    Lender is also entitled to all Rents at the Property upon an Event of Default. Section

3.2 of the ALR also provides that, upon or at any time after the occurrence and during the

continuance of a Default, Agent shall "immediately be entitled to possession of all Rents and all

sums due under any Lease Guaranties, whether or not Agent enters upon or takes control of the

Property." In other words, any Rent collected from the Mortgaged Property since the occurrence

of the Default must be provided to the Lender. (ALR § 3.2.)

      70.    The Loan Documents also stipulate that "Agent may, at its option, without waiving

such Default, without regard to the adequacy of the security for the Obligations, either in person

or by agent, nominee or attorney, with or without bringing any action or proceeding, or by a

receiver appointed by a court, dispossess Borrower and its agents and servants from the Property,

18

FILED: WESTCHESTER COUNTY CLERK 03/01/2022 07:23 PM
NYSCEF DOC. NO. 2

INDEX NO. 57012/2022

RECEIVED NYSCEF: 03/01/2022

21-07096-shl    Doc 45    Filed 03/11/22    Entered 03/11/22 17:37:28    Main Document
Pg 55 of 66

without liability for trespass, damages or otherwise, and exclude Borrower and its agents or servants wholly therefrom, and take possession of the Property and all books, records and accounts relating thereto and have, hold, manage, lease and operate the Property on such terms and for such period of time as Agent may deem proper, and either with or without taking possession of the Property in its own name, demand, sue for or otherwise collect and receive all Rents and all sums due under all Lease Guaranties, including, without limitation, those past due and unpaid . . . ." (*Id.*)

71.    The Leases, the Rents, the books, records, and other property relating to the ownership and operation of the Mortgaged Property (the "Borrower's Assets") are the sole assets of Borrower.

72.    Borrower and its agents are still in possession of Borrower's Assets.

73.    Lender has demanded that all Rents be paid directly to the Lender but Borrower has refused to abide by its contractual obligations.  As stated *supra*, Lender demanded the immediate turnover of past and future Rents paid to Borrower under the Operating Lease in the December Default Notice.  However, as of the date of this filing, Borrower has neither responded to the December Default Notice, turned over any Rents nor paid the principal amount of the Loan and accrued interest thereon.

74.    Lender, as an interested and secured party, is threatened with material losses and injuries, including the Borrower's Assets suffering continuous waste and a dissipation or diminution in value, if Borrower remains in control of Borrower's Assets.

75.    Lender reserves all rights to seek an Order appointing a Temporary Receiver over the Mortgaged Property, directing the turnover of all Rents to the Lender, or both.

19

## AS AND FOR A FIRST CAUSE OF ACTION
### (Foreclosure of the Mortgage)

76.     Lender repeats and realleges the allegations contained in paragraphs "1" through "75" as though fully set forth herein.

77.     Lender is the owner and holder of the Loan Documents and is authorized to commence a foreclosure action pursuant to the Loan Documents.

78.     Pursuant to Section 6.1(c) of the Mortgage, upon the occurrence and continuance of a Default or in the case that the principal of the Note becomes due and payable, whether by lapse of time or by acceleration, then and in every such case the Mortgagee (Lender) shall have the right to immediately proceed to foreclose the Mortgage lien against the property constituting the Mortgaged Property or any part thereof, in accordance with the laws of New York, including, without limitation, the provisions of Article 13 of R.P.A.P.L., as such provisions may be extended, renewed, modified or replaced from time to time, and may pursue any other remedy available to a commercial mortgage lender under the laws of New York, including all rights to judicial foreclosure under the laws of New York, and if authorized by the laws of the State of New York, all rights to nonjudicial foreclosure of mortgages. (Mortgage § 6.1(c).)

79.     As described above, Borrower has failed to fulfill a number of its obligations under the Loan Documents, each of which constituted an Event of Default, including but not limited to its failure to repay the Loan in full when the balance became due on the Maturity Date of August 1, 2020.

80.     By reason of the foregoing, Borrower is in Default under the Loan Documents.

81.     Pursuant to Section 6.1(c) of the Mortgage, and in accordance with the other terms of the Loan Documents, based upon the failure by Borrower to pay all amounts due under the Note on its Maturity Date, Lender elects to foreclose upon the Mortgage and recover the current

20

outstanding principal amount, that, as of March 1, 2022 is $38,500,000, plus accrued interest, fees and legal fees for a total payoff amount of $44,567,802.56, as of March 1, 2022, together with interest, late fees, and any other amounts to be added pursuant to the terms of the Loan Documents, including attorneys' fees (for which Borrower expressly agreed to be responsible, in accordance with Section 7.11 of the Loan Agreement and Section 6.1(c) of the Mortgage), exclusive of any tax reserves, interest reserves, insurance reserves, or other cash reserves to be applied to the indebtedness.

82.    In order to protect its security interest in the Mortgaged Property, Lender, as it is entitled to do under the Loan Documents, may be compelled to pay, during the pendency of this action, local taxes, assessments, water rates, insurance premiums, ground lease rent, and other charges affecting the Mortgaged Property, and any sums thus paid by Lender for such purposes, together with late payments due thereon, should be added to the sums otherwise due and deemed secured by the Mortgage and adjudged a lien.

83.    Lender shall not be deemed to have waived, altered, released or changed the election hereinafter made by reason of any payment after the date of commencement of this action of any or all of the defaults mentioned herein, and such election shall continue and remain effective until the costs and disbursements of this action, and any and all future defaults under the Loan Documents and occurring prior to the discontinuance of this action, are fully paid.

84.    Lender has complied with all the terms and provisions of the Loan Documents and, pursuant to R.P.A.P.L. 1301(2), no action or proceeding other than this action is pending to recover any part of the debt secured by the Mortgage owed to Lender.

85.    Lender states further that the Mortgaged Property is not a borrower-occupied one to four family dwelling or condominium unit, nor is the Mortgaged Property a high cost or

subprime home loan as defined by Sections 6-1 and 6-m of the New York Banking Law. Lender

has or will comply with the notice provisions of R.P.A.P.L. 1303(1)(b).

### AS AND FOR A SECOND CAUSE OF ACTION
**(Attorneys' Fees, Costs and Expenses)**

86.     Lender repeats and realleges the allegations contained in paragraphs "1" through

"85" as though fully set forth herein.

87.     Under the terms of the Loan Documents, Borrower agreed to pay all out-of-pocket

costs and expenses of the holder of the Note which may be incurred unless Borrower is the sole

prevailing party in an action to enforce or protect the rights or interests of such holder, including

attorneys' fees and expenses (including the market value of services of in-house counsel),

investigation costs and all court costs, whether before or after the Maturity Date defined in the

Loan Agreement, or whether in connection with bankruptcy, insolvency or appeal, or whether

collection is made against Borrower or any guarantor or endorser or any other Person primarily or

secondarily liable.  (Note § 3(c).)

88.     Additionally, under Section 6.1(c) of the Mortgage, Mortgagor (Borrower) agreed

to pay, in connection with any foreclosure of the lien or any action to enforce any other remedy of

Mortgagee under the Security Instrument, the Note or any other Loan Document, all expenditures

and expenses which may be paid or incurred by or on behalf of Mortgagee including, without

limitation, attorneys' fees and disbursements, court costs, appraiser's fees, outlays for

documentary and expert evidence, stenographers' chargers, publication costs, and costs of

procuring all such abstracts of title, title searches and examinations, title insurance policies, and

similar data and assurances with respect to title and value as Mortgagee may deem reasonably

necessary either to prosecute such suit or to evidence to bidders at any sale which may be had

pursuant to such decree the true condition of title to or the value of the Mortgaged Property, and

22

FILED: WESTCHESTER COUNTY CLERK 03/01/2022 07:23 PM
INDEX NO. 57012/2022
NYSCEF DOC. NO. 2
RECEIVED NYSCEF: 03/01/2022
21-07096-shl    Doc 45    Filed 03/11/22    Entered 03/11/22 17:37:28    Main Document
Pg 59 of 66

the right to such fees and expenses shall be deemed to have accrued on commencement of such action and shall be enforceable whether or not such action is prosecuted to judgment. (Mortgage § 6.1(c).)

89. Lender has incurred costs and fees in connection with foreclosing the Loan and exercising rights and remedies under the Loan Documents, including attorneys' fees.

90. By reason of the foregoing, Borrower is liable for expenses, including reasonable attorneys' fees, arising from Lender's incurred costs in connection with the foreclosure.

### AS AND FOR A THIRD CAUSE OF ACTION
**(Recovery Under the Guaranty)**

91. Lender repeats and realleges the allegations contained in paragraphs "1" through "90" as though fully set forth herein.

92. Pursuant to the Guaranty, the Guarantors jointly and severally, unconditionally, absolutely and irrevocably guaranteed payment (and not merely collectability) of and agreed to pay, protect, defend and save harmless Lender for, from and against, and indemnify Lender for, from and against any and all liabilities, obligations, actual losses, damages, costs and expenses (including, without limitation, reasonable attorneys' fees), causes of action, suits, claims, demands, and judgment of any nature or description whatsoever, which may at any time be imposed upon, incurred by or awarded against Lender as a result of, among other things, misapplication, misappropriation or conversion by Borrower, Guarantor, or any Affiliate of any of them of any Rents. (Guaranty § 1(a)(vii).)

93. Borrower defaulted on the Loan Documents and Lender has incurred costs and fees in connection with foreclosing the Loan, including attorneys' fees.

94. Upon information and belief, Borrower and/or the Guarantors have misapplied, misappropriated or converted Rents collected by them in connection with the Mortgaged Property.

23

95.     By reason of the foregoing, the Guarantors are liable for all liabilities, obligations, actual losses, damages, costs and expenses (including, without limitation, reasonable attorneys' fees), causes of actions, suits, claims, demands, and judgment of any nature which were incurred in connection with the enforcement of Lender's rights, remedies or recourse under the Loan Documents due to any misapplication, misappropriation or conversion by Borrower, Guarantor, or any Affiliate of any Rents.

96.     Pursuant to the Guaranty, the Guarantors also agreed that the Guaranty was an absolute, irrevocable and unconditional guaranty of payment and performance, and each party comprising Guarantor would be jointly and severally liable for the payment and performance of the Guaranteed Obligations as a primary obligor. (Guaranty § 4(a).)

97.     The Guarantors further agreed that in the event of the occurrence of a Default under the Loan Documents, the Guaranteed Obligations would become immediately due and payable at the election of the Agent and the Guarantor shall, on demand and without presentment, protest, notice of protest, further notice of nonpayment or of dishonor, default or nonperformance, or notice of acceleration or of intent to accelerate, or any other notice whatsoever, would pay the amounts due to Agent or Lender, and pay all Losses that may arise in consequence of such Event of Default (including, without limitation, all reasonable attorneys' fees and expenses, investigation costs, court costs, and any and all other costs and expenses actually incurred by Agent or Lender in connection with the collection and enforcement of the Guaranty). (Guaranty § 4(b).)

98.     In the event of foreclosure, the Guarantors agreed that only the net proceeds therefrom, after deduction of all charges and expenses of every kind and nature whatsoever, shall be applied in reduction of the amount due on the Note and Security Instrument, and the Lender

24

FILED: WESTCHESTER COUNTY CLERK 03/01/2022 07:23 PM
INDEX NO. 57012/2022
NYSCEF DOC. NO. 2
RECEIVED NYSCEF: 03/01/2022

21-07096-shl    Doc 45    Filed 03/11/22    Entered 03/11/22 17:37:28    Main Document
Pg 61 of 66

shall not be required to institute or prosecute proceedings to recover any deficiency as a condition of payment or enforcement. (Guaranty § 4(b).)

99.     Borrower is in Default under the Loan Documents.

100.    By reason of the foregoing, the Guarantors are liable for all amounts due to Lender by Borrower, including all Losses that arose as a result of Borrower's Default (including, without limitation, all reasonable attorneys' fees and expenses, investigation costs, court costs, and any and all other costs and expenses actually incurred by Agent or Lender in connection with the collection and enforcement of the Guaranty), and the Guarantors are liable for any deficiency due under the Loan Documents after application of the proceeds in the manner specified by the Court.

## AS AND FOR A FOURTH CAUSE OF ACTION
### (Deficiency Judgment)

101.    Lender repeats and realleges the allegations contained in paragraphs "1" through "100" as though fully set forth herein.

102.    Pursuant to the Loan Documents, Borrower and Guarantors are liable to pay Lender for any deficiency which may remain after applying all of said sales proceeds, together with interest thereon and other charges, in accordance with the Loan Documents. Such indebtedness will continue to accrue and, therefore, the precise amount due from Borrower and Guarantors to Lender through the date of Judgment herein should be determined by the Court.

**WHEREFORE,** Lender requests judgment as follows:

A.      That Defendants, or any of them, and persons claiming under them or any of them, and all persons claiming any interest in the Mortgaged Property with all of its fixtures, equipment and personal property thereon, subsequent to the commencement of this action and the filing of the notice of pendency of this action be forever barred and foreclosed of and from all estate, right,

25

FILED: WESTCHESTER COUNTY CLERK 03/01/2022 07:23 PM
NYSCEF DOC. NO. 2
INDEX NO. 57012/2022
RECEIVED NYSCEF: 03/01/2022

21-07096-shl    Doc 45    Filed 03/11/22    Entered 03/11/22 17:37:28    Main Document
Pg 62 of 66

title, interest, claim, lien and equity of redemption in and to the Mortgaged Property and each and

every part thereof;

      B.      That the Mortgaged Property be sold to obtain the greatest return of sale, whether

sold jointly as a single parcel or sold separately as two or more parcels;

      C.      That the Mortgaged Property should be sold "As Is" subject to: (i) any state of fact

that an inspection of the Mortgaged Property would disclose; (ii) any state of fact that an accurate

survey of the Mortgaged Property would show; (iii) covenants, restrictions, conditions;

reservations; easements; rights of way and public utility agreements of record, if any; (iv) building

restrictions and zoning ordinances of the municipality in which the Mortgaged Property is located

and possible violations of same; (v) any violations, orders, changes or notices now or hereafter

found on the Mortgaged Property, or filed in or issued by any governmental authority having

jurisdiction over the Mortgaged Property; (vi) existing leases of the Mortgaged Property or any

part thereof or rights of tenants in possession other than those tenants and lessees who are party

defendants herein at the time of sale; (vii) prior liens of record, if any, and (viii) any equity of

redemption of the United States of America to redeem the Mortgaged Property within 120 days

from the date of sale;

      D.      That the amount due to Lender under the Loan Documents be adjudged;

      E.      That the proceeds of any foreclosure sale of Borrower's interest in the Mortgaged

Property be distributed and applied in the following order of priority, as specified in Section 6.1(c)

of the Mortgage: (i) first, to payment of all costs and expenses incident to the foreclosure

proceedings; (ii) second, to the cost of any search and/or other evidence of title procured in

connection therewith and the transfer tax on any deed or conveyance; (iii) third, to all sums

expended under the terms hereof, not then repaid with accrued interest at the rate provided herein;

26

FILED: WESTCHESTER COUNTY CLERK 03/01/2022 07:23 PM
INDEX NO. 57012/2022
NYSCEF DOC. NO. 2
21-07096-shl    Doc 45    Filed 03/11/22    Entered 03/11/22 17:37:28    Main Document
RECEIVED NYSCEF: 03/01/2022
Pg 63 of 66

(iv) fourth, to payment of all remaining Secured Indebtedness, in such order as Mortgagee may

determine in its sole and absolute discretion; and (v) fifth, the remainder, if any to the person or

persons legally entitled thereto.

F.    That Borrower be adjudged liable for the payment of any costs and fees incurred in

connection with foreclosing the Loan, including attorneys' fees;

G.    That the Guarantors be adjudged liable under the Guaranty for liabilities,

obligations, actual losses, damages, costs and expenses (including, without limitation, reasonable

attorneys' fees), causes of actions, suits, claims, demands, and judgment of any nature which were

incurred in connection with the enforcement of Lender's rights, remedies or recourse under the

Loan Documents due to any misapplication, misappropriation or conversion by Borrower,

Guarantor, or any Affiliate of any Rents;

H.    That the Guarantors be adjudged liable for the prompt and unconditional payment

of all obligations and liabilities of Borrower pursuant to the Loan Documents, and all Losses that

arose in consequence of Borrower's Default (including, without limitation, all reasonable

attorneys' fees and expenses, investigation costs, court costs, and any and all other costs and

expenses actually incurred by Agent or Lender in connection with the collection and enforcement

of the Guaranty);

I.    That the Guarantors, to the extent the Guarantors have liability under the Guaranty,

be adjudged to pay the amount of any deficiency due under the Loan Documents, or any or all of

them, or so much thereof as the Court may determine to be just and equitable, of the debt remaining

unsatisfied after a sale of the Mortgaged Property and the application of the proceeds pursuant to

the directions contained in such judgment, the amount thereof to be determined by the Court, as

provided in R.P.A.L. section 1371, together with reasonable attorneys' fees, disbursements and

FILED: WESTCHESTER COUNTY CLERK 03/01/2022 07:23 PM
INDEX NO. 57012/2022

NYSCEF DOC. NO. 2

21-07096-shl    Doc 45    Filed 03/11/22    Entered 03/11/22 17:37:28    Main Document

RECEIVED NYSCEF: 03/01/2022

Pg 64 of 66

court costs incurred in connection with enforcement of their and Borrower's respective obligations under the Loan Documents;

J.      That in the event the proceeds from such sale are insufficient to pay the Lender the entire amount due pursuant to the Loan Documents as described above, then Lender shall have a judgment against Borrower and Guarantors for the amount of any such deficiency;

K.      That the Court appoint a receiver to take immediate possession of and hold, subject to the discretion of this Court, the Mortgaged Property and Borrower's Assets;

L.      That the Court enter an order directing the turnover of all Rents to the Lender; and

M.      That Lender have such other and further relief as the Court deems just and proper.

Dated: March 1, 2022
      New York, New York

**DLA PIPER LLP (US)**

By: _/s/ Christopher M. Strongosky_
Christopher M. Strongosky
Neal F. Kronley
1251 Avenue of the Americas
New York, New York 10020
Telephone:  (212) 335-4500
Facsimile:  (212) 335-4501

*Attorneys for Plaintiffs Garfield Park, LLC and Security Benefit Corporation*

FILED: WESTCHESTER COUNTY CLERK 03/01/2022 07:23 PM
NYSCEF DOC. NO. 2
21-07096-shl   Doc 45   Filed 03/11/22   Entered 03/11/22 17:37:28   Main Document
Pg 65 of 66
INDEX NO. 57012/2022
RECEIVED NYSCEF: 03/01/2022

# VERIFICATION

STATE OF CONNECTICUT            )
                               ) ss.:
COUNTY FAIRFIELD                )

Blaine Hirsch, being duly sworn, deposes and states:

I am an officer of Garfield Park, LLC and Security Benefit Corporation, the plaintiffs in this action. Garfield Park, LLC is a limited liability company duly organized and existing under the laws of the State of Kansas, with its principal place of business in Kansas, and Security Benefit Corporation is a corporation duly organized and existing under the laws of the State of Kansas. I have read the annexed complaint, and its factual contents are true to my personal knowledge, except as to the matters alleged on information and belief, and as to those matters, I believe them to be true.

Dated:   March 1, 2022

_____
Blaine Hirsch

Sworn to before me
this **01** of March 2022
_____
Notary Public



29

## SCHEDULE A

## LAND

Real property in the City of White Plains, County of Westchester, State of New York, described as follows:

ALL THAT CERTAIN PLOT, PIECE OR PARCEL OF LAND, SITUATE< LYING AND BEING IN THE CITY OF WHITE PLAINS, COUNTY OF WESTCHESTER AND STATE OF NEW YORK, SAID PARCEL BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT IN THE EASTERLY LINE OF CHURCH STREET WHERE THE SAME IS INTERSECTED BY THE SOUTHERLY LINE OF BARKER AVENUE;

RUNNING THENCE FROM SAID POINT NORTH 70° 40' 10" EAST A DISTANCE OF 173.57 FEET ALONG THE SOUTHERLY LINE OF BARKER AVENUE TO A POINT WHERE THE SAME IS INTERSECTED BY THE DIVISION LINE HEREIN DESCRIBED PARCEL ON THE WEST AND LANDS NOW OR FORMERLY OF KOEPPEL & MOHR EQUITIES ON THE EAST;

THENCE FROM SAID POINT AND ALONG SAID DIVISION LINE SOUTH 17° 59' 50" EAST A DISTANCE OF 200.51 FEET TO A POINT IN THE DIVISION LINE BETWEEN THE HEREIN DESCRIBED PARCEL ON THE NORTH AND LANDS NOW OR FORMERLY OF HAMILTON PLAZA COMPANY, INC. ON THE SOUTH;

THENCE FROM SAID POINT AND ALONG SAID LINE SOUTH 71° 01' 50" WEST A DISTANCE OF 173.24 FEET TO THE EASTERLY LINE OF CHURCH STREET;

THENCE FROM SAID POINT AND ALONG SAID LINE NORTH 18° 05' 04" WEST A DISTANCE OF 199.41 FEET TO THE POINT AND PLACE OF BEGINNING.

30