**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------------x

In re:

HBL SNF, LLC, d/b/a EPIC REHABILITATION AND       Chapter 11
NURSING AT WHITE PLAINS                         Case No. 21-22623 (SHL)
                        Debtor.

-----------------------------------------------------------------------x

WHITE PLAINS HEALTHCARE PROPERTIES I,
LLC,
        Plaintiff,

        v.                             Adv. Pro. No. 21-07096 (SHL)

HBL SNF, LLC, LIZER JOZEFOVIC and MARK
NEUMAN,
        Defendants and Third-Party Plaintiffs,

        v.

CCC EQUITIES, LLC, PROJECT EQUITY
CONSULTING, THE CONGRESS COMPANIES,
HOWARD FENSTERMAN, WILLIAM NICHOLSON,
and METROPOLITAN COMMERCIAL BANK

        Third-Party Defendants.

-----------------------------------------------------------------------x

<u>**MEMORANDUM OF DECISION**</u>

**A P P E A R A N C E S :**

**KLESTADT WINTERS JURELLER SOUTHARD & STEVENS, LLP**
*Counsel for the Debtor and the Debtor in Possession*
200 West 41st Street, 17th Floor
New York, NY 10036
By:    Tracy L. Klestadt, Esq.
        Christopher J. Reilly, Esq.
        Brendan Scott, Esq.

**MICHELMAN & ROBINSON, LLP**
*Special Counsel to the Debtor and Debtor in Possession*
800 Third Avenue, 24th Floor

New York, NY 10022
By:     John Giardino, Esq.

**BINDER & SCHWARTZ LLP**
*Counsel for White Plains Healthcare Properties I, LLC*
366 Madison Avenue, 6th Floor
New York, NY 10017
By:     Eric B. Fisher, Esq.
        Lindsay A. Bush, Esq.

**DELBELLO DONNELLAN WEINGARTEN WISE & WIEDERKEHR, LLP**
*Counsel for White Plains Healthcare Properties I, LLC*
One North Lexington Avenue, 11th Floor
White Plains, NY 10601
By:     Alfred E. Donnellan, Esq.
        Nelida Lara-Garduno, Esq.

**ABRAMS FENSTERMAN LLP**
*Counsel for White Plains Healthcare Properties I, LLC*
81 Main Street, Suite 306
White Plains, NY 10601
By:     Robert A. Spolzino, Esq.

**DLA PIPER LLP (US)**
*Counsel for Security Benefit*
200 South Biscayne Boulevard, Suite 2500
Miami, FL 33131
By:     Rachel Nanes, Esq. (admitted *pro hac vice*)

**SEAN H. LANE**
**UNITED STATES BANKRUPTCY JUDGE**

Before the Court is the motion of the Plaintiff, White Plains Healthcare Properties I, LLC

(the "Landlord") for partial summary judgment on the issue of whether the Landlord properly

terminated its lease with HBL SNF, LLC, d/b/a Epic Rehabilitation and Nursing at White Plains,

the Debtor in the above-captioned Chapter 11 case.  For the reasons set forth below, the Court

concludes that the lease was terminated and, therefore, the Landlord's motion is granted.

## BACKGROUND

The relevant facts in this case are undisputed, with the background taken from the

parties' submissions in this adversary proceeding and the underlying bankruptcy case.[1]

The Debtor is a 160-bedroom skilled nursing and rehabilitation facility located at 120

Church Street, White Plains, New York that opened in late 2019 (the "Property").  *See*

Declaration of Lizer Jozefovic Pursuant to Local Bankruptcy Rule 1007-2 and in Support of the

Chapter 11 Subchapter V Petition and First Day Motions ¶ 7 [Case No. 21-22623, ECF No. 3]

(the "First Day Declaration").[2]

In and around 2009, the Debtor began the process of developing the Property into a

skilled nursing facility.  *See* Debtor's SMF ¶ 1.[3]  Thereafter, the Debtor began working with the

---

[1]      The Court notes that the Debtor failed to file a response to the Landlord's Statement of Material Facts, *see* White Plains Healthcare Properties I, LLC's Statement of Undisputed Facts in Support of its Motion for Partial Summary Judgment on Lease Termination Issue [ECF No. 34] ("Landlord's SMF"), which technically made the facts in that statement undisputed for purposes of the record.  *See Cobalt Multifamily Invs. I, LLC v. Shapiro*, 9 F. Supp. 3d 399, 404 (S.D.N.Y. 2014) (citing *T.Y. v. New York City Dep't of Educ.*, 584 F.3d 412, 418 (2d Cir. 2009)) ("A nonmoving party's failure to respond to a Rule 56.1 statement permits the court to conclude that the facts asserted in the statement are uncontested and admissible.").  Instead, the Debtor filed its own, Rule 7056-1 Statement of Material Facts, *see* HBL SNF LLC's Statement of Undisputed Facts in Support of Opposition to Landlord's Motion for Summary Judgment [ECF No. 38] ("Debtor's SMF"), a procedural step that was unnecessary given the Debtor has not moved for summary judgment but instead only opposed the Landlord's motion.  *See* Hearing Transcript, dated March 24, 2022, at 9:8–22 ("Hr'g Tr.") [ECF No. 46].  The Debtor did, however, file a response to the statement of facts that the Landlord had filed while this matter was pending in New York state court. *See* Response to Statement of Material Facts, Index No. 60278/2020, N.Y. Supreme Court, Westchester County [NYSCEF No. 254].  Notwithstanding these procedural niceties, the reality is that there are no disputed facts here, only questions about what the factual record means as a matter of law.

[2]      References to the Case Management/Electronic Case Filing ("ECF") docket are to Adv. Pro. No. 21-07096 (SHL) unless otherwise specified.  References to the New York State Courts Electronic Filing ("NYSCEF") docket are to Index No. 60278/2020, N.Y. Supreme Court, Westchester County unless otherwise specified.

[3]      The parties submitted significant filings throughout the course of this proceeding.  *See* Landlord's Motion for Summary Judgment and attached supporting documents [NYSCEF Nos. 183–230];  Debtor's Opposition to Motion and in Support of Cross Motion to Strike and attached supporting documents [NYSCEF. Nos. 236–255].  In addition to the pleadings filed while the matter was still in state court, the parties submitted to this Court a supplemental brief, various documentary evidence, a statements of material facts, and a reply brief.  *See* Landlord's Supplemental Brief in Further Support of its Motion for Partial Summary Judgment on Lease Termination Issue [ECF No. 33] ("Landlord's Supplemental Memo"); Landlord's SMF; Supplemental Memorandum of Law of HBL SNF, LLC in Opposition to Landlord's Motion for Summary Judgment [ECF No. 35] ("Debtor's Supplemental Memo"); Declaration of John Giardino in Opposition to White Plains Healthcare Properties I, LLC's Motion for Summary Judgment [ECF No. 36] ("Giardino Declaration"); Declaration of Lizer Jozefovic in Opposition to Landlord's Summary Judgment Motion [ECF No. 37] ("Jozefovic Declaration"); Debtor's SMF; White Plains Healthcare Properties I, LLC's Supplemental Reply Brief in Further Support of Its Motion for Partial Summary

Landlord on the construction and financing of the facility. Debtor's SMF ¶ 4; First Day

Declaration ¶ 9. The Landlord and the Debtor entered into the initial lease in November 2015.

First Day Declaration ¶ 10. Also in 2015, the Debtor and the Landlord entered into a Term Sheet

in which the Debtor provided a non-interest bearing loan of $2,200,000 to the Landlord (the

"Term Sheet"). *See* Debtor's SMF ¶ 6; Landlord's CSF Response No. 6; Term Sheet, attached

as Exh. 6 to the Giardino Declaration. In exchange for this loan under the Term Sheet, the

Landlord agreed to provide the Debtor with title to furniture, fixtures, and equipment (the

"FF&E") and $700,000 in the form of rent credits to be paid over 420 months. *See* Debtor's

SMF ¶ 6; Landlord's CSF Response No. 6; Term Sheet, Section 1(e).

As part of the Landlord's obligation to secure financing for the project, the Landlord

entered into a number of agreements with Security Benefit Life Insurance Company, as lender,

and Security Benefit Corporation, as agent, (together "Security Benefit") in 2017. First Day

Declaration ¶¶ 14–16. These agreements, along with an amended lease, memorialized the

parties' obligations to one another in connection with the development and operation of the

Property as a skilled nursing facility. Three of the agreements are particularly relevant to this

dispute: an amended lease, the Landlord's loan agreement, and a security agreement.

A. **The Lease**

In July 2017, the Landlord and the Debtor entered into an amended lease for the Property.

Debtor's SMF ¶ 7; Landlord's SMF ¶ 1; *see also* Amended and Restated Operating Lease

[NYSCEF No. 239] (the "Amended Lease"). Under the Amended Lease, the Debtor is required to

pay "Rent," a term which includes both "Fixed Rent" and "Additional Rent." *See* Amended

---

Judgment on Lease Termination Issue [ECF No. 42] ("Landlord's Reply"); White Plains Healthcare Properties I,
LLC's Counterstatement of Facts [ECF No. 43] ("Landlord's CSF"); Debtor's Reply Memorandum in Opposition to
Landlord's Motion for Partial Summary Judgment [ECF No. 44] ("Debtor's Reply"); Declaration of John Giardino
in Further Opposition to Landlord's Supplemental Brief  [ECF No. 45].

Lease, Section 3.2(c).  "Rent" is owed without deduction or setoff.  *See id.* Section 3.2(b).  Under

the Amended Lease, the Debtor is obligated to pay the Landlord an annual "Fixed Rent" of

$6,073,158, with payments made in monthly installments of $506,096.50.  *See id.* Section 3.2(a).

Fixed Rent is to be paid on the first day of each calendar month.  *See id.* Section 3.2(d).

As part of its obligation to pay "Additional Rent," the Amended Lease requires the

Debtor to pay two forms of security deposits (collectively, the "Security Deposits").  First the

Debtor must pay a security deposit of $3,700,000, and to deliver this sum 60 days prior to the

"Commencement Date."  *See id.* Section 7.1(a)(ii).  Second, the Amended Lease requires the

Debtor to transfer funds held by the Debtor in a Chase bank account in an amount not less than

$1,600,000 to the Landlord 60 days prior to the "Commencement Date."  *Id.* Section 7.1(a)(iii).[4]

The Commencement Date is defined in Section 3.1 of the Amended Lease as "the later to occur

of the date of issuance of a permanent or temporary Certificate of Occupancy for the Facility" or

"the date that New York State Department of Health ("NYSDOH") determines that the

Landlord's work is sufficiently complete as constructed . . . to accept patients."  *See id.* Section

3.1(a).  On December 2, 2019, NYSDOH issued a letter, retroactive to November 14, 2019,

finding the facility substantially complete.  Debtor's Supplemental Memo, at 25.

The Debtor also has certain reporting obligations under the Amended Lease under

Section 7.4.  These include, but are not limited to, a requirement of the Debtor to "furnish

Landlord and Mortgagee, within thirty (30) days of the receipt by Tenant, the annual Medicaid

---

[4]      Of lesser importance to this dispute, the Amended Lease requires the Debtor to pay or cause to be paid all
charges for electricity, steam, telephone, cable, gas, oil, water, sewer, and all other services or utilities used on or
related to the premises during the lease term.  *See* Amended Lease, Section 4.1.  The Amended Lease also requires
the Debtor to pay general and special real estate taxes and assessments.  *See id.* Section 4.2.

and Medicare provider agreement(s) and the annual Medicaid and Medicare reimbursement rate sheets for the Facility. . . ." *See* Amended Lease, Section 7.4(g).

Section 16.1 of the Amended Lease governs tenant defaults and the Landlord's remedies. It sets forth the circumstances that constitute a "Lease Default" and provides that, for enumerated defaults, the Landlord may terminate the lease upon five (5) days written notice. *Id.* Section 16.1. Failure to pay "Rent" and "Additional Rent" is an enumerated default. *See id.* Section 16.1(i). Upon default, the Landlord is permitted to accelerate the payment of all Rent for the balance of the Term [as defined in Section 3.1(a) of the Amended Lease]. *Id.* If there is a breach for a non-enumerated event, i.e., a breach of another covenant, obligation or agreement, the Debtor is given 30 days to cure from the day they received written notice from the Landlord. *See id.* Section 16.1(ii).[5]

The Amended Lease also provides that it must give way to certain provisions contained in the Landlord's agreement with its lender, Security Benefit. More specifically, the Amended Lease provides in Section 11.2 that:

> [a]ll provisions contained in the loan documents between Landlord and Mortgagee, or any other document in connection therewith which concern or pertain to the restoration of the Leased Premises, the application of insurance proceeds and any and all matters concerning a casualty, shall take precedence over and be in lieu of any contrary provision provided for in this Lease, and in all respects are binding upon Tenant who agrees to and acknowledges the same.[6]

*Id.* Section 11.2.

The Amended Lease has various "non-waiver" provisions. The first and foremost of these provides that: "[t]he waiver by either party of a breach or violation of any provision of this

---

[5]       No party has identified any cure provisions for enumerated defaults.

[6]       The Amended Lease defines the Mortgagee as "the first and second priority mortgages secured by fee simple interest in the Real Property as amended, restated, extended or replacement from time to time in Landlord's discretion." *See* Amended Lease, Section 1.3. Based on the agreements entered into between the Landlord and Security Benefit, the mortgagee is Security Benefit.

Lease shall not operate as, or be construed to be a waiver of, any subsequent breach of the same or other provision hereof.  No waiver shall be effective unless set forth in writing and signed by the party against whom such waiver is asserted." *See id.* Section 20.2.  Section 20.3 provides that a delay in enforcing strict performance of the Amended Lease is not to be construed as a waiver and a partial exercise of a power under the Amended Lease shall not preclude any other future exercise of same.  Additionally, a waiver of one default is not to be construed as a waiver of a subsequent default.  *See id.* Section 20.3.

The Amended Lease also has a release provision under which the Debtor, as tenant, releases its claims against the Landlord.  It states:

> [e]ffective as of the date of this Lease, Tenant shall release Landlord from all claims which Tenant or any agent, representative, affiliate, employee, director, officer, partner, manager, member, servant, shareholder, trustee or other person or entity acting on tenant's behalf or otherwise related to of affiliated with tenant arising from or related to any matter or thing related to or in connection with the lease premises, including the information and any physical or environmental conditions, and tenant shall not look to Landlord in connection with the foregoing for any redress or relief. … [e]xcept as to matters specifically set forth in this Lease: (A) Tenant will acquires the leased premises solely on the basis of its own physical and financial examinations, reviews, and inspections, and (B) without limiting the foregoing, waives any right it otherwise may have at law or in equity against Landlord with respect to any aspect of leased premises.

*Id.* Section 5.6(b).

The Amended Lease also contains a merger clause which provides that the Amended Lease "contains the entire agreement between the Parties" and "[a]ll representations, promises and prior or contemporaneous undertakings between such Parties are merged into and express in this instrument, and any and all prior agreements between such Parties are hereby canceled." *See id.* Section 20.6.  In the same vein, the Amended Lease has an accord and satisfaction provision providing that the Landlord's acceptance of a check for lesser amounts does not prejudice its rights or remedies.  *See id.* Section 20.21.  Section 20.13 of the Amended Lease governs holdover and

provides that if the Debtor remains after the expiration of a term or past termination, this shall not constitute a lease renewal and instead the tenant will be a month-to-month tenant at 300% of the most recent Rent payable by tenant.

Section 3.8 of the Amended Lease gives the Debtor an option to purchase the Property for $65,055,000 at a certain time, if certain conditions are met (the "Purchase Option").  *See id.* Section 3.8.  The Amended Lease is governed by New York law and any applicable law of the United States.  *See id.* Section 20.1.

**B.  The Loan Agreement**

In August 2017, the Landlord entered into a Construction Loan Agreement (the "Loan Agreement") with Security Benefit to borrow money for the construction of the skilled nursing facility on the Property.  *See* Loan Agreement, attached as Exh. 11 to the Giardino Declaration.

Among its many terms, the Loan Agreement provides that "Borrower [here, the Landlord] will not, without the prior written consent of Agent [here, Security Benefit], terminate or consent to the cancellation or surrender of any Lease. . . ." *See* Loan Agreement, Section 3.5(vi).  The initial maturity date of the Loan Agreement is August 1, 2020,  but the Loan Agreement provides that the Landlord may, with Security Benefit's approval, request an extension of the maturity of the loan for two separate one-year periods following the initial maturity date subject to certain terms and conditions.  *See id.* Section 2.14.

**C.  The Security Agreement**

In the summer of 2017, the Debtor, the Landlord, and Security Benefit all entered into a Security Agreement, Assignment of Leases and Rents, and Fixture Filing.  [Case No. 21-22623, ECF No. 58, Exh. D] (the "Security Agreement").  The Security Agreement provided additional

security to Security Benefit in connection with its loan to the Landlord, in the form of a security interest in the Debtor's collateral property. *See* Security Agreement, Section 2.1.

The Security Agreement provides that: "[o]perator [here, the Debtor] absolutely and unconditionally assigns, sells and transfers to Agent [here, Security Benefit] all of Operator's right, title and interest in, to and under the Leases, including Operator's right, power and authority to modify the terms of any such Lease, or extend, amend or terminate any such Lease." *Id.* Section 4.1.

The Security Agreement defines the term "Loan Documents" as the Loan Agreement, the Security Agreement and other documents evidencing the Loan. *See id.* at 2, Recital D.

## D.  Subsequent History

Both before and after the Debtor took possession of the Property in September 2019, there were significant disputes between the parties.

To begin with, the parties agree that the Debtor refused to pay either of the Security Deposits under the Amended Lease. On the one hand, the Debtor never paid the $3,700,000 security deposit. Landlord's SMF ¶ 9. On the other hand, the Debtor deposited the $1,600,000 in August 2017 into a Chase bank account ending in *7272, but this money was never delivered to the Landlord. Debtor's SMF ¶¶ 8, 10; Landlord's SMF ¶¶ 11–12. The Debtor maintains it never turned over the Security Deposits because the Landlord had failed to uphold its prior obligations under the Term Sheet. Debtor's SMF ¶ 14.

The Landlord also alleges there were numerous other breaches of the Amended Lease by the Debtor. These include, but are not limited to, failure to timely pay Rent, failure to timely pay real estate taxes, failure to pay utility charges and deposits, failure to deliver certificates of insurance, failure to deliver Medicare and Medicaid information and failure to provide financial

and operational reporting.  Landlord's SMF ¶¶ 14, 21, 24, 30, 33.  As for the Fixed Rent, the

Landlord alleges that Debtor paid Fixed Rent more than five days late on three separate

occasions before the Landlord sent a Notice of Default in January 2020, as discussed below.  *See*

Lists of Rents and Late Charges [NYSCEF No. 214]; Affidavit of Edward Tabor in Support of

the Motion ¶¶ 7–8 [NYSCEF No. 212] ("Tabor Affidavit").  Specifically, the Fixed Rent due

September 30, 2019 was paid on July 31, 2021 (670 days late).  *See* Lists of Rents and Late

Charges.  The Fixed Rent due October 1, 2019 was paid on October 30, 2019 (29 days late).  *See*

*id.*  The Fixed Rent due November 1, 2019 was paid on November 18, 2019 (17 days late).  *See*

*id.*

The Landlord contends that the Debtor was in default of the Amended Lease when the

Debtor took possession of the Property in September 2019.  *See* Deposition Transcript of

Plaintiff White Plains Healthcare Properties I, LLC by Howard Fensterman, Esq., at 106:18–23

("Fensterman Dep.") attached as Exh. 1 to the Giardino Declaration ("We were discussing the

terms of the 2017 lease and what its requirements were. . . and we were telling him security

deposit was due and he was refusing, he refused to pay it);  *id.* at 107:9–12 ("We addressed the

entire security deposit at that meeting in July, August of 2019.  We addressed the $1.6 million

and we addressed the $3.7 million.  We wanted our security deposit.").

Some two months later, the parties entered into a Letter of Intent in November 2019 (the

"Letter of Intent") in an attempt to resolve their disputes.  *See* Letter of Intent, attached as Exh. 8

to the Giardino Declaration; Hr'g Tr., at 41:13–19; Landlord's Supplemental Memo at 2, 5.  The

Letter of Intent contemplated that the Landlord would transfer the Property to a Delaware

Statutory Trust in which the Debtor and the Landlord would jointly hold the benefits of the

Trust.  *See* Letter of Intent, at 1.  The Letter of Intent also contemplated changes to the Amended

10

Lease including the payment of the Security Deposits. *See id.* Sections 6(d), 6(e). More specifically, the Letter of Intent contemplated that the parties would enter into another amended lease that would commence on September 30, 2019, that would reduce the $3,700,000 security deposit to $2,000,000, to be paid in two installments with the first $1,000,000 due by December 1, 2019 (the "LOI Security Deposit"). *See id.* Sections 6(a), 6(d). As to the second security deposit of $1,600,000, the Letter of Intent contemplated that, instead of delivering this amount to the Landlord, the parties would enter into a blocked account agreement that would prohibit liquidation of this account until other payments were made. *See id.* Section 6(e). The Letter of Intent also would also suspend the Debtor's Purchase Option until full payment of the Security Deposit as defined in the Letter of Intent. *See id* Section 6(g).

Consistent with Section 1(a)(ii)(3) of the Letter of Intent, the Debtor paid the Landlord a non-refundable down payment of $2,200,000.00 on November 20, 2019. Debtor's SMF ¶ 20, 22; Landlord's CSF Response Nos. 20, 22. Notwithstanding this payment, the parties agree that the transaction contemplated by the Letter of Intent was never consummated. Debtor's SMF ¶ 21; Landlord's SMF ¶ 40. The Letter of Intent states that the closing of the transaction contemplated by the Letter of Intent must occur by April 1, 2020. *See* Letter of Intent, Section 1(h). The Letter of Intent provides that, if that closing does not occur, the Letter of Intent shall be terminated, and no party shall have any rights under it. *See id.*[7] Importantly, the Letter of Intent provides that the parties were to remain as Landlord and Tenant under the Amended Lease until such time as the transaction closed. *Id.*

---

[7]    If the closing did not occur—as was the case—certain other "Formal Contracts" were also rendered void. These "Formal Contracts" were additional contemplated agreements between the parties, specifically a Contribution Agreement, Redemption Agreement and Trust Agreement which were to be completed later in the month of November 2019. *See* Letter of Intent, Section 1(g).

Against the backdrop of the Amended Lease and this Letter of Intent, the Landlord sent the Debtor a Notice of Default in January 2020 (the "Notice of Default"). *See* Landlord's SMF ¶ 45; Debtor's SMF ¶ 26; Notice of Default, attached as Exh. 3 to the Giardino Declaration. The Notice of Default cites to many alleged defaults. First and foremost for our purposes, the Notice of Default states that the Debtor has failed to pay the required Security Deposits. More specifically, the Notice of Default cites to the Debtor's failure to deliver to the Landlord by December 1, 2019 the LOI Security Deposit under the Amended Lease Section 7.1(a)(ii) as amended by the Letter of Intent ¶ 6(d)(i). Notice of Default ¶ 9. It also cites to the Debtor's failure to deliver a blocked account agreement, which prohibits liquidation of the Chase account holding the $1,600,000.00 deposited by the Debtor as required by Amended Lease Section 7.1(a)(iii) as amended by the Letter of Intent ¶ 6(e). *Id.* ¶ 10.

The Notice also alleges that the Debtor failed to pay Fixed Rent due for the period of September 30, 2019 through December 31, 2019 totaling $10,831.79 and for the period of January 1 through January 31, 2020 totaling $40,000.00 in violation of Section 3.2 of the Amended Lease and the Letter of Intent ¶ 6(d)(ii). *Id.* ¶ 1. The Notice also alleges the Debtor failed to pay real estate taxes for the period of July 1, 2019 through December 31, 2019 totaling $61,456.39 and for the period of January 1, 2020 through June 30, 2020 totaling $121,587.12 in violation of Section 4.2 of the Amended Lease and the Letter of Intent ¶ 6(b). *Id.* ¶ 2.[8]

---

[8] The Notice of Default cites numerous other defaults that the Court will not address in detail in this Decision. For example, the Notice also alleges the Debtor failed to pay utility deposits in the amount of $60,356.10 and municipal maintenance escrows in the amount of $5,500.00 in violation of Section 5.2 of the Amended Lease and the Letter of Intent ¶ 6(b). Notice of Default ¶ 3. The Notice of Default also cites to the Debtor's failure to pay utility charges in violation of Section 4.1 of the Amended Lease and the Letter of Intent, Section 6(j), such that the Landlord paid a ConEdison invoice in the amount of $2,972.84 to avoid a power shutoff. *Id.* ¶ 4. The Notice of Default also cites to the Debtor's failure to deliver certificates of insurance in accordance with Article VI and Section 6.2 of the Amended Lease and the Letter of Intent ¶ 6(h). *Id.* ¶ 5. The Notice of Default also cites the Debtor's failure to deliver on its reporting obligations under Section 7.4 of the Amended Lease, including its failure to deliver Medicare and Medicaid agreements, and submit financial reporting and other written reports providing an operational overview of significant events and circumstances at the Facility. *Id.* ¶¶ 6–8. Lastly, the Notice of

In yet another attempt to resolve the ongoing disputes, the Debtor, the Landlord, and Security Benefit entered into negotiations for an intercreditor agreement in April and May 2020. Debtor's SMF ¶ 30; Landlord's CSF ¶ Response No. 30.  While negotiations began, no intercreditor agreement was ever consummated.  Debtor's SMF ¶ 31; Landlord's CSF ¶ 31. During these negotiations, the Landlord made clear its view that the Debtor was in default.  *See* Email from Patrick Formato to Mark H. Zafrin, attached as Exh. 10 to the Giardino Declaration ("We are undertaking this review [of the Intercreditor Agreement] in a good faith effort to cooperate despite Tenant's numerous defaults under the Lease and the LOI which were set forth in a Notice of Default dated January 7, 2020.").

While the Debtor and the Landlord were fighting, the Landlord was having its own difficulties with its lender, Security Benefit.  In mid-July 2020, the Landlord wrote to Security Benefit requesting an extension of the maturity date of the loan, along with the promise that the Landlord would direct the Debtor to pay rent to Security Benefit to the extent of the monthly interest (the "July Letter").  *See* the July Letter attached as Exh. 4 to the Giardino Declaration. The Debtor maintains that the Landlord, in fact, breached its Loan Agreement with Security Benefit by failing to make its monthly loan payments and by not obtaining Security Benefit's consent to any termination of the Amended Lease.  Debtor's Reply, at 12–14.

In September 2020, the Landlord initiated this proceeding against the Debtor in New York State Supreme Court.  *See* Index No. 60278/2020, N.Y. Supreme Court, Westchester County.  The case was removed to the U.S. District Court, S.D.N.Y. in November 2021 when the Debtor filed its petition for relief under Chapter 11, Subchapter V of the Bankruptcy Code.  *See* Case No. 7:21-cv-09048 (PMH).  It was then transferred to this Court.  *See* Copy of Certified

---

Default cites to the Debtor's failure to pay late fees and costs related to the referenced failures to pay its obligations under the Amended Lease, Sections 4.1, 3.2(c), and 9.1(b) in the amount of $23,425.09.  *Id.* ¶ 11.

Order Transferring Case No. 7:21-9048 (PMH) from the U.S. District Court, S.D.N.Y. to the

U.S. Bankruptcy Court, S.D.N.Y. [ECF No. 1]. After a short period of discovery, the parties

submitted briefing in this Court to supplement and crystalize the issues that were initially briefed

before the state court.

In its papers, the Landlord argues that the Amended Lease was breached by the Debtor

and terminated before this bankruptcy case was filed. Landlord's Supplemental Memo, at 8–17.

The Landlord points to a variety of alleged breaches, including failures to provide the required

Security Deposits, to pay timely Fixed Rent, to provide the required insurance coverage, and

failure to provide several kinds of required documentation. *Id.* at 9–12. The Landlord focuses

much of its attention on the Debtor's failure to provide the two Security Deposits required by the

Amended Lease: 1) the $3.7 million security deposit and 2) the turnover of the $1.6 million

security deposit. *Id.* at 9–11. The Landlord maintains that it sent an appropriate notice of default

and argues that certain of the Debtor's defaults under the Amended Lease do not have a right to

cure as the Debtor claims. Landlord's Supplemental Memo, at 15; Landlord's Reply, at 14–18.

For its part, the Debtor does not challenge the facts underlying the alleged defaults and

specifically acknowledges that the Amended Lease required delivery of the two Security

Deposits. Debtor's Supplemental Memo, at 4. But the Debtor has four main arguments about

why the Amended Lease nonetheless was never terminated. First, the Debtor claims that the

Landlord waived the Debtor's breaches by taking a variety of actions, including: 1) accepting

Rent after issuing the Notice of Default; 2) demanding that the Debtor take possession of the

Property despite the Security Deposits not being paid; and 3) directing the Debtor to pay the Rent

to an account of Security Benefit, the Landlord's lender. *Id.* at 30–32; Debtor's Reply at 3–8.

Second, the Debtor says its failure to pay the Security Deposits is excused by the fact that Debtor

never got credit for certain capital contributions that it made with the Landlord (totaling some
$4.4 million) under agreements other than the Amended Lease.  Debtor's Supplemental Memo,
at 4 (claiming that, once the dispute over these prior contributions is resolved, the Debtor can and
will cure the alleged Security Deposits defaults).  Third, the Debtor argues that the Notice of
Default was defective because it did not track the Security Deposits' requirements in the
Amended Lease or include the cure provisions of the Amended Lease regarding defaults.  *Id.* at
3.  Fourth and finally, the Debtor argues that its actions are excused by the Landlord's own
breaches of its Loan Agreement with Security Benefit, including the Landlord's failure to make
timely loan payments to Security Benefit and the Landlord's failure to obtain Security Benefit's
consent before terminating the Amended Lease with the Debtor.  *Id.* at 6; Debtor's Reply, at 12–
14.

## DISCUSSION

### A. Applicable Legal Standards

#### 1. Summary Judgment

Summary judgment is appropriate "if the pleadings, depositions, answers to
interrogatories, and admissions on file, together with the affidavits, if any, show that there is no
genuine issue as to any material fact and that the moving party is entitled to judgment as a matter
of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56(a) (made
applicable to the adversary proceeding by Fed. R. Bankr. P. 7056).  A material fact is one that
"might affect the outcome of the suit under governing law." *McCarthy v. Dun & Bradstreet
Corp.*, 482 F.3d 184, 202 (2d Cir. 2007) (internal citations and quotations omitted).

"The moving party bears the initial burden of 'informing the . . . court of the basis for its
motion, and identifying those portions of the pleadings, depositions, answers to interrogatories,

and admissions on file, together with affidavits, if any, which it believes demonstrate the absence

of a genuine issue of material fact.'" *Hellstrom v. U.S. Dep't of Veterans Affairs*, 46 Fed. App'x

651, 654 (2d Cir. 2002) (quoting *Celotex*, 477 U.S. at 322).  When the issue is one for which the

nonmoving party bears the ultimate burden of proof at trial, the burden on the party moving for

summary judgment is to "demonstrate 'that there is an absence of evidence to support the

nonmoving party's case.'" *Id.* (quoting *Celotex*, 477 U.S. at 325).  "'It is ordinarily sufficient for

the movant to point to a lack of evidence . . . on an essential element of the non-movant's claim .

. . .'" *Netherlands Ins. Co. v. United Specialty Ins. Co.*, 276 F. Supp. 3d 94, 105 (S.D.N.Y.

2017) (quoting *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008)).  This does

not, however, "absolve the movant of the obligation, articulated in *Celotex*, to 'identify[] those

portions of [the record] which it believes demonstrate the absence of a genuine issue of material

fact.'" *Nick's Garage, Inc. v. Progressive Casualty Ins. Co.*, 875 F.3d 107, 116 n.5 (2d Cir.

2017) (quoting *Celotex*, 477 U.S. at 323).

Once this burden is met, the non-moving party "must come forward with specific facts

showing that there is a genuine issue for trial." *Hellstrom*, 46 Fed. App'x at 654 (citing *Celotex*,

477 U.S. at 322).  A "dispute about a material fact is 'genuine' . . . if the evidence is such that a

reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby,

Inc.*, 477 U.S. 242, 248 (1986).  But where "reasonable minds . . . could not differ as to the

import of the evidence, then summary judgment is proper." *Hellstrom*, 46 Fed. App'x at 654

(citing *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991)).

The court should "resolve all ambiguities and draw all inferences in favor of [the] party

against whom summary judgment is sought." *Hellstrom*, 46 Fed. App'x at 654 (internal citations

omitted).  But a non-movant cannot defeat summary judgment merely by raising "a

16

'metaphysical doubt' concerning the facts" or by simply offering "conjecture or surmise." *Id*. (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). Moreover, the "nonmoving party's opposition may not rest on mere allegations or denials of the moving party's pleading, but 'must set forth specific facts showing that there is a genuine issue for trial.'" *Id*. (quoting Fed. R. Civ. P. 56(e)).

2. Interpretation of Leases under New York Law

When interpreting a lease under New York law, "the same rules of construction apply as are applicable to contracts generally." *Himmelberger v. 40-50 Brighton First Rd. Apts. Corp.* 943 N.Y.S.2d 118, 118 (App. Div. 2d Dep't 2012) (citing *George Backer Mgt. Corp. v. Acme Quilting Co.*, 46 N.Y.2d 211, 217 (1978)). "A lease is to be interpreted as a whole and construed to carry out the parties' intent, gathered, if possible, from the language of the lease." *Cobalt Blue Corp. v. 184 W. 10th St. Corp.*, 650 N.Y.S.2d 720 722 (App. Div. 1st Dep't 1996). Thus, "when parties set down their agreement in a clear, complete document, their writing should as a rule be enforced according to its terms." *W.W.W. Assoc. v. Giancontieri*, 77 N.Y.2d 157, 162 (1990). "It is well settled that extrinsic and parol evidence is not admissible to create an ambiguity in a written agreement which is complete and clear and unambiguous upon its face." *Id*. at 163. "Whether or not a writing is ambiguous is a question of law to be resolved by the courts." *Id.* at 162. "A court cannot, under the guise of interpretation, rewrite the parties' contract to impose additional terms." *Himmelberger*, 943 N.Y.S.2d at 118. "In short, the proper aim of the court is to arrive at a construction which will give fair meaning to *all* of the language employed by the parties, and to reach a practical interpretation of the expressions of the parties to the end that there will be a realization of [their] reasonable expectations." *Tantleff v. Truscelli*, 493 N.Y.S.2d 979, 983 (App. Div. 2d Dep't 1985) (emphasis in original) (internal citations and

quotations omitted). Where there are express conditions in a lease, these must be literally performed and substantial compliance will not suffice. *See Oppenheimer & Co. v. Oppenheim*, 86 N.Y.2d 685, 690 (1995).

## B.  **The Debtor's Defense of Waiver**

The Debtor's first argument is waiver. Under New York law, a waiver occurs when there "is an intentional abandonment or relinquishment of a known right or advantage which, but for such waiver, the party would have enjoyed." *Ring v. Mpath Interactive, Inc.*, 302 F. Supp.2d 301, 304 (S.D.N.Y. 2004) (quoting *Alsen Am. Portland Cement Works v. Degnon Contracting Co.*, 222 N.Y. 34, 37 (1917)); *see also Fundamental Portfolio Advisors, Inc. v. Tocqueville Asset Mgmt., L.P.*, 7 N.Y.3d 96, 104 (2006) ("Contractual rights may be waived if they are knowingly, voluntarily and intentionally abandoned."). "Such abandonment may be established by affirmative conduct or by failure to act so as to evince an intent not to claim a purported advantage." *Fundamental Portfolio*, 7 N.Y.3d at 104. But waiver cannot "be lightly presumed" and should be based on "a clear manifestation of intent to relinquish a contractual protection." *Id.* (internal citations and quotations omitted). "Generally, the existence of an intent to forego such a right is a question of fact." *Id.*; *see also Jefpaul Garage Corp. v. Presbyterian Hosp.*, 61 N.Y.2d 442, 446 (1984) (stating that a waiver "is essentially a matter of intent which must be proved"). "When a landlord accepts rent from a tenant while knowing of a lease violation which would otherwise permit the landlord to terminate the tenancy, New York courts normally deem the violation waived." *Ring*, 302 F. Supp.2d at 304 (citing *Woollard v. Schaffer Stores Co.*, 272 N.Y. 304, 312 (1936)). The rationale behind the rule is to avoid "the inconsistency inherent in the landlord's treating the tenant as both a tenant (in accepting rent) and as a trespasser (in maintaining the right to terminate the tenancy)." *Id.* (citing *Jefpaul*, 61 N.Y.2d at 448).

18

Waiver should not be inferred from a landlord's acceptance of rent when the parties have expressly agreed otherwise through a 'nonwaiver' clause in the lease.  Under such a clause, "the parties to a commercial lease may mutually agree that conduct, which might otherwise give rise to an inference of waiver, shall not be deemed a waiver of specific bargained for provisions of a lease."  *Excel Graphics Techs., Inc. v. CFG/AGSCB 75 Ninth Ave., LLC*, 767 N.Y.S.2d 99, 103 (App. Div. 1st Dep't 2003).  To infer a waiver in such circumstances would effectively render a term of the lease meaningless.  *See id.*; *see also Jefpaul*, 61 N.Y.2d at 446 ("While waiver may be inferred from the acceptance of rent in some circumstances, it may not be inferred, and certainly not as a matter of law, to frustrate the reasonable expectations of the parties embodied in a lease when they have expressly agreed otherwise.").

But "the existence of a nonwaiver clause does not in itself preclude waiver of a contract clause. . . ."  *Dice v. Inwood Hills Condo.*, 655 N.Y.S.2d 562, 562 (App. Div. 2d Dep't 1997) (internal citations and quotations omitted).  Where such a nonwaiver clause exists, "[w]hether a landlord has waived its rights is determined by the circumstances and conduct of the parties."  *Haslacha, Inc. v. Jubilee, Inc.*, 801 N.Y.S.2d 777, 777 (Civ. Ct. N.Y. Cty. 2005) (citing *Urban Horizons Tax Credit Fund v. Zarick*, 761 N.Y.S.2d 795 (Civ. Ct. Bronx Cty. 2003); *Apfel v. Kocher*, 61 N.Y.S.2d 508 (Sup. Ct. N.Y. Cty. 1946)).  It can occur where "the landlord's knowledge, acquiescence or 'active involvement' in the lease violation that waiver can be found and evidence can be produced sufficient to 'indic[ate] that the reasonable expectations of the parties under the original were supplanted by subsequent actions.'"  *18 Assocs., LLC v. Court St. Pizza, Inc.*, 66 N.Y.S.3d 653 (Civ. Ct. Kings Cty. 2017) (quoting *Simon & Son Upholstery, Inc. v. 601 West Assocs. LLC.*, 702 N.Y.S.2d 256, 257 (App. Div. 1st Dep't 2000)).  "Such waiver may be evinced by words or conduct including partial performance."  *Id.* (citing cases).  But such

"a waiver is not created by negligence, oversight, or thoughtlessness, and cannot be inferred

from mere silence." *Stassa v. Stassa*, 999 N.Y.S.2d 116, 119 (App. Div. 2d Dep't 2014).

Under New York law, the party asserting waiver bears the burden of showing that the

Landlord has waived its breaches. That is because as the party burdened by its duty to perform

under the lease, the Debtor is obligated to prove this duty has been charged by the occurrence of

a condition subsequent. *See Rachmani Corp. v. 9 E. 96th St. Apt. Corp.*, 629 N.Y.S.2d 382, 386

(App. Div. 1st Dep't 1995).

Applying these principles of waiver to the facts here, the Court rejects the Debtor's

waiver argument. The Debtor's position must be viewed against the high hurdle that exists under

New York law when the applicable contract contains a non-waiver clause. This is clear in

*Jefpaul Garage Corp.*, 61 N.Y.2d 442, a decision of New York's highest court. In *Jefpaul*, the

lease in question permitted renewal by the tenant, but also contained a non-waiver clause stating

that receipt of rent with knowledge of a breach of any lease covenant did not constitute waiver of

such breach and no provision of the lease was deemed waived unless such waiver was in writing.

*See id.* at 445–446. When the tenant sought to exercise the renewal option in April, the landlord

refused and notified the tenant that it was in default on the lease for failure to pay April and May

rent and neglecting to pay rent and taxes when due in the past. *See id.* at 445. The notice

provided for a 15-day cure period in accordance with the lease. *See id.* While the parties

disputed whether the cure took place within the required time, the landlord did accept the late

April and May rent checks. *See id.* In July, another notice to cure was served by the landlord,

alleging that the tenant had violated the lease because of late payments of rent and taxes and also

for subletting the premises without consent. *See id.* The tenant then obtained a "Yellowstone"

injunction tolling the cure period under the lease and the landlord continued to accept rent during

that period and subsequently until December 1982.  *See id.*  At that time, the tenant again tried to exercise the renewal option but was notified that its request was rejected and the term of the lease had expired at the end of 1982, during the pendency of the state court action.  *See id.*

The issue before the New York Court of Appeals was whether the landlord's "acceptance of rent during the term with knowledge of [the tenant's] violations and without terminating the lease . . . constituted a waiver of the violations as a matter of law and thus enabled [the tenant] not only to remain in possession during the lease term but also to exercise the option to renew." *Id.*  While the lower court had granted summary judgment in favor of the tenant, the New York Court of Appeals reversed.  It stated that whether the tenant had violated the terms of the lease and whether it had cured within the required period enabling it to exercise its renewal option were questions of fact.  *See id.* at 446, 449.  The Court of Appeals went on to conclude that the landlord had not waived any violations and the lower court had erred in holding at a matter of law that it did.  *See id.*

The Debtor relies on *Jefpaul* in support of its position that the acceptance of rent constitutes a waiver by a landlord.  It is true that *Jefpaul* acknowledged this legal principal applies "in some circumstances."  *Id.* at 446.  But more importantly, the court in *Jefpaul* cited the presence of a non-waiver clause in the lease, concluding that a waiver "may not be inferred, and certainly not as a matter of law, to frustrate the reasonable expectations of the parties embodied in a lease when they have expressly agreed otherwise."  *Id*. at 446.  The New York Court of Appeals noted that the language of the non-waiver clause was "clear and unambiguous," and "with the parties having mutually assented to its terms, the clause should be enforced to preclude a finding of waiver of the conditions precedent to renewal" of the lease.  *Id.*  So while the court in *Jefpaul* recognized "the settled principle that acceptance of rent by a landlord from a tenant

with knowledge of the tenant's violation of the terms of the lease normally results in a waiver of the violation," it went on to note that knowing acceptance of rent *without an effort to terminate* justifies an inference that the landlord has elected to hold the tenant to the lease." *Id.* at 447–448 (emphasis added).[9]

In this case, the Amended Lease contains the kind of broad non-waiver provisions found in *Jefpaul*. *See* Amended Lease, Section 20.2 (providing that the waiver of a breach or violation of the Lease shall not operate as a waiver of any subsequent breach of the same or other provision and that no waiver shall be effective unless set forth in writing); *id.* at Section 20.3 (a failure to insist on strict performance of any term or condition shall not operate as a waiver). Given the clear intent of the parties as reflected in these provisions of the Amended Lease, the Debtor cannot merely rely on the acceptance of rent. Rather, the Debtor can only meet its burden of establishing waiver by identifying additional words or conduct—including partial performance—to indicate that the reasonable expectations of the parties under the original agreement were supplanted by subsequent actions.

But the words and conduct identified by the Debtor here do not show that to be the case. Rather than evidencing waiver, the record establishes that the parties made numerous efforts to settle their differences—ultimately without success—while preserving all of their rights under the Amended Lease. As to the Security Deposits, for example, the Debtor cites to the Landlord

---

[9]     The Debtor seeks to distinguish this aspect of the *Jefpaul* holding, arguing that the New York Court of Appeals only addressed waiver of the lease renewal and chose to leave in place the lower court decision regarding termination of the lease. But the Court is not convinced. The court in *Jefpaul* noted that the intent to waive should not be inferred from acceptance of rent during the period of the 'Yellowstone' injunction. "The broad restraint of that order foreclosed defendant after July 30, 1981 *from taking any steps to terminate the lease and tolled the notice to cure*. The order applied only during part of the period under consideration but plaintiff attempted to exercise the option for both renewal terms during that time and it would be patently inequitable to hold that defendant had waived its objections to them by accepting rent during the period *when it was stayed indefinitely from terminating the lease and evicting plaintiff*." *Jefpaul*, 61 N.Y.2d at 446–47 (emphasis added).

permitting the Debtor to take possession of the Property in September 2019 despite the failure to

pay the Security Deposits.  But the Landlord maintained that the Debtor was in default at that

time.  *See* Fensterman Dep., at 106:18–23 ("We were discussing the terms of the 2017 lease and

what its requirements were. . . and we were telling him security deposit was due and he was

refusing, he refused to pay it. . .); *see also id.* at 107:9–12 ("We addressed the entire security

deposit at that meeting in July, August of 2019.  We addressed the $1.6 million and we addressed

the $3.7 million.  We wanted our security deposit.").  Another example of this pattern is the

Letter of Intent executed shortly after the Debtor took possession of the Property.  The Letter of

Intent reflects a proposed new agreement to transfer the Property to the Debtor, contingent on a

subsequent closing of the transaction set forth in the document.  But the Letter of Intent did not

go effective because the contemplated transaction did not close.  As it did not close, it cannot

support a claim of waiver because the Amended Lease continued to govern the relationship

between the parties.  Letter of Intent, ¶ 1(h) (providing that if the Letter of Intent did not close,

the Amended Lease continued to govern).[10]  Indeed, the Notice of Default in January of 2020 is

itself evidence that the Landlord was not waiving its rights as it occurred in the midst of the

parties' on and off efforts to resolve their disputes.

The Debtor also cites to the parties' negotiations for a potential Intercreditor Agreement

in the spring of 2020 to support a finding of waiver.  *See* Debtor's Supplemental Memo, at 20–

21.  But once again, correspondence about the Intercreditor Agreement makes clear that

Landlord maintained that the Debtor was in breach of the Amended Lease.  *See* Email from

Patrick Formato to Mark H. Zafrin ("We are undertaking this review [of the Intercreditor

Agreement] in a good faith effort to cooperate despite Tenant's numerous defaults under the

---

[10]    If the Letter of Intent did go effective, it still contained various obligations for the Debtor, including a
revised obligation for the Security Deposits.  As discussed below, even these more modest obligations were not met.

Lease and the LOI which were set forth in a Notice of Default dated January 7, 2020."). And in any event, no Intercreditor Agreement was ever reached.

The Debtor also relies upon the Landlord's direction that the Debtor pay the rent to Security Benefit on July 15, 2020, a direction that arose out of the Landlord's efforts to renegotiate its loan with Security Benefit. The Debtor claims that this manifests an intent of the Landlord to continue the Amended Lease into the foreseeable future. But the Court cannot read such an expansive intent given the context here. This direction did nothing to change or alter any of the Debtor's obligations as tenant. It merely provided an additional boon to Security Benefit as part of negotiations between Security Benefit and the Landlord.

In sum, none of these facts—or any circumstance cited by the Debtor—satisfy the Debtor's burden on showing waiver by words or conduct.

Two cases where waiver was found help prove the point. In *Simon & Son Upholstery, Inc.*, 702 N.Y.S.2d 256, a prior landlord had "active involvement" in approving alterations to the premises for use as a photography studio—a prohibited use under the lease—provided the tenant with parking for the studio, accepted rent from the photography tenant and used the studio in a sales brochure for the building. Despite the existence of a non-waiver clause, these actions were found to be "sufficient indicia that the reasonable expectations of both parties under the original lease were supplanted by subsequent actions." *See id*. at 257. The facts here do not rise to this level. Similarly, the evidence here does not rise to the conduct found in *18 Assocs.*, 66 N.Y.S.3d 653. Despite acknowledging the existence of a non-waiver clause, the court in that case found that the landlord's actions over several years of renting to a tenant operating a pizzeria constituted a waiver of certain lease violations, including use of the premises for a purpose not permitted under the lease through the sale of unpermitted menu items, as well as inappropriate

24

signage. *See id.* The behavior included the landlord's agent and the landlord's attorney eating at the tenant's pizzeria every day—including breakfast and other menu items prohibited by the lease—and that the managing member of the landlord walked past the restaurant daily and observed unpermitted menu signs and also frequently inspected the property but made no objections to the signage at the time. *See id.*; *see also Tranel, Inc. v. Fashion Inst. of Tech.*, 907 N.Y.S.2d 104 (App. Term, 1st Dep't 2010).[11]

Considering the weight of authority under New York law, the undisputed facts here do not rise to the level of the showing needed for waiver given the broad non-waiver clause here. *See Oppenheimer & Co. v. Oppenheim*, 86 N.Y.2d at 690 (where there are express conditions in a lease, these must be literally performed); *see also W.W.W. Assoc. v. Giancontieri*, 77 N.Y.2d at 162–63 (when an agreement is clear, it should be enforced according to its terms and extrinsic evidence should not create an ambiguity where the writing is clear and unambiguous on its face); *18 Assocs.*, 66 N.Y.S.3d 653 (waiver requires evidence sufficient to "indic[ate] that the reasonable expectations of the parties under the original were supplanted by subsequent actions") (internal citations and quotations omitted); *Haslacha*, 801 N.Y.S.2d 777 (waiver is a factual determination made by examining the "circumstances and conduct of the parties"); *Axginc Corp.*

---

[11]    The Debtor also relies on a trial court decision in *Troiano v. 55 Ehrbar Tenants Corp.*, 645 N.Y.S.2d 975 (Sup. Ct. Nassau Cty. 1996), to support its position that the Landlord's acceptance of rent can constitute a waiver in the face of a nonwaiver clause. In *Troiano*, the court found waiver despite the existence of a nonwaiver clause. But the *Troiano* case is distinguishable. In *Troiano*, the court relied upon the landlord's "failure to comply with the notice provisions of the proprietary [l]ease." *Troiano*, 645 N.Y.S.2d at 977. The court noted that "Article 31 of the [l]ease provides for a termination of the [l]ease on five days' notice following service of a written notice of default and a 30-day cure period" and went on to state that

> [w]hile, as noted above, there is a question as to whether the "Notice to Cure" was in fact ever served in October 1994, it is undisputed that no subsequent cure notice was served following the February 1995 notice of termination. It is also undisputed that defendant received and accepted monthly maintenance payments following the service of the February notice and the expiration of the date of termination contained in that notice.

*Id.* (noting that the termination notice had contained a "substantial defect").

*v. Plaza Automall, Ltd.*, 759 Fed. App'x 26, 28–29  (2d Cir. 2018) (holding that sublessor did not

waive its right to rent amount required under the sublease by invoicing sublessee for a reduced

amount over several months "particularly in light of the [s]ublease's unambiguous no-waiver

clause"); *Sunoce Props., Inc. v. Bally Total Fitness of Greater N.Y., Inc.*, 48 N.Y.S.3d 476, 478

(App. Div. 2d Dep't 2017) (citing to non-waiver provision in lease in determining that tenant had

not met burden on summary judgment to show that landlord had waived lease obligation to keep

premises in good repair despite landlord extending lease term multiple times while having

knowledge of property damage caused by tenant); *458 Broadway Leasing, LLC v. Bundlee*

*Fabrics Inc.*, 839 N.Y.S.2d 433 (App. Term 1st Dep't 2007) ("Giving proper affect to the 'no

waiver' provision of the lease, any delay by landlord in billing for additional rent undisputedly

due under the lease does not support a claim of waiver or latches."); *Excel Graphics Techs., Inv.*,

767 N.Y.S.2d at 102–04 (holding that the listing of subtenants' names in the building directory

and landlord's acceptance of rent from tenant with knowledge of subtenancies did not constitute

waiver of lease requirement of prior written consent for subleasing given non-waiver clause

contained in lease and noting that lower court "erred in disregarding the clear, unambiguous

terms of this negotiated lease; its determination effectively rendered meaningless a part of the

contract . . . and failed to give meaning to all of its terms" while also noting a lack of "active

involvement" on the part of the landlord that indicated agreement to modify the lease) (internal

citations and quotations omitted).

## C.  **The Landlord's Alleged Failure to Give Debtor Credit for Prior Payments**

For its second argument, the Debtor contends that its failure to pay the Security Deposits

is justified by other cash contributions made by the Debtor to the Property for which it did not

receive credit and that it otherwise performed its lease obligations.  The Debtor calculates some

$4.4 million in value that it paid to the Landlord. Debtor's Supplemental Memo, at 11–14.
More specifically, the Debtor identifies $2.2 million that it paid under the Term Sheet of
November 2015, in exchange for 1) conveying title to $1.5 million of FF&E and 2) giving a
$700,000 credit against future rent payments. *Id.* The Debtor also cites to another $2.2 million it
provided pursuant to the Letter of Intent in November 2019. *Id.* at 13; *id.* at 11 (noting that "it is
for these reasons [the failure to receive credit for $4.4 million] that the Debtor refused to turn
over to the Landlord the $1,600,000 cash account"); *id.* at 12 (citing Jozefovic Declaration ¶ 17)
("[g]iven the dispute over possession of the $1,600,000 security account, Debtor refused to
deliver the $3,700,000 letter of credit required by the Amended Lease").[12]

But there are problems with the Debtor's position. The most significant problem is that
the Amended Lease explicitly provides that the "Rent" is owed without deduction or setoff.
Amended Lease, Section 3.2(b). This reference to Rent includes both "Fixed Rent" and
"Additional Rent." "Additional Rent" includes all sums, amounts, fees, expenses and costs
payable or reimbursement to Landlord other than Fixed Rent, *see id.* Section 3.2(c), and thus
encompasses the Security Deposits. So far from absolving the Debtor from paying the Security
Deposits, the Amended Lease specifically requires full payment of the Additional Rent
regardless of deduction or setoff. The language of Section 3.2(b) by itself defeats Debtor's

---

[12] In other places, the Debtor calculates the contributions as $6 million. Debtor's Supplemental Memo, at 23.
But that $6 million figure includes the $1.6 million in the Chase account. Debtor's Reply, at 12. As the $1.6 million
in that account was indisputably never turned over to the Landlord—as required by Section 7.1(a) of the Amended
Lease—this $1.6 million cannot be included as part of any alleged credit to which the Debtor is entitled. *See*
Debtor's Supplemental Memo, at 11 (given the lack of accounting of the $4.4 million, the "Debtor refused to place
the additional $1.6 million funds into the Landlord's hands"). The Debtor seeks to excuse its failure to turn over the
$1.6 million by noting that it proposed that the funds be held in a joint account with the Landlord and delivered to
the Landlord documentation to give the Landlord control over this account. *See* Jozefovic Declaration ¶ 14. But
such an arrangement does not comply with the plain language of the Amended Lease. *See* Amended Lease, Section
7.1(a)(iii) ("Sixty days prior to the anticipated Commencement Date, the funds in the controlled account number …
in JP Morgan Chase Bank, N.A. in the amount not less than $1,600,000 shall be delivered by Tenant to Landlord
and released by Tenant to Landlord to be held as an additional security deposit by Landlord.").

attempt to justify its failure to pay the Security Deposits based on other financial dealings between the parties. This result is also consistent with the broad merger clause in the Amended Lease that cancels all prior agreements. *See id.* Section 20.6 ("This instrument contains the entire agreement between the parties.").

The Debtor's position is also at odds with the language and context of the two other agreements on which the Debtor relies. As for the Term Sheet, it is hard to fathom how payments made by the Debtor under an agreement from 2015 would excuse the Security Deposits required by the Amended Lease executed some two years later in 2017 given the "no setoff" provision. This result is confirmed by the very specific way the Term Sheet discusses the treatment of the $2.2 million paid by the Debtor. It provides that the $2.2 million disbursement to the Landlord shall be considered a non-interest bearing loan to be repaid to the Debtor under specific conditions. Term Sheet, Section 1(e). More specifically, it states that $700,000.00 shall be "repaid as a deduction from the rent over an[d] above payments for P&I, Taxes and Reserves at a rate of $2,700.00 per month for a term of 420 months." *Id.* Section 1(e)(2). These explicit instructions for the use of the $2.2 million cannot be squared with the Debtor's claim that this money should be seen as a credit towards the Security Deposits required under the Amended Lease. And once again, the broad release of claims in the Amended Lease is inconsistent with the Debtor's position. *See* Amended Lease, Section 5.6(b).[13]

The Debtor's reliance on the Letter of Intent fares no better. *See* Debtor's SMF ¶ 20; Letter of Intent, Section (1)(a)(ii)(3) (Letter of Intent providing that the Debtor is required to

---

[13] Given the release provision at Section 5.6(b) of the Amended Lease, the Landlord contends that the $700,000 in credits under the Term Sheet went away when the Term Sheet gave way to the Amended Lease. *See* Hr'g Tr., at 12:7–14:1 (Landlord's counsel arguing that there was a major substantive change in the commercial relationship between the Landlord and the tenant Debtor when the Amended Lease was executed, including new provisions regarding the option to purchase the Property for $65 million); *id.* at 14:6–15:10. But the Court does not need to address that contention as part of its ruling today.

28

make a non-refundable down payment of $2.2 million).  As a threshold matter, the Letter of

Intent was entered in November 2019—some two years after the Amended Lease—so it cannot

be that the Amended Lease somehow took into account the payments made under the not-yet

executed Letter of Intent.  Indeed, the Letter of Intent was not executed until after the Debtor had

taken possession of the Property and the Security Deposits were already due.[14]  Despite being

drafted while the parties had an active dispute about the Security Deposits, the Letter of Intent

makes no reference to the $2.2 million as being a credit for Additional Rent.  Rather, the $2.2

million is specifically labelled as a down payment for the Debtor's potential purchase of the

Property, subject to the closing of the transaction contemplated by the Letter of Intent, a closing

that never occurred.[15]  Given these circumstances, the Court sees nothing in the Letter of Intent

that excused the Debtor's failure to pay the Security Deposits.  In considering the Debtor's view

that it was entitled to credit for these other payments, it is noteworthy that the Debtor never paid

any of the Security Deposits required under the Amended Lease or contemplated by the Letter of

Intent.  So even providing a credit to the Debtor for some amounts that it paid to the Landlord

under the other agreements—such as a $2,700 a month rent credit under the Term Sheet or even

the $2.2 million under the Letter of Intent—the Debtor still would be well short of its total

---

[14]     There is some dispute over when the Commencement Date occurred, and thus when the Security Deposits
were due.  *See* Amended Lease, Section 7.1(a) (providing that the two Security Deposits are due 60 days prior to the
Commencement Date as that term is defined in Section 3.1 of the Amended Lease).  The Landlord's position is that
the Security Deposits were due in July 2019, given that the Debtor took possession of the facility on September 30,
2019.  Landlord's Supplemental Memo, at 9.  The Debtor cites to the NYSDOH letter finding the nursing facility to
be substantially complete on November 14, 2019 and uses that as the Commencement Date.  Debtor's Supplemental
Memo, at 25.  This would make the Security Deposits due sometime in mid-September 2019.  Under either of the
dates, the Security Deposits would still have been due before the execution of the Letter of Intent.  *See* Landlord's
Supplemental Memo, at 9 (Landlord explaining even using a Commencement Date of December 2, 2019, it would
still prevail as the Security Deposits would have been due no later than October 3, 2019).

[15]     Indeed, the Landlord contends that the $2.2 million paid under the Letter of Intent was a down payment on
the transaction to purchase the Property and, as such, the Debtor was not entitled to its return since the transaction
was never closed.  Landlord's Reply, at 7.  The Court does not need to resolve the Landlord's contention—one
disputed by the Debtor—given the scope of the Court's other rulings today.

Security Deposits of $5.3 million.  *See* Amended Lease, Section 7.1(a) (requiring payment of $3.7 million and transfer of an additional $1.6 million).

In any event, the failure to pay the Security Deposits was not the Debtor's only breach under the Amended Lease.  The Debtor also failed to timely pay the Fixed Rent.  The Amended Lease required the Debtor to pay the Fixed Rent in a timely manner.  *See* Amended Lease, Section 3.2(d).  Failure to pay the Fixed Rent within five days of its due date is one of the enumerated Lease Defaults.  *See* Amended Lease, Section 16.1(i).  The Landlord alleges that Debtor paid Fixed Rent more than five days late on three separate occasions before the Landlord sent the Notice of Default in January 2020.  *See* Lists of Rents and Late Charges; Tabor Affidavit ¶¶ 7–8.  The Debtor disputes that it failed to pay the Fixed Rent but simply says it was paid late; the Debtor maintains that there was no breach given that the Fixed Rent was ultimately paid.  *See* Debtor's Supplemental Memo, at 14–15.[16]  But this distinction does not help the Debtor.  The Lease requires the tenant to not only pay the Fixed Rent but also do so in a timely manner.  Thus, paying the Fixed Rent late is still a breach of the Amended Lease.  *See Oppenheimer & Co. v. Oppenheim*, 86 N.Y.2d at 690 (where there are express conditions in a lease, these must be literally performed and substantial compliance will not suffice).  While the Landlord has additional claims about penalties that flowed from the late payment of Fixed Rent, *see* Landlord's Supplemental Memo, at 4, the Court does not need to reach this issue, given that the late payment by itself is a breach of the Amended Lease.[17]

---

[16]    *Cf. id.* (Deposition Transcript of Plaintiff White Plains Healthcare Properties I, LLC by Bill Nicholson 143:25–144:8 (the "Nicholson Dep.") attached as Exh. 2 to the Giardino Declaration ("So my CFO has advised me that the rent was in many instances late so therefore it was not paid as required by the lease while I did previous testify that ultimately the base rent was paid, in addition there is a rent provision that requires that the rent be 300 percent of the base rent on default and that was not paid properly in accordance with the lease.")).

[17]    The Landlord also alleges some nonmonetary breaches, such as the Debtor's failure to provide the Landlord with the required Medicare and Medicaid Provider Agreements.  Landlord's SMF ¶ 30.  More specifically, the Landlord alleges that the Debtor delivered the Medicaid reimbursement sheets late (July 2021) and never provided the required Medicare documentation.  *See* HBL Medicaid Rates Dated 11-14-2019 [NYSCEF No. 226];

**D.  The Debtor's Reliance on the Landlord's Breach of Obligations to Security Benefit**

In seeking to excuse its breaches of the Amended Lease, the Debtor's third argument rests on the Landlord's alleged breach of its Loan Agreement with Security Benefit.  The Debtor argues that it is entitled to invoke the Landlord's alleged breaches of its Loan Agreement with Security Benefit because the Amended Lease and Loan Documents were all part of one integrated contract.  Debtor's Reply, at 12–14.  The argument goes, therefore, that the Landlord's alleged earlier failure to honor its obligations to Security Benefit excuses the Debtor's subsequent breach of the Amended Lease.

Under New York law, "[w]hen a contract lacks an express integration clause the [trial] court must determine whether the parties intended their agreement to be an integrated contract by reading the writing in light of the surrounding circumstances." *Starter Corp. v. Converse, Inc.*, 170 F.3d 286, 295 (2d Cir. 1999) (internal quotations and citations omitted).  "[Courts] examine 'surrounding circumstances' to see if the parties would ordinarily be expected to embody the agreement in a writing based upon the type of transaction involved, the scope of the written contract and the content of any other agreements." *Id.*

"The issue of the dependency of separate contracts boils down to the intent of the parties." *Novick v. AXA Network, LLC*, 642 F.3d 304, 312 (2d Cir. 2011) (quoting *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Turtur*, 892 F.2d 199, 205 (2d Cir. 1989)).  In *Novick*, the

---

Tabor Affidavit ¶¶ 35–36 (explaining this is the only rate sheet that was ever provided by the Debtor and not until July 2021).  Failure to give the Landlord timely notice or timely deliver copies of documents provided for under Section 7.4(c) through (o) constitutes an enumerated lease default. *See* Amended Lease, Section 16.1(xv).  Section 7.4(g) requires the Debtor to "furnish Landlord and Mortgagee, within thirty (30) days of the receipt by Tenant, the annual Medicaid and Medicare provider agreement(s) and the annual Medicaid and Medicare reimbursement rate sheets for the Facility. . . ."  On this point, the Debtor posits that some of the documents were ultimately provided. *See* Debtor's Supplemental Memo, at 18–19 (citing the Nicholson Dep.) ("Ed Tabor advised me that we got them in connection with the litigation through your office and that is the only, and I don't know, I am not sure whether the submission was complete or not but we did get some of them or all of them I don't know in connection with this litigation.").  But Debtor's position once again ignores that the Amended Lease has a timing requirement for providing this information.

31

Second Circuit found that further determinations were required to see if the district court was correct in its conclusion that "that [the plaintiff's] promise to repay [a] $1 million loan and [the defendant's] promises in [a prior agreement were] independent." *Id.* at 313.  For example, the argument that the "loan had been promised to [the plaintiff] to induce him to enter into the [prior agreement]" might have indicated that the loan was integral to the prior agreement.  *Id.*

Other factors that may indicate that multiple agreements should be read together include: "the drafting history and chronology, the cross-referencing of the agreements, the integral nature of the undertakings [of the contracts], [and] the relationships among the [parties]." *This Is Me, Inc. v. Taylor*, 157 F.3d 139, 143 (2d Cir. 1998).  In *This Is Me*, the Second Circuit read multiple agreements as one for those reasons, along with the existence of a separate document that governed the relationship between the parties in the dispute.  *Id.*  Contracts that were not executed at the same time "may still be construed as a single agreement if the parties assented to all the promises as a whole, so that there would have been no bargain whatever if any promise or set of promises had been stricken." *World Wide Polymers, Inc. v. Shinkong Synthetic Fibers Corp.*, 2010 U.S. Dist. LEXIS 77770, at *41 (S.D.N.Y. July 30, 2010) (quoting *Commander Oil Corp. v. Advance Food Serv. Equip.*, 991 F.2d 49, 53 (2d Cir. 1993)).

These principles apply to contracts that "were executed on different dates and were not all between the same parties."  *TVT Recs. v. Island Def Jam Music Grp.*, 412 F.3d 82, 89 (2d Cir. 2005) (quoting *This is Me*, 157 F.3d at 143).  "[T]he legally operative question [is] whether the contracts were part of a single transaction intended to effectuate the same purpose." *Id.* at 90.  In *TVT Recs.*, the Second Circuit found that two contracts signed by different parties were integrated because they were "intended to effectuate the same result [of] the production and release of a [music album]." *Id.* at 89.  The two contracts in question were further integrated

because it was the defendant's breach of one contract that "caused the demise" of the other. *Id.* at 90. That is, "if [the defendant's] promises had been 'stricken' from [one of the contracts], there 'would have been no bargain whatever.'" *Id.*

Some factors on their own are not sufficient to show that multiple contracts should be integrated. For example, the mere fact that an agreement was "created through ongoing participation of both parties and their counsel" does not in itself mean that an agreement should be integrated. *Starter Corp.*, 170 F.3d at 294. Some factors may weigh against the idea that an agreement should be integrated. In *Bourne v. Walt Disney Co.*, 68 F.3d 621 (2d Cir. 1995), the Second Circuit chose not to integrate the agreement at issue with prior agreements because doing so would lead to the "highly implausible" result of Disney relinquishing its rights to Snow White compositions right before Snow White's theatrical release. *Id.* at 627. Doing so would have also been "a considerable departure from the prior business relationship between the [parties]." *Id.* at 627–28. Lastly, the Court chose not to integrate the agreement because the plaintiff had never contended that Disney did not have rights to the Snow-White compositions until litigation. *Id.* at 628.

Applying all these principles here, there are good reasons to conclude that the Amended Lease and Loan Agreement "were intentionally integrated." Debtor's Supplemental Memo, at 28. The Loan Agreement and the Amended Lease were intended to effectuate the same result of the construction and operation of a skilled nursing home facility. *See TVT Recs*, 412 F.3d at 89 (citing *This is Me*, 157 F.3d at 143) ("Under New York law, 'all writings which form part of a single transaction and are designed to effectuate the same purpose [must] be read together, even though they were executed on different dates and were not all between the same parties.'"). For example, one of the recitals in the Loan Agreement between the Landlord and Security Benefit

33

states that "[Landlord]. . . desires to construct the Project consisting of a skilled nursing facility"

on the Property.  *See* Loan Agreement, at 1.  The Amended Lease between the Landlord and the

Debtor also references the various agreements between the parties regarding the Debtor's

operation of the Property as a skilled nursing facility.  *See* Amended Lease, Section 3.5 ("Tenant

[here, Debtor] acknowledges that all of the interest of Landlord in and to this Lease has been or

will be assigned to Mortgagee pursuant to the Loan Documents."); *id.* at Section 7.6 ("In order to

secure the payment and performance of all of Tenant's obligations under this Lease and all of

Tenant's obligations to Landlord, and all other documents contemplated thereby, Tenant hereby

grants to Landlord a first priority security interest in and lien upon, all of the asserts of Tenant. . .

.").

The terms of the Security Agreement further support the notion of an integrated

agreement here.  As a compliment to the Amended Lease and the Loan Agreement, the Security

Agreement is signed by the Landlord, the Debtor, and Security Benefit.  The Security Agreement

provides the Debtor "absolutely and unconditionally assigns, sells, and transfers to [Security

Benefit] all of [the Debtor's] right, title and interest in and to all Rents."  *See* Security

Agreement, Section 3.1.  The Security Agreement also provides that "as part of the consideration

for the Loan and approval of the Operating Lease, [Debtor] absolutely and unconditionally

assigns, sells and transfers to [Security Benefit] all of [its] right, title and interest in, to and under

the Leases, including [Debtor's right] . . . to . . . terminate any such Lease. *See id.* Section 4.1.

Along with those provisions, the Security Agreement lists the Debtor's covenants, along with the

covenant of "remain[ing] a 'Single Purpose Entity'" until the "Obligations under the Loan are

paid in full."  *See id.* Section 6.11; *see also id.* at 2, Recitals C and D (identifying and defining

the Operating Lease and the Loan Agreement).

34

As the terms of the Amended Lease, the Loan Agreement and the Security Agreement all revolve around the ultimate goal of the Debtor's operation of a skilled nursing home facility, one can conclude that these agreements were meant to be read as a cohesive, integrated agreement. *See World Wide Polymers*, 2010 U.S. Dist. LEXIS 77770, at *41 (in assessing whether an integrated agreement exists, one needs to examine whether the parties "assented to all the promises as a whole, so that there would have been no bargain whatever if any promise or set of promises had been stricken").

But even assuming that these agreements are integrated, that does not end the inquiry. Even if seen as an integrated agreement,[18] one still has to read the provisions of such an integrated agreement as a whole under the usual rules of contract interpretation to determine how, if at all, any breaches by the Landlord would impact the Debtor's obligations under the Amended Lease. *See, e.g.*, *Cobalt Blue Corp.*, 650 N.Y.S.2d at 722 ("A lease is to be interpreted as a whole and construed to carry out the parties' intent, gathered, if possible, from the language of the lease."); *Commander Oil Corp*, 991 F. 2d at 53 ("[C]ontracts should be interpreted together if the parties assented to all the promises as a whole, so that there would have been no bargain whatever if any promise or set of promises had been stricken.") (internal citations omitted). When the language of the various agreements here is examined—in isolation or together—the Court concludes that the alleged breaches by the Landlord of its Loan Agreement with Security Benefit do not excuse the Debtor's breaches of the Amended Lease.

The Debtor makes three arguments. First, the Debtor contends that the Landlord's termination of the Amended Lease was invalid because the Landlord did not receive Security

---

[18]     To be clear, the Landlord maintains that the Amended Lease and Loan Agreement should be construed separately and are not integrated. Hr'g Tr., at 26:1–12; 31:2–6. But it maintains that, even if these agreements are considered integrated, they do not support the Debtor's position. *Id.* at 34:4–24.

Benefit's consent to do so.  The Debtor cites Section 3.5(vi) of the Loan Agreement, which

provides that the "[Landlord] will not, without the prior written consent of [Security Benefit],

terminate or consent to the cancellation or surrender of any Lease . . . ."  *See* Loan Agreement,

Section 3.5.  But the Court rejects the notion that this provision excuses the Debtor's own

breaches for several reasons.  First and foremost, the Debtor does not point to any specific

provision in the agreements that supports the notion that the Debtor as tenant is entitled to invoke

for its own benefit the rights provided to Security Benefit.  Indeed, the language suggests

otherwise.  Debtor is not a signatory to the Loan Agreement, nor is it identified as a third-party

beneficiary.[19]  Moreover, the Loan Agreement provides that "[t]he Loan Documents are for the

sole benefit of Lender and Borrower and are not for the benefit of any third party."  *Id.* Section

7.3.  The Amended Lease itself does not contain any language that requires the consent of

Security Benefit for any termination by the Landlord; it also does not have any other language

indicating that the parties intended to give the Debtor the right to invoke the consent provision

from the Loan Agreement as a blanket excuse for any defaults on the Debtor's part.  Given the

importance of the default and termination provisions, the Court cannot infer such a significant

right given the absence of such an intent in the language.

Second, the Debtor relies on Section 11.2 of the Amended Lease, which is found in Article

XI of the Amended Lease entitled "Damage or Destruction."  Section 11.2 states that provisions

that "concern or pertain to the restoration of the Leased Premises, the application of insurance

proceeds and any and all matters concerning a casualty, shall take precedence over and be in lieu

of any contrary provided for in this Lease . . . ."  The Debtor claims that this is "an explicit transfer

---

[19]    The Loan Agreement defines Security Benefit as the Lender and Agent and the Landlord as the Borrower.
*See* Loan Agreement, at 1 ("This Construction Loan Agreement . . . is made . . . by and among Security Benefit
Corporation . . . ("Agent"), Security Benefit Life Insurance Company . . . ("Lender"), and White Plains Healthcare
Properties I, LLC . . .  ("Borrower")).

of rights from the Landlord to Security Benefit concerning the administration of the [Amended Lease]." *See* Debtor's Supplemental Memo, at 28. But as the Landlord correctly notes, Section 11.2 of the Amended Lease simply reflects how the Amended Lease should be read in connection with the other documents. It provides that the Amended Lease takes precedence if there is any inconsistency between the Amended Lease and other agreements with regard to any issue other than those specified in Section 11.2 of the Amended Lease. *See* Hr'g Tr., at 23:16–22. There is nothing in these provisions that provides a basis for the Debtor to be able to rely on Section 3.5(vi) of the Loan Agreement (providing Security Benefit must consent to a termination of the Amended Lease by the Landlord).[20]

Third, the Debtor argues that the Landlord's other breaches of the Loan Agreement— namely, its failure to make its monthly loan payments—bar the Landlord from terminating the Lease because the Landlord has not shown adequate performance of the contract. Debtor's Reply, at 13 (arguing that the Landlord is unable to demonstrate adequate performance and thus cannot assert a breach of contract claim against the Debtor).

But the cases cited by the Debtor all involve instances where the party asserting a breach had also breached the contract against the same counterparty. That is not the case here. The Debtor has not alleged that the Landlord breached the Amended Lease as against the Debtor. Moreover, the Debtor does not argue that the Landlord's alleged breaches of its Loan Agreement with Security Benefit somehow prevented the Debtor from performing its own obligations to the

---

[20] The Debtor argues that this language in Section 11.2 corresponds to Section 4.1 of the Security Agreement, which Debtor maintains assigns to Security Benefit all of the Landlord's rights under the Amended Lease. *Id.* Section 4.1 of the Security Agreement provides "[o]perator [here, the Debtor] absolutely and unconditionally assigns, sells and transfers to Agent [here, Security Benefit] all of Operator's right, title and interest in, to and under the Leases, including Operator's right, power and authority to modify the terms of any such Lease, or extend, amend or terminate any such Lease." But once again, there is nothing here that suggests that the Debtor is entitled to invoke the contractual rights of Security Benefit as a defense to the Debtor's breaches of its commitments to the Landlord.

Landlord under the Amended Lease.  Rather, the Debtor is seeking to leverage Security Benefit's independent rights for its own benefit, even though these rights do not impact Debtor's ability to perform.  Hr'g Tr., at 27:8-22 (Landlord's counsel noting that consent was not a right negotiated for the benefit of the tenant and there was no expectation that the tenant would be able to claim such rights).

In fact, the cases cited by the Debtor are distinguishable because they involve two parties with obligations under the same agreement where the question was how a breach by one party affected the non-breaching party.  None of the Debtor's cases involve integrated agreements. For example, the Debtor cites to *Comfort Inn Oceanside v. Hertz Corp.*, 2011 U.S. Dist. LEXIS 126294 (E.D.N.Y. Nov. 1, 2011).  In that case, there was a two-party dispute regarding breach of contract.  The court explained that if a party materially breaches the contract, the non-breaching party can either terminate or affirm.  *Id.* at *12 (citing *ARP Films, Inc. v. Marvel Entm't Grp.*, 952 F.2d 643, 649 (2d Cir. 1991)).  If the party affirms, they cannot then refuse their own performance.  *Id.*  But the Debtor here has not alleged that the Landlord has breached the Amended Lease in any way.  None of the other cases relied upon by the Debtor are helpful to its cause.  *See Radin v. Einstein*, 2005 U.S. Dist. LEXIS 9772 (S.D.N.Y. May 20, 2005) (student sued its university under various common law claims, claims of discrimination and sexual harassment, and a claim under the Racketeer Influenced and Corrupt Organizations Act); *Lowe v. Quinn* 27 N.Y.2d 397 (1971) (two-party dispute between a married man and his girlfriend for the return of an engagement ring that he gave to her with the condition that she would marry him upon his divorce); *cf. Masuda v. Mazzei*, 149 N.Y.S.3d 890 (Sup. Ct. N.Y. Cty. July 21, 2021) (case involved a series of disputes between residential tenants and their landlord).

Lastly, the Court notes that Security Benefit has not taken any role in this adversary proceeding, including but not limited to asserting any consent rights under Section 3.5(vi) of the Loan Agreement.  Security Benefit is not named as a party nor has it made any attempt to intervene in the proceedings, despite having actively participated in numerous other aspects of the bankruptcy case.  *See, e.g.*, Security Benefit's Motion for Relief from the Automatic Stay [Case No. 21-22623, ECF No. 92]; Security Benefit's Response to the Landlord's Objection to the Proposed Final DIP Order [Case No. 21-22623, ECF No. 72].  Instead, it has chosen to pursue its own remedies against the Landlord in New York state court, including moving for the appointment of a receiver.  *See* Hr'g Tr., at 35:7–38:3 (counsel for Security Benefit reserving its rights as to termination of the Amended Lease).

### E.  Debtor's Contention that the Notice of Default Was Defective

For its fourth argument, the Debtor argues that the Landlord did not terminate the Amended Lease because the January 7, 2020 Notice of Default was defective for two reasons. First, the Debtor complains that the Notice of Default failed to include a thirty-day cure period. Debtor's Supplemental Memo, at 20.  Second, the Debtor notes that the Notice of Default was inaccurate because it referred to obligations under the Letter of Intent rather than the Amended Lease.  *See* Hr'g Tr., at 64:9–13; Debtor's Supplemental Memo, at 19–20.[21]

Addressing the first argument requires the Court to parse the notice requirements and cure provisions for different kinds of defaults under the Amended Lease, which are found under

---

[21]    In its state court pleadings, the Debtor also argued that the Notice of Default was defective because it was signed by the Landlord's counsel and not sent directly from the Landlord.  *See* Memorandum of Law in Opposition to Motion for Summary Judgment and in Support of Cross Motion to Strike, at 17–18 (relying on *Siegel v. Kentucky Fried Chicken, Inc.*, 67 N.Y.2d 792 (1986)) [NYSCEF No. 255].  However, this argument was not included in the Debtor's briefs before this Court or addressed at oral argument, raising the question of whether it has been abandoned by the Debtor.  In any event, the Court finds that the Notice of Default does not run afoul of *Siegel*.  The Notice was signed by both the Landlord's counsel and the Landlord's authorized representative.  Additionally, the Debtor and Landlord's counsel had extensive dealings with the same counsel prior to the service of the Notice of Default.

Article XVI of the Amended Lease.  As to the thirty-day cure period, the Landlord correctly explains such a cure period exists only for unenumerated defaults, and that there is no cure right for enumerated defaults under Section 16.1 of the Amended Lease.  *See* Hr'g Tr., at 39:9–22.  If an enumerated default occurs, Section 16.1 states that:

> Landlord, may, if Landlord so elects, upon five (5) days written notice of such election, forthwith terminate this Lease and Tenant's right to possession of the Leased Premises and, at Landlord's sole and absolute discretion, accelerate the payment of all Rent for the balance of the Term and declare the same presently due and payable in full . . . .

*See* Amended Lease Section 16.1.  Enumerated defaults include, but are not limited to, failure to pay the Security Deposits and failure to timely pay Fixed Rent.  *See id.*  Section 16.1(i).  The Debtor admits that it failed to deliver the Security Deposits.  *See* Hr'g Tr., at 68:21–24; 69:14–15; Debtor's SMF ¶¶ 10, 14.  Moreover, the undisputed facts show that the Fixed Rent was paid late—that is beyond the five-day grace period—on more than one occasion.  As there is no dispute that these failures are enumerated "Lease Defaults," the Landlord was not required to include 30-day cure language as to these breaches.[22]

As to the Debtor's second argument about the Notice of Default referencing the Letter of Intent, the Court is not convinced.  The Notice of Default very clearly identifies the Debtor's failure to release the $1.6 million in additional security to the Landlord from the Debtor's JPMorgan Chase Bank account.  *See* Notice of Default ¶ 10.  This failure is undisputed by the Debtor.  As there is clear notice of this enumerated default in the Notice of Default, this by itself provides a sufficient basis for terminating the Amended Lease.

---

[22]  The Debtor also contends that the Landlord's Notice of Default is defective because it did not provide the required thirty-day cure period for the unenumerated defaults.  *See* Hr'g Tr., at 69:5–7.  The Landlord maintains that the Debtor failed to cure those unenumerated defaults within thirty days of receiving the Notice.  *See* Hr'g Tr. 39:13–22.  In any event, the Court does not need to address the sufficiency of the Notice of Default as to the unenumerated defaults given the Debtor's breaches of the enumerated defaults identified above.

To the extent that the Debtor complains that the Notice of Default is confusing or prejudicial because it references the LOI Security Deposit of $1 million, the Court disagrees. The LOI Security Deposit figure reflects an alternative path forward reached by the parties in the Letter of Intent of November 2019.  The Letter of Intent had a closing deadline of April 1, 2020 and was not effective unless it closed.  *See* Letter of Intent, Section 1(h) (providing that if the closing does not occur by that date with time being of the essence, the Letter of Intent is terminated and no party has any rights with respect to it); *see also* Debtor's SMF ¶ 21.  When the Notice of Default was sent in January 2020, the Letter of Intent was still potentially operative because the closing deadline had not yet arrived.  At the time the Notice of Default was issued, the Debtor had failed to meet its obligation to pay not only the Security Deposits under the Amended Lease but also the LOI Security Deposit, due by December 1, 2019.  As the parties in January 2020 still had two potential paths forward—the Amended Lease and the Letter of Intent—the Notice of Default quite reasonably put the Debtor on notice not only of the Debtor's breach of the Amended Lease (by failing to deliver control of the $1.6 million from the Chase account) but also of the Debtor's breach of the terms of the Letter of Intent (by failing to pay the LOI Security Deposit under that agreement).  Indeed, the Notice of Default set a lower bar for the Debtor by citing the $1 million figure of the LOI Security Deposit in the Letter of Intent rather than the $3.7 million security deposit contained in the Amended Lease. [23]   But Debtor failed to make even the lower payment.  In fact, the Debtor failed to make any payment at all.

---

[23]    As Landlord's counsel explained at the oral argument, the Letter of Intent contemplated a restructuring the Security Deposits of the Amended Lease, with $1 million due in December 2019, another $1 million due in April of the following year, and the rest of the $3.7 million coming from increased rent.  *See*  Hr'g Tr., at 16:4–21.  But the Debtor made none of these payments.

The Court cannot find that the Landlord's attempt to address all the Debtor's then existing deficiencies somehow rendered the Notice of Default defective.[24]

### **CONCLUSION**

For the foregoing reasons, the Plaintiff's motion for partial summary judgment is granted. Plaintiff is directed to settle an order on five days' notice. The proposed order granting partial summary judgment must be submitted by filing a notice of the proposed order on the Case Management/Electronic Case Filing docket, with a copy of the proposed order attached as an exhibit to the notice. A copy of the notice and proposed order shall also be served upon counsel to Defendants.

Having found that the Notice of Default was proper and, therefore, that the Amended Lease was terminated, questions remain about the future of this case. The Court can offer two observations. First, the next steps in this Chapter 11 case will need to appropriately consider and protect the rights of the patients who are at this nursing facility. There is a patient care ombudsman in the case, who obviously will need to be involved in that process. The Court expects any patient care issues will be raised and addressed as needed at future hearings. Second, the Court's decision today is not issued in a vacuum. There is state court litigation filed by Security Benefit against the Landlord for alleged breaches of the Loan Agreement. At the hearing on this motion, counsel for Security Benefit noted that it had moved for the appointment of a receiver in that state court litigation. Counsel also noted that Security Benefit had not waived any of its rights or even taken any positions yet vis-à-vis the termination of the Amended Lease. *See* Hr'g Tr., at 36:21–37:3.

---

[24] To the extent that any other argument raised by the Debtor has not been specifically addressed by the Court in this Decision, the Court finds that nothing presented by the Debtor provides a basis to deny Plaintiff's partial motion for summary judgment.

Given all these considerations, the Court will hold a status conference in this adversary proceeding and the underlying bankruptcy case on Tuesday May 24, 2022 at 11:00 am (Eastern Time).  The Hearing will be conducted using Zoom for Government.  In order to appear, a party must register their appearance by 4:00 p.m. the day prior to the Hearing utilizing the eCourt Appearances portal (https://www.nysb.uscourts.gov/ecourt-appearances) located on the Court's website.

Dated: White Plains, New York
          May 20, 2022

*/s/ Sean H. Lane*
UNITED STATES BANKRUPTCY JUDGE