UNITED STATES DISTRICT COURT
**SOUTHERN DISTRICT OF NEW YORK**

\-------------------------------------------------------- X

In re

HBL SNF, LLC, d/b/a EPIC REHABILITATION
AND NURSING AT WHITE PLAINS,

                                  Debtor.

\-------------------------------------------------------- X

WHITE PLAINS HEALTHCARE PROPERTIES I, LLC

                 Plaintiff/Appellee

HBL SNF, LLC, LIZER JOZEFOVIC AND MARK
NEUMAN,

                Defendants/Appellants.

\-------------------------------------------------------- X

Chapter 11

(Subchapter V)

Case No. 21-22623 (SHL)

Case No.

### DECLARATION OF TRACY L. KLESTADT IN SUPPORT OF APPELLANT'S EMERGENCY MOTION TO EXPEDITE CONSIDERATION OF APPEAL

       Tracy L. Klestadt declares as follows under penalty of perjury pursuant to 28 U.S.C. § 1746:

       1.     I am a partner in the law firm of Klestadt Winters Jureller Southard & Stevens, LLP, which is bankruptcy counsel for HBL SNF, LLC, d/b/a Epic Rehabilitation and Nursing Center at White Plains (the "<u>Debtor</u>" or "<u>Appellant</u>").  I submit this declaration ("<u>Declaration</u>") in support of the Appellant's Emergency Motion (the "<u>Motion</u>")[1] filed contemporaneously herewith for entry of an order pursuant to Rule 8013(a) of the Federal Rules of Bankruptcy Procedure expediting consideration of Appellant's appeal.

---

[1] Terms capitalized but not defined herein shall have the meanings ascribed to them in the Motion.

2.      Except as otherwise indicated herein, the facts set forth in this Declaration are based on my personal knowledge, my review of relevant documents, information provided to me by the Appellant's management, employees or professionals, or my opinion based upon my experience, knowledge, and information.

**I.      Background**

3.      The Debtor is a 160-bedroom skilled nursing and rehabilitation facility (the "Facility"), which opened in late 2019.

4.      Prior to the Petition Date, the Debtor entered into that certain Amended and Restated Operating Lease, dated November 19, 2015 (as amended from time to time, the "Lease"), by and between the Debtor, as tenant, and White Plains Healthcare Properties I, LLC (the "Landlord"), as landlord, with respect to the real property on which the Debtor's business is operated, located at 116-120 Church Street, White Plains, New York (the "Premises").   A copy of the Lease is attached hereto as Exhibit 1.

5.      On August 18, 2017, Appellee, Security Benefit Life Insurance Company, and Security Benefit Corporation entered into that certain Construction Loan Agreement, dated August 18, 2017, a copy of which is attached hereto as Exhibit 2.

6.      On November 20, 2019, the Debtor and the Landlord entered into a letter of intent (the "LOI"), a copy of which is attached hereto as Exhibit 3, which would have allowed the Debtor to purchase the facility from Landlord.

7.      On January 7, 2020, the Landlord issued a Notice of Default to the Debtor alleging breaches of the LOI and Lease and purporting to terminate the Lease.

8.      On September 18, 2020, Appellee commenced a civil action ("State Court Action") against Appellant in the New York State Supreme Court for the County of Westchester seeking, *inter alia*, a judgment declaring that the Lease had been terminated by Appellee.

9.      On August 21, 2021, Appellee filed a motion seeking summary judgment ("Summary Judgment Motion") against Appellant in the State Court Action.  Appellant vigorously opposed the Summary Judgment Motion.

10.      On November 1, 2021, Appellant filed a voluntary petition commencing a small business bankruptcy case under subchapter V of Chapter 11 of title of 11 of the United States Code, in the United States bankruptcy Court for the Southern District of New York.

11.      On November 3, 2021, Appellant filed a Notice of Removal of the entire State Court Action in the United States District Court for the Southern District of New York, and the matter was subsequently referred to the Bankruptcy Court under Adversary Proceeding No.: 21-07096 (SHL) ("Adversary Proceeding").

12.      The parties engaged in limited discovery in the Adversary Proceeding and submitted additional briefing and conducted oral argument on the Summary Judgment Motion.

13.      After conducting a hearing on the Summary Judgment Motion, the Bankruptcy Court entered the Memorandum of Decision on May 20, 2022 ("Memorandum Decision"), wherein it granted partial summary judgment in favor of Appellee.

14.      On June 28, 2022, the Bankruptcy Court entered the *Order Granting Motion for Partial Summary Judgment in Favor of White Plains Healthcare Properties I, LLC* ("Order") [ECF No. 61].

15.      On June 29, 2022, Appellant filed a Motion to Reargue the Memorandum Decision [ECF NO. 63].

3

16.     On July 19, 2022, the Bankruptcy Court entered an Order Denying Debtor's Motion For Reargument of the Memorandum Decision Dated May 20, 2022 [ECF No. 67].

17.     Appellant filed a Notice of Appeal on July 21, 2022 based upon the Bankruptcy Court's erroneous determination that the Lease had been terminated by Appellee.

## II.     Nature of the Emergency

18.     As indicated above, the Lease included a provision that allowed Appellant to purchase the Premises, including the Facility (the "Purchase Option").  The key to the Appellant's bankruptcy case is finality of a determination of whether the Lease had been terminated by Appellee prior to the commencement of Appellant's bankruptcy case.  A favorable decision would allow Appellant to cure any existing defaults and assume the Lease pursuant to 11 U.S.C. § 365 and then exercise the Purchase Option.  Appellant's ability to obtain financing to purchase the Facility through the Purchase Option and exit bankruptcy through a plan of reorganization hinges on a final determination of whether the Lease was terminated.

19.     Until the Appeal is concluded and unless the Decision is overturned, Appellant will be unable to assume the Lease. However, if Appellant does not assume the Lease on or before August 29, 2022 ("Lease Assumption Deadline"), *the Lease will be deemed to have been rejected under 11 U.S.C. §365(d)(4)* as a matter of law.  The Lease Assumption Deadline cannot be further extended by any Court except upon the consent of Appellee.

20.     In order to preserve the Lease Assumption Deadline while Appellant exhausts its appellate rights, it is imperative that the Appeal be considered on an expedited basis so that Appellant knows whether it will have the right to assume the Lease and file a viable plan of reorganization prior to the time that the Lease Assumption Deadline expires.

4

21.     If the Lease Deadline expires before the Appeal is concluded, Appellant will not have

the ability to assume the Lease. Thus, if the Lease Assumption Deadline expires before the Appeal is

determined, Appellant will have lost the ability to assume the Lease and save its business, even if the

Appeal is ultimately determined in its favor.

22.     Appellant respectfully proposes the following schedule: Appellant's Brief must be

served and filed on or before July 29, 2022; Appellee's Brief must be served and filed by August 5,

2022; Appellant's Reply Brief must be served and filed by August 9, 2022; and oral argument, if

any, held soon thereafter in mid-August 2022.

23.     Given this proposed schedule, irreparable harm would occur during the time needed

to consider a response to Appellant's motion, namely the deadline for Appellant's opening brief

under the proposed schedule may pass. Accordingly, Appellant's motion qualifies for treatment as an

emergency motion. See Fed. R. Bankr. P. 8013.

I declare under penalty of perjury that, to the best of my knowledge and after reasonable

inquiry, the foregoing is true and correct.


Dated:  New York, New York
        July 22, 2022

                                                 /s/ Tracy Klestadt
                                                Tracy L. Klestadt

5

# EXHIBIT - 1

AMENDED AND RESTATED OPERATING LEASE

By and Between

**WHITE PLAINS HEALTHCARE PROPERTIES I, LLC,**
a Massachusetts limited liability company
("Landlord")

and

**HBL SNF, LLC,**
a New York limited liability company ("Tenant")

Dated as of November 19, 2015

2305449v5/17057-6

TABLE OF CONTENTS

Page

ARTICLE I

INCORPORATION OF RECITALS; PRINCIPLES OF CONSTRUCTION,
DEFINITIONS

Section 1.1    Incorporation of Recitals..................................................................................1
Section 1.2    Principles of Construction...............................................................................1
Section 1.3    Definitions........................................................................................................2

ARTICLE II

LEASED PREMISES

Section 2.1    Leased Premises................................................................................................5

ARTICLE III

TERM AND RENT

Section 3.1    Term of Lease. ................................................................................................6
Section 3.2    Rent..................................................................................................................7
Section 3.3    Net Lease Provisions.............................................**Error! Bookmark not defined.**
Section 3.4    Rent Tax...........................................................................................................8
Section 3.5    Assignment of Lease to Mortgagee. ...............................................................9
Section 3.6    True Lease. .......................................................................................................9
Section 3.7    Option to Purchase...........................................................................................9

ARTICLE IV

UTILITIES AND TAXES

Section 4.1    Utilities...........................................................................................................11
Section 4.2    Taxes...............................................................................................................11
Section 4.3    Escrow Deposits.............................................................................................12

ARTICLE V

LANDLORD'S WORK, MAINTENANCE AND REPAIR; IMPROVEMENTS

Section 5.1    Landlord's Work ............................................................................................10
Section 5.2    Maintenance and Repair. ...............................................................................14

2305449v5/17057-6

Section 5.3   Improvements, Renovation, Alterations and Additions.........................................16
Section 5.4   Signage..................................................................................................................16
Section 5.5   Surrender...............................................................................................................17
Section 5.6   Condition of Leased Premises. ............................................................................19

## ARTICLE VI

## INSURANCE

Section 6.1   Insurance. ............................................................................................................20
Section 6.2   Certificates of Insurance. ....................................................................................24
Section 6.3   Waiver of Subrogation.........................................................................................24

## ARTICLE VII

## SECURITY, ACCESS AND REPORTING OBLIGATIONS

Section 7.1   Security Deposit/Guaranty...................................................................................25
Section 7.2   Access to Leased Premises. ................................................................................27
Section 7.3   Changes in Licensure and Certification Status. ..................................................28
Section 7.4   Reporting and Other Obligations.........................................................................28
Section 7.6   Security Agreement. .............................................................................................34

## ARTICLE VIII

## PERSONAL PROPERTY

Section 8.1   Landlord's Personal Property. .............................................................................36
Section 8.2   Tenant's Personal Property..................................................................................37

## ARTICLE IX

## INDEMNIFICATION

Section 9.1   Tenant's Indemnification .....................................................................................37

## ARTICLE X

## USE OF LEASED PREMISES

Section 10.1   Compliance with Laws and Regulations..............................................................38
Section 10.2   No Waste..............................................................................................................39
Section 10.3   Hazardous Materials and Hazardous Waste. ......................................................39

2305449v5/17057-6

# ARTICLE XI

## DAMAGE OR DESTRUCTION

Section 11.1   Damage or Destruction. ...........................................................................41
Section 11.2   Precedence of Rights of Mortgagee. ........................................................42

# ARTICLE XII

## EMINENT DOMAIN

Section 12.1   Eminent Domain. ......................................................................................42

# ARTICLE XIII

## NOTICES

Section 13.1   Notices. ...................................................................................................43
Section 13.2   Notices to Mortgagee. .............................................................................44

# ARTICLE XIV

## QUIET ENJOYMENT

Section 14.1   Quiet Enjoyment. .....................................................................................45

# ARTICLE XV

## SUBLETTING AND ASSIGNMENT

Section 15.1   Subletting and Assignment .......................................................................45
Section 15.2   Attornment and Related Matters. .............................................................46
Section 15.3   Assignment of Subleases. ........................................................................47
Section 15.4   Additional Sublease Requirements. .........................................................48
Section 15.5   Transfers In Bankruptcy.. ........................................................................48
Section 15.6   Management Agreement. ..........................................................................50
Section 15.7   Memorandum of Lease. ...........................................................................50

# ARTICLE XVI

## DEFAULT

Section 16.1   Default by Tenant and Remedies of Landlord. .........................................50
Section 16.2   Facility Operating Deficiencies. ..............................................................57



## ARTICLE XVII

## ENTRY AND REIMBURSEMENT RIGHTS OF LANDLORD

Section 17.1    Entry and Reimbursement Rights of Landlord. ........................................58

## ARTICLE XVIII

## REPRESENTATIONS AND WARRANTIES

Section 18.1    Tenant's Representations, Warranties and Covenants...........................58
Section 18.2    Representation and Warranties. .........................................................61

## ARTICLE XIX

## OPERATION, MERGER AND CONSOLIDATION RESTRICTIONS

Section 19.2    SPE Provisions...................................................................62
Section 19.3    Injunctive Relief................................................................62
Section 19.4    Equity Interests. ...............................................................62
Section 19.5    No Merger or Consolidation. ..............................................62

## ARTICLE XX

## MISCELLANEOUS

Section 20.1    GOVERNING LAW....................................................................63
Section 20.2    Waiver of Breach...................................................................64
Section 20.3    Delay Not a Waiver. ............................................................64
Section 20.4    Force Majeure. ....................................................................64
Section 20.5    Severability. .........................................................................64
Section 20.6    Entire Agreement; Amendments........................................64
Section 20.7    Counterpart Execution; Facsimile Execution. .................65
Section 20.8    Survival of Representations and Warranties.....................65
Section 20.9    Use of Brokers. ..................................................................65
Section 20.10   Owner for Federal Tax Purposes. ......................................65
Section 20.11   Estoppel Certificates..........................................................65
Section 20.12   Confidentiality. ..................................................................66
Section 20.13   Holdover. ............................................................................67
Section 20.14   Tenant's Waiver of Claim for Physical Injury.................67
Section 20.15   Binding Effect.....................................................................67
Section 20.16   Default by Landlord............................................................67
Section 20.17   Liens....................................................................................68
Section 20.18   Publicity..............................................................................68
Section 20.19   Trial by Jury........................................................................68
Section 20.20   Construction and Interpretation. ........................................68



Section 20.21  Accord and Satisfaction. ..........................................................68
Section 20.22  Captions and Headings. ..........................................................69
Section 20.23  Time is of the Essence. ..........................................................69
Section 20.24  Successors and Assigns..........................................................69
Section 20.25  No Third Party Beneficiaries ..................................................69
Section 20.26  Licenses and Transfer of Operations. ...................Error! Bookmark not defined.
Section 20.27  Subdivision. ..........................................................................70
Section 20.28  Landlord Not in Control; No Partnership. ..............................70

## ARTICLE XXI

### REMEDIES CUMULATIVE

Section 21.1  Cumulative Remedies. ..........................................Error! Bookmark not defined.

## ARTICLE XXII

### LIMITATION OF LIABILITY

Section 22.1  Liability. ...............................................................................71
Section 22.2  Consequential Damages. ........................................................72

## ARTICLE XXIII

### REGULATORY ACTIONS

Section 23.1  Notice of Litigation..................................................................72

## ARTICLE XXIV

### ANTI-TERRORISM AND ANTI-MONEY LAUNDERING COMPLIANCE

Section 24.1  Compliance with Anti-Terrorism Laws ....................................73
Section 24.2  Funds Invested in Tenant. ......................................................73
Section 24.3  No Violation of Anti-Money Laundering Laws. ........................73
Section 24.4  Tenant Compliance with Anti-Money Laundering Laws. ...........74



## LIST OF EXHIBITS AND SCHEDULES

| | |
|---|---|
| EXHIBIT "A" | Legal Description |
| EXHIBIT "B" | Guaranty |
| EXHIBIT 7.1(a) | Capital Funding Group Agreement |
| EXHIBIT 7.1(b) | Letter of Credit Agreement |
| EXHIBIT 7.1(c) | Letter to Bank |
| SCHEDULE 3.1 | Definition of Material Default |
| SCHEDULE 4.3(b) | Permitted Investments |
| SCHEDULE 7.4 | EBITDAR |
| SCHEDULE 18.1(d) | Litigation/Adverse Events |
| SCHEDULE 18(k) | Health Care Warranties and Representations |
| SCHEDULE 19.2 | Special Purpose Entity Provisions |

## EXHIBIT "A"

### Legal Description

ALL that certain plot, piece or parcel of land, situate, lying and being in the City of White Plains, County of Westchester and State of New York. Said parcel being more particularly described as follows:

BEGINNING at a point in the easterly line of Church Street where the same is intersected by the southerly line of Barker Avenue;

THENCE from said point North 70 degrees 40 minutes 10 seconds East a distance of 173.57 feet along the southerly line of Barker Avenue to a point where the same is intersected by the division line herein described parcel on the West and lands now or formerly of Koeppel & Mohr Equities on the East;

THENCE from said point and along said division line South 17 degrees 59 minutes 50 seconds East a distance of 200.51 feet to a point in the division line between the herein described parcel on the north and lands now or formerly of Hamilton Plaza Company, Inc. on the south;

THENCE from said point and along said line South 71 degrees 01 minutes 50 seconds West a distance of 173.24 feet to the easterly line of Church Street; and

THENCE from said point and along said line North 18 degrees 05 minutes 04 seconds West a distance of 199.41 feet to the point and place of BEGINNING.

EXHIBIT A

# EXHIBIT "B"

## GUARANTY

See Attached

EXHIBIT B



## SCHEDULE 3.1

### Definition of Material Default

Material Default shall mean the occurrence of any of the following:

    (a)    Any Lease Default except 16.1 (a) (xxv) and (xxxx), provided that the following Lease Defaults shall not be deemed a Material Default unless they occur two or more times within such period: 16.1 (a) (ix), (xvii), (xxx), (xxxxi),  and the following Lease Defaults shall not be deemed a Material Default unless they occur three or more times within such period: 16.1 (a) (i), (ii), (xvii).

    (b)    Any Lease Default during such period constitutes an "Event of Default" by Landlord under any Loan Document between Landlord and its Mortgagee(s) evidencing or documenting a loan secured by the Facility;

EXHIBIT 7.1(a)
See Attached

EXHIBIT 7.1(b)
See Attached

EXHIBIT 7.1(c)
See Attached

2305449v5/17057-6



## SCHEDULE 7.4

| PERIOD | EBITDAR TARGET |
|---|---|
| Quarter 1 (_____, 201__ through _____, 201__) | $_____ |
| Quarter 2 | $_____ |
| Quarter 3 | $_____ |
| Quarter 4 | $_____ |
| Quarter 5 | $_____ |
| Quarter 6 and thereafter | $_____ |

"**EBITDAR**" means with respect to any quarterly period for the Facility an amount determined on a consolidated basis equal to the sum of the following amounts for the Facility for a trailing twelve month period: (a) earnings/(net income or net loss) (including, as an expense an actual or theoretical management expense of five percent (5%) of gross receipts) from operations before (b) interest expense, (c) income tax expense, (d) depreciation expense, (e) amortization expense, and (f) Fixed Rent, defined in accordance with GAAP for such quarterly period. EBITDAR is not considered a measure of financial performance under GAAP. In calculating earnings for the trailing twelve months that encompasses any month prior to the Commencement Date, for the months prior to the Commencement Date, revenue shall be calculated using current rates of reimbursement, meaning reimbursement rates in effect as of the start of the applicable quarterly period.

SCHEDULE 15.3

## OPERATING LEASE

THIS AMENDED AND RESTATED OPERATING LEASE ("Lease") is entered into as of November 19, 2015 (the "Effective Date"), by and between WHITE PLAINS HEALTHCARE PROPERTIES I, LLC a Massachusetts limited liability company with its principal place of business located at 2 Bourbon Street, Suite 200, Peabody, MA 01960 ("WPHCP") or (the "Landlord") and HBL SNF, LLC a New York Limited Liability Company having an office at 537 Route 22, Purdys, New York 10578 (the "Tenant"), and amends and restates in its entirety the lease between the Parties dated as of November 19, 2015.

### RECITALS

A.    WHEREAS, Landlord is the owner of the real property, improvements, and personal property constituting the long-term care facility commonly known as 116-120 Church Street, White Plains, New York and more particularly described on Exhibit A, attached hereto and made a part hereof, (the "Real Property"), and following execution of this Lease, upon which certain buildings and improvements shall be erected (the "Facility"); and

B.    WHEREAS, Landlord desires to lease the entire Leased Premises (defined herein) to Tenant and Tenant desires to lease the Leased Premises from Landlord pursuant to the terms, conditions and covenants set forth herein; and

NOW, THEREFORE, in consideration of the mutual covenants, agreements, promises, representations and warranties set forth herein and for Ten Dollars ($10.00) and other good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged by the Parties, the Parties hereby agree as follows:

### ARTICLE I

### INCORPORATION OF RECITALS; PRINCIPLES OF CONSTRUCTION, DEFINITIONS

Section 1.1    Incorporation of Recitals. The aforesaid Recitals A through B are hereby incorporated into this Lease as if fully set forth herein. Landlord and Tenant are hereinafter sometimes individually referred to as a "Party" and collectively referred to as "Parties".

Section 1.2    Principles of Construction. All references to articles, sections, schedules and exhibits are to articles, sections, schedules and exhibits in or to this Agreement unless otherwise specified. Unless otherwise specified, the words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement. Unless otherwise specified, all meanings attributed to defined terms herein shall be equally applicable to both the singular and plural forms of the terms so defined. Unless the context clearly indicates a contrary intent or unless otherwise specifically provided herein, the word "Landlord" shall mean

1

2305449v5/17057-6



"Landlord and its successors and assigns"; the words "Leased Premises" shall include any portion of the Leased Premises and any interest therein, and the phrases "attorneys' fees", "legal fees" and "counsel fees" shall include any and all reasonable attorneys', paralegal, legal assistant and law clerk fees and disbursements, whether retained firms, the reimbursement for the expenses of in-house staff or otherwise, and, including, but not limited to, fees and disbursements at the pre-trial, trial and appellate levels incurred or paid by Landlord in protecting its interest in the Leased Premises and its rights hereunder. Wherever pursuant to this Lease it is provided that Landlord shall pay any costs and expenses, such costs and expenses shall include, but not be limited to, reasonable legal fees as defined above. Whenever the context may require, any pronouns used herein shall include the corresponding masculine, feminine or neuter forms, and the singular form of nouns and pronouns shall include the plural and vice versa. The words "includes", "including" and similar terms shall be construed as if followed by the words "without limitation". Whenever in this Lease any consent, approval, determination or decision of Landlord is to be made by Landlord, or any matter is to be satisfactory to Landlord, then unless expressly provided to the contrary, such provision shall be deemed to mean that such consent, approval, determination or decision of Landlord or determination whether a matter is satisfactory shall be made by Landlord in its sole and absolute discretion for any or no reason and shall be final and conclusive. Any reference in this Lease shall be deemed to include references to such documents as the same may hereafter be amended, modified, supplemented, extended, consolidated, replaced and/or restated from time to time. Any reference in this Lease shall be deemed to be a reference to this Lease (as defined herein), as the same may hereafter be amended, modified, supplemented, extended, consolidated, replaced and/or restated from time to time. Any reference in this Lease or in the Guaranty shall be deemed to be a reference to the Guaranty (as defined herein), as the same may hereafter be amended, modified, supplemented, extended, consolidated, replaced and/or restated from time to time.

Section 1.3   Definitions.

"**Additional Rent**" as defined in Section 3.2

"**Affiliate**" as defined in Section 20.31.

"**Change of Ownership**" means

"**Commencement Date**" as defined in Section 3.1.

"**Commissioner**"   means   the Federal Housing Commissioner also called the Assistant Secretary for Housing in the United States Department of Housing and Urban Development.

"**DOH**" means New York State Department of Health.

"**Effective Date**" as defined in introductory paragraph.

"**Eligible Institution**" as defined in Section 4.3.

"**Extension Term**" as defined in Section 3.1(b).



"**Facility**" as defined in Recital A.

"**First Refinance**" means the replacement or refinance of the Original Mortgage and/or original Junior Debt, in whole or part, in an amount not less than $42,200,000.

"**First Refinance Date**" means the date of the First Refinance.

"**Fixed Rent**" as defined in Section 3.2.

"**Governmental Authority**" as defined in Section 5.2.

"**Guarantors**" mean Lizer Josefovic and Mark Neuman.

"**Hazardous Materials**" as defined in Section 10.3

"**Hazardous Waste**" as defined in Section 10.3.

"**Health Care Authority or Authorities**" means any Governmental Authority (including HUD) having responsibility for the approval, licensing, certification, payment, issuance of guaranties and insurance for, and/or otherwise setting standards for the operation and occupancy of skilled nursing facilities.

"**Health Care Licenses**" means all Medicare and Medicaid certifications and provider agreements, all public third party payor certifications and provider agreements, and all certifications, permits, regulatory agreements or other agreements and approvals, including certificates of operation, completion and occupancy, and state nursing facility licenses or other licenses and certificates of need required by Health Care Authorities for the legal use, occupancy and operation of the Facility.

"**HUD**" means the **United States Department of Housing and Urban Development.**

"**Junior Debt**" means a mortgage on the Premises junior to the first Mortgage, and/or debt relating to the development and construction of the Premises.

"**Landlord**" as defined in introductory paragraph, and Section 1.2.

"**Landlord's Indemnitees**" as defined in Section 9.1.

"**Landlord's Work**" as defined in Section 5.1.

"**Laws**" as defined in Section 5.1.

"**Lease Default**" as defined in Section 16.1.

"**Leased Premises**" as defined in Section 2.1.

"**Lease Year**" as defined in Section 3.1.

3



"**Letter of Credit**" as defined I Section 7.1.

"**Material Default**" as defined in Schedule 3.1.

"**Mortgagee**" shall refer to the first and second priority mortgages secured by fee simple interest in the Real Property as amended, restated, extended or replaced from time to time in Landlord's discretion.

"**Original Mortgage**" means the original Mortgage placed on the Premises by Landlord.

"**Overdue Rate**" as defined in Section 9.1(b).

"**Primary Market of the Facility**" means a fifteen mile radius of the Leased Premises.

"**Prime Rate**" as defined in Section 9.1.

"**Prospective Mortgagee**" means any Person chosen by Landlord as a Mortgage prior to a closing of a Mortgage to be held by such Person.

"**Real Property**" as defined in Recital A.

"**Refinance**" means the replacement or refinance of the Mortgage, or Junior Debt, or any debt in replacement thereof, in whole or part, including the First Refinance.

"**Refinance Date**" means the date of any Refinance including the First Refinance.

"**Rent**" as defined in Section 3.2.

"**Security Deposit**" as defined in Section 7.1.

"**Special Purpose Entity**" as defined in Schedule 19.2.

"**Substantial Completion Date**" means the date which is the later of: (i) the date specified in the AIA Form G704, duly executed and certified by the Landlord's architect, that the Facility was substantially completed and in substantial compliance with the plans and specifications for the Facility, and (ii) the date Landlord delivers a Temporary Certificate of Occupancy (the "TCO") for the Facility, provided, however, if the Landlord is unable to obtain the TCO or Permanent CO because of the actions or inactions of the Tenant, its employees or agents including, but not limited to, a delay in obtaining the necessary DOH approvals then delivery of the TCO shall not be a condition under this clause (ii).

"**Tenant's Lease Coverage Ratio**" means EBITDAR divided by Fixed Rent.

"**Term**" as defined in Section 3.1 (including all exercised Extension Terms).

2305449v5/17057-6

"**Total Project Cost or "TPC"**  is the actual cost of purchasing, developing, constructing, and equipping the Facility, including without limitation, the cost of the Real Property and improvements, development costs, financing costs, and the cost of Landlord's Work and all equipment.

"**Utilities**" as defined in Section 4.1.

## ARTICLE II

## LEASED PREMISES

Section 2.1    Leased Premises. Landlord hereby leases and demises to Tenant, and Tenant hereby leases from Landlord, on the terms and conditions set forth in this Lease, the following assets:

(a)    all of Landlord's right, title, and interest in and to the Real Property, including, without limitation, all buildings, structures, erections, improvements, appurtenances, easements and fixtures, including fixed machinery and fixed equipment situated thereon or forming a part thereof; and

(b)    all of Landlord's right, title and interest in and to all machinery, trade equipment, trade fixtures, furniture, furnishings, beds, and accessories of all kinds used in connection with the Facility located on the Real Property.

All of the items described in Sections 2.1(a) and 2.1(b) herein are collectively referred to as the "Leased Premises." Landlord and Tenant acknowledge and understand that all of the items which comprise the Leased Premises, as repaired, rebuilt, replaced, restored, altered or added to as permitted or required by provisions of this Lease, shall be transferred back to Landlord in accordance with the terms and conditions set forth herein upon the expiration or earlier termination of this Lease.

Section 2.2    In connection with any assignment of Landlord's interest under this Lease and the assumption of this Lease by a new landlord, the original Landlord named herein, and each successor in interest, shall have the right to transfer all amounts deposited pursuant to Section 4.3 with respect to the Facility, less any amount used pursuant to Section 4.3, to such assignee (as the subsequent holder of Landlord's interest in this Lease) and upon such transfer, Landlord or the applicable successor in interest transferring the deposits shall thereupon be completely released from all liability with respect to such deposits so transferred and Tenant shall look solely to said assignee, as the subsequent holder of Landlord's interest under this Lease, in reference thereto. If Landlord's interest in the Leased Premises is sold or conveyed as provided above or otherwise or by operation of law: (i) at the new owner's option, Tenant shall attorn to and recognize the new owner as Tenant's Landlord under this Lease and Tenant shall take such actions to confirm the foregoing within ten (10) days after request.

5



## ARTICLE III

### TERM AND RENT

Section 3.1    Term of Lease.

(a)    The term (the "Term") of this Lease shall be for a period of thirty (30) years commencing on the later to occur of (i) the date of issuance of a permanent or temporary Certificate of Occupancy for the Facility and (ii) the date that New York State Department of Health (hereinafter sometimes, "DOH") determines that the Landlord's Work is sufficiently complete as constructed (but not necessarily the Tenant's operations) to accept patients, provided, however, if the Landlord is unable to obtain a permanent or temporary Certificate of Occupancy because of the actions or inactions of the Tenant, its employees or agents including, but not limited to, a delay in obtaining the necessary DOH approvals then delivery of a permanent or temporary Certificate of Occupancy shall not be a condition under clause (i) (the "Commencement Date"), and ending at 11:59:59 P.M. on the day preceding the thirtieth (30th) anniversary of the Commencement Date (the "Expiration Date").    Under any and all circumstances, Landlord shall not be liable to Tenant, in damages or otherwise, for any delay in delivering the Leased Premises to Tenant and Tenant shall have no right to terminate or rescind this Lease on account thereof. Notwithstanding the Commencement Date, certain of the rights and obligations of the parties shall commence on the Effective Date, but not including Tenant's obligations to pay Fixed Rent and Impositions prior to the Commencement Date, or to maintain the Leased Premises, insure the Leased Premises or restore the Leased Premises after a casualty or condemnation prior to the Commencement Date, or any other rights and obligations, which by their terms are intended to commence as of the Commencement Date, which rights and obligations shall commence on the Commencement Date.

As used herein with respect to the Term and the periods for payment of Rent (unless the context otherwise requires) the term "Lease Year" shall mean a 365 day period (or 366 day period in the case of a leap year), first commencing on the Commencement Date and thereafter on successive anniversaries thereof, and ending on the day prior to the next succeeding anniversary of the Commencement Date.

Landlord and Tenant hereby acknowledge that the Commencement Date is presently indeterminate and shall occur only as hereinabove provided in this Section. Except for the rights of Tenant expressly stated herein, Tenant hereby waives any right to rescind this Lease under the provisions of Section 223-a of the Real Property Law of the State of New York, and agrees that the provisions of this Article are intended to constitute "an express provision to the contrary" within the meaning of said Section 223-a. Landlord and Tenant shall execute a memo specifying the Commencement Date immediately following its occurrence.

(b)    Provided a Lease Default has not occurred and is then continuing either at the time of the exercise of the options provided below or at the end of the Term or Extension Term, or there has not been any Lease Default listed in Schedule 3.1 attached hereto (a "Material Default"), whether or not cured, within two years of the end of the Term or Extension Term, Tenant shall have the option to extend the Term of this Lease for three (3) additional periods of ten (10) years each (each an "Extension Term"), by giving written notice to Landlord

6



not less than five forty-five (545) days nor more than seven hundred (700) days prior to the expiration of the Term (or Extension Term as the case may be) of this Lease, TIME BEING OF THE ESSENCE to these time periods. These options may be exercised by Tenant serving written notice upon Landlord stating that Tenant is exercising the option to extend. If Tenant fails to give such notice in writing to Landlord within the time period specified herein, all rights and privileges granted to Tenant to extend this Lease shall lapse and become null and void. No later option may be exercised if Tenant has failed to exercise a prior option. If Tenant has validly exercised its option(s) to extend the Term, references herein to the "Term" shall be deemed to include an Extension Term.

Section 3.2   Rent.

(a)   Beginning in the first (1st) Lease Year of the Term and for each succeeding Lease Year thereafter, including during any and all Extension Terms, until the First Refinance Date, Tenant shall pay Landlord an annual amount of Six Million Seventy Three Thousand One Hundred Fifty Eight ($6,073,158) Dollars ("Fixed Rent") in monthly installments of $506,096.50.

(b)   Tenant shall pay the Rent to Landlord during the term without deduction or setoff and without demand.

(c)   The terms "Additional Rent" or "additional rent" means all sums, amounts, fees, expenses and costs (including, without limitation, legal fees and disbursements) payable or reimbursable to Landlord under this Lease other than Fixed Rent, and all of same shall be and constitute Additional Rent hereunder. The terms "Fixed Rent" and "Additional Rent" shall be collectively referred to as "Rent." Landlord shall have the same rights and remedies hereunder consequent upon a failure of Tenant to pay any item of Additional Rent as upon a failure of Tenant to pay any item of Fixed Rent.

(d)   Rent shall be due and payable in advance in equal monthly installments during each year on the first (1st) day of each calendar month thereof (or in the event the first day of the calendar month is not a business day, on the first business day following the first day of each calendar month) throughout the Term. Rent for any period which is less than a full calendar month or full year, as the case may be, during the Term, shall be prorated on a daily basis. Rent shall not be paid more than one (1) month in advance. Rent shall be paid to Landlord at Landlord's address set forth in Section 13.1 or at such other place as Landlord designates from time to time by written notice to Tenant. Tenant agrees to pay Rent, at Landlord's direction, by electronic transfer or wire, as directed by Mortgagee in writing.

(e)   TENANT HEREBY ACKNOWLEDGES THAT LATE PAYMENT BY TENANT TO LANDLORD OF RENT WILL CAUSE LANDLORD TO INCUR COSTS NOT CONTEMPLATED HEREUNDER, THE EXACT AMOUNT OF WHICH IS PRESENTLY ANTICIPATED TO BE EXTREMELY DIFFICULT TO ASCERTAIN. SUCH COSTS MAY INCLUDE PROCESSING AND ACCOUNTING CHARGES AND LATE CHARGES WHICH MAY BE IMPOSED ON LANDLORD BY THE TERMS OF ANY LOAN AGREEMENT AND OTHER EXPENSES OF A SIMILAR OR DISSIMILAR NATURE. ACCORDINGLY, IF ANY INSTALLMENT OF RENT THAT IS PAYABLE TO LANDLORD

7



OR ITS DESIGNEE SHALL NOT BE PAID WITHIN FIVE (5) DAYS OF THE DATE WHEN DUE, TENANT WILL PAY LANDLORD ON DEMAND A LATE CHARGE EQUAL TO FIVE PERCENT (5%) OF THE UNPAID PORTION OF THE AMOUNT OF SUCH INSTALLMENT. THE PARTIES AGREE THAT THIS LATE CHARGE REPRESENTS A FAIR AND REASONABLE ESTIMATE OF THE COSTS THAT LANDLORD WILL INCUR BY REASON OF LATE PAYMENT BY TENANT. THE PARTIES FURTHER AGREE THAT SUCH LATE CHARGE IS RENT AND NOT INTEREST AND SUCH ASSESSMENT DOES NOT CONSTITUTE A LENDER OR BORROWER/CREDITOR RELATIONSHIP BETWEEN LANDLORD AND TENANT. IN ADDITION, THE AMOUNT UNPAID, INCLUDING ANY LATE CHARGES, SHALL BEAR INTEREST AT THE OVERDUE RATE FROM THE DUE DATE OF SUCH INSTALLMENT TO THE DATE OF PAYMENT THEREOF, AND TENANT SHALL PAY SUCH INTEREST TO LANDLORD ON DEMAND. THE PAYMENT OF SUCH LATE CHARGE AND/OR SUCH INTEREST SHALL NOT CONSTITUTE A WAIVER OF, NOR EXCUSE OR CURE, ANY DEFAULT UNDER THIS LEASE, NOR PREVENT LANDLORD FROM EXERCISING ANY OTHER RIGHTS AND/OR REMEDIES AVAILABLE TO LANDLORD.

(f)     If a default is declared by the Commissioner under the provisions of the Regulatory Agreement, provided a copy of Notice of Default is given to Tenant, Tenant shall thereafter make all future payments under this Lease to the Commissioner.

Section 3.3     Net Lease Provisions. Landlord and Tenant intend that the Rent herein specified shall be net to Landlord in each year during the Term, and that all costs, expenses and obligations of every kind and nature, (known or unknown, general or special, ordinary or extraordinary, foreseen or unforeseen, direct or indirect, contingent or otherwise) relating to the operation, repair and maintenance of the Leased Premises (except Landlord's income taxes) which may arise or become due during the Term shall be timely paid by Tenant and that Landlord shall be indemnified by Tenant against such costs, expenses and obligations. Tenant's obligation to pay Rent is independent of all, and is in no manner conditioned upon any, other covenants, conditions and obligations of Landlord or Tenant under this Lease. There shall be no abatement of Rent payments for any reason nor shall Tenant be entitled to any offsets or deductions from Rent payments due hereunder.

Section 3.4     Rent Tax. If any governmental taxing authority levies, assesses, or imposes any tax, sales or use tax, privilege tax, excise or assessment (other than income or franchise taxes) upon or against the Rent payable by Tenant to Landlord, either by way of substitution for or in addition to any existing tax on land and buildings or otherwise, then Tenant shall be responsible for and shall pay such tax, excise or assessment, or, if Landlord pays same, Tenant shall reimburse Landlord for the amount thereof within ten (10) days after written demand by Landlord.

It is the intent of this Section 3.4 and all other provisions of this Lease to insure that the Rent (including Additional Rent) paid to Landlord by Tenant will be received by Landlord without diminution by any tax, assessment, charge or levy of any nature whatsoever, except United States, State of New York and local net income taxes, and the terms and conditions of this Lease shall be liberally construed to effect such purpose. Without limiting the generality of the foregoing, if any tax is assessed or based on gross income actually or

8



constructively received by Landlord pursuant to this Lease, Tenant shall pay such amount which, when added to said gross income, shall yield to Landlord, after deduction of all such tax payable by Landlord with respect thereto, a net amount equal to that which Landlord would have realized therefrom had no such tax been imposed.

Section 3.5_    Assignment of Lease to Mortgagee.    Tenant acknowledges that all of the interest of Landlord in and to this Lease has been or will be assigned to Mortgagee pursuant to the Loan Documents.

Tenant agrees to promptly execute and deliver to Landlord from time to time any and all documents required by a Mortgagee, Prospective Mortgagee, HUD and/or HUD's Approved Lender, or any successor, commercial, agency or private lender, including, without limitation, a lease addendum, regulatory agreement, subordination agreement, non-disturbance and attornment agreement, and/or estoppel certificate, in order to finance or refinance the Facility or otherwise.

Tenant will on request at any time or from time to time by Landlord or any Mortgagee or Prospective Mortgagee subordinate this lease and all of Tenant's rights and estate hereunder to such Person's Mortgage and to any renewals, extensions, substitutions, refinancings, modifications or amendments thereof, or declare such Mortgage to be prior to this lease and to any renewals, extensions, substitutions, refinancings, modifications or amendments thereof, and agree with such holder that Tenant will attorn thereto in the event of foreclosure. Landlord agrees to use reasonable efforts (except that Landlord shall not be obligated to expend money for any such agreement) to obtain a written agreement from any such holder in the form typically used by such holder which consents to this lease and provides that, notwithstanding such mortgage or any default, expiration, termination, foreclosure, sale, entry or other act or omission under, pursuant to or affecting said Mortgage, Tenant shall not be disturbed in peaceful enjoyment of the Leased Premises or this lease terminated or canceled at any time, except in the event Landlord shall have the right to terminate this lease under the terms and provisions set forth herein.

Section 3.6    True Lease.    It is the intent of Landlord and Tenant and the parties agree that this Lease is a true lease and that this Lease does not represent a financing agreement. Each party shall reflect the transaction represented hereby in all applicable books, records and reports (including income tax filings) in a manner consistent with "true lease" treatment rather than "financing" treatment.

Section 3.7    Right of First Refusal; Buyout.    (a) Landlord shall not sell, transfer or convey the Leased Premises to a third person or entity unless Tenant first is given the opportunity to purchase the Leased Premises pursuant to the terms and conditions set forth in this Section 3.7(a). If at any time during the first eleven years of Term Landlord receives from any third person or entity an Offer (as hereinafter defined) to purchase the Leased Premises which Landlord desires to accept, Landlord shall notify Tenant of such Offer by delivering written notice to Tenant, which notification (the "**Offer Notice**") shall contain a copy of the written Offer or, at Landlord's election, a written summary of the terms of the Offer. For purposes of this Lease, an "**Offer**" shall mean any bona fide written instrument or verbal communication setting forth the terms pursuant to which Landlord will convey the Leased Premises. Tenant shall have ten (10) Business Days after receipt of the Offer Notice in which to elect by written

9

notice delivered to Landlord (the "**Acceptance Notice**") to enter into a formal agreement on the same terms and conditions as those contained in the Offer ("**Tenant's Purchase Right**").  Such election shall be effective only if within ten (10) Business Days after delivery of the Acceptance Notice the parties enter into a written purchase agreement on terms reasonably acceptable to Landlord in good faith for the sale of the Leased Premises to Tenant containing all terms of the Offer.  If Tenant fails to timely deliver the Acceptance Notice, or if Tenant fails to timely enter into said purchase agreement as provided herein, Landlord shall have the right to accept the Offer or any modification thereof on terms substantially similar as those set forth in the Offer. Tenant's right to purchase the Leased Premises identified in the Offer Notice shall not apply to (i) transfers of less than one hundred percent of the ownership interests in Landlord, (ii) a public offering of ownership interests in Landlord, (iii) a recapitalization transaction of any kind involving Landlord, (iv) condemnation, eminent domain or similar proceedings, or (v), rights exercised by Mortgagees in foreclosure or in lieu thereof pursuant to Mortgages or other documents executed by Landlord in connection therewith, including the subsequent disposition of the Premises by Mortgagee or its affiliate or designee that acquires the Leased Premises in connection therewith.

(b)   Notwithstanding anything to the contrary, if Landlord's Offer Notice states that it is purchasing from Tenant Tenant's Purchase Right, then (i) Tenant shall have no further rights under Section 3.7(a), and Section 3.7(a) shall be null and void without further effect, and (ii) upon the closing of the purchase and sale of the Leased Premises pursuant to the Offer, Landlord shall pay Tenant ten percent (10%) of the excess of the sales price agreed to pursuant to the Offer (less costs and fees, including broker's fees) over the TPC, the "**Offer Fee**"), and (iii) the Rent shall be the greater of the amount as determined by Section 3.2(a) or fair market value, as shall be determined by an independent third party appraiser jointly appointed by Landlord or and Tenant, and absent their agreement appointed by the then chairman or similar officer of the Westchester County Society of Real Estate Appraisers.  For purposes of clarification, Tenant shall not be entitled to the receipt of the Offer Fee if Tenant exercises Tenant's Purchase Right as set forth in Section 3.7(a) above.

(c)   Upon expiration of the eleventh Lease Year, Tenant's Right of First Refusal as set forth in in Section 3.7(a) shall lapse and become null and void.

Section 3.8.   Option to Purchase.  Commencing on the latter of (i) the first day after the Commencement Date and (ii) 24 months from the date of the closing of the Original Mortgage, and ending on the last day of the fifteenth Lease Year of the Lease, Tenant shall have the option to purchase the Leased Premises from Landlord for a purchase price of $65,055,000 by giving written notice of its exercise of the Option to Purchase including a proposed closing date, provided if Tenant does not exercise the Option to Purchase prior to receiving an Offer Notice pursuant to Section 3.7, Tenant's Option to Purchase under this Section 3.8 shall lapse unless and until the conveyance of the Leased Premises contemplated under Section 3.7 does not occur.  Upon expiration of the fifteenth Lease Year, Tenant's the right to purchase the Leased Premises from Landlord, all as set forth above, shall lapse, become null and void, and Tenant shall have deemed to waived all such rights hereunder.

*Construction Loan*

ARTICLE IV

10



## UTILITIES AND TAXES

Section 4.1   Utilities.  From and after the Commencement Date, Tenant shall pay or cause to be paid all charges next coming due and payable for electricity, steam, telephone, cable, gas, oil, water, sewer and all other services or utilities used on or related to the Leased Premises (the "Utilities") during the Term.  Tenant covenants to place all Utilities in Tenant's name as of the Commencement Date.  Adjustment shall be made for Utilities applicable to any period prior to the Commencement Date.  In the event Landlord is billed directly by any service provider or utility company for any Utilities or services supplied to Tenant during the Term, Landlord shall send Tenant the bill and Tenant shall promptly pay the same.  Landlord shall have no obligation or liability with respect to any interruption or failure in the supply of any such Utilities.  If Landlord elects to or shall be required to pay for any Utilities to preserve and/or protect the Leased Premises, Tenant shall reimburse Landlord for the cost and expense thereof plus interest at the Prime Rate.

Section 4.2   Taxes.  Tenant shall be solely responsible for the payment, prior to the date when penalties would attach, of all general and special real estate taxes and assessments (together with any excise taxes on such real estate taxes and assessments levied or imposed by any governmental taxing authority), fire district taxes, liens, impositions, including capital stock, franchise, ad valorem, sales, use, single business, gross receipts, transaction privilege, rent or similar taxes; personal property taxes, assessments including assessments for public improvements or benefits, whether or not commenced or completed prior to the date hereof and whether or not to be completed within the Term; ground rents; water, sewer and other utility levies and charges; excise tax levies; fees including license, permit, inspection, authorization and similar fees; and all other governmental charges, in each case whether general or special, ordinary or extraordinary, or foreseen or unforeseen, of every character in respect of the Leased Premises, and all interest and penalties thereon attributable to any failure in payment by Lessee which at any time prior to, during or in respect of the Term hereof may be assessed or imposed on or in respect of or be a lien upon the Leased Premises (collectively, the "Impositions") that accrue from the Commencement Date through the Term.  Adjustment shall be made for Impositions applicable to any period prior to the Commencement Date.  Tenant shall pay all of the Impositions directly to the applicable taxing authorities and Tenant shall promptly forward proof of payment to Landlord in such form as shall be reasonably acceptable to Landlord unless Landlord elects to require escrow deposits in accordance with Section 4.3 hereof.  Landlord shall promptly forward any tax bills which it may receive to Tenant.  Landlord shall only bill Tenant for any of the Impositions if Tenant does not pay any of the Impositions before delinquency and Landlord is obligated or elects (in Landlord's sole and absolute discretion) to pay any of the Impositions directly to remain current with all taxing authorities.  Tenant shall pay the full amount of any increases in any of the Impositions resulting from alterations or improvements made by or for the benefit of Tenant.  After the expiration or termination of this Lease, Tenant shall pay all bills for any of the Impositions which become due and payable after the expiration or termination of the Lease covering any period through the expiration or earlier termination of the Lease.  If any governmental taxing authority acting under any present or future ordinance or regulation, shall levy, assess or impose a tax, excise and/or assessment (other than any net income or franchise tax) upon Landlord or Tenant for rental payable by Tenant to Landlord, either by way of substitution for or in addition to any existing tax on land, buildings or otherwise, then Tenant shall be responsible for and shall pay such tax, excise and/or assessment

11



or shall reimburse Landlord for the cost and expense thereof, as the case may be. Provided that Tenant shall have deposited a sufficient amount of funds to pay the Impositions pursuant to Section 4.3 and Tenant has done nothing to prevent payment by Landlord or its lender of the Impositions, then Tenant shall not be responsible for any and all late payment fees and/or penalties, including interest, imposed by any applicable taxing authorities with respect to the untimely payment of Impositions.

Section 4.3    Escrow Deposits.

(a)    Escrow. At the option of Landlord, which may be exercised at any time by Landlord in its sole and absolute discretion Tenant shall, on the first day of the first calendar month commencing after notice from Landlord, and on the first day of each calendar month thereafter during the Term (each of which dates is referred to as a "Monthly Deposit Date"), pay to and deposit with Landlord a sum equal to one-twelfth (1/12th) of the Impositions to be levied, charged, filed, assessed or imposed upon or against the Leased Premises within one (1) year after said Monthly Deposit Date and a sum equal to one-twelfth (1/12th) of the premiums for the property insurance policies required pursuant to Article VI which are payable within one (1) year after said Monthly Deposit Date. If the amount of the Impositions to be levied, charged, assessed or imposed or insurance premiums to be paid within the ensuing one (1) year period shall not be fixed upon any Monthly Deposit Date, such amount for the purpose of computing the deposit to be made by Tenant hereunder shall be reasonably estimated by Landlord with an appropriate adjustment to be promptly made between Landlord and Tenant as soon as such amount becomes determinable. In addition, Landlord may, at its option, from time to time require that any particular deposit be greater than one-twelfth (1/12th) of the estimated amount payable within one (1) year after said Monthly Deposit Date, if such additional deposit is required in order to provide to Landlord sufficient funds from which to make payment of all Impositions on or before the next due date of any installment thereof, or to make payment of any required insurance premiums not later than the due date thereof. If any Mortgagee or the Commissioner requires Landlord to impound insurance premiums on a periodic basis during the term, Tenant, on notice from Landlord indicating this requirement, shall pay a sum of money towards its liability under this Lease to Landlord on a periodic basis in accordance with Landlord's requirements. Landlord shall impound the premium payments received from Tenant in accordance with the requirements of Mortgagee and shall utilize such funds to timely pay insurance premiums.

(b)    Use of Deposits. The sums deposited by Tenant under this Section 4.3 shall be held by Landlord or Mortgagee and shall be applied in payment of the Impositions or insurance premiums, as the case may be, when due. Any such deposits may be commingled with other assets of Landlord or such Mortgagee, and shall be deposited by Landlord or such Mortgagee in an Eligible Institution in such account or accounts as Landlord or the Mortgagee may, from time to time select, and Landlord shall not be liable to Tenant or any other person (i) based on Landlord's or the Mortgagee's (or any bank's) choice of investment vehicles, (ii) for any consequent loss of principal or interest or (iii) for any unavailability of funds based on such choice of investment. Furthermore, subject to the foregoing regarding the use of depositories and accounts, Landlord and its Mortgagee shall bear no responsibility for the financial condition of, nor any act or omission by the depository bank. No income, if any, from such investment or interest on such deposits shall be paid to Tenant. To the extent that Landlord does not have an

12



invoice or bill specifying the due date for payment, Tenant shall give not less than thirty (30) days prior written notice to Landlord in each instance when an Imposition or insurance premium is due, specifying the Imposition or premium to be paid and the amount thereof, the place of payment, and the last day on which the same may be paid in order to comply with the requirements of this Lease. If Landlord, in violation of its obligations under this Lease, does not pay any Imposition or insurance premium when due, for which a sufficient deposit exists, Tenant shall not be in default hereunder by virtue of the failure to pay such Imposition or such insurance premium and Tenant shall not be liable for any late payment fees and/or penalties, including interest imposed as a result of such failure to pay. The term "Eligible Institution" shall mean a depository institution or trust company, the short term unsecured debt obligations or commercial paper of which are rated at least "A-1+" by S&P, "P-1" by Moody's and "F-1+" by Fitch in the case of accounts in which funds are held for thirty (30) days or less (or, in the case of accounts in which funds are held for more than thirty (30) days, the long term unsecured debt obligations of which are rated at least "AA" by Fitch and S&P and "Aa2" by Moody's).

(c)     Deficits.  If for any reason any deposit made by Tenant or held by Landlord under this Section 4.3 shall not be sufficient to pay any Imposition or insurance premium within the time specified therefor in this Lease, then, within ten (10) days after demand by Landlord, Tenant shall deposit an additional amount with Landlord, increasing the deposit held by Landlord so that Landlord holds sufficient funds to pay such Imposition or premium in full (or in installments as otherwise provided for herein), together with any penalty or interest thereon. Landlord may change its estimate of any Imposition or insurance premium for any period on the basis of a change in an assessment or tax rate or on the basis of a prior miscalculation or for any other good faith reason; in which event, within ten (10) days after demand by Landlord, Tenant shall deposit with Landlord the amount in excess of the sums previously deposited with Landlord for the applicable period which would theretofore have been payable under the revised estimate.

(d)     Transfers.  Consistent with Section 2.2, in connection with any assignment of Landlord's interest under this Lease and the assumption of this Lease by a new landlord, the original Landlord named herein and each successor in interest shall have the right to transfer all amounts deposited pursuant to the provisions of this Section 4.3 and not used pursuant to this Section 4.3 to such assignee (as the subsequent holder of Landlord's interest in this Lease) and upon such transfer, the original Landlord named herein or the applicable successor in interest transferring the deposits shall thereupon be completely released from all liability with respect to such deposits so transferred and Tenant shall look solely to said assignee, as the subsequent holder of Landlord's interest under this Lease, in reference thereto.

(e)     Security.  All amounts deposited with Landlord pursuant to the provisions of this Section 4.3 shall be held by Landlord as additional security for the payment and performance of Tenant's obligations under this Lease and, upon the occurrence and during the continuance of any Lease Default, Landlord may, in its sole and absolute discretion, apply such amounts towards payment or performance of such obligations.

(f)     Return.  Upon the expiration or earlier termination of this Lease, as long as all of the Rent and any and all other obligations due under this Lease have been fully paid and performed, any sums then held by Landlord under this Section 4.3 shall be refunded to Tenant,

13



and subject to the rights of a Mortgagee, together with all interest, if any, earned thereon and all income, if any, earned therefrom; provided, however, that if a Lease Default has occurred and is continuing, all of such sums may be applied by Landlord towards any amounts owed to Landlord pursuant to this Lease.

       (g)   Receipts. Tenant shall deliver to Landlord copies of all claims and bills in relation to the Impositions and insurance premiums promptly upon receipt thereof by Tenant.

This Article and the obligations herein shall survive expiration or earlier termination of this Lease.

## ARTICLE V

## LANDLORD'S WORK, MAINTENANCE AND REPAIR; IMPROVEMENTS

       Section 5.1   Landlord's Work. (a) Landlord shall cause the Facility to be constructed ("**Landlord's Work**").

       (b)   Landlord will give Tenant thirty (30) days' notice of the date Landlord expects to be the Substantial Completion Date. On or prior to the Substantial Completion Date, Landlord and Tenant shall jointly prepare a list of the items for the Facility that remain to be completed or corrected, set a dollar value for the cost to complete the work, and fix time for their completion or correction (collectively the "**Punchlist**").

       (c)   Notwithstanding anything in this lease to the contrary, on and after the Substantial Completion Date Tenant shall be deemed to have agreed Landlord has completed Landlord's Work to Tenant's complete satisfaction, except for (i) the Punchlist, (ii) such items of decoration or mechanical adjustment of which Tenant gives Landlord written notice within thirty (30) days after the Substantial Completion Date (the "**Initial Correction Items**") or (iii) any defects in the Facility which were not known or reasonably discoverable by Tenant in the time period specified in the immediately prior clause (ii) ("**Latent Defects**"); provided that, as to Latent Defects, Landlord will have no responsibility or liability therefor, or for the correction thereof, unless (A) Tenant conducts at least one inspection of the Facility with a qualified engineer or other expert, within one year from the Substantial Completion Date, and (B) Tenant gives Landlord notice of such Latent Defects within thirty( 30) days after discovery thereof and in any event not later than one year after the Substantial Completion Date, which notice will be accompanied by the certification of such engineer or other experts, specifying, in detail, such Latent Defects in the Facility.

       (d)   At its sole expense, Landlord shall complete the Punchlist, and remedy the Initial Correction Items, and the Latent Defects provided with respect to Latent Defects that the conditions set out in clause (iii) of section (c) are satisfied.

       (e)   To the extent assignable at no cost to Landlord, Landlord assigns to Tenant all manufacturer warranties on materials and equipment. Tenant shall have the benefit and right to enforce such warranties at its sole cost and expense.

14

2305449v5/17057-6



Section 5.2   Maintenance and Repair.   Except as provided in Section 5.1, Tenant, at Tenant's sole cost and expense, shall keep the Leased Premises, including all buildings, fixtures, trade equipment, trade fixtures, furniture, beds and other personal property leased to Tenant pursuant to this Lease, including, without limitation, all structural and non-structural components, the roof, foundation, all outer walls, plumbing, sprinklers, electrical, mechanical, heating, ventilation, utility service, air conditioning, vertical transport, telephone, communications, cable, computer, fire-life-safety, nursing call, and all other systems of the Leased Premises in good condition and repair and in compliance with all Laws.  Landlord shall not be responsible to make any improvements, repairs, maintenance or replacements whether occasioned by the act, omission, active negligence, or passive negligence of Landlord or Tenant and/or its agents, employees, invitees or licensees or otherwise, and Tenant shall pay for all improvements, repairs, replacements, maintenance and expenditures relating to the Leased Premises, whether interior or exterior, structural or non-structural, ordinary or extraordinary, foreseen or unforeseen or arising by reason of a condition existing prior to the commencement of the Lease, by Tenant's use or by a change in applicable Laws.  The Leased Premises and its appurtenances shall at all times be kept clean, safe and sanitary and in good order, condition, replacement and repair by Tenant, at Tenant's sole cost and expense, except for ordinary wear and tear (provided, however, that, without limiting the generality of this Section 5.2, Tenant shall be obligated to replace any portion of the Leased Premises upon any obsolescence thereof or if proper repair is impractical).   Tenant shall provide (if not currently a part of the Leased Premises) and maintain, repair and replace, as necessary, all furniture, fixtures, equipment and/or other personal property required by any Governmental Authority (other than furniture, fixtures, equipment and/or other personal property owned by contractors providing ancillary services at the Facility) necessary for the operation of the Facility and to comply with all Laws.  All such property provided by Tenant shall immediately become the property of Landlord and Tenant shall execute such documentation as Landlord may reasonably require vesting title in such property in Landlord.  Landlord shall have no liability or obligation with respect to such property or any of Tenant's operations relating thereto.  All replacements made by Tenant hereunder shall be made in a good and workmanlike manner in accordance with Laws using the same, similar or better quality of materials as being replaced and shall immediately become the property of Landlord.  Tenant acknowledges that title and ownership of all repaired and replaced furniture, fixtures, equipment and/or other personal property made hereunder shall belong to and is for the benefit of Landlord.  Tenant shall not enter into any equipment leases or conditional sales contracts for any furniture, fixtures, equipment and/or other personal property relating to the Facility without Landlord's consent which it may grant or withhold in its sole discretion.  The term "Laws" means, all federal, state, county, municipal and other governmental statutes, laws, rules, orders, regulations, ordinances, judgments, decrees and injunctions of Governmental Authorities affecting any Leased Premises or any part thereof, or the construction, use, alteration or operation thereof, or any part thereof, whether now or hereafter enacted and in force, and all permits, licenses and authorizations and regulations relating thereto, and all covenants, agreements, restrictions and encumbrances contained in any instruments, either of record or known to Tenant, at any time in force affecting the Leased Premises or any part thereof.  The term "Governmental Authority" means any court, board, agency, arbitrator, commission, office or other authority of any nature whatsoever for any governmental unit (foreign, federal, state, county, district, municipal, city or otherwise) whether now or hereafter in existence.

15



Section 5.3   Improvements, Renovation, Alterations and Additions.   Tenant shall have the right during the Term to make such non-structural interior alterations, changes and improvements to the Leased Premises as may be proper and necessary for the conduct of Tenant's business, to cause the Leased Premises to conform to all Laws, for patient comfort and safety, or for the full beneficial use of the Leased Premises, so long as such improvements do not (i) exceed Three Hundred Fifty Thousand Dollars ($350,000.00) in any given calendar year, (ii) interfere with any of the purposes for which the Facility was leased or affect the roof or structure, (iii) decrease the value of the Leased Premises, (iv) affect any building system, including, heating, ventilation, air conditioning, mechanical, electrical, plumbing or vertical transport systems, or (v) affect the exterior appearance of the Leased Premises. Tenant shall not make any other alterations, changes, or improvements without the express written approval in each instance by Landlord, which consent shall not be unreasonably withheld; provided, however, that the granting or withholding of consent shall not result in any liability to Landlord. Furthermore, Tenant may make all repairs or replacements required by a Governmental Authority without obtaining Landlord's consent, provided, however, Tenant shall give Landlord no less than ten (10) days prior written notice of such government mandated repairs or replacements prior to making or implementing same, unless emergency factors necessitate the making of such repairs before Tenant can reasonable give notice to Landlord, in which event Tenant shall give notice to Landlord as soon as reasonably possible. Tenant shall pay for all costs, fees and penalties imposed by the applicable state agencies or the Center for Medicare and Medicaid Services ("CMS") or other Governmental Authority in connection with any survey or the Change of Ownership.   Tenant shall notify Landlord of any alterations, changes or improvements required and/or permitted by the applicable state agencies or the CMS or other Governmental Authority prior to the commencement thereof. Tenant shall pay all costs and expenses of any required and/or permitted alterations, changes, and improvements, shall make the same in a good and workmanlike manner, and in accordance with all Laws, having obtained all necessary permits and approvals from Governmental Authorities having jurisdiction over the Facility and work performed thereon or therein, and shall assure Landlord, in form reasonably satisfactory to Landlord, all necessary permits and authorizations have been received and that payment for the work and materials will be made by Tenant. Tenant hereby completely and fully indemnifies Landlord against any mechanic's liens or other liens or claims in connection with the making of any alterations, changes, and/or improvements. Any liens arising out of any required and/or permitted alterations, changes, and/or improvements shall be discharged of record by Tenant within the earlier of thirty (30) days after the same have been filed by payment, bonding or otherwise, as permitted by law, or five (5) days after commencement of a foreclosure or enforcement action. Notwithstanding any provision of this Lease to the contrary, Tenant shall not undertake any alterations, renovations, or improvements to the Facility or otherwise commence any project or activity with respect to the Facility, which may result in any bed being taken out of service for more than seven (7) days without Landlord's and/or Mortgagee's prior written consent, which Landlord's consent shall not be unreasonably withheld. Tenant shall give Landlord written notice ten (10) days prior to commencing repairs, construction, or alterations whose costs exceed One Hundred Thousand Dollars ($100,000.00).

Section 5.4   Signage.   All signs installed by Tenant at the Facility shall comply with all Laws, and all necessary permits or licenses shall be obtained by Tenant. Tenant shall maintain all signs in good condition and repair, and/or replace as may be required by applicable law, at all times at Tenant's sole cost and expense. Upon vacating the Leased

16

Premises, Tenant shall remove all signs and supporting material or installations so installed by Tenant, but only if Landlord shall request such removal, and Tenant shall repair all damage caused by such removal. Landlord acknowledges and agrees that neither Landlord nor any subsequent tenant of Landlord shall be authorized to use any company or registered trade name of Tenant or any of Tenant's affiliates or subtenants.

Section 5.5   Surrender.   (a) Subject to applicable law and to receipt of any necessary DOH approval, Tenant shall deliver up and surrender to Landlord possession of the Leased Premises and all improvements and replacements thereof, including all of Tenant's alterations, improvements work (and all replacements thereof) and all fixtures permanently attached to the Leased Premises by Tenant during the Term, upon the expiration of this Lease or its termination in any manner whatsoever, in as good condition and repair and in substantially similar form, character and manner as the same shall be on the Commencement Date, reasonable wear and tear excepted (without compensation to Tenant), with permitted changes, improvements and additions made during the Term as authorized herein, subject to no liens, encumbrances, charges, restrictions, conditions, limitations or claims whatsoever to the extent not encumbering the Leased Premises as of the Commencement Date, and deliver the keys and/or operational security cards to the Leased Premises to Landlord or Landlord's designated agent.

(b) Licenses and Transfer of Operations.  Upon the expiration of the Term or earlier termination of the Lease, Tenant shall and shall cause its subtenants to, (i) transfer to Landlord or Landlord's nominee a fully operational, licensed and certified, and staffed facility and shall cooperate with Landlord or Landlord's designee or nominee in connection with the processing by Landlord or Landlord's designee or nominee of any applications for all licenses, operating permits and other governmental authorization, all contracts, including contracts with all Governmental Authorities or quasi governmental entities (provided that except following a Lease Default, the reasonable costs and expenses of the processing of any such application shall be paid by Landlord or Landlord's designee or nominee), (ii) transfer to Landlord or Landlord's nominee all tangible personal property of Tenant, including financial and accounting records, business records, data, employee and/or personnel records, patient and resident records, and all records held in electronic form, (all subject to the Laws requiring confidentiality), all equipment and small ware and all inventory used in connection with the Facility, (iii) transfer to Landlord or Landlord's nominee all intangible property except accounts receivable of Tenant, and (iv) transfer to Landlord or Landlord's nominee all residents in the Facility. With respect to resident funds, Tenant shall transfer to Landlord or its designee, all patient and resident trust accounts, and shall cause its subtenant to prepare and submit to Landlord or its designee a true, correct, and complete accounting and inventory (properly reconciled) of any patient trust funds and resident property to be transferred to Landlord, or its designee. Tenant shall, and shall cause its subtenant, not to commit any act or be remiss in the undertaking of any act that would jeopardize the licensure or certification of the Facility, and Tenant shall and shall cause its subtenant to comply with all requests for an orderly transfer of the same upon the expiration or early termination of the Term, including, but not limited to, upon the request of Landlord or its designee, the transitioning of employees in compliance with applicable laws. Without limiting the generality of the foregoing, if requested by Landlord or a proposed replacement operator for the Facility, Tenant hereby agrees to enter into a reasonable operations transfer agreement with such replacement operator. Tenant shall not unreasonably withhold, condition or delay its

17

consent to entering into any interim subleases or management agreements as may be necessary to effectuate an early transfer of the operations of the Facility prior to the time that such replacement operator holds all licenses and permits from all applicable Governmental Authorities with jurisdiction necessary to operate the Facility for its intended use. In addition, upon request, Tenant shall and shall cause subtenants, to promptly deliver copies to Landlord or Landlord's designee of all books and records relating to the Leased Premises and operations thereon (including inventories, employee lists and personnel records, and policies and procedures manuals). Tenant shall allow Landlord or a proposed replacement operator for the Facility to utilize Tenant's, subtenants' computer hardware and software for a minimum of ninety (90) days to facilitate the transfer of operations, the collection of accounts receivables, the billing of providers, and the provision of patient care. Tenant shall indemnify, defend, protect and hold harmless Landlord from and against any loss, damage, cost or expense incurred by Landlord or Landlord's designee or nominee in connection with the correction of any and all deficiencies of a physical nature identified by any Governmental Authority responsible for licensing the Leased Premises in the course of any change of ownership inspection and audit. Tenant shall be responsible for any alterations or renovations necessitated by, or imposed in connection with, a change of ownership inspection survey for the transfer of operation of the Leased Premises to Landlord or its designee. Tenant shall not commence to wind up and terminate the operations of the Facility or relocate the patients or occupants of the Facility to any other health care facility. In addition, Tenant shall not terminate the employees of the Facility except in connection with and upon the transfer of operations of the Facility to Landlord or its designee.

(c)     If Landlord notifies Tenant in writing that it intends to transfer the operations of the Facility to a new operator and desires to have Tenant continue to operate the Facility after the Expiration Date or earlier termination of the Lease, then Tenant shall continue to operate the Facility until the earliest to occur of (i) the date on which such successor operator shall assume operation of the Facility, or (ii) the date that is 180 days after the applicable Expiration Date or termination date (the **"Reimbursement Period"**).     During the Reimbursement Period (x) Landlord shall provide Tenant with an operating budget, (y) Landlord shall include in the aforesaid operating budget, and Tenant shall continue to pay during the Reimbursement Period, all Rent that would have been owing under this Lease as to the Leased Premises if this Lease had not expired or terminated as to, and/or Tenant had not been dispossessed from, such Leased Premises, and (z) provided that this Lease was not terminated with respect to, and Tenant was not dispossessed from, such the Lease Premises due to a Lease Default, Landlord shall reimburse Tenant for any operating deficits with respect to the Facility that Tenant may be required to fund out-of-pocket on account of operating losses and expenses incurred by Tenant by reason of, or arising out of compliance with, such budget with respect to the Reimbursement Period. Any such reimbursement shall be due from Landlord to Tenant within 60 days after request by Tenant, provided that Tenant shall furnish such documentation of any operating deficits, losses and expenses as Landlord may reasonably request. The terms of this Section 5.5(c) shall survive the expiration or earlier termination of this Lease and/or any dispossession of Tenant from the Lease Premises.

(d).     Use of Legacy Tradename.  Without limitation of the other provisions of this Section 5.5 and notwithstanding anything to the contrary contained in this Lease, Tenant agrees to allow Landlord or its designee operator, at its option and at no cost to Landlord or any such designee, to continue to use, in its signage, marketing and advertising materials, operations

and otherwise, any or all name(s) (including tradenames) associated with the operation of the Facility as a going concern for up to 180 days following (i) the expiration or termination of this Lease and (ii) the vacation from, and surrender of, the Leased Premises and Facility by Tenant. At the end of such 180 day period, or upon sooner written notice from Landlord to Tenant, Tenant shall, promptly and at its expense, remove its aforesaid name(s) from all signs on the Facility and repair any damage to such signs caused by such removal. Landlord acknowledges and agrees that Tenant, not Landlord, owns the aforesaid names and that neither Landlord nor any designee of Landlord may use the same except as described in this Section 5.5(d) or as otherwise agreed in writing by Tenant.

(e)    Management of Terminated/Dispossessed Premises. Commencing on the applicable Termination/Dispossession Date as to any Terminated/Dispossessed Premises, Landlord or its designee, upon notice to Tenant, may elect to assume the responsibilities and obligations for the management and operation of the Business at such Terminated/Dispossessed Premises, and Tenant agrees to cooperate fully to accomplish the transfer of such management and operation without interrupting the operation of such Business to the extent allowable by Laws. Tenant shall permit Landlord or its designee to operate the Facility under Tenant's licenses, certifications and other authorizations pending the issuance of new licenses, certifications and other authorizations Landlord or its designee. Tenant shall not commit any act or be remiss in the undertaking of any act that would jeopardize any licenses, certifications and other authorizations related to the Facility, and Tenant shall comply with all requests for an orderly transfer of all licenses, certifications and other authorizations related to the Facility and any payor's certifications.

(f)    In addition, upon any expiration or termination of this Lease, Tenant covenants and agrees to do such things and to take such action as may, from time to time, be necessary or appropriate to permanently surrender and withdraw from possession and operation (including but not limited to licensure and certification) of the Leased Premises, and shall thereafter be fully and permanently relieved of all powers, duties, responsibilities and obligations that are conferred or imposed upon Tenant under this Lease (except those continuing obligations, including but not limited to the obligation to pay all Rent due and owing under this Lease, and the obligation to pay all amounts owed by Tenant to the Medicare, Medicaid, third party payor programs and residents for the period of the Term, which survive the termination hereof as provided herein) and to restore and place Landlord or its designee in possession and operation of the Leased Premises, or any portion thereof, and Tenant covenants and agrees to execute and deliver to Landlord or Landlord's designee (each subject to the approval of DOH) all assignments, operation transfer agreements, consents, consents to assignments (including Medicare and Medicaid provider agreements, if requested by Landlord) documents and other instruments, to the reasonable satisfaction of Landlord in order to effectuate the provisions hereof.

Section 5.6    Condition of Leased Premises.    (a)    Subject to Section 5.1, Tenant shall accept and take possession of the Leased Premises in its "AS IS," "WHERE IS" "WITH ALL FAULTS" condition, and acceptance of possession of the Leased Premises on the Commencement Date shall be deemed an acknowledgment by Tenant of Tenant's acceptance of the condition of the Leased Premises. Tenant acknowledges and agrees that Landlord is not making any representation, warranty or covenant whatsoever with respect to the condition of the

19



Leased Premises, or any portion thereof, or its suitability for any particular purpose, and Tenant shall be relying solely on its inspection of the Leased Premises and due diligence investigations with respect thereto.

(b)    LANDLORD MAKES NO WARRANTY OR REPRESENTATION, EXPRESS OR IMPLIED, IN RESPECT OF THE LEASED PREMISES OR ANY PART THEREOF, EITHER AS TO ITS FITNESS FOR USE, DESIGN OR CONDITION FOR ANY PARTICULAR USE OR PURPOSE OR OTHERWISE, OR AS TO THE NATURE OR QUALITY OF THE MATERIAL OR WORKMANSHIP THEREIN, OR THE EXISTENCE OF ANY HAZARDOUS SUBSTANCE, IT BEING AGREED THAT ALL SUCH RISKS, LATENT OR PATENT, ARE TO BE BORNE SOLELY BY TENANT, INCLUDING ALL RESPONSIBILITY AND LIABILITY FOR ANY ENVIRONMENTAL REMEDIATION AND FOR COMPLIANCE WITH ALL ENVIRONMENTAL LAWS. EFFECTIVE AS OF THE DATE OF THIS LEASE, TENANT SHALL RELEASE LANDLORD FROM ALL CLAIMS WHICH TENANT OR ANY AGENT, REPRESENTATIVE, AFFILIATE, EMPLOYEE, DIRECTOR, OFFICER, PARTNER, MANAGER, MEMBER, SERVANT, SHAREHOLDER, TRUSTEE OR OTHER PERSON OR ENTITY ACTING ON TENANT'S BEHALF OR OTHERWISE RELATED TO OR AFFILIATED WITH TENANT ARISING FROM OR RELATED TO ANY MATTER OR THING RELATED TO OR IN CONNECTION WITH THE LEASED PREMISES, INCLUDING THE INFORMATION AND ANY PHYSICAL OR ENVIRONMENTAL CONDITIONS, AND TENANT SHALL NOT LOOK TO LANDLORD IN CONNECTION WITH THE FOREGOING FOR ANY REDRESS OR RELIEF. THIS RELEASE SHALL BE GIVEN FULL FORCE AND EFFECT ACCORDING TO EACH OF ITS EXPRESSED TERMS AND PROVISIONS, INCLUDING THOSE RELATING TO UNKNOWN AND UNSUSPECTED CLAIMS, DAMAGES AND CAUSES OF ACTION. EXCEPT AS TO MATTERS SPECIFICALLY SET FORTH IN THIS LEASE: (A) TENANT WILL ACQUIRE THE LEASED PREMISES SOLELY ON THE BASIS OF ITS OWN PHYSICAL AND FINANCIAL EXAMINATIONS, REVIEWS AND INSPECTIONS, AND (B) WITHOUT LIMITING THE FOREGOING, WAIVES ANY RIGHT IT OTHERWISE MAY HAVE AT LAW OR IN EQUITY AGAINST LANDLORD WITH RESPECT TO ANY ASPECT OF LEASED PREMISES.

## ARTICLE VI

### INSURANCE

Section 6.1    Insurance.    (a) Tenant shall obtain and maintain, or cause to be maintained, insurance for Tenant and the Facility providing at least the following coverages or as required from time to time by any Mortgagee:

(i)    comprehensive "all risk" insurance on the Facility and the Personal Property, including Building Ordinance Coverage from Operation of Building Laws, Demolition Costs and Increased Cost of Construction Endorsements, in each case (A) in an amount equal to one hundred percent (100%) of the "Full Replacement Cost," which for purposes of this Lease shall mean actual replacement value (exclusive of costs of excavations, foundations, underground utilities and footings) with a waiver of depreciation (except with respect to the insurance pursuant to clauses (D), (x), (y) and (z) below); (B) containing an agreed amount

2305449v5/17057-6

20

endorsement with respect to the Facility and Personal Property waiving all co-insurance provisions; (C) providing for no deductible in excess of Ten Thousand Dollars ($10,000.00) for all such insurance coverage (except as stated in the penultimate sentence of this subsection); and (D) containing an "Ordinance or Law Coverage" or "Enforcement" endorsement if the Facility or the use of the Facility shall at any time constitute legal non-conforming structures or uses and covering the increased cost of construction, demolition cost, value of the undamaged portion of the structure and any increased expenses to rebuild due to the enforcement of building or zoning laws or requirements following a covered loss of the Leased Premises. In addition, Tenant shall obtain: (x) if any portion of any of the Leased Premises is currently or at any time in the future located in a federally designated "special flood hazard area," flood hazard insurance in an amount equal to the lesser of (1) the outstanding principal balance of any loan encumbering the Leased Premises or (2) the maximum amount of such insurance available under the National Flood Insurance Act of 1968, the Flood Disaster Protection Act of 1973 or the National Flood Insurance Reform Act of 1994, as each may be amended, or successor legislation, or such greater amount as Landlord and/or Mortgagee shall require; (y) earthquake insurance in amounts and in form and substance satisfactory to Landlord and Mortgagee in the event the Facility is located in an area with a high degree of seismic activity and (z) coastal windstorm insurance in amounts and in form and substance satisfactory to Landlord and Mortgagee in the event the Facility is located in a coastal region; provided that the insurance pursuant to clauses (x), (y) and (z) hereof shall be on terms consistent with the comprehensive insurance policy required under this Subsection (i); and further provided that the earthquake insurance pursuant to clause (y) may provide for a deductible of up to the greater of One Hundred Thousand Dollars ($100,000.00) and two percent (2%) of the amount of such coverage, (III) the flood insurance pursuant to clause (x) may provide for a deductible of up to One Hundred Thousand Dollars ($100,000.00), and (IV) the ordinance and law coverage pursuant to clause (D) may have a sub-limit of Two Million Five Hundred Thousand Dollars ($2,500,000.00).

(ii)    commercial general liability insurance against claims for personal injury, bodily injury, death or property damage occurring upon, in or about the Facility, such insurance (A) with a combined limit of not less than Five Million Dollars ($5,000,000.00) in the aggregate and Two Million Dollars ($2,000,000.00) per claim (and, if on a blanket policy, containing an "Aggregate Per Location" endorsement); (B) to continue at not less than the aforesaid limit until required to be changed by Landlord and Mortgagee in writing by reason of changed economic conditions making such protection inadequate; and (C) to cover at least the following hazards: (1) premises and operations; (2) products and completed operations on an "if any" basis; (3) independent contractors; (4) blanket contractual liability; and (5) contractual liability covering the indemnities contained in Section 9.1 of the Lease to the extent the same is available;

(iii)    business income with extra expense insurance (A) with loss payable to Landlord and Mortgagee; (B) covering all risks required to be covered by the insurance provided for in Subsection (i) above; (C) containing an extended period of indemnity endorsement which provides that after the physical loss to the Facility and Personal Property has been repaired, the continued loss of income will be insured until such income either returns to the same level it was at prior to the loss, or the expiration of twelve (12) months from the date that the Facility is repaired or replaced and operations are resumed, whichever first occurs, and notwithstanding that the policy may expire prior to the end of such period; and (D) in an amount equal to one hundred

21



percent (100%) of the projected net profit and extra expense with respect to the Facility for a period of twelve (12) months from the date of such Casualty (assuming such Casualty had not occurred) and notwithstanding that the policy may expire at the end of such period. The amount of such business income insurance shall be determined prior to the date hereof and at least once each year thereafter based on Tenant's reasonable estimate of the gross income from the Facility for the succeeding twelve (12) month period. Nothing herein contained shall be deemed to relieve Tenant of its obligations to pay the Rent when due except to the extent such amounts are actually paid out of the proceeds of such business income insurance;

(iv) at all times during which structural construction, repairs or alterations are being made with respect to the Facility, and only if the Facility coverage form does not otherwise apply, (A) owner's contingent or protective liability insurance covering claims not covered by or under the terms or provisions of the above mentioned commercial general liability insurance policy; and (B) the insurance provided for in subsection (i) above written in a so-called builder's risk completed value form (1) on a non-reporting basis, (2) against all risks insured against pursuant to subsection (i) above and (3) with an agreed amount endorsement waiving co-insurance provisions;

(v) worker's compensation insurance with respect to any employees of Tenant, as required by any Governmental Authority, Health Care Authority, Legal Requirement or Health Care Requirement;

(vi) boiler and machinery insurance, if applicable, in amounts as shall be reasonably required by Landlord and Mortgagee on terms consistent with the commercial property insurance policy required under Subsection (i) above;

(vii) intentionally omitted;

(viii) motor vehicle liability coverage for all owned and non-owned vehicles, including rented and leased vehicles containing minimum limits per occurrence, including umbrella coverage, of One Million Dollars ($1,000,000.00);

(ix) if the Facility is or becomes a legal "non-conforming" use, ordinance or law coverage and insurance coverage to compensate for the cost of (upon a Casualty) demolition or rebuilding of the undamaged portion of the Facility along with any reduced value and the increased cost of construction in amounts as requested by Landlord and Mortgagee;

(x) the commercial property and business income insurance required under Sections 6.1(a)(i) and (iii) above shall cover perils of terrorism and acts of terrorism and Tenant shall maintain commercial property and business income insurance for loss resulting from perils and acts of terrorism on terms (including amounts) consistent with those required under Sections 6.1(a)(i) and (iii) above at all times during the Term;

(xi) professional liability and malpractice insurance with limits of at least Two Million Dollars ($2,000,000.00) per claim / Five Million Dollars ($5,000,000.00) in the aggregate. Tenant shall also require each medical director for the Facility and the associated nurse practitioner at the Facility to carry professional liability and malpractice insurance with

22



limits of not less than Two Million Dollars ($2,000,000.00) per claim / Five Million Dollars ($5,000,000.00) in the aggregate; and

(xii)   notwithstanding anything to the contrary in the foregoing, all insurance coverage required by any mortgagee of Landlord shall be met by Tenant, from time to time as necessary;

(xiii)   upon sixty (60) days' notice, such other reasonable insurance and in such reasonable amounts as Landlord and/or Mortgagee from time to time may reasonably request against such other insurable hazards which at the time are commonly insured against for property similar to the Facility located in or around the region in which the Facility is located.

(b)   All insurance provided for in Section 6.1(a) shall be obtained under valid and enforceable policies (collectively, the "Policies" or, in the singular, the "Policy"), and shall be subject to the approval of Landlord and Mortgagee as to insurance companies, amounts, deductibles, loss payees and insureds.  The Policies shall be issued by financially sound and responsible insurance companies authorized to do business in the State of New York and having a claims paying ability rating of "A" or better (and the equivalent thereof) by at least two (2) of the Rating Agencies rating the companies (one of which shall be S&P if they are rating the securities and one of which will be Moody's if they are rating the companies), or if only one Rating Agency is rating the companies, then only by such Rating Agency and shall specifically name Landlord and Mortgagee as loss payees and additional insureds, as applicable.  Not less than ten (10) days prior to the expiration dates of the Policies theretofore furnished to Landlord and Mortgagee, certificates of insurance evidencing the Policies accompanied by evidence satisfactory to Landlord and Mortgagee of payment of the premiums due thereunder (the "Insurance Premiums"), shall be delivered by Tenant to Landlord and Mortgagee.

(c)   Any blanket insurance Policy shall specifically allocate to the Facility the amount of coverage from time to time required hereunder and shall otherwise provide the same protection as would a separate Policy insuring only the Facility in compliance with the provisions of Section 6.1(a).

(d)   All Policies provided for or contemplated by Section 6.1(a), except for the Policy referenced in Section 6.1(a)(v), shall name Tenant as the insured and Landlord and Mortgagee as the additional insured, as their interests may appear, and in the case of property damage, boiler and machinery, flood and earthquake insurance, shall contain a so-called lender's loss payee endorsement in favor of Mortgagee providing that the loss thereunder shall be payable to Mortgagee.

(e)   All Policies provided for in Section 6.1 shall contain clauses or endorsements to the effect that:

(i)   no act or negligence of Tenant, or anyone acting for Tenant, or of any tenant or other occupant, or failure to comply with the provisions of any Policy, which might otherwise result in a forfeiture of the insurance or any part thereof, shall in any way affect the validity or enforceability of the insurance insofar as Landlord and Mortgagee are concerned;

23

(ii)     the Policies shall not be materially changed (other than to increase the coverage provided thereby) or canceled without at least thirty (30) days' written notice to Landlord and Mortgagee and any other party named therein as an additional insured;

(iii)     the issuers thereof shall give notice to Landlord and Mortgagee if the Policies have not been renewed fifteen (15) days prior to its expiration; and

(iv)     Neither Landlord nor Mortgagee shall be liable for any insurance premiums thereon or subject to any assessments due thereunder.

(f)     If at any time Landlord and Mortgagee is not in receipt of written evidence that all Policies are in full force and effect, either shall have the right, without notice to Tenant, to take such action as either deems necessary to protect its interest in the Leased Premises, including, without limitation, the obtaining of such insurance coverage as either in its sole discretion deems appropriate. All premiums incurred by Landlord and/or Mortgagee in connection with such action or in obtaining such insurance and keeping it in effect shall be paid by Tenant to Landlord and/or Mortgagee, as the case may be, upon demand and, until paid, shall be secured by the Mortgages and shall bear interest at the Overdue Rate.

(g)     Tail Insurance. If Tenant has claims made insurance coverage of any type, upon expiration or earlier termination of this Lease, Tenant shall purchase so-called "tail" insurance for a period of three years in an amount not less than its existing coverages in order to assure Tenant is covered by insurance after the expiration or earlier termination of this Lease for all claims arising or relating to the period prior to the expiration or earlier termination of this Lease, and Landlord and Mortgagee shall be named as additional insured thereunder.

Section 6.2     Certificates of Insurance. Upon the Commencement Date of this Lease, Tenant shall furnish Landlord, Mortgagee and other third parties which Landlord shall designate with appropriate certificates of insurance on acceptable Acord forms, together with an additional insurance endorsement showing that each type of insurance required under this Article VI is in full force and effect and not cancelable or modifiable without thirty (30) days prior written notice to Landlord, and upon request of Landlord or one or more of such additional insureds, deliver copies of such insurance policies.   Tenant will provide Landlord with acceptable certificates of insurance pursuant to this Section 6.2 evidencing the renewal of such Policies ten (10) Business Days prior to the Policies' expiration date. Tenant acknowledges that all such certificates shall name Landlord, its successors and assigns, and Mortgagee, its successors and assigns, as additional insureds on the general liability and umbrella policies and as a loss payee/mortgagee, as their interests may appear, on the property and boiler and machinery policies.

Section 6.3     Waiver of Subrogation. Landlord and Tenant hereby waive all rights of recovery for causes of action which either has or may have or which may arise hereafter against the other for any damage to the Leased Premises or the property or business of either of them or of anyone claiming through either of them, by way of subrogation or otherwise, caused by any of the perils covered by a special form policy of property insurance or contents insurance or by any other insurance for damage to property carried by the party whose property was damaged; provided, however, that the foregoing waiver shall apply only if and to the extent that

2305449v5/17057-6



a waiver of subrogation for property damage is not prohibited in the State of New York, has been consented to by the applicable insurance carrier, and only to the extent of such insurance coverage.

## ARTICLE VII

## SECURITY, ACCESS AND REPORTING OBLIGATIONS, WORKING CAPITAL

Section 7.1                    Security Deposit/Guaranty.

(a)    Contemporaneously with the execution of this Lease, Tenant, shall deliver a guarantee of this Lease (the "Guaranty") from Lizer Josefovic and Mark Neuman (collectively, the "Guarantors") in the form of Exhibit "B" attached hereto, or in form and amounts as may be otherwise required by the Landlord and Landlord's first and second Mortgagee. The Guaranty shall set forth that the Guarantors will be required to cooperate in turning the license over to the Landlord's designee or be personally liable for all costs, expenses and damages or deficiencies. The Guarantors shall ensure that the Tenant shall deliver all of the documents required to transfer the license in escrow to Posternak, Blankstein & Lund,. or such other party as Landlord designates. As further security for the Tenants performance under the Lease, the Tenant hereby agrees as follows:

(i)    Tenant agrees that it shall deliver to Landlord 60 days prior to the Commencement Date, an agreement by Capital Funding Group, which cannot be amended except by an agreement in writing signed by Landlord, Tenant and Capital Funding Group. in the form attached hereto as Exhibit 7.1(a) or otherwise approved by Landlord and Landlord's lenders in their reasonable discretion, wherein and whereby Capital Funding Group agrees to allow Tenant to draw down on its Credit Line each month so as to enable Capital Funding Group to pay directly to Landlord the sum of $506,096.50 per month commencing the Commencement Date and on each day Fixed Rent is due under the Lease for the following 11 months.

(ii)    Tenant agrees that it shall deliver 60 days prior to the anticipated Commencement Date either (i) an unconditional Letter of Credit, in accordance with the Letter of Credit Agreement attached hereto as Exhibit 7.1(b) (which shall be executed simultaneously herewith), in the amount of $3,700,000, or (ii) $3,700,000 in cash ("Security Deposit") to secure the full and timely payment and performance of Tenant's obligations under this Lease. Tenant's failure to deliver the Letter of Credit or timely pay to Landlord the Security Deposit shall be deemed a Lease Default by Tenant. Landlord may retain the Security Deposit in such accounts as Landlord elects in its sole discretion and Landlord may commingle the Security Deposit with other funds of Landlord or its affiliates. Tenant shall have no right to any interest on the funds comprising the Security Deposit that it delivers to Landlord.

(iii)    Sixty days prior to the anticipated Commencement Date, the funds in the controlled account number 3379737272 in JPMorgan Chase Bank, N.A. (the "Bank") in the amount not less than $1,600,000 shall be delivered by Tenant to Landlord and released by Tenant to Landlord to be held as an additional Security

25



Deposit by Landlord. The letter to Bank implementing the Tenant's obligations pursuant to the preceding sentence, attached hereto as Exhibit 7.1(c), which shall be held in escrow by Posternak, Blankstein & Lund, shall be delivered by it to the Bank sixty days prior to the anticipated Commencement Date upon notice from Landlord.

(b)     The term "Letter of Credit" shall mean an irrevocable, unconditional, transferable, clean sight draft letter of credit in favor of Landlord in form and content reasonably satisfactory to Landlord and entitling Landlord to draw thereon without the payment of any fees or charges in New York, New York, issued by a domestic banking institution or the U.S. agency or branch of a foreign banking institution; provided, that such banking institution has a long term senior unsecured debt obligation rating of at least "AA" by S&P.  The Letter of Credit shall have an expiration date of the date that is the first anniversary of the date hereof.  The Letter of Credit shall provide that it shall be deemed automatically renewed (without amendment) for consecutive periods of one year each thereafter during the Term unless the issuing bank sends written notice to Landlord and Tenant by certified mail, return receipt requested, not less than thirty (30) days preceding the then expiration date of the Letter of Credit that it elects not to have such Letter of Credit renewed.  If such notice is sent, then at least twenty (20) days prior to the expiration of the Letter of Credit (and each subsequent or replacement Letter of Credit), Tenant shall deliver to Landlord a new Letter of Credit in the same amount and a failure to do so shall entitle Landlord to draw upon the existing Letter of Credit and to receive the proceeds therefrom and hold such proceeds as a cash Security Deposit pursuant to this Section 7.1 pending delivery of a new Letter of Credit.

(c)     Upon a Lease Default, Landlord shall have the right, but not the obligation, in Landlord's sole and absolute discretion, to draw upon the Security Deposit and/or Letter of Credit and apply some or all of the funds to remedy such default or occurrence and to compensate Landlord for any loss or damage resulting therefrom, without prejudice to any other rights or remedies of Landlord under this Lease or at law or in equity.  Upon any such application by Landlord, Tenant shall promptly deposit with Landlord an amount in cash equal to the amount from the Security Deposit so utilized by Landlord. Landlord shall at all times have, as security hereunder, Letter of Credit and cash Security Deposit in the amounts stated in Section 7.1(a).  Upon the termination or expiration of this Lease, as long as Tenant has performed all of its obligations pursuant to this Lease and no Lease Default has occurred which is continuing, the remaining amount of the Security Deposit shall be returned or refunded to Tenant, without interest, subject in all events to Landlord's right to apply the Security Deposit as provided herein.

(d)     Upon the occurrence of a Lease Default, Landlord may use, apply or retain the whole or any part of the Security Deposit or draw under a Letter of Credit to the extent required for the payment of any Rent or any other sums as to which Tenant is in default or for any sum which Landlord may expend or may be required to expend by reason of Tenant's default in respect of any of the terms, covenants and conditions of this Lease, including, but not limited to, any damages or deficiency in the reletting of all or any portion of the Leased Premises, whether such damages or deficiency accrue before or after summary proceedings or other re-entry by Tenant.  If Landlord shall so use, apply or retain the whole or any part of the Security Deposit, Tenant shall upon demand immediately deposit with Landlord a sum equal to the amount so used, applied or retained.  In the event of any sale or financing of Landlord's interest in the Leased Premises, Landlord shall have the right to assign its interests in the

26

2305449v5/17057-6

Security Deposit to the transferee, assignee or mortgagee, as the case may be, and if Landlord has given notice to Tenant of the assignment of Landlord's interest in the Security Deposit and if assignee or transferee of the Security Deposit has accepted liability for the Security Deposit, Landlord shall thereupon be released by Tenant from all liability for the return or payment thereof; and Tenant shall look solely to the new landlord or mortgagee for the return or payment of the same. Tenant shall not assign or encumber or attempt to assign or encumber the Security Deposit and neither Landlord, nor its successors or assigns, shall be bound by any such assignment, encumbrance, attempted assignment or attempted encumbrance.

Section 7.2   Access to Leased Premises.   Tenant shall permit Landlord, Mortgagee and their agents to enter upon the Leased Premises at all reasonable times during ordinary business hours and upon at least twenty-four (24) hours advance oral notice (except that in the case of emergency, Landlord may enter at any time and without prior notice) to inspect and examine the Leased Premises, to perform repairs as to Landlord's Work pursuant to Section 5.1, and to inspect and copy any operating manuals, procedures manuals, training manuals, and other books and records concerning unemployment, workers' compensation, insurance, tax, and any other business issues pertaining to the Leased Premises (subject to applicable laws and regulations governing patient confidentiality and privacy and the confidentiality of medical records) and any information necessary for audit relating to cost reimbursement, collections, general financial matters, litigation, inquiries and related activities (as may be necessary in connection with the Lease or the Leased Premises or any matters relating to periods prior to the Commencement Date).   Any access by Landlord to patient records or medical records shall be strictly governed by Laws governing patient confidentiality and privacy and the confidentiality of medical records and all appropriate consents and/or waivers from residents or their guardians or representatives shall have been obtained before access to such records shall be granted. Landlord shall make reasonable efforts not to materially interfere with or materially disrupt Tenant's business and use and enjoyment of the Leased Premises during any such inspection or examination.   Landlord shall also have the right but not the obligation to conduct a physical inspection of the Facility and from time to time and within ninety (90) days prior to the expiration of the Term or earlier termination of the Lease, upon twenty-four (24) hours advance oral notice.   If Landlord reasonably determines based on this inspection that the Facility, or any portion of the Facility, requires repairs or maintenance so that the condition of the Facility is in compliance with this Lease and all Laws, then within thirty (30) days of notification by Landlord, Tenant shall commence making said repairs and diligently pursue such repairs to completion.   Should Tenant fail to do so, within seven (7) days of notification by Landlord, Tenant shall pay to Landlord a deposit of funds in an amount equal to Landlord's reasonable estimate of the costs of such repairs or maintenance, which funds shall be released to Tenant from time to time during the progress of such repairs and maintenance based on submission by Tenant of evidence reasonably satisfactory to Landlord that such work is complete and all costs and expenses incurred to date have been paid in full.   Tenant and Landlord acknowledge that the operations of the Facility and its maintenance are the sole and absolute responsibility of Tenant. Landlord shall have no liabilities or obligations with respect to the Facility, including no liabilities or obligations with respect to inspections of the Facility or the failure by Landlord to inspect the Facility.

Notwithstanding anything to the contrary in this in this Lease, Landlord and Tenant agree that all information, records and data collected or maintained regarding Facility

27



residents shall be confidential. Landlord, Tenant, and their respective employees and agents shall maintain the confidentiality of all Facility resident information received in accordance with applicable New York and federal laws, including the Health Insurance Portability and Accountability Act of 1996 (Public Law 104-91) and the regulations issued in connection therewith (collectively, "HIPAA"). No employee or agent of Landlord or Tenant shall discuss, transmit or narrate in any manner the Facility resident information of a personal, medical, or other nature except as a necessary part of providing services to the resident, effectuating a transfer of the Facility's assets, or otherwise fulfilling its obligations under this Lease or under law. The obligations under this Section 7.2 shall survive the termination of this Lease, whether by rescission or otherwise.

Section 7.3    Changes in Licensure and Certification Status.    As of the Commencement Date, Tenant represents and warrants that the number of beds licensed or certified for the Facility is one hundred sixty (160). Tenant shall not increase or decrease the licensed or certified number of beds, or change the license or certification thereof, without the consent of Landlord, which consent may be withheld in Landlord's sole and absolute discretion; Tenant may increase the number of licensed or certified beds of the Facility upon thirty (30) days prior written notice to Landlord, but without the prior written consent of Landlord. If required, Tenant shall not increase the number of beds without the consent of the Commissioner and/or the DOH and Tenant agrees to return to Landlord upon the expiration of the Lease, the Leased Premises. Should Tenant increase the number of licensed beds at the Facility, the Fixed Rent payable for the Facility shall be increased proportionately for such additional beds. In no event shall the Fixed Rent be reduced in the event the number of Licensed Beds at the Facility is reduced. Landlord and Tenant acknowledge that the Leased Premises are, and at all times under the Term of this Lease are, the sole and absolute property of Landlord. Upon any termination of this Lease or any Lease Default by Tenant hereunder (which breach or default is not cured within any applicable grace period), and subject to the approval of the DOH, Landlord shall have the right to cause the Facility's licenses to be reissued in Landlord's name or in the name of Landlord's designee upon application therefor to, and the receipt of approval from, the DOH and to further have the right to have any and all Medicare, Medicaid and any other provider and/or third party payor agreements issued in Landlord's name or in the name of Landlord's designee. In the event Landlord exercises its rights pursuant to this Section 7.3, Tenant and Guarantors shall cooperate with Landlord in transferring the aforementioned items to Landlord's name or for the benefit of Landlord or as Landlord may direct pursuant to the terms of this Lease.

Section 7.4    Reporting and Other Obligations.

(a)    During the Term, Tenant shall and shall cause all Subtenants, sub-subtenants and any operators of the Facility to provide (without duplication) Landlord and Mortgagor with the following reports, statements, and inspections:

(i)    Annual Budget. Within 60 days prior to the projected Substantial Completion Date, and no later than thirty (30) days prior to the end of each calendar year thereafter, Tenant shall submit to Landlord an annual budget (each an "Annual Budget") covering the operations of and proposed capital expenditures to be made with respect to the Facility for the next calendar year (or the remainder of the current calendar year, in the case of the initial Annual Budget).

28

2305449v5/17057-6



(A)     Capital Expenditures. The Annual Budget shall include a capital budget (the "**Capital Budget**") outlining a program of capital expenditures as may be required by Laws, any lender to Landlord, or Tenant's reasonable business judgment during the next calendar year (or the remainder of the current calendar year, in the case of the initial Capital Budget), in which each proposed capital expenditure will be designated as either mandatory, highly recommended or desirable. Tenant shall be responsible for designating as a "mandatory capital expenditure" any expenditure which, if not made would, in Tenant's reasonable judgment: (a) cause the Facility to lose or put at risk its License; (b) place at risk the safety of a patient or resident or employee of the Facility; (c) cause the ineligibility of the Facility under any third party payor program applicable to the Facility; (d) cause the issuance of a formal notice that any of the operating licenses for the Facility or any substantial portion of the Facility will be revoked or suspended or qualified in any material adverse respect; or (e) subject Landlord or Tenant to criminal prosecution. Tenant shall make during the calendar year, or calendar quarter for which they are budgeted, all capital expenditures approved by Landlord. On and after the Commencement Date, Tenant shall expend at least Five Hundred Twenty-Three Dollars ($523.00) per bed per annum for capital expenditures at the Facility, including amounts expended to comply with the licensure and other expenditures required by any Governmental Authority or such other amounts as may be required by Mortgagee from time to time. If Mortgagee requires Landlord to deposit sums for capital expenditures, replacements and/or refurbishments relating to furniture, fixtures, equipment and/or improvements to the Facility, then Tenant shall pay to Landlord, as Additional Rent hereunder, all reserve or escrow amounts, sums and/or deposits which Landlord is required to pay to such Mortgagee with respect to such capital expenditures, replacements and/or refurbishments. Tenant shall pay any and all of such amounts and sums to or as directed by Landlord as Additional Rent hereunder together with each payment of Fixed Rent hereunder. Tenant acknowledges that as of the date hereof, Mortgagee requires a monthly deposit of Five Hundred Twenty-Three Dollars ($523.00) per bed with respect to the Facility. In the event that such deposits are made by Tenant hereunder, Landlord shall use its reasonable efforts, subject to the terms and conditions of the loan agreements with Mortgagee, to obtain disbursements of such funds to be used for the payment of or reimbursement for the costs of such capital expenditures, replacements and/or refurbishments.

(B)     Operating Budget. The Annual Budget shall include an operating budget (the "**Operating Budget**") setting forth an estimate of operating revenues and expenses for the Facility for the next calendar year (or the remainder of the current calendar year, in the case of the initial Operating Budget), together with an explanation of anticipated changes in the Facility. Tenant shall provide to Landlord upon written request such other reports, including a cost comparison report, and all appropriate Medicare and Medicaid reports, as may be required under these programs, as are normally provided by Tenant to the owners of other similar rehabilitation hospitals, psychiatric hospitals, and skilled nursing facilities leased by Tenant.

(ii) Financial Reporting. Tenant will keep and maintain or will cause to be kept and maintained on a calendar year basis, in accordance with GAAP, proper and accurate books, records and accounts reflecting all of the financial affairs of Tenant and all items of income and expense in connection with the operation on an individual basis of the Facility. Notwithstanding the foregoing, Tenant's interim unaudited financial statements shall be prepared in accordance GAAP for interim financial information, but may not include all information or notes required by GAAP for a complete set of financial statements; such financial statements



shall include all adjustments and reclassifications of a normal recurring nature considered necessary for a fair and comparable presentation; all such interim financial statements shall be read in conjunction with most recent audited financial statements. Landlord and Mortgagee shall have the right from time to time at all times during normal business hours upon reasonable notice to examine such books, records and accounts at the office of Tenant or any other Person maintaining such books, records and accounts and to make such copies or extracts thereof as Landlord and/or Mortgagee shall desire. After the occurrence of a Lease Default, Tenant shall pay any costs and expenses incurred by Landlord and/or Mortgagee to examine Tenant's accounting records with respect to the Facility, as Landlord and/or Mortgagee shall reasonably determine to be necessary or appropriate in the protection of Landlord and/or Mortgagee's interest.

(iii) Tenant, at its expense, shall submit to Landlord and, upon Landlord's request to Mortgagee, as soon as available, and in any event (A) within thirty (30) days after each calendar month's end, unaudited monthly financial statements (which include income statements, balance sheets, statements of cash flows, occupancy and payor mixes) of Tenant for the month then-ended and year to date, prepared on a basis consistent with the annual statements; monthly census and revenue information of the Facility as of the end of such month and year to date in sufficient detail to show by patient-mix and revenue-mix (i.e., private, Medicare, Medicaid and V.A. and managed care (by program)) the average monthly census of the Facility and year to date; an aged accounts receivable report from the Facility in sufficient detail to show amounts due from each class of patient-mix by the account age classifications of 30 days, 60 days, 90 days, 120 days, and over 120 days; (B) within forty-five (45) days after the end of each calendar quarter, unaudited quarterly financial statements (which include income statements, balance sheets, statements of cash flows, occupancy and payor mixes) of Tenant for the quarter then-ended, prepared on a basis consistent with the annual statements; quarterly census and revenue information of the Facility as of the end of such quarter in sufficient detail to show by patient-mix and revenue-mix (i.e., private, Medicare, Medicaid and V.A. and managed care (by program)) the average quarterly census of the Facility; (C) no later than 120 days after the end of each calendar year of Tenant, audited annual financial statements of Tenant, prepared by an independent certified public accounting firm reasonably acceptable to Landlord, prepared in accordance with generally accepted accounting principles, with an unqualified opinion, and including a balance sheet, a statement of income and expenses for the year then ended, a statements of cash flow, and a schedule audited by such independent certified public accountant reconciling Tenant's, net operating income to net cash flow, which shall itemize all adjustments made to net operating income to arrive at net cash flow deemed material by such independent certified public accountant.

(iv)    Each financial report provided by Tenant shall reconcile and show variances between the actual experience incurred during each such reporting period with respect to each metric to the metric shown on the Operating Budget and Capital Budget for such period.

(v)    Tenant, at its expense, shall submit to Landlord and, upon Landlord's request to Mortgagee, any other reports and certificates reasonably requested by Landlord or Mortgagee from time to time.

30



(vi)     In addition, Tenant shall prepare and deliver to Landlord, and upon request or if required by Landlord's then existing Mortgagee, to Mortgagee, a written report providing an operational overview of significant events and circumstances at the Facility during the prior month, during the first six months of the Term and then quarterly thereafter, including, but not limited to, clinical events, employee relations and staffing matters and provide such other information as Mortgagee may require from time to time. Tenant shall provide Landlord, and upon request or if required by Landlord's then existing Mortgagee, to Mortgagee, with a copy of all federal income tax returns of Tenant and its Subtenants within fifteen (15) days after filing thereof. Whenever practicable, all reports shall be delivered to Landlord electronically in a format usable by Landlord.

(b)     All unaudited financial reports from Tenant shall include an Officer's Certificate certifying that such financial statements present fairly the financial condition and the results of the operations of Tenant and the properties being reported upon and that such financial statements have been prepared in accordance with the Tenant's customary accounting procedures. The Officer's Certificate accompanying the annual audited financial statements of Tenant shall also include a statement that they have been prepared in accordance with GAAP and whether there exists an event or circumstance which constitutes a default or an event of default under the Lease, the nature thereof, the period of time it has existed, and the action then being taken to remedy the same.

(c)     Tenant shall furnish Landlord and Mortgagee, within five (5) days of the receipt by Tenant, any and all notices (regardless of form) from any Health Care Authority that Tenant's license, Medicare or Medicaid certification, or VA or other governmental program participation is being, or could be revoked or suspended, that action is pending, being considered or being taken to revoke or suspend the Tenant's license or certification or to fine or penalize the Tenant, or that action is pending, being considered, or being taken, to discontinue, suspend, deny, decrease or recoup any payments due, made or coming due to Tenant or related to the operation of the Facility other than in the ordinary course of business related to billing adjustments.

(d)     Tenant shall furnish Landlord and Mortgagee, within two (2) days of the receipt by Tenant, any and all notices (regardless of form) from any Governmental Authority or third party payor (i) alleging that the Facility has three or more deficiency(ies) of a scope and severity of "G" or hire, or one or more deficiency(ies) of a scope and severity of "J" or higher, (ii) alleging that the residents of the Facility are in jeopardy, (iii) freezing admissions to the Facility or (iv) denying reimbursement for any class of residents by any third party payor.

(e)     Tenant shall furnish Landlord and Mortgagee, within two (2) days of the sending or receipt by Tenant of any communication copies thereof, including a plan of correction, with respect to the matters referenced in Section 7.4(d).

(f)     Tenant shall file all required reports, including without limitation, Medicare or Medicaid cost reports, on or prior to the date such reports are due (such due date to include approved regulatory extensions allowed by the applicable Governmental Authority for the filing of such reports) and shall furnish Landlord and Mortgagee, within thirty (30) days of the date of filing, a complete and accurate copy of the annual Medicare or Medicaid cost report

31

for Tenant, which will be prepared by Tenant and accompanied by an Officer's Certificate of Tenant certifying as of the date thereof that such report is accurate, complete and not misleading, and promptly furnish Landlord and Mortgagee any amendments filed with respect to such reports and all notices, responses, audit reports or inquiries with respect to such reports.

(g)     Tenant shall furnish Landlord and Mortgagee, within thirty (30) days of the receipt by Tenant, the annual Medicaid and Medicare provider agreement(s) and the annual Medicaid and Medicare reimbursement rate sheets for the Facility.

(h)     Tenant shall furnish Landlord and Mortgagee, within ten (10) days of receipt but at least five (5) days prior to the earliest date on which Tenant is required to take any action with respect thereto or would suffer any adverse consequence, a copy of any Medicare, Medicaid or other licensing or accreditation or rating agency or entity survey, report, warning letter, or notice, and any statement of deficiencies, and within the time period required by the particular agency for furnishing a plan of correction also furnish or cause to be furnished to Landlord and Mortgagee a copy of the plan of correction generated from such survey, report, warning letter, or notice to Tenant and any subsequent correspondence related thereto, and correct or cause to be corrected any deficiency, the curing of which is a condition of continued licensure or of full participation in Medicare or Medicaid or a care program offered by an insurance company, managed care company, or other third-party payor by the date required for cure by such agency or entity (plus extensions granted by such agency or entity).

(i)     Tenant shall furnish Landlord and Mortgagee, within ten (10) days of receipt by Tenant, any other notices or charges issued relating to the non-compliance by Tenant with any Governmental Authority, insurance company, managed care company, or other third-party payor laws, regulations, requirements, licenses, permits, certificates, authorizations or approvals, but only such matters which could reasonably be expected to have a material adverse effect on the financial condition of such Person or the operation of the Facility.

(j)     Tenant shall furnish Landlord and Mortgagee, within ten (10) days of receipt by Tenant, any new, revised or amended Medicare or Medicaid reimbursement rate sheets which may be issued subsequent to the annual reimbursement rate sheets.

(k)     Tenant shall notify Landlord within five (5) days of any condition or event that constitutes a breach of any term, condition, warranty, representation or provision of this Lease or any other agreement between Landlord or its Affiliates and any Tenant, any Guarantor or any of their Affiliates, and of any adverse change in the financial condition of any Tenant, any Guarantor or any Affiliate of any Tenant or any Guarantor and of any Event of Default. Additionally, Tenant shall notify Landlord within seven (7) days after receipt of any formal or informal written notice or advice from its insurance carrier, reinsurance provider, accountants, actuary, any Governmental Authority, or any third party payor program provider of any actual, pending, threatened or contemplated increase in Tenant's reserves for expenses relating to malpractice or professional liability claims or any material increase in the premium costs for malpractice or professional liability insurance.

(l)     To the extent performed, Tenant shall furnish Landlord and Mortgagee, a copy of written external consultant reports (including environmental, operations,

32



quality assurance, physical plant, property inspection, etc.) (which shall be delivered promptly upon receipt from the consultant).

(m)    Tenant shall furnish Landlord and Mortgagee, a copy of cost reports as filed by Tenant.

(n)    Any supporting documents or data requested by Landlord in connection with the items in this Section 7.4.

(o)    Within 10 days of event of any of the following, Tenant shall deliver to Landlord, notice of:

(i)    any rate appeal brought before any Governmental Authority or any administrator of any third party payor program or referral source;

(ii)    any reimbursement appeals or recoupment claims made or contests pending or threatened as a result of any audits by any third party payor; and

(iii)    any claim, requirement or demand (excluding all claims, requirements, and demands, if any, that have been waived) of any Governmental Authority, third party payor or insurance body or carrier having or claiming any licensing, certifying, supervising, evaluating or accrediting authority over the Leased Premises to rework or redesign the Leased Premises, its professional staff or its professional services, procedures or practices in any material respect or to make any of the Leased Premises conform to or comply with a legal requirement.

(p)    The receipt by Landlord of any reports, statements, financial information, surveys or otherwise from Tenant or its Affiliates shall not in any way impose any obligation or liability upon Landlord to act or take any action upon any information, facts or circumstances which may be disclosed or shown therein and Landlord shall have no liability for its failure to act thereon or as a result thereof.

(q)    Financial Covenants.    Tenant covenants and agrees to the following, as may be amended time to time as required by Landlord's 1st or 2nd Mortgagee:

(i)    Commencing the third full quarter of the Term Tenant's Current Ratio shall not be less than 1.1 to 1.0. The term **"Current Ratio"** means the current assets of Tenant divided by the current liabilities of Tenant determined in accordance with GAAP.

(ii)    For each quarter of the Lease Term commencing the third full quarter following the Commencement Date, Tenant's Lease Coverage Ratio shall be not less than 1.25 to 1.0.

(iii)    For each quarter of the Lease Term commencing the second full quarter following the Commencement Date, the Facility shall have achieved the EBITDAR benchmarks as described on Schedule 7.4, attached hereto. The term **"EBITDAR"** is defined in Schedule 7.4.

33



Section 7.5    <u>Payment in the Ordinary Course</u>.    Tenant shall pay in full:
(a) prior in each case to the date when penalties would attach, all Impositions (except only those
so long as and to the extent that the same shall be contested in good faith by appropriate and
timely proceedings and for which adequate reserves have been established in accordance with
GAAP, <u>provided</u> that (i) Landlord has given its prior written consent to such contest, which
consent shall not be unreasonably withheld or delayed) for which Tenant may be or become
liable; (ii) no Lease Default has occurred and remains uncured, (iii) such proceeding shall
suspend the collection of such Impositions or the Impositions shall have been paid, (iv) such
proceeding shall be permitted under and be conducted in accordance with the provisions of any
other instrument to which Tenant is subject and shall not constitute a default thereunder, (v) no
part of or interest in the Leased Premises will be in danger of being sold, forfeited, terminated,
canceled or lost, (vi) Tenant shall have furnished such security as may be required in the
proceeding, or as may be requested by Landlord or Mortgagee, to insure the payment of any such
Impositions, together with all interest and penalties thereon, which shall not be less than 125% of
the unpaid Impositions being contested and (vii) Tenant shall promptly upon final determination
thereof pay the amount of such Impositions, together with all costs, interest and penalties; (b) all
of Tenant's wage obligations to Tenant's employees in compliance with the Fair Labor
Standards Act (29 U.S.C. §§ 206-207) or any comparable provisions under federal, state or local
law; (c) all obligations owed in connection with any claim, demand or notice of any overpayment
received from Medicare, Medicaid or other third party payor; and (d) all of Tenant's obligations
calling for the payment of money (except only those so long as and to the extent that the same
shall be contested in good faith and for which adequate reserves have been established in
accordance with GAAP, provided that Landlord has given its prior written consent to such
contest, which consent shall not be unreasonably withheld or delayed) before such payment
becomes overdue.

Section 7.6    <u>Security Agreement</u>.    In order to secure the payment and
performance of all of Tenant's obligations under this Lease and all of Tenant's obligations to
Landlord, and all and all other documents contemplated thereby, Tenant hereby grants to
Landlord a first priority security interest in and lien upon, all of the assets of Tenant including,
without limitation, (i) all trade fixtures, equipment, furniture, merchandise, inventory and other
personal property located from time to time in or upon the Leased Premises (including the
proceeds thereof), and (ii) to the fullest extent permitted by applicable law, all accounts, accounts
receivable, licenses, certifications, certificates, accreditations, approvals, permits, variances,
waivers, provider agreements, certificates of need, and other authorizations issued to or held by
Tenant with respect to the operation of the Facility skilled nursing facility and Tenant's interest
in and rights under all third party payor provider agreements with respect to the Facility (the
items listed in clauses (i) and (ii), together with the proceeds of same, are collectively,
"<u>Collateral</u>").    The security interest granted to Landlord with respect to Tenant's tangible
personal property is intended to be subordinate to any purchase money security interest or capital
lease on any of Tenant's tangible personal property provided that Tenant has notified Landlord
of the creation of such security interest or capital lease prior to the creation thereof and Landlord
has approved same.    Landlord agrees to subordinate its lien on Tenant's accounts receivable in
favor of Tenant's accounts receivable lender, which shall be a nationally recognized nursing
home accounts receivable lender with experience acceptable to HUD or Mortgagee on at least 20
nursing homes, securing up to a $2,000,000.00 accounts receivable loan, provided such lender
enters into an intercreditor agreement reasonably acceptable to Mortgagee and Landlord. Should

2305449v5/17057-6



Mortgagee require a subordination of the priority of Landlord's security interest in the Collateral, Landlord and Tenant shall execute such documents as Mortgagee may request to subordinate Landlord's lien to the Mortgagee's security interest in the collateral. In addition, Tenant's members shall grant to Landlord a first lien pledge (subject to the following sentence) of the membership interests of Tenant. To the extent required by Tenant's accounts receivable lender, Landlord agrees to subordinate its lien on Tenant's membership interests to a lien in favor of such lender securing up to a $2,000,000.00 accounts receivable loan; provided such lender enters into an intercreditor agreement reasonably acceptable to Mortgagee and Landlord. On or before the Commencement Date, Tenant shall provide Landlord with a detailed list and description of all the Collateral. Upon a Lease Default by Tenant, Landlord shall have all the rights and remedies of a secured party under the laws of the State of New York. Tenant, as debtor, shall cause to be executed (if appropriate or necessary) and delivered to Landlord, as the secured party, upon execution of this Lease by Tenant, UCC-1 Financing Statements in proper form, and thereafter, from time to time, deliver to Landlord such extensions and/or updates of such financing statements as are required for the purpose of perfecting and maintaining the priority of the security interest granted to Landlord herein, and to perform any other acts reasonably necessary to the perfection of such security interest. Tenant and Tenant's members consent to Landlord's preparation of and the filing of such financing statements by Landlord and agrees that the provisions of this Section 7.6 shall constitute a security agreement for the purposes contemplated hereby. The security interest granted by this Section 7.6 shall be in addition to any lien of Landlord that may now or at any time hereafter be provided by law. In the event Landlord exercises its remedies to foreclose the security interest created under this Section 7.6, or elsewhere in this Lease, Tenant shall cooperate with Landlord in transferring all of the aforementioned items promptly as requested by Landlord in Landlord's or its designee's name or for the benefit of Landlord. Tenant covenants and agrees that it shall not sell, move, surrender, cancel, modify, transfer, assign, relocate, pledge, grant a security interest in, convey or in any other manner encumber any assets of Tenant including, without limitation, the personal property, the certificate of need approval or any of the licensed or Medicare- and/or Medicaid-certified beds at the Facility, or any licenses for the Facility, or attempt at any time to do same, except as expressly provided hereunder and with the written consent of Landlord. This Section 7.6 and Landlord's rights and remedies hereunder shall survive the termination of the Lease.

Section 7.7 Working Capital. As of the Effective Date, Tenant shall have and maintain until the Commencement Date in accounts, acceptable to Landlord in its sole and complete discretion, an amount of funds equal to the greater of ("Working Capital") (i) any debt service reserve required by Mortgagee, (ii) the aggregate negative net operating income of Tenant for the period of months from the Commencement Date to the first day of the first two month period in which aggregate net income from operations exceeds zero, all as reflected in the projections attached hereto as Schedule 7.7 ("Cash Requirement"); for the purpose of this calculation net operating income shall be determined on a cash basis, and (iii) 4.5 million dollars. Working Capital shall not include any accounts or reserves established to satisfy the requirements of Section 7.1(a) (i) and (ii). From and after the Commencement Date, the Working Capital, subject to any requirement of the Mortgagee, may be used by Tenant only to fund the Cash Requirement.

7.8 Refinance. Tenant shall fully cooperate with Landlord in its efforts to Refinance from time to time, including without limitation, providing all information and executing all

35



documents required by Landlord or its lender(s). On and after each Refinance Date the Fixed Rent for each twelve month period shall equal the sum of the amounts provided for in clauses (a) through (e): (a) the annual debt service payments (principal, interest, and mortgage insurance premiums, if any) that Landlord is required to pay to Lender pursuant to the first Mortgage (the "**Mortgage Debt**"), plus such additional amounts as Landlord may be required to pay under any of the Loan Documents with respect to tax, insurance and other reserve requirements and/or payment obligations; (b) the annual aggregate debt service payments or preferred equity payments that the Landlord is required to pay pursuant to the Junior Debt (or replacement thereof) (with the Mortgage Debt, the "**New Debt Service**"); plus such additional amounts as Landlord may be required to pay under any of the Loan Documents with respect to tax, insurance and other reserve requirements and/or payment obligations under the Junior Debt (or replacement thereof); (c) an annual amount equal to $1,390,115; (d) an additional amount of $250,000 per year prior to the fourth year of the Term; $350,000 per year during Lease Years 4 and 5; and $400,000.00 per Lease Year thereafter until the end of the Term, including all Extension Terms; and (e) an additional amount equal to one-half of the amount that (i) a sum equal to the last 12 months interest payment on the original Mortgage and Junior Debt exceeds (ii) New Debt Service.

## ARTICLE VIII

## PERSONAL PROPERTY

Section 8.1    Landlord's Personal Property.    Upon the expiration or termination of this Lease, Tenant shall leave all personal property leased to Tenant hereunder, as repaired, rebuilt, replaced, restored, altered or added to as permitted or required by provisions of this Lease, in or on the Leased Premises, except for ordinary wear and tear. Any and all restorations, alterations or replacements of, or repairs, reconstructions or additions to, the personal property at the Facility made by Tenant shall become part of Landlord's personal property, and any and all security interests (except in favor of Landlord) in Tenant's personal property and financing statements shall be cleared, terminated and/or released to the satisfaction of Landlord at Tenant's expense. Tenant shall pay off in full the remaining payments due on all personal property leased by Tenant and such personal property shall become part of Landlord's personal property and financing statements shall be cleared, terminated and/or released to the satisfaction of Landlord at Tenant's expense. Any of Tenant's software, software licenses, proprietary information, and policies, and procedures of Tenant ("**Retained Assets**") shall not become part of Landlord's personal property except in the event of the termination of this Lease as a result of a Lease Default, in which case the Retained Assets shall become the personal property of Landlord; provided, however, upon request of Landlord, in consideration of a payment by Landlord or its designee of Ten Dollars ($10.00) and any applicable lease, rent, or license fees owed to any third parties during the Transition Period (hereinafter defined), Tenant shall license Landlord or its designee(s) (at Tenant's cost with no mark-up) to utilize the Retained Assets for a period of one hundred twenty  (120) days (the "**Transition Period**") in connection with the transition of operations from Tenant and Landlord's new operator(s). To the extent Tenant or any Subtenants are obligated under license agreements with third party vendors supplying software (and/or computer hardware which Tenant does not own or lease) to such Tenant, Tenant shall use its best

36

2305449v5/17057-6

efforts to arrange for Landlord or Landlord to enter into licensing agreements with such third party vendors to allow Landlord or its designee to utilize such software and computer hardware supplied by such third party vendors for the duration of the Transition Period.

Section 8.2    Tenant's Retained Assets.    At the termination of the Lease, Landlord shall have the right to purchase all or a portion of Tenant's Retained Assets located at the Facility at the lower of its fair market value or book value. To the extent any of Tenant's Retained Assets is subject to a license, Landlord shall have the right but not the obligation to assume some or all of such license Landlord's sole cost and expense and at no additional liability to Tenant.

## ARTICLE IX

## INDEMNIFICATION

Section 9.1    Tenant's Indemnification (a) During the Term of this Lease and after the surrender of the Leased Premises in accordance with Section 5.5 of this Lease, Tenant shall protect, defend (at Landlord's request), indemnify and hold harmless Landlord, Landlord's members, managers, officers, owners, directors, employees, agents, representatives, and Mortgagee and their respective agents, executors, heirs, representatives and assigns, and any entity providing financing which is secured by the Leased Premises (collectively the "**Landlord's Indemnitees**"), from and against any claims, losses, costs, penalties, damages, charges and/or expenses (including reasonable attorneys' and consultants' fees and expenses) imposed or resulting from, arising out of or attributable in whole or in part to any of the following: (i) any violation of any Law, order of Governmental Authority, whether occasioned by the intentional act, omission, or negligence of Tenant or those holding under Tenant, (ii) any accident or other occurrence on or about the Leased Premises on or after the Commencement Date causing injury to any person or property whomsoever or whatsoever, including but not limited to patient care claims or elder abuse, (iii) any failure of Tenant in any respect to comply with or perform any term, condition, covenant, requirement and/or provision of this Lease, or a breach of this Lease by Tenant, including, but not limited to, a breach of any of Tenant's representations and warranties under Section 19.1 of this Lease, (iv) in any way relating to Tenant's use, operation and/or maintenance of the Facility (including, without limitation, third-party claims, whether by the State of New York, the United States, private insurers, private parties, for recoupment, false claims, or any other claims, assumption of and use by Tenant of Landlord's permits, variances, waivers, and certificate of need approval or its possession of the Leased Premises and/or (v) any liability under Section 20.14.    The indemnity provided for herein shall survive the expiration of this Lease or the surrender of the Leased Premises for the period of the relevant statute of limitations.

(b)    Any amounts which become payable by Tenant under this Article IX shall be paid within ten (10) days after liability therefor is determined by litigation or otherwise, and if not timely paid shall bear interest at the Prime Rate plus 5% (the "**Overdue Rate**") from the date of such determination to the date of payment. Tenant, at its sole cost and expense, shall contest, resist and defend any such claim, action or proceeding asserted or instituted against Landlord or may compromise or otherwise dispose of the same as Tenant sees fit provided that Landlord receives a full and complete release with respect to such claim, action or proceeding. Any legal

37



counsel selected by Tenant to defend Landlord shall be reasonably satisfactory to Landlord. All indemnification covenants are intended to apply to losses, damages, injuries, claims, costs, penalties, charges and/or expenses (including reasonable attorneys' and consultants' fees and expenses) incurred directly or indirectly by the indemnified parties and their property, as well as by the indemnifying party or third party, and their property. For purposes of this Article IX, any acts or omissions of Tenant, or by employees, agents, assignees, contractors, subcontractors or others acting for or on behalf of Tenant (whether or not they are negligent, intentional, willful or unlawful), shall be strictly attributable to Tenant. It is understood and agreed that payment shall not be a condition precedent to enforcement of the foregoing indemnification obligations. The **"Prime Rate"** shall mean on any date, a rate equal to the annual rate on such date publicly announced by Citibank, N.A., as its prime, base or reference rate. Such rate need not be the lowest rate charged by Citibank, N.A. If Citibank, N.A. discontinues its use of such prime, base or reference rate or ceases to exist, Landlord shall designate the prime, base or reference rate of another state or federally chartered bank with offices in New York, N.Y. to be used for the purpose of calculating the Prime Rate hereunder.

## ARTICLE X

### USE OF LEASED PREMISES

Section 10.1    Compliance with Laws and Regulations.    Tenant shall use the Leased Premises solely as a licensed Medicare- and Medicaid-certified skilled nursing facility with at least the number of licensed and certified beds existing at the Facility on the Commencement Date, and for no other purpose (the "**Intended Use**"). On or before the Commencement Date, Tenant shall have acquired, and thereafter Tenant shall maintain all licenses, certificates, accreditations, approvals, permits, variances, waivers, provider agreements and other authorizations needed to operate the Leased Premises as a licensed, Medicare and Medicaid certified skilled nursing facility. Tenant hereby covenants, warrants and represents to Landlord that as of the Commencement Date and throughout the Term: (a) Tenant (and any subtenant, operator or manager of Tenant) shall be, and shall continue to be validly licensed and Medicare and Medicaid certified to operate a skilled nursing facility in accordance with the applicable rules and regulations of the DOH, federal governmental authorities and accrediting bodies, including, but not limited to, the United States Department of Health and Human Services ("**DHHS**"), CMS, and the DOH; (b) Tenant (and any subtenant, operator or manager of Tenant) shall be, and shall continue to be, certified by and the holder of valid provider agreements with Medicare and Medicaid issued by DHHS, DOH and/or CMS and shall remain so certified and shall remain such a holder in connection with its operation of the Leased Premises as a licensed and Medicare and Medicaid certified skilled nursing facility; (c) Tenant (and any subtenant, operator or manager of Tenant) shall be, and shall continue to be in compliance with and shall remain in compliance with all applicable Laws with regard to the operation of the Facility, including, without limitation, compliance under Laws governing patient confidentiality and privacy and the confidentiality of medical records; (d) Tenant (and any subtenant, operator or manager of Tenant) shall operate the Facility in a manner consistent with high quality skilled nursing services and sound reimbursement principles under the Medicare and Medicaid programs and as required under Laws; and (e) Tenant (and any subtenant, operator or manager of Tenant) shall not abandon, terminate, vacate or fail to renew any licenses,

38



certifications, accreditations, certificates, approvals, permits, variances, waivers, provider agreements or any other authorization which relates to the operation of the skilled nursing facility business or other permitted operations on the Leased Premises or in any way commit any act which will or may cause any such licenses, certifications, accreditations, certificates, approvals, permits, variances, waivers, provider agreements or other authorization to be revoked by any Governmental Authority or accrediting body having jurisdiction thereof.

    Section 10.2 <u>No Waste.</u> Tenant shall not commit or suffer to be committed any waste on the Leased Premises nor shall Tenant cause or permit any nuisance thereon.

    Section 10.3 <u>Hazardous Materials and Hazardous Waste.</u> (a) Tenant shall not place or hold any Hazardous Materials on or at the Leased Premises, except as is necessary for the ordinary course of its business as a skilled nursing facility in compliance with <u>Section 10.1</u>. If Tenant's business requires the use of any Hazardous Materials, other than such cleaning materials as are typically found in skilled nursing facilities in compliance with <u>Section 10.1</u>, Tenant shall notify Landlord in writing and shall comply with hazard communication and notification requirements of the Occupational Safety and Health Act ("**OSHA**") and all Laws which require notification of employees, the community or any governmental agency of the hazardous properties of such Hazardous Materials. For purposes of this Lease, "**Hazardous Materials**" means and includes any hazardous substance defined as such in OSHA, the Comprehensive Environmental Response, Compensation, and Liability Act ("**CERCLA**"), the Toxic Substances Control Act ("**TSCA**"), or any other federal, state or local statute, law, ordinance, code, rule, regulation, order or decree regulating, relating to, or imposing liability or standards of conduct concerning, any hazardous substance or material, as now or at any time hereafter in effect.

    (c) Tenant shall not cause or allow any asbestos or any asbestos containing materials to be incorporated into any improvements or alterations which it makes or causes to be made on or to the Leased Premises. Tenant shall obtain and maintain O&M Programs for the Facility is if the Facility is determined to contain asbestos or asbestos containing materials and upon Landlord's request, shall furnish copies of same to Landlord, Mortgagee or their designee(s).

    (d) Tenant shall not place, hold or dispose of any Hazardous Waste on, under or at the Leased Premises except as specifically allowed in this <u>Section 10.3</u>. Tenant further agrees that it shall not use the Leased Premises as a treatment, storage, or disposal (whether permanent or temporary) facility for Hazardous Waste. If Tenant, in the ordinary course of its business as a skilled nursing facility generates Hazardous Waste, then Tenant shall comply with all applicable federal, state and local laws, statutes, ordinances, codes, rules, regulations, orders or decrees relating to the appropriate use, storage, transportation and disposal of Hazardous Waste. For the purposes of this Lease, "**Hazardous Waste**" means and includes any hazardous material that has entered the waste stream or any contaminant or pollutant as defined as such in the Resource Conservation and Recovery Act, CERCLA, as amended, any so-called "Superfund" or "Superlien" law, the TSCA, or any other Law, relating to or imposing liability or standards of conduct concerning, any hazardous, toxic or dangerous waste. Tenant further agrees that it shall properly dispose in accordance with Laws of all "infectious waste" such as laboratory waste, pathological waste, blood specimens or products, patient or resident waste including, without



limitation, bandages and disposable gowns, sharp waste and any material generated by the production or testing of biological agents. Immediately upon receipt of any Environmental Notice (as hereinafter defined) from any Person, Tenant shall deliver to Landlord a true, correct and complete copy of same. "**Environmental Notice**" shall mean any note, notice, or report of any suit, proceeding, investigation, order, consent order, injunction, writ, award, or action related to or affecting or indicating the treatment, storage, handling, disposal, generation, spill, release or discharge of any Hazardous Waste or Hazardous Materials in upon, under, from or affecting the Leased Premises. All of the terms, covenants, warranties and indemnifications contained in this Section 10.3 shall survive the expiration or termination of this Lease.

(e)    Without in any way limiting Tenant's obligation to indemnify Landlord and Landlord's Indemnitees under Section 9.1 of this Lease, Tenant shall indemnify, defend (at Landlord's request) and hold harmless Landlord and Landlord's Indemnitees from and against any claims, losses, costs, damages or expenses of any and every kind whatsoever (including reasonable attorney's fees and expenses and consultant's and expert's fees and expenses) which at any time or from time to time may be paid, incurred or suffered by, or asserted against Landlord and/or Landlord's Indemnitees for, with respect to, or as a direct or indirect result of: (a) a breach by Tenant of the covenants set forth in Section 10.3 or, (b) caused, permitted or allowed by Tenant or any agent, employee, invitee, or licensee of Tenant, the presence on or under, or the escape, seepage, leakage, spillage, discharge, emission, or release from, onto, or into the Leased Premises, the atmosphere, or any watercourse, body of water, or groundwater, of any Hazardous Material (including, without limitation, any losses, liabilities, damages, injuries, costs, expenses or claims asserted or arising under CERCLA, as amended, any so-called "Superfund" or "Superlien" law, or any other Law, relating to or imposing liability or standards of conduct concerning, any Hazardous Material) occurring from and after the Commencement Date; and the provisions of and undertakings and indemnification set out in this Section 10.3(d) shall survive the termination of this Lease, and shall continue to be the personal liability, obligation and indemnification of Tenant, binding upon Tenant, forever. If required by Mortgagee, Tenant shall enter into an agreement to indemnify, defend and hold harmless Mortgagee with respect to matters contained in this Section 10.3 and other similar matters pursuant to a form of agreement reasonably acceptable to Mortgagee. In no event however shall Tenant have any liability to Landlord or Landlord's Indemnitees for Hazardous Materials located at or under the Leased Premises prior to the Commencement Date or for the remediation of same.

(f)    If Tenant or its employees, agents, or contractors violate the provisions of this Section 10.3, then, in addition to any other duty or obligation of Tenant hereunder, at law or in equity, Tenant shall be obligated to clean up, remove, and dispose of the material causing the violation, in compliance with all applicable environmental laws and repair any damage to and remediate the Leased Premises within such period of time as may be reasonable under the circumstances after written notice by Landlord; provided that such work shall commence no later than thirty (30) days from the date of such notice and be diligently and continuously carried to completion by Tenant or Tenant's designated contractors. Tenant shall notify Landlord of its method, time and procedure for any clean-up, remediation or removal of material causing the violation under this provision, and Landlord shall have the right to require reasonable changes in such method, time or procedure.

40



(g)     Landlord reserves the right from time to time, but not more than once a year, except in the event of an emergency or during the occurrence and continuation of an uncured Lease Default during the Term hereof, at Landlord's cost and expense (except that, in the event of a continuing and uncured Lease Default, at Tenant's sole cost and expense), to have the Leased Premises inspected by environmental engineers and/or specialists for the purpose of determining compliance by Tenant with any environmental laws, rules and regulations applicable to Tenant's operations in or about the Leased Premises and with the terms and conditions of this Lease dealing with environmental matters, including without limitation, the provisions of this Section 10.3. If the environmental assessment or report resulting from such inspection discloses any non-compliance with Laws, Tenant shall immediately, following receipt of the environmental assessment, take all such steps as are necessary to put the Leased Premises into compliance, including without limitation, cleaning up any spills or other emissions of Hazardous Wastes or Hazardous Materials, and reimburse Landlord for the costs of its inspection.

(h)     Upon the expiration of the Term, or the earlier termination thereof, subject to the last sentence of Section 10.3(d) above, Tenant shall forthwith remove all Hazardous Materials and Hazardous Waste from the Leased Premises or any portion thereof in accordance with applicable Law. Landlord shall have the right to inspect the Leased Premises with regard to the management and disposal of Hazardous Materials and Hazardous Waste at all reasonable times during the Term.

## ARTICLE XI

## DAMAGE OR DESTRUCTION

Section 11.1     <u>Damage or Destruction.</u> Tenant shall immediately notify Landlord of any casualty, fire, damage, destruction or injury ("**Casualty**") affecting the Facility, including a description of the Casualty, and whether the Casualty is such as to cause the Leased Premises to be unsuitable, in whole or in part, for the Intended Use . Tenant shall proceed with reasonable diligence to repair or reconstruct the Leased Premises and Tenant shall be liable for any costs of repair or replacement to the Leased Premises, whether or not such Casualty, or the costs of repairing such Casualty, are fully covered by the proceeds of Tenant's insurance required to be carried hereunder. If such Casualty renders the Facility unsuitable for the purpose of this Lease and if Landlord's Mortgagee so requires, Landlord, upon notice to Tenant, Landlord may terminate this Lease and Landlord and Tenant shall be released from any further liability hereunder thereafter accruing with respect to the Facility, except that Tenant shall be responsible and shall pay Landlord an amount equal to the difference between the fair market value of the Leased Premises immediately prior to such Casualty and the proceeds of Tenant's insurance to the extent such difference results from Tenant's breach of Article VI. Notwithstanding the foregoing, if Landlord's obligations to its Mortgagee have been satisfied in full and the DOH approves and agrees to reimburse the costs of rebuilding the Facility, Landlord shall not so terminate this Lease with respect to the Facility, and Tenant shall repair or reconstruct the Leased Premises in substantially the same condition as just prior to the incident with the proceeds of the property casualty insurance carried by Tenant, as required hereunder (if not otherwise paid to the Mortgagee), and/or with funds of Tenant. Regardless of any Casualty, except as provided above, this Lease shall continue in full force and effect without any abatement of Rent, and Tenant shall

41



not be entitled to surrender possession of the Leased Premises as a result of such casualty. Landlord's receipt of Rent from Tenant's rental interruption insurance shall be credited against Rent payments due from Tenant hereunder. If Tenant fails to commence such repair or reconstruction within thirty (30) days of the Casualty, Landlord shall have the option, subject to the approval of the DOH if required by Laws, to either terminate this Lease upon written notice to Tenant or repair and reconstruct the Leased Premises in substantially the same condition just prior to the incident and costs and expenses incurred as a result thereof shall be deemed Additional Rent hereunder and shall be payable to Landlord by Tenant, upon demand. Upon payment of all such sums demanded by Landlord, Tenant may re-enter and resume possession of the Leased Premises pursuant to the terms of this Lease. All insurance proceeds collected under the Policies shall be paid to Landlord, and made available to Tenant to pay for or reimburse Tenant for the costs and expenses for such repairs and reconstruction subject to the terms, conditions and provisions of any mortgage or other loan documents encumbering the Leased Premises. If Mortgagee does not make the insurance proceeds available to Landlord, then Landlord may terminate this Lease upon thirty (30) days' notice to Tenant, and Landlord and Tenant shall be released from any further liability hereunder thereafter accruing with respect to the Facility, except that Tenant shall be responsible and shall pay Landlord an amount equal to the difference between the fair market value of the Leased Premises immediately prior to such Casualty and the proceeds of Tenant's insurance.

Section 11.2    <u>Precedence of Rights of Mortgagee.</u>  All provisions contained in the loan documents between Landlord and Mortgagee, or any other document in connection therewith which concern or pertain to the restoration of the Leased Premises, the application of insurance proceeds and any and all matters concerning a casualty, shall take precedence over and be in lieu of any contrary provision provided for in this Lease, and in all respects are binding upon Tenant who agrees to and acknowledges the same.

Section 11.3    Tenant hereby waives the provisions of Section 227 of the Real Property Law of the State of New York and acknowledges that the terms of this Article XI shall govern in lieu thereof.

## ARTICLE XII

## EMINENT DOMAIN

Section 12.1    <u>Eminent Domain.</u> (a) In the event that all or substantially all of the Leased Premises, or such portion of the Real Property which renders the balance of the Facility unsuitable for the purpose of this Lease, shall be taken by condemnation or right of eminent domain, this Lease shall terminate as of the day the taking authority takes possession of the Leased Premises, and Landlord and Tenant shall be released from any further liability hereunder thereafter accruing with respect to the Facility, except as otherwise expressly provided in this Lease. In the event only a portion (and less than substantially all) of the Leased Premises is taken by condemnation or right of eminent domain and the portion so taken does not render the balance of the Leased Premises unsuitable for the purposes of this Lease, as determined by Landlord, this Lease shall not terminate. In such an event, Tenant shall restore the Leased Premises with reasonable diligence with its own funds and with the proceeds of any award from the applicable public or quasi-public authority, or private corporation or individual having the

42

power of condemnation ("**Award**") to an architectural unit as nearly like its condition prior to such taking as shall be practicable.   Notwithstanding anything to the contrary herein, this Section 12.1(a) is subject to the terms, conditions and provisions of any mortgage and other loan documents encumbering the Leased Premises.

    (i)  Notwithstanding anything to the contrary contained in Section 12.1(a), Landlord may cancel this Lease with no further liability to Tenant, in the event that following a taking by condemnation or right of eminent domain, Mortgagee elects to require Landlord to repay the mortgage on the Leased Premises.

    (j)  Tenant shall not be entitled to any part of any award or settlement of damages representing the value of land and buildings appropriated, the value of this Lease or any estate therein, or damage to the residue of the Leased Premises or other property of Landlord; it being agreed as between Landlord and Tenant any such award shall be the sole property of Landlord.  No appropriation of part or all of the Leased Premises or cancellation of this Lease pursuant to this Article XII shall be deemed an eviction of Tenant or a breach of any covenants of Landlord hereunder.

## ARTICLE XIII

## NOTICES

    Section 13.1  Notices.  All notices, consents, approvals and requests required or permitted hereunder shall be given in writing and shall be effective for all purposes if (a) hand delivered or sent by (b) certified or registered United States mail, postage prepaid, return receipt requested or (c) Federal Express or other nationally recognized overnight next business day courier service at such other address and Person as shall be designated from time to time by any party hereto, as the case may be, in a notice to the other parties hereto in the manner provided for in this Section 13.1):

If to Tenant:

HBL SNF, LLC
1280 Albany Post Road
Croton-on-Hudson, New York 10520

with a copy to:
Michelman & Robinson
800 Third Avenue, 24th Floor
New York, NY 10022
Attn:  Mark Zafrin, Esq.
Telephone:  212.730.7700

If to Landlord:
White Plains Healthcare Properties I, LLC,

2 Bourbon Street ,Suite 200
Peabody, Ma 01960

with a copy to:
Gerald J. Billow, Esq.
Posternak Blankstein & Lund LLP
800 Boylston Street, Suite 3200
Boston, Massachusetts 02199

-and-

Howard Fensterman, Esq.
Abrams Fensterman
1111 Marcus Avenue
Lake Success, New York 11042

The effective date of such notices shall be as follows: (a) upon delivery or refusal of delivery if sent by personal delivery, (b) two (2) Business Days after mailing (or upon actual receipt, if earlier), if sent by certified or registered mail, (c) one (1) Business Day after deposit with the courier for next business day delivery, if sent by overnight courier. The term "Business Day" means any day other than (i) a Saturday or a Sunday, and (ii) a day on which federally insured depository institutions in New York, New York are authorized or obligated by law, regulation, governmental decree or executive order to be closed.

Section 13.2    Notices to Mortgagee.   (a) Tenant hereby agrees, upon request of Mortgagee, to give to Mortgagee copies of all notices given by Tenant of default by Landlord under this Lease at the same time and in the same manner as, and whenever, Tenant shall give any such notice of default to Landlord. Such Mortgagee shall have the right to remedy any default under this Lease, or to cause any default of Landlord under this Lease to be remedied, and for such purpose Tenant hereby grants such Mortgagee such period of time as may be reasonable to enable such Mortgagee to remedy, or cause to be remedied, any such default in addition to the period given to Landlord for remedying, or causing to be remedied, any such default which is a default. Tenant shall accept performance by such Mortgagee of any term, covenant, condition or agreement to be performed by Landlord under the Lease with the same force and effect as though performed by Landlord. No default by Landlord under the Lease shall exist or shall be deemed to exist (i) as long as such Mortgagee, in good faith, shall have commenced to cure such default and shall be prosecuting the same to completion with reasonable diligence, subject to Force Majeure, or (ii) if possession of the Leased Premises is required in order to cure such default, or if such default is not susceptible of being cured by such Mortgagee, as long as such Mortgagee, in good faith, shall have notified Tenant that such Mortgagee intends to institute proceedings under the mortgage and, thereafter, as long as such proceedings shall have been instituted and shall prosecute the same with reasonable diligence and, after having obtained possession, prosecutes the cure to completion with reasonable diligence. This Lease shall not be assigned by Tenant or modified, amended or terminated without Mortgagee's prior written consent in each instance, which consent shall not be unreasonably withheld or delayed. In the event of the termination of this Lease by reason of any default thereunder or for any other reason whatsoever except the expiration thereof, upon such Mortgagee's written request, given



within thirty (30) days after any such termination, Tenant, within fifteen (15) days after receipt of such request, shall execute and deliver to such Mortgagee or its designee or nominee a new lease of the Leased Premises for the remainder of the Term of the Lease upon, at a minimum, all of the terms, covenants and conditions of this Lease. Neither such Mortgagee or its designee or nominee shall become liable under this Lease unless and until such Mortgagee or its designee or nominee becomes, and then only for so long as such Mortgagee or its designee or nominee remains, the fee owner of the Leased Premises or the owner of the leasehold interest of Landlord under this Lease. Such Mortgagee shall have the right, without Tenant's consent, to, as the case may be, foreclose its mortgage or to accept a deed in lieu of foreclosure of such mortgage.

(b)     In the event of any act or omission of Landlord which would give Tenant the right, immediately or after lapse of a period of time, to cancel or terminate this Lease, or to claim a partial or total eviction, Tenant shall not exercise such right (i) until it has given written notice of such act or omission to Mortgagee, and (ii) unless such act or omission shall be one which is not capable of being remedied by Landlord or such Mortgagee within a reasonable period of time, until a reasonable period for remedying such act or omission shall have elapsed following the giving of such notice and following the time when such Mortgagee shall have become entitled under its loan documents with Landlord in connection therewith, as the case may be, to remedy the same (which reasonable period shall in no event be less than the period to which Landlord would be entitled under this Lease or otherwise, after similar notice, to effect such remedy).

## ARTICLE XIV

## QUIET ENJOYMENT

Section 14.1     Quiet Enjoyment.Landlord covenants, warrants and represents to Tenant that, provided no Lease Default exists under this Lease, Tenant shall at all times during the Term peaceably and quietly have, hold, occupy and enjoy the Leased Premises, subject to the terms and conditions of this Lease, without any hindrance, interference or molestation by Landlord or by, under or through Landlord.

## ARTICLE XV

## SUBLETTING AND ASSIGNMENT

Section 15.1     Subletting and Assignment (a) Tenant shall not, without the prior written consent of Landlord, which consent may be withheld in the Landlord's sole and absolute discretion (and, if required by law, without the prior written consent of the Commissioner, which consent may be withheld in the Commissioner's sole and absolute discretion), transfer or assign this Lease or Tenant's interest in the Leased Premises or any part thereof or sublease all or any part of the Leased Premises. In all events of assignment, transfers or subletting, the prior approval of the DOH shall be required. Tenant shall not at any time, without the prior written consent of Landlord, which consent may be withheld or given in the sole and absolute discretion

45

of Landlord, pledge, mortgage, or hypothecate the leasehold estate hereby created or any interest of Tenant therein. The issuance of or a transfer or series of transfers (including transfers caused by mergers, acquisitions or consolidations of any direct or indirect interests in the equity ownership interests in Tenant or any subtenant aggregating to forty-nine percent (49%) or more of the stock, membership or ownership interest in Tenant or any subtenant shall constitute an assignment for purposes of this Lease, requiring Landlord's consent thereof; notwithstanding anything to the contrary, any change in the management or control of Tenant such that Lizer Josefovic does not control all of the decisions of Tenant shall constitute an assignment for purposes of this Lease, requiring Landlord's consent thereof. Notwithstanding anything to the contrary, the issuance of or a transfer or series of transfers (including transfers caused by mergers, acquisitions or consolidations of any direct or indirect interests in the equity ownership interests in Tenant or any subtenant resulting in the aggregate interest of Lizer Josefovic, Marc Neuman, and their spouse or issue, or a trust for their benefit, equaling less than seventy-five percent (75%) of the stock, membership or ownership interest in Tenant or any subtenant to any person or entity shall constitute an assignment for purposes of this Lease, requiring Landlord's consent thereof; provided that any assignment by Lizer Josefovic to Joseph Josefovic made after five years after the Commencement date shall not be unreasonably denied by Landlord taking into account, among other things, the experience, performance record, and financial strength of Joseph Josefovic. The consent by Landlord to any transfer shall not constitute consent to any subsequent transfer or to any successive transfer. Further, subject to the provisions of Section 2.2, and without in any way limiting or otherwise affecting the provisions of this Lease, Landlord shall be permitted to assign this Lease and all agreements, duties, obligations and rights incidental thereto to any entity related to, or affiliated with Landlord, without any consent from Tenant. The term **"transfer"** shall mean any direct or indirect sale, conveyance, transfer, lease (including any amendment, extension, modification, waiver or renewal thereof), sublease, sub-sublease, assignment, mortgage, pledge, grant of a security interest or hypothecation, whether by operation of law or otherwise, whether voluntary or not, of or in (i) all or part of the Leased Premises (including any legal or beneficial direct or indirect interest therein) or (ii) any direct or indirect interest in Tenant.    Notwithstanding anything to the contrary contained herein, Tenant may assign this Lease to, or enter into a sublease with, or transfer interests in an entity comprising Tenant to, an affiliate under common control with Tenant, or owned by Lizer Josefovic, Marc Neuman, or their spouse or issue, or a Trust for their benefit, without Landlord's consent, provided (x) Landlord is given thirty (30) days prior written notice of such intended transfer, assignment or sublease with copies of the organizational documents of the assignee, transferree or sublessee, (y) after such transfer, assignment or sublease, Lizer Josefovic controls all of the decisions of the assignee, transferree or sublessee, and (z) all required consents from, the Mortgagee, the DOH and/or the Commissioner (if required), have been obtained by Tenant. Notwithstanding the foregoing and any other provision contained herein to the contrary, no transfer or series of transfers of legal, economic, beneficial or equitable (direct or indirect) interest in the Lease or in Tenant's membership interest that requires DOH's consent shall occur without the prior written consent of Landlord and DOH. Tenant shall enter into such subordination    agreements or subordination, non-disturbance agreements (**"SNDAs"**) as Mortgagee may request from time to time.

Section 15.2    Attornment and Related Matters. Any sublease shall be expressly subject and subordinate to all applicable terms and conditions of this Lease and provide that upon the expiration or earlier termination of this Lease, Landlord, at its option and without any

46



obligation to do so, may require any subtenant to attorn to Landlord, its successors and assigns, in which event Landlord shall undertake the obligations of Tenant, under such sublease from the time of the exercise of such option to the termination of such sublease; provided, however, that in such case Landlord shall not be liable for any prepaid rents, fees or other charges or for any prepaid security deposits paid by such subtenant to Tenant or for any other prior defaults of Tenant under such sublease. In the event that Landlord shall not require such attornment with respect to any sublease, then such sublease shall automatically terminate upon the expiration or earlier termination of this Lease, including any early termination by mutual agreement of Landlord and Tenant. In addition, any such sublease shall provide that in the event that the subtenant or other transferee receives a written notice from Landlord stating that a Lease Default has occurred or that an event or circumstance has occurred which with notice and/or passage of time would constitute a Lease Default, such subtenant or other transferee thereafter shall without further consent or instruction of Tenant pay all rentals accruing under such sublease directly to Landlord or as Landlord may direct; provided, however, that (a) as and to the extent that the amounts so paid to Landlord, together with other amounts paid to or received by Landlord on account of this Lease, exceed the amounts then due Landlord from Tenant under this Lease, the excess shall be promptly remitted to Tenant, and (b) at such time as the Lease Default has been cured and this Lease reinstated (if ever), Landlord shall notify and direct the subtenant(s) in writing to resume making payments of rentals under their sublease(s) directly to Tenant, or as Tenant may direct. Any such rentals collected from such subtenant or other transferee by Landlord shall be credited against the amounts owing by Tenant under this Lease in such order of priority as Landlord shall reasonably determine. Furthermore, any sublease or other agreement regarding a transfer shall expressly provide that the subtenant, assignee, manager or other transferee shall furnish Landlord, its lender, the Mortgagee, if applicable, the HUD Mortgagee, and/or the Commissioner, and /or DOH, if applicable, with such financial, operational and other information about the Facility and subtenant, etc., as Landlord may request from time to time.

Section 15.3    Assignment of Subleases. To secure the prompt and full payment by Tenant of the Rent and the faithful performance by Tenant of all the other terms and conditions herein contained on its part to be kept and performed, Tenant hereby assigns, transfers and sets over unto Landlord, subject to the conditions hereinafter set forth and any required consent(s) from DOH, all of Tenant's right, title and interest in and to all permitted subleases, assignments, licenses and occupancy agreements, to the extent permitted by law, involving the Facility, as set forth on Schedule 15.3 attached hereto (the "**Sublease**", and the subtenant under a Sublease herein referred to as a "**Subtenant**") and hereby confers upon Landlord, its agents and representatives, a right of entry (subject to prior notice) in, and sufficient possession of, the Leased Premises to permit and insure the collection by Landlord of the rentals and other sums payable under the Sublease, and further agrees that the exercise of said right of entry and qualified possession by Landlord shall not constitute an eviction of Tenant from the Leased Premises or any portion thereof and that should said right of entry and possession be denied Landlord, its agent or representative, Landlord, in the exercise of said right, may use all requisite force to gain and enjoy the same without responsibility or liability to Tenant, its servants, employees, guests or invitees, or any Person whomsoever; provided, however, that such assignment shall become operative and effective only if (a) a Lease Default shall occur and be continuing or (b) this Lease and the Term shall be cancelled or terminated pursuant to the terms, covenants and conditions hereof or (c) there occurs a repossession under a dispossessory warrant

47

or other re-entry or repossession by Landlord under the provisions hereof or (d) a receiver for all or a portion of the Leased Premises is appointed, and then only as to such of the subleases that Landlord may elect to take over and assume. At any time and from time to time within ten (10) days after Landlord's written demand, Tenant promptly shall deliver to Landlord a schedule of all Subleases, setting forth the names of all Subtenants, with a photostatic copy of each of the Subleases. Upon request of Landlord, Tenant shall permit Landlord and its agents and representatives, and Mortgagee, its agents and representatives, to inspect all Subleases affecting the Leased Premises. Tenant covenants that each Sublease shall provide that the Subtenant thereunder shall be required from time to time, upon request of Landlord or Tenant, to execute, acknowledge and deliver, to and for the benefit of Landlord, an estoppel certificate confirming with respect to such Sublease the information set forth in Section 20.11 hereof.

Section 15.4    Additional Sublease Requirements.  Tenant covenants and agrees that all Subleases hereafter entered into affecting the Leased Premises shall provide that (a) they are subject to this Lease and that the principals of the Subtenant acknowledge that they have read this Lease and accept the terms hereof, (b) the term thereof shall not end less than one (1) day prior to the Expiration Date hereof, unless Landlord shall consent otherwise, which consent may be withheld in Landlord's sole and absolute discretion, (c) the Subtenants will not do, authorize or execute any act, deed or thing whatsoever or fail to take any such action which will or may cause Tenant to be in violation of any of its obligations under this Lease, (d) the Subtenants will not pay rent or other sums under the Subleases with Tenant for more than one (1) month in advance, (e) the Subtenants shall give to Landlord at the address and otherwise in the manner specified in Section 13.1 hereof, a copy of any notice of default by Tenant as the landlord under the Subleases at the same time as, and whenever, any such notice of default shall be given by the Subtenants to Tenant; and (f) all of the representations, warranties and covenants given by Tenant to Landlord in this Lease, including but not limited to all reporting requirements and covenants set forth in Section 7.4 above, shall be made and given by each Subtenant for the benefit of Landlord, Mortgagee, and their respective successors and assigns.

Section 15.5    Transfers In Bankruptcy.    (a)    In the event of a transfer pursuant to the provisions of Title 11 of the United States Code or any statute of similar purpose or nature (the "**Bankruptcy Code**"), all consideration payable or otherwise to be delivered in connection with such transfer shall be paid or delivered to Landlord, shall be and remain the exclusive property of Landlord and shall not constitute property of Tenant or of the estate of Tenant within the meaning of the Bankruptcy Code. Any consideration constituting Landlord's property pursuant to the immediately preceding sentence and not paid or delivered to Landlord shall be held in trust for the benefit of Landlord and be promptly paid or delivered to Landlord. For purposes of this Section 15.5, the term "consideration" shall mean and include money, services, property and any other thing of value such as payment of costs, cancellation or forgiveness of indebtedness, discounts, rebates, barter and the like. If any such consideration is in a form other than cash (such as in kind, equity interests, indebtedness earn-outs, or other deferred payments, consulting or management fees, etc.), Landlord shall be entitled to receive in cash the then present fair market value of such consideration. If Tenant assumes this Lease and proposes to assign the same pursuant to the provisions of the Bankruptcy Code to any person or entity who shall have made a bona fide offer to accept an assignment of this Lease on terms acceptable to Tenant, then notice of such proposed assignment shall be given to Landlord by Tenant no later than fifteen (15) days after receipt of such offer by Tenant, but in any event no

48

later than ten (10) days prior to the date that Tenant shall file any application or motion with a court of competent jurisdiction for authority and approval to enter into such assumption and assignment. Such notice shall set forth (a) the name and address of the assignee, (b) all of the terms and conditions of such offer, and (c) the proposal for providing adequate assurance of future performance by such person under the Lease, including, without limitation, the assurance referred to in Section 365 of the Bankruptcy Code. Any person or entity to which this Lease is assigned pursuant to the provisions of the Bankruptcy Code shall be deemed without further act or deed to have assumed all of the obligations arising under this Lease from and after the date of such assignment. Any such assignee shall execute and deliver to Landlord upon demand an instrument confirming such assumption.

(b)    The term "adequate assurance of future performance" as used in this Lease shall mean (in addition to the assurances called for in Bankruptcy Code Section 365(1)) that any proposed assignee shall, among other things, (i) deposit with Landlord on the assumption of this Lease an amount equal to the greater of (x) two (2) times the then monthly Fixed Rent and Additional Rent or (y) such other amount deemed by the Bankruptcy Court to be reasonably necessary for the adequate protection of Landlord under the circumstances, as security for the faithful performance and observance by such assignee of the terms and obligations of this Lease, (ii) furnish Landlord with financial statements of such assignee for the prior three (3) calendar years, as finally determined after an audit and certified as correct by a certified public accountant, which financial statements shall show a net worth at least equal to the amount of the deposit referenced in (i) above, (iii) if determined by the Bankruptcy Court to be appropriate under the circumstances, grant to Landlord a security interest in such property of the proposed assignee as Landlord shall deem necessary to secure such assignee's future performance under this Lease, and (iv) provide such other information or take such action as Landlord, in its reasonable judgment, shall determine is necessary to provide adequate assurance of the performance by such assignee of its obligations under the Lease.

(c)    If, at any time after Tenant may have assigned Tenant's interest in this Lease in a proceeding of the type described in <u>Section 16.1 (iv)</u> through <u>(vii)</u>, this Lease shall be disaffirmed or rejected in any proceeding of the types described in <u>Section 16.1 (iv)</u> through <u>(vii)</u> hereof, or in any similar proceeding, or in the event of termination of this Lease by reason of any such proceeding or by reason of lapse of time following notice of termination given pursuant to Article XVI based upon any of the Lease Defaults set forth in said <u>Section 16.1 (iv)</u> through <u>(vii)</u> Tenant, upon request of Landlord given within thirty (30) days next following any such disaffirmance, rejection or termination (and actual notice thereof to Landlord in the event of a disaffirmance or rejection or in the event of termination other than by act of Landlord), shall (a) pay to Landlord all Rent due and owing by the assignee to Landlord under this Lease to and including the date of such disaffirmance, rejection or termination, and (b) as "tenant", enter into a new lease with Landlord for a term commencing on the effective date of such disaffirmance, rejection or termination and ending on the expiration date of the term, unless sooner terminated as in such lease provided, at the same Fixed Rent and Additional Rent upon the then executory terms, covenants and conditions as are contained in this Lease, except that (i) Tenant's rights under the new lease shall be subject to the possessory rights, if any, of the assignee under this Lease and the possessory rights of any person claiming through or under such assignee or by virtue of any applicable Law, (ii) such new lease shall require all defaults existing under this Lease to be cured by Tenant with due diligence, and (iii) such new lease shall require Tenant to

49

pay all Rent reserved in this Lease which, had this Lease not been so disaffirmed, rejected or terminated, would have accrued under the provisions of this Lease after the date of such disaffirmance, rejection or termination with respect to any period prior thereto. If Tenant shall default in its obligation to enter into said new lease for a period of ten (10) days next following Landlord's request therefor, then in addition to all other rights and remedies by reason of such default, either at law or in equity, Landlord shall have the same rights and remedies against Tenant as if Tenant had entered into such new lease and such new lease had thereafter been terminated as of the commencement date thereof by reason of Tenant's default thereunder.

Section 15.6    Management Agreement. Tenant agrees and acknowledges that it will not enter into any management agreements during the Term with regard to the Facility except with an entity (i) owned wholly by a an individual principal of Tenant which entity has been received establishment approval from the New York State Department of Health Public Health and Health Planning Council in compliance with 10 NYCRR 600.9(d)(1) and (ii) approved by HUD if the Facility is, or is about to be financed by a HUD program, and/or Mortgagee. Any such management agreement shall be subordinate to Landlord's rights hereunder, to the rights of Mortgagee and to the rights of the Commissioner. Tenant shall cause such manager to execute such documents as are required by Landlord or Mortgagee or by the Commissioner to effect such subordination.

Section 15.7    Memorandum of Lease. This Lease shall not be recorded, but either party may record a memorandum of lease in which shall describe the parties to this Lease, a description of the Leased Premises and a recitation of the Term. The party requesting that the memorandum of lease be recorded shall prepare and pay all costs of recording the memorandum of lease, and the other party agrees to execute at any and all times such instruments as may be reasonably required for such recording. Upon the expiration or earlier termination of this Lease, Landlord may release the memorandum of lease. For this purpose Tenant constitutes and appoints Landlord its true and lawful attorney-in-fact with full power of substitution to execute a release of such memoranda in the name of Tenant. Such power of attorney shall be deemed to be a power coupled with an interest and cannot be revoked. To the extent any transfer tax, conveyance tax, excise tax, or similar tax is imposed by any Governmental Authority as a result of the recording of such Memorandum of Lease, or is otherwise due and payable as to Tenant's leasehold interest granted pursuant to this Lease, Tenant shall pay same to the applicable Governmental Authority.

## ARTICLE XVI

## DEFAULT

Section 16.1    Default by Tenant and Remedies of Landlord. (a) Tenant shall be in default under this Lease upon the occurrence of any of the following events referred to herein individually or collectively as a "Lease Default" (any reference to such event occurring or involving Tenant shall be deemed to include any such event occurring or involving any of Tenant's Subtenants):

2305449v5/17057-6



(i)        if Tenant fails to pay any installment of Rent within five (5) days after the date when due;

(ii)       if Tenant defaults in the prompt and full performance of any other of Tenant's covenants, obligations or agreements hereunder which are not specifically enumerated herein as a Lease Default and fails to correct such failure within thirty (30) days of receipt of written notice from Landlord of such default (unless such default cannot reasonably be cured within thirty (30) days, in which event such period shall be extended, provided Tenant shall have commenced in good faith to cure such default within the first such thirty (30) day period and shall proceed with all due diligence to correct such default thereafter but in no event more than ninety (90) days of receipt of such written notice);

(iii)      if the leasehold interest of Tenant shall be levied upon under execution or be liened or attached and such levy, lien or attachment is not removed within sixty (60) days of the date Tenant receives notice of it;

(iv)      in the event of a filing by or against Tenant of a petition under federal or state law pertaining to bankruptcy or insolvency or for a reorganization or other relief;

(v)       if Tenant shall admit in writing its inability to pay its debts generally as they become due;

(vi)      if Tenant is adjudicated as bankrupt or a court of competent jurisdiction shall enter an order or decree appointing, with or without the consent of Tenant, a receiver or trustee of Tenant or of the whole or substantially all of its property;

(vii)     if Tenant makes any general assignment for the benefit of creditors;

(A)     if Tenant abandons the Leased Premises or if, except as a result of damage, destruction or a partial or complete condemnation, Tenant ceases operations of the Facility, or Tenant closes any portion of the Facility;

(viii)    if Tenant receives a state or federal notice of termination of license or de-certification and such notice has not been suspended, extended, withdrawn or terminated prior to 30 days before the effective date of such termination or decertification by any Governmental Authority;

(ix)      if Tenant fails to maintain its qualifications for licensure as required by this Lease if failure to do so would result in an inability to operate the Facility or would result in the appointment of a receiver with respect to the Facility;

(x)       if any transfer or assignment of this Lease or Tenant's direct or indirect interest therein or a transfer of Tenant's direct or indirect equity ownership interests occurs in violation of this Lease;

(xi)      if any malpractice award or judgment exceeding any applicable malpractice insurance coverage and any applicable umbrella coverage by more than One Million

51



Dollars ($1,000,000.00) shall be rendered against Tenant or any subtenant, and either (A) enforcement proceedings shall have been commenced by any creditor upon such award or judgment or (B) such award or judgment shall continue unsatisfied and in effect for a period of sixty (60) consecutive days without an insurance company reasonably satisfactory to Landlord having agreed to fund such award or judgment in a manner reasonably satisfactory to Landlord, or (C) such award or judgment has been appealed and without a bond having been posted to cover such amount that exceeds any insurance coverage, and in any case such award or judgment shall, in the reasonable opinion of Landlord, have a material adverse affect on the ability of Tenant or any subtenant to operate the Facility;

(xii)    upon the denial, refusal to issue, or loss of any licenses, certifications, certificates, approvals, permits, variances, waivers, provider agreements and other authorizations necessary or required for Tenant to operate the Facility in accordance with the requirements of this Lease;

(xiii)   if any of the representations or warranties made by Tenant under this Lease or any subtenant under its Sublease or otherwise proves to be untrue when made in any material respect;

(xiv)    if any Governmental Authority having jurisdiction over the operation of the Facility removes ten percent (10%) or more of the patients or residents who reside in the Facility for violations of standards of care;

(xv)    Tenant fails to give Landlord and Mortgagee timely notice or timely deliver copies of documents within the times required under Section 7.4 (c) through (o);

(xvi)    Tenant's receipt of notice of an allegation or determination of "Immediate Jeopardy" (as such term is customarily used) or equivalent notice from any Governmental Authority or officer, acting on behalf thereof relating to the Facility;

(xvii)   Tenant's receipt of notice of the freeze on admissions or the imposition of a denial of payment for new admissions or equivalent notice from any Governmental Authority or officer acting on behalf thereof relating to the Facility;

(xviii)  Tenant's breach of its obligations under Section 3.5 including Tenant's failure to execute and deliver to Landlord within seven days of its request therefore any and all documents, certificate or agreement required or reasonably requested by Landlord, a Mortgagee, Prospective Mortgagee, HUD and/or HUD's Approved Lender or the Commissioner, including confirming the subordination required hereunder;

(xix)    Tenant's breach of its obligations under Section 15.6 Management Agreement;

(xx)    Tenant's breach of its obligations under Section 7.6 Security Agreement;

52

2305449v5/17057-6

(xxi)    Tenant fails to notify Landlord within twenty-four (24) hours after receipt of any notice from any Governmental Authority, terminating or suspending or threatening termination or suspension of any material license or certification relating to the Facility;

(xxii)    a default beyond any applicable notice and cure periods under any Sublease, operating agreement, management agreement or any other material agreement relating to the Leased Premises or to which Landlord and Tenant are a party;

(xxiii)    the creation of any indebtedness relating to the Leased Premises (other than trade payables which are not more than 30 days past due, not evidenced by a note and not in excess of One Million Dollars $1,000,000.00);

(xxiv)    the amendment, modification, restatement, termination or cancellation of any material contract relating to the Leased Premises, including but not limited to any Sublease, without Landlord's prior written consent, which consent shall not be unreasonably withheld;

(xxv)    default or breach by Guarantor under the Guaranty beyond the expiration of any applicable cure period contained therein;

(xxvi)    failure by Tenant to deposit all or any portion of the Security Deposit or Letter of Credit or to replace any portion of the Security Deposit or Letter of Credit utilized by Landlord;

(xxvii)    a default or breach of any of the provisions set forth in Article XIX;

(xxviii)    Tenant violates any term, covenant or condition of Tenant's Regulatory Agreement (with respect to a HUD financing) which violation is not cured within thirty (30) days of written notice to Tenant;

(xxix)    a default or breach of the provisions set forth in Section 7.4(b) or a report required by Section 7.4 proves to be untrue in any material respect;

(xxx)    any act or omission by Tenant or any Subtenant referenced in Section 7.4 that constitutes a default by Landlord under its loan documents with Mortgagee;

(xxxi)    Tenant's failure to meet the covenants provided in Section 7.4 (q)

(xxxii)    the sale or transfer or attempted sale or transfer of all or any portion of any certificate of need, bed or unit right or other similar authorization relating to any portion of the Facility or the Leased Premises. assignment or subletting in violation of the provisions of Section 15.1;

(xxxiii)    the use of any portion of the Premises other than for the Intended Use;



(xxxiv)    the Facility appears on the Special Focus Facility List, or similar list established by CMS;

(xxxv)    Tenant fails to procure the insurance coverage, or loss of the insurance coverage, required by this Lease;

(xxxvi)Tenant enters into any corporate integrity agreement, settlement or consent decree, or deferred prosecution agreement with any Governmental Authority;

(xxxvii)    Any Governmental Authority assesses a fine or penalty against, or with, Tenant that imposes a payment or fine upon Tenant in excess of $75,000;

(xxxviii)        The conviction of, or plea of no contest or nolo contendere by, Tenant or any member or beneficial owner of Tenant with respect to (1) any felony or (2) any misdemeanor that involves any act of fraud, embezzlement, theft or misappropriation;

(xxxx)        Tenant fails to comply with its obligations in Section 18.1(n) within 10 days after written notice from Landlord; or

(xxxxi)        Tenant or any Subtenant fails or refuses to execute estoppel certificate required pursuant to Section 20.11, or otherwise complying with the requirements of Section 23 within ten (10) days after Tenant's receipt thereof.

Upon the occurrence of a Lease Default, Landlord, may, if Landlord so elects, upon five (5) days written notice of such election, forthwith terminate this Lease and Tenant's right to possession of the Leased Premises and, at Landlord's sole and absolute discretion, accelerate the payment of all Rent for the balance of the Term and declare the same presently due and payable in full provided, however, that with respect to a Lease Default under Section 16.1(a)(iv), this Lease shall automatically terminate.  In the event of such Lease termination, Tenant shall immediately pay Landlord the then present value of all such accelerated Rent.  Landlord, in addition to all other remedies given to Landlord at law or in equity, may by written notice to Tenant, without terminating this Lease, cause Tenant to apply to the DOH to install a manager and/or management consultant and/or a receiver having the necessary approvals from Governmental Authorities, of Landlord's choice, at Tenant's sole cost and expense or to the extent permitted by applicable law, reenter the Leased Premises by summary proceedings or otherwise.  In any event, upon a Lease Default, Landlord may require Tenant to consent to a so-called "Change of Ownership" and Landlord may dispossess Tenant upon approval of the Change of Ownership or Certificate of Need by DOH, it being the understanding that under no circumstances is this Lease to be an asset for Tenant's creditors by operation of law or otherwise.  In the event of such reentry, Landlord may relet the Leased Premises without being obligated so to do, and in the event of a reletting may apply the Rent therefrom first to the payment of Landlord's cost and expenses, including consultant and/or expert and attorneys' fees and expenses incurred by reason of such Lease Default, and the cost and expense of reletting including, but not limited to, repairs, renovation, or alteration of the Leased Premises and then to the amount of Rent and all other sums due from or payable by Tenant hereunder, Tenant remaining liable for all other sums due from or payable by Tenant hereunder and for any deficiency.  Tenant shall also be liable for and indemnify Landlord against all amounts owed to

Medicare, Medicaid, all applicable third-party payor programs, third party payors, or residents, including, but not limited to, any overpayments received by Tenant, relating to the Term. Any and all such deficiencies shall constitute Additional Rent hereunder and shall be payable by Tenant monthly on the date herein provided for the payment of Rent. In addition to the foregoing remedies, Landlord shall immediately be entitled to retain the Security Deposit and draw on and retain proceeds of the Letter of Credit, and thereafter Tenant shall have no further claim, right, title or interest therein to the extent of Landlord's claims only.

Landlord acknowledges that its rights of reentry onto the Leased Premises set forth in this Lease do not confer on Landlord the authority to operate a nursing facility as defined in Article 28 of the Public Health Law on the Leased Premises and agrees that except in the event of a Lease Default Landlord will give the DOH, Tower Building, Empire State Plaza, Albany, NY 12237, notification by certified mail of its intent to reenter the Leased Premises or to initiate dispossessory proceedings or that the Lease is due to expire at least thirty (30) days prior to the date on which Landlord intends to exercise a right of reentry or to initiate such proceedings or at least sixty (60) days before expiration of the Lease.

Upon receipt of notice from Landlord of its intent to exercise its right of reentry or upon the service of process in dispossessory proceedings and sixty (60) days prior to the expiration of the Lease, Tenant shall immediately notify by certified mail the DOH, Tower Building, Empire State Plaza, Albany, NY 12237 (or its then current address), of the receipt of such notice or service of such process or that the Lease is about to expire.

(b)     Except as provided in this Lease to the contrary, Rent and other sums not paid when due (unless paid within any applicable grace period) shall bear interest from the date when the same are first payable under the terms of this Lease until the same shall be paid at an annual rate of interest equal to the Overdue Rate.

(c)     Upon the filing of a petition by or against Tenant pursuant to the Bankruptcy Code, Tenant, as debtor and as debtor-in-possession, and any trustee who may be appointed shall: (i) timely perform each and every obligation of Tenant under this Lease until such time as this Lease is either rejected or assumed by order of the United States Bankruptcy Court; (ii) pay monthly in advance on the first day of each month as reasonable compensation for use and occupancy of the Leased Premises an amount equal to the Rent and other charges otherwise due pursuant to this Lease; and (iii) reject or assume this Lease within one hundred twenty (120) days after the filing of such petition under the Bankruptcy Code or within such time period as the Bankruptcy Code may allow. Tenant, as debtor and as debtor-in-possession and any trustee shall be deemed to have rejected this Lease in the event of the failure to comply with any of the above. Included within and in addition to any other conditions or obligations imposed upon Tenant or its successor, in the event of assumption and/or assignment is the prior written consent of any mortgagee to which this Lease has been assigned as collateral security.

(d)     In the event of termination of this Lease by reason of any Lease Default by Tenant, or upon the expiration of the Term, then, and in any of such events, Tenant, upon Landlord's written request, shall to the greatest extent permitted by law, transfer to Landlord or its designees or assigns, or cause its Subtenants and/or Affiliates, to transfer to Landlord or its designees or assigns, the following: (i) all federal, state or municipal licenses,

certifications, certificates, accreditations, approvals, permits, variances, waivers, provider agreements (including non-governmental) and other authorizations which relate to the operation of the Facility; and (ii) the name of the Facility as then commonly known to the general public. Tenant shall also prepare and file all notices required by applicable law in connection with such termination and shall also prepare and timely file all final Medicare and Medicaid cost reports. In the event Tenant fails or refuses to transfer any such licenses, certifications, certificates, accreditations, approvals, permits, variances, waivers, provider agreements, other authorization or trade name, then this provision shall constitute an act of assignment by Tenant to Landlord or its assigns without the necessity of any further written instrument. For this purpose, Tenant constitutes and appoints Landlord its true and lawful attorney-in-fact with full power of substitution to complete or undertake such replacements in the name of Tenant. Such power of attorney shall be deemed to be a power coupled with an interest and cannot be revoked.

(e)     Landlord shall have the option of taking over the operation of the Facility, or having the operation of the Facility taken over by a designee, in the event of a termination of this Lease for any reason, without Landlord or designee assuming any of Tenant's liabilities or obligations, including Tenant's liabilities and obligations with respect to employees, such as vacation, sick leave, health insurance and pension liabilities and Tenant's obligations under applicable law to offer and provide group health continuation coverage. Landlord shall give Tenant written notice of Landlord's intent to exercise the right set forth above, in which event, upon the approval of the DOH of the Change of Ownership, Tenant shall and shall cause the Subtenant to immediately turn over possession and control of the Facility without any further action having to be taken on the part of Landlord. At the request of Landlord, Tenant shall and shall cause the Subtenant to turn over any or all of inventories, personal property (including computer and telecommunications equipment but excluding any leased equipment) vehicles, and material contracts (including hospital, transfer, vendor, and managed care contracts).

(f)     No failure of Landlord to enforce any rights or remedies upon default of Tenant shall prejudice or affect the rights of Landlord upon any subsequent or similar default.

(g)     In the event of a Lease Default by Tenant of any of the terms, covenants, conditions or provisions of this Lease, which Lease Default is not cured within any applicable grace or cure period, Landlord shall have the right to invoke any remedy permitted to Landlord at law, in equity or otherwise. All remedies available to Landlord are declared to be cumulative and concurrent and the exercise of one shall not preclude or waive the right to exercise any other. No termination of this Lease and no taking or recovering of possession of the Leased Premises shall deprive Landlord of any of its remedies or actions against Tenant and Tenant shall remain liable for all past or future Rent, including all taxes, insurance premiums and all other charges and Rent payable by Tenant under this Lease, during and for the balance of the Term hereof. The bringing of any action for Rent or other default shall not be construed as a waiver of the right to obtain possession of the Premises.

(h)     If suit shall be brought for recovery of possession of the Leased Premises, for the recovery of Rent, or any other amount due under the provisions of this Lease, or because of the breach of any other covenant herein contained on the part of Tenant to be kept or performed, and breach shall be established, Tenant shall pay to Landlord all expenses,

56

including reasonable attorney fees, incurred therefor. This subsection shall survive termination of this Lease.

Section 16.2    Facility Operating Deficiencies.    On written notice of a request therefor by Landlord to Tenant, upon a Lease Default and for a period of time necessary to fully remedy the Lease Default, Tenant shall engage the services of a consultant, unaffiliated with Tenant and approved by Landlord, which approval shall not be unreasonably withheld, to review the management of the facility for the purpose of making recommendations to remedy the Lease Default. Subject to applicable legal requirements governing confidentiality of patient records, the consultant shall have complete access to the Facility, its records, offices and facilities, in order that it may carry out its duties. Tenant shall cause such consultant to prepare and deliver to Landlord and Tenant a written report of its recommendations within ten (10) days after its engagement. If Tenant shall fail to designate a consultant approved by Landlord as provided above within five (5) days after Tenant's receipt of Landlord's notice, Landlord may designate such consultant by further notice to Tenant. Tenant shall be responsible for payment of all fees and expenses reasonably charged and incurred by the consultant in carrying out its duties. Tenant shall promptly implement any and all reasonable recommendations made by such consultant in order to promptly correct or cure the Lease Default; provided, however, that in no event shall Tenant implement any such recommendations if the same would constitute a violation of applicable legal requirements, violate any rule or regulation of the DOH, or would otherwise cause a Lease Default hereunder (e.g., a transfer or change in use of the Leased Premises), unless Landlord consents in writing to such Lease Default, which consent may be given or withheld in Landlord's sole and absolute discretion. Nothing herein shall impose any liability or obligation on Landlord to (a) request the appointment of a consultant or (b) otherwise remedy the Facility Operating Deficiency(ies) nor shall it deem Landlord an operator of the Facility.

Section 16.3    Receivership.

Tenant acknowledges that one of the rights and remedies available under applicable law for nursing facilities which fail to comply with the conditions of participation for Medicare or Medicaid is to apply to a court of competent jurisdiction for the appointment of a receiver to take possession of the Facility, to collect the rents, issues, profits and income of the Facility and to manage the operation of the Facility. Tenant further acknowledges that the revocation, suspension or material limitation of the certification of the Facility for provider status under Medicare or Medicaid (or successor programs) and/or the revocation, suspension or material limitation of a license relating to the operation of the Facility for its intended use under the laws of the State of New York will materially and irreparably impair the value of Landlord's investment in the Facility. Therefore, in the event of a Lease Default, and in addition to any other right or remedy of Landlord under this Lease, at the request of Landlord, Tenant shall request DOH to, or to the extent permissible under law, Tenant shall, petition any appropriate court, for the appointment of a receiver to take possession of the Facility, to manage the operation of the Facility under Tenant's licenses and certifications, to collect and disburse all rents, issues, profits and income generated thereby and to preserve or replace to the extent possible any such license and provider certification for the Facility or to otherwise substitute the licensee or provider thereof. The receiver shall be entitled to a reasonable fee for its services as a receiver. All such fees and other expenses of the receivership estate shall be added to the

57



monthly Rent due to Landlord under this Lease as Additional Rent. Tenant hereby irrevocably stipulates to the voluntary appointment of a receiver under such circumstances and for such purposes and agrees not to contest such appointment.

Section 16.4    Tenant's Waiver; Mitigation.  In connection with the exercise by Landlord of any of its remedies under this Section 16, including the termination of this Lease, in whole or in part, Tenant waives, to the maximum extent permitted by applicable Laws, (1) any right of redemption, re-entry or repossession, (2) the benefit of any moratorium laws or any laws now or hereafter in force exempting property from liability for rent or for debt, (3) any duty on the part of Landlord to mitigate the damages recoverable from Tenant on account of any Lease Default by Tenant, except that, notwithstanding the foregoing or anything in this Lease to the contrary, Landlord agrees to comply with any duty to mitigate damages where applicable Laws do not allow Tenant to waive such right, (4) the right to interpose any counterclaim (other than compulsory counterclaims) in any summary proceeding instituted by Landlord against Tenant in any court or in any action instituted by Landlord in any court for unpaid Rent under this Lease, and (5) any other right provided to Tenant under applicable Laws relating to a breach of or Lease Default under this Lease, including any rights to cure such breach or Lease Default.

## ARTICLE XVII

## ENTRY AND REIMBURSEMENT RIGHTS OF LANDLORD

Section 17.1    Entry and Reimbursement Rights of Landlord.In addition to those rights set forth in Section 7.2 of this Lease, Landlord reserves the right at all reasonable times during business hours and upon at least twenty-four (24) hours' advance oral notice to go upon and inspect the Facility and every part thereof (subject to applicable Laws pertaining to patient confidentiality and privacy and the confidentiality of medical records).  If Landlord shall make any payments or perform any repairs on behalf of Tenant which are Tenant's obligation and which Tenant has failed to make after applicable notice from Landlord, then any reasonable amounts so paid by Landlord are agreed and declared to be Additional Rent, and shall be due and payable to Landlord by Tenant upon submission to Tenant of an invoice, bill, or statement therefor, together with interest charged at the Overdue Rate commencing on the date of such invoice, bill, or statement.  Nothing in this Section 17.1 shall impose any liability or obligation upon Landlord.

## ARTICLE XVIII

## REPRESENTATIONS AND WARRANTIES

Section 18.1    Tenant's Representations, Warranties and Additional Covenants. Tenant represents, warrants and covenants to Landlord and agrees (all of which shall survive the delivery and execution of this Lease) as follows (all of Tenant's representations, warranties, and covenants shall be deemed to include, in addition to that specified herein, the identical warranties, representations, and covenants of all Subtenants, which Tenant agrees to set forth in any Sublease and which are hereby incorporated herein by reference as if set forth in full herein):

58



(a)      <u>Corporate</u>.   Tenant is a limited liability company duly formed and validly existing and in good standing under the laws of the State of New York, and has the limited liability company power and authority to own its property and assets and to carry on its business as now being conducted or as will be conducted on and after the Commencement Date.

(b)      <u>No Breach of Statute or Contract</u>.   The execution, delivery and performance of this Lease by Tenant and any Sublease by a subtenant will not breach any statute or regulation of any Governmental Authority, and will not as of the Commencement Date conflict with or result in a breach of or default under any of the terms, conditions or provisions of Tenant's articles of organization, operating agreement, other material agreements, or any order, writ, injunction, decree, agreement or instrument to which Tenant is a party, or by which it or its property, may be bound.

(c)      <u>Authorization of Lease</u>.   The execution, delivery and performance of this Lease, and all Subleases, has been duly authorized by all necessary individuals, shareholders, members, officers, directors, managers and/or owners of Tenant and this Lease constitutes the valid and binding obligation of Tenant, fully enforceable in accordance with its terms.

(d)      <u>No Litigation or Adverse Events</u>.   Except as set forth on <u>Schedule 18.1(d)</u> attached hereto and incorporated herein, there is no suit, claim, action or legal, administrative, arbitration, or other proceeding or governmental investigation pending or threatened, by or against Tenant, and there exists no event or condition of any character, which could prevent the consummation of the transactions contemplated by this Lease or materially adversely affect Tenant's performance of the terms and conditions hereunder.

(e)      <u>Conduct of Business</u>.   Subject to the express provisions herein, at all times after the Effective Date, Tenant shall, and cause its subtenants to (i) operate the Leased Premises (after the Commencement Date) and otherwise conduct its/their business in the ordinary course, and in compliance with all statutory and regulatory requirements of any federal, state or local authority, (ii) continue to operate the Leased Premises after the Commencement Date and maintain it in substantially its condition as of the Commencement Date, reasonable wear and tear excepted, including but not limited to repairs and replacements permitted or required under this Lease, and in a lawful manner, (iii) not encumber all or any portion of its assets or properties or the Leased Premises, including without limitation, certificates of need, bed rights, or provider agreements, (iv) preserve the goodwill of the Facility, (v) not take any action from an accounting perspective which would materially adversely affect the reimbursement formula or tax benefits with respect to the Leased Premises or any portion thereof, (vi) utilize the Leased Facility only for the Intended Purpose, (vii) not relinquish or attempt to transfer the location of or sell the skilled nursing facility license, certificate of need approval, Medicare or Medicaid certification or any other licenses, certifications, certificates, accreditations, approvals, permits, variances, waivers, provider agreements or other authorizations , (viii) not refuse to admit patients without 30 days' written notice of intent to, and prior written consent of, Landlord, (ix) not dissolve, merge or consolidate with or into any other person or entity, or otherwise change its identity or company or capital structure, or (x) not change its name or its business address..

59



(f)     Continued Existence.  At all times on and after the Effective Date, Tenant shall cause to be done all things needed to preserve its rights and franchises and comply with all Laws applicable to it, and to continue to conduct its business in the ordinary course.

(g)     Payment of Obligations.  At all times on and after the Effective Date, Tenant shall timely pay, and cause its subtenants to timely pay, all of its/their obligations, indebtedness, taxes, charges and impositions, whether or not relating to the Leased Premises or this Lease, as they become due unless contested in good faith and diligently pursued only if permitted under and subject to the terms and conditions of this Lease.

(h)     Notice of Default.  At all times on and after the Effective Date, Tenant shall promptly notify Landlord of (i) any material default by Tenant relating to any indebtedness or obligation of Tenant, whether or not relating to the Leased Premises or this Lease, and (ii) any material violations by the Facility of any applicable Law.

(i)     Compliance with Law.  At all times on and after the Effective Date, Tenant shall comply in all respects, and cause its subtenants to comply in all respects, with all applicable Laws, including Medicare and Medicaid conditions of participation, to which it is subject or which are applicable to the Leased Premises and to Tenant's operation of the Leased Premises as a licensed, Medicare and Medicaid certified skilled nursing facility.

(j)     Beds and CON.  Tenant has been awarded a CON for construction and operation of 160 skilled nursing facility beds for use at the Lease Premises by DOH and such CON may be used in connection with this Lease.

(k)     Tenant, on behalf of itself and its Subtenants, makes the Health Care warranties and representations set forth in Schedule 18(k) attached hereto and incorporated herein, to Landlord, it's successors and assigns, which warranties and representations shall be true and correct as of Commencement Date and at all times during the Term.

(l)     Except for the Subleases of the Leased Premises to the Operators, there are no subleases or sub-subleases or occupancy agreements (other than residence agreements with patients or residents) for any portion of the Leased Premises.

(m)     Tenant shall maintain and comply at all times with all O&M Plans (Operation and Maintenance Plans covering the handling, treatment or maintenance of asbestos or Hazardous Materials) relating to the Leased Premises, or that shall be required in the future by Mortgagee or any HUD mortgagee or, where applicable, the Commissioner.

(n)     Obligations prior to Commencement Date.  In addition to all of Tenant's obligations provided in this Lease, Tenant shall:

(i) as soon as practical after the Effective Date, apply for all and rigorously pursue until obtained all Health Care Licenses;

(ii) as soon as practical after the Effective Date and continuing thereafter take all actions necessary or appropriate to obtain from DOH the maximize total project cost for the Facility approvable by DOH;

60

(iii)as soon as practical after the Effective Date and continuing thereafter take all actions necessary or appropriate to obtain the highest possible reimbursement rate with respect to the Medicare and Medicaid programs;

(iv)as soon as practical after the Effective Date, apply for and rigorously pursue until obtained provider agreements with third party payors providing reimbursement for skilled nursing facility services in the geographic area of the Facility;

(v) after the Effective Date take all actions requested by Landlord in order for Landlord to finance and complete Landlord's Work.

(vi)as soon as practical prior to the Commencement Date, hire, employ and train a staff adequate to provide services to the residents of the Facility immediately after the Commencement Date;

(viii)    as soon as practical prior to the Commencement Date, purchase a sufficient inventory of food, medicines and other perishable items necessary to provide services to the residents of the Facility immediately after the Commencement Date;

(ix)    as soon as practical prior to the Commencement Date, purchase and deliver to the Facility all small wares necessary provide services to the residents of the Facility immediately after the Commencement Date;

(x)    six months after the Effective Date and thereafter every six months until the Commencement Date, deliver to Landlord a detailed projected statement of income and expenses and cash flow for a three year period.

Section 18.2    <u>Representation and Warranties.</u>  Landlord hereby represents and warrants to Tenant, all of which shall survive the delivery and execution of this Lease, and agrees, as follows:

(a)    <u>No Breach of Statute or Contract</u>.  The execution, delivery, and performance of this Lease will not violate any provision of law, any order of any court or other agency of federal or state government or any provision of any indenture, agreement, or other instrument to which Landlord is a party or by which it or any of its properties or assets are bound; conflict with, result in a breach of, or constitute (with passage of time or delivery of notice, or both), a default under any such indenture, agreements or other instrument; or result in the creation or imposition of any lien or other encumbrance of any nature whatsoever upon any of the properties or assets of Landlord.

(b)    <u>Authorization of Lease</u>.  This Lease has been duly authorized by all necessary individuals, shareholders, members, officers, directors, managers and/or owners of Landlord and this Lease constitutes the valid and binding obligation of Landlord, fully enforceable in accordance with its terms.

(c)    <u>No Litigation or Adverse Events</u>.  There is no action, suit, examination, review, or proceeding by or before any governmental instrumentality or agency now pending or, to the knowledge of Landlord, threatened against Landlord, which, if adversely determined,

61



would materially impair the right of Landlord to carry on the business as contemplated under this Lease.

       (d)      No Default.  Landlord is not in default in the performance, observation, or fulfillment of any of the obligations, covenants, or conditions contained in any agreement or instrument to which it is a party relating to the Leased Premises and which default would have a material adverse affect on the Leased Premises; and

       (e)      Corporate.  Landlord is a limited liability company duly formed, validly existing, and in good standing under the laws of the State of New York and is qualified to do business in the State of New York, and has the limited liability company power and authority to own its properties and assets and to carry on its business as now being conducted.

## ARTICLE XIV

## OPERATION, MERGER AND CONSOLIDATION RESTRICTIONS

Section 19.1    Intentionally Omitted

    Section 19.2    SPE Provisions.  At all times during the term of this Lease, Tenant represents, warrants and covenants that Tenant and each Subtenant, and all successors and assigns of Tenant and Subtenants, is, shall be and shall continue to be a **"Special Purpose Entity"** as defined in Schedule 19.2.  The Operating Agreement of Tenant and each subtenant shall include the Special Purpose Entity provisions set forth in Schedule 19.2.

    Section 19.3    Injunctive Relief.  Notwithstanding anything to the contrary set forth in this Lease, the Parties hereto understand and agree that:  (a) each term of Article XIX of this Lease is fully required to protect Landlord's interests, and that no such term confers a benefit on Landlord that is disproportionate to the detriment imposed on Tenant, if any; (b) the remedy at law for any breach by Tenant of Article XIX would be inadequate; (c) the damages flowing from such breach are not readily susceptible to measurement in monetary terms; and (d) Landlord shall be entitled to immediate injunctive relief restraining any breach thereof. Nothing in this Agreement shall be deemed to limit Landlord's remedies at law or in equity for any such breach by Tenant of any term or provision of Article XIX of this Lease.

    Section 19.4    Equity Interests.  In the event that Tenant or any constituent entity under this Lease is ever a form of entity other than a limited liability company, the term **"membership interest"** as used in Articles XIX and XX hereof shall be deemed to mean the analogous form of equity ownership interest in such other type of entity, such as capital stock, partnership interest, beneficial interest or the like.

    Section 19.5    No Merger or Consolidation.  Except as expressly provided elsewhere in this Lease, Tenant shall not sell, or offer for sale, its assets or otherwise merge, consolidate, amalgamate or otherwise combine with any other entity other than selling non-material assets in the ordinary course of business, to any other entity, business or activity involving any of Tenant's officers, directors, members, managers, owners, representatives, agents, successors and assigns, and their respective successors, assigns, agents and

2305449v5/17057-6



representatives. Except as expressly provided elsewhere in this Lease, Tenant, Subtenants, Guarantor(s) and their Affiliates, shall not sell or offer to sell, assign, transfer, convey, pledge, or encumber its/their membership interests to, or otherwise attempt to merge with or otherwise merge, consolidate, amalgamate or otherwise combine with any other entity, business or activity, whether involving any of Tenant's officers, directors, members, managers, owners, representatives, agents, successors and assigns, and their respective successors, assigns, agents and representatives, or otherwise.

## ARTICLE XX

## MISCELLANEOUS

Section 20.1    GOVERNING LAW. (a) ALL MATTERS PERTAINING TO THIS LEASE OR THE LEASED PREMISES SHALL BE GOVERNED BY AND CONSTRUED ACCORDING TO THE LAWS OF THE STATE OF NEW YORK AND ANY APPLICABLE LAW OF THE UNITED STATES OF AMERICA. TO THE FULLEST EXTENT PERMITTED BY LAW, TENANT HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVES ANY CLAIM TO ASSERT THAT THE LAW OF ANY OTHER JURISDICTION GOVERNS THIS LEASE, AND THIS LEASE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK (WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAWS).

(b)    ANY LEGAL SUIT, ACTION OR PROCEEDING AGAINST LANDLORD OR TENANT ARISING OUT OF OR RELATING TO THIS LEASE MAY AT LANDLORD'S OPTION BE INSTITUTED IN ANY FEDERAL OR STATE COURT IN THE CITY OF WHITE PLAINS, COUNTY OF WESTCHESTER, PURSUANT TO SECTION 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW, AND TENANT WAIVES ANY OBJECTIONS WHICH IT MAY NOW OR HEREAFTER HAVE BASED ON VENUE AND/OR *FORUM NON CONVENIENS* OF ANY SUCH SUIT, ACTION OR PROCEEDING, AND TENANT HEREBY IRREVOCABLY SUBMITS TO THE JURISDICTION OF ANY SUCH COURT IN ANY SUIT, ACTION OR PROCEEDING. TENANT DOES HEREBY DESIGNATE AND APPOINT:

> Lizer Josefovic
> HBL SNF, LLC
> 1280 Albany Post Road
> Croton-on-Hudson, New York 10520

AS ITS AUTHORIZED AGENT TO ACCEPT AND ACKNOWLEDGE ON ITS BEHALF SERVICE OF ANY AND ALL PROCESS WHICH MAY BE SERVED IN ANY SUCH SUIT, ACTION OR PROCEEDING IN ANY FEDERAL OR STATE COURT IN NEW YORK, NEW YORK, AND AGREES THAT SERVICE OF PROCESS UPON SAID AGENT AT SAID ADDRESS AND WRITTEN NOTICE OF SAID SERVICE MAILED OR DELIVERED TO TENANT IN THE MANNER PROVIDED IN ARTICLE XIII OF THIS LEASE SHALL BE DEEMED IN EVERY RESPECT EFFECTIVE SERVICE OF PROCESS UPON TENANT IN ANY SUCH SUIT, ACTION OR PROCEEDING IN THE

2305449v5/17057-6

STATE OF NEW YORK.  TENANT (A) SHALL GIVE PROMPT WRITTEN NOTICE
TO LANDLORD OF ANY CHANGED ADDRESS OF ITS AUTHORIZED AGENT
HEREUNDER, (B) MAY AT ANY TIME AND FROM TIME TO TIME DESIGNATE, IN
THE FORM OF A WRITTEN NOTICE TO LANDLORD, A SUBSTITUTE
AUTHORIZED AGENT WITH AN OFFICE IN WHITE PLAINS, NEW YORK (WHICH
SUBSTITUTE AGENT AND OFFICE SHALL BE DESIGNATED AS THE PERSON
AND ADDRESS FOR SERVICE OF PROCESS), AND (C) SHALL PROMPTLY
DESIGNATE SUCH A SUBSTITUTE IF ITS AUTHORIZED AGENT CEASES TO
HAVE AN OFFICE IN NEW YORK, NEW YORK OR IS DISSOLVED WITHOUT
LEAVING A SUCCESSOR AND NOTIFY LANDLORD IN WRITING OF SUCH
SUBSTITUTION.

Section 20.2    Waiver of Breach.  The waiver by either party of a breach or
violation of any provision of this Lease shall not operate as, or be construed to be a waiver of,
any subsequent breach of the same or other provision hereof.  No waiver shall be effective unless
set forth in writing and signed by the party against whom such waiver is asserted.

Section 20.3    Delay Not a Waiver.  Neither any failure nor any delay on the part
of any party hereto in insisting upon strict performance of any term, condition, covenant or
agreement, or exercising any right, power, remedy or privilege hereunder, or any other document
or instrument entered into or delivered in connection herewith or pursuant hereto, shall operate
as or constitute a waiver thereof, nor shall a single or partial exercise thereof preclude any other
future exercise, or the exercise of any other right, power, remedy or privilege.  A waiver of one
default with respect to any Person shall not be construed to be a waiver of any subsequent default
with respect to such Person or any other Person or to impair any remedy, right or power
consequent thereon.

Section 20.4    Force Majeure.  Neither party shall be liable nor deemed to be in
default (other than monetary defaults) for any delay or failure in performance under this Lease or
other interruption of service or employment deemed resulting, directly or indirectly, from acts of
God, acts of public enemy, war, accidents, fires, explosions, earthquakes, floods, failure of
transportation, strikes or other work interruptions by either Parties' employees, or any similar or
dissimilar cause beyond the reasonable control of either party ("Force Majeure").

Section 20.5    Severability.  In the event any provision of this Lease is
held to be unenforceable for any reason, the unenforceability thereof shall not affect the
remainder of this Lease so long as the intent of the parties under this Lease can still be effected,
which shall remain in full force and effect and enforceable in accordance with its terms.

Section 20.6    Entire Agreement; Amendments.  This instrument contains the
entire agreement between the Parties hereto with respect to the subject matter hereof.  All
representations, promises and prior or contemporaneous undertakings between such Parties are
merged into and expressed in this instrument, and any and all prior agreements between such
Parties are hereby canceled.  The agreements contained in this instrument shall not be amended,
modified, or supplemented except by a written agreement duly executed by both Landlord and
Tenant.

2305449v5/17057-6



Section 20.7    Counterpart Execution; Electronic Execution.  This Lease may be executed in any number of counterparts with the same effect as if the Parties hereto had signed the same document.  All counterparts will be construed together and shall constitute one lease.  Signatures transmitted by email as PDFs shall have the same effect as original signatures.

Section 20.8    Survival of Representations and Warranties.  Except as specifically provided otherwise in this Lease, all representations and warranties of Landlord and Tenant shall survive the Term of this Lease.

Section 20.9    Use of Brokers.  Landlord and Tenant each represent and warrant to the other that no broker, finder or other person has been involved in regard to this Lease.  Landlord and Tenant hereby agree to indemnify, defend and hold the other harmless from and against any and all claims, liabilities, costs and expenses of any kind (including the injured party's reasonable attorneys' fees and expenses) in any way relating to or arising from a claim by any Person that such Person acted on behalf of a party to this Lease in connection with the transactions contemplated herein.   The provisions of this Section 20.9 shall survive the expiration and termination of this Lease.

Section 20.10   Owner for Federal Tax Purposes.  It is hereby agreed between Landlord and Tenant that for federal, state and local income tax purposes Landlord will be the owner of the Leased Premises and Tenant will be the lessee thereof, and each party hereto agrees to characterize this Lease as a lease for federal, state and local income tax purposes and to file all tax returns consistent therewith.

Section 20.11   Estoppel Certificates.  Tenant shall, without charge, at any time and from time to time, within ten (10) days after written request by Landlord or Mortgagee, deliver a written instrument to Landlord or any other person specified by Landlord, duly executed and acknowledged, certifying the following and such other matters as may be reasonably required by Landlord, including without limitation, current financial information relating to Tenant:

(a)    That Tenant has accepted and is in possession of the Leased Premises;

(b)    That this Lease is unmodified and in full force and effect or, if there has been any modification, that the same is in full force and effect as so modified, and identifying any such modification;

(c)    Whether or not there are then existing any setoffs or defenses in favor of Tenant against the enforcement of any of the terms, covenants, and conditions of this Lease by Landlord and, if so, specifying the same, and also whether or not Landlord has observed and performed all of the terms, covenants, and conditions on the part of Landlord to be observed and performed and, if not, specifying same;

(d)    That no Lease Defaults exist or are continuing; and

(e)    The dates to which Rent and all other charges hereunder have been paid.

65



Section 20.12 Confidentiality. (a) Landlord and Tenant agree to keep all aspects of (but not the existence of) this Lease confidential, and shall not disclose to any person other than the members, managers, owners, directors, officers, employees, agents, advisors, affiliates, brokers, lenders, attorneys or accountants (collectively the "Representatives") of the Parties hereto on a need-to-know basis, or to any Governmental Authority pursuant to regulatory authority, any confidential or proprietary information, knowledge or data concerning the business, affairs, operations, secrets, dealings or finances of the other party furnished directly or indirectly by such other party (collectively referred to as the "Confidential Information"). As used in this Lease, the term "Confidential Information" does not include any information which: (i) at the time of disclosure is generally available to and known by the public (other than as a result of a disclosure directly or indirectly by either party or their Representatives); (ii) was available to either party on a non-confidential basis from a source other than a party to this Lease or its Representatives, provided that such source is not and was not bound by a confidentiality agreement with the party hereto; (iii) has been independently acquired or developed by either party or their Representatives without violating any of the obligations hereunder; (iv) is required by law to be disclosed; or (v) relates to the tax structure, tax strategy or tax planning of this transaction.

(f)    In the event that either party or any of the Representatives receives notice of a legal request for disclosure of any of the Confidential Information (by deposition, interrogatory, request for documents, subpoena, civil investigative demand or similar process), the party receiving such notice ("Receiving Party") shall promptly notify the other party ("Notified Party") so that the Notified Party may seek a protective order or other appropriate remedy if it chooses to do so. Failure by the Notified Party to take action to seek a protective order or other remedy and to notify the Receiving Party of such action prior to the required disclosure date, shall be deemed a waiver of the provisions of this section. In the event that a protective order or other remedy is not obtained or that the Notified Party waives compliance with the provisions hereof, the Receiving Party shall exercise its best efforts to obtain a confidentiality agreement or protective order concerning the Confidential Information, and in the absence thereof, shall disclose only that portion of the Confidential Information which it is advised by written opinion of counsel is legally required to be disclosed, or which is compelled by court order.

(g)    In the event of any breach or threatened breach hereof, Landlord or Tenant shall be entitled to equitable relief, including a temporary preliminary and permanent injunction and specific performance, in addition to all other remedies available to them at law or in equity.

(h)    Notwithstanding anything herein to the contrary, Landlord (and each employee, agent, or other Representative of Landlord) may disclose to any and all persons, without limitation of any kind, the tax treatment and tax structure of this Lease, related documents and all materials of any kind (including opinions or other tax analyses) that are provided to Landlord relating to such tax treatment and tax structure. For this purpose, the tax treatment of a transaction is the purported or claimed U.S. federal income tax treatment of the transaction and the tax structure of a transaction is any fact that may be relevant to understanding the purported or claimed U.S. federal income tax treatment of the transaction.

2305449v5/17057-6



Section 20.13    Holdover.  If, at the expiration of the Term, or earlier termination of the Lease, Tenant continues to occupy the Leased Premises except during a Reimbursement Period, with Landlord's consent, such holding over shall not constitute a renewal of this Lease, but Tenant shall be a Tenant from month-to-month at 300% of the most recent Rent payable by Tenant hereunder, at Landlord's sufferance, and under the same terms and conditions as were in force and effect at the expiration of the Term (except only as to the Term), and except that in the event Tenant shall continue to occupy the Leased Premises after the expiration of the Term, without a duly executed extension agreement in writing having been entered into by and between Landlord and Tenant, then if Landlord shall suffer any damage, loss, cost or expense as a result of such holdover, then Tenant, in addition to such increased Rent, shall pay the amount thereof to Landlord immediately on demand. The provisions of this Section shall be deemed to be "an agreement expressly provided" otherwise as provided in Section 232-C of the Real Property Law of the State of New York. Holding Over.  Nothing contained herein shall constitute the consent, express or implied, of Landlord to the holding over of Tenant after the Expiration Date or earlier termination of this Lease, nor shall anything contained herein be deemed to limit Landlord's remedies.

Section 20.14    Tenant's Waiver of Claim for Physical Injury.  Landlord and Landlord's Indemnitees shall not be liable for, and Tenant waives and indemnifies Landlord and Landlord's Indemnitees against all claims for, damage or injury to person or property sustained by Tenant or any person claiming through Tenant, or otherwise, resulting from any accident or occurrence in, about, or upon the Leased Premises, whether occurring as a result of Landlord's active or passive negligence, or otherwise.

(a)    Such waiver shall include, but not be limited to, claims for damage resulting from:  (i) any equipment or appurtenances becoming out of repair or any other capital improvement, replacement, repair or maintenance; (ii) injury done or occasioned by wind; (iii) any defect in or failure of plumbing, heating, or air conditioning equipment, electric wiring, gas, water and steam pipes, stairs, rail or walks; (iv) broken glass; (v) the backing up of any sewer pipe or washstand, water closet, waste pipe, drain or any other pipe or tank in, upon or about the Leased Premises; (vi) the escape of steam or hot water; (vii) water, snow or ice being upon, falling from or coming through the roof, skylight, trap door, stairs, walks or any other place upon or near the Leased Premises; (viii) the falling of any fixture, plaster, drywall or stucco; and (ix) any act, omission or negligence of trespassers.

Section 20.15    Binding Effect.  This Lease does not constitute an offer to lease and shall not bind Landlord or Tenant unless and until each such party elects to be bound hereby by executing and delivering to the other party an executed original counterpart hereof.

Section 20.16    Default by Landlord.  Landlord shall in no event be charged with default in the performance of any of its obligations hereunder unless and until Landlord shall have failed to perform such obligations within sixty (60) days of when they are due to be performed, except in cases when documents are required or consents needed in less than sixty (60) days in which case failure to render timely shall be deemed to be approval or consent of Landlord (or such additional time as is reasonably required to correct any such default) except for Landlord's default in making timely payment of taxes and interest, in which case Landlord shall be in default when such payments are delinquent or past due. Tenant agrees to give to the

67

holder of record of any mortgage covering the Leased Premises notice simultaneously with any notice given to Landlord to correct any default of Landlord as hereinabove provided and agrees that the holder of record of any mortgage shall have the right, after receipt of notice of such default, within sixty (60) days after the expiration of Tenant's applicable cure period with respect thereto, to correct or remedy such default before Tenant may take any action under this Lease by reason of such default. Landlord shall also give to the holder of any mortgage copies of any notices of default which it may give or send to Tenant.

Section 20.17   Liens.  Tenant shall not do or suffer anything to be done whereby the Leased Premises, or any portion thereof, or any interest therein, may be encumbered by any liens of mechanics, laborers, or materialmen, chattel mortgages or any other liens. Tenant shall, whenever and as often as any such liens are filed against the Leased Premises, or any portion thereof, purporting to be for labor or material furnished or to be furnished to Tenant, discharge the same of record within thirty (30) days after the date of filing by payment, bonding or otherwise, as provided by law. In the event of the default of Tenant in procuring the discharge, as aforesaid, of any such lien, Landlord may, with five (5) days prior notice, procure such discharge and the expenses incurred by Landlord in obtaining such discharge shall be paid by Tenant as Additional Rent within ten (10) days after notice from Landlord of the amount thereof.

Section 20.18   Publicity.  All news releases, publicity or advertising by Tenant or their Affiliates through any media intended to reach the general public which refers to Landlord, or its Affiliates, this Lease or the purchase of the Real Property shall be subject to the prior written approval of Landlord.

Section 20.19   Trial by Jury.  **TENANT HEREBY AGREES NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVES ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THIS LEASE, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH.  THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY TENANT, AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE.  LANDLORD IS HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY TENANT.**

Section 20.20   Construction and Interpretation.  The Parties have each negotiated the terms and conditions hereof and reviewed this Lease carefully. It is the intent of the Parties that each word, phrase, sentence and other part hereof shall be given its plain meaning, and that rules of interpretation or construction of contracts that would construe any ambiguity of any part hereof against the draftsman, by virtue of being the draftsman, shall not apply.

Section 20.21   Accord and Satisfaction.  No payment by Tenant or receipt by Landlord of a lesser amount than shall be due hereunder, shall be deemed to be other than a payment on account nor shall any endorsement or statement on any check or any letter accompanying any check or payment as rent be given any effect or be deemed an accord and

68



satisfaction, and Landlord may accept such checks without prejudice to any other rights or remedies which Landlord may have.

        Section 20.22   Captions and Headings. The captions and headings set forth in this Lease are included for convenience and reference only, and the words obtained therein shall in no way be held or deemed to define, limit, describe, explain, modify, amplify or add to the interpretation, construction or meaning of, or the scope or intent of, this Lease, or any parts hereof or thereof.

        Section 20.23   Time is of the Essence. Time is of the essence of each and every term, condition, covenant and warranty set forth herein or in any of the other Lease Documents.

        Section 20.24   Successors and Assigns.  This Lease and the other Lease Documents shall (a) be binding upon Tenant and Tenant's legal representatives and permitted successors and permitted assigns, and (b) inure to the benefit of Landlord and any other person or entity who may now or hereafter hold the interest of Landlord under this Lease and their respective successors and assigns.

        Section 20.25   No Third Party Beneficiaries This Lease is solely for the benefit of Landlord, its successors and assigns, and Tenant, and nothing contained herein shall confer upon any person other than Tenant or Landlord or their respective successors and assigns, any right to insist upon or to enforce the performance or observance of any of the obligations contained herein, except only as may be otherwise specifically provided for in this Lease. All conditions to the obligations of Landlord to advance or make available proceeds of insurance or condemnation are imposed solely and exclusively for the benefit of Landlord, its successors and assigns. No other person or entity shall have standing to require satisfaction of such conditions in accordance with their terms, and no other person or entity shall, under any circumstances, be a beneficiary of such conditions, any or all of which may be freely waived in whole or in part by Landlord at any time, if in Landlord's sole and absolute discretion, Landlord deems it advisable or desirable to do so.

        Section 20.26   Non Competition and Non Solicitation.

        Tenant agrees to the following restrictive covenants and agreements which covenants are not severable from this Lease and which are included to protect the value of the Leased Premises. Accordingly, Tenant agrees that it and their Affiliates will not, during the Term of this Lease at any time for a period of two (2) years after the expiration or early termination of this Lease, directly or indirectly, together or alone or in conjunction with any others, engage in the following:

        (i)     compete with the business conducted at the Facility, and for these purposes will not own, manage, operate, join, control or participate in, or be connected as an officer, employee, partner, director, trustee or otherwise in any manner with a company which owns or operates (or provides consulting and/or management services to any skilled nursing facility located within the Primary Market of the Facility or (ii) any company providing hospice services in the Commonwealth of Massachusetts, or, otherwise lend credit to a person, firm or entity of a type which they prohibited from owning,



(ii)   solicit or hire any then current or former (having provided services during the period commencing one year prior to such date of solicitation or hire) employees of the Facility (except for employment at the Facility),

(iii)   solicit or cause any then current resident of the Facility to move to another nursing facility unless, except during the Term of this Lease the Facility can no longer provide adequate care for such resident.

Tenant acknowledges and agrees that the remedy at law for any breach or threat of breach of the foregoing agreements will be inadequate and that Landlord shall be entitled to in-junctive relief in addition to any rights or remedies available to it for any breach or threat of breach hereof. The foregoing covenants shall be deemed to be severable and if the same be held invalid by reason of length of time or area covered, or both, the Tenant agrees that such length of time or area covered, or either of them, shall be reduced to the extent necessary to cure such invalidity and the provisions hereof shall be enforceable to the fullest extent permitted by law.

Section 20.27   <u>Subdivision</u>. If the Leased Premises are in excess of that which is required to operate the Facility in accordance with the Intended Use, Landlord may subdivide the Leased Premises and amend this Lease to include only so much of the Leased Premises as is necessary to operate the Facility in accordance with the Primary Intended Use. If Landlord subdivides the Leased Premises there shall be no change in the Rent payable hereunder. After any such subdivision, Tenant shall have no rights to any land which is no longer part of the Leased Premises and Landlord may sell, lease or develop any land which is no longer part of the Leased Premises. If Landlord elects to subdivide the Leased Premises Tenant shall cooperate with Landlord and take all actions reasonably requested by Landlord to effect such subdivision.

Section 20.28   <u>Landlord Not in Control; No Partnership</u>. None of the covenants or other provisions contained in this Lease shall, or shall be deemed to, give Landlord the right or power to exercise control over the affairs or management of Tenant, the power of Landlord being limited to the rights to exercise the remedies referred to in this Lease. The relationship between Tenant, on the one hand, and Landlord, on the other hand, is, and at all times shall remain, solely that of landlord and tenant. No covenant or provision of this Lease is intended, nor shall it be deemed or construed, to create a partnership, joint venture, agency or common interest in profits or income between Landlord, on the one hand, and Tenant, on the other hand. Landlord undertakes or assumes no responsibility or duty to Tenant or to any other person with respect to the Facility or this Lease, except as expressly provided in this Lease; and notwithstanding any other provision of this Lease (a) Landlord shall not be construed as, a partner, joint venturer, alter ego, manager, controlling person or other business associate or participant of any kind of Tenant or its stockholders, members, or partners and Landlord never intends to ever assume such status; (b) Landlord shall not in any event be liable for any debts, expenses or losses incurred or sustained by Tenant; and (c) Landlord shall not be deemed responsible for or a participant in any acts, omissions or decisions of Tenant or their stockholders, members, or partners. Landlord, on the one hand, and Tenant, on the other hand, disclaim any intention to create any partnership, joint venture, agency or common interest in profits or income between Landlord, on the one hand, and Tenant, on the other hand, or any sharing of liabilities, losses, costs or expenses.

70

2305449v5/17057-6



Section 20.29  <u>Tenant Cooperation</u>.  Tenant agrees to cooperate with Landlord in providing, and upon request by Landlord or its lender, Tenant shall provide or cause its subtenants to provide, such documents, information, financial reports, and such other items as may be required by Mortgagee in connection with Landlord's loan or loans to acquire the Leased Premises.  Tenant agrees to cause its outside counsel to provide updated healthcare opinions required by Mortgagee in connection with the healthcare operations by Tenant or its subtenants at the Facility, and if required by Mortgagee, an opinion of counsel as to the due formation of Tenant and its subtenants and due execution by said parties, and Tenant Affiliates, of the Lease, all subleases, all guaranties of the Lease, and any other documents executed by such parties in connection with the loan(s) from Mortgagee to Landlord.  Tenant agrees to execute, and cause the subtenants to execute, SNDAs in form and substance required by Mortgagee and by its prospective lender who will be making HUD-insured loans to Landlords.  Tenant further agrees to cooperate with Landlord and with its lenders who are processing and will be making HUD Loans to Landlords.

Section 20.30  <u>Capitalized Terms</u>.  To the extent capitalized terms used herein are not defined, they shall have the same meaning as capitalized terms in the Loan Documents.

Section 20.31  <u>Affiliate</u>.  The term "<u>Affiliate</u>" shall mean, as to any Person, any other Person that, directly or indirectly, is in control of, is controlled by or is under common control with such Person or is a director or officer of such Person or of an Affiliate of such Person.

<div align="center">

ARTICLE XXI

REMEDIES CUMULATIVE

</div>

Section 21.1    The rights and remedies set forth under this Lease are in addition to all other rights and remedies afforded to Landlord under any of the other documents contemplated under this Lease ("<u>Lease Documents</u>") or at law or in equity, all of which are hereby reserved by Landlord, and this Lease is made and accepted without prejudice to any such rights and remedies.  All of the rights and remedies of Landlord under each of the Lease Documents shall be separate and cumulative and may be exercised concurrently or successively in Landlord's sole and absolute discretion.

<div align="center">

ARTICLE XXII

LIMITATION OF LIABILITY

</div>

Section 22.1    <u>Liability</u>.  No member, manager, officer, shareholder, employee or agent of Landlord or its respective affiliates shall be held to any personal liability, jointly, or severally, for any obligation of, or claim against Landlord under this Lease.  All persons dealing with Landlord, in any way, shall look only to the assets of Landlord for the payment of any sum or the performance of any obligations.

<div align="center">

71

</div>



Section 22.2   <u>Consequential Damages</u>.   Under no circumstances shall Landlord be liable to Tenant or any subtenant or Affiliate of Tenant for any consequential, specified, exemplary or permitted damages.

Section 22.3   <u>Liability Limited to Interest in Premises</u>.   Tenant shall look solely to Landlord's interest in the Leased Premises owned by Landlord to satisfy any liability arising under this Lease.   It is specifically agreed that no constituent partner in Landlord or officer, director, member, manager or employee of Landlord shall ever be personally liable for any such judgment or for the payment of any monetary obligation to Tenant.   Except as otherwise expressly provided herein, in no event shall Landlord ever be liable to Tenant for any indirect or consequential damages suffered by Tenant from whatever cause.

## ARTICLE XXIII

## REGULATORY ACTIONS

Section 23.1   <u>Notice of Litigation</u>.   (a)  Promptly after receipt by Tenant or its Affiliates of notice of the commencement thereof, Tenant shall provide Landlord with notice of all actions, suits, and proceedings before any Governmental Authority affecting Tenant, or its Affiliates or its Subtenants, which, if determined adversely to Tenant, its Affiliates or its Subtenants, could result in a judgment equal to or greater than Fifty Thousand Dollars ($50,000.00).

(b)   <u>Notice of Regulatory Actions</u>.  Promptly after receipt by Tenant or its Affiliates of the notice of commencement thereof, Tenant shall provide Landlord with notice of (i) any audit, investigation, claim (excluding adjustments, complaints, and corrective activity in the ordinary course of business), proceeding, settlement, judgment, consent order, or corporate integrity agreement by or imposed by any Governmental Authority, (ii) any suspension, debarment or disqualification of Tenant, its officers and members, or its Affiliates from being a health care provider, government contractor, holder of any health care license or recipient of reimbursement from any third party payor, (iii) any suspension, termination, or revocation of any health care license of Tenant or any or any of Tenant's Affiliates or (iv) any self or voluntary disclosure of any overpayment to a third party payor by Tenant or any of Tenant's Affiliates.

(c)   <u>Notice of Settlement Negotiations</u>.   Tenant shall provide Landlord with reasonable notice of any and all settlement discussions and/or negotiations (excluding adjustments, complaints and corrective activity in the ordinary course of business) between representatives of Tenant and/or its Subtenants and any Governmental Authority, including without limitation negotiations with respect to any claim, settlement agreement, consent order or corporate integrity agreement between Tenant and its Affiliates and any Governmental Authority ("<u>Settlement Discussions</u>").   In connection with Settlement Discussions, (i) Tenant shall timely provide Landlord with copies of any and all documents that Tenant and/or its Subtenants intends to submit, or that Tenant and/or its Subtenants receives, in connection with any Settlement Discussions, and (ii) Tenant shall advise Landlord as to the status of the Settlement Discussions.

2305449v5/17057-6



No receipt of any such notice under subsections (a), (b) and (c) shall impose any obligation on Landlord to take any action or to enforce its rights hereunder or otherwise remedy the circumstances leading to such notice.

## ARTICLE XXIV

## ANTI-TERRORISM AND ANTI-MONEY LAUNDERING COMPLIANCE

Section 24.1      <u>Compliance with Anti-Terrorism Laws</u>Tenant represents and warrants to Landlord that it is not, and, after making due inquiry, that no person who owns a controlling interest in or otherwise controls Tenant is, (i) listed on the Specially Designated Nationals and Blocked persons List (the "**SDN List**") maintained by the Office of Foreign Assets Control ("**OFAC**"), Department of the Treasury, and/or on any other similar list ("**Other Lists**" and, collectively with the SDN List, the "**Lists**") maintained by the OFAC pursuant to any authorizing statute, Executive Order or regulation (collectively, "**OFAC Laws and Regulations**"); or (ii) a person (a "**Designated Person**") either (A) included within the term "designated national" as defined in the Cuban Assets Control Regulations, 31 C.F.R. Part 515, or (B) designated under Sections 1(a), 1(b), 1(c) or 1(d) of Executive Order No. 13224, 66 Fed. Reg. 49079 (published September 25, 2001) or similarly designated under any related enabling legislation or any other similar Executive Orders (collectively, the "**Executive Orders**"). The OFAC Laws and Regulations and the Executive Orders are collectively referred to in this Agreement as the "**Anti-Terrorism Laws**". Tenant represents and warrants that it requires, and has taken reasonable measures to ensure compliance with the requirement, that no person who owns any other direct interest in Tenant is or shall be listed on any of the Lists or is or shall be a Designated Person. This <u>Section 24.1</u> shall not apply to any person to the extent that such person's interest in Tenant is through a U.S. Publicly-Traded Entity. As used in this Lease, "**U.S. Publicly-Traded Entity**" means a person (other than an individual) whose securities are listed on a national securities exchange, or quoted on an automated quotation system, in the United States, or a wholly-owned subsidiary of such a person.

Section 24.2      <u>Funds Invested in Tenant</u>. Tenant represents and warrants that it has taken reasonable measures appropriate to the circumstances (and in any event as required by law), with respect to each holder of a direct or indirect interest in Tenant, to assure that funds invested by such holders in Tenant are derived from legal sources ("<u>Anti-Money Laundering Measures</u>"). The Anti-Money Laundering Measures have been undertaken in accordance with the Bank Secrecy Act, 31 U.S.C. §§ 5311 *et seq.* ("<u>BSA</u>"), and all applicable laws, regulations and government guidance on BSA compliance and on the prevention and detection of money laundering violations under 18 U.S.C. §§ 1956 and 1957 (collectively with the BSA, "<u>Anti-Money Laundering Laws</u>").

Section 24.3      <u>No Violation of Anti-Money Laundering Laws</u>. Tenant represents and warrants to Landlord, to its actual knowledge after making due inquiry, that neither Tenant nor any holder of a direct or indirect interest in Tenant (i) is under investigation by any governmental authority for, or has been charged with, or convicted of, money laundering under 18 U.S.C. §§ 1956 and 1957, drug trafficking, terrorist-related activities or other money laundering predicate crimes, or any violation of the BSA, (ii) has been assessed civil penalties

73



under any Anti-Money Laundering Laws, or (iii) has had any of its funds seized or forfeited in an action under any Anti-Money Laundering Laws.

       Section 24.4      <u>Tenant Compliance with Anti-Money Laundering Laws</u>.  Tenant represents and warrants to Landlord that it has taken reasonable measures appropriate to the circumstances (in any event as required by law), to ensure that Tenant is in compliance with all current and future Anti-Money Laundering Laws and laws, regulations and government guidance for the prevention of terrorism, terrorist financing and drug trafficking.

**[SEE ATTACHED SIGNATURE PAGES]**

IN WITNESS WHEREOF, the Parties have executed or caused the execution of this Lease by their respective officers duly authorized as of the day and year first above written.

**LANDLORD:**

White Plains Healthcare Properties I, LLC, ,
a Massachusetts limited liability company

By: _____

_____, Manager


**TENANT:**

HBL SNF, LLC,
a New York limited liability company


By: _____
Name: _____
Its: _____

IN WITNESS WHEREOF, the Parties have executed or caused the execution of this Lease by their respective officers duly authorized as of the day and year first above written.

**LANDLORD:**

White Plains Healthcare Properties I, LLC, ,
a Massachusetts limited liability company

By:_____
                         , Manager

**TENANT:**

HBL SNF, LLC,
a New York limited liability company

By:    _____
Name:  _____
Its:   _____

## SCHEDULE 18(k)

### Health Care Representations

Health Care Representations. Tenant, for itself, and for the Subtenants, do hereby represent and warrant to Landlord, its successors and assigns, as of the date of the Lease, that:

(a)    All Medicare and Medicaid provider agreements, certificates of need, if applicable, certifications, governmental licenses, permits, regulatory agreements or other agreements and approvals, including certificates of operation, completion and occupancy, and state nursing facility licenses or other licenses required by Health Care Authorities (as defined in the Lease) for the legal use, occupancy and operation of the Facility (collectively, the "**Health Care Licenses**") for the Facility have been obtained by the party required to hold such Health Care Licenses and are in full force and effect, including approved provider status in any approved third-party payor program. **Each Subtenant (hereinafter "Operator")** owns and/or possesses, and holds free from restrictions or conflicts with the rights of others, all such Health Care Licenses and will operate or cause the Facility to be operated in such a manner that the Health Care Licenses shall remain in full force and effect;

(b)    The Facility is duly licensed as a skilled nursing facility as required under the applicable laws of the State of New York. The licensed bed capacity of the Facility and the actual bed count operated at the Facility is 160. The Tenant has not applied to reduce the number of licensed or certified beds of the Facility or to move or transfer the right to any and all of the licensed or certified beds of the Facility to any other location or to amend or otherwise change the Facility and/or the number of beds approved by the DOH or other applicable state licensing agency, and there are no proceedings or actions pending or contemplated to reduce the number of licensed or certified beds of the Facility;

(c)    The Health Care License with respect to the Facility (i) has not been and will not be (A) transferred to any location other than the Facility or (B) pledged as collateral security (other than any pledge as collateral security to Tenant's accounts receivable lender approved by Landlord which pledge is subject to the interests of (x) Landlord under the Lease and (y) Mortgagee, including the liens and security interests of the Loan Documents), (ii) is and will continue to be held free from restrictions or known conflicts that would materially impair the use or operation of the Facility as intended, and (iii) is not provisional, probationary, or restricted in any way, except in instances where a Governmental Authority or Health Care Authority has issued a provisional, probationary or restricted license, permit or certification in the ordinary course pending issuance of a final license, permit or certification;

(d)    Tenant has or will take any action to rescind, withdraw, revoke, amend, modify, supplement or otherwise alter the nature, tenor or scope of any Health Care

License or applicable provider payment program participation other than non-material alterations effected in the ordinary course of business;

(e)      Tenant and the operation of the Facility are in material compliance with the applicable provisions of the Laws and all orders, standards, policies, restrictions or rules of any Health Care Authority having jurisdiction over the ownership, use, occupancy or operation of the Facility, including (i) staffing requirements, (ii) health and fire safety codes including quality and safety standards, (iii) accepted professional standards and principles that apply to the Operator's provision of services at the Facility, (iv) federal, state or local laws, rules, regulations or published interpretations or policies relating to the prevention of fraud and abuse, (v) insurance, reimbursement and cost reporting requirements, government payment program requirements and disclosure of ownership and related information requirements, (vi) requirements of applicable Health Care Authorities, including those relating to the Facility's physical structure and environment, licensing, quality and adequacy of nursing facility care, distributions of pharmaceuticals, rate setting, equipment, personnel, operating policies, and additions of Facility and services, and (vii) any other applicable laws, regulations or agreements for reimbursement for the type of care or services provided by Tenant and/ with respect to the Facility. As used herein, "material compliance" means a level of compliance that would keep Tenant and/ (and the operation of the Facility) free from any final orders or sanctions by any Governmental Authority or Health Care Authority having jurisdiction over the operation of the Facility and would not adversely affect Tenant's and/'s operations, including, but not limited to, its right to receive reimbursement or insurance payments;

(f)      Tenant and the Facility are each in material compliance with the requirements for participation in the Medicare and Medicaid programs with respect to the Facility that currently participates in such programs and has a current provider agreement under Title XVIII and/or XIX of the Social Security Act which is in full force and effect. Facility has not had any deficiencies on its most recent survey (standard or complaint that would result in a denial of payment for new admissions with no opportunity to correct prior to termination. The Facility had not any deficiencies at "level G" or above on its most recent survey (standard or complaint), nor has Tenant been cited with any substandard quality of care deficiencies (as that term is defined in Part 488 of 42 C.F.R.) for the past two consecutive surveys. The Facility has not been designated as a Special Focus Facility (as such term is defined by the Centers for Medicare and Medicaid Services Special Focus Facility Program);

(g)      Neither Tenant nor the Facility is a target of, participant in, or subject to any action, proceeding, suit, audit, investigation or sanction by any Health Care Authority or any other administrative or investigative body or entity or any other third party payor or any patient or resident (including, without limitation, whistleblower suits, or suits brought pursuant to federal or state False Claims Acts, and Medicaid/Medicare/State fraud/abuse laws, but excluding medical malpractice claims and other civil liability lawsuits for which the Facility is maintaining insurance coverage in the ordinary course of business) which may result, directly or indirectly or with the passage of time, in the imposition of a fine, penalty, alternative, interim or final sanction, a lower rate

certification, recoupment, recovery, suspension or discontinuance of all or part of reimbursement from any Health Care Authority, third-party payor, insurance carrier or private payor, a lower reimbursement rate for services rendered to eligible patients, or any other civil or criminal remedy, or which could reasonably be expected to have a material adverse effect on Landlord, Tenant , or the operation of the Facility, including the Facility's ability to accept or retain residents, or which could result in the appointment of a receiver or manager, or in the modification, limitation, annulment, revocation, transfer, surrender, suspension or other impairment of a Health Care License, or affect Tenant's 's participation in the Medicare, Medicaid, or third-party payor program, as applicable, or any successor program thereto, at current rate certification, nor has any such action, proceeding, suit, investigation or audit been threatened;

(h)     There are no agreements with residents of the Facility or with any other persons or organizations that deviate in any material adverse respect from or that conflict with, any statutory or regulatory requirements.  All resident records at the Facility, including patient and/or resident accounts records, are true, complete, and correct in all material respects;

(i)     Other than the Medicare, Medicaid, and Veteran Administration programs, Tenant  is not a participant in any federal, state or local program whereby any federal, state or local government or quasi-governmental body, or any intermediary, agency, board or other authority or entity may have the right to recover funds with respect to any Individual Property by reason of the advance of federal, state or local funds, including, without limitation, those authorized under the Hill-Burton Act (42 U.S.C. 291, et seq.). Tenant has received no notice, and is not aware of any violation of applicable antitrust laws;

(j)     Tenant's   private payor, Medicaid, Medicare, and/or managed care company, insurance company or other third-party insurance accounts receivable with respect to the Facility are free of any liens and Tenant has not pledged any of its receivables as collateral security for any loan or indebtedness;

(k)     Tenant is not a party to any collective bargaining agreement or other labor contract applicable to persons employed by it at the Facility and there are no threatened or pending labor disputes at the Facility;

(l)     Tenant has instituted, and the Facility is operated in material compliance with, a compliance plan which follows applicable guidelines established by Health Care Authorities;

(m)     Tenant is in compliance with the Health Care Insurance Portability and Accountability Act of 1996, and the regulations promulgated thereunder;

(n)     There is no threatened or pending revocation, suspension, termination, probation, restriction, limitation, or non-renewal affecting Tenant and/or the Facility or provider agreement with any third-party payor, Medicare or Medicaid;

(o)     All Medicare, Medicaid, and private insurance cost reports and financial reports submitted by or on behalf of the Facility are and will continue to be materially accurate and complete and have not been and will not be misleading in any material respects;

(p)     The Facility and the use thereof complies in all material respects with all applicable local, state, and federal building codes, fire codes, and other similar regulatory requirements and no waivers of such physical plant standards exist at the Facility;

(q)     Any existing agreement relating to the management or operation of the Facility is in full force and effect and is not in default by any party.  In the event any management or operating agreement is terminated or in the event of foreclosure or other acquisition, the subsequent operator need not obtain a certificate of need prior to applying for and receiving a license to operate the Facility or prior to receiving Medicare or Medicaid payments, as applicable;

(r)     There are no actions, suits, or proceedings at law or in equity by any person or entity, including any Governmental Authority or any Health Care Authority or other agency now pending or threatened against or affecting Tenant and/or the Facility, which actions, suits or proceedings, individually or collectively, if determined against Tenant and/or the Facility, might materially adversely affect the condition (financial or otherwise) or business of Tenant and/or the  condition, ownership or operation of the Facility.

2305449v5/17057-6



## SCHEDULE 19.2

"**Special Purpose Entity**" shall mean a corporation, limited partnership or limited liability company (such entity sometimes referred to herein as the "**Company**") which at all times on and after the date hereof:

(d) is organized solely for the purpose of (i) acquiring, developing, owning, holding, selling, leasing, transferring, exchanging, managing and operating the Leased Premises, entering into this Lease with Landlord, subleasing the Leased Premises to affiliated subtenants; and (ii) transacting lawful business that is incident, necessary and appropriate to accomplish the foregoing;

(e) is not engaged and will not engage, directly or indirectly, in any business unrelated to those activities required or permitted to be performed under the Lease, including pursuant to this definition of "Special Purpose Entity" and Subsection (a) above, as applicable;

(f) does not have and will not have any assets other than those (i) related to the Leased Premises or its partnership interest in the limited partnership or the member interest in the limited liability company that operates the Leased Premises or acts as the general partner or managing member thereof, as applicable, and (ii) incidental personal property necessary for the conduct of its business, as applicable;

(g) has not engaged, sought or consented to and will not engage in, seek or consent to any dissolution, winding up, liquidation, consolidation, merger, sale of all or substantially all of its assets, transfer of partnership or membership interests (if such entity is a general partner in a limited partnership or a member in a limited liability company) or amendment of its limited partnership agreement, articles of incorporation, articles of organization, certificate of formation or operating agreement (as applicable) with respect to the matters set forth in this definition;

(h) is and will remain solvent and pay its debts and liabilities (including, as applicable, shared personnel and overhead expenses) from its assets as the same shall become due, and is maintaining and will maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations;

(i) has not failed and will not fail to correct any known misunderstanding regarding its separate identity;

(j) has maintained and will maintain its accounts, books and records separate from those of any other person, individual or entity (a "**Person**") and maintain its bank accounts separate from those of any other Person. To the extent required by law to file a tax return, will file its own tax returns, except to the extent it is required to file consolidated tax returns by law;

(k) has maintained and will maintain its own records, books, resolutions and agreements;

(l) has not commingled and will not commingle its funds or assets with those of any other Person and has not participated and will not participate in any cash management system with any other Person other than pursuant to its *[insert any credit facilities or accounts receivables financings]*;

(m) has held and will hold its assets in its own name;

(n) has conducted and will conduct its business in its name;

(o) has maintained and will maintain its financial statements, accounting records and other entity documents separate from any other Person and has not permitted and will not permit its assets to be listed as assets on the financial statement of any other entity except as required by GAAP; provided, however, that any such consolidated financial statement shall contain a note indicating that its separate assets and liabilities are neither available to pay the debts of the consolidated entity nor constitute obligations of the consolidated entity;

(p) has paid and will pay its own liabilities and expenses, including the salaries of its own employees, if any, out of its own funds and assets, and has maintained and will maintain a sufficient number of employees, if any, in light of its contemplated business operations and in accordance with all Laws;

(q) has observed and will observe all partnership, corporate or limited liability company formalities, as applicable;

(r) has and will have no indebtedness other than (i) liabilities under this Lease or any Sublease (ii) liabilities incurred in the ordinary course of business relating to the ownership and operation of the Leased Premises and the routine administration of Tenant, and (iii) such other liabilities that are permitted under this Lease;

(s) has not and will not assume or guarantee or become obligated for the debts of any other Person or hold out its credit as being available to satisfy the obligations of any other Person except as permitted pursuant to this Lease;

(t) has not and will not acquire obligations or securities of its partners, members or shareholders or any other Affiliate;

(u) has allocated and will allocate fairly, reasonably and in accordance with all Laws, any overhead expenses that are shared with any Affiliate, including, but not limited to, paying for shared office space and services performed by any employee of an Affiliate;

(v) maintains and uses and will maintain and use separate stationery, invoices and checks bearing its name. The stationery, invoices, and checks utilized by the Tenant or utilized to collect its funds or pay its expenses shall bear its own name and shall not bear the name of any other entity;

(w) has not pledged and will not pledge its assets for the benefit of any other Person;

(x) has held itself out and identified itself and will hold itself out and identify itself as a separate and distinct entity under its own name and not as a division or part of any other Person;

(y) has maintained and will maintain its assets in such a manner that it will not be costly or difficult to segregate, ascertain or identify its individual assets from those of any other Person;

(z) has not made and will not make loans to any Person or hold evidence of indebtedness issued by any other Person or entity;

(aa)   has not identified and will not identify its partners, members or shareholders, or any Affiliate of any of them, as a division or part of it, and has not identified itself and shall not identify itself as a division of any other Person;

(bb)   has not entered into or been a party to, and will not enter into or be a party to, any transaction with its partners, members, shareholders or Affiliates except (A) in the ordinary course of its business and on terms which are intrinsically fair, commercially reasonable and are in compliance with all Laws and no less favorable to it than would be obtained in a comparable arm's-length transaction with an unrelated third party and (B) in connection with this Lease;

(cc)   has not and will not have any obligation to, and will not, indemnify its partners, officers, directors or members, as the case may be, unless such an obligation is fully subordinated to the Rent payable under this Lease and will not constitute a claim against it in the event that cash flow in excess of the amount required to pay the Rent is insufficient to pay such obligation;

(dd)   it shall consider the interests of its creditors in connection with all limited liability company actions;

(ee)   does not and will not have any of its obligations guaranteed by any Affiliate except obligations under this Lease;

(ff) if such entity is a limited liability company, it shall have its own board of directors or board of managers, and shall cause such board to meet at least annually or act pursuant to written consent and keep minutes of such meetings and actions and observe all other corporate formalities;

(gg)   has complied and will comply with all of the terms and provisions contained in its organizational documents.   The statement of facts contained in its organizational documents are true and correct and will remain true and correct;

(hh)·  has not and will not permit any other Person independent access to its bank accounts;

(ii) has caused and will cause all representatives of Tenant to act at all times with respect to Tenant consistently and in furtherance of the foregoing; and

(jj) has not and will not form, acquire, or hold any subsidiary or own any equity interest in any other entity.

# EXHIBIT - 2

**Copy - Please Stamp**   RECEIVED

AUG 2 5 2017

TIMOTHY C. IDONI
COUNTY CLERK
JNTY OF WESTCHESTER

Sec 125.67
Blk 3
Lot 1

CONSTRUCTION LOAN AGREEMENT

among

E PLAINS HEALTHCARE PROPERTIES I, LLC,
a Massachusetts limited liability company,
as Borrower

and

RITY BENEFIT LIFE INSURANCE COMPANY,
a Kansas insurance company,
as Lender

and

SECURITY BENEFIT CORPORATION,
a Kansas corporation,
as Agent

Dated as of August 18, 2017

**NOTICE: THIS AGREEMENT IS INTENDED TO BE FILED AS A "BUILDING LOAN AGREEMENT" FOR PURPOSES OF THE NEW YORK LIEN LAW. A SECTION 22 AFFIDAVIT IS ATTACHED HERETO AS EXHIBIT "N".**

3020-857113-T

First American Title
Insurance Company
666 Third Avenue  5th fl
New York, N.Y. 10017
Phone: (212) 922-9700
Fax: (212) 922-0881

CONSTRUCTION LOAN AGREEMENT

among

WHITE PLAINS HEALTHCARE PROPERTIES I, LLC,
a Massachusetts limited liability company,
as Borrower

and

SECURITY BENEFIT LIFE INSURANCE COMPANY,
a Kansas insurance company,
as Lender

and

SECURITY BENEFIT CORPORATION,
a Kansas corporation,
as Agent

Dated as of August 18, 2017

**NOTICE: THIS AGREEMENT IS INTENDED TO BE FILED AS A "BUILDING LOAN AGREEMENT" FOR PURPOSES OF THE NEW YORK LIEN LAW. A SECTION 22 AFFIDAVIT IS ATTACHED HERETO AS EXHIBIT "N".**

FILED: WESTCHESTER COUNTY CLERK 05/01/2021 09:40 AM
NYSCEF DOC. NO. 3
INDEX NO. 55883/2021
RECEIVED NYSCEF: 05/01/2021

21-07096-shl    Doc 71    Filed 07/22/22    Entered 07/22/22 17:18:19    Main Document
Pg 106 of 227

## TABLE OF CONTENTS

Page No.

ARTICLE 1 - THE LOAN .................................................................................. 1
    1.1    General Information and Exhibits.................................................. 1
    1.2    Purpose ................................................................................... 2
    1.3    Commitment to Lend ................................................................ 2
    1.4    Budget; Budget Contingency; Budget Line Items ....................... 2
    1.5    Borrower's Deposit .................................................................. 3
    1.6    Evidence of Debt ..................................................................... 4

ARTICLE 2 - INTEREST RATE, ADVANCES AND PAYMENTS ....................... 4
    2.1    Interest Rate ............................................................................ 4
    2.2    Unused Line Fee ...................................................................... 4
    2.3    Exit Fee .................................................................................. 5
    2.4    Computations and Determinations ............................................. 5
    2.5    Reserved ................................................................................. 5
    2.6    Inability to Determine LIBOR Rate ........................................... 5
    2.7    Increased Costs ........................................................................ 5
    2.8    Late Charge ............................................................................. 6
    2.9    Prepayment ............................................................................. 6
    2.10   Default Rate ............................................................................ 7
    2.11   Taxes ..................................................................................... 7
    2.12   Payment Schedule and Maturity Date ........................................ 8
    2.13   Advances and Payments ........................................................... 8
    2.14   Initial Maturity Date; Extension Option ..................................... 9

ARTICLE 3 - ADDITIONAL COVENANTS AND AGREEMENTS; NEGATIVE
              COVENANTS ......................................................................... 10
    3.1    Construction of the Improvements ............................................. 10
    3.2    Plans and Changes ................................................................... 10
    3.3    Material Contracts; Governmental Approvals .............................. 11
    3.4    Required Equity ....................................................................... 11
    3.5    Leases .................................................................................... 11
    3.6    Compliance with Laws; Operation ............................................ 12
    3.7    Insurance; Maintenance of the Project; Alterations ...................... 13
    3.8    Assignment of Plans and Contracts and Government Approvals .... 13
    3.9    Storage of Materials ................................................................. 14
    3.10   Construction Inspector ............................................................. 14
    3.11   Inspection ............................................................................... 14
    3.12   Notice to Agent ....................................................................... 14
    3.13   Financial Statements ................................................................ 15
    3.14   Other Information .................................................................... 16
    3.15   Reports and Testing ................................................................. 16
    3.16   Appraisal ................................................................................ 16
    3.17   Reporting Compliance .............................................................. 16
    3.18   Payment of Withholding Taxes ................................................. 16
    3.19   ERISA and Prohibited Transaction Taxes .................................. 16
    3.20   Environmental Laws; Access Laws ........................................... 17

TABLE OF CONTENTS
(continued)

Page

| | | |
|---|---|---|
| 3.21 | Taxes and Other Charges | 17 |
| 3.22 | Existence; Qualifications | 18 |
| 3.23 | Organizational Requirements | 18 |
| 3.24 | Operation of the Property | 19 |
| 3.25 | Reserved | 19 |
| 3.26 | Additional Indebtedness | 19 |
| 3.27 | Limitation on Distributions, etc. | 19 |
| 3.28 | Contracts with Affiliates | 19 |
| 3.29 | Transfers; Encumbrances | 19 |
| 3.30 | Ownership; Merger; Consolidation; Purchase or Sale of Assets | 20 |
| 3.31 | Financial Covenants | 22 |
| 3.32 | Use of Proceeds; Income from the Property | 22 |
| 3.33 | Reserved | 22 |
| 3.34 | Easements and Restrictions; Zoning | 22 |
| 3.35 | HVCRE Matters | 22 |
| ARTICLE 4 - REPRESENTATIONS AND WARRANTIES | | 23 |
| 4.1 | Organization | 23 |
| 4.2 | Authorization; No Conflict | 23 |
| 4.3 | Enforceability | 23 |
| 4.4 | No Violation; No Litigation | 23 |
| 4.5 | Initial Equity | 25 |
| 4.6 | Material Contracts | 25 |
| 4.7 | Title | 25 |
| 4.8 | Taxes | 25 |
| 4.9 | Plans | 25 |
| 4.10 | Requirements; Zoning | 25 |
| 4.11 | Separate Tax Lot | 26 |
| 4.12 | No Conveyance | 26 |
| 4.13 | Construction Matters | 26 |
| 4.14 | Utilities | 26 |
| 4.15 | Financial Matters | 26 |
| 4.16 | Borrower Not a Foreign Person | 26 |
| 4.17 | Business Loan | 27 |
| 4.18 | Insurance | 27 |
| 4.19 | Condemnation | 27 |
| 4.20 | Flood Zone | 27 |
| 4.21 | Public Access | 27 |
| 4.22 | Boundaries | 27 |
| 4.23 | Liens | 27 |
| 4.24 | Other Agreements; Defaults | 27 |
| 4.25 | Usury; Offsets | 27 |
| 4.26 | Interim Disbursements | 27 |
| 4.27 | Use of Project | 27 |
| 4.28 | Margin Stock | 27 |
| 4.29 | Investment Company Act | 28 |
| 4.30 | Sanctions | 28 |

TABLE OF CONTENTS
(continued)

Page

| | | |
|---|---|---|
| 4.31 | ERISA | 28 |
| 4.32 | No Fraudulent Transfer | 28 |
| 4.33 | Full and Accurate Disclosure | 28 |
| 4.34 | Single Purpose Entity | 29 |
| 4.35 | No Default | 29 |
| 4.36 | Labor Matters | 29 |
| 4.37 | Intellectual Property | 29 |
| ARTICLE 5 - DEFAULT AND REMEDIES | | 29 |
| 5.1 | Events of Default | 29 |
| 5.2 | Remedies | 32 |
| ARTICLE 6 - AGENT AND LENDER | | 34 |
| 6.1 | Appointment | 34 |
| 6.2 | Delegation of Duties | 34 |
| 6.3 | Exculpatory Provisions | 34 |
| 6.4 | Reliance by Agent | 34 |
| 6.5 | Non-Reliance on Agent and Lender | 34 |
| 6.6 | Indemnification | 35 |
| 6.7 | Agent in Its Individual Capacity | 35 |
| 6.8 | Successor Agents | 35 |
| 6.9 | Limitations on Agent's Liability | 35 |
| ARTICLE 7 - GENERAL TERMS AND CONDITIONS | | 35 |
| 7.1 | Consents | 35 |
| 7.2 | Borrower's Indemnity | 36 |
| 7.3 | Miscellaneous | 37 |
| 7.4 | Notices | 37 |
| 7.5 | Payments Set Aside | 38 |
| 7.6 | Successors and Assigns | 38 |
| 7.7 | Cooperation | 40 |
| 7.8 | No Set-off | 41 |
| 7.9 | Servicer | 41 |
| 7.10 | Survival | 41 |
| 7.11 | Costs and Expenses | 41 |
| 7.12 | Further Assurances | 42 |
| 7.13 | Inducement to Agent and Lender | 42 |
| 7.14 | Forum | 42 |
| 7.15 | Interpretation | 42 |
| 7.16 | No Partnership, etc. | 43 |
| 7.17 | Records | 43 |
| 7.18 | Reserved | 43 |
| 7.19 | USA Patriot Act Notice | 43 |
| 7.20 | Entire Agreement | 43 |
| 7.21 | Governing Law | 44 |
| 7.22 | Exculpation | 44 |
| 7.23 | Lien Law Compliance | 44 |

FILED: WESTCHESTER COUNTY CLERK 05/01/2021 09:40 AM
NYSCEF DOC. NO. 3
INDEX NO. 55883/2021
RECEIVED NYSCEF: 05/01/2021
21-07096-shl    Doc 71    Filed 07/22/22    Entered 07/22/22 17:18:19    Main Document
Pg 109 of 227

TABLE OF CONTENTS
(continued)

Page

ARTICLE 8 - CASH MANAGEMENT ................................................................... 44
    8.1    Cash Management ............................................................................. 44
    8.2    Disbursements from the Cash Management Account ......................... 45

ARTICLE 9 - RESERVE FUNDS ........................................................................ 46
    9.1    Interest Reserve Funds ...................................................................... 46
    9.2    Tax Funds ......................................................................................... 46
    9.3    Insurance Funds ................................................................................ 47
    9.4    Security Interest ................................................................................ 47

ARTICLE 10 - OPERATING LEASE ISSUES ..................................................... 48
    10.1    Tenant Letter of Credit ..................................................................... 48
    10.2    Cash Security Deposit ....................................................................... 49
    10.3    Security Interest ................................................................................ 49
    10.4    Lease Guarantees .............................................................................. 49
    10.5    Application of Tenant Funds ............................................................. 49

## CONSTRUCTION LOAN AGREEMENT

THIS CONSTRUCTION LOAN AGREEMENT (as amended, restated, replaced, supplemented or otherwise modified from time to time, this "**Agreement**") is made as of August 18, 2017, by and among SECURITY BENEFIT CORPORATION, a Kansas corporation, having an address at One Security Benefit Place, Topeka, KS 66636 (together with its successors and/or assigns, "**Agent**"), SECURITY BENEFIT LIFE INSURANCE COMPANY, an insurance company organized under the laws of Kansas, having an address at One Security Benefit Place, Topeka, KS 66636 (together with its successors and/or assigns, "**Lender**"), and WHITE PLAINS HEALTHCARE PROPERTIES I, LLC, a Massachusetts limited liability company, having its principal place of business at West Peabody Executive Center, Suite 200, 2 Bourbon Street, Peabody, MA 01960 (together with its permitted successors and assigns, collectively, "**Borrower**").

### RECITALS:

WHEREAS, Borrower owns the Land and desires to construct the Project consisting of a skilled nursing facility and other related improvements thereon; and

WHEREAS, Lender has agreed to make the Building Loan to Borrower in the amount of up to $30,293,625 in which all or a portion of the Building Loan Costs shall be advanced to Borrower, consisting solely of costs of improvements as defined in Section 2 of the New York Lien Law; and

WHEREAS, Lender has further agreed to make additional loan advances to Borrower for certain other soft costs and related costs with respect to the Project in the amount of up to $8,206,375 (the "**Project Loan**"); and

WHEREAS, the Loan secured hereby, in the total amount of up to $38,500,000, collectively refers to both the Building Loan and the Project Loan as further described in this Agreement; and

WHEREAS, Borrower, Lender and Agent desire to set forth certain agreements relating to the Loan. This Agreement constitutes both a "**Building Loan Agreement**" and a "**Project Loan Agreement**" for purposes of New York Lien Law.

NOW, THEREFORE, Borrower, Lender and Agent do hereby agree as follows.

### ARTICLE 1 - THE LOAN

1.1    General Information and Exhibits. This Agreement includes the Exhibits listed below, all of which Exhibits are attached hereto and made a part hereof for all purposes. Borrower, Agent and Lender agree that if any Exhibit to be attached to this Agreement contains blanks, the same shall be completed correctly and in accordance with this Agreement prior to or at the time of the execution and delivery thereof.

| Exhibit "A" | – | Legal Description of the Land |
| Exhibit "B" | – | Definitions and Financial Statements |
| Exhibit "C" | – | Reserved |
| Exhibit "C-2" | – | Reserved |
| Exhibit "D" | – | Reserved |
| Exhibit "E" | – | Advances |
| Exhibit "E-1" | – | Draw Request |
| Exhibit "F" | – | Survey Requirements |
| Exhibit "G" | – | Reserved |

5962984                                    - 1 -

|            |   |                                        |
|------------|---|----------------------------------------|
| Exhibit "H" | – | Leasing and Tenant Matters             |
| Exhibit "I" | – | Subcontractor Default Insurance        |
| Exhibit "J" | – | Schedule of Lenders                    |
| Exhibit "K" | – | Organizational Requirements            |
| Exhibit "L" | – | Tenant Direction Notice                |
| Exhibit "M" | – | Form of Compliance Certificate – Borrower |
| Exhibit "N" | – | Section 22 Affidavit                   |
| Exhibit "O" | – | Form of Letter of Credit Agreement     |
| Schedule 4.1 | – | Organizational Chart                  |

The Exhibits and Schedules contain other terms, provisions and conditions applicable to the Loan. Capitalized terms used in this Agreement shall have the meanings assigned to them in <u>Exhibit "B"</u>. This Agreement, the other Loan Documents, which must be in form, detail and substance satisfactory to Agent, evidence the agreements of Borrower, Agent and Lender with respect to the Loan. Borrower shall comply with all of the Loan Documents.

1.2 <u>Purpose</u>. The proceeds of the Loan shall be used by Borrower to pay the following, and only the following, items, in each case subject to the terms and conditions hereof: (a) refinancing of any existing mortgage loan secured by the Land; (b) the Hard Costs and Soft Costs of the construction and development of the Improvements on the Land, and interest, taxes and other operating costs of the Project, all in accordance with the Budget; (c) costs, expenses and fees associated with the Loan; and (d) costs of Borrower of any furniture, fixtures, personal property and equipment to be used at the Project following Completion, and (e) utility connection fees and charges, all in accordance with the Budget.

1.3 <u>Commitment to Lend</u>. Borrower agrees to borrow from Lender, and Lender agrees to make Advances of the Loan Proceeds to Borrower in amounts at any one time outstanding not to exceed the Maximum Loan Amount, on the terms and subject to the conditions set forth in this Agreement and, without limitation, <u>Exhibit "E"</u> attached to this Agreement. Lender's commitment to lend shall expire and terminate automatically (a) if the Loan is prepaid in full, (b) upon the occurrence of a Default (unless Lender subsequently elects to reinstate its commitment if Lender elects to waive such Default in writing), and (c) at the end of the Availability Period (after giving effect to any amounts borrowed on such date in accordance with this Agreement). Notwithstanding anything to the contrary contained herein, for avoidance of doubt, no additional advances shall be made by Lender after the end of the Availability Period. The Loan is not revolving. Any amount repaid may not be reborrowed.

1.4 <u>Budget; Budget Contingency; Budget Line Items</u>.

(a) <u>Budget</u>. The Budget is attached to the Certificate of Budget dated on or near the date hereof, executed by Borrower, and agreed to by Lender and Agent (the "Budget"). The amount listed in the Budget as the (i) "**Total Costs**" is the maximum cost anticipated by Borrower for each item specified therein; (ii) "**Total Budget**" is the maximum cost anticipated by Borrower for the Project; (iii) "**Loan Proceeds**" is the maximum amount to be advanced under the Loan anticipated to be advanced for such Aggregate Cost; (iv) "**Expended Cost**" is equal to the amount shown in the Budget as representing the portion of the Aggregate Cost previously paid by Borrower as of the date of this Agreement; and (v) "**Mezzanine Loan Proceeds**" is the amount to be advanced under the Mezzanine Loan anticipated to be advanced for such aggregate costs. Advances of the Loan shall be advanced subject to the terms, covenants, conditions and provisions of this Agreement. Except as set forth in <u>Subsection (c)</u> below, Borrower shall not amend the Budget, or otherwise reallocate Loan funds from one Budget line item to another, without the prior written approval of Agent in its sole discretion; provided, however, Borrower shall have the right to reallocate cost savings and use the Contingency Fund in accordance with the terms of this Agreement. The Budget has been prepared by Borrower, and Borrower represents to Agent and Lender that the Budget includes the entire Aggregate Cost

as estimated by Borrower in good faith as of the date of this Agreement. Unless approved by Agent in its sole discretion, no Advance shall be made (A) for any item of expenditure not set forth in the Budget, (B) from any line item in the Budget that, when added to all prior Advances from that line item, would exceed the lesser of (i) the actual cost incurred by Borrower for such line item, or (ii) the sum shown in the Budget for such line item, (C) except as set forth in Subsection (c) below, from any Contingency Fund, or (D) to pay interest on the Loan after commencement of operations of any component of the Improvements if and to the extent that there is sufficient net operating income from the Property to pay such interest. Except as set forth in Subsection (c) below, Advances from any line item in the Budget for purposes other than those for which amounts are initially allocated to such line item, or changes in the relative amounts allocated to particular line items in the Budget may only be made as Agent in its sole discretion deems necessary or advisable.

(b)     Budget Contingencies. The Budget contains line items other than the line item designated for contingency (collectively, the "**Contingency Fund**") which represent amounts necessary to provide reasonable assurances to Agent and Lender that funds are available within the applicable Budget if additional costs, expenses and/or delays are incurred or additional interest accrues on the Loan, or other unanticipated events or problems occur. Agent may, in its discretion, re-allocate the required amount of any Contingency Fund to other Budget Line Items during the continuance of a Potential Default or Default.

(c)     Budget Line Items. The Budget includes line items (collectively, "**Budget Line Items**") for the cost of all labor, materials, equipment, fixtures and furnishings needed for the completion of all work for the Improvements, and all other costs, fees and expenses relating in any way whatsoever to the construction work and the development, operation, ownership and marketing of the Project. Borrower agrees that the Advances shall be used only for the Budget Line Items for which such proceeds of the Loan are made available. Borrower may apply savings from one Budget Line Item (provided such savings are (x) in a Budget Line Item for Hard Costs, other than the Contingency Fund, or (y) in a Budget Line Item for Soft Costs, other than any Budget Line Items for interest, operating shortfalls), to cost overruns in another Budget Line Item or to the Contingency Fund, or to any other unbudgeted costs of the Improvements provided (i) there are no Defaults existing, (ii) (A) all work with respect to any Budget Line Item is completed (as verified by the Construction Inspector, if applicable), all costs and expenses with respect to such work have been paid in full, and the portion of the Loan allocated to such Budget Line Item exceeds the aggregate amount of Loan proceeds actually disbursed for the payment of such costs and expenses, or (B) Borrower demonstrates to the reasonable satisfaction of Agent that the amount allocated to any such Budget Line Item exceeds the aggregate amount of Loan proceeds that will be required in order to achieve completion of such work and pay all costs and expenses with respect thereto, and (iii) such reallocation will not affect the priority of the Security Instrument on the Project. Unused funds in any Budget Line upon payment in full of all costs and expenses for such Budget Line shall be moved to the Contingency Fund. Borrower may, with Agent's prior written consent, not to be unreasonably withheld or delayed, reallocate funds from the Contingency Fund to other Budget Line Items for costs in the Budget; provided, however, that Agent's consent shall not be required so long as (A) the percentage of the Contingency Fund reallocated by Borrower at all times is less than or equal to the percentage of the Improvements that have been completed as of the time of such reallocation, (B) Borrower delivers to Agent and Lender prior notice of such reallocation together with a certificate certifying as to calculation described in the foregoing clause (A), and (C) there are no Defaults existing.

1.5     Borrower's Deposit.

(a)     Budget. Notwithstanding anything in this Agreement to the contrary, the Loan shall at all times be In Balance. The Loan shall be deemed to be "**In Balance**" for so long as there is no Budget Shortfall. A "**Budget Shortfall**" is the deficiency, as determined by Agent, on an aggregate funds available basis, between (i) Agent's Estimate of Costs and (ii) the sum of the then undisbursed portion of the Loan,

plus any sums provided by Borrower from other sources as shown in the Budget, including, without limitation, Mezzanine Loan Proceeds.

(b)      "**Agent's Estimate of Costs**" means Agent's reasonable estimate of the remaining costs to complete the construction of the on-site and off-site work related to the Improvements through the Completion Date based on (i) the costs set forth in the Budget plus (ii) such additional amounts as Agent reasonably deems necessary through the Completion Date, which estimate shall be based on executed construction contracts, executed subcontracts and purchase orders, or, in those instances where construction contracts, subcontracts or purchase orders have not yet been executed, upon the basis of either written bids with responsible contractors, tradesmen and material suppliers obtained by Borrower and reasonably approved by Agent, or Agent's reasonable estimate of such costs where written bids have not been obtained, and shall take into account all costs and expenses to be paid by Borrower through the Completion Date, with such allowances for reserves and contingencies as Agent shall reasonably deem appropriate in its reasonable discretion (including, without limitation, any budget reallocations and use of cost savings permitted by Section 1.4).

(c)      If for any reason the Loan shall not be In Balance, within ten (10) days after written notice from Agent to Borrower, Borrower shall bring the Loan into balance (i.e., restore the In Balance status of the Loan) by making the Borrower's Deposit. Borrower shall deposit all such funds to an interest-bearing collateral account controlled by Agent with Wells Fargo, N.A. ("**Wells Fargo**"), with interest earned thereon to be part of Borrower's Deposit. Such Borrower's Deposit is hereby pledged to Agent for the benefit of Lender, and Borrower hereby grants and conveys to Agent for the benefit of Lender a security interest in all funds so deposited with Agent, as additional security for the Loan. Agent, for the benefit of Lender may advance all or a portion of Borrower's Deposit prior to making any further Advances. Agent, for the benefit of Lender may (but shall have no obligation to) apply all or any part of Borrower's Deposit against the unpaid Indebtedness in such order as Lender determines. Notwithstanding anything to the contrary, upon the Completion Date, (x) Borrower's obligations under this Section 1.5 shall cease and (y) any remaining Borrower's Deposit shall be immediately applied against the outstanding principal balance of the Loan.

1.6      Evidence of Debt. Amounts of the Loan funded by Lender shall be evidenced by one (1) or more accounts or records maintained by Agent and/or Lender in the ordinary course of business. The accounts or records maintained by Agent and Lender shall be conclusive absent manifest error of the amounts of the Loan funded by Lender to Borrower and the interest and payments thereon. Any failure to so record such amounts, interest or payments or any error in doing so shall not, however, limit or otherwise affect the obligation of Borrower hereunder to pay any amount owing with respect to the Indebtedness. Lender may attach schedules to its Note(s) and endorse thereon the date, amount and maturity of the applicable Note and payments with respect thereto.

## ARTICLE 2 - INTEREST RATE, ADVANCES AND PAYMENTS

2.1      Interest Rate. Subject to this Article 2, the Principal Debt from day to day outstanding which is not past due, shall bear interest at a fluctuating rate of interest equal to the Interest Rate. Interest shall be computed for the actual number of days which have elapsed, on the basis of a 360-day year.

2.2      Unused Line Fee. From and after the Closing Date and until the end of the Availability Period or, if sooner, the date the Commitments terminate, Borrower shall pay to Agent, for the account of Lender, a fee (the "**Unused Line Fee**") based on the unused amount of the Loan. The Unused Line Fee for each day shall be calculated as (i) the product of (A)(1) the Maximum Loan Amount outstanding on each day minus (2) the outstanding principal balance of the Loan on each day, multiplied by (B) 1/360, multiplied by (C) one hundred basis points (1.00%) per annum. The Unused Line Fee payable for each calendar month

FILED: WESTCHESTER COUNTY CLERK 05/01/2021 09:40 AM

NYSCEF DOC. NO. 3

21-07096-shl    Doc 71    Filed 07/22/22    Entered 07/22/22 17:18:19    Main Document
Pg 114 of 227

INDEX NO. 55883/2021

RECEIVED NYSCEF: 05/01/2021

shall be the sum of the Unused Line Fee for each day during the applicable calendar month. The Unused Line Fee shall be payable monthly in arrears, beginning with September 1, 2017 and ending at the end of the Availability Period or, if sooner, the date the Commitments terminate (but in no event later than the Maturity Date), with the Unused Line Fee to be prorated to the date of such final payment.

2.3     Exit Fee. In all events and under all circumstances, voluntary, mandatory or otherwise, Borrower shall be obligated to pay to Lender an exit fee (the "**Exit Fee**") in an amount equal to one percent (1.00%) of the Maximum Loan Amount, which amount shall be payable as follows: (i) upon any (and each) partial prepayment of the Loan in accordance with the terms hereof (except as set forth below), Borrower shall pay to Lender, on account of the Exit Fee, an amount equal to one percent (1.00%) of the amount so prepaid; (ii) upon any (and each) application of any condemnation awards or insurance proceeds to the principal amount of the Loan in accordance with the terms of this Agreement and the Security Instrument, one percent (1.00%) of the amount thereof shall be retained by Lender on account of the Exit Fee and the balance thereof shall be the repayment of the principal amount of the Loan; and (iii) upon the earliest to occur of repayment in full of the principal amount of the Loan or the Maturity Date, Borrower shall pay to Lender the entire Exit Fee less any amounts on account thereof previously paid to Lender under the foregoing clauses (i) and (ii) of this Section 2.3. Notwithstanding the foregoing, with respect to any payment made under Section 9.1(c) in connection with the termination of the Interest Reserve Fund, and with respect to any payment of principal on a monthly basis pursuant to Section 8.2 arising from the disbursement or application of a regular monthly installment of rent, the Exit Fee shall not be payable on the date of such partial paydown, but shall be deferred, without interest thereon, until the Loan is paid in full or otherwise becomes due. Agent shall keep an accounting of any such deferred Exit Fee to be paid to Lender. Borrower's payment of the Exit Fee to Lender shall be in addition to all other amounts payable by Borrower to Lender under this Agreement and the other Loan Documents (including, without limitation, any Lockout Prepayment Premiums payable pursuant to Section 2.9(a) of this Agreement). The Exit Fee shall be deemed earned as of the date hereof and shall not be subject to reduction nor be refundable under any circumstances.

2.4     Computations and Determinations. Agent shall determine each interest rate applicable to the Principal Debt in accordance with this Agreement and its determination thereof shall be conclusive in the absence of manifest error. The books and records of Agent shall be prima facie evidence of all sums owing to Lender from time to time under this Loan, but the failure to record any such information shall not limit or affect the obligations of Borrower under the Loan Documents.

2.5     Reserved.

2.6     Inability to Determine LIBOR Rate. If the LIBOR Daily Floating Rate is no longer published or otherwise ascertainable, Lender shall select another reference rate most comparable to the LIBOR Daily Floating Rate (the "**Replacement Rate**") and thereafter the Interest Rate shall equal such Replacement Rate plus 700 basis points.

2.7     Increased Costs. If any Change in Law shall:

(a)     impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, any Lender;

(b)     subject Lender to any Taxes (other than (A) Indemnified Taxes, (B) Taxes described in clauses (b) through (d) of the definition of Excluded Taxes and (C) income taxes) on its loans, loan principal, letters of credit, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto; or

(c)    impose on Lender any other condition, cost or expense affecting this Agreement or any Note or the Advances made by Lender;

and the result of any of the foregoing shall be to increase the cost to Lender of making, converting to, continuing or maintaining any Advance the interest on which is determined by reference to the LIBOR Daily Floating Rate (or of maintaining its obligation to make any such Advance), or to reduce the amount of any sum received or receivable by such Lender hereunder (whether of principal, interest or any other amount) then, upon request of Agent, Borrower will pay to such Lender such additional amount or amounts as will compensate such Lender for such additional costs incurred or reduction suffered under this Loan. Nothing herein contained shall be construed or shall operate to require Borrower to pay any interest, fees, cost or changes greater than is permitted by applicable Law. Notwithstanding the foregoing, such Lender shall assess costs or reductions to Borrower pursuant to this Section 2.7 only to the extent such Lender assesses similar costs to borrowers with loans of similar type and nature.

2.8    Late Charge. If Borrower shall fail to make any payment due hereunder or under the terms of any Note within five (5) days after the date such payment is due (excluding the repayment of the principal amount due on the Maturity Date and prepaid interest being held by Wells Fargo), Borrower shall pay to Agent for the benefit of Lender on demand, in addition to payment of interest and other amounts hereunder, a late charge equal to five percent (5%) of such payment. The "**late charge**" is imposed for the purpose of defraying the expenses of Agent and Lender incident to handling such defaulting payment. This charge shall be in addition to, and not in lieu of, any other remedy Agent and Lender may have and is in addition to any fees and charges of any agents or attorneys which Agent and Lender may employ upon the occurrence of a Default, whether authorized herein or by Law.

2.9    Prepayment.

(a)    Voluntary Prepayment; Prepayment Premium. The Loan may be prepaid in whole or in part in minimum increments of not less than One Million Dollars ($1,000,000), not more than once in any thirty (30) day period, on a Business Day, with not less than thirty (30) days' (but no more than sixty (60) days') prior written notice delivered to Lender. In connection with any such prepayment, Borrower shall pay to Agent, for the benefit of Lender (i) all amounts due hereunder and under the Note and the other Loan Documents (including, without limitation, the Exit Fee), (ii) the Prepayment Premium (as defined below); and (iii) the interest which is anticipated to accrue on the amount being prepaid for the period commencing on the date of prepayment through the first Payment Date thereafter at the Interest Rate. If the prepayment occurs prior to the date that is twenty-four (24) months from the date of this Agreement (the "**Minimum Loan Term**"), the Borrower shall pay a Prepayment Premium designed to compensate Lender for the interest payments it would have received if the Loan had been advanced and outstanding for the Minimum Loan Term. The Prepayment Premium shall be the product of the following: (a) the number of months remaining in the Minimum Loan Term; and (b) the monthly interest payments that would be payable on the principal balance being prepaid, based on the Interest Rate in effect on the date that is three (3) Business Days prior to the date of prepayment.

(b)    Mandatory Prepayment.

(i)    On each date on which Agent, for the benefit of Lender actually receives a distribution of casualty insurance proceeds or an award in respect of any Condemnation, and Agent and Lender do not have any obligation to make such proceeds available to Borrower for Restoration and elects not to make such proceeds available for Borrower for Restoration, Agent shall, at Agent's option, (i) make the proceeds available to Borrower for Restoration or (ii) apply such proceeds against the Principal Debt, without payment of any otherwise applicable Prepayment Premium, in which event Borrower shall be

deemed to have prepaid the Principal Debt in an amount equal to one hundred percent (100%) of such proceeds and any other amounts due in accordance with this Agreement.

(ii) From and after the end of the Availability Period, if and to the extent permitted under the terms of this Agreement, Borrower sells or otherwise disposes of equipment or personal property for cash consideration, and Borrower does not purchase equipment or personal property of similar type within one hundred eighty (180) days thereafter, Borrower shall prepay the Loan in an amount equal to one hundred percent (100%) of the net proceeds of the sale or disposition of such equipment or personal property, together with the applicable Exit Fee and Prepayment Premium thereon.

2.10    Default Rate. Notwithstanding anything to the contrary contained herein, after the occurrence and during the continuance of a Default (including the expiration of any applicable cure period), the rate of interest accruing on the outstanding principal balance under any Loan Document shall be increased by five hundred (500) basis points above the rate of interest otherwise applicable or to the maximum rate permitted by applicable Laws, whichever is less ("**Default Rate**"), independent of whether Lender accelerates the outstanding principal balance under any Loan Document.

2.11    Taxes.

(a)    Any and all payments by or on account of any obligation of Borrower under any Loan Document shall be made without deduction or withholding for any Taxes, except as required by applicable Laws. If any applicable Laws (as determined in the good faith discretion of Lender) require the deduction or withholding of any Tax from any such payment by Lender or Borrower, then Lender or Borrower shall be entitled to make such deduction or withholding, upon the basis of the information and documentation to be delivered.

(b)    If Borrower or Lender shall be required by any applicable Laws to withhold or deduct any Taxes from any payment, then (i) Borrower or Lender, as required by such Laws, shall withhold or make such deductions as are determined by it to be required based upon the information and documentation, (ii) Borrower or Lender, to the extent required by such Laws, shall timely pay the full amount withheld or deducted to the relevant Governmental Authority in accordance with such Laws, and (iii) to the extent that the withholding or deduction is made on account of Indemnified Taxes, the sum payable by Borrower, shall be increased as necessary so that after any required withholding or the making of all required deductions (including deductions applicable to additional sums payable under this Section 2.11) the applicable Recipient receives an amount equal to the sum it would have received had no such withholding or deduction been made.

(c)    In addition, Borrower agrees to pay to the relevant Governmental Authority in accordance with applicable Law, or at the option of Lender reimburse within ten (10) days after demand for the payment of, any and all Other Taxes.

(d)    Borrower shall, and does hereby indemnify each Recipient, and shall make payment in respect thereof within ten (10) days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section 2.11) payable or paid by such Recipient or required to be withheld or deducted from a payment to such Recipient, and any penalties and interest, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority; provided, however, that if Borrower does not receive written notice of such Indemnified Taxes (an "**Indemnified Tax Notice**") within one hundred eighty (180) days after a Recipient first receives notice of such Indemnified Taxes, then no Recipient shall be entitled to receive payments from Borrower pursuant to this Section 2.11(d) for any amounts of penalties or interest incurred or accruing prior to the receipt by Borrower of the Indemnified Tax Notice. A certificate

as to the amount of such payment or liability delivered to Borrower by Lender shall be conclusive absent manifest error.

(e)     Upon written request by Borrower or Lender, as the case may be, after any payment of Taxes by Borrower or by Lender to a Governmental Authority as provided in this <u>Section 2.11</u>, Borrower shall deliver, to Lender or Lender shall deliver to Borrower, as the case may be, the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of any return required by Laws to report such payment or other evidence of such payment reasonably satisfactory to Borrower or Lender, as the case may be.

(f)     If any Recipient determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified by Borrower with respect to which Borrower has paid additional amounts pursuant to this <u>Section 2.11</u>, it shall pay to Borrower an amount equal to such refund (but only to the extent of indemnity payments made, or additional amounts paid, by Borrower under this <u>Section 2.11</u> with respect to the Taxes giving right to such refund), net of all out-of-pocket expenses (including Taxes) incurred by such Recipient, and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund), <u>provided</u> that Borrower, upon the written request of the Recipient, agrees to repay the amount paid over to Borrower (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Recipient in the event the Recipient is required to repay such refund to such Governmental Authority. Notwithstanding anything to the contrary in this <u>Section 2.11(f)</u>, in no event will the applicable Recipient be required to pay any amount to Borrower pursuant to this <u>Section 2.11(f)</u> the payment of which would place the Recipient in a less favorable net after-Tax position than such Recipient would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid. This <u>Section 2.11(f)</u> shall not be construed to require any Recipient to make available its tax returns (or any other information relating to its taxes that it deems confidential) to Borrower or any other Person.

(g)     If in the opinion of counsel for Agent or Lender (i) it might be unlawful to require Borrower to make any payment or reimbursement required pursuant to this <u>Section 2.11</u> or (ii) the making of such payment or reimbursement might result in the imposition of interest beyond the maximum amount permitted by law, then and in such event, Agent, for the benefit of Lender may elect, by notice in writing given to Borrower, to declare all of the Indebtedness to be and become due and payable sixty (60) days from the giving of such notice.

(h)     Without prejudice to the survival of any other agreement of Borrower hereunder, the agreements and obligations of Borrower, Agent and Lender contained in this <u>Section 2.11</u> shall survive the termination of the Commitments and the payment in full of all the other Indebtedness.

2.12     <u>Payment Schedule and Maturity Date</u>. Accrued and unpaid interest shall be due and payable on the first (1st) day of each calendar monthly after the date of this Agreement commencing on September 1, 2017, and continuing on the first day of each month thereafter (each a "**Payment Date**") until the Maturity Date, or the date that all principal and accrued interest owing on this Loan shall have been fully paid and satisfied, if earlier. If the first day of the calendar month is not a Business Day, the applicable Payment Date shall be the succeeding Business Day. The entire principal balance of the Loan then unpaid and all accrued interest then unpaid shall be due and payable in full on the Maturity Date.

2.13     <u>Advances and Payments</u>.

(a)     Following receipt of a Draw Request for any Advance, upon satisfaction of all conditions to advance thereof, Lender shall make proceeds of the Loan in an amount equal to the Advance available

5962984                                          - 8 -

to Borrower on the applicable Funding Date by advancing such funds to Borrower in accordance with the provisions of Exhibit "E". All Advances made hereunder are intended to be made by both Lender and Mezzanine Lender on a pro rata basis under both the Loan and the Mezzanine Loan, as reflected in the Budget. All Draw Requests are intended to be joint requests for draws under both this Loan and the Mezzanine Loan.

(b)     All payments by Borrower shall be made without condition or deduction for any counterclaim, defense, recoupment or setoff. Except as otherwise expressly provided herein, all payments by Borrower hereunder shall be made to Agent, for the benefit of Lender, and remitted to Lender at Lender's Office in U.S. Dollars and in immediately available funds not later than 12:00 p.m. (Lender's Time) on the date specified herein. All payments received by Lender after 12:00 p.m. (Lender's Time) shall be deemed received on the next succeeding Business Day and any applicable interest or fee shall continue to accrue. If any payment to be made by Borrower shall come due on a day other than a Business Day, payment shall be made on the next following Business Day, and such extension of time shall be reflected in computing interest or fees, as the case may be. Borrower shall not be responsible for late payments from the Interest Reserve Fund to the extent of funds deposited therein that Lender or Agent failed to draw.

2.14     Initial Maturity Date; Extension Option. The Initial Maturity Date of the Loan is August 1, 2020. Borrower may, upon approval of Lender, in its discretion, request an extension of the maturity of the Loan for two (2) separate one year periods following the Initial Maturity Date (each, an "**Extension Period**"), upon and subject to the following terms and conditions:

(a)     Borrower shall request the applicable one-year extension, if at all, by written notice (the "**Extension Notice**") to Agent not more than 120 days, and not less than 30 days prior to the Initial Maturity Date, or the first extended maturity date, as applicable.

(b)     The Completion Date shall have occurred.

(c)     No Potential Default or Default shall have occurred or be continuing at the time of delivery of the Extension Notice and the commencement of the Extension Period.

(d)     Current financial statements regarding Borrower and Guarantor (dated not earlier than sixty (60) days prior to the Extension Notice) and all other financial statements and other information as may be required under the Loan Documents regarding Borrower, Guarantor and the Property, shall have been submitted promptly to Agent.

(e)     The representations and warranties made or deemed made by Borrower and Guarantor in the Loan Documents to which any of them is a party, shall be true and correct in all material respects at the time of delivery of the Extension Notice and on the commencement of the Extension Period, with the same force and effect as if made on and as of each such date, except for those that may no longer be true as a result of the passage of time and do not result in a Default or Potential Default.

(f)     Whether or not the extension becomes effective, Borrower shall pay all out-of-pocket costs and expenses incurred by Agent and Lender in connection with the proposed extension (pre- and post-closing), including, without limitation, appraisal fees, environmental audit and legal fees; all such costs and expenses incurred up to the time of Agent and Lender's written agreement to the extension shall be due and payable prior to Agent's and Lender's execution of that agreement (or if the proposed extension does not become effective, then upon demand by Agent or Lender, as applicable), and any future failure to pay such amounts shall constitute a Default under the Loan Documents.

(g)    All applicable regulatory requirements applicable to Agent and/or Lender shall have been satisfied with respect to the extension.

(h)    Not later than the Initial Maturity Date or the extended maturity date, as applicable, (i) Agent shall have been provided with an updated title report and judgment and lien searches, and appropriate title insurance endorsements shall have been issued as required by Agent; and (ii) Borrower shall have paid to Agent, for the benefit of Lender a non-refundable extension fee in an amount equal to one percent (1.00%) of the sum of the then outstanding principal balance of the Loan. The one percent (1.0%) fee applies to the exercise of each such extension.

(i)    The Loan-to-Value Ratio shall not exceed sixty-five percent (65%); provided, however, that, subject to Borrower's satisfaction of all other conditions to extension set forth in this Section 2.14, Borrower may, at its sole election, prepay such portion of the Loan to the extent necessary to satisfy this condition (i).

(j)    The Operating Lease shall remain in full force and effect and no default shall exist thereunder.

If all of the foregoing conditions are not satisfied strictly in accordance with their terms, the extension shall not be or become effective.

## ARTICLE 3 - ADDITIONAL COVENANTS AND AGREEMENTS; NEGATIVE COVENANTS

3.1    Construction of the Improvements. Borrower shall prosecute the construction of the Improvements with diligence and continuity, in a good and workmanlike manner, and in accordance with sound building and engineering practices, all applicable Laws and governmental requirements, the Plans, the Construction Schedule, the Budget, and the Loan Documents in all material respects. Borrower shall complete construction of the Improvements free and clear of all liens (except liens created by the Loan Documents and Permitted Encumbrances), and shall obtain a temporary certificate of occupancy and all other permits, licenses and approvals from all applicable Governmental Authorities required for the occupancy, use and operation of the Improvements, in each case satisfactory to Agent, on or before the Completion Date. In no event shall Borrower permit or suffer any party, including subcontractors, to commence proceedings to enforce any lien (including, without limitation, any mechanic lien) unless said lien is fully bonded and such bonding effects, in accordance with Laws, the removal of any such liens or claims. Borrower shall promptly correct (a) any material defect in the Improvements, (b) any material departure from the Plans, Law or governmental requirements, or (c) any unpermitted encroachment by any Improvements or structure on any building setback line, easement, property line or restricted area. Borrower shall maintain all permits and Governmental Approvals necessary for construction of the Improvements, and Borrower shall not commence construction of any work or component or phase of work, until Borrower has obtained all permits and Government Approvals that are required to be obtained prior to the commencement of construction of such work, component or phase of work. Borrower shall, upon demand of Agent based upon the advice of the Construction Inspector, correct any Unsatisfactory Work; and the Advance shall not constitute a waiver of Agent's right to require compliance with this covenant with respect to any such Unsatisfactory Work. None of Agent, Lender or the Construction Inspector shall have any affirmative duty to Borrower or any third party to inspect for Unsatisfactory Work or other defects or to call them to the attention of Borrower or anyone else.

3.2    Plans and Changes. No construction shall be undertaken on the Land except substantially as shown in the Plans. Borrower assumes full responsibility for the compliance of the Plans and the Property with all Laws, governmental requirements and sound building and engineering practices. No plans or

specifications for material improvements on the Property or any material changes thereto shall be included as part of the Plans until approved by Agent, Construction Inspector, all applicable Governmental Authorities, and all other parties required under the Loan Documents. Except for Permitted Changes, without Agent's prior written consent, Borrower shall not change or modify the Plans, agree to any change order, or allow any extras to any contractor or any subcontractor. Agent shall respond to a request for approval of a material addition or modification to any Plans within ten (10) business days of written request from Borrower. At any time that Agent's approval is required under this Section 3.2, Agent's approval shall be deemed given if Agent shall not have responded to any specific written request within such ten (10) business day period.

3.3     Material Contracts; Governmental Approvals. Without Agent's prior written approval, Borrower shall not (a) enter into any Material Contract, (b) terminate any such Material Contracts, (c) sell, assign, pledge, transfer, mortgage, hypothecate or otherwise dispose of (by operation of law or otherwise) or encumber any part of its interest in any Material Contract or any material Government Approval, (d) waive any material default under or breach of any material provisions of any Material Contract or any material Government Approval, or waive, forgive, release or fail to enforce any material right, interest or entitlement, howsoever arising, under or in respect of any of the foregoing, or vary or agree to the variation in any material way of any of the foregoing or of the performance of any other Person or Governmental Authority thereunder, (e) amend or modify any provision of, or give any consent under, any Material Contract or any material Government Approval, or (f) petition, request or take any other legal or administrative action that seeks, or may reasonably be expected, to rescind, terminate or suspend any General Contract, any Material Contract, any other Project Document or any Government Approval. Borrower shall not default under any contract or permit any contract to terminate by reason of any failure of Borrower to perform thereunder, and Borrower shall promptly notify Agent of Borrower's receipt of written notice of any default thereunder.

3.4     Required Equity. Borrower shall cause all Required Equity to be disbursed for payment of costs and expenses incurred by Borrower in accordance with the Budget before any Advance is made by Lender pursuant to this Agreement.

3.5     Leases. Borrower shall not enter into any Lease (or any renewals, amendments or modifications of a Lease) at the Property without Agent's prior written consent. Borrower agrees that (i) Borrower will observe and perform in all material respects all of the obligations imposed upon Borrower in the Leases and will not do or permit to be done anything to impair the security thereof; (ii) Borrower will use enforce or secure, or cause to be enforced or secured, the performance of each and every material obligation and undertaking of the respective tenants under the Leases and will appear in and defend, at Borrower's sole cost and expense, any action or proceeding arising under, or in any manner connected with, the Leases; (iii) no Rents will be waived, released, discounted, set off or compromised; (iv) except as stated in the Leases, Borrower has not received any funds or deposits from any tenant which for credit has not already been made on account of accrued Rents; (v) Borrower will not without the prior written consent of Agent waive, release, discount, set off, compromise, reduce or defer any Rent, receive or collect Rents more than one (1) month in advance (other than security deposits required pursuant to such Lease), grant any rent-free period to any tenant, reduce any Lease term or waive, release or otherwise amend or modify any other material obligation under any Lease, renew or extend any Lease except in accordance with a right of the tenant thereto in such Lease, approve or consent to an assignment of a Lease or a subletting of any part of the premises covered by a Lease, or settle or compromise any claim against a tenant under a Lease in bankruptcy or otherwise; (vi) Borrower will not, without the prior written consent of Agent, terminate or consent to the cancellation or surrender of any Lease; (vii) Borrower shall give prompt notice to Agent, as soon as Borrower first obtains notice, of any claim, or the commencement of any action, by any tenant or subtenant under or with respect to a Lease regarding any claimed damage, default, diminution of or offset against Rent, cancellation of the Lease, or constructive eviction, and Borrower shall defend, at Borrower's

expense, any proceeding pertaining to any Lease, including, if Agent so requests, any such proceeding to which Agent is a party; and (viii) if a Default exists, promptly upon request by Agent, Borrower shall, subject to compliance with all Laws, deliver to Lender all security deposits and executed originals of all Leases and copies of all records relating thereto.

3.6     Compliance with Laws; Operation.

(a)     Borrower shall: (i) observe and comply with all Laws applicable to the ownership, construction, operation, use and maintenance of the Property; (ii) obtain, comply with and maintain in full force and effect all Government Approvals as shall now or hereafter be necessary under applicable Law in connection with the ownership, construction, operation, use or maintenance of the Project or the execution, delivery and performance by Borrower of any Material Contract to which it is a party; and promptly furnish a true and complete copy of each such Government Approval to Lender; and (iii) unless otherwise approved by Agent, contest any proceedings before any Governmental Authority, and resist any proposed adverse changes in applicable Law if it is commercially reasonable to do so.

(b)     After prior notice to Agent, Borrower, at its own expense, may contest by appropriate legal proceedings promptly initiated and conducted in good faith and with due diligence, the validity or application of any applicable Law; provided that: (i) no Potential Default or Default exists; (ii) Borrower shall pay any outstanding fines, penalties or other payments under protest unless such proceeding shall suspend the collection of such items; (iii) such proceeding shall be permitted under and be conducted in accordance with the provisions of any other instrument to which Borrower or the Property is subject and shall not constitute a default thereunder; (iv) no part of or interest in the Property will be in danger of being sold, forfeited, terminated, canceled or lost during the pendency of the proceeding; (v) such proceeding shall not subject Borrower, Agent or Lender to criminal or civil liability (other than civil liability as to which adequate security has been provided pursuant to clause (vi) below); (vi) Borrower shall have furnished such security as may be required in the proceeding, or as may be reasonably requested by Agent, to insure the payment of any such items, together with all interest and penalties thereon, which shall not be less than one hundred ten percent (110%) of the maximum liability of Borrower as determined by Agent; and (vii) Borrower shall promptly upon final determination thereof pay the amount of such items, together with all costs, interest and penalties.

(c)     Borrower will preserve, protect, renew, extend and retain all requisite rights, powers, authority, privileges and franchises to carry on its business and to own and operate the Property in accordance with the Leases, the Permitted Encumbrances and otherwise in accordance with this Agreement, and all other material rights and privileges granted for or applicable to the Property. Borrower will not initiate or permit any zoning reclassification of the Property or seek any variance under existing zoning ordinances applicable to the Property. Borrower shall not use or permit the use of the Property in such a manner which would result in such use becoming a nonconforming use under applicable zoning ordinances or other Law. If under applicable zoning provisions the use of all or any portion of the Property is or shall become a nonconforming use, Borrower will not cause or permit the nonconforming use to be discontinued or the nonconforming Improvement to be abandoned without the prior written consent of Agent.

(d)     Other than a Permitted Encumbrance, Borrower will not impose any easement, restrictive covenant or encumbrance upon the Property, execute or file any subdivision plat or condominium declaration affecting the Property or consent to the annexation of the Property to any municipality, without the prior written consent of Lender. Without the prior written consent of Agent, there shall be no drilling or exploration for or extraction, removal or production of any mineral, hydrocarbon, gas, natural element, compound or substance (including sand and gravel) from the surface or subsurface of the Land regardless of the depth thereof or the method of mining or extraction thereof.

3.7     Insurance; Maintenance of the Project; Alterations.

(a)     Borrower shall maintain insurance with respect to the Property with such coverages, amounts and policy requirements as set forth in Section 3(d) and (e) of the Security Instrument. Borrower shall cause General Contractor to, and shall use commercially reasonable efforts (and exercise all applicable rights and remedies under any applicable agreements) to cause each Subcontractor, to maintain insurance in such amounts and coverages as set forth in the Security Instrument.

(b)     Following the Lease Commencement Date, Borrower shall: (i) maintain or cause to be maintained the Project in good condition and repair, in a manner consistent with a skilled nursing facility in Westchester County, New York, and make or cause to be made all reasonably necessary repairs or replacements thereto; (ii) subject to the alterations permitted under the Operating Lease, not remove, demolish or structurally alter, or permit or suffer the removal, demolition or structural alteration of, any of the Improvements without the prior written consent of Lender except to the extent (A) required pursuant to the development of the Project, (B) in connection with the construction work or as permitted by this Agreement, (C) in accordance with the Budget, (D) required by applicable Law or (E) performed in connection with the restoration of the Project after the occurrence of a casualty in accordance with the terms and provisions of the Security Instrument and this Agreement; (iii) subject to the terms of the Loan Documents, promptly restore or cause to be restored in like manner any portion of the Improvements which may be damaged or destroyed from any cause whatsoever; (iv) not commit, or permit, any waste of the Project; and (v) subject to the terms of the Loan Documents, not remove or permit the removal of any item constituting part of the Project without replacing it, except for the sale or disposition, in the ordinary course of business, of any property which is obsolete, all as subject to the consent of Agent.

(c)     Following the Completion Date, Borrower shall obtain Lender's prior written consent to any alterations to any Improvements that may have a material adverse effect on Borrower's financial condition, the use, operation or value of the Project, other than alterations performed in connection with the restoration of the Project after the occurrence of a casualty in accordance with the terms and provisions of the Security Instrument and this Agreement.

3.8     Assignment of Plans and Contracts and Government Approvals. As additional security for the Obligations, Borrower hereby transfers and assigns to Agent, for the benefit of Lender, and grants a security interest in all of Borrower's right, title and interest, but not its liability, in, under and to the Plans, all Material Contracts and Government Approvals, and agrees that all of the same are covered by the security agreement provisions of the Security Instrument and the General Assignment. Borrower agrees to deliver to Agent from time to time upon Agent's reasonable request such consents to the foregoing assignment from parties contracting with Borrower as Agent may require. Neither this assignment nor any action by Agent or Lender shall constitute an assumption by Agent or Lender of any obligation with respect to the Plans or under any Project Document or Government Approval. Borrower hereby agrees to perform all of its material obligations under any Project Document or Government Approval, and Borrower shall continue to be liable for all obligations of Borrower with respect thereto. Borrower agrees to take all necessary action to prevent the termination, in accordance with the terms thereof or otherwise, of the General Contract, any Material Contract, any other material Project Document and any Government Approval and to enforce in accordance with its terms each material covenant or obligation set forth in the General Contracts, each Material Contract, each other Project Document and each Government Approval. During the continuance of a Default, Agent, for the benefit of Lender, shall have the right (but shall have no obligation) to take in its name or in the name of Borrower such action as Agent may determine to be necessary to cure any default with respect to the Plans, any Government Approval or under any Project Document or to protect the rights of Borrower, Agent or Lender with respect thereto. Borrower irrevocably constitutes and appoints Agent as Borrower's attorney-in-fact, which power of attorney is coupled with an interest and irrevocable, to enforce in Borrower's name or in the name of Agent, for the benefit of Lender,

all rights of Borrower with respect to the Plans, the Government Approvals or under any Project Document during the continuance of a Default. Agent and Lender shall incur no liability if any action so taken by Agent or on Agent's or Lender's behalf shall prove to be inadequate or invalid. Subject to the rights of third parties that prepared the Plans, Agent and Lender may use the Plans for any purpose relating to the Improvements. Borrower indemnifies and holds Agent and Lender harmless from and against any actual, out-of-pocket loss, cost, liability or expense (including consultants' fees and expenses and reasonable attorneys' fees and expenses) incurred in connection with Borrower's failure to perform such contracts or any action taken by Agent and Lender. Borrower represents and warrants to Agent and Lender that the copies of the Plans delivered to Agent are and shall be true and complete copies thereof, that the copy of any Project Document and Government Approval furnished or to be furnished to Agent is and shall be a true and complete copy thereof, that there have been no modifications thereof which are not fully set forth in the copies delivered, and that Borrower's interest therein is not subject to any claim, setoff or encumbrance.

3.9     Storage of Materials. Borrower shall cause all materials supplied for, or intended to be utilized in the construction of the Improvements, but not yet affixed to or incorporated into the Improvements, on the Land or at such other site as Agent may reasonably approve, in each case, to be stored on the Land or at such other site as Agent may approve ("**Approved Off-Site Location**"), in each case with adequate safeguards to prevent loss, theft, damage or commingling with materials for other projects. The aggregate cost of materials stored on the Land at any one time shall not exceed One Million and No/100 Dollars ($1,000,000.00) and the aggregate cost of materials stored at the Approved Off-Site Location shall be Two Million Five Hundred Thousand Dollars ($2,500,000.00), in each case unless otherwise approved by Agent acting in its reasonable discretion (the "**Stored Materials Advance Limit**").

3.10     Construction Inspector. Agent, for the benefit of Lender may retain the services of a Construction Inspector, whose duties may include, among others, reviewing, on a monthly basis, the Budget, the Plans and the Construction Schedule and any proposed changes to the Budget, the Plans or the Construction Schedule, performing construction cost analyses, observing and inspecting work in place and reviewing Draw Requests. Construction Inspector shall provide reports on such inspections to Agent. The duties of Construction Inspector run solely to Agent, for the benefit of Lender, and Construction Inspector shall have no obligations or responsibilities whatsoever to Borrower, the General Contractor, any of Borrower's Design Professionals or other contractors or any of their agents or employees; provided, however, Construction Inspector is not released from any liability arising out of Construction Inspector's gross negligence or willful misconduct. All fees, costs, and expenses of Construction Inspector shall be paid by Borrower. Borrower shall cooperate with Construction Inspector and will furnish to Construction Inspector such information and other material as Construction Inspector reasonably requests in connection with the performance of its duties.

3.11     Inspection. Agent, for the benefit of Lender and its agents, including Construction Inspector, may enter upon the Property to inspect the Property, the Project and any materials at any reasonable time so long as at least one (1) business day prior notice to Borrower has been provided, unless Agent deems such inspection is of an emergency nature, in which event Borrower shall provide Agent (and its Construction Inspector) with immediate access to the Property. Borrower will also permit Agent and its agents, including Construction Inspector, to photograph the Property during normal business hours and at any other reasonable time. Borrower will furnish to Agent and its agents, including Construction Inspector, for inspection and copying, all Plans, shop drawings, specifications, books and records, and other documents and information that Agent may reasonably request from time to time.

3.12     Notice to Agent. Borrower shall, within ten (10) days after Borrower is aware of the occurrence of any of the following events, notify Agent in writing thereof, specifying in each case the action Borrower has taken or will take with respect thereto: (a) any Default or Potential Default hereunder or under

any of the other Loan Documents; (b) any violation of any Law by Borrower or any Guarantor, or any claim or assertion by any Governmental Authority that the Property or Improvements fail to comply with any Law; (c) the commencement of any investigation of Borrower or the Property by any Governmental Authority, or any litigation, arbitration or other proceeding instituted or threatened in writing against Borrower or any Guarantor or the Property, and any material development therein; (d) any actual or threatened condemnation of any portion of the Property, any negotiations with respect to any such taking, or any loss of or substantial damage to the Property; (e) any material labor controversy pending or threatened against Borrower or any contractor, and any material development in any labor controversy; (f) any written notice received by Borrower with respect to the cancellation, alteration or non-renewal of any insurance coverage maintained with respect to the Property; (g) any failure by Borrower or any contractor, subcontractor or supplier to perform any material obligation under any Material Contract, any event or condition which would permit termination of a Material Contract or suspension of work thereunder for a period of more than fifteen (15) consecutive days, or any written notice given by Borrower or any contractor with respect to any of the foregoing; (h) any lien filed against the Property or any stop notice served on Borrower in connection with construction of the Improvements; (i) any required permit, license, certificate or approval with respect to the Property lapses or ceases to be in full force and effect; (j) any occurrence or event that would reasonably be expected to result in a Material Adverse Effect; or (k) the occurrence of any judgments for the payment of money rendered against Borrower aggregating in excess of $50,000.00 or against Guarantor in excess $50,000.00, or of any material non-monetary judgments, orders or decrees entered against Borrower or any of the Borrower Parties that adversely affect Agent's and/or Lender's interest in the Loan, in either case, if the same shall remain undischarged, stayed or otherwise adequately bonded (if pursuant to statutory procedure whereby the bond stays any action to enforce judgment) against within thirty (30) days thereof (or any action shall be legally taken (and not dismissed or withdrawn) by a judgment creditor to attach or levy upon any assets of Borrower or such Borrower Party to enforce any such judgment).

3.13   Financial Statements.

(a)   Borrower shall deliver to Agent, in form and detail reasonably satisfactory to Agent, the Financial Statements and other statements and information at the times and for the periods described in (i) Exhibit "B" attached hereto and (ii) any other Loan Document.

(b)   Borrower will keep and maintain full and accurate books and records administered in accordance with sound accounting principles, consistently applied, showing in detail the earnings and expenses of the Property and the operation thereof. All Financial Statements shall be in form and detail reasonably satisfactory to Agent and shall contain or be attached to the signed and dated written certification of the reporting party in form specified by Agent to certify that the Financial Statements are furnished to Agent, for the benefit of Lender in connection with the extension of credit by Lender and constitute a true and correct statement of the reporting party's financial position. All certifications and signatures on behalf of corporations, partnerships, limited liability companies or other entities shall be by the chief accounting officer, the chief financial officer, or another representative of the reporting party reasonably satisfactory to Agent. All Financial Statements for a reporting party who is an individual shall be on a form reasonably satisfactory to Agent. All fiscal year-end Financial Statements of Borrower shall be audited and certified, without any qualification or exception not acceptable to Agent in its reasonable discretion, by an independent certified public accountant reasonably acceptable to Agent, and shall contain all reports and disclosures required by generally accepted accounting principles for a fair presentation. All monthly and quarterly Financial Statements may be prepared by the applicable reporting party and shall include a minimum of a balance sheet, income statement, and statement of cash flow. Borrower shall provide, upon Agent's reasonable request, convenient facilities for the audit and verification of any such statement. Additionally, Borrower will provide Agent at Borrower's expense with all evidence that Lender may from time to time reasonably request in writing as to compliance with all provisions of the Loan Documents.

3.14    Other Information. Borrower shall promptly furnish to Agent from time to time upon Agent's request: (a) copies of any or all subcontracts entered into by contractors or subcontractors and the names and addresses of all Persons with whom Borrower or any contractor has contracted or intends to contract for the construction of the Improvements or the furnishing of labor or materials in connection therewith; (b) copies of any or all contracts, bills of sale, statements, receipts or other documents under which Borrower claims title to any materials, fixtures or articles of personal property incorporated or to be incorporated into the Improvements or subject to the lien of the Security Instrument; (c) a list of all unpaid bills for labor and materials with respect to construction of the Improvements and copies of all invoices therefor; (d) budgets of Borrower and revisions thereof showing the estimated costs and expenses to be incurred in connection with the completion of construction of the Improvements; (e) the Accounts Payable List with each Draw Request for Soft Costs; (f) current or updated detailed Project schedules or construction schedules; and (g) such other information related to Borrower, Guarantor, the Improvements, the Property, the Loan, the construction of the Improvements or any security for the Loan. In addition, Borrower shall from time to time deliver to Agent copies of UCC, lien, judgment and litigation searches and title updates with respect to any Borrower Party and the Property as reasonably requested by Agent.

3.15    Reports and Testing. Borrower shall (a) promptly deliver to Agent, without any representation or warranty whatsoever, copies of all reports, studies, inspections and tests made on the Land, the Improvements or any materials to be incorporated into the Improvements, and (b) make such additional tests on the Land, the Improvements or any materials to be incorporated into the Improvements as Agent reasonably requires. Borrower shall immediately notify Agent of any report, study, inspection or test that indicates any adverse condition relating to the Land, the Improvements or any such materials.

3.16    Appraisal. Agent, for the benefit of Lender, at Borrower's sole cost and expense, may obtain, from time to time, an appraisal of all or any part of the Property prepared in accordance with written instructions from Agent by a third-party appraiser engaged directly by Agent, for the benefit of Lender. Each such appraiser and appraisal shall be satisfactory to Agent (including satisfaction of applicable regulatory requirements). Unless required by applicable Laws, Borrower shall pay the cost of any appraisal hereunder within ten (10) Business Days after written demand, such amount and shall be secured by the Loan Documents. Borrower shall not be required to pay for more than one (1) appraisal per calendar year, unless a Potential Default or a Default is then continuing.

3.17    Reporting Compliance. Borrower agrees to comply with any and all reporting requirements applicable to the Loan which are set forth in any law, statute, ordinance, rule, regulation, order or determination of any governmental authority, including The International Investment Survey Act of 1976, The Agricultural Foreign Investment Disclosure Act of 1978, The Foreign Investment in Real Property Tax Act of 1980 and the Tax Reform Act of 1984 and further agrees upon request of Agent to furnish Agent, for the benefit of Lender with evidence of such compliance.

3.18    Payment of Withholding Taxes. Borrower shall not use, or knowingly permit any contractor or subcontractor to use, any portion of the proceeds of any Advance to pay the wages of employees unless a portion of the proceeds or other funds are also used to make timely payment to or deposit with (a) the United States of all amounts of tax required to be deducted and withheld with respect to such wages under the Code, and (b) any state and/or local Governmental Authority or agency having jurisdiction of all amounts of tax required to be deducted and withheld with respect to such wages under any applicable state and/or local Laws.

3.19    ERISA and Prohibited Transaction Taxes. As of the date hereof and throughout the term of this Agreement: (a) Borrower is not and will not be (i) an "employee benefit plan," as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("**ERISA**"); or (ii) a "plan" within the meaning of Section 4975(e) of the Internal Revenue Code of 1986, as amended from time to time

(the "**Code**"); (b) the assets of Borrower do not and will not constitute "plan assets" within the meaning of the United States Department of Labor Regulations set forth in 29 C.F.R. § 2510.3-101; (c) Borrower is not and will not be a "governmental plan" within the meaning of Section 3(32) of ERISA; (d) transactions by or with Borrower are not and will not be subject to state statutes applicable to Borrower regulating investments of fiduciaries with respect to governmental plans; and (e) Borrower shall not engage in any transaction which would cause any obligation or action taken or to be taken hereunder (or the exercise of any of Agent's or Lender's rights under this Agreement, any Note or the other Loan Documents) to be a non-exempt (under a statutory or administrative class exemption) prohibited transaction under ERISA or Section 4975 of the Code. Borrower further agrees to deliver to Agent and/or Lender such certifications or other evidence of compliance with the provisions of this Section 3.19 as Agent and/or Lender may from time to time request.

    3.20    <u>Environmental Laws; Access Laws</u>.

    (a)    Borrower shall comply strictly and in all respects with applicable Environmental Laws in accordance with the provisions of the Environmental Agreement. Borrower shall provide to Agent, at Borrower's expense promptly upon the written request of Agent from time to time, an Environmental Assessment or, if required by Lender, an update to any existing Environmental Assessment, to assess the presence or absence of any Hazardous Materials and the potential costs in connection with abatement, cleanup or removal of any Hazardous Materials found on, under, at or within the Project. Borrower shall pay the cost of no more than one such Environmental Assessment or update in any twelve (12) month period, unless Lender's request for an Environmental Assessment is based on (i) information provided under Section 8 of the Environmental Agreement, (ii) a reasonable suspicion of the presence of Hazardous Materials at or near the Project in violation of Environmental Law, (iii) a breach of representations under Section 2 of the Environmental Agreement in any material respect, or (iv) a Default, in which case any such Environmental Assessment or update shall be at Borrower's expense.

    (b)    Borrower agrees that it shall ensure that the Project shall at all times comply with the applicable requirements of the Americans with Disabilities Act of 1990, the Fair Housing Amendments Act of 1988, all state and local laws and ordinances related to handicapped access and all rules, regulations, and orders issued pursuant thereto including, without limitation, the Americans with Disabilities Act Accessibility Guidelines for Buildings and Facilities (collectively, "**Access Laws**"). Borrower agrees to give prompt notice to Agent of the receipt by Borrower of any written complaints related to violation of any Access Laws with respect to the Project and of the commencement of any proceedings or investigations which relate to compliance with applicable Access Laws.

    3.21    <u>Taxes and Other Charges</u>. Borrower shall pay, or shall cause its Tenant to pay (to the extent any Tenant is obligated to make such payments under its Lease) all Property Taxes and Other Charges now or hereafter levied or assessed or imposed against the Property, or any part thereof, as the same become due and payable (and with respect to Property Taxes, prior to the date the same become delinquent); provided, however, Borrower's obligation to directly pay Property Taxes shall be suspended for so long as Borrower complies with the terms and provisions of Section 9.2 hereof. Borrower will deliver to Agent receipts for payment or other evidence reasonably satisfactory to Agent that the Property Taxes and Other Charges have been so paid or are not then delinquent no later than ten (10) days prior to the date on which the Property Taxes and/or Other Charges would otherwise be delinquent if not paid; provided, however, Borrower is not required to furnish such receipts for payment of Property Taxes in the event that such Property Taxes are to be paid by Agent pursuant to Section 9.2 hereof. Subject to the terms of this Section 3.21, Borrower shall not suffer and shall promptly cause to be paid and discharged any Lien or charge whatsoever, which may be or become a Lien or charge against the Property or any portion thereof, and shall promptly pay for all utility services provided to the Property. After prior notice to Agent, Borrower, at its own expense, may contest by appropriate legal proceeding, promptly initiated and conducted in good faith and with due

5962984                   - 17 -

diligence, the amount or validity or application in whole or in part of any Property Taxes or Other Charges; provided that (a) no Default or Potential Default has occurred and remains uncured; (b) such proceeding shall be permitted under, and be conducted in accordance with, the provisions of any other instrument to which Borrower is subject and shall not constitute a default thereunder and such proceeding shall be conducted in accordance with all applicable statutes, laws and ordinances; (c) neither the Property nor any part thereof or interest therein will be in danger of being sold, forfeited, terminated, cancelled or lost; (d) Borrower shall promptly upon final determination thereof pay the amount of any such Property Taxes or Other Charges, together with all costs, interest and penalties which may be payable in connection therewith; (e) such proceeding shall suspend the collection of such contested Property Taxes or Other Charges from the Property (except that if such Property Taxes or Other Charges must be paid sooner in order to avoid being delinquent, then Borrower shall cause the same to be paid prior to delinquency, and upon making such payment prior to delinquency Borrower may continue such contest); (f) Borrower shall furnish such security as may be required in the proceeding, or as may be reasonably requested by Agent, to insure the payment of any such Property Taxes or Other Charges, together with all interest and penalties thereon. Agent may pay over any such cash deposit or part thereof held by Agent to the claimant entitled thereto at any time when, in the judgment of Lender, the entitlement of such claimant is established or the Property (or part thereof or interest therein) shall be in danger of being sold, forfeited, terminated, cancelled or lost or there shall be any danger of the Lien of the Security Instrument being primed by any related Lien; and (g) such contest shall not delay or affect the construction of the Project as required under this Agreement.

3.22    Existence; Qualifications. Borrower shall do or cause to be done all things necessary to preserve, renew and keep in full force and effect its existence and comply in all material respects with all Law applicable to it, shall not cease to be validly existing and in good standing under the laws of the Commonwealth of Massachusetts or cease to be authorized to do business in, and if required by Law, in good standing in, each state in which the Property is located.

3.23    Organizational Requirements.

(a)    Borrower shall comply with the terms and conditions of Exhibit "K" with respect to the matters described therein.

(b)    Borrower shall conduct business only in its own name (including its trade name or names) and shall not change its name, identity, or type of organization specified in the first paragraph of this Agreement unless Borrower shall have obtained the prior written consent of Agent. Borrower shall promptly notify Agent (i) of any change of its organizational identification number, or (ii) if Borrower does not now have an organization identification number and later obtains one, of such organizational identification number.

(c)    Borrower shall not change the location of its chief executive office or principal place of business unless Borrower (i) shall have given Agent at least ten (10) Business Days' prior written notice and (ii) shall have taken all actions necessary or reasonably requested by Lender to file or amend any UCC financing statement or continuation statement required to assure perfection and continuation of perfection of security interests under the Loan Documents. Borrower's principal place of business and chief executive office, and the place where Borrower keeps its books and records, including recorded data of any kind or nature, regardless of the medium of recording including software, writings, plans, specifications and schematics concerning the Property, shall be the location described in the notice provision for Borrower in this Agreement; provided, however, that Borrower shall have the right (but not the obligation) to keep its books and records at the Project.

(d)     The certificate of organization and limited liability company operating agreement of each of Borrower and Member shall not be amended, modified, supplemented and/or amended and restated without the prior written consent of Agent.

3.24     Operation of the Property.

(a)     Borrower shall not enter into any agreement for the management and/or operation of the Property without Agent's prior written consent, and conditioned upon an assignment and subordination of management agreement being executed and delivered by any such manager and Borrower as is acceptable to Agent.

(b)     All Material Agreements shall be subject to the prior review and approval of Agent.

(c)     Following Final Completion, Borrower shall, or cause its Tenant to, obtain and maintain all licenses required to operate the Property as contemplated as a skilled nursing facility. Borrower shall not transfer any licenses, except to Agent pursuant to the terms of the Loan Documents.

3.25     Reserved.

3.26     Additional Indebtedness. Borrower shall not avail itself of or permit any additional extension of credit or debt of any kind (including any guarantees or other contingent obligations) (whether recourse or non-recourse, secured or unsecured) without the prior written consent of Agent except for (A) the Indebtedness; (B) the Mezzanine Loan; (C) the construction costs for the Project incurred in the ordinary course of construction in conformance with the Budget; and (D) trade payables in the ordinary course of its business of owning and operating the Property and developing the Project, provided that such trade payables are not evidenced by a note, do not exceed in the aggregate three percent (3%) of the Loan, and such obligations are paid within sixty (60) days of the date an invoice is received for payment thereof, subject to any rights of Borrower to contest same in accordance with the terms of this Agreement. Neither Borrower nor Sole Member shall make any loans, and no direct or indirect interest in Borrower nor Sole Member may be pledged as collateral for any financing or otherwise other than the Loan.

3.27     Limitation on Distributions, etc.     So long as any amount of the Loan is outstanding, Borrower shall not make any dividend, payment or distribution to any owner of any direct or indirect equity interests of Borrower or any Affiliate of any such owner of any direct or indirect equity interests of Borrower, other than payments pursuant to either the Development Agreement between Borrower and Congress Construction Corporation (the "**Development Agreement**") and the General Contract, or the payment of Approved Operating Expenses.

3.28     Contracts with Affiliates. Except for the Development Agreement and the General Contract, without the prior written consent of Agent in its sole and absolute discretion, Borrower shall not enter into any Affiliate Contract or amend, modify or terminate any Affiliate Contract that has been approved by Agent, and Member shall not enter into any Affiliate Contract with respect to Borrower or the Property, or amend, modify or terminate any such Affiliate Contract, that has been approved by Lender.

3.29     Transfers; Encumbrances. Borrower shall not, voluntarily or involuntarily, directly or indirectly, sell, convey, transfer, lease or otherwise dispose of, or mortgage, encumber or create a lien or security interest in, the Property or the income or any other revenues therefrom or permit or suffer any such action to be taken, except in each case as permitted by the Loan Documents. Except as otherwise provided in the terms of the Loan Documents, none of the collateral for the Loan may be subject to any negative pledge or other encumbrance that prohibits the granting of a lien on such collateral to secure the Borrower's obligations hereunder or under the other Loan Documents.

5962984                                                  - 19 -

3.30    Ownership; Merger; Consolidation; Purchase or Sale of Assets.

(a)    Without the prior written consent of Agent:

(i)    Except for Permitted Transfers, Borrower shall not allow or permit any transfer of any direct or indirect interest in any member of the Borrower Group or any direct or indirect partner, member or other legal or beneficial interest holder therein to occur;

(ii)    Except for Permitted Transfers, except due to death or incapacity of an individual, Borrower shall not (A) directly or indirectly sell, transfer, convey or assign any interest in the Project or any part thereof; (B) further mortgage, pledge, encumber, alienate, grant a Lien or grant any other interest in the Project or any part thereof, whether voluntarily or involuntarily; or (C) except for matters having no Material Adverse Effect which are approved in writing by Agent, enter into any easement or other agreement granting rights in or restricting the use or development of the Project;

(iii)    Except for Permitted Transfers, no change in the organizational documents of any member of the Borrower Group or the holder of any direct or indirect interest therein which is reasonably likely to have a material adverse effect on the Project and/or management of the Project shall be effected;

(iv)    As used in this Section 3.30, "**transfer**" shall include (A) the sale, transfer, conveyance, mortgage, pledge, grant of a Lien upon, or assignment of any direct or indirect legal or beneficial ownership of the Property or the Project, (B) the sale, transfer, conveyance, mortgage, pledge, grant of a Lien upon, or assignment of any direct or indirect partnership, membership or other legal or beneficial interest, at any tier or level, in the any member of the Borrower Group, (C) the admission or withdrawal of any partner, member or other legal or beneficial interest holder to or from any member of the Borrower Group or any direct or indirect partner, member or other legal or beneficial interest holder therein, at any tier or level, or (D) the acquisition, directly or indirectly, of the right or responsibility to manage and administer the business and affairs, or otherwise exercise rights of Control over, any member of the Borrower Group or any direct or indirect partner, member or other legal or beneficial interest holder therein, at any tier or level, but shall expressly exclude any Permitted Encumbrance.

(b)    A transfer that complies with the following terms and conditions shall be considered a Permitted Transfer:

(i)    The transfer occurs after the Completion Date.

(ii)    In connection with any such transfer, Agent shall have received not less than thirty (30) days prior to the date on which such transfer is to become effective: (A) written notice of such proposed transfer, (B) true and correct copies of all documentation that will be entered into with respect to the same, and (C) if, as a result of any transfer, when considered cumulatively with all previous transfers, any Person who did not previously own ten percent (10%) or more of the direct or indirect ownership or economic interests in Borrower would acquire or hold ten percent (10%) or more of the direct or indirect ownership or economic interests in Borrower, all appropriate papers reasonably requested by Agent that reflect the identity, organization, good standing, tax status and financial standing of the proposed transferee, which papers shall include certified copies of all documents relating to the organization and formation of transferee and of the entities, if any, which are partners or members of transferee and updated organizational charts reflecting such transfer, as well as all other documents and information reasonably requested by Agent (including such

documents as it may require for Agent to undertake such background checks and satisfy such "know-your-customer" requirements as may be required to be performed by it pursuant to applicable Law); provided, however, the proposed transferee shall not be required to provide confidential information regarding the identity, organization, tax status or financial standing of any limited partners or non-managing members who have no management authority in such proposed transferee and who do not, together with their affiliates, own ten percent (10%) or more of the direct and/or indirect ownership or economic interests in Borrower;

(iii)    Such transfer shall not affect or waive Agent's rights to enforce its rights and remedies under the Loan Documents with respect to any breach or Default by Borrower or Guarantor, including, without limitation, any breach or Default under any of the Loan Documents regarding compliance with (A) single purpose entity covenants as set forth in Exhibit "K" and other covenants applicable to Borrower, or (B) negative or other covenants in any of the Loan Documents;

(iv)    The transferee shall (x) satisfy all applicable Patriot Act and related statues, rules and regulations, including applicable "know-your-customer" requirements of Agent, (y) if, as a result of any transfer, when considered cumulatively with all previous transfers, any Person who did not previously own ten percent (10%) or more of the direct or indirect ownership or economic interests in Borrower would acquire or hold ten percent (10%) or more of the direct or indirect ownership or economic interests in Borrower, satisfy suitability requirements imposed by Agent with respect to the financial standing, qualification, lending conduct and reputation, including, without limitation, there shall not have been any (1) "bad act" default (i.e., a "bad act" which is customarily the subject of a recourse carve-outs guaranty similar to the Carveout Guaranty) on indebtedness for which Agent, Lender or any of Agent's or Lender's Affiliates is or was a lender, (2) criminal convictions against such transferee (or any Affiliate of such transferee) other than a misdemeanor not involving moral turpitude, or any ongoing criminal proceedings, (3) voluntary or involuntary bankruptcy, reorganization or insolvency proceedings with respect to such transferee (or any Affiliate of such transferee) within the seven (7) year period prior to such transfer or (4) litigation with respect to such transferee (or any Affiliate of such transferee) is pending, or has been previously filed, involving Agent, Lender or any of Agent's or Lender's Affiliates, or there has been any exercise or threatened exercise of remedies against such transferee (or any Affiliate of such transferee), in connection with any real estate finance-related transaction during the five (5) year period prior to the proposed transfer, and (z) not be the subject of any Sanctions nor be located, organized or a resident in a Designated Jurisdiction;

(v)    if, as a result of any transfer, when considered cumulatively with all previous transfers, any Person would acquire or hold ten percent (10%) or more of the direct or indirect ownership or economic interests in Borrower, Borrower shall have delivered to Agent such opinions, organizational documents, financial information and additional information related to the transferee as Agent may reasonably request; and

(vi)    such transfer, when considered cumulatively with all previously transfers, shall not result in twenty-five percent (25%) of more of the indirect ownership interest in Borrower having been transferred and/or a change in Control of Borrower.

(c)    Agent's written consent to any one proposed transfer shall not be construed to be a waiver of the right of Agent to make such a determination as to any other transfer, or as a waiver of any right of Agent to consent to transfer, to the extent required hereunder.

5962984                                     - 21 -

(d)    Borrower shall reimburse Agent for all out-of-pocket expenses, including reasonable legal fees and costs, incurred by Agent in connection with any transfer for which the consent of Agent is required hereunder or which is described in <u>Section 3.30(b)</u>.

3.31    <u>Financial Covenants</u>. From and after Completion, (a) the Loan-to-Value Ratio shall not exceed 65%, and (b) the Debt Service Coverage Ratio shall not be less than 1:25:1.00. In addition, all financial covenants of Tenant set forth in Section 7.4 of the Operating Lease shall be satisfied.

3.32    <u>Use of Proceeds; Income from the Property</u>. Borrower shall use the proceeds of the Loan only for the purposes set forth in <u>Section 1.2</u> hereof. Borrower shall first apply all income derived from the Property to pay costs and expenses associated with the ownership, maintenance, development, operation and marketing of the Property, including all amounts then required to be paid under the Loan Documents, before using or applying such income for any other purpose.

3.33    <u>Reserved</u>.

3.34    <u>Easements and Restrictions; Zoning</u>. Except for Permitted Encumbrances and Required Permits, Borrower shall submit to Agent for Agent's approval, not to be unreasonably withheld, conditioned or delayed, prior to the execution thereof by Borrower all proposed easements, restrictions, covenants, permits, licenses, and other instruments which would affect the title to the Property or use of the Property for its intended purposes, accompanied by a Survey showing the exact proposed location thereof and such other information as Agent shall reasonably require. Borrower shall not subject the Property or any part thereof to any easement, restriction or covenant (including any restriction or exclusive use provision in any lease or other occupancy agreement) which is not a Permitted Encumbrance without the prior approval of Agent. With respect to any and all existing easements, restrictions, covenants or operating agreements which benefit or burden the Property, any easement, restriction or covenant to which the Property may hereafter be subjected in accordance with the provisions hereof and any zoning or land use classification of the Property approved by Agent, Borrower shall: (a) observe and perform the obligations imposed upon Borrower or the Property in all material respects; (b) not alter, modify or change the same without the prior written approval of Agent, not to be unreasonably withheld, conditioned or delayed; (c) enforce its rights thereunder in a commercially reasonable manner so as to preserve for the benefit of the Property the full benefits of the same; and (d) deliver to Agent a copy of any notice of default or other notice or correspondence received or delivered by Borrower in respect of the same promptly after Borrower's receipt or within a reasonable period of time before delivery of such notice or correspondence. Borrower shall not initiate or consent to any zoning reclassification of any portion of the Property or seek any variance under any existing zoning ordinance, or use or permit the use of any portion of the Property in any manner that could result in such use becoming a non-conforming use under any zoning ordinance or any other applicable land use law, rule or regulation, in each case, without the prior written consent of Agent.

3.35    <u>HVCRE Matters</u>. Notwithstanding anything herein to the contrary, Borrower shall not make any distribution of cash or other property to its constituent direct and indirect owners which could cause the Loan to be classified as an HVCRE Loan, and in any event shall at all times maintain sufficient cash equity invested in the Property to ensure that the Loan is not categorized as an HVCRE Loan. Notwithstanding the foregoing to the contrary, Lender's consent to any distribution of cash or other property by Borrower to its constituent direct or indirect owners shall not be unreasonably withheld, conditioned or delayed so long as such distribution would not cause the cash equity invested in the Property by Borrower to be less than fifteen percent (15%).

## ARTICLE 4 - REPRESENTATIONS AND WARRANTIES

To induce Lender to make the Loan, Borrower hereby represents and warrants to Agent and Lender that:

4.1    Organization.

(a)    Borrower is a limited liability company and will continue to be (a) duly organized, validly existing and in good standing under the Laws of the state of its organization, (b) authorized to do business and in good standing in the State of New York, and (c) possessed of all requisite power and authority to carry on its business, to own the Property and to develop and operate the Improvements as contemplated in this Agreement and the other Loan Documents.

(b)    Borrower has heretofore delivered to Agent a true and complete copy of the Organizational Documents of each Borrower Party. Schedule 4.1 contains a true and accurate chart reflecting the ownership of all of the direct and indirect equity interests in Borrower, including the percentage of ownership interest of the Persons shown thereon and shall remain true and accurate hereafter unless changed to reflect transfers permitted under the terms of this Agreement.

4.2    Authorization; No Conflict. Each Loan Document executed by Borrower and each Borrower Party has been duly authorized, executed and delivered by Borrower and each Borrower Party, and the obligations thereunder and the performance thereof by Borrower and each Borrower Party in accordance with their terms are and will continue to be within Borrower's and such Borrower Party's power and authority without the necessity of joinder or consent of any other Person. No provision of the Loan Documents violates or will violate any applicable Law, any covenants or restrictions affecting the Property, any order of any court or governmental authority or any contract or agreement binding on Borrower, any Borrower Party or the Property. The Loan Documents do not and will not result in the creation of any encumbrance against any assets or properties of Borrower or any Person liable, directly or indirectly, for any part of the Indebtedness except as expressly provided in such documents. Except for Governmental Approvals to be issued following construction of the Improvements, each Government Approval required for and each consent or approval required to be obtained from, and notice required to be delivered to, any other Person in connection with the execution, delivery and performance by Borrower of this Agreement, the other Loan Documents, and the General Contract has been obtained or delivered and is in full force and effect.

4.3    Enforceability. The Loan Documents constitute legal, valid and binding obligations of Borrower enforceable in accordance with their terms, except as the enforceability thereof may be limited by Debtor Relief Laws and except as the availability of certain remedies may be limited by general principles of equity.

4.4    No Violation; No Litigation.

(a)    Borrower is not in violation of any Law, regulation or ordinance, or any order of any court or Governmental Authority, and no provision of the Loan Documents violates any applicable Law, any covenants or restrictions affecting the Property, any order of any court or Governmental Authority or any contract or agreement binding on Borrower or the Property. There is no judicial or administrative action, claim, investigation, inquiry, proceeding or demand pending (or, to Borrower's actual knowledge, threatened) against Borrower or against any other Person liable directly or indirectly for any part of the Indebtedness or which adversely affects the Property (including any that challenges or which otherwise adversely affects Borrower's title to the Property) or the validity, enforceability or priority of any of the Loan Documents. There are no actions or proceedings pending before any court, quasi-judicial body or

administrative agency relating to compliance of the Property with any applicable zoning, subdivision, building, environmental or land use law, ordinance or resolution.

(b)     Borrower and the Project, as applicable, and the contemplated use thereof and operations thereat, comply, and upon completion of construction of the Improvements applicable thereto shall comply, with all applicable Law.

(c)     All Government Approvals necessary in connection with the construction and operation of the Project as contemplated by the Loan Documents and the Material Contracts, other than those Government Approvals to be obtained after the date hereof as expressly identified in the Permitting Schedule, have been duly obtained, were validly issued, are in full force and effect, are not subject to appeal, are held in the name of Borrower (except for the Certificate of Need and other licenses for the operation of the licensed skilled nursing home that are held by tenant under the Operating Lease) (in the case of the Project) and are free from conditions or requirements which Borrower does not reasonably expect to be able to be satisfied in the ordinary course of business. Borrower is not aware of any proceeding pending or that has been threatened in writing that expressly seeks, or may reasonably be expected to result in, the rescission, termination, modification or suspension of any such Government Approval necessary in connection with the construction and operation of the Project as contemplated by the Loan Documents and the Material Contracts.

(d)     The information set forth in each application and other written material submitted by Borrower to the applicable Governmental Authority in connection with each Government Approval obtained by Borrower is accurate and complete in all material respects.

(e)     The Government Approvals expressly described on the Permitting Schedule as those Government Approvals which shall be obtained after the date hereof are required solely in connection with later stages of development, construction or operation of the Improvements and are not customarily obtained until a later stage of development or construction, and shall be obtained on or prior to the date when so required.

(f)     The Project (if constructed in accordance with the Plans and the Material Contracts) will conform to and comply with all covenants, conditions, restrictions and reservations in the Government Approvals and all applicable Laws.

(g)     Borrower has no reason to believe that Agent, acting for the benefit of Lender, will not be entitled, without undue expense or delay, to the benefit of each Government Approval set forth on the Permitting Schedule hereto with respect to the Project upon the exercise of remedies under the Security Instrument and the other Loan Documents.

(h)     Borrower has delivered to Agent a true and complete copy of each material Government Approval heretofore obtained with respect to the Project as indicated on the Permitting Schedule, as the same shall be supplemented during the course of obtaining additional Government Approvals as the construction work proceeds.

(i)     There is no action, suit or proceeding, judicial, administrative or otherwise (including any condemnation or similar proceeding), pending, filed or, to Borrower's knowledge, threatened or contemplated against any member of the Borrower Group or any Guarantor or against or affecting the Property that is not fully covered by insurance that would be reasonably likely to have a Material Adverse Effect.

(j)      Neither the Improvements as contemplated to be constructed by Borrower, nor the intended use of the Property and the contemplated accessory uses by Borrower, will violate (a) any applicable Laws (including subdivision, zoning, building, environmental protection and wetland protection Laws), or (b) any building permits, restrictions or records, or agreements affecting the Property or any part thereof. Neither the zoning authorizations, approvals or variances nor any other right to construct or to use the Property is to any extent dependent upon or related to any real estate other than the Property. The Improvements to be constructed by Borrower on the Property will comply with all applicable Laws once the Completion Date has occurred. To Borrower's actual knowledge, there are no violations or notices of violations of any Laws relating to Borrower or the Property that have not been cured as of the date of this Agreement.

4.5      Initial Equity. Borrower has caused the Initial Equity to be applied as provided in the Budget.

4.6      Material Contracts. Borrower has heretofore delivered to Agent a true and complete copy of each Material Contract and, subject to the terms of Section 3.3, none of the Material Contracts has been further amended, modified or terminated. The Material Contracts are in full force and effect and no party is in default under or with respect to any Material Contract. No party has any defense, offset right or other right to withhold performance under or terminate any Material Contract.

4.7      Title. Borrower has good, marketable and insurable fee simple title to the real property comprising the Property, and good title to the balance of the Property, free and clear of all liens on the Property whatsoever except the Permitted Encumbrances. The Security Instrument, when properly recorded in the appropriate records, together with any Uniform Commercial Code financing statements required to be filed in connection therewith, will create (i) a legal, valid and enforceable first priority, perfected security interest in and to, and perfected collateral assignments of, all personalty, the proceeds arising from the Property and other collateral securing the Loan, to the extent a security interest may be created therein and perfected by the filing of a UCC Financing Statement under the Uniform Commercial Code as in effect in the applicable jurisdiction, all in accordance with the terms thereof, in each case subject only to any Permitted Encumbrances.

4.8      Taxes. Borrower is not a party to any tax sharing agreement; except as disclosed in the preliminary title reports delivered to Agent, there is no proposed property tax assessment against Borrower. All U.S. federal income and other material tax returns and other reports required by applicable requirements of Law to be filed by Borrower and Guarantor have been filed, or extensions have been obtained, and (ii) all material taxes, assessments, and other governmental charges imposed upon Borrower and Guarantor or any property of Borrower and Guarantor have been paid, except to the extent contested in good faith by proper proceedings for which adequate reserves have been set aside for the payment thereof on the Financial Statements in accordance with GAAP.

4.9      Plans. Borrower has delivered to Agent a true, accurate and complete copy of the Plans. The Plans are complete in all material respects, contain all necessary detail and are adequate for construction of the Improvements, are satisfactory to Borrower. The Plans have been approved by all applicable Governmental Authorities and comply with the Loan Documents and all applicable Laws, restrictive covenants, and governmental requirements, rules and regulations. The Plans do, and the Improvements when constructed will, comply with all applicable Law regarding access and facilities for handicapped or disabled persons.

4.10      Requirements; Zoning. The Land and the Improvements comply in all material respects with all Laws and governmental requirements, including all subdivision and platting requirements, without reliance on any adjoining or neighboring property. The current and anticipated use of the Property will

comply in all material respects with all applicable zoning ordinances, regulations and restrictive covenants affecting the Land without the existence of any additional variance, non-complying use, nonconforming use or other special exception, all use restrictions of any Governmental Authority having jurisdiction have been satisfied, and no violation of any Law or regulation exists with respect thereto.

4.11    Separate Tax Lot. The Land is not part of a larger tract of land owned by Borrower or any of its Affiliates or Guarantor, is not otherwise included under any unity of title or similar covenant with other lands not encumbered by the Security Instrument, and constitutes one or more separate tax lots with a separate tax assessment or assessments for the Land and Improvements, independent of those for any other lands or improvements.

4.12    No Conveyance. With the exception of the collateral assignments in the Loan Documents, Borrower has not conveyed, assigned or otherwise disposed of or transferred (or agreed to do so) any development rights, air rights or other similar rights, privileges or attributes with respect to the Property, including those arising under any zoning or land use ordinance or other Law or governmental requirement.

4.13    Construction Matters. The Budget includes the entire Aggregate Cost and is true, correct and complete in all material respects as of the date thereof and does not omit to state any fact or circumstance necessary to make the statements contained therein not misleading in any material respect. The construction schedule for the Project is realistic and the Required Completion Date is a reasonable estimate of the time required to complete the Project. Attached hereto as Exhibit "I" is a description of the subcontractor default insurance to be provided by Borrower in connection with completion of the Improvements, and to the best of Borrower's knowledge, no other bonds, letters of credit or other security are currently required or will be required to be provided by Borrower prior to completion of the Improvements.

4.14    Utilities. All utility services necessary for the development of the Land and the construction of the Improvements and the operation thereof for their intended purpose are available at the boundaries of the Land, including electric and natural gas facilities, telephone service, water supply, storm and sanitary sewer facilities.

4.15    Financial Matters. Borrower is solvent after giving effect to all borrowings contemplated by the Loan Documents and no proceeding under any Debtor Relief Law is pending (or to Borrower's knowledge threatened) by or against Borrower or any Affiliate of Borrower as a debtor. All Financial Statements, financial information, reports, statements, plans, budgets, applications, agreements and other data and information (collectively, "**Submissions**") heretofore furnished or hereafter to be furnished by or on behalf of Borrower to Agent and/or Lender are and will be true, correct and complete in all material respects as of their respective dates and do not and will not omit to state any fact or circumstance necessary to make the statements contained therein not misleading. There has been no event or condition that could reasonably be expected to have a Material Adverse Effect on Borrower's or Guarantor's financial condition from the financial condition of Borrower or Guarantor (as the case may be) indicated in such Submissions. To Borrower's knowledge, no material adverse change has occurred since the dates of such Submissions in the financial condition of any tenant under any lease described therein. For purposes of this Section 4.15, "**Borrower**" shall also include any Person liable directly or indirectly for the Indebtedness or any part thereof, including any joint venturer or general partner of Borrower.

4.16    Borrower Not a Foreign Person. Neither the Borrower nor any Borrower Party is a "foreign person" within the meaning of the Code, Sections 1445 and 7701 (*i.e.*, neither Borrower nor any Borrower Party is a non-resident alien, foreign corporation, foreign partnership, foreign trust or foreign estate as those terms are defined therein and in any regulations promulgated thereunder).

5962984                                    - 26 -

4.17   Business Loan. The Loan is solely for business and/or investment purposes, and is not intended for personal, family, household or agricultural purposes. Borrower warrants that the proceeds of the Loan shall be used for commercial purposes and stipulates that the Loan shall be construed for all purposes as a commercial loan.

4.18   Insurance. Borrower has obtained and delivered to Agent an environmental insurance policy and certificates of insurance for the Property reflecting the insurance coverages, amounts and other insurance requirements set forth in the Loan Documents. Neither Borrower nor, to the actual knowledge of Borrower, any other Person has done, by act or omission, anything which would materially and adversely impair the coverage of any such policy.

4.19   Condemnation. Borrower has not received any written notice of, and to Borrower's knowledge, no Person has threatened, any actual or proposed Condemnation.

4.20   Flood Zone. Except as may otherwise be disclosed on the Survey, none of the Improvements are, or when constructed will be, located in an area identified by the Federal Emergency Management Agency as an area having special flood hazards, or, if any portion of the Improvements is, or will be, located within such area, Borrower has obtained the insurance prescribed herein.

4.21   Public Access. All easements and rights of way necessary for the contemplated utilization of the Improvements have been acquired.

4.22   Boundaries. All of the improvements to be developed in connection with the Project lie wholly within the boundaries and building restriction lines of such project, and except as may otherwise be disclosed in the Survey and insurance against by the Title Policy, no improvements on adjoining properties encroach upon such project, and no improvements encroach upon or violate any easements or other encumbrances upon such project, so as to affect the value or marketability of such project.

4.23   Liens. Except as otherwise provided for in the Loan Documents, Borrower has not made any contract or arrangement of any kind the performance of which by the other party thereto would give rise to a lien on the Property other than Permitted Encumbrances.

4.24   Other Agreements; Defaults. Neither Borrower nor any Borrower Party is a party to any agreement or instrument or subject to any court order, injunction, permit, or restriction which might adversely affect the Project or the business, operations, or condition (financial or otherwise) of Borrower or any Borrower Party. Neither Borrower nor any Borrower Party is in violation of any agreement which violation would have a Material Adverse Effect.

4.25   Usury; Offsets. The terms of this Agreement are not usurious. Borrower has no offsets, counterclaims or defenses with respect to its Obligations.

4.26   Interim Disbursements. All proceeds of the Loan, if any, disbursed prior to the date hereof by Agent to Borrower have been applied to the respective items listed in the respective Draw Advance, except that in the case of any disputed items, such proceeds of the Loan have been applied to other Budget Line Items with Agent's prior approval or repaid to Agent for the benefit of Lender.

4.27   Use of Project. The Project, upon completion of the construction of the Improvements, will be used exclusively for purposes described in the Recitals to this Agreement.

4.28   Margin Stock. No part of proceeds of the Loan will be used for purchasing or acquiring any "margin stock" within the meaning of Regulations T, U or X of the Board of Governors of the Federal

Reserve System or for any other purpose which would be inconsistent with such Regulation U or any other Regulations of such Board of Governors, or for any purposes prohibited by Legal Requirements or by the terms and conditions of this Agreement or the other Loan Documents.

4.29    Investment Company Act. Borrower is not (a) an "investment company" or a company "controlled" by an "investment company," within the meaning of the Investment Company Act of 1940, as amended or (b) subject to any other federal or state law or regulation which purports to restrict or regulate its ability to borrow money.

4.30    Sanctions. Neither Borrower, any member of the Borrower Group, Guarantor, any of their respective subsidiaries nor, to Borrower's knowledge, any other Affiliate of Borrower, Guarantor or any subsidiary of Borrower or Guarantor or any of the partners, directors, officers, employees, agents, trustees, administrators, managers, advisors and representatives of Borrower, any member of the Borrower Group, Guarantor or any of their respective subsidiaries or other Affiliates, is an individual or entity currently the subject of any Sanctions, nor is Borrower, any member of the Borrower Group, Guarantor or any subsidiary of Borrower or Guarantor located, organized or resident in a Designated Jurisdiction.

4.31    ERISA. (a) Neither Borrower, nor any member of the Borrower Group is (i) an "employee benefit plan," as defined in Section 3(3) of ERISA or (ii) a "plan" within the meaning of Section 4975(e) of the Code; (b) the assets of Borrower and any member of the Borrower Group do not constitute "plan assets" within the meaning of the United States Department of Labor Regulations set forth in 29 C.F.R. §2510.3-101; and (c) neither Borrower nor any member of the Borrower Group is a "governmental plan" within the meaning of Section 3(32) of ERISA.

4.32    No Fraudulent Transfer. Borrower (i) has not entered into the transaction or any Loan Document with the actual intent to hinder, delay, or defraud any creditor, and (ii) received reasonably equivalent value in exchange for its Obligations under the Loan Documents. Giving effect to the Loan and Borrower's acquisition of the Property, the fair saleable value of Borrower's assets exceeds and will, immediately following the making of the Loan and Borrower's acquisition of the Property, exceed Borrower's total liabilities, including subordinated, unliquidated, disputed and contingent liabilities. The fair saleable value of Borrower's assets is, and immediately following the making of the Loan, will be, greater than Borrower's probable liabilities, including the maximum amount of its contingent liabilities on its debts as such debts become absolute and matured. Borrower does not intend to, and does not believe that it will, incur Indebtedness and liabilities (including contingent liabilities and other commitments) beyond its ability to pay such Indebtedness and liabilities as they mature (taking into account the timing and amounts of cash to be received by Borrower and the amounts to be payable on or in respect of the obligations of Borrower). No petition in bankruptcy has been filed against Borrower, and Borrower has never made an assignment for the benefit of creditors or taken advantage of any insolvency act for the benefit of debtors. Borrower is not contemplating either the filing of a petition by it under any state or federal bankruptcy or insolvency laws or the liquidation of all or a major portion of Borrower's assets or properties, and Borrower has no Knowledge of any Person contemplating the filing of any such petition against it or such constituent Persons.

4.33    Full and Accurate Disclosure. No statement of fact made by or on behalf of Borrower or any Borrower Party in this Agreement or in any of the other Loan Documents to which it is a party or in any certificate, statement or questionnaire delivered by Borrower or any Borrower Party in connection with the Loan contains any untrue statement of a material fact or omits to state any material fact necessary to make statements contained herein or therein not misleading. There is no material fact presently known to Borrower or any Borrower Party which has not been disclosed to Agent which materially and adversely affects, nor as far as Borrower can reasonably foresee, based on facts and circumstances presently known

FILED: WESTCHESTER COUNTY CLERK 05/01/2021 09:40 AM

NYSCEF DOC. NO. 3

21-07096-shl   Doc 71   Filed 07/22/22   Entered 07/22/22 17:18:19   Main Document

INDEX NO. 55883/2021

RECEIVED NYSCEF: 05/01/2021

Pg 138 of 227

to Borrower, is reasonably likely to materially and adversely affect, the Project or the business, operations or condition (financial or otherwise) of Borrower or any Borrower Party.

     4.34    <u>Single Purpose Entity</u>. Borrower hereby represents and warrants that Borrower (a) is and has always been duly formed, validly existing and in good standing in the state of its incorporation and in all other jurisdictions where it is qualified to do business; (b) has not had and does not have any judgments or liens of any nature against it except for tax liens not yet delinquent; (c) has been and is in compliance with all Laws and has received or is in the process of obtaining all permits (including the Required Permits) necessary for it to operate its contemplated business; (d) is not, and has not been, the subject of, or currently, or in the past, involved in any capacity in, any pending or threatened litigation; (e) is not, and has not been, involved in any dispute with any taxing authority other than contesting real property taxes; (f) has paid all Taxes, as applicable, which have become due and payable; (g) has never owned any property other than the Property and has never engaged in any business except the entitlement and development of the Property, and other activities related to the foregoing; (h) has not failed to provide Agent with complete financial statements that reflect a fair and accurate view of its financial conditions; and (i) has no material contingent or actual obligations not related to the Property.

     4.35    <u>No Default</u>. Neither Borrower nor any Borrower Party is in default of any provision of this Agreement or the Loan Documents to which it is a party.

     4.36    <u>Labor Matters</u>. There are no collective bargaining agreements or similar agreement in effect with respect to Borrower or the Property. Borrower does not have any employees.

     4.37    <u>Intellectual Property</u>. Neither Borrower nor any Affiliate (i) has or holds any tradenames, trademarks, servicemarks, logos, copyrights, patents or other intellectual property (collectively, "**Intellectual Property**") with respect to the Property or the use or operations thereof.

## ARTICLE 5 - DEFAULT AND REMEDIES

     5.1    <u>Events of Default</u>. The occurrence of any one of the following Potential Defaults shall be a default under this Agreement if the same has not be cured within the notice and cure period set forth herein, if any ("**Default**"):

     (a)    Any of the Indebtedness or any fees payable under the Note or this Agreement is not paid when due, whether on the scheduled due date or upon acceleration, maturity or otherwise; provided, however, that Borrower shall have a five (5) day grace period following the date when due for all payments that are not due on a Payment Date or the Maturity Date, and following written notice for any payment to be made by Agent from the Interest Reserve Fund, provided that any required deposits have been made by Borrower to the Interest Reserve Fund.

     (b)    Any covenant, agreement or condition in this Agreement or in any other Loan Document (other than covenants to pay the Indebtedness and other than Defaults expressly listed in this <u>Section 5.1</u>) is not fully and timely performed, observed or kept by Borrower and such failure shall continue unremedied for more than thirty (30) days after notice thereof shall have been given to Borrower by Lender; <u>provided, however</u>, that if such failure is of a nature such that it cannot be cured by the payment of money and if such failure requires work to be performed, acts to be done or conditions to be removed which cannot reasonably, with due diligence, be performed, done or removed, as the case may be, within such thirty (30) day period and Borrower shall have commenced to cure such failure within such thirty (30) day period, such period shall be deemed extended for so long as shall be required by Borrower in the exercise of due diligence to cure such failure, but in no event shall such thirty (30) day period be so extended to be a period in excess of ninety (90) days.

(c)     Any statement, representation or warranty in any of the Loan Documents, or in any Budget, Financial Statement or any other writing heretofore or hereafter delivered to Lender in connection with the Indebtedness is false, misleading or erroneous in any material respect on the Closing Date or on the date as of which such statement, representation or warranty is made or deemed made; provided, however, that if Borrower did not have actual knowledge at the time of such representation or warranty that such representation or warranty was false or misleading in any material respect, the same is immaterial and non-recurring, and the facts underlying such representation or warranty are capable of being conformed to the representation or warranty as made, the same shall not be a Default hereunder if same is cured within thirty (30) days after written notice from Lender or Borrower become aware of same.

(d)     A default or breach by Borrower, Member or Guarantor of any obligation under any other Loan Document (taking into account any applicable notice and cure period set forth in such Loan Document).

(e)     Borrower shall fail in the due performance and observance of any of its covenants contained in Section 3.4, 3.6(d), 3.19, 3.23 and 3.26 through 3.31, inclusive, or Article 8.

(f)     Borrower shall fail in the due performance and observance of any of its covenants contained in Section 3.11, 3.12, 3.14, 3.15 or 3.24, and such failure shall continue for ten (10) days after notice thereof shall have been given to Borrower by Agent; provided, however, with respect to Section 3.14 (if such items are not within the possession or control of Borrower) and Section 3.15 only, if such failure requires work to be performed, acts to be done or conditions to be removed which cannot reasonably, with due diligence, be performed, done or removed, as the case may be, within such ten (10) day period and Borrower shall have commenced to cure such failure within such ten (10) day period, and there is no adverse effect on the Property such period shall be deemed extended for so long as shall be required by Borrower in the exercise of due diligence to cure such failure, but in no event shall such ten (10) day period be so extended to be a period in excess of sixty (60) days.

(g)     Any insurance required under the Loan Documents lapses or ceases to be in full force and effect.

(h)     Borrower shall fail in the due performance and observance of any its covenants contained in Section 2(i) of the Security Instrument pertaining to deposit of insurance proceeds and condemnation awards, Section 2(c) of the Security Instrument pertaining to payment of real estate taxes and/or Section 3.21 hereof (and such failure shall continue for thirty (30) days after notice thereof shall have been given to Borrower by Lender), or Section 2(b) of the Security Instrument pertaining to title and permitted encumbrances (and, to the extent such failure shall not affect the validity or priority of the Security Instrument, such failure continue for thirty (30) days after notice thereof shall have been given to Borrower by Lender).

(i)     Borrower uses, or permits the use of, funds from the Reserve Accounts for any purpose other than the purpose for which such funds were disbursed from the Reserve Accounts and such funds are not applied for such purpose or returned to the Reserve Accounts within five (5) Business Days after Borrower obtains knowledge of the same.

(j)     The construction of the Improvements, or any materials for which an Advance has been requested, fails to comply with the Plans, the Loan Documents, any Laws or Government Approvals, or any applicable restrictive covenants in any material respect and such failure adversely affects Lender's interest in the Loan in any material respect.

(k)     The Completion Date does not occur by the Required Completion Date.

(l)    Any Government Approval that is required for the continued construction of the Improvements or the continuous operation of the Property lapses or ceases to be in full force and effect and such event shall continue unremedied for more than thirty (30) days after the earlier of Borrower becoming aware of same or notice thereof shall have been given to Borrower by Lender; provided, however, that if such failure is of a nature such that it cannot be cured by the payment of money and if such failure requires work to be performed, acts to be done or conditions to be removed which cannot reasonably, with due diligence, be performed, done or removed, as the case may be, within such thirty (30) day period and Borrower shall have commenced to cure such failure within such thirty (30) day period, such period shall be deemed extended for so long as shall be required by Borrower in the exercise of due diligence to cure such failure, but in no event shall such thirty (30) day period be so extended to be a period in excess of ninety (90) days.

(m)    A Borrower's Deposit is not made with Agent within ten (10) days after Agent's request therefor in accordance with Section 1.5.

(n)    If for any reason any General Contract or any Material Contract is terminated prior to the end of its contractual term and not promptly replaced with a substitute general contract or Material Contract, as the case may be, in each case acceptable to Agent and from a new general contractor, guarantor or contractor, as the case may be, approved by Agent using commercially reasonable discretion, and shall be deemed given for any subcontractor default insurer approved subcontractor for such trade.

(o)    Borrower shall fail to cause any Unsatisfactory Work to be corrected to the reasonable satisfaction of Agent and the Construction Inspector within thirty (30) days after written notice of such disapproval; provided, however, that if such Unsatisfactory Work cannot reasonably be corrected within such thirty (30) day period, then so long as Borrower shall have commenced to cause the correction of such Unsatisfactory Work within such thirty (30) day period and thereafter diligently and expeditiously proceeds to cause the correction of the same, such thirty (30) day period shall be extended for such time as is reasonably necessary for Borrower in the exercise of due diligence to cause the correction of such Unsatisfactory Work.

(p)    The occurrence with respect to the General Contractor or parent company of the General Contractor, of any of the occurrences or events described in Section 5.1(f), (u)(i) or (ii) or (v) or the occurrence of any material default by General Contractor under the General Contract and, in either case, failure of Borrower to procure a contract with a new general contractor, in which case each of such contract, general contractor, guarantee and guarantor, as the case may be, shall be subject to the reasonable approval of Agent, within one hundred twenty (120) days after the occurrence of such event.

(q)    The Operating Lease is in default beyond any applicable cure period.

(r)    The owner of the Property enters into any lease of part or all of the Property which does not comply with the Loan Documents.

(s)    A lien for the performance of work or the supply of materials which is established against the Property, or any stop notice served on Borrower, the General Contractor, Agent or any Lender, remains unsatisfied or unbonded for a period of twenty (20) days after the date of filing or service.

(t)    Any condition or situation occurs which, in the sole determination of Agent, constitutes an impairment of the lien of the Security Instrument, if such condition or situation is not remedied within ten (10) days after written notice to Borrower thereof.

(u)    Borrower, Member or any Guarantor:

(i)     (A) Executes an assignment for the benefit of creditors, or takes any action in furtherance thereof; or (B) admits in writing its inability to pay, or fails to pay, its debts generally as they become due; or (C) as a debtor, files a petition, case, proceeding or other action pursuant to, or voluntarily seeks the benefit or benefits of, any Debtor Relief Law, or takes any action in furtherance thereof; or (D) seeks the appointment of a receiver, trustee, custodian or liquidator of the Property or any part thereof or of any significant portion of its other property; or

(ii)     Suffers the filing of a petition, case, proceeding or other action against it as a debtor under any Debtor Relief Law or seeking appointment of a receiver, trustee, custodian or liquidator of the Property or any part thereof or of any significant portion of its other property, and (A) admits, acquiesces in or fails to contest diligently the material allegations thereof, or (B) the petition, case, proceeding or other action results in entry of any order for relief or order granting relief sought against it, or (C) in a proceeding under Debtor Relief Laws, the case is converted from one chapter to another, or (D) fails to have the petition, case, proceeding or other action permanently dismissed or discharged on or before the earlier of trial thereon or the sixtieth (60th) day following the date of its filing; or

(iii)     Conceals, removes, or permits to be concealed or removed, any part of its property, with intent to hinder, delay or defraud its creditors or any of them, or makes or suffers a transfer of any of its property which may be fraudulent under any fraudulent conveyance law or Debtor Relief Law; or makes any transfer of its property to or for the benefit of a creditor at a time when other creditors similarly situated have not been paid; or suffers or permits, while insolvent, any creditor to obtain a lien (other than as described in Subsection (iv) below) upon any of its property through legal proceedings which are not vacated and such lien is not discharged prior to enforcement thereof or in any event within sixty (60) days from the date thereof; or

(iv)     Fails to have discharged within a period of thirty (30) days any attachment, sequestration, or similar writ levied upon the Property or any of its material assets.

(v)     Any member of the Borrower Group, any Guarantor or any Person obligated to pay any part of the Indebtedness is liquidated, terminated, dissolved, or merged or consolidated into another entity without Lender's prior written consent.

(w)     Guarantors fail to satisfy the Guarantor Net Worth Requirement.

5.2     Remedies. Upon the occurrence and during the continuance of a Default, Agent, for the benefit of Lender, may, without notice, exercise any and all rights and remedies afforded by this Agreement, the other Loan Documents, Law, equity or otherwise, including (a) declaring any and all Indebtedness immediately due and payable, (b) reducing any claim to judgment, or (c) obtaining appointment of a receiver (to which Borrower hereby consents) and/or judicial or nonjudicial foreclosure under the Security Instrument. Provided, however, that upon the occurrence of and during the continuance of a Default, Agent, for the benefit of Lender, at its election may (but shall not be obligated to) without notice, do any one or more of the following: (a) terminate Lender's Commitment to lend and any obligation to disburse any Borrower's Deposit hereunder; (b) in its own name or in the name of Borrower, enter into possession of the Property, perform all work necessary to complete construction of the Improvements substantially in accordance with the Plans (as modified as deemed necessary by Lender), the Loan Documents, and all applicable Laws, governmental requirements and restrictive covenants, and continue to employ Borrower's architect, engineer and any contractor pursuant to the applicable contracts or otherwise; or (c) set-off and apply against any Indebtedness, to the extent thereof and to the maximum extent permitted by Law, any and all deposits, funds, or assets in which Agent and/or Lender has been granted a security interest on behalf

of Lender pursuant to any Loan Document to or for the credit or account of Borrower, subject to the provisions of Article 10.

Borrower hereby appoints Agent as Borrower's attorney-in-fact, which power of attorney is irrevocable and coupled with an interest, with full power of substitution if Agent so elects, to do any of the following in Borrower's name upon the occurrence and continuance of a Default: (i) use such sums as are necessary, including any proceeds of the Loan and any Borrower's Deposit, make such changes or corrections in the Plans, and employ such architects, engineers, and contractors as may be required, or as Agent, for the benefit of Lender, may otherwise consider desirable, for the purpose of completing construction of the Improvements substantially in accordance with the Plans (as modified as deemed necessary by Agent), the Loan Documents, and all applicable Laws, governmental requirements and restrictive covenants; (ii) execute all applications and certificates in the name of Borrower which may be required for completion of construction of the Improvements; (iii) endorse the name of Borrower on any checks or drafts representing proceeds of any insurance policies, or other checks or instruments payable to Borrower with respect to the Property; (iv) do every act with respect to the construction of the Improvements that Borrower may do; (v) prosecute or defend any action or proceeding incident to the Property; (vi) pay, settle, or compromise all bills and claims so as to clear title to the Property; and (vii) take over and use all or any part of the labor, materials, supplies and equipment contracted for, owned by, or under the control of Borrower, whether or not previously incorporated into the Improvements. Any amounts expended by Agent and Lender to construct or complete the Improvements or in connection with the exercise of its remedies herein shall be deemed to have been advanced to Borrower hereunder as a demand obligation owing by Borrower to Agent or Lender, as applicable, and shall constitute a portion of the Indebtedness, regardless of whether such amounts exceed any limits for Indebtedness otherwise set forth herein. Agent and Lender shall not have any liability to Borrower for the sufficiency or adequacy of any such actions taken by Agent or Lender.

No delay or omission of Agent or Lender to exercise any right, power or remedy accruing upon the happening of a Default shall impair any such right, power or remedy or shall be construed to be a waiver of any such Default or any acquiescence therein. No delay or omission on the part of Agent or Lender to exercise any option for acceleration of the maturity of the Indebtedness, or for foreclosure of the Security Instrument following any Default as aforesaid, or any other option granted to Agent or Lender hereunder in any one or more instances, or the acceptances by Agent or Lender of any partial payment on account of the Indebtedness, shall constitute a waiver of any such Default, and each such option shall remain continuously in full force and effect. No remedy herein conferred upon or reserved to Agent or Lender is intended to be exclusive of any other remedies provided for in any Note, any of the other Loan Documents, and each and every such remedy shall be cumulative, and shall be in addition to every other remedy given hereunder, or under any Note, any of the other Loan Documents, or now or hereafter existing at Law or in equity or by statute. Every right, power and remedy given to Agent or Lender by this Agreement, any Note, any of the other Loan Documents shall be concurrent, and may be pursued separately, successively or together against Borrower, or the Property or any part thereof, or any personal property granted as security under the Loan Documents, and every right, power and remedy given by this Agreement, any Note or any of the other Loan Documents may be exercised from time to time as often as may be deemed expedient by the Agent or Lender, as applicable.

Regardless of how Lender may treat payments received from the exercise of remedies under the Loan Documents for the purpose of its own accounting, for the purpose of computing the Indebtedness, payments shall be applied as elected by Lender. No application of payments will cure any Default or prevent acceleration or continued acceleration of amounts payable under the Loan Documents or prevent the exercise or continued exercise of rights or remedies of Agent or Lender hereunder or thereunder or at Law or in equity.

WHETHER OR NOT AGENT OR LENDER ELECTS TO EMPLOY ANY OR ALL OF THE REMEDIES AVAILABLE UPON THE OCCURRENCE OF A DEFAULT, LENDER SHALL NOT BE LIABLE FOR THE CONSTRUCTION OF OR FAILURE TO CONSTRUCT, COMPLETE OR PROTECT THE IMPROVEMENTS OR FOR PAYMENT OF ANY EXPENSES INCURRED IN CONNECTION WITH THE EXERCISE OF ANY REMEDY AVAILABLE TO AGENT OR LENDER OR FOR THE PERFORMANCE OR NON-PERFORMANCE OF ANY OTHER OBLIGATION OF BORROWER.

### ARTICLE 6 - AGENT AND LENDER

6.1     Appointment. Lender hereby irrevocably designates and appoints Agent as the agent of Lender hereunder and under the other Loan Documents, including, without limitation, acting as collateral agent for Lender under the Loan Documents, or any of them. In its capacity as Lender's contractual representative, Agent is a "representative" of Lender as used within the meaning of "Secured Party" under Section 9-102 of the Uniform Commercial Code.

6.2     Delegation of Duties. Agent may execute any of its duties under the Loan Documents by or through Agent or attorneys-in-fact and shall be entitled to receive and rely upon advice of counsel concerning all matters pertaining to such duties. Agent shall not be responsible to Lender for the negligence or misconduct of any agents or attorneys-in-fact selected by it with reasonable care.

6.3     Exculpatory Provisions. Neither Agent nor any of its officers, directors, employees, agents, attorneys-in-fact or affiliates shall be (1) liable to Lender for any action lawfully taken or omitted to be taken by it or such Person under or in connection with the Loan Documents (except for its or such Person's own gross negligence or willful misconduct), or (2) responsible in any manner to Lender for any recitals, statements, representations or warranties made by Borrower or any officer of Borrower contained in the Loan Documents or in any certificate, report, statement or other document referred to or provided for in, or received by Agent under or in connection with the Loan Documents or for the value, validity, effectiveness, genuineness, enforceability or sufficiency of the Loan Documents or for any failure of Borrower to perform its obligations hereunder. Agent shall not be under any obligation to Lender to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, the Loan Documents or to inspect the properties, books or records of Borrower.

6.4     Reliance by Agent. Agent shall be entitled to rely, and shall be fully protected in relying, upon any note, writing, resolution, notice, consent, certification, affidavit, letter, cablegram, telegram, telecopy, telex or teletype message, statement, order or other document or conversation reasonably believed by it to be genuine and correct and to have been signed, sent or made by the proper Person or Persons and upon advice and statements of legal counsel (including, without limitation, counsel to Borrower), independent accountants and other experts selected by Agent.

6.5     Non-Reliance on Agent and Lender. Lender expressly acknowledges that neither Agent nor any of its officers, directors, employees, agents, attorneys-in-fact or affiliates has made any representations or warranties to it, and that no act by Agent hereinafter taken, including any review of the affairs of Borrower, shall be deemed to constitute any representation or warranty by Agent to such Lender. Lender represents to Agent that it has, independently and without reliance upon Agent, and based on such documents and information as it has deemed appropriate, made its own appraisal of, and investigation into, the business, operations, property, financial and other condition and creditworthiness of Borrower and made its own decision to make its loans hereunder and enter into this Agreement. Lender also represents that it will, independently and without reliance upon Agent, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under this Agreement, and to make such investigation as it deems necessary to

5962984                                           - 34 -

inform itself as to the business, operations, property, financial and other condition and creditworthiness of Borrower. Except for notices, reports and other documents expressly required to be furnished to a Lender by Agent hereunder, Agent shall not have any duty or responsibility to provide Lender with any credit or other information concerning the business, operations, property, financial and other condition or creditworthiness of Borrower which may come into the possession of Agent or any of their officers, directors, employees, agents, attorneys-in-fact or affiliates.

6.6     Indemnification. Lender agrees to indemnify Agent from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind whatsoever which may at any time (including without limitation at any time following the payment of the Obligations) be imposed on, incurred by or asserted against Agent in any way relating to or arising out of the Loan Documents or any documents contemplated by or referred to herein or the transactions contemplated hereby or any action taken or omitted by Agent under or in connection with any of the foregoing. Any obligation of Borrower or any other party to indemnify Lender under the Loan Documents shall also include an obligation of Borrower or such other party to indemnify Agent. The provisions of this Section 6.6 shall survive the payment of the Obligations and the termination of this Agreement.

6.7     Agent in Its Individual Capacity. Agent and its affiliates may make loans to, accept deposits from and generally engage in any kind of business with Borrower and affiliates as though Agent were not Agent hereunder. With respect to such loans made or renewed by it and any note issued to it, Agent shall have the same rights and powers under the Loan Documents as a Lender and may exercise the same as though they were not Agent, and the term "**Lender**" shall include Agent in their respective individual capacities as a Lender.

6.8     Successor Agents. Agent may resign as Agent under the Loan Documents upon thirty (30) days' notice to Lender and Borrower provided Lender shall have appointed a successor Agent and such successor Agent has accepted such appointment. The term "**Agent**" shall mean each such successor Agent, effective upon its appointment, and the former Agent's rights, powers and duties as Agent shall be terminated, without any other or further act or deed on the part of such former Agent or any of the parties to this Agreement or any of the Loan Documents or successors thereto. After any retiring Agent's resignation hereunder as Agent, the provisions of the Loan Documents shall inure to its benefit as to any actions taken or omitted to be taken by it while it was an Agent under the Loan Documents. Upon the acceptance of any appointment as an Agent hereunder by a successor Agent and upon the execution and filing or recording of such financing statements, or amendments thereto, and such amendments or supplements to the Security Instrument and Assignment of Leases, and such other instruments or notices, as may be necessary or desirable in order to continue the perfection of the Liens granted or purported to be granted by the Loan Documents, such successor Agent shall succeed to and become vested with all the rights, powers, discretion, privileges and duties of the retiring Agent, and the retiring Agent shall be discharged from its duties and obligations under the Loan Documents.

6.9     Limitations on Agent's Liability. No syndication agents, arranger, or book running manager, in such capacities, shall have any right, power, obligation, liability, responsibility or duty under this Agreement.

**ARTICLE 7 - GENERAL TERMS AND CONDITIONS**

7.1     Consents. Except where otherwise expressly provided in the Loan Documents, in any instance where the approval, consent or the exercise of Agent's or Lender's judgment is required, the granting or denial of such approval or consent and the exercise of such judgment shall be (a) within the sole and absolute discretion of Agent or Lender, as applicable, (b) deemed to have been given only by a specific writing intended for the purpose given and executed by Agent or Lender, as applicable, and (c) free from

any limitation or requirement of reasonableness. Notwithstanding any approvals or consents by Agent or Lender, Agent and Lender have no obligation or responsibility whatsoever for the adequacy, form or content of the Plans, the Budget, any appraisal, any contract, any change order, any lease, or any other matter incident to the Property or the construction of the Improvements. Agent's acceptance of an assignment of the Plans for the benefit of Lender shall not constitute approval of the Plans. Any inspection, appraisal or audit of the Property or the books and records of Borrower, or the procuring of documents and financial and other information by or on behalf of Agent or Lender, shall be for Agent's and Lender's protection only, and shall not constitute an assumption of responsibility to Borrower or anyone else with regard to the condition, value, construction, maintenance or operation of the Property, or relieve Borrower of any of Borrower's obligations. Borrower has selected all surveyors, architects, engineers, contractors, materialmen and all other Persons furnishing services or materials to the Project. Agent and Lender have no duty to supervise or to inspect the Property or the construction of the Improvements, nor any duty of care to Borrower or any other Person to protect against, or to inform Borrower or any other Person of the existence of, any negligent, faulty, inadequate or defective design or construction of the Improvements.

7.2    Borrower's Indemnity. Agent and Lender shall not be liable or responsible for, and Borrower shall indemnify Agent and Agent's Affiliates, Lender and Lender's Affiliates, and their respective partners, members, shareholders, directors, officers, agents, advisors, attorneys and employees (collectively, the "**Indemnitees**") from and against: (a) any claim, action, actual, out-of-pocket loss or cost (including reasonable attorneys' fees and costs) arising from, relating to or otherwise in connection with (i) the Property, the Improvements and the other collateral, including any defect therein, (ii) the performance or default of Borrower, Borrower's surveyors, architects, engineers, contractors, the Construction Inspector or any other Person, (iii) any failure to construct, complete, protect or insure the Improvements in accordance with the requirements set forth in this Agreement, (iv) the Cash Management Account and all other accounts of Borrower or the Property, but excluding any claim, action, loss or cost arising from the fraud or gross negligence of any unrelated third party, (v) the payment of costs of labor, materials or services supplied for the construction of the Improvements, (vi) in connection with the protection and preservation of the Loan collateral (including those with respect to property taxes, insurance premiums, completion of construction, operation, management, improvements, maintenance, repair, sale and disposition), or (vii) the failure of Borrower to perform any obligation of Borrower whatsoever; (b) any and all liabilities, obligations, losses, damages, penalties, claims, demands, actions, judgments, suits, costs, expenses and disbursements (including reasonable attorneys' fees and costs) of any kind or nature whatsoever which may at any time be imposed on, incurred by or asserted against any such Indemnitee in any way relating to or arising out of or in connection with (i) any of the matters described in the foregoing clause (a), (ii) the execution, delivery, enforcement, performance or administration of any Loan Document or any other agreement, letter or instrument delivered in connection with the transactions contemplated thereby or the consummation of the transactions contemplated thereby, (iii) any Commitment or Loan, or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory (including any investigation of, preparation for, or defense of any pending or threatened claim, investigation, litigation or proceeding) and regardless of whether any Indemnitee is a party thereto; (c) any claim, action, cause of action, liability, loss or cost (including reasonable attorneys' fees and costs) arising from, relating to or otherwise in connection with a management agreement; (d) any claim, action, cause of action, liability, actual out-of-pocket loss or cost (including reasonable attorneys' fees and costs) arising due to Borrower's violation of any federal, state or local laws relating to employment or labor practices; and (e) any and all liabilities, actual losses, out-of-pocket costs or expenses (including reasonable attorneys' fees and costs) that any Indemnitee suffers or incurs as a result of the assertion of any foregoing claim, demand, action, cause of action or proceeding, or as a result of the preparation of any defense in connection with any foregoing claim, demand, action, cause of action or proceeding, in all cases, whether or not an Indemnitee is a party to such claim, demand, action, cause of action or proceeding and whether it is defeated, successful or withdrawn, (all of the foregoing, collectively, the "**Indemnified Liabilities**"); provided, however, that such indemnity shall not, as to any Indemnitee, be

available to the extent that such liabilities, obligations, losses, damages, penalties, claims, demands, actions, judgments, suits, costs, expenses or disbursements are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee. Nothing, including any advance or acceptance of any document or instrument, shall be construed as a representation or warranty, express or implied, to any party by Agent or Lender. Inspection shall not constitute an acknowledgment or representation by Agent, Lender or the Construction Inspector that there has been or will be compliance with the Plans, the Loan Documents, or applicable Laws, governmental requirements or restrictive covenants, or that the construction is free from defective materials or workmanship. Inspection, whether or not followed by notice of Default, shall not constitute a waiver of any Default then existing, or a waiver of Agent's or Lender's right thereafter to insist that the Improvements be constructed in accordance with the Plans, the Loan Documents, and all applicable Laws, governmental requirements and restrictive covenants. Agent's or Lender's failure to inspect shall not constitute a waiver of any of Agent's or Lender's rights under the Loan Documents or at Law or in equity. All payments on account of the Indemnified Liabilities shall be due and payable upon demand by Agent or Lender therefor. The indemnities in this Section 7.2 shall not terminate upon the release, foreclosure or other termination of the Security Instrument but will survive the release, reconveyance, foreclosure of the Security Instrument or conveyance in lieu of foreclosure, the repayment of the Indebtedness, the release or reconveyance of the Security Instrument and the discharge of the other Loan Documents, any proceedings pursuant to Debtor Relief Laws, and any other event whatsoever.

7.3     Miscellaneous. This Agreement may be executed in several counterparts, all of which are identical, and all of which counterparts together shall constitute one and the same instrument. The Loan Documents are for the sole benefit of Lender and Borrower and are not for the benefit of any third party. A determination that any provision of this Agreement is unenforceable or invalid shall not affect the enforceability or validity of any other provision and the determination that the application of any provision of this Agreement to any Person or circumstance is illegal or unenforceable shall not affect the enforceability or validity of such provision as it may apply to other Persons or circumstances. Time shall be of the essence with respect to Borrower's obligations under the Loan Documents.

7.4     Notices.

(a)     Modes of Delivery; Changes. Except as otherwise provided herein, all notices and other communications required or which any party desires to give under this Agreement, any other Loan Document shall be in writing. Unless otherwise specifically provided in such other Loan Document, all such notices and other communications shall be deemed sufficiently given or furnished if delivered by personal delivery, by nationally recognized overnight courier service, by registered or certified United States mail, postage prepaid, or by facsimile (with, subject to Subsection (b) below, a confirmatory duplicate copy sent by first class United States mail), addressed to the party to whom directed or by (subject to Subsection (c) below) electronic mail address to Borrower, at the addresses set forth at the end of this Agreement or to Lender at the addresses set forth at the end of this Agreement (unless changed by similar notice in writing given by the particular party whose address is to be changed). Any such notice or communication shall be deemed to have been given and received either at the time of personal delivery, or in the case of courier or mail, as of the date of first attempted delivery at the address and in the manner provided herein, or in the case of facsimile, upon receipt; provided, however, that service of a notice required by any applicable statute shall be considered complete when the requirements of that statute are met. Notwithstanding the foregoing, no notice of change of address shall be effective except upon actual receipt. This Section shall not be construed in any way to affect or impair any waiver of notice or demand provided in any Loan Document or to require giving of notice or demand to or upon any Person in any situation or for any reason.

(b)     Effectiveness of Facsimile or Electronic Mail Documents and Signatures. The Loan Documents may be transmitted and/or signed by facsimile or e-mail transmission (e.g. "pdf" or "tif"). The effectiveness of any such documents and signatures shall, subject to applicable Law, have the same force and effect as manually-signed originals and shall be binding on all parties to the Loan Documents. Agent may also require that any such documents and signatures be confirmed by a manually-signed original thereof; provided, however, that the failure to request or deliver the same shall not limit the effectiveness of any facsimile or e-mail document or signature. The words "execute," "execution," "signed," "signature," and words of like import in any amendment or other modification hereof (including waivers and consents) shall be deemed to include electronic signatures, the electronic matching of assignment terms and contract formations on electronic platforms approved by Agent, or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable Law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

(c)     Limited Use of Electronic Mail. Electronic mail and internet and intranet websites may be used only to distribute routine communications, such as financial statements and other information, and to distribute Loan Documents for execution by the parties thereto, and for other purposes described herein, and may not be used for any other purpose.

7.5     Payments Set Aside. To the extent that any payment by or on behalf of Borrower is made to Agent or Lender, or Agent or Lender exercises any right of set-off, and such payment or the proceeds of such set-off or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by Lender in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any Debtor Relief Law, to a depository (including Agent, Lender or their respective Affiliates) for returned items or insufficient collected funds or otherwise, then to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such set-off had not occurred.

7.6     Successors and Assigns.

(a)     Successors and Assigns Generally. The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that neither Borrower nor Guarantor may assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of Agent. Agent and Lender shall have the right, without the consent of Borrower or any other Person, to (i) sell, encumber, pledge, hypothecate or otherwise transfer the Loan or any portion thereof, or (ii) issue or sell one or more participation interests in the Loan. (The transactions referred to in clauses (i) and (ii) are each hereinafter referred to as a "**Secondary Market Transaction**"). At Agent's and Lender's election, each note and/or component composing the Loan may be subject to one or more Secondary Market Transactions. Borrower acknowledges that Agent and Lender are composed of more than one Person and that each such Person composing Agent and Lender shall have the right, individually, to the benefits of this Section 7.6 and Section 7.7. Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent permitted in Subsection (d) of this Section 7.6 and, to the extent expressly contemplated hereby, the Related Parties of Lender) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)    Assignments by Lender. Lender may assign to one or more assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment and the Loan at the time owing to it); *provided* that any such assignment shall be subject to the following conditions:

(i)    Proportionate Amounts. Each partial assignment shall be made as an assignment of a proportionate part of all Lender's rights and obligations under this Agreement with respect to the Loan and the Commitment assigned.

(ii)    No Consents. No consent shall be required for any assignment.

(iii)    No Assignment to Certain Persons. No such assignment shall be made to a natural Person.

Subject to acceptance and recording thereof by Lender pursuant to Subsection (c) of this Section 7.6, from and after the effective date specified, the assignee shall be a party to this Agreement and, to the extent of the interest assigned by such assignment and assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such assignment and assumption, be released from its obligations under this Agreement (and, in the case of an assignment and assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of this Agreement with respect to Borrower's obligations surviving termination of this Agreement). Upon request by Lender, Borrower (at its reasonable expense) shall execute and deliver a Note ("**Replacement Note**") to the assignee Lender. Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this Subsection shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with Subsection (d) of this Section 7.6.

(c)    Register. Agent, acting solely for this purpose as an agent of Borrower (and such agency being solely for tax purposes), shall maintain at Agent's office a copy of each Assignment and Assumption delivered to it (or the equivalent thereof in electronic form) and a register for the recordation of the names and addresses of Lender, and the Commitments of, and the principal amount (and stated interest) of each Lender's share of the Loan owing to, each Lender pursuant to the terms hereof from time to time (the "**Register**"). The entries in the Register shall provide such books and records as are necessary for the registration and transfer of the Loan in a manner that shall cause the Loan to be considered to be in "registered form" within the meaning of Sections 163(f), 871(h)(2) and 881(c)(2) of the Code and any related regulations (and any other relevant or successor provisions of the Code or such regulations). In connection with the foregoing: (i) Lender shall record the name and address of each Lender and the amount of principal owing to each Lender under the Loan Documents, (ii) notwithstanding anything in the Loan Documents to the contrary, Borrower, Agent and Lender shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary, and (iii) the Register maintained by the Registrar shall be prima facie evidence of all sums owing to Lender(s) from time to time under this Agreement. The Register shall be available for inspection by Borrower and Lender, at any reasonable time and from time to time upon reasonable prior notice.

(d)    Participations. Lender may at any time, without the consent of, or notice to, Borrower, sell participations to any Person (other than a natural Person or Borrower or any of Borrower's Affiliates or Subsidiaries) (each, a "**Participant**") in all or a portion of Lender's rights and/or obligations under this Agreement (including all or a portion of its Commitment and/or the Loan owing to it); *provided* that (i) Lender's obligations under this Agreement shall remain unchanged, (ii) Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, (iii) Borrower, Agent and

Lender shall continue to deal solely and directly with Lender in connection with Lender's rights and obligations under this Agreement.

Any agreement or instrument pursuant to which Lender sells such a participation shall provide that Lender shall retain its sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement. A Participant shall not be entitled to receive any greater payment under Section 1.6 than the Lender would have been entitled to receive with respect to the participation sold to such Participant. A Lender that sells a participation shall, acting solely for this purpose as an agent of Borrower, maintain a register on which it enters the name and address of each Participant and the principal amount (and stated interest) of each Participant's interest in the Loan or other obligations under the Loan Documents (the "**Participant Register**"); *provided* that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any commitments, loans, letters of credit or its other obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations. Notwithstanding anything in the Loan Documents to the contrary, the entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.

7.7    Cooperation. If requested by Agent in writing, Borrower shall reasonably assist Agent, at Agent's and Lender's cost, in satisfying the market standards to which Agent customarily adheres or which may be required in the marketplace, by prospective investors, applicable Legal Requirements and/or otherwise in the marketplace in connection with any Secondary Market Transactions, including, without limitation, to:

(a)    promptly provide updated financial and other information with respect to the Property, the business operated at the Property and the Borrower, (i) provide updated budgets (including, without limitation, the applicable Budget) relating to the Property and the Project, (ii) provide updated appraisals, market studies, environmental reviews and reports (Phase I's and, if appropriate, Phase II's), property condition reports and other due diligence investigations of the Property and (iii) promptly provide updated representations and warranties set forth in Article 4 of this Agreement, with such changes to update for changes in circumstances at the time such updated representations and warranties are made (the "**Updated Information**") to the extent such Updated Information is provided or otherwise required under the Loan Documents, together, if customary, with appropriate verification of the Updated Information through letters of auditors or opinions of counsel acceptable to Agent; and

(b)    promptly provide opinions of counsel, which may be relied upon by Agent, underwriters and their respective counsel, agents and representatives, customary in Secondary Market Transactions with respect to the Property, the Loan Documents, and Borrower and its Affiliates, which counsel and opinions shall be satisfactory to.

(c)    Notwithstanding anything set forth herein to the contrary, Borrower shall not be required to modify any Loan Document or organizational document in any manner which would increase Borrower's obligations or decrease Borrower's rights (other than to a de minimis extent).

(d)    Subject to Section 7.7(c) and Section 7.7(e) hereof, Agent and Lender, without in any way limiting Agent's or Lender's other rights hereunder, in its sole and absolute discretion, shall have the right, at any time to require Borrower (at no material cost to Borrower) to execute and deliver "component" notes and/or modify the Loan in order to create one or more senior and subordinate notes (i.e., an A/B or A/B/C structure) and/or one or more additional components of the Note or any subsequently created Note(s),

reduce the number of components of any Note, revise the interest rate for each component, reallocate the principal balances of the notes constituting the Note and/or the components, increase or decrease the monthly debt service payments for each component or eliminate the component structure and/or the multiple note structure of the Loan (including the elimination of the related allocations of principal and interest payments), provided that the outstanding principal balance of all components immediately after the effective date of such modification equals the outstanding principal balance immediately prior to such modification and the weighted average of the interest rates for all components immediately after the effective date of such modification equals the interest rate of the original Note immediately prior to such modification. Agent and Lender shall have the right to modify the Note and/or Note and any components in accordance with this <u>Section 7.7(d)</u> and, provided that such modification shall comply with the terms of this <u>Section 7.7(d)</u>, it shall become immediately effective.

(e)    Subject to <u>Section 7.7(c)</u>, Borrower shall reasonably cooperate, at Agent's and Lender's expense, with all reasonable requests of Agent and Lender in connection with <u>Section 7.7(d)</u>). If requested by Agent, Borrower shall promptly execute and deliver such documents as shall be required by or in connection with any modification pursuant to <u>Section 7.7(d)</u>, all in form and substance satisfactory to Agent, including, the severance of security documents if requested. It shall be an Event of Default under this Agreement, the Note, the Security Instrument and the other Loan Documents if Borrower fails to comply with any of the terms, covenants or conditions of this <u>Section 7.7(e)</u> after expiration of fifteen (15) Business Days after notice thereof.

7.8    <u>No Set-off</u>. Neither Lender nor any assignee, Participant or Affiliate thereof (each, a "**Lender Party**") shall proceed directly, by right of set-off, banker's lien, counterclaim or otherwise, against any assets of Borrower or Guarantor (including any general or special, time or demand, provisional or other deposits or other indebtedness owing by such Lender Party to or for the credit or the account of Borrower or Guarantor) for the purpose of applying such assets against the Indebtedness, without the prior written consent of Lender.

7.9    <u>Servicer</u>. At the option of Agent, the Loan may be serviced by a servicer or special servicer (the "**Servicer**") selected by Agent and Agent may delegate all or any portion of its responsibilities under this Agreement and the other Loan Documents to the Servicer pursuant to a servicing agreement (the "**Servicing Agreement**") between Agent and Servicer. Lender shall pay all of the fees and expenses of the Servicer. Irrespective of whether or not Agent elects to have the Loan serviced by a Servicer, Borrower shall be responsible for the payment to Agent, on a quarterly basis, of an Agent fee (the "**Agent Fee**") of $50,000.00 per annum (i.e., $12,500.00 per quarter), payable in advance on each Payment Date.

7.10    <u>Survival</u>. This Agreement shall continue in full force and effect until the Indebtedness is paid in full and all of Lender's obligations under this Agreement are terminated; and all representations and warranties and all provisions herein for indemnity of the Indemnitees and Lender (and any other provisions herein specified to survive) shall survive payment in full, satisfaction or discharge of the Indebtedness, the replacement of any Lender, and any release or termination of this Agreement or of any other Loan Documents.

7.11    <u>Costs and Expenses</u>. Without limiting any Loan Document and to the extent not prohibited by applicable Laws, Borrower shall pay when due, shall reimburse to Agent and Lender on demand and shall indemnify Agent and Lender from, all out-of-pocket fees, costs and expenses paid or incurred by Lender in connection with the negotiation, preparation and execution of this Agreement or the other Loan Documents (and any amendments, approvals, consents, waivers and releases requested, required, proposed or done from time to time), or in connection with the disbursement, administration or collection of the Loan or the enforcement of the obligations of Borrower or the exercise of any right or remedy of Agent or Lender, including: (a) all reasonable fees and expenses of Agent's and Lender's counsel; (b) fees and charges of

each Construction Inspector, consultant, and engineer; (c) appraisal, re-appraisal and survey costs; (d) title insurance charges and premiums; (e) title search or examination costs, including abstracts, abstractors' certificates and Uniform Commercial Code searches; (f) judgment and tax lien searches for Borrower and each Guarantor; (g) escrow fees; (h) fees and costs of environmental investigations, site assessments and remediations; (i) recordation taxes, documentary taxes, transfer taxes and mortgage taxes; and (j) filing and recording fees. Borrower shall pay all costs and expenses incurred by Agent and Lender, including reasonable attorneys' fees, if the obligations or any part thereof are sought to be collected by or through an attorney at law, whether or not involving probate, appellate or administrative proceedings or proceedings under any Debtor Relief Law. Borrower shall pay all costs and expenses of complying with the Loan Documents, whether or not such costs and expenses are included in the Budget. Borrower's obligations under this Section 7.11 shall survive the delivery of the Loan Documents, the making of Advances, the payment in full of the Indebtedness, the release or reconveyance of any of the Loan Documents, the foreclosure of the Security Instrument or conveyance in lieu of foreclosure, any proceeding under any Debtor Relief Law, and any other event whatsoever.

7.12    Further Assurances. Borrower will, upon Agent's request (a) promptly correct any defect, error or omission in any Loan Document, (b) execute, acknowledge, deliver, procure, record or file such further instruments and do such further acts as Lender deems necessary, desirable or proper to carry out the purposes of the Loan Documents and to identify and subject to the liens and security interest of the Loan Documents any property intended to be covered thereby, including any renewals, additions, substitutions, replacements or appurtenances to the Property, (c) execute, acknowledge, deliver, procure, file or record any document or instrument Agent deems reasonably necessary, desirable or proper to protect the liens or the security interest under the Loan Documents against the rights or interests of third persons, and (d) provide such certificates, documents, reports, information, affidavits and other instruments and do such further acts deemed reasonably necessary, desirable or proper by Agent or Lender to comply with the requirements of any Governmental Authority having jurisdiction over Agent or Lender. In addition, at any time, and from time to time, upon request by Agent, Borrower will, at Borrower's expense, provide any and all further instruments, certificates and other documents as may, in the opinion of Agent, be necessary or desirable in order to verify Borrower's identity and background in a manner satisfactory to Agent.

7.13    Inducement to Agent and Lender. The representations, warranties, covenants, and agreements contained in this Agreement, the other Loan Documents (a) are made to induce Lender to make the Loan and extend any other credit to or for the account of Borrower pursuant hereto, and each of Agent and Lender is relying thereon and will continue to rely thereon, and (b) shall survive any foreclosure, any conveyance in lieu of foreclosure, or any proceedings under any Debtor Relief Law involving Borrower, Guarantor or the Property.

7.14    Forum. Any legal suit, action or proceeding against Borrower arising out of or relating to the Loan Documents may at Agent's option be instituted in any Federal or State Court in the State in which the Property is located. Each party to this Agreement hereby agrees and consents that, in addition to any methods of service of process provided for under applicable Law, all service of process in any such suit, action or proceeding in any state court or any United States federal court sitting in the State of New York may be made by certified or registered mail, return receipt requested, directed to such party at its address for notice stated in the Loan Documents, or at a subsequent address of which Lender received actual notice from such party in accordance with the Loan Documents, and service so made shall be complete five (5) days after the same shall have been so mailed. Nothing herein shall affect the right of Lender to serve process in any manner permitted by Law or limit the right of Agent or Lender to bring proceedings against any party in any other court or jurisdiction.

7.15    Interpretation. References to Articles, Sections, and Exhibits are, unless specified otherwise, references to articles, sections and exhibits of this Agreement. Captions and headings in the Loan Documents

are for convenience only and shall not affect the construction of the Loan Documents. All references (a) to the Loan Documents are to the same as extended, amended, restated, supplemented or otherwise modified from time to time unless expressly indicated otherwise, and (b) to the Land, the Improvements or the Property shall mean all or any portion of each of the foregoing, respectively. References to "Dollars," "$," "money," "payments" or other similar financial or monetary terms are references to lawful money of the United States of America. Words of any gender shall include each other gender. Words in the singular shall include the plural and words in the plural shall include the singular. References to Borrower or Guarantor shall mean, each Person comprising same, jointly and severally. The words "herein," "hereof," "hereunder" and other similar compounds of the word "here" shall refer to this entire Agreement (including the attached exhibits) and not to any particular Article, Section, paragraph or provision. The terms "agree" and "agreements" mean and include "covenant" and "covenants". The words "include" and "including" shall be interpreted as if followed by the words "without limitation".

7.16    No Partnership, etc.  The relationship between Lender and Borrower is solely that of lender and borrower. Each of Agent and Lender has no fiduciary or other special relationship with or duty to Borrower and none is created by the Loan Documents. Nothing contained in the Loan Documents, and no action taken or omitted pursuant to the Loan Documents, is intended or shall be construed to create any partnership, joint venture, association or special relationship between Borrower, on the one hand, and Agent or Lender, on the other hand, or in any way make Agent or Lender a co-principal with Borrower with reference to the Project, the Property or otherwise. In no event shall Agent's and/or Lender's rights and interests under the Loan Documents be construed to give Agent and/or Lender the right to control, or be deemed to indicate that Lender is in control of, the business, properties, management or operations of Borrower.

7.17    Records.  The unpaid amount of the Loan and the amount of any other credit extended by Lender to or for the account of Borrower set forth on the books and records of Lender shall be presumptive evidence of the amount thereof owing and unpaid, but failure to record any such amount on Lender's books and records shall not limit or affect the obligations of Borrower under the Loan Documents to make payments on the Loan when due.

7.18    Reserved.

7.19    USA Patriot Act Notice.  Agent and Lender hereby notifies Borrower that pursuant to the requirements of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "Act") and the federal regulations issued with respect thereto, it is required, from time-to-time, to obtain, verify and record information that identifies Borrower and/or Guarantor, which information includes the name, address, tax identification number of Borrower or Guarantor, as applicable, and other information that will allow Lender to identify Borrower in accordance with the Act and as shall otherwise be necessary for Agent and/or Lender to comply with federal law, including the Act and the federal regulations issued with respect thereto. Borrower and Guarantor shall, promptly following a request by Agent and/or Lender, provide all documentation and other information that Agent and/or Lender requests, including, without limitation, the information in the preceding sentence, in order to comply with its ongoing obligation under "know your customer" and anti-money laundering rules and regulations, including the Act.

7.20    Entire Agreement.  The Loan Documents constitute the entire understanding and agreement between and among Borrower, Agent and Lender with respect to the transactions arising in connection with the Loan, and supersede all prior written or oral understandings and agreements between and among Borrower, Agent and Lender with respect to the matters addressed in the Loan Documents. In particular, and without limitation, the terms of any commitment letter, letter of intent or quote letter by Agent or Lender to make the Loan are merged into the Loan Documents. Agent has not made any commitments to Lender, and Lender has not made any commitments to extend the term of the Loan past its stated maturity date or

FILED: WESTCHESTER COUNTY CLERK 05/01/2021 09:40 AM
NYSCEF DOC. NO. 3
INDEX NO. 55883/2021
RECEIVED NYSCEF: 05/01/2021

21-07096-shl   Doc 71   Filed 07/22/22   Entered 07/22/22 17:18:19   Main Document
Pg 153 of 227

to provide Borrower with financing except as set forth in the Loan Documents. Except as incorporated in writing into the Loan Documents, there are not, and were not, and no Persons are or were authorized by Agent or Lender to make, any representations, understandings, stipulations, agreements or promises, oral or written, with respect to the matters addressed in the Loan Documents.

7.21   Governing Law. **THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAW.**

7.22   Exculpation. Anything herein or in any other Loan Document or any certificate given in connection therewith or pursuant thereto (the Loan Documents and each such certificate, collectively, the "**Relevant Documents**") to the contrary notwithstanding, each of Agent and Lender agrees that, for repayment of the Loan and the payment and performance of any and all of Borrower's obligations under the Relevant Documents or any claim based thereon or otherwise in respect thereof, it shall look solely to the Property, the Project and the other assets of Borrower, and to such other collateral as may now or hereafter be given to secure the Loan or the Guarantor Documents, and no other property or assets of Borrower's direct or indirect constituent partners, members, affiliates, or the directors, officers, shareholders, agents or employees of Borrower or such constituent partners, members or affiliates (collectively, the "**Exculpated Parties**") shall be subject to levy, execution or other enforcement procedure for the satisfaction of remedies of Agent and/or Lender, or for any payment required to be made under the Relevant Documents or for the performance of any of the covenants or warranties contained in any of the Relevant Documents or for any claim based thereon or in respect thereof, nor shall any claim be brought against the Exculpated Parties; provided, however, notwithstanding anything to the contrary contained hereinabove, the foregoing provisions of this paragraph shall not (i) limit the right of Agent and/or Lender to name Borrower and/or the Guarantor or either of them as a party defendant in any action or suit for judicial foreclosure and sale under the Security Instrument so long as no deficiency judgment shall be sought or enforced against the Exculpated Parties, or (ii) affect or limit in any way the obligations of any party under the Guarantor Documents.

7.23   Lien Law Compliance. A statement given under oath and verified by the Borrower, as required under Section 22 of the New York Lien Law, is attached hereto as Exhibit "N" and made a part hereof.

**ARTICLE 8 - CASH MANAGEMENT**

8.1   Cash Management.

(a)   Not later than sixty (60) days prior to the anticipated rent commencement date under the Operating Lease, Borrower shall establish an account with Wells Fargo, or another bank acceptable to Lender in its sole discretion (the "**Cash Management Account**") in the name of Borrower for the sole and exclusive benefit of Agent (on behalf of Lender) into which Borrower shall deposit, or cause to be deposited, all revenue generated by the Property.

(b)   Borrower represents, warrants and covenants that, so long as the Principal Debt remains outstanding, (i) Borrower shall immediately deposit all revenue derived from the Property and received by Borrower, into the Cash Management Account; (ii) Borrower shall immediately deposit (A) all revenue derived from the Property into the Cash Management Account and (B) all funds otherwise payable to Borrower in connection with the Property into the Cash Management Account; (iii) (A) Borrower shall have sent (and hereby represents that it has sent) a notice, substantially in the form of Exhibit "L" attached hereto, to each tenant to pay all rent and other sums due under its Lease into the Cash Management Account (such notice, the "**Tenant Direction Notice**"), (B) simultaneously with the execution of any lease entered

5962984
- 44 -

into on or after the date hereof in accordance with the applicable terms and conditions hereof, Borrower shall furnish each tenant under each such lease the Tenant Direction Notice and (C) Borrower shall continue to send the aforesaid Tenant Direction Notices until each addressee thereof complies with the terms thereof; (iv) there shall be no other accounts maintained by Borrower or any other Person into which revenues from the ownership and operation of the Property are directly deposited; and (v) neither Borrower nor any other Person shall open any other such account with respect to the direct deposit of income in connection with the Property. Until deposited into the Cash Management Account, any Rents and other revenues from the Property held by Borrower shall be deemed to be collateral and shall be held in trust by it for the benefit, and as the property, of Agent, for the benefit of Lender pursuant to the Security Instrument and shall not be commingled with any other funds or property of Borrower. Borrower warrants and covenants that it shall not rescind, withdraw or change any notices or instructions required to be sent by it pursuant to this Section 8.1 without Agent's prior written consent.

    8.2    Disbursements from the Cash Management Account.

    (a)    Agent shall direct the Cash Management Bank to allocate available funds on deposit in the Cash Management Account on each Payment Date in the following amounts and order of priority (and during the existence of a Default (as set forth in Section 9.4(c)):

    (i)    First, to the Tax Reserve Fund in an amount sufficient to pay the monthly deposit, if any, required to be made for Property Taxes in accordance with the terms and conditions of Section 9.2;

    (ii)    Second, to the Insurance Reserve Fund (if applicable) in an amount sufficient to pay the monthly deposit, if any, required to be made for Insurance Premiums in accordance with Section 9.3;

    (iii)    Third, to pay the Cash Management Bank the monthly portion of fees charged by such banks in accordance with the Cash Management Agreement;

    (iv)    Fourth, to provide funds sufficient to pay interest then due and payable on the Indebtedness (including interest and any fees, such as the Unused Line Fee and the Agent Fee), to be applied in accordance with the terms of this Agreement;

    (v)    Fifth, to provide funds sufficient to pay interest then due and payable on the Mezzanine Indebtedness, to the extent permitted under the Intercreditor Agreement;

    (vi)    Sixth, to provide funds to Borrower to pay for, or reimburse Borrower for, Approved Operating Expenses;

    (vii)    Seventh, after the Completion Date, to reduction of the Principal Debt under the Loan, whether or not then due and payable; and

    (viii)    Eighth, after the Completion Date, to reduction of the Mezzanine Indebtedness, whether or not then due and payable.

    (b)    The insufficiency of funds on deposit in the Cash Management Account (or any sub-account thereunder) shall not absolve Borrower of the obligation to make any payments as and when due pursuant to this Agreement or the other Loan Documents, and such obligations shall be separate and independent, and not conditioned on any event or circumstance whatsoever.

## ARTICLE 9 - RESERVE FUNDS

9.1     Interest Reserve Funds.

(a)     Deposits to Interest Reserve Fund. On or about the date of this agreement, or in any event prior to the payment due on September 1, 2017, Lender is making an initial advance to Borrower to be held in the Interest Reserve Fund, in the amount of Three Million Three Hundred Seventy-Five Thousand Dollars ($3,375,000.00). Amounts deposited pursuant to this Section 9.1 are referred to herein as the "**Interest Reserve Fund**." If at any time Agent reasonably determines that the Interest Reserve Fund will not be sufficient to pay the next three monthly installments of interest, Agent shall notify Borrower of such determination and if there are not, Borrower shall deposit within ten (10) days the amount of such shortfall. Any interest earned on the Interest Reserve Fund shall be added to the Interest Reserve Fund and become a part thereof.

(b)     Disbursements from Interest Reserve Fund. Provided that no Default has occurred and is continuing, Agent will direct the Depository Bank to apply the Interest Reserve Fund to payment of accrued interest, and the Unused Line Fee, required to be made by the Borrower pursuant to this Agreement on the applicable scheduled Payment Date. In making any payment relating to the Interest Reserve Fund, the Depository Bank may do so according to any statement from Agent, without inquiry into the accuracy of such statement unless said statement is obviously incorrect. If the amount of the Interest Reserve Fund shall exceed the amounts due for interest on the applicable scheduled Payment Date pursuant to this Agreement, Agent shall retain such excess in the Interest Reserve Fund. Any Interest Reserve Funds remaining after the Obligations (other than Obligations that survive the payment in full of the Debt hereunder) have been paid in full shall be returned to Borrower.

(c)     Termination of Interest Reserve Fund. After the tenant has made its first rent payment under the Operating Lease, the Interest Reserve Fund shall terminate, and any funds remaining in the Interest Reserve Fund prior to such termination shall be applied to reduce the Principal Debt (but without payment of any Prepayment Premium).

9.2     Tax Funds.

(a)     Deposits to Tax Reserve Fund. On each Payment Date following the Lease Commencement Date, Borrower shall deposit or cause to be deposited with Agent, for deposit in the Tax Reserve Fund, one-twelfth of the real estate taxes that Agent reasonably estimates will be payable during the next ensuing twelve (12) months in order to accumulate with Lender fifteen (15) Business Days prior to their respective due dates sufficient funds to pay all such real estate taxes (said amounts together with the amount set forth in the first sentence of this Section 9.1, being, collectively, the "**Tax Reserve Fund**"). If at any time Agent reasonably determines that the Tax Reserve Fund is not or will not be sufficient to pay real estate taxes by the dates set forth above, Agent shall notify Borrower of such determination and Borrower shall increase its periodic payments to Agent by the amount that Agent reasonably estimates is sufficient to make up the deficiency thirty (30) days prior to delinquency of the real estate taxes. Any interest earned on the Tax Reserve Fund shall be added to the Tax Reserve Fund and become a part thereof.

(b)     Disbursements from Tax Reserve Fund. Borrower shall furnish Agent with (i) bills for the charges for which such deposits are required and (ii) a disbursement request reasonably satisfactory to Agent, executed by an authorized officer of Borrower, at least fifteen (15) days prior to the date on which the charges first become payable. Following receipt of the disbursement request and provided that no Default has occurred and is continuing, Agent will direct the Depository Bank to apply the Tax Reserve Fund to payments of real estate taxes required to be made by the Borrower pursuant to this Agreement, and under the Security Instrument but not, in any event, earlier than ten (10) days prior to the due dates thereof.

In making any payment relating to the Tax Reserve Fund, the Depository Bank may do so according to any bill, statement or estimate procured from the appropriate public office, without inquiry into the accuracy of such bill, statement or estimate or into the validity of any tax, assessment, sale, forfeiture, tax lien or title or claim thereof unless said bill, statement or estimate is obviously incorrect. If the amount of the Tax Reserve Fund shall exceed the amounts due for real estate taxes pursuant to this Agreement, Agent shall, in its sole and absolute discretion either return any excess to Borrower or credit such excess against future payments to be made to the Tax Reserve Fund.

9.3    Insurance Funds.

(a)    Deposits to Insurance Reserve Fund. On each Payment Date, following the Lease Commencement Date, Borrower shall deposit with Agent, or cause to be deposited with Agent, an amount equal to one-twelfth of the amount necessary to pay the property insurance premiums on the date the insurance premiums are due, such that the monthly amount deposited multiplied by the number of months remaining until the next scheduled due date for the payment of insurance premiums would equal the total amount of the insurance premiums due on such scheduled due date, as reasonably estimated by Agent, for the renewal of the coverage afforded by the property insurance policies required pursuant to this Agreement upon the expiration thereof. Amounts deposited pursuant to this Section 9.3 are referred to herein as the "**Insurance Reserve Fund**." If at any time Agent reasonably determines that the Insurance Reserve Fund will not be sufficient to pay the property insurance premiums, Agent shall notify Borrower of such determination and the monthly deposits for insurance premiums shall be increased by the amount that Agent reasonably estimates is sufficient to make up the deficiency at least thirty (30) Business Days prior to the due date for renewal of the insurance policies. Any interest earned on the Insurance Reserve Fund shall be added to the Insurance Reserve Fund and become a part thereof.

(b)    Disbursements from Insurance Reserve Fund. Borrower shall furnish Agent with (i) bills for the charges for which such deposits are required and (ii) a disbursement request reasonably satisfactory to Agent, executed by an authorized officer of Borrower, at least fifteen (15) Business Days prior to the date on which the charges first become payable. Following receipt of the disbursement request and provided that no Default has occurred and is continuing, Agent will direct the Depository Bank to apply the Insurance Reserve Fund to payment of insurance premiums required to be made by the Borrower pursuant to this Agreement, and under the Security Instrument but not, in any event, earlier than ten (10) days prior to the due dates thereof. In making any payment relating to the Insurance Reserve Fund, the Depository Bank may do so according to any bill, statement or estimate procured from the appropriate insurer or agent, without inquiry into the accuracy of such bill, statement or estimate unless said bill, statement or estimate is obviously incorrect. If the amount of the Insurance Reserve Fund shall exceed the amounts due for insurance premiums pursuant to this Agreement, Agent shall, in its sole and absolute discretion, either return any excess to Borrower or credit such excess against future payments to be made to the Insurance Reserve Fund.

9.4    Security Interest.

(a)    Borrower hereby grants to Agent, for the benefit of Lender a first-priority perfected security interest in, and assigns and pledges to Lender, the Cash Management Account, and each Reserve Account and any funds now or hereafter maintained therein (collectively, the "**Reserve Funds**") as collateral security for payment of the Obligations of Borrower. The provisions of this Section 9.4 and other provisions of this Agreement and the other Loan Documents are intended to give Lender or any subsequent holder of the Loan "control" of the Cash Management Account, each Reserve Account and the Reserve Funds within the meaning of the Uniform Commercial Code of each applicable jurisdiction.

(b)    Borrower authorizes Agent to file any financing statement or statements required by Agent to establish or maintain the validity, perfection and priority of the security interest granted herein in connection with the Cash Management Account and the Reserve Accounts. Borrower agrees that at any time and from time to time, at the expense of Borrower, Borrower will promptly and duly execute and deliver all <u>further</u> instruments and documents, and take all further action that Lender may reasonably request, in order to perfect and protect any security interest granted or purported to be granted hereby or the priority thereof, to obtain or preserve the full benefits of this Agreement and of the rights and powers herein granted, or to enable Agent to exercise and enforce its rights and remedies hereunder.

(c)    Upon the occurrence and during the continuance of a Default, Agent may exercise any or all of its rights and remedies as a secured party, pledgee and lienholder with respect to the Cash Management Account, the Reserve Accounts and the Reserve Funds. Borrower hereby irrevocably authorizes Agent upon the occurrence and during the continuance of a Default to make any and all withdrawals and transfers from the Cash Management Account and the Reserve Accounts as Agent shall determine in its sole discretion. Without limitation of the foregoing, upon the occurrence and during the continuance of any Default, Agent may in its sole discretion apply amounts held in the Cash Management Account and the Reserve Accounts to pay for the costs of protecting or preserving the liens under the Loan Documents and/or the value of any collateral given in connection with the Loan, and, with the prior written consent of the Agent, for such other purposes as Agent may elect in its sole discretion, including for any of the following purposes: (i) repayment of the Obligations, including principal prepayments, if any, applicable to such full or partial prepayment; (ii) reimbursement of Agent and/or Lender for all losses, fees, costs and expenses (including reasonable legal fees) suffered or incurred by Agent and/or Lender as a result of such Default; (iii) payment of any amount expended in exercising any or all rights and remedies available to Agent and/or Lender at law or in equity or under this Agreement or under any of the other Loan Documents; or (iv) payment of any item as required or permitted under this Agreement; <u>provided</u>, <u>however</u>, that any application of funds shall not cure or be deemed to cure any Default. Without limiting any other provisions hereof, each of the remedial actions described in the immediately preceding sentence shall be deemed to be a commercially reasonable exercise of Agent's rights and remedies as a secured party with respect to the Cash Management Account and the Reserve Accounts and shall not in any event be deemed to constitute a setoff or a foreclosure of a statutory banker's lien. Nothing in this Agreement, the Cash Management Agreement shall obligate Agent to apply all or any portion of the Cash Management Account or any Reserve Account to effect a cure of any Default, or to pay the Obligations, or in any specific order of priority. Agent's right to withdraw and apply funds as stated herein, in the Cash Management Agreement shall be in addition to all other rights and remedies provided to Agent and Lender under this Agreement, the Note, the Security Instrument and the other Loan Documents. The exercise of any or all of Agent's and/or Lender's rights and remedies under this Agreement or under any of the other Loan Documents shall not in any way prejudice or affect Agent's rights to initiate and complete a foreclosure under the Security Instrument.

## ARTICLE 10 - OPERATING LEASE ISSUES

10.1    <u>Tenant Letter of Credit</u>. Pursuant to the terms of the Operating Lease, Tenant has agreed to deliver to Borrower at least sixty (60) days prior to the anticipated Lease Commencement Date, either an unconditional letter of credit in the amount of $3,700,000.00 (the "**Letter of Credit**") or $3,700,000.00 in cash (the "**Cash Deposit**"). If a Letter of Credit is delivered to Borrower as security pursuant to the terms of the Operating Lease, then in connection with such delivery, and in all events at least thirty (30) days prior to the anticipated Lease Commencement Date, Borrower and Lender shall enter into a Letter of Credit Agreement substantially in accordance with the form attached hereto as <u>Exhibit "O"</u>, whereby Lender holds the Letter of Credit but Borrower retains the drawing rights thereunder, until such time as a Default occurs under the Loan. If Tenant under the Operating Lease delivers the Cash Deposit, Borrower

shall arrange with the depository bank to provide Lender with a first priority perfected security interest in such Cash Deposit, pursuant to a control agreement or otherwise.

10.2   Cash Security Deposit. At least sixty (60) days before the Lease Commencement Date, Tenant, under the Operating Lease, is required to deliver to Borrower the sum of $1,600,000.00 (or more, as provided in the Operating Lease), as an additional security deposit (the "**Additional Security Deposit**"). If Tenant under the Operating Lease delivers the Additional Security Deposit, Borrower shall arrange with the depository bank to provide Lender with a first priority perfected security interest in such Additional Security Deposit, pursuant to a control agreement or otherwise; provided, however, Lender acknowledges that Lender shall not have any right to draw upon such Additional Security Deposit unless Tenant is in default under the Operating Lease.

10.3   Security Interest. Borrower hereby pledges to Lender, and grants Lender a security interest in, all rights of Borrower, whether now existing or arising in the future, in and to the Cash Deposit, the Additional Security Deposit, and any other security deposit posted by Tenant under the Operating Lease, including any existing funds held at JP Morgan Chase Bank ("Chase") for the benefit of Borrower as described in the Operating Lease, a control agreement, or related documents, including that certain Collateral Assignment and Pledge of Membership Interest and Security Agreement entered into by and between Lizer Jozefovic (as assignor) and Howard Fensterman, as nominee for Borrower (as assignee), and as assigned to Borrower by Howard Fensterman, as nominee for Borrower (the "Pledge Agreement"); and further assigns to Lender, as collateral security for the Loan, all of its rights under the Pledge Agreement to any membership interest in Waterview Acquisition I, LLC. Lender acknowledges, however, that Lender shall not have any right to draw upon any such security or security deposit posted by Tenant or to foreclose any other rights under the Pledge Agreement, unless Tenant is in default under the Operating Lease. Borrower shall not agree to release any of such funds held at Chase, or to modify any control agreement or security interest in such funds, without the prior written consent of Lender.

10.4   Lease Guarantees. The Operating Lease includes lease guarantees from Lizer Jozefovic and Mark Neuman (the "**Operating Lease Guarantees**"). To Borrower's knowledge, the Operating Lease Guarantees are in full force and effect. Borrower agrees to enforce such Operating Lease Guarantees in accordance with commercially reasonably practices. The Operating Lease Guarantees shall not be amended or modified without the prior written consent of Agent. The Operating Lease Guarantees have been assigned to Lender as security for the Loan pursuant to the Assignment of Leases and Rents.

10.5   Application of Tenant Funds. Borrower agrees that if Borrower draws on any funds posted as security under the Operating Lease pursuant to or described in this Article 10, or if Borrower obtains any payments or proceeds from the Lease Guarantees, any such funds shall be promptly delivered to Lender as additional security for the Loan. So long as the Loan is not in Default, such funds may, upon written request of Borrower, be used to pay debt service payments under the Loan or be applied to retenanting expenses for the Property, upon written approval of Lender. If the Operating Lease is in Default, and the Loan is in Default, any such funds shall be applied to the Principal Debt, together with any accrued interest, fees, prepayment fees, exit fees and other charges due under the Loan.

*[Signatures appear on the following page.]*

FILED: WESTCHESTER COUNTY CLERK 05/01/2021 09:40 AM
NYSCEF DOC. NO. 3

INDEX NO. 55883/2021

RECEIVED NYSCEF: 05/01/2021

21-07096-shl    Doc 71    Filed 07/22/22    Entered 07/22/22 17:18:19    Main Document
Pg 159 of 227

THE WRITTEN LOAN DOCUMENTS REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first written above.

BORROWER:

WHITE PLAINS HEALTHCARE PROPERTIES I, LLC, a Massachusetts limited liability company

By: _____

William A. Nicholson, a Manager

COMMONWEALTH OF MASSACHUSETTS
_____ County, ss

On this 28 day of July 2017, before me, the undersigned notary public, personally appeared the above-named William A. Nicholson, a Manager of White Plains Healthcare Properties I, LLC, proved to me through satisfactory evidence of identification, which was □ photographic identification with signature issued by a federal or state government agency, □ oath or affirmation of a credible witness, □ personal knowledge of the undersigned, to be the person whose name is signed on the preceding or attached documents, and acknowledged to me he signed it voluntarily as his free act and deed, and the free act and deed of the White Plains Healthcare Properties I, LLC, as a manager of such limited liability company, for its stated purpose.

_____
Notary Public          Andrea N. Emond
My Commission Expires: _____ 1|13|23

Borrower's Address for Notices:
West Peabody Executive Center, Suite 200, 2 Bourbon Street, Peabody, MA 01960, Attention: William Nicholson, Telephone: 978-535-6700, Fax: 978-535-6701, E-mail Address: wnicholson@congressconstruction.com

With a copy to:

Posternak Blankstein & Lund LLP, Prudential Tower, 800 Boylston Street, Boston, MA 02199-8004, Attn: Jo-Ann M. Marzullo, Phone: 617.973.6267. 617.722.4935 fax, E-Mail: jmarzullo@PBL.COM

LENDER:

SECURITY BENEFIT LIFE INSURANCE
COMPANY, a Kansas insurance company,
as Lender

By: _____

      Name: Joseph Wittrock
      Title: Chief Investment Officer

STATE OF KANSAS       )
                     )ss.
COUNTY OF Shawnee  )

    The foregoing instrument was acknowledged before me on July 28, 2017, by Joseph
Wittrock, as Chief Investment Officer of Security Benefit Life Insurance Company, a Kansas insurance
company, on behalf of the corporation.



                  Notary Public

My Appointment Expires: 7-12-21
(Notarial Seal)

> **Cassandra Blackwell**
> NOTARY PUBLIC—STATE OF KANSAS
> MY APPT EXP: 7-12-21

The address of Lender is:

Security Benefit Life Insurance Company, 1 SW Security Benefit Pl, Topeka, Kansas 66636, Attention:
Douglas Schneider, Telephone: (785) 438-1642, Fax: (785) 438-3080, E-mail Address:
Douglas.Schneider@securitybenefit.com

With a copy to:

Nyemaster Goode, P.C., 700 Walnut Street, Suite 1600, Des Moines, Iowa 50309, Attention: James C.
Wine, Telephone: 515-283-3188, Fax: 515-283-8045, E-mail Address: jwine@nyemaster.com

AGENT:

SECURITY BENEFIT CORPORATION, a Kansas corporation, as Agent

By: _Joseph L. Wittrock_

Name: Joseph Wittrock
Title: Chief Investment Officer

STATE OF KANSAS            )
                           )ss.
COUNTY OF _Shawnee_        )

    The foregoing instrument was acknowledged before me on _July 28_, 2017, by Joseph Wittrock, as Chief Investment Officer of Security Benefit Corporation, a Kansas corporation, on behalf of the corporation.

_Cassandra Blackwell_

Notary Public

My Appointment Expires: _7-12-21_
(Notarial Seal)

Cassandra Blackwell
NOTARY PUBLIC—STATE OF KANSAS
MY APPT EXP: 7-12-21

The address of Agent is:

Security Benefit Life Insurance Company, 1 SW Security Benefit Pl, Topeka, Kansas 66636, Attention: Douglas Schneider, Telephone: (785) 438-1642, Fax: (785) 438-3080, E-mail Address: Douglas.Schneider@securitybenefit.com

With a copy to:

Nyemaster Goode, P.C., 700 Walnut Street, Suite 1600, Des Moines, Iowa 50309, Attention: James C. Wine, Telephone: 515-283-3188, Fax: 515-283-8045, E-mail Address: jwine@nyemaster.com

5962984

EXHIBIT "A"

LEGAL DESCRIPTION OF LAND

Real property in the City of White Plains, County of Westchester, State of New York, described as follows:

ALL THAT CERTAIN PLOT, PIECE OR PARCEL OF LAND, SITUATE, LYING AND BEING IN THE CITY OF WHITE PLAINS, COUNTY OF WESTCHESTER AND STATE OF NEW YORK, SAID PARCEL BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT IN THE EASTERLY LINE OF CHURCH STREET WHERE THE SAME IS INTERSECTED BY THE SOUTHERLY LINE OF BARKER AVENUE;

RUNNING THENCE FROM SAID POINT NORTH 70° 40' 10" EAST A DISTANCE OF 173.57 FEET ALONG THE SOUTHERLY LINE OF BARKER AVENUE TO A POINT WHERE THE SAME IS INTERSECTED BY THE DIVISION LINE HEREIN DESCRIBED PARCEL ON THE WEST AND LANDS NOW OR FORMERLY OF KOEPPEL & MOHR EQUITIES ON THE EAST;

THENCE FROM SAID POINT AND ALONG SAID DIVISION LINE SOUTH 17° 59' 50" EAST A DISTANCE OF 200.51 FEET TO A POINT IN THE DIVISION LINE BETWEEN THE HEREIN DESCRIBED PARCEL ON THE NORTH AND LANDS NOW OR FORMERLY OF HAMILTON PLAZA COMPANY, INC. ON THE SOUTH;

THENCE FROM SAID POINT AND ALONG SAID LINE SOUTH 71° 01' 50" WEST A DISTANCE OF 173.24 FEET TO THE EASTERLY LINE OF CHURCH STREET;

THENCE FROM SAID POINT AND ALONG SAID LINE NORTH 18° 05' 04" WEST A DISTANCE OF 199.41 FEET TO THE POINT AND PLACE OF BEGINNING.

FILED: WESTCHESTER COUNTY CLERK 05/01/2021 09:40 AM INDEX NO. 55883/2021
NYSCEF DOC. NO. 3   21-07096-shl   Doc 71   Filed 07/22/22   Entered 07/22/22 17:18:19   Main Document   RECEIVED NYSCEF: 05/01/2021

Pg 163 of 227

EXHIBIT "B"

DEFINITIONS

1.      DEFINITIONS: As used in this Agreement and the attached exhibits, the following terms shall have the following meanings:

"**Access Laws**" has the meaning set forth in Section 3.20.

"**Accounts Payable List**" means a written summary from Borrower of all accounts paid and payable for Soft Costs associated with the applicable Draw Request identifying each such account and the invoice amount due, and shall be in form and substance acceptable to Agent.

"**Act**" has the meaning set forth in Section 7.19.

"**Advance**" means an advance of a portion of the Loan in accordance with the terms of this Agreement.

"**Affiliate**" shall mean, as to any Person, any other Person that (i) owns directly or indirectly ten percent (10%) or more of all equity interests in such Person, and/or (ii) is in Control of, is Controlled by or is under common ownership or Control with such Person, and/or (iii) is a director or officer of such Person or of an Affiliate of such Person, and/or (iv) is the spouse, issue or parent of such Person or of an Affiliate of such Person.

"**Affiliate Contract**" means any contract, agreement or similar arrangement between Borrower or Member, on the one hand, and any Affiliate of Borrower, on the other hand.

"**Agent Fee**" has the meaning set forth in Section 7.9.

"**Aggregate Costs**" means all costs incident to the Loan and the Project through the end of the Availability Period after taking into account the requirements of this Agreement, including "Hard Costs" and "Soft Costs", fees and expenses, and interest that may accrue and be payable on the Loan.

"**Agreement**" has the meaning set forth in the introductory paragraph of this Agreement, and includes all exhibits attached hereto and referenced in Section 1.1.

"**Annual Budget**" shall mean the operating budget, including all planned Capital Expenditures, for the Property prepared by Borrower in accordance with Exhibit B, Section 2 hereof for the applicable Fiscal Year or other period.

"**Approved Appraisal**" means an MAI appraisal that is (a) compliance with Title XI of the Financial Institutions Reform, Recovery and Enforcement Act of 1989 and the Uniform Standards of Professional Appraisal Practice, (b) in form and substance acceptable to Agent, and (c) prepared by an independent appraiser firm engaged by and otherwise acceptable to Agent.

"**Approved Annual Budget**" shall have the meaning set forth in Exhibit B, Section 2 hereof.

"**Approved Operating Expenses**" means the following expenses of Borrower, incurred in connection with the operation of the Property; payments for insurance premiums with respect to insurance required by the Security Instrument but not finished by Tenant; accounting and auditing expenses incurred by

Borrower to provide the financial statements required for the Loan; distributions for payment of income taxes arising from the Project; provided, however, that Approved Operating Expenses shall not exceed One Hundred Seventy-Two Thousand and No/100 Dollars ($172,000.00) per year.

"**Availability Period**" means the period from the Closing Date to the earlier to occur of (a) the Completion Date and (b) the last Business Day of the twenty-four (24th) month following the Closing Date.

"**Bankruptcy Code**" shall mean Title 11 of the United States Code, 11 U.S.C. § 101, et seq., as the same may be amended from time to time, and any successor statute or statutes and all rules and regulations from time to time promulgated thereunder, and any comparable foreign laws relating to bankruptcy, insolvency or creditors' rights or any other federal or state bankruptcy or insolvency law.

"**Borrower**" has the meaning set forth in the introductory paragraph of this Agreement.

"**Borrower Group**" means each of Borrower, Member and each Guarantor.

"**Borrower Party**" means each member of the Borrower Group and each Guarantor.

"**Borrower's Architect**" means The Architectural Team, Inc., a Massachusetts corporation.

"**Borrower's Deposit**" means a deposit by Borrower in the amount of any Budget Shortfall.

"**Borrower's Share**" means a fraction, (a) the numerator of which is the positive difference between (i) the Required Equity minus (ii) the Initial Equity, and (y) the denominator of which is the positive difference between (i) the sum of (A) the Maximum Loan Amount plus (B) the Required Equity, minus (ii) the sum of (A) the Initial Advance plus (B) the Initial Equity.

"**Budget**" means the budget and cost itemization for the Project, as defined in Section 1.4 of this Agreement.

"**Budget Line Item**" has the meaning set forth in Section 1.4(c).

"**Budget Shortfall**" means any deficiency, as determined or projected by Agent and Agent's Construction Inspector in their reasonable discretion on a line item basis (after taking into account any immediately available, documented costs savings and usage of applicable Contingency Fund as permitted by Section 1.3(b) or (c), so long as after giving effect to such usage, an adequate reserve for contingencies of the Project, whether foreseeable or unforeseeable, as determined by Agent in its sole and absolute discretion would remain available), between the amount of undisbursed Loan proceeds, plus any sums provided or to be provided by Borrower as shown in the Budget (including any such determination that the undisbursed Loan proceeds allocated for the payment of future interest on the Loan to be advanced or for the payment of future taxes or carrying costs, each on a line-item by line-item basis, are insufficient), and the Aggregate Cost. A Budget Shortfall may occur from a shortage of funds in any single line item or category of the Budget even if there are undisbursed Loan proceeds in other line items or categories.

"**Building Loan**" has the meaning set forth in the Recitals.

"**Building Loan Costs**" means those costs consisting solely of "costs of improvements" as defined in Section 2 of the New York Lien Law, as generally identified on the Section 22 Affidavit attached hereto as Exhibit "N".

"**Business Day**" means any day other than a Saturday, Sunday or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the state where Lender's Office is located.

"**Capital Expenditures**" shall mean, for any period, the amount expended for items capitalized under an income tax basis, consistently applied (including expenditures for building improvements or major repairs, leasing commissions and tenant improvements).

"**Carveout Guaranty**" shall mean that certain Guaranty Agreement, dated as of the date hereof, from Guarantor in favor of Agent, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Cash Management Account**" means the cash management account at Depository Bank established in accordance with Section 8.1(a) and pursuant to the Cash Management Agreement.

"**Cash Management Agreement**" means that certain Reserve Account Control Agreement contemplated to be entered into by and among Borrower, Agent, and the Depository Bank, in accordance with Section 8.1(a), as the same may be modified, amended, supplemented or reaffirmed from time to time.

"**Change in Law**" means the occurrence, after the date of this Agreement, of any of the following: (a) the adoption or taking effect of any Law, (b) any change in any Law or in the administration, interpretation, implementation or application thereof by any Governmental Authority, or (c) the making or issuance of any request, rule, guideline, or directive (whether or not having the force of Law) by any Governmental Authority; provided that notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and (y) all requests, rules, guidelines, or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority), or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted, or issued.

"**Closing Date**" shall mean the date of the initial funding of the Loan.

"**Closing Checklist**" means that certain Closing Requirements and Checklist setting forth the conditions for closing the Loan and recording the Security Instrument.

"**Code**" has the meaning set forth in Section 3.19.

"**Commitment**" means, as to Lender, its obligation to advance the Loan in an aggregate principal amount not exceeding the amount set forth opposite such Lender's name on the Schedule of Lenders at any one time outstanding, as such amount may be reduced or adjusted from time to time in accordance with this Agreement.

"**Completion Date**" shall mean the date when all on-site and off-site work related to the Improvements shall have been completed; all conditions to the final advance for the Improvements set forth in Exhibit "E" shall have been satisfied; Agent shall have received a certification from the Construction Inspector that final completion has been achieved and that all final lien waivers, as-built drawings and surveys (which survey shall satisfy all of the requirements of Exhibit "F"), and other closing-out items as required by Agent have been received and approved; a temporary certificate of occupancy shall have been issued for all components of the Project subject only to conditions acceptable to Agent, and that the Lease Commencement Date shall have occurred.

"**Completion Guaranty**" shall mean that certain Completion Guaranty, dated as of the date hereof, from Guarantor in favor of Agent, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Construction Inspector**" means the construction inspector, if any, engaged by Agent with respect to the Project.

"**Construction Inspector Report**" means a written report from the Construction Inspector due to Agent on a specified predetermined day of each month acceptable to Agent.

"**Construction Schedule**" means the schedule which is attached to the Certificate of Construction Schedule and Plans dated on or near the date hereof, executed by Borrower, and agreed to by Lender and Agent, which has been prepared and certified by Borrower and verified by the Construction Inspector establishing a timetable for commencement and completion of the construction work of the Improvements, showing, on a monthly basis, the anticipated progress of the construction work and showing that all of the construction work will be completed on or before the Required Completion Date.

"**Control**" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto.

"**Debt Service Coverage Ratio**" means the ratio of (a) Net Operating Income, to (b) Deemed Debt Service, as determined by Lender in its sole but good faith discretion.

"**Debtor Relief Law(s)**" means any federal, state or local law, domestic or foreign, as now or hereafter in effect relating to bankruptcy, insolvency, liquidation, receivership, reorganization, arrangement, composition, extension or adjustment of debts, or any similar law affecting the rights of creditors.

"**Deemed Debt Service**" means, with respect to any particular period, interest payments payable under this Agreement, the Note and other Loan Documents during such period, using for the interest calculation the product of (i) the Interest Rate per annum as of the date of determination, multiplied by (ii) the outstanding principal balance of the Loan as of the date of determination.

"**Default**" has the meaning set forth in Section 5.1.

"**Default Rate**" shall have the meaning set forth in Section 2.10.

"**Depository Bank**" shall mean the depository bank party to the Cash Management Agreement.

"**Design Professional**" means Borrower's Architect and each structural engineer, mechanical engineer, geotechnical engineer, soils engineer and other engineering or design professional engaged with respect to any portion of the construction work, as approved by Agent. Any reference in this Agreement to a certification or other document to be executed by a Design Professional shall mean one or more of such Design Professionals designated by Agent as the Design Professional to execute such certification or document, depending on the areas of expertise covered by such certification or document.

"**Designated Jurisdiction**" means any country or territory to the extent that such country or territory itself is the subject of any Sanction.

"**Draw Request**" has the meaning set forth in Section 1 of Exhibit "E".

"**Eligible Assignee**" means any Person that meets the requirements to be an assignee under Sections 7.6(b)(ii) and (iv) (subject to such consents, if any, as may be required under Section 7.6(b)(ii)).

"**Environmental Agreement**" means the Environmental Indemnity Agreement of even date herewith by Borrower and Guarantor to Agent, as amended, modified, replaced, extended or renewed from time to time.

"**Environmental Assessment**" means a written report (including all drafts thereof) of an environmental assessment of the Property of such scope as may be requested by Agent, including the taking of soil borings and air and groundwater samples and other above- and below-ground testing, by a consulting firm acceptable to Agent and made in accordance with Agent's established guidelines.

"**Environmental Laws**" has the meaning assigned thereto in the Environmental Agreement.

"**ERISA**" has the meaning set forth in Section 3.19.

"**Excluded Taxes**" means any of the following Taxes imposed on or with respect to any Recipient or required to be withheld or deducted from a payment to a Recipient, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, imposed as a result of such Recipient being organized under the Laws of, or having its principal office or, in the case of any Lender, the jurisdiction imposing such Tax (or any political subdivision thereof), (b) in the case of a Lender, U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Loan advance or Commitment pursuant to a Law in effect on the date on which such Lender acquires such interest in the Loan advance or Commitment or (c), amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto, and (d) any U.S. federal withholding Taxes imposed pursuant to FATCA.

"**Exculpated Parties**" has the meaning set forth in Section 7.22.

"**Excusable Delay**" means a delay, not to exceed a total of thirty (30) days, caused by unusually adverse weather conditions which have not been taken into account in the Construction Schedule, fire, earthquake or other acts of God, strikes, lockouts, acts of public enemy, riots or insurrections or any other unforeseen circumstances or events beyond the control of Borrower (except financial circumstances or events or matters which may be resolved by the payment of money), and as to which Borrower notifies Agent in writing within five (5) days after such occurrence; provided, however, no Excusable Delay shall extend the Completion Date or suspend or abate any obligation of Borrower or any Guarantor or any other Person to pay any money.

"**Exit Fee**" has the meaning set forth in Section 2.3.

"**Extension Notice**" has the meaning set forth in Section 2.14.

"**Extension Period**" has the meaning set forth in Section 2.14.

"**FATCA**" means Sections 1471 through 1474 of the Code, as in effect on the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with and any current or future regulation or official interpretation thereof).

"**Financial Statements**" means for each reporting party, a balance sheet, income statement, statements of cash flow and amounts and sources of contingent liabilities and associated footnotes, a reconciliation of changes in equity and liquidity verification, cash flow projections, real estate schedules

providing details on each individual real property in the reporting party's portfolio, including, but not limited to raw land, land under development, construction in process and stabilized properties and unless Agent otherwise consents, consolidated and consolidating statements if the reporting party is a holding company or a parent of a subsidiary entity. For purposes of this definition and any covenant requiring the delivery of Financial Statements, each party for whom Financial Statements are required is a "<u>reporting party</u>" and a specified period to which the required Financial Statements relate is a "<u>reporting period</u>"; (ii) if the reporting party is Borrower, then the Financial Statements for such reporting party shall be prepared in accordance with GAAP; and (iii) if the reporting party is Guarantor, then the Financial Statements for such reporting party shall be limited to statements of the fair market value of the assets held by such reporting party and shall be prepared in accordance with the fair market value basis of accounting, consistently applied, or another method of accounting reasonably approved by Agent.

"**Funding Date**" means the date on which an Advance of Loan proceeds shall occur.

"**GAAP**" shall mean generally accepted accounting principles set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board (or agencies with similar functions of comparable stature and authority within the accounting profession), or in such other statements by such entity as may be in general use by significant segments of the U.S. accounting profession.

"**General Assignment**" means the Assignment of Contracts and Other Project Documents dated as of the date hereof, from Borrower in favor of Agent, as amended, modified, supplemented, restated and replaced from time to time.

"**General Contractor**" means Congress/Consigli, Joint Venture comprised of Congress Building Corporation, a Massachusetts corporation, and Consigli Construction NY LLC, a New York limited liability company.

"**General Contract**" means that certain Standard Form of Agreement Between Owner and Contractor A102-2007, dated as of June 12, 2017, by and between Borrower and General Contractor, which shall be in form and substance acceptable to Agent, as the same may be modified, amended, supplemented or reaffirmed from time to time in accordance with the terms of this Agreement.

"**Government Approval**" means any action, authorization, consent, approval, license, lease, ruling, permit, tariff, rate, certification, exemption, filing or registration by or with any Governmental Authority (together with all applicable conditions thereto and restrictions therein or required as a result thereof, and any notices thereof), including all licenses, permits, allocations, authorizations, approvals and certificates obtained by or in the name of, or assigned to, Borrower and used in connection with the ownership, design, construction, operation, use or occupancy of the Project, including building permits, zoning and planning determinations or approvals, business licenses, licenses to conduct business (other than licenses held by any tenant), certificates of occupancy and all such other permits, licenses and rights.

"**Governmental Authority**" means the government of the United States or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"**Guarantor**" means, individually and collectively, jointly and severally, William A. Nicholson, Howard Fensterman, Matthew Barbara and Paul Barbara.

- B-6 -

21-07096-shl    Doc 71    Filed 07/22/22    Entered 07/22/22 17:18:19    Main Document
Pg 169 of 227

"**Guarantor Documents**" means, collectively, (a) the Carveout Guaranty, (b) the Completion Guaranty and (c) the Environmental Agreement, and each other guaranty executed and delivered by Guarantor to Agent from time to time in accordance with this Agreement.

"**Guarantor Net Worth Requirement**" shall mean a minimum net worth of Sixty Million Dollars ($60,000,000.00) in the aggregate.

"**Hard Costs**" means the aggregate costs of all labor, materials, equipment and fixtures necessary for completion of construction of the Improvements, as more particularly set forth in the Budget.

"**Hazardous Materials**" has the meaning assigned thereto in the Environmental Agreement.

"**HVCRE**" means High Volatility Commercial Real Estate pursuant to the Basel III Regulations.

"**HVCRE Loan**" means a loan that is classified as an HVCRE exposure.

"**Improvements**" means all on-site and off-site improvements to the Land for the skilled nursing facility to be constructed on the Land, together with all fixtures, tenant improvements and appurtenances now or hereafter to be erected or installed on the Land and/or in such improvements.

"**Indebtedness**" means any and all obligations, indebtedness and liabilities of Borrower that constitute Obligations.

"**Indemnified Liabilities**" has the meaning set forth in Section 7.2.

"**Indemnified Taxes**" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of Borrower or Guarantor under any Loan Document and (b) to the extent not otherwise described in clause (a), Other Taxes.

"**Indemnitees**" has the meaning set forth in Section 7.2.

"**Initial Advance**" means the initial Advance of proceeds of the Loan made in accordance with this Agreement.

"**Initial Equity**" means the amount of Required Equity invested in the Property effective upon the funding of the Initial Advance, but in no event less than Twelve Million Six Hundred Fifty-Five Thousand and Fifty-One and No/100 Dollars ($12,655,051.00).

"**Initial Maturity Date**" means August 1, 2020.

"**Insurance Reserve Fund**" has the meaning set forth in Section 9.3.

"**Intercreditor Agreement**" means the Loan Document bearing that heading between Lender and Bradford Allen Capital Corporation.

"**Interest Rate**" means, for any day, a fluctuating rate per annum equal to the LIBOR Daily Floating Rate, plus seven hundred (700) basis points.

"**Land**" means the parcel of real property described on Exhibit "A" attached hereto and made a part hereof.

"**Law**" or "**Laws**" means all constitutions, treaties, statutes, laws, ordinances, regulations, rules, orders, writs, injunctions, or decrees of any Governmental Authority.

"**Lease**" shall mean the Operating Lease, together with any other lease, sublease or subsublease, letting, license, concession or other agreement (whether written or oral and whether now or hereafter in effect) pursuant to which any Person is granted a possessory interest in, or right to use or occupy all or any portion of any space in the Property by or on behalf of Borrower (excluding patients), and (a) every modification, amendment or other agreement relating to such lease, sublease, subsublease, or other agreement entered into in connection with such lease, sublease, subsublease, or other agreement, and (b) every guarantee of the performance and observance of the covenants, conditions and agreements to be performed and observed by the other party thereto (including, without limitation, the Operating Lease Guarantees).

"**Lease Commencement Date**" means the Commencement Date as defined in the Operating Lease.

"**Lender**" means, singly or collectively, each lender from time to time party to this Agreement.

"**Lender's Office**" means Lender's address and account as set forth herein, or such other address or account as Lender hereafter may from time to time notify Borrower.

"**Lender's Time**" means the time of day observed in the city where Lender's Office is located.

"**LIBOR Daily Floating Rate**" means, for any day, the rate per annum equal to (a) LIBOR, at approximately 11:00 a.m., London time determined two (2) London Banking Days prior to such date for U.S. Dollar deposits being delivered in the London interbank Eurodollar market for a term of one (1) month commencing that day or (b) if such published rate is not available at such time for any reason, the rate per annum determined by Agent to be the rate at which deposits in U.S. Dollars for delivery on the date of determination in same day funds in the approximate outstanding amount of the Loan and with a term equal to one (1) month would be offered to major banks in the London interbank Eurodollar market at their request at the date and time of determination. Notwithstanding the foregoing, in no event shall the LIBOR Daily Floating Rate be more than a rate of five percent (5.00%) per annum.

"**Loan**" means the loan made by Lender to Borrower, including both the Building Loan and the Project Loan, in the maximum amount of $38,500,000.00 (the "**Maximum Loan Amount**").

"**Loan Documents**" means this Agreement (including all exhibits), the Security Instrument, each Note, the Guarantor Documents, any financing statements, the Budget, each Draw Request, and such other documents evidencing, securing or pertaining to the Loan as shall, from time to time, be executed and/or delivered by Borrower, Guarantor, or any other party to Agent and/or Lender pursuant to this Agreement, as they may be amended, modified, restated, replaced or supplemented from time to time.

"**Loan Proceeds**" has the meaning set forth in Section 1.4.

"**Loan-to-Cost Ratio**" means the ratio of (a) the Maximum Loan Amount, to (b) the costs of acquiring and developing the Property, as determined by Lender in its sole but good faith discretion, which determination shall be conclusive and binding absent manifest error.

"**Loan-to-Value Ratio**" means, as of any date, the ratio of (a) the Outstanding Principal Balance, to (b) the "as is" (appraised value of the Property as of such date, as determined by Lender in its sole but good faith discretion whether pursuant to its underwriting practices or an updated appraisal.

"**London Banking Day**" means a day on which dealings in U.S. Dollar deposits are conducted by and between banks in the London interbank Eurodollar market.

"**Material Adverse Effect**" means: (a) a material adverse change in, or a material adverse effect on, the Property and Improvements thereon, or the operations, business, assets, properties, liabilities (actual or contingent), condition (financial or otherwise) of Borrower; (b) a material adverse effect on the rights and remedies of Agent or Lender under any Loan Documents, or of the ability of Borrower to perform its obligations under any Loan Documents, or a material adverse effect on the Guarantor that would be reasonably likely to have a material adverse effect on the Borrower's or Guarantor's ability to perform their obligations under any Loan Documents; or (c) a material adverse effect upon the legality, validity, binding effect or enforceability against any party to the Loan Documents to which it is a party.

"**Material Contract**" means, collectively, (i) the General Contract, (ii) each contract with a Design Professional entered into by Borrower in accordance with this Agreement, (iii) any Affiliate Contract, and (iv) any other contract for the performance of any work or the supplying of any labor, materials or services entered into by Borrower in compliance with this Agreement related to the construction or design of the Improvements or any component thereof which exceeds $400,000.00 in total price, as the same may be modified, amended or supplemented from time to time as permitted under the Loan Documents.

"**Maturity Date**" means the Initial Maturity Date, as it may be extended in accordance with Section 2.12 hereof.

"**Member**" means any member of Borrower.

"**Mezzanine Borrower**" means White Plains Mezzanine, LLC, a Massachusetts limited liability company.

"**Mezzanine Indebtedness**" means all principal, interest and other sums due and owing under the Mezzanine Loan.

"**Mezzanine Lender**" means Bradford Allen Funding Company LLC.

"**Mezzanine Loan**" means the $9,500,000 loan from Bradford Allen Funding Company LLC to Mezzanine Borrower.

"**Net Operating Income**" means from any period.

"**Note**" means, the Note dated as of the Closing Date, executed by Borrower and payable to the order of Lender, together with all replacements and substitutes thereof, in each case, as amended, modified, replaced, restated, extended or renewed from time to time.

"**Obligations**" means all liabilities, obligations, covenants and duties of Borrower or any other party to a Loan Document arising under or otherwise with respect to any Loan Document, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest and fees that accrue after the commencement by or against Borrower or any party to a Loan Document or any Affiliate thereof of any proceeding under any Debtor Relief Laws naming such Person as the debtor in such proceeding, regardless of whether such interest and fees are allowed claims in such proceedings.

"**OFAC**" means the Office of Foreign Assets Control of the United States Department of the Treasury.

- B-9 -

"**Operating Contract**" shall mean any cleaning, maintenance, service, repair, supply, credit, personnel, staffing or other contract or agreement relating to the ownership, management, development, use, operation, leasing, maintenance or repair of the Property or any portion thereof to which any Borrower Related Party is a party. "Operating Contract" does not include any Lease, any Permitted Encumbrance, any Construction Contract or any Material Contract.

"**Operating Expenses**" shall mean, for any period, the total of all expenditures, computed in accordance with GAAP, consistently applied, of whatever kind relating to the operation, maintenance and management of the Property, which expenditures are incurred on a regular monthly or other periodic basis, including without limitation, utilities, ordinary repairs and maintenance, insurance, license fees, Taxes, Other Charges, advertising expenses, management fees, payroll and related taxes, computer processing charges, tenant improvements and leasing commissions, operational equipment or other lease payments as approved by Agent, and other similar costs. Notwithstanding anything to the contrary in the foregoing, Operating Expenses shall (x) not include depreciation, amortization and other non-cash items, debt service, Capital Expenditures, any contributions to any of the Reserve Funds, income taxes or other taxes in the nature of income taxes on sales, or use taxes required to be paid to any Governmental Authority, equity distributions, and other extraordinary and non-recurring items, and legal or other professional services fees and expenses unrelated to the operation of the Property, (y) be increased to reflect known increases in Operating Expenses that are anticipated, in Agent's reasonable determination, to occur within the succeeding twelve (12) month period including without limitation those related to Property Taxes and Insurance Premiums and (z) include the greater of (I) the actual fees paid to any Manager pursuant to Management Agreement for such period of determination and (II) an amount equal to the greater of three percent (3%) of Gross Income from Operations for such period.

"**Operating Lease**" means the Amended and Restated Lease to HBL SNF, LLC dated as of November 19, 2015.

"**Operating Lease Guarantees**" has the meaning set forth in Section 10.4.

"**Other Charges**" shall mean all ground rents, maintenance charges, impositions other than Taxes, any "common expenses" or expenses allocated to and required to be paid by Borrower and any other charges, including, without limitation, vault charges and license fees for the use of vaults, chutes and similar areas adjoining the Property or any portion thereof, now or hereafter levied or assessed or imposed against the Property or any part thereof.

"**Other Taxes**" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document.

"**Participant**" has the meaning set forth in Section 7.6(d).

"**Participant Register**" has the meaning set forth in Section 7.6(d).

"**Payment Amount**" means an Advance of the Loan, an unreimbursed Indemnified Liability, or any other amount that Lender is required to fund under this Agreement.

"**Payment Date**" has the meaning specified in Section 2.12.

"**Permitted Changes**" means changes to the Plans or Improvements, provided that the cost of any single change or extra does not exceed $100,000.00 and the aggregate amount of all such changes and extras

(whether positive or negative) does not exceed $750,000.00 (the "**Aggregate Limit**"). Notwithstanding the foregoing, individual change orders in excess of the Aggregate Limit shall be permitted provided that no such change order shall exceed $15,000.00.

"**Permitted Encumbrances**" means, collectively, (a) those exceptions to title set forth in the Title Insurance issued to Agent which are set forth on Schedule B of the Title Insurance dated as of the date hereof, (b) the Operating Lease, (c) other liens approved by Agent in writing to the extent such approval is required under the Loan Documents; it being understood that no such approval shall subordinate the lien of the Security Instrument to any right or interest of a third party unless the instrument granting such approval expressly provides for the same, (d) the liens and security interests created by the Loan Documents, (e) the liens, if any, for Taxes imposed by any Governmental Authority which are not yet delinquent, and (f) any workers', mechanics' or other similar liens on the Property provided that any such lien is bonded or discharged within thirty (30) days after Borrower becomes aware of or receives written notice of such lien, solely to the extent that the items set forth in clauses (a)-(f) of this definition, do not, in the aggregate, materially adversely affect the value or use of the Property or any portion thereof or Borrower's ability to repay the Loan.

"**Permitted Transfer**" means, (a) the Mezzanine Loan, subject to the terms and conditions of the Intercreditor Agreement, and (b) the transfer permitted pursuant to Section 3.30 of this Agreement.

"**Person**" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"**Plans**" means the plans and specifications attached to the Certificate of Construction Schedule and Plans dated on or near the date hereof, executed by Borrower, and agreed to by Lender and Agent, and all modifications thereof and additions thereto that are included as part of the Plans as the same shall be approved by Agent in the exercise of its reasonable discretion in accordance with the terms of this Agreement.

"**Potential Default**" means any condition or event which with the giving of notice or lapse of time or both would, unless cured or waived, become a Default.

"**Prime Rate**" means a rate set by *The Wall Street Journal* as the "US Prime Rate Lending Rate" based upon various factors including Lender's costs and desired return, general economic conditions and other factors, and is used as a reference point for pricing some loans, which may be priced at, above, or below such announced rate. Any change in such Prime Rate announced by *The Wall Street Journal* shall take effect at the opening of business on the day specified in the public announcement of such change.

"**Principal Debt**" means the aggregate unpaid principal balance of this Loan at the time in question.

"**Prohibited Person**" means any Person:

(a)    listed in the annex to, or who is otherwise subject to the provisions of, Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001, and relating to Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism (the "**Executive Order**");

(b)    that is owned or controlled by, or acting for or on behalf of, any person or entity that is listed in the annex to, or is otherwise subject to the provisions of, the Executive Order;

(c)    with whom a Person is prohibited from dealing or otherwise engaging in any transaction by any terrorism or money laundering law, including the Executive Order;

(d)     who commits, threatens or conspires to commit or supports "terrorism" as defined in the Executive Order;

(e)     that is named as a "specially designated national and blocked person" on the most current list published by the U.S. Treasury Department Office of Foreign Assets Control at its official website or at any replacement website or other replacement official publication of such list; or

(f)     who is an Affiliate of a Person listed in clauses (a) through (e) above.

"**Project**" means the construction of the Improvements, and if applicable, the leasing and operation of the Improvements.

"**Property**" means the Land, the Improvements, all personal property owned by Borrower and encumbered by the Security Instrument and all other property constituting the "**Property**" as described and defined in the Security Instrument, or subject to a right, lien or security interest to secure the Loan pursuant to any other Loan Document, together with all rights pertaining to such Land, Improvements and property.

"**Property Taxes**" shall mean all real estate and personal property taxes, assessments (excluding income taxes), and water rates or sewer rents (to the extent billed with real estate taxes) now or hereafter levied or assessed or imposed against the Property or part thereof, together with all interest and penalties thereon.

"**Recipient**" means Agent or Lender, as applicable.

"**Register**" has the meaning set forth in Section 7.6(c).

"**Related Parties**" means, with respect to any Person, such Person's Affiliates and the partners, directors, officers, employees, agents, trustees, administrators, managers, advisors and representatives of such Person and such Person's Affiliates.

"**Relevant Documents**" has the meaning set forth in Section 7.22.

"**Rents**" shall mean all rents (including additional rents of any kind and percentage rents), rent equivalents, moneys payable as damages (including payments by reason of the rejection of a Lease in a Debtor Relief Action) or in lieu of rent or rent equivalents, royalties (including, without limitation, all oil and gas or other mineral royalties and bonuses), income, receivables, receipts, revenues, deposits (including security, utility and other deposits), accounts, cash, issues, profits, charges for services rendered, and other payments and consideration of whatever form or nature received by or paid to or for the account of or benefit of Borrower or any of its agents or employees from any and all sources arising from or attributable to the Property or any portion thereof, and the Improvements, including charges for oil, gas, water, steam, heat, ventilation, air-conditioning, electricity, license fees, maintenance fees, charges for Property Taxes, operating expenses or other amounts payable to Borrower (or for the account of Borrower), revenues from vending, and all receivables, customer obligations now existing or hereafter arising or created out of the sale, lease, sublease, license, concession or other grant of the right of the use and occupancy of the Property (or any portion thereof) or rendering of services by Borrower, or any of its agents or employees and proceeds, if any, from business interruption or other loss of income insurance.

"**Replacement Note**" has the meaning set forth in Section 7.6(b).

"**Required Completion Date**" means the final day of the Availability Period.

"**Required Equity**" means an amount equal to Twelve Million Six Hundred Fifty-Five Thousand Fifty-One and No/100 Dollars ($12,655,051.00) of unborrowed funds, which Borrower has caused and shall cause to be contributed to or applied in payment of the costs and expenses incurred by Borrower in connection with Borrower's development of the Property.

"**Reserve Account**" means, collectively, the Cash Management Account, the Tax Reserve Fund, the Insurance Reserve Fund, the Interest Reserve Fund and any other sub-accounts established in accordance with this Agreement or the Loan Documents.

"**Reserve Funds**" has the meaning assigned thereto in Section 9.1 of this Agreement.

"**Restoration**" means, following the occurrence of a casualty or a Condemnation which of a type necessitating the repair of the Property (or any portion thereof), the completion of the repair and restoration of the Property (or applicable portion thereof) as nearly as possible to the condition the Property (or applicable portion thereof) was in immediately prior to such casualty or Condemnation, with such alterations as may be reasonably approved by Agent.

"**Retainage**" means (i) with respect to the General Contract, the actual retainage required under the General Contract, or (ii) with respect to any other direct trade contract entered into by Borrower and relating to construction of Improvements, either (a) ten percent (10%) of each advance on all subcontractors , (b) ten percent of each advance on work performed by General Contractor (excluding general conditions, Contractor's Fee and insurance premiums upon which Retainage shall be 0%) until Borrower's Architect has certified, and the Construction Inspector has confirmed, on AIA Form G704 or other reasonably customary form, that the work has been substantially completed in accordance with the Plans and Specifications and the terms of the General Contract, at which time all retainage shall be released other than two hundred percent (200%) of the monetized value of the punchlist, or (b) a lesser amount approved by Agent in writing.

"**Sanction(s)**" means any international economic sanction administered or enforced by the United States Government, including OFAC, the United Nations Security Council, the European Union, Her Majesty's Treasury or other relevant sanctions authority.

"**Schedule of Lenders**" means the schedule of lenders party to this Agreement as set forth on Exhibit "J", as it may be modified from time to time in accordance with this Agreement.

"**Security Instrument**" means the Mortgage, Assignment of Rents and Leases, Security Agreement and Fixture Filing dated as of the date hereof, from Borrower to the trustee named therein for the benefit of Agent, securing repayment of the Indebtedness and Borrower's performance of its other obligations to Agent and Lender under the Loan Documents, as amended, modified, supplemented, restated and replaced from time to time.

"**Servicer**" has the meaning set forth in Section 7.9.

"**Servicing Agreement**" has the meaning set forth in Section 7.9.

"**Single Purpose Entity**" is an entity that satisfies the requirements set forth on Exhibit "K" attached hereto.

"**Soft Costs**" means interest payable on the principal amount of the Loan, carrying costs for the Project and all other costs in the Budget which constitute costs, excluding Hard Costs, which relate to the

construction of the Improvements, including professional service fees, development and project management costs, permits, impact fees, and other similar fees and expenses.

"<u>Stored Materials</u>" means building materials or furnishings that are not yet incorporated into the Improvements.

"<u>Stored Materials Advance Limit</u>" has the meaning set forth in <u>Section 3.9</u>.

"<u>Subsidiary</u>" of a Person means a corporation, partnership, joint venture, limited liability company or other business entity of which a majority of the shares of securities or other interests having ordinary voting power for the election of directors or other governing body (other than securities or interests having such power only by reason of the happening of a contingency) are at the time beneficially owned, or the management of which is otherwise controlled, directly, or indirectly through one or more intermediaries, or both, by such Person. Unless otherwise specified, all references herein to a "<u>Subsidiary</u>" or to "<u>Subsidiaries</u>" shall refer to a Subsidiary or Subsidiaries of Borrower.

"<u>Survey</u>" means a survey prepared in accordance with <u>Exhibit "F"</u> or as otherwise approved by Agent in its reasonable discretion.

"<u>Tax Reserve Account</u>" has the meaning assigned to such term in the Cash Management Agreement.

"<u>Tax Reserve Fund</u>" has the meaning set forth in <u>Section 9.1</u>.

"<u>Taxes</u>" means all taxes, assessments, fees, levies, imposts, duties, deductions, withholdings, or other charges of any nature whatsoever from time to time or at any time imposed by any Law or Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"<u>Tenant</u>" shall mean the lessee of all or any portion of the Property under a Lease.

"<u>Tenant Direction Notice</u>" has the meaning set forth in <u>Section 8.1</u>.

"<u>Title Company</u>" means First American Title Insurance Company.

"<u>Title Insurance</u>" means the loan policy or policies of title insurance issued to Lender by the Title Company, in an amount equal to the maximum principal amount of the Loan, insuring the validity and priority of the Security Instrument encumbering the Land and Improvements for the benefit of Agent.

"<u>Title Insurance Report</u>" means an update of the Title Insurance in a form and substance satisfactory to Agent.

"<u>Total Budget</u>" has the meaning set forth in <u>Section 1.4</u>.

"<u>Total Costs</u>" has the meaning set forth in <u>Section 1.4</u>.

"<u>Unused Line Fee</u>" has the meaning set forth in <u>Section 2.2</u>.

"<u>Unsatisfactory Work</u>" means any construction work of any portion of the Improvements which Agent and/or the Construction Inspector has determined has not been completed in a good and workmanlike manner, or, to the extent any construction work of any portion of the Improvements is not specifically addressed in the construction drawings and specifications, not completed in a manner consistent with sound design principles and/or sound construction practices, or in substantial conformity with the Plans, or in accordance with all applicable Law.

2.    FINANCIAL STATEMENTS: Borrower shall provide or cause to be provided to Agent all of the following:

(a)    Financial Statements of Borrower: (i) for each fiscal year of such reporting party, within sixty (60) days after the close of each fiscal year, and (ii) for each calendar month, as soon as reasonably practicable and in any event within thirty (30) days after the end of such month.

(b)    Compliance Certificate of Borrower: a duly completed compliance certificate in the form attached hereto as Exhibit "M", together with all calculations and documentation required therein, concurrently with the delivery of the financial statements referred to in clause (a) above.

(c)    Financial Statements of Guarantor: Annual Financial Statements in each instance within sixty (60) days after the end of each calendar year.

(d)    Until the completion of the Improvements, within thirty (30) days of the end of each calendar month, the following, in form and substance reasonably satisfactory to Agent, setting forth in reasonable detail (i) Borrower's total sources of funds and uses thereof during such month (specifically identifying any uses of Contingency Funds permitted to be advanced by Lender), (ii) the amount by which actual costs were greater than or less than costs anticipated in the Budget for the applicable month, (iii) the aggregate amounts paid during such month to General Contractor and/or subcontractors and any unpaid amounts owing to General Contractor and/or subcontractors which are sixty (60) days past their due date, (iv) variations from the Construction Schedule, including, without limitation, the projected Completion Dates, and the reasons therefor, (v) if the amounts payable to General Contractor and/or subcontractors during such month are at variance from the amounts scheduled to be paid pursuant to the applicable Request for Loan Advance, the reasons for such variance, (vi) any liens placed on the Project and their payment status, and (vii) the status of construction generally and of the Government Approvals necessary for the construction and operation of the Project. If the progress or costs of construction of the Project deviate in any material respect from the approved Construction Schedule or Budget, Borrower shall deliver to Agent, together with such monthly reconciliation report, its certification setting forth the actions that Borrower is taking or planning to take in order to cause the progress of such construction work to be completed in accordance with the Construction Schedule and within such Budget. Borrower will furnish, or cause to be furnished, to Agent as soon as available and in any event within thirty (30) days after the end of each calendar month (x) monthly and year-to-date operating statements (including Capital Expenditures and carrying costs) prepared for each calendar month, including a log of Stored Materials in a form acceptable to Agent and such other information as Agent may request and other information necessary and sufficient to fairly represent the financial position and results of operation of the Borrower and Property during such calendar month and containing a comparison of budgeted income and expenses and the actual income and expenses together with a detailed explanation of any variances of five percent (5%) or more between budgeted and actual amounts for such periods, all in form satisfactory to Agent, and (y) until the Completion Date and upon final close-out of the Budget, a monthly cost report for the construction of the Project on a cumulative basis and broken down by Line Item, showing percentage of completion, the original budgeted amount, the current budgeted amount pursuant to an updated Budget approved by Agent, costs incurred to date, projected costs to complete, explanations of any Budget variances, a summary of any approved reallocations, a summary of permitted approved and pending change orders, an explanation of any variances from the Budget and/or Plans and Specifications and an updated Budget and/or Plans and Specifications, as applicable, for which Borrower has requested Agent's approval. All such operating statements referenced in clause (i)(x) above shall be prepared by Borrower.

(e)    Following completion of the Improvements: (i) prior to the beginning of each fiscal year of Borrower, (A) an Annual Budget as described below, (B) rent rolls, and (C) a current leasing status report (including tenants' names, occupied tenant space, lease terms, rents, vacant space and proposed

rents); and (ii) for each month, property operating statements which include all income and expenses in connection therewith, within sixty (60) days after the end of each such quarter, certified in writing as true and correct by a representative of Borrower satisfactory to Agent. Items provided under this Subsection (i) shall be in form and detail satisfactory to Agent.

(f)     From and after the Completion Date, for the partial year period commencing on the date thereof, and for each Fiscal Year thereafter, Borrower shall submit to Agent an Annual Budget not later than sixty (60) days prior to the commencement of such period or Fiscal Year in form reasonably satisfactory to Agent. The Annual Budget shall be subject to Agent's approval (each such Annual Budget, an "**Approved Annual Budget**"), which approval shall not be unreasonably withheld, condition or delayed. In the event that Agent objects to a proposed Annual Budget submitted by Borrower which requires the approval of Agent hereunder, Agent shall advise Borrower of such objections within fifteen (15) days after receipt thereof (and deliver to Borrower a reasonably detailed description of such objections) and Borrower shall promptly revise such Annual Budget and resubmit the same to Agent. Agent shall advise Borrower of any objections to such revised Annual Budget within ten (10) days after receipt thereof (and deliver to Borrower a reasonably detailed description of such objections) and Borrower shall promptly revise the same in accordance with the process described in this subsection until Agent approves the Annual Budget. Until such time that Agent approves a proposed Annual Budget that requires the approval of Agent hereunder, the most recently Approved Annual Budget shall apply; provided that, such Approved Annual Budget shall be adjusted to reflect actual increases in Taxes, Insurance Premiums and Other Charges.

(g)     Copies of filed federal income tax returns and any extensions thereof, of Borrower for each taxable year (with all K-1s and other forms and supporting schedules attached if an individual), within thirty (30) days after filing the same.

(h)     From time to time promptly after Agent's reasonable request, such additional information, reports and statements respecting the Property and the Improvements, or the business operations and financial condition of Borrower, as Agent may reasonably request.

Borrower will keep and maintain full and accurate books and records administered in accordance with sound accounting principles, consistently applied, showing in detail the earnings and expenses of the Property and the operation thereof. All Financial Statements shall be in form and detail reasonably satisfactory to Agent and shall contain or be attached to the signed and dated written certification of the reporting party in form specified by Agent to certify that the Financial Statements are furnished to Agent in connection with the extension of credit by Lender and constitute a true and correct statement of the reporting party's financial position. All certifications and signatures on behalf of corporations, partnerships, limited liability companies or other entities shall be by the chief accounting officer, the chief financial officer, or another representative of the reporting party reasonably satisfactory to Agent (an "**Authorized Representative**"). All fiscal year-end Financial Statements of Borrower shall be audited and certified, without any qualification or exception not acceptable to Agent in its reasonable discretion, by an independent certified public accountant reasonably acceptable to Agent. All monthly, quarterly Financial Statements to be provided by Borrower shall include a minimum of a balance sheet, income statement, statement of cash flow and schedule of contingent liabilities and associated footnotes. Borrower shall provide, upon Agent's request, convenient facilities for the audit and verification of any such statement. Additionally, Borrower will provide Agent at Borrower's expense with all evidence that Agent may from time to time reasonably request as to compliance with all provisions of the Loan Documents. Borrower shall promptly notify Agent of any event or condition that could reasonably be expected to have a Material Adverse Effect in the financial condition of Borrower or Guarantor (if known by Borrower), or in the construction progress of the Improvements.

EXHIBIT "C"

RESERVED

FILED: WESTCHESTER COUNTY CLERK 05/01/2021 09:40 AM
INDEX NO. 55883/2021
NYSCEF DOC. NO. 3
RECEIVED NYSCEF: 05/01/2021

21-07096-shl    Doc 71    Filed 07/22/22    Entered 07/22/22 17:18:19    Main Document
Pg 180 of 227

EXHIBIT "C-2"

RESERVED

EXHIBIT "D"

RESERVED

EXHIBIT "E"

ADVANCES

1.      Draw Request. A "Draw Request" means a properly completed and executed written application by Borrower to Agent in the form of Exhibit "E-1" setting forth the amount of Loan proceeds desired, together with the related AIA Documents G-702 and G-703 or such other forms approved by Agent and such schedules, affidavits, releases, waivers, statements, invoices, Accounts Payable Lists, bills, and other documents, certificates and information satisfactory to Agent, to the extent applicable for an Advance for the applicable Aggregate Cost. At least five (5) Business Days before the requested date of each Advance made under the Budget from of the Loan, Borrower shall deliver a Draw Request to Agent. Borrower shall be entitled to an Advance only in an amount approved by Agent in accordance with the terms of this Agreement and the Loan Documents. Lender shall not be required to make Advances more frequently than once each calendar month. Lender shall, only upon the satisfaction, as determined by Agent in its sole but good faith discretion, of all applicable conditions of this Agreement and the Loan Documents, be required to make the requested Advance to Borrower on a Funding Date which is a Business Day within five (5) Business Days after such satisfaction. Each Draw Request, and Borrower's acceptance of any Advance, shall be deemed to ratify and confirm, as of the date of the Draw Request and the Advance, respectively, that, except as specified in the Draw Request, (a) all representations and warranties in the Loan Documents remain true and correct, and all covenants and agreements in the Loan Documents remain satisfied, (b) there is no uncured Potential Default or Default existing under the Loan Documents, (c) all conditions to the Advance, whether or not evidence thereof is required by Agent or Lender, are satisfied, (d) the AIA Document G-702 and G-703 forms executed by each contractor and approved by Borrower's architect, together with all schedules, affidavits, releases, lien waivers, statements, invoices, Accounts Payable Lists, bills, and other documents, certificates and information submitted for the Draw Request are complete and correct, and in all respects what they purport and appear to be for the amount and period applicable to the Draw Request, (e) all Advances previously made to Borrower were disbursed, and the proceeds of the Advance requested in the Draw Request will immediately be disbursed, for payments of the costs and expenses specified in the Budget for which the Advances were made, and for no other purpose, (f) after the Advance, all obligations for work and other costs heretofore incurred by Borrower in connection with the Project and which are due and payable will be fully paid and satisfied, and (g) any unadvanced portion of the Loan to which Borrower is entitled, plus the portions of the Aggregate Cost that are to be

paid by Borrower from other funds that, to Agent's satisfaction, are available, set aside and committed, is or will be sufficient to pay the actual unpaid Aggregate Cost.

2.      Advances. Borrower shall use and apply all Advances made to Borrower for payment of the costs and expenses specified in the Budget for which the Advance were made, and for no other purpose. Following receipt and approval of a Draw Request, all supporting documentation and information required by Agent, and receipt and approval of a Construction Inspector Report (which shall include Construction Inspector's review and, if applicable, approval of such Draw Request) and Title Insurance Report satisfactory to Agent, Agent will determine the amount of the Advance in accordance with this Agreement, the Loan Documents, the Budget and, if and to the extent required by Agent, to Agent's satisfaction, the following standards:

(a)     For construction work, a portion of each Advance shall be retained by Lender until Borrower's Architect has certified, and the Construction Inspector has confirmed, on AIA Form G704 or other appropriate form, that the relevant Improvements have been substantially completed in accordance with the Plans and Specifications. The Retainage portion of each advance for labor, services and/or material (i) shall be the amount prescribed by the Construction Agreement or such lesser amount as may be approved in writing by Agent, and (ii) will be disbursed following timely completion of the applicable Improvements in accordance with the Plans and Specifications unless Agent and agrees to disbursements at an earlier stage.

(b)     No Advances will be made for Stored Materials unless (i) Borrower has good title to the Stored Materials and the Stored Materials are components in a form ready for incorporation into the Improvements a, (ii) the Stored Materials are in Borrower's possession and satisfactorily stored on the Land or such materials are satisfactorily stored at such other site as Agent may reasonably approve, (iii) the Stored Materials are protected and insured against theft and damage in a manner and amount satisfactory to Agent, (iv) the Stored Materials have been paid for in full or will be paid for with the funds to be Advanced and all lien rights and claims of the supplier have been released or will be released upon payment with the Advanced funds, and (v) Agent has or will have upon payment with the Advanced funds a perfected, first priority security interest in the Stored Materials. Notwithstanding the foregoing, the aggregate amount of Advances for Stored Materials that have not yet been incorporated into the Improvements shall not exceed the Stored Materials Advance Limit.

3.      Conditions to All Advances. As conditions precedent to each Advance made pursuant to a Draw Request, in addition to all other requirements contained in this Agreement, if and to the extent required by Agent:

(a)     With respect to the Initial Advance, in addition to all items set forth in clause (b) below, Agent shall have received and approved the following:

(i)      True, correct and complete copy of the General Contract, in form and substance satisfactory to Agent and a duly executed, acknowledged and delivered original consent and agreement from General Contractor in form and substance satisfactory to Agent.

(ii)     True, correct and complete copy of the agreement with Borrower's Architect, in form and substance satisfactory to Agent and a duly executed, acknowledged and delivered original consent and agreement from Borrower's Architect in form and substance satisfactory to Agent.

(iii)    Evidence satisfactory to Agent that upon the funding of the Initial Advance, there shall remain Initial Equity invested in the Property in an amount not less than Twelve Million Six Hundred Fifty-Five and Fifty-One and No/100 Dollars ($12,655,051.00).

        (iv)     Evidence satisfactory to Agent that the Loan-to-Cost Ratio shall not exceed sixty-five percent (65%).

        (b)     The Availability Period shall not have ended, and Agent shall have received and approved the following:

        (i)     Evidence satisfactory to Agent of the continued satisfaction, as of the date of the proposed Advance, of all conditions to the recording of the Security Instrument, as set forth in the Budget.

        (ii)     A Draw Request.

        (iii)     Evidence satisfactory to Agent that no Default or Potential Default exists under the Loan Documents.

        (iv)     Evidence satisfactory to Agent that the representations and warranties made in the Loan Documents are true and correct on and as of the date of each Advance and no event shall have occurred or condition or circumstance shall exist which, if known to Borrower, would render any such representation or warranty incorrect or misleading.

        (v)     Evidence satisfactory to Agent that each subcontract or other contract for labor, materials, services and/or other work included in a Draw Request has been duly executed and delivered by all parties thereto and is effective, and a true and complete copy of a fully executed copy of each such subcontract or other contract as Agent may have requested, together with performance and payment bonds securing such contracts and subcontracts, to the extent required by Agent, in form and substance satisfactory to Agent.

        (vi)     Evidence satisfactory to Agent that no mechanic's, materialman's or other similar lien or other encumbrance has been filed and remains in effect against the Property, no stop notices have been served on Agent or Lender that have not been bonded by Borrower in a manner and amount satisfactory to Agent, and releases or waivers of mechanic's liens and receipted bills showing payment of all amounts due to all parties who have furnished materials or services or performed labor of any kind in connection with the Property.

        (vii)     Evidence satisfactory to Agent that the Title Insurance has been endorsed and brought to date in a manner satisfactory to Agent to increase the coverage by the amount of each Advance through the date of each such Advance with no additional title change or exception not approved by Agent.

        (viii)     Certification by Construction Inspector, and if required by Agent, by Borrower's architect, that to the best of such party's knowledge, information, and belief, construction is in accordance with the Plans and Construction Schedule, the quality of the work for which the Advance is requested is in accordance with the applicable contract, the amount of the Advance requested represents work in place based on on-site observations and the data comprising the Draw Request, the work has progressed in accordance with the construction contract and schedule, and the applicable contractor is entitled to payment of the amount certified. Such certification may be provided in whole or in part on AIA Form G702.

        (ix)     Evidence satisfactory to Agent that as of the date of making such Advance, no event shall have occurred, nor shall any condition exist, that could have a Material Adverse Effect.

FILED: WESTCHESTER COUNTY CLERK 05/01/2021 09:40 AM
NYSCEF DOC. NO. 3
21-07096-shl    Doc 71    Filed 07/22/22    Entered 07/22/22 17:18:19    Main Document
INDEX NO. 55883/2021
RECEIVED NYSCEF: 05/01/2021
Pg 183 of 227

(x)     With respect to any Advance other than the Initial Advance, Borrower shall have deposited with Agent an amount equal to the product of (x) Borrower's Share and (y) the aggregate amount contemplated to be disbursed in connection with such Draw Request.

(xi)     Evidence satisfactory to Agent that the Improvements shall not have been damaged and not repaired and shall not be the subject of any pending or threatened condemnation or adverse zoning proceeding.

(xii)     Evidence satisfactory to Agent that Borrower has paid all amounts then required to be paid by Borrower under the Budget.

(xiii)     Borrower's Deposit if required by Section 1.5 of this Agreement.

(xiv)     With respect to any Advance to pay a contractor, original applications for payments in form approved by Agent, containing a breakdown by trade and/or other categories acceptable to Agent, executed and certified by each contractor and Borrower's architect, accompanied by invoices for all payments in excess of $10,000, and approved by Construction Inspector.

(xv)     Copies of notarized partial lien waiver forms executed by each contractor and each appropriate subcontractor, supplier and materialman, including such partial lien waivers from all parties sending statutory notices to contractors, notices to owners, or notices of nonpayment, specifying in such partial lien waivers the amount paid in consideration of such partial releases as may be required by Agent. Lien waivers shall include a conditional waiver, with an amount stated, as to the current amount to be paid with the Advance, and an unconditional waiver, with a cumulative amount stated for all prior Advances. Unless otherwise required by the Title Company, partial lien waivers shall not be required for payments of $10,000 or less.

(xvi)     Accounts Payable List for any soft costs.

(xvii)     Evidence that the Loan-to-Value Ratio, taking into account any proposed Advance, would not exceed 65%.

(xviii)     Such other information, documents and supplemental legal opinions as may be required by Agent.

4.     Final Advance for Improvements. If and to the extent required by Agent, to Agent's satisfaction, the final Advance for the Improvements (including retainage) shall not be made until thirty (30) days after the later of (i) the date on which the Improvements have been "completed" as defined by applicable state Law, and (ii) if required by Agent, the date on which an affidavit of completion has been recorded. In the case of each such Draw Request, if and to the extent required by Agent, Agent shall have received the following as additional conditions precedent to the requested Advance:

(a)     Certificates from Borrower's Architect, General Contractor and any other Design Professional required by Agent and if required by Agent, from the Construction Inspector, certifying that the Improvements (including any off-site improvements) have been completed in accordance with, and as completed comply with, the Plans and all Laws and governmental requirements; and Agent shall have received two (2) sets of detailed "as-built" Plans approved in writing by Borrower, Borrower's Architect, General Contractor and any each Design Professional.

(b)    Final affidavits (in a form approved by Agent) from Borrower's Architect, General Contractor and each Design Professional required by Agent certifying that each of them and each of their subcontractors, laborers and materialmen has been paid in full for all labor and materials for construction of the Improvements; and final lien releases or waivers (in a form approved by Agent) by Borrower's Architect, General Contractor, each Material Contractor and each Design Professional, and all subcontractors, materialmen, and other parties who have supplied labor, materials or services for the construction and/or design of the Improvements, or who otherwise might be entitled to claim a contractual, statutory or constitutional lien against the Property.

(c)    The Title Insurance shall be endorsed to remove any exception for mechanics', materialmen's or similar liens or pending disbursements, with no additional title change or exception objectionable to Agent, and with such other endorsements required by Agent.

(d)    Evidence satisfactory to Agent that all Laws and governmental requirements have been satisfied, including receipt by Borrower of all necessary Governmental Approvals (including certificates of occupancy) with respect to the completion, use, occupancy and operation of the Improvements, together with evidence satisfactory to Agent that all such licenses, certificates and permits are in full force and effect and have not been revoked, canceled or modified.

(e)    Three (3) copies of a final as-built survey satisfactory to Agent and, to the extent required by Agent, complying with Exhibit "F".

(f)    If applicable, an estoppel certificate as Agent may reasonably require, in form and content satisfactory to Agent from each tenant, subtenant and guarantor required by Agent, and written confirmation by each tenant having the right to do so that such tenant has approved the completed Improvements.

5.    Direct Advances. Borrower hereby irrevocably authorizes Lender (but Lender shall have no obligation) to (a) advance Loan funds directly to pay interest due on the Loan, and (b) advance or authorize disbursement of, and directly apply the proceeds of any Advance, to the satisfaction of any of Borrower's obligations under any of the Loan Documents, even though Borrower did not include that amount in a Draw Request and/or no Default exists. Each such direct advance (except for application of a Borrower's Deposit) shall be added to the outstanding principal balance of the Loan and shall be secured by the Loan Documents. Unless Borrower pays such interest from other resources, Lender may advance Loan funds pursuant to this Section 5 for interest payments as and when due. Nothing contained in this Agreement shall be construed to permit Borrower to defer payment of interest on the Loan beyond the date(s) due. The allocation of Loan funds in the Budget for interest shall not affect Borrower's absolute obligation to pay the same in accordance with the Loan Documents. Agent may hold, use, disburse and apply the Loan and Borrower's Deposit for payment of any obligation of Borrower under the Loan Documents. Borrower hereby assigns and pledges the proceeds of the Loan and any Borrower's Deposit to Agent for itself and for the benefit of Lender for such purposes. Agent and/or Lender may advance and incur such expenses as Agent and/or Lender deems necessary for the completion of the Improvements and to preserve the Property, and any other security for the Loan, and such expenses, even though in excess of the amount of the Loan, shall be secured by the Loan Documents and shall be payable on demand. Agent and Lender may disburse any portion of any Advance at any time, and from time to time, to Persons other than Borrower for the purposes specified in this Section 5 and the amount of Advances to which Borrower shall thereafter be entitled shall be correspondingly reduced.

6.    Conditions and Waivers. All conditions precedent to the obligation of Lender to make any Advance are imposed hereby solely for the benefit of Agent and Lender, and no other party may require satisfaction of any such condition precedent or be entitled to assume that Lender will refuse to make any

Advance in the absence of strict compliance with such conditions precedent. Lender shall have the right to approve and verify the periodic progress, costs incurred by Borrower, and the estimated costs remaining to be incurred, after consultation with the Construction Inspector. No Advance shall constitute an approval or acceptance by Agent or Lender of any construction work, or a waiver of any condition precedent to any further Advance, or preclude Agent or Lender from thereafter declaring the failure of Borrower to satisfy such condition precedent to be a Default. No waiver by Agent or Lender of any condition precedent or obligation shall preclude Agent or Lender from requiring such condition or obligation to be met prior to making any other Advance or from thereafter declaring the failure to satisfy such condition or obligation to be a Default.

7.    _Funding through Title Company_. Lender or Agent may require that any Advance made hereunder be made by Title Company pursuant to a separate escrow agreement to be entered into with Title Company. Borrower acknowledges that Lender, Agent or Title Company may condition the payment of any such Advance upon paying the invoice or statement of any contractor or subcontractor for the Project directly.

FILED: WESTCHESTER COUNTY CLERK 05/01/2021 09:40 AM
NYSCEF DOC. NO. 3
INDEX NO. 55883/2021
RECEIVED NYSCEF: 05/01/2021

21-07096-shl    Doc 71    Filed 07/22/22    Entered 07/22/22 17:18:19    Main Document
Pg 186 of 227

EXHIBIT "E-1"

DRAW REQUEST

[attached]

FILED: WESTCHESTER COUNTY CLERK 05/01/2021 09:40 AM
NYSCEF DOC. NO. 3
INDEX NO. 55883/2021
RECEIVED NYSCEF: 05/01/2021
21-07096-shl    Doc 71    Filed 07/22/22    Entered 07/22/22 17:18:19    Main Document
Pg 187 of 227

Sworn Owner's Statement
White Plains Healthcare LLC 1
Draw #1
Date:

The affiants, William A. Nicholson, being first duly sworn, on oath deposes and say that he is a Manager of White Plains Mezzanine, LLC which is the sole member of White Plains Healthcare Properties I, LLC (for which he is a Manager), of the above described property in White Plains, NY, to wit:

1. That he is thoroughly familiar with all the facts and circumstances concerning the property described above;
2. That with respect to improvements on the premises the only invoices received for work done or materials furnished to date are as listed below;
3. That the only contracts as modified by approved change orders let to date for the furnishing of future work or materials relative to the contemplated improvements are listed below; and
4. That this statement is true and complete statement of all such original contracts and approved change orders thereto and costs, previous payments and balances due if any, except for pending change orders or claims, and retainages.

| DESCRIPTION | PROJECT BUDGET | | | | DRAW REQUESTS | | | REMAINING BALANCE |
|---|---|---|---|---|---|---|---|---|
| | Original | Prior Rev | Current Rev | REVISED | PREVIOUS | CURRENT | TOTAL | |
| **PRELIMINARY EXPENSE** | | | | | | | | |
| Hard Costs | | | | | | | | |
| CM Contingency | | | | | | | | |
| Preconstruction Expense | | | | | | | | |
| FF&E | | | | | | | | |
| Kitchen Equipment | | | | | | | | |
| Subguard Insurance | | | | | | | | |
| CGL Ins | | | | | | | | |
| Builder's Risk Insurance | | | | | | | | |
| **Total PRELIMINARY EXPENSE** | $    - | $    - | $    - | $    - | $    - | $    - | $    - | $    - |

| LAND ACQUISITION | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Acquisition - Land | | | | | | | | |
| | | | | $    - | | | $    - | $    - |
| **Total LAND COSTS** | $    - | $    - | $    - | $    - | $    - | $    - | $    - | $    - |

| DESIGN AND CONSTRUCTION COSTS | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Beds Taylor | | | | | | | | |
| Beds HH & Bethel | | | | | | | | |
| Arch. & Eng. - Plans | | | | | | | | |
| Arch. & Eng. - CA | | | | | | | | |
| Enclosure Consultant | | | | | | | | |
| Civil & Landscape | | | | | | | | |
| Geotech | | | | | | | | |
| Borings & Soils | | | | | | | | |
| LEED Consultant | | | | | | | | |
| Printing, Reproductions | | | | | | | | |
| Materials Testing | | | | | | | | |
| Surveys: As Built | | | | | | | | |
| Surveys: Initial | | | | | | | | |
| Building Permits | | | | | | | | |
| Appraisals | | | | | | | | |
| Market Studies | | | | | | | | |
| **Total DESIGN & CONSTRUCTION COSTS** | | | | | | | | |

Z:\White Plains - Westchester\Application for Payment\Owner Draw Requests\2017-08-02 - 3 - Sworn Owner's Statement - WP

FILED: WESTCHESTER COUNTY CLERK 05/01/2021 09:40 AM

INDEX NO. 55883/2021

NYSCEF DOC. NO. 3

21-07096-shl   Doc 71   Filed 07/22/22   Entered 07/22/22 17:18:19   Main Document

RECEIVED NYSCEF: 05/01/2021

Pg 188 of 227

| GENERAL & ADMINISTRATIVE | | | | | | | |
|---|---|---|---|---|---|---|---|
| NYDOH FEE | | | | | | | |
| RE Maint. UTIL. Misc. Precon | | | | | | | |
| Utility Co. Backcharges | | | | | | | |
| Plan Reviews AHJ | | | | | | | |
| Legal: Zoning | | | | | | | |
| Title Ins. | | | | | | | |
| Owner GL Insurance | | | | | | | |
| Clos'g Misc. (UCC Insurance Premium) | | | | | | | |
| Clos'g, Filing, Record'g | | | | | | | |
| RE Taxes Precon & Const. | | | | | | | |
| Legal: Transaction | | | | | | | |
| Legal: Lender | | | | | | | |
| Organizational | | | | | | | |
| CON Consultant | | | | | | | |
| Accounting | | | | | | | |
| Traffic studies | | | | | | | |
| Inspection Fee | | | | | | | |
| Total GENERAL & ADMINISTRATIVE | | | | | | | |

| MARKETING & LEASING | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Total MARKETING & LEASING | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |

| FINANCING COSTS | | | | | | | |
|---|---|---|---|---|---|---|---|
| Mezzanine Interest Reserve | | | | | | | |
| Senior Interest Reserve | | | | | | | |
| Legacy Broker Fee | | | | | | | |
| Developer Fee | | | | | | | |
| O'Malley Brokerage Fee - Senior | | | | | | | |
| O'Malley Brokerage Fee - Mezz | | | | | | | |
| BAC Placement Fee | | | | | | | |
| Greystone Fee | | | | | | | |
| Origination Fee - SBL | | | | | | | |
| Origination Fee - BAC | | | | | | | |
| Total FINANCING COSTS | | | | | | | |

| PROJECT CONTINGENCY | | | | | | | |
|---|---|---|---|---|---|---|---|
| Contingency - Changes | | | | | | | |
| Contingency: Soft | | | | | | | |
| Total PROJECT CONTINGENCY | | | | | | | |

| TOTAL PROJECT COSTS | | | | | | | |
|---|---|---|---|---|---|---|---|

Z:\White Plains - Westchester\Application for Payment\Owner Draw Requests\2017-08-02 - 3 - Sworn Owner's Statement - WP

FILED: WESTCHESTER COUNTY CLERK 05/01/2021 09:40 AM
NYSCEF DOC. NO. 3
INDEX NO. 55883/2021
RECEIVED NYSCEF: 05/01/2021

21-07096-shl    Doc 71    Filed 07/22/22    Entered 07/22/22 17:18:19    Main Document
Pg 189 of 227

| SOURCES OF FUNDS | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Owner/Other Equity | | | | | | | | |
| Security Benefit | | | | | | | | |
| | | | | | | | | |
| Lender (Bradford Allen Funding Co) - Mezzanine Loan | | | | | | | | |
| TOTAL PROJECT SOURCES | | | | | | | | |

The undersigned hereby approve the above amounts for payment.


WHITE PLAINS HEALTHCARE PROPERTIES I, LLC

By: _____
      William A. Nicholson, a Manager


WHITE PLAINS MEZZANINE, LLC

By: _____
      William A. Nicholson, a Manager



Subscribed and sworn to before me this _____ day of _____, 201__.


_____
Notary Public

My Commission Expires: _____


Z:\White Plains - Westchester\Application for Payment\Owner Draw Requests\2017-08-02 - 3 - Sworn Owner's Statement - WP

White Plains Healthcare LLC 1
Pre-Draw #1
Date:

| Draw Description | Vendor | Invoice | Partial Y/N | Amount | Sub Total |
|---|---|---|---|---|---|
| **LAND ACQUISITION** | | | | | |
| Acquisition - Land | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| **Land Acquisition Sub Total** | | | | | |

| Draw Description | Vendor | Invoice | Partial Y/N | Amount | Sub Total |
|---|---|---|---|---|---|
| **GENERAL & ADMINISTRATIVE** | | | | | |
| Beds Taylor | | | | | |
| Beds HH & Bethel | | | | | |
| NYDOH FEE | | | | | |
| Plan Reviews AHJ | | | | | |
| Legal: Zoning | | | | | |
| Title Ins. | | | | | |
| Clos'g Misc | | | | | |
| RE Taxes Precon & Const. | | | | | |
| Arch. & Eng.- Plans | | | | | |
| Civil & Landscape | | | | | |
| Geotech, Borings, Soils | | | | | |
| Printing, Reproductions | | | | | |
| Surveys: Initial | | | | | |
| Building Permits | | | | | |
| Appraisals | | | | | |
| Market Studies | | | | | |
| Legal: Transaction | | | | | |
| Organizational | | | | | |
| CON Consultant | | | | | |
| **General & Administrative Sub Total** | | | | | |

| Draw Description | Vendor | Invoice | Partial Y/N | Amount | Sub Total |
|---|---|---|---|---|---|
| **FINANCING COSTS** | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| **Financing Costs Sub Total** | | | | | $    - |

| TOTAL DRAW REQUEST | | | | | $ |
|---|---|---|---|---|---|
| From Owner Equity/Other Sources | | | | | |
| | | | | | |

FILED: WESTCHESTER COUNTY CLERK 05/01/2021 09:40 AM
NYSCEF DOC. NO. 3
INDEX NO. 55883/2021
RECEIVED NYSCEF: 05/01/2021
21-07096-shl    Doc 71    Filed 07/22/22    Entered 07/22/22 17:18:19    Main Document
Pg 191 of 227

White Plains Healthcare LLC 1
Draw #1
Date:

| Draw Description | Vendor | Invoice | Partial Y/N | Amount | Sub Total |
|---|---|---|---|---|---|
| **PRELIMINARY EXPENSE** | | | | | |
| Preconstruction Expense | | | | | |
| RE Maint, UTIL, Misc: Precon | | | | | |
| **Preliminary Expense Sub Total** | | | | | |
| | | | | | |
| **LAND ACQUISITION** | | | | | |
| | | | | | |
| **Land Acquisition Sub Total** | | | | | |
| | | | | | |
| **DESIGN AND CONSTRUCTION COSTS** | | | | | |
| Arch. & Eng - Plans | | | | | |
| Civil & Landscape | | | | | |
| Geotech, Borings, Soils | | | | | |
| Printing, Reproductions | | | | | |
| **Design and Construction Sub Total** | | | | | |
| | | | | | |
| **GENERAL & ADMINISTRATIVE** | | | | | |
| Subguard Insurance | | | | | |
| Utility Co. Backcharges | | | | | |
| CGL Ins | | | | | |
| Builder's Risk Insurance | | | | | |
| Plan Reviews AHJ | | | | | |
| Title Ins. | | | | | |
| Clos'g Misc | | | | | |
| Clos'g, Filing, Record'g | | | | | |
| Surveys: Initial | | | | | |
| Legal: Transaction | | | | | |
| Legal: Lender | | | | | |
| Organizational | | | | | |
| CON Consultant | | | | | |
| **General & Administrative Sub Total** | | | | | |
| | | | | | |
| **FINANCING COSTS** | | | | | |
| Mezzanine Interest Reserve | | | | | |
| Senior Interest Reserve | | | | | |
| Legacy Broker Fee | | | | | |
| Developer Fee | | | | | |
| O'Malley Brokerage Fee - Senior | | | | | |
| O'Malley Brokerage Fee - Mezz | | | | | |
| BAC Placement Fee | | | | | |
| Origination Fee - SBL | | | | | |
| Origination Fee - BAC | | | | | |
| **Financing Costs Sub Total** | | | | | |
| | | | | | |
| **TOTAL DRAW REQUEST** | | | | | |
| From Owner Equity/Other Sources | | | | | |
| | | | | | |

EXHIBIT "F"

SURVEY REQUIREMENTS

1.    Requirements. The survey shall be made in accordance with, and meet the requirements of, the certification below by a registered professional engineer or registered professional land surveyor. The description shall be a single metes and bounds perimeter description of the entire land, and a separate metes and bounds description of the perimeter of each constituent tract or parcel out of the land. The total acreage and square footage of the land and each constituent tract or parcel of the land shall be certified. If the land has been recorded on a map or plat as part of an abstract or subdivision, all survey lines must be shown, and all lot and block lines (with distances and bearings) and numbers, must be shown. The date of any revisions subsequent to the initial survey prepared pursuant to these requirements must also be shown.

2.    Certification. The certification for the property description and the map or plat shall be addressed to Agent, Borrower and the Title Company, signed by the surveyor (a registered professional land surveyor or registered professional engineer), bearing current date, registration number, and seal, and shall be in the following form or its substantial equivalent:

To Security Benefit Corporation, as Agent, Security Benefit Life Insurance Company, as Lender, WHITE PLAINS HEALTHCARE PROPERTIES I, LLC, a Massachusetts limited liability company, as Borrower, and First American Title Insurance Company, as Title Company:

This is to certify that this map or plat and the survey on which it is based were made in accordance with the 2016 Minimum Standard Detail Requirements for ALTA/NSPS Land Title Surveys, jointly established and adopted by ALTA and NSPS, and includes Items 1, 2, 3, 4, 6(b), 8, 13, 16, 17, 18, 19, 20 of Table A thereof. The field work was completed on _____.

Date of Plat or Map:_____
(Surveyor's signature, printed name and seal with Registration/License Number)

FILED: WESTCHESTER COUNTY CLERK 05/01/2021 09:40 AM
NYSCEF DOC. NO. 3

21-07096-shl    Doc 71    Filed 07/22/22    Entered 07/22/22 17:18:19    Main Document
                                        Pg 193 of 227

INDEX NO. 55883/2021
RECEIVED NYSCEF: 05/01/2021

EXHIBIT "G"

RESERVED

EXHIBIT "H"

LEASING AND TENANT MATTERS

Borrower, Security Benefit Corporation, as Agent, and Lender agree as follows:

1.     Approved Leases. Borrower shall not enter into any tenant lease in the Improvements unless approved by Agent prior to execution. Any tenant lease shall be expressly subordinate to the Security Instrument. Borrower shall provide to Agent, a correct and complete copy of each tenant lease. Borrower shall, throughout the term of this Agreement, pay all reasonable costs incurred by Agent, in connection with Agent's review and approval of tenant leases and each guaranty thereof (if any), and also in connection with Agent's negotiation of subordination agreements and subordination, nondisturbance and attornment agreements with tenants, including reasonable attorneys' fees and costs.

2.     Delivery of Leasing Information and Documents. If any Leases have been entered into, from time to time upon Agent's request, Borrower shall promptly deliver to Agent (a) complete executed originals of each tenant lease, including any exhibits thereto and each guaranty thereof (if any), (b) a complete rent roll of the Property in such detail as Agent may require, together with such operating statements and leasing schedules and reports as Agent may require, (c) any and all financial statements of the tenants, subtenants and lease guarantors (if any) to the extent available to Borrower, (d) such other information regarding tenants and prospective tenants and other leasing information as Agent may request, and (e) such estoppel certificates and subordination agreements and/or subordination, nondisturbance and attornment agreements executed by such tenants, subtenants and guarantors, if any, in such forms as Agent may require.

3.     Compliance and Default. As additional conditions to Agent's and Lender's obligations under this Agreement, all tenants having the right to do so must approve all Plans and all changes thereto, the construction of the Improvements, and all other aspects of the Project requiring tenants' approval. A default by Borrower under or any failure by Borrower to satisfy any of the conditions of a lease shall constitute a Default under this Agreement. Borrower shall promptly notify Agent in writing of any failure by any party to perform any material obligation under any lease, any event or condition which would permit a tenant to terminate or cancel a lease, or any notice given by a tenant with respect to the foregoing, specifying in each case the action Borrower has taken or will take with respect thereto.

FILED: WESTCHESTER COUNTY CLERK 05/01/2021 09:40 AM
NYSCEF DOC. NO. 3

INDEX NO. 55883/2021

RECEIVED NYSCEF: 05/01/2021

21-07096-shl   Doc 71   Filed 07/22/22   Entered 07/22/22 17:18:19   Main Document
Pg 195 of 227

EXHIBIT "I"

SUBCONTRACTOR DEFAULT INSURANCE

[attached]

# Coverage



*Subcontractor Default Insurance* provides broad, consistent coverage to secure your project



- Insures the risk of economic loss associated with non-performance of subcontractors and suppliers on the project
  - An estimated 80-90% of project values

- Coverage is provided by a *single* insurance carrier with a *single* set of terms
  - Providing certainty around what is and is not covered
  - No inconsistencies of having multiple bonding companies providing performance bonds for various subs

- Subcontractor Default Insurance is the broadest form in the industry, providing many coverage extensions not available anywhere else

© 2015, XL Catlin companies. All rights reserved. | *MAKE YOUR WORLD GO*

6

- I-2 -

FILED: WESTCHESTER COUNTY CLERK 05/01/2021 09:40 AM
INDEX NO. 55883/2021
NYSCEF DOC. NO. 3
RECEIVED NYSCEF: 05/01/2021
21-07096-shl    Doc 71    Filed 07/22/22    Entered 07/22/22 17:18:19    Main Document
Pg 197 of 227

# Summary



- Subcontractor Default Insurance:

  - Is a cost effective means to secure subcontractor performance risk

  - Covers the major costs associated with subcontractor default

  - Has a proven track record

  - Covers your project through statute period

  - Allows your GC to respond quickly to any subcontractor performance issues

  - Helps keep your job on time and on budget

  - *Makes your project go*





© 2015, XL Catlin companies. All rights reserved. | *MAKE YOUR WORLD GO*

10

Benefits of Subcontractor Default Insurance (SDI)

- Control. CM has control of subcontractor prequalification and of the default process and remedy.
- Ability of the CM to address a default immediately without interference from an insurance company or surety
- Eliminates project delays associated with subcontractor default
- Most sub bond forms allow 21 days before the surety must meet with the CM
- Ability of the CM to be more proactive in subcontractor management which reduces the likelihood of actually having to default a subcontractor
- Ability of the CM to address a default in the best interest of the Project as opposed to subcontractor's surety
- 100% of subcontractors are covered on SDI projects vs bonding all subcontractors over a certain dollar limit.
- Coverage is provided for extended warranties up to 10 years after the completion of the work or applicable statute of limitations/ repose.
- Coverage for indirect and internal costs not paid by a surety (i.e., delay of other subs, expert consultant's)
- Larger pool of bidders - Coverage for subs that otherwise find it difficult to secure a bond.
- Limit of each default is $30m. Not limited to the penal sum of the bond. Average bond claim is 2.5 X's value of original subcontract
- Most project owners/ lenders opt not to have the CM provide performance & payment bonds as 100% of the subcontractors are covered.
- Owner can be afforded same subcontractor default protection as the CM contractually via a "Financial Interest Endorsement"

EXHIBIT "J"

SCHEDULE OF LENDERS

SECURITY BENEFIT LIFE INSURANCE COMPANY, as Lender          Percent of Loan 100%
1 SW Security Benefit Place
Topeka, Kansas 66636
Telephone:
Facsimile:
E-mail Address:

Notices:

Security Benefit Life Insurance Company
1 SW Security Benefit PL
Topeka, Kansas 66636
Telephone:
Facsimile:
E-mail Address:

Payment Instructions:

ABA #
[Bank Name]
Account #
Account Name:
FFC:
REF: Security Name, Identifier, or Reason for Wire

EXHIBIT "K"

ORGANIZATIONAL REQUIREMENTS

Borrower shall at all times be a limited liability company, duly organized in the Commonwealth of Massachusetts, which at all times has complied with and shall at all times comply with the following requirements (the "**Single Purpose Entity Requirements**") (in each case, except to the extent set forth in or contemplated by or pursuant to the terms of the Loan Documents):

(a)    is and will be formed solely for the purpose of acquiring, developing, owning, holding, selling, marketing, leasing, transferring, exchanging, financing, managing and operating the Property and transacting lawful business that is incident, necessary and appropriate to accomplish the foregoing, including executing and delivering the Loan Documents to which it is a party and performing its obligations thereunder;

(b)    is not, and will not be engaged in any business unrelated to the acquisition, development, ownership, holding, sale, marketing, leasing, transfer, exchange, financing, management, or operation of the Property;

(c)    does not have and will not have any assets other than those related to the Property;

(d)    will, to the fullest extent permitted by law, not engage in, seek or consent to or permit, (i) any dissolution, winding up, liquidation, consolidation, merger, or sale of all or substantially all of its assets, (ii) any transfer of direct ownership or equity interests in Borrower, or (iii) any amendment of its certificate of limited partnership, articles of incorporation, articles of organization, certificate of formation, by-laws, limited partnership agreement or operating agreement (as applicable) without the written consent of Agent;

(e)    will maintain its intention to remain solvent and has paid and intends to continue to pay its debts and liabilities (including, as applicable, shared personnel and overhead expenses) from its assets as the same have or shall become due, and is currently maintaining and will endeavor to maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations, in each case, to the extent sufficient cash flow exists from the Property;

(f)    will not fail, to correct any known misunderstanding regarding the separate identity of such entity;

(g)    has filed and will file its own tax returns, except to the extent that it has been or has elected or is required to file consolidated tax returns by law;

(h)    will maintain its own records, books, resolutions and agreements;

(i)    will not commingle, its funds or assets with those of any other Person other than as provided in this Agreement;

(j)    will hold its assets in its own name;

- K-1 -

(k)  will maintain its financial statements, accounts, books, records and other entity documents separate from any other Person;

(l)  will pay its own liabilities and expenses, including the salaries of its own employees (if any), out of its own funds and assets, in each instance to the extent of its sufficient cash flow from the Property; provided, however, that the foregoing shall not be interpreted so as to require any capital contributions from any Person to such Person;

(m)  will observe in all material respects all partnership, corporate or limited liability company formalities, as applicable;

(n)  has no and will have no Indebtedness other than (i) the Loan and (ii) such other liabilities that are permitted pursuant to the Loan Documents or imposed by Law;

(o)  will not assume or guarantee or become obligated for, the debts of any other Person and has not held out and will not hold out its credit as being available to satisfy the obligations of any other Person except as expressly permitted pursuant to this Agreement;

(p)  now maintains and uses, and will maintain and use, separate stationery, invoices and checks bearing its name; the stationery, invoices, and checks utilized by it or utilized to collect its funds or pay its expenses have borne and shall bear its own name and have not borne and shall not bear the name of any other entity unless such entity is clearly designated as being its agent;

(q)  will not pledge its assets for the benefit of any other Person, other than to Agent;

(r)  will hold itself out and identify itself, as a separate and distinct entity under its own name;

(s)  will maintain its assets in such a manner that it will not be costly or difficult to segregate, ascertain or identify its individual assets from those of any other Person; and

(t)  will not make loans to any Person.

EXHIBIT "L"

TENANT DIRECTION NOTICE

[____], 2017

HBL SNF, LLC

      Re:     Amended and Restated Operating Lease

Ladies and Gentlemen:

      This letter shall constitute notice to you that the undersigned has granted a security interest in the captioned lease and all rents, additional rent and all other monetary obligations to landlord thereunder (collectively, "Rent") in favor of Security Benefit Corporation ("Agent"), to secure certain of the undersigned's obligations to the Agent. The undersigned hereby irrevocably instructs and authorizes you to continue to deliver all Rent to the following address:

                **[Bank's Address]**
                Account No. _____
                Attention: _____
                ABA# _____

      The instructions set forth herein are irrevocable and are not subject to modification in any manner, except that the Agent, or any successor agent so identified by the Agent, may by written notice to you rescind the instructions contained herein.

Sincerely,

**BORROWER:**

WHITE PLAINS HEALTHCARE PROPERTIES I, LLC,
a Massachusetts limited liability company

By: _____
    William A. Nicholson, a Manager

EXHIBIT "M"

FORM OF COMPLIANCE CERTIFICATE -- BORROWER

[_____], 20[____]

COMPLIANCE CERTIFICATE

Security Benefit Corporation, as Agent
1 SW Security Benefit PL
Topeka, Kansas 66636
Attn:

Re:    **White Plains Healthcare - Compliance Statement**

Ladies and Gentlemen:

This quarterly compliance certificate (this "Certificate") is being delivered pursuant to Section 2(b) of Exhibit "B" of that certain Construction Loan Agreement, dated as of August ___, 2017, by and among the undersigned ("Borrower"), Agent and Security Benefit Life Insurance Company ("Lender") (as the same may have been or may hereafter be amended, modified, supplemented, restated and replaced from time to time, the "Loan Agreement"). All capitalized terms used but not defined in this Certificate shall have the meanings given in the Loan Agreement.

This Certificate is being given for the fiscal quarter ending on _____. Borrower hereby certifies to Agent and Lender as follows:

1.    No Default has occurred and is continuing as of the date of this Certificate, except as set forth below [if blank, there are no exceptions]:

_____
_____
_____

2.    All representations and warranties made by Borrower in the Loan Documents (and any certificate, document or financial or any other statement furnished pursuant to or in connection therewith) remain true and correct in all material respects except for those that may no longer be true as a result of the passage of time or a change in circumstance and are not the result of a Default on and as of the date of this Certificate with the same force and effect as if made on and as of such date.

3.    The Financial Statements delivered to Lender pursuant to Section 2(a) of Exhibit "B" of the Loan Agreement are true, correct and accurate as of the date of such Financial Statements.

Should you require any further documentation or have any questions, please contact _____.

[SIGNATURE PAGE FOLLOWS]

- M-1 -

IN WITNESS WHEREOF, the undersigned has executed this Compliance Certificate as of the date set forth above.

WHITE PLAINS HEALTHCARE PROPERTIES I, LLC,
a Massachusetts limited liability company

By: _____
        William A. Nicholson, a Manager

EXHIBIT "N"

SECTION 22 AFFIDAVIT

[attached]

FILED: WESTCHESTER COUNTY CLERK 05/01/2021 09:40 AM
INDEX NO. 55883/2021
NYSCEF DOC. NO. 3
21-07096-shl    Doc 71    Filed 07/22/22    Entered 07/22/22 17:18:19    Main Document
RECEIVED NYSCEF: 05/01/2021
Pg 206 of 227

## SECTION 22 AFFIDAVIT

COMMONWEALTH OF MASSACHUSETTS )
                                         ) SS.:
COUNTY OF SUFFOLK              )

William A. Nicholson, being duly sworn, deposes and says:

1.     I reside in Ipswich, Massachusetts.  I am a Manager of White Plains Healthcare Properties I, LLC, a Massachusetts limited liability company (the "Borrower").

2.     Reference hereby is made to that certain Construction Loan Agreement (the "Building Loan Agreement"), dated as of July ____, 2017, between Borrower, Security Benefit Life Insurance Company, a Kansas insurance company ("Lender"), and Security Benefit Corporation, a Kansas corporation ("Agent for Lender") in the original amount of $30,293,625 (the "Loan"), which Building Loan Agreement is to be filed in the Office of the Westchester County Clerk simultaneously herewith.

3.     The consideration paid, or to be paid, by the Borrower to the Lender for the Building Loan described in the Building Loan Agreement is $0, and all other expenses constituting cost of the Improvements incurred, or to be incurred, in connection with such Building Loan, and advanced or to be advanced pursuant to the Building Loan Agreement are as follows:

    (a)     Architect's Fees: $225,200
    (b)     Engineer's and Surveyors' Fees and Permits: $46,306
    (c)     Lender Inspections: $32,000
    (d)     Insurance Premiums During Construction: $647,499
    (e)     Demolition Costs:  $0
    (f)     Mortgage Recording Tax and Stamp Tax: $0
    (g)     Building Loan Service Fees: $0
    (h)     Sums paid to take by assignment prior existing mortgages which are consolidated with building loan mortgages and also the interest charges on such mortgages: $0
    (i)     Sums paid to discharge or reduce the indebtedness under mortgages and accrued interest thereon and other prior existing encumbrances: $0
    (j)     Taxes, Assessments, Water Rents and Sewer Rents paid (existing prior to commencement of improvement): $0
    (k)     Examination and insurance of title and recording fees: $0
    (l)     Attorneys' fees of Lender's counsel for preparation of documents, etc.: $0
    (m)     Interest reserve: $0
    (n)     Broker's commissions: $0

TOTAL: $951,006

FILED: WESTCHESTER COUNTY CLERK 05/01/2021 09:40 AM
NYSCEF DOC. NO. 3
21-07096-shl   Doc 71   Filed 07/22/22   Entered 07/22/22 17:18:19   Main Document
Pg 207 of 227
INDEX NO. 55883/2021
RECEIVED NYSCEF: 05/01/2021

4.      The amount, if any, to be advanced from the Building Loan to repay amounts previously advanced to the Borrower pursuant to Draw Requests for costs of the Improvements is: $0.

5.      The amount, if any, to be advanced from the Building Loan to reimburse the Borrower for costs of the Improvements expended by the Borrower after the commencement of the Improvements but prior to the date hereof is:  $0.

6.      The amount to be advanced from the Building Loan for indirect costs of the Improvements which may become due and payable after the date hereof and during the construction of the Improvements (such as bond and insurance premiums, fees of the architects, engineers and surveyors, taxes, assessments and water and sewer rent, ground rent, fees for Lender's counsel, interest on the mortgage(s) which secure the Building Loan Agreement) other than as included in paragraph (3) above is: $0.

7.      The net sum which the Borrower estimates will be available to it from the Building Loan to pay contractors, subcontractors, laborers and materialmen for the Improvements is: $29,342,619.

8.      This affidavit is made pursuant to and in compliance with Section 22 of the Lien Law of the State of New York, as amended by Chapter 859 of Laws of 1930.

9.      The reason this statement is verified by deponent, and not by the Borrower, is that the Borrower is a limited liability company, and deponent is a Manager thereof.

10.     The facts herein stated are true to the knowledge of the deponent.

William A. Nicholson

Sworn to and subscribed before me
on the __28__ day of July, 2017

Notary Public



FILED: WESTCHESTER COUNTY CLERK 05/01/2021 09:40 AM

NYSCEF DOC. NO. 3

INDEX NO. 55883/2021

RECEIVED NYSCEF: 05/01/2021

21-07096-shl   Doc 71   Filed 07/22/22   Entered 07/22/22 17:18:19   Main Document

Pg 208 of 227

EXHIBIT "O"

FORM OF LETTER OF CREDIT AGREEMENT

## Agreement Regarding Letter of Credit

This Agreement Regarding Letter of Credit (the "Agreement") is made as of _____ ___, 20___ by and between WHITE PLAINS HEALTHCARE PROPERTIES I, LLC, a Massachusetts limited liability company ("Borrower") and SECURITY BENEFIT LIFE INSURANCE COMPANY, a Kansas corporation ("Lender").

RECITALS

A.      Borrower is indebted to Lender under a loan (the "Loan") as evidenced by a Construction Loan Agreement (the "Loan Agreement") and a Secured Promissory Note each dated on or about the Effective Date in the original principal amount of $38,500,000.00 (the "Note,").

B.      The Note is secured, in part, by a Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing dated as of the Effective Date granted by Borrower for the benefit of Lender (the "Security Instrument") and encumbering that certain land situated in Westchester County, New York as described therein, together with all buildings and improvements located thereon (such land, buildings, and improvements, being collectively referred to herein as the "Real Property").

C.      Borrower has assigned to Lender as security under the Loan, all of its rights under that certain Amended and Restated Operating Lease dated November 19, 2015 (as may be amended from time to time, the "Lease") between Borrower, as Landlord, and HBL SNF, LLC, as tenant ("Tenant"), together with all guaranties and security therefor.

D.      The Lease requires Tenant to obtain and deliver to Borrower a letter of credit to secure its obligations thereunder.

E.      Borrower and Lender desire to enter into this Agreement to provide for the grant by Borrower to Lender of a security interest in Borrower's rights under the Letter of Credit and the proceeds thereof and to provide for the drawing thereon and the disposition of any amounts drawn thereon.
NOW, THEREFORE, in consideration of the premises, in order to induce Lender to accept the Real Property as security for the Loan and to disburse the proceeds of the Loan, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.      Recitals. The Recitals are incorporated herein by reference.

2.      Letter of Credit. As used herein, the term "Letter of Credit" shall mean that certain irrevocable standby letter of credit no. _____ in the amount of $_____ issued by _____ (the "Issuer") for the benefit of Borrower's, a copy of which is attached hereto as "Exhibit A," and all amendments, extensions, substitutions and replacements thereof. Borrower shall furnish Lender with copies of all notices received from the Issuer promptly following Borrower's receipt thereof. Borrower represents and warrants to Lender that: (a) the Letter of Credit is valid and is in full force and effect; (b) the Letter of Credit has not been drawn upon; and (c) Borrower has not previously transferred or pledged the Letter of Credit or assigned the proceeds thereof to any person or entity. On the date hereof, Borrower has delivered to the Lender:

(a)    the original Letter of Credit; and

(b)    a transfer certificate in the form attached as Exhibit A to the Letter of Credit, executed by the Borrower, with the name of the transferee left blank, to be completed by Lender in accordance with the terms of this Agreement (the "Transfer Certificate").

3.    <u>Security Interest</u>. Borrower hereby pledges to Lender, and grants to Lender a continuing and unconditional first priority security interest (the "Security Interest") in, and the exclusive control over, the Letter of Credit, all of Borrower's rights as beneficiary to present and draw on the Letter of Credit, and all proceeds of the Letter of Credit. The Security Interest is given to assure the timely payment and performance of all of the obligations of Borrower under the Loan Agreement, the Note, the Mortgage, and all other instruments or documents now or hereafter evidencing or securing the Loan (collectively, the "Loan Documents").

4.    <u>Transfer of Letter of Credit</u>. Lender agrees to hold the Transfer Certificate and to not present the Transfer Certificate to the Issuer, until such time as a Default (as hereinafter defined) has occurred. Upon the occurrence of a Default, Lender may, at its option, complete and fill in the name of the transferee, which shall be the name of the Lender, or its successors or assigns at such time, and present the Transfer Certificate to the Issuer. Upon the transfer of the Letter of Credit, the Lender shall have all the rights of the beneficiary of the Letter of Credit, including the right to draw upon the Letter of Credit. If drawn upon by Lender, the proceeds of such Letter of Credit shall be applied by Lender to any amounts then owing from Borrower to Lender under the Loan Documents, and the balance shall be applied as set forth in Section 6 below.

5.    <u>Right to Draw on Letter of Credit Prior to Default</u>. Prior to the occurrence of a Default under this Agreement, the Borrower shall retain the right to draw upon the Letter of Credit, subject to the following terms and conditions:

(a)    Borrower shall immediately notify Lender in writing of any circumstance under which any draw may be made upon the Letter of Credit and the amount of such draw. Such notification shall constitute a representation under the Loan Documents. Borrower may, concurrently with such notification, request that the Letter of Credit be returned to Borrower for the purpose of making such draw.

(b)    Borrower agrees to draw upon the Letter of Credit, upon the request of Lender, either before or after the occurrence of a Default hereunder, under any of the following circumstances: (i) Lender determines in good faith that a default has occurred under the Lease (which has not been cured within the applicable grace period) and either the Letter of Credit expires within twenty (20) days or Lender determines in good faith that the failure to draw upon the Letter of Credit will adversely affect the subsequent right to draw; or (ii) notice has been given that the Letter of Credit will not be renewed, and Tenant has failed to make arrangements, reasonably satisfactory to Lender, for issuance of a substitute Letter of Credit in compliance with the terms of the Lease within twenty (20) days of the stated expiration date of the Letter of Credit. Borrower agrees that if it fails to draw upon the Letter of Credit in accordance with the terms of this paragraph, Lender shall be irreparably harmed and shall have no adequate remedy at law. Borrower agrees that Lender shall have, in addition to all other rights provided by law, the right to specific performance and all other equitable remedies to enforce the provisions set forth in this paragraph and in this Agreement.

FILED: WESTCHESTER COUNTY CLERK 05/01/2021 09:40 AM    INDEX NO. 55883/2021
NYSCEF DOC. NO. 3    21-07096-shl    Doc 71    Filed 07/22/22    Entered 07/22/22 17:18:19    Main Document    RECEIVED NYSCEF: 05/01/2021

Pg 210 of 227

(c)     Upon the Borrower's request to draw upon the Letter of Credit pursuant to subsection (a) above, or upon Lender's request that Borrower draw upon the Letter of Credit pursuant to subsection (b) above, Lender shall deliver the original Letter of Credit to Borrower for the sole purpose of Borrower drawing upon the Letter of Credit. The Borrower shall cause the Issuer to deposit the proceeds of the Letter of Credit into the Cash Management Account (as defined in the Loan Agreement), or, at Lender's written request, if a Default occurs under the Loan, directly to Lender. The proceeds of the Letter of Credit shall be disbursed in accordance with Section 6 below. If only a partial draw is made, the original Letter of Credit shall be returned to Lender after making such draw.

(d)     Upon the earlier to occur of (a) the repayment of the Loan in full or (b) the date that the conditions for release of the Letter of Credit are met by Tenant under the terms of the Lease, the Letter of Credit (if extant) will be returned by Lender to Tenant.

6.     <u>Application of Proceeds of the Letter of Credit</u>. Upon the occurrence of a Default hereunder, the proceeds of the Letter of Credit shall be applied by Lender to reduction of the Principal Debt, and any other sums due under the Loan, in such order and manner as Lender may reasonably determine.

Notwithstanding the foregoing, if the Letter of Credit is drawn upon prior to the occurrence of a Default under this Agreement, the proceeds from such Letter of Credit shall be deposited in the Cash Management Account (the "Proceeds"). Until the occurrence of a Default hereunder, Lender shall periodically disburse the Proceeds for the following purposes:

(a)     If Tenant has defaulted in its payment of Rent under the terms of the Lease, Lender shall, on a monthly basis, on the date that rent is due under the Lease, disburse a portion of the Proceeds to payment of any sums then due under the Loan;

(b)     Lender may in its discretion also disburse to Borrower, upon request of Borrower, Retenanting Expenses relating to the space previously leased by Tenant pursuant to the Lease; and

(c)     Lender may hold any such Proceeds not released pursuant to (a) or (b) above as additional security for the Loan.

Any proceeds of the Letter of Credit held by Lender after all of Borrower's obligations under the Loan Documents have been performed shall be remitted to Borrower.

For purposes of this Agreement the term "Retenanting Expenses" shall mean the following:

(i)     Actual tenant improvement expenses, including cash allowances paid to the tenants, construction costs, engineering and architectural fees, permits and license fees and attorney fees;

(ii)     Leasing commissions paid to third party entities; and

(iii)     Other related expenses approved by Lender in its discretion.

7.     <u>Default</u>. Borrower shall be in default ("Default") hereunder if: (a) a Default occurs under the Loan Agreement, or any of the other Loan Documents; (b) Borrower fails to comply with or perform or observe any agreement, covenant, obligation, or condition to be performed, observed, or complied with by Borrower under this Agreement (including any failure to notify Lender in writing promptly of any act or circumstance which entitles Borrower to draw upon the Letter of Credit) within the applicable time period specified herein (time being of the essence of each and every provision hereof); (c) any of the representations or warranties made by Borrower under this Agreement proves to be misleading or untrue in any material respect. Any Default under this Agreement shall constitute a Default under the Loan Agreement, and any other Loan Documents.

8.      Lender's Costs.  All costs and expenses (including, without limitation, reasonable attorneys' fees) whatsoever incurred by Lender in connection with the enforcement of this Agreement (whether arising before trial, at trial, or on appeal), the protection of this Agreement in any bankruptcy proceeding, or the presentation, drawing upon, or collecting of the Letter of Credit shall be paid by Borrower to Lender upon demand and shall be secured by the Security Instrument, the other Loan Documents, and this Agreement.

9.      Captions.  The section titles or captions contained in this Agreement are for convenience only and shall not be deemed to define, limit or otherwise modify the scope or intent of this Agreement.

10.     Variations in Pronouns.  All the terms and words used in this Agreement, regardless of the number and gender in which they are used, shall be deemed and construed to include any other number, singular or plural, and any other gender, masculine, feminine, or neuter, as the context or sense of this Agreement or any paragraph or clause herein may require, the same as if such word had been fully and properly written in the correct number and gender.

11.     Notices.  In order for any demand, consent, approval or other communication to be effective under the terms of this Agreement, "Notice" must be provided under the terms of this Subsection. All Notices must be in writing.  Notices may be (a) delivered by hand, (b) transmitted by fax (with a duplicate copy sent by first class mail, postage prepaid), (c) sent by certified or registered mail, postage prepaid, return receipt requested, or (d) sent by reputable overnight courier service, delivery charges prepaid.  Notices shall be addressed as set forth below:

If to Lender:

> Security Benefit Life Insurance Company
> 1 SW Security Benefit Pl
> Topeka, Kansas 66636
> Attention: Douglas Schneider
> Telephone: (785) 438-1642
> Fax: (785) 438-3080
> E-mail Address: Douglas.Schneider@securitybenefit.com

With a copy to:

> Nyemaster Goode, P.C.
> 700 Walnut Street, Suite 1600
> Des Moines, Iowa 50309
> Attention:  James C. Wine
> Telephone: 515-283-3188
> Fax: 515-283-8045
> E-mail Address: jwine@nyemaster.com

If to Borrower:

> White Plains Healthcare Properties I, LLC
> West Peabody Executive Center, Suite 200
> 2 Bourbon Street
> Peabody, MA 01960
> Attention: William Nicholson
> Telephone: 978-535-6700
> Fax: 978-535-6701
> E-mail Address: wnicholson@congressconstruction.com

With a copy to:

> Posternak Blankstein & Lund LLP
> Prudential Tower
> 800 Boylston Street
> Boston, MA 02199-8004
> Attn: Jo-Ann M. Marzullo
> Phone: 617.973.6267
> 617.722.4935 fax
> E-Mail: jmarzullo@PBL.COM

Notices delivered by hand or by overnight courier shall be deemed given when actually received or when refused by their intended recipient. Faxed Notices will be deemed delivered when a legible copy has been received (provided receipt has been verified by telephone confirmation or one of the other permitted means of giving Notices under this Subsection). Mailed Notices shall be deemed given on the date of the first attempted delivery (whether or not actually received). Either Lender or Borrower may change its address for Notice by giving at least fifteen (15) Business Days' prior Notice of such change to the other party.

12.   <u>Counterparts</u>.   This Agreement may be executed in multiple counterparts, all of which taken together shall constitute one and the same Agreement and the signature page of any counterpart may be removed therefrom and attached to any other counterpart.

13.   <u>Severability</u>.   In the event that any one or more of the provisions of this Agreement shall for any reason be held to be invalid, illegal or unenforceable, in whole or in part, or in any respect, or in the event that any one or more of the provisions of this Agreement shall operate, or would prospectively operate, to invalidate this Agreement, then, and in any such event, such provision or provisions only shall be deemed to be null and void and of no force or effect and shall not affect any other provision of this Agreement, and the remaining provisions of this Agreement shall remain operative and in full force and effect and shall in no way be affected, prejudiced or disturbed thereby.

14.   <u>WAIVER OF JURY TRIAL</u>.   ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING TO ENFORCE OR DEFEND ANY RIGHTS (i) UNDER THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR (ii) ARISING FROM ANY LENDING RELATIONSHIP EXISTING IN CONNECTION WITH THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT IS HEREBY WAIVED BY BORROWER AND LENDER, AND IT IS AGREED BY BORROWER AND LENDER THAT ANY SUCH ACTION OR PROCEEDING SHALL BE TRIED BEFORE A JUDGE AND NOT BEFORE A JURY. THIS WAIVER OR RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY BORROWER AND BORROWER, AND IS INTENDED TO

ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE.

15.    <u>Governing Law</u>.  This Agreement shall be construed and enforced according to, and governed by, the laws of the State of New York without reference to conflicts of law provisions.

16.    <u>Successors and Assigns</u>.  The terms, covenants, conditions and warranties contained herein and the powers granted hereby shall inure to the benefit of and bind the parties hereto and their respective successors and assigns.

IN WITNESS WHEREOF, Borrower and Lender have caused this Agreement to be duly executed effective as of the day and year first above written.

WHITE PLAINS HEALTHCARE PROPERTIES I, LLC, a Massachusetts limited liability company

By:_____
Name:_____
Title:_____

SECURITY BENEFIT LIFE INSURANCE COMPANY, a Kansas corporation

By:_____
Name:_____
Title:_____

**EXHIBIT "A"**

**Copy of Letter of Credit**

SCHEDULE 4.1

Organizational Chart

> **Construction Loan Borrower**
> WHITE PLAINS HEALTHCARE
> PROPERTIES I, LLC, a Massachusetts
> limited liability company
>
> **Its Managers**
> William A. Nicholson and
> Howard Fensterman
>
> **Its Sole Equity Member**
> White Plains Mezzanine, LLC,
> a Massachusetts limited liability company



> **Mezz Loan Borrower**
> White Plains Mezzanine, LLC, a Massachusetts
> limited liability company
>
> **Its Managers**
> William A. Nicholson and
> Howard Fensterman
>
> **Its Members**
> William A. Nicholson      6.67%
> HOWBOB LLC      13.33%
> CCC Equities I, LLC      80%

# EXHIBIT - 3

DocuSign Envelope ID: B1B7AD25-A75D-4808-A38E-81A0C54A002F

**HBL-SNF, LLC**
**1280 Albany Post Road**
**Croton-on-Hudson, NY 10520**

November 20, 2019

White Plains Healthcare Properties, I, LL
West Peabody Executive Center
2 Bourbon Street
Peabody, MA 01960
Attn: William Nicholson

<div style="margin-left: 2em;">

Re:   **Letter of Intent**
      **Premises: 116-120 Church Street**
      **White Plains, New York**
</div>

Dear Mr. Nicholson

    This Letter of Intent ("LOI") outlines our proposal for White Plains Health Care Properties, I, LLC (the "Contributor") to transfer the premises known as 116-120 Church Street, White Plains New York (the "Premises") to a Delaware Statutory Trust where we would jointly hold the beneficial interests in the Trust on the terms and conditions set forth below. The Building a skilled nursing home facility consisting of one hundred sixty (160) beds (the "Facility") had been constructed pursuant to a Development Agreement dated November 19th, 2015 and for which we had simultaneously entered into that certain operating lease by and between you as Landlord and us as Tenant/Operator, (the "Lease").

1)  **Basic Transaction:** (the "Transaction"):  Contributor shall contribute premises 116-120 Church Street White Plains, New York to a newly formed Delaware Statutory Trust (the "Trust") formed by the parties.  This transaction shall be memorialized by a contribution agreement in substantially the form annexed hereto as Exhibit A.  The Contribution shall be governed by IRC Sec. 721.  The agreed upon cost and fair market basis shall be $67,345,348.00

    a)  Lizer Jozefovic and Mark Neuman  will acquire from the Trust by a Purchase Agreement 77.50 Percent of the Beneficial Interests in the Trust and redemption of a portion of the B Beneficiaries' interest for a purchase price of $52,200,000.00 paid as follows;

        i)  By a down payment (the "Down Payment") not to be held in escrow, but to be made upon the execution and delivery of this LOI of $2,200,000.00 by wire transfer to the account of  White Plains Healthcare Properties I, LLC according to the wire instructions annexed hereto.

        ii)  By the Trust obtaining a new first mortgage of $51,000,000.00 to pay the balance of the Purchase Price and cover closing costs to be used as follows;

NY\243882.1

DocuSign Envelope ID: B1B7AD25-A75D-4808-A38E-81A0C54A002F

(1) To pay the first Mortgage held by Security Benefit Life Insurance in the approximate amount of $39,226,253 plus accrued interest and fees.

(2) To pay the loan encumbering the membership interests of the Contributors by Bradford Allen in the approximate amount of $9,770,963 plus accrued interest and fees;

(3) By the Trust making a non-refundable down payment of $2,200,000.00

(4) To pay the costs of the financing.

b)  Lizer Jozefovic and Mark Neuman shall be the A Beneficiaries of the trust holding a 77.50% Beneficial interest, and the present members of the Contributor or their designees shall be the B Beneficiary with a 22.5% equity position.

c)  The A Beneficiaries shall be the personal guarantors of the new financing in the amount of Fifty-One Million ($51,000,000.00) Dollars. The Transaction is to close thirty (30) days after Buyer has received approval for the Financing set forth in paragraph 1)a) ii)). The Contribution Agreement shall call for a purchase price equal to Transferors cash basis in the property and shall not result in a taxable event for Contributor;

d)  The Financing shall be an obligation of the Trust secured by a first mortgage loan on the Facility and the Premises.

e)  Lizer Jozefovic and Mark Neuman shall act as the Personal Guarantors and shall be obligated if necessary, to secure additional personal guarantors to ensure that none of the B beneficiaries shall have any obligation to guarantee the Financing. Any additional guarantors on the Financing shall also execute and deliver a personal guaranty of Tenant's obligations to Landlord on the Lease. All guaranties on the Lease shall be full unlimited personal guarantees.

f)  The Financing shall bear interest at a constant rate of no more than 7% per annum with Principal and Interest paid on an amortization schedule of 35 years and shall be subject to the reasonable approval of the Contributor, which consent shall not be unreasonably withheld or delivered without cost to the Tenant Borrower.

g)  Formal Contracts: The Parties intend that additional agreements including the Contribution Agreement, Redemption Agreement and Trust Agreement (the Formal Contracts") shall be complete as of November 22nd, 2019, and absent execution of Formal Contracts this LOI shall govern provided the Down Payment is received in good funds by Contributor upon execution of this LOI, and in no event latter than the end of business November 22, 2019. In the event Tenant defaults in the payment of rent on the Lease and such default continues for five (5) days, Contributor shall have the right to terminate this LOI and all Formal Contracts.

h)  Closing: The Closing of the Transaction ("Closing") will occur at the offices of the First Mortgagee Bank's counsel or such other location within the State of New York as may be agreed upon by the Parties thirty (30) days after receipt by the Trust of approval for

DocuSign Envelope ID: B1B7AD25-A75D-4808-A38E-81A0C54A002F

the Financing but no later than April 1st, 2020. If the Tenant has a commitment letter on April 1st, 2020 that is in the process of closing or if the closing is delayed by a title issue, the closing date shall be automatically extended for another Ninety-Days. If the closing does not occur by such date, time being of the essence, this LOI and the Formal Contracts shall be terminated and no party shall have any rights with respect thereto. The parties shall remain as Landlord and Tenant pursuant to the existing Lease until such time as the Transaction closes. The Lease may be amended as provided herein but only if and when such amendments are approved by Contributor's existing Lender.

2) **Structure of the Trust:** The Contributor and Tenant have agreed to create a Trust as a "statutory trust" in accordance with Chapter 38 of Title 12 of the Delaware Code, 12 Del. C. 3801 and enter into a Trust Agreement which shall constitute the "governing instrument" of the Trust. Each party will become a Beneficiary and will transfer certain sums of money and/or property to the Trust in exchange for a beneficial interest in the Trust as set forth above;

a) The Trust shall be a special purpose entity which is being formed solely for the purpose of acquiring the Trust Property from the Contributor and maintaining, improving, building upon, and leasing the Trust Property for use as a skilled nursing facility and all and such other activities incident or appropriate to the preceding

b) Simultaneously upon the closing of the transaction, the existing lease shall be modified only as set forth herein.

c) The trust shall be permitted to have only the following liens on the Trust Property and no other:

   i) A Mortgage in the amount of Fifty-One Million ($51,000,000.00) Dollars (the "First Mortgage") the terms of which shall be acceptable to the Department of Health and the Contributor.

   ii) The Trust will designate Howard Fensterman and William Nicholson as the Administrative Trustees of the B interests.

      (1) The Trust Agreement shall provide that Howard Fensterman and William Nicholson as the B beneficiaries Administrative Trustees shall have the sole authority to all issues governing administering and enforcing the terms of the Lease including the collection and distribution of rent.

      (2) Lizer Jozefovic shall be responsible as the overall Administrative Trustee for all other matters concerning the building including but not limited to repairs, maintenance, and operation of the building. Any Trustee may be removed for cause including misconduct, bad faith, fraud or gross negligence.

      (3) Except as otherwise provided in a Trust Agreement to be executed and notwithstanding any provision of the Act that otherwise so empowers the Trust, neither the Beneficiaries nor any Trustees nor any other Person shall be authorized or empowered, nor shall they permit the Trust, to take any of the following actions

1566078_3.docx

3

DocuSign Envelope ID: B1B7AD25-A75D-4808-A38E-81A0C54A002F

without the prior unanimous written consent of all of the Beneficiaries:

(a) Make any arrangements to reduce, modify, or forebear on the payment of rent by the Tenant.

(b) Guarantee any obligation of any Person, including any Affiliate;

(c) engage, directly or indirectly, in any business other than the actions required or permitted to be performed hereunder;

(d) incur, create or assume any indebtedness;

(e) make or permit to remain outstanding any loan or advance to, or own or acquire any stock or securities of, any Person;

(f) To the fullest extent permitted by law, engage in any dissolution, liquidation, consolidation, merger, asset sale or transfer of their Interests subject to obtaining any approvals required under this Trust Agreement other than a sale of the interests to qualified purchasers under a syndicated offering of the B interests.   The cost of such syndication shall not be charged to the B Beneficiaries and all monies derived therefrom and due hereunder shall be net of the costs of the syndication.

(g) allow any business to be conducted on the Property other than the operation of a skilled nursing facility and ancillary uses;

(h) own any other property or engage in any business other than owning and leasing the Trust Property for use as a skilled nursing facility;

(i) take any action to consolidate or merge the Trust with or into any Person;

(j) sell all or any portion of or any interest in the Trust Property;

(k) grant an option to lease all or any portion of the Trust Property for a term (with all extension periods) ending on or after the 45th Anniversary Date;

(l) amend, terminate or waive any material provisions of any lease for all or any portion of the Trust Property;

(m) enter into any agreement with any Person giving any Person any rights with respect to the Trust Property that extend beyond the 45th Anniversary Date or which are not terminable without penalty on less than 90 days' notice;

(n) encumber the Trust Property with any mortgages or another lien, easement, covenant or restriction other than the First Mortgage, or a HUD Mortgage to refinance the debt contemplated by this Agreement, at such time as HUD regulations shall allow;

(o) modify the Trust Agreement or the Trust's certificate of trust in any manner, issue additional Interests in the Trust to any Person, or modify the rights and privileges of the Interest owners;

(p) institute proceedings to have the Trust be adjudicated bankrupt or insolvent, or consent to the institution of bankruptcy or insolvency proceedings against the Trust or file a petition seeking, or consent to, reorganization or relief with respect to the Trust under any applicable federal or state law relating to bankruptcy, or consent to the appointment of a receiver, liquidator, assignee, trustee, sequestrate (or other similar official) of the Trust or a substantial part of its property;

(q) make any assignment for the benefit of creditors of the Trust;

DocuSign Envelope ID: B1B7AD25-A75D-4808-A38E-81A0C54A002F

(r) admit in writing the Trust's inability to pay its debts generally as they become due;

(s) take action in furtherance of any of the foregoing actions; or dissolve or liquidate the Trust.

iii) The 22.5% of the Trust Owned by the B Beneficiaries interest shall be subject to a Redemption Agreement where the B interests shall be sold to the A interests or their designees, assigns or transferees, over five years for a total price of $19,800,000.00 in four tranches tranches each representing interests of 5.625% each

    (1) Tranche one on or before August 1, 2020 in the amount of $3,786,250.00

    (2) Tranche two on or before August 1, 2021 in the amount of $3,786,250.00

    (3) Tranche three on or before August 1, 2022 in the amount of $3,786,250.00

    (4) Final Tranche by August 1, 2023 in the amount of $8,441,250

iv) Any purchase of the membership interests shall be a purchase of Beneficial Interests from the B Beneficiaries and shall reduce the Priority Return proportionate to the payments as a percentage of the total remaining price of $19,800,000, which is the balance after payment of the non-refundable Down Payment.

v) The A Beneficiaries shall prepare at their sole cost and expense of the A Beneficiaries a Private Placement Memorandum for the Sale of Membership interests in the Trust by a Broker Dealer who specializes in sales of marginal interests in Delaware Statutory Trusts to individuals and other entities who have to designate property as target property in connection with 1031 Exchanges of Property. The A Beneficiaries shall have the right to designate a portion of their membership interests as C interests for the purpose of selling them as part of the same syndication, provided that (1) there is no change in control of the A Beneficiaries or the Tenant entity.

vi) The B Beneficiaries will be entitled to a priority return ( the "Priority Return") equal to all available rental and other income over and above the payment of the P&I on the New First Mortgage which shall in no event be less than $2,000,000 per year (as adjusted by periodic redemptions) and shall be paid to the B Beneficiaries as a Priority Return until such time as they have been fully redeemed pursuant to the Redemption Agreement.

vii) The Trustee shall deposit all rents and other funds collected from the operation of the Real Estate in the bank designated by the first mortgagee (the "Operating Account") which shall be subject to both a Deposit Account Control Agreement and Deposit Account Instruction Agreement. The Trust shall maintain books and records of the funds from the Real Estate deposited in such account, interest earned thereon, and withdrawals therefrom. The Trustee shall pay from the Operating Account the operating expenses of the Real Estate (other than those paid by a tenant of the Real Estate as set forth in its lease) and any other payments relative to the Real Estate as required by this the Trust Agreement.

DocuSign Envelope ID: B1B7AD25-A75D-4808-A38E-81A0C54A002F

viii)   The Trustee shall be responsible for receiving all cash from the Tenant and placing such cash into one or more accounts as required under the distribution and investment obligations of the Trust Agreement. The Trustees shall furnish quarterly and annual reports to each of the Beneficiaries as to the amounts of rent received from the Tenant, the expenses incurred by the Trust with respect to the Real Estate (if any), the amount of any Reserves and the amount of the distributions made by the Trust to the Beneficiaries.

ix) To the extent permitted by the Internal Revenue Code depreciation, which shall be calculated on a straight-line depreciation method shall be allocated as follows: a) first to the B Beneficiary to the extent necessary to shelter the Priority return from taxes and b) second to the beneficiaries, pro rata, in accordance with the ownership interests.

3)   **Condition of Property and Title**:   Contributor shall give, and the Trust and the Trust shall accept, a good and marketable title which any National Title Insurance Company (the "Title Company"), will approve and insure at standard rates, free and clear of all liens, hypothecations, mortgages, easements, and encumbrances, except for the Permitted Exceptions.

i)   The Premises is being contributed subject to the following exceptions to the title (the "Permitted Exceptions"):

(1) Zoning and building regulations, restrictions and ordinances now or hereafter adopted or imposed by any governmental or quasi-governmental body having or asserting jurisdiction over the Premises or any part thereof;

(2) Future Real Estate taxes, assessments, water charges, sewer rents or other charges not yet due and payable (subject to apportionment as provided herein) and certified, confirmed or ratified assessment liens and pending assessments, if any;

(3) The state of facts shown on an updated as built survey prepared originally prepared and revised to be an as built survey, (the "Survey") and such additional state of facts which said survey would show or reveal provided such additional state of facts do not render title unmarketable;

(4) Any state of facts a physical inspection of the Premises would reveal;

(5) Exceptions permitted by the Title Company (as defined herein) (the "Title Exceptions");

4)   All payments made to purchase any portion of the B Beneficiaries 22.5% interest shall also act to proportionally reduce the amount of Priority Return paid to the B beneficiaries under the Trust and the proportionate difference shall be paid to the A Beneficiaries or whoever purchases the B Beneficiaries interests as the case may be.,

a)   Distributions:   Provided that all required payments set forth herein have been made by the Tenant, During the interim period prior to the purchase of the premises Tenant may pay Management Fees so long as (i) the amount of such Management Fees paid in any twelve-month period shall not exceed five percent (5%) of Tenants' gross revenues for such period

DocuSign Envelope ID: B1B7AD25-A75D-4808-A38E-81A0C54A002F

and (ii) there shall not then exist, and/or the paying of such Management Fees shall not cause there to exist, a Default or Event of Default under the Lease the first mortgage on the property or the Tenant's Working Capital Loans, (iii) the Initial Payment, the payment of Rent, and all other payments set forth herein have been made by the Buyer/Tenant.. Upon the occurrence of an Event of Default, Tenant shall not pay Management Fees. The Tenant will make no distributions to its shareholders, officers, affiliates, or any related party unless the Down Payment, the payment of Rent is current, and.

5) **Confidentiality and Disclosure**: Tenant and Contributor shall each maintain the confidentiality of all confidential and non-public information supplied by the other.  If this Transaction is not consummated, each party shall return all documents obtained to the other. Except as required by law, without the prior written consent of the other party, neither Tenant nor Contributor will make, and each will direct its representatives not to make, directly or indirectly, any public comment, statement, or communication with respect to, or otherwise disclose or to permit the disclosure of the existence of discussions regarding, a possible transaction between the parties or any of the terms, conditions, or other aspects of the transaction proposed in this Letter of Intent.  If a party is required by law to make any such disclosure, the parties shall consult with each other and seek to agree upon appropriate language for such disclosure.  The Tenant acknowledges that Contributor will be unable to furnish any patient health information unless such disclosure complies specifically and completely with all terms, conditions, regulations, and guidelines in HIPAA.

6) **Interim Operation**: Subject to the approval in writing of Contributor's existing Lender, the parties will enter into an amendment of the Lease as follows to allow for the operation of the facility before the closing.

a) Commencement Date:The Commencement Date according to the Lease shall be September 30, 2019.

b) Rent:   An initial rent payment of $509,000.00 has been paid receipt of which is on account toward the rental period from September 30, 2019 to October 31, 2019 (the "October 2019 Rent") leaving a balance of $13,735 for October 2019 Rent. November 1, 2019, to November 30, 2019 (the "November 2019 Rent") shall be postponed until November 18, 2019 and shall be paid by Tenant on that date.  The next rental payment shall be the December monthly rent amount outlined in the Lease - $506,097 which shall be paid on December 5, 2019.  Also, the Tenant will reimburse the Landlord for their municipal maintenance escrow and utility deposits of $5,500 and $60,356, respectively.  Such reimbursement payment shall be made on or before December 5th, 2019. Upon receipt of the $60,356 for the utility deposits from the Tenant, Landlord will direct any refund from the Utility companies to the Tenant, or otherwise pay such refund over to the Tenant forthwith provided Landlord has previously received those funds from the Tenant.

i) The following amounts are in dispute, and neither party will be obligated to waive their rights and positions by the signing of this agreement.  The landlord has demanded the following sums due to their Lender.

DocuSign Envelope ID: B1B7AD25-A75D-4808-A38E-81A0C54A002F

     (1) Late and Default Interest costs of $201,997.34 for September 2019 and October 2019,

     (2) $19,000 of Late Fees for November 2019,

     (3) $5,061 per day for Default Interest premium during November 2019.

  ii) The A Beneficiaries and the B Beneficiaries shall jointly negotiate with the Contributor's current Lenders to effectuate the best possible settlement of these late costs ( the "Late Costs"). The amounts if any remaining after such joint negotiation will be paid by the 77.5% by the Buyer and 22.5% by the Contributor (provided the Initial Payment, the payment of Rent and all other payments set forth herein are made timely) from Financing proceeds. If not available from the Financing proceeds the Tenant shall pay all Late Costs. .

c) Security Deposit/ Guaranty:   Section 7.1(a)(i) the Lease shall be amended to provide that Tenant shall enter into a Deposit Account Control Agreement with Metropolitan National Bank which can only be revoked with the consent of both parties, which shall provide that each month, the Tenant's Lender shall draw on the loan amount first to pay rent to the Landlord, notwithstanding the adequacy of any accounts receivable borrowing base calculations.  This Document shall be part of the Closing Documents on the Tenant's first initial Term Loan and shall be delivered in full effect by December 1, 2019.

d) Section 7.1(a)(ii) of the Lease shall be amended to provide that the obligation for the Security Deposit shall initially be reduced to 2,000,000 dollars.

  i)  The sum shall be paid by Tenant as follows: (a) Provided that the Contributor has obtained a permanent Certificate of Occupancy the Tenant shall draw the initial $1,000,00.00 from its credit line on or no later than  December 1, 2019. (b) Landlord shall obtain a release of the lien of its Lender on the FF&E, upon delivery of free and clear title to the FF&E the Tenant will enter into a reverse lease and obtain at least $1,000,000.00 which shall be paid on account of the Security Deposit no later than April 1, 2020.

  ii)  Also, Tenant shall pay the sum of $40,000 per month commencing January 1, 2020 to be treated as additional rent until there is a total $3,700,000 posted as Security Deposit under 7.1(a)(i).

e) Section 7.1(a)(iii) of the Lease shall be amended to provide that instead of delivering the sum of $1,600,000 in cash, the parties shall enter into a blocked account agreement wherein and whereby account number 3379737272 in JP Morgan Chase Bank NA prohibiting any liquidation of that account until the Second Payment is paid.  Such account shall be not be posted as collateral security to Landlord's Lender provided the Initial Payment has been made in full, and all payments of Rent are current and the Tenant is not otherwise in Default, except that the Landlord shall have a security interest in such account under a DAISA, which allows the Landlord to demand the liquidation of such account to pay any defaults under the lease.

1566078_3.docx

DocuSign Envelope ID: B1B7AD25-A75D-4808-A38E-81A0C54A002F

f) Working Capital: Section 7.7 of the Lease shall be amended to suspend the requirement for providing the working capital account. The Tenant shall be obtaining a single working capital line for $8,000,000.00 no later than December 1, 2019.

g) Right of First Refusal and Option to Purchase: The Tenant's rights with respect to the right of first refusal and option to purchase under Sections 3.7 and 3.7 of the Lease will be suspended pending payment in full of the Security Deposits required by Section 7.1(a)(i), 7.1(a)(ii) and 7.1(a)(iii) of the Lease as amended , the payment of the Initial Payment, the working capital required by Section 7.7 of the Lease and Tenant being in full compliance with the Lease.

h) Insurance: Tenant shall obtain property insurance, effective as of September 30, 2019, and (2) provide the property insurance, and all other insurances required by the Lease by November 19, 2019, effective retroactively back to September 30, 2019.

i) Real Estate Taxes: Real estate taxes shall be prorated as of September 30, 2019 and the Tenant's portion shall be paid to the Landlord no later than December 1, 2019, plus any late charges which the City of White Plains may impose.

j) Utilities: Tenant shall pay actual costs of utilities incurred at the property covering the rental period from September 30, 2019 (pro-rated as the utility company billing periods may require) forthwith upon presentation of invoices for the same from the Landlord, no later than December 1, 2019.

k) Punchlist: The punch list and all other developer obligations are deemed complete except for.

   i) The White Plains Outstanding Punchlist November 5, 2019 (the Remaining Punchlist), the value of which is has been determined by the Architect and agreed herein to be $3,800.

   ii) The Electric Blinds in rooms (the "Suspended Work") the value of which is agreed herein to be $35,000.

   iii) Provided the Initial Payment is made by November 15, 2019 and provided there are no other Defaults by the Tenant, Landlord shall complete the Remaining Punchlist and the Suspended Work to the approval of the Architect, within 45 days from the date of the Contributor's receipt of the Initial Payment. Should Landlord not do so, then the Tenant may credit the agreed values of any uncompleted Punchlist or Suspended Work from the February, 2020 Rent payment, and the Landlord's Work under the Lease and Development Agreement shall be deemed complete.

   Security: Tenant shall assume all property security obligations as of   November 11, 2019.

Upon the closing of the purchase of the premises by the Trust, the Trust shall take an assignment of the lease as amended above.

DocuSign Envelope ID: B1B7AD25-A75D-4808-A38E-81A0C54A002F

7) **Exclusivity**: In consideration of (1) the Initial Payment, (2) the payment of Rent as set forth herein, and (3) Tenant's efforts in pursuing the Transaction, Contributor agrees that (1) until the termination of this Letter of Intent, or execution of the Formal Contracts and (2) provided the payment of the Initial Payment and the payment of Rent as set forth herein is made, and (3) all other obligations of the Tenant set forth herein,, Contributor will not permit any of its affiliates to, and will not authorize or permit any officer, director, employee, counsel, agent, investment banker, accountant, or other representative of any of them, directly or indirectly, to: (a) initiate contact with any person in an effort to solicit any proposal (other than that contemplated by this Letter of Intent for the acquisition (directly or indirectly , by sale of stock or assets, or by merger or consolidation or otherwise) of the operation of the Real Estate, or any of the Assets, or any other business combination or financing transaction involving such business (a "Proposal"); (b) cooperate with, or furnish or cause to be furnished any non-public information concerning the operation of the Real Estate, to, any person in connection with any Proposal; (c) negotiate or enter into discussions with any person with respect to any Proposal; or (d) enter into any agreements or understanding with the intent to effect a Proposal. Contributor will immediately give written notice to Tenant of the details of any Proposal of which Contributor becomes aware. Contributor will, and will cause its officers, directors, affiliates, agents, and representative to, terminate all discussions regarding a Proposal, other than those with Tenant and its representatives concerning the Transaction, and represents that neither it nor any of its officers, directors, affiliates, agents, or representatives have entered into any executory agreements or accepted any commitments concerning any Proposal other than the Transaction provided that (1) this LOI or successor Formal Contracts has not terminated, and (2) the payment of the Initial Payment, the payment of Rent as set forth herein have all been paid and are current, and (3) all other obligations of the Tenant set forth herein are not in Default and are current.

8) **Waiver of Claims**: Except as set forth herein above, the Tenant waives any and all claims against the Landlord it has or every may have had for the following: (1) any claims by the Tenant that the Landlord is or ever was required to deliver a mortgage of any particular amount, terms, amortization or interest rate, for Medicaid rate setting or any other purposes (2) any claims for Punchlist or uncompleted Work, except for the Remaining Punchlist and the Suspended Work defined herein above, and the Warranties and Guarantees set forth in the Lease, (3) any claims related to the Cost Certification, except the Landlord shall complete the Final Cost Certification in the usual and ordinary course, upon the receipt of the Initial Payment, the Rent having been brought and remaining current, and all other obligations of the Tenant are paid as set forth herein above.

9) **Expenses**: Tenant and Contributor shall each be responsible for their respective accounting, legal, advisory, and other costs and expenses in connection with the Transaction. Tenant shall reimburse Contributor for its legal, advisory and other costs and expenses in connection with the Transaction and the Termination of the Lease. Reimbursement for such legal and transaction fees shall not to exceed $125,000 and may be made from the proceeds of the Closing, provided the Closing occurs and the Contributor's existing 1st Mortgage Loan and Mezzanine Loan are paid off from the proceeds of the Financing by March 31, 2020, and (2) the Initial Payment is made as set forth herein above, and (3) the Tenant is not in default under this LOI or the successor Formal Contracts. Otherwise the $125,000 cap shall expire and the Tenant shall pay the Contributor all such costs incurred after September 30, 2019.

10

1566078_3.docx

DocuSign Envelope ID: B1B7AD25-A75D-4808-A38E-81A0C54A002F

10) **Letter of Intent**: This LOI represents a statement of all of the terms, conditions, representations, warranties, indemnities, covenants, and other provisions that would be contained in the definitive documentation for the proposed transactions. This LOI shall constitute a binding agreement upon payment of the  or any of their respective affiliates will have any legal obligation under this LOI unless and until one or more subsequent definitive written agreements are mutually executed and delivered by each of Contributor and Buyer. No past, present, or future action, course of conduct, or failure to act relating to the transactions referenced in this LOI or relating to the negotiation of the terms of such transactions will give rise to or serve as the basis for any obligation or other liability on the part of Contributor or Buyer or any of their respective affiliates.[ These changes should be rejected]

11) **Governing Law**: This Agreement shall be governed by and construed by the internal laws of the State of New York, Venue shall be in Westchester County without application of its conflicts of law rules. If you agree with the preceding, please sign and return one copy of this Letter of Intent.

**HBL-SNF, LLC**

Lizer Jozefovic

**ACKNOWLEDGED AND AGREED**

**WHITE PLAINS HEALTHCARE PROPERTIES I, LLC**

By: _____
Name: **William A. Nicholson**
Title: **Manager**

**Accepted and Agreed**

Howard Fensterman

11

1566078_3.docx